LC2HHac1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

HACHETTE BOOK GROUP, INC., et
al.,

                Plaintiffs,

       v.                          20 Civ. 4160 (JGK)(OTW)

INTERNET ARCHIVE,

                Defendant.           Conference

------------------------------x

                              New York, N.Y.
                              December 2, 2021
                              4:15 p.m.

Before:

                    HON. ONA T. WANG,

                              U.S. Magistrate Judge

                      APPEARANCES

DAVIS WRIGHT TREMAINE LLP
     Attorneys for Plaintiffs
BY:  ELIZABETH A. McNAMARA
     -and-
OPPENHEIM & ZEBRAK, LLP
BY:  SCOTT A. ZEBRAK

DURIE TANGRI LLP
     Attorneys for Defendant
BY:  JOSEPH C. GRATZ

LC2HHac1

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your

3     appearances for the record.

4          MS. McNAMARA:  Yes, Good afternoon, your Honor.

5     Elizabeth McNamara of Davis Wright Tremaine, for the

6     plaintiffs.

7          MR. ZEBRAK:  Good afternoon, your Honor.  Scott

8     Zebrak, also for the plaintiffs, Oppenheim & Zebrak LLP.

9          MR. GRATZ:  Good afternoon, your Honor.  Joseph Gratz

10    from Durie Tangri in San Francisco, on behalf of defendant

11    Internet Archive.

12         THE COURT:  We've had so many travelers come in today.

13         All right.  Welcome.  As you can see, we are still

14    observing full masking protocols in the courtroom.  Make sure

15    your mask is over your nose and mouth.  Addressing the Court,

16    you don't need to stand up.  Just make sure you speak into the

17    microphone and make sure that it's fairly close so the court

18    reporter can hear you.  OK.

19         All right.  Let's see.  Pulling up my agenda, let's

20    look at the issues in ECF 47 and the letters that followed.

21         Defendant seeks to compel production of information

22    regarding commercial performance of books published by

23    plaintiff.  I think I'm a little bit concerned that the request

24    is so broad, and maybe you can show me otherwise or show me

25    that you've tried to meet and confer and come up with something

LC2HHac1

1   that's more proportional.  If anybody wants to talk about where

2   the parties are at this point on this request.

3   　　　　MR. GRATZ:  Absolutely, your Honor.  So I agree with

4   you that production of monthly commercial performance data for

5   every book of the plaintiffs is not the ideal and most narrowly

6   tailored way to go about doing this analysis.  We would like,

7   as the defendants, to do it a different way.  We would like to

8   do it by comparing to comparable books, and in meet-and-confer

9   that's what we proposed, that we try and reach a set of

10  mutually agreeable comparable books and have the data produced

11  for those.  Plaintiffs weren't interested in talking about

12  reaching an agreeable set of comparable books, based on their

13  view that no book is comparable with any other book for these

14  purposes, notwithstanding the fact that, based on what we've

15  learned in discovery, the plaintiffs compare books to the

16  performance of other books that they consider comparable all

17  the time for forecasting purposes.

18  　　　　So in order to be able to develop a view of what the

19  comparable books may be, we think we may need all of it.

20  Again, we don't think that's the most narrowly tailored way to

21  do it, but it is --

22  　　　　THE COURT:  I don't think that's proportional.  So go

23  on.

24  　　　　MR. GRATZ:  We don't think that's the most narrowly

25  tailored way to do it.  We would like to do it in a narrower

LC2HHac1

way.  We tried to meet and confer and find something narrower,
and plaintiffs weren't interested in trying to find some middle
ground on what books may be comparable.

THE COURT:  Before I let Ms. McNamara speak, I'm
admittedly not as well versed in the area of the law.  I assume
that you all are experts in this area of the law compared to
me.  But this does sound to me a lot like some of the disputes
I hear in employment cases where one is trying to find what the
comparators are, right, that -- what is similarly situated in
terms of the employee -- plaintiff employee and other -- when a
plaintiff is alleging, say, discrimination on the basis of sex
or race or something else, what is the appropriate comparator,
right?  This seems like it's the same general concept, and we
talk a lot about what's proportional.

So I guess now I want to ask Ms. McNamara to explain
to me what your thoughts are on this dispute.

MS. McNAMARA:  Thank you, your Honor.

Let me begin by underscoring I think you're correct in
saying what's being demanded here is just extraordinary and
clearly not proportional, but we need to take a step back, I
think, initially, and focus on the fact that the rationale for
this demand, however you establish the comparables, is that
they want to establish evidence that they believe might support
market harm or lack of market harm, and there's two means of
market harm that are primarily at issue in this litigation.

LC2HHac1

```
 1   One is that Internet Archive is not paying the customary
 2   license fee that actual libraries versus the Internet Archive
 3   paid to acquire and distribute e-books.  And we've established,
 4   and there's no dispute, that there's a thriving market for
 5   licensing e-books to lending libraries.  Internet Archive just
 6   refuses to pay that customary license fee.  This demand has
 7   nothing to do with that form of economic harm.  That is
 8   established, and I think the lens in looking on this and to
 9   further underscore the lack of proportionality is the fact that
10   in the case they cited in support of this motion on Davis v.
11   The Gap, there's a reference to Ringgold v. BET, which is a
12   Second Circuit decision, where the court observed that the fact
13   that an infringement had little likelihood of adversely
14   affecting sales deserves little weight in the fair use analysis
15   against a plaintiff alleging appropriation without payment of a
16   customary license fee.
17          So that's the lens we need to look at this is that the
18   lost sales, which is the only thing they're focusing on with
19   this demand, in this context where we have a customary license
20   fee established in the market is given little weight in the
21   fair use analysis.  So with that predicate, we can step back,
22   and I think what's important here is that the plaintiffs have
23   already produced a massive amount of financial data concerning
24   the 127 representative works at issue in this litigation.  That
25   data includes more than 670,000 lines in an Excel spreadsheet.
```

LC2HHac1

That data allows them to provide the comparison that they're

seeking.  That data, for the most part, while it varies from

book to book but goes back as far back as 1996 for some of the

works, they can run a comparison of sales of those books prior

to the time they appeared on the Internet archive and after the

time they appeared on the Internet Archive and make whatever

argument they want to make about lost sales or lack of lost

sales.  And that is a comparison that is an apples-to-apples

comparison with the same books and the sales and pre- and

post-times on Internet Archive.

What they are proposing here is finding other books

that are supposedly comparable.  They want, in effect, to make

an apples-to-zebras comparison.  Mr. Gratz is correct when he

says that we have objected to identifying comparable books for

purposes of this type of comparison, because we can't do that,

nor do we really believe that you can, in fact, do that in any

coherent, concrete way.  These works, like, for example, the

works-in-suit include *Song of Solomon* by Toni Morrison, Sylvia

Plath, *The Bell Jar*, Salinger's *Catcher in the Rye*.  What other

novels, whether they had comparable sales or not, would be

deemed actually comparable to those books?

