# Durie Tangri

Joseph C. Gratz<br>
jgratz@durietangri.com

June 9, 2022

**VIA ECF**

The Honorable John G. Koeltl
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 14A
New York, NY 10007-1312

Re:   *Hachette Book Group, Inc. et al. v. Internet Archive*, Case No. 1:20-CV-04160-JGK

Your Honor:

I write on behalf of Defendant Internet Archive pursuant to Paragraph 2-B of Your Honor's Individual Practices to request a pre-motion conference on a motion for summary judgment in the above matter.

## I.     The Basis for the Anticipated Motion

This case raises two distinct questions.  *First*, may a nonprofit library that owns a lawfully made and acquired print copy of a book loan a digital copy of that book to a library patron, if the library (1) loans the book to only one patron at a time for each non-circulating print copy it owns (thus maintaining a one-to-one "owned-to-loaned" ratio); (2) implements technical protections that prevent access to the book by anyone other than the current borrower; and (3) limits its digital lending to books published in the past five or more years?  This describes Internet Archive's implementation of a practice known as "Controlled Digital Lending," or "CDL."

*Second*, during a twelve-week period when a global pandemic forced the closure of substantially all physical libraries, such that they could not physically loan any of the millions of print books they owned, was a nonprofit library permitted to lend books digitally *without* imposing the one-to-one owned-to-loaned ratio, so long as the library (1) implemented the same technical protections and five-year limitation it implements under CDL, and (2) reimposed the one-to-one owned-to-loaned ratio as soon as libraries were once again widely able to lend physical books?  This short-lived service was called the "National Emergency Library," or "NEL."

The answers to these questions will shape how libraries continue to serve the public interest in the digital age.  They come to this Court in the context of a suit for copyright infringement brought by major book publishers against a decades-old 501(c)(3) nonprofit library, Internet Archive.  The publishers assert that both CDL and the NEL infringe their copyrights.  Internet Archive intends to move for summary judgment that both the CDL and NEL are lawful fair uses.

The Honorable John G. Koeltl
June 9, 2022
Page 2

### A. Controlled Digital Lending by a nonprofit library is fair use.

As to the first fair use factor, "the purpose and character of the use," courts inquire into the commercial or noncommercial character of the use, to its transformativeness, and to the relationship of the use to the purposes of copyright. As to commerciality, the Internet Archive is a 501(c)(3) nonprofit public charity that lends books for free; it could hardly be less commercial. "There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021). As to transformativeness, CDL "utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018). Digital lending of library books is more efficient than physical lending in some respects; a library need not deliver or mail a book to a patron when the lending occurs digitally. And CDL does not encroach on the commercial entitlements of the rights holder; just as with physical lending, only one patron can borrow the book at a time, and the one patron who has borrowed a particular print copy from a library is entitled to read it. Thus, "the improved delivery was to one entitled to receive the content." *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018). And lending library books serves the ultimate purposes of copyright by encouraging "the intellectual enrichment of the public." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013).

As to the second factor, "the nature of the copyrighted work," this factor "has rarely played a significant role in the determination of a fair use dispute," *Authors Guild v. Google, Inc.*, 804 F.3d 202, 220 (2d Cir. 2015), and this case is no exception. The works that the publishers selected are "of every type of work imaginable," and so the "fair-use analysis hinges on the other three factors." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014). And the fact that they were previously published—almost all more than five years before availability for lending—tilts this factor in favor of fair use.

As to the third factor, "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," borrowing a book from a library necessarily entails borrowing the whole thing. Thus, lending out an entire book to the one patron at a time who has borrowed it from the library is "reasonable in relation to the purpose of the copying." *Authors Guild*, 804 F.3d at 221.

The fourth factor examines "the effect of the use upon the potential market for or value of the copyrighted work." "Analysis of this factor requires us to balance the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991) (internal quotation marks omitted). The record overflows with public benefits: increasing the efficiency with which libraries can lend print books saves library staff time, saves library patrons trips (or postage), and gets library books to the people who want to read them, one at a time. And when it comes to harm, analysis of lending data shows that neither Plaintiffs' book sales nor Plaintiffs' licensed library ebook lending saw any decrease in demand when the works in suit were made available via CDL, nor any increase in demand when the works in suit were no longer available. Plaintiffs' feared harms simply never materialized; indeed, analysis of the available data shows that they would not materialize even if CDL became a more widespread practice. Further, courts "must consider not just the amount but also the source of the loss." *Google LLC*, 141 S. Ct. at 1206. Here, that claimed source is a nonprofit library lending books it owns. To the extent that the feared market harms are the very same ones that would flow from handing a particular copy to a library

The Honorable John G. Koeltl
June 9, 2022
Page 3

patron, or mailing it to them, rather than lending that copy digitally, those harms are not ones that copyright takes into account. Every copy Internet Archive lends out was bought from the publishers, and it is not fair to demand that libraries pay again to lend the copy they already own.

For those reasons, CDL easily passes the "ultimate test of fair use," which asks "whether the copyright law's goal of 'promoting the Progress of Science and useful Arts,' would be better served by allowing the use than by preventing it." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (cleaned up). American copyright law has never regarded one-at-a-time library lending as copyright infringement, and now is no time to start.

      **B.**      **Under the unique circumstances of Spring 2020, the National Emergency Library was fair use.**

In the spring of 2020, an unprecedented global pandemic forced all of the libraries to close. Library patrons could not access the millions of books that libraries had bought from publishers. Under those unique circumstances, Internet Archive lifted its one-to-one owned-to-loaned ratio. And under those unique circumstances, lending a single library book to more than one patron at a time was fair use. As with CDL, analysis of the data reflects that the publishers did not actually lose out on any revenues as a result of the NEL. But even if they had, the public benefits of reuniting students with the books locked up in their shuttered classrooms, and reuniting the public with the books locked up in their shuttered libraries, justified that temporary measure. As the headline on Jill Lepore's article in The New Yorker read: "The National Emergency Library Is a Gift to Readers Everywhere." It was—and it was a fair use.

In addition, Internet Archive expects to move for summary judgment that, in the event either CDL or the NEL was found not to be fair use, statutory damages should be remitted based on the Copyright Act's requirement that a "court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was . . . a nonprofit educational institution, library, or archives . . . which infringed by reproducing the work in copies or phonorecords[.]"  17 U.S.C. § 504(c)(2).

**II.**      **Procedural Matters Relating to the Motion**

The schedule for the anticipated motion was previously set by order of Magistrate Judge Wang, ECF No. 70, with the deadline for dispositive motions set for July 7, 2022; oppositions due September 2, 2022; and replies due October 7, 2022. Because of the complexity of the issues presented, the parties both request enlarged word limits for the briefing: 12,000 words for opening briefs, 10,000 words for oppositions, and 6,000 words for reply briefs.

We look forward to discussing the anticipated motion with Your Honor.

Respectfully submitted,

*/s/ Joseph C. Gratz*

Joseph C. Gratz
cc:      All Counsel (via ECF)