**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>                              Plaintiffs,<br>v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>                              Defendants. | Case No. 1:20-CV-04160-JGK<br><br>**DECLARATION OF<br>ALAN PAVESE** |

Pursuant to 28 U.S.C. § 1746, I, **ALAN PAVESE**, declare as follows:

1.      I am a Senior Vice President, Pricing, Data & Operations at John Wiley & Sons, Inc. ("Wiley"). I submit this declaration in support of the motion for summary judgment filed in this action by Wiley and plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, and Penguin Random House LLC (collectively, "Plaintiffs"). This declaration is based on my personal knowledge except as otherwise stated. This action concerns the Internet Archive's free ebook website ("Website"), which can be accessed either through the Internet Archive's "Open Library" website, http://openlibrary.org, or the Internet Archive's general website at http://archive.org, which actually hosts the ebook files. This lawsuit concerns the works in the Internet Archive's "Books to Borrow" collection – which have been scanned and uploaded by the Internet Archive rather than third parties.

**Introduction**

2.      Founded in 1807, Wiley is a leading publisher of scientific and medical works, including works written by over 450 Nobel Laureates. Wiley publishes both academic journals with scholarly articles and books – including textbooks, reference works, professional books and

"trade books." Its publications span a broad array of subjects, including physical sciences and engineering, medicine, mathematics and statistics, life sciences, business, computer science and information technology. Trade books, which are general interest books that one might find in a bookstore chain or community bookstore, constitute a comparatively small portion of Wiley's catalog. The nineteen Works in Suit published by Wiley at issue in this lawsuit are all trade books, ranging from popular business leadership books by Patrick Lencioni to several works in the well-known *"For Dummies"* series of "how to" books.

3. Given the academic and scientific nature of Wiley's list, libraries are its largest sales channel in both print and digital. Wiley licenses an enormous amount of content to library ebook aggregators, who in turn license the ebooks to libraries for use by their patrons. In particular, Wiley works closely with ebook aggregators focused on serving academic libraries and markets such as EBSCO/GOBI ("EBSCO") and ProQuest. While much of the content licensed to EBSCO and ProQuest is geared for an academic audience, Wiley also licenses its general trade book ebook titles to EBSCO and ProQuest in light of its existing relationship with them. Likewise, Wiley works with library ebook aggregators like OverDrive that focus more heavily on licensing general trade book ebooks to public libraries.

4. As set forth below, Wiley has worked closely with libraries and library ebook aggregators in a collaborative fashion and is constantly experimenting with a wide array of different models to determine those that best serve the interests of libraries and their patrons. Thus, for example, in addition to the most commonplace model under which libraries lend ebooks on a One Copy/One User basis, Wiley collaborates with EBSCO and ProQuest and licenses many of its trade books in ebook form to libraries on a One Copy/Three User basis, subscription models, and concurrent access models.

5.      Wiley's One Copy/One User model for library ebooks is both similar to and different from the other Plaintiffs in this case. The essential nature of this model is the same for all of us – namely, one library patron at a time is able to borrow the ebook. Further, like the other Publishers, Wiley licenses ebooks to both public and academic libraries via aggregators based on the fundamental premise that each individual library may only lend the ebooks to its registered members – whether the local inhabitants of the town with a library card, or for academic libraries, the students, faculty and staff. However, the other Plaintiff publishers set a one or two-year term or a limit on the number of circulations for ebooks licensed to public libraries, while using a perpetual term for their licenses to academic libraries (i.e., the license does not expire). In contrast, we use a perpetual term for all our library ebook licenses under the One Copy/One User model. Despite the long term, we set the digital list price for the library ebook as the same price as our print list price. Although we devised this model with academic libraries in the forefront of our minds, it has been simpler for us to offer a perpetual term for all ebook titles, including trade book titles, licensed to all libraries under the One Copy/One User model. The company understands that some libraries prefer a perpetual model to a time-limited one, and Wiley has been able to maintain its perpetual model for its trade ebook titles because the market for its trade titles is comparatively small.

6.      Internet Archive's Website harms Wiley, as further detailed below. As the Foster Declaration dated June 29, 2022 recounts, the Internet Archive has scanned close to 5,000 of our print titles, and made each of these texts available in full and for free in ebook form to any person around the globe. Any person can visit the Website and immediately access a free electronic copy of over 15% of all of the books published by Wiley in print and digital formats, without any payment to us or our authors. (Foster Decl.¶ 115(i).) Internet Archive has continued with its operation despite our takedown notices. (True and correct copies of examples of takedown notices

3

Wiley submitted to Internet Archive are annexed hereto as Exhibit 1.)

