**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>      Plaintiffs,<br><br>   v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>      Defendants. | Case No. 1:20-CV-04160-JGK<br><br>**DECLARATION OF<br>CHANTAL RESTIVO-ALESSI** |

Pursuant to 28 U.S.C. § 1746, I, **CHANTAL RESTIVO-ALESSI**, declare as follows:

1. I am the Chief Digital Officer and CEO, International Foreign Language for HarperCollins Publishers LLC ("HarperCollins"). I submit this declaration in support of the motion for summary judgment filed in this action by HarperCollins and plaintiffs Hachette Book Group, Inc., John Wiley & Sons, Inc., and Penguin Random House LLC (collectively, "Plaintiffs"). This declaration is based on my personal knowledge except as otherwise stated. This action concerns the Internet Archive's free ebook website which can be accessed either through the Internet Archive's "Open Library" website, http://openlibrary.org, or the Internet Archive's general website at http://archive.org, which actually hosts the ebook files (together, "Website"). This lawsuit concerns the works in the Internet Archive's "Books to Borrow" collection – which have been scanned and uploaded by the Internet Archive rather than by third parties.

2. The Internet Archive has scanned over 7,000 printed books published by HarperCollins, and is distributing the resulting bootleg ebooks for free to anyone around the world without making any payment to us or our authors. As detailed below, the Internet Archive radically

interferes with HarperCollins' digital strategy as rightsholders and representatives of its authors. A thriving publishing industry requires enormous investments of time, money and resources to publish books. The revenues earned from all formats of a work are critical to preserving the incentives to create and publish books and to invest in new technologies, as well as the viability of our publishing business. We do not price print books with the expectation that they will serve as both print books and ebooks readily capable of free worldwide distribution. Moreover, print books and ebooks have very different characteristics. Ebooks can be reproduced and distributed instantaneously and at minimal cost. For that reason, we set different terms and conditions and pricing structures for commercial ebooks and library ebooks than for print books. In our view, Internet Archive has no right to take the benefits of the digital medium for itself without compensating the parties who own the rights and have created the works.

3.      Notably, while the Internet Archive claims to be improving the efficiency of delivering content, there is already a thriving library ebook market. After years of investments and innovation, HarperCollins has developed economically viable lending terms that impose limits on the distribution of library ebooks while promoting broad free public access to ebooks for library patrons. All new HarperCollins titles released as ebooks are available as library ebooks on the publication date. From 2017-2020, libraries licensed approximately 7.5 million copies of HarperCollins ebooks, with slightly more than 75% being older "backlist" titles. (A true and correct copy of a spreadsheet reflecting this data is annexed hereto as Exhibit 1.) Library ebook lending of HarperCollins titles has only increased since then. Moreover, our library ebooks are reasonably priced, with 26 circulations of the ebook (a rough approximation of the life span of a library print book) costing only slightly more than the suggested retail price of the corresponding print book. And prices under our Pay Per Use model, described in more detail below, are a small

fraction of the print retail price. All of this has made library ebook lending tremendously popular among these institutions and their patrons: in 2021 alone, HarperCollins made more than 63 million e-book checkouts available to patrons.

4. The Internet Archive's widespread, unauthorized distribution of thousands of our ebooks, with no payments to HarperCollins or its authors, jeopardizes this vibrant and important market as well as consumer ebook sales. As I explain below, the conduct of Internet Archive causes several types of significant economic harm to the company.

A. **Background**

5. HarperCollins, founded in 1817 in New York, is the second-largest consumer book publisher in the world. HarperCollins' current catalog of works exceeds 50,000 titles. Writing in virtually every genre, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among others. The company proudly serves as the publishing house for literary legends – including J. R. R. Tolkien, Agatha Christie, and Harper Lee – along with a myriad of important contemporary voices, including Louise Erdrich, Ann Patchett, and Angie Thomas.

6. The thirty-three Works in Suit published by HarperCollins include monumental works of fiction that have been beloved by countless readers for decades, including *Their Eyes Were Watching God* (Zora Neale Hurston), *The Lion, the Witch and the Wardrobe* (C.S. Lewis) and Sylvia Plath's *The Bell Jar*. Also included are works of contemporary fiction such as *The Miseducation of Cameron Post* (Emily M. Danforth) and mysteries, such as *Dance of the Bones* (J.A. Jance), as well as the dystopian novel *Breathe* (Sarah Crossan). Likewise, the Works in Suit include non-fiction works such as Benjamin Graham's *The Intelligent Investor*, which has been described by Warren Buffet as "the best book on investing ever written." Finally, the Works in

Suit include many imaginative children's titles, ranging from Laura Ingalls Wilder's timeless *Little House on the Prairie* and Patrick Skene Catling's lesson-filled *The Chocolate Touch*, to more contemporary titles like *Simon vs. the Homo Sapiens Agenda* (Becky Albertalli) and *Red: A Crayon's Story* (Michael Hall). All the Works in Suit are sold by HarperCollins in print and digital formats. (A true and correct copy of a spreadsheet reflecting U.S. sales for the Works in Suit is annexed hereto as Exhibit 2.) While our records do not go back beyond 1992, since that date HarperCollins has earned over $192 million in revenue from the sale of the thirty-three Works in Suit in all formats, including over $15 million in revenue from ebook sales alone.

7. HarperCollins provides its authors with editorial and production excellence, marketing reach, long-standing connections with booksellers, and industry-leading insight into consumer behavior. Our authors and their literary works are at the center of everything our company does.

8. I joined HarperCollins as Chief Digital Officer in May 2012. My role expanded to CEO, International Foreign Language in April 2015. In these roles I lead the overall global digital strategy for the company as well is its foreign language publishing program. I work with each worldwide division to manage commercial relationships with new and existing digital partners and to grow digital revenues. I also serve as a member of the company's executive committee.

9. While at HarperCollins, I have pioneered the use of new digital sales channels. I have secured numerous deals with new distributors such as subscription services Scribd and Storytel, and I have overseen an exponential growth in digital sales. I also led the launch of HarperCollins' e-commerce platform on our website HC.com and have spearheaded efforts for the company's other direct-to-consumer programs across the globe.

