**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>                            Plaintiffs,<br><br>       v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>                            Defendants. | Case No. 1:20-CV-04160-JGK<br><br>**<u>DECLARATION OF<br>JEFFREY WEBER</u>** |

Pursuant to 28 U.S.C. § 1746, I, **JEFFREY WEBER**, declare as follows:

1.      I am the Senior Vice President, Online and Digital Sales, for Penguin Random House LLC ("PRH"). I submit this declaration in support of the motion for summary judgment filed in this action by PRH and plaintiffs Hachette Book Group. Inc., HarperCollins Publishers LLC, and John Wiley & Sons, Inc. (collectively, "Plaintiffs"). This declaration is based on my personal knowledge except as stated herein. This action concerns the Internet Archive's free ebook website ("Website"), which can be accessed either through the Internet Archive's "Open Library" website, http://openlibrary.org, or the Internet Archive's general website at http://archive.org, which actually hosts the digital files. This lawsuit concerns the works in the Internet Archive's "Books to Borrow" collection – which have been scanned and uploaded by the Internet Archive rather than third parties.

### A.     Background

2.     PRH is a publishing company that represents more than 70,000 authors.  Its history stretches back to the mid-nineteenth century founding of several venerable imprints – including Putnam (1838, publisher of Edgar Allan Poe), Dutton (1852, publisher of H.G. Wells and Gore Vidal) and Frederick Warne & Co. (1865, publisher of the Beatrix Potter books).  In 1936, Random House, Inc. ("Random House") published the first authorized edition of James Joyce's *Ulysses* in the English-speaking world.  Today, the global PRH portfolio contains more than 275 independent imprints, which annually publish approximately 15,000 fiction and non-fiction books for readers of all ages and tastes.  Each year, PRH sells roughly 800 million books across print, audiobook and ebook formats.

3.     I joined Random House in 2001 as a Sales Assistant.  After advancing through a series of marketing and sales roles, I became Random House's Director, Digital Sales in 2010.  One year later, I was promoted to Vice President, Director, Online & Digital Sales, which is a position that I maintained after Random House merged with Penguin Publishing Group in 2012 to form PRH.  I was promoted to Senior Vice President, Online and Digital Sales in January 2018 and have held that position ever since.

4.     In my current role, I have three primary areas of responsibility.  I am the main point person for online accounts – which encompasses platforms like Amazon, Apple, Google, or Kobo that sell PRH books online in any format, including physical books, ebooks and audiobooks.  I also oversee a metadata and advertising group, which handles things like search engine optimization and paying for advertisements on retailer sites.  And my third main area of responsibility is running an online-and-digital-focused business development group.  In this

capacity, I oversee the creation and adoption of new terms (including for library ebooks) as well as onboarding new accounts.

**B.     The Library Ebook Market Is Well-Established and Continues to Evolve**

5.      There has been an explosion in both the popularity and diversity of digital distribution channels for books within the last twenty years, which I have experienced firsthand during my time at PRH.  First, the sales of physical books via online retailers started to grow exponentially in the 1990s and continued to increase as more of the population participated in online shopping.  Then came the rise of retail ebooks in the early to mid-2000s, which by 2020 represented somewhere between 12 and 15% of the book market.  And then, only within the last ten years, there has been a massive growth in the market for library eBooks (*i.e.*, lendable ebook files licensed by libraries for a fee).

6.      Despite its relative newness, the data clearly shows that the market for lendable ebook files has already established itself as an important and growing channel for distributing PRH content and one that is serving the needs of many Americans.  An analysis performed by PRH showed that for titles published or distributed by PRH that were first published between January 2017 and August 2019, library patrons checked out the PRH ebooks a total of 34.3 million times using OverDrive, the predominant library ebook aggregator platform.  These checkouts constituted 39% of  all ebook "reads" for these titles, including commercial ebooks purchased from Amazon and other retail platforms.  (A true and correct copy of a document reflecting the data from this analysis is annexed hereto as Exhibit 1.)  Which means that, of all the Americans reading PRH ebooks released during this nearly three-year period, 39% obtained the ebook for free from a library.  Indeed, this percentage is likely even higher, since PRH distributes library ebooks through other library ebook aggregators in addition to OverDrive.  Moreover, the 39% percent of ebook

reads from library patrons accounted for only 25% of PRH's total ebook revenue for that same time period, with the remaining approximately 75% of ebook revenue coming from consumers that purchased their ebooks. This ratio demonstrates the support that PRH has provided to the library community and its patrons in the ebooks arena.

7.     PRH has increased its commitment to library ebook lending as demand for library ebooks has surged. When Random House started distributing ebooks through OverDrive in August of 2010, it made its then entire ebook catalogue -- approximately 12,000 titles – available through that channel. After the merger between Random House and Penguin, the complete ebook catalogue from both publishers was made available through OverDrive, which was more than 50,000 titles in 2015 and today is 70,000 titles. And, as a matter of practice, the lendable library ebook format and the consumer ebook format of any given title are released simultaneously.

8.     PRH also has seen significant revenue growth as library ebooks have become more popular. In 2010, for instance, PRH earned over $5 million from U.S. digital library sales, which includes both ebooks and digital audio. By 2020, that figure had grown more than fifteen-fold to over $83 million. (A true and correct copy of a spreadsheet produced by PRH containing this data is annexed hereto as Exhibit 2.)

9.     The money generated from ebook licenses provides authors with a return on investment for their work in the form of royalty payments and generates significant revenue that PRH uses to invest in new authors, new books and new distribution and format technologies.

10.     The growth of ebooks licensed to libraries is not limited to PRH, but rather is a phenomenon felt across the entire book publishing industry. I understand that the total number of library ebook checkouts via OverDrive, for example, increased by approximately ████ in a decade. I further understand, as reflected in the Declaration of Elizabeth A. McNamara

("McNamara Decl."), that during that same time period, the number of ebook titles loaned to patrons jumped by a magnitude of over eleven. Today, according to the American Library Association, more than 93% of libraries in the United States lend ebooks to their patrons. (A true and correct copy of an August 31, 2021 article published by the American Library Association, titled "National survey finds libraries play expanded role in digital equity, bridging gaps in access to technology," is annexed hereto as Exhibit 3.) And in 2020, more than 100 public library systems exceeded one million digital checkouts via OverDrive alone. (A true and correct copy of a press release issued by OverDrive on January 7, 2021 titled "33% Growth for Digital Books from Public Libraries and Schools in 2020 Sets Records" is annexed hereto as Exhibit 4.)

11. Library ebooks serve many constituents but are particularly helpful to patrons who find it difficult to visit physical libraries – including busy professionals, those in rural areas with limited branches, or the disabled. The benefits of library ebooks are being felt strongly in rural areas. The biggest growth in ebook adoption between 2014 and 2018, for instance, was "among rural libraries (14 percent) compared to other locales (between 1 and 8 percent) and was larger for libraries serving small populations (19 percent) compared to other population size groups (between 4 and 9 percent)."[1] A "library system" in many rural states actually covers the entire state, which allows local branches within the system with limited resources to pool their resources by licensing

---

[1] "The Use and Cost of Public Library Materials: Trends Before the COVID-19 Pandemic," Institute of Museum and Library Services (Jan. 2021), https://www.imls.gov/sites/default/files/2021-02/pls_fy18_research_brief.pdf.

ebooks collectively and making them available to patrons anywhere in the state, no matter how far away they might be from a brick-and-mortar branch.[2]

12.    Even in non-rural areas, library ebooks often are purchased by library consortia which offers efficiencies beyond simply resource pooling.  The automatic check out and check in functions offered by aggregators like OverDrive eliminate the time consuming and costly processes involved with interlibrary loans of physical books shared between branches.

