# McNamara Declaration Exhibit 19

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3   ----------------------------------------------x

 4   HACHETTE BOOK GROUP, INC.,

     HARPERCOLLINS PUBLISHERS LLC,

 5   JOHN WILEY & SONS, INC., and

     PENGUIN RANDOM HOUSE LLC,

 6

 7              Plaintiffs,

 8   vs.                    Case No. 1:20-cv-04160-JGK

 9

     INTERNET ARCHIVE and DOES 1

10   through 5, inclusive,

11

12              Defendants.

13   ----------------------------------------------x

14

15     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

16                    SUSAN HILDRETH

17               Monday, May 17, 2022

18

19

20

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 5228055
```

Page 43

1   BY MS. McNAMARA:

2      Q    And if I understand your testimony, you

3   believe that's fair if those -- if that flexibility

4   results in less money being paid to the publishers

5   or authors?

6            MS. LANIER:  Objection, mischaracterizes

7   previous testimony.  Go ahead, Susan.

8            THE WITNESS:  My comment was that I think

9   it could be likely that with CDL materials meeting

10  some patron requests, the result that the library

11  would not necessarily have to license that specific

12  title to meet a patron demand, they would be able

13  and it is likely that they would purchase additional

14  e-materials, other materials -- other e-materials to

15  meet other patron demand.

16  BY MS. McNAMARA:

17     Q    When you say that they wouldn't have to

18  pay for that specific title, you understand then

19  that that specific author would not receive a

20  royalty even if they -- even if they acquired

21  e-books from another publisher or another author; is

22  that correct?

23           MS. LANIER:  Objection.  Again, I'm not

24  sure I understand that question or who "they" refers

25  to in the context --

Page 44

1          MS. McNAMARA:  Jessie, and I would suggest
2     to you we have had a strict rule in these
3     depositions that you do not have speaking
4     objections.
5          You can say objection to form.  You can
6     say, you know, something like vague.  But you get
7     into specifics, you're coaching the witness and I
8     ask you to stop.
9          MS. LANIER:  Well, I respectfully object
10    to your classification of my objections as coaching
11    the witness.  I also don't think that was a speaking
12    objection.
13         I'd just ask you to rephrase the question,
14    please.
15         MS. McNAMARA:  I'll ask the witness to do
16    so, not you.
17      Q    Ms. Hildreth --
18         MS. McNAMARA:  Can we have read back the
19    last question?
20              (Discussion off the record.)
21              (Requested testimony read by the reporter.)
22         MS. LANIER:  Same objection.
23    BY MS. McNAMARA:
24      Q    Can you answer the question, Ms. Hildreth?
25      A    I understand that a specific author would

Page 45

1    not receive a royalty for a specific title.  I am

2    looking at the situation in my mind more globally in

3    terms of overall what royalties would go to not a

4    specific author but a number of authors.

5             So that's my response to that.

6        Q    If the specific title that was available

7    through CDL was Catcher in the Rye by J.D. Salinger,

8    let's say, and you would agree that then the

9    Salinger estate would not receive a royalty if that

10   work was available via the Internet Archive and CDL?

11            MS. LANIER:  Objection, calls for

12   speculation.

13            THE WITNESS:  I'd have to know the context

14   of that question and I mean -- frankly, I'd have to

15   know the context of the question and there could be

16   many other avenues for obtaining access to

17   The Catcher in the Rye than purely relying

18   necessarily on CDL or the Digital Lending Library

19   for it.

20   BY MS. McNAMARA:

21       Q    Do you have a general opinion,

22   Ms. Hildreth, as to whether the plaintiffs have

23   suffered any economic harm as a result of the

24   Digital Lending Library?

25       A    I'm challenged in answering that question

1      A     My opinion is not necessarily based on fact.

2   But from what I know of the e-book demand for --

3   generally in public libraries in the CD O or available

4   at a Digital Lending Library is a factor there.

5              But the demand for e-books and the revenue

6   that publishers and authors have had from the

7   expansion of the e-book market in public libraries

8   would lead me to the opinion that publishers and

9   authors are receiving -- are receiving funds as a

10  result of e-books in the library marketplace.

11     Q     The question really was not whether they

12  are receiving funds in the library marketplace,

13  because as I understand your testimony, you

14  recognize that there is a thriving e-book licensing

