# McNamara Declaration
# Exhibit 121

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5     HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

6     JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

7

              Plaintiffs,

8

         vs.                    No. 1:20-cv-04160-JGK

9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11            Defendants.

      _____/

12

13

14    VIDEOTAPED RULE 30(B)(6) DEPOSITION OF INTERNET ARCHIVE

15                   BY LILA BAILEY

16                     Volume 1

17               Remote Zoom Proceeding

18             San Francisco, California

19              Monday, October 18, 2021

20

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 142                    Job No. 4841846

Page 82

1          MR. GRATZ:  Why don't we go -- why don't we go

2     off the record and figure out when to come back.

3          MS. MCNAMARA:  Okay.

4          THE VIDEOGRAPHER:  Okay.  We're going off the

5     record the time is 11:43 a.m.

6          (Recess.)

7          THE VIDEOGRAPHER:  The time is 12:08 p.m., and

8     we are back on the record.

9          Q.  BY MS. MCNAMARA:  Okay.  So, Lila, I think when

10    we cut off, we were turning to the issue of Michelle Wu

11    acting as counsel for Internet Archive.  Okay?

12         A.  Yes.

13         Q.  So did there come a point in time where Michelle

14    Wu was retained as counsel for Internet Archive?

15         A.  Yes.

16         Q.  And can you tell me when that occurred?

17         A.  Sometime in 2017.

18         Q.  Now we've looked at your privilege log, and you

19    have indicated that there were attorney-client

20    communications with Michelle Wu as of September 15, 2016.

21         Does that change your answer?

22         A.  That could be right as well.

23         Q.  So obviously, if the privilege log is correct,

24    she was acting as counsel in September of 2016; is that

25    right?

1      Q.  Did you have an understanding as, given the

2   prior retention of Ms. Wu, why it was decided seven,

3   eight months later to formalize the retention?

4          MR. GRATZ:  Lacks foundation.

5          THE WITNESS:  I think that decision would be

6   privileged.

7      Q.  BY MS. MCNAMARA:  Okay.  Had the role of the

8   retention changed between 2015 and March of 2017?

9          MR. GRATZ:  Objection.  Calls for

10   attorney-client privileged information.

11          I instruct the witness not to answer.

12      Q.  BY MS. MCNAMARA:  Did that retention agreement

13   last -- how -- strike that.

14          How long did the retention agreement last?

15      A.  So I don't recall exactly what it said in the

16   letter about the duration.  However, I can say that, you

17   know, Michelle Wu would periodically offer legal advice

18   to the Internet Archive, either to me or directly

19   Brewster for at least a year or so following, maybe more,

20   following that retention letter.

21      Q.  So that would have been at least until March,

22   April, May of 2018?

23      A.  At least, yeah, at least until then.  That

24   sounds about right.

25      Q.  Do you have any reason to believe it extended

1    Dave's white paper.  So I feel like I should -- I should

2    stop talking here.

3         Q.  Have you heard -- and by "Kyle and Dave," you

4    mean Kyle Courtney and Dave Hansen; is that correct?

5         A.  That's right.

6         Q.  They're -- they're the fellow band of supporters

7    of Internet Archive or Friends of the Internet Archive;

8    is that right?

9         A.  I would describe Kyle Courtney and Dave Hansen

10   and Michelle Wu as Friends of the Internet Archive.

11        Q.  Okay.  So have you heard Mr. Courtney or

12   Mr. Hansen give a presentation on their white paper to

13   libraries?

14        A.  I have at the Library Leaders Forum that was

15   held in the San Francisco Public Library, which was the

16   2019 one.

17        Q.  And did -- in the course of giving that

18   presentation, would they go through the risk mitigation

19   factors?

20        A.  Kyle likes to talk about buckets of risk, and

21   Dave likes to talk about mission risks, which are the

22   risks associated with not doing Controlled Digital

23   Lending or, you know, living up to a library's mission.

24   I don't remember if they like walked through each

25   recommendation in the white paper or not.  That specific

Page 129

1      Q.  And so it's -- it's a different organization

2   from the Authors Guild; is that correct?

