# McNamara Declaration
# Exhibit 125

| | |
|---|---|
| **From:** | David Hansen, J.D. |
| **Sent:** | Thursday, July 12, 2018 5:24 PM EDT |
| **To:** | Lila Bailey; Courtney, Kyle K. |
| **Subject:** | Re: More robust thoughts on the White Paper |

Thanks, Lila! Very much appreciated.

On the 4th factor section vs. risk section, I'm not totally settled on where I think we should put those arguments about friction and 20th century book market failure. I'm tending to think we should have some repetition and they should go in both parts… There is already a small amount of repetition.

I like the idea of explicitly using that enumerated list of 6 things from the *Statement* to define "controlled," and on using those again in the market harm section. I'm curious about whether you have any thoughts on how to talk best about the 6th requirement-- the DRM recommendation. To me that fits in with the other "friction" arguments (it's hard to copy a physical book, which makes proliferation of copies unlikely. We should make it similarly hard to copy a digital book to also make proliferation of digital copies unlikely), but I wonder if there are other/better ways to frame that.

Point taken about transformative use. Personally, I don't think this is transformative and I'm not too interested in trying to make everything fit into that transformative box. But, why concede the argument if we don't need to.

Your thoughts on the risk section are also very helpful! I'm inclined to follow your organizational advice for that section.

Thanks,

Dave

**From:** Lila Bailey <███@archive.org>
**Date:** Thursday, July 12, 2018 at 2:48 PM
**To:** "Courtney, Kyle K." <███████@harvard.edu>, "David Hansen, J.D." <█████████@duke.edu>
**Subject:** More robust thoughts on the White Paper

Hi guys,

I have some more higher level and structural thoughts and comments about the white paper that seemed to make more sense to just put in an email rather than in the Google Doc. Obviously, normal caveats apply: take these comments as you will, it's your paper. Since these are quite long, I composed them in Word, so I'm also attaching them as a .doc, so you don't have to dig around in our email if you want to go back to something I said. I'm also pasting them in below (formatting may be messed up as a result).

CONFIDENTIAL                                                                                                                                                                    INTARC466829

Thanks for all the good and hard work so far, and here are some thoughts I have to make the paper even stronger:

First, I wanted to say that my comments relate to what I see as the two main purposes of the white paper: 1 – to support and flesh out the arguments and concepts presented in the Statement and 2 – to help libraries understand and assess risk.

**On the first purpose:**

1. I think it would clarify and make the whole document stronger to set forth more explicitly what we mean by "controlled." Specifically, we have 6 minimum requirements that we set out in the Statement that must be present for proper implementation of "control." I would put those right up top, then refer back to them in the 4th factor section and again in the risk section. I don't think you can be too redundant on those fundamental points.
2. The statement doesn't take a position on transformativeness, but your paper does. At a minimum, I think you need to acknowledge that the statement doesn't take a position, and explain that there are arguments on both sides (you can cite TVEyes, Sony etc) and that at least some stakeholders in the library community think CDL is transformative. I think it's fine if you two want to come down on the side of not transformative, but I think you need to at least explain why the statement doesn't take a position.
3. I would not recommend underestimating the importance of the third factor. I'm convinced the reason TVEyes went the way it did is that they had no good answer for "10 minute clips." We have arguments in the Statement about the copies being temporary, which can be analogized to the low-resolution thumbnails in Kelly v ArribaSoft, at least in the sense of not being a full market substitute. Further, it would be worth having a long ass string cite to every case that has held that it's OK to use the entire work. Most of those will be in the context of transformativeness, but still. Also worth mentioning that the statutory preamble mentions multiple copies for classroom use, which I generally think means the whole thing. Anyway, I would suggest spending more time on this section.
4. On the 4th factor, I would hit really hard on why the 6 controls are why we win on the market harm argument – because they are what mimic the traditional lending practices. This also fully answers the security concerns topic IMO. If you do decide to go into those additional rights holder arguments (that digital books don't degrade and transactional friction) I think this section should be where you soundly refute those arguments. As currently drafted, it seems like you think they are good points, and systems should be built to accommodate them. But the Statement does NOT say that those are necessary, so at best these arguments and system design options being in the 4th factor section is confusing, at worst it undermines the Statement. On the Market Failure argument and 20th Century books… I think this is a really important point, and I'm not sure it belongs only here in the 4th factor section. First of all, the Statement doesn't limit to those books, so again you want to avoid being confusing. However, it is clear that this is indeed where the strongest case

