# McNamara Declaration

# Exhibit 126

# part 1

| | |
|---|---|
| **From:** | Lila Bailey |
| **Sent:** | Friday, August 3, 2018 5:58 PM EDT |
| **To:** | Michelle Wu; Kyle K. C. |
| **CC:** | Mary Minow; Schultz, Jason; David Hansen, J.D. |
| **Subject:** | Re: last draft CDL |
| **Attachments:** | DRAFT White Paper on Controlled Digital Lending of Library Books.edit 6.5 LIB.docx |

Wow, you guys have done a great job on this draft! I think the added length is totally worth it for the depth of analysis and practical considerations. I added a few comments on top of Michelle's (I figured that would be easier than toggling between multiple versions) - it's looking really good.

I will look forward to hearing how the feedback from reviewers goes!

Have a good weekend, and please don't forget to send us any comments you have on the website stuff I sent out earlier this week. Michelle and I need to pin this down early next week so there's time before the semester gets going. I'd appreciate thoughts no later than Sunday.

Best,

Lila


On 8/3/18 7:30 AM, Michelle Wu wrote:

> Thanks to you both! This looks great, and I just had a few additional suggested edits and comments in the attached.
> Best,
> Michelle

On Fri, Aug 3, 2018 at 2:44 AM Courtney, Kyle K. <████████@harvard.edu> wrote:
> Good Evening -
> Yes, its late, but it worth it! Dave and I had the good fortune to both be in Cambridge for the last 4 days together (on and off) and pushed through this final version.
> Attached is the last draft version of the White Paper on Controlled Digital Lending. We addressed nearly all of your comments, edits, suggestions, and grammatical insights - many thanks! And, of course, we welcome any further insights - but all in all, this feels to be 99.9% done (so to speak - a few footnote fixes, phrases, etc.). Let us know what you think! Starting next week, we will begin to share with our top affiliates/endorsers (Pam, Kevin Smith, Kenny, etc.) and then I will work on booking meeting time with ALA/ARL.
> Thanks all!
> Best,
> Kyle


--

Michelle M. Wu  | Associate Dean for Library Services & Professor of Law

CONFIDENTIAL

111 G Street, N.W. | Washington, D.C. 20001
Office: ██████████ | Email: ██████████@law.georgetown.edu

CONFIDENTIAL

# A White Paper on Controlled Digital Lending of Library Books

David R. Hansen & Kyle K. Courtney[1] [2]

This paper is about how libraries can legally lend digital copies of books. It explains the legal and policy rationales for the process— "controlled digital lending"— as well as a variety of risk factors and practical considerations that can guide libraries seeking to implement such lending.  We write this paper in support of the *Position Statement on Controlled Digital Lending*,[3] a document endorsed by many libraries, librarians, and legal experts.  Our goal is to help libraries and their lawyers more fully understand the legal rationale for controlled digital lending, as well as situations in which this rationale is the strongest.

For this paper we define "controlled digital lending" (CDL) just as the *Statement* does:

> CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner. Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation. For example, if a library owns three copies of a title and digitizes one

---

[1] David R. Hansen is Associate University Librarian for Research, Collections & Scholarly Communications at Duke University Libraries. Kyle K. Courtney is Copyright Advisor for Harvard Library. *These institutional affiliations are for identification purposes only.*

[2] We're grateful for comments and suggestions from a number of people including Lila Bailey, Mary Minow, and Michelle Wu. Thanks also to participants who helped hone our thoughts in sessions we held on this topic at the 2018 American Association of Law Libraries Annual Meeting, the 2018 Kraemer Copyright Conference, and the 2018 University Information Policy Officers Meeting hosting by The Ohio State University Libraries.

[3] We are both contributors to that statement. We wrote this paper independently, with comments and input from selected *Statement* drafters and endorsers.

CONFIDENTIAL

WU00003024

copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization. Essentially, CDL must maintain an "owned to loaned" ratio. Circulation in any format is controlled so that only one user can use any given copy at a time, for a limited time. Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies.[4]

Thus, CDL would permit circulation of copies equal to those that had been legitimately acquired by the participating libraries. When the digital copy is being read by a patron, however, the physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one. A library can lend a physical book to a patron through standard circulation or to another library through interlibrary loan. What CDL does do is shift that lending to a new format that opens up access possibilities for readers with disabilities, physical access limitations, research efficiency needs, or other needs for digitally-accessible content.

