# McNamara Declaration Exhibit 133

| | |
|---|---|
| **From:** | Brewster Kahle |
| **Sent:** | Thursday, October 26, 2017 7:02 PM EDT |
| **To:** | Brianna Schofield; Katie Hafner |
| **CC:** | @archive.org; Caitlin Olson; Wendy Hanamura |
| **Subject:** | background for the book program |
| **Attachments:** | statement-controlled lending v6 .pdf, signature.asc |

Katie--

Trying to get a complete library of books to digital learners.

1923 on back is public domain, hurrah, we have digitized 3 million of
these and getting 25million reads per month (!).

out of print 1923-1941 can be digitized and made available.

   Announced Oct 11, 2017:
http://blog.archive.org/2017/10/10/books-from-1923-to-1941-now-liberated/

     collection:

https://archive.org/details/last20

Big deal:  digitize and lend:

   We have been doing it for 6 years with the boston public library and
others (500k books), but one reader at a time in the whole world.

    Here are your (katie's) books lent in this way:

https://archive.org/details/texts?&and[]=katie%20hafner%20AND%20scanner:*

     Houghton Mifflin Harcourt explicitly signed on for their backlist

Next big step forward:

   open this up so other libraries can lend books based on their
holdings (not just 1 book for the world based on Internet Archive's copy).

   this is called "Open Libraries"

     a paper about the general concept:

https://er.educause.edu/articles/2017/3/transforming-our-libraries-from-analog-to-digital-a-2020-vision

     a website about it:  http://openlibraries.online

     legal folks statement about "Controlled Digital Lending by

CONFIDENTIAL      INTARC00458732

Libraries" (do not distribute because not public yet)  attached to this message

MIT Press explicitly signs on:
https://blog.archive.org/2017/05/30/mit-press-classics-available-soon-at-archive-org/

Macarthur grant narrative, with awesome letters of support:
https://archive.org/details/OpenLibrariesNarrative

Exec Summary:

Open Libraries

Looking for a trusted source of information? For millions of citizens there's only one place to head: their local library—society's great equalizer, where wifi, computers, and knowledge are offered for free, to anyone who can enter the door. Yet, due to distance, time, cost or disability, people in marginalized populations are too often denied access to physical books. Today for many learners, if a book isn't digital, it's as if it doesn't exist. Yet there's almost a century of knowledge that still lives only on the printed page, missing from our digital shelves.

The Internet Archive's Open Libraries offers a solution bringing four million books online, through purchase or digitization, while honoring the rights of creators and expanding their online reach. Added to our existing 2.5 million ebooks, we can build the online equivalent of a great, modern public library. Working with US libraries and Benetech, the world's largest digital library for the print disabled, the Internet Archive (IA) will bring millions of free digital books to billions of people. For the blind, ebooks are a lifeline, yet only one in ten exists in accessible formats. Digital content is instantly available to people in rural areas, with widely ranging physical abilities. By digitizing millions of books, we unlock them for communities with limited or no access.

At the same time, we have a rare opportunity to shape digital collections to serve communities that are increasingly diverse. In 2015, 50% of newborn US babies were children of color, yet over a twenty-year span, on average only 11% of children's books contained multicultural content. Because our library shelves can and must be as diverse as readers, we will curate inclusive content.

IA will select and preserve diverse collections and help libraries greatly expand their digital holdings. In 2013, ebooks comprised an average of 17% of U.S. public libraries collections; we can turn 80% of library collections digital by 2023. We'll build an open infrastructure for at-scale ebook circulation so US libraries that own the hardcopy can offer their patrons temporary digital access, just like loaning a book. Working with Benetech, we'll expand ebooks for the print disabled by 10x. Global agreements allow sharing these ebooks with the vision impaired in 29 nations.

In this era of disinformation, ready access to trustworthy sources is critical. Library books are trusted sources for life-long learning. By bringing them online, we empower journalists and Wikipedia editors to cite "snippets" directly, grounding readers in the vetted, published

CONFIDENTIAL

INTARC00458733

record.

A century ago, Andrew Carnegie funded a vast network of public libraries because he recognized democracy can only exist when citizens have equal access to diverse information. Libraries continue to play that vital role, welcoming the whole of society to use their free resources for individual learning, while respecting citizens' privacy and dignity. Through its support, the MacArthur Foundation can help us build a financially sustainable infrastructure for digital libraries across this nation--ensuring that all citizens, including our most vulnerable, have equal and unfettered access to knowledge.


