# McNamara Declaration
# Exhibit 137

# 16-2321-cv

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

---

CAPITOL RECORDS, LLC, CAPITOL CHRISTIAN MUSIC GROUP, INC., VIRGIN RECORDS IR HOLDINGS, INC.,

*Plaintiffs – Appellees,*

– *v* –

REDIGI INC., JOHN OSSENMACHER, LARRY RUDOLPH, AKA LAWRENCE S. ROGEL,

*Defendants – Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 12-CV-0095,
JUDGE RICHARD J. SULLIVAN

---

**BRIEF OF AMICI CURIAE AMERICAN LIBRARY ASSOCIATION, ASSOCIATION OF COLLEGE AND RESEARCH LIBRARIES, ASSOCIATION OF RESEARCH LIBRARIES, AND INTERNET ARCHIVE IN SUPPORT OF REVERSAL**

---

*Counsel of Record*
JONATHAN BAND PLLC
21 Dupont Circle NW, 8th Floor
Washington, DC 20036
(202) 296-5675
jband@policybandwidth.com
*Counsel for Amici Curiae*

Dated: February 14, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae the American Library Association, the Association of College and Research Libraries, the Association of Research Libraries, and the Internet Archive state that none of these entities has a parent corporation and no publicly held corporation has an ownership stake of 10% or more in any entity.

Dated: February 14, 2017         /s/ Jonathan Band
                                     *Counsel of Record*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................ i

TABLE OF CONTENTS ................................................................................. ii

TABLE OF AUTHORITIES ......................................................................... iii

INTEREST OF AMICI ................................................................................... 1

SUMMARY OF ARGUMENT ...................................................................... 4

ARGUMENT .................................................................................................. 5

I.   The First Sale Doctrine Weighs in Favor of a Fair Use Finding ............ 5

   A. This Court Has Found that Specific Exceptions Positively Influence
      the First Factor Analysis .................................................................... 6

   B. Specific Exceptions Have Positively Influenced the Copyright
      Register's Fair Use Analyses. .......................................................... 7

      1. Jailbreaking ................................................................................. 8

      2. 3D Printers ................................................................................ 11

      3. Abandoned Video Game Software ............................................ 11

      4. MOOCs ..................................................................................... 13

   C. The First Sale Right Should Positively Influence the First Factor
      Analysis in this Case ........................................................................ 14

II.  Finding Fair Use in this Case Would Encourage Innovative Digital
     Services in Libraries ............................................................................ 16

   A. Fair Use Technology Cases Have Spurred Innovation in Libraries 16

   B. Libraries are Building Innovative Digital Lending Services ........... 18

CONCLUSION .............................................................................................. 22

CERTIFICATE OF COMPLIANCE ............................................................ 23

CERTIFICATE OF SERVICE ..................................................................... 24

# TABLE OF AUTHORITIES

## Federal Cases

*Authors Guild v. HathiTrust,*
  755 F.3d 87, 102 (2d Cir. 2014) ...................................................... 4, 6, 21

*Authors Guild, Inc. v. Google,*
  804 F.3d 202 (2d Cir 2015) ..................................................... 17

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569, 579 (2004) ...................................................... 17

*Harper & Row v. Nation Enterprises*,
  471 U.S. 539 (1985)................................................................. 8

*Kelly v. Arriba Soft,*
  336 F.3d 811 (9th Cir. 2003) .................................................. 17

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  133 S. Ct. 1351, 1363 (2013)................................................. 14

*See Golan v. Holder*,
  132 S. Ct. 873 (2012)............................................................... 3

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S 417 (1984)................................................................. 17

## Federal Statutes

17 U.S.C. § 106(3) ......................................................................... 3

17 U.S.C. § 107............................................................................ 4, 5

17 U.S.C. § 108 ............................................................................ 14

17 U.S.C. § 109(a) ......................................................................... 6

17 U.S.C. § 110(2) .................................................................... 13, 14

17 U.S.C. § 117.......................................................................... 11, 14

17 U.S.C. § 121 ..................................................................... 4, 6, 14

17 U.S.C. § 1201 ................................................................... passim

# Legislative Materials

H.R. Rep. No. 94-1476, § 109 (1976) ........................................... 4

