# McNamara Declaration Exhibit 138

# ARL Policy Notes

A blog of the Association of Research Libraries Influencing Public Policies strategic direction.

HOME    SUBSCRIBE

## The Implications of the ReDigi Decision for Libraries

*Guest blog post by Jonathan Band, Counsel to the Library Copyright Alliance, which consists of the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries*

**Summary**

The U.S. Court of Appeals for the Second Circuit has finally issued its long-awaited decision in *Capitol Records v. ReDigi*. The Second Circuit affirmed the district court's finding that the ReDigi service, which allowed the resale of iTunes files, infringed copyright. The Second Circuit's reasoning clearly closes the door on the concept of digital first sale in a commercial setting. It also raises questions concerning the viability of Controlled Digital Lending ("CDL") by libraries. Accordingly, CDL initiatives must be carefully reevaluated in light of this decision.

- The Second Circuit affirmed that the first sale right, codified at 17 U.S.C. 109(a), is a limitation on the distribution right, not the reproduction right, and thus does not provide a defense to the making of copies during the course of the sale of digital files.
- The court rejected ReDigi's argument that its technology transferred digital files without reproducing them.
- The court rejected ReDigi's argument that fair use permitted any copies it made.
- The decision is problematic for CDL for two reasons:

1. The decision is the most analogous precedent to the library sharing of digital files of copyrighted works; and
2. The decision could be read as implicitly rejecting the cornerstone of CDL's fair use argument: that the first sale right should have a positive influence on the analysis of the first fair use factor.

- Libraries need to consider whether their CDL programs are likely to pass muster under a more traditional fair use analysis that does not rely on section 109 exercising a positive influence on the first factor.

**Background**

The now defunct ReDigi service allowed a consumer to sell iTunes music files to other consumers. Under ReDigi's technology, the music file on the seller's server was broken into small packets, which were transferred one at a time to ReDigi's server. When a packet was transferred from the seller's computer, it was deleted from her computer. The same process was repeated when the file was transferred from ReDigi's server to the buyer's computer.

Capitol Records and other record labels sued ReDigi for copyright infringement. In 2013, the district court rejected ReDigi's first sale defense on the grounds that the first sale doctrine is an exception to the distribution right and not the reproduction right, and ReDigi's technology infringed the reproduction right. Further, the district court rejected ReDigi's fair use defense with little discussion, noting that ReDigi's use was commercial, non-transformative, and harmful to the market for music files.

---

Unless otherwise noted, posts dated January 10, 2014,–August 16, 2019, were written by Krista L. Cox, then Director of Public Policy Initiatives at ARL. Some of the content here is not written or created by ARL, but rather is collected from elsewhere on the web. Quotation does NOT imply endorsement!

We tweet @ARLpolicy and @ARLnews. Check out all of ARL's programs and resources at our homepage.

**RECENT POSTS**

Fair Use/Fair Dealing Week Day 5 Roundup
Fair Use/Fair Dealing Week Day 4 Roundup
Fair Use in South Africa
Fair Use/Fair Dealing Week Day 3 Roundup
Fair Use/Fair Dealing Week 2020 Day 2 Roundup

**ARCHIVES**

Select Month

**LATEST TWEETS**

No Tweets available. Login as Admin to see more details.

RSS Feed

The Second Circuit held a marathon two-hour oral argument on August 22, 2017. On December 12, 2018, the Second Circuit affirmed the district court's decision with an opinion written by Judge Leval, one of the country's leading copyright jurists.

**Judge Leval's Opinion**

Judge Leval agreed with the district court that the first sale doctrine provided ReDigi with no defense against Capitol's claim that ReDigi infringed its *reproduction* right; the first sale doctrine was a limitation on the *distribution* right, not the r*eproduction* right. Judge Leval then turned to ReDigi's contention that it had not infringed Capitol's reproduction right. ReDigi noted that in its system, each packet was deleted from the seller's computer as soon as it was transferred to ReDigi's server. Accord to ReDigi, at no time was there a copy of a file on both the seller's computer and ReDigi's server. ReDigi argued that this meant that it didn't reproduce the file, but just transferred it. Judge Leval rejected this interpretation, finding that the "phonorecord"—a defined term in the Copyright Act–that ended up on ReDigi's server was a different "material object" from the phonorecord that had existed on the seller's computer. Additionally, Judge Leval observed that as a factual matter, ReDigi could not ensure that a user had not retained duplicates stored on devices other than the computer on which the user installed the ReDigi software.

