# McNamara Declaration
# Exhibit 172

TOM UDALL
NEW MEXICO

531 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224–6621
(202) 228–3261 FAX
http://tomudall.senate.gov



**United States Senate**

WASHINGTON, DC 20510

COMMITTEES:
APPROPRIATIONS

COMMERCE, SCIENCE, AND TRANSPORTATION

FOREIGN RELATIONS

INDIAN AFFAIRS

RULES AND ADMINISTRATION

April 16, 2020

*VIA ELECTRONIC SUBMISSION*

Ms. Maria Strong
Acting Register of Copyrights and Director of Policy and International Affairs
U.S. Copyright Office
101 Independence Ave, S.E.
Washington, D.C. 20559

Dear Ms. Strong,

Thank you for your work and leadership at the U.S. Copyright Office. I write to you in consideration of the COVID-19 pandemic's recent effect on temporary library closures, and the subsequent availability of books and other media to the public, including materials used for distance learning of students facing extended school closures. I encourage your office to work with America's libraries, within existing law, to maximize the availability of educational materials for the benefit of both students and the broader public, while respecting the copyrights of authors who rely on royalties for their livelihoods.

As part of this effort, I also urge you to examine the National Emergency Library that has been organized by the Internet Archive which is operating without typical library licenses and is causing authors in New Mexico concern about the integrity of their copyrights. While the Internet Archive is one outlet, there may be others who are taking similar actions or plan to pursue them in the future, so I believe legal guidance from your office on this topic is in the public interest.

Since the emergence of e-books, libraries have provided e-books to readers through legally well-established means of paying for licensing fees for e-books that they lend, of which a portion of the licensing fees extend to authors as royalties. It is my understanding that the Internet Archive has loosened its restrictions on its controlled digital lending library, Open Library, to allow increased lending of materials. Rather than lending one copy at a time, the National Emergency Library opened its digital archive to the public on March 24, 2020, allowing an unlimited number of people from anywhere in the world to download the same digital file.

Authors whose books appeared as digital did not have the ability to opt into their work's availability on the National Emergency Library, but instead, were given the option to opt out only after their books became available through the online library. I have heard from authors who are concerned that such action is not legal and presents additional challenges to them at an economically difficult time. With average incomes of only $20,300 a year prior to the pandemic, authors are struggling due to cancelled book tours and loss of freelance work.[1] I request

---

[1] The Authors Guild, *Internet Archive's National Emergency Library Harms Authors*, Mar. 27, 2020, https://www.authorsguild.org/industry-advocacy/internet-archives-uncontrolled-digital-lending/.

ALBUQUERQUE:
400 GOLD AVENUE SW
SUITE 300
ALBUQUERQUE, NM 87102
505–346–6791

LAS CRUCES:
201 N. CHURCH STREET
SUITE 201B
LAS CRUCES, NM 88001
575–526–5475

PORTALES:
100 SOUTH AVENUE A
SUITE 113
PORTALES, NM 88130
575–356–6811

SANTA FE:
120 SOUTH FEDERAL PLACE
SUITE 302
SANTA FE, NM 87501
505–988–6511

TOM UDALL
NEW MEXICO

531 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224–6621
(202) 228–3261 FAX
http://tomudall.senate.gov



**United States Senate**

WASHINGTON, DC 20510

APPROPRIATIONS

COMMERCE, SCIENCE, AND TRANSPORTATION

FOREIGN RELATIONS

INDIAN AFFAIRS

RULES AND ADMINISTRATION

that the U.S. Copyright Office examine this arrangement and its effects on authors' work, including whether any harm comes from the release of digital books without their prior permission.

As New Mexico and many other parts of the country face more weeks of social distancing which may keep America's libraries closed for a longer period, I request that you provide guidance to both America's libraries and authors about how more material can be provided online to students and the public under established copyright mechanisms. As part of that effort, please include a legal analysis of the Internet Archive's National Emergency Library under 17 U.S.C.S. § 107 and other relevant law, and recommend any corrective action that you deem necessary to comply with copyright law and protect authors.

At this challenging time, I urge your office to use its expertise and guidance to help libraries, authors, and online outlets to identify potential solutions that respect both the ownership of the creator community's work and the broader public's need to access online collections within legal bounds.  Thank you for your work and I appreciate your attention to this matter.

Sincerely,

Senator Tom Udall

STATE OFFICES:

ALBUQUERQUE:
400 GOLD AVENUE SW
SUITE 300
ALBUQUERQUE, NM 87102
505–346–6791

LAS CRUCES:
201 N. CHURCH STREET
SUITE 201B
LAS CRUCES, NM 88001
575–526–5475

PORTALES:
100 SOUTH AVENUE A
SUITE 113
PORTALES, NM 88130
575–356–6811

SANTA FE:
120 SOUTH FEDERAL PLACE
SUITE 302
SANTA FE, NM 87501
505–988–6511



**The Register of Copyrights of the United States of America**
United States Copyright Office · 101 Independence Avenue SE · Washington, DC 20559-6000 · (202) 707-8350

The Honorable Tom Udall
United States Senate
531 Hart Senate Office Building
Washington, DC 20510

May 15, 2020

Dear Senator Udall:

I am pleased to provide this response to your letter dated April 16, 2020, requesting that the United States Copyright Office provide legal information and analysis with respect to the Internet Archive's creation of what it calls the "National Emergency Library." You also requested that the Office provide guidance regarding how libraries and authors may offer the public access to written works online within the confines of copyright law during this period when school and library buildings are closed. I appreciate that you are seeking the Office's input on these important issues after receiving inquiries from your constituents.

As you know, the Copyright Office is the expert agency created by Congress to administer the country's copyright laws and provide impartial advice to Congress, federal agencies, and others on matters of copyright law and policy, as well as educational information for the general public.[1]  While the Office regularly publishes reports on matters relating to copyright law and policy, it is not the Office's general practice to provide legal advice about specific factual scenarios. The Office is particularly cautious about weighing in on circumstances or disputes between private parties.

In composing this response, the Office has prioritized the need to provide schools and libraries with general guidance about how to be responsive to the public interest in accessing reading materials online in a way that respects copyright law. The Office first provides a brief summary of library and school activities explicitly permitted under the Copyright Act, as well as more general provisions that may prove relevant to this analysis (Parts I-III). In the final section (Part IV), the Office addresses how these provisions and doctrines may relate to an analysis of the Internet Archive's recent activities. The Office has based its analysis of the Internet Archive's National Emergency Library upon the facts of which the Office is currently aware.

---

[1] *See* 17 U.S.C. § 701(b). Copyright functions were first centralized within the Library of Congress 150 years ago in 1870, and the Copyright Office became a separate department of the Library of Congress in 1897.

## I.   COPYRIGHT ACT PROVISIONS PERMITTING CERTAIN USES BY SCHOOLS AND LIBRARIES

The Copyright Act includes several provisions that could facilitate activities libraries and schools are engaged in to make educational materials more readily available during this time of crisis. As discussed in detail below, the Copyright Act permits copyright owners to authorize others to use their copyrighted materials. Additionally, section 108 of the Copyright Act permits certain activities of libraries and archives that could otherwise constitute copyright infringement. Section 110 of the Copyright Act likewise permits educators and government bodies who meet certain requirements to use copyrighted materials in distance learning programs. Finally, the fair use doctrine may permit certain uses by schools and libraries. The Copyright Office has published a circular providing information about these provisions and other general information on permitted reproductions of copyrighted works by educators and librarians, which is available to the public on our website.[2]

The Office applauds the creativity shown in all copyright sectors as individuals and organizations respond to the challenges of providing access to educational materials during the current crisis by expanding licensing—including, in some cases, offering zero-cost licenses for educational uses—and relying upon provisions in the Copyright Act that authorize certain uses, including the fair use doctrine. We recognize that many individuals and organizations are making efforts to meet public needs at this time (even as they face challenges of their own) while respecting well-established copyright principles.

