**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>                  Plaintiffs,<br><br>    v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>                  Defendants. | Case No. 1:20-CV-04160-JGK<br><br>ORAL ARGUMENT REQUESTED |

### *REDACTED* DEFENDANT INTERNET ARCHIVE'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

Defendant Internet Archive respectfully submits this statement of material facts under Local Rule 56.1 in support of its motion for summary judgment.

1.      The Internet Archive is a 501(c)(3) public charity.  Declaration of Joseph C. Gratz submitted herewith ("Gratz Decl.") Ex. A (Stipulation of Undisputed Facts ("Stipulation")).

2.      The guiding mission of the Internet Archive is to provide universal access to all knowledge.  Declaration of Brewster Kahle submitted herewith ("Kahle Decl.") ¶ 4.

3.      In furtherance of that mission, over more than two decades, the Internet Archive has preserved, curated, and made available much of humanity's most important information.  *Id*. ¶ 5.

4.      The Internet Archive has become a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals.  *Id.* ¶ 6.

5.      One of the Internet Archive's first projects was to archive every public webpage on the fledgling World Wide Web.  Today, over a quarter century of web history is preserved and accessible through the Internet Archive's Wayback Machine.  The Wayback Machine has become a crucial database for journalists, researchers, lawyers, and courts.  *Id.* ¶ 7.

6.      The Internet Archive works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts.  *Id.* ¶ 8.

7.      The Internet Archive has been a member of the American Library Association since 2000.  The Internet Archive is also an affiliate member of the Boston Library Consortium, and participates in interlibrary loan via the OCLC and RapidILL interlibrary loan networks.  *Id.* ¶ 9.

8.      In December 2006, the State of California formally recognized the Internet

Archive as a library, making it eligible to receive funding under the Library Services and

Technology Act and qualifying it for E-Rate, a federal program that provides discounts to

schools and libraries to ensure they are able to obtain affordable telecommunications services.

*Id.* ¶ 10.

9.      In mid-2007, the Internet Archive was awarded a Library Services and

Technology Act grant for its Open Library project (openlibrary.org)—an effort to create a

comprehensive library book catalog with a webpage for every book published.  *Id.* ¶ 11.

10.     The Internet Archive has also received grant funding from the Institute of

Museum and Library Services ("IMLS"), an independent federal agency whose mission is to

support museums, libraries, and related organizations.  For example, in 2017, the Internet

Archive received a grant under the IMLS's Laura Bush 21st Century Library Program.  In order

to receive this grant, the Internet Archive had to qualify as a library or library-related

organization.  *Id.* ¶ 12.

11.     This lawsuit concerns the Internet Archive's implementation of Controlled Digital

Lending ("CDL"), through which the Internet Archive digitizes its print books and lends them

digitally to its patrons.  Compl., ECF No. 1.

12.     In 2011, in partnership with over two dozen library systems including the Boston

Public Library, the Internet Archive made an initial collection of more than 80,000 books

available for digital lending.  Kahle Decl. ¶ 13.

13.     In November 2011, the Internet Archive's digital lending effort was unanimously

endorsed by all fifty state libraries through the Chief Officers of State Library Agencies

("COSLA").  *Id.* ¶ 14.

14.     As of this filing, the Internet Archive contains more than three million books available for borrowing in its collection.  *Id.* ¶ 15.

15.     The Internet Archive launched and expanded this program on the basis that it is fair use.  *Id.* ¶ 16.

16.     In developing and maintaining this belief, the Internet Archive and its Digital Librarian, Brewster Kahle, relied on *A White Paper on Controlled Digital Lending of Library Books*, authored by Dave Hansen, then the Associate University Librarian and Lead Copyright & Information Policy Officer for Duke University, and Kyle Courtney, then a copyright advisor for Harvard University Library—each copyright scholars known to the Internet Archive to be respected in their fields.  The White Paper concludes that "there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use."  *Id.*

17.     The Internet Archive and Mr. Kahle also relied on the *Position Statement on Controlled Digital Lending*.  This document was co-authored by Mr. Courtney; Mr. Hansen; Mary Minow, then affiliated with the Berkman Klein Center for Internet and Society at Harvard University; Jason Schultz, a Professor of Clinical Law at New York University School of Law; and Michelle Wu, then a law professor and librarian at the Georgetown Law Center.  Lila Bailey, the Internet Archive's most senior lawyer, was also a co-author of this statement.  The Internet Archive understood all co-authors of the *Position Statement* to be well-respected copyright scholars.  Dozens of copyright law professors and scores of libraries and library associations became signatories to the statement, including the Association of Research Libraries, Boston Public Library, Los Angeles Public Library, the Metropolitan New York Library Council, and

the Chief Officers of State Library Agencies, representing the state librarians of all fifty states.  *Id.* ¶ 17.

