**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY      :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,

                                                :        Case No. 1:20-cv-04160-JGK

                 Plaintiffs,

                                                :

-against-

                                                  :

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,                                              :

                 Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFFS' MEMORANDUM OF LAW OF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      jessefeitel@dwt.com
      carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**
Scott A. Zebrak (*pro hac vice*)
Matthew J. Oppenheim
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

*Attorneys for Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley*
*& Sons, Inc. and Penguin Random House LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 5

    A.    The Publishers Invest Heavily in Publishing Books in all Formats................................... 5
    B.    The Commercial and Library Ebook Markets are Thriving ............................................... 6
    C.    Internet Archive's Website Is Stocked with Bootleg Copies of the Works and Millions of Other In-Copyright Books ................................................................................................ 9
    D.    The Goal of Internet Archive Is to Make Unauthorized Ebook Editions of Every Book Ever Published Available for Anyone in the World with an Internet Connection to Read for Free ....................................................................................................................... 12

ARGUMENT ........................................................................................................................ 18

I.      INTERNET ARCHIVE HAS INFRINGED PLAINTIFFS' COPYRIGHTS ................. 18

II.     INTERNET ARCHIVE'S INFRINGEMENT IS NOT FAIR USE ................................. 19

    A.    Factor One – The Purpose and Character of the Use ....................................................... 20

          1.   Internet Archive's Publication of Bootleg Ebooks on its Website Is Not Transformative ....................................................................................................... 21
          2.   Internet Archive's Claimed Non-Profit Status Does Not Support Fair Use .............. 25

    B.    Factor Two – The Nature of the Copyrighted Work......................................................... 28
    C.    Factor Three – The Amount and Substantiality of the Use .............................................. 29
    D.    Factor Four – The Effect of Internet Archive's Uses on the Potential Market for the Works in Suit .................................................................................................................. 29

          1.   Lost Fees from the Internet Archive ...................................................................... 30
          2.   Market Substitution:  IA Offers A Competing Substitute, Leading to Potential Lost Ebook Sales to Libraries and Consumers ................................................................. 33

    E.    Aggregate Assessment of the Four Factors ..................................................................... 39

III.    THE NATIONAL EMERGENCY LIBRARY WAS NOT FAIR USE........................... 42

CONCLUSION..................................................................................................................... 42

CERTIFICATION OF COMPLIANCE .................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records v. Napster*,
239 F.3d 1004 (9th Cir. 2001) ...............................................................22

*Andy Warhol Found for the Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021) ..............................................................20, 34

*AP v. Meltwater U.S. Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...............................................22, 31

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ......................................................... *passim*

*Authors Guild v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ............................................................21, 24

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) ...............................................................33

*Campbell v. Acuff-Rose Music*,
510 U.S. 569 (1994) ................................................................. *passim*

*Capital Records v. ReDigi, Inc.*,
910 F.3d 649 (2d Cir. 2018) ........................................................ *passim*

*Davis v. Gap, Inc.*,
246 F.3d 152 (2d Cir. 2001) .......................................................20, 31, 33

*Disney Enters. v. VidAngel*,
869 F.3d 848 (9th Cir. 2017) ...........................................................24, 25

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ...............................................................20

*Eldred v. Ashcroft*,
537 U.S. 186 (2003) ..........................................................................41

*Folsom v. Marsh*,
9 F. Cas. 342 (Cir. Ct. Mass. 1841) .......................................................25

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) ........................................................ *passim*

*Google v. Oracle Am.*,
    141 S. Ct. 1183 (2021) ..................................................................................20, 40

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ................................................................................ *passim*

*Infinity Broad. Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) .................................................................24, 29, 34

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999) ................................................................................22

*Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*,
    868 F. Supp. 2d 962 (C.D. Cal. 2012) .............................................................27

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014) .........................................................................33

*Penguin Grp. (USA) v. Am. Buddha*,
    2015 WL 11170727 (D. Ariz. May 11, 2015) ...........................................26, 30, 35

*Ringgold v. Black Entm't TV, Inc.*,
    126 F. 3d 70 (2d Cir. 1997) .................................................................... *passim*

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012) .................................................................... *passim*

*Sony BMG Music Entm't v. Tenenbaum*,
    672 F. Supp. 2d 217 (D. Mass. 2009) ...............................................................37

*Sony Corp of Am. v. Universal City Studios*,
    464 U.S. 417 (1984) .....................................................................................22, 23

*Twin Peaks Prods. v. Publ'ns Int'l Ltd.*,
    996 F.2d 1366 (2d Cir. 1993) ........................................................................31, 34

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ..............................................................24, 31

*United States v. Am. Soc'y of Composers, Authors & Publishers*,
    599 F. Supp. 2d 415 (S.D.N.Y. 2009) ............................................................22, 31

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
    342 F.3d 191 (3d Cir. 2004) ..............................................................................22

*Weissman v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989) ........................................................................26, 27

*Worldwide Church of God v. Phila. Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ................................................................27

**Statutes**

Copyright Act.................................................................................... *passim*

**Other Authorities**

Letter from The Register of Copyrights to Senator Tom Udall dated May 15, 2020 .............................24

Report Of The Register Of Copyrights 101 (2015),
  https://www.copyright.gov/orphan/reports/orphan-works2015.pdf ........................................40

Rule 56 of the Federal Rules of Civil Procedure ..........................................................1

U.S. Constitution, Article I, § 8, cl. 8 .........................................................................19

iv

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House LLC ("PRH") (collectively, the "Publishers") respectfully submit this memorandum of law in support of their motion for summary judgment against defendant Internet Archive ("IA") pursuant to Rule 56 of the Federal Rules of Civil Procedure on Plaintiffs' causes of action for copyright infringement.

## PRELIMINARY STATEMENT

The Publishers bring this lawsuit on behalf of themselves and their authors to put an end to the Internet Archive's mass-scale copyright infringement of tens of thousands of their books. Masquerading as a not-for-profit library, Internet Archive digitizes in-copyright print books on an industrial scale and distributes full-text digital bootlegs for free. Internet Archive has amassed a collection of more than three million unauthorized in-copyright ebooks – including more than 33,000 of the Publishers' commercially available titles – without obtaining licenses to do so or paying the rightsholders a cent for exploiting their works. Anybody in the world with an internet connection can instantaneously access these stolen works via IA's interrelated archive.org and openlibrary.org websites (collectively, the "Website"). Having scaled up its operations since the complaint was filed, IA now "lends" bootleg ebooks to users approximately 25 million times a year. Plaintiffs' Statement of Undisputed Material Facts ("SUMF"), ¶249. IA urges libraries to use its Website instead of licensing authorized library ebooks from the Publishers, literally telling them "You Don't Have to Buy it Again!" SUMF ¶383. In short, the Website offers infringing copies of the Publishers' works that directly compete with the Publishers' well-established markets for authorized consumer and library ebooks. As Sandra

Cisneros – the acclaimed author of *The House on Mango Street,* a Work in suit – observes, "Internet Archive hurts all of the authors whose work it steals and it should be stopped so that it does not threaten anybody else's chances of living from their pen."  SUMF¶12.

No case has held or even suggested that IA's conduct is a lawful fair use.  As the Second Circuit stated in *Authors Guild v. Google, Inc.*, 804 F.3d 202, 225 (2d Cir. 2015) ("*Google Books*"): "If Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong." Yet Internet Archive assumes that all "information should be free" and has searched for years to find a legal rationale for its radical infringements.  Around 2018, it helped manufacture and market a theory called "controlled digital lending" or "CDL," which was developed with no input from authors or publishers and without the imprimatur of Congress.  Directly contradicting the idea that copyright protects a bundle of divisible rights, IA posits that it is lawful for a library to make digital copies of any print book it acquires and distribute that digital copy over the internet, without a license, as long as (a) the library uses digital rights management ("DRM") technology to prevent additional copying, and (b) the library "only loan[s] simultaneously the number of [print] copies that it has legitimately acquired."  SUMF¶436.  Regardless of whether it actually complies with CDL – and it does not – Internet Archive's practice of CDL violates fundamental principles of copyright law, and undermines market incentives necessary to spur the creation of new works.

"An author's right to control and profit from the dissemination of her work ought not to be evaded by conversion of the work into a different form."  *Google Books*, 804 F.3d at 225.  As *Google Books* reaffirms, the republication of an original print work in ebook format creates a

derivative work, and the exclusive right to publish and monetize derivative works belongs to the rightsholder, not Internet Archive.  *Id.* at 215.  IA nonetheless argues that broader principles in the "first sale doctrine" codified at 17 U.S.C. §109 should transform its mass digitization scheme into fair use.  But the Second Circuit rejected that theory in *Capital Records v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018), holding that the first sale doctrine does not protect "unauthorized reproduction" of works.

