# EXHIBIT G



# IFLA Position on Controlled Digital Lending

Controlled Digital Lending (CDL) has become widely talked about over the last two years, and in particular in the context of the COVID-19 pandemic. While the specific term has only relatively recently come to be used[1], forms of controlled lending have been utilised for many years, for example in the context of document supply. As such, controlled lending has helped to fulfil the mission of libraries to support research, education and cultural participation within the limits of existing copyright laws.

Licensed eBooks have opened the door to a radical undermining of the traditional public interest functions and freedoms of libraries. These still exist for paper books, but with the advent of licensed eBooks, libraries are no longer free to decide when or what to purchase, with some publishers even refusing to sell to libraries. Controlled digital lending provides an alternative to a licensing approach, and so a means of redressing the balance.

This paper provides background on what CDL is, and provides an economic and legal case for all libraries and their users to be able to benefit from the approach. Library associations and libraries in individual countries and regions will need to consider their particular policy environment.

## What is CDL?

CDL in the context of book lending promotes the idea that libraries are – or should be – able to lend out digitised copies of works in their collections on a strict owned-to-loaned ratio[2]. It applies to the lending of digital copies of in-copyright works, given that those already in the public domain (i.e. no longer subject to economic rights) can already be digitised and made freely available. This lending, crucially, is 'controlled' through the use of technological protection measures, which prevent illicit copying and limit the length of loan periods. In effect, it gives libraries a choice between digital and physical formats in how to give access to works in their collection.

Crucially, CDL is based on exceptions and limitations or "user rights" in copyright law, in contrast to market-based licensing solutions. In the United States it has been justified, in an article by David Hansen and Kyle Courtney[3], under the legal doctrine of fair use. The authors assert that digitisation and

---

[1] Hansen, David and Courtney, Kyle (2018), *A White Paper on Controlled Digital Lending of Library Books. Available at https://controlleddigitallending.org/whitepaper*
[2] For example, if a library has one copy of the book in paper form it can digitise it, put the paper copy beyond public access, and only lend the eBook to a single user at a time . If the library has two paper copies the same principle should apply that no more than two copies (irrespective of the format) should be available at any one time to the public.
[3] Hansen and Courtney, ibid

**IFLA Position on Controlled Digital Lending**
2 June 2021

lending of an electronic copy by libraries is permitted after the exhaustion of rights following the first sale of the physical copy, as long as the total number of copies in circulation (physical and digital combined) does not exceed the number owned by the library, and each physical copy is withheld from public access for as long as a corresponding digital copy is on loan. There have also been moves to clarify the legal status of eLending in Europe, where the European Court of Justice has found that libraries are permitted to lend not just paper books but eBooks under existing copyright law.[4]

The compatibility of CDL with current laws is increasingly in the spotlight, given a case brought in the United States by a number of publishers against a key proponent of the approach, the Internet Archive.[5] If CDL is declared legal in the US, attention is likely to shift to other countries. Even if the specific approach to CDL used in the United States by the Internet Archive is deemed illicit, there remains a strong case for the principle of digitisation and lending by libraries of books using controlled lending technologies.

In reality, library users in other countries are already benefiting from CDL, for example when receiving electronic document supply copies, and in Canada, there are moves by some libraries to provide access to works in their own collections using the approach[6].

## The Economic Case for CDL

A key reason why CDL is necessary is the failure of markets to provide access to works in digital form on a consistently fair basis. First of all, a very small share of books are currently available in digital form for libraries, due either to being out of print (and so no investment is made in releasing digital versions), a lack of resources in publishing houses, or a refusal to sell to libraries[7]. This effectively prevents libraries from fulfilling their mission in a digital age and undermines research and learning in society.

The COVID-19 crisis brought many of the availability and pricing issues of eBooks to the fore, as patrons could no longer physically visit the library and access had to switch to electronic overnight. Where eBooks are available for libraries to purchase, they are often licensed to libraries at significantly higher

---

[4] C174/15 Vereniging Opebare Bibliotheken vs Stichting Leenrecht
http://curia.europa.eu/juris/liste.jsf?num=C-174/15

[5] Hachette Book Group Inc v. Internet Archive 1:20-cv-04160, US District Court, S.D. New York. Available at https://www.courtlistener.com/docket/17211300/hachette-book-group-inc-v-internet-archive/

[6] Canadian Libraries Internet Archive Canada at https://archive.org/details/toronto

[7] SCONUL (2018) *Understanding the value of the CLA licence to UK higher education,* https://www.sconul.ac.uk/sites/default/files/documents/CNAC%20Research%20Project%20Report%20FINAL%20with%20logos.pdf

prices than their paper equivalent[8], or under much more restrictive conditions than for physical books. In some cases, libraries are obliged to buy into larger collections of eBooks as publishers will not allow access to specific desired titles only, which consequently reduces libraries' freedom of choice to buy other books. This undermines the ability of a library to respond to the needs of researchers and the public, and exacerbates the already acute "monograph crisis"[9][10].

When there is no eBook available or terms and conditions are barriers, the possibility for libraries to digitise physical copies of legally-acquired works would mean that, in setting prices and conditions for eBooks and other electronic resources, rightsholders would need to apply the same principles as for physical books. In effect, it would break down the wall between the markets for physical books and eBooks, allowing for more competition between the two. This would help ensure the continued effectiveness of the safeguard that libraries provide against the negative consequences of poorly functioning eBook markets.

