IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>                         Plaintiffs,<br><br>    v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>                        Defendants. | Case No. 1:20-CV-04160-JGK<br><br>ORAL ARGUMENT REQUESTED |

*REDACTED* MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
INTERNET ARCHIVE'S MOTION FOR SUMMARY JUDGMENT

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................1

II.   STATEMENT OF FACTS .......................................................................3

    A.    The Internet Archive is a nonprofit library. ............................................3

        1.    Providing the public with access to knowledge has been a guiding mission of the Internet Archive for over a quarter century.........................3

        2.    The Internet Archive performs the traditional function of a library by lending its books to its patrons..................................................4

            a.    The Digitization and Digital Lending Process...............................5

            b.    The Internet Archive's Lending Policies ........................................6

            c.    Benefits to the Public ....................................................................7

    B.    At the beginning of the COVID-19 pandemic, when schools and libraries were closed, the Internet Archive launched the temporary National Emergency Library. ............................................................................8

    C.    The Publishers and the Works in Suit...................................................11

    D.    The undisputed facts reflect a lack of market harm.................................12

III.  LEGAL STANDARD............................................................................13

IV.  ARGUMENT ....................................................................................14

    A.    The Internet Archive's implementation of Controlled Digital Lending is fair use.............................................................................................15

        1.    The first factor strongly favors fair use................................................16

            a.    CDL is wholly noncommercial....................................................16

            b.    CDL is a transformative use. ......................................................16

            c.    CDL helps fulfill the goals of copyright's exhaustion doctrine. ....................................................................................19

        2.    The second factor is neutral. ...............................................................21

            a.    Factual versus Fictional Works....................................................22

            b.    Published versus Unpublished Works ...........................................22

        3.    The third factor is neutral.....................................................................23

|   |   | 4. | The fourth factor favors fair use. | ................................................ | 24 |

a. CDL has had no negative market effect. ........................................ 25

b. Widespread CDL would not cause market harm. .......................... 26

  i. Dr. Reimers' Analysis ...................................................... 27

  ii. Dr. Jørgensen's Analysis ................................................... 28

c. Against this affirmative evidence, Plaintiffs provide only conjecture and innuendo. ................................................... 28

d. There is no licensing market for CDL. .......................................... 29

e. Even if CDL displaced some book sales or licenses, the fourth factor would still weigh in favor of fair use because any market harm to particular books would not affect incentives to publish. ................................................................. 32

B. The temporary National Emergency Library was also a lawful fair use. .............. 34

C. If the Court finds the Internet Archive's digital lending was not fair use, it should remit statutory damages pursuant to Section 504(c)(2). ........................... 35

V. CONCLUSION ................................................................................................ 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994), *as amended* (July 17, 1995) .................................................16, 32

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26 (2d Cir. 2021), *cert. granted*, 142 S. Ct. 1412 (2022) ........................................24

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)...................................................................................20, 22, 23, 24

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015)...................................................................................... *passim*

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)...........................................................................................15

*Cambridge Univ. Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) ......................................................................................33

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)...........................................................................................23, 26, 32

*Capitol Recs., LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018)...........................................................................................17, 20

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)...........................................................................................15, 20

*Doan v. American Book Co.*,
  105 F. 772 (7th Cir. 1901) .............................................................................................21

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018)...........................................................................................17

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021)............................................................................................. *passim*

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)....................................................................................................22, 23

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  568 U.S. 519 (2013)....................................................................................................19, 20

*Lennon v. Premise Media Corp.*,
   556 F. Supp. 2d 310 (S.D.N.Y. 2008) ............................................................22, 23

*MCA, Inc. v. Wilson*,
   677 F.2d 180 (2d Cir. 1981) ...................................................................................24

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ...................................................................................... *passim*

*Wright v. Warner Books, Inc.*,
   953 F.2d 731 (2d Cir. 1991) ...................................................................................24

**Statutes**

17 U.S.C. § 107 ............................................................................................... *passim*

17 U.S.C. § 109 ..............................................................................................19, 20

17 U.S.C. § 504(c)(2) ..............................................................................14, 35, 36

**Rules**

Fed. R. Civ. P. 56(a) ...............................................................................................13

**Other Authorities**

H.R. 4850, 93rd Cong. (1973) ................................................................................30

H.R. Rep. No. 94-1476 (1976) ..........................................................................21, 36

S. 658, 99th Cong. (1985) .......................................................................................30

## I.      PRELIMINARY STATEMENT

Informed citizens need comprehensive libraries that meet people where they are.  Today, that means online spaces that welcome everyone to use their resources, invite them to create new and truthful works, and respect the interests of both authors and readers.

The Internet Archive is such a library.

Through Controlled Digital Lending ("CDL"), the Internet Archive and other nonprofit libraries make and lend digital scans of print books in their collections at no cost to their patrons. Each book loaned via CDL has already been bought and paid for, so authors and publishers have already been fully compensated.  Each book is then digitized at the library's own expense and, replicating longstanding brick-and-mortar practice, only one patron at a time can borrow it.

Libraries have been practicing CDL in one form or another for more than a decade, and hundreds of libraries use it to lend books digitally today—including large public libraries such as the Boston Public Library and academic libraries such as Georgetown.  The library community has made a substantial investment in CDL, because CDL helps ensure that the public can make full use of the books in their collections.  For its part, the Internet Archive has been digitizing books lawfully acquired through purchase or donation and, since 2011, lending those digitized books on this owned-to-loaned basis, backstopped by strong technical protections to enforce lending limits.

CDL is fundamentally the same as traditional library lending; it's just a better way of getting the book to the one patron who borrowed it.  Because every book in the Internet Archive's print collection has already been bought and paid for, everyone agrees the Internet Archive could loan those books by handing or mailing them to a patron.  The only difference is that the Internet Archive is loaning the books over the Internet.  Either way, the books on loan are not available to other patrons until they are returned.

1

CDL does not harm publishers or authors. Libraries have been around for thousands of years; they are older than copyright law itself. The publishing industry in the United States continues to thrive alongside widespread library lending. Never in the history of the United States have libraries needed to obtain special permission or to pay license fees to lend the books they already own. Thus, what the publishers who have coordinated to bring this lawsuit hope to obtain from this Court is not protection from harm to their existing rights. Instead, they seek a new right foreign to American copyright law: the right to control how libraries lend books. Such an outcome would disrupt libraries' longstanding right to lend the books they own and their ability to preserve and share much of our cultural heritage in digital form. Indeed, the publishers have not offered any evidence that Internet Archive's digital lending, or anyone else's, has cost them one penny in revenues. In fact, their overall profits have grown substantially, and sales of the works at issue in this case appear to have *increased*. Plaintiffs' own witnesses admitted that their theory of harm is "speculative" and simply an "inference one could make." And tellingly, Plaintiffs specifically instructed their expert not to try to measure any economic harm.

Against the (nonexistent) harm to the Plaintiffs' private interests, we weigh CDL's tremendous, documented public benefits. CDL makes it easier for patrons who live far from a brick-and-mortar library, or who have print disabilities, to access books. It supports research, scholarship, and cultural participation in myriad ways. For example, the Internet Archive's CDL program helps fight disinformation by facilitating ongoing easy access to authoritative sources for Wikipedia articles. It helps fight censorship by giving librarians a way to curate and share books banned by local school districts. It helps inspire new creativity by allowing researchers to curate and share the results of their investigations. Like all libraries, it helps the public discover new works that they love enough to purchase their own copies.

The need for broad digital access to a robust set of library resources is even clearer now, in the wake of the COVID-19 crisis.  In March of 2020, libraries and schools suddenly closed. With millions of print books locked away, the Internet Archive knew that the number of concurrent digital loans would not exceed the number of non-circulating print copies, and digital lending was the only practical way to get books to those who needed them.  In response to urgent pleas from teachers and librarians, and in consultation with the library community, the Internet Archive temporarily suspended technical enforcement of the one-to-one owned-to-loaned policy. The Internet Archive called this temporary program the "National Emergency Library."  Twelve weeks later, other options had emerged to fill the gap, and the Internet Archive was able to return to the traditional CDL approach.

