IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>　　　　　　　　Defendants. | Case No. 1:20-CV-04160-JGK |

**REPLY EXPERT REPORT OF SUSAN H. HILDRETH**

**ATTORNEYS' EYES ONLY**

After completing my initial expert witness report on February 25, 2022, I received a copy of the expert witness report of Jeffrey T. Prince. The Internet Archive ("IA") asked me to review this expert witness report and to determine whether I should rebut any portion of it. I indeed do find that Dr. Prince's report warrants a rebuttal. I therefore wish to provide, below, my rebuttal.

1.　　Dr. Prince observes in his report that there are a number of transaction costs to consumers (by which I believe he means library patrons) entailed in borrowing a book from a library. Specifically he says: "Although consumers [patrons] do not pay a library to borrow a book, they incur transactions costs in the borrowing of a book. These costs include the effort of having to sign up for a library membership, the time a consumer must spend finding the work on the library's website, possibly having to wait for another patron to return a digital loan before the work is available to borrow, and a limit on the amount of time the borrower may retain the book before it must be returned to the lender." Prince Rpt. ¶ 61 (footnote omitted).

1

2. Based on my understanding of the functionality of the IA's Digital Lending Library, each of these transaction costs are also present when a patron borrows a digitized book from the IA. See Hildreth Rpt. ¶¶ 30, 54. Before checking out a book from the IA's Digital Lending Library, an individual must sign up as a patron of the IA.[1] The patron must then search the IA website for the title.[2] The patron must then wait for an available digitized copy to be checked back in.[3] Finally, a work checked out from the IA is automatically checked back in after the loan period expires.[4]

3. In my Opening Report, I noted that demand for digital resources, especially, ebooks was increasing. Hildreth Rpt. ¶¶ 22-26. I also noted that demand for ebooks currently exceeds supply. *E.g., id.* ¶ 39 ("[M]any libraries have lower limits on the number of ebook requests (often ten to fifteen) due to the limited inventory of ebooks libraries can afford."). Because the demand for ebooks is increasing as rapidly as it is, it is highly improbable that libraries would redirect portions of their reallocation budget to products other than ebooks/books. I have seen no evidence—anecdotal or empirical—to suggest otherwise.[5] As Michael Blackwell,[6] Director of St. Mary's County Library, Maryland, confirmed: "If we had more funding, we would put it back into more ebook licenses. If the publishers slashed the prices by

---

[1] Internet Archive, Borrowing Books Through Open Library (Sept. 13, 2021), https://openlibrary.org/help/faq/borrow#how.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] See Hildreth Dep. 257:1-258:8.

[6] Michael Blackwell also leads the Readers First Initiative.

2

half, we get twice the number. Demand is high. The issue is that currently licensing is making it nearly impossible to sustain what we have even now."[7]

4. Dr. Prince observes that the IA's Digital Lending Library "likely" decreased the number of print book sales and the number of ebook licenses to libraries because the increased supply of digital books for borrowing "likely" reduced patron demand to borrow print books. See Prince Rpt. ¶ 60. I have seen no evidence—empirical or anecdotal—to suggest that the IA's Digital Lending Library has caused other libraries to purchase fewer physical books or to license fewer ebooks.

5. Dr Prince, in several places in his report, mischaracterizes the opinions I offer in my first report. Prince Rpt. ¶¶ 9, 58, 69, 73, 75, 76. Specifically Dr Prince stated:

- "Ms. Hildreth acknowledges that the Internet Archive's conduct likely caused plaintiffs lost revenues from licensing fees and sales of the Works in Suit to libraries." *Id.* ¶ 9.

- "Displaced library sales are consistent with Ms. Hildreth's expert report, where she states that 'a library decided not to license a title because digitized print copies are available for borrowing under CDL . . . .'" *Id.* ¶ 58.

