**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>Plaintiffs,<br><br>v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>Defendants. | Case No. 1:20-CV-04160-JGK |

**RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO
GENUINE ISSUE TO BE TRIED IN SUPPORT OF PLAINITFFS' MOTION FOR
<u>SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

I.   THE PARTIES................................................................................................ 1

    A.   Plaintiffs Hachette, HarperCollins, PRH, and Wiley................................. 1

    B.   Defendant Internet Archive...................................................................... 2

    C.   This Action............................................................................................. 2

II.   THE BOOK PUBLISHING INDUSTRY ....................................................... 3

    A.   Books Are Not Self-Generating................................................................ 3

    B.   The Publishers Make It Possible For Thousands Of Authors To Write Books For A Living By Paying The Upfront Costs Of Book Publishing ................................... 4

    C.   The Publishers Provide Financial Support to Authors............................... 4

    D.   The Publishers Invest in Generating an Audience for Each New Book ................. 5

    E.   By Exercising the Exclusive Rights Granted By Each Author, Publishers Generate Revenue to Invest in New Books ........................................................ 6

        1.   The Publishers Depend on Steady Revenue from Backlist Titles, Over Decades of Time .......................................................................... 7

        2.   Revenue from the Sale of Books in All Formats Incentivizes the Publishers' Creation of New Books......................................................... 12

III.   WITH DISTINCT PRICING, TERMS, AND CONDITIONS, THE PUBLISHERS INVESTED IN THE CREATION OF A VIABLE EBOOK MARKET ........................ 13

    A.   In the Shadow of Rampant Music Piracy, The Publishers Developed Terms to Make Ebooks Available to the Public............................................................ 13

    B.   Factors Considered by the Publishers When Developing the Ebook Market....... 14

    C.   The Publishers Have Made Significant Financial Investments to Create a Viable Ebook Market............................................................................... 16

    D.   Ebooks Benefit Consumers and the Publishers ................................... 19

IV.   DEVELOPMENT OF THE PUBLISHERS' LIBRARY EBOOK MARKET................ 20

    A.   The Role of Public Libraries in American Life ................................... 20

    B.   Hachette ............................................................................................. 24

    C.   HarperCollins..................................................................................... 24

    D.   PRH.................................................................................................... 26

    E.   Wiley .................................................................................................. 26

i

F.     The Publishers' Library Ebook Market Provides Americans with Millions of Free Ebooks..................................................................................... 28

V.     THE PUBLISHERS MAKE EBOOKS BROADLY ACCESSIBLE TO PERSONS WITH DISABILITIES AND RESPOND QUICKLY IN EMERGENCY CIRCUMSTANCES ................................................................................. 32

A.     The Publishers' Efforts to Serve the Blind and Print Disabled People................ 32

B.     The Publishers' Response to the COVID-19 Pandemic ..................................... 33

VI.     INTERNET ARCHIVE'S USE OF THE PUBLISHERS' REGISTERED WORKS ...... 35

A.     The Works in Suit ............................................................................................. 35

B.     Internet Archive's Use of the Works in Suit..................................................... 36

C.     Copyright Registration and Ownership ........................................................... 37

VII.     THE INTERNET ARCHIVE'S EBOOK LENDING WEBSITE .................................... 38

A.     Internet Archive's Evolution and Stated Goals ................................................ 38

B.     The Internet Archive Ebook Lending Service At Issue in This Lawsuit.............. 41

C.     User Experience of the Internet Archive's Website .......................................... 45

D.     Evolution of Internet Archive's Infrastructure To Lend Ebooks Through its Website ...................................................................................................................... 47

     1.     Internet Archive Partners With Libraries to Scan Their Collections........ 48

     2.     Internet Archive Acquires Print Books from Other Sources ................... 50

     3.     Internet Archive Preservation of Physical Books .................................... 51

E.     Internet Archive's Relationship With and Eventual Acquisition of Better World Books ................................................................................................................ 52

F.     "Monetized" Aspects of the Internet Archive Website...................................... 56

G.     Internet Archive's Creates the "Open Libraries" Project .................................. 57

     1.     Imposing and Then Removing Geographic Limitations on Ebook Lending ...................................................................................................................... 57

     2.     Expanding the Number of Concurrent Ebook Loans Available on the Website ................................................................................................... 58

H.     Establishing the Open Libraries Project ........................................................... 59

I.     Marketing the Open Libraries Project to Prospective Libraries ......................... 61

J.     Growth of Internet Archive's Partner Libraries................................................. 64

K.     Encouraging Libraries to Provide Links to Internet Archive's Website.............. 65

L.     Internet Archive's Overlap Analysis ................................................................ 65

VIII.  DEVELOPMENT OF THE "CONTROLLED DIGITAL LENDING" THEORY.......... 66

    A.  Development of the Statement and White Paper ................................... 66

    400.  Prior to about 2018, IA did not rely on a model called "Control Digital Lending" to support its scanning and republication of in-copyright books.  (McN Decl. ¶77.)66

    B.  Publication of The Statement and White Paper in September 2018 .................... 71

    C.  Initial Criticism of the Statement and White Paper ............................... 74

    D.  Criticism of the Statement and White Paper Following the *ReDigi* Decision...... 75

    E.  Signatories to the CDL Statement.......................................................... 76

    F.  Internet Archive's Reliance on the Statement and White Paper.......................... 77

    G.  The Statement, White Paper As Applied to Internet Archive's Activities .......... 79

        1.  The Owned-to-Loan Ratio ...................................................... 79

        2.  Controls over Partner Library Operations.................................. 81

IX.  INTERNET ARCHIVE'S POLICY RATIONALES ....................................... 84

    A.  Providing Missing 20th Century Books.................................................. 84

        1.  Internet Archive and Authorized Library Ebook Aggregators ................ 86

    B.  Providing Access to Print-Disabled Patrons ......................................... 88

X.  NATIONAL EMERGENCY LIBRARY ....................................................... 90

XI.  THE IMPACT OF THE INTERNET ARCHIVE ON THE MARKET FOR THE PUBLISHERS' WORKS.......................................................................... 96

    A.  Lost Customary Fee from Internet Archive ........................................ 96

    B.  Lost Library Ebook Sales..................................................................... 99

    C.  Lost Consumer Ebook Sales ............................................................ 102

    D.  Inadequate Protection of Intellectual Property ................................. 104

XII.  INTERNET ARCHIVE'S SCANS, WHILE ENTIRELY LEGIBLE, FALL SHORT OF THE QUALITY OF AUTHORIZED EBOOKS. THE PUBLISHERS' ENFORCEMENT OF RIGHTS AGAINST INTERNET ARCHIVE ....................................... 104

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House LLC ("PRH") (collectively, the "Plaintiffs" or "Publishers") respectfully submit this statement pursuant to Local Rule 56.1 of the United States District Court for the Southern District of New York, in support of the Publishers' Motion for Summary Judgment against Defendant Internet Archive on Plaintiffs' causes of action for copyright infringement. The material facts[1] as to which there is no genuine issue to be tried are as follows:

## I.   THE PARTIES

### A.   Plaintiffs Hachette, HarperCollins, PRH, and Wiley

1.     The Plaintiffs are four of the leading book publishers in the United States.

2.     Hachette is a publishing company based in New York. The history of Hachette in the United States stretches back nearly two centuries, to the 1837 founding of Little, Brown and Company ("Little Brown"). Hachette works with bestselling authors who have been awarded Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals and Nobel Prizes. Last year, Hachette published more than 1,400 adult titles in print and digital format, 300 books for young readers and 450 audio book titles. Sevier Decl. ¶5.

3.     HarperCollins is a publishing company based in New York. HarperCollins has more than 200 years of history in the book publishing industry, with a current catalog of in-print

---

[1] The facts provided in this Rule 56.1 Statement are set forth in the declarations of Sandra Cisneros, sworn to on July 5, 2022 ("Cisneros Decl."), Dr. Ian Foster, sworn to on June 29, 2022 ("Foster Decl."), Elizabeth A. McNamara, sworn to on July 7, 2022 ("McN Decl."), Tracy Offner, sworn to on February 7, 2022 ("Offner Decl."), Benjamin Sevier, sworn to on July 7, 2022 ("Sevier Decl."), Chantal Restivo-Alessi, sworn to on July 1, 2022 ("R-A Decl."), Alan Pavese, sworn to on June 30, 2022 ("Pavese Decl."), Jeffrey Weber, sworn to on July 2, 2022 ("Weber Decl.") submitted herewith, and any exhibits annexed to the aforementioned declarations, as well as the Publishers' Complaint ("Compl.") and Internet Archive's Answer ("Ans.").

works that exceeds 50,000.  Writing in virtually every genre, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among others.  R-A Decl. ¶5.

4.      PRH is a publishing company based in New York.  Its history stretches back to the mid-nineteenth century founding of several venerable imprints – including Putnam (1838, publisher of Herman Melville and Edgar Allan Poe), Dutton (1852, publisher of H.G. Wells and Gore Vidal) and Frederick Warne & Co. (1865, publisher of the Beatrix Potter books). The global PRH portfolio contains more than 275 independent imprints, which annually publish approximately  15,000 new titles per year.  Each year PRH sells roughly 800 million books across print books, audiobooks, and ebooks formats.  Weber Decl. ¶2.

5.      Wiley is a publishing company based in Hoboken, New Jersey.  The company was founded in 1807 and focuses on publishing scientific and medical works in print and digital formats.  Wiley publishes over 2,000 new books each year and currently offers over 120,000 titles in its catalog.(Pavese Decl. ¶¶2,9.)

**B.      Defendant Internet Archive**

6.      Internet Archive was founded in 1996 by Brewster Kahle, who remains its leader. (McN Decl. ¶28.)

**C.      This Action**

7.      This action concerns the unauthorized reproduction and distribution of in-copyright ebooks on Internet Archive's interrelated archive.org and openlibrary.org websites (collectively, the "Website").  (McN Decl. ¶1.)

8.      Internet Archive offers several other different online services, including the Wayback Machine.  This action does not challenge those other online services, including the Wayback Machine.  (McN Decl. ¶30.)

9.      Instead, this action concerns the "Books to Borrow" portion of the Website, on which Internet Archive provides its users with digital versions of physical books in their entirety. (McN Decl. ¶1.)

## II.     THE BOOK PUBLISHING INDUSTRY

### A.     Books Are Not Self-Generating

10.     Books have long been essential to our society. Fiction and non-fiction alike, they transport us to new worlds, broaden our horizons, provide us with perspective, reflect the evergrowing knowledge of humanity in every field, spark our imaginations and deepen our understanding of the world. Yet, books are not self-generating. They are the product of training and study, talent and grit, perseverance and creativity, investment and risk, and untold hours of work.  Compl. ¶4; Ans. ¶4.

11.     Books generally require a significant creative investment by authors.  Often, it may take years for an author to write a single book.  (Sevier Decl. ¶13; R-A Decl. ¶54; Weber Decl. Pavese Decl. ¶12; Cisneros Decl. ¶5.)

12.     Authors may rely on revenue streams from advances and royalties paid by publishers to support them during the writing process and for years after their books are published. (Sevier Decl. ¶17, 22; R-A Decl. ¶55; Weber Decl. ¶29; Cisneros Decl. ¶9.)   The author Sandra Cisneros has stated that "Internet Archive hurts all of the authors whose work it steals and it should be stopped so that it does not threaten anybody else's chances of living from their pen." (Cisneros

Decl. ¶16.)

### B.   The Publishers Make It Possible For Thousands Of Authors To Write Books For A Living By Paying The Upfront Costs Of Book Publishing

13.    The Publishers invest in authors and their books by bearing the upfront costs that are required to get a book published and sold through various book markets.  For this reason, the Publishers bear most of the financial risk associated with book publishing.  Book publishers have no guarantee that they will recoup their investment in any particular title.  (Sevier Decl. ¶¶13-30; R-A Decl. ¶¶55-56; Weber Decl. ¶¶26-28; Pavese Decl. ¶12.)

14.    The Publishers collectively spend hundreds of millions of dollars each year in costs in connection with the books they publish.  (Sevier Decl. ¶15; Weber Decl. ¶26.)

### C.   The Publishers Provide Financial Support to Authors

15.    For the Works in suit, the Publishers typically pay each author of a new work a non-refundable advance against future royalties.  The amount of the advance varies, and the author can use the advance to cover living or other expenses while they work on writing the book.  (Sevier Decl. ¶17; R-A Decl. ¶55.)

16.    Per their publishing agreements,  authors are generally are not required to refund the advance – even if the book never earns enough revenue to "earn out" the advance.  (Sevier Decl. ¶17; R-A Decl. ¶55.)

17.    The advance payments are recouped, if at all, from sales of the books.(Sevier Decl. ¶30; R-A Decl. ¶55.)

18.    The Publishers employ editors, who are literary professionals that select new works for acquisition and work with their authors to provide editorial advice to improve the text, and other support.   (Cisneros Decl. ¶8; Sevier Decl. ¶¶7, 16, 19; R-A Decl. ¶¶7, 56;Weber Decl. ¶26.)

4

19.     The Publishers also hire copy editors to correct grammar, spelling and ensure consistency throughout a particular work.  Additionally, the Publishers maintain art departments and illustrators to design book covers and legal departments that work with authors on pre-publication review and on defending the Publishers' works.  (Sevier Decl. ¶¶20-21; R-A Decl. ¶56; Cisneros Decl. ¶8.)

20.     The Publishers employ design professionals to layout print and digital editions of the books they publish.  (Sevier Decl. ¶20; R-A Decl. ¶56.)

21.     For audiobooks, the Publishers employ a separate production process involving the reading and recording of a title.  (Sevier Decl. ¶20.)

**D.     The Publishers Invest in Generating an Audience for Each New Book**

22.     The Publishers devote resources to marketing their books.  Marketing can continue for the life cycle of a book and is not limited to its initial publication.(Cisneros Decl. ¶8; R-A Decl. ¶56; Sevier Decl. ¶23; Weber Decl. ¶26)

23.     The Publishers each maintain sales departments that promote the sales of the titles in the Publishers' catalogue.  (Sevier Decl. ¶¶24-25; R-A Decl. ¶56; Weber Decl. ¶26.)

24.     The Publishers respective marketing departments engage in a broad range of promotional activities, which may include social media campaigns, website development, trade and consumer advertising; distribution of review and promotional copies of the book to members of the media and influential readers; in-store displays and other placement promotions; and author tours and readings.  (Sevier Decl. ¶¶23, 27; R-A Decl. ¶56.)

25.     The Publishers' respective sales departments work on sales of their titles across the different channels or markets that books are published in, including retail outlets, wholesalers, and

4891-8421-5847v.16 0092453-000002

aggregators that sell to libraries. (Sevier Decl. ¶¶24-35; R-A Decl. ¶56.)

26.     The Publishers also undertake the costs of distributing books in all the formats they have rights to, which includes printing costs associated with the creation of print books.  (Sevier Decl. ¶29; Weber Decl. ¶27.)

### E.     By Exercising the Exclusive Rights Granted By Each Author, Publishers Generate Revenue to Invest in New Books

27.     The commercial success of any book is uncertain.  (Weber Decl. ¶28; Sevier Decl. ¶34.)

28.     The sales of any one book are driven by numerous factors.  Every book is unique and has a unique life cycle.  (Sevier Decl. ¶¶34, 80; Weber Decl. ¶28, 88.)

29.     These factors include seasonality, school uses, marketing, relevance of topics of current interest, pricing of the work and competing works, supply chain issues and other factors. (Sevier Decl. ¶80.)

30.     In 2020, COVID, the Black Lives Matter movement, and the presidential primaries and election had an impact on individual book sales and licenses that different by title.  (Sevier Decl. ¶81.)

31.     Title revenue figures, and library checkouts, alone do not indicate the cause of an increase or decrease.  (Sevier Decl. ¶¶80-81; Weber Decl. ¶88.)

32.     The Publishers are incentivized to maximize long term revenue from every book they publish because the sales of successful books pay for upfront investments in new books. (Pavese Decl. ¶14; Sevier Decl. ¶¶37-38; R-A Decl. ¶¶34-38; Weber Decl. ¶¶29-32.)

33.      The authors of the Works in Suit assigned to the Publishers the exclusive rights to publish their Works in certain formats – including print, ebook and often audio.  The publishing

agreement for the Works in Suit also grant rights for the Works in defined geographic areas, typically either the entire world or the United States. (Pavese Decl. ¶13; Sevier Decl. ¶31; R-A Decl. ¶57; Weber Decl. ¶29; McN Decl. ¶8.)

34.    These exclusive rights derive from copyright law, which was designed to provide authors an incentive to write books by giving them a limited monopoly over sales once their books are published. (R-A Decl. ¶58.)

35.    The Publishers' ability to generate income derives from their ability to exclusively exercise certain rights they obtain from authors including:  (a) the right to sell books for their copyright term; and (b) the right to collect separate income streams for each different format. (Weber Decl. ¶30; R-A Decl. ¶57; Sevier Decl. ¶8.)

36.    Some of the profits the Publishers receive from books they publish are used to pay the costs of publishing new authors or books. (Weber Decl. ¶29; Sevier Decl. ¶30; R-A Decl. ¶63; Pavese Decl. ¶14.)

37.    Some of the profits the Publishers receive from books they publish are used to develop new technologies or improve current technologies associated with various format they publish the works in, like ebooks or audiobooks. (Pavese Decl. ¶15; R-A Decl. ¶2; Weber Decl. ¶29.)

### 1.    The Publishers Depend on Steady Revenue from Backlist Titles, Over Decades of Time

38.    All but two of the Works in Suit were published more than five years before this action was commenced. (McN Decl. ¶115.)

39.    Depending on the Publisher, backlist books are defined as titles that were first published more than either one or two years ago. (Sevier Decl. ¶36; R-A Decl. ¶60; Weber Decl.

¶30.)  The vast majority of the Works in Suit were published more than five years ago, and some were published decades ago.  (McN Decl. ¶115; R-A Decl. ¶¶64-65;Weber Decl. ¶21.)

40.     The Works in Suit continue to earn revenues and are significant books for the Publishers.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

41.     The Publishers' backlist catalogs provide revenue that helps them invest in new works and/or new authors.  (Sevier Decl. ¶¶13-30; R-A Decl. ¶¶58-68; Weber Decl. ¶¶29-32; Pavese Decl. ¶14.)

42.     Year over year, many of the Works in Suit sell thousands of copies and generate significant annual revenues, including in ebook form.  Each of the Publishers' revenues for the Works in Suit are reflected in their sales records produced in this action.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

43.     Many of the Works in Suit were first published decades ago and several have become literary classics or are well-known, highly regarded titles, including for example *The Lord of the Flies* by William Golding, *Song of Solomon* and *The Bluest Eye* by Toni Morrison, *The Catcher in the Rye* by J.D. Salinger, and *The House on Mango Street* by Sandra Cisneros.  (Weber Decl. ¶¶21-22; McN Decl. ¶7.)

44.      The Publishers rely on backlist titles like the Works in Suit to generate revenue year on year for sometimes decades after first publication.  These revenues can offset the costs of new books that underperform or result in a loss.  (Sevier Decl. ¶37; R-A Decl. ¶¶61-68; Weber Decl.¶¶30-31; Pavese Decl. ¶14.)

45.     A review of the sales revenues for the Works in Suit demonstrates the Publishers' reliance on books published more than five years ago for substantial revenue.  (Pavese ¶19; R-A

Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)  For example, HarperCollins first published the C. S. Lewis novel *The Lion, the Witch and the Wardrobe* (The Chronicles of Narnia)" in 1950.  Over the course of the last 72 years, the book has been named to TIME Magazine's 100 Best Young-Adult Books of All Time and 100 best English-language novels published since 1923.  Since 1950, sales from the title have generated HarperCollins over $47.5 million in revenue.  (R-A Decl. ¶45.)

46.     Another Work in Suit published by HarperCollins, Zora Neale Hurston's "*Their Eyes Were Watching God*," a classic of the Harlem Renaissance and Hurston's best-known work, was originally published in 1937.  Between 1992 and 2020, HarperCollins sold more than five million copies of the title, earning the company over $38 million in net sales.  (R-A Decl. ¶65.)

47.     The classic *Little House in the Big Woods*, published in 1932 as the first book in the "Little House" series, earned HarperCollins over $7 million in net sales between 1992 and 2020.  (R-A Decl. ¶65.)

