UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC,<br><br>Plaintiffs,<br><br>v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No.: 1:20-CV-04160-JGK |

**[PROPOSED] BRIEF OF MICHELLE M. WU AS *AMICUS CURIAE***

Max Rodriguez
POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361

*Attorneys for Amicus Curiae*

## Table of Contents

STATEMENT OF INTEREST ............................................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 2

ARGUMENT ............................................................................................................ 4

    I.    CDL was carefully crafted to balance respect for publishers and authors with the essential role of libraries in a digital age. ................... 4

    II.    CDL advances both private and public interests in the dissemination and accessibility of works. ........................................................................ 5

        A.    CDL advances the essential public function performed by libraries to acquire, preserve, and provide wide community access to content. ........................................................................ 6

        B.    CDL maximizes the use of a library's collection and limited resources, bringing libraries into the modern, digital age. ........... 8

        C.    Licensing is not a workable alternative to CDL because it is overly restrictive and disproportionately costly to libraries. ...... 11

    III.    This Court should not adopt Plaintiffs' overbroad attack on CDL. ....... 12

        A.    CDL is not the monolith described by Plaintiffs. ......................... 12

        B.    Plaintiffs purport to represent all publishers but fail to acknowledge publisher objectives that are helped (not harmed) by CDL. .................................................................................... 14

CONCLUSION ..................................................................................................... 16

# Table of Authorities

**Cases**

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) .................................................................................. 7

**Other Authorities**

Andrew Albanese, *Survey Says Library Users Are Your Best Customers*,
   PUBLISHER'S WEEKLY (Oct. 28, 2011) .................................................................. 6

David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending
   of Library Books*, LAWARXIV, 2018 .................................................................... 1

Kameel Stanley, *Libraries are needed more than ever. But many aren't sure how to
   reopen amid the coronavirus pandemic,* USA TODAY (June 11, 2020, 2:17 PM) ..... 7

Lynn Sillipigni Connaway et al., *"If it is too inconvenient I'm not going after it:"
   Convenience as a critical factor in information-seeking behaviors*, 33 LIBR. & INFO.
   SCI. RSCH. 179 (July 2011) .................................................................................. 9

Mary Kate Boyd-Byrnes & Marilyn Rosenthal, *Remote Access Revisited:
   Disintermediation and its Discontents*, THE JOURNAL OF ACADEMIC LIBRARIANSHIP
   (2005) .................................................................................................................. 7

Michelle M. Wu, *Building A Collaborative Digital Collection: A Necessary Evolution
   in Libraries*, 103 L. LIBR. J. 527 (2011) ............................................................... 4

Michelle Wu, Assoc. Dean, Geo. Univ. L. Ctr., Keynote Speaker at the Law Library
   Association of Maryland Legal Research Institute (Oct. 11, 2019) ...................... 1

Michelle Wu, Assoc. Dean, Geo. Univ. L. Ctr., Presenting at Special Libraries
   Association Annual Meeting: Controlled Digital Lending as a Path to Increasing
   Accessibility and Usability of Library Materials (June 18, 2019) ........................ 1

Michelle Wu, Assoc. Dean, Geo. Univ. L. Ctr., Presenting at the Law Library
   Association of Maryland Legal Research Institute: Fair Use & Digitization (Oct.
   11, 2019) .............................................................................................................. 1

Michelle Wu, Professor L., Geo. Univ. L. Ctr., Provocateur at the Harvard
   Conference on The Future of Law Libraries: The Future Is Now?: Expanding
   Collections and Building a Digital Law Library Through Collaboration (June 16,
   2011) .................................................................................................................... 1

Nancy Maron et al., *Covid Impact Survey*, SPARC (Sept. 2021) ................................ 7

Ryan Holmes, *How Libraries Are Reinventing Themselves to Fight Fake News,*
   FORBES (Apr. 10, 2018, 10:17 AM) ..................................................................... 10

Umberto Bacchi, *Coronavirus curbs seen taking heavy toll on people without
   internet*, THOMSON REUTERS FOUNDATION (May 5, 2020, 2:31 AM) ..................... 7

**STATEMENT OF INTEREST**

*Amicus curiae* Michelle M. Wu is a former Professor of Law and the former Law Library Director at Georgetown University Law Center. Through her career spanning over twenty-five years,[1] Ms. Wu has worked with every function in a library from interlibrary loan to cataloging to reference to systems administration.[2]

Ms. Wu is recognized by many as the originator of the legal theory underlying controlled digital lending ("CDL") and possesses an intimate understanding of CDL's purpose and effects.[3] She has presented on CDL dozens of times and engaged with hundreds of libraries on the topic.[4] Through her work,[5] Ms. Wu has developed a deep understanding of how a wide range of libraries view and value CDL as an

---

[1] A copy of Ms. Wu's curriculum vitae is attached as Exhibit A.

