IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC.,<br>HARPERCOLLINS PUBLISHERS LLC,<br>JOHN WILEY & SONS, INC., and<br>PENGUIN RANDOM HOUSE LLC,<br><div align="right">Plaintiffs,</div><br>v.<br><br>INTERNET ARCHIVE and DOES 1 through<br>5, inclusive,<br><div align="right">Defendants.</div> | Case No. 1:20-CV-04160-JGK |

**[PROPOSED]**
*AMICUS CURIAE* **BRIEF OF INTELLECTUAL PROPERTY LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Rebecca Tushnet
rtushnet@law.harvard.edu
520 Hauser, Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02130
Telephone: 703-593-6759

*Attorney for Amici Curiae*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES**.........................................................................ii

**IDENTITY OF AMICI CURIAE AND INTEREST IN THIS CASE**..............1

**SUMMARY OF ARGUMENT** ...................................................................1

**I.    Nonprofit Library Lending Is a Favored Noncommercial Use.** ................2

**II.   Nonprofit Library Lending Is Presumptively Not Harmful To Markets in Which the Copyright Owner Has a Legitimate Interest.**..............................8

**CONCLUSION**...........................................................................................16

**APPENDIX** ...............................................................................................17

# TABLE OF AUTHORITIES

**Constitutional Provisions**

Art. I, sec. 1, cl. 8 ...................................................................................................1

**Cases**

*American Geophysical Union v. Texaco Inc., 60 F.3d 913* (2d Cir.1994)...............3

*American Society for Testing & Materials v. Public.Resource.Org, Inc.*, --- F.
   Supp. 3d --, 2022 WL 971735 (D.D.C. Mar. 31, 2022)...................................9, 12

*Arica Institute, Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992)................................10

*Ass'n of Am. Med. Colls. v. Cuomo*, 928 F.2d 519 (2d Cir. 1991) ...........................9

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)...................................12

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ..............................12

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006).....8

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ...................................................4, 10

*Cambridge University Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014).. 1, 3, 6, 11,
   12

*Campbell v. Acuff-Rose*, 510 U.S. 569 (1994)..........................................................8

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ..................................................................6

*Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060 (9th Cir. 2014) .................9

*Google v. Oracle*, 141 S. Ct. 1183 (2021); ............................................. 3, 10, 11, 13

*Harbus v. Manhattan Institute for Policy Research, Inc.*, 2020 WL 1990866
   (SD.N.Y. Apr. 27, 2020) ......................................................................................4

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003)....................................8, 10

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F. Supp. 1283 (N.D.
   Cal. 1991) ...........................................................................................................11

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.,* 964 F.2d 965 (9th Cir. 1992) ...............................................................................................................11

*National Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio*, 15 F.3d 559 (6th Cir. 1994)................................................................................................4, 9

*Núñez v. Caribbean Intern. News Corp.*, 235 F.3d 18 (1st Cir. 2000)....................10

*Peterman v. Republican National Comm.*, 369 F. Supp. 3d 1053 (D. Mont. 2019)

...................................................................................................................... 6-7

*Philpot v. Media Research Center Inc.*, 279 F.Supp.3d 708 (E.D. Va. 2018) ..........5

*Princeton Univ. Press v. Mich. Document Servs.*, Inc., 99 F.3d 1381 (6th Cir. 1996)................................................................................................................9

*Sony Corp. o Universal City Studios, Inc.*, 464 U.S. 417 (1984) ........................6, 8

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir.2014)

...................................................................................................................... 8, 10,

*Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570 (S.D.N.Y. 2020) .............11

*Williams & Wilkins Co. v. United States*, 420 U.S. 376 (1975) ...............................5

*Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (Ct. Cl. 1973)..................5

## Statutes

17 U.S.C. §107..............................................................................................................1

17 U.S.C. §108..............................................................................................................2

17 U.S.C. §109..............................................................................................................2

17 U.S.C. §110..............................................................................................................2

17 U.S.C. §111..............................................................................................................2

17 U.S.C. §112..............................................................................................................2

17 U.S.C. §118..............................................................................................................2