And no one can dispute, nor do they, that book sales

rise and fall based on myriad and random events.  An author

dies, often the sales go up.  An author gets arrested, the

sales go down.  They appear on Oprah, they go up.  The book is

LC2HHac1

1    made into a movie, there's myriad ways that sales are dictated,

2    and so being able to pick out of this choice and finding actual

3    coherent comparables makes no sense.

4            Now, the testimony that he's referencing from certain

5    witnesses, they have described and made it crystal clear that

6    it's an art, not a science.  That when they sometimes are

7    determining -- when they're trying to determine what advance to

8    pay an author, they sometimes run comparisons to kind of just

9    make a gist.  But it's like a back-of-the-envelope issue that

10   really doesn't have any kind of scientific proof, and what

11   they're trying to establish is evidence to put into a court

12   record showing comparable sales and an increase or loss.

13           Finally, I'll note, your Honor, on the burden here,

14   the burden here is beyond extraordinary, as your Honor has

15   already recognized.  This literally would take months in order

16   to gather.  There are multiple databases that the data would

17   have to be drawn from.  There will be literally billions of

18   lines of data concerning these works.  We're talking about a

19   half a million books published by these four publishers in the

20   ten-year period.  The burden would just be extraordinary.  We

21   don't know how to begin to find the comparables.

22           I end with underscoring, again, they have the data to

23   run comparables.  They have all this massive data, and we're at

24   a loss on why that isn't sufficient.

25           THE COURT:  All right.  What I'm hearing, and for my

LC2HHac1

simple mind, is that you're also making a relevance argument

and also that the data is not -- that the information that you

would use to support sales calculations pre and post a book's

appearance in the Internet Archive has already been provided?

MS. McNAMARA:  Correct, your Honor.

MR. GRATZ:  May I address those, your Honor?

THE COURT:  Sure.

MR. GRATZ:  As to relevance, there isn't any

comparable license for what the Internet Archive is doing, that

is, owning a physical copy of a book, digitizing it, and

lending it to one patron per owned physical copy.  So you can't

just look to the license fee and say nothing else is important;

that is, if what Internet Archive did didn't affect at all the

revenues either from print sales, e-book sales, or library

lending licenses, that that just doesn't matter to the question

that the statute asks, the question being to what extent did

this have an effect on the market for or value of the

copyrighted work?

So as to relevance, we want to be able to say, and we

think we will be able to say, they didn't lose a dime.  They

didn't lose one licensing opportunity.  They made 100 percent

of their value; that is, this wasn't replacing transactions

that otherwise would have happened in a way that got them

money.  We think we can do that by showing that compared to

things that this wasn't happening to that are comparable,

LC2HHac1

1       there's no difference.

2                   As to --

3                   THE COURT:  Wait, wait.  How does Internet Archive

4       make its money?

5                   MR. GRATZ:  Internet Archive does not make its money.

6       It's a 501(c)(3) public charity.  Internet Archive operates on

7       grants, including government grants that support what it does

8       in the public interest.

9                   THE COURT:  All right.  The other thing I'm hearing --

10      I know I cut you off on the relevance argument, but I'm also

11      concerned about the burden.  Even if you got this information,

12      if you're talking about billions of lines, of 500,000 books,

13      how would you even analyze that?

14                  MR. GRATZ:  Let me respond on burden and then

15      answer -- let me actually start by answering your Honor's

16      question and then move to burden.

17                  We would analyze it using statistical software.  What

18      we want to do is look for books that had sales -- sales graphs

19      or things about their sales that looked pretty similar, looking

20      for, effectively, twins that are out there before they were

21      included in controlled digital lending through Internet Archive

22      and then see whether at the time that changed, the time they

23      started getting offered for controlled digital lending through

24      Internet Archive, whether one twin diverged from the other.

25      And we can't do that analysis, we can't find those twins,

LC2HHac1

```
 1   without the whole set of the population.  We're happy to try
 2   doing it some other way, that is, taking a random sample,
 3   seeing whether -- trying to find the twins some other way,
 4   taking a random sample of 127 other books and see how they
 5   match up.  That, I think, your Honor, is my answer on burden.
 6          One answer on burden, your Honor, is their witnesses
 7   have testified that this data's just sitting in a database.
 8   They can just pull it up; that is, they can just put in a book
 9   and get the data.  Doing that on a mass basis may be harder.
10   We're happy to talk about ways to lessen that burden.  But this
11   is not data that is in some inaccessible form.  Their witnesses
12   have testified that even the folks we are talking to are able
13   just, on their computers, to pull up this granularity of data.
14          MS. McNAMARA:  May I address that, your Honor, because
15   that isn't actually accurate?
16          THE COURT:  Just a moment.
17          MS. McNAMARA:  Sure.
18          THE COURT:  I guess before you address that,
19   Ms. McNamara, I have just another question for Mr. Gratz.
20          Why can't you compare each book and the data from
21   before and after that book appeared in the Internet Archive?
22   Why is that not sufficient, or why is that not an appropriate
23   first step at least?
24          MR. GRATZ:  So that is one thing that we can do, your
25   Honor.  Certainly, that's something I think we're going to try
```

LC2HHac1

and do.  One thing, by the way, that is hampering that is that
they didn't produce monthly data even for the books-in-suit,
which is another thing we're asking for in this motion.

        But here's why we think we need to do more than that
if we can, and that is, there's lots of extrinsic factors that
affect the sales of lots of books.  One of those, a really big
one, is one that's central to this case: the COVID-19 pandemic.
That is, comparing sales of a book in the past to sales of a
book in the present doesn't necessarily tell the whole story
without knowing something about the book market as a whole, at
least for comparable books.  So the concern, your Honor, with
comparing a book to itself is that there may be confounding
factors over time.

        THE COURT:  With that big fancy statistical analysis,
you can do that analysis.  I agree it might be harder if you
don't have monthly data, and maybe we can explore that, but why
can't you control for that factor in the analysis of pre and
post and then see what you see?