7. While Wiley believes that the Website is illegal and causing financial harm to our company and our authors, the Internet Archive has argued that its service constitutes a fair use because it is merely increasing the efficiency with which libraries can lend books to their patrons. But it is Wiley, working with its authors, that has both invested the time and funds necessary to create high quality content, and that has provided libraries with many options to make library ebook lending more versatile and affordable. As noted above, Wiley's library ebook lending models afford libraires an array of lending options, including an option to obtain a perpetual license for a similar price as the print book, the ability for multiple patrons to access an ebook at the same time, or for a library to offer a large selection of titles for lending through a subscription-based product. These are the ways that Wiley has tangibly increased the efficiency with which libraries can lend ebooks to the public.

8. I also understand that the Internet Archive attempts to justify its actions as in the public interest by arguing that the terms under which publishers license ebooks to libraries – including the metering limitations and pricing structures – make ebooks quite expensive for libraries and allegedly harm libraries by depriving them of the key benefits of acquiring print books. But Wiley, because of its principal role as an academic publisher, licenses its trade book ebooks to libraries for a perpetual term at the same price as a print book – in other words, in a fashion closely akin to the acquisition of print books. Yet the Internet Archive posts thousands of our books on its Website along with everyone else's – suggesting that this public interest argument is a pretext.

**A. Background**

9. Wiley has over 200 years of experience publishing scientific, professional, and education books and journals in print and digital formats. In its early years, Wiley was best known

4

for publishing works of 19th century American literary giants like Washington Irving and Edgar Allan Poe.  By the 20th century, Wiley had focused in the critical areas of scientific, technical, medical, and scholarly research. Wiley currently publishes over 2,000 new books each year and now offers over 157,000 titles.

10. I joined Wiley in May 2018.  For most of the last ten years I have been working in Pricing, Commercial Model, Data & Operations roles in the publishing industry.  Prior to Wiley, I worked at Macmillan for two years.  Prior to Macmillan I worked at Cengage Group for almost six years.  In my current role, I am responsible for Pricing, Data, Operations and business management of Wiley's Academic & Professional Learning Division.

B. **To Expose Their Books to the Widest Possible Audience, Wiley's Authors Expect the Company to Successfully Develop and Utilize New Book Formats**

11. I have reviewed the declarations of Ben Sevier of Hachette Publishing Group, Jeffrey Weber of Penguin Random House and Chantal Restivo-Alessi of HarperCollins and concur with their themes.  I will not repeat those here, but rather will focus solely on material subjects that differ for Wiley.

12. Like the other Plaintiffs, Wiley and its authors invest significant time and resources to write and publish their books.  Indeed, the nature of Wiley's books – including its trade books – often require extensive research and mastery over a technical subject.  (A true and correct copy of a spreadsheet detailing Wiley's company-wide costs, including royalty and overhead costs, for trade books and books published in the *For Dummies* series is annexed hereto as Exhibit 2.)

13. Likewise, like the other Plaintiffs, whenever Wiley acquires new works to publish, our authors grant the company the exclusive rights to develop and distribute that work in different formats. In order to secure an adequate return on the significant investment the company makes

5

in its authors, Wiley must be compensated for the sale of each of its titles in each format the title is sold in.

14. Similar to the other Plaintiffs, Wiley depends on its backlist, including titles that are more than five years old, to act as the steady sellers that permit it to invest in newer, more risky books. Indeed, many of the non-fiction books that Wiley publishes aim to address topics of long-standing interest, as compared with, for example, commercial fiction published by trade publishers that may well have a shorter shelf-life.

15. Likewise, similar to the other Plaintiffs, Wiley has invested heavily in the development of new forms of digital delivery for its works, including Wiley E-Text, which provides students with the option to study Wiley-published materials on their laptop, on a desktop, or on-the-go on a mobile device. If Wiley were unable to reap the rewards of the sale of its works in each different format, it would not have the same incentives to invest in them.

16. In the last twenty or so years, ebook sales for our trade books have become a critical source of revenue for Wiley and our authors, as readers have flocked to ebooks. As demonstrated in Exhibit 2, which tracks our revenues for all our trade books including the *For Dummies* series, Wiley earned over $114 million in print revenues and over $36 million in digital revenues in fiscal year 2021.

17. As compared to the longstanding print library lending market, Wiley's library ebook market is relatively new and continues to evolve. But at this stage, it is clearly a well-established market for the company. Every newly-released Wiley trade book title that is published as an ebook is available as a library ebook on the same publication date. For certain types of content outside of the Works in Suit and outside of the trade business in general, like textbooks, some content is not made available through the library channel.