10. I graduated from Sapienza University of Rome in 1987 with a Bachelor's Degree

in International Political Sciences and from Columbia University in 1993 with a Master of Business Administration degree. I also hold a Masters in Foreign Trade and International Marketing from ICE Italian Institute. Before joining HarperCollins, I worked for three years at ING Bank in London, where I was Head of Media Corporate Finance. Prior to my role at ING Bank, I worked for ten years at EMI Music, one of the largest record labels in the world, where I eventually served as COO, Rest of World and Head of Music Corporate Strategy. I also have worked for Aegis Group PLC, and Booz & Company.

### B. The Lessons of the Music Piracy Made Clear That We Need to Offer Ebooks But Under Terms and Conditions to Protect our Assets

11. HarperCollins consistently has been at the forefront of innovation and technological advancement in book publishing. Indeed, much of my work as Chief Digital Officer is to ensure that HarperCollins pioneers and develops the use of digital technology to expand our audiences and innovatively delivers creative content to the public. It is my job to exploit opportunities to deliver healthy royalties for our authors and choice and ease of access to consumers.

12. Our authors grant HarperCollins the exclusive rights to distribute each title in multiple formats. The company considers hardcovers, trade paperbacks, mass-market paperbacks, ebooks, and audiobooks each to constitute a different format. Indeed, HarperCollins' publishing agreements contain royalty payment rates that differ by each format. Not only are the actual rates different, but royalties on print books are based on retail cover price, and royalties on ebooks and audiobooks are based on net receipts. It is critical that HarperCollins be compensated for the sale of each format. If that were not the case, the company would have little financial incentive to invest in the development of new book formats (or new books).

13. Over the last two decades, HarperCollins has invested tens of millions of dollars in digital publishing, developing technologies, infrastructure, licensing models and pricing structures

for ebooks in both the retail and library markets.

14.     The ebook was developed in the shadow of rampant piracy in the music industry in the late 1990s and early 2000s.  Concerns about the widespread unauthorized distribution of digital copies were front of mind when the company first began to evaluate the ebook format decades ago and have remained in the forefront of my thoughts once I joined the company in 2012.  I know this history first-hand because I worked in the record industry from 1996 to 2007.

15.     At that time, the music industry witnessed the growth and eventual dominance of file sharing sites like Napster, Limewire, and Kazaa.  Napster, for example, allowed users to search for virtually any popular song and download an unauthorized, unrestricted MP3 music file onto the user's computer for free.  The record companies had not yet developed a legitimate alternative for consumers to access digital music, and by the time the industry took legal action against the file sharing sites or took steps to create an easily accessible alternative, the pirate sites had proliferated in popularity.  Countless unauthorized MP3 files had already been uploaded and shared on the Internet with users around the world, and consumers had already internalized that there was no barrier to an unauthorized and free copy of a song.

16.     After these services were identified as copyright infringers and ordered to cease operations, the music publishing industry largely embraced authorized streaming services (Spotify is one example) as a primary means to deliver music files over the Internet.  But after allowing piracy to become rampant, the music recording industry was effectively forced to offer a subscription model as a low-priced alternative to piracy, so that consumers would not be tempted by free illegal copies.  It has been widely reported that this streaming model tends to disproportionality favor the most popular artists while less popular artists are less favored and often get mere fractions of a cent per stream.  In short, these streaming services offered an

alternative to piracy and afforded the record companies with a modicum of control, but at the expense of artist revenue.

        **C.**      **With Distinct Pricing and Terms and Conditions, HarperCollins Has Fostered a Commercially Viable and Successful Ebook Market**

     17.    Given the travails of the music industry, HarperCollins needed to develop a sustainable digital book market in which it offered affordable ebooks but with critical controls. The very nature of the digital medium dictated that distribution be reasonably limited so as not to threaten HarperCollins' overall markets. Further, the experience of the music industry taught book publishers that it was critical to fight against those illegally converting their analog works into digital files and distributing them on the internet – much as Internet Archive does today. As HarperCollins' Chief Digital Officer, fighting the distribution of unauthorized free copies of our ebooks on the Internet is one of my top concerns. There is a truism in the book publishing and music industries: paid content cannot compete with free. And the widespread availability of content for free has an enormously detrimental effect on paid content and cheapens the overall value of all formats.

     18.    While ebooks display the same text as print books and both are used by consumers for the same intrinsic purpose – namely use and enjoyment of the content via reading – there are several key differences between these two formats that inform our discrete terms and conditions and pricing for ebooks.

     19.    For one, print books are tangible objects. Critically, they need to be physically moved from place to place, costing time and money that both increase with distance. Over time, they exhibit wear and tear. For both these reasons, there is a practical limit to the number of people who are able to access a print book as a material object.

     20.    Ebooks present a number of advantages that print books cannot offer. Readers do

not need to travel to a store or library to access an ebook. Instead, they can instantly download an ebook to a device from any location and begin reading in seconds. Readers can store numerous ebooks on a single device without the burden of carrying multiple print books.

21.     That said, the characteristics of an ebook that make the format so attractive to consumers present a potential risk for both authors and publishers. Critically, an unrestricted digital file containing the text of a book can be infinitely and rapidly replicated at virtually no cost. Likewise, an unrestricted digital file can be distributed in an instant to millions of users around the world at no or minimal cost. Unlike a print book, the digital file never deteriorates and takes up no physical space. Indeed, one digital copy of an ebook file without any limitations could satisfy all ebook demand for all time for that title. For all these reasons, it was critical for HarperCollins to develop business models that set limits on the broad dissemination capabilities of an electronic file so as not to decimate its broader book markets.

22.     HarperCollins first began offering commercial ebooks in 2001 and currently considers ebooks to be one of its major formats and markets. Given the critical differences between print and digital, HarperCollins uses a different business model for the two formats. Most notably, the distribution of a commercial ebook is limited to one user account – which differs, of course, from print books, which can be shared and otherwise re-distributed. This has allowed HarperCollins to price commercial ebooks at a price that is generally lower than the comparable print book price.