13.    As PRH learns more about the economics of library ebook lending and its effects on the broader publishing market, it continues to develop new terms and technologies for its library ebook products (as discussed in greater detail below).  PRH also has endeavored to respond to the needs and concerns of libraries whenever it makes decisions affecting library ebooks.  To this end, Skip Dye, PRH's Senior Vice President of Library Sales and Digital Strategy regularly consults with librarians, library directors, state librarians, and ALA leaders, staying abreast of developments in that industry.

14.    To recap: in ten years, library ebook lending has grown into a vibrant, well-established market for ebooks.  In that short time, library ebook lending has experienced  massive growth in every meaningful dimension – including the number of titles available to libraries, the volume of free ebooks checked out by readers and the amount of revenue generated for rightsholders.  PRH investment into the development and distribution of the lendable library ebook

---

[2] Idaho Digital Consortium, "Home Page." (https://idahodigital.overdrive.com/, viewed on April 28, 2022), (Idaho); Library2Go, "Digital Media" (https://ndlibrary2go.overdrive.com/, viewed on April 28, 2022), (North Dakota); OK Virtual Library, "Home Page." (https://okvirtuallibrary.overdrive.com/, viewed on April 28, 2022), (Oklahoma); Mississippi eBook Consortium, "Home Page." (https://mlpebooks.overdrive.com/, viewed on April 28, 2022), (Mississippi).

format has contributed to the growth in this distribution channel and, as the market evolves, will continue to work to make sure that it remains viable for all stakeholders, including libraries and authors. Maintaining library ebook revenue streams is critical to growing this vibrant market.

**C.    Internet Archive's Infringement Undermines Authorized Library Ebook Lending**

15.    Internet Archive scans physical copies of PRH's books in industrial quantities and distributes the resulting ebooks through its website under a so-called theory named "controlled digital lending." By doing so, it operates a black market version of the authorized platforms that currently exist for the same basic purpose – *i.e.*, to distribute PRH ebooks to library patrons.[3]

16.    Libraries already have the ability to license tens of thousands of PRH titles in ebook formats and loan them out to their patrons, instantaneously and for free. But Internet Archive distributes a staggering number of unauthorized ebook versions of those very same titles, which were created without permission or payment as part of a mass digitization project. According to a report commissioned by Plaintiffs' expert in this case, there were 16,496 PRH titles published in print and digital – or 35.8% of our catalogue – available to "borrow" from Internet Archive's website. This percentage jumps to 48.4% of the titles first published through 2015. (*See* July 7, 2022 Declaration of Ian Foster ("Foster Decl.") at ¶116(k).) Further, the Internet Archive is continually adding more scans of our works, including a substantial number after we filed suit. (*Id.* at ¶¶18, 118, and Figure 13.) And while Internet Archive's scans are inferior in quality to PRH's specially formatted ebooks, they are certainly legible and can satisfy a consumer's demand for a particular book.

---

[3] PRH does not take issue with services offered by Internet Archive that are unrelated to its mass digitization of in-copyright ebooks, including the Wayback Machine.

17.     PRH has tried to put a stop to this blatant infringement for many years, but to no avail.  In 2014, PRH sent Internet Archive correspondence demanding that it remove "the "[u]nauthorized scanned versions of Penguin Random House books being lent to patrons … immediately" – and sent a spreadsheet containing "close to 60,000 unique isbns" to assist the takedown process.  (A true and correct copy of that correspondence is annexed hereto as Exhibit 5.)  The Internet Archive provided assurances that it would comply with this demand.  (A true and correct copy of that correspondence is annexed hereto as Exhibit 6.)  Nonetheless, Internet Archive was soon distributing thousands of PRH titles on its Website.  After that, PRH paid anti-piracy vendors to engage in a game of "whack a mole" in which they sent thousands of takedown requests for individual titles, which were frequently ignored or proved ineffective when books reappeared after being temporarily removed.  As our expert Ian Foster reports, today, approximately 48% of the titles listed in PRH's 2014 spreadsheet are currently present on the Internet Archive website.  That is over 28,000 of our titles.  (*See* Foster Declaration ¶134.)

18.     Keep in mind, these serious concerns preceded the exponential growth Internet Archive has experienced in the last few years and its now-stated goals, which give us far greater concern.  PRH has been particularly concerned about several developments regarding the Internet Archive.  The first is the Internet Archive's so-called "Open Libraries" program.  As I understand it, under this program, the Internet Archive is now acting as a centralized hub; rather than merely lending out ebooks made from scanning the print books in its *own* warehouse collection, it is now counting toward its maximum loan count over three million print copies of books housed in academic and public libraries scattered around the country.  The Internet Archive has not created any new scans of these books, but increases its own loan count based on an "overlap analysis" comparing its partner libraries' holdings and its own, and makes loans of its scanned copy on the

premise that the partner library will not circulate its print copy to local patrons at the same time as the ebook copy is distributed by Internet Archive.  (A true and correct copy of the Open Libraries webpage on Internet Archive's website is annexed hereto as Exhibit 7.)  Further, it was particularly alarming to learn from a 2019 public announcement that Internet Archive had effectively acquired the world's largest online used book store in order "to provide a steady stream of books to be digitized by the Internet Archive" – including thousands upon thousands of PRH titles.  (A true and correct copy of Internet Archive's blog post dated November 6, 2019, titled "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books," is annexed hereto as Exhibit 8.)  The confluence of several developments and their deeply concerning and potentially far reaching implications inspired PRH to join this suit against the Internet Archive.

19.     Finally, it was likewise alarming to learn about Internet Archive's decision to unilaterally abandon lending caps during its so-called National Emergency Library so that a functionally infinite number of people could read its unauthorized versions of PRH's ebooks at once, as is referenced in the attached.  (A true and correct copy of Internet Archive's blog post dated June 10, 2020, titled "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending," is annexed hereto as Exhibit 9.)  Loosening of the (already inadequate) restrictions Internet Archive imposes on its ebooks led to more usage of its website, as is clear from the spike in circulation immediately after lending caps were lifted for the National Emergency Library.  (A true and correct copy of Exhibit 12 of the February 25, 2022 report of Rasmus Jørgensen, Ph.D. ("Jorgensen Report") is annexed hereto as Exhibit 10.) (A true and correct copy of relevant excerpts of the Jorgensen Report is annexed hereto as Exhibit 11.) (*See id.* ¶ 40.)  Internet Archive's own expert confirmed that the number of users borrowing *Lord*

*of the Flies*, a PRH title, during that period exceeded the number of people who checked out the authorized version on OverDrive.  (*See* Exhibit 10.)

20.     On June 1, 2020, the Plaintiffs sued Internet Archive for copyright infringement for scanning their print books and distributing the resulting ebooks on the Website, citing a sample of 127 books, including 48 in-copyright books published by PRH.  Each of the PRH Works in Suit has been available as an ebook and an authorized library ebook since before this lawsuit was filed. (A true and correct copy of a spreadsheet reflecting the sales records of the Works in Suit from 2010- 2020 is annexed hereto as Exhibit 12.)