15  market for libraries; isn't that right?

16     A     Yes.

17     Q     And it's a thriving e-book market that has

18  increased in recent years; isn't that right?

19     A     Correct, yes.

20     Q     And that e-book market is predicated on

21  licensing revenues that are paid by libraries to

22  entities like OverDrive; is that right?

23     A     Correct, yes.

24     Q     And CDL does not pay those same licensing

25  revenues or Internet Archive's CDL practices do not

Page 226

1      A    Yes.

2      Q    Are you suggesting that acquisition

3  budgets are at particular risk of being squeezed

4  because they are discretionary?

5           MS. LANIER:  Objection, vague as to

6  "squeezed."

7           THE WITNESS:  I am suggesting that it is

8  not uncommon that required expenses -- legally

9  required expenses, say insurance or updating of fire

10 equipment or a variety of expenses that are required

11 to keep a building open to the public may take

12 priority over expenses allocated to materials.

13 BY MS. McNAMARA:

14     Q    In Paragraph 109 of your report, you

15 indicate that "In light of the priority of materials

16 acquisition and the current state of limited budgets

17 for those materials, libraries would not reduce

18 their materials budgets if reliance on CDL for

19 certain digital content reduced their spending on

20 the particular titles that were provided through

21 CDL."

22           Do you see that?

23     A    Yes.

24     Q    Is it your expert opinion that libraries

25 will spend less money on licensing the e-book

Page 254

1    habits and book habits of patrons over many years.

2        Q     Have you done any -- are you aware of any

3    research that has been made available to you

4    concerning why patrons of the Internet Archive use

5    the one-hour option?

6        A     No.  No, I've not seen anything, any

7    research.

8        Q     So as you sit here today, you have no

9    information that would substantiate that most users

10   of the one-hour option are in order to browse?

11           MS. LANIER:  Objection, mischaracterizes

12   her prior testimony and asked and answered.

13           THE WITNESS:  I don't have any factual

14   information on how anyone might be using that one

15   hour of browsing.

16   BY MS. McNAMARA:

17       Q     But we can agree that someone could read

18   most, if not all of the work in that one hour?

19           MS. LANIER:  Objection, asked and answered

20   multiple times, vague, calls for speculation and

21   lacks foundation.

22           THE WITNESS:  I think it really is a

23   determination based on the type of e-book, the

24   amount of content, the length, the subject matter,

25   whether -- certainly some could be read in an hour

Page 255

1    but many could not be read in an hour at all.

2    BY MS. McNAMARA:

3         Q    You have not done any survey to determine

4    what percentage of books available on Internet

5    Archive for the one-hour option could be read in

6    their entirety?

7              MS. LANIER:  Objection --

8              MS. McNAMARA:  Excuse me.

9              MS. LANIER:  Sorry, Liz, I could not tell

10   when you finished the question because you paused.

11   Forgive me.

12             MS. McNAMARA:  I was pausing.

13             MS. LANIER:  I understand that now.

14   BY MS. McNAMARA:

15        Q    Did you hear the question, Ms. Hildreth?

16        A    Yes, I heard the question.  And I have no

17   research in regard to how the one-hour browsing is

18   used.

19             MS. McNAMARA:  Let's go off the record and

20   I'm going to go through a few things.  I'm very

21   close to being done, you'll be happy to hear,

22   Ms. Hildreth.  And so let me go through and see

23   what, if anything, I need to ask you.

24             Let's come back probably in five or ten

25   minutes.

Page 266

1          I, LYNNE M. LEDANOIS, a Certified

2    Shorthand Reporter of the State of California, do

3    hereby certify:

4          That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that a record of the proceedings was made by me

7    using machine shorthand which was thereafter

8    transcribed under my direction; that the foregoing

9    transcript is a true record of the testimony given.

10          Further, that if the foregoing pertains to

11    the original transcript of a deposition in a Federal

12    Case, before completion of the proceedings, review

13    of the transcript [X] was [] wasn't requested.

14          I further certify I am neither financially

15    interested in the action nor a relative or employee

16    of any attorney or party to this action.

17          IN WITNESS WHEREOF, I have this date

18    subscribed my name.

19

20

21    Dated: May 19, 2022

22

23          *Lynne Marie Ledanois*

24          _____

             LYNNE MARIE LEDANOIS

25          CSR No. 6811