3      A.  Yes.

4      Q.  Are you familiar with the Authors Guild?

5      A.  I am.

6      Q.  And you're familiar with the -- that the Authors

7   Guild has not supported Controlled Digital Lending; are

8   you not?

9          MR. GRATZ:  Objection.  Lacks foundation,

10   outside the scope.

11          THE WITNESS:  I am aware that the Authors Guild

12   has written a number of things that say they don't agree

13   with the idea of Controlled Digital Lending.

14      Q.  BY MS. MCNAMARA:  Now there came a time, did

15   there not, where there was a May 23 to 24, 2017 meeting

16   of a number of lawyers, intellectual property lawyers,

17   concerning Controlled Digital Lending?

18      A.  There was a meeting.

19      Q.  How did that meeting come to pass?

20      A.  Pam Samuelson convened a group scholars and also

21   library practitioners.  It was modeled after a meeting

22   that she did around the Google Books case.

23      Q.  What does that mean?

24      A.  I don't know enough about that, that meeting.  I

25   just know that that's what Pam said.  She was like, well,

Page 130

1   we did this for Google; it would be interesting to do it

2   here.

3        Q.  Do you know what precipitated -- I mean, the

4   Google Books, there was a litigation pending.  What

5   precipitated having a meeting in May of 2017 concerning

6   Controlled Digital Lending, to your knowledge?

7        A.  I believe it was -- oh, like having to do with

8   the MacArthur -- the MacArthur Grant Challenge.

9        Q.  How did it relate to the MacArthur Grant

10  Challenge?

11       A.  One of the significant barriers to solving -- so

12  let me back up and say the framing of the MacArthur

13  100&Change Grant Challenge is solving one of the world's

14  largest problems or something like that.

15            And as part of the grant proposal, barriers to

16  solving the problem are identified.  One of the

17  significant barriers to libraries being able to loan out

18  their digital collections was copyright -- copyright

19  uncertainty, lack of clarity in the law.

20            I believe that Pam was an advisor on the grant,

21  like among the advisors, as I was, as Michelle was, and

22  she wanted to basically have an open discussion, an

23  academic discussion with other scholars and library

24  practitioners who understood how libraries were engaging

25  in this practice, which, again, at the time was not

Page 131

1  called Controlled Digital Lending, but we've been over

2  that.

3      Q.  And was one of the goals to mitigate the legal

4  opposition to what became Controlled Digital Lending?

5      A.  No.  The real goal of that meeting was academic

6  inquiry.  It was -- I guess you could say or I would say

7  the one -- among the ways that Pam Samuelson formulates

8  her opinions on subjects of this nature where it's --

9  there is something going on out in the world that is

10  legally untested, is she likes to talk to other academics

11  about it.

12      And so she was in charge of the list of who --

13  who was there and the agenda for the meeting and how it

14  was run.

15      Q.  And the topic, the legally untested topic was

16  what became known as Controlled Digital Lending; isn't

17  that right?

18      A.  The subject was -- yes, digital -- what became

19  known as Controlled Digital Lending.

20      MS. MCNAMARA:  Okay.  So let's have marked as

21  Exhibit 59 the flier for the tab 49, Jesse, for the May

22  27th meeting.

23      (Exhibit 59, Open Libraries Copyright Scholars

24      Meeting, May 24, 2017, San Francisco, CA,

25      INTARC00151183 - 185, marked for identification

```
 1            by counsel electronically.)
 2       Q.  BY MS. MCNAMARA:  Are you familiar with this
 3   presentation concerning the May 24th, 2017 copyright
 4   scholars meeting?
 5            MR. GRATZ:  Objection to the form.
 6            THE WITNESS:  I have actually not seen this
 7   before.
 8       Q.  BY MS. MCNAMARA:  Okay.  So you'll see that
 9   there's a list of attendees on -- or the participants on
10   the second and third page of this exhibit.
11       A.  Uh-huh.
12       Q.  Is that right?
13       A.  Yes.
14       Q.  And so amongst the attendees there is Brewster
15   Kahle, obviously of Internet Archive, Corynne McSherry of
16   the Electronic Frontier Foundation, your counsel, one of
17   your counsel on this case, David Hansen from Duke, as
18   well as the one and only Joe Gratz, who is there.
19            MS. MCNAMARA:  Is that -- is that a lovely
20   picture of you, Joe, sitting next to Kyle Courtney?
21            MR. GRATZ:  It is a picture of me, but it is not
22   a lovely picture of me.  I think it was taken during
23   lunch.
24            MS. MCNAMARA:  I am correct that you are sitting
25   next to one of the fellow travelers, Mr. Courtney; is
```

1   that right?