CONFIDENTIAL                                                                                                           INTARC466830

can be made. I'm a little unsure exactly what to do with this piece, I'm just noting that as it stands as one of 3 prongs under the 4th Factor analysis, it's confusing.

**On the second purpose:**

I was surprised the risk section was so short. I thought it would be at least half of the whole paper, since this is probably the main reason this white paper is viewed as necessary by Jon Band and co. In terms of framing this section, here is a place to reiterate the importance of consulting a lawyer to build the library's own CDL implementation. This section should also be a stand alone "how to think about implementing CDL" even if you haven't read the legal section as I think many folks will just jump to this section, so being a bit redundant here is a good idea. It might also be a good idea to put 504© in the top of this section as well, to explain why having clear library policies in place can help mitigate risk when relying on fair use.

Some additional things that could go in this section are: sovereign immunity for those libraries to whom it applies, and the fact that thus far plantiffs suing libraries over fair use have not sought damages, only injunctions (cite to Hathi and GA State). I think this is a helpful point for those institutions concerned about their endowment.

My main suggestion is expanding this section and organizing it under 3 clear headers: System Design, Collection Choices, and Library Policies.

1.  System Design Choices

Reiterate the fundamental importance of the 6 "minimum requirements" from the statement as the first thing, not the last thing. Then go into additional system design issues.

One thing the statement does not take on, which I think the white paper should, is the importance of libraries being able to make sure physical copies are not lent out at the same time as physical ones. This may mean digital lending only happens for off site books, closed stacks, or with a special system built for the purpose. But this is really important and is currently missing.

You could talk in this section about who gets access (is it just students/library patrons? Or broader?), or that could go in the library policy section below.

This is where I would suggest putting in the more conservative design options, like on-site terminals, adding "friction" into the design, caps on total # of loans, and so on. Some of these ideas really do undermine the whole point of going digital, so I would want to be really clear that these are optional and more conservative design ideas, not necessary but recommended for more risk averse institutions.

CONFIDENTIAL                                                                                                                           INTARC466831

2. Collection Choices

You already have some of this in there, but I'd suggest expanding on this concept a bit further and being more explicit. You say older books are safer, but not really why. I think you could use 108(h) as a way to say that those really early books from 1923-1942 are very low risk. And then why 1942-64 is another lower risk bucket (higher likelihood of public domain for failure to meet formalities) and so on.

You could also explain more on the searching for commercial availability, right now the work is in the footnote to Melissa Levine's paper, but I think some of the work should be in the text.

You could also mention special collections, rare books or monographs, non-fiction collections such as genealogies, medical reference works, and others that have lesser copyright protection. I think you mention these briefly in the 2nd Factor section, but you should repeat them here.

3. Library Policies

This section should talk about the importance of both internal and external library policies in managing risk. Good policies that document the library's CDL implementation and rationale could help with proving 504(c) and just ensure compliance with best practices. Some security concerns could also be addressed by policy, as well as limiting who has access to the CDL system.

But in this section the most important policy I'd really recommend discussing is a takedown policy. Whether this is internal only, or something clearly stated on the 'library's CDL website interface, a library's willingness to respond to author or publisher takedown notices is a really practical way of managing potential issues as they arise. Some libraries may not want to allow takedowns (I imagine Michelle's would not, for example), which is totally fine, but I think a "bend not break" approach is WAY more important in managing risk than, for example, building extra time between lends and other ways of making the product worse for the user.

CONFIDENTIAL                                                                                                INTARC466832