A CDL system is not a brand-new concept. There are multiple versions of CDL-like systems currently being used in libraries. The idea was first explored in the pioneering article "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries"[5] by Michelle Wu, Professor of Law and Law Library Director at Georgetown University School of Law. Later, the Internet Archive created the "Open Library: Digital Lending Library" project, which has been highly successful and has utilized a unique CDL-like system for the past 8 years.[6] In fact, the program was so successful, multiple libraries have harnessed the same CDL system and partnered with Internet Archive to loan their digital copies of books. These partners include large library systems such as the Boston Public Library, to smaller specialized libraries such as the Allen County Public Library, which houses the largest genealogical collection of any public library in

---

[4] Cite to Statement website?

[5] Michelle M. Wu, "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries," 103 Law Libr. J. 527 (2011). See also Michelle M. Wu, "Piece-by-Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use," 36 Legal Reference Services Q. 51 (2017).

6 See https://openlibrary.org. See also Geoffrey A. Fowler, "Libraries Have a Novel Idea," Wall St. J., June 29, 2010, available at http://online.wsj.com/article/SB10001424052748703279704575335193054884

CONFIDENTIAL                                                   WU00003025

the country.[7] And, most recently, Georgetown Law Library launched its own CDL-like service.[8]

At its core, CDL is about replicating with digital lending the legal and economically significant aspects of physical lending. To do so, we libraries must truly exercise control in the process. The *Statement* identifies six specific ways to do so. It states that for CDL, libraries should:

(1) ensure that original works are acquired lawfully;

(2) apply CDL only to works that are owned and not licensed;

(3) limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio);

(4) lend each digital version only to a single user at a time just as a physical copy would be loaned;

(5) limit the time period for each lend to one that is analogous to physical lending; and

(6) use digital rights management to prevent wholesale copying and redistribution.

Our principal legal argument for controlled digital lending is that fair use - an "equitable rule of reason"[9]- permits libraries to do online what they have always done with physical collections under the first sale doctrine: lend books. The first sale doctrine, codified in Section 109 of the Copyright Act, provides that anyone who legally acquires a copyrighted work from the copyright holder receives the right to sell, display, or otherwise dispose of that particular copy, notwithstanding the interests of the copyright owner. This is how libraries loan books.  Additionally, fair use ultimately asks, "whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."[10] In this case we believe it would be. Controlled digital lending as we conceive it is premised on the idea that libraries can extend their traditional lending role to the digital environment. The system we propose maintains the market balance long-recognized by the courts and Congress as between rightsholders and libraries,[11] makes it possible for libraries

---

[7] Internet Archive, "Digital Lending Library" Internet Archive Blogs (June 28, 2010), https://blog.archive.org/2010/06/28/digital-lending-library [https://perma.cc/R4A2-QUW6]

[8] [Michelle had a blog post about this?]

[9] HR Rep No 94-1476, 94th Cong, 2d Sess 65 (1976).

[10] Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006).

[11] For users generally, the House Judiciary Committee Report on the 1976 Copyright Act explains that under section 109(a), "[a] library that has acquired ownership of a copy is entitled to

Page   3

CONFIDENTIAL

WU00003026

to fulfill their "vital function in society"[12] by enabling the unrestricted lending of books to benefit the general learning, research, and intellectual enrichment of readers by allowing them limited and controlled digital access to materials online.

## I.   THE 20TH CENTURY BOOK PROBLEM

For decades, libraries and cultural institutions have sought to provide greater access to their collections with the hope of reaching a broader and more diverse set of readers.[13] A confluence of technological advances and expanding copyright protection have driven the problem.

Copyright terms are now extremely long (95 years or more for many published works), "formalities" that once required rightsholders to take action to obtain and retain rights have been eliminated, rights are infinitely divisible among private parties causing uncertainty about ownership, and the quantity of copyright-eligible works has exploded with the technological ability to easily and quickly create and publish new works.[14] Librarians now puzzle over questions such as whether a work is actually still protected by copyright (did the rightsholder comply with applicable U.S. copyright formalities?), who owns digital rights (publisher or author?), and whether the rightsholder can be found (or is the work an orphan?). Attempting to clearly answer those questions on a title-by-title basis has proven costly,[15] making full digital access for large

---

lend it under any conditions it chooses to impose." H.R. Rep. No. 94-1476, § 109, at 79 (1976). The Copyright Act in several other places identifies special considerations with respect to libraries. *See* 17 U.S.C. § 108 (specific exceptions to reproduce and distribute for libraries and archives); 17 U.S.C. § 504(c)(2) (special damage exceptions for libraries and archives);

[12] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 105 (2001), https://perma.cc/59TU-2NKJ [hereinafter, DMCA SECTION 104 REPORT].