-brewster

CONFIDENTIAL                                                                                                                                                      INTARC00458734

# Statement on Controlled Digital Lending by Libraries

## October 2017



Co-Authored By:
**Lila Bailey**, Policy Counsel, Internet Archive
**Kyle Courtney**, Copyright Advisor, Harvard University
**David Hansen**, Director of Copyright and Scholarly Communications, Duke University Libraries
**Mary Minow**, Fellow 2017-18, Berkman Klein Center for Internet and Society, Harvard University
**Jason Schultz**, Professor of Clinical Law, NYU Law
**Michelle Wu**, Associate Dean for Library Services, Professor of Law, Georgetown Law

CONFIDENTIAL                                                                                                    INTARC00458735

## Statement on Controlled Digital Lending by Libraries



### The Purpose of This Statement

This Statement offers a good faith interpretation of U.S. copyright law for American libraries considering how to perform traditional lending functions using digital technology while preserving an appropriate balance between the public benefit of such lending and the protected interests of private rights holders. This Statement only applies to in-copyright works, as public domain works may be distributed without restriction. This Statement is not intended to describe the upper limits of the fair use or other rights of libraries, bind the signatories to any legal position, or constitute legal advice. Because the following analysis is general, any library considering implementing controlled digital lending should consult a competent attorney to develop an appropriate program responsive to the specific needs of the institution and community.

### Controlled Digital Lending ("CDL")

One of the most fundamental and socially beneficial functions of libraries is providing broad non-discriminatory access to information by lending books and other materials to their communities.  To lend materials more effectively, libraries can apply CDL to their collections in order to fulfill their missions. CDL techniques like those described in this Statement are designed to mirror traditional library practices permitted by copyright law.

Properly implemented, CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner. Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation. For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization. Essentially, CDL must maintain an "owned to loaned" ratio. Circulation in any format is controlled so that only one user can use any given copy at a given time, for a limited time. Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies.

### Legal Support For CDL

As U.S. libraries consider implementing CDL, questions may arise about how such programs interact with U.S. copyright law. As with traditional physical lending, there are two main areas of copyright law that support CDL: the principle of exhaustion and the fair use doctrine.

#### First Sale and the Common Law Exhaustion Principle

Traditional library lending has been common practice for hundreds of years, primarily due to the common law principle of exhaustion, which is codified in part at Section 109 of the Copyright Act and is also known as the "first sale" doctrine. This legal set of rules mandates that any time there is an authorized transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy are terminated or "exhausted." Exhaustion allows the owner of a particular copy of a work to sell, lend, or give away that copy without payment to or permission from the rights holder. Among other important benefits, exhaustion ensures that after copyright holders price and control the initial distribution of their works, secondary outlets (such as libraries) and markets (such as used bookstores) can expand the affordability, preservation, and availability of works. Library CDL approaches that track the principle of exhaustion are thus much more likely to fall within its protections.

#### Fair Use

Fair use has also existed for hundreds of years within U.S. copyright law to protect and preserve socially beneficial secondary uses of copyrighted works. It is an essential part of U.S. copyright law and acts as a First Amendment "safety valve" that protects free speech from encroachment by copyright holders. Section 107 of the U.S. Copyright Act gives several examples of canonical fair use such as " criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research," and expressly states that fair use is not an infringement of copyright. Other socially beneficial purposes, such as increasing public access to works, may also qualify for fair use.  Library CDL approaches that are designed for socially beneficial purposes are much more likely to fall within the protections of fair use.

The law further provides four nonexclusive factors for courts to consider in determining whether a particular use is fair:
> (1) the purpose and character of the use, including whether such use is of a
> commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted
> work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

All four factors must be weighed together in a fact-specific inquiry—each case is decided individually. Courts may consider additional factors, when appropriate, including whether the purpose of the use supports the underlying purpose of copyright law to expand public knowledge and understanding.

### Application of Fair Use and Exhaustion to CDL

Both the exhaustion doctrine and the fair use doctrine support CDL when properly implemented. Because there is no directly analogous case on point, this Statement offers a more detailed explanation of how fair use and copyright exhaustion can work together to effectuate CDL practices:

#### 1. The Purpose and Character of the Use

The purposes of library lending are diverse but all focus on socially beneficial outcomes that favor fair use, including providing access to information in order to encourage literacy, education, criticism, comment, news reporting, teaching, scholarship, and research, creating the informed citizenry essential to a functioning democracy. Both physical lending and

# Statement on Controlled Digital Lending by Libraries

(2)

CDL facilitate these purposes, and CDL substantially enhances them by providing non-discriminatory access and informational self sufficiency to residents in rural communities, the elderly or physically disabled, and others for whom a trip to their local library may be a barrier to access. During natural disasters and severe weather, as well as during health emergencies, CDL may be the only practical way for citizens to access what their libraries have purchased for their use. Moreover, another purpose of CDL is to fulfill the promise of the exhaustion doctrine, enabling libraries to distribute the copies they own, just in a different format, and this also weighs in favor of fair use. Public, school, and academic libraries lend books for noncommercial purposes, also strongly weighing in favor of fair use.

Another consideration under this factor is whether the use is transformative—that is, whether the secondary use has a different purpose or character from the original. A finding of transformativeness weighs heavily in favor of fair use, but a finding of transformation is not necessary when other socially beneficial purposes are present. This Statement is not premised on CDL being transformative. On balance the noncommercial and socially beneficial purposes of CDL favor fair use.

### 2. The Nature of the Copyrighted Work

Under this factor, published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred. CDL will almost always be used for books that have been published, and therefore this factor will generally favor fair use, or at least will not tip against it.