# Other Authorities

Aaron Perzanowski & Jason Schultz, *The End of Ownership: Personal Property in the Digital Economy*, 103 (2016) ......................................... 20

Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y 453 (2012) .................... 6

Michelle Wu, *Collaborative Academic Library Digital Collections Post-Cambridge University Press, HathiTrust and Google Decisions on Fair Use*, Journal of Copyright in Education and Librarianship, p 3 (Vol. 1, Issue 1 2016) ........................................................................... 17

Recommendation of the Register of Copyrights, *Section 1201 Rulemaking: Fourth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2010) ..................................................... 8, 9

Recommendation of the Register of Copyrights, *Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2015) ....................................... 8, 10, 11, 13

# INTEREST OF AMICI[1]

The American Library Association ("ALA"), established in 1876, is a nonprofit professional organization of more than 57,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries ("ACRL"), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals. It is dedicated to enhancing the ability of academic library and information professionals to serve the information needs of the higher education community and to improve learning, teaching, and research.

The Association of Research Libraries ("ARL") is an association of 124 research libraries in North America. ARL's members include university libraries, public libraries, government and national libraries. ARL programs

---

[1] All parties consent to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no party's counsel authored this brief in whole or in part, and neither any party, nor any party's counsel, contributed money towards the preparation of this brief. No person other than amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

and services promote equitable access to and effective use of recorded knowledge in support of teaching and research.

Collectively, these three library associations represent over 100,000 libraries and 350,000 librarians and other personnel that serve the needs of their patrons in the digital age. As a result, the associations share a strong interest in the balanced application of copyright law to new digital dissemination technologies.

The Internet Archive is a public nonprofit organization that was founded in 1996 to build an "Internet library," with the purpose of offering researchers, historians, scholars, artists, and the general public permanent access to historical collections in digital format. Located in San Francisco, California, the Internet Archive receives data donations and collects, records, and digitizes material from a multitude of sources, including libraries, educational institutions, government agencies, and private companies. The Internet Archive then provides free public access to its data—which include text, audio, video, software, and archived web pages.

One of the most basic functions of libraries is lending books and other materials to the public.[2] Section 106(3) of the Copyright Act grants the copyright holder the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by . . . lending." 17 U.S.C. § 106(3). However, the first sale right, codified at section 109(a) of the Copyright Act, exhausts the copyright holder's distribution right in a particular copy "lawfully made under this title" after the first sale of that copy. 17 U.S.C. § 109(a). The House Judiciary Committee Report on the 1976 Copyright Act explains that under section 109(a), "[a] library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose." H.R. Rep. No. 94-1476, § 109, at 79 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5693. The first sale right thus is critical to the operation of libraries: "[w]ithout this exemption, libraries would be unable to lend books, CDs, videos, or other materials to patrons." Carrie Russell, *Complete Copyright: An Everyday Guide for Librarians* 43 (2004).

A growing percentage of libraries' collections consist of materials in digital form. And libraries increasingly are using digital technology to perform their everyday activities, including preservation and lending.

---

[2] Libraries circulate a wide variety of materials in addition to books, including journals, dissertations, computer programs, phonorecords, and audiovisual works.

Accordingly, libraries need to ensure that they can employ existing copyright exceptions and limitations in the digital environment. The fair use right, codified at 17 U.S.C. § 107, is a built-in mechanism by which the Copyright Act allows itself to be updated. *See Golan v. Holder*, 132 S. Ct. 873, 890 (2012)(describing fair use as a "built-in First Amendment accommodation"). In particular, Amici believe that fair use enables the application of the first sale right with respect to the transmission of digital works in appropriate circumstances.