Next, Judge Leval considered whether the creation of this new phonorecord was a fair use. His analysis of fair use was more thorough and thoughtful than the district court's, although he reached the same conclusion. He focused on the first and fourth factors, the purpose and character of the use and the impact of the use on the market for the work. His first factor analysis centered on whether the use was transformative—whether the use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message, that than merely superseding the original work." He explained, "uses that criticize, comment on, provide information about, or provide new uses for the copyrighted work are those likely to be deemed transformative."

Additionally, Judge Leval stated that a secondary use may be transformative if it expands the utility of the original. Examples of utility-expanding transformative fair uses include scanning books to create a full text searchable database (*Authors Guild v. HathTrust*); copying works into a database to detect plagiarism (*A.V. ex. rel. Vanderhye v. iPardigms*); and displaying low resolution thumbnail images to facilitate image search (*Perfect 10 v. Amazon*, *Kelly v. Arriba Soft*).

To this familiar list of utility-expanding uses Judge Leval added the Supreme Court's decision in *Sony v. Universal*, where the Court found that fair use permitted a consumer to record a television broadcast for viewing a more convenient time. *Sony* typically is treated as a paradigmatic example of a non-transformative fair use. Judge Leval, however, endorsed the Second Circuit's interpretation earlier this year in *Fox News v. TV Eyes* that the consumers' use in *Sony* was transformative: a use may be fair "if it utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder."

Judge Leval found that ReDigi's use was not transformative because "it provides neither criticism, commentary, nor information" about copyrighted works. Moreover, it did not "deliver the content in a more convenient and usable form to one who has acquired an entitlement to receive the content." Instead, it just provided "a market for the resale of digital music files, which sales compete with sales of the same recorded music by the rights holder." Further tilting the first factor against fair use was the commercial nature of ReDigi's activity.

After cursory treatment of the second and third factors, the nature of the copyright work and the amount and substantiality of the portion used, Judge Leval examined the fourth factor, the effect of the use upon the potential market for or value of the copyrighted work, in more detail. Judge Leval noted that ReDigi made reproductions for "the purpose of resale in competition with the Plaintiffs' market for the sale of their sound recordings." ReDigi sold its copies

**RECENT POSTS**

Fair Use/Fair Dealing Week Day 5 Roundup
Fair Use/Fair Dealing Week Day 4 Roundup
Fair Use in South Africa
Fair Use/Fair Dealing Week Day 3 Roundup
Fair Use/Fair Dealing Week 2020 Day 2 Roundup

**ARCHIVES**

Select Month

Unless otherwise noted, posts dated January 10, 2014,–August 16, 2019, were written by Krista L. Cox, then Director of Public Policy Initiatives at ARL. Some of the content here is not written or created by ARL, but rather is collected from elsewhere on the web. Quotation does NOT imply endorsement!

We tweet @ARLpolicy and @ARLnews. Check out all of ARL's programs and resources at our homepage.

"to the same consumers whose objective in purchasing was to acquire Plaintiffs' music." Judge Leval also distinguished the resale of physical copies from digital copies. "The digital files resold by ReDigi, although used, do not deteriorate the way printed books and physical records deteriorate." The only difference between the copies sold by Capitol and the copies sold in ReDigi's secondary market was that ReDigi's copies were less expensive.

Judge Leval then weighed the four factors together. He found that "even if ReDigi is credited with some faint showing of a transformative purpose, that purpose is overwhelmed by the substantial harm ReDigi inflicts on the value of Plaintiffs' copyrights through direct competition in the rights holders' legitimate market, offering consumers a substitute for purchasing from the rights holders."

At the end of the opinion, Judge Leval considered an argument raised in an amicus brief by copyright law professors that the first sale doctrine "must be read to vindicate purchasers' ability to alienate digital copyright works…without regard to technological medium." Judge Leval expressed reluctance to wade into this policy argument. "Courts are poorly equipped to assess the inevitably multifarious economic consequences that would result from such changes of law." Furthermore, reading section 109(a) to accommodate digital resale "would exceed the proper exercise of the court's authority." Here, "Congress dictated the terms of the statutory entitlement." Section 109(a) clearly "negates a claim of unauthorized *distribution* in violation of the author's exclusive rights…but not a claim of unauthorized *reproduction*." Accordingly, "if ReDigi and its champions have persuasive arguments in favor of the change of law they advocate, it is Congress they should persuade."