### A.   Authorized Use of Copyrighted Materials

Section 106 of the Copyright Act recognizes that the owner of a copyright has the exclusive rights to reproduce, distribute copies of, perform publicly, display publicly, and create derivative works based on the copyrighted work — or to authorize others to do any of these activities.[3] These broad rights represent a starting point for copyright owners to determine when and how others may use their works.[4] Under this section, copyright owners may authorize schools and libraries to use their copyrighted works on whatever terms the copyright owners deem acceptable, including without compensation.

Like many participants in our economy, publishers and authors have been negatively impacted by economic stresses inflicted by COVID-19. Many publishers and authors have responded to the crisis by engaging in efforts to ensure that readers, students, and others continue to be able to access their works, even as businesses remain closed and large parts of the country

---

[2] U.S. COPYRIGHT OFFICE, CIRCULAR 21: REPRODUCTION OF COPYRIGHTED WORKS BY EDUCATORS AND LIBRARIANS (2014), https://www.copyright.gov/circs/circ21.pdf.

[3] 17 U.S.C. § 106.

[4] Letter from Maria A. Pallante, Register of Copyrights, to Reps. Marsha Blackburn, G.K. Butterfield, Doug Collins, and Ted Deutch, at 3 (Aug. 3, 2016), https://www.copyright.gov/laws/hearings/fcc-set-top-box-proposal.pdf.

are covered by stay-at-home orders.[5] Many publishers have expanded online access to digital books and articles to students, educational institutions, or the general public, in some cases making some or all of their titles freely available. A few examples include:

- Cambridge University Press, which has made over 700 textbooks available online to students through their university library, regardless of whether they were previously purchased;
- Cengage, which has provided students with free access to all its digital platforms and eBooks for the remainder of the spring semester;
- Macmillan Learning, which has provided free access to its online platforms through the rest of the term to college instructors who have adopted their print titles; and
- Running Press, which is making free art projects and storytime videos available on its website and social media channels.[6]

Other publishers and authors, such as Penguin Random House and J. K. Rowling, have provided "read-along" licenses to permit teachers to read works to students online.[7]

Nonprofit entities and cultural institutions have also engaged in efforts to expand online access to educational and other digital materials during the pandemic. Examples of such efforts include the following:

- In a recent survey of public libraries, 74% report that they have continued, added, or expanded online services like e-books and streaming media, while 61% have added virtual programming for their patrons;[8]
- The digital library JSTOR has expanded institutional access, including providing access to its entire collection to institutions, regardless of the institution's licensing agreement; it has provided free access to select journal articles to the general public and increased its free read-online access limit from 6 to 100 articles per month "[t]o support independent researchers at a time when they are unable to get to physical libraries;"[9]
- Many museums and national libraries have launched resource pages and made parts of

---

[5] As of May 13, 2020, a number of states have begun to loosen restrictions on travel and commerce, but nearly half remain under "stay-at-home" orders. Sarah Mervosh, Jasmine C. Lee, Lazaro Gamio & Nadja Popovich, *See Which States Are Reopening and Which Are Still Shut Down*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (last updated May 13, 2020). *See generally CDC COVID Data Tracker*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/covid-data-tracker/index.html (last updated May 13, 2020) (tracking COVID-19 spread in the United States).

[6] These and many other publisher initiatives are collected on the Association of American Publishers website. *See What Publishers Are Doing to Help During the Coronavirus Pandemic*, ASS'N OF AM. PUBLISHERS, https://publishers.org/aap-news/covid-19-response/ (last visited May 13, 2020).

[7] Morgan Gstalter, *J.K. Rowling Grants Open License for Teachers Reading "Harry Potter" Online During Coronavirus Pandemic*, THE HILL (Mar. 21, 2020, 11:03 AM), https://thehill.com/blogs/blog-briefing-room/news/488794-jk-rowling-grants-open-license-for-teachers-reading-harry.

[8] *Public Libraries Respond to COVID-19: Survey of Response & Activities*, PUB. LIBRARY ASS'N, http://www.ala.org/pla/issues/covid-19/surveyoverview (last visited May 13, 2020).

[9] *Expanded Access to JSTOR During COVID-19 Crisis*, JSTOR (Apr. 15, 2020), https://about.jstor.org/news/expanded-access-to-jstor-during-covid-19-crisis/.

their collections available online, including the Library of Congress[10] and the Smithsonian here in the United States;[11] and

- The American Alliance of Museums launched the Museum Distance Learning Repository to collect online resources from art, history, science, and children's museums, as well as zoos and other cultural institutions.[12] As of May 13, the repository contained links to over 700 free resources that can be narrowed by such options as target age range, content area, and time required.[13]

The Copyright Office is encouraged by the collaborative efforts undertaken to date among copyright owners, libraries, educational institutions, and others and appreciates their continued efforts to explore ways to ensure researchers, students, and other readers can continue to access works during this crisis, including through easy to understand licensing, opt-in open access models, and mutually accepted best practices and guidance.

### B.    Section 108 Exceptions for Libraries and Archives

Section 108 of the Copyright Act provides exceptions to a copyright owner's rights specifically applicable to libraries and archives for certain core activities.[14] These exceptions are conditioned on a number of requirements, including that the library or archives must be open to the public and the reproduction and distribution of works may not be for the purposes of direct or indirect commercial advantage.[15]

Several provisions in section 108 permit the reproduction of a work for the purpose of preserving or replacing a copy in a library's or archives' collections. Section 108(b) permits copying unpublished works for preservation or for deposit in another library or archives for research. Section 108(c) permits making copies of published works to serve as replacement copies for the original. And section 108(h) permits copying and other uses of certain works in their last 20 years of copyright protection for preservation, scholarship, or research.

Other provisions allow libraries and archives, under certain conditions, to reproduce and distribute copies of all or part of a copyrighted work held in their collections at the request of a user or another library or archive. Section 108(d) permits the reproduction and distribution "of no more than one article or other contribution to a copyrighted collection or periodical issue,

---

[10] *Library of Congress: Engage!*, LIBRARY OF CONGRESS, https://loc.gov/engage/ (last visited May 13, 2020).

[11] *Smithsonian Cares*, SMITHSONIAN, https://www.si.edu/online (last visited May 13, 2020).

[12] Sarah Jenkes, *Introducing the Museum Distance Learning Repository*, AM. ALL. OF MUSEUMS (Apr. 20, 2020), https://www.aam-us.org/2020/04/20/introducing-the-museum-distance-learning-repository/.

[13] The Museum Distance Learning Repository is available at https://sites.google.com/view/museum-distance-learning/home.

[14] 17 U.S.C. § 108. The exceptions in section 108 work in tandem with fair use. 17 U.S.C. § 108(f)(4) ("Nothing in this section . . . in any way affects the right of fair use as provided by section 107"). Separately, as noted in the Office's 2017 Section 108 Discussion Document (discussed below), the Office recommends adding museums to the list of institutions eligible for section 108 exceptions.

[15] 17 U.S.C. § 108(a).

or . . . of a small part of any other copyrighted work."[16] Section 108(e) permits the reproduction and distribution of an "entire work, or . . . a substantial part of it . . . if the library or archives has first determined, on the basis of a reasonable investigation, that a copy or phonorecord of the copyrighted work cannot be obtained at a fair price."[17] Both exceptions require that the copy become the property of the user and that the library has no notice that the copy will be used "for any purpose other than private study, scholarship, or research."[18]

These exceptions only apply to "isolated and unrelated reproduction or distribution of a single copy . . . of the same material on separate occasions."[19] They do not apply when a library or archives "is aware or has substantial reason to believe that it is engaging in the related or concerted reproduction or distribution of multiple copies" of the same material, whether at one time or over a period of time.[20] Nor do they apply to a library or archives that "engages in the systematic reproduction or distribution of single or multiple copies" of a work.[21]

Section 108 has been periodically updated by Congress. In 1998, as part of the Digital Millennium Copyright Act ("DMCA"), Congress amended the section to allow libraries and archives "to take advantage of digital technologies when engaging in specified preservation activities."[22] Among other changes, the "replacement copy" exception in section 108(c) was amended to "permit[] such copies or phonorecords to be made in digital as well as analog formats."[23] But the amendment expressly prohibited remote or online access to such copies; the Senate Committee Report explained, "any copy of a work that the library or archive makes in a digital format must not be made available to the public in that format except for use on the premises of a library or archives in lawful possession of such copy."[24]

The Copyright Office has engaged in ongoing efforts to examine potential reforms to section 108 for over a decade.[25] In the mid-2000s, it convened a Section 108 Study Group with

---

[16] *Id.* at § 108(d).