18.     The Internet Archive—or another 501(c)(3) public charity it works closely with, Open Library of Richmond—lawfully acquires print books by purchase or donation that it wishes to make available for digital lending.  Kahle Decl. ¶ 18; Gratz Decl. Ex. A (Stipulation).

19.     Open Library of Richmond holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.  Kahle Decl. ¶ 19.

20.     The Internet Archive or Open Library of Richmond owns at least one lawfully made copy of each of the 127 Works in Suit ("Works in Suit").  Gratz Decl. Ex. A (Stipulation).

21.     The Internet Archive sends print books to a scanning center, where an operator carefully turns and photographs each page using a book-digitization device the Internet Archive developed called a Scribe.  Gratz Decl. Ex. B ¶¶ 80–82 (Suppl. Expert Rpt. of Ian Foster) .

22.     The print book is then placed in archival storage, and its specific location is carefully tracked.  Gratz Decl. Ex. B ¶ 83 (Suppl. Expert Rpt. of Ian Foster).

23.     Print books stored in the physical archive facilities are non-circulating; it is not available to be accessed in its print form.  Kahle Decl. ¶ 20.

24.     The digital images of the book are processed and formatted, and if the book meets certain criteria set by Internet Archive policies, it is then made available for digital lending to one registered patron at a time.  Gratz Decl. Ex. B ¶¶ 80, 111–25 (Suppl. Expert Rpt. of Ian Foster).

25.     Anyone can become a patron of the Internet Archive—and digitally borrow books—for free by signing up for an Internet Archive account.  (Internet Archive has policies,

not relevant here, for terminating accounts.)  Kahle Decl. ¶ 21; Gratz Decl. Ex. B ¶ 19 (Suppl.

Expert Rpt. of Ian Foster).

26.     Doing so grants them a digital library card that lets them borrow up to ten books

at a time from the collection, for limited periods of up to fourteen days.  Kahle Decl. ¶ 22.

27.     The Internet Archive offers its patrons several ways of engaging with a book they

have borrowed.  Gratz Decl. Ex. B ¶¶ 31, 35–36 (Suppl. Expert Rpt. of Ian Foster).

28.     The patron can read the book in their web browser through a tool called

BookReader.  *Id.* ¶ 31.

29.     BookReader lets patrons flip through a book's pages, zoom in on a book's

images, enlarge the book's text for easier reading, and search through the book.  Kahle Decl.

¶ 23.

30.     When finished, the patron may return the book.  Gratz Decl. Ex. B ¶ 32 (Suppl.

Expert Rpt. of Ian Foster).

31.     Otherwise, the loan will automatically expire at the end of the loan period.  At

that point, the patron is no longer able to access the book, and it is once again available to be

borrowed.  Kahle Decl. ¶ 24.

32.     Instead of reading books in their web browsers, patrons can choose to download

an encrypted PDF or encrypted ePub version of the book onto their computer or device.  Gratz

Decl. Ex. B ¶¶ 35–36 (Suppl. Expert Rpt. of Ian Foster).

33.     These files are secured using the same security system that Plaintiffs use to secure

digital files of Plaintiffs' books:  a type of "digital rights management" or "DRM" software

created by Adobe.  Gratz Decl. Ex. C, Deposition Transcript of Steve Potash ("Potash Dep. Tr.")

81:1–82:5.

34.     The Adobe DRM allows only the authorized patron to download and read the borrowed book using authorized software and prevents the patron from copying or further distributing the book or from accessing it after their loan has ended.  Kahle Decl. ¶ 25.

35.     The Internet Archive does not digitally loan all books it has scanned.  Instead, it implements a number of policies that limit the books available for digital lending.  *Id.* ¶ 26.

36.     As applicable here, to be available for digital lending, a digital book must have been scanned from a print copy owned by the Internet Archive.  *Id.* ¶ 27.

37.     It is the Internet Archive's policy not to lend books published within the previous five years.  Gratz Decl. Ex. B ¶¶ 113, 123 (Suppl. Expert Rpt. of Ian Foster).

38.     This limitation is intended to exclude from lending the latest bestsellers, as a belt-and-suspenders accommodation to publishers.  Kahle Decl. ¶ 28.

39.     Dr. Imke Reimers analyzed revenue patterns of works on the USA Today Top 150 Bestsellers List.  Declaration of Imke Reimers submitted herewith ("Reimers Decl.") Ex. 1 ¶¶ 9, 20–24 (Reimers Expert Rpt.).

40.     Between 1994 and 2021, only 21% of the book appearances on the USA Today weekly bestseller list first appeared at least 52 weeks earlier.  *Id.* ¶¶ 9, 21–24.