Internet Archive also argues that its mass infringement serves the public interest, at various times claiming that its Website helps reading disabled or rural populations, or makes available the "missing" 20th century of non-digitized books, or uses technology to improve the efficiency of delivering content.  SUMF¶¶509-522, 530-540.  The undisputed evidence now shows that only a tiny percent of its users are visually impaired (and that population is well-served by HathiTrust or market innovations); IA does not even track rural readers and ignores the considerable geographic reach of authorized library ebooks; and the vast majority of IA's in-copyright books were published after 1980 and many are widely available through lawful ebook channels.  *Id.*  Nor do IA's actions provide efficiencies in delivering content that do not otherwise exist.  IA's own expert confirms that there is a well-established library ebook market efficiently serving millions of readers.  SUMF¶168.  Indeed, three of the Publishers estimate that between 35% to 50% of Americans who read an ebook use free library copies, rather than purchasing a commercial ebook.  SUMF¶¶174-180.  IA's ebooks are no more "efficient" than the authorized ebooks that libraries license – except the authorized ebooks generate revenue for authors and publishers.

In sum, Defendant's copying and distribution of the 127 works in suit (the "Works") is copyright infringement (POINT I, *infra*).  Internet Archive cannot bear its burden of establishing an affirmative defense of fair use under the four-factor test (POINT II, *infra*).  IA fails the crucial first factor because there is nothing transformative about repackaging and republishing commercially available, in-copyright books to achieve the same purpose for which they were originally published: to be read.  Nor does nonprofit status excuse blatant infringement, especially since IA trades off the authors' scholarship, and since IA engages in commercial activities to such an extent that, as its own Director of Finance testified, "every single page of the Archive is monetized."  SUMF¶349.  The second and third factors also weigh against fair use because the Works are highly creative and IA republishes them in their entirety.  Finally, under the fourth factor, it cannot be plausibly disputed that IA's ebooks are free substitutes that compete with authorized ebooks and thereby cause potential market harm to Plaintiffs, including the "lending" fees IA refuses to pay and market substitution for library and retail ebook sales.  These harms would be disastrously compounded if  IA's activities became unrestricted and widespread.   For similar reasons, IA's National Emergency Library program during the start of COVID was not fair use (POINT III, *infra*).

To be clear, this lawsuit does not intend to foreclose the possibility that the unlicensed use of a particular work may be fair use in extenuating circumstances, such as the digital preservation or occasional e-loan of a clearly orphaned work.  Further, the Association of American Publishers ("AAP") has long supported legislative modernization of Section 108 of the Copyright Act regarding library digitization to address preservation needs.  But Internet Archive has gone far beyond what any calibrated exception might allow by appropriating every in-

copyright work it can find without license or payment.  In doing so, it ignores the publishing ecosystem, including one that supports a thriving market for library ebooks – which Publishers worked hard to create.  Plaintiffs respectfully request that their motion for summary judgment be granted.

## FACTUAL BACKGROUND

### A.   The Publishers Invest Heavily in Publishing Books in all Formats

The Publishers finance a complex chain of investment to put books in the hands of readers.  SUMF¶¶10-26.  From identifying new works, paying author advances, providing editorial guidance, creating marketing and sales strategies, underwriting operations, and innovating digital technologies, formats, and delivery modes, the Publishers spend millions of dollars to make books available to the public.  *Id.*

At the same time, the Publishers bear the financial risk of publishing.  SUMF¶13.  They seek to ameliorate that risk by nurturing long-term revenue streams for their books.  SUMF¶¶27-68.  The life cycle of each book is unique and its commercial success (or failure) is driven by countless factors – many not within the publisher's control and many that may change over the life of the book's copyright protection.  *Id.*

Given this uncertainty, the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago.  SUMF¶¶38-62.  As well as generating vital royalties for authors, backlists drive Publishers' profits and provide steady, relatively predictable income that supports the publication of new works.  *Id.*  To cite just two examples, the Works Toni Morrison's *Bluest Eye* or Zora Neal Hurston's *Their Eyes Were*

*Watching God* have generated millions of dollars over decades, which not only compensates the authors (and their heirs) but helps fund subsequent generations of classic works.  SUMF¶46.

The Publishers regularly acquire the exclusive rights to publish literary works in print and digital formats, including hardcover, paperback, mass market, audiobook and ebook. SUMF¶¶63-68.  Each format is a distinct product geared to different (sometimes overlapping) channels and sold under different terms that correspond to each format's unique qualities.  *Id*. The Publishers' author agreements recognize these differences by delineating the rights for each format separately and setting different royalty rates for each one.  *Id.*

Publishers and authors historically have been paid, and need to be paid, for each format they publish, just as rightsholders in other creative industries, *e.g.*, music or film, depend on numerous formats to target different market channels.  SUMF¶¶63-68.  Publishers will have little incentive to invest in new formats like ebooks and their related markets, and less incentive to publish new titles, if third parties can unilaterally transform print books into digital books *en masse*, republish them for anybody on the internet, and pay rightsholders nothing for doing so. *Id*.

### B.  The Commercial and Library Ebook Markets are Thriving

Controlled digital lending, as practiced by Internet Archive, collapses the boundaries between physical books and ebooks.  SUMF¶¶432-447.  CDL's basic tenet is that a non-profit entity that owns a physical book can scan that book and distribute the resulting ebook as a proxy for the physical copy.  *Id*.  But this ignores that ebooks are a fundamentally different product from physical books.  SUMF¶¶76-92.  Print books are physical objects that need to be physically

transported from place to place, which costs time and money.  *Id*.  They occupy space on shelves

and libraries generally need to replace them as they deteriorate over time.  *Id*.

Ebooks, on the other hand, are digital files that readers typically download from the

internet and consume on personal computers or devices.  *Id.*  Ebooks are infinitely replicable, can

last ages without degrading and can be distributed worldwide instantaneously at minimal cost.

*Id*.  Ebook readers need not travel to bookstores or libraries; instead, they can download ebooks

at all hours from their home, office, or on the go.  *Id*.

Starting in the late 1990's, the Publishers invested millions in developing authorized

mechanisms for distributing ebooks.  SUMF¶¶66-68, 94.  Mindful of the havoc wrought on the

music industry by piracy and the uncontrolled appropriation of digital content, the Publishers

developed a sustainable market for affordable ebooks with critical controls, including limiting

commercial ebooks to one user account.  *Id*.  The popularity of ebooks grew rapidly after the

release of dedicated e-readers like Amazon's Kindle (2007) and Apple's iPad (2010) and

represented 12-15% of the book market by 2020.  SUMF¶102.  Today the Publishers publish

virtually every new adult trade book, as well as the bulk of their backlists, in ebook form.

SUMF¶108.

Starting a decade ago, the Publishers offered ebooks to libraries via "one-copy, one user"

licenses – *i.e.*, libraries pay for ebook files that may be "checked out" by one patron at a time, as

opposed to multiple patrons reading simultaneously.  SUMF¶¶127-128.  The Publishers deeply

value  libraries, recognizing that they foster public literacy, serve local communities, and

increase the visibility of authors through book clubs, author talks, and other creative means of

reader involvement.  SUMF¶¶115-116.  Libraries support authors by paying for print books and ebooks.  SUMF¶113.

The Publishers enter into agreements with aggregators (*i.e.*, distributors) such as OverDrive, who in turn license the ebooks to libraries and manage the relevant platforms. SUMF¶¶158-182.  Critically, library licenses strictly limit distribution of the book to patrons entitled to access that library's physical collections, namely a public library's local residents or students, faculty and staff affiliated with academic libraries.  *Id*.  These community restrictions serve Publishers' need to control distribution and ensure that libraries cater to their tax-paying populations.  The Works  are all licensed to libraries in ebook form.  SUMF¶112.

The library ebook market has exploded over the last decade.   SUMF ¶164.   In 2012, OverDrive processed 70 million total digital checkouts (including both ebooks and audiobooks); by 2020, the number of total digital checkouts ballooned to 430 million.  SUMF ¶164.  During that same time span, the number of different titles checked out by patrons via OverDrive also increased exponentially.  SUMF ¶165.  The Publishers' annual revenue from the library ebook market, which is shared with authors, has risen to hundreds of millions of dollars, simultaneously establishing an important market channel for many titles and serving a more digital public. SUMF¶169.