**The Legal Case for CDL**

Recognising that copyright laws vary from one country to the next, IFLA provides the following principles related to the implementation of CDL in libraries around the world. Each principle, in itself, should be reflected in national laws and libraries should seek to pursue these principles with policy makers where they are not. Collectively, they provide a sufficient basis for enabling controlled digital lending.

### *1) Freedom to acquire and lend represents a core function of the work of libraries*

The freedom to acquire any book or other material it chooses and then lend it represents a key means for libraries to fulfil their mission to support education, research and access to culture.

Lending fills a gap in situations where purchase of a work is not appropriate – for example because they only need to use a small part of a work, because they are testing out a new author, or because they do not have the resources to buy a whole work etc. There is considerable evidence that lending contributes to

---

[8] For a single user licence an eBook can be ten times the price of the paper version. See Academic EBook Campaign: https://academicebookinvestigation.org/

[9] The Forever Decline: Academia's Monograph Crisis: https://openscience.com/the-forever-decline-academias-monograph-crisis/

[10] The Monograph Crisis: Open Access for Art and Design Scholarship https://blogs.openbookpublishers.com/the-monograph-crisis-open-access-for-art-and-design-scholarship/

3

future sales[11]. Lending also helps build the readers, researchers, and writers of the future, contributing to innovation and creativity.

Importantly, lending does not represent an exclusive right under international law[12], and in most countries it takes place under the doctrine of exhaustion or the first sale principle. In those countries where lending rights do feature in legislation, moves towards Controlled Digital Lending will need to take account of this[13].

### *2) Digital uses should have at least the same flexibility as physical ones*

While the ideas behind copyright have their roots firmly in the analogue age, they need to keep up with new usages. If this doesn't happen, there is a risk that copyright will fail to deliver on the public interest goals that it aims to achieve. In Europe, at least, this argument was used in the VOB vs Stichting Leenrecht judgement[14] to justify the decision that eBooks fell under existing rules for library lending.

For IFLA this 'technological neutrality' should also protect against the deliberate or inadvertent use of contract terms and technological protection measures to prevent legitimate uses of works under exceptions and limitations.

This should therefore mean that libraries are able – either under the exhaustion principle or under a lending exception – to digitise and lend works electronically in the same way as they do physically. In the case of electronic lending, as long as core principles of CDL are respected – such as limited loan-periods and the use of a strict owned-to-loaned ratio, enforced through technological protection measures – the digitisation and subsequent lending of the created electronic book should be acceptable. IFLA believes that as a result of the VOB vs Stichting Leenrecht judgement, in some EU countries, this would already be permitted.

---

[11] How Libraries Help Authors Boost Book Sales, Rachel Kramer Bussel, Forbes, April 12, 2019: accessed on the 15/01/2021: https://www.forbes.com/sites/rachelkramerbussel/2019/04/12/how-libraries-boost-book-sales/

[12] Berne Convention, WIPO website, accessed on the 15/01/2021: https://wipolex.wipo.int/en/treaties/textdetails/12214

[13] To note, and as set out in its Position on Public Lending Right (https://www.ifla.org/publications/the-ifla-position-on-public-lending-right--2016), IFLA recognises the importance of supporting authors to ensure ongoing production of new works. As such, IFLA encourages governments to look for more efficient and effective approaches than PLR, including improved contract terms, tax breaks and direct tools such as cultural funds. Where compensation under PLR is required, reflection will be necessary on its application to CDL. IFLA is strongly opposed to PLR on eBooks which are only available for a limited number of loans or time.

[14] Ibid.


**IFLA Position on Controlled Digital Lending**
2 June 2021

CDL extends the opportunity for use to additional locations. Forcing users to come to libraries is a source of discrimination against those who are less mobile or who live in remote areas.

### *3) It is acceptable to make use of more than one exception or limitation at a time*

Exceptions will often need to be used in conjunction with others in order to be effective. For example carrying out text and data mining using a preserved copy of a work can entail two different exceptions. So too can giving access to a digitised copy of a work on a dedicated terminal inside a library, as established in the TU Darmstadt ruling[15] for countries in the European Union. As set out in the judgement in this case, exceptions often have to be combined for public interest purposes, as long as they remain consistent with the three-step test in the Berne Convention[16].

### Conclusion

This position argues that there is a strong socio-economic case for enabling Controlled Digital Lending in libraries around the world, and that where a number of desirable and widely-recognised principles are respected (libraries' ability to freely acquire and lend, the technological neutrality of law, the possibility to combine exceptions), its legal basis will in turn support the wider public interest.

In some countries in the European Union, the bases for CDL are likely to be already in place, and so all that will be required is for libraries to establish the applicability of the VOB vs Stichting Leenrecht judgement to their national situation. Where the legal conditions in countries globally are not in place, IFLA urges action to correct this, thus enabling libraries to digitise and lend eBooks on an owned-to-loaned ratio, and so realise further their potential to support learning, research and access to culture in a digital age.

---

[15] C117-13 Technische Universität Darmstadt vs Eugen Ulmer KG, http://curia.europa.eu/juris/liste.jsf?num=C-117/13

[16] WIPO website, Berne's Convention: https://www.wipo.int/treaties/en/ip/berne/