The Internet Archive and the hundreds of libraries and archives that support it are not pirates or thieves.  They are librarians, striving to serve their patrons online just as they have done for centuries in the brick-and-mortar world.  Copyright law does not stand in the way of a library's right to lend its books to its patrons, one at a time.

## II.    STATEMENT OF FACTS

### A.    The Internet Archive is a nonprofit library.

#### 1.    Providing the public with access to knowledge has been a guiding mission of the Internet Archive for over a quarter century.

The guiding mission of the Internet Archive, a 501(c)(3) public charity, is to provide universal access to all knowledge.  Def.'s Rule 56.1 Statement submitted herewith ("Statement") ¶¶ 1–2.  In furtherance of that mission, over more than two decades, the Internet Archive has preserved, curated, and made available much of humanity's most important information.  *Id.* ¶ 3. In so doing, the Internet Archive has become a trusted resource for millions of people and institutions, and a model for other archives and libraries with similar goals.  *Id.* ¶ 4.

3

For example, one of the Internet Archive's first projects was to archive every public webpage on the fledgling World Wide Web.  Today, over a quarter century of web history is preserved and accessible through the Internet Archive's Wayback Machine, which has become a crucial database for journalists, researchers, lawyers, and courts.  *Id.* ¶ 5.  The Internet Archive also works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts.  *Id.* ¶¶ 6-10.

        **2.**      **The Internet Archive performs the traditional function of a library by lending its books to its patrons.**

This lawsuit concerns the Internet Archive's implementation of CDL, through which the Internet Archive digitizes its print books and lends them digitally to its patrons.  Statement ¶ 11.

In 2011, in partnership with over two dozen library systems including the Boston Public Library, the Internet Archive made an initial collection of more than 80,000 books available for digital lending.  *Id.* ¶ 12.  This effort was unanimously endorsed by all fifty state libraries through the Chief Officers of State Library Agencies ("COSLA").  *Id.* ¶ 13.  Since then, the Internet Archive has expanded its CDL implementation considerably.  Dozens more libraries have signed on as partners, and the collection has expanded to include more than three million books.  *Id.* ¶ 14.  The Internet Archive launched and expanded this program on the basis that it is fair use.  *Id.* ¶ 15.

### a.   The Digitization and Digital Lending Process

Once the Internet Archive acquires a print book (by purchase or donation)[1] that it wishes to make available for digital lending, the Internet Archive sends the book to a scanning center, where an operator carefully turns and photographs each page using a book-digitization device the Internet Archive developed called a Scribe.  Statement ¶¶ 18, 21, 24.  The print book is then placed in archival storage and its specific location carefully recorded.  *Id.*  ¶ 22.  The stored print book is non-circulating; it is not available to be accessed in print form.  *Id.* ¶ 23.

Anyone can become a patron of the Internet Archive—and digitally borrow books—without charge by signing up for an Internet Archive account.  *Id.* ¶ 25.  Doing so grants the patron a digital library card that lets them borrow up to ten books at a time from the collection, for limited periods of up to fourteen days.  *Id.* ¶ 26.

The Internet Archive offers its patrons several ways of engaging with a book they have borrowed.  *Id.* ¶ 27.  The patron can read the book in their web browser through a tool called BookReader, which lets that patron flip through pages, zoom in on images, enlarge text for easier reading, and search through the book.  *Id.* ¶¶ 28–29.  When finished, the patron may return (or "check in") the book; otherwise, the loan will automatically expire at the end of the loan period.

---

[1] A nonprofit that works closely with the Internet Archive, Open Library of Richmond, holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.  Statement ¶ 19.  For simplicity, regarding ownership of print books, we use the term "Internet Archive" to refer collectively to the Internet Archive and Open Library of Richmond. It is undisputed that the Internet Archive or Open Library of Richmond owns at least one lawfully made copy of each of the Works in Suit.  *Id.* ¶ 20.

At that point, the patron is no longer able to access the book, and it is once again available to be borrowed.  *Id.* ¶¶ 30–31.

Instead of reading books in their web browsers, patrons can choose to download an encrypted PDF or encrypted ePub version of the book onto their computer or device.  *Id.* ¶ 32. These files are secured using the same security system that Plaintiffs use to secure digital files of Plaintiffs' books: a type of "digital rights management" or "DRM" software created by Adobe. *Id.* ¶ 33.  The Adobe DRM allows only the authorized patron to download and read the borrowed book using authorized software and prevents the patron from copying or further distributing the book or from accessing it after their loan has ended.  *Id.* ¶ 34.

### b.     The Internet Archive's Lending Policies

The Internet Archive does not digitally loan all of the books it has scanned; instead, it implements a number of policies that limit the books available for digital lending. Statement ¶ 35.  As applicable here, to be available for digital lending, a digital book must have been scanned from a print copy owned by the Internet Archive.  *Id.* ¶ 36.  And it is the Internet Archive's policy not to lend books published within the previous five years.[2]  *Id.* ¶ 37.  This limitation is intended to exclude from lending the latest bestsellers, as a belt-and-suspenders accommodation to publishers; sales of a given book generally peak soon after publication and then rapidly decline.  *Id.* ¶¶ 38, 39–48.

---

[2] As a result of human error, two Works in Suit published in 2019—*All the President's Women: Donald Trump and the Making of a Predator* and *The Man Who Solved the Market*—were made available for digital lending.  Statement ¶ 49.  The mistake was rectified as soon as the Internet Archive realized the error.  *Id.*

Two factors determine the number of digital copies of a particular book that can be borrowed at any given time from the Internet Archive.  *Id.* ¶ 50.  First, the Internet Archive makes available one digital copy for each non-circulating print copy of a book it has in archival storage.  *Id.* ¶ 51.  Second, for any of those books the Internet Archive has made available for CDL, the Internet Archive works with dozens of library partners—from the University of Arizona to the Delaware County District Library in Ohio—to contribute their own non-circulating copies of that book toward the number of lendable copies.  *Id.* ¶ 52.  For example, if the Internet Archive has one non-circulating physical copy of *Little House on the Prairie*, and three partner libraries have each chosen to contribute a physical copy of *Little House on the Prairie*, then *Little House on the Prairie* could be digitally loaned to up to four patrons at a time.  Each concurrent loan would thus still be associated with one non-circulating physical copy.  If all four copies of *Little House on the Prairie* were checked out, patrons seeking to borrow *Little House on the Prairie* could join a waitlist until one or more copies were checked back in.  *Id.* ¶ 53.

### c.    Benefits to the Public

While any patron may borrow books via the Internet Archive, digital lending is particularly helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, and patrons who have print disabilities that make it more difficult to hold or read print books.  Statement ¶ 55.  Digital lending is also particularly helpful for brief or spontaneous access to books—for example, for checking citations or references, or looking up discrete facts—that wouldn't be worth a trip to a brick-and-mortar library.  *Id.* ¶ 56.  Recognizing these benefits, many libraries other than the Internet Archive digitally loan print books they own.  The International Federation of Library Associations and Institutions observed, in its position statement on the subject, that CDL "has helped to fulfil the

mission of libraries to support research, education and cultural participation within the limits of existing copyright laws." *Id.* ¶ 57.

Digital lending also allows the Internet Archive to promote education, research, preservation, and scholarship. *Id.* ¶ 58. Writers use books they have borrowed from the Internet Archive as a resource for inspiration or research for their own works. *Id.* ¶ 59. The Internet Archive has made knowledge resources like Wikipedia more reliable by enabling readers to confirm that books cited as authorities actually support the encyclopedia's entries. *Id.* ¶¶ 60, 63. In 2019, with funding from the U.S. Department of the Interior, the Internet Archive digitized and made available [books related to the incarceration of Japanese Americans during World War II.](#) (And indeed, the [Wikipedia article on the Internment of Japanese Americans](#) currently cites and links to 20 books available via CDL from the Internet Archive.) *Id.* ¶¶ 61–62. In 2022, a group of volunteer librarians curated collections of books that have been banned by school districts across the country but are still borrowable from the Internet Archive. *Id.* ¶ 66. These are only a few of the many examples documented by the Internet Archive of beneficial uses of its implementation of CDL.