- "Likewise, even if many public libraries were to become 'partner libraries' of Internet Archive or other equivalent websites and/or IA were to become a central repository, the number of concurrent copies of a title freely available 'to borrow' on IA or similar websites would skyrocket; libraries would no longer need to obtain a considerable number of legal backlist ebooks titles to serve their communities because they could link to IA or similar websites as an alternative to their purchase of authorized ebook licenses, as explained by Ms. Hildreth." *Id.* ¶ 69.

- "IA's library expert Ms. Hildreth's [sic] appears to acknowledge that IA's conduct likely harmed rightsholders." *Id.* ¶ 73.

- "Ms. Hildreth opines that if IA's conduct 'reduced the necessity of lending those titles via licensed ebooks . . . [libraries] would reallocate their spending away from ebook licensing for those titles . . .' Ms. Hildreth's admission that Internet Archive's conduct likely caused lost licensing sales of the Works in Suit to

---

[7] Email from Michael Blackwell to author (May 5, 2022) (on file with author).

3

libraries is an admission that IA's conduct harms market participants, including the publishers and the authors of the Works in Suit." *Id.* ¶ 75 (alterations in Prince Rpt.).

- "Although [Ms. Hildreth] acknowledges that IA's conduct likely harmed Plaintiffs . . . ." *Id.* ¶ 76.

Each of these characterizations is incorrect. The portions of my report he cites for his statements are Paragraphs 11 and 106.[8]

Paragraph 11 stated in full:

> In brief, my opinions are that:
>
> • In the twenty-first century, libraries strive for improved patron access to knowledge and to adapt to increasing patron demand for digital access. To do so, libraries must leverage their investments in their print collections. See Section III.
>
> • Patrons by and large prefer to browse or sample a title, digital or print, before making the decision to borrow it. See Section III.
>
> • Libraries have shared their physical collections through interlibrary loans and regional resource-sharing for many years. Interlibrary lending is a way for libraries to conserve resources and focus acquisition-based spending on works their patrons are most likely to frequently request. See Section IV.
>
> • The growing practice of CDL by libraries is but one method libraries use to leverage their existing physical collection to better serve the reading population. The Digital Lending Library is one example. See Section IV.
>
> • Library budgets are both limited and finite. Libraries strive to maximize their acquisition budgets to meet patron demand, but acquisition budgets are often one of the few discretionary line items in a library budget and so may be constrained based on other required library expenses. Library budgets for acquisition of works are never large enough to meet patron demand. See Section V.

---

[8] Professor Prince misrepresents the contents of Paragraph 11 of my report in a number of places in his report, including Paragraph 69, where he suggests that an increase in the number of the IA's partner libraries would cause the number of concurrent copies of a title to "skyrocket."

• As to physical book acquisitions, libraries initially buy multiple copies of popular titles, and then subsequently reduce the number of copies in their collection of a title. Sometimes reduction happens when a physical copy wears out or is damaged, and other times a reduction happens when libraries sell or giveaway additional copies of a title after demand for that title has decreased. Libraries seldom buy replacement copies of a title. Demand for popular titles diminishes rapidly, and one-to-one replacement would not be a good use of a library's limited acquisition budget. Moreover, libraries can and do make small repairs (example: taping a torn page) to damaged physical copies. Only a small percentage of a library's acquisition budget is spent purchasing new replacement copies of a title. See Section VI.

• Ebooks have presented particular challenges for libraries. Patron demand for ebooks has been increasing. But, when libraries pay for the ability to loan ebooks to patrons, libraries pay only for a temporary license. The purchase of ebook licenses therefore does not add to a libraries' permanent collection. Moreover, ebook collection management requires heavy use of libraries' staff resources. In many cases it takes more staff resources to manage library ebook licensing systems than it does to manage physical collections. See Section VII.

• CDL does not result in less library spending on books. Libraries spend all of their allocation budgets each period. If a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title—or on purchasing print books. See Section VIII.

Paragraph 106 stated in full:

Because library acquisition budgets are limited and scarce, the existence of CDL does not result in less spending than what has been allocated for materials acquisitions. In fact, even if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions. They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books.