48.     Even those titles bringing in smaller sums of revenue are important to each Publisher on a cumulative basis and remain important to their authors or estates, on an individual basis.  (Weber Decl. ¶30.)

49.     Revenue from backlist titles for three of the Publishers has matched or exceeded the revenue for frontlist books in certain years.  (Sevier Decl. ¶36; R-A Decl. ¶61 & Ex. 1; Weber Decl. ¶32.)

50.     For Hachette, revenue from the sale of backlist ebook titles exceeded frontlist ebook revenue in 2019 and 2020.  (Sevier Decl. ¶36; R-A Decl. ¶61 & Ex. 1; Weber Decl. ¶32.)

51.     One backlist title published by Hachette in 1951, "Catcher in the Rye," generated tens of millions of dollars in sales between 1999 and 2020.  (Sevier Decl. ¶37.)

9

52.     Between 2017 and 2020, PRH's backlist revenue exceeded its revenue from frontlist titles (i.e., books published within the last year).   This is so despite that the fact that in that same period of time, PRH published bestselling frontlist biographies of First Lady Michelle and President Barack Obama (2018 and 2020, respectively).  (Weber Decl. ¶32.)

53.     Backlist book revenue makes up more than 60% of HarperCollins' annual print book revenue from the sale of all adult and children's titles.  (R-A Decl. ¶61.)

54.     Between 2017 and 2020, the number of backlist library ebook units sold by HarperCollins exceeded the number of frontlist library ebook units sold.  For example, in 2020, HarperCollins sold approximately 700,000 frontlist units versus 3.3 million backlist units.  (R-A Decl. ¶61.)

55.     The majority of Hachette's most successful books do not earn the bulk of their earnings in the first five years.  Rather, they earn revenue over the course of many years or even decades after the publication date.  (Sevier Decl. ¶36.)

56.     Backlist sales are also important because books may not achieve their full commercial potential in their first year of publication.  It may take years for a book to start selling in large quantities for a number of different (and sometimes unpredictable) factors.  (Weber Decl. ¶31.)

57.     Even books that were critically well-received when published may see significant jumps in revenue well after they were first published, including author life events.   (Sevier Decl. ¶80; Weber Decl. ¶31.)   For example, the death of author Toni Morrison in August 2019 corresponded with a significant jump in library ebook checkouts and associated revenue for works authored by Ms. Morrison.

58.     Sales of a particular work may go up or down based on other external factors.  For instance, sales of a title can increase rapidly if a news story brings a particular subject into prominence or if an author receives an award or sudden fame or if a popular movie version of a book is released.  (Sevier Decl. ¶¶38, 80; R-A Decl. ¶67.)

59.     For example, the book "Crazy Rich Asians" by Kevin Kwan was first published by PRH in 2013.  When a motion picture adaptation of the film was released in 2018, library ebook checkouts for the title through OverDrive, the library ebook aggregator, increased by a factor of over nine.  (McN Decl. ¶115; Weber Decl. ¶31.)

60.     An author may not "break out" before publishing multiple books and when an author does achieve success later in their career, the Publishers will usually see a significant uptick in revenue from their earlier works, even if those works did not sell well when first released.  (Sevier Decl. ¶38; R-A Decl. ¶67.)

61.     The book *The 5 Simple Fixes That Will Make You Healthy, Fit, and Eternally Awesome* by Darin Olien, was published by an imprint of HarperCollins in February 2015.  For the first five years after it was published, the ebook title had been checked out by library patrons across the United States in the low double-digits (and sometimes in the single digits) each month.  Then, in July 2020, checkouts spiked, eventually resulting in nearly 700 checkouts in September 2020 alone.  (McN Decl. ¶116.)

62.     The increased interest in the book, over five years after its publication, coincided with the July 2020 release of the Netflix series "Down to Earth with Zac Efron," in which the  actor Zac Efron promoted the "5 Simply Fixes" book at the beginning of each episode.  (McN Decl. ¶116.)

       **2.**     **Revenue from the Sale of Books in All Formats Incentivizes the Publishers' Creation of New Books**

63.     The Publishers' right to collect revenue from the sale of their books in each format – and to control the terms and conditions governing each format – can make it possible for the Publishers to support authors and invest in the next generation of books.  (R-A Decl. ¶68; Sevier Decl. ¶48; Weber Decl. ¶¶36.)  And, just as in the music and film industries, every format is a different product geared to different (sometimes overlapping) channels and sold under different terms that correspond to each format's unique qualities.  (R-A Decl. ¶12.)

64.     The Publishers' publishing agreements for the Works in Suit, produced in this action, generally include specific royalty rates payable to the author based on the format of the book, channel of distribution, and other factors.  The agreements for the Works in Suit show that the authors will receive specific and generally different royalty rates for the different formats the book is published in, e.g., hardcover, trade paperback, mass market paperback, ebook, and/or audio book.  (Sevier Decl. ¶18; Weber Decl. ¶34; R-A Decl. ¶12.)

65.     Because each of the publishing agreements for the Works in Suit include different royalty rates for different formats of the Works, the Publishers and their authors are paid on sales of each format that a book is published in.  (Sevier Decl. ¶39; R-A Decl. ¶¶12, 57.).

66.     Over the last three decades, the Publishers have collectively invested millions of dollars in developing new formats and markets to deliver their works in the digital age, including ebooks.  (Weber Decl. ¶¶53-82; R-A Decl. ¶¶11-24; Sevier decl. ¶¶45-48; Pavese Decl. ¶¶11-20.)

67.     The Publishers' investments over the last three decades have contributed to the development and success of ebooks and audiobooks. Digital works (ebooks and audiobooks) are distinct book formats from print books.  (Weber Decl. ¶¶53-82; R-A Decl. ¶¶17-24; Sevier Decl.

4891-8421-5847v.16 0092453-000002

¶45-48; Pavese Decl. ¶¶11-20.)  Ebook pricing, both commercial and library ebooks, is distinct from the prices of print books. The different pricing is based on the fact that the different formats (print books vs. ebooks) are used differently in the commercial and library markets and is a control mechanism that helps to make the distribution of ebooks economically sustainable.  (Weber Decl. ¶¶46-49.)

68.     The development of ebooks and audiobooks have been a benefit for the public and the new format have allowed the Publishers to reach different audiences.  (Sevier Decl. ¶41; Weber Decl. ¶¶53-54.)

## III.    WITH DISTINCT PRICING, TERMS, AND CONDITIONS, THE PUBLISHERS INVESTED IN THE CREATION OF A VIABLE EBOOK MARKET

### A.    In the Shadow of Rampant Music Piracy, The Publishers Developed Terms to Make Ebooks Available to the Public

69.     In the late 1990's and early 2000's, the music industry witnessed the growth and eventual dominance of file sharing sites like Napster, Limewire, and Kazaa.  (R-A Decl. ¶15.)

70.     Napster, for example, allowed users to search for virtually any popular song and download an unauthorized, unrestricted MP3 music file onto the user's computer for free.  (R-A Decl. ¶15.)

71.     The record companies had not yet developed an authorized alternative for consumers to access digital music when the file sharing sites, like Napster, became popular.  By the time the music industry took legal action against the file sharing sites or took steps to create an easily accessible alternative, the pirate sites had proliferated.  (R-A Decl. ¶15.)

72.     Countless unauthorized MP3 files had already been uploaded and shared on the Internet with users around the world.  Consumers had already been presented with a popular

13

alternative that presented no barrier to an unauthorized and free copy of a song.  (R-A Decl. ¶15.)

73.     After these services were identified as copyright infringers and ordered to cease operations, the music publishing industry largely embraced authorized streaming services as a primary means to deliver music files over the Internet.  These streaming services offer a subscription model, which makes streaming music affordable for many consumers, while preventing against the proliferation of free illegal copies.  (R-A Decl. ¶16.)

74.     It has been  reported that this streaming model tends to disproportionality favor the most popular music artists while less popular artists are less favored and often get mere fractions of a cent per stream.  (R-A Decl. ¶16.)

75.     While these streaming services offered an alternative to piracy and afforded the record companies with a modicum of control, it came at the expense of artist revenue.  (R-A Decl. ¶16.)

**B.     Factors Considered by the Publishers When Developing the Ebook Market**

76.      By around 2002, the Publishers began to enter the digital book market.  They worked to develop a sustainable digital book market in which they could offer affordable ebooks but with critical controls.  (R-A Decl. ¶17; Weber Decl. ¶56.)

77.     The nature of the digital medium dictated that distribution be reasonably limited so as not to threaten the Publishers' overall book markets.  (R-A Decl. ¶17; Weber Decl. ¶¶65-69; Pavese Decl. ¶¶22-24.)

78.     The experience of the music industry also taught the Publishers that it was critical to prevent pirates from illegally converting print works into digital works to be widely distributed on the Internet, including for free.  (R-A Decl. ¶17.; Weber Decl. ¶55; Pavese Decl. ¶20.)

14

79.     While ebooks display the same text as print books and both are used by consumers to read the same underlying work, there are several key differences between these two formats that informed the Publishers' development of discrete terms and conditions and pricing for ebooks. (R-A Decl. ¶18; Weber Decl. ¶¶38-42.)

80.     An ebook is a digital file that consists of specially formatted text that readers typically download to their personal computers or devices from either commercial sites (like Amazon books) or from their local library (often via OverDrive).  (Weber Decl. ¶39; Sevier Decl. ¶¶20, 25.)

81.     Ebooks generally do not degrade.  Ebooks generally do not get damaged or lost. (Weber Decl. ¶39; Sevier Decl. ¶53; R-A Decl. ¶21.)

82.     Readers do not have to travel to a bookstore or library to obtain ebooks.  Whether commercial ebooks or ebooks obtained from their library, readers can download ebooks at any time from their home, office, or on the go.  (Weber Decl. ¶39; Sevier Decl. ¶54; R-A Decl. ¶20.)

83.     Ebooks contain technological features that enhance the reader's experience, including text digitized for an electronic device.  Ebooks also allow readers to interact with the works by running searches across the text or even reading in the dark. Ebooks also make it easier to carry multiple books.   A reader can carry multiple ebooks on a single device without the burden of carrying multiple print copies.  (Weber Decl. ¶39; R-A Decl. ¶20.)

84.     By contrast, print books are tangible objects.  They need to be physically moved from place to place, costing time and money that both increase with distance.  Over time, they can exhibit wear and tear.  (R-A Decl. ¶19; Weber Decl. ¶38.)

85.     There is a practical limit to the number of people who are able to access – *i.e.*, hold

in hand and read – a print book as a material object.  (R-A Decl. ¶19; Weber Decl. ¶38.)

86.    The same characteristics of an ebook that make the format so attractive to consumers present a potential risk for both authors and the Publishers.  (R-A Decl. ¶21; Weber Decl. ¶41.)

87.    First, an unrestricted digital file containing the text of a book could be repeatedly and rapidly reproduced and distributed to Internet users around the world at no or minimal cost.  (R-A Decl. ¶21; Weber Decl. ¶41.)

88.    Second, a digital file does not deteriorate as pages in a physical book do, and ebooks take up negligible physical space.  (R-A Decl. ¶21; Weber Decl. ¶39.)

89.    The Publishers considered these characteristics when they developed business models that set limits on the broad dissemination capabilities of an electronic file so as not to decimate their broader book markets.  (R-A Decl. ¶21; Pavese Decl. ¶5; Weber Decl. ¶¶38-42.)

90.    The Publishers distribute ebooks under a different model than print books.  (R-A Decl. ¶¶22-23, 28-41; Weber Decl. ¶¶42-49; Pavese Decl. ¶¶21-31.)

91.    When projecting possible revenues from a book, the Publishers take into account that they will receive revenues from each of the formats they publish the book in, including hardcover, paperback, ebook and/or audiobook.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶¶20, 46.)

92.    Print books are not priced with the expectation that they will be distributed in both print and digital formats.  (R-A Decl. ¶2.)

C.    **The Publishers Have Made Significant Financial Investments to Create a Viable Ebook Market**

93.    Each of the Publishers have played a role in the development of new digital book

formats designed to reach new audiences.  (Weber Decl. ¶¶55-61; R-A Decl. ¶¶13-16; Sevier decl. ¶¶44-48; Pavese Decl. ¶¶11-20.)

94.     Starting in the late 1990's and continuing into the early 2000's, each of the Publishers began investing in the development of authorized mechanisms for distributing ebooks. (Weber Decl. ¶¶55-61; R-A Decl. ¶¶13-16; Sevier decl. ¶¶44-48; Pavese Decl. ¶¶11-20.)

95.     For example, some of the divisions of what is now PRH began in the late 1990's to invest in creating authorized mechanisms for distributing digital books in order to create viable products for consumers to read as an affordable alternative to using pirate websites.(Weber Decl. ¶56.)

96.     At the same time, Random House, Inc. ("Random House") (a predecessor of PRH) and Wiley, together with publisher McGraw Hill, were members of the Open Ebook consortium that designed the original standard format for ebooks that evolved into the ePub ebook format that was launched in 2007 and remains in wide use today.  (Weber Decl. ¶57.)

97.     By 2000, Random House had invested more than $5 million into the development of ebook publishing software and pledged to invest $10 million more within the next three to five years after that.  (Weber Decl. ¶57.)

98.     The Publishers distribute commercial ebooks to paying consumers with restrictions geared to the nature of the digital medium.  (Sevier Decl. ¶45; Weber Decl. ¶43; R-A Decl. ¶¶22-23.)

99.     Several of the Publishers use an agency model for distributing commercial ebooks. The Publishers' retained agents, which include Amazon or Barnes & Noble, impose terms and conditions on those downloading commercial ebooks and restrict them to one user account.(Weber

Decl. ¶43; R-A Decl. ¶23; Sevier Decl. ¶45.)

100.    For example, the Terms of Use set by Amazon in connection with ebooks purchased through its Kindle platform state as follows:

> Use of Kindle Content. Upon your download or access of Kindle Content and payment of any applicable fees . . ., the Content Provider grants you a non-exclusive right to view, use, and display such Kindle Content an unlimited number of times . . ., solely through a Kindle Application or as otherwise permitted as part of the Service, solely on the number of Supported Devices specified in the Kindle Store, and solely for your personal, non-commercial use.  Kindle Content is licensed, not sold, to you by the Content Provider." Further, the Amazon Terms of Use provide under "Limitations" that the purchaser "may not sell, rent, lease, distribute, broadcast, sublicense, or otherwise assign any rights to the Kindle Content or any portion of it to any third party. . . .

(R-A Decl. ¶23.; Weber Decl. ¶43.)

101.    The Publishers also required, and still do require, that entities distributing their ebooks to the public use DRM technology to ensure that the digital book files are limited to one user account at a time.  (Sevier Decl. ¶¶45-46; Weber Decl. ¶43; R-A Decl. ¶23.)

102.    In or around the early 2000's, PRH began distributing ebook editions of selected books to consumers through specialized electronic retail platforms.  The popularity of ebooks then grew rapidly after the release of dedicated e-readers like Amazon's Kindle (2007) and Apple's iPad (2010).  (Pavese Decl. ¶19; R-A Decl. ¶30; Sevier Decl. ¶44; Weber Decl. ¶59.)

103.    Consumers pay for an ebook that they download from an authorized e-vendor, whether or not they read the whole book or only consult a small portion of it.  (McN Decl. ¶10.)

### D.     Ebooks Benefit Consumers and the Publishers

104.     Since the early 2000's, millions of consumers have acquired authorized ebooks published by the Plaintiffs.  (R-A Decl. ¶24.)

105.     While the figures have varied over time, in fiscal year 2021, ebooks constituted approximately 14% of HarperCollins' U.S. book revenue (not including audiobooks).  (R-A Decl. ¶24.)

106.     For Penguin Random House, by 2020, retail ebooks constituted somewhere between 12 and 15% of the book market.  (Weber Decl. ¶5.)

107.     For Hachette, in 2021, ebook revenue from the retail and library channels made up approximately 15% of their business.  (Sevier Decl. ¶46.)

108.     Today, the Publishers offer virtually all of their new titles in ebook format. The exceptions tend to be for books that are not well-suited to the digital realm (like certain children's books or cookbooks), or reprints of books originally published by other publishers for which the Publishers do not have the digital rights.  (Sevier Decl. ¶46; R-A Decl. ¶24; Weber Decl. ¶60; Pavese Decl. ¶18.)

109.     In 2007, Random House had only approximately 3800 ebook titles available and Penguin had approximately 300 ebook titles available.  Today, virtually all original titles in the adult trade books category published by PRH are available as an ebook, including the 48 Works in Suit published by PRH.  (Weber Decl. ¶60.)

110.     The Publishers invested time and money to publish their backlist titles as ebooks. In several cases, the Publishers had to separately acquire ebook rights from its authors where older publication agreements did not encompass these right.  Once they acquired the ebook rights, the

Publishers published the works as ebooks.  (Sevier Decl. ¶47; Weber Decl. ¶60.)

111.    As a result, the vast majority of each of the adult trade titles in each Publisher's backlist catalog are also now published as ebooks.  (Weber Decl. ¶60; R-A Decl. ¶24; Sevier Decl. ¶47.)

112.    Each Work in Suit is available as a commercial ebook.  Each Work in Suit was available as a commercial ebook when Internet Archive first scanned and posted the Work on its Website for distribution.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

## IV.    DEVELOPMENT OF THE PUBLISHERS' LIBRARY EBOOK MARKET

### A.    The Role of Public Libraries in American Life

113.    Public and academic libraries in the United States spend billions of dollars each year – typically from local tax revenue – on obtaining books for patrons to access for free.  For example, public libraries spent almost $1.5 billion on physical and ebooks in 2019.  (McN Decl. ¶11.)

114.    The history of libraries lending print books stretches back hundreds of years.  Under this lending model, the Publishers sell copies of print books to libraries, or to wholesalers serving the library market, who in turn sell to libraries.  (R-A Decl. ¶26; Weber Decl. ¶43.)

115.    Many public libraries provide services to their local communities, ranging from a curated selection of books and communications geared towards the interests and needs of community members, to services like free internet and community-tailored tutoring sessions. Public libraries also promote literacy.  (R-A Decl. ¶25.)

116.    Public libraries often increase the visibility of the Publishers' works, including through author visits, book clubs, creating virtual and physical displays to promote certain book

4891-8421-5847v.16 0092453-000002

for different occasions, and/or email marketing directed to the interests of local library patrons. (R-A Decl. ¶27; Sevier Decl. ¶¶49-50.)

117.   Each of the Publishers make their ebooks available to libraries through library distributors (or "aggregators"), who license the Publishers' ebooks to libraries, and each of the Works in Suit were available as ebooks from libraries.  (R-A Decl. ¶28; Sevier ¶10l; Weber Decl. ¶6; Pavese Decl. ¶3.)

118.   The Publishers' sales records produced in this action track the revenues earned when library aggregators obtained each of the Works in Suit for licensing to libraries.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)  Further, OverDrive maintained records capturing the number of library ebook checkouts for the Works in Suit between 2017 and 2020, as well as OverDrive's revenue for ebooks of the Works in Suit acquired by libraries from OverDrive during this time period.  (McN Decl. ¶11.)

119.   The largest aggregator is OverDrive, which licenses authorized ebooks to more than 14,000 public and academic libraries for free distribution to their patrons.  (McN Decl. ¶11.)

120.   The authorized library ebook market is governed by licensing terms that the Publishers have developed over many years, and continue to refine to this day.  (Weber Decl. ¶77.)

121.   The music, movie, and television industry also utilize licensing terms to make digital goods available to the public.  (R-A Decl. ¶28.)

122.   The specific terms of the Publishers' various licensing models are enforced in the library aggregators' licenses to libraries.  (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

123.   As part of this licensing regime, the four Publishers require that a library or library

4891-8421-5847v.16 0092453-000002

consortia can lend each Publisher's ebooks only to its own verified library members.  For example, public libraries often restrict lending to local residents with a library card.  For school and university libraries, lending is often restricted to their students, professors, and staff.  (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

124.    For example, Wiley's Ebook Distribution Agreement with ProQuest defines an "Authorized User" as follows: "For public libraries:  library staff, individual residents of Customer's reasonably defined geographic area served, and walk-in patrons while they are on site" and "For schools and other academic institutions:  currently enrolled students, faculty, staff and visiting scholars, as well as walk-in patrons while they are on-site.  (Pavese Decl. ¶23.)