[2] No person or entity other than *amicus* and her counsel assisted in or made monetary contribution to the preparation or submission of this brief.

[3] *See, e.g.*, David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library Books*, LAWARXIV, 2018, at 2 ("The idea was first explored in the pioneering article . . . by Michelle Wu, Professor of Law and Law Library Director at Georgetown University School of Law.").

[4] *See, e.g.*, Michelle Wu, Assoc. Dean, Geo. Univ. L. Ctr., Keynote Speaker at the Law Library Association of Maryland Legal Research Institute (Oct. 11, 2019); Michelle Wu, Assoc. Dean, Geo. Univ. L. Ctr., Presenting at the Law Library Association of Maryland Legal Research Institute: Fair Use & Digitization (Oct. 11, 2019); Michelle Wu, Assoc. Dean, Geo. Univ. L. Ctr., Presenting at Special Libraries Association Annual Meeting: Controlled Digital Lending as a Path to Increasing Accessibility and Usability of Library Materials (June 18, 2019); Michelle Wu, Professor L., Geo. Univ. L. Ctr., Provocateur at the Harvard Conference on The Future of Law Libraries: The Future Is Now?: Expanding Collections and Building a Digital Law Library Through Collaboration (June 16, 2011).

[5] Ms. Wu was, in addition to her academic library roles, Of Counsel to Defendant Internet Archive from about 2016–2018 in connection with the year 2016 Macarthur grant application process. She is no longer affiliated with the Internet Archive.

integral tool to fulfill their public purpose to acquire, preserve, and provide community access to content, while carefully balancing and respecting copyright laws.

As an *amicus curiae*, Ms. Wu speaks from the perspective of librarians, libraries, readers, and countless others who benefit from CDL and may be impacted by the Court's decision in this case.

## **SUMMARY OF ARGUMENT**

Copyright is, above all else, a balancing act. This equity principle is especially important when technology collides with traditional copyright. Market effects are certainly an important feature of that balance but must be weighed against other equitable interests, regardless of their technological form. Literary criticism, second-hand sales, and library lending all have the potential to impact sales but nevertheless are considered social goods that copyright is intended to foster.

CDL was established to innovate these core, well-established components of copyright law, allowing libraries to secure their collections and maintain their relevance as physical stewards of knowledge in an increasingly digital age. CDL takes many forms. Many libraries around the United States offer works through CDL subject to their own individual platforms and practices. The arguments offered by Plaintiffs in support of their motion for summary judgment are a broad-based attack on all of them, shoehorning the very concept of CDL into a dispute about the Internet Archive's individual implementation of it. *See, e.g.*, ECF No. 99 at 1–5. Indeed, they go so far as to generally call digitized copies of physical works "bootleg." *Id.* at 1.

A*micus* respectfully submits that this Court should (1) reject Plaintiffs' argument in support of their motion that CDL *generally* does not constitute fair use, and (2) regardless of this Court's decision on the motions for summary judgment, narrowly construe the parties' arguments to reach an outcome that has as little effect as possible on the hundreds of unrelated CDL programs at libraries around the country.

*Amicus* addresses three fundamental points for this Court's consideration and benefit. *First*, CDL was carefully crafted to balance respect for public and private copyright interests in a digital age. *Second*, CDL creates enormous benefits for libraries, the users they serve, and society at large that are integral to the fair use analysis. Digital licensing, Plaintiffs' proposed alternative to CDL, is wholly insufficient to fulfill libraries' missions and hampers libraries' ability to serve the public good.