17 U.S.C. §121 ............................................................................................2

17 U.S.C. §121A ..........................................................................................2

## Other Authorities

Dan Ariely, *Predictably Irrational 65* (2009) ...........................................9

Jack M. Balkin, *Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society*, 79 N.Y.U. L. Rev. 1 (2004)................ 3-4

Mark Bartholomew & John Tehranian, *An Intersystemic View of Intellectual Property and Free Speech*, 81 George Washington Law Review 1, 22 (2013) ....7

Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005*, 156 U. Pa. L. Rev. 549, 602-03 (2008) ...........................................5

Yochai Benkler, *Through the Looking Glass: Alice and the Constitutional Foundations of the Public Domain*, Law & Contemp. Probs. Winter/Spring 2003, at 173 ..........................................................................................3

Black's Law Dictionary (10th ed. 2014) ...................................................7

Julie E. Cohen, *Copyright and the Perfect Curve*, 53 Vand. L. Rev. 1799, 1816 (2000)........................................................................................5

Jennifer Femminella, *Online Terms and Conditions Agreements: Bound by the Web*, 17 St. John's J. Legal Comment. 87, 115–18 (2003)..................................13

Laura N. Gasaway, *The New Access Right and Its Impact on Libraries and Library Users*, 10 J. Intell. Prop. L. 269, 299 (2003) .......................................13

Paul Goldstein, *Copyright's Highway: From Gutenberg To The Celestial Jukebox*, 153-54 (rev. ed. 2003) .........................................................................4

Henry B. Hansmann, *The Role of the Nonprofit Enterprise*, 89 Yale L.J. 835, 843-45 (1979).......................................................................................2

Lexabear, A Deadly Education: the "dreadlocks" reference has been updated / authorial ability to update books due to modern technology, Reddit.com, https://www.reddit.com/r/Fantasy/comments/leattu/a_deadly_education_the_dreadlocks_reference_has/.......................................................................15

Glynn S. Lunney, Jr., *The Copyright Tax*, 68 J. Copyright Soc'y U.S.A. 117 (2021) ...........................................................................................................................11

William F. Patry & Shira Perlmutter, *Fair Use Misconstrued: Profit Presumptions, and Parody*, 11 Cardozo Arts & Ent. L.J. 667, 680 (1992) ....................................5

Matthew Sag, *Predicting Fair Use*, 73 Ohio St. L.J. 47, 60 (2012)..........................7

Kristina Shampanier, Nina Mazar, & Dan Ariely, *Zero as a Special Price: The True Value of Free Products*, 26 Marketing Sci. 742, 742 (2007) .......................9

Janet Sinder, Correcting the Record: Post-Publication Corrections and the Integrity of Legal Scholarship, 112 Law Libr. J. 365 (2020) .........................................14

Rebecca Tushnet, *All of This Has Happened Before and All of This Will Happen Again*, 29 Berkeley Tech. L.J. 1447 (2014) .................................................. 13, 15

Eugene Volokh, *Freedom of Speech and Intellectual Property: Some Thoughts After Eldred, 44 Liquormart, and Bartnicki*, 40 Hous. L. Rev. 697, 726 (2003) ..4

Webster's New Collegiate Dictionary 226 (1973) ....................................................7

Neil Weinstock Netanel, *Copyright and a Democratic Civil Society*, 106 Yale L.J. 283 (1996)..................................................................................................................3

Neil Weinstock Netanel, *Market Hierarchy and Copyright in Our System of Free Expression*, 53 Vand. L. Rev. 1879, 1907-09 (2000)..............................................6

## IDENTITY OF AMICI CURIAE AND INTEREST IN THIS CASE

Amici are scholars whose research and teaching focus is copyright law.[1]

Amici's interest is in the correct development of copyright law.[2]

## SUMMARY OF ARGUMENT

The constitutional goal of copyright protection is to "promote the progress of science and useful arts," Art. I, sec. 1, cl. 8, and the first copyright law was "an act for the encouragement of learning," *Cambridge University Press v. Patton*, 769 F.3d 1232, 1256 (11th Cir. 2014). This case provides an opportunity for this Court to affirm that vision by recognizing the special role that noncommercial, nonprofit uses play in supporting freedom of speech and access to knowledge. Noncommercial, nonprofit uses such as those made by libraries receive special consideration in the fair use analysis because those uses serve important democratic interests that aren't served elsewhere, are easily suppressed because they aren't supported by the profit motive, and have different market effects than profit-seeking uses.