        MR. GRATZ:  Well, I have a number of responses to that
your Honor.  One of them is we want to have the most robust
analysis that we can.  It is not that we don't think that would
be a potentially valid way to do it.  We're just thinking about
what their expert's going to say in that expert --

        THE COURT:  What I'm saying here is let's take a
measured -- let's not wholesale throw money at the problem

LC2HHac1

|    | |
|----|-|
| 1  | perspective of -- I'm trying to come up with an analogy, and |
| 2  | I'm coming up short at this hour. |
| 3  | You don't necessarily need gold-plated Tiffany garden |
| 4  | shears, if they even exist, to prune a bush.  What I'm |
| 5  | concerned about is that let's see if you can get some |
| 6  | information out of what's already been produced and do that |
| 7  | comparison, because you know what?  If it turns out that you |
| 8  | can make arguments from the comparison that you've already done |
| 9  | that warrant going further, then I think you're in a much |
| 10 | better position.  But right now it just sounds like an almost |
| 11 | inconceivably huge burden to put plaintiffs to to produce the |
| 12 | information, and then also an exceedingly large burden on your |
| 13 | part to analyze that data when you actually have a smaller data |
| 14 | set, and maybe that data set could be expanded, but a smaller |
| 15 | data set that you can do some preliminary analyses on and |
| 16 | figure out whether this is an appropriate way to go forward. |
| 17 | The reason why I'm suggesting that is because |
| 18 | otherwise I would be making you brief with case law the point |
| 19 | that Ms. McNamara raised about what is actually an appropriate |
| 20 | measure of damages, and I'm not quite sure we're there yet.  We |
| 21 | may get there in a month anyway, but I'd like to see what you |
| 22 | can get with what you already have or some expansion on what |
| 23 | you already have. |
| 24 | So, Ms. McNamara, you mentioned 670,000 lines on an |
| 25 | Excel spreadsheet that relates to 127 representative works. |

LC2HHac1

1   What's the form of that data?  Because Mr. Gratz just said that

2   that doesn't contain monthly sales.

3           MS. McNAMARA:  Actually, I have a flash drive that has

4   the data if your Honor wants to have it.

5           THE COURT:  I shake my head for a number of reasons.

6   One of which is our IT department would --

7           MS. McNAMARA:  Kill you.

8           THE COURT:  -- kill me.  They have to go through their

9   whole process to make sure that I don't take down the entire

10  federal judiciary by plugging something into a computer here.

11          MS. McNAMARA:  Of course.

12          THE COURT:  And we've had concerns.

13          But the other part of it is if you can explain to me

14  as a layperson, because you would have to do this or you'd have

15  to have your expert do this to a jury later --

16          MS. McNAMARA:  Yes.

17          THE COURT:  -- or is this a bench trial?  But anyway,

18  you have to have your expert explain what this data is anyway.

19          MS. McNAMARA:  Yes.

20          THE COURT:  I'd rather not get into this briefing

21  about what the appropriate measure of damages is this early in

22  the case.  So go ahead.

23          MS. McNAMARA:  Thank you, your Honor.  I'm happy to

24  try to do that, although I probably suffer from some of the

25  same problems/burdens you have with explaining all this.

LC2HHac1

1          But at any rate, what we have produced for each of the

2      127 works-in-suit is data that shows all the comparable factors

3      that they've identified and that they want, the various

4      distribution channels, the prices, the revenue streams broken

5      down between paper, hard cover, e-books, and the related data.

6      In order to do that, they had to pull that data.  That's what I

7      wanted to correct Mr. Gratz seemingly suggesting that this is

8      like a button you can push.  This data had to be aggregated

9      from multiple databases and pulled together and pulled out over

10     the -- dealings going back 10, 15, 20 years for some of these

11     works, and it was an enormous undertaking even for the 127

12     works.

13          Now, some of the publishers, namely, specifically

14     Hatchette, routinely have this data in monthly indications, and

15     we have produced for all the Hatchette books monthly data.

16     We've similarly produced monthly data for many of the Harper

17     Collins works.  The two publishers, Penguin Random House and

18     Wiley are the ones that there has not been a production of

19     monthly data.  We would entertain some limited supplement on

20     the monthly data in order for them, the defendant, to make this

21     comparison that we think is readily available from this data.

22     But I would underscore that we don't need monthly data going

23     back from the first time this book appeared, like when Salinger

24     first published in the -- whenever that was, in the '70s or

25     whatever.

LC2HHac1

          THE COURT:  OK.

          MS. McNAMARA:  Because, really, the monthly data is
only important, arguably, in my mind, for two purposes:  One is
what Mr. Gratz already identified, which is during the
pandemic, the world kind of shifted, as we all know, within a
month or two, and so for that period of time in 2019, during
the early stage of the pandemic, it seems to me that there's a
rational reason to have monthly data so you can see what
changed.  It was also during that period of time that the
Internet Archive for three months instituted what they called
the "National Emergency Library," during which they threw all
their supposed rules to the wind and just made these books
available to anyone anywhere anyhow across the board.  So for
that period of time, I think there's a logic to monthly sales
reports, and we can endeavor to provide some of that.

          The other rational, I think, reason would be if
there's a change.  The Internet Archive knows -- and I'm not
sure whether it's clear in the data they have provided to us --
but when each of these 127 works were originally published on
the Internet Archive and made available to the world for free,
and so I think that they indicate in their letter that if that
happened in March of whatever year, there might be a reason to
kind of do a comparison around months concerning when they were
initially posted.  If Internet Archive wants to provide us with
that data or that information for the 127 works, I can speak to

LC2HHac1

1    my clients about whether there's some accommodation to be made

2    on the monthly sales figures.

3            THE COURT:  Mr. Gratz, anything to add?

4            MR. GRATZ:  Yes, your Honor.  That sounds like a fine

5    first step; that is, what we need is monthly -- in order to do

6    what your Honor is suggesting, which we are happy to do, that

7    is, try to boil the pot before we see whether we need to

8    collect the ocean, we would be happy to see whether monthly

9    data about the works-in-suit for some reasonable period before

10   they first appeared in Internet Archive's lending library,

11   which data we have produced, but we're happy to point out or

12   produce in a more readily usable form.

13           We also, your Honor, would need monthly data about the

14   book market as a whole, or at least about these publishers'

15   sales as a whole, in order to try and pull out macro trends

16   that may have been sort of versus the micro trends versus the

17   effect, which we don't think exists, of what Internet Archive

18   was doing.

19           MS. McNAMARA:  Your Honor, on that point, obviously, I

20   don't object to the two other points regarding the time periods

21   I suggested, but this macro -- there's been an ongoing back and

22   forth with the defendant in this action about what data is

23   provided from their data sets concerning the books and how

24   they've made these books available for free and our data, and

25   the parties have consistently tried to keep this to data points

LC2HHac1

1   surrounding the works-in-suit, and they have limited our

2   ability to get a lot of information from them beyond the

3   works-in-suit.  So I really object to trying to backdoor all of

4   a sudden getting data concerning entire book sales for these

5   entire publishers for all the book sales that they have.  I

6   don't see the logic of that.  I don't see why it's relevant and

7   what the macro necessity is.