18. The nineteen Works in Suit published by Wiley are all available as ebooks and as library ebooks, and libraries have obtained them for lending via library ebook aggregators. The Works in Suit include *The Energy Bus: 10 Rules to Fuel Your Life, Work, and Team* (Jon Gordon), a bestselling guide to business success, and *The Five Dysfunctions of a Team: a Leadership Fable* (Patrick Lencioni), which has served as a guide to countless executives and organizations. Evergreen academic title *Basic Physics* (Karl F. Kuhn) is one of the Works in Suit, along with *Ages and Stages: a Parent's Guide to Normal Childhood Development* (Charles E. Schaefer; Theresa Foy DiGeronimo), which has helped guide many parents through sleepless nights. The Works in Suit also include five selections from Wiley's extensive *For Dummies* series. For decades, *For Dummies* books have transformed complicated subjects into easy-to-use guides that enable learners of all ages to advance their personal and professional goals. Revenue earned from the sale of Wiley books across multiple channels – including ebooks – allows the company to invest in publishing *For Dummies* books on numerous niche or highly specific subjects, including oil painting and the study of comparative religion, the focus of two of the Works in Suit.

19. Wiley earned over $87,000 in revenue from the license of the Works in Suit as ebooks in the library market, through its aggregator partners OverDrive, EBSCO, and ProQuest, between 2001 and 2021. (A true and correct copy of a spreadsheet reflecting Wiley's sales records for the Works in Suit is annexed hereto as Exhibit 3.)

20. Finally, like the other Plaintiffs, Wiley's experience is that unauthorized digital copies of its works distributed on the internet hurt its sales – an issue that is particularly problematic with textbooks. Wiley devotes considerable resources to fighting digital piracy. The company has escalated its efforts to attack digital piracy in recent years, including a recent $10 million investment in strengthening its in-house anti-piracy team and its relationships with third-party vendors that engage in significant anti-piracy efforts on Wiley's behalf. In fact, the Internet

7

Archive first came to my attention after it was included in a round-up of websites making pirated versions of Wiley ebooks available for free. The company's significant investments in these efforts are consistent with industry data reflecting that publishing companies have suffered hundreds of millions of dollars in losses attributable to widespread pirated content that is available on the Internet. This pirated content damages Wiley, its authors, and its aggregator partners. Wiley plans to continue to make additional investments to strengthen its efforts to fight piracy, including investing in new technologies; for instance Wiley is experimenting with techniques including automation, artificial intelligence, and web scraping – all in an effort to identify and remove unauthorized Wiley content from the Internet.

### C.  Recognizing the Significant Benefits Afforded by Library Ebooks, Wiley Has Invested In Creating Balanced Terms to Govern the Market

21. Wiley and its library ebook aggregators have invested untold hours in developing different models for library ebook lending that will best serve the interests of libraries and their patrons. We continue to experiment to this day.

22. Wiley's most popular lending models for its trade titles are a One-Copy/One-User model or One-Copy/Three Users model, both with a perpetual term. Under these models, when a library obtains a license for one ebook copy of a Wiley title, only one – or three – users at a time can access that copy. A library's license to lend out the copy under the terms of the license does not expire.

23. This model includes a critical restriction – namely each library or library consortium may only make Wiley titles available to the narrow universe of its own community, thus setting an important territorial restriction that prevents against the widespread distribution of a digital book file. For example, Wiley's Ebook Distribution Agreement with ProQuest defines an "Authorized User" as follows: "For public libraries: library staff, individual residents of

8

Customer's reasonably defined geographic area served, and walk-in patrons while they are on site" and "For schools and other academic institutions: currently enrolled students, faculty, staff and visiting scholars, as well as walk-in patrons while they are on-site. (A true and correct copy of the ProQuest agreement is annexed hereto as Exhibit 4.) Similarly, in its agreement with library ebook aggregator OverDrive, Wiley requires OverDrive to "require participating [libraries] to take reasonable measures to ensure that only Authorized Patrons of their libraries . . . may access the offline or download collection" and that "OverDrive will require that participating [libraries] provide it the right to audit their access control systems." (A true and correct copy of the Overdrive agreement is annexed hereto as Exhibit 5.)

24. Putting in place this critical territorial restriction protects Wiley's return on its investment in its works, and allows it to advance the interests of its authors. Otherwise, a limited number of ebook licenses to a handful of libraries could serve broad geographic demand for a title. This limitation is particularly crucial since Wiley is licensing the ebook on a perpetual term with a digital list price that equals the print list price – and yet an ebook would be capable of far more efficient reproduction and distribution than a print book, allowing it to serve exponentially greater demand.