23.     HarperCollins uses Digital Rights Management technology as one prong of its effort to prevent unauthorized copying and ensure limited distribution of its digital book files to one user account. Moreover, HarperCollins uses an agency model for distributing commercial ebooks, and its retained agents, such as Amazon or Barnes & Noble, impose critical terms and

conditions on those downloading commercial ebooks.  The Terms of Use set by Amazon in connection with ebooks purchased through its Kindle platform state as follows:  "Use of Kindle Content. Upon your download or access of Kindle Content and payment of any applicable fees . . ., the Content Provider grants you a non-exclusive right to view, use, and display such Kindle Content an unlimited number of times . . ., solely through a Kindle Application or as otherwise permitted as part of the Service, solely on the number of Supported Devices specified in the Kindle Store, and solely for your personal, non-commercial use.  Kindle Content is licensed, not sold, to you by the Content Provider."  Further, the Amazon Terms of Use provide under "Limitations" that the purchaser "may not sell, rent, lease, distribute, broadcast, sublicense, or otherwise assign any rights to the Kindle Content or any portion of it to any third party. . . ."  (A true and correct copy of the Amazon Kindle Store Terms of Use is annexed hereto as Exhibit 3.)

24.     While print books remain HarperCollins' largest sales format, millions of consumers have acquired our authorized ebooks – whether because they generally prefer the ebook format or wish to switch between print and digital in different situations.  While the figures have varied over time, in fiscal year 2021, ebooks constituted approximately 14% of our U.S. book revenue (not including audiobooks).  Today, HarperCollins offers virtually all new titles in its catalog in ebook format.  (The exceptions are generally books that are not well-suited to the digital realm or reprints of books originally published by other publishers for which we do not have the digital rights.)  HarperCollins has digitized reams of books that were initially published long before the advent of modern ebook technology.  And during the pandemic, the ebook market allowed us to satisfy increased consumer demand.

**D.     HarperCollins Develops a Sustainable Model to Foster Library Ebook Lending that Is Free to Patrons**

25.     HarperCollins was one of the first trade publishers to offer ebooks to libraries.  As

early as 2003, it entered into a library ebook distribution agreement with OverDrive, Inc., the first and now dominant library ebook aggregator in the market. Public libraries provide countless services to their local communities, ranging from a curated selection of books and other media geared towards the interests and needs of community members to services like free internet and community-tailored tutoring sessions. And of course they help to promote literacy.

26. Libraries pay for their books – typically from local tax revenue funds. These earnings are shared with our authors and reinvested by the company into publishing new works. In the print book market, HarperCollins, like most trade book publishers, primarily sells print books to libraries through wholesalers, such as Baker & Taylor, who in turn sell them to libraries, independent bookstores and other retailers.

27. Public libraries also provide a critical service to HarperCollins by increasing the visibility of our books and our authors through direct engagement with local patrons. For example, public libraries hold author talks, organize book clubs, create virtual and physical displays to promote certain books for different occasions, and engage in email communications directed to the local interest of library patrons. This is true for both frontlist titles and older backlist titles.

28. Since HarperCollins first entered the library ebook market in 2003, it has provided ebooks to library distributors (or "aggregators"), who in turn license them to libraries, rather than selling them outright as with print books. Licensing allows HarperCollins to set critical limits on the reproduction and distribution of digital files – which is why most media industries, including the music, movie, and television industries, use licensing for digital goods.

29. HarperCollins started with a One-Copy/One-User model, which allows multiple library patrons to check out a single copy *seriatim*. Under this model, libraries can lend HarperCollins ebooks to their patrons for a time-limited loan only on a One-Copy/One-User basis,

in a fashion that mimics how a library typically operates with a print book. Critically, a library or library consortia can lend its ebooks only to its own verified library members – generally, for a public library, the local residents with a library card or, for school and university libraries, their students and professors. For example, according to HarperCollins' agreement with leading library ebook aggregator OverDrive, only school and university libraires and "public entities that maintain a physical collection of books for lending to its registered patrons" may distribute HarperCollins ebooks to their patrons, and OverDrive must require participating Institutional Accounts to take reasonable measures to ensure that only registered and authorized patrons of their physical collections have access to the ebook collection. (A true and correct copy of the agreement between HarperCollins and OverDrive, dated September 1, 2013, is annexed hereto as Exhibit 4.) (*See id.*, Schedule C, Section B.1 and B.2; Schedule F.) This limitation on borrowers is critical. Given the ease of distributing digital books, HarperCollins needs to ensure that a small number of ebooks licensed to a few local libraries do not serve national demand. That scenario would have been impossible with a print book, but an ebook has far greater distribution capabilities. This requirement also ensures that the municipal funding each library spends on ebooks is actually dedicated to patrons in that local community. The Internet Archive seeks to evade such limitations by scanning print books and distributing them worldwide, greatly enhancing their ability to substitute for other sales.

30.     HarperCollins initially set a perpetual term for our One-Copy/One-User model. In the early 2000s, when HarperCollins' first introduced its initial library ebook lending model, ebooks were read predominantly on desktop computers and the sales across all channels were a fraction of one percent of the company's revenue. But by 2011, ebook sales had exploded, resulting in a rapid acceleration of ebook retail and library sales. A "perpetual" term was a very

long time for a product like an ebook that does not degrade, and our pricing of ebooks was not consistent with the number of readers who would read, respectively, print and ebook formats.

31.     Moreover, while HarperCollins feels strongly about supporting libraries, it is always critical to it to ensure that library pricing does not unduly impact our commercial sales. For the consumer, borrowing a free ebook from a library's website, on the one hand, or obtaining it from Amazon or other e-retailers, on the other hand, are extremely similar experiences except that one is free and one is not. "Free" books present a considerable allure.