21.     The Works in Suit include fiction masterpieces by landmark authors like *Song of Solomon* by Toni Morrison (winner of the 1993 Nobel Prize for Literature) and Sandra Cisneros' *The House on Mango Street* (winner of the 1985 American Book Award).  There are also several important works of contemporary fiction, including *The Road* (Cormack McCarthy, winner of the 2007 Pulitzer Prize for Fiction), *Station Eleven* (Emily St. John Mandel), and *A Brief History of Seven Killings* (Marlon James, winner of the 2015 Man Booker Prize).

22.     In addition to prizewinning literary novels, the PRH Works in Suit include bestselling thrillers like *Gone Girl* by Gillian Flynn and works by John Grisham, romances by Sandra Brown, and a fantasy novel from George R.R. Martin's epic *Game of Thrones* series.  The list also contains popular non-fiction titles ranging from Bill Bryson's *A Short History of Nearly Everything* and Elizabeth Gilbert's *Eat Pray Love*, to *Neurotribes* by Steve Silberman, Jon Krakauer's *Into the Wild,* and *The Body Keeps the Score* by Bessel van der Kolk.  And it includes beloved titles for children and adolescents, including the *Junie B. Jones* series, *Simon v. the Homo Sapiens Agenda, The One and Only Ivan,* and *Lord of the Flies*.

23.    As set forth above, there is an active licensing market for library ebook versions of the PRH Works in Suit.  Between 2017 and 2020, the 48 PRH Works in Suit were checked out approximately ███████ times via OverDrive.  (*See* Jorgensen Report ¶ 40.)  The Works in Suit generated approximately $1.23 million of U.S. library ebook revenue in the same time period, much of which was distributed as royalties to PRH authors pursuant to the terms of their publishing agreements.  (*See* Exhibit 12.)

24.    Internet Archive's Website provides competing versions of PRH's authorized and licensed ebooks: verbatim and complete digital copies of the PRH Works in Suit.  The primary difference being that IA (unlike the public libraries that OverDrive serves) never paid PRH (or the author of any of the books) the license fees that it charges libraries via legitimate library ebook aggregators.  Internet Archive has suggested that its unlicensed free ebook website does not harm PRH and does not diminish authorized library ebook lending or the book publishing market more generally.  For example, in one presentation urging prospective partner libraries to join its program, Internet Archive claimed that its Website does not cause PRH any financial harm because each "Library owns a legitimate copy of the book" and that "The digital copy substitutes for the owned item."  (A true and correct copy of a powerpoint document reflecting the presentation is annexed hereto as Exhibit 13.)  But this false contention is based on basic misunderstandings about aspects of PRH's business – including but not limited to how authors are paid for their books, the immense costs of publishing books, the investments PRH has historically made in developing new book formats and distribution technologies, and the careful balance PRH has struck between the competing needs of libraries, on the one hand, and authors, booksellers and publishers, on the other hand, to make library ebook lending the viable and dynamic market that exists today.

**D.    PRH Operates a Complex Business Geared Towards Shouldering the Immense Costs Required to Publish Books**

25.    Every book that PRH publishes is the result of a true partnership with an author, a partnership that requires PRH to make substantial and risky investments both upfront and over the long term.  MacArthur Genius grant winning novelist and poet Sandra Cisneros, who has been a PRH author for more than thirty years, has submitted her own declaration in this action that speaks to the importance of these investments to her work.  But from PRH's perspective, its business depends on the ability to act as the exclusive steward of the publishing rights that authors entrust to it.  The right to curate and control the timing of each book's release into each commercially viable format and distribution channel  is of critical importance.  This is how publishers cover the daunting costs required to publish books in a commercially sustainable way, including the cost of investment in new formats or technologies (like library ebooks) required to reach new audiences.

### i.    The Heavy Costs of Publishing Books

26.    The collective time, money and effort PRH invests in publishing each individual book is extensive.  PRH's average annual investment as measured by its operating expenses between 2017 and 2020 was over $600 million.  (A true and correct copy of a spreadsheet containing this data is annexed hereto as Exhibit 14.)  Not only does PRH make significant investment in its books, but it takes on the financial risk of publishing a new work by paying an advance to the author to fund his or her writing of the book.  A significant portion of our investment in each year's book publishing efforts comes in the form of author advances and editorial and marketing services that support the author through every stage of the publication process and a sales force that effectuates our sales.

27.    PRH also makes significant investment into new and innovative ways to expand the audience for each author's works.  Print on demand technology is but one such example, in addition to the specific examples discussed below.  PRH has invested millions of dollars in

developing technologies and systems capable of introducing readers to books in whatever format they prefer and in improvements to those formats, including in the digital age.

28.     Whether any given title will provide the needed return on these investment in order to fund an on-going publishing program is never certain.  The success of any given title is never guaranteed and inherently unpredictable. Every book is unique.  Its commercial success or failure will depend on countless factors that are impossible to fully predict, even after publication.

>           ii.     **Paying the Costs of Publishing a Book and the Importance of the Backlist**

29.     Over the course of more than one hundred years, the varied publishing divisions that now make up PRH have not only shouldered the enormous costs of book publishing but also generated (wherever possible) a lifelong stream of royalty revenue for many authors.  A significant amount of the profits earned on PRH books is reinvested to pay the costs of publishing new authors or books and developing products capable of reaching new audiences.  The ability to invest in new authors, create life long royalty streams for authors and to run a profitable business depends on the ability to *exclusively* exercise two of the rights it obtains from authors – the right to sell books for their copyright term and the right to collect separate income streams for each different format, including the right to control the pricing and terms and conditions governing each different format.

30.     The exclusive right to publish the books acquired for the term of copyright enables PRH to rely on the sales of "backlist books" – defined as titles that were published more than a year ago – as a source of steady income to subsidize the publication of new books.  New books are a risky proposition and may not succeed; our backlist is a reliable engine that fuels our ability to invest in new works.  Particularly important are the sales of perennial sellers, which can be relied upon to generate significant revenue year on year for decades after first publication – and offset the costs of new books that underperform and result in a loss.  (*See* Exhibit 11.)  A review of PRH's

sales records for the Works in Suit further demonstrates that many of our backlist books published more than five years ago are bringing in very substantial revenues. (*See id.*) Even those bringing in steady but smaller sums are important to us on a cumulative basis and remain important to their authors, on an individual basis.

31.     Backlist sales are also important because many books do not achieve their full commercial potential in their first year of publication. It may take years for a book to start selling in large quantities for countless, often unpredictable, factors. For example, a book that is critically well-received, may not be a top seller in its first year of publication. Such books often achieve peak sales later in their life cycle after they win a prestigious literary award or as they begin to be incorporated into the curriculum of high school and college literature classes. Likewise, a book that is adapted into film or television series inevitably experiences increased sales even if it did not initially sell well as a frontlist title. A prime example of this is *Crazy Rich Asians* by Kevin Kwan, which PRH published in 2013 and, upon information and belief, as reflected in the McNamara Declaration, featured a dramatic increase in library ebook checkouts when a blockbuster movie version was released five year later.

32.     Overall, PRH's backlist revenue between 2017 and 2020 exceeded revenue from frontlist titles (*i.e.*, books published within the last year). (*See* Exhibit 14.) This means that backlist sales overshadowed frontlist sales even in a period that includes the years which PRH published the immensely successful biographies of Michelle and Barack Obama (2018 and 2020, respectively).

33.     Equally important to the funding of the book publishing process is the ability to sell its authors' books in different formats – including paper backs, ebooks and audiobooks. In our experience, and as a matter of common sense, readers generally read a book once; they do not

typically buy the paperback edition of a book if they've already read it in hardcover. Nor will they buy the print edition, if they already have the digital edition.