2          MR. GRATZ:  In that picture, I am sitting next

3   to Mr. Courtney.  I don't remember whether I was sitting

4   next to Mr. Courtney all day.

5          MS. MCNAMARA:  Okay.

6          MR. GRATZ:  But also -- yeah.

7      Q.  BY MS. MCNAMARA:  Okay.  So obviously he's

8   pictured, but he's also identified as a participant, Kyle

9   Courtney.  And then you were there, Lila Bailey?

10     A.  I was there.

11     Q.  Mary Minow, Michelle Wu, and Pam Samuelson, was

12  the whole gang.

13         And I understand that these were pulled together

14  as 20 copyright experts in the area relevant to kind of

15  the topic of the conference, the Controlled Digital

16  Lending; is that right?

17         MR. GRATZ:  Objection to the form.

18         THE WITNESS:  Well, that is definitely what it

19  says here.  Let me get familiar with this document.

20         So, okay, sorry, ask your question.  Because

21  really this is the first time I'm seeing this document.

22     Q.  BY MS. MCNAMARA:  Okay.  Well, as you see on the

23  first page, the caption to the photograph that is on the

24  bottom right of that, which is a little blurry so -- at

25  least on my --

Page 134

```
 1        A.  Yeah.
 2        Q.  -- rendering.  That's Michelle Wu at the bottom
 3   left; is that right?
 4        A.  I'm sorry, which photo are we looking at?
 5   They're very fuzzy.
 6        Q.  Yes.  The photo that is the group of people on
 7   the first page of the exhibit.  That's at the bottom.
 8        A.  Michelle, no.  Michelle is --
 9        Q.  Oh, I see Michelle.  She's to the right of Pam
10   Samuelson in that middle photo.
11        A.  Yeah, she's to Pam's right.
12        Q.  Yes, okay.
13        A.  Yes.
14        Q.  So the caption on this bottom photo is "20 of
15   the nation's top copyright scholars."
16            Do you see that?
17        A.  I see that.
18        Q.  Okay.  Did you -- did Ms. Samuelson include any
19   copyright lawyers who represent content creators at this
20   panel?
21            MR. GRATZ:  Objection to the form.
22            THE WITNESS:  I don't know if -- I mean, they're
23   primarily professors and library practitioners.  I
24   have -- I don't know if any of these people in other
25   capacities may have represented any content creators.  I
```

Page 135

1    can certainly say I know Corynne McSherry has represented

2    content creators, but I don't know if we'd agree on that

3    term.

4        Q.  BY MS. MCNAMARA:  Okay.  Do you know whether any

5    papers or articles were distributed prior to the

6    conference in connection with the conference?

7        A.  I don't remember.  That was -- I've been a part

8    of a couple these things that Pam has pulled together,

9    these kind of roundtable discussions, and usually there

10   is reading that goes along with it, but I don't know what

11   she pulled together for this.

12       Q.  Do you know whether Michelle Wu's 2016 or 2017

13   articles that we have identified at the deposition,

14   whether they were distributed at the conference or before

15   the conference?

16       A.  I don't remember.

17       Q.  Do you know whether they were discussed at the

18   conference?

19       A.  Not in any kind of detail that I recall.

20       Q.  Do you know whether Mr. Gratz made any kind of

21   presentation at the conference?

22       A.  He did not.

23       Q.  Did he speak at the conference?

24       A.  I -- the thing I remember for all of me and Joe

25   and Corynne was stating at the top of the meeting that we

1   had -- had represented the Internet Archive and were

2   conscious of privilege issues and were mostly there to

3   listen.