[13] For example, Project Gutenberg is a volunteer effort to digitize and archive cultural works, to "encourage the creation and distribution of books." It was founded in 1971 by Michael S. Hart and is the oldest digital library. See http://www.gutenberg.org/. Others efforts include the HathiTrust digital library, https://www.hathitrust.org/, OpenLibrary, http://openlibrary.org/, and—with a corporate partner—Google Books, https://books.google.com/.

[14] In the context of the "orphan works" problem, these and related causes are explained in more detail in David R. Hansen, *Orphan Works: Causes of the Problem* (Berkeley Digital Library Copyright Project White Paper No. 3, 2012), https://ssrn.com/abstract=2038068.

[15] *See, e.g.,* Cornell University Library, Response to the Notice of Inquiry Concerning Orphan Works (Mar. 23, 2005), https://perma.cc/NZ8W-UWMK (spending $50,000 in staff time to identify rightsholders for 198 books); Carnegie Mellon University Libraries, Response to Notice of Inquiry about Orphan Works 2 (Mar. 22, 2005), https://perma.cc/95XW-TV4Z (similar). *See also* Maggie Dickson, Due Diligence, Futile Effort: Copyright and the Digitization of the Thomas E. Watson Papers, 73 AM. ARCHIVIST 626 (2010), https://perma.cc/QD2X-F3D8 (reporting on

CONFIDENTIAL   WU00003027

numbers of works based on rightsholder permission difficult. Particularly for books and other published materials for which there was once an active market, libraries have not yet been able to provide broad full-text access online.[16]

So, many 20th Century books are not available for purchase as new copies in print or as digital versions online.[17] Libraries would like to provide digital access, but many rightsholders have largely not offered those titles for sale in that format. The morass of rights management, combined with the orphan works problem and the ever-increasing copyright length, has made it complicated to see a path forward to broad digital access.

For modern libraries with users whose research and information use patterns mean they look to digital access first,[18] this means that a whole world of research is effectively invisible to a variety of types of users. For some, the inability to physically travel to a library because of their remote physical location, economic wherewithal, or homebound limitations means that physical lending is not practical.  For others, physical access is a matter of great inefficiency in their research and learning. For users with print disabilities--those who currently have some digital access to print collections due to the fair use holding in the *HathiTrust* case which addressed copying and access of books for print-disabled users[19] —access is currently hampered by hurdles that require users to self-

---

similar efforts in the context of special collections). The same is true in jurisdictions with relative clarity about what steps are necessary for such a search. *See* Victoria Stobo, Kris Erickson, Aura Bertoni & Flavia Guerrieri, *Report 3: Current Best Practices among Cultural Heritage Institutions when Dealing with Copyright Orphan Works and Analysis of Crowdsourcing Options* (EnDOW Report 3, May 2018), https://perma.cc/SQH8-H3CT ("This study shows that digitization remains a paradox for [cultural heritage institutions]. Rights clearance in particular remains expensive and ranges considerably depending on the nature of the work and the approach taken by the institution.").

[16] In contrast, U.S. libraries have increasingly relied on fair use to provide full-text access to archival and special collections materials for which original markets are more clearly limited. *See* DAVID R. HANSEN, DIGITIZING ORPHAN WORKS: REDUCING LEGAL RISKS FOR OPEN ACCESS TO COPYRIGHTED ORPHAN WORKS, 111 (Kyle K. Courtney & Peter Suber eds., Harvard Library 2016), https://dash.harvard.edu/handle/1/27840430 (listing 30 different online digital collections in which libraries have openly disclosed the likely orphan status of their materials and their reliance on fair use as a basis for online digital access).

[17] *See* Paul J. Heald, *How Copyright Keeps Works Disappeared,* 11 J. EMPIRICAL L. STUDIES 829 (2014).

[18] *See, e.g.,* John Palfrey & Urs Gasser, Born Digital: Understanding the First Generation of Digital Natives (Basic Books, 2010).

[19] *See* Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 101 (2d Cir. 2014) (finding it fair use for the HathiTrust digital library to provide access to print-disabled patrons under a system which requires patrons to "submit documentation from a qualified expert verifying that the disability prevents him or her from reading printed materials" before gaining access).