In some fair use cases, the content of the work (e.g., fact vs. fiction) will influence the fair use outcome, with courts allowing more uses when the underlying work is more informational or factual. Although this factor is rarely dispositive, library choices regarding which types of books they lend through CDL can help strengthen the analysis of this factor when weighed together with the other factors. Thus, the case for fair use may be stronger when the underlying work is academic, informational, or nonfiction. Other considerations regarding the nature of the work may also be considered relevant, for example, the case for fair use may be even stronger when the underlying work is commercially inactive, out-of-print, or a so-called "orphan work" whose owner cannot be identified or located.

### 3. The Amount and Substantiality of the Portion Used

The amount used must be reasonable in light of the purpose of the use and many courts have found use of entire works fair for many purposes. With CDL, a user is typically granted temporary access to the entire work for non-commercial, socially beneficial purposes. After the temporary lending period, the user may no longer access the book, unless she checks it out again. If the library only owns one physical copy of the work, then additional users must wait in line. Just as it is reasonable and customary for brick-and-mortar libraries to lend out entire physical copies of books for a short period, providing temporary access to an entire digital work is reasonable for CDL purposes.

### 4. The Market Effect

The final fair use factor looks at the market effect of the secondary use. For CDL, the arguable negative impact is the loss of sales due to lending as a substitution. However, this effect, to the degree it exists, is unlikely to be counted against fair use because it is comparable to the current effect of physical lending, because properly implemented CDL programs maintain an "owned to loaned" ratio. Because libraries are entitled to distribute copies they own, any market effect from such activities is unlikely to impact the fair use analysis. Fair use jurisprudence recognizes a long-established principle that not all market harms are cognizable copyright injuries. The classic example is the market harm from a negative book review—although sales may be lost, this does not "count" as harm under the fourth factor. Moreover, because CDL depends on all copies having been legitimately acquired, the rights holder will have been compensated for all CDL copies at the time of first acquisition.

## Scope of CDL

Taken together, properly implemented CDL programs stand the best chance of having all the four fair use factors weigh in their favor.

In order to properly position CDL within the analysis above, libraries should (1) ensure that original works are acquired lawfully, (2) apply CDL only to works that are owned and not licensed, (3) limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio); (4) lend each digital version only to a single user at a time just as a physical copy would be loaned; (5) limit the time period for each lend to one that is analogous to physical lending, e.g. two weeks; and (6) use digital rights management to prevent copying and redistribution.

The scenarios below are examples of practices that would not be considered properly implemented CDL or qualify for the analysis outlined above:
• A library digitizes an in-copyright book and makes it publicly available without any DRM allowing users to proliferate available copies of the work.
• A library owning one print copy of an in-copyright book digitizes it and makes it available to multiple users simultaneously, with or without DRM.
• A library digitizes an in-copyright book it has borrowed through interlibrary loan and makes it available to its users, even if only to one user at a time, and controlled through DRM.
• A commercial entity implements CDL and lends digitized versions of books it has purchased to customers for a fee or supported by advertising, even if only to one user at a time, and controlled through DRM.

## Statement on Controlled Digital Lending by Libraries



### Endorsed by

**Institutional:**

**Authors Alliance**
**Duke University Libraries**
**NSCU Libraries**
**Phillips Academy, Andover, Oliver Wendell Holmes Library**
**UNC Chapel Hill Libraries**
**University of Kansas Libraries**

**Individual:**

**Chris Bourg**
Director
MIT Libraries

**Brandon Butler**
Director of Information Policy
University of Virginia Libraries

**Robert Darton,**
University Librarian, Emeritus
Harvard University

**Elizabeth Townsend Gard,**
Jill. H and Avram A. Glazer Professor in Social Entrepreneurship
Co-Director, Tulane Center for IP, Media & Culture
Tulane University Law School

**Ariel Katz,**
Associate Professor, Innovation Chair in Electronic Commerce
Faculty of Law,  University of Toronto

**Lydia Loren**
Henry J. Casey Professor of Law
Lewis & Clark Law School

**Teresa Miguel-Stearns,**
Law Librarian and Professor of Law
Yale Law School

**Aaron Perzanowski**
Professor of Law
Case Western Reserve University School of Law

**Pamela Samuelson**
Richard M. Sherman Distinguished Professor
of Law and Information
University of California - Berkeley

**Ronald E. Wheeler,**
Director of Fineman & Pappas Law Libraries,
Associate Professor of Law and Legal Research
Boston University Law

**Beth Williams,**
Senior Lecturer in Law, Director Robert Crown Law Library
Stanford Law School

**Michael Wolfe,**
Scholarly Communications Officer
University of California - Davis

We welcome additional endorsements. To add your name or institution, please contact: Lila Bailey, lila@archive.org.


Creative Commons Attribution (CC-BY)
https://creativecommons.org/licenses/by/4.0

CONFIDENTIAL                                                                                                                                                          INTARC00458738

NATIVE DOCUMENT PLACEHOLDER

Please review the native document INTARC00458739.asc

CONFIDENTIAL INTARC00458739