## SUMMARY OF ARGUMENT

This brief makes two arguments relating to fair use. First, in its truncated fair use analysis, the district court ignored the similarity between the use ReDigi sought to make and uses authorized by Section 109(a). This similarity should have tilted the first fair use factor, the purpose and character of the use, in favor of ReDigi. In *Authors Guild v. HathiTrust,* 755 F.3d 87, 102 (2d Cir. 2014), this Court used the rationale for a specific exception—17 U.S.C. § 121, which permits the making of accessible format copies for people who have print disablilites—to support a finding of a valid purpose under the first factor. Likewise, the Copyright Office has repeatedly based fair use conclusions on specific exceptions in the context of a rulemaking under section 1201 of the Digital Millennium Copyright Act, 17

4

U.S.C. § 1201. As this Court did in *HathiTrust* and the Copyright Office did in the section 1201 rulemaking, the district court should have recognized that the purpose behind the first sale right tilted the first fair use factor in favor of ReDigi.

Second, the brief argues that a positive fair use determination in this case would encourage libraries to provide innovative services to their users. Fair use findings in technology cases have permitted libraries to provide new, digitally-based services such as HathiTrust Digital Library. In addition to enabling researchers to find relevant texts and perform critical data-mining, HathiTrust provides full-text access to over fourteen million volumes to people who have print disabilities. A fair use finding in this case would provide libraries with additional legal certainty to roll out innovative services such as the Internet Archive's Open Library. Such a result would increase users' access to important content without diminishing authors' incentive to create new works.

## ARGUMENT

## I. The First Sale Doctrine Weighs in Favor of a Fair Use Finding

The district court below rejected ReDigi's fair use claims with little analysis. In particular, the district court's consideration of the first fair use factor, the purpose and character of the use, 17 U.S.C. § 107(1), was limited

to asking whether the use was transformative or commercial. The district court overlooked the obvious fact that the use ReDigi sought to enable was analogous to one permitted by a central feature of the Copyright Act: the first sale right, codified at 17 U.S.C. § 109(a). The district court found that ReDigi's uses did not fall within the scope of section 109(a) because the first sale doctrine is a limitation on the distribution right, not the reproduction right, and ReDigi's service involves reproduction. However, the similarity between ReDigi's service and conduct permitted under section 109(a) should have weighed in ReDigi's favor under the first fair use factor.[3]

## A. This Court Has Found that Specific Exceptions Positively Influence the First Factor Analysis

In support of its conclusion that providing access to the print disabled was a valid purpose under the first fair use factor, this Court in *Authors Guild v. HathiTrust,* 755 F.3d 87, 102 (2d Cir. 2014), noted that 17 U.S.C. § 121, which permits "authorized entities" to make accessible format copies for the print disabled, "illustrates Congress's intent that copyright law make appropriate accommodations for the blind and print disabled." In other words, this Court used the rationale behind a specific exception, which

---

[3] *See* Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y 453 (2012), for a more detailed discussion of how specific exceptions should affect the fair use calculus.

might not otherwise have applied, to support a finding of a valid purpose under the first factor. In adopting an exception, Congress recognized the strong public policy interest in permitting the use in situations meeting the exception's requirements. The same public policy interest still exists in situations where many, but not all, of the exception's requirements are met. The *HathiTrust* Court understood that this Congressionally recognized public policy interest should influence the fair use calculus. The *HathiTrust* Court likewise gave weight to expressions of Congressional intent outside of the Copyright Act when it noted that Congress, in enacting the Americans with Disabilities Act, "reaffirmed its commitment to ameliorating the hardships faced by the blind and the print disabled." *Id*.

### B. Specific Exceptions Have Positively Influenced the Copyright Register's Fair Use Analyses.

In the rulemaking under section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, the Register of Copyrights is required to make recommendations to the Librarian of Congress on the grant of proposed exemptions to section 1201(a)'s prohibition on the circumvention of technological protection measures. In making this recommendation, the Register must consider whether users of a class of works are likely to be adversely affected by the circumvention prohibition "in their ability to make noninfringing uses" of the class of works. 17 U.S.C.

§ 1201(a)(1)(C). Thus, a central issue in this analysis is the lawfulness of the proposed use. In the past six rulemakings, the Register has issued voluminous recommendations that examine in detail the lawfulness of the proposed uses—typically the permissibility of the use under section 107. In the Register's most recent recommendation, issued in October 2015, specific exceptions informed the Register's first factor analysis with respect to four of the proposed uses.