**Implications for Libraries**

The *ReDigi* decision requires reevaluation of CDL initiatives. The decision is the most analogous precedent to library sharing of digital files of copyrighted works. To be sure, a library would engage in CDL for noncommercial educational purposes, in contrast to ReDigi's clearly commercial motivation. Moreover, a library could design its CDL program to make it as different from ReDigi's as possible. For example, the library might engage in CDL only with respect to out of print scholarly monographs. Nonetheless, libraries cannot ignore the long shadow cast by the decision.

Furthermore, the decision calls into question the theoretical underpinnings of CDL. Specifically, CDL relies on the fair use right to replicate the first sale right in the digital environment. Judge Leval's decision, however, could be read to suggest that the objectives of the first sale right cannot guide the fair use analysis.

The Library Copyright Alliance ("LCA") filed an [amicus brief](#) in support of ReDigi, where we argued that the similarity between the use ReDigi sought to make and uses authorized by section 109(a) should have tilted the first fair use factor in favor of ReDigi. We noted that in [*Authors Guild v. HathiTrust*](#), the Second Circuit used the rationale for a specific exception—17 U.S.C. § 121, which permits the making of accessible format copies for people who have print disabilities—to support a finding of a valid purpose under the first factor. Likewise, the Copyright Office has repeatedly based fair use conclusions on specific exceptions in the context of a rulemaking under section 1201 of the Digital Millennium Copyright Act, 17 U.S.C. § 1201. We urged the Second Circuit to recognize that the purpose behind the first sale right favored ReDigi in the first fair use factor analysis.

Unfortunately, Judge Leval did not address this argument. The lack of reference to this argument is somewhat surprising given that it was based on the Second Circuit's reasoning in the *HathiTrust* decision, and that the Association of American Publishers filed an amicus brief specifically responding to LCA's brief. Moreover, fair use was the obvious means of addressing the policy concerns raised by the copyright law professors in their amicus brief. Fair use could achieve the objectives of the first sale doctrine in the digital environment without Congress amending the statute.

In one passage, Judge Leval arguably disagreed with this argument. When responding to the law professors' suggestion that section 109(a) be interpreted to apply in the digital context, Judge Leval stated "the copyright statute is a patchwork, sometimes varying from clause to clause, as between provisions for which Congress has taken control, dictating both policy and the details of its execution, and provisions in which Congress approximatively summarized common law developments, implicitly leaving further such developments to the courts. The paradigm of the latter category is § 107 on fair use." This could be interpreted to imply that specific exceptions should not influence the first factor analysis—that specific exceptions and fair use should each stick to their own lanes.

On the other hand, by not rejecting it, Judge Leval arguably allowed the argument to live to fight another day. Additionally, Judge Leval's copyright patchwork argument really doesn't make much sense. The first sale right is a judge-made doctrine which was codified in section 109(a), just as the fair use right is a judge-made doctrine which was codified in section 107. Thus, it is completely appropriate for a court to consider the principles underlying the first sale right when applying the fair use right.

The status of the argument is particularly significant for libraries interested in engaging in CDL. CDL relies heavily on the notion that fair use enables libraries to replicate the first sale right in a digital context. In their *White Paper on Controlled Digital Lending of Library Books*, David Hansen and Kyle Courtney state,

> The core concept with CDL is that it closely mimics the economic transaction that Congress has already provided for through the first sale doctrine under Section 109. The purpose of the use with CDL is to fulfill the statutory objectives and balance of rights already identified by Congress in Section 109, effectuating that balance considering a new technological use not contemplated at the time Section 109 was enacted. The crux of the proposition is that the purpose and intent of Section 109 should positively influence the "purpose and character" assessment in the fair use analysis.

This, of course, is the same theory LCA articulated in its amicus brief. LCA still believes this theory is correct, and will continue believing in its correctness unless and until the Supreme Court explicitly rejects it. However, Judge Leval's failure to even acknowledge the theory when he had the opportunity to do so should cause libraries to reevaluate their CDL initiatives. In particular, they need to consider whether their CDL programs are likely to pass muster under a more traditional fair use analysis that does not rely on section 109 exercising a positive in-fluence on the first factor.

**Please share...**



This entry was posted in Uncategorized and tagged Fair Use, First Sale, Jonathan Band, Public Policy

This entry was posted in Uncategorized and tagged Fair Use, First Sale, Jonathan Band, Public Policy on December 21, 2018 by ARL Communications.

← ARL Files Comments in NTIA Request for Comment on Consumer Privacy

Celebrating New Works Entering the Public Domain in the United States →

Proudly powered by WordPress