[17] *Id.* at § 108(e).

[18] *Id.* at § 108(d)(1), (e)(1).

[19] *Id.* at § 108(g).

[20] *Id.* at § 108(g)(1).

[21] *Id.* at § 108(g)(2). Section 108(g)(2) provides further, "[t]hat nothing in this clause prevents a library or archives from participating in interlibrary arrangements that do not have, as their purpose or effect, that the library or archives receiving such copies or phonorecords for distribution does so in such aggregate quantities as to substitute for a subscription to or purchase of such work."

[22] S. Rep. No. 105-190, at 60 (1998), https://www.congress.gov/105/crpt/srpt190/CRPT-105srpt190.pdf.

[23] *Id.* at 61.

[24] *Id.* The Senate Committee Report explained, "this proviso is necessary to ensure that the amendment strikes the appropriate balance, permitting the use of digital technology by libraries and archives while guarding against the potential harm to the copyright owner's market from patrons obtaining unlimited access to digital copies from any location." S. Rep. No. 105-190 at 61-62.

[25] *See* U.S. Copyright Office, Section 108 of Title 17: A Discussion Document of the Register of Copyrights (2017), https://www.copyright.gov/policy/section108/discussion-document.pdf ("Section 108 Discussion Document"); U.S. Copyright Office & Library of Congress, The Section 108 Study Group Report (2008), http://www.section108.gov/docs/Sec108StudyGroupReport.pdf ("The Section 108 Study Group Report").

the Library of Congress' National Digital Information Infrastructure and Preservation Program, which issued a final report in March 2008 recommending several amendments to section 108.[26]

The Study Group report included discussion of issues on which the Study Group could not reach consensus. One such area was whether to depart from the balance Congress struck in the DMCA and permit remote access to digital replacement copies, provided that doing so "can be conditioned in such a way as to protect rights holders' markets from potential harm that might otherwise result."[27] The Study Group report catalogued arguments for and against permitting remote access.[28]

The Copyright Office revisited section 108 most recently in 2017, when it issued a Discussion Document to review developments and issues raised over the past decade, outline the Office's current views and proposals on the various revision issues, and present and explain model statutory language for a new section 108.[29] The model statutory language retained the current section 108(c) prohibition on providing remote access to electronic replacement copies of published works.[30] It did, however, propose expanding the section 108(b) exception for creating preservation or security copies of works not disseminated to the public to allow remote access, by a single user at a time, for a limited time, to electronic copies of such works.[31]

The Office is happy to provide any follow-up that may be desired regarding the recommendations made in the Section 108 Discussion Document as Congress considers issues related to online access to works in library collections during the COVID-19 outbreak, as well as any additional considerations regarding modernizing the section 108 exceptions.

## C.     Section 110 Exceptions for Distance Learning

The Copyright Act includes provisions designed to facilitate distance learning. Since 1976, the Copyright Act has included a provision that allows teachers in nonprofit educational institutions to publicly display or perform copyrighted works in the course of face-to-face teaching activities.[32] The Technology, Education, and Copyright Harmonization Act (the "TEACH Act"), enacted in 2002, was designed to provide similar authorization to educators and government bodies who were teaching remotely.[33] The TEACH Act "allows students and teachers to benefit from deployment in education of advanced digital transmission technologies

---

[26] THE SECTION 108 STUDY GROUP REPORT at i–ii.

[27] *Id.* at 57.

[28] *Id.* at 58–60.

[29] SECTION 108 DISCUSSION DOCUMENT at 1–4.

[30] *Id.* at 32-33.

[31] *Id.* at 26. The Office introduced the statutory language "dissemination to the public" to replace "publication" as a distinguishing factor for how a work is treated under Section 108, explaining, "[w]ith the rise of digital media and the internet, the distinction between published and unpublished, as legal terms of art, has become difficult to parse." *Id.* at 24.

[32] 17 U.S.C. § 110(1).

[33] Pub. L. No. 107-273, § 13301, 116 Stat. 1910 (2002) (codified as 17 U.S.C. §§ 110(2), 112(f) (2005)).

like the Internet, while introducing safeguards to limit the additional risks to copyright owners that are inherent in exploiting works in a digital format."[34]

As explained in a recent Copyright Office blog entry posted when schools began transitioning to distance learning in March, the TEACH Act explicitly permits performances of nondramatic literary works and nondramatic musical works, performances of "reasonable and limited portions" of any other work, and displays of the amount of any work "typically displayed in the course of a live classroom session" if the educational institution through which the course is offered meets certain requirements.[35] First, the TEACH Act contemplates that the public performance or display of the copyrighted material is an "integral part of a class session" provided by a governmental body or an accredited nonprofit educational institution that offers "systematic mediated instructional activities."[36] Additionally, the government body or educational institution must take a number of steps to minimize the risk that the copyrighted works will be further distributed, including making efforts to limit the transmission of the copyrighted works to individuals officially enrolled in the course, preventing students from retaining copies of the work for longer than the "class session," and instituting a robust copyright policy.[37] The TEACH Act allows hard copy works to be converted by educators into digital formats for use in distance learning only if the amount is limited to the amount permitted to be publicly performed or displayed under section 110(2) and no digital version of the work is reasonably available.[38]

For example, pursuant to the TEACH Act, if a school district meets the requirements, an elementary school teacher may display a picture book he is reading in a video to be viewed by all students in his class because it is typical for elementary school teachers in live classroom settings to display all pages of a picture book. Likewise, a university professor may digitally display limited movie clips to illustrate a particular concept relating to a course, just as she would do in a live setting, if the university meets the requirements of the TEACH Act.

## II.   FIRST SALE DOCTRINE

Another doctrine that could potentially apply to schools and libraries during this period is the first sale doctrine. Copyright's first sale doctrine is what permits, among other things, libraries to lend physical copies of copyrighted works to patrons without the need to obtain the permission of copyright owners or make royalty payments. The doctrine is codified under section

---

[34] H.R. REP. No. 107-687, at 2 (2002), https://www.congress.gov/107/crpt/hrpt687/CRPT-107hrpt687.pdf.
[35] David Welkowitz, *TEACHing From a Distance and Copyright Considerations*, COPYRIGHT: CREATIVITY AT WORK (Mar. 17, 2020), https://blogs.loc.gov/copyright/2020/03/teaching-from-a-distance-and-copyright-considerations/ (quoting 17 U.S.C. § 110(2)). The Act excludes works that are marketed specifically for use as digital instructional activities and performances or display of copies "not lawfully made and acquired" under the U.S. Copyright Act, if the educational institution "knew or had reason to believe" that they were not lawfully made and acquired. 17 U.S.C. § 110(2).
[36] *Id*.
[37] *Id*.
[38] 17 U.S.C. § 112(f)(2).

109 of the Copyright Act.[39] Under the first sale doctrine, a copyright owner does not retain the legal right to control the resale or other distribution of copies or phonorecords of a work that have been lawfully sold.[40]

The question arises whether this exception applies in the digital world; that is, whether a "digital first sale" doctrine permits libraries, for example, to "lend" copies of ebooks via digital transmission, without permission of the copyright owner, the same way they lend physical copies of books to patrons.

The Copyright Office has previously considered the application of the first sale doctrine to copies of works transmitted digitally. In its 2001 DMCA Section 104 Report, the Office said,

> Section 109 limits a copyright owner's exclusive right of distribution. It does not, by its terms, serve as a defense to a claim of infringement of any of the other exclusive rights. The transmissions that are the focus of proposals for a "digital first sale doctrine" result in reproductions of the works involved. The ultimate product of one of these digital transmissions is a new copy in the possession of a new person. Unlike the traditional circumstances of a first sale transfer, the recipient obtains a new copy, not the same one with which the sender began. Indeed, absent human or technological intervention, the sender retains the source copy. This copying implicates the copyright owner's reproduction right as well as the distribution right.
>
> Section 109 provides no defense to infringements of the reproduction right. Therefore, when the owner of a lawful copy of a copyrighted work digitally transmits that work in a way that exercises the reproduction right without authorization, section 109 does not provide a defense to infringement.[41]

---

[39] 17 U.S.C. § 109. This section provides, in part, "[n]otwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." The first sale doctrine is an extension of the Copyright Act's principle that "[o]wnership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202.