41.     Between 1994 and 2021, only 8% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than two years earlier.  *Id.*

42.     Between 1994 and 2021, only 2% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than five years earlier.  *Id.*

43.     For titles that enter the Top 150 bestseller list, approximately 90% of sales occur in the first five years after publication.  *Id.* ¶¶ 9, 28.

44.     Books published by HarperCollins that are less than a year old account for between 37% and 40% of all units sold between 2017 and 2019 and 34% in 2020.  Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. D (HC0030132).

45.     Books published by Penguin Random House that are less than a year old account for between 47% and 52% of all units sold between 2017 and 2019 and 43% in 2020.  Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. E (PRH0072194).

46.     Books published by Hachette that are less than two years old account for between 70% and 73% of all units sold between 2017 and 2019 and 65% in 2020.  Reimers Decl. Ex.1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. F (HACHETTE0012377).

47.     Based on the available data, most of the Works in Suit behave consistently with the patterns of the works on the USA Today Top 150 Bestsellers List in that sales drop off quickly after publication and most sales occur within five years after a book is published. Reimers Decl. Ex. 1 ¶¶ 9, 21, 26–28 (Reimers Expert Rpt.); *Id.* Ex. 2 ¶¶ 10, 11 (Reimers Reply Rpt.).

48.     Peak sales for most titles occur within one to two years after the date of the first publication of the title.  Reimers Decl. Exs. 1 ¶¶ 20, 28 (Reimers Expert Rpt.) & 2 ¶¶ 9–15 (Reimers Reply Expert Rpt.).

49.     As a result of human error, two Works in Suit published in 2019—*All the President's Women: Donald Trump and the Making of a Predator* and *The Man Who Solved the Market*—were made available for digital lending.  The mistake was rectified as soon as the Internet Archive realized the error.  Kahle Decl. ¶ 29.

50.     Two factors determine the number of digital copies of a particular book that can be borrowed at any given time from the Digital Lending Library.  *Id.* ¶ 30.

51.     First, the Internet Archive makes available one digital copy for each non-
circulating print copy of a book it has in archival storage.  *Id.* ¶ 31; Gratz Decl. Ex. B ¶ 130
(Suppl. Expert Rpt. of Ian Foster).

52.     Second, for any of those books the Internet Archive has made available for CDL,
the Internet Archive works with dozens of library partners—from the University of Arizona to
the Delaware County District Library in Ohio—to contribute their own non-circulating copies of
that book toward the number of lendable copies.  Even if a partner library has multiple copies of
a particular book, the Internet Archive counts only one additional copy per library.  Kahle Decl.
¶ 32; Gratz Decl. Ex. B ¶¶ 130, 141 (Suppl. Expert Rpt. of Ian Foster).

53.     For example, if the Internet Archive has one non-circulating physical copy of
*Little House on the Prairie*, and three partner libraries have each chosen to contribute a physical
copy of *Little House on the Prairie*, then the Internet Archive would loan *Little House on the
Prairie* to up to four patrons at a time.  Each concurrent loan would thus still be associated with
one non-circulating physical copy.  If all four copies of *Little House on the Prairie* were checked
out, patrons seeking to borrow *Little House on the Prairie* could join a waitlist until one or more
copies were checked back in.  Kahle Decl. ¶ 33.

54.     Many libraries other than the Internet Archive digitally loan print books.  *See,
e.g.*, HathiTrust, *Emergency Temporary Access Service*, at https://www.hathitrust.org/ETAS-
Description (describing a system by which more than 200 academic libraries enabled digital
lending of books in their physical collections during the COVID-19 pandemic); Carnegie Mellon
University Libraries, *Introducing Controlled Digital Lending*, at
https://www.library.cmu.edu/about/news/2020-10/introducing-controlled-digital-lending
(describing use of CDL at Carnegie Mellon); Michigan State University Libraries, *Controlled*

*Digital Lending at Michigan State University*, at

https://www.slideshare.net/BaltimoreNISO/weller-and-lndsay-case-study-on-implementation-of-cdl (describing use of CDL at Michigan State); Caltech Library, *Implementing Controlled Digital Lending as a Core Library Service*, at https://www.cni.org/wp-content/uploads/2021/03/CNI_Implementing_Davison.pdf (describing use of CDL at Caltech); National Information Standards Organization, *Interoperable System of Controlled Digital Lending*, at https://www.niso.org/standards-committees/is-cdl (describing standards body's work to establish technical standards for "CDL as a natural extension of existing rights held and practices undertaken by libraries for content they legally hold"); Project ReShare, *Project ReShare and Stanford Libraries Launch Controlled Digital Lending Implementers Group*, at https://librarytechnology.org/pr/25314 (describing organization for librarians working to implement CDL in their respective libraries).