Library ebooks are so prevalent that initial analyses by two of the Publishers suggest that 39-50% of Americans who read ebooks currently read library ebooks for free, rather than purchasing commercial ebooks.  SUMF¶¶174-182.  The convenience of library ebook lending – particularly the ability to check ebooks out instantaneously, anytime and anywhere – makes it a highly attractive proposition to consumers who might otherwise purchase ebooks.  *Id*.  Moreover,

library ebooks offer comparatively good value: one Publisher found that between 2017 and 2020, library ebooks accounted for 50% of total ebook reads but brought in only 13% of total ebook revenue. SUMF¶¶177-180.

The success of authorized library ebooks depends on licensing terms that balance the benefits ebooks confer on library communities with the economic interests of authors. SUMF¶¶113-182. As the market economics have changed, the Publisher's licensing models have evolved (and continue to change). *Id.* Today, the four Publishers each offer somewhat different licensing terms. All offer a One-Copy/One User model – with the restriction referenced above that only *bona fide* patrons of the licensing library can borrow the ebook. *Id.* Some Publishers limit the license to a one or two year term (during which time there is no limit on the number of times the ebook can be read). SUMF¶¶134, 147. Another allows ebooks to circulate 26 times over an unlimited time period. SUMF¶¶135-140. The Publishers all offer academic libraries a perpetual term, while one permits perpetual licenses for all libraries. SUMF¶¶130-132. Two of the Publishers also include a Pay-Per-Use model, which is a one-time circulation to a single patron at a significantly reduced fee, while another experiments with subscription models. SUMF¶¶141-146, 191. During the COVID lockdown, the Publishers stepped in to help libraries and schools meet increased demand for ebooks. SUMF¶¶187-197.

### C.   Internet Archive's Website Is Stocked with Bootleg Copies of the Works and Millions of Other In-Copyright Books

Internet Archive was founded in 1996 by its current Chairman Brewster Kahle with the stated goal of providing "universal access" to all published books by allowing anyone in the world with an internet connection to download ebook editions, free and on demand. SUMF¶¶215-235. Striving initially for 4 million free ebooks on its Website, IA launched a

massive scanning project in which print books were copied and uploaded to its Website without authorization.  SUMF¶¶236-269.  By doing this on an industrial scale, IA has created a Website that distributes free full-text copies of each Work, together with more than 33,000 other in-copyright books published by the four Publishers in print and digital form.  *Id.*

IA's Website now hosts more than 3 million unauthorized in-copyright books and effectuates approximately 70,000 "borrows each day," which translates to 25 million "borrows" a year – without compensating the books' authors.  SUMF¶¶248-249.  IA claims that the Website primarily collects books from the "20th Century Black Hole," meaning that the "vast majority" are older works that "do not have a commercially available ebook."  SUMF¶553.  But IA's own current data shows that 78.9% of the in-copyright books on its Website were published after 1980 and only 6.2% were published before 1963.  SUMF¶517.  IA knowingly adds boatloads of ebooks to its Website that the Publishers already offer in authorized digital formats.  SUMF¶522.

The experience of reading a book on IA's Website is highly similar to borrowing or acquiring the Publishers' authorized ebooks.  SUMF¶¶523-529.  Searching Google for terms like "free ebooks," or "Toni Morrison Beloved free read" yields results containing links to IA's Website on the first page, above links to platforms offering the Publishers' authorized library ebooks.  SUMF ¶256.  Unlike libraries that restrict access to geographic or academic communities, IA "lend[s] to the world."  SUMF¶236-269.  Anyone can register as a member of IA's Website – and read free ebooks on their devices in a matter of seconds – simply by submitting a valid email address.  SUMF¶¶236-238.  Nor is the Website academically focused, as IA suggests.  The Website touts titles in a range of popular categories – including Romance,

Thrillers, "Books we Love" and "Trending Books."  SUMF¶514-16.  IA's own internal documents admit that "reality has it that we are competing for eyeballs with" Amazon and OverDrive (SUMF¶¶524-25), and the Website's homepage strongly resembles the landing page for OverDrive users:



SUMF¶514 (comparing IA homepage to Detroit Public Library Overdrive homepage).

Users of IA's Website can check out ebooks of their choice by clicking the BORROW button, just as they would check out an authorized ebook via OverDrive.  SUMF¶¶207-209.  IA provides ebooks in PDF and ePUB versions and boasts that its PDF versions are "High Quality."

SUMF¶¶277.  At the time of the complaint, the default loan period was for 14 days.

SUMF¶¶251-252.  Post-litigation, IA switched to a default that allows users to read an ebook for one-hour loans that can be repeated indefinitely subject to availability.  *Id*.  Downloads for 14 days are still permitted for titles when IA owns more than one copy (on its own or in combination with partner libraries), which appears to be the case for approximately one third of the ebooks on IA's Website.   SUMF¶¶253, 261.   Further, IA admits that entire books can "absolutely" be read on the Website, and evidence demonstrates users want to (and do) read books in whole or substantial part – as they are encouraged to do by the openlibraries.org website ("Read Free Library Books Online").  SUMF¶256.  IA's library expert admitted that "certainly some [ebooks] could be read in an hour."  SUMF ¶258.

The 127 Works – which run the gamut from literary classics by authors such as C.S. Lewis to thrillers, romances, children's books and the non-fiction books of Malcolm Gladwell – were all scanned and posted on the Website by Internet Archive.  SUMF¶¶198-209.  Between 2017 and 2020 alone, the 127 Works were checked out more than 46,000 times on IA's Website. SUMF¶203.  If these checkout rates are extrapolated across the 33,000 titles published in print and digital form by the Publishers and posted without authorization on the Website, this would mean that IA's bootleg versions of the Publishers' ebooks were read many millions of times – without any payment to authors – in a three-year period alone. SUMF¶¶586-587.

> **D.   The Goal of Internet Archive Is to Make Unauthorized Ebook Editions of Every Book Ever Published Available for Anyone in the World with an Internet Connection to Read for Free**

To finance its massive digitization agenda, IA has long operated a fee-based business where libraries pay to scan physical books from their collections – which IA does either onsite or

by shipping the books to offshore scanning centers where they can be scanned cheaply. SUMF¶¶289-290.  Under the standard terms of IA's Library Digitization Agreement, both IA and the libraries obtain an ebook which IA can "post … on the Internet Archive Website." SUMF¶291-293.  Internet Archive made approximately $35 million from scanning books between 2011 and 2020.  SUMF¶289.

IA's appetite for physical books to digitize for its Website was not sated by scanning library collections because most libraries, "based on copyright concerns," would not allow IA to scan in-copyright books.  SUMF¶297-299.  Undaunted by such concerns, IA looked to acquire in-copyright physical books to scan via purchase or donation.  SUMF¶300-309.  IA keeps those print books in shipping containers that are inaccessible to the public (unlike libraries open to the public).  SUMF¶310-321.

Today, Internet Archive's primary source of print books is the world's largest used bookstore, the for-profit Better World Books ("BWB").  SUMF¶¶322-345.  BWB is a "pipeline" that "provide[s] a steady stream of books to be digitized by Internet Archive."  SUMF¶338.  IA received about one million in-copyright books from BWB from 2013 to 2019, but it "want[ed] more of the flow."  SUMF¶330.  Kahle told a potential investor that he hoped to acquire "7 million [new titles] over the next few years" and that "[t]he successful operation of BWB will provide funding back to the Internet Archive to help ensure that it can continue to deliver free services to the world …."  SUMF¶¶330-332.  A shell company controlled by Brewster Kahle acquired BWB in 2019 and installed Kahle as chairman of the board.  SUMF¶¶333-338.  Since the acquisition of BWB, IA and BWB have developed commercial "synergies," including

"purchase from Better World Books" links on the Website.  SUMF¶¶339-350.  As IA's Director of Finance put it, "every single page of the [Internet] Archive is monetized."  SUMF¶349ff.

By 2017, Internet Archive was applying for a large grant from the MacArthur Foundation to support its actions (which it did not receive).  SUMF¶¶400-431.   To try to provide legal cover, in May 2017, IA convened a group of friendly copyright scholars to address the "copyright uncertainty" surrounding its practices. *Id*.  The result was a September 2018 White Paper which manufactured a "concept" and called it "controlled digital lending" – without input from authors, publishers, the public, or congressional deliberation.  *Id*.  At the same time, IA spearheaded a Statement on CDL to provide an easy summary.  *Id*.