**B.    At the beginning of the COVID-19 pandemic, when schools and libraries were closed, the Internet Archive launched the temporary National Emergency Library.**

At the beginning of the COVID-19 pandemic, and for many months thereafter, most schools and libraries were physically closed to prevent the spread of the coronavirus. Statement ¶ 67. School districts and university libraries reached out to the Internet Archive concerned that students and teachers could no longer physically access books—including assigned books that schools had already purchased. *Id.* ¶ 68. Libraries reached out to the Internet Archive worried about how they could best serve their communities when they could not physically loan out millions of print books now locked away. *Id.* ¶ 69. Indeed, by the Internet Archive's

estimation—based on data from the federal Institute of Museum and Library Services ("IMLS")—the closure of libraries took 650 million books out of circulation. *Id.* ¶ 70.

Hearing these pleas, the Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio. Since all of the libraries were closed, the Internet Archive reasoned, there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place. *Id.* ¶ 71. The Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently. (Indeed, Plaintiffs testified that negotiating workarounds for access issues caused by the pandemic took weeks and sometimes months.) *Id.* ¶¶ 72–73. The Internet Archive launched the National Emergency Library ("NEL") on March 24, 2020, intending for this temporary program to "run through June 30, 2020, or the end of the US national emergency, whichever is later." *Id.* ¶ 74.

Prior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement, and more than 100 institutions signed a statement in support of the temporary project. *Id.* ¶ 75. There was also widespread public support, including, for example, an article written by Jill Lepore in *The New Yorker* titled: "The National Emergency Library Is a Gift to Readers Everywhere." *Id.* ¶ 76. The Internet Archive believed then, and believes now, that under those unique circumstances, operating the NEL was lawful. *Id.* ¶ 77.

As expected, the NEL offered critical support to teachers, students, researchers, and readers who could not access their physical schools or libraries. *Id.* ¶ 78. When the University of Oklahoma campus shut down in spring of 2020, for example, students no longer had access to physical library books. Humanities instructor Laura Gibbs relied on the Internet Archive to provide her students access to books she had placed on reserve at the campus library before the

pandemic closures. *Id.* ¶¶ 79–80.  Through her use of the Internet Archive, Ms. Gibbs discovered additional relevant books for her students that were not otherwise available through the University of Oklahoma library system. *Id.* ¶ 81.

Half of English teacher Lauren Sherman's tenth grade students had left their copies of the Folger edition of *Much Ado About Nothing* in their lockers, which they were forbidden from accessing after the pandemic started.  In addition to giving students the option to re-purchase the book or to attempt to access their local public library's digital collection, Ms. Sherman was able to direct them to an online version to borrow through the Internet Archive. *Id.* ¶¶ 82–84.

When his university library shut down, Daniel Smith, a Ph.D. student at the University of Cambridge, similarly could not access the books he needed to write his dissertation.  He turned to the Internet Archive, where he was able to borrow primary and secondary source material and complete his dissertation on time. *Id.* ¶¶ 85–86.

The NEL also supported frontline workers.  Benjamin Saracco is a librarian at a hospital library affiliated with a medical school in New Jersey that serves doctors, nurses, medical students, and other healthcare workers. *Id.* ¶ 87.  In March 2020, the governor ordered buildings, including academic libraries, to be closed.  Mr. Saracco received a flood of requests from students, nurses, and doctors for information about COVID-19 and relevant patient care to address the high rate of hospitalization in the state. *Id.* ¶¶ 88–89.  With no access to physical library materials, Mr. Saracco was able to direct doctors and nurses to patient care training manuals available for borrowing from the Internet Archive via CDL. *Id.* ¶ 90.

Dozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about the ways they relied on the NEL during an uncertain time. *Id.* ¶ 91.

The Internet Archive's belief that the NEL's loaned copies would be fewer than the number of existing non-circulating physical copies proved to be correct. For example, the largest number of concurrent loans for any Work in Suit was for *The Lion, The Witch, and the Wardrobe*, at 888. *Id.* ¶ 92. Given that there are over 9,000 public library systems in the United States alone, thousands of which have at least one copy of that book and virtually all of which were closed during the NEL, the number of loans surely was smaller than the number of non-circulating copies even at that peak moment. *Id.* ¶¶ 93–95.

On June 16, 2020, when some libraries had begun to reopen, and this lawsuit had been filed, the Internet Archive shut down the National Emergency Library, twelve weeks after it launched. *Id.* ¶ 96.

### C.      The Publishers and the Works in Suit

The Plaintiffs are among the largest and most profitable book publishers in the United States, and they have enjoyed increasing profits in recent years. Statement ¶¶ 97–98. In 2020 and 2021, the publishing industry as a whole enjoyed record profits for electronic and physical formats of books. *Id.* ¶ 99.

When the four Plaintiffs filed suit against the Internet Archive in June of 2020, they selected 127 works (the "Works in Suit") on which to bring suit. *Id.* ¶ 100. The Works in Suit include non-fiction and fiction works and works from many genres (fantasy, children's, psychology, science, sports, biography, and others). All of the Works in Suit were, of course, published prior to being digitized and loaned by the Internet Archive. *Id.* ¶¶ 101–02.

Plaintiffs sell physical copies of books to libraries and readers. *Id.* ¶ 103. They also license electronic copies of books ("ebooks") to libraries and readers. *Id.* ¶ 104. These licenses include limitations that cause books to disappear from libraries' virtual shelves after a certain period or after a certain number of loans. *Id.* ¶¶ 105–09. Plaintiffs refuse to sell copies of

ebooks to libraries outright.  *Id.* ¶ 110.  Internet Archive purchases ebooks from other publishers who *are* willing to sell them outright and would purchase ebooks from Plaintiffs if they were willing to sell them.  However, Plaintiffs have declined each time Internet Archive has asked over the years.  *Id.* ¶¶ 111–13.

Those ebooks are distributed to patrons of libraries who have purchased licenses via "aggregators."  The ▮▮▮▮▮▮▮ OverDrive, which has ▮▮▮▮▮▮▮ of the U.S. public library ebook market share and which offers books through its Libby app, and which has seen increases in demand over the past five years.  *Id.* ¶¶ 114–15.  Relative to the library market for ebook licenses via aggregators like OverDrive, the number of Internet Archive checkouts is small.  For instance, from 2017 until March 23, 2020 (i.e., prior to the NEL), the number of checkouts of the Works in Suit from the Internet Archive was ▮▮▮▮▮ of the number of checkouts of the Works in Suit from OverDrive.  *Id.* ¶ 116.  Even including the period of the NEL, the total loan volume of Works in Suit from the Internet Archive was ▮▮▮▮▮▮▮ of the number of OverDrive checkouts.  *Id.* ¶ 117.

**D.    The undisputed facts reflect a lack of market harm.**

Analysis by two separate economists shows that the Internet Archive's lending practices have no negative effect on the market for the Works in Suit.  Statement ¶ 118.  When editions of the Works in Suit were first made available for borrowing from the Internet Archive via CDL, their corresponding print sales at retail did not decline relative to other books.  Indeed, when the Works in Suit were *removed* from the Internet Archive after this lawsuit was filed, their print sales slightly *worsened* relative to other books.  *Id.* ¶¶ 119–22.  Plaintiffs refused to produce data that would have enabled similar calculations regarding sales of consumer ebooks.  *Id.* ¶¶ 124–35.