6.  Nowhere in either paragraph, or, for that matter, anywhere in my report, do I state that I believe it is "likely" that the IA's Digital Lending Library harmed rightsholders (including Plaintiffs). Nor do I state anywhere in my report, nor do I hold the view, that the IA's Digital Lending Library has *in fact harmed* rightsholders or would in fact harm rightsholders if its operations scaled up. Nowhere in either paragraph, or, for that matter, anywhere in my report, do I state, nor do I hold the view, that the IA's Digital Lending Library "likely caused plaintiffs lost revenues from licensing fees and sales of the Works in Suit to libraries." Prince Rpt. ¶ 9. Nor do I state anywhere in my report, nor do I hold the view, that the IA's digital lending would cause Plaintiffs to lose revenue from libraries if its operations scaled up. Nor do I state anywhere in my report, nor do I hold the view, that public libraries becoming partner libraries with the IA would result in libraries no longer needing "to obtain a considerable number of legal backlist ebooks titles to serve their communities because they could link to IA or similar websites as an alternative to their purchase of authorized ebook licenses, . . . ." *Id.* ¶ 69. In fact, I do not mention partner libraries at all in my report. In Paragraph 58 of his report, Dr. Prince omits a key part of my report—the word "if." The full sentence from which he quotes is as follows (italicized portions are portions Dr. Prince omits): "*If* a library decided not to license a title because digitized print copies are available for borrowing under CDL, *a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title—or on purchasing print books*." Hildreth Rpt. ¶ 11. These omitted passages make clear that my opinion is that *in the event* a library decided not to license a title due to additional availability of that title under CDL, the library would use the money it saved to acquire another title, either as an ebook or a print book. In Paragraph 75 of his report, too, Dr. Prince omits key portions of a passage to change its meaning. The full sentences from which he quotes are as follows

6

(italicized portions are portions Dr. Prince omits): "*In fact, even if you were to assume that CDL* reduced the necessity of lending those titles via licensed ebooks, *and even if books more than five years old all became easier to lend electronically through CDL for all libraries*, libraries *would not spend less money on acquisitions.* They would reallocate their spending away from ebook licensing for those titles *being accessed through CDL and would spend more on ebook licensing for newer titles or on print books*." Hildreth Rpt. ¶ 106. These omitted passages make clear that my opinion is not that the IA's conduct likely caused lost licensing sales, as Dr. Prince claims.

7. I am not an economist, and, as I stated at my deposition, I do not have an opinion as to whether Plaintiffs suffered any economic harm as a result of the IA's Digital Lending Library:

> Q: Do you have a general opinion, Ms. Hildreth, as to whether the plaintiffs have suffered any economic harm as a result of the Digital Lending Library?
>
> A. I'm challenged in answering that question because I feel that it would be better answered through economists' research. I don't feel that I have a qualification to specifically answer that question.[9]

8. To the contrary, my opinion, based on decades as a library professional, is that the IA's Digital Lending Library (and the practice of CDL by other libraries) affirmatively assists libraries, who own the copy of a physical book they have lawfully acquired, and readers, whose tax dollars support public libraries who purchase physical books and pay for ebook licenses. Moreover, I am unaware of any instance of a library paying for access to fewer ebook copies of a title—or buying fewer copies of a physical book for a title—where that title is available for

---

[9] Hildreth Dep. 45:20-46:4.

borrowing through CDL, either from the IA or from another library. I note that Dr. Prince does not point to any instances of this, either.

9. Dr. Prince notes in his report that the availability of a title through CDL from the IA has "likely devalued Plaintiff Publishers' products in several ways." See Prince Rpt. ¶ 63. I have not observed lower prices of physical copies or ebook copies of titles with respect to transactions with libraries. Indeed, based on my decades of experience as a library professional and based on my current work with libraries as a consultant, materials costs for these formats are only increasing for libraries.

Dated: May 27, 2022

DocuSigned by:

*Susan H. Hildreth*
4AF2CEED802C4EB...

SUSAN H. HILDRETH