125.    In Wiley's agreement with library ebook aggregator OverDrive, Wiley requires OverDrive to "require participating [libraries] to take reasonable measures to ensure that only Authorized Patrons of their libraries . . . may access the offline or download collection" and that "OverDrive will require that participating [libraries] provide it the right to audit their access control systems."  (Pavese Decl. ¶23.)

126.    The Publishers also require that each library aggregator employ approved DRM and other security measures to ensure that only one-user account can access each copy of a Publisher's ebook, and to prevent the unauthorized copying or distribution of ebook files.   (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

127.    Starting in the early 2000's, and still today, each of the Publishers made library ebooks available on a "one-copy, one-user"  licensed basis. This license terms allows multiple library patrons to check out a single copy successively, subject to the community-based limitations described above and DRM restrictions.  Each of the Publishers initially offered this model with a

22

perpetual term.  (Sevier Decl. ¶51; R-A Decl. R-A Decl. ¶¶30; Weber Decl. ¶68; Pavese Decl. ¶¶5, 22.)

128.    Under the one-copy, one user model, libraries pay a license fee when they select a title for their collection.   (Weber Decl. ¶76; R-A Decl. ¶¶33, 37; Pavese Decl. ¶5; Sevier Decl. ¶¶68, 74.)  The library pays the same license fee regardless of whether library patrons read the entire ebook or short excerpts.  (McN Decl. ¶10.)

129.    The same is true for commercial ebook licenses:  like print books, a purchaser pays for the work regardless of whether the purchaser actually reads any or all of the book.  (McN Decl. ¶10.)

130.    As library ebooks became increasingly more popular, HarperCollins, Penguin Random House, and Hachette each determined that a perpetual term for its one-copy, one-user model was not serving the economic interests of its authors.  They each ceased offering a perpetual term to public libraries in 2011, 2018, and 2019, respectively.  (Sevier Decl. ¶65; R-A Decl. ¶¶30-32; Weber Decl. ¶¶71-75.)

131.    These three Publishers currently offer a one-copy, one-user model with a perpetual term to academic libraries.  Academic libraries have different needs and lending patterns than public libraries.  (Sevier Decl. ¶68; R-A Decl. ¶40; Weber Decl. ¶77).

132.    Wiley maintains a one-copy, one user model with perpetual access for its trade books that it makes available to all libraries as ebooks.  (Pavese Decl. ¶¶5, 25-26.)

133.    Today, each of the Publishers offer somewhat different licensing terms for library ebooks:

**B.     Hachette**

134.    In 2019, Hachette adopted a two-year term for its one-copy, one user model for library patrons to access its trade ebooks, which remains in effect today.  At the end of two-years from the date of purchase, the terms governing this lending model state that "the Digital Book will expire and will no longer be available … unless repurchased."  (Sevier Decl. ¶¶65-68.)

**C.     HarperCollins**

135.    In 2011, HarperCollins adopted a one-copy, one-user model with a total of 26 circulations ("26-Circ Model"), which remains in effect today.  (R-A Decl. ¶¶32-35.)

136.    Under the 26-Circ Model, a library ebook is available for twenty-six circulations. Once the twenty-six circulations are exhausted, the library can decide whether to re-order the ebook for an additional twenty-six circulations, or use their resources to buy other titles.  (R-A Decl. ¶32.)

137.    For many years, HarperCollins priced the 26-Circ model at the same price as the suggested retail price for print books; currently it is priced at slightly more than the suggested retail price for print books.  (R-A Decl. ¶33.)

138.    HarperCollins enacted this model with the intention that it be similar to the economics that govern the sale of print books that show wear and tear from usage and need to be replaced or are lost over time.  (R-A Decl. ¶33.)

139.    The price per circulation of a library ebook under the 26-Circ Model is lower than the price of a commercial ebook.  (R-A Decl. ¶33.)

140.    The 26-Circ Model generated just over $3.45 million in revenue for HarperCollins in fiscal year 2014; by fiscal year 2019, the model generated over $9.95 million.  (R-A Decl. ¶35.)

4891-8421-5847v.16 0092453-000002

141.    In 2017, HarperCollins adopted an additional library distribution model to supplement its 26-Circ Model, the Pay-Per-Use model ("PPU Model"), which remains in effect today.  (R-A Decl. ¶36.)

142.    Under this model, libraries offer their patrons an opportunity to borrow an ebook from HarperCollins' catalog and pay a fee for a single, individual use only when a particular title is checked out by a patron.  (R-A Decl. ¶36.)

143.    Currently, all HarperCollins titles qualify for the PPU Model twelve months after the initial publication date.  Libraries also retain the option to obtain these backlist titles under the 26-Circ Model as well.  (R-A Decl. ¶36.)

144.    The PPU Model allows a library to license the right to a single circulation of an ebook for a small percentage of the price of an ebook license under the 26-Circ Model.  (R-A Decl. ¶36.)

145.    The PPU Model addresses two needs in the library channel.  First, smaller libraries with few members that are less likely to fully exhaust all twenty-six circulations in the standard model can access a broader catalog for their patrons and manage their budgets on a month-to-month basis.  Second, larger libraries that have focused on widely read titles can provide their patrons with access to a much broader selection of books at a lower cost:  if only a few members of a public library are interested a book, the library can obtain ebook copies for that handful of individuals at a price point lower than the 26-Circ Model.  (R-A Decl. ¶36.)

146.    In fiscal year 2018, just after it was introduced, the model generated $154,789 in revenue for HarperCollins.  By fiscal year 2020, HarperCollins earned over $2 million in revenue from library ebook checkouts via the PPU Model.  (R-A Decl. ¶33.)

### D.     PRH

147.     In 2018, PRH adopted a two-year metered model for library patrons to access its trade ebooks, which remains in effect today.  Through one of PRH's aggregator partners, a library obtains a license to make one copy of an ebook available to patrons on a "one-copy, one-user" basis, but for "a limited term of two (2) years from the time that each such copy is first purchased and available for lending by that institution…"  At the end of the two-year period, the ebook copy "will expire" and the library must obtain another copy if it wants to keep lending that ebook through the aggregator's platform.  (Weber Decl. ¶75.)

### E.     Wiley

148.     For its trade titles, Wiley continues to offer libraries a one-copy, one-user model or one-copy, three-users model, both with a perpetual term.  Under these models, when a library obtains a license for one ebook copy of a Wiley title, only one – or three – users at a time can access that copy.  A library's license to lend out the copy under the terms of the license does not expire.  The one-copy, one-user and one-copy, three-users model are Wiley's most popular lending models for its trade ebooks.  (Pavese Decl. ¶22.)

149.     Wiley developed these models largely with the interests of academic libraries in mind.  (Pavese Decl. ¶25.)

150.     Academic libraries are the primary customers of Wiley's science and academic-focused titles, which make up the majority of its catalog. While all libraries exist to serve patrons and expand access to information, academic libraries have a slightly different mission than their public counterparts.  Academic libraries highly prioritize the building of long-term collections, whereas public libraries often weed their collections. Further, professors and college students tend

to make somewhat different uses of academic-focused ebooks than the general public does with trade ebooks in the public library context.  (Pavese Decl. ¶25.)

151.    As a result of these differences, a perpetual licensing model is particularly attractive to academic libraries.  Although Wiley adopted a perpetual term for its one-copy, one-user and one-copy, three users models with academic libraries in the forefront of its mind, Wiley has concluded that it is simpler for the company to offer a perpetual term for all ebook titles, including trade book titles, licensed to all libraries (including public libraries) under these models.  (Pavese Decl. ¶¶25-26.)

152.    Wiley sets the digital list price for its library ebooks on the one-copy, one-user model at the same price as its print list price.  (Pavese Decl. ¶24.)

153.    Although Wiley, because of its principal role as an academic publisher, licenses its trade book ebooks to all libraries for a perpetual term at the same price as a print book, in a fashion closely akin to the acquisition of print books, the Internet Archive posts thousands of Wiley books on its Website along with the other Publishers' books.  (Pavese Decl. ¶8.)

154.    Because Wiley's books largely serve the academic community, the company also has worked with the leading academic-focused aggregators EBSCO and ProQuest to develop additional and unique lending models that serve the specific needs of libraries and readers of Wiley's science-focused and other titles.  (Pavese Decl. ¶¶3-4, 27-30.)

155.    For instance, Wiley works with these library ebook aggregators to offer subscription-based models.  These subscription models offer libraries to prospect of paying for students to have unlimited access to a large volume of ebooks.  Three of the Works in Suit published by Wiley are available under these subscription models.  (Pavese Decl. ¶¶28-29.)

27

156.     Wiley also works with its aggregator partners to offer a "Concurrent User Access Model," which is specifically designed to account for the frequent but brief use of titles in academic settings.  Under that model, content is available for a maximum of 365 "uses" within a particular year.  A use is defined to exclude a brief consultation of less than 10 minutes.  (Pavese Decl. ¶30.)

157.     Likewise, Wiley offers a number of "Short Term Loans" – ranging from one-day, seven-day, 14-day, and 28-day periods – where a library purchases access to a title for only that specific period of time.  (Pavese Decl. ¶30.)

**F.     The Publishers' Library Ebook Market Provides Americans with Millions of Free Ebooks**

158.     In addition to the Publishers' investments in the ebook format, the library ebook aggregators have invested in the creation of convenient platforms and applications that can be used by library patrons to download free ebooks to their devices anywhere there is an internet connection.  (Weber Decl. ¶68, 82; R-A Decl. ¶¶42-43.)

159.     For example, the country's leading library ebook aggregator, OverDrive, has developed the Libby app for public libraries.  (Weber Decl. ¶82; R-A Decl. ¶¶42.).

160.     Using the Libby app, a library patron can enter her local library card information and be granted instant access to that library's ebook holdings.  (R-A Decl. ¶42.)

161.     The library patron may check out and access library ebooks using the app.  If a title is not available, a patron may place a hold on the book and receive a notification when the title is available to be checked out.  (R-A Decl. ¶42.)

162.     Several other leading aggregators have developed similar platforms and applications for patrons to use to access library ebooks.  (Weber Decl. ¶68.)

4891-8421-5847v.16 0092453-000002

163.    The authorized library ebook market has provided library members across the United States with hundreds of millions of ebooks.  (Weber Decl. ¶10; McN Decl. ¶11.)

164.    The number of licensed library ebooks checked out via OverDrive was ███ in 2010, but this increased ███ to nearly ███ checkouts in 2020.  (McN Decl. ¶11.)  Additionally, in 2012, OverDrive processed 70 million total digital checkouts (which includes both ebooks and audiobooks); by 2020, the number of total digital checkouts ballooned to 430 million.  (McN Decl. ¶11.)

165.    During that same ten-year time span, the number of different titles that were checked out by patrons via OverDrive increased exponentially from ███ to more than ███.  (McN Decl. ¶11.)

166.    According to the American Library Association, more than 93% of libraries in the United States lend ebooks to their patrons.  (Weber Decl. ¶10.)  In 2020, more than 100 public library systems exceeded one million digital checkouts via OverDrive.  (Weber Decl. ¶10.)

167.    According to the Institute of Museum and Library Services ("IMLS"), an independent federal agency that provides library grants, museum grants, policy development, and research, between FY 2014 and FY 2018, the percentage of libraries offering electronic collection materials increased from 80 percent to 90 percent.  (Weber Decl. ¶11.)  The IMLS data further reflects that the biggest growth in ebook adoption between 2014 and 2018  was "among rural libraries (14 percent) compared to other locales (between 1 and 8 percent).  (Weber Decl. ¶11.)

168.    Internet Archive's library expert, Susan Hildreth, testified that there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive."  (McN Decl. ¶9.)

169.   The Publishers' annual revenue from the library ebook market has increased from only a few million to hundreds of millions of dollars in less than a decade.  (Weber Decl. ¶8.)

170.   For example, in 2010, PRH earned over $5 million from U.S. digital library sales, which includes both ebooks and digital audio.  By 2020, that figure had grown to over $83 million. Ebooks currently generate $59 million for PRH from library channels.  (Weber Decl. ¶8.)

171.   From January 2017 and August 2019, approximately 25% of PRH's annual ebook revenue was generated from U.S. digital library sales; the remaining approximately 75% of revenue was generated from retail channels.  (Weber Decl. ¶64.)

172.   HarperCollins earned $46.91 million in revenue from ebooks in the United States library market between 2015 and 2020.  Library ebook licenses also make up an increasing percentage of HarperCollins' overall ebook revenue.  In fiscal year 2015, library ebook licenses in the United States constituted 2.3% of HarperCollins' total U.S. ebook revenue.  By fiscal year 2020, that share grew substantially to 7.4% and reached 12.9% of all U.S. ebook revenue by mid-2021.  As of mid-2021, HarperCollins earned over $19 million in revenue from library ebook licenses in the United States.  (R-A Decl. ¶48.)

173.    The numbers of Americans reading authorized free ebooks from the library has increased more than the number of people purchasing ebooks in the retail market.  (Sevier Decl. ¶57; R-A Decl. ¶50.)

174.   Three of the Publishers have performed analyses to determine the proportion of ebook readers in the United States who access authorized ebooks for free from a library, as compared with purchasing a commercial ebook.  (Sevier Decl. ¶¶55-59; Weber Decl. ¶¶6, 64; R-A Decl. ¶50.)

175.    In 2020, PRH performed a preliminary study using nearly 87,000 titles first published by the company between January 2017 and August 2019 and compared library checkouts via OverDrive with commercial ebooks purchased from Amazon and other retail platforms.  The study determined that library patrons checked out the ebook titles 34.3 million times, which accounted for approximately 39% of all ebook reads for these titles.  Which means that, of all the Americans reading PRH ebooks available during this nearly three year time period, 39% obtained the ebook for free from a library.  (Weber Decl. ¶¶6, 64.)

176.    Moreover, the 39% percent of eBook reads from library patrons accounted for only 25% of PRH's total ebook revenue for that same time period, with the remaining approximately 75% of ebook revenue coming from consumers that purchased their ebooks.  (Weber Decl. ¶¶6, 64.)

177.    In a 2021 study, Hachette looked at three years of data comparing the number of authorized ebook circulations of its titles to library patrons via OverDrive, as compared with the number of consumers purchasing their ebooks.  It found that between 2017 and 2020, library ebook circulations made up, on average, 50% of "reads."  In other words, the study reflected that half of the people who read Hachette's ebooks are library readers who obtained the ebooks for free.  (Sevier Decl. ¶¶55-56.)

178.    The study also reflected that, although library ebooks made up 50% of reads, library ebooks brought in only 13% of total ebook revenue for Hachette; the remaining approximately 87% of revenue was generated from retail channels.  (Sevier Decl. ¶56.)

179.    Hachette's analysis also concluded that since 2017, the percentage of their consumer reads has been shifting from retail towards library, especially for backlist.  Of all HBG

31

backlist ebooks either purchased or checked out in 2020, 38% were bought at retail and 62% checked out from libraries.  (Sevier Decl. ¶57.)

180.     Finally, the study reflected that in the year 2020, library ebooks brought in 16% of total ebook revenue for Hachette.  During the same year, 57% of the people who read Hachette's ebooks were library readers who obtained the ebooks for free.  (Sevier Decl. ¶56.)

181.     In 2021, through its 26-Circ and PPU models, HarperCollins made over 63 million ebook checkouts available to library patrons through its library ebook sales, exceeding retail ebook sales by more than 30 million.  This figure reflects all potential check-outs under the 26-Circ model, not actual check-outs.  (R-A Decl. ¶50.)

182.     While HarperCollins made more "reads" available through library ebook sales than through retail sales, library ebook revenue accounted for approximately 10-15% of the company's ebook revenue in 2021.  (R-A Decl. ¶50.)

## V.   THE PUBLISHERS MAKE EBOOKS BROADLY ACCESSIBLE TO PERSONS WITH DISABILITIES AND RESPOND QUICKLY IN EMERGENCY CIRCUMSTANCES

### A.     The Publishers' Efforts to Serve the Blind and Print Disabled People

183.     The Publishers make efforts to ensure that their ebooks are available in a format accessible to the blind and visually disabled, at no cost to those patrons.  (Sevier Decl. ¶71; R-A Decl. ¶51; Pavese Decl. ¶.)

184.     Hachette and HarperCollins make their works available through Bookshare, which is the world's largest accessible online library for people with print disabilities.  Bookshare makes its services available, free of charge, to all qualifying students in the United States through an award from the U.S. Department of Education, Office of Special Education Programs.  (Sevier

4891-8421-5847v.16 0092453-000002

Decl. ¶51; R-A Decl. ¶51.)

185.    As a result, Bookshare is free for all qualified U.S. students.  Individuals who are not students or international patrons can pay a nominal annual fee for their membership. Bookshare makes content available through a range of assistive technologies, including braille readers, text to speech and ebooks.  If a reader requested title is print exclusive or has never yet been available in ebook format, the Publishers produce a special PDF exclusive to Bookshare for the unique purpose of fulfilling this obligation to readers.  (Sevier Decl. ¶51.)

186.    For the general population, the Publishers also produce ebooks with the typical features of type resizing, page magnification, and screen contrast so readers can adjust the text to their preference.  (R-A Decl. ¶52; Sevier Decl. ¶71.)

**B.    The Publishers' Response to the COVID-19 Pandemic**

187.    Starting in March 2020, as the COVID-19 pandemic caused various shutdowns, the Publishers enacted programs and new lending models to assist libraries and schools to meet the increased demand for ebooks.  (Sevier Decl. ¶70; Weber Decl. ¶¶79-80; R-A Decl. ¶41.)

188.    During the pandemic, many public libraries in the United States were provided with time-limited federal funding under the American Rescue Plan Act that could be directed towards obtaining library ebooks for patrons.  Some of the Publishers adjusted their models to allow libraries to qualify for this funding.  (R-A Decl. ¶41; Weber Decl. ¶79.)

189.    PRH implemented two library ebook models in the spring of 2020.  (Weber Decl. ¶79.)

190.    First, PRH created a one-year metered model under which libraries can purchase a license to access an ebook title on a one-copy, one-user basis for half the digital list price than the

33

company's standard two-year model.  (Weber Decl. ¶79.)

191.    Second, PRH created a pay-per-use model.  If a library participates in this model, the patrons of that library are given the option to access a one-time, time-limited loan of any ebook in PRH's catalog.  Each time a title is checked out through this model, the library pays 10% of the standard digital list prince under PRH's standard two-year library ebook model.  (Weber Decl. ¶80.)

192.    Starting in the beginning of the pandemic, Hachette adopted protocols under which teachers and professors could obtain up to 250 codes for their students to use to obtain ebooks that could be read in lieu of physical copies that were inaccessible.  (Sevier Decl. ¶70.)

193.    In response to the pandemic, Hachette also provided discount ebooks to academic libraries on a case-by-case basis, either under a simultaneous use option that allowed up to twenty students to read a single copy of an ebook for two months for $20, or through a discounted one-copy, one user model where a library would be charged $3 for each ebook copy, for a three-month access period.  (Sevier Decl. ¶70.)

194.    During the pandemic, HarperCollins temporarily instituted a prorated, time-metered model for libraries to make HarperCollins' ebooks available to their patrons.  The company developed this model with the intent to allow libraries to spend their time-limited federal funding on licensed ebooks.  (R-A Decl. ¶41.)

195.    At the start of the pandemic, HarperCollins reduced prices on approximately 1,000 popular backlist trade and children's ebook titles for several months.  (R-A Decl. ¶41.)

196.    HarperCollins also expanded the titles in the PPU model at this time.  While the PPU Model had previously been confined to books published more than eighteen months ago, the

company moved up the time frame for frontlist books to enter the PPU Model to six months post-publication.  (R-A Decl. ¶41.)

197.    Additionally, starting in the beginning of the pandemic, HarperCollins extended permission to authors, educators, and librarians to read the company's titles online and on video. (R-A Decl. ¶41.)

## VI.    INTERNET ARCHIVE'S USE OF THE PUBLISHERS' REGISTERED WORKS

### A.    The Works in Suit

198.    The Publishers brought this suit as to each of the 127 literary works listed in Exhibit A (the "Works") to their Complaint.  (McN Decl. ¶7.)