*Third*, this Court should not adopt Plaintiffs' overbroad attack on CDL. Whatever decision this Court reaches on the particular facts of these plaintiffs against this defendant's particular CDL program, CDL has many different expressions and applications in libraries all over the United States, serving a diverse set of interests including publishers, authors, users, and libraries themselves. Plaintiffs flatten these distinctions, treating CDL as a monolithic bad and themselves as the monolithic representatives of the interests of copyright holders, when they represent only one profit-focused perspective in the equitable

considerations of copyright law (and indeed, only one perspective of publishers). *See, e.g.*, ECF No. 1 at 4–5.

Plaintiffs' motion for summary judgment attacks and denigrates the very concept of CDL, when it just as easily could have been narrowly construed. A wide-reaching holding against CDL — which Plaintiffs request of this Court — would have wide-reaching consequences far beyond the parties, harming the ability of libraries to adequately serve the public in the digital age.

## ARGUMENT

### I. CDL was carefully crafted to balance respect for publishers and authors with the essential role of libraries in a digital age.

CDL was carefully crafted to respect the balance of copyright.[6] It is used only by libraries, as entities uniquely invested in all interests. Their mission relies equally on the continued supply of reputable works and the public's access to knowledge. Libraries' systems and practices reflect the commitment to both private and public interests by carefully recording and tracking inventory, paying for copies of works acquired, and establishing procedures to encourage broad community engagement with the content purchased.

---

[6] Plaintiffs, seeking to delegitimize CDL as a conceptual matter, assert that the theory was *post hoc* manufactured by the Internet Archive when it "convened a group of friendly copyright scholars to address the 'copyright uncertainty' surrounding its practices" that "manufactured a 'concept' and called it 'controlled digital lending'" …. (ECF No. 99 at 19). Leaving aside the unbecoming opprobrium, the characterization is fundamentally inaccurate, as Ms. Wu first proposed the idea (if not the term) in 2011. *See* Michelle M. Wu, *Building A Collaborative Digital Collection: A Necessary Evolution in Libraries*, 103 L. LIBR. J. 527 (2011).

CDL contemplates using technology to effectuate a library's pre-existing mission to acquire, preserve, and provide community access to content. It is only applicable to materials legitimately acquired through purchase or gift by non-profit libraries, where the author's private interest in compensation would have been exhausted during the book's first sale or distribution. If the library digitizes the acquired title, it remains constrained to lending simultaneously only the same number of copies it acquired. Furthermore, any digital copy circulated must be controlled through digital rights management (DRM) to enforce a timed loan and to prevent wholesale copying and distribution.

In other words, CDL's practical effect is to replicate the lending of a print book by a non-profit library in a digital environment. In CDL, the rightsholder is paid for the number of copies used, and the community can borrow the number of copies legitimately acquired, a design that embodies the very spirit of copyright.

## II. CDL advances both private and public interests in the dissemination and accessibility of works.

CDL advances both private and public interests by increasing dissemination and access. It does so by making books — whether they are published, no-longer-published, or never published in e-form — more accessible, easier to find through full-text searching, and overall more visible. This increased accessibility, in turn, indirectly advances the income generation interest of publishers, as users otherwise unaware of a work or author are given opportunities to uncover them, leading to subsequent purchases by those with means where the work carries long-term value.

Plaintiff publishers argue that this concept — CDL leading to income generating purchases of books — is a myth, however the real-world experience of librarians says otherwise. Even library directors with relatively few chances for individual user engagement can name instances where their community members were introduced to a book or author that they would have otherwise missed or ignored outside of the library. These discoveries often lead to readers following authors and purchasing more of their works or leads them to purchase other titles within a genre or on similar topics. Ms. Wu recalls such experiences in her own career, as well as in countless conversations with librarians at other institutions.[7]

### A. CDL advances the essential public function performed by libraries to acquire, preserve, and provide wide community access to content.

CDL's impact is even more widespread in the countervailing interest of copyright: the public interest. CDL provides numerous benefits that are widely recognized in scholarship and conferences, which Ms. Wu lays out for this Court's benefit.