---

[1] Institutional affiliations are provided solely for purposes of identification.

[2] The Internet Archive has consented to the filing of this brief. Plaintiffs do not object. Neither the parties nor their counsel have authored this brief, and neither they nor any other person or entity other than counsel for amicus curiae contributed money that was intended to fund preparing or submitting this brief.

I.      Nonprofit Library Lending Is a Favored Noncommercial Use.

The first fair use factor requires a court to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. §107. The statutory language opposes "commercial" to "nonprofit educational," and while there are many variations on the scenarios in which works are used fairly, and many commercial fair uses, the Internet Archive's digital lending program falls on the specially favored nonprofit, noncommercial side.

Nonprofit uses do not depend on the profit motive. Nonprofit users cannot internalize all the benefits of their uses through charging a market-set price. *See* Henry B. Hansmann, *The Role of the Nonprofit Enterprise*, 89 Yale L.J. 835, 843-45 (1979). As a result, socially beneficial nonprofit uses, including those that support the "Progress of Science and Useful Arts," will often not occur unless there are special protections in place for them. *See id.* at 877-79. It is for this reason that copyright law, like other areas of law, has long accorded special treatment to nonprofit activities, not just in §107 but in §108 (library/archive reproductions), §109 (nonprofit lending), §110 (nonprofit performances), §111 (nonprofit transmissions), §112 (nonprofit ephemeral copies), §114 (noncommercial educational radio), §118 (noncommercial broadcasting), and §121 & §121A (nonprofit reproductions for people with disabilities); see also *American*

*Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir.1994) (distinguishing "commercial exploitation" from fair uses that generate "value that benefits the broader public interest"; distinction turns on "private economic rewards reaped by the secondary user (to the exclusion of broader public benefits)").

Because of these special features of nonprofit uses, they are also consistent with the ultimate constitutional goal of copyright, to promote creative progress. *See Google v. Oracle*, 141 S. Ct. 1183, 1196, 1203, 1208 (2021); *Patton*, 769 F.3d at 1257. They do so by providing access that would otherwise be unavailable. Nonprofit uses enable a richer, more democratic culture that is vibrant and creative precisely because they provide alternatives to commercial exchange for creating and accessing knowledge. *See* Jack M. Balkin, *Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society*, 79 N.Y.U. L. Rev. 1 (2004); Yochai Benkler, *Through the Looking Glass: Alice and the Constitutional Foundations of the Public Domain*, Law & Contemp. Probs., Winter/Spring 2003, at 173; Neil Weinstock Netanel, *Copyright and a Democratic Civil Society*, 106 Yale L.J. 283 (1996).

Improving access is important because democracy requires more than democratically elected rulers; it requires informed democratic culture and knowledge. Freedom to participate in public life requires the resources to participate and the freedom to debate and disagree about meaning of shared

culture. And this requires robust nonprofit institutions providing access to the basic elements of culture. Balkin, supra, at 34-45, 50-54. A work accessed through the Internet Archive "is materially more valuable to readers than the original that they can't get, that costs too much, or that they don't know about . . . ." Eugene Volokh, *Freedom of Speech and Intellectual Property: Some Thoughts After Eldred*, 44 Liquormart, and Bartnicki, 40 Hous. L. Rev. 697, 726 (2003); see also Paul Goldstein, *Copyright's Highway: From Gutenberg To The Celestial Jukebox*, 153-54 (rev. ed. 2003) (uses in schools and libraries "advance copyright's general aim of promoting cultural and political discourse"). This ability to equalize and share resources is a particularly important function in times of extreme social isolation, such as the global COVID pandemic.