8            MR. GRATZ:  Your Honor, as to that last point, this is

9   data that they already make publicly available.  They just

10   didn't want to produce it and offered to sell it to us at its

11   normal retail price when --

12           THE COURT:  Wait, wait, wait.

13           MS. McNAMARA:  What are you talking about?

14           MR. GRATZ:  The Association of American Publishers,

15   your Honor, which the same counsel already represents, we had

16   asked Association of American Publishers for macro sales data,

17   which it compiles.

18           THE COURT:  Are we talking about the 127 works or

19   the --

20           MR. GRATZ:  We are not, your Honor.  And this is --

21           THE COURT:  Can we -- go on, but --

22           MR. GRATZ:  I'll focus down, your Honor.  I am not

23   talking about per-book numbers.  I am talking about single

24   industry-wide numbers on a monthly basis.  And the reason for

25   that, your Honor, is if book sales as a whole doubled in a

LC2HHac1

1    particular month or halved in a particular month, the fact that

2    the sales of one of the works-in-suit doubled in a particular

3    month or halved in a particular month, one would want to take

4    that into account in the analysis.

5            Does that answer your Honor's question?

6            THE COURT:  Yes.  But, I mean, these are -- this is

7    information that you may be able to use without demanding that

8    it be produced in a certain format.

9            MR. GRATZ:  I agree, your Honor.

10            THE COURT:  Yes.  You can do -- I say a lot of "you

11    can do" here without actually knowing.

12            Wouldn't that be a factor that you could account for

13    in an analysis based on publicly available information?

14            MR. GRATZ:  We think that we could try, although we

15    would like, to the extent possible, to avoid a dispute about

16    which publicly available information about overall monthly book

17    sales is the reliable kind, which is why we wanted to get it

18    from Association of American Publishers.  And they said we

19    won't give it to you in discovery.  You should buy it from us.

20            THE COURT:  How much does it cost?

21            MR. GRATZ:  It was like $16,000.

22            THE COURT:  There was a part of me that, when

23    Ms. McNamara was talking about the burden of production of some

24    of the data that you wanted, that I thought about mentioning

25    that a lot of the time the burden is because it will be costly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LC2HHac1

1  and time-consuming, and sometimes the party that wants the data

2  could pay for it or pay for the cost of -- or share the cost or

3  pay for the cost of collecting, aggregating, and maintaining

4  that data.

5       MR. GRATZ:  But we have no objection, your Honor, to

6  paying the actual cost of the Association of American

7  Publishers giving us a copy of the reports they have already

8  created, to the extent there is such a cost, but we don't think

9  that's the number that they have suggested to us.

10       THE COURT:  Go ahead.

11       MR. ZEBRAK:  Thank you, your Honor.  I appreciate your

12  allowing me to chime in on this.

13       So if I'm understanding Mr. Gratz correctly, the data

14  he's referring to with AAP, I think he's mixing apples and

15  oranges here again, or apples and zebras, to use Ms. McNamara's

16  reference.  AAP collects data across the industry for kind of

17  industry-wide sales figures and reporting, but I believe what

18  they've been interested in is library sales information, which

19  is not something that they track or report on.  I believe this

20  has already been explained to them.

21       And just on the whole notion of monthly data, the

22  other thing that sort of sticks out to us is that if they

23  understand that in year Y they scanned and started distributing

24  copies of a work, I don't know why they couldn't use the sales

25  figure on a yearly basis for what they have in the following

LC2HHac1

1    years and do comparisons that way rather than sort of turning

2    the companies upside down for this data.

3           Thank you, your Honor.

4           THE COURT:  Normally, I like parties to try to work

5    something out.  What I heard that was some kind of quasi

6    agreement was whether defendants might work with some of the

7    information that they have from the 670,000-line Excel

8    spreadsheet.  Particularly, once I learned that at least two of

9    the publishers have already provided monthly -- have provided

10   monthly information, why can't you do that in the first

11   instance and then see if you can make a better claim for why

12   you need more?  If you can't agree on a resolution to this

13   discovery dispute, I'm going to have to ask you -- I'm going to

14   have to order you to brief it, which is going to be expensive

15   for both of you.

16          One of my favorite rules to cite is Rule 37(a)(5).  So

17   think about the cost to brief it, think with the potential cost

18   if you were to lose a motion like that and how badly you really

19   need this information as opposed to making the sufficient

20   defense, because I think whether or not you get to this whole

21   commercial performance of plaintiffs' books and finding the

22   comparators is a question that any -- that remains in this case

23   is Internet Archive was not paying the customary license fee

24   paid to this -- that normally is paid to distribute these

25   particular e-books.

LC2HHac1

1          What does that mean as far as liability and damages on

2     whether plaintiffs are entitled to the license fee at all,

3     right?  Even if you were to get this information that you seek,

4     and I'm not suggesting that you would, but even if you did and

5     you put plaintiffs to all that trouble, does that have any

6     bearing on what I'm hearing as defendant's failed to pay the

7     customary license fee and that, at a minimum, is a measure of

8     damages?

9          So think about that.  I'm not going to rule on it, but

10     I'm going to really suggest that we focus on the case and

11     making sure that the case moves forward in an expedient and

12     cost-sensitive way.

13          MS. McNAMARA:  Thank you, your Honor.

14          MR. GRATZ:  Thank you, your Honor.

15          THE COURT:  Next issue is the issue on -- let me see,

16     on the privilege, withholding on privileged or arguably

17     privileged communications.  I thought it was an ECF 47.  I

18     guess I'm not sure I'm seeing it.

19          MR. GRATZ:  It is.  If I may, your Honor, it's ECF 54,

20     and the response is ECF 56.

21          THE COURT:  I missed ECF 54, but I have ECF 56.

22          ECF 54, I guess, was plaintiffs, right?

23          MR. GRATZ:  ECF 54 was defendants, your Honor.

24          THE COURT:  All right.  Why don't you tell me what the

25     dispute is.

LC2HHac1

1          MR. GRATZ:  Certainly, your Honor.  There are two

2     deeply intertwined disputes here.  They both relate to

3     communications among members of the Association of American

4     Publishers, the trade group that instigated this lawsuit about

5     the Internet Archive and about library lending.  Some of those

6     communications are likely to be privileged, communications

7     about selection of counsel, communications about legal

8     strategy, communications among the plaintiffs, things like

9     that.  Many of those communications we think are not

10    privileged, that is, communications about the business aspects

11    of how to think about what the Internet Archive is doing, how

12    to think about what libraries in general are doing and how it

13    affects the plaintiffs' businesses.

14          Many of the withheld communications with respect to --

15    that have been logged by the plaintiffs include people who are

16    neither plaintiffs nor the AAP, and the plaintiffs are claiming

17    that the AAP, the trade association, is acting as their lawyer

18    in this context.  While it's conceivable that a trade

19    association can act as a lawyer for members under some

20    circumstances, the case law sets forth a variety of showings

21    that would need to be made in order for there to be a finding

22    that a trade association, who isn't a lawyer but might employ

23    lawyers, is acting as counsel for a particular member in a

24    particular communication.