25. The One Copy/One User model with a perpetual term was devised largely with the interests of academic libraries in mind. These libraries are the primary customers of Wiley's science and academic-focused titles, which make up the vast majority of its list. While all libraries exist to serve patrons and expand access to information, academic libraries have a slightly different mission than their public counterparts. Academic libraries highly prioritize the building of long-term collections, whereas public libraries often weed their collections. Further, professors and college students tend to make somewhat different uses of academic-focused ebooks than the general public does with trade ebooks in the public library context. As a result of these differences,

a perpetual licensing model is particularly attractive to academic libraries.

26. Nevertheless, Wiley has continued to make its One-Copy/One User model available with a perpetual term for all of Wiley's licenses of trade titles to public libraries. We have done so for the sake of simplicity, because of our sense of the how libraries view our trade titles, and because comparatively this is not a very large market for Wiley. We believe that our license terms provide significant value to libraries.

### 1. Wiley Has Worked Closely and Collaboratively with its Aggregator Partners to Adopt Lending Models Not Generally Adopted by Trade-Focused Publishing Companies

27. Additionally, because so many of Wiley's books are in demand in the academic context and consumed by readers in these settings, our company has been fortunate to work in close tandem with the leading academic-focused aggregators, EBSCO and ProQuest, to develop additional lending models that better serve the specific needs of libraries and readers of Wiley's science-focused titles. (A true and correct copy of a spreadsheet produced by Wiley, which summarizes the various terms offered by two of Wiley's key aggregator partners, EBSCO and ProQuest, is annexed hereto as Exhibit 6.) I know firsthand the work that went into assessing these lending models for Wiley, which aim to make it more efficient, cost-effective, and economical for large academic institutions to make thousands of works available to thousands of students and faculty.

28. In addition to the One Copy/One User model, these library ebook aggregators offer subscription-based models. Rather than setting aside funding for particular titles, these subscription models offer libraries the prospect of paying a comparatively low price for students to have unlimited access to a large volume of ebooks. While a subscription model may not be desirable in other contexts where demand may spike sharply for a given period of time, as with the release of a bestselling commercial book, the model works better in the context of lending

academic-focused works.

29. The decision of which titles to make available through a subscription model is one that is made carefully by Wiley after consideration of all the relevant factors. We are always thinking about the question: How do people want to access our titles? If the company includes certain titles as part of a subscription model, how will this serve our readers and our library partners? Three of the Works in Suit published by Wiley are available under these subscription models. (A true and correct copy of a spreadsheet reflecting which of the Works in Suit are available pursuant to one of the EBSCO or ProQuest academic subscription models is annexed hereto as Exhibit 7.)

30. Exhibit 6 provides several other examples of the potpourri of lending models offered by Wiley's aggregator partners. We offer many of our trade books under these various models. The "Concurrent User Access Model" is specifically designed to account for the frequent but brief use of titles in academic settings. Under that model, content is available for a maximum of 365 "uses" within a particular year. A use is defined to exclude a brief consultation of less than 10 minutes. Likewise, Wiley offers a number of "Short Term Loans" – ranging from one-day, seven-day, 14-day, and 28-day periods – where a library purchases access to a title for only that specific period of time, at a lower price than what one copy would cost under the One-Copy/One User model with a perpetual term.

31. Wiley generally strives to comply with the accessibility needs of the market and spends millions of dollars each year to improve and increase access and accessibility of its products and content.

### D. The Internet Archive Causes Significant Harm to Wiley and its Authors

32. The Internet Archive causes the company harm for all the reasons set forth in the declarations from our co-plaintiffs and incorporated herein. At the most fundamental level,

Internet Archive harms Wiley by failing to pay us a fee for distributing our ebooks for short-term lending. Internet Archive claims it is a library, but libraries customarily pay us a fee to engage in the short-term lending of Wiley's books. Viewed from another perspective, Wiley is also harmed because the Internet Archive's Website directly competes with our library ebook market and our consumer ebook market.[1] The Internet Archive's free, unauthorized ebooks serve the same purpose as our authorized ebooks – they can be read to use or enjoy their contents. Thus, they are capable of displacing both library and consumer ebook sales.

33. The Internet Archive also devalues Wiley's ebooks by making them broadly available for free, which is a particularly pervasive problem as digital piracy has become more prolific and sophisticated.

34. In sum, the Internet Archive disrupts our digital strategies and free-rides on our significant investments to create informative non-fiction works. By scanning print books to turn them into digital assets, it appropriates for itself the benefits of digital, without compensating the rightsholders. Wiley – not Internet Archive – should be the one to set the terms for how our ebooks are distributed, and to be compensated for those circulations.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

---

[1] While Wiley contends that the Internet Archive also harms its print book sales revenues in the commercial and library markets, its summary judgment motion is solely based on ebook sales. Wiley reserves the right to address print sales in the event of a trial in this matter.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on June 30, 2022.

_____
ALAN PAVESE