32.     In considering how to adjust our model, the company engaged with librarians to understand purchasing preferences and how ebooks fit into the library ecosystem. After taking these considerations into account, HarperCollins introduced a revised term for its library channel model in 2011. Rather than materially raise its prices, HarperCollins adopted a One-Copy/One-User Model with a total of 26 circulations ("26-Circ Model"), which remains in effect today. Under the 26-Circ Model, a library ebook is only available for twenty-six (26) circulations. Once the twenty-six circulations are exhausted, the library can decide whether to re-order the ebook for an additional twenty-six circulations, or use their resources to buy other titles more currently in demand in their community.

33.     For many years, HarperCollins priced the 26-Circ model at the same price as the suggested retail price for print books; currently it is priced at slightly more than the suggested retail price for print books. This model is intended to be similar to the economics that govern the sale of print books that show wear and tear from usage and need to be replaced or are lost over time. At the same time this model keeps the prices down and maintains the major benefits to libraries inherent in ebooks, including ease of circulation, remote access, and no need to sort and re-shelve. Notably, the price per circulation of a library ebook under the 26-Circ Model is also far lower than

the price of a commercial ebook.  Again, the Internet Archive interferes with these metering limits in our library ebook model by copying print books and distributing them for unlimited numbers of circulations.

34.     While librarians have a wide range of opinions on library ebook lending models, the 26-Circ Model presents important advantages to libraries while protecting interests we share with our authors.  Libraries tend to have significant patron demand for popular new books and order many copies in multiple formats.  Demand from library patrons for some of those titles, however, tends to decline over time – although other books remain of steady interest.  The 26-Circ Model allows libraries to calibrate the use of their public funding based on current demand spending more only where demand is highest.

35.     Libraries have embraced the 26-Circ Model.  For example, the 26-Circ Model generated just over $3.45 million in revenue for us in fiscal year 2014; by fiscal year 2019, the model generated over $9.95 million.  (A true and correct copy of a spreadsheet reflecting this data is annexed hereto as Exhibit 5.)

36.     In 2017, HarperCollins was the first major trade publisher to adopt an additional library distribution model to supplement its 26-Circ Model:  the Pay-Per-Use model ("PPU Model").  The PPU Model allows a library to license the right to a single circulation of an ebook for a fraction of the price of an ebook license under the 26-circ model.  Under this model, libraries offer their patrons an opportunity to borrow an ebook from our catalog and pay a fee for a single, individual use only when a particular title is checked out by a patron.  Currently, all HarperCollins titles qualify for the PPU Model twelve months after the initial publication date, although libraries retain the option to obtain these backlist titles under the 26-Circ Model as well.

37.     The PPU Model addresses two specific needs in the library channel.  First, smaller

libraries with few members that are less likely to fully exhaust all twenty-six circulations in the standard model can access a far broader catalog for their patrons and manage their budgets on a month-to-month basis.  Second, larger libraries that have focused on widely read titles can provide their patrons with access to a much broader selection of books at a lower cost:  if only a few members of a public library are interested a book with an esoteric subject, the library can obtain ebook copies for that handful of individuals at a price point far lower than the 26-Circ Model. Since the introduction of the PPU Model, HarperCollins has encouraged all its library ebook aggregators to adopt this model.

38.     The PPU Model has exploded in popularity over the last several years.  In fiscal year 2018, just after it was introduced, the model generated $154,789 in revenue for the company. By fiscal year 2020, HarperCollins earned over $2 million in revenue from library ebook checkouts via the PPU Model.  (*See* Exhibit 5.)

39.     In sum, the 26-Circ and PPU Models have been tremendously successful and have resulted in patrons accessing tens of millions of ebooks for free, with ease.  Between 2017 and 2020, HarperCollins licensed approximately 7.5 million ebook units to libraries.  (Under the 26-Circ Model, HarperCollins calculates one unit for each time a library purchases a 26-Circ license (not for each successive checkout); under the PPU Model, one unit is calculated each time a library purchases a license to lend out a title one time.)  The number of units sold increased dramatically over those years and continues to do so.

40.     Further, HarperCollins has continued to experiment with new lending models.  In fiscal year 2018, HarperCollins began making ebooks for select academic titles available for licensing by academic libraries on a perpetual basis.  Academic libraries highly prioritize the building of long-term collections.

41.     During the COVID-19 pandemic, HarperCollins has taken significant steps to ensure that we adapted to the needs of readers and libraries, once again demonstrating a willingness to experiment to meet an evolving library ebook market.  In an effort to help libraries maximize federal funding provided under the American Rescue Plan Act, the company temporarily instituted a prorated, time-metered model, which allowed libraries to spend time-limited ARPA funding on HarperCollins ebooks.  At the outset of the pandemic, the company also significantly reduced prices on approximately 1,000 popular backlist trade and children's ebook titles for several months.  Further, the company expanded the titles in the PPU model.  While the PPU Model had previously been confined to books published more than eighteen months ago, the company temporarily moved up the time frame for frontlist books to enter the PPU Model to six months post publication.  Additionally, from the earliest days of the pandemic, HarperCollins has extended permission to authors, educators, and librarians to read the company's titles online and on video.

42.     While HarperCollins has invested to develop the ebook and library ebook market, so too have library ebook aggregators.  These aggregators make the experience of checking out a library ebook seamless and easy.  For example, once patrons download OverDrive's Libby app and enter details from their library card, access is granted to their local library's entire ebook holdings.  A user can open Libby, search for a title, and access the title from anywhere through the Libby app in mere seconds.  The ebook can be downloaded onto any Internet connected device, and from any location.

43.     Aggregators also provide libraries with a dedicated platform to license ebooks, manage their digital collections, and manage the lending and return of ebooks from patrons, which relieves libraries of dedicating staff time to these administrative tasks.  Finally, aggregators provide a service to HarperCollins and its authors by enforcing the terms of the library ebook licenses and

implementing price and lending model changes in a seamless fashion.

44. Currently HarperCollins works with nearly a dozen library ebook aggregators in the United States. Some of these aggregators focus on particular libraries (e.g., academic libraries) or on a particular distribution model (i.e., the PPU model), but all service the library market.