34.     Publishing agreements typically have separate provisions for royalties on hard cover sales versus paperback versus audiobook versus ebooks. Our current publishing contracts explicitly contemplate publication of one title in multiple formats and specifically address the royalties owed on a format by format basis and by sales channel. In the case of books initially published before the eBook form existed, PRH makes sure to obtain permission from the author (or the author's estate) before publishing a digital version of that title. If PRH loses control over how each format enters the market, it can't possibly hope to recoup its investment in the book or maximize the author's royalty earnings. Without the ability to set terms and prices that reflect the different characteristics of each format, PRH cannot effectively market each title to different audiences and generate sustainable revenue streams.

35.     In my role as Senior Vice President, Online and Digital Sales, I have learned that if the publisher cannot exercise this control (or do so effectively), the different formats and channels may fall out of balance in a way that has significant negative effects on the publisher's overall market. This phenomenon is discussed in greater detail below with respect to ebooks specifically, but the general principle is that a glut of underpriced (or even free) books in one format poses a clear threat of loss of revenue from consumers who would have paid more for the book in their preferred format if the price in the underpriced format was not so low. The same is true for different channels. We watch for these effects as we assess dynamic discounts for our commercial ebooks and keep an eye on the impact of library ebooks on commercial ebook sales. This is why piracy is a danger that book publishers constantly guard against. In our experience, it is impossible for a publisher to compete effectively against easily obtainable, free substitutes for

their books, especially if they appear to be legitimate. The general economic principle – which we refer to as "cannibalization" – is that saturation of the market with unsustainably underpriced books will drive down revenue overall for both us and our authors.

36.     Copyright law gives book authors the exclusive rights to control the timing and format of the publication and dissemination of their works, not only in their first year of publication, but for the term of copyright. Authors are able to license those exclusive rights to publishers which, in turn, enables publishers to both generate revenue from backlist books and control the distribution of books in different formats in a way that maximizes revenue for author, publisher and bookseller. In this way, the copyright law aims to give authors their best chance to achieve the stable and long term income required to make a living from writing.

### iii.     The Controlled Digital Lending Fallacy

37.     The controlled digital lending theory espoused by Internet Archive threatens to undermine the book publishing business – and, indeed, all content industries – because it recklessly collapses the boundaries between formats. Internet Archive's position, as I understand it, is that the publisher's right to control the publication of a book in different formats is extinguished as soon as a physical copy of a book is lawfully purchased. Which, according to Internet Archive, means that a library or other non-profit entity that owns a physical book can scan that book and distribute the resulting ebook as if it were a proxy for the physical version (at least as long as the two copies are not in use simultaneously). This theory fundamentally misunderstands the basic reality that the ebook format is fundamentally different from the physical book format.

38.     To state the obvious, print books are physical objects (*i.e.*, ink printed on bound paper pages) that inhabit the real material world. They need to be physically transported from place to place, which costs time and money, especially across long distances. They also cannot be

instantaneously replicated, since reproducing the book requires each page to be scanned or copied by some other means.  Like all physical objects, they take up space on a shelf or other furniture or in warehouses.  They periodically get lost or worn out, requiring those like libraries to buy new copies.  And, because a physical book can only be read by one person at a time and has limited distribution capacities, it is necessary as a practical matter to sell individual copies of the book in large quantities and disperse those copies widely in order to enable large numbers of people to read the book simultaneously.

39.     An ebook, by contrast, is a digital file that consists of specially formatted text (and sometimes illustrations) that readers typically download from the internet and consume on personal computers or devices, like e-readers, smartphones or tablets.  Electronic formats offer many valuable features that, due to the immutable laws of physics, paper editions cannot match. Ebook files last forever without degrading and do not get damaged or lost.  Readers of ebooks can instantly access many millions of titles, which would fill entire buildings in hard copy form, on devices that fit comfortably in a purse or trouser pocket.  Readers of ebooks also do not need travel to a bookstore or library during business hours, or even wait for a book to arrive in the mail, but rather have the option anytime of the day or night to download ebooks to their computer, phone or e-reader device from the comfort of their home or any other location with an internet connection – and start reading any book of their choosing in a matter of seconds.  Ebook readers also enable readers to run searches for particular words in the text, look up the meaning of words via a dictionary function or even read in the dark.

40.     The ebook format also has additional benefits for libraries themselves.  For example, ebooks reduce the time and costs related to check outs and check ins; and the sharing of

ebooks between individual members of library consortia does not require physical books to be somehow shipped or delivered to and from consortium members.

41.     The characteristics that make ebooks valuable also mean that there is a significant threat to the company if third parties scan our books or otherwise obtain unauthorized digital copies of our books.  This is because anyone in possession of an unprotected digital file containing the text of a book can (for all intents and purposes) replicate it infinitely, instantaneously and at practically no cost.  And ebooks can be distributed instantaneously anywhere, anytime and to anyone with an internet connection, again at practically no cost.  And if consumers can easily get ebooks for free, they have no incentive to purchase their own copy.  Likewise, if public libraries can send their patrons to free ebooks on the internet, they have less of an incentive to expend tax dollars on those titles.

42.     These inherent differences between physical books and ebooks require publishers to handle the two products very differently – which is chiefly expressed in the terms and conditions on which they are sold and priced (which are of course interrelated).  The book publishing business actually has a long history of publishing in a variety of different formats and channels, with different pricing models -- such as hardcover, trade paperback, mass market paperback, book club editions, and audiobook.  Having different terms and conditions and pricing for digital works as opposed to analog works, or different formats or modes of delivery, is hardly unique to the book publishing industry.  As any consumer of movies, television and music is aware, there are a plethora of choices to enjoy these media (ranging, for movies, from visiting a movie theater to DVDs to streaming), all with different terms and pricing models.

43.     PRH's model for commercial ebooks is premised on the notion that distribution is limited to one user account.  Whereas PRH largely sells print books to wholesalers, it uses a form

of an agency model for commercial ebooks,[4] and its agents, such as Amazon, both apply DRM (digital rights managements) and impose terms and conditions to enforce its "one user account" model. For example, the Terms of Use set by Amazon in connection with ebooks obtained through its Kindle platform state as follows:

> "Use of Kindle Content. Upon your download or access of Kindle Content and payment of any applicable fees . . ., the Content Provider grants you a non-exclusive right to view, use, and display such Kindle Content an unlimited number of times . . ., solely through a Kindle Application or as otherwise permitted as part of the Service, solely on the number of Supported Devices specified in the Kindle Store, and solely for your personal, non-commercial use. Kindle Content is licensed, not sold, to you by the Content Provider."

Further, the Amazon Terms of Use provide under "Limitations" that the purchaser "may not sell, rent, lease, distribute, broadcast, sublicense, or otherwise assign any rights to the Kindle Content or any portion of it to any third party. . . ." (A true and correct copy of the Amazon Kindle Store Terms of Use is annexed hereto as Exhibit 15.)

44.     Library aggregators license our ebooks to libraries on set terms and conditions to enforce the various models that we have selected for that market, as detailed below. Licenses make infinitely more sense in the digital realm – which is why all manner of copyrighted content

---

[4] Under an agency model, the publisher sets the price that appears on the retailers website and that is paid by the consumer. The retailer is compensated by taking a commission on the sale, typically 30%. By contrast, in the wholesale model, the publisher sets a recommended price for the print book (the "list price") and then sells the books to wholesalers at a discount on that price – whereupon the wholesaler can sell the book to consumers at a price of their choosing.