4       Q.  BY MS. MCNAMARA:  And is that, in fact, what you

5   did?

6       A.  That is, in fact, what I did, and that is what I

7   recall both Joe and Corynne doing.

8       Q.  Do you know whether the meeting was taped?

9       A.  It was not.

10      Q.  Do you know whether -- did you or anybody else

11  from the Internet Archive that was present, so that would

12  be you and Mr. Kahle and Jim Michalko and John Gonzalez

13  and -- I think those are all the representatives of the

14  Internet Archive at the conference or the meeting.

15          Do you know whether any of those individuals

16  took notes of the meeting?

17      A.  I did take notes.  I will -- I would like to

18  state that with the exception of me, everyone else from

19  the Internet Archive was only there for the first hour.

20      Q.  Okay.  So have you retained the notes that you

21  took at that meeting?

22      A.  They were paper notes and I -- no, I don't

23  believe I still have them.

24      Q.  Do you know when, if you discarded them, when

25  did you discard them?

1      A.   Probably in the three to six months after the

2   meeting, as I no longer needed them.

3      Q.   Why would -- why would you no longer need them

4   three to six months after the meeting?

5      A.   It's not in my practice to go back to old notes

6   from old meetings.

7      Q.   Okay.  Do you have a distinct recollection of

8   discarding those notes or are you guessing?

9      A.   I mean --

10          MR. GRATZ:  Objection to the form.

11          THE WITNESS:  I have a distinct recollection of

12   them being paper notes, and I know that I have a practice

13   of shredding my paper notes on a relatively regular

14   basis.  You can see I have a small home office so I

15   regularly purge.

16      Q.   BY MS. MCNAMARA:  As a result of that 2017

17   meeting that was organized by Pam Samuelson, was it

18   agreed that Mr. Courtney and Mr. Hansen would author a

19   white paper concerning the legality of Controlled Digital

20   Lending?

21      A.   No.  At that point, at the end of the meeting --

22   so at the end of the meeting, what I remember is Pam

23   saying something like whoever is interested in writing

24   something else about this should let the group know, that

25   kind of a thing.

1        And then after the meeting had concluded and we

2   were having like a dinner afterwards, I believe that is

3   when Kyle and Dave and Michelle and I started talking

4   about the idea of writing something up.

5        Q.  And so was it agreed at that dinner that the

6   primary authors of the paper would be Mr. Courtney and

7   Hansen?

8            MR. GRATZ:  Objection.  Vague.

9            THE WITNESS:  The white paper idea came quite a

10  bit later.

11       Q.  BY MS. MCNAMARA:  Tell me about that.  How did

12  that come about?

13       A.  The original idea was to write something short

14  and easy for a non-lawyer to understand about the legal

15  underpinning of Controlled Digital Lending.

16       Q.  And that became the statement that you

17  co-authored; is that right?

18       A.  That's right.  That became the Position

19  Statement.

20           As that document crystallized, another kind of

21  need was identified in the community.  Basically people

22  were like -- would say, "My general counsel has

23  questions, has more questions than this document

24  answers."

25           And it was in light of that more lawyerly

Page 141

1    STATE OF CALIFORNIA     ) ss:

2    COUNTY OF MARIN         )

3

4        I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5    hereby certify:

6        That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9        That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16       I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20       IN WITNESS WHEREOF, I have subscribed my name

21   this 22nd ay of October, 2021.

22

23

24

25       LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

1             IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5     HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

6     JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

7

8             Plaintiffs,

9         vs.                      No. 1:20-cv-04160-JGK

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11            Defendants.

      _____/

12

13

14

15    VIDEOTAPED RULE 30(B)(6) DEPOSITION OF INTERNET ARCHIVE

16                   BY LILA BAILEY

17                     Volume 2

18             Remote Zoom Proceedings

19             San Francisco, California

20             Tuesday, October 19, 2021

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Job No. 4842007

Page 219

1    the question -- as the question is phrased, I instruct

2    the witness not to answer.