CONFIDENTIAL                                                                 WU00003028

identify disabilities and request special access to digital copies. For a large research library, this means holdings of millions of volumes, already purchased at a cost of hundreds of millions of dollars, ~~that~~ are not accessible in a format that is most meaningful and easy for many researchers today.[20]

It's this category of book that we are mainly concerned with—books primarily from the mid-20[th] Century, presumptively still protected by copyright, but not currently available in electronic form from their rightsholders.[21] Some of these books may well be described as "orphaned," without identifiable owners. Others may have identifiable owners, but are in practice neglected, unavailable in the digital marketplace and with no plan for revitalization in modern formats. For all, it means that they are not fully meeting the basic goals of copyright to promote "the Progress of Science and the useful Arts."[22] Their unavailability online benefits neither creators nor the reading public.

So, how can libraries provide access? First, we start with a detailed look at the two fundamental copyright law doctrines that already empower libraries to fulfill their missions: first sale and fair use.

## II.   THE LEGAL FRAMEWORK: FIRST SALE AND FAIR USE

Section 106 of the Copyright Act enumerates the basic bundle of rights granted to copyright owners: the exclusive right to control reproduction of the work, public distribution of the work, public performances, public displays, and creation of derivative works.[23] For individuals who want to lend or resell copies of works they have purchased, the rightsholder's exclusive right to control public

---

[20] Some of the most popular, commercially-viable books remain in print and are available in a variety of formats. For many 20th Century books, however, the window for commercial viability passes only a few years after first publication. Several copyright scholars have studied the phenomenon. *See* William M. Landes & Richard A. Posner, *Indefinitely Renewable Copyright,* 70 U. CHI. L. REV. 471, 474 (2003); Paul J. Heald, *Property Rights and the Efficient Exploitation of Copyrighted Works: An Empirical Analysis of Public Domain and Copyrighted Fiction Bestseller*s, 92 MINN. L. REV. 1031 (2008).

[21] Controlled digital lending may be well adapted to other types of library lending, for example of serials, or of audio or audiovisual works, or even archival materials. The same principles may also support other related activities such as users' donation of ebooks to libraries. The market dynamics and use scenarios that those situations raise are different enough that we believe they merit separate treatment in a subsequent paper. *See* Paul J. Heald, *The Demand for Out-of-Print Works and their (Un)Availability in Alternative Markets* (Illinois Public Law and Legal Theory Research Papers Series No. 14-31, 2014), http://papers.ssrn.com/abstract=2409118 (noting differences between the book markets and music markets).

[22] U.S. CONST., Art. I, Sec. 8, Cl. 8.

[23] 17 U.S.C. § 106.

CONFIDENTIAL                                                              WU00003029

distribution[24] is potentially problematic. But, the rights granted in Section 106 are limited by a number of statutory exceptions. Section 109 is one such provision. It states that "[n]otwithstanding the provisions of section 106(3) [the public distribution right], the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."[25]

Entire industries and enterprises are built upon the first sale doctrine. Libraries were built on it. eBay relies on the provision when it permits users to sell copyright protected works through its site,[26] used record stores similarly rely on it to distribute copies they have acquired, college bookstores buy and sell used textbooks based on this doctrine, and libraries rely on it to lend physical books in their collections. The first sale doctrine balances the rights of copyright owners to distribute with those of purchasers to dispose of their copies as they wish. Without it, copyright holders could enforce rights in the "secondary market," which would impact selling, loaning, or gifting any copyrighted work. The rationale is that "once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."[27]

A critical limitation in the text of Section 109 is that it only allows the "owner of a copy" to "sell or otherwise dispose" of that particular copy. With distribution of physical copies, such as lending a print book to a library user, that framework works well enough. But digital copies by their very nature require the creation of a *new copy* to be made *even temporarily* in order to transfer from device to device; physical "distribution" of the original copy does not work. So, what could be a practically and economically very similar transaction, such as lending a digital copy of a book to a library user, requires a technical reproduction *and then deletion* of the work that is not clearly permitted under the terms of Section 109.

That brings us to fair use. Unlike first sale, fair use applies to uses implicating any or all of the copyright holder's exclusive rights, including both public distribution and the right to control reproductions.[28] Like the first sale doctrine,

---

[24] *Id.* ("copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending").

[25] *Id.*

[26] UMG Recordings, Inc. v. Augusto, 628 F.3d 1175, 1180 (9th Cir. 2011).

[27] Quality King Distributors, Inc. v. L'anza Research Intern., Inc., 523 U.S. 135, 152 (1998).