### 1. Jailbreaking

When discussing the first fair use factor in the context of the proposed "jailbreaking" exemption, the Register observed that "the goal of jailbreaking is to allow the operating system on a device to interoperate with other programs, a favored purpose under the law." Recommendation of the Register of Copyrights, *Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2015)("*2015 Recommendation*") at 188. The Register based her statement that interoperability is a favored purpose under the law on the DMCA's interoperability exception, 17 U.S.C. § 1201(f).

The Register's detailed analysis of this issue appears in her 2010 recommendation concerning jailbreaking. Recommendation of the Register of Copyrights, *Section 1201 Rulemaking: Fourth Triennial Proceeding to*

8

*Determine Exemptions to the Prohibition on Circumvention* (2010)("*2010 Recommendation*"). The Register cited language in the Supreme Court's decision in *Harper & Row v. Nation Enterprises*, 471 U.S. 539 (1985), that fair use has traditionally been defined as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent." *2010 Recommendation* at 91 (citing 471 U.S. 539, 549 (1985)). The Register then asserted that "in evaluating whether a particular use is being made in such a reasonable manner, it is helpful to look at the judgments Congress has made as to what kinds of uses of copyrighted material are reasonable and should be considered non-infringing." *2010 Recommendation* at 92. The Register observed, "in this case, one does not have to look far. In fact, section 1201 itself offers strong evidence that the conduct at issue here is conduct that, at the time Congress enacted the prohibition on circumvention, it anticipated and considered to be reasonable and lawful." *Id*.

That "evidence" was the interoperability exception in 17 U.S.C. § 1201(f). After describing section 1201(f)'s provisions, the Register stated:

> In the legislative history associated with that provision, Congress expressed a commitment to permit and encourage interoperability between independently created computer programs and existing programs. Endorsing the holding of *Sega Enters. Ltd. v. Accolade, Inc*., Congress stated in the legislative history that the purpose of the reverse engineering exemption, an exemption that it described as

9

permitting "the circumvention of access control technologies for the sole purpose of achieving software interoperability," was to "avoid hindering competition and innovation in the computer and software industry."

*2010 Recommendation* at 92.

On the basis of this legislative history, the Register found that "Congress has determined that reverse engineering for the purpose of making computer programs interoperable is desirable when certain conditions are met, and has crafted a specific exemption from section 1201(a)'s prohibition on circumvention in such cases." *Id*. at 93. The Register reasoned that "while an iPhone owner who 'jailbreaks' does not fall within the four corners of the statutory exemption in section 1201(f), the fact that he or she is engaging in jailbreaking in order to make the iPhone's firmware interoperable with an application specially created for the iPhone suggests that the purpose and character of the use are favored." *Id.*

In sum, the Register viewed a specific exception—17 U.S.C. § 1201(f)—as evidence of a favored purpose under the first fair use factor analysis.[4]

_____

[4] The Register cited the foregoing analysis when stating that the fair use calculus with respect to the "unlocking" of mobile devices is "in many respects analogous to the reasoning that has led the Register to conclude in past rulemakings that 'jailbreaking' of smartphones is likely to be a fair use." *2015 Recommendation* at 162.

## 2. 3D Printers

As with jailbreaking, the Register gave weight to Congress's enactment of section 1201(f) when considering the copying of computer programs necessary to employ alternative feedstock for 3D printers. With respect to the first factor, "the Register notes that interoperability is recognized as a favored purpose under the law." *2015 Recommendation* at 368. Specifically,

> Congress recognized the importance of compatibility in the DMCA by including a statutory exemption to the prohibition on circumvention for certain reverse engineering activities. See 17 U.S.C. § 1201(f); see also 144 Cong. Rec. E2138 (daily ed. Oct. 13, 1998) (statement of Rep. Bliley) (stating that "section 1201 should not inhibit interoperability of devices 'in the consumer electronics environment'").