[40] Separately, 17 U.S.C. § 202 provides "[t]ransfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object."

[41] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 79-80 (2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf. The Office reiterated this conclusion in its 2016 report on the Making Available Right in the United States, saying, "the first sale doctrine protects only distribution by the owner of a particular copy or phonorecord . . . of that copy or phonorecord. By contrast, a digital file transfer creates a new copy or phonorecord on the transferee's computer." U.S. COPYRIGHT OFFICE, THE MAKING AVAILABLE RIGHT IN THE UNITED STATES 22 n.94 (2016) (internal quotation marks omitted), https://www.copyright.gov/docs/making_available/making-available-right.pdf.

In 2016, the Department of Commerce Internet Policy Task Force ("IPTF") published a white paper that addressed three issues at the intersection of copyright law and internet policy, including "the relevance and scope of the first sale doctrine in the digital environment."[42] The IPTF accepted the Copyright Office's conclusion that the first sale doctrine did not apply to digital transmissions and declined to recommend extending the doctrine to apply to digital transmissions of copyrighted works.[43]

The Second Circuit subsequently considered the question of digital first sale in *Capitol Records v. ReDigi*.[44] There, record label plaintiffs alleged that ReDigi's operation of an online marketplace for the resale of lawfully purchased digital music files resulted in unauthorized reproduction and distribution of plaintiffs' works. ReDigi argued, in part, that the resale of digital music files was permitted under the first sale doctrine. It asserted that, from a technical standpoint, because its system ensured that no additional copies of a work were created during its transfer process, it did not make a reproduction of the works under the copyright law. The court rejected ReDigi's first sale argument, holding that the online marketplace resulted in the reproduction of works during the course of its operations, and thus was not permitted under section 109. The court cited to the Office's DMCA Section 104 report as support for its conclusion.[45]

## III.   FAIR USE

Finally, and importantly, uses of copyrighted works that are not authorized by any of the above-discussed provisions of the Copyright Act could potentially be found to be non-infringing under the fair use doctrine. Section 107 of the Copyright Act provides that "the fair use of a copyrighted work, including such use by reproduction in copies . . . is not an infringement of copyright."[46] The statutory preamble lists several illustrative, but not limitative, potentially fair uses, including use "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."[47] In determining whether the use of a copyrighted work is fair, a court must consider four factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

---

[42] DEPARTMENT OF COMMERCE IPTF, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES iii (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf. The Department of Commerce IPTF is led by the U.S. Patent and Trademark Office (USPTO) and the National Telecommunications and Information Administration (NTIA). The IPTF White Paper was the result of a multi-year review that included input gathered through a public meeting at the USPTO, multiple public roundtables, and written comments from stakeholders and the general public.
[43] *Id.* at 58.
[44] *Capitol Records, LLC v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018).
[45] *Id.* at 659–60.
[46] 17 U.S.C. § 107.
[47] *Id.*

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.[48]

These factors "are not meant to be exclusive."[49]

The final step in the fair use analysis is to weigh the four statutory factors and any other relevant information in light of the purpose of copyright.[50] The Constitution grants Congress the power to "promote the Progress of Science and useful Arts" by giving authors the exclusive right to their writings for a limited time.[51] The Supreme Court has recognized that providing them with an exclusive opportunity to profit from the sale or licensing of their works is "intended to motivate the creative activity of authors."[52] Ultimately, too, copyright "serves the purpose of enriching the general public through access to creative works."[53] Thus, each factor "stands as part of a multifaceted assessment of the crucial question: how to define the boundary limit of the original author's exclusive rights in order to best serve the overall objectives of the copyright law to expand public learning while protecting the incentives of authors to create for the public good."[54]

Because fair use requires an individualized analysis and weighing of all relevant factors, courts vary widely in how they weigh the factors and ultimately rule on fair use. The Copyright Office provides a number of resources to help the public understand the principles and application of fair use. The Office maintains the Fair Use Index, which is a project undertaken by the Office in support of a 2013 initiative of the White House Office of the Intellectual Property Enforcement Coordinator.[55] This regularly updated, searchable index summarizes significant court opinions ruling on fair use issues; currently 227 opinions are indexed. The Fair Use Index is a valuable resource in educating the public about the types of uses of copyrighted materials courts have determined to be fair or not fair. The Office also provides general information about fair use and a short video explaining fair use concepts on its website.[56] Additionally, Circular 21 provides detailed information, including extensive excerpts of relevant legislative history,

---

[48] *Id.*
[49] *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 560 (1985).
[50] *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994).
[51] U.S. CONST. art. I, § 8, cl. 8.
[52] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).
[53] *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994).
[54] *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015) ("*Google Books*").
[55] The Fair Use Index is available at https://www.copyright.gov/fair-use/fair-index.html.
[56] *More Information on Fair Use*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/fair-use/more-info.html (last visited May 13, 2020); *Learning Engine Video Series: Fair Use*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/learning-engine/ (last visited May 13, 2020).

intended to assist librarians and educators considering whether reproduction of copyrighted materials for education and research purposes may constitute fair use.[57]

## A.      Factor One: Purpose and Character of the Use

The first factor, the purpose and character of the use, requires consideration of both whether the secondary use is commercial and whether, and to what extent, it is "transformative," which is to say "whether the new work merely supersedes the objects of the original creation, . . . or instead adds something new, with a further purpose or different character."[58]

The goals of promoting scholarship and education are explicitly identified in the statute as favored purposes.[59] However, that does not mean that all uses of copyrighted works for educational purposes are fair uses.[60] It is generally understood that many uses of copyrighted works by schools and universities must be licensed.[61]

Using a work in a manner that serves a different function than the original is transformative.[62] In contrast, simply reproducing a work in a new format is not transformative.[63] Specifically, courts have held that reproducing the text of physical books in digital format is not

---

[57] U.S. Copyright Office, CIRCULAR 21: REPRODUCTION OF COPYRIGHTED WORKS BY EDUCATORS AND LIBRARIANS (2014), https://www.copyright.gov/circs/circ21.pdf.

[58] *Campbell,* 510 U.S. at 579 (internal quotations omitted).

[59] 17 U.S.C. § 107.

[60] *See Cambridge Univ. Press v. Albert*, 769 F.3d 1232, 1263–64 (11th Cir. 2014) ("[A]llowing some leeway for educational fair use furthers the purpose of copyright by providing students and teachers with a means to lawfully access works. . . But, as always, care must be taken not to allow too much educational use, lest the court undermine the goals of copyright by enervating the incentive for authors to create the works upon which students and teachers depend."); H.R. REP. No. 94–1476, at 66–67 (1976), https://www.copyright.gov/history/law/clrev_94-1476.pdf ("[A] specific exemption freeing certain reproductions of copy-righted works for educational and scholarly purposes from copyright control is not justified."); Linda Starr, *Is Fair Use a License to Steal?*, EDUCATION WORLD (2015), https://www.educationworld.com/a_curr/curr280b.shtml.

[61] *See Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) (holding that reproduction of significant portions of copyrighted works for use in course packets was not fair use); *Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983) (holding that reproduction of 12 pages of book for use in educational booklet was not fair use even though the work was used for a nonprofit educational purpose).

[62] *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (holding that the use of images in search engine was transformative because it served purpose of pointing users to sources rather than entertainment, aesthetic or informative purposes of the original photographs); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) (copying of images for display as thumbnail image in search results is transformative because the thumbnail images serve the purpose of improving access to information online and the original images serve aesthetic and illustrative purposes).