56.     Digital lending is particularly helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, and patrons who have print disabilities that make it more difficult to hold or read print books.  Kahle Decl. ¶ 34.

56.     Digital lending is also particularly helpful for brief or spontaneous access to books—for example, for checking citations or references, or looking up discrete facts—that wouldn't be worth a trip to a brick-and-mortar library.  *Id.* ¶ 35.

57.     The International Federation of Library Associations and Institutions has observed, in its position statement on the subject, that CDL "has helped to fulfil the mission of libraries to support research, education and cultural participation within the limits of existing copyright laws."  Gratz Decl. Ex. G

(https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-
_controlled_digital_lending.pdf).

58.     Digital lending also allows the Internet Archive to promote education, research,
preservation, and scholarship.  Kahle Decl. ¶ 36.

59.     Writers use books they have borrowed from the Internet Archive as a resource for
inspiration or research for their own works.  Declaration of Laura Gibbs submitted herewith
("Gibbs Decl.") ¶¶ 5, 8.

60.     The Internet Archive has made knowledge resources like Wikipedia more reliable
by enabling readers to confirm that books cited as authorities actually support the encyclopedia's
entries.  Kahle Decl. ¶ 37.

61.     In 2019, with funding from the U.S. Department of the Interior, the Internet
Archive digitized and made available books related to the incarceration of Japanese Americans
during World War II.  *Id.* ¶ 40.

62.     The Wikipedia article on the Internment of Japanese Americans currently cites
and links to 20 books available via CDL from the Internet Archive.  *Id.* & Ex. 9 at 70 (Wikipedia
Citations to Books Available to Borrow from Internet Archive via CDL).

63.     There are 202,026 citations in Wikipedia articles in English that link to books
available to borrow from the Internet Archive via CDL, and those links lead to 88,284 different
books.  Kahle Decl. ¶ 39 & Ex. 9 at 1 (Wikipedia Citations to Books Available to Borrow from
Internet Archive via CDL).

64.     The Wikipedia article on World War II cites, and links to, 48 different CDL
books.  Kahle Decl. ¶ 38 & Ex. 9 at 2–4 (Wikipedia Citations to Books Available to Borrow
from Internet Archive via CDL).

65.     A partial listing of the CDL books cited in Wikipedia articles, limited to articles that cite 10 or more such books, goes on for more than three hundred single-spaced pages.  Kahle Decl. Ex. 9 at 1-337 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

66.     In 2022, a group of volunteer librarians curated collections of books that have been censored by school districts across the country but are still borrowable from the Internet Archive.  Kahle Decl. ¶ 44.

67.     At the beginning of the COVID-19 pandemic, and for many months thereafter, most schools and libraries were physically closed to prevent the spread of the coronavirus.  Gratz Decl. Exs. H (https://www.ala.org/pla/issues/covid-19/march2020survey) & I (https://www.edweek.org/leadership/map-coronavirus-and-school-closures-in-2019-2020/2020/03).

68.     School districts reached out to the Internet Archive concerned that students and teachers could no longer physically access books—including hundreds of copies of assigned books that the school had already purchased.  Kahle Decl. ¶ 42.

69.     Libraries reached out to the Internet Archive worried about how they could best serve their communities when they could not physically loan out millions of print books now locked away.  *Id.* ¶ 43.

70.     By the Internet Archive's estimation—based on data from the federal Institute of Museum and Library Services—the closure of libraries took 650 million books out of circulation. *Id.* ¶ 44.

71.     Hearing these pleas, the Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio.  Since all of the libraries were closed, the

Internet Archive reasoned, there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place.  *Id.* ¶ 45.

72.     The Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently.  *Id.* ¶ 46.

73.     Adam Silverman, one of HarperCollins's Rule 30(b)(6) designees, testified that it took a month—from April to May of 2020—to negotiate a pandemic-related special request with the Chicago Public School System.  Gratz Decl. Ex. J, Deposition Transcript of Adam Silverman ("Silverman Dep. Tr.") 270:6–273:14.

74.     The Internet Archive launched the National Emergency Library ("NEL") on March 24, 2020, intending for this program to "run through June 30, 2020, or the end of the US national emergency, whichever is later."  Kahle Decl. ¶ 47 & Ex. 12.

75.     Prior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement, and more than 100 institutions signed a statement in support of the National Emergency Library.  Kahle Decl. ¶ 48 & Ex. 7.

76.     There was also widespread public support, including, for example, an article written by Jill Lepore in *The New Yorker* titled, "The National Emergency Library Is a Gift to Readers Everywhere."  Gratz Decl. Ex. K.