As IA acknowledges, the "most critical" component of controlled digital lending is the "owned to loaned ratio," which supposedly allows libraries to create and "circulate a digitized title in place of a physical one in a controlled manner."  SUMF¶¶436, 476.  The White Paper stresses that "libraries must truly exercise *control* in the process."  SUMF¶443 (emphasis added).  Steps must be taken to ensure that "[w]hen the digital copy is being read by a patron … the corresponding physical copy is restricted and unavailable for consultation." *Id*.   IA's own advisor on the CDL project, the copyright expert Peter Jaszi, wrote that IA's Statement of CDL is a "one-sided puff piece that seriously misrepresents both the state of the law and the risks to institutions of pursuing the strategy" and that CDL "serve[s] the institutional interests of the IA."  SUMF¶430.  Further, IA did not change its practices after the Second Circuit's decision in *ReDigi*, which its own outside counsel admitted "calls into question the theoretical underpinnings of CDL."  SUMF¶460.

14

As IA embraced its newly coined legal theory around 2018, it all but discarded CDL's "critical" "owned to loaned ratio" by implementing the confusingly named "Open Libraries project" to magnify the broad reach of its Website.  As IA recognized at the time, "for controlled digital lending to work at scale, more physical copies are needed to loan against, especially for titles … that enter the public zeitgeist" and are thus in high demand.  SUMF¶356.  Through a practice known as "overlap analysis," the Open Libraries project allows Internet Archive to increase the number of concurrent loans it can make of works without scanning or owning more physical books. SUMF¶366.  "Partner libraries" send IA data listing all the books in their collection, which Internet Archive runs against its Website's catalogue.  SUMF¶365.  Every time there is a match, IA increases the lending cap for that ebook on the Website by one copy – regardless of the number of copies of the work physically owned by IA.  SUMF¶¶367-.  As IA admits, there are no upper limits to the number of copies available for concurrent lending via the overlap analysis – the project potentially could allow IA to make 10,000 or more concurrent loans of any one title.  SUMF¶¶368.

Since its Open Libraries project began, Internet Archive has added 81 "Partner Libraries" (mostly academic libraries) and, via this project, added almost 3 million copies to lend ebooks against.  SUMF¶389-91.  Internet Archive also encourages libraries to populate their websites with links directing patrons to ebooks on IA's Website.  SUMF¶¶393-96.  IA openly markets the Open Libraries project with promises that Partner Libraries no longer need to license ebooks: joining as a Partner Library "ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format."  SUMF¶382.  Or, as it pithily suggests, "You Don't Have to Buy It Again."  SUMF¶383.

The Open Libraries project effectively turned Internet Archive into a centralized hub, which increases the number of books it loans beyond the number of physical copies it actually holds by counting millions of physical books in libraries scattered across the country. SUMF¶¶366-68.  Under IA's current CDL practices, the maximum number of ebooks that it loans does not equal the number of physical copies in IA's *own* collection.  SUMF¶¶368.  This compounds the infringement of the Works by significantly increasing the number of concurrent loans permitted.  SUMF¶367.   Likewise, the patrons of each Partner Library, and any other library, linking to IA's Website can read far more copies of a title than the library physically owns.  SUMF¶482.  Indeed, IA expressly stated that it does not restrict lending to the patrons of particular libraries because it "lend[s] to the world."  SUMF¶542.

Similarly, IA does not "dictate" or exercise any "control" over its Partner Libraries to make sure there is compliance with the "owned to loan" ratio.  SUMF¶¶493-508.  As IA admitted, it has "no way of knowing . . . whether the physical and digital copies of a book were in circulation simultaneously."  SUMF¶495.  Neither in the one-page agreement for Partner Libraries, nor in practice, does IA require Partner Libraries to ensure that the physical books in their collections, which are counted towards concurrent lending caps on IA's website, remain unavailable while the ebook is checked out.  SUMF¶374.   And IA knows that some libraries do *not* suppress circulation of their physical books and "are taking the approach that they don't need to suppress circulation" because the likelihood is "slim" that IA's digital copies and all their physical copies "would be checked out at the same time."  SUMF¶493.

In sum, CDL provides no legal cover for Internet Archive's massive infringement, and further, the undisputed evidence establishes that IA's compliance with even the most critical

principles of CDL is a charade.  This was most evident when, on March 24, 2020, IA dispensed with core CDL principals by launching a "National Emergency Library" ("NEL"), purportedly to address COVID-19 shutdowns.  SUMF¶541.  The NEL, which offered the same pool of ebooks previously available through CDL, abandoned the owned-to-loaned concept entirely.  SUMF¶542.  Unlimited free ebooks were made available because, IA admitted, "we don't have the time or staffing to allow us to limit NEL access only to people directly impacted by COVID 19."  SUMF¶548.  The Copyright Office promptly issued a written letter to Congressman Udall raising doubts over the NEL's legality.  SUMF¶¶551-52.  IA ended the NEL on June 10, 2020, ten days after the Publishers filed this action, returning to its version of "traditional controlled digital lending."  SUMF¶570.

For each iteration of its Website, Internet Archive refused to back down despite knowing that copyright owners – publishers, authors, rights organizations – strongly objected to the unauthorized republication of their work.  SUMF¶¶448-60.  Thousands of emails and letters have been sent by authors and publishers objecting to IA's infringements, including those with concrete evidence of "significant damage."  SUMF¶¶622-635.  Each of the four Publishers in this action has demanded the removal of thousands of their authors' works from IA's Website.  SUMF¶¶622-33.  IA not only failed to permanently remove books owned by complaining authors and Publishers, it increased the scope and scale of its Website.  SUMF¶¶247-50, 264-69.  Since this action was filed, IA has massively increased its infringement, adding more than two million in-copyright titles, with daily circulation of ebooks doubling, and the number of users increasing from 2.6 million to over 5.9 million.  SUMF¶250.  IA even added over 19,000 copies

of the Publishers' books to its Website after they filed suit.  SUMF ¶581.  In short, IA knowingly and willfully engages in industrial-scale copyright infringement.

## ARGUMENT

## I.   INTERNET ARCHIVE HAS INFRINGED PLAINTIFFS' COPYRIGHTS

The Publishers have satisfied the *prima facie* elements of copyright infringement, namely (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant.  The Publishers each hold exclusive publishing rights in the Works in Suit pursuant to 17 U.S.C. §106, including ebook rights, and the Works were timely registered with the Copyright Office. SUMF¶¶210-14.

The Publishers have established infringement because Internet Archive admits that it "digitally scanned physical books embodying the Works" and "provided … patrons with … digital versions of physical books embodying the Works" via its Website.  SUMF¶¶242-45.  This conduct infringes five of the Publishers' exclusive rights.  Underline First, Internet Archive violates the reproduction right (§106(1)) by creating multiple digital copies of every book scanned.  *Id*. Underline Second, IA violates the right to prepare derivative works (§106(2)) by "recasting" the Publishers' print books into an ebook format.  *Google Books*, 804 F.3d at 215.  *See also id*.  Underline Third, IA infringes the distribution right (§106(3)) by distributing ebook copies of the Works to its users via the Open Library.  *Id*.  Underline Fourth, the public performance right (§106(4)) is violated by the "read aloud" function IA offers on its Website.  SUMF¶276.  And Underline fifth, IA has visibly shown the

Works to users through its in-browser viewer and thus infringed the Publishers' display right (§ 106(5)).  *Id.*[1]

## II.   INTERNET ARCHIVE'S INFRINGEMENT IS NOT FAIR USE

Internet Archive's sole justification for infringing millions of in-copyright books is that its actions are fair use.  They are not.  IA freerides on the authors' literary contributions and aggressively competes with the Publishers' authorized digital works by republishing its own unlicensed ebooks in full, including over 30,000 titles that the four Publishers already market to libraries and retail consumers.  This is the very opposite of fair use.  The Copyright Clause embedded in the U.S. Constitution, art. I, § 8, cl. 8, demonstrates that "the Framers intended copyright … to be the engine of free expression.  By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas."  *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

Pursuant to 17 U.S.C. § 107, "the fair use of a copyrighted work, including … for purposes such as criticism, comment, news reporting, teaching[,] … scholarship, or research, is not an infringement of copyright."  While these listed categories "have an illustrative and not limitative function … the illustrative nature of the categories should not be ignored," and IA's Website does not fall under any of them.  *Ringgold v. Black Entm't TV, Inc.*, 126 F. 3d 70, 78 (2d Cir. 1997).  Courts ultimately determine fair use by assessing and balancing four factors:

> (1)   the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

---

[1] Internet Archive is also liable for secondary copyright infringement because it contributed to, induced and vicariously caused direct infringement by users obtaining ebooks on the website.  SUMF¶209.

(2)     the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the
copyrighted work as a whole; and

(4)     the effect of the use upon the potential market for or value of the
copyrighted work.

17 U.S.C. § 107.  Fair use may be resolved on summary judgment where, as here, the material

facts are not in dispute.  *Google v. Oracle Am.*, 141 S. Ct. 1183, 1199-1200 (2021) ("[T]he

ultimate question whether … facts showed a fair use is a legal question for judges to decide

….").