The NEL provides a "natural experiment" from which one can draw conclusions about what effect the Internet Archive's lending practices would have (or not have) on the book market if those practices became widespread. Because the closure of all of the libraries and the suspension of one of the Internet Archive's usual technical controls permitted more concurrent digital loans than are otherwise possible, those events provide a window into a future in which digital lending of books libraries own is even more widely practiced. And they show that digital library lending, as practiced by the Internet Archive, has no negative effect on the market for or value of books. *Id.* ¶ 118. Specifically, unit sales did not decline while the NEL was in place, nor did they increase when the NEL shut down. *Id.* ¶¶ 121–22. Nor was there an increase in the number of checkouts of the Works in Suit from OverDrive when the NEL shut down. *Id.* ¶ 140.

Moreover, even if we assume that CDL reduced the necessity of paying for an ebook license for books available via CDL, and made books more than five years old more readily available for borrowing, libraries would not spend less money on acquisitions. *Id.* ¶ 148. In fact, most libraries spend their entire acquisitions budgets each year. *Id.* ¶ 151. So even in the event that CDL reduced spending on ebook licenses for older works, libraries would reallocate any savings to ebook licensing for newer titles or to purchasing print books. *Id.* ¶ 148. In other words, libraries would not spend any less money on publishers' products in any event.

Plaintiffs, for their part, have made no attempt to quantify any market harm.

## III.   LEGAL STANDARD

Courts grant summary judgment when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the central question is one of fair use. Because "the ultimate question whether [the undisputed] facts showed a 'fair use' is a legal question for judges to decide *de novo*," *Google LLC v. Oracle Am.,*

*Inc.*, 141 S. Ct. 1183, 1199 (2021), fair use cases are frequently amenable to decision on summary judgment. *Id*.

"In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.

This "list of factors is not exhaustive," and "some factors may prove more important in some contexts than in others." *Google LLC* at 1197 ("we have understood the provision to set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'") (citation omitted).

## IV. ARGUMENT

The argument proceeds in three parts.

*First*, we discuss why Internet Archive's implementation of Controlled Digital Lending, which uses technical controls to enforce a one-to-one owned-to-loaned ratio, is fair use.

*Second*, we discuss why, under the unique circumstances presented by the early days of the COVID-19 pandemic when nearly every copy of every library book was inaccessible, it was fair use to operate the National Emergency Library, which lent books digitally without technical enforcement of a one-to-one owned-to-loaned ratio.

*Third*, we discuss why, in the event the Court finds that either CDL or the NEL was not a fair use, it should remit statutory damages because Internet Archive "believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use." 17 U.S.C. § 504(c)(2).

A.      **The Internet Archive's implementation of Controlled Digital Lending is fair use.**

Controlled Digital Lending brings traditional library lending into the digital age, allowing library books to be more effectively used to benefit the public that bought them.  As set forth at length above in section II.A.2.c, digital lending serves the public interest by increasing access to and dissemination of knowledge, without harming the commercial interests of the publisher. That is the ultimate purpose of copyright: to encourage "the intellectual enrichment of the public." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (citation omitted).

In the sections that follow, with that purpose of copyright in mind, we turn to the four factors set forth in Section 107.  The purpose and character of the use strongly favors a finding of fair use because the use is wholly noncommercial; is transformative under the Second Circuit's fair use precedents; and furthers the ends of copyright's exhaustion doctrine.  The nature of the copyrighted works at issue does not materially affect the analysis because the works chosen by Plaintiffs are of all different types and were published years ago.  The amount of the works used is the entire book, since that is what it means to borrow a library book; the use of the whole is directly connected to the favored purpose of the use.  And there is no negative effect on the market for or value of the books at issue:  the record shows that CDL hasn't harmed Plaintiffs and won't harm Plaintiffs even if the practice becomes widespread.  Plaintiffs do not even attempt to quantify any such harm.

For all of these reasons, CDL satisfies the "ultimate test of fair use," which asks "whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' would be better served by allowing the use than by preventing it." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (cleaned up) (citations omitted).

### 1.      The first factor strongly favors fair use.

The first factor examines the commercial or noncommercial character of the use; the transformativeness of the use; and the relationship of the use to the purposes of copyright.  We address each of these issues in turn.

### a.      CDL is wholly noncommercial.

"There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use."  *Google LLC*, 141 S. Ct. at 1204.  The Internet Archive is a nonprofit organization that does not charge patrons of its digital library any fees at all, for any service, including borrowing books.  It is therefore not commercial in nature.  *See Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994), *as amended* (July 17, 1995) ("The commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work.").  Patrons' borrowing and private reading is also noncommercial in nature.  *Cf. Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449 (1984) ("time-shifting for private home use must be characterized as a noncommercial, nonprofit activity"); *id.* at 450 n.33.

It is hard to imagine a use that is less commercial than a 501(c)(3) public charity lending books for personal and noncommercial reading by individual members of the public.

### b.      CDL is a transformative use.

A transformative use "communicates something new and different from the original **or expands its utility**, thus serving copyright's overall objective of contributing to public knowledge."  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) (emphasis added).  The Internet Archive makes many transformative uses of the Works in Suit, such as indexing them for the purpose of searching, displaying short excerpts in response to searches and citations,

and supporting research in text and data mining.  Mindful of the Second Circuit precedent

directly on point with respect to these uses in the *Authors Guild v. Google* case, Plaintiffs chose

not to challenge any of those uses in this lawsuit, limiting their claims to digital lending.

But digital lending, too, is transformative.  Like the video recording technology at issue

in *Sony*, CDL "utilizes technology to achieve the transformative purpose of improving the

efficiency of delivering content without unreasonably encroaching on the commercial

entitlements of the rights holder."  *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177

(2d Cir. 2018) (describing the *Sony* court's "apparent reasoning"); *see Capitol Recs., LLC v.

ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018) (identifying the use in *Sony* as being among the

"utility-expanding transformative fair uses" that courts had recognized).

By delivering library books to one patron at a time over the Internet, CDL makes the

delivery more efficient than physically handing or mailing that same print book, as would be

necessary without that technology.  That is at least as transformative as the use at issue in *Sony*,

which held that it was fair use to make copies of movies shown on television in order to watch

them at a more convenient time, even where the improvement in content delivery was simply

"copying to avoid interrupting a poker game."  *Sony*, 464 U.S. at 455 n.40.

And as Judge Pierre Leval later explained, the use in *Sony* was achieved "'without

unreasonably encroaching on the commercial entitlements of the rights holder' because the

improved delivery was to one entitled to receive the content."  *ReDigi*, 910 F.3d at 661 (quoting

*TVEyes*, 883 F.3d at 177).  In *Sony*, the copying at issue "merely enable[d] a viewer to see such a

work which he had been invited to witness in its entirety free of charge" at the time of its original

over-the-air broadcast.  464 U.S. at 449.  The person gaining more efficient access to the content

in *Sony* did not have any special or commercial relationship with the content or with the

copyright holder; they were "entitled to receive the content" simply by virtue of being in a place where they could receive a broadcast television signal with an antenna.  There was no limit in *Sony* to the number of viewers who could concurrently view a particular program, either at the time of its broadcast or at a later more convenient time made possible by the allegedly infringing copying at issue in that case.

Here, the patron who digitally borrows a library book via CDL has an even more specific entitlement to receive that content:  that patron is *the one person in the world* who is then borrowing that particular, bought-and-paid-for library book.  Just as a patron who borrows a library book physically is entitled to read it, so is a patron who borrows that same library book by a more efficient, digital method.

Moreover, the transformativeness of the Internet Archive's digital lending is not limited to increased efficiency or convenience.  The Internet Archive's CDL program facilitates new and expanding interactions between library books and the web:  writers of Wikipedia articles, for example, can borrow books from the Internet Archive's collection, and then link from their article to the particular page in the particular book that supports a particular fact.  Statement ¶ 60. There are 202,026 citations in Wikipedia articles in English that link to books available to borrow from the Internet Archive via CDL, and those links lead to 88,284 different books. *Id.* ¶ 61.  These include the [Wikipedia article on World War II](#) which cites, and links to, 48 different CDL books, all of which can be digitally borrowed with a click to check references or research in greater depth.  *Id.* ¶ 64.  Even a partial listing of the CDL books cited in Wikipedia articles, limited to articles that cite 10 or more such books, goes on for more than three hundred single-spaced pages.  *Id.* ¶ 65.  This capability helps fight misinformation by providing direct links to authoritative sources, that support an accurate, verifiable factual record.  It contributes to

the creation of new works—Wikipedia articles and other fruits of library research—in a way that is even more direct than traditional systems of research and citation. *Id.* ¶¶ 56–57.