199.    The 127 Works in Suit range from well-known titles like *The Bell Jar* and *Lord of the Flies,* to groundbreaking titles, like Zora Neale Hurston's *Their Eyes Were Watching God* or Toni Morrison's *Bluest Eye,* to popular non-fiction and fiction titles, like Malcolm Gladwell's *Blink,* Gillian Flynn's *Gone Girl,* Ann Patchett's *Commonwealth,* and George R.R. Martin's *A Dance with Dragons* (from the *Game of Thrones* series), to classic children's titles, like the *Big Nate* or *Lemony Snicket* books, to biographies, to romance novels, like CJ Redwine's *Defiance,* and Patrick Lencioni's best-selling management books.  (McN Decl. ¶7; Weber Decl. ¶¶21-22; Sevier Decl. ¶73; R-A Decl. ¶6; Pavese Decl. ¶18.)

200.    For each of the Works in Suit, the Publishers obtained from each author the exclusive rights to publish the underlying work in multiple formats, including hardcover, paperback, and ebook formats.  (McN Decl. ¶8.)

201.    All 127 Works in Suit are available as authorized ebooks, which retail consumers pay to read and libraries pay to license so that they can be loaned for free to their patrons.  (Sevier

Decl. ¶9; Weber Decl. ¶20; R-A ¶20; Pavese Decl. ¶18.)

202.    Over the three years prior to this action, the Works in Suit collectively generated over $1 million in library ebook revenues alone for the respective Publishers and their authors. (Weber Decl. ¶23; R-A ¶49.)

**B.    Internet Archive's Use of the Works in Suit**

203.    The Works in Suit were checked out on Internet Archive's Website 46,307 times between March 2017 and approximately September 2, 2020.  (Foster Decl. ¶104.)  As of May 2020, Internet Archive provided registered users of its website with digital versions of the physical books embodying the Works in Suit.  (Offner Decl. ¶14.)

204.    Digital versions of each of the Works in Suit could be accessed on Internet Archive's website using a standard Internet Archive account.  A specially qualified account held be someone with a print disability was not necessary to access the Works in Suit.  (Offner Decl. ¶6.)

205.    The Internet Archive generates a "details" page for each book listed on its website, with a separate URL.  (Offner Decl. ¶8.)

206.    As of May 2020, each of the Works in Suit had a "details" page with a separate URL on the Internet Archive's website.  (Offner Decl. ¶14.)

207.    As of May 2020, while on the "details" pages for all of the Works in Suit, a user could click a button labeled "Borrow".  (Offner Decl. ¶11.)

208.    As of May 2020, after clicking the "Borrow" button on the "details" pages for all of the Works in Suit, a user would obtain access to each full book for 14 days.  (Offner Decl. ¶14.)

209.    For all of the Works in Suit, once a user accessed each full book, a user could:

- Scroll through and read the book within the Internet Archive website's online book-reader interface;

- Utilize the listen feature, called "Read this book aloud," of the Internet Archive website's online book-reader interface to hear an audio rendering of each book; and

- Use the download feature to download each full book from Internet Archive website, for access on a computer using Adobe Digital Editions.  The download feature allowed for downloads in both PDF and ePUB formats.

(Offner Decl. ¶12.)

### C.    Copyright Registration and Ownership

210.    Hachette holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Hachette is identified as the publisher.  (McN Decl. ¶8.)

211.    HarperCollins holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which HarperCollins is identified as the publisher.  (McN Decl. ¶8.)

212.    Penguin Random House holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Penguin Random House is identified as the publisher. (McN Decl. ¶8.)

213.    Wiley holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the

37

Complaint for which Wiley is identified as the publisher.  (McN Decl. ¶8.)

214.    Each of the 127 Works was registered with the United States Copyright Office within the time period required to recover statutory damages and attorneys' fees under 17 U.S.C. § 412 with respect to the allegations set forth in the Complaint.  (McN Decl. ¶8.)

## VII.    THE INTERNET ARCHIVE'S EBOOK LENDING WEBSITE

### A.    Internet Archive's Evolution and Stated Goals

215.     Internet Archive endorses the phrase "Universal Access to All Knowledge."  (McN Decl. ¶27.)

216.    Internet Archive was founded in 1996 by Brewster Kahle, who currently serves as its Chairman.  (McN Decl. ¶28.)

217.    Mr. Kahle is a computer scientist who sold two technology companies in the 1990s, one to AOL and another to Amazon.  (McN Decl. ¶28.)

218.    The considerable profits from those sales were used, in part, to fund the Kahle/Austin Foundation, which Kahle runs as President with his wife and which reported assets worth approximately $120 million in 2019.  (McN Decl. ¶28.)

219.    Internet Archive is a 501(c)(3) corporation. (McN Decl. ¶29.)

220.    In a 2017 grant application, Internet Archive stated that it has a guaranteed source of philanthropic support to sustain its basic services in perpetuity."  (McN Decl. ¶29.)

221.    Internet Archive's activities are in large part funded by Mr. Kahle's various entities, including the Kahle/Austin Foundation.  IA's former Director of Finance Jacques Cressaty testified that Mr. Kahle "would use various ways of channeling these funds [to IA]" including via the Kahle/Austin Foundation.  (McN Decl. ¶29.)

4891-8421-5847v.16 0092453-000002

222.    Government funding made up only 1.8% of Internet Archive's revenue between 2011 and 2020.  (McN Decl. ¶29.)

223.    Mr. Kahle wrote in a March 1, 1997 article for *Scientific American* that "the continued reduction in price of data storage, and also data transmission, could lead to interesting applications as all the text of a library, music of a radio station, and video of a video store become cost effective to store and later transmitted in digital form."  (McN Decl. ¶31.)

224.    In approximately 2000 or 2001, Internet Archive started uploading public domain books to its Website in order to "build[] a digital library".  (McN Decl. ¶31.)

225.    The Google Books service  at issue in *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015), allowed users to search through and read "snippets" of books, but did not allow users to access the complete text of a book.  (McN Decl. ¶¶33-34.)

226.    In a December 20, 2006 article, Mr. Kahle was quoted as saying "[t]he whole Google Books Search looks like Amazon's Search Inside the Book.  Let's go open with these collections.  These are beautiful books."  (McN Decl. ¶33.)

227.    About a year later, Internet Archive announced that "together with the Boston Public library and the Woods Hole Library,  it would start scanning out-of-print but in-copyright works to be distributed through a digital interlibrary loan system."  (McN Decl. ¶34.)

228.    In contrast, a *New York Times* article stated that "Google scans copyrighted works as well, but it does not allow users to read the full text of those books online, and it allows publishers to opt out of the program."  (McN Decl. ¶34.)

229.    Mr. Kahle has stated that he sees Internet Archive's activities in connection with the Website as a "rebellious" act that "SIMPLY ASSUME[s]" that Internet Archive "can perform

a function in the online environment that [libraries] routinely perform in the physical print environment." (McN Decl. ¶15.)

230. Today, subject to its claim that it does not post books published within the last five years, Internet Archive scans any in-copyright books it acquires and posts ebook versions of those titles on its Website. (McN Decl. ¶35.)

231. Internet Archive does not always comply with its five year limitation. For example, two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the IA's Website that same year. (McN Decl. ¶115.)

232. Internet Archive has set public goals for the number of in-copyright books it would like to make available for borrowing as ebooks on the Website. For example, in March 2018, Internet Archive announced that its short-term goal is to digitize more than four million in-copyright books and add them to the Website. (McN Decl. ¶36.)

233. Then, eight months after this lawsuit was filed, Internet Archive announced that it had added its two millionth in-copyright book to the Website on February 3, 2021. (McN Decl. ¶36.)

234. IA currently lists more than 3 million in-copyright books on its Website. If IA continues to add in-copyright books at a similar rate, it is on track to meet its four million-book milestone within a year. (McN Decl. ¶36.)

235. In an August 2011 article in *The Guardian*, Mr. Kahle stated that he has a "realistic goal of 10 million books – the equivalent of a major university library." (McN Decl. ¶36.)

40

**B.     The Internet Archive Ebook Lending Service At Issue in This Lawsuit**

236.    At present, anybody in the world with an Internet connection and a valid email account can obtain an account to access any of the millions of ebooks available on IA's Website. (McN Decl. ¶3.)

237.    Chris Freeland, Internet Archive's Director of Open Libraries, testified that any person can "sign up" for free access to the Website "from anywhere in the world" by entering "[b]asic contact information including [an] email address."  (McN Decl. ¶3.)

238.    According to Mr. Freeland, Internet Archive "[l]end[s] to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into [controlled digital lending] by particular users."  (McN Decl. ¶3.)

239.    The Publishers commenced this copyright infringement action on June 1, 2020, alleging that Internet Archive was infringing the 127 Works in Suit.  (McN Decl. ¶7.)

240.    An analysis of the Website shows that over 33,000 in-copyright books published by the Publishers in print and digital form are available on the Website.  (McN Decl. ¶7.)

241.    The Works in Suit are a fraction of the more than 33,000 in-copyright books published by the Publishers that Internet Archive has posted as ebooks on the Website without authorization, license or any compensation.  (McN Decl. ¶7; Foster Decl. ¶¶112-118.)

242.    Internet Archive scanned physical books published by the Plaintiffs and "republishes" ebook editions on the Website.  (McN Decl. ¶13.)

243.    The Publishers have not granted Internet Archive permission to scan their physical books to create digital copies.  (McN Decl. ¶13.)  The Plaintiffs have not granted Internet Archive permission to distribute these unauthorized ebook editions on the Website.  (McN Decl. ¶13.)

244.     Internet Archive admits that it lacks permission from the Publishers to engage in these activities.  (McN Decl. ¶13.)

245.     Mr. Freeland testified that Internet Archive does not "pay royalties in connection with the digitization of [each author's] work" or "pay authors royalties for making their books available for free" on the Website.  (McN Decl. ¶37.)

246.     Mr. Freeland testified that Internet Archive does not "license materials" for its Website. (McN Decl. ¶12.)

247.     When this lawsuit was filed in June 2020, Internet Archive admitted in its Answer to the Complaint that "more than 1.3 million books are available on archive.org for one patron to borrow at a time."  (McN Decl. ¶1.)

248.     Since June 2020, the number of in-copyright ebooks available on the Website has increased to over 3.2 million.  (McN Decl. ¶1.)

249.     The Website effectuates about 70,000 "borrowing events" per day – which amounts to 25 million per year.  (McN Decl. ¶2.)

250.     As of July 2022, IA's Website reflects that it has 5.9 million users.  This figure was 2.6 million when this action was filed in June 2020.  (McN Decl. ¶2.)

251.     According to Internet Archive, at the time this action was filed, any user who logged in with a valid Internet Archive account could "borrow" for free in-copyright ebooks for a period of 14 days.  (McN Decl. ¶4.)

252.     After this action was filed, Internet Archive changed it practices and now its default option allows valid users to "borrow" free in-copyright ebooks for a period of one hour.  (McN Decl. ¶4.)

253.    Internet Archive still offers users the ability to "borrow" a book for 14 days if the title is available for concurrent lending by more than person at once.  Each title has a lending cap based on the number of concurrent loans of the work is allowed at one time. If the lending cap for a particular ebook title has been exceeded, the user goes on a waitlist until it becomes available. (McN Decl. ¶4.)

254.    Internet Archive has indicated that it offers "High Quality Page Images" of the books available for reading or downloading on its Website.  (McN Decl. ¶4.)

255.    One of Internet Archive's experts, Dr. Imke Reimers, testified that the quality of the scans were "fine," "quite similar to the Google Books scans" and sufficiently clear to serve as a "potential substitute" for authorized library or commercial ebooks.  (McN Decl. ¶4.)

256.    Internet Archive invites its users to read the ebooks on the Website.  For example, the top of the home page of openlibrary.org invites readers to "Read Free Library Books Online." (McN Decl. ¶5.)   Internet users who search Google for terms like "free ebooks," "borrow ebooks" or "Toni Morrison beloved free read" will see links to Internet Archive's Free Ebook Website on the first page of results, above any links to platforms offering the Plaintiffs' authorized library ebooks.  (McN Decl. Exhibit 185.)

257.    Mr. Kahle testified that once an ebook is checked out, a user can "flip through or read all the pages, absolutely."  (McN Decl. ¶4.)

258.    Internet Archive's library expert admitted that "certainly some [ebooks] could be read in an hour."  (McN Decl. ¶4.)

259.    Internet Archive is aware that at least some of its users use the Website to read books in full.  In June 2020, when Internet Archive changed its default loan period from 14 days to 1 hour, it received complaints from users.  (McN Decl. ¶5.)

260.    For example, one user asked the Internet Archive, "How come all the books I try to read have a one hour limit? I'm confused and I'd just love to finish a series I'm reading."  (McN Decl. ¶5.)

261.    As of July 2020, there are more than 1.1 million ebooks listed for 14-day downloads on the Website.  (McN Decl. ¶4.)

262.    For the books that are available on the Website for one hour loans only, the top of the page view tells users that the loans are "[r]enewable every hour, pending availability."   (McN Decl. ¶6.)

263.    Internet Archive's dissemination of  ebooks on its Website has expanded in recent years.  (Foster Decl. ¶18.)

264.    The number of ebooks that Internet Archive makes available for lending on its Website has increased from (a) 648,117 scans on April 1, 2018; (b) 965,499 scans on April 1, 2019; (c) 1,476,344 scans on May 26, 2020; and (d) 3,211,204 scans on February 19, 2022. (Foster Decl. ¶18.)

265.    The data further reflects an increase in Internet Archive's scanning of the Publishers' works in 2020 and 2021 after the Publishers filed suit in June 2020, as compared to prior years.  (Foster Decl. ¶18.)

266.    Since this action was filed, Internet Archive has added a total of 2,993 in-copyright works published by Hachette for lending on the Website.  (Foster Decl. ¶118, Figure 11.)

267.    Since this action was filed, Internet Archive has added a total of 4,171 in-copyright works published by HarperCollins for lending on the Website.  (Foster Decl. ¶118, Figure 12.)

268.    Since this action was filed, Internet Archive has added a total of 9,558 in-copyright works published by PRH for lending on the Website.  (Foster Decl. ¶118. Figure 13.)

269.    Since this action was filed, Internet Archive has added a total of 2,622 in-copyright works published by Wiley for lending on the Website.  (Foster Decl. ¶118, Figure 14.)

### C.    User Experience of the Internet Archive's Website

270.    The Website's home page includes a "BOOKS" tab that, when clicked, prominently shows icons for "Books to Borrow" and "Open Library." The first icon leads to a page for the "Books to Borrow" collection of electronic books on the Website. The second icon leads to the Openlibrary.org page, which is a component of Internet Archive's Website.  (Foster Decl. ¶21.)

271.     Internet Archive organizes its various content into "collections." The "Books to Borrow" page provides access to digitized books within the "inlibrary" collection, reported as holding 3,211,204 items as of Feb 21, 2022 and presently at over 3.4 million  (Foster Decl. ¶21; McN Decl. ¶1.)

272.    Clicking on the "About" icon on the "Books to Borrow" page toggles to text explaining that "Books in this collection may be borrowed by logged in patrons. You may read the books online in your browser or, in some cases, download them into Adobe Digital Editions, a free piece of software used for managing loans." The description at the "About" icon on the "Books to Borrow" page, at https://archive.org/details/inlibrary?tab=about, also indicates:

> Please note that works in this collection are protected by copyright
>
> law (Title 17 U.S. Code) and copying, redistribution or sale, whether

or not for profit, by the recipient is not permitted unless authorized

by the rightsholder or by law.

(Foster Decl. ¶23.)

273.  Until June 2020, the Website functionality enabled downloads of any borrowed book into Adobe Digital Editions.  After this action was filed, in June 2020, Internet Archive changed its system so that only 14 day loans allowed downloads of the books.  The 1-hour loans are available for online viewing in your browser.  (Foster Decl. ¶24.)

274.  Users can presently use a search feature on the "Books to Borrow" page to locate titles within the collection.  Apart from that search interface, the Internet Archive groups books into various "Topics and Subjects" for users to find a book.  (Foster Decl. ¶24.)

275.  The Internet Archive requires users to be logged in to an Internet Archive account to access many of its functions, including full access to free copies of complete digital books in the inlibrary collection.  (Foster Decl. ¶27.)

276.  The "BookReader application" allows the user to use the arrow keys on their keyboard, or to click on navigation buttons in the reader, to move to different pages in the borrowed book.  The BookReader app on the Website also has a "Read Aloud" feature, which a logged in user can activate for a borrowed book by clicking on headphones icon in the BookReader.  The feature converts the text to audio and plays it aloud.  (Foster Decl. ¶28.)

277.  With a 14-day loan, the user is presented with text providing for additional "DOWNLOAD OPTIONS" including "ENCRYPTED ADOBE EPUB" and "ENCRYPTED ADOBE PDF" (with "High Quality Page Image").  Clicking on the latter results in a file download to a user's computer, which can be opened in the "Adobe Digital Editions 4.5" application. The

scanned book is then in the user's Adobe Digital Editions "Library," from where the user can open and read it on a computer and a variety of other devices, including an iPad. (Foster Decl. ¶30.)

278.     Depending on the number of concurrent loans allowed, multiple users can obtain and read copies of the same Internet Archive scan of a book at the same time. (Foster Decl. ¶31.)

**D.     Evolution of Internet Archive's Infrastructure To Lend Ebooks Through its Website**

279.     Internet Archive has developed technology to facilitate its practice of obtaining physical books and of scanning those books in order to distribute the resulting ebooks on its Website. (McN Decl. ¶38.)

280.     According to Mr. Kahle's "Universal Access to Knowledge" speech in 2006, Internet Archive had by that time "developed [its] own little book scanner to get the cost per page – if you were to scan inside the United States – down to ten cents." (McN Decl. ¶39.)

281.     That machine, known as a Scribe, photographs the pages of books, which are turned manually by an operator raising and lowering a V-shaped pane of glass that keeps the pages flat. (McN Decl. ¶39.)

282.     The photographs of each page of the book are run through software developed by Internet Archive, also called Scribe, to create digital copies of print books. The Scribe machine and software are collectively known as the Scribe system. (McN Decl. ¶39.)

283.     Internet Archive subsequently created "digitization centers," where operators run multiple Scribe machines to scan high volumes of books. Around 2009, Internet Archive partnered with a company called Data Datum to scan books in China. (McN Decl. ¶40.)

284.     Internet Archive also operates scanning centers in the United States, United Kingdom and Canada. (McN Decl. ¶40.)

285.    In 2019, IA opened a "superscanning" center in Cebu, Philippines that receives shipping containers full of books and digitizes them for inclusion on the Website.  (McN Decl. ¶40.)

286.    Using these facilities, as of about 2021, Internet Archive scans about 3,500 books a day, which amounts to 1.28 million books annually.  (McN Decl. ¶40.)

287.    Internet Archive does not license ebooks and does not pay any royalties to authors or publishers in connection with its digitizing and posting books on its Website for free. (McN Decl. ¶12.)

288.    Instead,  Internet Archive stocks its Website by scanning and digitizing physical books that it obtains primarily via two channels – (1) by partnering with libraries to scan their collections, and (2) acquiring print books.  (McN Decl. ¶41.)

### 1.    Internet Archive Partners With Libraries to Scan Their Collections

289.    Internet Archive enters into contracts with certain libraries to scan their collections as part of a "commercial" book scanning business.  IA's book scanning business has generated more than $35 million of income since 2011.  (McN Decl. ¶42.)

290.    Participating libraries enter into an agreement to provide IA with print books from their collections to scan, which can be done on premises or offsite.  The scanning process keeps the book intact and, once scanned, the physical books return to the library for further circulation. (McN Decl. ¶42.)

291.    Under standard terms in the Scanning Agreement, Internet Archive "provide[s] one digital copy of each digitized [book] … to the Library and will retain additional Digital Copies. Internet Archive will post Digital Copies on the Internet Archive in a newly created sub-

48

collection… The Digital Copies will be freely available from Internet Archive via HTTP, Torrent or a similar method."  (McN Decl. ¶43.)

292.     The terms further state that both the library and Internet Archive "may freely use their Digital Copies … in any manner" that is "permitted under applicable copyright law," including "reproducing, displaying, storing, modifying, or distributing the Digital Copies." (McN Decl. ¶43.)

293.     Internet Archive engaged in marketing to invite libraries to participate in a scanning project.  For example, Internet Archive produced a flier inviting libraries to "Digitize your Collections [a]t one of our Regional Digitization centers or on your Table Top Scribe locally" that promises "[u]nlimited downloads of your items, with perpetual access.  Keep and distribute copies!"  (McN Decl. ¶42.)

294.     The majority of the books Internet Archive scanned from library collections were in the public domain, but some books are in-copyright.  (McN Decl. ¶43.)