First, CDL is recognized as improving access for community members with accessibility challenges. For example, CDL benefits individuals with disabilities,

---

[7] This phenomenon is not merely anecdotal: a study conducted by Bowker PubTrack Consumer and The Library Journal found that "over 50% of all library users report purchasing books by an author they were introduced to in the library" and that "libraries are a powerful economic engine for the book business." Andrew Albanese, *Survey Says Library Users Are Your Best Customers*, PUBLISHER'S WEEKLY (Oct. 28, 2011), *available at* https://www.publishersweekly.com/pw/by-topic/industry-news/publishing-and-marketing/article/49316-survey-says-library-users-are-your-best-customers.html.

individuals who are homebound, users who live far away from their library, users who work during the hours that their library is open, poor users (who may overlap with other listed categories as well), and users who otherwise cannot reach their physical library building.[8] Furthermore, all of these demographics' challenges in accessing the library resources to which they are entitled were exacerbated by the pandemic. *See* Umberto Bacchi, *Coronavirus curbs seen taking heavy toll on people without internet*, THOMSON REUTERS FOUNDATION (May 5, 2020, 2:31 AM).[9] Indeed, for certain periods of the pandemic, no one was able to access physical library inventories. *See* Kameel Stanley, *Libraries are needed more than ever. But many aren't sure how to reopen amid the coronavirus pandemic,* USA TODAY (June 11, 2020, 2:17 PM).[10]

Second, CDL is a tool that allows libraries to serve their communities and preserve their inventories, even when facing headwinds of budget constraints. *See, e.g.*, Nancy Maron et al., *Covid Impact Survey*, SPARC (Sept. 2021) ("Nearly 80% of

---

[8] *See, e.g.*, *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014) (holding that the HathiTrust digital library providing access to print-disabled patrons under a system which requires patrons to "submit documentation from a qualified expert verifying that the disability prevents him or her from reading printed materials" before gaining access was fair use); Mary Kate Boyd-Byrnes & Marilyn Rosenthal, *Remote Access Revisited: Disintermediation and its Discontents*, 31 THE JOURNAL OF ACADEMIC LIBRARIANSHIP 216 (2005) (pointing to the underdeveloped information seeking skills of nontraditional learners in higher education who depend entirely on remote access to resources).

[9] *Available at* https://www.reuters.com/article/health-coronavirus-tech-idUKL8N2CM2PR.

[10] *Available at* https://www.usatoday.com/story/news/2020/06/11/when-libraries-reopen-after-coronavirus-might-months/5316591002/.

libraries had to contend with budget cuts as a result of COVID").[11] The digitization aspect of CDL preserves content that might otherwise be destroyed in, for example, natural disasters or armed conflicts. CDL also helps to blunt the harmful effect of significant cost pressures on libraries, including storage, physical interlibrary loan systems, and more.

Ms. Wu has experienced firsthand the effects of flooding on a library collection as the acting director of the University of Houston Law Library shortly after Tropical Storm Allison in June 2001. The financial *and* informational costs of losing the collection were enormous. Though FEMA designated over $20 million for restoration, many titles lost from the storm were no longer available on *any* market, used or new. While working to rebuild the parts of the Law Library's collection that could be rebuilt, there were several years during which the community's informational needs (particularly those of public patrons) were not fully met. Indeed, Ms. Wu's involvement in the aftermath of Tropical Storm Alison inspired her work originating the legal theory that became CDL.

### B. CDL maximizes the use of a library's collection and limited resources, bringing libraries into the modern, digital age.

CDL and its logical adjuncts supply numerous benefits to the public and authors. In addition to the discovery and accessibility benefits discussed above, CDL is essential for libraries to fulfill and maximize their core objective: giving people affordable access to materials.

---

[11] *Available at* https://sparcopen.org/wp-content/uploads/2021/09/SPARC-COVID-Impact-Survey-092021.pdf.

We live in a world fundamentally shaped by the interconnectedness of the internet. In recognition of that reality, library directors have a core responsibility to make it as likely as possible that users will reach the information they need. Systems librarians analyze library search data to understand what types of online searches were failing to produce desired results and why. Ms. Wu's experience as a former systems librarian indicated that most users prefer searching online. Furthermore, the transformation of nearly every sector of our society in the last several decades shows that online searchers prefer online access. Studies show that convenience drives information choice, even where the searcher knows that higher-quality information is better found in other ways. *See, e.g.*, Lynn Sillipigni Connaway et al., *"If it is too inconvenient I'm not going after it:" Convenience as a critical factor in information-seeking behaviors*, 33 LIBR. & INFO. SCI. RSCH. 179 (July 2011).[12] Searching a database is more convenient than browsing the stacks because it does not require co-location with the collection, can be accessed anywhere at any time, and can mine a large collection simultaneously.