Here, the Internet Archive's use was precisely the kind of noncommercial, nonprofit use that is specially favored under the law. *See National Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio*, 15 F.3d 559, 562 (6th Cir. 1994) (nonprofit's free dissemination of work was noncommercial, favoring fair use); *Harbus v. Manhattan Institute for Policy Research, Inc.*, 2020 WL 1990866 (SD.N.Y. Apr. 27, 2020) (first factor "weighs decidedly in favor of a finding of fair use" where copier was 501(c)(3) nonprofit that didn't use copying to solicit donations or promote sales) (citing *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) ("The commercial/nonprofit dichotomy concerns the unfairness that arises

4

when a secondary user makes unauthorized use of copyrighted material to capture

significant revenues as a *direct consequence* of copying the original work.")

(emphasis added) (citation omitted); *Philpot v. Media Research Center Inc.*, 279

F.Supp.3d 708, 718 (E.D. Va. 2018) (freely distributed use by nonprofit favored

fair use); Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions,*

*1978-2005*, 156 U. Pa. L. Rev. 549, 602-03 (2008) (finding significant influence of

noncommerciality in caselaw; "the fact that a defendant's use is for a

noncommercial purpose should be understood, as it appears it already is in

practice, strongly to support a finding of fair use"); William F. Patry & Shira

Perlmutter, *Fair Use Misconstrued: Profit Presumptions, and Parody*, 11 Cardozo

Arts & Ent. L.J. 667, 680 (1992) ("a use for educational purposes in a nonprofit

institution not charging any fee" stands "[a]t one extreme of the continuum (the

most favorable for the defense)").

By providing the building blocks for future insights, these access-promoting

institutions serve the purposes of copyright and the First Amendment. *Williams &*

*Wilkins Co. v. United States*, 487 F.2d 1345, 1358 (Ct. Cl. 1973) (holding that

copying, for research purposes, material that is "stimulating or helpful," even if not

"crucial," produces important social benefits), *aff'd by an equally divided Court*,

420 U.S. 376 (1975); Julie E. Cohen, *Copyright and the Perfect Curve*, 53 Vand.

L. Rev. 1799, 1816 (2000) (noting the connection and potential temporal gap

between access and further uses, including transformative uses); Neil Weinstock

Netanel, *Market Hierarchy and Copyright in Our System of Free Expression*, 53

Vand. L. Rev. 1879, 1907-09 (2000) (arguing that works shared by many people

have additional value over and above the intrinsic value to the individual

consumer).

Special protections for noncommercial, nonprofit use also implement the

First Amendment's distinction between commercial speech—speech that proposes

a commercial transaction—and noncommercial speech. *See, e.g.*, *Peterman v.*

*Republican National Comm.*, 369 F. Supp. 3d 1053, 1062 (D. Mont. 2019)

(defendant's copying was noncommercial and thus subject to greater First

Amendment protection than commercial speech that advertises a product; "[i]t

makes sense that fair use doctrine respects [the First Amendment] distinction, as

"copyright's purpose is to promote the creation and publication of free

expression") (citing *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003)). Nonprofit uses

are a particularly valuable and necessary subset of noncommercial speech, given

their distance from marketplace transactions.

It is also important that a use does not become "commercial" simply because

it may replace a sale or license—that would turn factor one into a mere repetition

of factor four, market effect. See *Sony Corp. v. Universal City Studios, Inc.*, 464

U.S. 417, 450 n.33 (1984) (rejecting the argument that a use is necessarily

commercial if it replaces a sale); *Patton*, 769 F.3d at 1265 (such "circular"

reasoning on commerciality is "of limited usefulness" given that "any unlicensed

use of copyrighted material profits the user in the sense that the user does not pay a

potential licensing fee"; "[i]f this analysis were persuasive, no use could qualify as

'nonprofit' under the first factor"); *id.* at 1267 (finding that copying for student

coursepacks was "nonprofit educational" use favored by Congress, and this was

"sufficiently weighty" to tilt first factor in favor of defendants even absent

transformativeness); *Peterman*, 369 F. Supp. 3d at 1063 ("[S]elf-interest is not

equivalent to commerciality; if [plaintiff's] proposed interpretation of

commerciality were adopted, no use would be [non]commercial."); Mark

Bartholomew & John Tehranian, *An Intersystemic View of Intellectual Property

and Free Speec*h, 81 George Washington Law Review 1, 22 (2013) (noting that

First Amendment doctrine limits the concept of commerciality in speech, and that

factor four addresses market harm); Matthew Sag, *Predicting Fair Use*, 73 Ohio

St. L.J. 47, 60 (2012) (market effect should not be double-counted).[3]