25          THE COURT:  You already have a privilege log?

LC2HHac1

1              MR. GRATZ:  So with respect to the plaintiffs', your

2      Honor, we do.  With respect to the AAP, they've refused to

3      produce a log.

4              MS. McNAMARA:  Your Honor, do you want me to address

5      this?

6              THE COURT:  Yes, please.

7              MS. McNAMARA:  Thank you very much, your Honor.

8              THE COURT:  You can bring it right up to your mouth.

9      That's better for all of us.

10             MS. McNAMARA:  OK.  Great.

11             In reviewing the exchange of letters in preparation

12     for this hearing today, I was struck by the fact that there is

13     no issue that the Internet Archive is really presenting to this

14     Court.  There's nothing concrete that they have identified

15     where they have a concern about the production, or lack of

16     production, looking at actual documents that have been

17     withheld.  There's no dispute amongst the parties as to the

18     legal principles at issue here.  Mr. Gratz just identified some

19     of them.  No one disputes that some communications can be

20     privileged between the AAP and its members.  There's no dispute

21     that some communications concerning lobbying, and the like,

22     with Congress can be protected by a First Amendment privilege,

23     and there's no dispute that a privilege doesn't arise just out

24     of mere membership in an organization.

25             But the plaintiffs have not withheld any documents

LC2HHac1

based on that contention.  Internet Archive doesn't point to a

single example, doesn't identify for this Court a single

example, that reflects that the plaintiffs did withhold

documents simply because they were communications with AAP.

Instead, it's clear that the privilege log makes clear, and the

plaintiffs know this, that we have produced a number and large

number of documents, of communications between AAP and the

plaintiffs or others, including others when they dealt with

business issues.  No one disputes that you have to analyze

documents as to whether this is rendering legal advice or

concerning business issues.  The documents have been carefully

reviewed to withhold only those documents that dealt with

privilege issues, and that's reflected on the privilege log,

and the letter to your Honor doesn't identify a single example

where it appears to be citing to business issues.  Instead, the

log would say something like "legal advice re anticipation of a

copyright infringement litigation against IA."  That is clearly

legal advice.

          Now, when this issue first arose and they said, well,

you need to establish that there was a attorney-client

relationship between the parties, that testimony has now been

rendered in this case, that has been asked in depositions.

There was the deposition of Skip Dye, who's one of the key

witnesses here, and he had indicated -- was asked squarely:

          Does the AAP serve as its attorney outside of this

LC2HHac1

1    lawsuit?

2              Yes.

3              Does it provide legal advice?

4              Yes.

5              And the testimony of Alison Lazarus from Hatchette --

6    Skip Dye is from PRH -- was asked similarly:  Does the AAP act

7    as Hatchette's counsel, and do they give legal advice from AAP?

8    And the answer is:  Yes, I believe we do.

9              Now, these are not -- you have to understand who the

10   AAP is and who its executive director is in order to appreciate

11   that this is bona fide, compelling legal advice.  The executive

12   director of the AAP is a woman by the name of Maria Pallante.

13   She was the former register of copyrights and the director of

14   the U.S. Copyright Office.  She is far more equipped to give

15   advice on copyright issues than I could begin to be, and even

16   though I practice in the area of copyright quite a lot, she is

17   far more of an expert than I.

18             THE COURT:  Let me just pause, because it's getting

19   late.

20             MS. McNAMARA:  Yes.

21             THE COURT:  I feel like an air traffic controller or

22   maybe, yes, the LaGuardia during a thunderstorm.

23             What are the documents that defendants seek to compel,

24   who produced them, and is there a log?

25             MR. GRATZ:  So, sorry, is that a question?

LC2HHac1

```
1              THE COURT:  Yes.
2              MR. GRATZ:  So the answer is with respect to the
3    documents in the possession of the publishers, we have not at
4    this point in the dispute process teed up in our letter which
5    log lines we think should be produced.  We have identified them
6    instead by category, for example, communications between --
7    solely between nonparty third parties and communications
8    between plaintiffs and third parties who are not the AAP, and
9    we think they need to redact a number of the documents that are
10   likely to be mixed.
11             THE COURT:  OK.
12             MR. GRATZ:  Then with respect to the AAP, who we have
13   subpoenaed, your Honor, they haven't produced a log.
14             THE COURT:  AAP isn't here.
15             MR. GRATZ:  They are here, your Honor.
16             MS. McNAMARA:  Yes, AAP, but, your Honor, this is not
17   the proper jurisdiction for AAP.  They were subpoenaed in
18   Washington, D.C., and I think that if there's any motion to
19   compel with regard to the AAP, it needs to be held in D.C., not
20   before your Honor.
21             THE COURT:  So the AAP is in D.C.  They're a nonparty.
22             MR. GRATZ:  May I be heard on that?
23             THE COURT:  No, not yet.
24             AAP is in D.C.  They're a nonparty.  AAP and AAP's
25   docs are in D.C., is that right?
```

LC2HHac1

1            MS. McNAMARA:  Correct, your Honor.

2            THE COURT:  Let's go back to the documents in the

3     publishers' productions.

4            Do you want to brief it?  I'm not sure that you're

5     ready to brief it.  I think you probably need to meet and

6     confer and have another round because what I heard was we're

7     complaining about particular categories, and we think that

8     things something should be produced in redacted form.  I could

9     put you on a briefing schedule or I could put you on a briefing

10    schedule after you have had another chance to meet and confer

11    on the documents produced by plaintiffs for which you have a

12    log.

13           MR. GRATZ:  We think, your Honor, in light of today's

14    discussion, that it might make sense to see whether there is at

15    least some common ground we can reach with respect to the

16    things to which we have a log, with respect to at least the

17    production of redacted documents where there is mixed business

18    and --

19           THE COURT:  How about this?  Let's set a date for a

20    status letter for you to tell me where, if any, dispute remains

21    on this issue.  I don't want to make people work over the

22    holidays if they weren't already planning to.  I don't even

23    want to say "if they weren't already planning to."  I don't

24    want to be the cause of an attorney, particularly an attorney

25    not in this room, having to make changes to their holiday plans

LC2HHac1

 1 │ or giving up time spent with their family to deal with this

 2 │ issue.

 3 │         MS. McNAMARA:  Thank you, your Honor.

 4 │         THE COURT:  I'd like you to spend some time to meet

 5 │ and confer, get back -- is a status letter in January

 6 │ appropriate?

 7 │         MS. McNAMARA:  That's fine.