45. The Internet Archive makes an end-run around all of the ebook licensing terms reviewed above by scanning print books and distributing them worldwide without any metering limit and without paying the customary fees associated with authorized ebook licenses.

**E. The Library Ebook Market is Thriving and Provides Access to Instant, Free Ebooks to Tens of Millions of Americans**

46. While revenues from our print book sales to libraries exceed our library ebook revenues, the library ebook market has become a core part of our business. While it is relatively new and continues to develop, after a decade or so of striking growth, the library ebook market is currently a well-established market.

47. With its investments in the ebook format and its partnership with library ebook aggregators, HarperCollins has helped drive a dramatic industry-wide increase in free, authorized ebooks that are available to library patrons throughout the United States. Our figures for library ebooks licensed through OverDrive, Hoopla and Bibilo show a sharp rise in the popularity of library ebooks, even before the impact of COVID. In 2017, we licensed 757,097 units. In 2018, we licensed 1,075,189 units. In 2019, we licensed 1,631,705 units. In 2020, we licensed 4,027,465 units. (*See* Exhibit 1.)

48. HarperCollins earned $46.91 million in revenue from ebooks in the United States library market between 2015 and 2020, revenues that are shared with our authors. Library ebook licenses make up a growing and significant portion of HarperCollins' overall ebook revenue. In fiscal year 2015, library ebook licenses in the United States constituted 2.3% of HarperCollins'

total U.S. ebook revenue. By fiscal year 2020, that share grew substantially to 7.4% and reached 12.9% of all U.S. ebook revenue by mid-2021. (HarperCollins' fiscal year ends June 30.) Indeed, as of mid-2021, HarperCollins earned over $19 million in revenue from library ebook licenses in the United States, which was nearly twice as much revenue as we earned from library ebook licenses in the United States during FY 2020. (*See* Exhibit 5.)

49.     The thirty-three Works in Suit published by HarperCollins are all available as library ebooks and have been acquired as ebooks for lending by libraries, via library aggregators, pursuant to the lending models I explained above. (A true and correct copy of a spreadsheet reflecting sales to libraries in all formats for the Works in Suit between 2017 and 2020 is annexed hereto as Exhibit 6.) Between 2017 and 2020, the thirty-three Works in Suit published by HarperCollins generated over $768,000 in revenue from the license of library ebooks alone.

50.     The thriving nature of the library ebook market is perhaps best illustrated by the numbers of Americans reading ebooks free from the library, as compared with the number of Americans purchasing an ebook. In 2021, through its 26-Circ and PPU models, HarperCollins made over 63 million ebook checkouts available to library patrons through its library ebook sales,[1] exceeding retail ebook sales by more than 30 million. While HarperCollins thus made far more "reads" available through library ebook sales than through retail sales, library ebook revenue accounted for 10-15% of HarperCollins' ebook revenue in 2021. These figures starkly illustrate the balance that HarperCollins has achieved by making free, authorized ebooks widely available to all Americans, while still ensuring that authors are fairly compensated for creating new works.

51.     Finally, to support readers who are visually impaired, HarperCollins was among the earliest publishers to support Bookshare.org in its mission to provide the world's largest

---

[1] This figure reflects all potential check-outs under the 26-Circ model, not actual check-outs.

accessible online library for people with disabilities. Bookshare is free for all qualified U.S. students. Individuals who are not students or international patrons can pay a nominal annual fee for their membership. Bookshare makes content available through a range of assistive technologies (e.g., braille readers, text to speech and ebooks). If a reader requested title is print exclusive or has never yet been available in ebook format, HarperCollins either provides a PDF of the title to the reader or, if no PDF is available, makes other arrangements to enable access.

52.     For the general population who don't access content through Bookshare, HarperCollins produces ebooks with the typical features of type resizing, page magnification, and screen contrast so readers can adjust the text to their preference. In addition, HarperCollins enables text-to-speech functionality on our ebooks that are sold through major retailers such as Amazon. And we are in the progress of updating our catalog to comply with the emerging standards for accessible ebooks, using the Web Content Accessibility Standards ("WCAG") that are being advanced by the World Wide Web Consortium (W3C). HarperCollins has been an active member of the ebook trade organizations – the W3C and its predecessor the International Digital Publishing Form ("IDPF") – that are driving the push to make all content accessible.

**F.     HarperCollins' Significant Investments Allow Authors to Create Books**

53.     The Internet Archive's scanning of millions of print books and distribution of the resulting ebooks for free to any user around the world fundamentally interferes with the critical incentives that encourage authors to write books and publishers like HarperCollins to invest in publishing and distributing them. At its core, it is based on the false premise that once a physical book or other creative work is sold, the author and publisher's right to obtain revenue from its digitization is extinguished, and they have no right to collect additional revenues for licensing the work in a digital format, or to control the related terms and conditions of its license. This is a radical premise in any media industry – whether books, film, television or music. Moreover, by

scanning print books to turn them into digital books, Internet Archive misappropriates the value of the digital format for itself.

54. As I have witnessed, authors are required to make enormous creative investments to write and must be compensated for those efforts in order to incentive their continued investments. Works of fiction require an author to develop a story with a distinctive narrative voice and style. Nonfiction books require an author to investigate, research or explore their personal experiences to create a work that illuminates the human experience. Writing a book is extremely time-consuming, frequently taking a year or longer to complete. Authors frequently give up other professional responsibilities to devote adequate time to their writing.

55. Like its authors, HarperCollins must be compensated in order to be incentivized to make its investments of time, money and labor, which are extensive. HarperCollins incurs the same general types of costs set forth below and recounted in the Declaration of Ben Sevier of Hachette at paragraphs 13-30, which I will incorporate by reference and not repeat here. First, HarperCollins exclusively bears the upfront costs to get a book published, with no guarantee that it will recoup those costs. This includes paying the author a non-refundable advance against future royalties before the book is published. Advance payments are critical to the livelihood of authors, because they allow writers to earn income while the book is being researched and written. In short, HarperCollins assumes the significant and genuine financial risk of commercial failure for each book that it publishes.