(ranging from software to music) is licensed for digital formats, not sold. This is because rightsholders need to exercise control over the digital files to set the limited extent of usage, which is determined in relation to the pricing. The license terms also limit reproduction and distribution, providing legal contract terms that reinforce the DRM to prevent rampant piracy.

45.     The sale of print books to libraries makes sense for us, because of the practical limitations on the distribution of a print book. Digital books, however, can readily be distributed around the world. Thus, one of the crucial requirements that a license allows us to enforce is that each library or library consortium can only distribute their ebooks to their own local community members or academic community, and not nationwide.

46.     The other control mechanism that publishers rely on to ensure that ebook distribution is economically sustainable is price. PRH offers different prices for each of its formats, and the way that price is calculated for ebooks differs from physical books to reflect the characteristics of each product. The prices of ebooks factor in the greater value posed by the format, but also the limitations imposed by the licensing terms. Prices for retail ebooks, for instance, are calculated in part on the basis that the ebook can only be downloaded onto devices associated with the purchasing account. If the ebook could be shared among devices belonging to multiple users, the cost would be significantly higher to reflect the broader distribution. And the price to purchase an ebook file, without restrictions on its further use or distribution, would be utterly unaffordable as a practical matter given that it could potentially satisfy global ebook demand for that title.

47.     In a similar vein, prices for lendable, library ebooks typically exceed the prices for consumer ebooks because there is an expectation that each copy will be read by multiple people on multiple devices. The prices of library ebooks exceed the prices of physical library books to

reflect both the benefits conferred by the electronic formats on librarians and consumers. The pricing of lendable ebooks at a rate higher than the price for a single ebook also helps to avoid a scenario where cheap ebooks flood the market and satisfy the demands of many or even most readers who might otherwise have paid for their own ebook. The pricing thus reflects the fact that library ebooks have far more potential to satisfy consumer demand than physical books, particularly because (unlike physical books) they are instantaneously accessible from anywhere at any time and because the experience of both obtaining and reading a library ebook is essentially indistinguishable from reading a commercial ebook.

48.     The control PRH exerts over ebook pricing also gives it latitude to offer discounts on ebook titles. PRH has fairly recently, for instance, responded to requests from colleges and some companies that wish to give ebook copies of a particular title to their students or employees. PRH also frequently discounts retail ebook prices for a limited time period for a range of promotional purposes, including themed promotions. Control over ebook prices also allows PRH to discount an author's earlier works before the release of a new book in order to prime consumer interest in advance of the upcoming title. These are strategic pricing decisions that PRH makes in order to serve the interests of author, publisher and bookseller.

49.     For all of these reasons, Internet Archive's notion that physical and electronic formats are freely interchangeable according to the whims of the purchaser of a print book is profoundly dangerous. If Internet Archive is permitted to acquire outright ownership of PRH ebooks for the cost of acquiring and scanning a secondhand paperback, it will undermine the carefully calibrated ebook formats that are economically sustainable in large part because PRH retains control over licensing terms and price.

50.     If controlled digital lending were given a legal green light, there would likely be widespread and unrestricted adoption of mass digitization and distribution of copyrighted content under the guise of legitimate library activity.  Any large tech company, for instance, could incorporate or partner with a not-for-profit organization to digitize huge numbers of books.

51.     Other entities would be emboldened to push the boundaries, either by experimenting with ways to monetize the content taken or by branching out into other media.  It is not difficult to imagine similar "controlled digital lending" services for movies, television shows, music, video games or any other type of content.  There would be nothing, for instance, to stop a non-profit entity from purchasing and digitizing old music cassettes or movies on video, and distributing the music or movies for free over the internet in numbers equal to the physical copies.

52.     Yet another practical effect of allowing Internet Archive to continue with its mass digitization project would be to strongly disincentivize PRH from investing significant time and money into pursuing new formats that it cannot reasonably expect to control and monetize.  In other words, our willingness to invest in new formats depends on the baseline expectation that we will be able to sell each format separately, and control the terms on which each format exists in the market.  Internet Archive's activities are contrary to the public interest since the well-established and still evolving marketplace for library ebook lending that currently exists simply would not be possible in its current form without the long term investments and enthusiastic participation of book publishers like PRH.

**E.      PRH Has a Proud Legacy of Innovation in Book Publishing**

53.     PRH has long played a prominent role in the development of publishing technology and new book formats designed to reach new audiences.  When Penguin Books was founded in 1935, for instance, it revolutionized the publishing business with its paperback editions of high-

quality fiction and non-fiction titles.  By creating a lower-price alternative to hardcover editions, establishing its iconic brand of color-coded cover designs, and aggressively distributing books through popular main street stores like Woolworths, Penguin was one of the first publishers to bring serious content to the mass market and was rewarded by finding larger audiences for its authors' works than were previously thought possible.  Penguin Books' business thrived and generated revenue that was reinvested in developing and publishing important new voices.

54.     The audiobook divisions that are now part of PRH also were integral to the development of the audiobook.  PRH's audiobook division has its roots in Listening Library, which was founded in 1955 by Helen and Anthony Ditlow, who was partially blind.  It was one of the first companies to distribute audiobooks on vinyl LPs to schools, libraries and other special markets like VA hospitals.  PRH also operates the iconic Books on Tape brand, which started out nearly 50 years ago by lending cassette tapes of unabridged audiobooks via direct mail order and now offers more than sixteen thousand audio titles on compact discs or as downloads.  In recent years, PRH has invested heavily in digital audiobooks as audiences for audiobooks have grown exponentially, as many consumers discover that they prefer listening to books over reading books, at least in certain situations like long car journeys or during exercise.  Across its whole audiobook division, which also includes Penguin Audio and Random House Audio, PRH annually publishes 1,500 to 2,000 audio titles in multiple formats.

55.     The spirit of innovation has continued to drive PRH in the late 20th and early 21st century.  PRH spent millions of dollars and untold employee hours on pioneering ebook products – which were embryonic when I joined Random House more than two decades ago.  Foremost in our minds was the havoc wrought on the music industry by piracy and uncontrolled distribution of digital content.  Random House was acutely aware that the music industry imploded during the

early 2000s in large part because anyone could purchase a single compact disc containing an album for less than $20, effortlessly rip all the songs onto a computer in mp3 format and then disseminate the content on those files over the internet for anybody else in the world to download for free – which is how millions of people became accustomed to consuming music, to the detriment of musical artists and record labels that have never truly recovered. Internet Archive's mass digitization of books has worrisome echoes of the free music websites that were rampant at that time.

56.     Starting at least in the late 1990's, some of the divisions of what is now PRH began investing heavily in creating authorized mechanisms for distributing digital books in order to create viable products for consumers to read as an affordable alternative to using pirate websites. By pursuing the goal of unleashing the potential of digital books while maintaining the control necessary to avoid tanking the entire publishing industry, PRH and other publishers have created thriving markets for in-copyright ebooks where essentially none existed less than twenty-five years ago. For example, ebooks are now a core part of our business that generates $59 million per year from library channels.

57.     By 2000, Random House had invested more than $5 million into the development of ebook publishing software and pledged to invest $10 million more within the next three to five years after that. In the late 1990s, Random House was (together with McGraw Hill and Wiley) a member of the Open Ebook consortium that designed the original standard format for ebooks that evolved into the ePub ebook format that was launched in 2007 and remains in wide use today. We continue invest in studying and developing new distribution systems, sales systems, and formats for our titles, as well as in improving the systems we have.