3              MS. MCNAMARA:  Okay.  I don't think that -- I

4    mean, that it calls for attorney-client privilege or work

5    product, but we can go through it methodically if that's

6    easier.

7        Q.  So, Ms. Bailey, one of the suggestions

8    articulated in the white paper is that one way to -- a

9    design feature that may reduce risks and enhance the

10   fair-use position is to introduce additional artificial

11   friction into the system, for example, by extending the

12   time between digital lends more closely mirroring how

13   physical books are lent and returned.

14             Do you see that?

15       A.  Sorry, what page are we on here?

16       Q.  Page 36 in the paragraph that begins:  "One way

17   is to introduce additional artificial friction."

18       A.  So I was on the wrong page that's why I'm not

19   seeing it.  Okay.  I see it now.

20       Q.  Okay.  Are you aware of what this means as to

21   kind of introducing friction and introducing time between

22   digital lends?

23             MR. GRATZ:  Objection to the form.

24             THE WITNESS:  I understand the principle.

25       Q.  BY MS. MCNAMARA:  Okay.  Is that a practice

Page 220

1    followed by Internet Archive?  Do they introduce friction

2    between lends so there's a time period between when a

3    book is returned and when it can be checked out again?

4        A.  Not to my knowledge.

5        Q.  A second suggestion by the authors of the white

6    paper is that in the next paragraph, you'll see it says:

7    "A conservatively designed CDL system could also

8    introduce characteristics that mimic physical

9    degradation.  For example, a library might introduce

10   lending limits based on library experience with physical

11   lending.  If a physical book could be expected to

12   circulate 2000 times before it degrades, the library

13   could place the same limit on circulation of the digital

14   copy."

15            Do you see that?

16            MR. GRATZ:  Objection to the form.

17            THE WITNESS:  I see that.

18       Q.  BY MS. MCNAMARA:  Is that a practice followed by

19   Internet Archive?  Do they take a book out of circulation

20   after it is determined that it might be consistent with

21   how a physical book would degrade?

22            MR. GRATZ:  Objection to the form.

23            THE WITNESS:  Not to my knowledge.

24       Q.  BY MS. MCNAMARA:  The -- on page 37 of the white

25   paper, there is a paragraph that begins:  "Libraries may

Page 221

1    also limit who they will lend digital copies to as an

2    additional way to limit the overall reach of the copy and

3    therefore the potential market effect."

4        Do you see that?

5    A.  I see that.

6    Q.  And it goes on to recognize that some libraries

7    serve particular communities of users, and so it could

8    restrict lending to the communities of users that it

9    serves.

10       Do you understand that as an idea that is being

11   put forth by the authors of the white paper as a means to

12   reduce risk?

13       MR. GRATZ:  Objection to the form.

14       THE WITNESS:  I do understand the principle.

15   Q.  BY MS. MCNAMARA:  And I am correct, am I not,

16   that Internet Archive is a global website; isn't that

17   right?

18       MR. GRATZ:  Objection to the form.

19       THE WITNESS:  The Internet Archive -- so

20   Archive.org is a website that is accessible from anywhere

21   in the world.

22   Q.  BY MS. MCNAMARA:  And that's true of the

23   Controlled Digital Lending component of Internet Archive;

24   isn't that right?

25   A.  It is accessible from anywhere in the world,

Page 222

1    yes.

2        Q.  So anywhere in the world, someone could lend a

3    book?

4            MR. GRATZ:  Objection to the form.

5        Q.  BY MS. MCNAMARA:  Or could take out a book, I

6    should say.

7        A.  Anyone who has an account with the Internet

8    Archive can borrow a book.

9        Q.  Okay.  So turning now to page 38 of the white

10   paper, do you see under the subhead B, "Collection

11   Choices," the first sentence reads:  "The choice in what

12   books are selected for CDL can also play a significant

13   role in risk mitigation."

14           Do you see that?

15       A.  I do.

16       Q.  And proceeds to say:  "The book candidates with

17   the lowest risk and the strongest fair-use argument,

18   though those analyses are not necessarily tied together,

19   are generally those with the lowest likelihood of market

20   exploitation."