CONFIDENTIAL                    WU00003030

fair use is widely used and entire industries (e.g., home recording device manufacturers, search engines, filmmakers, publishers ) rely on it.[29] Described as an "equitable rule of reason," fair use was developed by the courts beginning in the 1800s.[30] Congress in 1976 codified the doctrine in Section 107 of the Copyright Act, which provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not copyright infringement."[31] Those examples are "illustrative and not limitative" however.[32] To apply the doctrine, Congress identified four non-exclusive factors that courts and users should consider:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Those four statutory factors must not be "treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright."[33]  Ultimately, the fair use inquiry asks, "whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."[34] The next section examines how this flexible doctrine can apply to CDL.

---

[28] 17 U.S.C. § 107 (Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright.")

[29] *See, e.g.*, Computer & Communications Industry Association, Fair Use in the U.S. Economy: Economic Contribution of Industries Relying on Fair Use (2017), https://perma.cc/EGH4-N88D (summarizing industries reliant on fair use).

[30] *See Folsom v. Marsh*, 9. F. Cas. 342 (C.C.D. Mass. 1841); Matthew Sag, *The Pre-History of Fair Use*, 76 BROOKLYN L. REV. 1371 (2011).

[31] 17 U.S.C. § 107 (2018).

[32] Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577–78 (1994).

[33] *Id.*

[34] Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006).

CONFIDENTIAL                                                                          WU00003031

### III.   CONTROLLED DIGITAL LENDING AS FAIR USE

The basic concept of "digital first sale" is not new, either as justified under the first sale doctrine alone, as fair use, or through some combination of the two together. The U.S. Copyright Office in 2001 examined the issue of "digital first sale," soliciting comments that exhibited a range of views about whether the first sale doctrine does or should be made to apply to digital transactions. In part because the use of digital technology was so new at the time, the Office concluded that it does not and should not.[35] More recently, the U.S. Patent & Trademark Office studied the issue itself and released a white paper expressing similar views in 2016.[36] Scholarship on "digital first sale" and related concepts has flourished in recent years.[37] And most recently the courts in *Capitol Records v. ReDigi, LLC,* have weighed how these doctrines apply to a commercial, digital resale market for mp3s.[38]

Much of the literature on digital first sale recognizes that library lending raises unique concerns requiring special treatment.[39] Though other use scenarios are certainly possible, we view library lending uses as special, as detailed in the sections below, and of all uses among the most likely to be justified under a fair use rationale. Indeed, several libraries have already engaged in limited CDL for years without issue, indicating perhaps a tacit acknowledgement of the strength of their legal position.[40] So, while the concept of digital first sale may have many

---

[35] DMCA SECTION 104 REPORT, *supra* note 30, at 80, 90 ("[W]hen the owner of a lawful copy of a copyrighted work digitally transmits that work in a way that exercises the reproduction right without authorization, section 109 does not provide a defense to infringement" and "we recommend no change to section 109 at this time").

[36] U.S. PATENT & TRADEMARK OFFICE, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 58 (2016), https://perma.cc/RJ7Z-5REZ [hereinafter USPTO FIRST SALE STUDY] (examining a wide range of potential applications, including library uses, but ultimately concluding that "we cannot at this time recommend extending the first sale doctrine to apply to digital transmissions of copyrighted works.").

[37] For some representative work, see Aaron Perzanowski & Jason Schultz, *Digital Exhaustion,* 58 UCLA L. REV. 889 (2011); R. Anthony Reese, *The First Sale Doctrine in the Era of Digital Networks,* 44 B.C. L. Rev. 577, 584 (2003); Victor F. Calaba, *Quibbles 'n Bits: Making A Digital First Sale Doctrine Feasible,* 9 MICH. TELECOMM. TECH. L. REV. 1 (2002).

[38] 934 F. Supp. 2d 640 (2013), on appeal, Case No. 16-2321-cv (2d Cir. 2016).

[39] DMCA SECTION 104 REPORT, *supra* note XX, at 104-105 (addressing library specific issues); USPTO FIRST SALE STUDY, *supra* note XX, at 48, 50; Calba, *supra* note XX, at 31-32 ("special measures for libraries"); Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive in Support of Reversal, Capitol Records, LLC v. Redigi Inc., Case No. 16-2321-cv (2d Cir. 2016), https://perma.cc/79AL-649N; Michelle Wu, *Piece by Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use,* 36 LEGAL REF. SERV. Q. 51 (2017), https://doi.org/10.1080/0270319X.2017.1359059.

CONFIDENTIAL                                                        WU00003032