*Id.* at 368 n.2481. Guided by this Congressional recognition, the Register found that the first factor favored the proponents because "third-party feedstock often cannot be used without altering the printer operating system software." *Id.* at 368.

## 3. Abandoned Video Game Software

When discussing the copying necessary for video-gamers and libraries to use abandoned video-game software, the Register noted that the proponents had not relied on 17 U.S.C. § 117, which permits the owner of a copy of a computer program to copy or adapt that program when the copy or

adaptation is created as an "essential step" in the utilization of the program in conjunction with a machine. Nonetheless, the Register observed that section 117 "evinces Congress's understanding that reverse engineering and the pursuit of interoperability are favored activities under the law." *Id*. at 336. Later, in the context of applying the first fair use factor to continued play by gamers, the Register stated that "[h]ere, where gamers wish to modify a copy of video game software they have lawfully acquired simply to allow its continued personal use on their own computers—akin to the adaptation exception embodied in section 117—the first factor tends to support a finding of fair use." *Id.* at 338. The Register thus suggested that the favored nature of reverse engineering and interoperability indicated by section 117 tilted the first factor in favor of a fair use finding.

The Register then considered the lawfulness of the copies made by librarians and archivists for purposes of preservation, research, and study. The Register stated that "[t]hough it does not address the full range of preservation-related activities advocated by proponents, section 108 of the Copyright Act, which exempts certain activities of libraries and archives, is helpful to this inquiry." *Id*. at 341. She elaborated:

> The Register finds that section 108 provides useful and important guidance as to Congress's intent regarding the nature and scope of legitimate preservation activities, and hence the types of uses that are most likely to qualify as fair in this area. Section 108 suggests that

12

such activities should be carried out by a preservation-oriented institution—a library or archives—and, as noted, must not be for direct or indirect commercial gain. While section 108 is limited to libraries and archives, the record here reflects that museums engage in similar efforts to preserve video games. In light of their similar preservation mission in this context, the Register sees no reason to exclude museums from the reach of the proposed exemption.

*Id*. at 342. Thus, the Register suggested not only that section 108 guide courts as they apply fair use to preservation activities of libraries and archives that might fall beyond the four corners of section 108; she also suggested that section 108 guide courts as they apply fair use to the preservation activities of museums, to which section 108 does not extend.

### 4. MOOCs

Finally, the TEACH Act, 17 U.S.C. § 110(2), informed the Register's evaluation of the lawfulness of using audiovisual clips in Massive Open Online Courses (MOOCS): "While the TEACH Act may not itself provide a comprehensive basis for a finding of noninfringing use in the MOOC context, the Register believes that the Act, which became law in 2002, provides useful and important guidance as to Congress' intentions regarding the need for and nature of excepted uses to permit certain performances and

13

displays of copyrighted works for distance learning." *2015 Recommendation* at 74. [5]

### C. The First Sale Right Should Positively Influence the First Factor Analysis in this Case

This Court in *HathiTrust* relied on 17 U.S.C. § 121 to identify a favored purpose under the first fair use factor. The Register of Copyrights similarly relied on the exceptions in 17 U.S.C. §§ 108, 110(2), 117, and 1201(f) to recognize other purposes favored by Congress. The first sale right should receive no less deference under the first factor than these exceptions. Justice Breyer, writing for the U.S. Supreme Court in *Kirtsaeng v. John Wiley & Sons, Inc*., 133 S. Ct. 1351, 1363 (2013), stated that first sale "is a common-law doctrine with an impeccable historic pedigree." He quoted a 17th century articulation of "the common law's refusal to permit restraints on the alienation of chattels," *id*., and observed that "a law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly 'against Trade and Traffi[c], and bargaining and

---

[5] The Register also recommended "that any exemption for uses in connection with MOOCs be tied to key aspects of section 110(2), including its emphasis on implementation of TPMs in distance learning that incorporates copyrighted works." *Id*. "The Register is persuaded that while the strict contours of section 110(2) may be an imprecise fit for the rapid emergence of the MOOC model, section 110(2) nonetheless offers important and meaningful guidance concerning Congress's desire to balance pedagogical needs in distance learning with copyright owners' concerns of harmful impact." *Id*. at 102.

contracting.'" *Id*. Justice Breyer underscored "the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of these goods." *Id*. Competition, "including the freedom to resell, can work to the advantage of the consumer." *Id*.