[63] *See, e.g., Kelly,* 336 F.3d at 819 (distinguishing the use at issue, which the court found to be a fair use, from activities like "reproducing music CDs in computer MP3 format," in which "both formats are used for entertainment purposes"); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 n.2 (2d Cir. 1998) (reformatting radio broadcasts to make them available by phone was not transformative); *UMG Recordings, Inc. v. MP3.com, Inc.,* 92 F.Supp.2d 349, 351 (S.D.N.Y.2000) (finding that reproduction of audio CD into computer MP3 format did not transform the work); *see also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990) (finding that the use of copyrighted work that "merely repackages or republishes the original" is unlikely to be a fair use).

transformative unless the change in format results in new *uses* for the work.[64] Additionally, because textbooks and research monographs are created for educational purposes, offering those materials for educational purposes would not serve a different purpose than the original.

## B.       Factor Two: Nature of the Work

The second fair use factor directs a court to consider "the nature of the copyrighted work."[65] Whether a work is published or unpublished has historically been one consideration, although Congress amended section 107 in 1992 to add "[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all above factors."[66] Courts also consider whether a work is creative or informational. The Supreme Court has observed "that some works are closer to the core of intended copyright protection than others."[67] Consequently, "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."[68] The second fair use factor is likely the least important of the four factors, and it rarely plays any significant role in a fair use analysis.[69]

Somewhat distinct from unpublished and published works are "out-of-print" works—works that had previously been published but are currently unavailable in the marketplace. The legislative history for the second fair use factor suggests that there may be "more justification" for reproducing an out-of-print work, but at the same time, "the existence of organizations licensed to provide photocopies of out-of-print works at reasonable cost is a factor to be considered."[70] The case law addressing a work's print status under the second factor is mixed.[71]

---

[64] *Oracle America, Inc. v. Google LLC*, 886 F.3d 1179, 1201 (Fed. Cir. 2018) ("[M]oving material to a new context is not transformative in and of itself—even if it is a sharply different context.") (internal quotation marks omitted); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97–101 (2d Cir. 2014) (reproducing books in format that makes them readable by people with print disabilities is not transformative but digitization of books to create search function identifying the page numbers on which a term is found within a work and the number of times the term appears on each page is transformative).

[65] 17 U.S.C. § 107(2).

[66] An Act to amend Title 17, United States Code, relating to fair use of copyrighted works, Pub. L. No. 102-492, 106 Stat. 3145 (1992), https://www.govinfo.gov/content/pkg/STATUTE-106/pdf/STATUTE-106-Pg3145.pdf#page=1.

[67] *Campbell*, 510 U.S. at 586.

[68] *Harper & Row*, 471 U.S. at 563.

[69] *See Google Books*, 804 F.3d at 220 (citing WILLIAM F. PATRY, PATRY ON FAIR USE § 4.1 (2015)).

[70] S. REP. No. 94–473, at 64 (1975), https://www.copyright.gov/history/law/clrev_94-473.pdf.

[71] *Compare Meeropol v. Nizer*, 560 F.2d 1061, 1070 (2d Cir. 1977) ("The fact that the Rosenberg letters have been out of print for 20 years does not necessarily mean that they have no future market which can be injured. The market for republication or for sale of motion picture rights might be affected by the infringing work."), *with Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1176 n.14 (5th Cir.1980) ("[I]f the copyrighted work is out of print and cannot be purchased, a user may be more likely to prevail on a fair use defense."), *and Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1314 (11th Cir. 2008) (distinguishing works withdrawn from the market because of "dearth of sales" from works affirmatively withdrawn from the market by the copyright owner for other reasons, and concluding works of the latter variety do not favor defendants' claim of fair use); *see also* 4 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 10:140 (2020).

### C.      Factor Three: Amount and Substantiality of Portion Used

The third factor considers the amount and substantiality of the portion used in relation to the copyrighted work as a whole.[72] The key to this factor is whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor.[73] As such, copying an entire work often weighs against a finding of fair use.[74] If it were necessary to copy the entire copyrighted work to achieve the purpose of the secondary use, the third factor would not weigh against a finding of fair use.[75]

### D.      Factor Four: Effect of the Use on the Value of the Copyrighted Works

The fourth fair use factor directs courts to consider "the effect of the use upon the potential market for or value of the copyrighted work."[76] The Supreme Court has said this factor is "undoubtedly the single most important element of fair use."[77] In applying the fourth factor, the focus is on whether widespread conduct similar to the conduct of the alleged infringer "would adversely affect the *potential* market for the copyrighted work."[78] The examination of potential markets is not without limit; courts generally only consider "traditional, reasonable, or likely to be developed markets" when assessing the fourth factor.[79] This inquiry includes not only market harm to the original work, but also harm to the market for derivative works.[80]

Two recent cases illustrate the overlap between the third and fourth fair use factors in digitization cases, where the risk that the digitized version will serve as a market substitute for the original work increases as the amount of the work that is made accessible to the public increases. In *Authors Guild v. Google, Inc.*, Google copied tens of millions of books to create a search function that allowed users to determine the number of times a specific term appeared and to view limited "snippets" of works containing the search terms.[81] In evaluating a service that it determined "test[ed] the boundaries of fair use," the court concluded the use was a fair use

---

[72] 17 U.S.C. § 107.

[73] *Campbell,* 510 U.S. at 586–87.

[74] *Wall Data, Inc. v. L.A. County Sheriff's Dept.*, 447 F.3d 769, 780 (9th Cir. 2006) (defendant's verbatim copying of entire copyrighted work weighed against finding of fair use); *Worldwide Church of God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110, 1118 (9th Cir. 2000) ("While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use.") (internal quotation marks omitted).

[75] *HathiTrust*, 755 F.3d at 98.

[76] 17 U.S.C. § 107(4).

[77] *Harper & Row*, 471 U.S. at 566.

[78] *Id.* at 568 (1985) (emphasis in original) (*quoting Sony Corp. of Am.*, 464 U. S., at 451); *see also Campbell*, 510 U.S. at 590.

[79] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929–930 (2d Cir. 1994); *see also* 4 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 10:152 ("Judge Pierre Leval has rightly observed, 'By definition, every fair use involves some loss of royalty revenue because the secondary user has not paid royalties.' This means that contrary to copyright owners' belief that all uses can be licensed and should not therefore be fair use, the ability to license does not equate with negatively weighing the fourth factor against the defendant. Such an approach would eliminate much of what has always been regarded as fair use, or as noninfringement.").

[80] *Harper & Row*, 471 U.S. at 568.

[81] *Google Books*, 804 F.3d at 222.

13

because, in addition to the search engine functionality being transformative, the public display of limited snippets of the works was unlikely to harm the value of the copyrighted works.[82] The court emphasized that the strict limitations Google imposed on the snippet function played a key role in its decision, noting that "[t]he larger the quantity of the copyrighted text the searcher can see and the more control the searcher can exercise over what part of the text she sees, the greater the likelihood that those revelations could serve her as an effective, free substitute for the purchase of the plaintiff's book."[83]

Similarly, in *Authors Guild, Inc. v. HathiTrust*, the court held that the HathiTrust's creation of digital copies of books to develop a search function that allowed users to determine how many times and on what pages a specific term appeared in a work was a fair use.[84] The court stressed that the public was not able to view any portion of the text from the underlying copyrighted works and that the digital library did "not add into circulation any new, human-readable copies of any books."[85]

## IV.    NATIONAL EMERGENCY LIBRARY

### A.    Background

Schools, colleges, universities, and public libraries, the sources through which many people obtain reading materials, have shuttered their physical locations because of closures related to the COVID-19 crisis (although many continue to operate on a more limited basis online). According to the Internet Archive, approximately 650 million books in public libraries that are normally accessible to the public are now inaccessible, and some teachers were unable to distribute copies of class sets of books before schools were closed.[86] In light of these circumstances, on March 24, 2020, the Internet Archive launched what it calls the "National Emergency Library," through which it provides free electronic access to scanned versions of

---

[82] *Id.* at 206, 223–24.

[83] *Id.* at 222. The Second Circuit reiterated this point in *Fox News Network v. TVEyes, Inc.*, 883 F. 3d 169, 179 (2d Cir. 2018), saying, the third factor "clearly favors Fox because TVEyes makes available virtually the entirety of the Fox programming that TVEyes users want to see and hear. . . . In this respect, the TVEyes Watch function is radically dissimilar to the service at issue in *Google Books*.").