77.     The Internet Archive believed then, and believes now, that under those unique circumstances, operating the NEL was fair use.  Kahle Decl. ¶ 49.

78.     The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries.  *Id.* ¶ 50.

79.     When the University of Oklahoma campus shut down in spring of 2020, students no longer had access to physical library books.  Gibbs Decl.  ¶ 4.

80.     Humanities instructor Laura Gibbs relied on the Internet Archive to provide her students access to books she had placed on reserve at the campus library before the pandemic closures.  *Id.*

81.     Through her use of the Internet Archive, Ms. Gibbs discovered additional relevant books for her students that were not otherwise available through the University of Oklahoma library system.  *Id.* ¶ 5.

82.     Ms. Gibbs has since retired from teaching but regularly writes about African folktales available to borrow through the Internet Archive.  *Id.* ¶ 7.

83.     Half of English teacher Lauren Sherman's tenth grade students had left their copies of the Folger edition of *Much Ado About Nothing* in their lockers, which they were forbidden from accessing after the pandemic started.  Declaration of Lauren Sherman submitted herewith ("Sherman Decl.") ¶ 7.

84.     In addition to giving students the option to re-purchase the book or to attempt to access their local public library's digital collection, Ms. Sherman was able to direct them to an online version to borrow through the Internet Archive.  *Id.*

85.     When his university library shut down, Daniel Smith, a Ph.D. student at the University of Cambridge, similarly could not access the books he needed to write his dissertation.  Declaration of Daniel Smith submitted herewith ("Smith Decl.") ¶ 4.

86.     Mr. Smith turned to the Internet Archive, where he was able to borrow primary and secondary source material and complete his dissertation on time.  *Id.* ¶ 5.

13

87.     Benjamin Saracco is a librarian at a hospital library affiliated with a medical school in New Jersey that serves doctors, nurses, medical students, and other healthcare workers. Declaration of Benjamin Saracco submitted herewith ("Saracco Decl.") ¶ 7.

88.     In March 2020, the governor ordered buildings, including academic libraries, to be closed.  *Id.* ¶ 8.

89.     Mr. Saracco received a flood of requests from students, nurses, and doctors for information about COVID-19 and relevant patient care to address the high rate of hospitalization in the state.  *Id.* ¶ 9.

90.     With no access to physical library materials, Mr. Saracco was able to direct doctors and nurses to patient care training manuals, such as the *Basic Life Support for Healthcare Providers and the Advanced Cardiovascular Life Support Provider Manual*, available for borrowing from the Internet Archive via CDL.  *Id.*

91.     Dozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time.  Kahle Decl. ¶ 51 & Exs. 14–17.

92.     The largest number of concurrent loans for any Work in Suit was for *The Lion, The Witch, and the Wardrobe*, which had at most 888 concurrent loans.  That figure represents the sum of the peak concurrent loan numbers for each of the editions of that book which were available for borrowing.  Gratz Decl. Ex. B ¶ 196; *id.* at Ex. T3 (Suppl. Expert Rpt. of Ian Foster).

93.     There are over 9,000 public library systems in the United States alone.  *Id.* Ex. L (https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey).

94.     Virtually every library was closed during the NEL.  *Id.*

95.     More than 888 public libraries in the United States have a copy of *The Lion, the Witch, and the Wardrobe*. *Id.* Ex. M (https://www.worldcat.org/title/lion-the-witch-and-the-wardrobe/oclc/28291231).

96.     Although the NEL was slated to end on June 30, 2020, the Internet Archive shut it down two weeks early—on June 16, 2020—after this lawsuit was filed.  Kahle Decl. ¶ 52.

97.     The Plaintiffs are among the largest and most profitable book publishers in the United States.  Gratz Decl. Ex. N, Deposition Transcript of Skip Dye ("Dye Dep. Tr.") 369:20–370:7; *see also id.* Ex. O (https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/72889-ranking-america-s-largest-publishers.html).

98.     In recent years, Plaintiffs' profits have increased.  *Id.* Exs. P–R (Excerpt of Bertelsmann 2018, 2019, 2021 Annual Reports), Exs. S–T (Excerpts of Wiley 2020, 2021 Form 10-K), Ex. U–V  (Excerpts of News Corp. 2019, 2021 Annual Report), Ex. W–Y  (Excerpts of Lagardere 2018, 2020, 2021 Registration Document).

99.     In 2020 and 2021, the publishing industry as a whole enjoyed record profits for electronic and physical formats of books.  Gratz Decl. Ex. Z ("*A Year for the (Record) Books in Publishing*" describing 2020 profits), Ex. AA ("*America's Biggest Publishers Keep Posting Profits*" describing 2021 profits); Ex. BB ("*In Surprise Ending for Publishers: In 2020, Business Was Good*" describing 2020 profits).