"Fair use is an affirmative defense" to copyright infringement and IA "bears the burden

of proving it."  *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018); *Andy*

*Warhol Found for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 37 (2d Cir. 2021) (citation

omitted), *cert. granted*, No. 21-869 (U.S. Mar. 28, 2022); *Dr. Seuss Enters., L.P. v. ComicMix*

*LLC*, 983 F.3d 443, 459 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021).  Internet Archive

cannot shoulder its burden of demonstrating that the four factors weigh in favor of fair use,

whether viewed individually or in combination.

**A.     Factor One – The Purpose and Character of the Use**

The first factor has been called the "heart of the fair use inquiry" (*Davis v. Gap, Inc.*, 246

F.3d 152, 174 (2d Cir. 2001)), and is "focused chiefly on the degree to which the use is

'transformative.'"  *Goldsmith*, 11 F.4th at 37.  The first factor weighs heavily against IA because

there is no transformative purpose or legally cognizable justification for its infringements.

20

1.      **Internet Archive's Publication of Bootleg Ebooks on its Website Is Not Transformative**

There is nothing transformative about Internet Archive's Website because it merely "repackage[s] [and] republish[es]" the full text of Publishers' books in unauthorized digital formats and publishes them for free, competing with the Publishers' authorized ebooks. *Authors Guild v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).

The Supreme Court instructs that "[t]he central purpose of [the transformativeness] investigation is to see . . . whether the new work 'supersede[s] the objects' of the original creation … or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994) (internal citations omitted).  Where, as here, "the purpose of the challenged use is ... the same … purpose for which the [original] is sold, the defendants' use has indeed 'superseded the objects' of the original" and is not transformative. *Ringgold*, 126 F.3d at 79. And when a "text that contains protectable expression is included in another work, solely to convey the original text to the reader without adding any comment or criticism, the second work may be said to have supplanted the original because a reader of the second work has little reason to buy a copy of the original." *Id*.

The Internet Archive's republication of unauthorized ebook editions of the Works is a quintessential non-transformative use because the bootleg copies serve the exact same expressive "purpose" for which the originals are sold and licensed – *i.e.*, providing readers content to use and enjoy.  Here, IA scans the Publisher's books in their entirety and publishes the resulting ebook on a Website whose homepage invites users to "Read Free Library Books Online."

SUMF¶256.  IA "makes no change in the copyrighted work.  It provides neither criticism, commentary, nor information about it."  *ReDigi*, 910 F.3d at 661.[2]

In an effort to gin up a transformative purpose, the Internet Archive seizes upon language in *TVEyes*, 883 F.3d at 177-78, and *ReDigi*, 910 F.3d at 661, suggesting that a secondary use may be transformative if it "expands [the] utility" of the original (despite the holdings in each case that there was no fair use).  More specifically, IA argues that its Website "utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder."  *ReDigi*, 910 F.3d at 661 (citing *Sony Corp of Am. v. Universal City Studios*, 464 U.S. 417 (1984)).  In other words, IA argues that "[d]igital lending of library books is more efficient than physical lending.…"  Dkt. 79 (IA Pre-Motion Ltr.), 2.  So true, but *authorized* ebooks licensed through the vast library market provide the exact same efficiencies. SUMF¶¶80-88, 117.

Internet Archive conveniently ignores that Judge Leval's *ReDigi* decision provides "[e]xamples of such utility-expanding transformative uses," which make abundantly clear that IA's activities are not consistent with fair use.  *ReDigi*, 910 F.3d at 661.  Transformative "utility-expanding" uses involve copying that achieves a fundamentally different purpose from the original – most typically a previously-unavailable "full-text searchable database and public

---

[2] *See also Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 200 (3d Cir. 2004); *AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 552 (S.D.N.Y. 2013); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 71-72 (2d Cir. 1999); *United States v. Am. Soc'y of Composers, Authors & Publishers* ("*ASCAP*"), 599 F. Supp. 2d 415, 424 (S.D.N.Y. 2009).

search function." *Id.*   Notably, the transformative functions "did not allow users to read the texts" in full, but rather involved the snippets in *Google Books* or a database used to detect plagiarism (*iParadigms*). *Id.* (citing other examples).

Nor does *ReDigi*'s reference to *Sony* support IA's "utility" argument. *Id.* (citing 464 U.S. at 448-55).[3]   In *Sony*, the Supreme Court held that the manufacturer of Betamax home video recorders was not liable for contributory copyright infringement when home dwellers recorded broadcast television shows to facilitate home viewing at a more convenient time (*i.e.*, "time-shifting"). *Sony*, 464 U.S. at 442.   *Sony* held that the first factor tipped in favor of fair use because "time-shifting for private home use" "merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge." *Id.*, 464 U.S. 417.   *ReDigi* and *TVEyes* emphasize that the home-video recording in *Sony* was transformative "because the improved delivery was to one entitled to receive the content." *ReDigi,* 910 F.3d at 661; *TVEyes*, 883 F.3d at 177.

 IA's Website bears no relation to the "single, noncommercial home viewing" at issue in *Sony* because IA is not converting books to digital formats for its own personal convenience, but is rather systematically republishing millions of unauthorized, in-copyright ebooks and disseminating them to the world.  SUMF¶¶203-209, 215-345.  Moreover, unlike television channels broadcasting free content over the airwaves ("in [their] entirety free of charge"), libraries and retail consumers pay Publishers to access authorized ebook copies – and Internet

---

[3] *Cf. TVEyes*, 883 F.3d at 188-90 (Kaplan, J., concurring) ("I certainly do not find within *Sony* the idea that efficiency-enhancing technology is transformative.").

Archive has not been "invited" to consume this content for free.  SUMF¶¶128-29, 201.  *See A&M Records v. Napster*, 239 F.3d 1004, 1019 (9th Cir. 2001) (finding *Sony* to be "inapposite" because its time shifting did not "involve distribution of the copyright material to the general public").

Further, the Second Circuit's decision in *Google Books* makes explicitly clear that "the recasting of a novel as an e-book" constitutes the creation of a derivative work, which is a right accorded to the rightsholder and is *not* a "transformative use."  *Google Books*, 804 F.3d at 215 ("While such changes can be described as transformations, they do not involve the kind of transformative purpose that favors a fair use finding").  This is in keeping with longstanding precedent that the first factor weighs heavily against infringers who do nothing more than "change[] the format" of a preexisting work.  *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 n.2 (2d Cir. 1998).  *See also Disney Enters. v. VidAngel*, 869 F.3d 848, 862 (9th Cir. 2017) (courts "unanimously reject the view that space-shifting is fair use under § 107" and holding it was not fair use to "make[] illegal copies of pre-selected movies [on discs] and then sell[] streams … in a different format than that in which they were bought."); *HathiTrust*, 755 F.3d at 96 ("Added value or utility is not the test: a transformative work is one that serves a new and different function from the original work and is not a substitute for it.").[4]  In short, IA's "utility" argument does not comport with the law.

---

[4] *See also UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (service that "simply repackage[d] those recordings to facilitate their transmission through another medium" was not transformative); Letter from The Register of Copyrights to Senator Tom Udall dated May 15, 2020 at 11-12 (hereinafter "Copyright Register/Internet Archive Letter") ("[S]imply reproducing a work in a new

Finally, the artificial strictures of CDL – which IA does not even follow – do not magically convert IA's derivative use into a transformative one.  IA's adoption of arbitrary and ever changing restrictions that loosely imitate some – while ignoring others – of the Publishers' terms for library ebooks merely confirms that IA's ebooks are near perfect market substitutes for authorized ebooks. SUMF¶¶351-574.  In *ReDigi* the defendant had a resale platform for digital music files that operated on principles roughly akin to a 1:1 own-to-loan ratio, but that did not rescue its fair use argument. *ReDigi*, 910 F.3d at 653-55.  *See also Vidangel*, 869 F.3d at 861 ("Vidangel's purchases of discs . . . does not excuse its infringement.")

Here, by trampling on the Publishers (and authors) rights, Internet Archive by definition "unreasonably encroach[es] on the commercial entitlements of the rights holder." *ReDigi*, 910 F.3d at 661.  This is one of the "exceedingly obvious" cases of unlawful copyright infringement recognized by Justice Story where "the whole substance of one work has been copied from another" and used for the exact same expressive purpose as the Publishers' authorized products. *Folsom v. Marsh*, 9 F. Cas. 342, 344 (Cir. Ct. Mass. 1841).