Thus, the Internet Archive's lending practices are "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Google LLC*, 141 S. Ct. at 1203.

### c.      CDL helps fulfill the goals of copyright's exhaustion doctrine.

Copyright's exhaustion doctrine (sometimes referred to as "first sale"), which limits the control a copyright holder can exert over the use of a copy once it has sold that copy, also favors the purpose and character of CDL. This "common-law doctrine with an impeccable historic pedigree," *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013), enables libraries to advance the purposes of copyright law by purchasing copies of works and then loaning them to their patrons. In 1976, Congress approved this judge-made doctrine, codifying a first sale right in Section 109 of the Copyright Act. Because this codification predated the spread of digital copyrighted works, however, it focused on the distribution and display rights, not the reproduction right that is implicated by digital lending.

Fortunately for the public, that does not mean these new forms of lending are unlawful. As the Supreme Court noted in *Sony*, where "Congress has not plainly marked our course, [courts] must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests." 464 U.S. at 431. Such circumspection is appropriate here, given the exhaustion doctrine's deep roots in copyright jurisprudence. Indeed, while Section 109 does not expressly encompass the reproduction right, neither does it abrogate the common-law principle favoring the ability of the owner of a copy to freely give,

19

sell, or lend it.[3]  To the contrary, Congress "intended to retain the substance of the common law"

of exhaustion when it enacted Section 109.  *Kirtsaeng*, 568 U.S. at 538 (citation omitted).

Because Section 109 does not address the reproduction right implicated by digital

lending, the fair use doctrine steps in to ensure that the substance of the common-law exhaustion

rule survives technological changes in the way copyrighted works are loaned and read.  Indeed,

this is one of the principal purposes of the fair use doctrine:  to avoid applications of copyright

law that would elevate form over substance, operating contrary to the ultimate purpose of

copyright:  "the intellectual enrichment of the public."  *Cariou*, 714 F.3d at 705.

Moreover, the Second Circuit Court of Appeals has recognized that uses that advance the

purposes of narrower statutory exceptions and limitations are *more* likely to be protected under

Section 107, because they further the guiding principles behind the Copyright Act.  In *Authors*

*Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (2d Cir. 2014), for example, the court addressed a

copyright claim against a nonprofit library book-digitization program that made books available

to the visually impaired but did not fall within the specific copyright exception for visually

impaired people (the Chafee Amendment).  As part of its fair use analysis, the court reasoned

that "the Chafee Amendment illustrates Congress's intent that copyright law make appropriate

accommodations for the blind and print disabled."  *Id.*  That intent, the court concluded,

supported a fair use finding.  *Id.*  Likewise, here, the existence of Section 109 and its intent to

secure libraries' right to lend books they own favors a finding of fair use.

---

[3] In *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 664 (2d Cir. 2018), the court held that

because that statute addresses distribution but not reproduction, Section 109(a) does not provide

an independent defense to a reproduction claim.  The *ReDigi* court did not address the impact of

the exhaustion doctrine on the fair use inquiry.

Further, the common-law doctrine of exhaustion can encompass reproduction of copyrighted material in some circumstances.  In *Doan v. American Book Co.*, 105 F. 772 (7th Cir. 1901), for example, the defendant reproduced new copies of the cover of a children's schoolbook which featured a "unique design, catching the eye."  *Id.* at 777.  The copyright holder claimed that this sort of restoration of worn books infringed its copyright because the new copies would undermine the market for replacement copies.  The Seventh Circuit Court of Appeals held that the exhaustion doctrine barred the copyright claim, even though some reproduction was involved:  "A right of ownership in the book carries with it and includes the right to maintain the book as nearly as possible in its original condition, so far, at least, as the cover and binding of the book is concerned."  *Id.*

Finally, the right to engage in reproduction in order to facilitate library lending is also, at least in one form, specifically identified as an example of fair use in the legislative history of the Copyright Act, which lists "reproduction by a library of a portion of a work to replace part of a damaged copy" as a paradigmatic fair use.  Declaration of Joseph C. Gratz submitted herewith ("Gratz Decl."), Ex. II, H.R. Rep. No. 94-1476, at 65 (1976).

CDL is noncommercial.  It is transformative.  It furthers the purposes of well-established copyright jurisprudence and the public interest.  Factor one favors fair use.

### 2.     The second factor is neutral.

The second factor "has rarely played a significant role in the determination of a fair use dispute," *Authors Guild*, 804 F.3d at 220, and this case is no exception.  The analysis turns on two questions:  whether the copyrighted work is factual or fictional works, and whether it is published or unpublished.

### a.      Factual versus Fictional Works

In some fair use cases, the factual versus fictional nature of the copyrighted work at issue plays a role in the court's analysis.  *See, e.g.*, *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985) ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.").  In *Authors Guild v. Google*, however, the Second Circuit Court of Appeals expressly disavowed this consideration where, as here, the use concerned a large number of books on wildly varying topics.  The factual or fictional nature of the books at issue did not "change in any way [its] appraisal" in such a case.  *Authors Guild*, 804 F.3d at 220.  Because the challenged practice was applied to books "of every type of work imaginable," the "fair-use analysis hinges on the other three factors."  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d at 98.  The same is true here:  the 127 Works in Suit are of many different types, and their factual or fictional nature does not impact the fair use inquiry.

### b.      Published versus Unpublished Works

The scope of fair use is broader with respect to published works, and narrower with respect to unpublished works.  *Harper & Row*, 471 U.S. at 564.  That is because "the author's right to control the first public appearance of his expression weighs against such use of the work before its release," *id.*, since the use of an unpublished work risks "supplanting the copyright holder's commercially valuable right of first publication."  *Id.* at 562.  Where a work has already been "widely published," by contrast, that fact "weighs a bit in favor of fair use."  *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 325 (S.D.N.Y. 2008).

Here, all of the Works in Suit were widely published and almost all were published five or more years before the Internet Archive made them available for digital lending.  Statement ¶ 37.  Accordingly, far from interfering with an "author's right to control the first public appearance of his expression" or "the copyright holder's commercially valuable right of first

publication," *Harper & Row*, 471 U.S. at 562, the use at issue here was deliberately limited to works that had long been broadly disseminated. Thus, this consideration weighs at least "a bit in favor of fair use." *Lennon*, 556 F. Supp. 2d at 325.

Because the factual versus fictional nature of the Works in Suit does not impact the fair use inquiry, and the published versus unpublished nature of the Works in Suit weighs slightly in favor of fair use, the second factor is at least neutral.

### 3.      The third factor is neutral.

The third factor favors fair use where the amount of the original work used is "reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). In other words, it asks whether the challenged use "employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor." *HathiTrust*, 755 F.3d at 96. "For some purposes, it may be necessary to copy the entire copyrighted work, in which case Factor Three does not weigh against a finding of fair use." *Id.* at 98.

For example, the copying of entire books was held to be fair use in both *Authors Guild v. Google* and *Authors Guild v. HathiTrust*; the copying of entire movies was held to be fair use in *Sony*. In each of those cases, the copying of the entire copyrighted work was necessary to effectuate the favored purpose and character of the defendant's use. If Google had only scanned part of the books, it would not have been able to compile a comprehensive search index; if HathiTrust had only scanned part of the books, it would not have been able to make the books readable by the visually impaired; if Sony's VCR could only record part of a movie, it would be useless for noncommercial time-shifting.