295.     Mr. Freeland first testified that in-copyright books scanned from library collections cannot be checked out on its Website.  (McN Decl. ¶43.)

296.     But, after he was shown an example of a work scanned from the collection of the Boston Public Library that apparently was available for borrowing, Mr. Freeland testified that in-copyright "books may well be available for lending on archive.org that were obtained via scanning agreement..." (McN Decl. ¶43.)

297.     According to Internet Archive, libraries were apparently reluctant to allow IA to scan in-copyright books because of "copyright concerns."  (McN Decl. ¶¶44-45.)

298.     Mr. Kahle stated in a July 2019 blog post that Internet Archive "has worked with

49

500 libraries over the last 15 years to digitize 3.5M books.  But based on copyright concerns the selection has often been restricted to [public domain] books."  (McN Decl. ¶44.)

299.    Internet Archive's former Director of Finance, Jacques Cressaty, also testified that, by 2016, "our library partners ran out of books that were out of copyright, so pre-1923, and they're reluctant to give us books that were in copyright."  (McN Decl. ¶43.)

### 2.    Internet Archive Acquires Print Books from Other Sources

300.    To obtain physical books to scan, Internet Archive has looked to sources outside of libraries that have executed scanning agreements.  Internet Archive has gathered some books from donations, including  "about 500,000 books" by 2011.  (McN Decl. ¶45.)

301.    Internet Archive also purchased books that its scanning contractor, "Datum Data," had obtained "through their connections in China."  (McN Decl. ¶45.)

302.    Internet Archive has no policy in place to assess whether a particular physical book in its collection is a counterfeit copy before making a digital copy of the book and making that digital copy available for lending.  (McN Decl. ¶45.)

303.    Internet Archive has also obtained books by absorbing entire library collections.  In 2020, the defunct Marygrove College donated its entire collection of "70,000 books" and other works.  (McN Decl. ¶46.) (

304.    The materials in the Marygrove College collection were packed for shipping, digitized and resulting ebook copies were posted on the Website.  (McN Decl. ¶46.)

305.    Internet Archive also has operated a book sponsorship program that allows users to contribute money towards the purchase and scanning of particular books they want to see added to the Website.  (McN Decl. ¶47.)

4891-8421-5847v.16 0092453-000002

306.   Mr. Cressaty testified that, "[i]f you have a book that you are interested in having a digital copy of …, you can send us money or you can send us a book plus a donation to cover the cost of … the digitization of that book."  (McN Decl. ¶47.)

307.   Mr. Cressaty further testified that "the donor gives Internet Archive money in excess of the price of the book, and that money covers the purchase of the book and its scanning." (McN Decl. ¶47.)

308.   Internet Archive also has funded its projects with donations of bitcoin.   For instance, Internet Archive received "$1M in Bitcoin" from the anonymous donor behind the "Pineapple Fund."  (McN Decl. ¶48.)

309.   Internet Archive testified that "there's no way you can tell" where this money is coming from and the source "could be ISIS, for all you know."  (McN Decl. ¶48.)

### 3.   Internet Archive Preservation of Physical Books

310.   The physical books Internet Archive obtains are typically packed into shipping containers and sent to offshore digitization facilities in Cebu or China, where they are rendered into ebooks by the Scribe system.  (McN Decl. ¶49.)

311.   The books are then shipped back to facilities operated by IA's affiliates, where they "are stored in double-stacked shipping containers in … physical archive facilities in Richmond, CA and Pennsylvania."  (McN Decl. ¶49.)

312.   Unlike the physical books in the collections of public libraries, the physical books Internet Archive "preserves" in shipping containers are not available to the public.  (McN Decl. ¶49.)

313.   The books and the facilities housing the shipping containers are legally owned by

a separate entity, Open Library of Richmond Inc. ("OLR").  (McN Decl. ¶50.)

314.    Mr. Kahle testified that "the Open Library of Richmond [] is actually the organization that stores and owns the books." (McN Decl. ¶50.)

315.    Internet Archive does not own the physical books that it makes available on its Website.  (McN Decl. ¶50.)

316.    According to Internet Archive's 990 tax form, Open Library of Richmond paid Internet Archive a $4,840,000 grant in 2016.  (McN Decl. ¶50.)

317.    Mr. Kahle is the principal officer of Open Library of Richmond.  He funds the entity from his personal finances.  (McN Decl. ¶50.)

318.    Internet Archive has a number of other affiliate companies in addition to OLR. (McN Decl. ¶50.)

319.    During his deposition, Mr. Cressaty referred to these companies as the "Kahle/Austin Empire."  (McN Decl. ¶50.)

320.    These companies own Internet Archive's "headquarters, warehouses and some distributed data centers.  (McN Decl. ¶50.)

321.    According to Internet Archive, these companies were created "[a]s a strategy to mitigate risk."  (McN Decl. ¶50.)

E.    **Internet Archive's Relationship With and Eventual Acquisition of Better World Books**

322.    In or about 2013, Internet Archive started sourcing physical books to scan and post on its Website from the for profit, used book retailer, Better World Books ("BWB"). BWB has obtained nearly 400 million print books, including from libraries discarding (or what Internet Archive describes as BWB's "weeding") unwanted copies.   (McN Decl. ¶51.)

4891-8421-5847v.16 0092453-000002

323.   In April 2013, Internet Archive and BWB drafted a memorandum of understanding, which stated that ███████████████████████████████████████████████ ████████████████████████████████████████ (McN Decl. ¶51.)

324.   Internet Archive would periodically identify print books that it wanted to acquire based on what was available from BWB's inventory, which BWB either donated or sold to IA for a modest fee.  (McN Decl. ¶52.)

325.   In a 2016 email from Brewster Kahle to BWB's Director, Strategic Sales & Partnerships, for instance, Mr. Kahle stated that Internet Archive had identified "about 13k books that were … 'desirable' for us" from BWB's list  and offered to purchase those "books for $1 each." (McN Decl. ¶52.)

326.   Eventually, in 2018 Internet Archive sent a "wish list" containing approximately "1.5M ISBNs" for BWB to run against its list to determine which books were available.  (McN Decl. ¶53.)

327.   In that same message, Mr. Kahle and Freeland "agreed that our best path to millions of books is arm-in-arm with BWB…"  (McN Decl. ¶53.)

328.   By April 2018, IA was ████████████████████████████████████████ ██████████████  (McN Decl. ¶53.)

329.   In the fall of 2018, Internet Archive started exploring the possibility of acquiring Better World Books.  In an email sent to Kahle on November 12, 2018, the founder of BWB wrote that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████ (McN Decl.

¶54.)

330.    On April 17, 2020, Mr. Kahle wrote in an email to a potential investor that Better

World Books "get[s] 30 million books a year, and sell[s] 10 million – the others are donated or

recycled.  We want more of the flow… This is a bold move and our library colleagues believe it

can help rearrange how books work in the library field in general: libraries buy books, and now

consign or donate them to BWB, the new non-profit would keep 1 copy for digitization and

preservation, the rest get sold.  This is what BWB does already, but we would ramp this up.  As a

self sustaining business, this will keep the books flowing year after year."  (McN Decl. ¶55.)

331.    In the same message, Mr. Kahle also wrote that "they are a going concern and

hopefully even profitable.  If they generate money then they could pay for the digitization…" and

that "The successful operation of BWB will provide funding back to The Internet Archive to ensure

that it can continue to deliver free services to the world…"  (McN Decl. ¶55.)

332.    Finally, Mr. Kahle wrote that Internet Archive would obtain "maybe 7 million

[books] over the next few years" (id.) at a rate of "1mm books per year."  (McN Decl. ¶55.)

333.    In June 2019, Internet Archive via affiliated entities acquired Better World Books.

According to the Executive Vice President and General Counsel of Better World Books, Ms.

Patton-Schmidt, ███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████ (McN Decl. ¶56.)

54

334.    Mr. Kahle used funds from his personal fortune to fund the transaction.  The funds passed through OLR before the funds were received by Better World Books.  (McN Decl. ¶56.)

335.    As part of the transaction, OLR ███████████████████████████████████ ████████████████████████████████████████████ (McN Decl. ¶56.)

336.    Under the terms of the acquisition Better World Libraries – a 501(c)(3) corporation controlled by Kahle – became the sole shareholder of Better World Books.  (McN Decl. ¶56.)

337.    Kahle is the Chairman of Better World Libraries and a Director of Better World Books, which is controlled by "people affiliated with the Austin Kahle [sic] Empire."  (McN Decl. ¶56.)

338.    Internet Archive announced the acquisition on November 6, 2019 in a blog post. The post stated that "[t]his new relationship will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books… Any book that does not yet exist in digital form will go into a pipeline for further digitization, preservation and access."  (McN Decl. ¶57.)

339.    Internet Archive and Better World Books have explored and adopted a number of what the two entities have described as "synergies" – or "ways that BWB could work with IA and its affiliates to make both business perform better."  (McN Decl. ¶58.)

340.    For instance, webpages for books on the Better World Books website are provided with links to "borrow" those books from the Internet Archive's Website.  (McN Decl. ¶58.)

341.    According to BWB's Ms. Patton-Schmidt, following its acquisition, Better World Books ███████████████████████████████████████████████.  (McN Decl. ¶60.)

342.    Ms. Patton-Schmidt further testified that "Better World Books has vast management experience in libraries e-commerce and supply chain management that can be beneficial to IA."  (McN Decl. ¶60.)

343.    Ms. Patton-Schmidt testified that between 2020 and 2021, ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████  (McN Decl. ¶60.)

344.    Between the acquisition in July 2019 and September 12, 2021, Better World Books has identified and packed up more than 2.8 million books from Internet Archive's "wishlist." (McN Decl. ¶61.)

345.    Many of these books have been shipped off to the Cebu scanning center for digitization, posted on the IA's Website, and set for eventual delivery to the facilities operated by IA affiliates for "preservation."  (McN Decl. ¶61.)

**F.    "Monetized" Aspects of the Internet Archive Website**

346.    Webpages for ebooks on the Internet Archive's Website contain links to purchase that title from Better World Books, including a "Purchase at Better World Books" button that appears at the top of the window when users read an ebook on IA's ebook browser.  (McN Decl. ¶61.)

347.    Internet Archive receives a payment from Better World Books every time a user clicks on a link on the Internet Archive's Website to purchase a used book from Better World Books' website.  (McN Decl. ¶59.)

348.    The webpages on IA's Website also include links to "Donate" to the Internet Archive.  (McN Decl. ¶59.)

349.    As Internet Archive's former Director of Finance testified, "every single page of the Archive is monetized."  (McN Decl. ¶61.)

350.    The screenshot below reflects the Website's "Donate" option.



(McN Decl. ¶59.)

## G.    Internet Archive's Creates the "Open Libraries" Project

### 1.    Imposing and Then Removing Geographic Limitations on Ebook Lending

351.    The limits placed by Internet Archive on how the ebooks on its Website have changed over time.  Initially, Internet Archive had "80,000+" in-copyright ebooks in its "In-Library eBook Lending Program. (McN Decl. ¶63.)

352.    In an email from this time, Internet Archive's Office Manager stated that the ebooks could "only be borrowed by a patron of a physical library that participates in [Internet Archive's] program" and that the ebooks must be "access[ed] through our site from the physical library's network."  (McN Decl. ¶63.)

353.    Later, Internet Archive removed any geographical limits so that anybody in the world with an Internet connection could access in-copyright books on the Website. (McN Decl. ¶64.)

354.    Internet Archive has not reinstated any geographic limits since this initial phase.

57

(McN Decl. ¶64.)

**2.      Expanding the Number of Concurrent Ebook Loans Available on the Website**

355.    In or about 2018, Internet Archive began what it called its "Open Libraries" project. Prior to that time, IA limited the number of concurrent loans on any one title to the number of physical copies of the title owned by IA (or an affiliated entity).  (McN Decl. ¶67.) (¶70)

356.    On November 13, 2018, Mr. Freeland published a blogpost stating that this "own one, loan one principle" based on the books Internet Archive owned was "viable, but limited," and "for controlled digital lending to work at scale, more physical copies are needed to loan against, especially for titles … that enter the public zeitgeist and become part of a major news story."  (McN Decl. ¶65.)

357.    Two years before Internet Archive started the Open Libraries project, in October 2016, Mr. Kahle issued a statement titled "Transforming Our Libraries into Digital Libraries:  A digital book for every physical book in our libraries."  (McN Decl. ¶66.)

358.    In that statement, Mr. Kahle proposed a "collaborative effort [with libraries] to select and digitize the most useful books of the 20th and 21st centuries, and to build a robust system to circulate the resulting e-books to millions, and eventually billions of people."  (McN Decl. ¶66.)

359.    According to the statement, Mr. Kahle sought to achieve this goal by collaborating with libraries "to digitize the materials efficiently, minimizing duplication, and lend the texts with the same limitations placed on physical books."  (McN Decl. ¶66.)  Mr. Kahle wrote that "Internet Archive could create a circulation system that would administer the lending [for libraries].  In effect, then, each library can choose from a variety of methods to lend digital versions of the physical books in their collection.  This would keep the local libraries in control but leverage the

4891-8421-5847v.16 0092453-000002

convenience of a cloud-based system that others maintain and update."  (McN Decl. ¶66.)

360.    To accomplish this, Mr. Kahle stated that, "in each library's online catalog, when a digital version of a book exists [on Internet Archive], we can include a web-link on the record for the physical book, giving readers the ability to browse the book on screen or to borrow it from the convenience of their homes.  In this way, we can smoothly enhance a library's collection, from analog to digital, at scale. . . . To build this future, we will need the participation of multiple sectors to bring thousands of libraries digital."  (McN Decl. ¶66.)

361.    According to Mr. Kahle, this "collaborative digital library collection and circulations system," "could help deliver e-books to millions of patrons with a flip of a digital switch."  (McN Decl. ¶66.)

### H.    Establishing the Open Libraries Project

362.    The concept identified in Mr. Kahle's 2016 statement would eventually be named the "Open Libraries" project.  (McN Decl. ¶67.)

363.    According to Internet Archive, this program allows libraries to "pool[] their physical collections" with Internet Archive "in order to make more lendable copies of digital books available to their users and the world."  (McN Decl. ¶67.)

364.    According to its website, the purpose of the Open Libraries project is "to increase lending counts" on IA's Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches." (McN Decl. ¶67.)

365.    Under this system, a library participating in the Open Libraries project – known as a "Partner Library" – sends its catalogue to Internet Archive to "run an overlap analysis that

compares [ISBN numbers for] their physical holdings with our digital holdings."  (McN Decl. ¶68.)

366.    Internet Archive does not make new scans of the libraries' books identified by the overlap analysis.  Internet Archive does not take possession of the print book owned by the Partner Library.  (McN Decl. ¶68.)

367.    Rather, every time a book in the Partner Library's catalogue matches an ebook on IA's Website, Internet Archive "just increases by one the number of concurrent checkouts of that book" permitted on the Website.   (McN Decl. ¶68.)

368.    According to Mr. Freeland, Internet Archive does not "set any upper limit to the number of copies available via concurrent lending."  As a result, the overlap analysis dictates that "if a hundred partner libraries possessed a copy of the same book, the Internet Archive would be able to lend a hundred copies of that book simultaneously."  (McN Decl. ¶68.)

369.    Mr. Freeland testified that if there were "a thousand libraries that had the same book and put them into controlled digital lending," then one thousand users would be able to view the ebook scan on the Website."  (McN Decl. ¶68.)

370.    In order to become a Partner Library in the Open Libraries project, libraries need to submit an "online form."  (McN Decl. ¶69.)

371.    That form states that "Internet Archive's Open Libraries project offers the prospect of making every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own."  (McN Decl. ¶69.)

372.    According to the Open Libraries Form Agreement, Partner Libraries that participate in the project agree to "share their catalog of books with the number of copies of each book with

the Internet Archive."  (McN Decl. ¶69.)

373.    The Open Libraries Form Agreement imposes no substantive restrictions on the Partner Libraries' use of the physical books that match the ebooks on the Website.  (McN Decl. ¶69.)

374.    The Open Libraries Form Agreement imposes no contractual requirement that the Partner Library remove the print book from circulation when the Internet Archive is lending out an ebook correlated with that print book.  (McN Decl. ¶69.)

375.     The Open Libraries Form Agreement provides that any partner "Library may integrate links to the borrowable Books in their catalog and other services.  The Internet Archive will add books to the collections offered on the Internet Archive's sites."  (McN Decl. ¶69.)

376.    It is currently free for libraries to become Partner Libraries.  (McN Decl. ¶70.)

377.    Mr. Kahle has stated that "it would be understandable if we charged libraries that did not contribute digitization or backend services for access to digital books.  It would be equally understandable to charge a one-time transfer fee to libraries that wanted to store their own local copies" of the ebooks on the IA Website.  (McN Decl. ¶70.)

I.    **Marketing the Open Libraries Project to Prospective Libraries**

378.    Internet Archive has marketed the Open Libraries project to libraries as a substitute for paying for authorized ebooks via authorized library ebook aggregators and as a means of obtaining "free ebooks for your patrons" with "no cost involved."  (McN Decl. ¶71.)

379.    Mr. Freeland sent an email to the Associate Dean of University of Oklahoma Libraries stating that "[t]he main offer we have in hand with the Open Libraries today is the ability to match your physical holdings with the 1.1M in-copyright books we have *already* digitized

and where there's a match, provide you back a link to the digitized book."  (McN Decl. ¶71.)

380.    In another instance, an Internet Archive representative sent a librarian an email stating that the Open Libraries project "can leverage controlled digital lending to provide your patrons with free ebooks of your physical collections.  As an Open Libraries, we match your in-copyright holdings with our digital holdings and serve free ebooks where they overlap.  Join Open Libraries, access free ebooks – so simple, we had to share!"  (McN Decl. ¶71.)

381.    Mr. Freeland gave a presentation entitled "Open Libraries Introduction & Internet Archive programs" that included the following slide:



(McN Decl. ¶71.)

382.    The notes to a slide for a separate presentation that Mr. Freeland gave to libraries stated that the Open Libraries project "ensures that a library will not have to buy the same content over and over, simply because of a change in format."  (McN Decl. ¶71.)

383.    Another presentation about the Open Libraries project by Mr. Freeland was titled "Maximizing institutional investments in print resources through controlled digital lending" – with the subtitle, "Or, You Don't Have to Buy it Again!"  (McN Decl. ¶71.)

4891-8421-5847v.16 0092453-000002

384.    In 2019, a vendor acting on behalf of Internet Archive sent an email to one of the subscribers to its Library.Link Network, the Evergreen Indiana Library Consortium, with a subject line of "Free eBooks for Indiana Evergreen."  (McN Decl. ¶71.)  That email stated that "Open Libraries provides a way for you to offer digitized books to your patrons for free" and that joining as a partner would "bring this added value to your libraries."  (McN Decl. ¶71.)

385.    In another instance, the same representative sent an email message to libraries asking whether they "would like to participate and get free ebooks for your end users."  (McN Decl. ¶71.)

386.    The same vendor sent a librarian an email inviting them to join the Open Libraries project, which stated that the "1, 2, 3 of it is, once you sign the form we do the rest… would you like to participate and get free ebooks for your end users?... Internet Archive now offers FREE ebooks for all Library.Link libraries when you participate in the Open Libraries Controlled Digital Lending (CDL) project."  (McN Decl. ¶71.)

387.    Internet Archive's Website contains a video of a July 14, 2021 presentation entitled "Implementation & Integration: CDL for All Libraries" that describes controlled digital lending as a "[l]ow risk, reasonable solution that preserves legal and fiscal value in collections" and contains the following slide:

4891-8421-5847v.16 0092453-000002



(McN Decl. ¶71.)

388.    Internet Archive gave a presentation at the 2019 Library Leaders Forum that summarized the "[s]teps to participate in Open Libraries: Join Open Libraries, Share your catalog, Overlap study, Integrate links back into your catalog, Lend digital books to your patrons."  (McN Decl. ¶71.)

**J.     Growth of Internet Archive's Partner Libraries**

389.    At the 2020 Library Leaders summit, Mr. Kahle announced that "2.8M copies" of in-copyright books were added to concurrent lending counts through the Open Libraries' project. (McN Decl. ¶72.)

390.    Mr. Freeland testified that the number of books added through overlap analysis has increased since that time.  (McN Decl. ¶72.)