CDL allows libraries to maximize the use of their collections and their utility in the digital age. Virtually every library has materials sitting unused on its shelves at any given time. While factors such as relevance, interest, currency, and the short-term-use nature of research can contribute to that reality, so do the challenges in discovery and access.

---

[12] *Available at* https://www.sciencedirect.com/science/article/abs/pii/S0740818811000375.

Furthermore, the human desire for convenience has dangerous implications that libraries play an essential role in combatting: misinformation.[13] No citation is necessary to show to this Court the prevalence and danger of internet misinformation. CDL is an essential pillar of countering misinformation by making library materials accessible, relevant, and competitive. When made searchable, digital works made available through CDL increase the likelihood of exposing users to a wider range and greater number of works, and also help to build an environment where authoritative texts can be as easily found as misinformation. This type of discovery cannot be replicated with vendor-provided e-books, both because not all publishers make full-text content available for searching and because differing vendor indexes produce inconsistent search results.

---

[13] Libraries play a large role in combating misinformation. Libraries throughout the country are fighting back against misinformation by teaching information literacy, and most are utilizing technology to do so. For example, "The International Federation of Library Associations and Institutions put together a handy 'How To Spot Fake News' infographic, which has been translated into 37 languages and is used around the world." Ryan Holmes, *How Libraries Are Reinventing Themselves to Fight Fake News,* FORBES (Apr. 10, 2018, 10:17 AM), *available at* https://www.forbes.com/sites/ryanholmes/2018/04/10/how-libraries-are-reinventing-themselves-to-fight-fake-news/?sh=1ae8090fd161. Librarians at Indiana University East developed an interactive fake news website, complete with tips on fact-checking and a deconstruction of an article about "hollow earth." *Id.* And this service is needed now more than ever: a study conducted by Stanford University found that "[f]ewer than 20% of middle school students were even able to distinguish between 'sponsored content' and a real news story — let alone assess underlying bias." *Id.* CDL and easy to access, searchable information is key in these libraries' role in preventing the spread of misinformation.

## C. Licensing is not a workable alternative to CDL because it is overly restrictive and disproportionately costly to libraries.

Petitioners suggest that existing licensing arrangements should be preferable to CDL. But the licensing structure is disproportionately costly for libraries and erects arbitrary barriers to equitable access and preservation. A library that *owns* its collection through physical copies of books bears little risk in collecting widely, including materials that may not be popular or heavily used. These titles often fall into the category of minority voices, small press runs, or niche subjects. Whether the book is used today, next year, or 30 years later, or whether it is used once or a hundred times, the cost remains the same.

However, that same book, if subject to an annual or use license, is a much riskier and costlier proposition. Under a licensing arrangement, libraries may have to pay for a limited number of uses or use within a restricted time period. These arrangements often require libraries to attempt to predict what books the public is most likely to use short-term, causing libraries to favor mainstream titles over fostering a diverse collection. Furthermore, a licensing approach would mean that the library could afford fewer other books, as it may have to pay multiple times for the use of a single title, whereas its print equivalent could be used perpetually by community members for a one-time cost.

Libraries are not bookstores. They seek not only to provide popular titles to the public but also serve as a haven for public access to knowledge, a task that can only be accomplished through the acquisition and preservation of diverse titles. For libraries, CDL not only boosts visibility and discovery but also facilitates broad

collection development, across many more authors, publishers, and subject matters than when constrained by licensing models. CDL further allows for that broad collection to be preserved for future users as well as current ones — an objective not permitted by most commercial licenses — ensuring that future generations will have access to no less information than present users.

## III. This Court should not adopt Plaintiffs' overbroad attack on CDL.

The parties' claims and defenses can focus only on Internet Archive's use of CDL (and its offshoot during the National Emergency Library period) and the impact as perceived by them. However, Plaintiff publishers' arguments on summary judgment are much broader, and this Court's decision may impact thousands of libraries throughout the country who rely on CDL.

Hundreds of libraries in the United States already use CDL. The effect of Plaintiffs' broadside attack, were this Court to adopt it, would be to make libraries' valuable collections less accessible while also imposing greater costs on society in accessing high-quality information. The inescapable result of this dynamic is a "blood from a stone" effect, by which libraries under constantly high budget pressures are forced to buy duplicative copies of works to adapt to the digital world or render themselves incapable of serving the public in the manner it wishes to be served: digitally.