---

[3] At the time the Copyright Act was enacted, Webster's relevantly defined the
adjective "commercial" as "engaged in work designed for the market," "of or
relating to commerce," "characteristic of commerce," "viewed with regard to
profit," and "designed for a large market," with "commerce" relevantly defined as
"the exchange or buying and selling of commodities on a large scale. . . ."
Webster's New Collegiate Dictionary 226 (1973). *See also* Black's Law Dictionary
(10th ed. 2014) ("commercial" means "[o]f, relating to, or involving the buying
and selling of goods ... [r]esulting or accruing from commerce or exchange …

Courts regularly require commercial entities to seek to profit *directly* from a work before weighing commerciality against them; the rule cannot be harsher for a nonprofit use. *See, e.g.*, *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir.2014) (discounting commercial nature of use where "the link between the defendant's commercial gain and its copying is attenuated such that it would be misleading to characterize the use as commercial exploitation") (cleaned up); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) (defendant did not use images "in its commercial advertising or in any other way to promote the sale of [its] book" and therefore "DK does not seek to exploit the images' expressive value for commercial gain"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) (finding "use of [copyrighted work] was more incidental and less exploitative in nature than more traditional types of commercial use" where commercial defendant did not use works directly to promote itself or sell them).

II.   Nonprofit Library Lending Is Presumptively Not Harmful To Markets in Which the Copyright Owner Has a Legitimate Interest.

In 1984, the Supreme Court established a presumption that noncommercial uses are not harmful to markets in which the copyright owner has a legitimate

---

while "commercial use" is "[a] use that is connected with or furthers an ongoing profit-making activity").

interest. The burden is on the plaintiff to show "by a preponderance of the evidence that some meaningful likelihood of future harm exists." *Sony*, 464 U.S. at 451.

The Supreme Court has never retreated from this presumption, despite altering aspects of its analysis of commercial fair uses. *See Campbell v. Acuff-Rose* [full/pincite]. Courts have repeatedly applied the presumption, including in cases of full copying. *See, e.g.*, *Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1069 (9th Cir. 2014) (weighing fourth factor in favor of noncommercial use); *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996); *National Rifle Ass'n*, 15 F.3d at 561; *Ass'n of Am. Med. Colls. v. Cuomo*, 928 F.2d 519, 526 (2d Cir. 1991) (Mahoney, J., concurring); *American Society for Testing & Materials v. Public.Resource.org, Inc.*, --- F. Supp. 3d --, 2022 WL 971735, at *15 (D.D.C. Mar. 31, 2022) (*ASTM*) (finding that fourth factor favored noncommercial defendant for its public distribution).

The presumption makes sense given the different role that nonprofit, noncommercial use plays in allowing access and supporting uses that would not survive in a purely commercial market because users cannot internalize their full benefits, as discussed above.  It is consistent with the strong empirical evidence that people react very differently to "free" offers, even compared to a cost of only

one penny.[4] Users of the Internet Archive are simply unlikely to be paying customers even if the Internet Archive were unavailable, and so the existence of market harm needs to be proven. For similar reasons, including the constraints of institutional budgets and libraries' incentives to offer as broad a range of resources as possible, the hypothesis that institutions would be taking more licenses in the absence of the Internet Archive is unpersuasive.