 8 │         MR. ZEBRAK:  That's fine, your Honor.

 9 │         THE COURT:  Mr. Gratz wants to say something.  Now

10 │ that you're not sitting next to each other because of this

11 │ strange COVID arrangement, you can't see when Mr. Gratz wants

12 │ to say something.  Yes, Mr. Gratz.

13 │         MR. GRATZ:  I will wait a moment for Mr. Zebrak to

14 │ finish whatever Mr. Zebrak was saying.

15 │         What I was going to say was --

16 │         THE COURT:  No, but you're not waiting because you

17 │ just said you would wait and then you started talking.

18 │         Go ahead.

19 │         MR. GRATZ:  I'm sorry, your Honor.

20 │         A status letter in January sounds fine.  We currently

21 │ have close of discovery in two weeks, and I think we need to do

22 │ something about that.

23 │         THE COURT:  Yes, I will extend that date.

24 │         Mr. Zebrak, what were you going to say?

25 │         MR. ZEBRAK:  Thank you, your Honor.

LC2HHac1

```
 1              So there's actually a third discovery dispute that the

 2    plaintiffs brought here.

 3              THE COURT:  I know.  I'm just trying to --

 4              MR. ZEBRAK:  Very quickly.

 5              THE COURT:  -- get through.

 6              MR. ZEBRAK:  I think we could do it very quickly, your

 7    Honor.

 8              THE COURT:  No, but I want to close out this issue

 9    unless you're -- I want to set a date for a joint status

10    letter.

11              MR. ZEBRAK:  Yes, your Honor.

12              THE COURT:  We close out one issue, and then we move

13    to the next one, right?

14              What's the date for your joint status letter on this?

15    Is mid-January OK, or would you like the end of January?

16              MS. McNAMARA:  Mid-January's fine, your Honor.

17              THE COURT:  January 14 status letter on the privilege

18    log issues.

19              Although I hate to burden a sister court, my question

20    is why couldn't you or wouldn't you bring any subpoena issues

21    with AAP's production in D.C.?

22              MR. GRATZ:  I think the answer, your Honor, is we

23    could, but I think it would be exceptionally inefficient to

24    spin up something else there.  At the time we served the

25    subpoena, the place for production was in D.C. since we didn't
```

LC2HHac1

1    know that Ms. McNamara would be representing with -- her office

2    in New York would be representing the AAP in this matter.  We

3    can just serve a subpoena with the place of performance to be

4    New York and solve it that way.  Of course, Rule 45(f) also

5    allows us to file it there and then consent to bring it here.

6              THE COURT:  OK.  Yes.

7              MR. ZEBRAK:  Your Honor, the place of compliance is

8    where the nonparty's located, it's not where counsel chooses to

9    bring the document.

10             THE COURT:  Right.  My question is if this is going to

11   end up being a motion to compel AAP, and I'm not sure that it's

12   ripe yet because it doesn't sound like there's been production

13   or a log, but I'm just trying to get a little bit ahead of this

14   problem.  Can you guys please agree on a place to deal with

15   this motion, if you can't actually address it without having to

16   file a motion?

17             MR. ZEBRAK:  Yes, your Honor, we will endeavor to

18   resolve this with defendant's counsel.  The issue here is that

19   it's an incredibly broad subpoena that they've made no effort

20   to narrow.

21             THE COURT:  I don't want to hear your argument about

22   the subpoena.  I understand you have a dispute about the

23   subpoena.  I'm just trying to see whether the dispute has -- if

24   you can't resolve the dispute, whether it has to be brought

25   here or whether you can agree to either have it brought here.

LC2HHac1

1    I'm happy to hear it if I have jurisdiction.  I'm happy to hear

2    it if you agree, and I would actually prefer that you find a

3    way to agree.  Whether it's to agree to bring it here or

4    whether you agree to litigate it in D.C., I don't really care.

5    I mean, obviously, it would be a little easier if I didn't have

6    to deal with it.  At the same time, since I'm dealing with the

7    main case, it does make some sense for me to deal with it.  So

8    please work that out.

9              I think that does mean that -- meet and confer status

10   letter on the logs of the documents that have already been

11   produced is January 14.  OK.  I think that now goes to

12   Mr. Zebrak's issue.  That's ECF 58 and 59?

13             MR. ZEBRAK:  Yes, your Honor.  Thank you.

14             Several issues have been resolved, so it would help me

15   to address --

16             THE COURT:  Why don't we start out with the issues

17   that have been resolved.

18             MR. ZEBRAK:  Thank you, your Honor.

19             I can begin by saying that the numbers that I believe

20   have been resolved are Categories 3, 5, 6, and 7.  For Category

21   3, the defendant produced documents after we filed our letter.

22   For Category 6, the defendant produced documents after we filed

23   our letter.  For Category 7, we haven't yet reviewed the

24   documents, but we understand that last night the defendant

25   produced documents.  And for Category 5, the defendant has

LC2HHac1

1    indicated that the documents are inaccessible to them without

2    undue burden.  And at this time, I think we'll leave it at

3    that.  The defendant -- I can get into more detail, but I think

4    we can just focus on the three that still remain outstanding.

5            MR. GRATZ:  With respect to Category 5, we may

6    actually turn out to have some additional documents for you

7    that I will give you an update on as soon as I have it,

8    Mr. Zebrak.

9            THE COURT:  OK.

10            MR. ZEBRAK:  Thank you.

11            THE COURT:  All right.  Let's look at Category 1.

12    What is Category 1?

13            MR. ZEBRAK:  Sure.  Category 1, just one quick

14    backdrop.  The defendant distributes e-books.  The defendant

15    does it two ways.  Some are e-books in the public domain that

16    the defendant distributes without any restrictions; someone you

17    can just download and keep a permanent copy forever.  The other

18    way the defendant distributes e-books, typically, e-books that

19    the defendant has scanned from physical form into a digital

20    version, the defendant does it from what it calls its lending

21    library.  That's what this focuses on.  It concerns defendants'

22    rules, policies, procedures, specifications for how it's

23    supposed to work, and the actual computer code that designates

24    something into the lending library.  This is very significant

25    because they distribute millions of copyrighted books that

LC2HHac1

they've digitized from a physical form.  So their rules for how

something makes its way in the lending library and what's

associated with that are quite relevant in this case.  It's at

the center in a lot of ways.

           We've been following up on this for quite some time,

and what the defendant has done is indicate that there's a

single document from July of 2018 that they've produced that

supposedly lays out essentially their intent for what gets

designated into different collections, including the lending

library.

           Your Honor, that just doesn't quite make sense that

there would be one document only from 2018, from three years

ago, when this is so central to a process that's been the

subject of so much controversy, that there's not documents

concerning the implementation of these rules, updates to these

rules.  It's a single two-page document from 2018 they've

identified to us as being the only thing that they have that

they've produced.  We would like them to be ordered to produce

whatever else exists that they have not yet collected and

produced.