56. HarperCollins also provides authors with professional editorial, production and marketing services. The company employs hundreds of editors, art department employees, and design professionals. HarperCollins' marketing department engages in a wide array of promotional activities, including social media campaigns, website development, trade and

consumer advertising, distribution of promotional copies to reviewers and influential readers prior to the publication date, in-store displays, author tours, media appearances, and other promotional placements. HarperCollins invests in marketing resources not only on initial publication, but over the course of the life cycle of each title – including for its perennial bestselling backlist books. Separately, HarperCollins employs sales professionals dedicated to each of the various channels that HarperCollins serves, including retail outlets, wholesale sellers, and public libraries. Sales professionals are our experts and points of contact with each channel and they both manage relationships with our customers and help us set prices and terms strategically. HarperCollins also incurs substantial expenses related to the costs of production (including paper, printing and binding for print books), warehouse and inventory management, and shipping.

57.     In exchange for all our investments in their works, authors typically assign to HarperCollins in their publishing agreement the exclusive rights to publish their new books in print, ebook, and audiobook within a defined geographical area. Both the author's and our own financial ability to continue publishing books depends on our ability to have exclusive rights over print and digital formats. The company naturally seeks to recoup its investments and to make a profit, while sharing with the author the revenues generated by each title. HarperCollins also continually reinvests its earnings to fund the creation of new works. Our ability to rely on the fact that we hold exclusive rights, that we can charge separately for each format, and that we can control the terms and conditions of our digital sales is a critical incentive to our investments.

58.     In sum, HarperCollins makes tremendous investments in its authors that can last decades while ensuring that the company and its authors are fairly compensated. This model is premised on our and our authors' ability to enforce the exclusive rights granted them in the Copyright Act, including the creation of a derivative digital work.

### G. Revenue from Backlist Books Sustains HarperCollins' Ability to Invest in Authors

59.     The Internet Archive purports to limit its unauthorized distribution of ebooks to works initially published more than five years ago. This hardly excuses its conduct given the economic realities of publishing – especially our enormous reliance on steady-selling older books to fund our more risky publication of new books, which do not have predicable sales.

60.     HarperCollins defines a "backlist" book to be one that has been published for more than a year. (By contrast, "frontlist" books are ones that have been published for less than one year.) While this is the formal definition, most of our bestselling backlist books have been published for far more than one year, and many were first published over a decade ago. Outstanding books may remain popular indefinitely – or have a resurgence in popularity at a later date. In our view, one of our key obligations to our authors is to promote and maximize the sale of their backlist titles.

61.     Backlist book sales make up more than 60% of the company's annual print unit sales from adult and children's titles. Backlist books in all formats constitute a considerable portion of HarperCollins' sales revenue in both the library and retail markets. For example, between 2017 and 2020, the number of backlist library ebook units sold vastly exceeded the number of frontlist library ebook units sold. More specifically, in 2020, HarperCollins sold approximately 700,000 frontlist units versus 3.3. million backlist units. (*See* Exhibit 1.) Thus, revenue from backlist book titles is crucially important to HarperCollins.

62.     HarperCollins has continued to invest in new ways to fully capture the value of its robust backlist catalog. Both e-commerce platforms and ebooks have enabled us to more broadly promote and profit from our backlists, as compared to the days when brick and mortar bookstores could stock only a limited number of titles.

63.     While HarperCollins maintains a valuable collection of backlist books, its steady perennial sellers are particularly important. These books – which are often years or decades old – have either become "classics" or are otherwise well-known, highly regarded titles. These are the books that provide HarperCollins with the ability to invest so robustly into the creation of new titles. A review of the sales revenues for the Works in Suit quickly demonstrates our reliance on books published more than five years ago for substantial revenue. (*See* Exhibit 2.)

64.     For example, the timeless C. S. Lewis classic "*The Lion, the Witch and the Wardrobe (The Chronicles of Narnia)*," one of the Works in Suit, was first published in 1950. Over the course of the last 72 years, the book has been named to TIME Magazine's 100 Best Young-Adult Books of All Time and 100 best English-language novels published since 1923. It has been adapted for television, the stage, and as a major theatrical film by Walt Disney Pictures in 2005 (which was followed by two more films adapting books in the Narnia series). Since 1950, sales from the title have generated HarperCollins over $47.5 million. (*See id.*)

65.     Another Work in Suit, Zora Neale Hurston's "*Their Eyes Were Watching God*," a classic of the Harlem Renaissance and Hurston's best-known work, was originally published in 1937. Between 1992 and 2020, HarperCollins sold more than five million copies of the title, earning the company over $38 million in net sales. (*See* Exhibit 2.) The classic "Little House in the Big Woods," published in 1932 as the first book in the "Little House" series, earned HarperCollins over $7 million in net sales between 1992 and 2020. (*See id.*)

66.     A backlist title does not have to be many decades old to generate extraordinary revenue for the company. For example, one of the Works in Suit is "*Big Nate Goes for Broke*" by Lincoln Pierce, which is the fourth book in the popular Big Nate series. The book was published in 2012, and since then, through 2020, the title has sold nearly 800,000 copies to generate over

well over $3 million in net sales for the company and the author. (*See id.*)

67.     It is also common for works to have substantially increased sales many years after initial publication for a variety of reasons, including because the author published another work that "broke out" or because the original title has been adapted as a movie or television program. The commercial potential of a particular book cannot possibly be known after five years, Internet Archive's inclusion date.

68.     These examples underscore why it is so important for HarperCollins to maintain control over its backlist books. The revenue that HarperCollins earns from backlist titles provides essential financial stability to the company and the ability to invest in the next generation of authors in the creation of new works. The company has always focused on backlist titles, but the availability of e-commerce platforms and the development of ebook markets has provided HarperCollins with even more opportunities to expand the reach of its rich backlist catalog. Exposing consumers to that catalog is a core part of HarperCollins' purpose as a publisher.