58.     Random House also invested heavily in the creation of production and business systems in support of its digital publishing products and created Random House Ventures, L.L.C. ("Random House Ventures"), a wholly owned e-investment subsidiary, on March 3, 2000 in order to advance digital publishing technology.   On November 1, 2000, the Random House imprint Modern Library announced that it would offer 100 classic backlist books in ebook format at an average cost of $4.93.   In order to make this project feasible, Random House partnered with Reciprocal, Inc., an epublishing technology company that implemented digital rights management technology ("DRM").

59.     In 2002, PRH began distributing ebook editions of selected books to consumers through specialized electronic retail platforms.   The popularity of ebooks grew rapidly after the release and widespread adoption of dedicated e-readers like Amazon's Kindle (2007), the Barnes & Noble Nook (2008) and the Kobo ereader (2010), as well Apple's iPad (2010), which was released with its dedicated ebook reading app, iBooks.   Between 1998 and the launch of Amazon's Kindle device in 2007, the Random House division of what is now PRH published approximately 3800 titles in ebook format.   Between 2007 and 2010, Random House published about 12,000 additional ebook titles.   By 2015, the total PRH number exceeded 50,000 titles and ebooks reached their peak of 25% of total book revenue as compared with 71% from print (with the remainder from digital audiobooks).   Although retail ebook sales declined from this peak (and then rose again during COVID), in all recent years they have been a substantial percentage of our book revenues.

60.     PRH's commitment to ebooks is also amply reflected in the range of titles it offers as ebooks.   By 2007, Random House offered approximately 3800 ebook titles and Penguin had approximately 300 ebook titles available.   Today, virtually all original titles in the adult trade books category are available as an ebook – including the 48 PRH titles at issue in this lawsuit.   In

general, the few original titles that are not distributed as ebooks are highly graphical works that do not translate well to ebook formats. But the vast majority of new titles are published simultaneously as ebooks and in print. And PRH has invested millions in creating ebook versions of works published before the format came into widespread use. The process to turn older works into ebooks involved an extra step beyond creating the digital files, since it often was necessary for PRH to negotiate amended agreements with authors to publish an electronic version of their work.

61.     Despite the challenges and following decades of sustained investment, PRH and other publishers have built up the technology, terms and trust with authors necessary to create and develop sustainable retail markets for ebooks. The recent pandemic illustrated the importance of the publishing community's investment in ebooks, since the presence of an established ebook market permitted consumers to access books even when bookstores were closed and complex supply chain issues impacted the delivery of some physical books.

**F.     PRH Invested Heavily in Library Ebooks and Continues to Help the Market Evolve**

62.     Although the bulk of its library revenue still comes from the sale of physical books, PRH has embraced library ebook lending and it now accounts for roughly 30% of its overall library business (with digital audio books contributing another 16%). PRH views libraries as immensely beneficial to society. They play an integral role both in fostering public literacy and serving their communities, including by selecting titles of local interest and serving as community gathering places. Public libraries do much to publicize our authors and titles, including by hosting author readings and book clubs, as well as circulating updates to their communities on books of interest.

63.     Libraries also spend enormous amounts of money on purchasing books published by PRH and other book publishers. In 2019 alone, for instance, public libraries spent almost $1.19

billion on physical and ebooks.  (A true and correct copy of a spreadsheet reflecting this data is annexed hereto as Exhibit 16.)  This money ultimately translates into royalties for authors and revenue for publishers that can be reinvested into new book projects or efforts to find new audiences.

64.     A striking feature of the library ebook market is the number of Americans who read their ebooks for free from libraries, as compared with buying them the commercial ebook market. As noted above, PRH did a preliminary study of the universe of consumers accessing titles in ebook form from OverDrive, using titles published and distributed by PRH and first published between January 2017 and August 2019.  (*See* Ex. 1.)  PRH determined that library patrons checked out these titles 34.3 million times as ebooks, which accounted for approximately 39% of all ebook reads for these titles.  In other words, for these nearly 87,000 titles, when PRH compared the number of Americans who borrowed a free ebook from a library with the number of Americans purchasing a commercial ebook, it found that approximately 39% obtained the ebook free from the library.[5]  This is the case even though approximately 75% of ebook revenue was generated from retail channels.  This ratio illustrates the  extraordinary support that PRH has provided to the library community in connection with library ebooks and the fact that authorized library ebooks already contribute greatly to the public interest in the widespread free availability of content, without the help of unauthorized bootleg copies from the Internet Archive.

65.     But it took considerable time and effort to calibrate economically viable library ebook products and to build the library ebook market into what it is today.  This is because the

---

[5] When looking only at the period within three months after each title was released – when initial library holds for each title are at their highest and ebook availability at libraries is lower – library reads accounted for 24% of all digital reads for these titles.

economics of distributing ebooks through libraries are considerably more complicated than retail ebook channels, which are hardly straightforward. The challenges of library ebooks derive, once again, from the unique characteristics of digital media. The dilemma has been apparent for decades.

66.    As one journalist noted in the April 1993 edition of *Wired Magazine*, "[t]he world's great libraries share a great vision: books once hoarded in subterranean stacks will be scanned into computers and made available to anyone, anywhere, almost instantly, over high-speed networks." But, he continued, "[i]f someday in the future anybody can get an electronic copy of any book from a library free of charge, why should anyone ever set foot in a bookstore again?" Thus "compromise is badly needed" in order to unlock the potential of ebook lending while avoiding a scenario in which "libraries … put publishers out of business with free competition." (A true and correct copy of that article, "Libraries Without Walls for Books Without Pages" by John A. Browning, is annexed hereto as Exhibit 17.)

67.    In the nearly thirty years since that article was written, PRH and other rightsholders have taken the lead in making the tricky compromises necessary to develop the thriving and still-evolving market for library ebooks that currently exists. It took many years of investment and experimentation for PRH to strike the balance needed to create viable ebook lending channels and products for its titles. In or around 1998, for instance, publishers worked with a company called netLibrary to create a database that offered full-text, online access to thousands of mostly scholarly books. And in October 2000 Random House Ventures made a substantial investment in ebrary, which was a service that made scholarly content in books, periodicals and other traditionally printed documents accessible on the Internet via a non-subscription, pay-per-use model.

68. One important innovation in the library ebook market was the development of partnerships between publishers and aggregators like OverDrive, EBSCO, ProQuest and Hoopla. Aggregators operate the digital platforms that make library ebook lending technologically feasible. And they are responsible for enforcing the terms prescribed by publishers and, as trusted partners, provide the control required for publishers to distribute library ebooks that readers will ultimately access for free. They also provide crucial administrative services to publishers, including administering and collecting licensing revenue.

69. Eventually, and in consultation with librarians and aggregators, PRH settled on terms that were designed to unlock the potential of library ebooks while also protecting the economic interests of publishers and authors. The first model adopted by PRH is reflected in the terms of sale that were in place as of January 1, 2016, which reconciled the previously different terms offered by Random House and Penguin Books prior to their merger. (A true and correct copy of those terms is annexed hereto as Exhibit 18.) To some extent, these terms roughly approximated the process of physical lending by adopting a "one copy/one registered user" model that permitted libraries to pay for perpetual access to ebooks so long as they were loaned out to one user at a time.[6] A library that wanted to loan to multiple users at once would have to pay for multiple ebook copies, just like it would for physical books.