21           Do you see that?

22       A.  I see that.

23       Q.  So, for example, the article goes on to indicate

24   that old books and books in the public domain would be

25   less risky under this analysis; correct?

1          MR. GRATZ:  Objection to the form.

2          THE WITNESS:  Yeah.  The paper talks about older

3    books, public domain books posing a lower risk.

4      Q.  BY MS. MCNAMARA:  And Internet Archive's

5    practice of Controlled Digital Lending is not limited to

6    public domain books, is it?

7      A.  It is not.

8      Q.  So it circulates books that are in copyright?

9          MR. GRATZ:  Objection to the form.

10          THE WITNESS:  Circulates -- I'm sorry, the

11    Internet Archive circulates books that are very likely --

12    at least some of them are likely to be protected by

13    copyright.

14      Q.  BY MS. MCNAMARA:  Okay.  And there's a chart

15    that appears on page 39, or a diagram that appears on

16    page 39 of the white paper, and it divides the kind of

17    universal books into pre-1943 books, pre-1963 books,

18    pre-1989 books, and books first published in the United

19    States, and it ascribes different risk analysis to those

20    different categories.

21          Do you understand that?

22          MR. GRATZ:  Objection.  Misstates the content of

23    the document.

24          THE WITNESS:  I understand that there are --

25    this is what Kyle called buckets of risk.

1        Q.  BY MS. MCNAMARA:  Okay.  So on page 40, there's

2    a subcategory of out-of-print and off-the-market books.

3            Do you see that?

4        A.  I see that.

5        Q.  Now we've established that Internet Archive

6    publishes books that are still protected by copyright;

7    isn't that right?

8            MR. GRATZ:  Objection to the form.

9            THE WITNESS:  Did you mean to use the word

10   "publishes"?

11       Q.  BY MS. MCNAMARA:  Well, it distributes, it makes

12   available to -- to -- to its users books that are in

13   copyright; isn't that right?

14           MR. GRATZ:  Objection to the form.

15           THE WITNESS:  Books that may be protected by

16   copyright are included in our Controlled Digital Lending

17   environment.

18       Q.  BY MS. MCNAMARA:  And does the Internet Archive

19   have any time restriction on -- on books that it will not

20   publish or will not make available to its readers?

21           MR. GRATZ:  Objection to the form.

22           THE WITNESS:  The Internet Archive does place a

23   limit based on a date for books that are made available

24   through our Controlled Digital Lending system.

25       Q.  BY MS. MCNAMARA:  And what is that limit?

Page 225

1      A.  Currently, I believe it is the last two years or

2  five years.  I realize I'm not confident in my answer

3  there.

4      Q.  Okay.  So it's either two years or five years.

5  And by that, means two years or five years from the date

6  of original publication?

7      A.  No -- oh, wait, sorry.  I'm getting myself

8  turned around.  Can you restate the question?

9      Q.  Yes.

10         Does Internet Archive place a time restriction

11  on books that are available on its -- on its Internet

12  Archive lending website?

13      A.  Yes.

14      Q.  What is that time restriction?

15         MR. GRATZ:  Outside the scope.

16         You can answer.

17         THE WITNESS:  So I am not 100 percent certain of

18  the date cutoff as I sit here today.  I don't --

19      Q.  BY MS. MCNAMARA:  I have seen indications

20  that -- that books that were published, originally

21  published within the last five years, are generally --

22  but there's exceptions -- are generally not to be made

23  available to the lending portion of the Internet Archive.

24         Does that sound correct to you?

25      A.  It does sound correct to me, although again,

Page 226

1    that exact where that cutoff is -- is something that I

2    recognize that I am -- I don't have my head around today.

3        Q.  Okay.  Okay.  So back on page 40, under

4    out-of-print and off-the-market books.  Do you agree that

5    Internet Archive does not limit what is available on its

6    lending library to out-of-print books?

7        A.  The Internet Archive does not limit its lending

8    library to books that are out -- are determined to be out

9    of print.

10       Q.  And similarly, it does not limit its lending

11   library to books that are off the market.