By enacting section 109(a), Congress recognized the value of allowing a person to transfer her right to possess a copy of a work. Enabling transfer of the right of possession thus should be viewed as a favored purpose under the first fair use factor. This, of course, is the purpose of the copies made during the course of the ReDigi service.

Recognizing that the purpose of the ReDigi service is favored does not necessarily mean that ReDigi should "win" the first factor, nor that the ReDigi service is a fair use. Recognition that the purpose of a use is favored is not outcome determinative; it is only one consideration in the broader first factor (and much broader overall fair use) analysis.

However, it is worth noting that the ReDigi service has the same market impact as a distribution under section 109(a). At the beginning of a transfer under section 109(a), the seller has a copy, and the buyer does not. At the end of the process, the buyer has a copy, and the seller does not. The ReDigi service attempts to recreate this process in the digital environment. To be sure, the buyer does not end up with the seller's actual copy. Rather,

she has a copy of the seller's copy. Nonetheless, the seller no longer possesses a copy, and the buyer does. In other words, so long as the seller's copy is deleted, the ReDigi service leaves the copyright holder no worse off than it would be due to the transfer of a physical copy under the first sale doctrine.

## II. Finding Fair Use in this Case Would Encourage Innovative Digital Services in Libraries

### A. Fair Use Technology Cases Have Spurred Innovation in Libraries

Very few copyright cases involve libraries directly. Yet copyright law affects libraries in many complex ways because much of a library's work involves accessing, indexing, storing, and giving the public access to copyrighted material. Fair use provides necessary breathing space in copyright law, making sure that control of the right to copy and distribute does not also become control of the right to create and innovate.

When interpreting and applying fair use, libraries must generally look to fair use cases in other contexts and to the actual practices of their peer institutions for guidance. For example, a collaborative mass digitization effort between Google and research libraries resulted in HathiTrust—a digital preservation repository and highly functional, secure access platform which houses millions of digital books today. When this project started in 2005, the legal landscape was less clear than it is today. However, Google

16

and the research libraries were able to move forward based on then-current fair use precedent. *See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc*., 464 U.S 417 (1984) (holding that time shifting of entertainment content is fair use), *Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2003) (holding that the operation of an image search engine was fair use), *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579 (2004) (coining the transformative use test). Together, these cases established a foundation on which libraries could innovate.

HathiTrust makes books in accessible formats available to people who have print disabilities, allowing them to participate fully in academic and civil society. *HathiTrust*, 755 F. 3d at 91. It also provides access to a database allowing full-text searches across all of the items in its repository. *Id*. This promotes the nonconsumptive analysis of a vast corpus of materials for research and scholarship purposes. Finally, HathiTrust preserves works in digital form, permitting members to create a replacement copy of the work, if a library's original copy is lost, destroyed, or stolen. *Id*. at 92.

The mass digitization project was challenged in two lawsuits, one against Google and the other against some of the research libraries. Both cases resulted in fair use victories. *Authors Guild, Inc. v. Google,* 804 F.3d 202 (2d Cir 2015); *HathiTrust*, 755 F. 3d at 87. These decisions have

17

encouraged efforts to build digital library services by creating further legal certainty around what can be done with in-copyright materials. Michelle Wu, *Collaborative Academic Library Digital Collections Post-Cambridge University Press, HathiTrust and Google Decisions on Fair Use*, Journal of Copyright in Education and Librarianship, p 3 (Vol. 1, Issue 1 2016). A finding of fair use in this case similarly would encourage further innovation and experimentation by libraries, without harm to copyright holders.