[84] *HathiTrust*, 755 F.3d 87, 103. Relying heavily on legislative history that specified that copying a book to make it accessible to a blind person was a fair use, the court also held that HathiTrust's provision of access to the full text of copyrighted works solely to patrons who certified that they had a print disability was a fair use. *Id*. at 102 (citing H.R. Rep. No. 94–1476, at 73).

[85] *Id.* at 97.

[86] Chris Freeland, *Internet Archive Responds: Why We Released the National Emergency Library*, Internet Archive (Mar. 30, 2020), http://blog.archive.org/2020/03/30/internet-archive-responds-why-we-released-the-national-emergency-library/; Wendy Hanamura, *Teachers and the National Emergency Library: Stories from the Frontlines of Online Schooling*, Internet Archive (Apr. 13, 2020), http://blog.archive.org/2020/04/13/teachers-the-national-emergency-library-stories-from-the-frontlines-of-online-schooling/; *see also Public Libraries Respond to COVID-19: Survey of Response & Activities*, Public Library Ass'n (Apr. 9, 2020), http://www.ala.org/pla/ issues/covid-19/surveyoverview (survey of public libraries found 98% had closed their buildings to the public).

books for access by an unlimited number of users through June 30, 2020 or "the end of the US national emergency," whichever is later.[87]

The Internet Archive's collection contains scanned versions of approximately 1.4 million books.[88] Before March 24, the Internet Archive provided public access to the collection under what proponents have called a Controlled Digital Lending ("CDL") model, through which the number of digital versions a particular work that users may access at one time is limited to the number of physical copies of the work a lender has in its possession.[89] Under a CDL model, if the number of users interested in accessing a digital copy of the work exceeded the number of physical copies of the work, a waiting list is set up for that work. The Internet Archive cites a White Paper on Controlled Digital Lending of Library Books ("*CDL White Paper*") and a Position Statement on Controlled Digital Lending authored by academic librarians, clinical law professors, and the Internet Archive's policy counsel providing legal justifications for the CDL model.[90]

Starting on March 24, the Internet Archive suspended all waiting lists so that each digital copy can be checked out by an unlimited number of users simultaneously. Users may check out up to ten works at a time, each of which can be checked out for a fourteen-day period, at which point it can be checked out again.[91] As noted in your letter, rather than seek permission from authors or publishers prior to posting digital copies of the works or removing the waiting lists, the Internet Archive requires that authors affirmatively opt out of the program to have their books removed from the collection.[92]

The Internet Archive concedes that the National Emergency Library is an "extraordinary step," one it claims is justified due to the "unprecedented need" for access to reading and research materials due to the closing of local libraries and self-quarantine.[93] It claims that removing waiting lists will "put books in the hands of people who need them, supporting

---

[87] Chris Freeland, *Internet Archive Responds: Why We Released the National Emergency Library*, INTERNET ARCHIVE (Mar. 30, 2020), http://blog.archive.org/2020/03/30/internet-archive-responds-why-we-released-the-national-emergency-library/.

[88] Chris Freeland, *Announcing a National Emergency Library to Provide Digitized Books to Students and the Public*, INTERNET ARCHIVE (Mar. 24, 2020), http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/.

[89] *Id.*

[90] DAVID R. HANSEN & KYLE K. COURTNEY, A WHITE PAPER ON CONTROLLED DIGITAL LENDING OF LIBRARY BOOKS 21 (2018), https://osf.io/preprints/lawarxiv/7fdyr/ ("CDL WHITE PAPER"); Lila Bailey, Kyle K. Courtney, David Hansen, Mary Minow, Jason Schultz & Michelle Wu, *Position Statement on Controlled Digital Lending* (2018), https://controlleddigitallending.org/statement.

[91] Chris Freeland, *Announcing a National Emergency Library to Provide Digitized Books to Students and the Public*, INTERNET ARCHIVE (Mar. 24, 2020), http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/.

[92] *Id.*

[93] Chris Freeland, *Internet Archive Responds: Why We Released the National Emergency Library*, INTERNET ARCHIVE (Mar. 30, 2020), http://blog.archive.org/2020/03/30/internet-archive-responds-why-we-released-the-national-emergency-library/.

emergency remote teaching, research activities, independent scholarship, and intellectual stimulation while universities, schools, training centers, and libraries are closed."[94]

The Internet Archive states that the books in the National Emergency Library "focus on materials published during the 20th century, the vast majority of which do not have a commercially available ebook," and which therefore would not be publicly available when schools and libraries are closed.[95] However, the Internet Archive does not appear to have verified if any of the works in its collection were available to the public in digital formats prior to including those books in its collection or removing its waiting lists. The National Emergency Library collection includes many books for which ebooks are available commercially, and often through local libraries, such as:

- thrillers by authors such as Stephen King, Dean Koontz and Jeffrey Archer;
- several books from the *Diary of a Wimpy Kid* series;
- *The Song of Solomon* and several books by Toni Morrison;
- *The Handmaid's Tale* by Margaret Atwood; and
- *Steve Jobs* by Walter Isaacson

Individual authors, as well as The Authors Guild and the Association of American Publishers, have criticized the National Emergency Library and argued that the project infringes their copyrights.[96]

The Internet Archive admits that it "didn't engage with the creator community and the ecosystem in which their works are made and published" prior to removing its waiting lists.[97] After the Internet Archive launched its program, at least two academic publishers provided

[94] *National Emergency Library FAQs*, INTERNET ARCHIVE (Apr. 22, 2020), https://help.archive.org/hc/en-us/articles/360042654251-National-Emergency-Library-FAQs.

[95] Chris Freeland, *Announcing a National Emergency Library to Provide Digitized Books to Students and the Public*, INTERNET ARCHIVE (Mar. 24, 2020), http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/.

[96] *Internet Archive's National Emergency Library Harms Authors*, THE AUTHORS GUILD (Mar. 27, 2020), https://www.authorsguild.org/industry-advocacy/internet-archives-uncontrolled-digital-lending/; *Comment from AAP President and CEO Maria Pallante on the Internet Archive's "National Emergency Library"*, ASS'N OF AM. PUBLISHERS (Mar. 27, 2020), https://publishers.org/news/comment-from-aap-president-and-ceo-maria-pallante-on-the-internet-archives-national-emergency-library/; *see also* Colson Whitehead (@colsonwhitehead), TWITTER (Mar. 28, 2020), https://twitter.com/colsonwhitehead/status/1243932648973709313; Neil Gaiman (@neilhimself), TWITTER (Mar. 28, 2020), https://twitter.com/neilhimself/status/1244087854063468544; N. K. Jemisin (@nkjemisin), TWITTER (Mar. 29, 2020), https://twitter.com/nkjemisin/status/1244289290080788483; Roxane Gay (@rgay), TWITTER (Mar. 28, 2020), https://twitter.com/rgay/status/1244014637407809536.

[97] Brewster Kahle, *The National Emergency Library – Who Needs It? Who Reads It? Lessons From the First Two Weeks*, INTERNET ARCHIVE (Apr. 7, 2020), http://blog.archive.org/2020/04/07/the-national-emergency-library-who-needs-it-who-reads-it-lessons-from-the-first-two-weeks/.

permission to the Internet Archive to post digital versions of their works that were in the National Emergency Library collection until June 30, 2020, under certain conditions.[98]

### B.      Is the National Emergency Library Permitted by the First Sale Doctrine?

As discussed above, the Copyright Office has concluded that the first sale doctrine does not permit the creation and digital transmission of a file.[99] This position has been accepted by the Department of Commerce's Internet Policy Task Force[100] and is consistent with the Second Circuit's decision in *Capitol Records v. ReDigi*.[101] Because a new copy of a work is created when the Internet Archive lends a work to a user, the Internet Archive would appear to be unable to rely on the first sale doctrine as the legal basis for its actions.[102]

### C.      Is the National Emergency Library a Fair Use?

As discussed above, a fair use analysis must consider each of the four statutory factors and then weigh the factors as well as any other relevant information in light of the purpose of copyright.[103] The Office has tried to identify some key issues that may be relevant to considering whether the Internet Archive's copying, publicly displaying, and distributing the copyrighted works is a fair use. Again, the Office offers this analysis as requested to aid your consideration based on facts as the Office currently understands them, but does not wish to get ahead of actions taken by private parties.