100.    When the four Plaintiffs filed suit against the Internet Archive in June of 2020, they selected the Works in Suit.  Compl. Ex. A, ECF No. 1-1.

101.    The Works in Suit include non-fiction and fiction works and works from many genres (fantasy, children's, psychology, science, sports, biography, and others).  *Id.* ¶¶ 21, 22.

102.     All of the Works in Suit were published prior to being digitized and loaned by the
Internet Archive.  Kahle Decl. ¶ 28 (all of the Works in Suit were made available for borrowing
after lawfully acquired—bought or donated—new or used physical copies of the Works in Suit
were digitized and the Internet Archive does not acquire physical copies of books that have not
been published); *see also* Compl. ¶¶ 6, 21, ECF No. 1.

103.     Plaintiffs sell physical copies of books to libraries and to readers.  *See* Gratz Decl.
Ex. CC, Deposition Transcript of Josh Marwell ("Marwell Dep. Tr.") 59:3–9.

104.     Plaintiffs license electronic copies of books ("ebooks") to libraries and readers.
Gratz Decl. Ex. C, Potash Dep. Tr. 141:20–142:9.

105.     Licensed ebooks are distributed to patrons of libraries that have purchased
licenses via "aggregators."  Gratz Decl. Ex. N, Dye Dep. Tr. 36:20–37:8; 86:14–18.

106.     There are multiple licensing structures for ebooks.  One is a "one copy/one user"
or "perpetual access" model that allows libraries to lend out one copy at a time to patrons for a
discrete period of time, with no expiration from the licensing libraries' digital collection.  Gratz
Decl. Ex. C, Potash Dep. Tr. 49:4–50:2; *id.* Ex. N, Dye Dep. Tr. 120:22–121:7.

107.     The "perpetual access" model is not currently in use by Hachette, HarperCollins,
or Penguin Random House for ebooks made available through aggregators to public libraries.
ECF No. 92 ¶¶ 61, 65 (Declaration of Ben Sevier); ECF No. 94 ¶¶ 30, 32 (Declaration of Chantal
Restivo-Alessi); ECF No. 95 ¶¶ 69, 75 (Declaration of Jeffrey Weber); Gratz Decl. Ex. C, Potash
Dep. Tr. 50:3–53:9.

108.     Another type of license is metered access by time.  Under this model, a library has
the ability to loan an ebook to patrons for a discrete period of time, commonly two years, to an
ebook title.  Gratz Decl. Ex. C, Potash Dep. Tr. 44:17–24.

109.     Another type of license is metered access by the number of check-outs, commonly twenty-six checkouts.  Under this model, a library has the ability to loan an ebook to patrons until that copy of an ebook has been borrowed twenty-six times.  *Id.*

110.     Plaintiffs do not sell ebooks to libraries outright.  Kahle Decl. ¶ 53

111.     The Internet Archive purchases ebooks from publishers who are willing to sell them outright (rather than license them).  *Id.*

112.     The Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them).  *Id.* ¶ 54.

113.     Plaintiffs have declined each time the Internet Archive has asked to buy ebooks. Id. ¶ 55.

114.     The ███████ aggregator is OverDrive, which has about ████ of the market share of the library ebook market in the United States.  Gratz Decl. Ex. C, Potash Dep. Tr. 196:5–12.

115.     One of the ways OverDrive offers ebooks for reading is through its Libby application.  *See* https://www.overdrive.com/apps/libby; Gratz Decl. Ex. C, Potash Dep. Tr. 82:19–24.

116.     From March 2017 until March 23, 2020 (i.e., prior to the NEL), the number of checkouts of the Works in Suit from the Internet Archive was ███████ of the number of checkouts of the Works in Suit from OverDrive.  Declaration of Rasmus Jørgensen submitted herewith ("Jørgensen Decl.") Ex. 1 ¶ 36 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster); *id.* Ex. DD (OverDrive_Supp_002).

117.     Looking at data from 2017–2020, which includes the period of time when the NEL was operational, the total loan volume of Works in Suit from the Internet Archive was ███

███ of the number of OverDrive checkouts for the Works in Suit.  Jørgensen Decl. Ex. 1 ¶¶

8, 35 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl.

Expert Rpt. of Ian Foster).

118.    The expert reports of Drs. Reimers and Jørgensen conclude that the Internet

Archive's lending practices had no negative effect on the market for the Works in Suit.

Jørgensen Decl. Ex. 1 ¶ 8 (Jørgensen Expert Rpt.); Reimers Decl. Ex. 1 ¶ 9 (Reimers Expert

Rpt.).