### 2.    Internet Archive's Claimed Non-Profit Status Does Not Support Fair Use

The first factor also considers "whether [the] use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  While Internet Archive contends that it is a nonprofit library that lends books for free, it does not get a free pass for copyright infringement because of its tax status and decision not to charge users.  *Penguin Grp. (USA) v. Am. Buddha*,

---

format is not transformative.  Specifically, courts have held that reproducing the text of physical books in digital format is not transformative unless the change in format results in new *uses* for the work.").

2015 WL 11170727, at *4-5 (D. Ariz. May 11, 2015).  First, IA does not exist for a "nonprofit *educational purpose*[]."  It indisputably does not use the Works to teach students in a structured manner, like a school or university does.  Further, the Website substantially consists of general interest books – including romances, thrillers and fantasy novels which are not inherently "educational."  SUMF¶¶514-16.  Nor does IA add anything of educational value to its bootleg ebooks – like criticism or scholarship.  SUMF¶¶281-82.   Finally, as the Second Circuit has made clear, "there is … no reason to presume categorically that a nonprofit educational purpose should qualify as a fair use" because the "publication of educational materials would be substantially curtailed if such publications could be freely copied for nonprofit educational purposes."  *Google Books*, 804 F.3d at 219 n.20.

The evidence also shows that IA engages in significant commercial undertakings, all in service of finding ways to expand its free ebook Website without paying rightsholders.  The determination of whether a use is commercial "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price."  *Harper & Row*, 471 U.S. at 562.  Under the correct analysis, "the profit/non-profit distinction is context specific, not dollar dominated" (*Weissman v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)), and courts consider things like increased standing in the community or indirect financial gains like donations.  *See, e.g.*, *Am. Buddha*, 2015 WL 11170727, at *4 (noncommercial status of online library rejected where the website solicited donations and stood to gain recognition and financial support via the posting of the books); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012) (church official's posting of religious texts on website qualified as commercial because

defendant "benefitted by being able to provide, free of cost, the core text of the Works to members of the Orthodox faith, and by standing to gain at least some recognition within the Orthodox religious community for providing electronic access").[5]

Internet Archive actively uses its Website to attract new members, solicit donations and bolster its contention that it has standing in the library community.  SUMF¶¶378-88.  Even more telling, IA has grown the Website by engaging in a host of activities that its own Director of Finance deemed "commercial" – like its scanning business that generated tens of millions of dollars.  SUMF¶¶289-99.  Indisputably "commercial" is IA's effective ownership of and entanglement with Better World Books, an enormous for-profit company.  SUMF¶¶322-45.  The for-profit activities conducted by BWB are integral to IA's operations.  *Id*.  As Kahle wrote to a potential investor before, he hoped BWB would be "*profitable*" because "the successful operation of BWB will provide funding back to The Internet Archive to ensure that it can continue to deliver free services to the world."  SUMF¶331 (emphasis added).  BWB also commits significant resources to running the "book pipeline" that syphons millions of books away from BWB so that IA can digitize them in offshore scanning centers.  SUMF¶¶338-345.  This has enabled IA to ramp up to its goal of digitizing one million books per year.  SUMF¶332.

---

[5] *See also Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (same); *Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962, 979 (C.D. Cal. 2012) (commercial use where infringing videos "generated traffic to the anti-abortion websites" and defendants thus "appropriated the copyrighted material to advance their own message"); *Weissmann*, 868 F.2d at 1324.

The highly commercial "synergies" between IA and BWB are hallmarks of commercial activity, like the "Purchase at Better World Books" buttons that appear at the top of the browser window on the Website whenever a book is checked out.  SUMF¶346.  This link drives users to BWB, where they can pay for a used copy and generate revenue to be reinvested in acquiring more books for IA to digitize.  SUMF¶347.  And BWB pays IA every time a user clicks the "Purchase" link.  *Id*.  As IA's Director of Finance admitted, practically every webpage on the Website is "monetized" because it contains the "Purchase" button or a link inviting users to donate money directly to Internet Archive.  SUMF¶¶346-50.  The Supreme Court makes clear that "the less a use provides transformative value, the more its commercialism will weigh against a finding of fair use."  *Campbell*, 510 U.S. at 579.  IA's patently non-transformative copying of the Works, coupled with its many commercial elements, decidedly stacks the first factor against fair use.

    **B.**    **Factor Two – The Nature of the Copyrighted Work**

The second factor weighs strongly against fair use because the Works are fiction and non-fiction books – *i.e.*, "creative expression" – that "fall[] within the core of the copyright's protective purposes."  *Campbell*, 510 U.S. at 586.  This is self-evident for the many Works of fiction, including award winning books by Sylvia Plath, Cormac McCarthy, and J.D. Salinger.  No less worthy of protection are the non-fiction Works, which are not fact-bound "directories" but more akin to "elegantly written biograph[ies]."  *Harper & Row*, 471 U.S. at 563 (citation omitted).  As the Second Circuit stated in *Google Books*, 804 F.3d at 220, "[w]hile each of the three Plaintiffs' books in this case is factual, we do not consider that as a boost to Google's claim

of fair use." Accordingly, the second factor weighs equally strongly against fair use for all 127
Works.

### C. Factor Three – The Amount and Substantiality of the Use

"The third factor, amount and substantiality… used, recognizes that the more of a
copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad.*, 150 F.3d at
109. While the "use of the entirety of a [work] is not necessarily inconsistent with a finding of
fair use," there is likewise no question that wholesale copying, as here, clearly "tends to disfavor
a finding of fair use." *ReDigi*, 910 F.3d at 662; *see also Campbell*, 510 U.S. at 587-88 ("A work
composed primarily of an original, particularly its heart, with little added or changed, is more
likely to be a merely superseding use, fulfilling demand for the original."). "The Copyright
Office has ... consistently expressed doubt that providing digital access to complete works can be
considered a fair use." Copyright Register/Internet Archive Letter at 19. Thus, the third factor
weighs heavily against fair use. *See TVEyes*, 883 F.3d at 179 ("[Third factor] clearly favors Fox
because TVEyes makes available virtually the entirety of the Fox programming that TVEyes
users want to see and hear.").

### D. Factor Four – The Effect of Internet Archive's Uses on the Potential Market for the Works in Suit

The fourth factor focuses on "the effect of the use upon the *potential* market for or value
of the copyrighted work." *Ringgold*, 126 F.3d at 80 (emphasis in original) (quoting 17 U.S.C.
§107(4)). The relevant inquiry "must take account not only of harm to the original but also of
harm to the market for derivative works." *Harper & Row*, 471 U.S. at 568. A secondary use that
"competes in the rightsholder's market as an effective substitute for the original … impedes the
purpose of copyright to incentivize new creative works by enabling their creators to profit from

29

them." *ReDigi*, 910 F.3d at 662.  Critically, this factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (citation omitted).

The first and fourth factors are closely linked.  Id. at 591.  "[W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Id.* (internal citation, quotation marks and alterations omitted).  This observation is not limited to commercial uses as courts have found it applies equally to nonprofit websites distributing literary works for free (outside of the educational context). *See, e.g.*, *Am. Buddha,* 2015 WL 11170727, at *6; *Gregory*, 689 F.3d at 64.

Courts have recognized two related but distinct species of fourth factor market harm –  lost licensing revenue from the defendant and market substitution – and both are relevant here.

### 1.      Lost Fees from the Internet Archive

First, Internet Archive harms the Publishers by failing to pay them fees for the distribution of their works.  Under settled law, there is market harm when the infringer engages in "exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562.  "The fourth factor will favor [the Publishers] if [they] can show a traditional, reasonable, or likely to be developed market for licensing" and failure by the infringer to pay a customarily paid fee. *Ringgold*, 126 F.3d at 81 (citation and internal quotation marks omitted).  In *TVEyes*, the Second Circuit found market harm when a media monitoring

service failed to pay Fox for the distribution of its news clips. "It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."  883 F.3d at 180 (citation omitted).  *See also Davis*, 246 F.3d at 165 ("If a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, it seems entirely reasonable to conclude that the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for."); *Meltwater*, 931 F. Supp. 2d at 559  ("By refusing to pay a licensing fee to AP, Meltwater not only deprives AP of a licensing fee in an established market for AP's work, but also cheapens the value of AP's work by competing with companies that *do* pay a licensing fee ….").[6]

The Second Circuit further held in *Ringgold* that, in order to establish loss of customary license fees, the Publishers are "not required to show a decline in the number of licensing requests" from third parties or lost sales. *Ringgold*, 126 F.3d at 81 n.16.  Nor would a potential increase in sales change that conclusion: "Even if the unauthorized use of plaintiff's work in the televised program might increase poster sales, that would not preclude [plaintiff's] entitlement to a licensing fee."  *Id.* at n.16; *see also Twin Peaks Prods. v. Publ'ns Int'l Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993) (promoting discoverability of original work is irrelevant).