Just so here. Borrowing a book from a library necessarily entails borrowing the whole thing. If the Internet Archive only loaned *part* of a book, the patron that borrowed the book

would not be able to read the whole book, as any other patron who borrows a book at a library can.  Because the purpose of nonprofit library lending is a purpose for which it is "necessary to copy the entire copyrighted work," this is a case in which "Factor Three does not weigh against a finding of fair use."  *HathiTrust*, 755 F.3d at 98.

### 4.    The fourth factor favors fair use.

The fourth fair use factor examines "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.  The fourth factor requires courts "to balance the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied."  *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021), *cert. granted*, 142 S. Ct. 1412 (2022) (quoting *Wright v. Warner Books, Inc.*, 953 F.2d 731, 739 (2d Cir. 1991)).  "The less adverse effect that an alleged infringing use has on the copyright owner's expectation of gain, the less public benefit need be shown to justify the use."  *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d Cir. 1981).  *See also, e.g.*, *Sony*, 464 U.S. at 454 (contrasting the lack of evidence of financial harm to the copyright holders against "the fact that to the extent time-shifting expands public access to freely broadcast television programs, it yields societal benefits.").

As discussed above in section II-A-2-c, the magnitude of the public benefit that flows from CDL is massive and would outweigh any market harm—*if any such harm occurred*.  The undisputed record shows that it did not and will not.  As discussed below, the available data show that Internet Archive's implementation of CDL has not negatively affected the market for the Works in Suit and would not have such an effect if it became widespread.  Moreover, there is no licensing market for CDL, and incentives to publish new books would be unaffected even if CDL caused libraries to reallocate their expenditures toward newer books.

### a.      CDL has had no negative market effect.

Where there is no actual or likely future loss of revenue to copyright holders from the challenged practice, the inquiry ends and the fourth factor does not weigh against a finding of fair use, since "a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony*, 464 U.S. at 450–51.

CDL is such a use.  In a copyright lawsuit against a practice that has continued for years, one would expect the copyright holder to be able to point to some metric showing that the defendant's conduct has harmed them.  Yet Plaintiffs have failed to quantify *any* market harm from CDL.  And there's a good reason:  because the lending, licensing, and sales data demonstrate that no such harm has occurred or is likely to occur.

There is no evidence that CDL has harmed the market for the Works in Suit.  In fact, the available data shows that people don't buy fewer copies of a book when that book is available for borrowing via CDL.  Statement ¶ 121.  Expert analysis of print sales for each of the Works in Suit shows that there was no noticeable dip in unit sales of print formats of the Works in Suit when those works became available for CDL borrowing via the Internet Archive.  *Id.* ¶ 118. (Defendant requested in discovery, but Plaintiffs refused to produce, the data needed to do the same analysis with respect to sales to consumers in ebook format.  *Id.* ¶ 124.)  In fact, when the Works in Suit were *removed* from the Internet Archive after this case was filed, their sales *worsened* slightly.  *Id.* ¶ 122.  As with other lending programs, this effect may be the result of the "discovery" book lending enables:  patrons decide they enjoy the books they have borrowed enough to purchase those books and recommend them to others.  *See id*. ¶ 152.

The lack of market harm is not surprising.  The lending numbers from the Internet Archive for the Works in Suit are small relative to the size of the library market for ebooks.

From 2017 until the NEL began in March 2020, the number of checkouts of the Works in Suit from the Internet Archive was ███████████ of the number of checkouts of the same titles from OverDrive. *Id.* ¶ 116. (During the NEL period, the relative total remained small████ ███. *Id.* ¶ 117.) This small number relative to OverDrive is meaningful, as OverDrive is responsible for ███████████ of the library ebook license market. *Id.* ¶ 114.

Nor does CDL depress revenues for ebooks from the library channel in particular. Over the last five years, while the Internet Archive has been actively lending digitized books to its patrons, demand for ebooks from libraries has only increased. *Id.* ¶ 150.

### b.   Widespread CDL would not cause market harm.

The fourth factor analysis also considers whether, if a practice became "widespread," it would *then* "result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (cleaned up) (citation omitted). In many cases, that impact can be hard to predict. Here, however, the parties and the Court can assess what widespread digital borrowing would look like, and what effect it would have on the market, based on the snapshot provided by the NEL. It provides a "natural experiment" about what would happen if CDL became widespread. During the NEL, the number of copies available for digital borrowing was limited only by patron demand. If an effectively unlimited number of patrons could borrow a digitized book at the same time, in the manner in which Internet Archive digitally lends books, would that have an effect on the market?

Examining the question from different angles, two experts came to the same answer: No. Additional borrowing of digitized books, including the Works in Suit, *had no statistically significant effect on the book marketplace*.

26

### i.      Dr. Reimers' Analysis

Dr. Reimers examined the sales rankings of the Works in Suit on Amazon and how those rankings changed (i) over the course of the NEL and (ii) before and after the book was removed from the Internet Archive entirely.  Statement ¶¶ 119, 122.  Historical Amazon ranking data is particularly helpful because it shows how an edition of a book is performing *relative* to other works, so industry-wide changes don't affect the results.  *Id.* ¶ 120.  Here, the data show that not only did Works in Suit not drop in rank when the NEL began, the Amazon rankings for the Works in Suit actually *improved*—by about 2%—almost immediately.  *Id.* ¶ 138.  Those rankings remained at that level while the NEL was in operation and worsened shortly after the books were removed from the Internet Archive.  *Id.* ¶¶ 121–22.

Dr. Reimers considered whether the observed improvement in rankings was "seasonal"—in other words, attributable to factors other than availability of the book for borrowing.  She looked at the behavior of Amazon rankings of the Works in Suit during same time period the year prior.  The rankings behaved similarly, strongly suggesting that the NEL and additional circulation of digitized books did not have any effect at all on sales rankings—and thus revenues—of the Works in Suit.  This analysis shows that Plaintiffs' fears about widespread CDL harming their bottom line are unfounded.  Even when many patrons could borrow a book concurrently, loaning digitized books did not affect book sales.  *Id.* ¶¶ 136–39.

There is a good reason that a work's availability for digital lending through the Internet Archive is unlikely to cause a noticeable decrease in demand.  Libraries lend books as soon as they are published.  *Id.* ¶ 153.  But the Internet Archive makes a digitized book available for the first time to its patrons long after the publisher has probably sold the vast majority of the copies it will ever sell.  As discussed above, for the overwhelming majority of its books, the Internet Archive waits *five years* after the date of publication of the title to make it available for

27

borrowing.  Sales of most titles decay significantly within *just one year* of first publication.

*Id.* ¶ 48.

### ii.      Dr. Jørgensen's Analysis

Dr. Jørgensen came to the same conclusion, but by a different route.  He observed that,

despite the removal of the Works in Suit from the Internet Archive around the shutdown of the

NEL, there was no concurrent increase in OverDrive checkouts of those same titles.  Statement

¶¶ 140-41.  Instead, there was a ███████████ in OverDrive checkouts after the NEL ended.  *Id.*

Nor, according to the available data, did the removal of the Works in Suit from lending

coincide with any increase in print and ebook sales of the Works in Suit.  Because only Hachette

produced monthly sales data—and even then, only for 2020—Dr. Jørgensen limited his analysis

to the effect of the closing of the NEL on sales of Hachette's Works in Suit from vendors that he

concluded would capture sales in the United States.  *Id.* ¶¶ 142-43.  He observed that Hachette's

sales of paperback formats of the Works in Suit *decreased* by approximately 21%, and sales of

ebook formats of the Works in Suit *decreased* by approximately 29% from the second quarter of

2020 (when the NEL was operating) to third quarter of 2020 (after the NEL closed).  *Id.* ¶ 144.

Given the lack of a corresponding increase in OverDrive loans or print and ebook sales,

Dr. Jørgensen concluded that no evidence supported Plaintiffs' theory that the Internet Archive's

digitized Works in Suit acted as competing market substitutes.  *Id.* ¶ 145.