391.    Chris Freeland testified that Internet Archive had 81 Partner Libraries as of December 2021.  (McN Decl. ¶72.)

392.    As of December 24, 2021, Internet Archive's Objections and Responses to Plaintiffs' Second Set of Interrogatories stated that 62 Partner Libraries contributed books to the

overlap analysis and 13 of those were public libraries.  (McN Decl. ¶72.)

**K.      Encouraging Libraries to Provide Links to Internet Archive's Website**

393.    Many libraries – both Partner Libraries and other libraries – have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their library websites.  (McN Decl. ¶73.)

394.    For instance, the Georgetown University Law Library's catalog features the language "Full text availability" next to a particular title and presents a link to access the "full text" of the title through "Internet Archive Controlled Digital Lending."  (McN Decl. ¶73.)

395.    Likewise, the Dartmouth College Library's catalog entry for "The Catcher in the Rye," which is one of the Works in Suit, features a link to access an ebook version through the Internet Archive's Website.  (McN Decl. ¶73.)

396.    Many other unaffiliated libraries have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their main library websites, including public library systems in New York, California, and elsewhere.  (McN Decl. ¶74.)

**L.      Internet Archive's Overlap Analysis**

397.    According to Mr. Freeland, for each Partner Library that contributes its catalogue for overlap analysis, the Internet Archive gets "an additional copy to lend" of every matching book "without … having to incur the cost associated with scanning."  (McN Decl. ¶75.)

398.    Mr. Freeland testified that "[a]s a result of the Internet Archive implementing overlap analysis … wait lists [have] been reduced on" the Website "for certain titles."  (McN Decl. ¶75.)

399.    Mr. Freeland testified that "the more books Internet Archive has been able to obtain

and scan" through the Internet Archive's acquisition of Better World Books, "the greater likelihood there would be matches in the overlap analysis with potential partner libraries." (McN Decl. ¶75.)

## VIII.   DEVELOPMENT OF THE "CONTROLLED DIGITAL LENDING" THEORY

### A.   Development of the Statement and White Paper

400.    Prior to about 2018, IA did not rely on a model called "Control Digital Lending" to support its scanning and republication of in-copyright books. (McN Decl. ¶77.)

401.    As Mr. Kahle stated in the "Universal Access to Knowledge" speech he gave in 2006, Internet Archive had "found that if you put things out there in a nonprofit setting, it works for people in the sense that they don't gripe.  The idea of opt-out as opposed to opt-in – putting it up and then if somebody complains, taking it down – works very well in these sorts of communities.  I would suggest being a bit bold and making things available..." (McN Decl. ¶77.)

402.    By 2015, the Copyright Office had issued a report concluding that "[t]here is broad agreement that no colorable fair use claim exists" for "providing digital access to copyrighted works in their entirety." (McN Decl. ¶78.)

403.    In the prior year, a subcommittee of the Judiciary Committee of the House of Representatives held hearings about the first sale doctrine, including on whether to adopt a digital first sale doctrine. (McN Decl. ¶78.)

404.    Groups including the Association of American Publishers strongly opposed the adoption of a digital first sale doctrine. (McN Decl. ¶78.)

66

405.    While the subcommittee announced unrelated reforms for the Copyright Office and the Congress passed the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, the Copyright Act was not amended to recognize a digital first sale defense.  (McN Decl. ¶78.)

406.    In 2017, Internet Archive applied for a $100 million grant from the MacArthur Foundation.   According to its application, Internet Archive intended to use the grant to "turn 80% of library collections digital by 2023."  (McN Decl. ¶79.)

407.    Lila Bailey, Internet Archive's in-house policy counsel, testified that "as part of the grant proposal, barriers to solving the problem are identified.   One of the significant barriers to libraries being able to loan out their digital collections was … copyright uncertainty, lack of clarity in the law."  (McN Decl. ¶79.)

408.    Ms. Bailey further testified that "the MacArthur Grant Challenge" is "what precipitated having a meeting in May of 2017 concerning Controlled Digital Lending."  (McN Decl. ¶79.)

409.    Accordingly, the Internet Archive convened what it described as the "Open Libraries Copyright Workshop" on May 23 and 24, 2017 to "consider the digitize and lend model that the Internet Archive is proposing to expand through the MacArthur Foundation's 100%Change grant."  (McN Decl. ¶79.)

410.    The Workshop was led by one of IA's advisors for the grant, the copyright scholar Pamela Samuelson, and was "modeled after a meeting that she did around the Google books case." (McN Decl. ¶79.)

411.    According to Ms. Bailey's testimony, Ms. Samuelson "wanted to basically have an open discussion, an academic discussion with other scholars and library practitioners who understood how libraries were engaging in this practice."  (McN Decl. ¶80.)

412.    The participant roster for the Workshop submitted as part of the MacArthur Foundation Application included Ms. Bailey, Mr. Kahle, two other Internet Archive employees, two of the lawyers that have appeared for IA in this action (Joseph Gratz and Corynne McSherry) and several other individuals who would later participate in formulating a digital lending theory – including David Hansen, Kyle Courtney, Jason Schultz, Mary Minow and Michelle Wu.  (McN Decl. ¶80.)

413.    Ms. Bailey testified that she was not aware of "any copyright lawyers who represent copyright creators at this panel."  (McN Decl. ¶80.)

414.    At a dinner shortly after the Workshop, Ms. Bailey "started talking about the idea of writing something up" with Courtney, Hansen and Wu.  (McN Decl. ¶81.)

415.    Michelle Wu was a Georgetown University law professor and librarian who was another advisor to Internet Archive for the McArthur Grant and, according to Internet Archive, "crafted the legal theory behind Controlled Digital Lending."  (McN Decl. ¶81.)

416.    Ms. Wu also was retained by Internet Archive as its counsel, but did not reveal that affiliation in her letter submitted in support of IA's MacArthur grant application.  (McN Decl. ¶81.)

417.    Kyle Courtney is a Copyright Advisor at Harvard University and David Hansen was the Lead for Copyright and Information Policy and Associate University Librarian at Duke University.  (McN Decl. ¶81.)

418.    Ms. Bailey described Wu, Courtney and Hansen as "[f]riends of the Internet Archive."  (McN Decl. ¶81.)

419.    According to Ms. Bailey, at the May 2017 dinner, Ms. Bailey, Mr. Courtney, Mr. Hansen and Ms. Wu decided to draft "something short and easy for a non-lawyer to understand about the legal underpinning of Controlled Digital Lending."  (McN Decl. ¶81.)

420.    The group subsequently decided that there should also be a "white paper" that would address the legal issues more fully.  (McN Decl. ¶81.)

421.    The MacArthur Foundation rejected the Internet Archive's application for the $100 million grant in September 2017.  (McN Decl. ¶82.)

422.    The primary drafters of a statement describing controlled digital lending (the "Statement") emerged as Ms. Bailey, Mr. Courtney, Mr. Hansen, Ms. Wu, Mary Minow, and Jason Schultz.  (McN Decl. ¶82.)

423.    Mr. Courtney and Mr. Hansen were also subsequently selected to draft a white paper on controlled digital lending (the "White Paper").  (McN Decl. ¶82.)

424.    Mr. Courtney and Mr. Hansen sent a draft of the White Paper to Ms. Bailey prior to publication for her edits and comments.  (McN Decl. ¶82.)

425.    When Mr. Freeland was asked about the status of the White Paper, he wrote in an email that "IA is officially NOT leading the effort for the sake of being impartial."  (McN Decl. ¶82.)

426.    In its MacArthur grant application, Internet Archive wrote that a "working group willing to craft a joint statement" about controlled digital lending had formed after the May 2017

meeting in San Francisco, that the group's work "is now in progress[,]" and that "[t]his critical area of work is led by Internet Archive's legal counsel, Lila Bailey."  (McN Decl. ¶79.)

427.    When Ms. Bailey was informed that the release of the White Paper may be delayed, she wrote in an email to Mr. Courtney, Mr. Hansen, Ms. Wu, and Ms. Minow and Schultz to the group to say that "[t]he Internet Archive has more than an academic interest in this moving forward" and that "it will be a complete failure and waste of our time if it's not released by [an upcoming IA event].  I'm just being real about the impact of delay on my client (and potentially on my job if this isn't done… seriously guys)."  (McN Decl. ¶83.)

428.    Other scholars were consulted during the project for their thoughts on the draft Statement, including Peter Jaszi, a copyright expert and advisor to the Internet Archive who attended the Workshop.  (McN Decl. ¶84.)

429.    An Internet Archive blog post refers to Mr. Jaszi as one of Bailey's "heroes." (McN Decl. ¶84.)

430.    Mr. Jaszi wrote to at least one librarian to warn them that the draft Statement was a "one-sided puff piece that seriously misrepresents both the state of the law and the risks to institutions of pursing the strategy" and that controlled digital lending "serve[s] the institutional interests of the IA."  (McN Decl. ¶84.)

431.    Additionally, library copyright expert Kenneth Crews wrote in an email responding to a draft of the Statement to say that "CDL use is NOT identical to current physical lending" and that if physical copies of books "are still available for non-circulating use, one could argue that you have doubled the number of readable and useable copies."  (McN Decl. ¶85.)

### B.      Publication of The Statement and White Paper in September 2018

432.     The Statement and White Paper on controlled digital lending were published simultaneously in September 2018 on the website. https://controlleddigitallending.org/ (the "CDL Website").  (McN Decl. ¶86.)

433.     Ms. Bailey testified that she was part of the "collaborative effort" that resulted in the publication of the Statement and White Paper on the CDL Website.  (McN Decl. ¶79.)

434.     The Statement lists as co-authors Ms. Bailey, Mr. Courtney, Mr. Hansen, Ms. Minow, Mr. Shultz, and Ms. Wu.  (McN Decl. ¶86.)

435.     The Statement does not disclose that Michelle Wu had been engaged as an attorney for Internet Archive from 2017 until at least March or 2018.  (McN Decl. ¶86.)

436.     The Statement includes the following statement:

"Properly implemented, CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner.   Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation.  For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization.   *Essentially, CDL must maintain an 'owned to loaned' ratio*.  Circulation in any format is controlled so that only one user can use any given copy at a time, for a limited time.   Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies."

(McN Decl. ¶86.)

437.    The Statement further claims that "there are two main areas of copyright law that support CDL: the principle of exhaustion and the fair use doctrine."  (McN Decl. ¶87.)

438.    The Statement states that the "first sale" doctrine allows creating and lending digital files of the physical books because "any time there is a lawful transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy is terminated or 'exhausted.'"  (McN Decl. ¶87.)

439.    The Statement makes the proposition that "fair use and copyright exhaustion can work together to effectuate CDL practices."  (McN Decl. ¶87.)  The Statement  acknowledges that there is no "directly analogous case on point" to support this proposition.  (McN Decl. ¶87.)

440.    The Statement states that controlled digital lending is not unlawful because the "purposes of library lending … all focus on socially beneficial outcomes that favor fair use" and because there is no market harm "because properly implemented CDL programs maintain an 'owned to loaned ratio' that is comparable to physical lending."  (McN Decl. ¶87.)

441.    The White Paper acknowledges that there is a "considerable point of concern that CDL is not clearly transformative."  (McN Decl. ¶88.)

442.    The White Paper states that in "mass digitization cases involving books – *Google Books* …, for example – courts have largely focused on how those projects enabled transformative access to information by enabling text search, as well as research uses, such as text and date mining."  (McN Decl. ¶88.)

443.    The White Paper emphasizes, in italicized text, that "libraries must truly exercise *control* in the process."  (McN Decl. ¶89.)

444.     The White Paper states that "[w]hen the digital copy is being read by a patron, however, the physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one."  (McN Decl. ¶89.)

445.     The White Paper states that libraries must "ensure that original works are acquired lawfully," "lend each digital version only to a single user at a time just as a physical copy would be loaned," "limit the time period for each lend" and "use digital rights management to prevent wholesale copying and redistribution."  (McN Decl. ¶89.)

446.     The White Paper includes several "risk mitigation" measures that controlled digital lenders can implement to further reduce legal risk, including:

- adding artificial "friction" by extending the time between digital lends, more closely mirroring how physical books are lent and returned;

- "introduce characteristics that mimic physical degradation[,]" by, as the White Paper explains, "plac[ing] the same limit on circulation of the digital copy" that would approximate the number of times a print book would be circulated before it degrades;

- limiting the audience to "particular communities of users" (*e.g.*, students of an academic institution or "local residents") "to limit the overall reach of the copy and therefore the potential market effect;"

- only distributing older works published pre-1989 and public domain books;

- only distributing out-of-print or orphan works; and

- only distributing highly factual books.

(McN Decl. ¶90.)

73

447.   Internet Archive's Policy Counsel testified that Internet Archive does not practice any of the risk mitigation measures listed in the White Paper.  (McN Decl. ¶90.)

### C.   Initial Criticism of the Statement and White Paper

448.   The Statement and the White Paper was criticized by groups including the Association of American Publishers ("AAP") and the Authors Guild.  (McN Decl. ¶91.)

449.   On February 4, 2019, the AAP released a "Statement on Flawed Theory of 'Controlled Digital Lending'" which stated that "AAP strongly disagrees with the analysis of the White Paper and its call to libraries to copy and transmit entire books to the public in disregard of the law.  CDL not only rationalizes what would amount to systematic infringement, it denigrates the incentives that copyright law provides to authors and publishers to document, write, invest in, and disseminate literary works for the benefit of the public ecosystem."  (McN Decl. ¶91.)

450.   On January 8, 2019, the Authors Guild released a statement entitled "Controlled Digital Lending is Neither Controlled nor Legal."  (McN Decl. ¶92.)

451.   The Authors Guild statement explained that Internet Archive had "started rejecting notices sent by Guild members asking for unauthorized digital copies of their books to be taken down, citing that it 'operates consistently with the "Controlled Digital Lending [sic].'"  (McN Decl. ¶92.)

452.   The Authors Guild statement stated that Internet Archive's "threat to author income and the ebook market comes from two directions: 1) unauthorized scanning and e-lending of books that were previously published only in physical formats would usurp the market for creating new ebook versions; and 2) instead of purchasing library ebook licenses (which are more expensive

74

than consumer editions for good reason), libraries would simply digitize the print book from their collection, depriving authors and publishers of important licensing income."  (McN Decl. ¶93.)

453.    "Needless to say," the statement continued, "if Internet Archive's plans to expand Open Library to all libraries are realized, it would eventually decimate the market for library ebooks, put a massive dent in the ebook market in general, and usurp authors' rights to bring their older works back to the market."  (McN Decl. ¶93.)

454.    In several email messages, Mr. Freeland responded to similar complaints about CDL from an English authors' union.  After Tom Blake, a librarian at the Boston Public Library, forwarded him emails from the union's chief executive complaining that CDL "prevent[s] authors [from] making a living by licensing the content of [their] work," Mr. Freeland wrote, "Nice that they included their real interest: 'negotiate and purchase lending licenses from the copyright owners.'"  (McN Decl. ¶94.)

### D.    Criticism of the Statement and White Paper Following the *ReDigi* Decision

455.    In December 2018, the Second Circuit issued its decision in *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018), in which the Court held that "[u]nauthorized reproduction is not protected by" the first sale doctrine and that "the making of such reproductions is not a fair use."  (McN Decl. ¶95.)

456.    Jonathan Band, who is counsel for the American Library Association ("ALA"), submitted an amicus brief to the Second Circuit in *ReDigi* on behalf of Internet Archive, the ALA and others.  (McN Decl. ¶96.)

4891-8421-5847v.16 0092453-000002

457.     The brief submitted by Mr. Band was in support of the defendant, ReDigi, and urged the Second Circuit to hold that ReDigi's practices were covered by the first sale doctrine or fair use.  (McN Decl. ¶96.)

458.     The brief explained that "A fair use finding in this case would provide libraries with additional legal certainty to roll out innovative services such as the Internet Archive's Open Library."  (McN Decl. ¶96.)

459.     After the *ReDigi* decision was issued, Mr. Band published an article stating that it "raises questions concerning the viability of Controlled Digital Lending … by libraries," which "must be carefully reevaluated in light of this decision."  (McN Decl. ¶96.)

460.     In that article, Mr. Band warned that "the decision calls into question the theoretical underpinnings of CDL.  Specifically, CDL relies on the fair use right to replicate the first sale right in the digital environment.  Judge Leval's decision, however, could be read to suggest that the objectives of the first sale right cannot guide the fair use analysis."  (McN Decl. ¶96.)

### E.     Signatories to the CDL Statement

461.     Academic libraries make up the majority of signatories to the Statement. (McN Decl. ¶98.)

462.     Of the 9,000 public libraries in the United States only a handful endorsed the Statement.  (McN Decl. ¶98.)

463.     Copyright experts Mr. Band, Mr. Crews and Mr. Jaszi did not sign on as a signatory to the Statement.  (McN Decl. ¶98.)

464.     The American Library Association did not sign on as a signatory to the Statement. (McN Decl. ¶98.)

4891-8421-5847v.16 0092453-000002

465.    The MIT Press had previously allowed IA to digitize a selection of backlist books. (McN Decl. ¶98.)

466.    The MIT Press did not sign on as a signatory to the Statement.  In an email, a representative from the MIT Press told Internet Archive that it would not be a signatory to the Statement because "being able to monetize digital sales of trade books and text books is currently a significant part of what allows us to survive as an [open access] friendly mission driven publisher."  (McN Decl. ¶98.)

### F.    Internet Archive's Reliance on the Statement and White Paper

467.    Starting in about 2019, Internet Archive began to reference the Statement and White Paper in its outreach to libraries in connection with the Open Libraries project.  (McN Decl. ¶99.)

468.    For example, in a November 2018 email to a prospective Partner Library in Oregon, Mr. Freeland wrote that "[l]ast October, "a group of copyright scholars, including Michelle Wu from Georgetown Law, Kyle Courtney from Harvard Library, Dave Hansen from Duke University Libraries, and Lila Bailey from Internet Archive worked together on two documents meant to help libraries understand the legal framework for our digital lending, described as 'controlled digital lending.' Those two documents have been released [on the CDL Website]."  (McN Decl. ¶99.)

469.    Internet Archive published a blog post on July 29, 2020 stating that "CDL is a respectful and secure way to bring the breadth of our library collections to digital leaners… Publishers are seeking to shut this library down, claiming copyright law does not allow it.  Our response is simple:  Copyright law does not stand in the way of libraries' rights to own books, to digitize their books, and to lend those books to patrons in a controlled way."  (McN Decl. ¶99.)

4891-8421-5847v.16 0092453-000002

470.     Internet Archive convened a panel at the Boston Public Library "to seek to educate the public on the work of the Internet Archive and Open Libraries" and the event description stated that "[t]hrough controlled digital lending, libraries can make twentieth century scholarship available that is largely absent from their digital holdings in a way that respects the rights of authors and publishers."  (McN Decl. ¶99.)

471.     A July 1, 2019 blogpost by Mr. Kahle stated that "[w]e believe that every library can transform itself into a digital library.  If you own the physical book, you can choose to circulate a digital version instead."  (McN Decl. ¶99.)

472.     In another blogpost, the Internet Archive referenced a February 11, 2021 "mythbusting" panel that "dispelled myths about CDL" by "[e]mphasizing the limited and controlled aspect of the practice" and explaining that "[t]he 'fair use' section of the law allows libraries to responsibly lend materials, and experts say logically includes both print and digital works."  (McN Decl. ¶99.)  The blogpost also states that "[t]he law makes no mention of the amount of material that can be made available under 'fair use,' so for libraries to fulfill their purpose they can make complete books – whether in print or digital – available to patrons."  (McN Decl. ¶99.)

473.     Another Internet Archive presentation entitled "How Controlled Digital Lending Works for Libraries" contained a slide stating that "Controlled digital lending is a longstanding widespread library practice that you can use to help your patrons access digitized books.  The Internet Archive has more than 1.8M digitized books you can claim & offer your patrons today. Your library can participate by joining Open Library."  (McN Decl. ¶99.)

4891-8421-5847v.16 0092453-000002

474.     Internet Archive does not indemnify Partner Libraries for liability arising from its infringement.  As Mr. Freeland wrote to a librarian at Duke University, Mr. Kahle "generally gets allergic to indemnification clauses…"  (McN Decl. ¶100.)

475.     At least four Partner Libraries have withdrawn from the Open Libraries project since this action was filed.  (McN Decl. ¶100.)

G.     **The Statement, White Paper As Applied to Internet Archive's Activities**

1.     **The Owned-to-Loan Ratio**

476.     According to Mr. Freeland, the owned-to-loaned principle is the "most critical" principle of CDL.  (McN Decl. ¶101.)