### A. CDL is not the monolith described by Plaintiffs.

Plaintiffs' all-encompassing attack on CDL as a concept based on the Internet Archive's individual use of it fails to consider the many distinctions between CDL programs around the country and around the world.

Libraries implementing programs that constitute CDL use a wide variety of practices to suit their unique needs and challenges. They use different systems in generating, managing, and distributing works through CDL. What CDL looks like at any library can be substantially different than any other.

Some libraries make CDL materials available to all of their users, others use narrower definitions (e.g., course reserves only available to the students enrolled in the course), and still others have broader ones (e.g., available for all regular library uses, including interlibrary loan).

With respect to content control and management, the approaches are just as diverse. Libraries use different document control platforms with granular controls. They adopt varying levels of automation, from manual control to full self-service check-out. They each enforce authentication through different combinations of tools including integrated library systems, IP authentication, and university single-sign-on interfaces. They each choose to allow or disallow certain reading options such as viewing a text in full online or downloading a temporary-use DRM copy, and deliver works in different formats (e.g., image only or OCR text). Processes adopted to comply with the loan-to-own ratio also differ, with some libraries moving print books into cold storage while others have adopted practices ranging from disabling loans for print copies or requiring mediated access to print copies. Library systems have been used to facilitate such control, whether by suppressing visibility of print or e-copies, not allowing the book to be checked out at circulation terminals, or by

prompting library staff to verify CDL-equivalent copy status before checking out a print book.

Furthermore, each library has its own unique approach and methodology to selecting materials that will be made available through CDL, including works of particular dates (e.g., only pre-2000 materials), statuses (e.g., out-of-print only), types (e.g., non-fiction only), genres, subjects, countries of origin, languages, book conditions (e.g., fragile materials only), and purposes (e.g., course reserve only).

The parties have not presented these distinctions and their many permutations for this Court's consideration, and indeed those many hundreds of CDL systems not before this Court would not be justiciable even if they had been presented. Nevertheless, Plaintiffs' motion for summary judgment is suffused with categorical rejections of CDL as a concept based on a single use.

### B. <u>Plaintiffs purport to represent all publishers but fail to acknowledge publisher objectives that are helped (not harmed) by CDL.</u>

Plaintiffs are but a few out of thousands of publishers in the United States, and though they hold a large portion of the market share, they represent only a minority of published authors. Plaintiffs also represent only the elite perspective in publishing. This perspective, focused on high sales, is far removed from the reality facing most authors and publishers, as the average title sells around 200 copies a year and 1,000 in a lifetime.

Plaintiffs' focus on their own perspectives as the largest and most profitable publishers simultaneously disadvantage the majority of rights holders by ignoring other legitimate interests. For example, many authors engaged in traditional

publishing have non-profit purposes, such as academics, who use publishing to build expertise, gain tenure, maximize exposure to an idea, develop a field of study, and/or advance knowledge. Ms. Wu's own published works have been assigned both as required and recommended readings in higher education. CDL would serve her interests as an author by facilitating access to her ideas in educational information.

Publishers' primary purposes are as varied as authors' and are not adequately represented by Plaintiffs' complaint or their positions on summary judgment. In addition to profit, publishers may seek to amplify minority voices, improve the dissemination of information and ideas, advance social justice causes, and more. CDL necessarily serves all of these goals by making information more accessible, disseminating titles that would otherwise be difficult to obtain, and making book lending more equitable, *all without affecting the profit of the publisher because the library purchased the work and only lends the number of copies equivalent to what it owns.*

## CONCLUSION

For these reasons, to the extent necessary, *amicus* respectfully submits this Court should reject Plaintiffs' argument that CDL is categorically not a fair use, and, whatever conclusion the Court reaches on the cross-motions for summary judgment, cabin as much as possible its holding to the particular facts and circumstances before it.

Dated: July 14, 2022

Respectfully Submitted,

POLLOCK COHEN LLP

By: */s/ Max Rodriguez*
   Max Rodriguez
   111 Broadway, Suite 1804
   New York, NY 10006
   (212) 337-5361

   *Attorney for Amicus Curiae*