The presumption against harm further implements the Supreme Court's instruction that the market analysis must "take into account the public benefits the copying will likely produce." *Oracle*, 141 S.Ct. at 1206. Such a presumption against cognizable harm is particularly appropriate in situations in which the copyright owner has already had significant opportunity to exploit its work, interacting with factor two of the fair use analysis. *See, e.g.*, *Swatch*, 756 F.3d at 89 ("[B]ecause Swatch Group publicly disseminated the spoken performance embodied in the recording before Bloomberg's use, the publication status of the work favors fair use."); *Blanch v. Koons*, 467 F.3d 244, 256 (2d. Cir. 2006); *Kelly*,

---

[4] Dan Ariely, *Predictably Irrational* 65 (2009) (finding that "free" substantially changes consumption behavior); Kristina Shampanier, Nina Mazar, & Dan Ariely, *Zero as a Special Price: The True Value of Free Products*, 26 Marketing Sci. 742, 742 (2007) (same; 73% were willing to pay 14¢ for a truffle instead of 1¢ for a Hershey's Kiss, but 69% chose the Kiss when the truffle was 13¢ and the Kiss was free; finding that "people appear to act as if zero pricing of a good not only decreases its cost but also adds to its benefits," even where an objective cost-benefit analysis would disagree).

336 F.3d at 820 ("The fact that a work is published or unpublished also is a critical element of its nature. Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred.") (footnote omitted); *Núñez v. Caribbean Intern. News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) (fact that photographs had been distributed favored fair use); *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (factor two favors fair use where accusing work is "a published work available to the general public"); *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 585 (S.D.N.Y. 2020) (use of a previously published work favors fair use); *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F. Supp. 1283, 1293 (N.D. Cal. 1991) ("The works' published nature supports the fairness of the use."), *aff'd,* 964 F.2d 965 (9th Cir. 1992).

Because copyright is a "tax on readers for the purpose of giving a bounty to writers," *Oracle*, 141 S.Ct. at 1195 (citing Thomas Macauley), it is only justified when it is necessary to provide sufficient incentives to generate new expression. Glynn S. Lunney, Jr., *The Copyright Tax*, 68 J. Copyright Soc'y U.S.A. 117 (2021) (presenting empirical research showing that broad copyright, particularly in digital copies, harms public more than it provides creative incentives). Copyright control is not justified unless the marginal benefit of the control over a use provides that incentive, but previous widely authorized dissemination makes it unlikely that such

marginal benefit is present, especially years after initial publication. This fact provides additional support for the well-established rule that a copyright owner's desire and willingness to license does not in itself support a finding of market harm. *See, e.g.*, *Patton*, 769 F.3d at 1276 ("The goal of copyright is to stimulate the creation of new works, not to furnish copyright holders with control over all markets. Accordingly, the ability to license does not demand a finding against fair use.").

In *ASTM*, for example, the court noted that the plaintiffs' existing distribution mechanisms often allowed individuals to read copies of their codes freely. This is equally true of current sales of physical copies to libraries, given the existence of first sale, which allows libraries to distribute their physical copies freely. Given the wide availability of free-to-the-end-user copies, the plaintiffs could not show sufficient *additional* harm to their markets or incentives to tilt the fourth fair use factor against them. *ASTM*, 2022 WL 971735, at *15 (further noting that evidence that individuals used defendants' nonprofit service did not mean that they would otherwise have paid for access); *see also Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015) ("But the possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original. There must be a *meaningful or significant effect* 'upon the

potential market for or value of the copyrighted work.'") (emphasis added) (citing

§107); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014) (relying

on Article III standing doctrine to require a showing of market injury that is more

than "conjectural" or "speculative"); *Patton*, 769 F.3d at 1282 (factor four "asks

whether the market harm caused by Defendants' unpaid copying will *materially*

impair Plaintiffs' incentive to publish") (emphasis added).

    Finally, a presumption against harm is particularly appropriate in the library

context, where the putative licensing alternatives regularly come with policies that

harm the larger mission of libraries to preserve information and make it available

to citizens on a nondiscriminatory basis. *See, e.g.*, Laura N. Gasaway, *The New

Access Right and Its Impact on Libraries and Library Users*, 10 J. Intell. Prop. L.

269, 299 (2003) (discussing licenses that restrict libraries' ability to distribute

public domain works digitally); Jennifer Femminella, *Online Terms and

Conditions Agreements: Bound by the Web*, 17 St. John's J. Legal Comment. 87,

115–18 (2003) (discussing terms in library contracts that limit interlibrary loan,

prevent archiving, and in other ways threaten long-term access to works); *cf.