           THE COURT:  Mr. Gratz.

           MR. GRATZ:  Two observations, your Honor:  One, we are

not making a relevance or a burden or an anything else

argument.  We have looked for documents.  We have produced what

we were able to find.  We have identified by Bates number the

LC2HHac1

```
1    key document.  And I think, most relevantly, plaintiffs are

2    taking the deposition in about a week and a half of the person

3    responsible for this, the 30(b)(6) designee on this topic.

4    They can ask about this topic.  They can ask about what

5    documents are there, and they can satisfy themselves that they

6    understand this document, they understand the procedures.  And

7    to the extent they can get testimony about some document that,

8    despite our diligence, we haven't found, we'll give it to them.

9              THE COURT:  When's the 30(b)(6) depo again?

10             MR. GRATZ:  The 17th, which is currently the last day

11   of fact discovery.

12             THE COURT:  Right.  Yes, I know.  I will extend it.

13             All right.  So on Category 1, take your deposition,

14   see if you can resolve this one with a meet-and-confer after

15   the deposition, and then you can put that in a status letter.

16             MR. ZEBRAK:  We will, your Honor.  Of course, the

17   difficulty is that a witness is not going to be able from

18   memory to cite different documents, and documents others --

19             THE COURT:  But it's a 30(b)(6) deposition, right?  So

20   what he says is binding the corporation, right?

21             MR. ZEBRAK:  Well, OK.

22             THE COURT:  I have had cases where one would expect

23   certain documents to exist, and it turns out after discovery,

24   some discovery into processes, that such documents never

25   existed in the first place or they were destroyed before the
```

LC2HHac1

1    litigation ever began.

2            MR. ZEBRAK:  True.  There is one thing now that I know

3    exists which they haven't produced, which is the code that

4    actually moves stuff into the lending library and indicates

5    where it's pulled from and the records it's pulling from for

6    all.  So that's just one I know about right now that they can

7    produce but haven't.

8            THE COURT:  Mr. Gratz, what about that?

9            MR. GRATZ:  I think we have produced that.

10           MR. ZEBRAK:  We'll confer with them afterwards.

11           THE COURT:  Yes.

12           MR. ZEBRAK:  I don't believe that they have, but we

13   will confer.

14           THE COURT:  Category 2.

15           MR. ZEBRAK:  Category 2, your Honor, so again one

16   quick second of backdrop, otherwise this will also seem like

17   it's written in a foreign language.

18           What the defendant does when it starts with a physical

19   book is that it digitizes that book and then distributes copies

20   of it from its website.  Except during this period of what --

21   for three months during 2020, what the defendant says it does

22   is that it limits one user at a time to that digitized copy of

23   the book.  However, what the defendant wants to do in order to

24   scale how many copies it can deliver at a time to the world is

25   that it reaches out to libraries and does what it calls an

LC2HHac1

1   "overlap analysis" with a library where the Internet Archive

2   compares Internet Archive's data about the Internet Archive

3   digital holdings of books to whatever data the library has

4   about what the library thinks is in its physical holdings.  The

5   Internet Archive calls this an "overlap analysis."  In this

6   overlap analysis, the Internet Archive has what it calls

7   "direct matches," and it also has what's called "similar

8   matches."

9           THE COURT:  OK.

10          MR. ZEBRAK:  And after this overlap analysis occurs,

11  libraries that participate in the analysis with the Internet

12  Archive, afterward the Internet Archive will then just

13  sometimes on the basis of this data comparison -- it doesn't

14  just scan the library books.  Essentially, Internet Archive

15  treats all books as fungible and it then increases the

16  concurrent lending count based on whatever match it thinks

17  happened.  And we've asked for the policies and procedures for

18  how this works, not just stray emails here and there, and we

19  said, including how you implement, whether you're going to use

20  just the direct match or a similar match, again, you're using

21  this as the basis to distribute millions of copyrighted books.

22  You couldn't imagine that there aren't policies or procedures

23  for this.

24          The defendant, despite our request, has not identified

25  which documents they've produced that supposedly speak to this.

LC2HHac1

1   What they've said in their letter to your Honor is that they've

2   produced documents relating to the overlap analysis.  They

3   haven't said they produced the documents that we've asked for,

4   the policies the procedures, how do you implement this?  We

5   have none of that, and that's what we're asking for your Honor

6   to compel them to produce.

7           (Continued next page)

LC2THAC2

1          THE COURT:  I mean again, I can direct Mr. Gratz to

2     produce things, but if they don't exist, I have a slight

3     concern.

4          MR. GRATZ:  This is the same witness who is --

5          THE COURT:  Okay, but before we get to the witness, do

6     documents exist?

7          MR. GRATZ:  So documents do exist that describe this

8     process, the documents Mr. Zebrak has been talking about.

9          Are there policies or sort of formal procedural

10    documents or the things that Mr. Zebrak would sort of I think

11    prefer exist that we're withholding?  No, not that we found.

12          THE COURT:  Okay.

13          MR. ZEBRAK:  Your Honor, where I get hung up is when

14    they say not that they were found, because, for instance the

15    person that handles the designation "The Lending Library,"

16    that's Category 1, that's a non-custodian.  They chose not to

17    make that witness a custodian.

18          So we're deposing different witnesses, but this

19    individual, Mr. Freeland, might have no idea about the

20    documents that are in Category 1, and we're not going to learn

21    of that unless he educates himself on it.

22          And it's the same thing here in Category 2.

23    Mr. Freeland is not an engineer, he has an engineer that works

24    for him and others that have done these overlap analyses, and

25    Mr. Freeland, when he's deposed, may not know of documents.

LC2THAC2

1   And this is key.

2           THE COURT:  Again, you are making an argument about

3   the sufficiency of the 30(b)(6) witness's prep before the

4   deposition has happened.  Number one, I hope that your 30(b)(6)

5   notice topics are broad enough to cover, and I hope that

6   Mr. Gratz doesn't impose any bad faith objections on this so

7   that you can understand and satisfy yourselves whether

8   documents actually exist and also whether the preparation was

9   sufficient.

10          MR. ZEBRAK:  Thank you, your Honor.

11          THE COURT:  And like I said, sometimes documents don't

12  exist, and there is -- if you get to trial, they're not going

13  to get to use that and they're not going to get to use a new

14  document that they suddenly discovered.  You all have laid the

15  basis for excluding that document, so you're not without any

16  recourse if it turns out that such documents that you would

17  expect to exist don't exist or no longer exist.

18          MR. ZEBRAK:  Thank you, your Honor.  Fully understood.

19          THE COURT:  Same thing, January 14, '21 status on

20  whether this is remains to be an issue.