### H.     **Internet Archive Harms HarperCollins and its Authors**

69.     The Internet Archive's unlicensed and unpaid distributions of our ebooks to worldwide users for free directly harms us. These harms can be conceived in several ways.

70.     **Lost Customary Fee from Internet Archive:** HarperCollins is directly harmed by Internet Archive's unauthorized distribution of our titles because it fails to pay the company the fees customarily paid by libraries engaged in short-term loans of ebooks. As reviewed above, when a library obtains an ebook for lending to its patrons, HarperCollins is paid a fee. There is a well-established market where libraries pay library ebook aggregators, who in turn pay publishers, to provide short term loans of ebooks to their patrons. The Internet Archive brands itself a "non-profit library." (*See* https://archive.org.) The Internet Archive has distributed each of the 33 HarperCollins Works in Suit without payment to us. By failing to pay us this revenue, Internet

Archive has caused financial harm to HarperCollins.

71. While this lawsuit focuses on the Works in Suit, Internet Archive's practices are already widespread with respect to our entire catalog, and thus their failure to pay us a customarily paid fee for short term ebook lending causes us substantial financial harm. I understand (from having reviewed the relevant paragraphs of Ian Foster's declaration) that Internet Archive distributes over 7,000 titles published by HarperCollins, which constitutes approximately 37% of the titles currently published by HarperCollins in print and digital form. (*See* July 7, 2022 Declaration of Ian Foster ("Foster Decl.") ¶117 and Table 1.) He indicates that the percentage is even higher if one looks at books initially published more than five years ago, which the Internet Archive claims is its prime focus; for these books, the Internet Archive is distributing free ebooks for over half (namely 54.6%) of our titles published in print and digital form. Internet Archive has failed to pay us the fee customarily paid by libraries engaged in Short Term Ebook Lending for each of these titles. The Plaintiffs' lost fees are highly significant in monetary terms, since it would cost Internet Archive millions of dollars to license authorized library versions of the Works in Suit and the Plaintiff Publishers' 33,000 other titles that currently reside on the Internet Archive for national, unlimited distribution without a metering limit.

72. I understand from Foster's declaration that both the number of scans of our titles being distributed by the Internet Archive, and the number of its members and borrows has grown rapidly, including since we filed suit in 2020. (*See* Foster Decl. ¶¶18, 118, and Figure 12; Declaration of Elizabeth A. McNamara ("McNamara Decl.") ¶¶1-2.)

73. In short, by scanning the Works in Suit and our other print books, the Internet Archive has both taken for itself the greater benefits of the digital medium and avoided paying the separate fee charged by book publishers for each separate format, namely the separate fee for

digital books with all their benefits.

74.     Finally, more broadly, it is basic common sense that if third parties can obtain and distribute our ebooks for Short Term Ebook Lending without paying us the fees customarily paid, that will damage our ability to collect future fees in this well-established market.

75.     **Lost Library Ebook Sales**: Viewed from another angle, Internet Archive has harmed HarperCollins' library ebook sales, leading to lost sales revenues.  Internet Archive provides libraries with an attractive free alternative to licensing authorized ebooks.  It is obvious from simply viewing the Internet Archive's Website and the OverDrive website side-by-side that Internet Archive operates as a competitor to the authorized library ebook aggregators, since both perform a highly similar function, namely providing short term ebook lending to users.  The key difference, of course, is that HarperCollins and its authors are compensated for authorized ebooks. Moreover, by creating ebooks through the scanning of print books, the Internet Archive interferes with our comprehensive digital strategy by allowing public and academic libraries to evade the reasonable licensing restrictions that HarperCollins has devised for the library ebook market.  For example, in contrast to the licensing limitations imposed by HarperCollins, Internet Archive users around the country can check out the ebooks from Internet Archive without regard for whether they are tax-paying residents of a given library community, and the Internet Archive distributes its ebooks without a limiting term or number of circulations.

76.     To fully understand the impact of the Internet Archive on publishers it is important to understand the Internet Archive's "Open Libraries" program with "partner libraries" contributing to the Internet Archive's lending count, described in the McNamara Declaration at ¶¶62-76.   That declaration indicates that the Internet Archive's current version of "Controlled Digital Lending" no longer envisions that the maximum number of ebooks that it will loan does

not exceed the number of physical copies in its *own* collection. Instead, the declaration explains that the Internet Archive has become a centralized hub, which counts as available for lending in digital form millions of copies of print books located in libraries scattered across the country. Further, when a library puts a link on its website sending its local patrons to the Internet Archive, as Internet Archive suggests, its local patrons would have the ability to borrow from a collection of far more ebooks of that title than its own local library's collection. (*See* McNamara Decl. ¶¶68, 103.) Once patrons have been routed to the Internet Archive, demand for library ebooks is sure to decline. In our experience, libraries are sensitive to patron demand and prone to order fewer copies of an ebook if their patrons do not seek it.

77. Upon information and belief, through the Open Libraries program, the Internet Archive has added two million additional copies of its existing titles. (*See id.* at ¶72.) For example, I understand that through the Open Libraries program, the Internet Archive has increased by approximately 39 the number of copies of *The Lion, the Witch and the Wardrobe* available for lending and has increased by approximately 37 the number of copies of *Their Eyes Were Watching God* available for lending. (*See* Foster Decl. Exhibit 5A.) With a greater number of copies to circulate, the Internet Archive's harm to HarperCollins increases.