70. Some of the most crucial terms in the library ebook terms are the limitations designed to ensure that ebook lending remains localized within a geographic or academic library community (or consortium of libraries) in order to avoid the scenario in which a few pooled ebooks can satisfy nationwide demand for a popular title. This is a critical difference between library

---

[6] The same terms also governed library lending of PRH's digital audiobooks, which are also distributed through aggregators.

ebooks and the print books purchased by libraries, and one necessitated by the far greater distribution capabilities of digital media. To this end, the 2016 terms state that aggregators can only distribute ebooks to a "Public Library" (defined as "an entity that is established to serve a defined community, district or region, supported in whole or in part with public funds") or a "School Library" (which is an entity "affiliated with a public, private or religious educational institution"). The terms also impose a critical "[o]ne copy/one registered user" requirement on these libraries, which dictates that "[a]t any given time, a library or institution may loan out only as many digital copies as it has actually purchased from the [aggregator], and only to its registered patrons who have hard copy lending privileges." There also are requirements that the aggregator's platform "prohibit patrons from copying the file," "utilize digital rights management and security technology approved by PRH" and impose limited "check-out periods" to prevent patrons from obtaining indefinite access to the book.

71.    In 2018, PRH determined that the perpetual term for its "one copy/one registered user" model was not in the best interests of its authors or many of its library customers. By 2018, the library ebook market had grown exponentially and PRH realized that a perpetual term with endless circulations into the distant future was not a good value proposition for its authors. At that time, the digital list price was set at three times the cover price of the hardcover, but was too low for an ebook product that could potentially satisfy consumer demand for generations.

72.    But even as the digital list price for the perpetual model was too low for rightsholders, it was also relatively high for libraries and inefficient because the licenses did not allow libraries to follow the natural rhythms of patron demand. In the course of its discussions with librarians, PRH discovered the specific problem that libraries were having with perpetual

ebooks. Libraries are highly responsive to patron demand for new releases of bestselling titles, like a new thriller by John Grisham or a Sandra Brown romance.

73.     In practical terms, this means that librarians buy large numbers of blockbuster books to meet the initial rush of interest even though they know that the interest will wane within a year or less, leaving the library with a large number of surplus copies. In the world of physical books, libraries "weed out" these copies in order to free up shelf space. But under the perpetual model, libraries were forced to pay for more ebooks than they would need over the long term. Even worse, some libraries' funding was tied to the circulation rates of their inventory – which meant that holding onto excess copies of ebooks that were not circulating could mean that the libraries receive less money. These libraries were eager for a way to get rid of excess stock.

74.     In order to hopefully alleviate this issue, PRH launched a pilot ebook buyback program in May of 2018 whereby libraries could "return" unwanted ebook copies for credit that could be put towards new ebook purchases. (A true and correct copy of an email outlining the terms of the buyback program is annexed hereto as Exhibit 19.) In total, PRH bought back 48,275 ebooks and paid out $289,650.00 in credit. (A true and correct copy of a spreadsheet summarizing the results of the buyback program is annexed hereto as Exhibit 20.)

75.     But in order to address the broader problems with its perpetual term, PRH ultimately decided to change its library ebook terms and, on October 1, 2018, adopted a two-year metered model for public library, school library and "special library" wholesalers.[7] (A true and

---

[7] "Special Library" was a new category of libraries that was added to the entities previously listed in the 2016 terms, which is defined as "an entity that provides an organized collection of specialized printed materials or other media maintained for use by or lending to a specialized and limited clientele, not as merchandise or for sale, and the facilities

correct copy of the October 1, 2018 public library terms is annexed hereto as Exhibit 21.)  The terms of the metered license allow libraries to lend ebooks to an unlimited number of patrons on a "one-copy/one-registered-user" basis, but for "a limited term of two (2) years from the time that each such copy is first purchased and available for lending by that institution…"  At the end of the two-year period, the ebook copy "will expire" and the library must obtain another copy if it wants to keep lending that ebook through the aggregator's platform.

76.     The change to a two-year metered model allowed publishers to reduce digital library list prices to a maximum of fifty-five dollars for adult trade titles, forty-five dollars for young adult titles and thirty-five dollars for children's titles while also securing a fairer return on investment for authors, who would receive periodic payments for popular books that libraries wanted to keep in their digital collections over time.  (These prices are maximum amounts and actual pricing is dynamic.)  The metered terms also mitigated the problem libraries had when they were forced to over-purchase perpetual ebooks that they knew they would not need in the medium or long term.  Under the metered model, libraries can purchase enough copies to meet initial demand at a lower per-copy price and then let unused copies drop out of their collection as demand wanes, as they would weed physical books.

77.     While it is impossible to make everybody happy and some libraries would prefer to buy cheap, perpetual ebooks without meaningful restrictions, it must be noted that the current costs of PRH ebooks are a fraction of the cost of a commercial ebook on a per circulation basis.  And the terms on which PRH licenses to libraries are constantly being evaluated and refined as the

---

necessary to house and support such a collection."  PRH does not consider Internet Archive to be a "special library" because it does not have "a specialized and limited clientele."

relatively new markets become more widely understood.  For instance, PRH adopted a special model offering a perpetual term for academic libraries (at a higher price point) when it adopted its two-year metered model for public, school and special libraries, given their different needs and patterns.  (A true and correct copy of the October 1, 2018 terms for academic libraries is annexed hereto as Exhibit 22.)

78.     Another innovation was PRH's introduction of a specially metered classroom distribution channel, which was introduced on February 2, 2020.  (A true and correct copy of the February 2, 2020 ebook terms for the classroom distribution channel is annexed hereto as Exhibit 23.)  Under these terms, schools purchase time-limited access to ebooks that can be loaned to students on a one-copy/one registered user for a sixty day period, which is typically enough time to complete a classroom assignment.  And the sixty day time limit enables PRH to offer ebooks to schools at a severely discounted digital list price, which is about 10% of the Library Wholesale List Price.  In January 2021, PRH amended the model to expand the loan period from sixty to ninety days.  (A true and correct copy of the January 10, 2021 ebook terms for the classroom distribution channel is annexed hereto as Exhibit 24.)

79.     PRH also made changes to its ebook licensing terms for public, school and special libraries in response to the COVID-19 pandemic.  In order to meet the needs of libraries struggling during lockdown and in anticipation of surging demand for library ebooks, PRH implemented two library ebook models in the spring of 2020.  The first is a one-year metered model under which libraries can purchase ebooks for half the digital list price than the standard two-year model.  The second is a pay-per-use model.  The pay-per-use model gives library patrons the option to check out a single copy of any ebook in PRH's catalogue; each time a book is checked out, the library pays 10% of the two-year digital list price to provide a one-time temporary loan to that user.  This

model makes it particularly affordable for libraries to obtain less popular backlist books for their interested patrons. (A true and correct copy of an email setting out the terms for these models is annexed hereto as Exhibit 25.)

80.     The one-year and pay-per-use models have given libraries greater flexibility in responding to surges in ebook demand, and they remain in effect. These models also enabled libraries to spend federal COVID relief money on ebooks because that funding came with a time limited spending requirement that precluded the purchase of ebooks on the two-year metered model. PRH is open to the possibility of continuing to offer these terms for the long term and is constantly seeking new ways to balance its economic prerogatives with the desires of libraries.

81.     In addition to its own direct relations with libraries, PRH has supported libraries in other forums. The Association of American Publishers, the leading book publishing trade group of which PRH is a member, publicly has advocated for a legislative expansion and modernization of the rights of libraries to engage in certain preservation activities under the Copyright Act and, more generally, for their ability to distribute so-called "orphan works" under appropriate circumstances. In common parlance, orphan works are older books for which it is impossible to locate their authors, author's estates or publishers after a diligent inquiry.