12           MR. GRATZ:  Objection.  Vague.

13       Q.  BY MS. MCNAMARA:  Correct?

14       A.  So if I'm reading the paper correctly, off the

15   market is something closer to orphan works?

16       Q.  I don't think so.  So let's try to clarify

17   because I think your counsel was probably right.  It was

18   vague as said.  So let's clarify it as to how it's being

19   used in the white paper.

20           In the third sentence of the subsection 2 under

21   out of print and off the market, the paper indicates that

22   a key, though not necessarily determinative factor in

23   fair use, is whether or not the work is available to the

24   potential user.  If the work is out of print or

25   unavailable for purchase through normal challenges" --

Page 227

1    "channels, the user may have more justification for

2    reproducing it."

3            Do you see that?

4            MR. GRATZ:  Objection.  Objection to the form of

5    the question.

6            THE WITNESS:  That's -- sorry, yeah, it looks

7    like this is trying to quote something, but I don't see

8    where the beginning of the quote is in the paper.  I

9    think there's a typo in the paper.  I'm just noticing as

10   we read it here today.  But I do see that.

11       Q.  BY MS. MCNAMARA:  Okay.

12       A.  Yes.

13       Q.  And so does Internet Archive limit the books

14   that are available through its lending library to books

15   that are unavailable for purchase through normal

16   channels?

17           MR. GRATZ:  Objection to the form.

18           THE WITNESS:  The Internet Archive does not

19   limit works -- sorry.  The Internet Archive does not

20   limit the availability of works in its lending library by

21   whether they are unavailable for purchase through normal

22   channels.

23       Q.  BY MS. MCNAMARA:  Okay.  And we've already

24   established -- this goes on to talk about orphan works.

25   We've already established that Internet Archive does not

Page 228

1   limit the availability of works on its lending library to

2   orphan work; isn't that right?

3       A.   That is right.

4       Q.   Okay.  Then -- and I'm -- and I'm cognizant of

5   the time.  I know that we're supposed to try to keep to

6   hour increments, and so I'm almost done so I don't think

7   want you to think I'm being disrespectful of your time.

8           On page 41, there's a subhead 3:  "Nonfiction

9   and Factual Works."

10      A.   I see that.

11      Q.   Do you see that?

12      A.   I do.

13      Q.   It says:  "Finally, a third collection

14  characteristic that may reduce risk and enhance the

15  fair-use position is for libraries to focus their CDL

16  efforts on works that are nonfiction or primarily

17  factual.

18          Do you see that?

19      A.   I see that.

20      Q.   Does Internet Archive in its lending library

21  limit the books that are either nonfiction or primarily

22  factual?

23          MR. GRATZ:  Objection to the form.

24          THE WITNESS:  The Internet Archive lending

25  library is not limited to works that are only nonfiction

Page 229

1   or factual.

2            MS. MCNAMARA:  Okay.  This is a good time to

3   break.  So how much time -- where are we in your schedule

4   of kind of what we so here?

5            MR. GRATZ:  So we have, by my count, we've been

6   on the record for about five hours and 53 minutes.  So

7   we've got about another hour and seven minutes to go.

8            Lila, do you want to take a -- take a longer

9   break now and then, you know, go through to the finish

10  line or a shorter break now and break it up into pieces,

11  or how would you prefer to proceed?

12           THE WITNESS:  Are we still on the record?

13           MR. GRATZ:  We should probably go off the

14  record.

15           THE WITNESS:  Yes.

16           THE VIDEOGRAPHER:  We're going off the record.

17  The time is 11:53 a.m.

18           (Recess.)

19           THE VIDEOGRAPHER:  The time is 12:45, and we are

20  back on the record.

21           MS. MCNAMARA:  Okay.  Thank you for that.

22        Q.  So, Lila, I wanted to turn our attention, if I

23  may, to Mary Minow.  I think we haven't really discussed

24  Ms. Minow.  We've referenced her, but we haven't

25  discussed her in any detail.

Page 254

1    STATE OF CALIFORNIA     ) ss:

2    COUNTY OF MARIN         )

3

4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5    hereby certify:

6          That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9          That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16         I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21   this 25th day of October, 2021.

22

23

24

25         LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462