## B. Libraries are Building Innovative Digital Lending Services

Libraries serve many different purposes in today's world—from providing Internet access to a large number of Americans to literacy programs for youth. However, providing free access to knowledge, information, and opportunity—in particular by lending copies of books to patrons—has always been a core traditional function of a library. Regardless of what form a work takes, libraries need to be able to lend in order to fulfill their core mission. In today's digital world, it has become clear that libraries need to adapt and offer digital versions of their collections to the public. Indeed, books, journals, music, video, and software are essential resources for the next generation of learners and scholars. Until these materials are

available in digital formats, scholars and learners of all kinds will not be able to harness knowledge fully for greater innovation and discovery.[6]

To this end, libraries have developed new and innovative services to offer digital works to the public. For example, the Open Library is a platform that makes millions of books available in various formats, and with varying degrees of technical restrictions on copying and further distribution. Open Library, https://openlibrary.org/ (last visited Feb. 6, 2017). Titles in the public domain (published prior to 1923) are completely readable and downloadable without restriction in a variety of file formats. Certain in-copyright titles are available in the DAISY format only for use by people who have print disabilities. Some titles still under copyright are made available in a managed online system that prevents copying and downloading. These in-copyright titles are available only to one user at a time for a period of two weeks. When a title is checked out digitally, that title is not available to any other user. This program is referred to as "digital lending" or the "lending library" at the Internet Archive. Internet Archive Lending Library, https://archive.org/details/lendinglibrary (last visited Feb. 6, 2017).

---

[6] As this Court observed in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006), "[t]he ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."

Over the last five years, the Internet Archive has digitized and lent modern materials originating from the Boston Public Library, University of Toronto, and many other libraries. More than 250,000 modern book titles are currently accessible to scholars and learners worldwide through the lending library, expanding free access to works that otherwise are seldom consulted. Like ReDigi, Open Library seeks to replicate in the digital realm the sorts of uses that are permissible with a physical copy of a work. Library lending is valuable to society in a number of ways. "For many, the library-lending model is a hallmark of achievement for education and public access to knowledge." Aaron Perzanowski & Jason Schultz, *The End of Ownership: Personal Property in the Digital Economy* 103 (2016).

These values do not change with the format of the work. First and foremost, providing free access to library collections encourages literacy and reading—foundational skills for any member of modern society. Allowing digital access to these works expands the reach of these collections, especially to those living in rural communities and to disabled individuals who may not be able to physically access a local library.

Most books in most libraries are not available in eBook form from the publisher. Although publishers do make some of their catalog available through eBook subscriptions, libraries may have reasons for wanting to

20

digitize and lend their own collections in lieu of or in addition to what is available through eBook vendors. Libraries may have unique or special collections that they wish to make more widely available, for example. Alternatively, libraries may not agree to some of the more onerous terms of eBook lending agreements with publishers, which often require the disclosure of user information in violation of library patron privacy policies. Digitization and access also spurs the long-term preservation of the works libraries have carefully curated for their local communities. Finally, technical systems like Open Library that allow digital lending are using the same systems that publishers use for their in-print eBooks and do not affect the market for the work any more than traditional library lending. Assuming the same number of copies of a given work remains available to the public, the author or publisher is in no worse a position by virtue of the format of the book being borrowed.

A finding of fair use in this case would provide additional legal certainty along with cases like *HathiTrust* to spur investment and innovation in digital services by libraries. The resulting availability of comprehensive collections of digital books, and potentially other types of works such as music and films, will have lasting public benefit, without disadvantaging copyright holders.

# CONCLUSION

For the foregoing reasons, amici urge this Court to reverse the decision below.

Respectfully submitted,

*Counsel of Record*
JONATHAN BAND PLLC
21 Dupont Circle NW, 8th Floor
Washington, DC 20036
(202) 296-5675
jband@policybandwidth.com

*Counsel for Amici Curiae*

Dated: February 14, 2017

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 4,668 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

/s/ Jonathan Band

## CERTIFICATE OF SERVICE

I hereby certify, that on February 14, 2017, a true and correct copy of the foregoing Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive was timely filed in accordance with FRAP 25(a)(2)(D) and served on all counsel of record via CM/ECF pursuant to Local Rule 25.1(h).

/s/ Jonathan Band