With respect to the first factor, the purpose and character of the use, the Internet Archive makes the works in the National Emergency Library available for free, such that the use of the copyrighted works is non-commercial. The Internet Archive's stated purpose for its copying is to allow people to access reading material while universities, schools, and libraries are closed due to the coronavirus.[104] While the goals of promoting scholarship and education are explicitly identified in the statute as favored purposes, as explained above, that alone does not establish fair use. The types of materials included in the National Emergency Library, which include Stephen

---

[98] John Sherer & Dean Smith, *Cooperation and the Creation of a National Public Library*, UNC PRESS BLOG (Apr. 15, 2020, 3:00 PM), https://uncpressblog.com/2020/04/15/cooperation-and-the-creation-of-a-national-emergency-library/ (discussing Statement of Cooperation between Internet Archive and Duke University Press and UNC Press).
[99] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 79–80 (2001),
https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf; U.S. COPYRIGHT OFFICE, THE MAKING AVAILABLE RIGHT IN THE UNITED STATES 22 n.94 (2016), https://www.copyright.gov/docs/making_available/making-available-right.pdf.
[100] DEPARTMENT OF COMMERCE IPTF, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 58 (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf.
[101] *ReDigi*, 910 F. 3d at 659–660.
[102] The Office notes that a separate reproduction is made when a book is initially digitized. This reproduction would similarly not be excused by the first sale doctrine, and unless some other exception applies, could constitute infringement.
[103] *Campbell*, 510 U.S. at 577–78.
[104] Chris Freeland, *Announcing a National Emergency Library to Provide Digitized Books to Students and the Public*, INTERNET ARCHIVE (Mar. 24, 2020), http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/.

King thrillers and joke books, also suggest that at least some of the materials are likely to be accessed for entertainment rather than educational purposes.

The Internet Archive claims that the vast majority of books in its collection were published more than twenty years ago and are not generally available electronically.[105] The Internet Archive does not explain if it verified whether any of the works in its collection, or works that include substantially equivalent information, were available to the public in digital formats prior to including those books in its collection or removing its waiting lists. The argument that the Internet Archive's purpose was to make available materials that would otherwise be unavailable does not apply to any books that were available in digital formats at the time of the copying.[106]

If the analysis is limited to those books in the archive that are offered for educational purposes and that were previously unavailable in digital formats, the evaluation under the first factor would involve weighing the non-commercial, educational purpose of the copying against the non-transformative nature of the use. Offering access for educational purposes to works like research monographs, originally intended to educate, is not transformative. Here, the complete text of books has been reproduced and posted in digital format without adding anything new to the works, or providing the type of search functionality that has been deemed transformative in other digitization cases.[107] Indeed, the *CDL White Paper* takes no position on whether digitizing entire works is transformative, explaining that the drafters could not agree on that issue, contending instead that the non-commercial nature and educational purposes of CDL are sufficient for the first factor to weigh in favor of fair use.[108]

An analysis of the second factor would be fact-specific, as each work (or at least category of works) would need to be evaluated independently. The works in the National Emergency Library vary in terms of how close they are "to the core of intended copyright protection."[109] Some are works of creative fiction, while others may be factual or informational works. Although a focus on out-of-print works might in some circumstances favor fair use under this factor,[110] it does not appear that this was the focus of the National Emergency Library's collections; rather, the focus was on "materials published during the twentieth century, the vast

---

[105] Chris Freeland, *Internet Archive Responds: Why We Released the National Emergency Library*, INTERNET ARCHIVE (Mar. 30, 2020), http://blog.archive.org/2020/03/30/internet-archive-responds-why-we-released-the-national-emergency-library/.

[106] The *CDL White Paper* also argues that "CDL's purpose aligns closely with the statutory purpose of the first sale doctrine," which should weigh in a library's favor with respect to the first factor. CDL WHITE PAPER at 21. As discussed above, the argument that CDL is analogous to a digital first sale doctrine applies only if the library limits the number of copies it lends to the number of physical copies it possesses of a book. As the Internet Archive has removed this limitation, this argument is not relevant here.

[107] *See, e.g., Google Books*, 804 F.3d 202; *HathiTrust*, 755 F.3d 87; *Perfect 10*, 508 F.3d 1146.

[108] CDL WHITE PAPER at 21.

[109] *Campbell*, 510 U.S. at 586.

[110] *See supra* note 71.

majority of which are not commercially available in electronic form ('e-book').''[111] No mention of the works' overall availability is made.

With respect to the third factor, the amount and substantiality of the portion of the original work used, the *CDL White Paper* argues that it is necessary to copy the entire book to achieve the purpose of providing digital access to the work, such that the copying is not excessive in relation to the library's purpose.[112] It also argues that the library prevents users from making additional copies of or further distributing the book and limits the duration for which a user can access a book.[113]  Consideration of this factor and the fourth factor may be informed by recent digitization cases *HathiTrust* and *Google Books*; those courts emphasized that the defendants had not made the full text of the copied works visible to the public, which reduced the risk of defendants' copies serving as market substitutes for the original works.[114] The Copyright Office has also consistently expressed doubt that providing digital access to complete works can be considered fair use.[115]

There appears to be disagreement among stakeholders over whether the analysis of market harm under the fourth fair use factor should consider the Internet Archive's activities as roughly analogous to physical lending by libraries, or whether the markets for physical lending and ebook licensing to libraries are distinct.[116] Under the former line of argument, if digital lending is seen as akin to physical lending, then any market harm would be outside the scope of consideration in connection with this factor, pursuant to the first sale doctrine in the Copyright Act. The Office is not aware of any courts that have embraced this approach, and the Second Circuit squarely rejected it in *ReDigi*.[117] In addition, the Office has previously noted significant differences between lending physical and online lending that are "directly relevant to the balance between copyright owners and users in section 109."[118]

---

[111] Letter from Brewster Kahle, Founder and Digital Librarian, Internet Archive, to Sen. Thom Tillis (Apr. 10, 2020), https://www.publishersweekly.com/binary-data/ARTICLE_ATTACHMENT/file/000/004/4367-1.pdf.

[112] CDL WHITE PAPER at 21.

[113] *Id*.  This applicability of this argument is somewhat limited with respect to the National Emergency Library, as the Internet Archive is allowing multiple, simultaneous users to access the work at the same time, and allowing users to re-checkout a particular work for the duration of its operation.

[114] *Google Books*, 804 F.3d at 222; *HathiTrust*, 755 F.3d at 97.

[115] *See, e.g.,* SECTION 108 DISCUSSION DOCUMENT at 15 ("[T]here remain many essential library and archives activities that may not be authorized by fair use. . . —specifically in the area of distribution of [full-text] copies of works to users."); U.S. COPYRIGHT OFFICE, ORPHAN WORKS AND MASS DIGITIZATION: A REPORT OF THE REGISTER OF COPYRIGHTS 101 (2015), https://www.copyright.gov/orphan/reports/orphan-works-2015.pdf ("[T]here is broad agreement that no colorable fair use claim exists" for "providing digital access to copyrighted works in their entirety."); U.S. COPYRIGHT OFFICE, LEGAL ISSUES IN MASS DIGITIZATION: A PRELIMINARY ANALYSIS AND DISCUSSION DOCUMENT 23 (2011), https://www.copyright.gov/docs/massdigitization/ USCOMassDigitization_October2011.pdf ("[T]he large scale scanning and dissemination of entire books is difficult to square with fair use").

[116] *Compare, e.g.*, *Controlled Digital Lending Is Neither Controlled nor Legal*, THE AUTHORS GUILD (Jan. 8, 2019), *with* CDL WHITE PAPER at 23-26.

[117] *ReDigi*, 910 F. 3d at 649.

[118] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 82–85 (2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf ("Time, space, effort and cost no longer

Regardless, this analogy is not squarely applicable to the National Emergency Library. The National Emergency Library lacks the controls cited by the *CDL White Paper* as necessary to mitigating market harm; rather than limiting the total number of copies in any format in circulation to the number of physical copies the library lawfully owns and lending each digital version only to a single user at a time, the Internet Archive has suspended waitlists, allowing an unlimited number of users to borrow any given title simultaneously.