119.    Dr. Reimers analyzed the change of the Amazon rankings of the Works in Suit

relative to when each edition of a Work in Suit was made available for lending through the NEL.

Reimers Decl. Ex. 1 ¶¶ 36–54 (Reimers Expert Rpt.).

120.    Amazon rankings are a good proxy for the market for print sales because using

ranking data controls for factors that affect the physical book retail market as a whole and

because Amazon makes up at least 50% of the market share for print books.  Reimers Decl. Ex. 1

¶¶ 35, 36, 41–43 (Reimers Expert Rpt.).

121.    When editions of the Works in Suit were first made available for borrowing from

the Internet Archive via CDL, their corresponding print sales at retail did not decline relative to

other books.  Reimers Decl. Ex. 1 ¶¶ 10, 38, 47 (Reimers Expert Rpt.).

122.    When the Works in Suit were removed from the Internet Archive after this

lawsuit was filed, their print sales slightly worsened relative to other books.  Reimers Decl. Ex. 1

10, 38, 49, 50 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

123.    Historical Amazon data is only publicly available for print books—not for

ebooks.  Reimers Decl. Ex. 1 nn.33, 36 (Reimers Expert Rpt.); *id.* Ex. 2 ¶ 1 (Reimers Reply

Expert Rpt.).

124.    Because there is not publicly available commercial performance data about ebooks, and because Plaintiffs declined to produce the monthly performance data the Internet Archive requested, Dr. Reimers was unable to make similar calculations regarding the sales of consumer ebooks.  Reimers Decl. Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

125.    The Internet Archive requested monthly commercial performance data for the Works in Suit for the time period from 2011 to 2020.  Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

126.    Plaintiffs declined to produce the requested monthly data.  Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 3 n.1, ECF No. 49.

127.    Each book began to be available for digital lending on a particular known date, so having monthly commercial performance data would allow a comparison of the commercial performance before that particular date with the commercial performance after that date.  Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

128.    Hachette was the only Plaintiff to produce monthly data for all of its Works in Suit, but Hachette only produced this data for 2020.  Hachette produced annual data for 2015 to 2019.  Gratz Decl. ¶ 43; *see also* Gratz Decl. Ex. JJ (HACHETTE0002474) & Ex. KK (HACHETTE0002475).

129.    For its Works in Suit, HarperCollins produced annual data for 2017 to 2020.  Gratz Decl. ¶ 44; *see also* Gratz Decl. Ex. LL (HC0010272).

130.    For its Works in Suit, Penguin Random House produced annual data for 2010 to 2020.  Gratz Decl. ¶ 45; *see also* Gratz Decl. Ex. MM (PRH0025907)

131.    For its Works in Suit, Wiley produced annual data for 1996 to 2020.  Gratz Decl. Ex. 46; *see also* Gratz Decl. Ex. NN (WILEY0005650)

132.    The Internet Archive requested data about the commercial performance of all Plaintiffs' books, broken down by month, since 2011.  Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47.

133.    This data would allow a comparison of the commercial performance of books that were available for digital lending with books that were not available for digital lending.  *Id.*

134.    Plaintiffs refused to provide data about books other than the Works in Suit.  Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47; Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 1, 3, ECF No. 49.

135.    The Internet Archive requested that Plaintiffs produce monthly commercial performance data about a set of books Plaintiffs regarded as comparable to the Works in Suit, but Plaintiffs refused.  Gratz Decl. ¶ 42.

136.    The National Emergency Library provided an opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit.  Reimers Decl. Ex. 1 ¶¶ 34, 35, 37 (Reimers Expert Rpt.); Jørgensen Decl. Ex. 1 ¶ 49 (Jørgensen Expert Rpt.).

137.    Dr. Reimers observed the Amazon rankings for the Works in Suit relative to when the NEL was launched.  Reimers Decl. Ex. 1 ¶¶ 34, 48–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

138.    The Amazon rankings for the Works in Suit improved by approximately 2% at the time the NEL was launched.  The Amazon rankings held steady while the NEL was in effect.  Then, around the time that most Works in Suit were removed from the Internet Archive, the rankings reverted to their pre-NEL levels.  However, the Works in Suit behaved similarly the year prior at the same time of the year.  In sum, the Amazon rankings of the Works in Suit did

not undergo a statistically significant decrease relative to when the NEL was launched.  Reimers

Decl. Ex. 1 ¶¶ 51–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

139.    Dr. Reimers concluded that these observations signified that the NEL did not

depress Plaintiffs' unit sales of physical formats of the Works in Suit.  Reimers Decl. Ex. 1 ¶¶

10, 53 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.) .