This species of market harm is easily established here.  IA's library expert testified that there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and

---

[6] *See also ASCAP*, 599 F. Supp. 2d at 432; *UMG Recordings*, 92 F. Supp. 2d at 352.

"is predicated on licensing revenues that are paid by libraries to entities like OverDrive." SUMF¶577. And IA has consistently held itself out as a "non-profit library" that offers users "millions of free books" (and "ebooks" specifically), but it has never paid the fees that libraries customarily pay to provide precisely the same service: free short-term ebook loans. SUMF¶¶286-88. The lost fee revenues for the 33,000 of Plaintiffs books on the Website are huge. SUMF¶¶575-88. Given IA's failure to pay customary license fees, the fourth factor favors the Publishers. *See Ringgold*, 126 F.3d at 81; *TVEyes*, 883 F.3d at 180.

This conclusion is underscored by the fact that Internet Archive undermines the Publishers' digital strategy. Revenues from *all* formats are critical to preserving the incentives for Publishers (and their authors) to create new books and invest in new technologies. SUMF¶¶63-68. Print books have never been sold (or priced) with the expectation that they will become ebooks readily capable of no-cost worldwide distribution. *Id.* Given the inherent differences between ebooks and print books, it is critical to protect the Publishers' exclusive right to tailor appropriate terms for each market and format, including limiting library ebook loans to local community members and metering limitations based on time or number of circulations. *See* 7-9, *infra*. IA circumvents all those carefully designed restrictions – and compounds the lost licensing revenues – by lending ebooks on terms of its own devising – including global distribution, setting lending caps according to the number of books owned by Partner Libraries and foregoing metering. SUMF¶¶351-77.

Nor does this conclusion conflict with "the danger of circularity in considering whether the loss of potential licensing revenue should weigh the fourth factor in favor" of fair use. *Ringgold*, 126 F.3d at 81. The Second Circuit "avoid[s] the vice of circularity by considering only traditional, reasonable, or likely to be developed markets when considering a challenged use

upon a potential market" – and authorized library and retail ebook markets certainly qualify.  *Id.* (citation omitted).  Moreover, the "vice of circularity" arises in cases where the secondary use is transformative and thus justifies the non-payment of a fee – but IA's copying is blatantly non-transformative.  *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006).  And IA cannot undermine a finding of lost fees and hence market harm by arguing that the Publishers refuse to "sell" (vs. license) ebooks on terms it is willing to accept. This is because "[h]ypothetical-license damages assume rather than require the existence of a willing seller and buyer."  *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014); s*ee also Davis*, 246 F.3d at 165 ("[W]hether the infringer might in fact have negotiated with the owner or purchased at the owner's price is irrelevant.").

In short, IA's failure to pay fees, when libraries customarily pay fees to lend ebooks, establishes market harm without more.

### 2.      Market Substitution:  IA Offers A Competing Substitute, Leading to Potential Lost Ebook Sales to Libraries and Consumers

Viewed from another angle, the Publishers have suffered market harm because IA's Website "offers the marketplace a significantly competing substitute for the [Works]."  *Google Books*, 804 F.3d at 222.  If public and academic libraries and consumers use the Website to access complete copies of the Works and over 30,000 of the Publishers' other titles, rather than acquiring authorized ebooks, the Publishers will experience significant potential lost ebook revenues in these markets and harm to the value of their works.  SUMF¶¶580-88, 589-620. Moreover, the Open Libraries project greatly increases the harm (which will grow exponentially if condoned)  because the project turns IA into a centralized hub, which counts millions of additional copies of print books located in libraries scattered across the country towards IA's

lending caps.  SUMF¶¶362-77.  In short, Internet Archive offers a competing substitute for the

Publishers' ebooks, creating the "likelihood that potential purchasers may opt to acquire the

[Internet Archive's] copy in preference to the original."  *Google Books*, at 223.  IA distributes

the Publishers "copyrighted material in a market that [the Publishers], as the copyright owner,

[are] exclusively entitled to exploit. . . . [Defendant] *replaces* [Plaintiffs] as the supplier of those

[ebooks] to meet the demand of [its] customers.  This is precisely the kind of harm the fourth

factor aims to prevent."  *Infinity Broad.*, 150 F.3d at 111; *Twin Peaks*, 996 F.2d at 1377 (fourth

factor focuses on whether the Defendant "competes in markets in which [the Publishers have] a

legitimate interest"); *ReDigi*, 910 F.3d at 662.

       To prevail, the Publishers do not need to present evidence of specific lost revenue – a

near-impossible task to reliably perform given that each Work has a unique lifecycle and its

revenue is impacted by innumerable factors that change over time.  SUMF¶¶27-29, 59-62.  The

Second Circuit "ha[s] never held that the rightsholder bears the burden of showing actual market

harm" to establish unlawful market substitution "[n]or would [it] so hold."  *Goldsmith*, 11 F.4th

at 49.  Further, "[a] rule that would require a victim of infringement to delay taking action to

defend its copyright until actual (and perhaps irreparable) harm had accrued would run contrary

to the very purpose of the Copyright Act."  *Gregory*, 689 F.3d at 64 n.23 (citation omitted).

Instead, the question is whether the IA's complete ebooks "could usefully serve as a competing

substitute for the original."  *Google Books*, 804 F.3d at 221-22.

       Thus, for example, in *American Buddha*, the nonprofit website distributing free

unauthorized scanned copies of Penguin's books argued that the fourth factor weighed in its

favor because Penguin "failed to present financial data regarding the market harm caused by

American Buddha's publication of the Works."  The district court rejected that argument,

holding that because American Buddha "offered identical or near-identical versions of the

creative Works on its Website for the precise purpose for which [the plaintiff] had created the

Works in the first place," it had "harmed their potential market value."  2015 WL 11170727, at

*6.  "In addition, unrestricted and widespread conduct of the sort engaged in by American

Buddha would essentially gut the potential market for the Works.  'If anyone could freely access

the Works ... the plaintiff would have no market in which to try and publish ....'"  *Id.* (quoting

*Gregory*, 689 F.2d at 65).

   Here, the relevant market is the Publishers' market for ebooks, particularly the library

and retail channels.[7]  Since the Publishers' have established themselves as major players in a

thriving ebook market (SUMF¶¶93-182), Internet Archive's publication of unauthorized,

complete ebook editions of the Works for reading purposes is sufficient to establish potential

market substitution without more.  Once again, *Google Books* is instructive.  The Second Circuit

noted that even transformative copying would cause market harm "if done in a manner that

results in the widespread revelation of sufficiently significant portions of the original as to make

available a significantly competing substitute."  *Google Books*, 804 F.3d at 223.  While Google

Books' snippets were deemed too brief and disjointed to "threaten the rights holders," the

---

[7] For purposes of this motion only, the Publishers do not address whether IA harms its markets for print

books or audiobooks – although they do not concede that there was no harm to those markets and reserve

the right to establish such harm at later proceedings.

Second Circuit made plain that publication of entire books would give rise to a "strong" claim of infringement.  *Id*. at 223-25.

Internet Archive's own documents and testimony confirm the obvious – that its ebooks are capable of acting as a substitute for the Publishers' authorized ebook editions (and are often intended as such).  While IA periodically proclaims without any evidence that its users only quickly browse their ebooks, internal documents show that IA's users read books via the Website – which is no surprise.  SUMF¶¶256-62.  An employee of IA has referred to the Website as providing "Similar Services" to library aggregators and stated that Internet Archive "competes for eyeballs" with Amazon and OverDrive.  SUMF¶¶524-25.  And IA cajoles libraries to  use its Website instead of authorized library ebooks in presentations urging libraries to join the Open Libraries project.  SUMF¶378.  For example:

- IA says its Open Libraries model  "***ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format***."

- IA's click-through agreement with its Open Libraries partners explicitly states: "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own."

- In a document titled "Maximizing institutional investment in print resources through controlled digital lending," IA summarizes its offer to turn print books into ebooks as ***"You Don't Have To Buy It Again."***

- Yet another Internet Archive presentation summed up the benefits of joining the Open Libraries Project as follows:

36



SUMF¶¶379-388.

These documents are irrefutable proof that IA causes (and will cause) harm to the Publishers and their authors. They necessarily experience lost library ebook revenues when libraries do not "purchase the same content again" in an electronic format and instead make use of ebooks on IA's Website that were created from scanning print books. Further, courts recognize the common sense conclusion that "[i]t is difficult to compete with a product offered for free.… Even if every download does not represent a lost sale, … it is plain that consumers who regularly pay for [content] would shift to free downloads if given the chance." *Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d 217, 231 (D. Mass. 2009).