### c.      Against this affirmative evidence, Plaintiffs provide only conjecture and innuendo.

The record is overwhelming:  CDL has not and will not harm the Plaintiffs' market.

What concrete evidence do Plaintiffs present in response, with a decade of industry data from

which to draw?

Nothing.

Plaintiffs' expert offers only conclusory generalities, because Plaintiffs' counsel *instructed him not to attempt to quantify any harm* from CDL.  Gratz Decl. Ex. EE, Prince Dep. Tr. 52:16–53:22; 202:23–203:10.  The strongest opinion he offers is that "there's reason to believe that those numbers are not de minimis."  *Id.* at 54:9–16.  But he doesn't analyze any actual numbers.  Statement ¶ 146.  Instead, he relies entirely on what he calls "theoretical reasoning" about what his view of economic theory would predict, untethered to the evidence in this case about what actually happened.  *Id.* at 230:4–5.

Nor do Plaintiffs themselves claim to have any facts about harm.  Statement ¶ 147.  One 30(b)(6) designee candidly admitted, that when it comes to market harm, "I don't have any evidence."  Gratz Decl. Ex. N, Dye Dep. Tr. 106:3–107:13.  Another 30(b)(6) designee admitted that trying to identify harm would be "speculative because you can't truly directly make that correlation, meaning, again, I—we can't tell, you know, why somebody borrowed a book versus buying the book."  *Id.* Ex. FF, Lazarus Dep. Tr. 38:12–22; *id*. at 27:9–12 (Hachette has conducted no analysis of any harm).  A third agreed, conceding with respect to substitution: "But there's no, you know, there's no factual analysis.  It's just one inference one could make."  *Id.* Ex. GG, Restivo-Alessi Dep. Tr. 224:7–225:9.

In sum, against two experts' careful analysis of specific data, Plaintiffs offer only conjecture.  That is not sufficient to tilt the fourth factor against a finding of fair use.  Indeed, given that Plaintiffs presumably have access to reams of market data and have had years to develop concrete evidence, their failure to do so helps tilt this factor decidedly in *favor* of fair use.

**d.     There is no licensing market for CDL.**

Libraries in the United States have never needed a license to lend books they own to their patrons.  The "customary price" a library pays for the right to lend a book is already included in

the price the library paid to buy the book.  Here, it is undisputed that Internet Archive owns lawfully made copies of each of the Works in Suit.  Statement ¶¶ 18, 20.  The publishers have received the price they demanded when they sold the copies that Internet Archive owns and, in return for that price, Internet Archive gained full ownership of those copies.  And ownership of a copy by a library includes the right to lend that book to one patron at a time.

It is not news that publishers would *like* to receive additional money every time a library lends a book.  That desire has been brought to Congress periodically over the past fifty years, and Congress has chosen not to act upon it.  *See, e.g.*, *A bill to establish a commission to study and make recommendations on methods for compensating authors for the use of their books by libraries*, H.R. 4850, 93rd Cong. (1973); *A bill to establish a commission to study and make recommendations on the desirability and feasibility of amending the copyright laws to compensate authors for the not-for-profit lending of their works*, S. 658, 99th Cong. (1985).  In this country, libraries do not need to ask a publisher's permission or pay an extra fee to lend books they bought and paid for.

Plaintiffs may argue that the market for library ebook licenses through aggregators like OverDrive shows that libraries are willing to pay to lend books digitally.  But what libraries are paying OverDrive for is not the right to lend a copy the library owns.  Library ebook licenses do not require a library to maintain a non-circulating copy for each concurrent loan of a book; they are not tied to what print books the library owns or what the library does with them.  A library that owns a dozen copies of *Catcher in the Rye* in storage pays the same price to make *Catcher in the Rye* available to its patrons via OverDrive as a library that owns no copies of that book. Statement ¶¶ 106–09.

OverDrive lending is like Netflix, but with books; what is available at any given time depends on what the publishers decide to make available. That means libraries cannot develop a permanent collection that the publishers can't take away. Indeed, the library never itself possesses even an ephemeral copy of books that patrons access via OverDrive. In short, the existing library ebook market provides a service that is useful for some libraries, but it is quite different from library lending of print books the library actually owns, to one patron at a time, whether that lending is by physical means or by digital means.

When it comes to digital lending of books a library owns to one patron at a time, there is no evidence of any licensing market whatsoever. American libraries have never paid a publisher for a license to digitally lend a book the library owns to one patron at a time. And this has remained true even as digital lending of purchased print books has become a more widespread library practice. Statement ¶ 54. *See, e.g.*, HathiTrust, *Emergency Temporary Access Service*, https://www.hathitrust.org/ETAS-Description (last visited July 4, 2022) (describing a system by which more than 200 academic libraries enabled digital lending of books in their physical collections during the COVID-19 pandemic); Carnegie Mellon University Libraries, *Introducing Controlled Digital Lending*, https://www.library.cmu.edu/about/news/2020-10/introducing-controlled-digital-lending (last visited July 4, 2022) (describing use of CDL at Carnegie Mellon); Michigan State University Libraries, *Controlled Digital Lending at Michigan State University*, https://www.slideshare.net/BaltimoreNISO/weller-and-lndsay-case-study-on-implementation-of-cdl (last visited July 4, 2022) (describing use of CDL at Michigan State); Caltech Library, *Implementing Controlled Digital Lending as a Core Library Service*, https://www.cni.org/wp-content/uploads/2021/03/CNI_Implementing_Davison.pdf (last visited July 4, 2022) (describing use of CDL at Caltech); National Information Standards Organization, *Interoperable System of*

*Controlled Digital Lending*, https://www.niso.org/standards-committees/is-cdl (last visited July 4, 2022) (describing standards body's work to establish technical standards for "CDL as a natural extension of existing rights held and practices undertaken by libraries for content they legally hold."); Project ReShare, *Project ReShare and Stanford Libraries Launch Controlled Digital Lending Implementers Group*, https://librarytechnology.org/pr/25314 (last visited July 4, 2022) (describing organization for librarians working to implement CDL in their respective libraries).

"Only an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994) (cleaned up).  There is no *traditional* market for publishers to license borrowing via CDL; no such license has ever existed.  There is no *reasonable* market for publishers to license borrowing via CDL; libraries have already bought and paid for these books, and there is no good reason they should pay again.  And there is no *likely-to-be-developed* market for publishers to license borrowing via CDL; the fact that no such market has developed over the decade that libraries have been practicing CDL is a strong indication that the future will be like the past.

> **e.    Even if CDL displaced some book sales or licenses, the fourth factor would still weigh in favor of fair use because any market harm to particular books would not affect incentives to publish.**

For the market harm factor to tilt against fair use, it is not enough for an allegedly infringing use to merely cause a decline in sales, because harms that do not offend the purposes of copyright are not "cognizable" under the fourth factor.  *Campbell*, 510 U.S. at 591–92.  That is because "a potential loss of revenue is not the whole story," and courts "must consider not just the amount but also the source of the loss."  *Google LLC*, 141 S. Ct. at 1206.  Courts must focus

on market effects that would "frustrate the purposes of copyright by materially impairing [rightsholders'] incentive to publish the work." *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014). "Copyright should not grant anyone more economic power than is necessary to achieve the incentive to create." *Google LLC*, 141 S. Ct. at 1198 (cleaned up) (quoting Nat'l Comm'n on New Tech. Uses of Copyrighted Works ("CONTU") Final Report 11, 12 (July 31, 1978)).

As discussed above, analysis of Internet Archive and OverDrive lending data shows that CDL has no effect on licensed ebook lending via OverDrive. But a factual dispute about that question would not be material to the fourth-factor analysis. The undisputed facts show that publisher revenues from libraries would likely remain constant even if CDL caused a library to purchase fewer ebook licenses for some titles. As former director of the federal Institute of Museum and Library Services, Susan Hildreth, explains in her expert report, "[E]ven if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions." Hildreth Decl. Ex. 1 ¶ 106 (Hildreth Rpt.). Instead, libraries "would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books." *Id.* "With CDL in place in libraries throughout the United States, libraries would have additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products." *Id.* ¶ 109; Statement ¶ 149.