477.     According to the Statement, to comply with the "owned-to-loan" principle,  a "library may only loan simultaneously the number of copies that it has legitimately acquired." (McN Decl. ¶101.)

478.     According to the Internet Archive, the overlap analysis conducted as part of the Open Libraries project enables libraries to "pool[] their physical collections in order to make more lendable copies of digital books available…" (McN Decl. ¶101.)

479.     Mr. Freeland described this practice in an email to a librarian, where he stated that "libraries put one copy in for our matched records (even if you have multiple copies), and those counts are added to a pool for a given book.  When a patron checks out a book, they are checking out a copy from the pool, not an individual library; for a variety of reasons, including reader privacy, we don't connect the circulation back to an individual library." (McN Decl. ¶101.)

480.    Mr. Kahle testified that a match under the overlap analysis will "increase the number of concurrent borrowers by one, independent of the number that [the partner library] ha[s] in the library."  (McN Decl. ¶102.)

481.    Mr. Kahle testified that that if three Partner Libraries contributed a book to the concurrent lending count under an overlap analysis and one of those libraries, for instance the MIT Library, only had one physical copy, three MIT patrons would be able to read the ebook on the Website at once.  (McN Decl. ¶102.)

482.    Mr. Freeland testified that the overlap analysis allows Partner Libraries to loan more copies than they individually own. (McN Decl. ¶102.)

483.    According to Mr. Freeland, "If the Internet Archive possessed one copy of Catcher in the Rye and then [a] partner library had one copy" that was added from its system, "and then another partner library added a third copy to the Open Library system, there would be available for concurrent borrowing from Internet Archive users of three copies."  (McN Decl. ¶102.)

484.    Under its current system, "[a]ll users have equitable access to the materials [Internet Archive] lend[s].  When a library adds a copy into [the] lending counts, that book can be checked out by any user."  (McN Decl. ¶103.)

485.    Internet Archive has stated that non- Partner Libraries can integrate links to Internet Archive ebooks into their websites.  For example, in a 2020 blogpost, Internet Archive stated that, "To be clear, you don't have to join the program to access our books. Anyone can link to our books right now."  (McN Decl. ¶103.)

486.    A librarian at Fordham University contacted Internet Archive in July 2020 about the possibility of "digitiz[ing] approximately 450 volumes … to support CDL for distance learning."  (McN Decl. ¶104.)

487.    The Fordham librarian stated that "[t]hese are largely or entirely in-copyright books, so the scans could not be made public, and will only be released to our users in proportion to the number of physical copies which we have embargoed."  (McN Decl. ¶104.)

488.    In response, Mr. Freeland replied "[t]hat's not how our implementation of CDL currently works – we lend to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into CDL by particular users, so there's no way for us to limit use to only your patrons.  Happy to discuss further on a call."  (McN Decl. ¶104.)

489.    In 2019, Mr. Freeland received an inquiry from Wendy Knapp, the Deputy Director of Indiana State Library, asking whether its copies of a particular book, *Slaughterhouse Five*, "would be added to the total number of copies in OpenLibrary.org" or whether those books would start "a new waitlist just for Indiana patrons…"  (McN Decl. ¶105.)

490.    Mr. Freeland responded that the Indiana State Library's copies "would decrease the waitlist and be loaned to all users" of IA's website.  (McN Decl. ¶105.)  Indiana's Deputy Director responded that her Library "still have hesitation around the idea that a format shift has not been indisputably set as a fair use" and declined to join as an Open Libraries Partner Library.  (McN Decl. ¶105.)

### 2.    Controls over Partner Library Operations

491.    The White Paper instructs that "libraries must truly exercise *control* in the process." (McN Decl. ¶106.)

492.    The Open Libraries Form contains no provisions on how libraries implement CDL because Internet Archive considers this to be a "local decision."  (McN Decl. ¶106.)

493.    In response to an email from a librarian expressing "concern[] about being in compliance," Mr. Freeland wrote that "how libraries limit circulation for books in CDL is a local decision made by the library… [Some] libraries are taking the approach that they don't need to suppress circulation because the likelihood is slim that all our digital copies and all the physical copies across our network of partners are all checked out at the same time."  (McN Decl. ¶106.)

494.    Mr. Freeland testified that Internet Archive "was aware … that some partner libraries did not suppress circulation when they agreed to bec[o]me a partner library and put their books into controlled digital lending."  (McN Decl. ¶106.)

495.    Mr. Freeland testified that Internet Archive has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously."  (McN Decl. ¶107.)

496.    Mr. Freeland testified that Internet Archive does not know how Partner Libraries store the physical books counted in the overlap analysis.  (McN Decl. ¶107.)

497.    Mr. Freeland testified that Internet Archive is also aware that even if a library puts a physical book into a non-circulating reference collection, it could be read in the library while the ebook equivalent is checked out.  (McN Decl. ¶107.)

498.    Internet Archive does not employ a technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating.  (McN Decl. ¶107.)

4891-8421-5847v.16 0092453-000002

499.   Mr. Freeland testified that Internet Archive has never "taken any action against a library that did not suppress circulation properly."  (McN Decl. ¶107.)

500.   Mr. Kahle testified that "monitoring" libraries would amount to "hav[ing] people going and snooping around," which it will not do.  (McN Decl. ¶107.)

501.   According to the Open Libraries Form, Internet Archive requires Partner Libraries to submit their catalogues on a "quarterly" basis so that Internet Archive can re-run the overlap analysis to periodically add new books that the library acquired and subtract books that dropped out of the collection as a result of weeding.  (McN Decl. ¶108.)

502.   Mr. Freeland testified that in first years of the Open Libraries project, it did not "require updates at a specific time frame" and "sometimes Internet Archive did annual updates" depending on "the library's preferences."  (McN Decl. ¶108.)

503.   Mr. Freeland testified that Internet Archive does not employ any measures to ensure the accuracy of the catalogues it receives; Internet Archive "depends on our partners for verifying the data."  (McN Decl. ¶108.)

504.   According to Mr. Freeland's testimony, while Internet Archive began to run the overlap analysis on a monthly basis after this action was filed, it still does not require Partner Libraries  to inform it when they weed out books and no longer physically own the titles.  (McN Decl. ¶108.)

505.   Mr. Freeland testified that it was possible the concurrent lending count for an ebook could exceed the number of Partner Libraries with that physical book in their collection, if a library discarded a print copy at any time after that library has engaged in the overlap analysis.  (McN Decl. ¶108.)

506.    Mr. Kahle testified that Internet Archive also does not "audit library collections to ensure that the library still owns the physical copy it's lending against" because, according to Mr. Kahle, the "Internet Archive doesn't snoop around dumpsters or things."  (McN Decl. ¶108.)

507.    Internet Archive's overlap analysis has resulted in errors that have led to inaccurate concurrent loan caps due to certain inaccurate or not properly organized data and metadata.(Foster Decl. ¶88.)

508.    The Internet Archive has stated that "Open Library's book catalog has millions of books and thousands of data errors.  Sometimes author names are misspelled, book covers are missing, or works and authors are duplicated or conflated."  (McN Decl. ¶109.)

## IX.    INTERNET ARCHIVE'S POLICY RATIONALES

### A.    Providing Missing 20th Century Books

509.    Internet Archive asserted in the first paragraph of the Executive Summary to its application for the $100 million McArthur Foundation grant that "there's almost a century of knowledge still living only on the printed page, missing from our digital shelves."  (McN Decl. ¶111.)

510.    In 2018, Mr. Kahle wrote to the Librarian of Congress, Carla Hayden, stating that controlled digital lending was "a way to get 20th century books onto the net respectfully."  (McN Decl. ¶111.)  In that email, Kahle also forwarded a blog post by Mr. Courtney and Mr. Hansen to the Librarian of Congress, Carla Hayden, stating that the goal of controlled digital lending is "particularly to help address access to the large number of books published in the '20th Century black hole' that have little hope of otherwise being made available to readers"  (McN Decl. ¶111.)

511.    The Internet Archive has stated that the "black hole" refers to the gap between the date when books enter the public domain (currently 1926) and "the 1990s."  (McN Decl. ¶111.)

512.    Mr. Kahle stated in the "Transforming Our Libraries into Digital Libraries" paper that "[t]he Internet Archive, working with library partners, proposes bringing millions of books online, through purchase or digitization, starting with the books most widely held and used in libraries and classrooms."(McN Decl. ¶112.)

513.    Mr. Kahle continued by stating that, "[f]or the books we can not [sic] buy in electronic form, I am proposing a collaborative effort to select and digitize the most useful books of the 20th and 21st centuries."  (McN Decl. ¶112.)

514.    The homepage for Internet Archive's Website lists books in categories like "Trending Books," "Romance," "Thrillers," "Kids," "Classic Books" and "Books We Love." (McN Decl. ¶113.)  The home page of openlibrary.org strongly resembles the interface that public library patrons use to read authorized ebooks via OverDrive.  (McN Decl. ¶118.)

515.    There is no category on the homepage for "Lost 20th Century Books."  (McN Decl. ¶113.)

516.    The "program lead for OpenLibrary.org," Michael "Mek" Karpeles, confirmed that "there are tens of thousands of readers on Open Library who are looking for romance novels, self-help books, kids books, and modern thrillers."  (McN Decl. ¶113.)

517.    Internet Archive's breakdown of ebooks by publication date on its Website shows that 78.9% of the in-copyright books were published after 1980 and only 6.2% of those books were published before 1963.  (McN Decl. ¶114.)

518.    Internet Archive has represented to the Court that it "limits its digital lending to books published in the past five or more years."  (McN Decl. ¶115.)

519.    Two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the IA's Website that same year.  (McN Decl. ¶113; Foster Decl. ¶69.)

520.    Mr. Freeland  testified that Internet Archive "add[s] ebooks" to the Website that are "available to purchase commercially or to license to libraries."  (McN Decl. ¶117.)

521.    Mr. Freeland testified that Internet Archive does not take steps "to make sure that the books they add to the Open Libraries projects are not yet available in digital form" and does not "instruct libraries to segregate out books that are otherwise available in digital form."  (McN Decl. ¶117.)

522.    The 127 Works in Suit – which are all available as authorized library ebooks – were republished as unauthorized ebooks on the Website; the Website has also posted 33,000 other titles available from the Publishers in digital formats.  (McN Decl. ¶115; *See* Foster Decl. ¶¶112-117; Pavese Decl. ¶18; R-A Decl. ¶49; Sevier Decl. ¶9; Weber Decl. ¶60)

1.    **Internet Archive and Authorized Library Ebook Aggregators**

523.    The home page of openlibrary.org resembles the interface that public library patrons use to read authorized ebooks via OverDrive; both pages display rows of thumbnail book covers available to be "borrowed," organized into categories of general interest such as "Trending" books.  (McN Decl. ¶118.)

524.    Internet Archive has acknowledged that its Website competes with distributors of the Publishers' authorized ebooks.  Mr. Karpeles wrote an email stating  that "reality has it that we

are competing for eyeballs with Amazon, Goodreads (45M monthly users), Overdrive, OCLC Worldcat, and countless other websites…"   (McN Decl. ¶119.)   Mr. Karpeles reiterated this statement during his deposition.  (McN Decl. ¶119.)

525.    Mr. Karpeles also created a document listing the library ebook aggregators OverDrive and Hoopla, as well as the ebook retail platforms Amazon and Google Books – all of which license the Publishers' works – as  "similar services" to Internet Archive.  (McN Decl. ¶119.)

526.    Internet Archive's library expert, Susan Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL."  (McN Decl. ¶120.)

527.    Ms. Hildreth further testified that "I think it could be likely that with CDL materials meeting some patron requests, the result that [sic] the library would not necessarily have to license the specific title to make patron demand, they would be able and it is likely that they would purchase additional e-materials … to meet other patron demand." (McN Decl. ¶120.) Ms. Hildreth acknowledged "that a specific author would not receive a royalty for a specific title" if revenue was shifted in this way.  (McN Decl. ¶120.)

528.    A user of the Website testified that he read an ebook on Internet Archive's Website that he could have read in an authorized ebook format through his university library because "it didn't matter to me … whether I was using Internet Archive or [the authorized platform]… [I]t didn't … matter to me.  Or it didn't factor into my thinking because I was more concerned with getting these materials I needed…"  (McN Decl. ¶121.)

529.    Another Internet Archive user who writes blogs distributing links to ebooks on Internet Archive testified that she would not add links to authorized ebook platforms, in part because "[t]he Internet Archive is reaching a potentially broader audience than the North Carolina Digital Library."  (McN Decl. ¶121.)

### B.    Providing Access to Print-Disabled Patrons

530.    Internet Archive has stated that the ebooks on its Website serve the needs of print disabled users.  For example, it stated in the Executive Summary of the MacArthur Foundation application that "[w]orking with US libraries and Benetech, operator of the world's largest digital library for people with disabilities that impact reading, the Internet Archive (IA) will bring millions of free digital ebooks to billions of people.  For the blind, ebooks are a lifeline…"  (McN Decl. ¶122.)

531.    The vast majority of Internet Archive users are not print disabled; only 2 print disabled users were added in 2017 and, by 2021, there were only 10,891 such users – which is less than 0.2% of the accounts currently registered with the Website.  (McN Decl. ¶122.)

532.    The needs of print disabled readers are served by HathiTrust, which "provides print-disabled patrons with versions of all of the [20 million +] works contained in its digital archive in formats accessible to them" – and HathiTrust truly focuses on the print disabled by prohibiting the general population from accessing full ebooks.  (McN Decl. ¶122; *Authors Guild, Inc., v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014).)

533.    Internet Archive also stated in the Executive Summary of their application for the MacArthur Foundation grant that by "digitizing millions of books, we unlock them for communities with limited or no access" – particularly "people in rural areas."  (McN Decl. ¶123.)

4891-8421-5847v.16 0092453-000002

534.    Mr. Freeland testified that Internet Archive does not target particular geographic locations because "someone could sign up from anywhere in the world."  (McN Decl. ¶123.)

535.    Mr. Freeland testified that it would not know whether a user checking out an ebook from the Website "was coming from New York City or coming from some small town in Upstate New York" because Internet Archive only maintains "state- or country-level" geographic data about users.  (McN Decl. ¶123.)

536.    When commenting on the Statement, the library copyright expert Kenneth Crews noted that the argument that CDL is necessary to serve individuals in rural areas is "not very convincing.  Many rural communities are well served.  Sometime[s] the biggest need is in the cities, where parking is miserable, and realistically students and profs are doing their research at home." (McN Decl. ¶124.)

537.    The founder of OverDrive testified that "many of the public libraries that are [his] customers … serve rural communities," "serve disabled communities," "serve poor communities or impoverished communities" – including by OverDrive making donations when appropriate. (McN Decl. ¶124.)

538.    National data indicates that rural communities have seen more growth and value from authorized library ebooks than libraries serving more densely populated districts.  (McN Decl. ¶124.)

539.    Internet Archive also asserted in its Answer to the Complaint that the ebooks on its Website can be used for data or text mining.  (Ans. at p. 2.)

540.     Mr. Freeland testified in his capacity as Internet Archive's 30(b)(6) witness on this topic that he does not know "what percentage of users engage" in those practices and knows of only three projects that could be described as datamining.  (McN Decl. ¶126.)

## X.     NATIONAL EMERGENCY LIBRARY

541.     On March 24, 2020, Internet Archive launched a "National Emergency Library" in the wake of COVID-19 pandemic shutdowns of libraries.  (McN Decl. ¶127.)

542.     According to Mr. Kahle, the National Emergency Library drew from the same pool of ebooks that were previously available on the Website, but it "suppressed the wait-list function" – *i.e.*, "[d]id away with the one-to-one ratio."  (McN Decl. ¶127.)  The blog post announced that "we lend to the world" (McN Decl. ¶127.)

543.     Mr. Freeland testified that Internet Archive "did away with waitlists" and "did away with the one-to-one ratio" by raising the cap on concurrent loans to 10,000.  (McN Decl. ¶128.)

544.     Demand for ebooks on IA's Website increased after lending limits were relaxed and, even after those limits were reimposed, key metrics like monthly circulation and number of total members have remained higher than their pre-pandemic levels.  (McN Decl. ¶128.)

545.     For example, as of September 2019, IA reported over 2.7 million total "Members" of the Website; by April 2022, that figure had nearly doubled to over 5.5 million.  (McN Decl. ¶128.)

546.     As of March 2020, IA reported that the number of "ebooks borrowed" "over the last 28 days" on the Website was 41,296; by July 2022, the number of ebooks borrowed over the last 28 days is listed as over 349,984 – a more than eightfold increase.  (McN Decl. ¶128.)

547.     Mr. Freeland testified that Internet Archive did not require users of the National Emergency Library "to certify that they were directly impacted by COVID-19" to access Internet Archive's ebooks on demand and without waitlists.  (McN Decl. ¶129.)

548.     Ms. Bailey wrote that the Internet Archive did not put in place any such requirement because "we don't have the time or staffing to allow us to limit NEL access only to people directly impacted by COVID 19."  (McN Decl. ¶129.)

549.     Internet Archive offered rightsholders an option to "opt-out" of the National Emergency Library, but Mr. Freeland testified that when an author would send such an opt-out request, books that "were taken out of the National Emergency Library, … were not taken out of controlled digital lending."  (McN Decl. ¶129.)

550.     Mr. Freeland testified that Internet Archive was aware that there were "copyright concerns" about the National Emergency Library.  (McN Decl. ¶130.)

551.     Senator Tom Udall of New Mexico wrote to Maria Strong, the U.S. Register of Copyrights, to urge her "to examine the National Emergency Library that has been organized by the Internet Archive which is operating without typical library license and is causing authors in New Mexico concern about the integrity of their copyrights."  (McN Decl. ¶130.)

552.     Senator Udall noted that "[s]ince the emergence of e-books, libraries have provided e-books to readers through legally well-established means of paying for licensing fees for e-books that they lend, of which a portion of the licensing fees extend to authors as royalties."  (McN Decl. ¶130.)  But given the National Emergency Libraries distribution of ebooks without payment, he had "heard from authors who are concerned that such action is not legal and presents additional challenges to them at an economically difficult time."  (McN Decl. ¶130.)

553.     In response, Register Strong wrote that, despite the Internet Archive's claim "that the books in the National Emergency Library 'focus on materials published during the 20th century, the vast majority of which do not have a commercially available ebook,' and which therefore would not be publicly available when schools and libraries are closed[,]" "the Internet Archive does not appear to have verified if any of the works in its collection were available to the public in digital formats prior to including those books in its collection or removing its waiting lists." (McN Decl. ¶131.)

554.     Register Strong also wrote that "The types of materials included in the National Emergency Library, which include Stephen King thrillers and joke books, also suggest that at least some of the materials are likely to be accessed for entertainment rather than educational purposes." (McN Decl. ¶132.)

555.     Two days after the launch of the National Emergency Library, the Director of Stanford University Press made "a formal request to exclude all [its] content from the National Emergency library." (McN Decl. ¶133.)

556.     The Director explained that "[w]e do not grant those rights to our content, and do not agree that the current coronavirus emergency constitutes an argument for copyright violation. To support the community during this crisis, we are in the process of making all our content more liberally available through the existing library aggregators, and responding to individual requests for content access." (McN Decl. ¶133.)

557.     In a subsequent email to Mr. Freeland, the Stanford University Press Director stated Internet Archive's practices were "entirely unacceptable" given that "IA simply grabbed

everything without any discussion and the bad will is now oozing through us all."  (McN Decl. ¶133.)

558.    On March 31, 2020, the Director the University of Minnesota Press wrote an email to Mr. Freeland stating that "the National Emergency Library goes further than we can legally or ethically allow."  (McN Decl. ¶134.)

559.    After acknowledging that takedown requests had been sent, Mr. Freeland stated that he would "be happy to discuss making limited Minnesota content available as part of the National Emergency Library, understanding that we *always* consult authors or rights holders before making such decisions – indeed, we've just done a round of that for course books we've made openly available for emergency course use on our Manifold OA platform.  We'd also need some kind of binding legal agreement."  (McN Decl. ¶134.)

560.    On April 2, 2020, the Executive Director of the Authors Guild, Mary E. Rasenberger, wrote to Mr. Kahle to "set up a time to talk" about the National Emergency Library. (McN Decl. ¶135.)According to the email, she wanted to "dispel any rumors you have heard that the Authors Guild is planning to bring suit.  The Guild is not; we cannot possibly afford a litigation. We were financially stressed as you know before COVID-19 and having to cancel our gala means a loss of over a quarter of the revenue in our budget.  We are instead addressing this bold infringement by letting authors know how they can request IA to take their books down, and we hope to appeal to your decency in asking you to shut this ill-planned (even if well-intentioned) initiative down.  There are plenty of other sources for books for students and teachers right now. We can help you point people to them."  (McN Decl. ¶135.)

4891-8421-5847v.16 0092453-000002

561.    Mr. Kahle responded to this message by writing, "We talked before, and I felt deposed by a lawyer, which you are, and therefore not a good idea for layman [sic] (and against some lawyer ethics rules as I understand it); and so I talked with multiple of your board members with no apparent effect.  We are actively working with others and are making great progress.  Wish us all luck, we are all trying to get a digital world that works for everyone."  (McN Decl. ¶136.)

562.    The Internet Archive did not respond to public complaints by the AAP.  (McN Decl. ¶136.)

563.    On April 8, 2020, PRH approved a request by a school for special COVID-19 class set pricing for *Interview with the Vampire* by Anne Rice and *Lolita* by Vladimir Nabokov.  (McN Decl. ¶137.)

564.    But PRH was informed by OverDrive that "the school will not be moving forward with a purchase.  They cited that they needed the materials more urgently and the professor was able to find both titles on the Internet Archive / DPLA site with simultaneous checkout so they used those versions."  (McN Decl. ¶137.)

565.    On April 14, 2020, Mr. Kahle wrote an email to the Executive Director of the Authors Alliance and Pamela Samuelson (who sits on its Board of Directors) to notify them that "the Authors Guild is going to be meeting with some staffers [in Congress] about copyright matters, and possibly about NEL as well.  I thought I would alert you to this, as the Authors Alliance, I think, was formed to be at the table when these discussions were happening."  (McN Decl. ¶138.)

566.    Mr. Kahle is on the Advisory Board to the Authors Alliance, and Dave Hansen, one of the White Paper's co-authors, is on the Staff.  (McN Decl. ¶138.)

567.    Internet Archive asked the Authors Alliance to endorse the National Emergency Library but according to an email response, the Authors Alliance "didn't support the NEL [National Emergency Library]."  (McN Decl. ¶138.)

568.    Mr. Kahle posted a blogpost on April 14, 2020 entitled "The National Emergency Library – Who Needs It?  Who Reads It?  Lessons from the First Two Weeks."  (McN Decl. ¶139.)

569.    In the blogpost, Mr. Kahle wrote that "[W]e moved in 'Internet Time' and the speed and swiftness of our solution surprised some and caught others off guard. In our rush to help we didn't engage with the creator community and the ecosystem in which their works are made and published. We hear your concerns and we've taken action: the Internet Archive has added staff to our Patron Services team and we are responding quickly to the incoming requests to take books out of the National Emergency Library. While we can't go back in time, we can move forward with more information and insight based on data the National Emergency Library has generated thus far."  (McN Decl. ¶139.)

570.     The Internet Archive ended the National Emergency Library on June 10, 2020, ten days after the Publishers filed this action and two weeks before the earliest possible date Internet archive had previously announced for its closure.  (McN Decl. ¶140.)

571.    According to the blog post, Mr. Kahle announced that Internet Archive would return to "traditional controlled digital lending" pursuant to overlap analysis, which it continues to practice to this day.  (McN Decl. ¶140.)

572.    On September 4, 2020, the Executive Director of HathiTrust, Mike Furlough, declined an invitation from Kahle to speak on a panel called "Digital Lending in a Pandemic." (McN Decl. ¶141.)

573.     During COVID-19, HathiTrust expanded access to its ebooks in the wake of school library closures but imposed, among other restrictions, limits to ensure that only students of the institutions affected could read those works.  (McN Decl. ¶141.)

574.     Mr. Furlough declined the invitation to speak because "[i]f I am asked to define the difference between what we have done and what you have done and are now doing, I will end up pointing out that we have put a good many more *controls* on the service that you did for NEL or for ongoing lending … I may have to end up directly contrasting some things, which would implicitly suggest a criticism of your approach.  And we made some very different decisions – when we did our legal analysis, it pointed us in directions that are quite different from those you have taken.  And we did not feel that the methods you were employing were ones *we* could defend.  We didn't think we could rely on the same legal theories that you were relying on.  I'd rather keep all that to ourselves and not be quoted or paraphrased as suggesting that your actions are NOT defensible, especially at your own party."  (McN Decl. ¶142.)

## XI.     THE IMPACT OF THE INTERNET ARCHIVE ON THE MARKET FOR THE PUBLISHERS' WORKS

### A.     Lost Customary Fee from Internet Archive

575.     The Internet Archive has scanned, posted and distributed the Works in Suit for short term loans to its users without authorization from the Publishers.  (McN Decl. ¶13.)

576.     The Internet Archive has not paid the Publishers or their authors any fees for their use and distribution of the Works in Suit.  (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

577.     As stated by the Internet Archive's expert witnesses, Susan Hildreth, there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is

predicated on licensing revenues that are paid by libraries to entities like OverDrive."  (McN Decl. ¶9.)

578.    When a library obtains an ebook from an authorized aggregator (like OverDrive) that is published by one of the Publishers for lending to its patrons, that Publisher earns a fee. (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

579.    The Internet Archive holds itself out a "non-profit library."  (McN Decl. ¶¶1, 77; R-A Decl. ¶70.)

580.    The Internet Archive does not pay the Publishers the fees paid by libraries engaged in short-term loans of ebooks.  (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶¶70-71; Sevier Decl. ¶74; Weber Decl. ¶84.)

581.    IA added over 19,000 of the Publishers' books to its Website after the Publishers filed suit.(Foster Decl. ¶118, Figures 11-14.)

582.    In addition to the Works in Suit, the Internet Archive is distributing ebooks for additional works in each of the Publishers' respective catalogs:

a.    Internet Archive distributes 4,519 titles published by Hachette, which constitutes 34.6% of the titles currently published by Hachette in print and digital form.  (Foster Decl. ¶117.)

b.    Internet Archive distributes 7,055 titles published by HarperCollins, which constitutes 36.7% of the titles currently published by HarperCollins in print and digital form. (Foster Decl. ¶117.)

c.    Internet Archive distributes 16,496 titles published by Penguin Random House, which constitutes 35.8% of the titles currently published by Penguin Random House in print and digital form.  (Foster Decl. ¶117.)

4891-8421-5847v.16 0092453-000002

d.      Internet Archive distributes 4,933 titles published by Wiley, which constitutes 15.5% of the titles currently published by Wiley in print and digital form.  (Foster Decl. ¶117.)

583.    The percentage is higher if one looks at books initially published more than five years ago.  For these books:

e.      Internet Archive distributes 4,220 titles published by Hachette, which constitutes 54.6% of the titles currently published by Hachette in print and digital form.  (Foster Decl. ¶117.)

f.      Internet Archive distributes 15,746 titles published by Penguin Random House, which constitutes 48.4% of the titles currently published by Penguin Random House in print and digital form.  (Foster Decl. ¶117.)

g.      Internet Archive distributes 4,889 titles published by Wiley, which constitutes 21.3% of the titles currently published by Wiley in print and digital form.  (Foster Decl. ¶117.)

584.    Internet Archive has not paid the Publishers the fee customarily paid by libraries engaged in library ebook lending for each of these additional titles.  (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶¶70-71; Sevier Decl. ¶74; Weber Decl. ¶84.)

585.    The Publishers earn substantial fees from the library ebook market.  For example, between 2017-2020, the 48 Works in Suit published by PRH generated approximately $1.23 million in U.S. library ebook revenue.  (Weber Decl. ¶49.)  During the same time period, the 33 Works in Suit published by HarperCollins generated over $768,000 in revenue from the license of library ebooks.  In short, for these 88 Works in Suit, the two Publishers earned almost $2 million in library ebook revenues.  (R-A Decl. ¶49.)

586.    By extrapolation, the Publishers earn many millions in library ebook revenues for the 33,000 works published by them in print and digital form that are posted on the Internet

98

Archive.  (R-A Decl. ¶49.)

587.    It would cost Internet Archive millions of dollars to license authorized library versions of the Works in Suit and the Publishers' 33,000 other titles that currently reside on the Internet Archive for national, unlimited distribution without a metering limit.  (R-A Decl. ¶71; Weber Decl. ¶84.)

588.    Both the number of the Publishers' titles being distributed by the Internet Archive, and the number of its members and borrows has grown over time, including since this lawsuit was filed.  (*See supra* ¶¶544-547.)

### B.    Lost Library Ebook Sales

589.    Internet Archive provides libraries and their patrons with a free alternative to licensed ebooks from the Publishers' authorized library ebook aggregators.  Internet Archive provides an option not to pay the fees for authorized library ebooks.  (R-A Decl. ¶¶75-79; Pavese Decl. ¶32; Weber Decl. ¶¶85-86, 88, 90-93; Sevier Decl. ¶¶76-77.)

590.    Internet Archive provides short term ebook lending to users.  (McN Decl. ¶¶4-5, 13; R-A Decl. ¶75.)

591.    Authorized library ebook aggregators – working pursuant to agreements with the Publishers – also provide short term ebook lending to users.  (McN Decl. ¶11; R-A Decl. ¶75.)

592.    By providing short term ebook lending on the internet, Internet Archive and authorized library ebook aggregators perform a similar function.  (McN Decl. ¶¶117-121; R-A Decl. ¶75.)  Internet Archive does not compensate the Publishers and authorized library lending does compensate the Publishers.  (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶¶75-76; Sevier Decl. ¶74; Weber Decl. ¶84.)

593.    By creating ebooks through the scanning of the Publishers' print books, the Internet Archive enables public and academic libraries to avoid certain licensing restrictions that each Publisher has devised for the library ebook market.  (Pavese ¶¶23, 34; R-A Decl. ¶¶2, 29,75; Sevier Decl. ¶67; Weber Decl. ¶70.)

594.    Internet Archive does not restrict the users of its Website to identified community residency or academic credentials; rather, Internet Archive distributes its ebooks on its Website without a limiting term (such as for two years) or a limiting number of circulations (like 26).  (McN Decl. ¶¶4, 6, 62; R-A Decl. ¶75.)

595.    Multiple libraries have links to IA's Website on their websites.  (*See supra* at ¶¶393-396.)When a library puts a link on its website sending its local patrons to the IA's Website, the ebooks available on the Website are not authorized for lending by the Publishers.  (McN Decl. ¶13.)

596.    When a library puts a link on its website sending its local patrons to IA's Website, that library's local patrons may have the ability to borrow from a collection of ebooks not available in its own local library's collection.  (McN Decl. ¶¶104, 108; R-A Decl. ¶76.)

597.    Susan Hildreth, Internet Archive's library expert, stated in her report that libraries engage in CDL "to leverage their existing physical collection" to obtain ebooks.  (McN Decl. ¶14.)

598.    When libraries leverage their existing physical collections to obtain ebooks, they do not pay for authorized ebooks.  (McN Decl. ¶14; R-A Decl. ¶78.)

599.    Ms. Hildreth also stated in her report that "if a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title – or on

purchasing print books."  (McN Decl. ¶14.)

600.    If a library decides not to license an ebook title from authorized ebook aggregators because digitized print copies are available for borrowing under CDL and uses the money on another ebook title, that other ebook title may not be written by the same author or published by the same publisher as the first title.  (McN Decl. ¶14.; R-A Decl. ¶¶75; 78.)

601.    Ms. Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL."  (McN Decl. ¶14.)

602.    As a result, the Publisher and author will receive less money from the library for those particular titles.  (McN Decl. ¶14.)

603.    The Internet Archive's Open Libraries Agreement form explicitly states, "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own."  (McN Decl. ¶69.)

604.    The Publishers experience lost potential ebook license revenues when a library makes their collection digital by using a physical volume that they own, rather than obtaining an authorized ebook license for a fee from an authorized ebook aggregator.   (R-A Decl. ¶78.)

605.    The Internet Archive has advised libraries that they need not spend money on authorized ebooks because their patrons can instead access ebook titles on the Internet Archive's Website and/or use their print copies to leverage them into digital copies. (*See supra* at ¶¶380; 597-98; R-A Decl. ¶78.).

606.    For example, in presentations to libraries, Internet Archive has explained that its model "ensures that a library will not have to repurchase the same content repeatedly simply

because of a change in format."  (McN Decl. ¶71; R-A Decl. ¶78.)

607.    As another example, in a document titled "Maximizing institutional investment in print resources through controlled digital lending," Internet Archive summarizes its project as "Or, You Don't Have To Buy It Again."  (McN Decl. ¶71; R-A Decl. ¶78.)

608.    The Publishers experience lost revenues when a library does not "repurchase the content again" via an authorized ebook license and instead makes use of the Internet Archive's ebook for its patrons.  (R-A Decl. ¶78.)

609.    As of June 2020, when the Works in Suit were removed from the Internet Archive, it had fewer members and monthly loans than today.  (*See supra* ¶¶544-547.)

610.    If the Internet Archive's conduct continues or other similar websites follow its example and its practices become widespread, there will be more free ebooks to satisfy user demand.  (R-A Decl. ¶¶76-79; Weber Decl. ¶50.)

611.    There are many millions of print books housed in libraries nationwide.(McN Decl. ¶11.; R-A Decl. ¶79.)

612.    While fewer than 15 public libraries now act as Partner Libraries in the Open Libraries project, their widespread participation would increase the number of IA's copies of the type of trade books published by the Plaintiffs.  (McN Decl. ¶72.)

613.    The Publishers price and sell print based on the assumption that they are material objects with limited distribution capabilities.  (R-A Decl. ¶22; Sevier Decl. ¶40; Weber Decl. ¶42.)

C.    **Lost Consumer Ebook Sales**

614.    A consumer who wishes to read a particular book can read or download the ebook for free from IA's Website rather than obtaining the ebook from Amazon, B&N.com, or the

4891-8421-5847v.16 0092453-000002

Publishers' other e-vendors for a fee.  (Sevier Decl. ¶¶9, 75; R-A Decl. ¶80; Weber Decl. ¶¶87-93.)

615.    If a consumer obtained an ebook from Amazon, B&N.com, or the Publishers other e-vendors, the consumer would pay a fee for the work.  (R-A Decl. ¶80.)  If the same consumer instead obtains the ebook from IA's Website, they would not pay a fee for the work.  (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

616.    The Publishers employ anti-piracy vendors.  This retention is informed by the belief that the distribution of free unauthorized digital copies of their book on internet websites leads to lost sales revenue.  (Pavese ¶20; R-A Decl. ¶81; Sevier ¶21; Weber ¶17.)

617.    Hachette's study of library and commercial ebook sales from 2017 to 2020 shows that its library ebook reads are increasing, while its retail ebook sales are declining.  This study includes data which shows, for instance, that revenues for certain writers who have had steady commercial ebook sales has gone down while the circulation numbers for their library ebooks have gone up.  (Sevier Decl. ¶¶57; 58-59.)

618.    This study suggests that free short term lending of ebooks may potentially serve as a substitute for the acquisition of commercial ebooks.  (Sevier Decl. ¶59.)

619.    These trends in the Hachette study show that members of the public are increasingly using free ebook options, such as from libraries.  (Sevier Decl. ¶¶55-59; *see also* Weber Decl. ¶64.)

620.    If there were widespread and unrestricted adoption of the conduct practiced by Internet Archive, that would lead to a greater supply of copies of each backlist ebook title available for free short term loan from internet websites, with reduced or no waitlists.  (R-A Decl. ¶81;

Weber Decl. ¶¶90-93.)

**D.    Inadequate Protection of Intellectual Property**

621.    The Foster Declaration provides examples in which the Internet Archive has made metadata errors or other mistakes with assorted ramifications, including instances in which in-copyright books have been treated as public domain, or titles have been confused.   (Foster Decl. ¶88; Weber Decl. ¶89; Sevier Decl. ¶78.)

**XII.    INTERNET ARCHIVE'S SCANS, WHILE ENTIRELY LEGIBLE, FALL SHORT OF THE QUALITY OF AUTHORIZED EBOOKS.   THE PUBLISHERS' ENFORCEMENT OF RIGHTS AGAINST INTERNET ARCHIVE**

622.    The Plaintiffs or their representatives have sent copyright notices to Internet Archive identifying unauthorized copies of the Plaintiffs' works to be removed.  (Foster Decl. ¶119.)

623.    Internet Archive failed to remove or disable access to certain of the alleged infringements cited in copyright notices that the Plaintiffs or their representatives sent before the lawsuit, both for some of the Works in Suit and for other works published by the Plaintiffs. (Foster Decl. ¶122.)

624.    On July 23, 2014, "PRH emailed its catalog to Internet Archive in an Excel spreadsheet, demanding that IA remove "[u]nauthorized, scanned versions of Penguin Random House titles being lent to patrons... immediately."  (Weber Decl. ¶17.)

625.    The email added that the "attached file includes both print and eBook isbn for all Random House titles, and print isbns (only) for Penguin titles. It includes close to 60,000 unique isbns. Please let us know the time frame in which we can expect these titles to be removed, and if you need anything additional from us to facilitate this process."  (Weber Decl. ¶17.)

104

626.    In response, the Internet Archive provided assurances that it would comply with this demand; Internet Archive's Office Manager stated that "We've been disabling lending access to our list of items with matching ISBN metadata that also have either an Ebook ISBN or 'Y' in the 'Ebook Eligible' column on your spreadsheet. I will confirm when this has been completed." (Weber Decl. ¶17.)

627.    Of the 58,754 ISBNs listed in the July 2014 PRH catalog, 35,413 (60.3%) remain in PRH's current commercial catalog, and 23,341 (39.7%) do not.  (Prince Decl. ¶134.)

628.    Today, the Internet Archive makes nearly half of the books listed in the 2014 PRH catalog available for lending on the Website; the Website currently makes available (a) 47.1% (16,681 of 35,413) of the 2014 catalog books that are in PRH's current catalog; (b) 48.7% (11,366 of 23,341) of the 2014 catalog books that are not in PRH's current catalog; and (c) 47.7% (28,047 of 58,754) of all 2014 catalog books.  (Prince Decl. ¶134.)

629.    Likewise, in 2018, counsel for HarperCollins sent Internet Archive a letter "demand[ing] that you immediately disable the 'Borrow eBook' function for our books still under copyright." (R-A Decl. ¶83.)

630.    Internet Archive did not comply with this cease and desist letter.  (R-A Decl. ¶83.)

631.    As a result, HarperCollins instructed its anti-piracy vendor to send takedown notices to Internet Archive for hundreds of links to in-copyright works on the Website.  Despite these notices, Internet Archive has continued to upload and make thousands of HarperCollins works available for lending.  (R-A Decl. ¶83.)

632.    Other Plaintiffs or their representatives have sent copyright notices to IA identifying unauthorized copies of Plaintiffs' works to be removed.  (Pavese Decl. ¶6; Sevier Decl.

¶82).

633.    Internet Archive failed to remove or disable access to certain of the alleged infringements cited in those notices, both for the Works in Suit, and for other works.  (Foster Decl. ¶122.)

634.    Internet Archive has also received requests from authors requesting that their books be removed from the Website.  For example, Internet Archive received an email from an author writing "from a little farm house in Tasmania where [she had] existed on a meager writer income for the past ten years in order to support my two children as a single mother," who told IA that it was "stealing" from her by posting her books and had imperiled her ability to "feed [her] kids and pay [her] house loan."  (McN Decl. ¶24.)

635.    In that same message, the author asked "[c]ould you please consider an agreement between myself and my publishers that will offer remuneration for any future lendings.  If not could you remove [my] titles from your system."  "Incidentally," the email continued, "I noticed Girls Night In 4 was listed… the authors in that collection gave those stories over for free to support the War Child charity.  I'm concerned that [a] valuable charity is missing out on sales.  Could you also please consider within your heart and soul if what you are doing is honourable [sic] towards authors.  We all love books and we all love sharing books, but the original creator needs to be paid at some stage in your system."  (McN Decl. ¶24.)

Dated: New York, New York
           July 7, 2022

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning

106

Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      jessefeitel@dwt.com
      carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

*Attorneys for Hachette Book Group,*
*Inc., HarperCollins Publishers LLC,*
*John Wiley & Sons, Inc., and Penguin*
*Random House LLC*

107