Oracle*, 141 S.Ct. at 1207 (license offered by copyright owner was no substitute for

fair use where it would have afforded copyright owner control over "branding and

cooperation"); Rebecca Tushnet, *All of This Has Happened Before and All of This

Will Happen Again*, 29 Berkeley Tech. L.J. 1447 (2014) (enumerating ways in

which license-only models that attempt to substitute for fair use harm free speech, competition, and innovation).

Of particular relevance to libraries and the public interest in neutral and comprehensive archives, digital licensing schemes allow publishers to pull books that they now consider politically sensitive, or replace an initially published version with an edited version, without disclosing what has been removed or changed. This practice destroys the integrity of the public record. *See, e.g.*, Glenn D. Tiffert, *Peering down the Memory Hole: Censorship, Digitization, and the Fragility of Our Knowledge Base*, 124 Am. Hist. Rev. 550 (2019) (documenting the removal of selected issues and articles from an important online database of Chinese scholarship that is most scholars' only means of accessing the scholarship). Such edits "materially distort the historical record but are invisible to the end user," *id.* at 554, and can deceive good-faith researchers or make objections to the original version look unfounded. *See also* Janet Sinder, *Correcting the Record: Post-Publication Corrections and the Integrity of Legal Scholarship*, 112 Law Libr. J. 365, 367-68 (2020) (elaborating concerns around digital post-publication editing and transparency of changes); *id.* at 381 (noting that post-publication editing without transparency "leaves scholarship open to manipulation by authors who might want to 'correct' past statements, perhaps for political reasons (e.g., an author who is applying for a new job or running for

14

political office). Without a tracking or versioning system in place, authors and journals are free to change the record to their benefit."); Lexabear, A Deadly Education: the "dreadlocks" reference has been updated / authorial ability to update books due to modern technology, Reddit.com, https://www.reddit.com/r/Fantasy/comments/leattu/a_deadly_education_the_dreadl ocks_reference_has/ (visited Jul. 13, 2022) (discussing an undisclosed change to a popular ebook edition in response to criticism).

History is too important to leave to the self-interest of copyright owners. *See* Tushnet, *supra*, at 1452, 1454-55, 1460-61, 1470-71 (surveying examples of how copyright owners restrict digital licenses in ways that tend to block core fair uses and undermine copyright law's speech-enhancing purposes.). Where the licensing "alternatives" are inferior substitutes to the access and preservation of historical versions allowed by fair use, they do not weigh in favor of finding market harm.

## CONCLUSION

The Supreme Court has instructed courts not merely to balance the fair use factors, but to balance them in light of the purposes of copyright. Noncommercial uses are favored in the law for a reason. This Court should recognize their substantial benefits to society and to the foundations of free speech in weighing the fair use factors.

DATED: July 14, 2022

/s/  *Rebecca Tushnet*
Rebecca Tushnet
rtushnet@law.harvard.edu
520 Hauser, Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02130
Telephone: 703-593-6759

Attorney for Amici Curiae IP Law Professors

## APPENDIX

## List of *Amici*

*University affiliations for identification purposes only*

Patricia Aufderheide, University Professor, School of Communication
American University

Dan L. Burk, Chancellor's Professor of Law
University of California, Irvine Law

Professor Michael A. Carrier, Distinguished Professor
Rutgers Law School

Zachary L. Catanzaro, Assistant Professor of Law
St. Thomas University College of Law

Rebecca Curtin, Professor of Law
Suffolk University Law School

Christine Haight Farley
American University-Washington College of Law

Jim Gibson, Sesquicentennial Professor of Law
University of Richmond School of Law

Yvette Joy Liebesman, Professor
St. Louis University School of Law

Glynn S. Lunney, Jr., Professor of Law
Texas A&M University School of Law

Mark P. McKenna, Professor of Law
UCLA School of Law

Betsy Rosenblatt, Professor of Law
University of Tulsa College of Law

Pamela Samuelson, Richard M. Sherman Distinguished Professor of Law

Berkeley Law

Sunita Tripathy, Researcher
Law Department, European University Institute

Rebecca Tushnet, Frank Stanton Professor of First Amendment Law
Harvard Law School