21          Category 4, which I understand is our last category.

22  Then we push the discovery end date and the people who have

23  been waiting patiently in my courtroom for hours today, I will

24  then talk to them.

25          MR. GRATZ:  I hope that I can shortcut Category 4,

LC2THAC2

1   your Honor --

2                   THE COURT:  Okay.

3                   MR. GRATZ:  -- by saying I think we have some

4   additional data that I think will satisfy this.  I'm happy to

5   explain a little bit, but we think it is work we are -- we have

6   additional data that I expect us to be producing, frankly

7   today, that will provide at least sort of some additional

8   information on Category 4, and the witness who is to testify

9   about Category 4 and how those records are kept, his

10  deposition, as of now, is tomorrow.

11                  THE COURT:  Okay.  Mr. Zebrak, response?

12                  MR. ZEBRAK:  Your Honor, I'm not sure what to do with

13  that exactly because we have been trying to obtain an answer on

14  this for really months, and --

15                  THE COURT:  Funny how an in-person court conference

16  often shakes things loose.

17                  MR. ZEBRAK:  First of all, I don't know what they

18  intend to produce the night before his deposition, but we have

19  not been getting our questions answered about an issue that is

20  something that they believe is core to their case.  The

21  defendant wants to argue that there's no harm here because the

22  books are only borrowed and used for a short period of time.

23  And that's something they trumpet again and again and again.

24  And we said if you want to make that claim, we have to see the

25  background for it.  You can't go to trial on statistical and

LC2THAC2

1    other claims without providing background.

2             And they referred us in two directions; both have

3    been, thus far, dead ends.  For the works in suit they produced

4    essentially two different types of files with technical data,

5    your Honor.  We are referring to them in file format just for

6    shorthand, but one is a CSV file.  And the CSV file, there is

7    data there on loans, but you can't use it to see when one loan

8    begins and one ends because they do this thing with concurrent

9    multiple loans, and it gets in the weeds quickly, but we're all

10   in agreement between the plaintiffs and the defendants that you

11   can't see when one loan begins and when one loan ends looking

12   at that data.

13            THE COURT:  But I thought you said earlier that

14   Internet Archives supposedly only loans one copy, like one user

15   at a time.

16            MR. ZEBRAK:  That's one model, and sometimes they will

17   do concurrent users where if they believe there's a library

18   that also has a physical copy --

19            THE COURT:  That's where you get to the overlap

20   analysis.

21            MR. ZEBRAK:  So without digitizing that book, they

22   just said now it goes to two, three, four, then it's all thrown

23   into these files in a suit and you can't see where one begins

24   and one ends.  That's the CSV files.

25            We then said OK, there's these JSON files that you

LC2THAC2

produced but there's a lot of essentially encrypted or

scrambled or obfuscated data.  We said:  What does that mean?

Can you produce it in a way that will allow us to see when

loans begin and end?  So we contest your narrative.  And we

have never gotten an answer to that question, including in

response to their letter.  So that's the technical data.

        And then the other place they referred us, they

referred us to two places, the technical data, and then they

referred us to a bunch of handwritten analysis about how long

books were supposedly used, I think it was on a given day, I

don't recall the specifics right now, but we said so there's a

lot of summary level data and analysis there by whoever wrote

this by hand, give us the back-up data.  You can't just give

your summary without that backup.

        And again, they didn't respond to it here, and our

basic proposition is if you want to make claims about how long

books are borrowed, you got to produce the data to support it.

And that's essentially what we're looking to see compelled

here, and that's Category 4.

        THE COURT:  Okay.  Mr. Gratz, briefly, please.

        MR. GRATZ:  We have no objection to producing what we

have that is reasonably accessible.  As I said, there is some

additional data on this that I think ought to be

satisfactory -- although whether it will be, I don't know --

that has just shaken loose that will allow you to get some

LC2THAC2

1    breakdowns of buckets of how many loans were how long in

2    certain period of time.

3           There is other more granular data that is truly

4    stupendously difficult to get at, which is in the form of what

5    we call web logs.  It's just so voluminous that it's hard to

6    get at.  We're happy to talk about sampling or something to

7    lessen that burden.  That is a discussion that's ongoing that I

8    hope, in light of what I hope we produce today, that it won't

9    even be a discussion we need to have.

10          THE COURT:  Okay.  Again, let's put this in the

11   January 14 status also, whether you resolved it or whether a

12   dispute remains.

13          I wrote down summary analysis with handwriting, maybe

14   that's an appropriate witness for deposition if there aren't

15   documents.

16          Mr. Zebrak?

17          MR. ZEBRAK:  It will be helpful to know what data he's

18   producing tonight.

19          MS. McNAMARA:  If this is for the witness tomorrow, we

20   might need to have a supplemental deposition of that witness.

21          THE COURT:  I expect that you would work together to

22   make that happen.

23          MR. GRATZ:  Or kick the deposition if we need to.

24          THE COURT:  It's scheduled for tomorrow.  They have

25   been preparing.  The deposition is going to go forward.  I

LC2THAC2

1  don't think it's really appropriate to use last-minute produced

2  documents to adjourn the deposition.

3        MR. GRATZ:  We are happy to proceed either way.

4        THE COURT:  Please do, because if it turns out that

5  because of some of these document issues that there might need

6  to be additional time allocated to a certain witness's

7  deposition, again, you know how to write letters to the Court

8  and ask for things, so we'll deal with that if and when it

9  becomes ripe.

10       Let's set a fact discovery end date now of January 31.

11 I don't expect -- I start out the day supremely optimistic, and

12 by the time I get to the end of each day my optimism gets

13 tarnished and wanes and sometimes falls into the gutter, but

14 let's set a discovery end date of January 31, 2022, which

15 perhaps, if you were able to resolve all of the disputes, and

16 you were able to say so on January 14, that might be a

17 realistic end date, but I won't hold you to it because I

18 understand there are a lot of issues outstanding.  But let's

19 keep that as a placeholder so that come January 14 I will see

20 what remains.

21       Let's make that a wholesale discovery status letter

22 also, because then at that point if you do need more time, you

23 will be able to tell me with some specificity what is still

24 outstanding, what disputes remain, and sort of where along the

25 ripeness scale they are.  And probably what I will do is have

LC2THAC2

1    another in-person conference, but we'll schedule it after the

2    January 14 letter.  Okay?

3                MR. ZEBRAK:  Thank you very much, your Honor.

4                THE COURT:  Anything else that we need to do at this

5    time?

6                MR. GRATZ:  No, your Honor.

7                THE COURT:  Have a happy and safe and healthy holiday.

8    We are adjourned.  Please order a copy of the transcript, split

9    it 50/50.

10                (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25