78. I have been made aware of the following examples in which the Internet Archive advises libraries that they need not spend money on authorized ebooks because their patrons can instead access ebook titles on the Internet Archive's Website and/or use their print copies to leverage them into digital copies. The expert report of Internet Archive's own expert Susan Hildreth states that "Controlled Digital Lending" allows libraries to "leverage their existing physical collection" by using these assets as ebooks. (A true and correct copy of Section II of the Expert Report of Susan H. Hildreth is annexed hereto as Exhibit 7.) (*See id.* at ¶11.) The Internet

Archive's short form click-through agreement with its Open Libraries partners explicitly states: "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own." (A true and correct copy of the agreement to participate in Open Libraries is annexed hereto as Exhibit 8.) In presentations to libraries, Internet Archive has explained that its model "***ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format***." (A true and correct copy of Internet Archive's presentation to the Library Leaders Forum is annexed hereto as Exhibit 9 (emphasis added).) As yet another example, in a document titled "**Maximizing institutional investment in print resources through controlled digital lending,**" Internet Archive pithily summarizes its program as ***"Or, You Don't Have To Buy It Again."*** (A true and correct copy of this document is annexed hereto as Exhibit 10 (emphasis added).) This is exactly the harm to us. In short, the Plaintiff publishers experience lost library ebook sales as a result of the Internet Archive when libraries do not "purchase the same content again" in a different format and instead make use of an ebook created from a scanned print book posted on the Internet Archive's Website. When that occurs, we are deprived of the revenue due for each format. Critically, the loss is greater than any one library's decision not to purchase a given title in ebook form because the Internet Archive acts as a central hub pooling and lending all the copies contributed by itself and its partner libraries.

79. Further, if Internet Archive's conduct continues unrestricted or other similar websites spring up, their collective impact on HarperCollins' library ebook sales would be even more substantial. As indicated above, Internet Archive or similar websites could act as a central hub, lending digital books anywhere in the country based on hundreds of libraries somewhere having a print copy of a book that is not being currently borrowed. There are many millions of print books housed in libraries scattered nationwide. These are books that have been priced and

sold based on the assumption that they are material objects with limited distribution capabilities. If the Internet Archive or its equivalents were able to act as a centralized hub using all those now-dispersed physical books to leverage them into digital books that can be distributed worldwide in seconds at minimal cost, with none of the licensing limitations imposed by our library ebook licenses, our library ebook market for backlist books will be radically diminished if not destroyed.

80.     **<u>Lost Commercial Ebook Sales</u>**:   The Internet Archive also competes with commercial retailers that sell HarperCollins' ebooks.  A consumer who wishes to read a title can read the ebook for free from the Internet Archive, rather than purchasing the ebook from Amazon, B&N.com or any of our other e-vendors.  As noted above, in our experience "free" is an insurmountable competitor.  Therefore, the Internet Archive has a substantial potential impact on our consumer ebooks sales revenue (and likely has already diminished our ebook sales revenue). Moreover, unlike in the music industry where consumers tend to listen to songs over and over again, I believe that in most instances adults do not read trade books repeatedly.  For example, someone who reads the Internet Archive's copy of *Night Watch*, a fantasy novel by bestselling author Terry Pratchett, or *Defiance*, a gripping story of the largest armed rescue operation of Jews by Jews in World War II (both Works in Suit), and knows the ending of those books, is unlikely to read it, check it out of a library, or buy it again.

81.     The potential material harm to our ebook sales from a free unauthorized copy is likewise born out through my professional experience in supervising our efforts against book piracy.  As HarperCollins' Chief Digital Officer, I believe that book piracy – namely the distribution of free unauthorized digital copies of our books from internet websites – leads to lost sales revenue, and that anti-piracy protections increase our sales by reducing such piracy.  It is based on that conviction that we employ anti-piracy vendors to send takedown notices and

delisting requests to search engines, as well as engaging in other efforts to combat such free unauthorized digital distribution of our works.  Further, if there were widespread and unrestricted adoption of the conduct practiced by the Internet Archive, including if its practices are held to be legal, that would inevitably lead to a greater supply of copies of each backlist title available for free loan with no waitlists, posing a dire threat to our commercial ebook market.[2]

82.    **Devaluing Our Products**:    Additionally, Internet Archive's creation of unauthorized digital copies of HarperCollins books has devalued our company's products.  As I witnessed in the music industry, the broad availability of a song for free from unauthorized sources makes it very difficult to convince consumers to pay a fair fee for the song.  In the music context, this harmed the industry, where most music is now sold through subscription services which pay minimal royalties to creators, far lower than in earlier times.  In the same vein, while currently at a lower scale, the Internet Archive has cheapened HarperCollins' ebooks by making them easily available as a free substitute.  Once again, this concern will only mushroom if the Internet Archive's conduct were to scale up or become widespread as others embraced its practices.

83.    **Inadequate Protection of Our Intellectual Property**:    Finally, the Internet Archive has exposed HarperCollins to the risk of the inadequate protection of our intellectual property.  Recognizing this, HarperCollins has tried for years to put a stop to Internet Archive's scheme.  In 2018, counsel for HarperCollins sent Internet Archive a letter "demand[ing] that you immediately disable the 'Borrow eBook' function for our books still under copyright."  (A true and correct copy of that correspondence is annexed hereto as Exhibit 11.)  After Internet Archive failed to comply with this cease and desist letter, HarperCollins was forced to have its anti-piracy

---

[2] While HarperCollins contends that the Internet Archive also harms its print book sales revenues in the commercial and library markets, its summary judgment motion is solely based on ebook sales.  HarperCollins reserves the right to address print sales in the event of a trial in this matter.

vendor send takedown notices to Internet Archive for hundreds of links to in-copyright works on the Website, to no or little avail. Despite these notices, Internet Archive has continued to upload and make thousands of HarperCollins works available for lending. Indeed, as the Foster Declaration documents, after the complaint was filed in this action, Internet Archive added 4,171 additional scans of HarperCollins titles to its Website. (*See* Foster Decl. Figure 12.) Further, the Foster Declaration is replete with examples in which the Internet Archive has made metadata errors or other mistakes with wide-ranging ramifications. (*See* Foster Decl. ¶¶ 86-95.) While we do not believe that the Internet Archive's reliance on "Controlled Digital Lending" provides any defense, its failures to actually abide by those principles further harms our intellectual property.

84. In conclusion, the Internet Archive of today inflicts harm on us, but that harm will be exponentially greater and threaten our library ebook market and incentives to invest if it were allowed to scale up or its practices were to become widespread.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on July 1, 2022.

CHANTAL RESTIVO-ALESSI