82.     From PRH's perspective, library ebook lending is a success story that is still being written. The benefits of a functioning ebook lending market to libraries, patrons, publishers and authors is clear. Libraries have access to tens of thousands of authorized ebook titles, which they can distribute seamlessly to patrons through aggregator platforms that provide many benefits, including an automated and integrated platform for checking books in and out (thus reducing administrative costs and increasing the frequency with which ebooks can be circulated compared to physical books). Library patrons have the ability to check these books out for free anytime,

anywhere and in an instant – which they do tens of millions of times – on convenient platforms that run on their devices, like the popular Libby app.  And publishers get to impose sustainable licensing terms and prices that ensure a return on investment for themselves and their authors.

### G.     Internet Archive's Website Harms PRH

83.     The Internet Archive has caused real and significant harm to PRH.  This harm can be viewed in a number of interrelated ways.

84.     First, Internet Archive deprives PRH of the revenue that libraries, via the authorized platforms like OverDrive, customarily pay in order to distribute our ebooks to library consumers for short-term loans.  The Internet Archive and its "Open Library" website hold itself out as a library.  There is an established market for short term "lending" of ebooks, and the Internet Archive fails to pay a fee, like all others in the authorized library ebook market.  Withholding this revenue causes substantial financial harm to Plaintiffs.  Internet Archive's practices are already significant – and increasing at an exponential rate – because it distributes 35.8% of PRH's catalogue (which equates to more than 16,000 works).  The cumulative loss of the fees that Internet Archive should have paid to lend out that volume of ebooks is already very substantial and would run to millions of dollars.

85.     Viewed from another perspective, Internet Archive is actively encouraging libraries to direct patrons to use its free ebook website as an alternative to authorized library aggregator platforms – which some libraries have opted to do either by integrating links to Internet Archive's websites onto their online catalogues or by contributing books through the Open Libraries program.  (*See* McNamara Decl. ¶¶67-74.)  This inevitably reduces demand for authorized library ebooks, which in turn will incentivize libraries to purchase fewer of them and harms PRH by depriving it of revenues that it would have otherwise collected from library ebook licenses.

86.     Further, as my colleague Skip Dye, SVP Library Sales and Digital Strategy, testified, it is "common sense" that if a library patron "can't find it on their library's website, [they] will go to Internet Archive and see it there and download it."  (A true and correct copy of relevant excerpts from the transcript of the November 18, 2021 deposition of Skip Dye (the "Dye Tr.") is annexed hereto as Exhibit 26.)  (*See id.* at 106:10-107:7; *see also id.* at 96-110, 372-74.)  Moreover, the fact that the Internet Archive's own communications with libraries repeatedly emphasize that they can leverage controlled digital lending and IA's website to provide their patrons with free ebooks (McNamara Decl. ¶71), that libraries are linking to Internet Archive on their webpages (*id.* at ¶¶73-74), and that  Internet Archive is making 25 million loans a year makes it very obvious to me that it is acting as an alternative source to authorized library ebooks.

87.     Likewise, Internet Archive harms PRH because there are consumers who may be willing to purchase ebooks, but instead decide to read the free alternative offered by Internet Archive that does not compensate the author or publisher.[8]  The Internet Archive's ebooks are capable of serving the same purpose as our commercial ebooks – allowing the consumer to use and enjoy the contents of the literary work by reading it.  PRH ultimately cannot compete with a free substitute for its ebooks.  And the allure of Internet Archive's bootleg products is particularly pernicious because its promotion of the controlled digital lending theory lends the Website a deceptive veneer of legitimacy that makes readers feel like they are using a legitimate resource and are not, in fact, stealing copyrighted content.  Internet Archive's free ebooks also devalue publishers' authorized products because these zero-price alternatives put downward price pressure

---

[8] While Penguin Random House contends that the Internet Archive also harms its print book sales revenues in the commercial and library markets, its summary judgment motion is solely based on ebook sales.  Penguin Random House reserves the right to address print sales in the event of a trial in this matter.

on PRH's incumbent products, and consumers may perceive that authorized books are cheapened by the availability of a free substitute.

88.     I understand that the Internet Archive's experts have tried to determine the financial impact of the Internet Archive on the Plaintiffs by looking at OverDrive checkouts, sales figures and Amazon print sales rankings.  As Mr. Dye aptly testified when asked what factors might affect how a title performs, "I have a list that's an arm long or longer, your arm or mine or both, of factors that play[ ] into it," and "every book has its own life and its own life story."  (Dye Tr. at 109:12-16.) (*See also id.* at 100-101, 109-110.)   Based on my long-term experience as a sale executive at PRH, any economic analysis of the Internet Archive's impact on publishers revenues that does not take into account the innumerable factors impacting each individual book differently at different times cannot be reliable given the nature of the book publishing industry.

89.     Further, Internet Archive's conduct also exposes Plaintiffs to harm via the inadequate protection of their intellectual property – including harm caused by IA's poor metadata that allows in-copyright books to be confused with public domain works and distributed without any restrictions and due to takedown failures.  And the circulation of Internet Archive's scans – which are good enough to read but of obviously lower quality than licensed ebooks – puts pressure on PRH's relationships with authors, who expect their work to be distributed in optimal formats.

90.     All of these harms will compound exponentially if Internet Archive is permitted to continue on its current trajectory.  If the Internet Archive's conduct were unrestricted and it scaled up further, its impact on Plaintiffs library ebooks sales would be even more substantial.  As of December 24, 2021, only about 58 libraries participated in the Internet Archive's Open Libraries program, but there are approximately 9,000 public libraries in the U.S. – not to mention academic and research libraries – that could participate in an overlap analysis and increase the number of

copies of books available for borrowing from the Internet Archive (especially if the Court were to condone its practices). With a greater number of copies available for borrowing, Internet Archive can meet much broader demand without wait lists.

91. This impact of the Internet Archive's conduct will be greatly accelerated if it is sanctioned by a court of law and scales up its activities further. A decision in Internet Archive's favor would also incentivize it and other entities engaged in mass digitization to loosen the flimsy controls Internet Archive purports to impose on its unauthorized ebooks, which it already showed a willingness to do when it lifted lending caps in order to create the National Emergency Library. Internet Archive could easily drop its self-imposed (and spottily enforced) policy of excluding titles published within the last five years from its Website.

92. But even if Internet Archive and other similar entities did not deviate from its current practices, the effects on PRH and the publishing industry would be devastating. This would create a world with a platform providing free ebooks of all our titles, created and stockpiled by scanning and stockpiling millions of physical copies of books, and counting as metaphysical additional copies print books allegedly taken off the shelf in academic and public libraries or other similar entities scattered around the country. It would be impossible for PRH ebooks to effectively compete with these free substitute products, especially if there were multiple Websites with centralized hubs containing millions of books from different publishers sourced from numerous different libraries, using no geographic limitations or metering (like Internet Archive) on the distribution of their bootleg ebooks.

93. Given the importance of maintaining separate channels for books in different formats (which are fundamentally different products) and the centrality of backlist book revenues to PRH's business, it is my professional judgment based on more than that twenty years of

experience working in the book publishing industry that the lost customary fees from the Internet Archive and its followers, and the lost library and consumer ebook sales that would result from these scenarios, would significantly impair our ability to invest in new books and destabilize our industry.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on July 2, 2022.

JEFFREY WEBER