If, instead, the relevant market is the ebook market, the analysis changes. There currently exists a market where publishers and authors license their works to libraries for the purpose of digitally "lending" them to patrons. It is an established market; major publisher Hachette, for example, first began providing ebooks to libraries in 2001.[119] And since 2014, all the "Big Five" publishers have been licensing all titles in their ebook collections to U.S. libraries.[120] The terms and prices of these licensing agreements vary by publisher and title.[121] The fourth factor analysis might focus on whether the creation and distribution of digital versions of these works would affect this market, and also how, if such conduct became widespread, it would affect this market. The National Emergency Library may seek to demonstrate that there are not currently digital versions of the works in question available in the marketplace.[122] Although the fourth fair use factor requires looking at the potential market of a work[123] and the Supreme Court has said that "[t]his inquiry must take account not only of harm to the original but also of harm to the market for derivative works,"[124] the Eleventh Circuit has held that the unavailability of digital permissions for a work "'favor[s]' fair use" under the fourth factor.[125] Thus, this factor might favor fair use for some, but not necessarily all, of the works contained in the National Emergency Library.

### D.    Exigent Circumstances and Fair Use

As discussed above, consideration of a fair use defense requires an individualized analysis and weighing of all relevant factors. Any analysis would need to take into account that the Internet Archive suspended its waitlists during a time of international crisis. Pointing to a

---

act as barriers to the movement of copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost.").

[119] *See* Randall Stross, *Publishers vs. Libraries: An E-Book Tug of War*, N.Y. TIMES (Dec. 24, 2011), https://www.nytimes.com/2011/12/25/business/for-libraries-and-publishers-an-e-book-tug-of-war.html.

[120] Matt Enis, *Technology: Vendors Talk Ebook Future*, LIBRARY JOURNAL, Sept. 1, 2014.

[121] *See, e.g.*, DEPARTMENT OF COMMERCE IPTF, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 61 (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf ("Some publishers offer perpetual licenses permitting an unlimited number of loans (sometimes limited to one user at a time), while others have limits of one or two years, or 26 or 52 loans, after which renewal would be required.").

[122] Although they acknowledged not having confirmed this fact before making each work available.

[123] 17 U.S.C. § 107(4).

[124] *Harper & Row*, 471 U.S. at 568.

[125] *Cambridge Univ. Press*, 906 F.3d at 1295 (describing the district court's holding, which the court held was correct).

"temporary and significant need" caused by the closing of physical libraries, the Internet Archive suggests that the COVID-19 crisis provides additional legal justification for its actions.[126]

The waiver or relaxation of certain legal obligations or duties during times of emergency such as the COVID-19 pandemic is not without precedent. In the copyright context, for example, Congress included provisions in the CARES Act that authorize the Register of Copyrights to temporarily adjust timing provisions in the Copyright Act if she determines that a national emergency is generally disrupting the normal operation of the copyright system.[127] Similarly, during World War II, Congress authorized the President to grant extensions of time to foreign copyright owners to comply with the Copyright Act's manufacturing clause requirements.[128] But these responses involve changes expressly enacted by Congress through its legislative powers.

Section 107 does not expressly provide for consideration of exigent circumstances when analyzing fair use. That said, the four factors that courts shall consider are "illustrative and not limitative."[129] Courts at times have considered factors beyond the four statutory factors when assessing fair use, although we are not aware of cases which have considered the presence of emergency conditions as part of a fair use analysis.[130] If exigent circumstances are factored into a fair use analysis, it does not necessarily follow that they would provide an unconditional expansion of the scope of fair use. One might also look at whether the use goes beyond addressing the asserted need that arises from the exigency. For example, one might consider a use that provides access to works to a specific affected community more favorable to fair use than one that provides widespread access to works to the public at large.

There is undoubtedly a strong public interest in ensuring continued access to educational materials in this unprecedented time, which could weigh in favor of fair use. While the Internet Archive's goal of making research and educational materials publicly available may be laudable, so is respect for copyright. It would be imprudent to excuse widespread copying due to a national emergency without considering the possible repercussions on copyright law and copyright owners. There is also a strong public interest in ensuring that authors are able to financially survive the coronavirus crisis to be able to continue to produce creative works. Alongside serious challenges to teachers and students thrust into a distance-learning environment with little to no

---

[126] Letter from Brewster Kahle, Founder and Digital Librarian, Internet Archive, to Sen. Thom Tillis (Apr. 10, 2020), https://www.publishersweekly.com/binary-data/ARTICLE_ATTACHMENT/file/000/004/4367-1.pdf.

[127] CARES Act, Pub. L. No. 116-136, § 19011 (2020). Exercising this authority, the Register has since adjusted certain deadlines relating to copyright registration and notices of termination in specific cases for persons unable to comply due to the COVID-19 national emergency and temporarily tolled certain timing provisions during the period of disruption caused by the pandemic.

[128] Act of September 25, 1941, Pub. L. No. 77-258, 55 Stat. 732 (1941), https://www.loc.gov/law/help/statutes-at-large/77th-congress/session-1/c77s1ch421.pdf.

[129] Section 107 provides, "In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include. . . ." Section 101 of the Copyright Act states "The terms 'including' and 'such as' are illustrative and not limitative."

[130] *See* 4 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 10:156 (2020) ("Examples of other factors include privacy interests in the case of unpublished works, defendant's good faith or lack thereof, attribution (as indicative of 'propriety'), 'wrongful denial of exploitative conduct towards the work of another,' deliberate distortion of the meaning of the original, and the plaintiff's misuse of his or her copyright to suppress unfavorable comment.").

preparation, writers who were already surviving on meager salaries prior to the pandemic have had their livelihoods severely threatened by the cancellation of book tours and speaking engagements as well as the loss of side jobs and freelance work. A court would almost certainly also take into account the effect the Internet Archive's secondary use could have on writers and publishers.

It seems it would have been beneficial for the Internet Archive to engage with writers and publishers prior to launching the National Emergency Library to discuss the contemplated parameters for the project and determine their willingness to participate. As noted above, some publishers affirmatively opted-in to the project after it was launched, although on somewhat altered terms.[131] Going forward, the Internet Archive may explore opportunities for collaboration with writers and publishers, for example by allowing them to opt into making digital versions of their works publicly available for a certain period under specified conditions.

## Conclusion

The Copyright Office appreciates your engagement with these issues. We are hopeful that we have provided guidance in this response that will be helpful in working with schools and libraries seeking to make their materials available during this unprecedented pandemic and in evaluating questions you have received regarding the Internet Archive's National Emergency Library. Should Congress consider these issues in the longer term, we direct your attention to our previous work on section 108,[132] extended collective licensing,[133] orphan works, and mass digitization[134] as potentially helpful starting points.

Please do not hesitate to contact me if you need any additional information.

Respectfully Submitted,

Maria Strong
Acting Register of Copyrights and Director
U.S. Copyright Office

---

[131] *See* John Sherer & Dean Smith, *Cooperation and the Creation of a National Public Library*, UNC PRESS BLOG (Apr. 15, 2020, 3:00 PM), https://uncpressblog.com/2020/04/15/cooperation-and-the-creation-of-a-national-emergency-library/ (discussing Statement of Cooperation between Internet Archive and Duke University Press and UNC Press).

[132] SECTION 108 DISCUSSION DOCUMENT.

[133] *Mass Digitization Pilot Program*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/policy/massdigitization/.

[134] U.S. COPYRIGHT OFFICE, ORPHAN WORKS AND MASS DIGITIZATION: A REPORT OF THE REGISTER OF COPYRIGHTS 101 (2015), https://www.copyright.gov/orphan/reports/orphan-works2015.pdf; U.S. COPYRIGHT OFFICE, LEGAL ISSUES IN MASS DIGITIZATION: A PRELIMINARY ANALYSIS AND DISCUSSION DOCUMENT 23 (2011), https://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf; U.S. COPYRIGHT OFFICE, REPORT ON ORPHAN WORKS (2006), https://www.copyright.gov/orphan/orphan-report-full.pdf.