140.    Dr. Jørgensen observed the change in OverDrive checkouts for the Works in Suit

after the shutdown of the NEL and effective removal of the Works in Suit from the Internet

Archive.  He observed that after the closure of the NEL, the number of OverDrive check-outs of

the Works in Suit ███████████████████████████████████████████

███████████.  Jørgensen Decl. Ex. 1 ¶¶ 49–53 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 17

(Jørgensen Reply Rpt.).

141.    Dr. Jørgensen concluded that the evidence was not consistent with Plaintiffs'

theory that the Internet Archive's loan volume of the Works in Suit reduced digital lending

through OverDrive.  *Id.*

142.    Dr. Jørgensen also analyzed whether the closure of the NEL impacted Hachette's

book sales of the Works in Suit.  Jørgensen Decl. Ex. 1 ¶¶ 54–58 (Jørgensen Expert Rpt.).

143.    Dr. Jørgensen was unable to analyze whether the closure of the NEL impacted all

four of the Plaintiffs' sales of the Works in Suit because Hachette was the only Plaintiff—despite

the Internet Archive's requests—to produce monthly sales data for 2020 for each of its Works in

Suit.  Jørgensen Decl. Ex. 1 ¶ 54 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 40 (Jørgensen Reply Rpt.);

Gratz Decl. ¶¶ 42–46.

144.    When the Internet Archive shut down the NEL, Hachette did not see increases in

paperback or ebook sales of the Works in Suit.  Rather, Hachette's sales of the Works in Suit

contracted approximately 21% between the second and third quarter of 2020 for paperbacks and approximately 29% between the second and third quarter of 2020 for ebooks.  Jørgensen Decl. Ex. 1 ¶¶ 57–58 (Jørgensen Expert Rpt.).

145.    Dr. Jørgensen concluded this simultaneous contraction was not indicative that the Internet Archive's lending of Hachette's Works in Suit acted as market substitutes.  Jørgensen Decl. Ex. 1¶¶ 57–58 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶¶ 17–18 (Jørgensen Reply Rpt .)

146.    Dr. Prince made no attempt to quantify the effect of the Internet Archive's digital lending on Plaintiffs.  Gratz Decl. Ex. EE, Deposition Transcript of Jeffrey Prince ("Prince Dep. Tr.") 52:16–53:21, 54:9–16, 202:23–203:10, 230:3–8.

147.    Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues.  Gratz Decl. Ex. N, Dye Dep. Tr. 106:3–107:13; *id.* Ex. FF, Deposition Transcript of Allison Lazarus ("Lazarus Dep. Tr.") 27:9–12; 38:12–22; *id.* Ex. GG, Deposition Transcript of Chantal Restivo-Alessi ("Restivo-Alessi Dep. Tr.") 224:7–225:9; *id.* Ex. HH, Deposition Transcript of Alan Pavese ("Pavese Dep. Tr.") 55:3–16.

148.    Even if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions.  They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books.  Declaration of Susan Hildreth submitted herewith ("Hildreth Decl.") Ex. 1  ¶ 106 (Hildreth Expert Rpt.).

149.    With CDL in place in libraries throughout the United States, libraries would have additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products. *Id.* ¶ 109.

150.    There have been no instances of a library paying for access to fewer ebook copies of a title—or buying fewer copies of a physical book for a title—where that title is available for borrowing through CDL, either from the IA or from another library. *Id.* Ex. 2 ¶ 8 (Hildreth Reply Rpt.).

151.    Most libraries stive to spend their entire annual materials allocation within the fiscal year in which funds were allocated. In fact, it is highly unusual for a library not to spend the entire allocation each year. *Id.* Ex. 1 ¶ 71 (Hildreth Expert Rpt.).

152.    Libraries help readers discover books—through purposeful searching as well as accident or "serendipity." Readers can browse physical shelves of libraries and a library's online catalog. Hildreth Decl. Ex. 1 ¶¶ 34, 35, 39 (Hildreth Expert Rpt.).

153.    Libraries generally begin lending a book as soon as it is published. Hildreth Decl. ¶ 5.

Dated:  July 7, 2022                    DURIE TANGRI LLP

By:                       */s/ Joseph C. Gratz*
    Joseph C. Gratz (*Pro Hac Vice*)
    Jessica E. Lanier (*Pro Hac Vice*)
    Aditya V. Kamdar (*Pro Hac Vice*)
    Annie A. Lee (*Pro Hac Vice*)
    217 Leidesdorff Street
    San Francisco, CA 94111
    (415) 362-6666
    jgratz@durietangri.com
    jlanier@durietangri.com
    akamdar@durietangri.com
    alee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

/s/ Joseph C. Gratz
JOSEPH C. GRATZ