The testimony of Internet Archive's own witnesses underscore this market harm. IA's library expert testified that it is her "expert opinion that libraries will spend less money on licensing the e-Book editions of the particular titles that were provided through CDL." SUMF¶¶526-27. That would be a direct loss for the publisher and author of that title. Multiple third party witnesses proffered by IA also testified that they have used IA's Website to access ebooks that they could have read as an authorized library ebook (for example, through their

university library).  SUMF¶¶528-29.  Lower patron demand ultimately depresses library ebook acquisitions and thus royalties to rightsholders.  SUMF¶¶526-29.

Finally, there is no question that "unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590 (citation omitted).   Since courts must focus on the prospective impact of unrestricted and widespread infringement, not just historic lost sales, it is highly significant that Internet Archive has far more members and views today than in June 2020 when the Works were taken down and has plans for further significant expansion.  SUMF¶¶247-50.  Moreover, in similar cases where the defendants have provided free copies of all (or substantially all) of a work, courts regularly assume that "unrestricted and widespread conduct of the sort engaged in by the defendant" would result in a substantial adverse impact.  *See, e.g.*, *Gregory*, 689 F.3d at 65 ("If anyone could freely access the Works, … the Monastery would have no market in which to try and publish, disseminate or sell its translations . . . . and to reap the fruits of its labor.").

Indeed, it is not difficult to envision that allowing Internet Archive to continue its current trajectory would cause devastating consequences for the Publishers.  Aided by its industrial scanning apparatus and book pipeline, IA can realistically achieve its goal of offering 80% of all books currently residing in libraries within the decade.  SUMF¶406.  Lending caps are simultaneously ballooning thanks to the ingestion of partner libraries' catalogues via the overlap analysis, and there is a real risk that waitlists will be reduced further.  SUMF¶¶389-92.  While fewer than 15 public libraries now act as partner libraries in the Open Libraries program, presumably because of copyright concerns, their "widespread" participation would vastly

38

increase the number of IA's copies of the type of trade books published by the Plaintiffs. SUMF¶¶367-69. IA's data indicates that more titles and more available copies attracts more users to its Website, which will inevitably depress demand for authorized library and retail ebooks. SUMF¶¶544-46. Given that Internet Archive currently has 25 million borrows a year, the realistic prospect of a few hundred million "borrows" a year would clearly cause substantial harm to the Publishers' potential markets for the Works. In a world in which there is "unrestricted and widespread conduct" of the sort engaged in by IA, other nonprofit entities (some opportunistically branded as libraries) would compete against the Publishers with their own unauthorized digital products, scanned from the millions of print books currently circulating. SUMF¶¶69-75, 620. (Nor would there be any reason to limit the Court's ruling to books. The same principle could be used to create a "universal media library" from currently unused CDs, DVDs and video games.) It is evident to the Publishers from their decades of experience and basic economic common sense that the unregulated growth of centralized databases offering millions of free ebooks would cause substantial losses and seriously imperil their ability to publish new books, support authors with a reliable stream of royalties and invest in new publishing technologies like authorized library ebooks. SUMF¶¶589-621. The fourth factor weighs heavily against fair use.

### E.   Aggregate Assessment of the Four Factors

The factors weigh strongly against fair use, both singularly and in the aggregate. Internet Archive engages in commercial operations to scan millions of highly creative books in their entirety and posts the resulting copies on its Website for the quintessentially non-transformative purpose of providing users with free reading material, thus violating the Publishers' valuable

right to create derivative works and causing market harm.  SUMF¶¶215-635.  As the Copyright Office stated in a report about mass digitization, "there is broad agreement that no colorable fair use claim exists" for "providing digital access to copyrighted works in their entirety."[8]  This case should be no exception.

Internet Archive's position that the Website's public benefit – namely its promotion of broad, free access to books – outweighs the rights of the Publishers and their authors is without merit.[9]  The Supreme Court's observation in *Harper & Row* fittingly governs:  "Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." 471 U.S. at 569.  Thus, courts in the copyright context have only permitted categorical exceptions to copyright law in limited circumstances, none of which apply here:  *e.g.*, where the challenged works are transformative or incorporated by official legal codes, where there is no existing market for distribution of the work, or where, in a teaching or research setting, an academic or similar institution distributes limited excerpts of a work for the advancement of research or education.  Copyright law would be a nullity if Internet Archive's generic public interest argument prevailed.  "If every volume that was in the public interest could be pirated

---

[8] U.S. Copyright Office, Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101 (2015), https://www.copyright.gov/orphan/reports/orphan-works2015.pdf.

[9] The Supreme Court recently considered public benefits as part of the fourth factor analysis in a case involving the copying of highly functional computer code, but it warned that this may not "always [be] relevant to the application of fair use" and suggested that the sole focus on such an inquiry would be on the benefits of a transformative use.  *Oracle Am.*, 141 S. Ct. at 1206.

away by a competing publisher … the public soon would have nothing worth reading." *Harper & Row*, 471 U.S. at 559 (citation and alteration omitted).

Likewise, any effort by IA to argue that it is sound public policy to employ the fair use analysis to advance the spirit of the first sale doctrine, despite violating its terms, cannot stand after *ReDigi*. As Judge Leval stated, the first sale doctrine codified at 17 U.S.C. §109 is a provision of the Copyright Act in which "Congress has taken control, dictating both policy and the details of its execution" and Congress determined that first sale does not extend to unauthorized *reproductions*. 910 F.3d at 664. Given Congress' clear intent, and since courts "are poorly equipped to assess the inevitably multifarious economic consequences" of changes in the law, courts should not "substitute their judgment for that of Congress" on this issue. *Id.* at 663-64. Any such interference with Congress' explicit legislation would be particularly inappropriate here since a subcommittee of the House Judiciary Committee recently conducted a "comprehensive [ ] review" of the Copyright Act, including a June 2014 hearing on the first sale doctrine in a digital age, but ultimately did not revise §109. SUMF§403-05.

The public is best served by putting an end to IA's mass infringement. "The economic philosophy behind the [Copyright] [C]lause ... is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors." *Eldred v. Ashcroft*, 537 U.S. 186, 214 (2003) (citation omitted). The ability of copyright law to incentivize the creation of new works will be profoundly undermined if Internet Archive devalues books further by continuing its mission to put bootleg copies of every book it can acquire on the Website.

III.    **THE NATIONAL EMERGENCY LIBRARY WAS NOT FAIR USE**

The National Emergency Library was not a fair use for the same reasons that IA's practice of CDL is not fair use, plus more.  While COVID-19 was a historic emergency, copyrights were not suspended and access to authorized library ebooks continued.  As the Copyright Office noted in a letter casting significant doubt on the legality of the NEL, the general population of authors struggled during this time and were heavily reliant on royalty income from their copyrights.  Copyright Register/Internet Archive Letter at 21-22.  Further, as that letter reiterated, "publishers and authors … responded to the crisis by engaging in efforts to ensure that readers, students, and others continue[d] to be able to access their works .…"  *Id*. at 2.  These efforts included new terms, discount prices and free ebooks for approved classroom use.  SUMF¶187-97.

Ultimately, the NEL underscores IA's conviction that it is the final arbiter of how the Publishers' books are published in digital formats, which turns copyright on its head.  IA does not feel bound even by the limitations it has imposes on itself.  SUMF¶542.   Whatever version of "controlled digital lending" it is currently using, the Internet Archive's "universal access" scheme violates fundamental principles of copyright law and should be halted.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for summary judgment against Internet Archive with respect to the causes of action set forth in the Complaint.

Dated: New York, New York          **DAVIS WRIGHT TREMAINE LLP**
      July 7, 2022

                                                   */s/ Elizabeth A. McNamara*

Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      jessefeitel@dwt.com
      carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

*Attorneys for Hachette Book Group,*
*Inc., HarperCollins Publishers LLC,*
*John Wiley & Sons, Inc., and Penguin*
*Random House LLC*

43

**CERTIFICATION OF COMPLIANCE**

As counsel of record to Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc. and Penguin Random House LLC, I hereby certify that this brief complies with the type-volume limitations set forth in this Court's Individual Rule II.D and complies with all formatting requirements set forth therein.  I am relying upon the word count function of the word-processing system (Microsoft Word), which indicates that 11,870 words appear in the brief, except for the portions excluded from the word count by Rule II.D.

/s/ Elizabeth A. McNamara
_____
Elizabeth A. McNamara