Because the practice at issue in this case is the digital lending of books *more than five years old*, it is conceivable (though very unlikely) that libraries might spend less on books *more than five years old* if that practice became widespread. But if they did, they would reallocate that

money to spend more on books *less than five years old*, that were not available for digital

lending.  There is no reason to think that such a reallocation, were it to occur, would negatively

affect incentives to publish new books; if anything, it would enhance those incentives, because

libraries would be spending more money on new books and less money on old books.  *Id.* ¶ 148.

Factor four tilts firmly in favor of fair use.

### B.     The temporary National Emergency Library was also a lawful fair use.

When the pandemic began in spring of 2020, the Internet Archive fielded numerous

requests from students, scholars, and educators concerning the obstacles to access the pandemic

presented.  Children were unable to access copies of their books in their school lockers, and

students and scholars at universities were unable to access print books at their libraries.

Statement ¶¶ 67–68.  Multiple libraries reached out to the Internet Archive and explained that

their entire physical collections—by the Internet Archive's estimation using IMLS data, 650

million books—were not circulating.  *Id.* ¶¶ 69–70.  Moreover, the pandemic created an

emergency need for reliable information that was also easily accessible.  For instance, health care

professionals looked to the Internet Archive to digitally borrow works like *Basic Life Support for

Health Care Providers* and the *Advanced Cardiovascular Life Support Provider Manual*.

*Id.* ¶ 90.

In those unique circumstances, the Internet Archive reasoned that the technical controls

limiting the number of concurrent lends to the number of non-circulating copies Internet Archive

or its partner libraries had on hand was not necessary.  *Id.* ¶ 71.  Given the massive number of

books sitting idle on library shelves, doing so would not increase the number of copies of books

in circulation above the number of copies libraries had bought and paid for.  *Id.* ¶¶ 92–95.  The

Internet Archive still imposed the full array of other protections—lending books for limited

periods, using DRM software to protect the books from being kept outside that loan period, and so on. *Id.* ¶¶ 34–35.

      And under those unique circumstances, lending books in that way was fair use. As with CDL, analysis of the data reflects that the publishers did not actually lose out on any revenues as a result of the NEL. But even if they had, the public benefits of reuniting students with the books locked up in their shuttered classrooms, and reuniting the public with the books locked up in their shuttered libraries, justified that temporary measure.

      Applying the fair use factors, the first factor analysis set forth in the balance of the brief is even stronger with respect to the NEL, because the purpose and character of the use was to provide temporary access to books during a public health emergency, and in fact the number of concurrent loans during the NEL appears to have been well below the number of inaccessible physical copies even at its peak. The second and third factor analysis is the same. And as to the fourth factor, as discussed above in section IV-A-4-b, there is no evidence of market harm from the NEL.

      As the headline on Jill Lepore's article in The New Yorker read: "The National Emergency Library Is a Gift to Readers Everywhere." It was—and it was a fair use.

    **C.**    **If the Court finds the Internet Archive's digital lending was not fair use, it should remit statutory damages pursuant to Section 504(c)(2).**

      For the reasons explained above, the Internet Archive's digital lending is fair use. However, if this Court determines the Internet Archive's lending of digitized books, through its CDL program or its temporary NEL, were not fair, the Court should remit any award of statutory damages because the Internet Archive had a good faith basis for believing each program was fair use.

Under section 504(c)(2), a court "shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was . . . an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment, or such institution, library, or archives itself, which infringed by reproducing the work[.]"  In addition, it is *the plaintiff's* burden to prove that the defendant *did not* believe and did not have reasonable grounds for believing that the use was fair use.  Gratz Decl. Ex. II, H.R. Rep. No. 94-1476, at 163 ("It is intended that, in cases involving this provision, the burden of proof with respect to the defendant's good faith should rest on the plaintiff.").

The Internet Archive—through its Digital Librarian, Brewster Kahle—has always believed its implementation of CDL and the NEL was fair use.  Statement ¶¶ 15, 77.  In developing and maintaining that belief, Mr. Kahle and the Internet Archive relied on *A White Paper on Controlled Digital Lending of Library Books*.  That paper was authored by Dave Hansen, then the Associate University Librarian and Lead Copyright & Information Policy Officer for Duke University, and Kyle Courtney, then a copyright advisor for Harvard University Library—all copyright scholars that the Internet Archive knew to be respected in their fields.  That analysis concludes that "there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use."  *Id.* ¶ 16.

The Internet Archive also relied on the *Position Statement on Controlled Digital Lending*.  This document was co-authored by Mr. Courtney; Mr. Hansen; Mary Minow, then affiliated with the Berkman Klein Center for Internet and Society at Harvard University; Jason Schultz, a Professor of Clinical Law at New York University School of Law; and Michelle Wu, then a law

professor and Director of the Law Library at the Georgetown University Law Center.  Lila

Bailey, the Internet Archive's most senior lawyer, was also a co-author of this statement.  The

Internet Archive understood all co-authors of the *Position Statement* to be well-respected

copyright scholars.  Dozens of copyright law professors and scores of libraries and library

associations became signatories to the statement, including the Association of Research

Libraries, Boston Public Library, Los Angeles Public Library, the Metropolitan New York

Library Council, and the Chief Officers of State Library Agencies, representing the state

librarians of all fifty states.  *Id.* ¶ 17.

The Internet Archive also believed that the temporary NEL was fair use.  *Id.* ¶ 77.  The

program was needed to alleviate significant access issues imposed by the pandemic, and the

program was initiated after the Internet Archive received a flood of requests from students,

teachers, and librarians.  *Id.* ¶¶ 67–70.  Indeed, over 100 libraries signed a statement in support

of the NEL.  *Id.* ¶ 75.  And Mr. Kahle believed—correctly, as it turns out—that the number of

concurrent loans via the NEL would never actually exceed the number of copies that were

prevented from circulating due to the widespread emergency closure of libraries.  *Id.* ¶¶ 71, 92–

95.  Providing additional access to books, in the context of the pandemic, provided a needed

public service, and Mr. Kahle believed—correctly—that doing so was fair use.

## V.    CONCLUSION

The purpose of copyright law is to encourage creation and enrich the public commons.

By facilitating public access to books—without harming the market for them—Internet

Archive's digital lending advances that goal.  The Court should grant summary judgment for

Defendant.

Dated:  July 7, 2022                    DURIE TANGRI LLP


                                        By:            */s/ Joseph C. Gratz*
                                           Joseph C. Gratz (*Pro Hac Vice*)
                                           Jessica E. Lanier (*Pro Hac Vice*)
                                           Aditya V. Kamdar (*Pro Hac Vice*)
                                           Annie A. Lee (*Pro Hac Vice*)
                                           217 Leidesdorff Street
                                           San Francisco, CA 94111
                                           (415) 362-6666
                                           jgratz@durietangri.com
                                           jlanier@durietangri.com
                                           akamdar@durietangri.com
                                           alee@durietangri.com

                                           ELECTRONIC FRONTIER FOUNDATION
                                           Corynne McSherry (*Pro Hac Vice*)
                                           Kit Walsh (*Pro Hac Vice*)
                                           Cara Gagliano (*Pro Hac Vice*)
                                           815 Eddy Street
                                           San Francisco, CA 94109
                                           (415) 436-9333
                                           corynne@eff.org
                                           kit@eff.org
                                           cara@eff.org

                                           Attorneys for Defendant
                                           INTERNET ARCHIVE

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the following statements are true:

This brief complies with the formatting rules of the Individual Practices of Judge John G. Koeltl Section II.D and the Court's Order regarding word count (ECF No. 80).  It has been prepared using a proportionally spaced typeface using Microsoft Word 2016 in 12-point Times New Roman font and includes 11,979 words.

*/s/ Joseph C. Gratz*

JOSEPH C. GRATZ

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ
