# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and
PENGUIN RANDOM HOUSE LLC,

                    Plaintiffs,

v.

INTERNET ARCHIVE and DOES 1

through 5, inclusive,

                    Defendants.

Case No. 1:20-CV-04160-JGK

 

**BRIEF OF AMICI CURIAE LIBRARY FUTURES INSTITUTE, EVERYLIBRARY INSTITUTE, AND READERSFIRST IN SUPPORT OF THE INTERNET ARCHIVE**

Yuliya M. Ziskina
Kyle K. Courtney
Library Futures Institute
319 Main Street
Biddeford, ME 04005
(206) 819-1015
juliya@libraryfutures.net

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CITED AUTHORITIES …………………………………………………………ii

INTERESTS OF AMICI CURIAE…………………………………………………………..1

SUMMARY OF ARGUMENT …………………………………………………………..2

ARGUMENT…………………………………………………………………………...5

I.   CDL is a reasonable method of expanding equitable access to information
     that is squarely grounded in law…………………………………………………..5

     A.   How CDL Works …………………………………………………………5

II.  CDL is a well-established practice in the library community……………………..7

     A.   Numerous libraries have implemented successful CDL programs……………..7

III. CDL is a service that preserves the investment taxpayers make in library collections…...9

IV.  The licensed digital lending market prevents libraries from fulfilling their
     mission of preservation and providing equitable access to information…………………11

     A.   Negotiation for eBook access is virtually nonexistent for libraries……………...11

     B.   Books loaned via CDL are distinct from licensed eBooks………………………13

CONCLUSION………………………………………………………………………..17

CERTIFICATE OF COMPLIANCE……………………………………………………19

# TABLE OF CITED AUTHORITIES

**Cases**

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014)…………………………………14

*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908)……………………………………………..7

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003)………………………………………..15

*Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242 (3d Cir. 1992)……………1

*Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976)……………………1

**Statutes**

U.S. Const. art. I, § 8, cl. 8………………………………………………………………………...5

**Other Authorities**

Annalee Newitz, *Amazon Secretly Removes "1984" from the Kindle*, Gizmodo (July 18, 2009, 7:00 PM), https://perma.cc/38SA-AQ3X………………………………………………………17

Argyri Panezi, *A Public Service Role for Digital Libraries: The Unequal Battle Against (Online) Misinformation Through Copyright Law Reform and the Emergency Electronic Access to Library Material*, 31 Cornell J.L. & Pub. Policy (forthcoming) (2021)…………………17

Cindy Long, *One-Quarter of U.S. Students Don't Have What They Need for Online Learning*, NEA News (Oct. 21, 2020), https://perma.cc/7E5T-GSJH…………………………………12

Daniel A. Gross, *The Surprisingly Big Business of Library E-Books*, The New Yorker (Sept. 2, 2021), https://perma.cc/D4YZ-7SEJ…………………………………………………4, 13

David Moore, *Publishing Giants Are Fighting Libraries on E-Books*, Sludge (Mar. 17, 2022), https://perma.cc/3BFJ-6W69…………………………………………………………11

Dept. Com. Internet Policy Task Force, *White Paper On Remixes, First Sale, And Statutory Damages: Copyright Policy, Creativity, And Innovation In The Digital Economy* 49 (2016), https://perma.cc/R5HG-X3X4…………………………………………………14

Derek Kilmer, *Jamestown S'Klallam Library Wins National Medal for Museum and Library Service* (May 22, 2019), https://perma.cc/7SNQ-7DPX………………………………10

Gabrielle Emanuel, *Inside the eBook 'War' Waging Between Libraries and Publishers*, GBH News (Jan. 6, 2020), https://perma.cc/L4NR-N3HW.......................................................13

Geoffrey A. Fowler, *Libraries Have a Novel Idea*, Wall Street Journal (June 29, 2010), https://perma.cc/6EA5-8ECG................................................................................6

*IFLA Statement on Controlled Digital Lending*, Int'l Fed'n Libr. Ass'ns & Insts. (June 2, 2021), https://perma.cc/38KS-24H8.............................................................................13

Jennie Rose Halperin, *Publishers Are Using E-books to Extort Schools and Libraries*, The Daily Beast (Apr. 18, 2021), https://perma.cc/VR6A-DJBK.......................................................12

Jenny Rothschild, *Hold On, eBooks Cost How Much? The Inconvenient Truth About Library eCollections*, Sm@rt B*t(c)hes Trashy Books (Sept. 6, 2020), https://perma.cc/KYK5-TNV8................................................................................................................11

Joanna Sei-Ching, *Disparities in Public Libraries' Service Levels Based on Neighborhood Income and Urbanization Levels: A Nationwide Study*, 45 Am. Soc'y for Inf. Sci. & Tech. 1 (June 3, 2009), https://perma.cc/YS3Z-KANG....................................................16

Katelyn Mirabelli, *The Consolidation of Book Publishing in the U.S.: A Network Graph Study*, Pratt Institute (May 11, 2021), https://perma.cc/G52F-NRFT.........................................13

Kun Lin, *Controlled Digital Lending With Existing Tools In The Toolbox: Alma Digital* (2018), https://perma.cc/8PLG-U4VK.........................................................................................9

Kyle K. Courtney and David R. Hansen, *A White Paper on Controlled Digital Lending of Library Books* (2018), https://perma.cc/4QME-JUER.......................................................6

Lauren, *Libraries and eBooks: An Introduction*, Denver Public Library (Oct. 30, 2019), https://perma.cc/CED2-7NEB.........................................................................................16

Laura Hautala, *What eBooks at the Library Mean for Your Privacy*, CNET (Apr. 8, 2019), https://perma.cc/W5LG-EGYL.......................................................................................16

Lila Bailey, et al., *Position Statement on Controlled Digital Lending by Libraries*, ControlledDigitalLending.org (2018), https://perma.cc/Y4LF-XV46................................6

Linda Holmes, *Hard Choices: Do Libraries Really Destroy Books?*, NPR (Oct. 12, 2011), https://perma.cc/U9MB-WAYB.......................................................................................11

Mark O'Connell, *The Marginal Obsession with Marginalia*, New Yorker (Jan. 26, 2012), https://perma.cc/R7CU-PSVD.......................................................................................14

Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, Legal Reference Services Quarterly (Aug. 24, 2021), https://perma.cc/6W6C-J4EY.................................................................................3, 11, 12

*NISO Awarded Mellon Funding for Controlled Digital Lending Project*, NISO (last visited July 11, 2022), https://perma.cc/L3YX-PYH8..............................................................................9

Paul N. Courant & Matthew "Buzzy" Nielsen, *On the Cost of Keeping a Book*, The Idea of Order: Transforming Research Collections for 21st Century Scholarship 81 (June 2010), https://perma.cc/6V34-EE48...........................................................................................10

*Preservation Principles*, LOCKSS, https://perma.cc/R34U-UHWQ...........................................17

*Privacy*, Am. Libr. Ass'n (last modified Apr. 2017), https://perma.cc/C5MH-MABU...............16

*Publisher Price Watch*, ReadersFirst (last visited July 8, 2022), https://perma.cc/ULD5-EWBH...................................................................................................11, 12

*Publishers Aghast at Copyright Ruling*, N.Y. Times, June 3, 1908, at 7, available at https://perma.cc/NJ95-FUFU..........................................................................................7

Shawnda Hines, *ALA turns to Congress as Macmillan ignores public call to reverse library eBook embargo*, ALA News (Nov. 1, 2019), https://perma.cc/G4YL-WG6R.................11

*Testimony on Rhode Island Bill*, ReadersFirst (May 3, 2022), https://perma.cc/8MHA-6R9G.........................................................................................................12

# INTERESTS OF AMICI CURIAE[1]

Courts in the United States have called libraries "the quintessential locus of the receipt of information" and "a mighty resource in the free marketplace of ideas." *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992); *Minarcini v. Strongsville City Sch. Dist.*, 541 F.2d 577, 582 (6th Cir. 1976). A library is "specially dedicated to broad dissemination of ideas." *Minarcini*, 541 F.2d at 583. The dissemination of these ideas to readers in a library system is enabled by the book loaning process.

Library Futures Institute is a non-profit grassroots organization and one of the leading digital library policy and advocacy organizations in the United States. Our coalition includes a diverse array of individuals, libraries, library consortia, and non-profit organizations that are committed to empowering libraries to take control of their digital futures. One of the principles of Library Futures Institute is to protect the ability for libraries to continue to loan their collections to patrons in the digital era. We support digital lending that uses technology to mirror the library's right, enshrined in the Copyright Act, to loan legally acquired books under controlled conditions while respecting copyright.[2]

---

[1] Internet Archive has consented to the filing of this brief. Hachette et al. has not consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part and no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief.

[2] Library Futures Institute was co-founded by one of the authors on this *amici curiae*, Kyle K. Courtney. Both he and David R. Hansen co-authored the original paper outlining and defining the CDL method. *See* Courtney, Kyle K. and David R. Hansen, *A White Paper on Controlled Digital Lending of Library Books* (2018), available at https://dash.harvard.edu/handle/1/42664235.

The EveryLibrary Institute (ELI) is a public policy and tax policy research and training organization focusing on issues affecting the future of public, academic, and school libraries and the profession of librarianship in the United States. Its areas of interest include funding, copyright, ownership, the structure and governance of libraries, and the impact of library work on society.

ReadersFirst is a non-profit organization of nearly 300 libraries representing 200 million readers dedicated to ensuring access to free and easy-to-use eBook content. As readers increasingly turn to eBooks, ReadersFirst believes that libraries have a responsibility to provide them with the same open, easy, and vital access to content they have with physical books.

## SUMMARY OF ARGUMENT

Library practices reflect a commitment to both the economic and access goals of copyright: purchasing books from publishers, vendors, and authors; adding them to collections; and establishing loaning programs to provide equitable access to the copyrighted content that is legally purchased or acquired. Controlled Digital Lending (CDL) replicates the carefully protected balance encapsulated in one of the core functions of the library mission: loaning legally acquired books. CDL uses technology to effectuate a library's time-honored mission to acquire, preserve, and provide communities access to content. It is only applicable to books legitimately acquired by non-profit libraries through purchase, gift, or donation, where the rightsholder's private interest in compensation would have been exhausted during the book's first purchase or distribution.

CDL has become a critical part of library practice in the United States because it is a reasonable way for libraries to offer greater access to their legally acquired collections. Most recently, during the height of pandemic closures in the United States, dozens of libraries developed their own in-house CDL systems to be able to increase access to textbooks, reserves, and research, such as the California Institute of Technology and Miami University. In addition, over 100 libraries

have utilized the CDL system hosted at the Internet Archive to loan their digital copies of books. This was followed by a rapid formation of new library advocacy organizations dedicated to fostering and empowering communities to engage in and adopt CDL. In addition, vendors, software developers, and standards organizations have framed CDL as the new baseline for digitized access. This has led to grants, software, and new streamlined systems for CDL integration into library work.

CDL also has value beyond simply providing access to books; it maximizes economic opportunity for communities, promotes equitable and dependable education, improves the civil rights function of libraries, and democratizes knowledge by expanding access. In this way, CDL amplifies libraries' role as an important community resource. Libraries build collections over the long term; without the ability to purchase materials, they are unable to collect and preserve. Moreover, through CDL, libraries can significantly improve the accessibility of works that might otherwise remain unused on shelves.

Despite the Plaintiffs' claims of a "thriving market for library eBooks" (ECF No. 99), negotiation for eBook access is virtually nonexistent for libraries. Publishers have adopted licensing as the primary distribution strategy for digital books, replacing ownership of copies of copyrighted works and circumventing many of the public interest goals intended by copyright law. Publishers have set eBooks to expire after a certain number of unilaterally-determined uses, such as when HarperCollins decided that eBooks licensed to libraries would expire after 26 checkouts, despite actual usage statistics from libraries demonstrating that analog works last significantly longer through standard maintenance and repair. Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, Legal Reference Services Quarterly (Aug. 24, 2021), https://perma.cc/6W6C-J4EY. Shockingly, some materials are not for sale to libraries at all, or are

subject to markups magnitudes higher than their physical counterparts. Daniel A. Gross, *The Surprisingly Big Business of Library E-Books*, The New Yorker (Sept. 2, 2021), https://perma.cc/D4YZ-7SEJ. Given the publishers' outsized market share due to years of consolidation, most libraries have little, if any, bargaining power and are rarely able to change the terms of the contracts offered to them by publishers.

Books loaned via CDL are distinct from licensed eBooks. To begin with, some books are not currently available for digital lending, or in some cases, the publisher refuses to sell to libraries. Where books are unavailable for eBook lending, CDL bridges the gap. Even where a work is available for lending as an eBook, lending via CDL offers different features and serves different purposes; for example, a reader or researcher might want to consult a particular edition of a book, or a particular copy might have scholarly significance that can only be effectively shared via CDL. Controlled digital lending also enables libraries to lend books on their own terms, allowing them to avoid the problematic privacy-implicating data collection practices of publishers and eBook aggregator services that may otherwise be unavoidable with licensed eBooks.

The goals of copyright are furthered not despite library lending, but because of it. Libraries are favored institutions under the Copyright Act because they embody and advance the purposes of copyright. The Internet Archive, through its CDL practices, serves an equal function to traditional libraries: the preservation and dissemination of knowledge. CDL brings the traditional, treasured function of book lending into the digital realm. It shares the same purpose as physical book lending, and uses technology to closely mirror its character. To that end, CDL ensures libraries can continue to serve the existing needs of their communities.

**ARGUMENT**

I. **CDL is a reasonable method of expanding equitable access to information that is squarely grounded in law.**

CDL replicates the carefully protected balance encapsulated in one of the core functions of the library mission: loaning legally acquired books. This aspect of the library mission has been understood for centuries—from common law through the current Copyright Act and the crucial copyright statutory exceptions. The library mission relies equally on the ability to acquire creative works, serve the economic purpose of copyright, and distribute those works to the public "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. In this way, library loaning programs are a core part of copyright law. Library practices reflect a commitment to both the economic and access goals of copyright: purchasing books from publishers, vendors, and authors; adding them to collections; and establishing loaning programs to provide open, non-discriminatory access to copyrighted content that is legally purchased or acquired, and preserving that work for future generations.

A. **How CDL Works**

CDL uses technology to effectuate a library's long-established mission to collect, preserve, and provide communities access to legitimately acquired books. Simply put, with CDL, a library can expand its book loaning program into the digital space; that is, a library circulates a digitized title in place of a physical one in a controlled manner. Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired through purchase or donation. At its core, CDL must maintain an "owned to loaned" ratio. This means, just like in print, circulation in any format is controlled so that only one user can use any given copy at a time, for a limited duration. Further, CDL systems employ appropriate technical measures to prevent users

from retaining a permanent copy or distributing additional copies. Lila Bailey, et al., *Position Statement on Controlled Digital Lending by Libraries*, ControlledDigitalLending.org (2018), https://perma.cc/Y4LF-XV46.

Thus, CDL permits the circulation of copies equal to those that have been legitimately acquired by the participating libraries. For example, when a patron is reading the digital copy, the corresponding physical copy is restricted and unavailable to access. There is no situation in which the library is circulating more than what would be possible in a print collection. A library can also lend the physical book to a patron through standard circulation or to another library through interlibrary loan. CDL shifts traditional print lending to a digital format, opening access possibilities for readers with disabilities, physical access limitations, research efficiency needs, or other needs for digitally accessible content.

The idea for shared digital collecting was first explored in the pioneering article, "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries" by Michelle Wu, Professor of Law and former Law Library Director at Georgetown University School of Law. Wu developed the concept in 2002 to protect her library's print collection from natural disaster—an imperative she faced in rebuilding a library destroyed by flooding. In 2010, the Internet Archive partnered with the Boston Public Library and other libraries to begin lending out digitized versions of physical library books to one reader at a time—an early implementation of the practice that would later be called Controlled Digital Lending. Geoffrey A. Fowler, *Libraries Have a Novel Idea*, Wall Street Journal (June 29, 2010), https://perma.cc/6EA5-8ECG. The legal underpinnings of the CDL method were refined, named, and detailed in "A White Paper on Controlled Digital Lending of Library Books," by Kyle K. Courtney and David R. Hansen (https://perma.cc/4QME-JUER).

## II.     CDL is a well-established practice in the library community.

A robust industry for copyrighted works has harmoniously coexisted with library lending since the inception of copyright law. The goals of copyright are furthered not despite library lending, but because of it. Libraries are favored institutions under the Copyright Act because they embody and advance the purposes of copyright. CDL brings the traditional, treasured function of book lending into the digital realm. It shares the same purpose as physical book lending and uses technology to closely mirror its character. To that end, CDL first and foremost ensures libraries can continue to serve the existing needs of their own communities. It allows libraries to do what they have always done—to lend one book to one patron at a time, free of charge—in this case via the internet rather than in person.

While publishers have repeatedly proposed dire predictions regarding loss of profits, time has demonstrated that these fears are unjustified. For example, following the Supreme Court's landmark first-sale decision in *Bobbs-Merrill Co. v. Straus* in 1908, which held that publishers holding a copyright cannot for that reason fix a set price at which the book must be sold, *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908), publishers expressed fear that it would be "a terrible blow to the book sellers of the country and to the publishers and the public." *Publishers Aghast at Copyright Ruling*, N.Y. Times, June 3, 1908, at 7, available at https://perma.cc/NJ95-FUFU. More than a century later, that prediction has not come to pass.

### A.     Numerous libraries have implemented successful CDL programs.

Because it is a reasonable solution to offer greater access to legally acquired collections, CDL has become a critical part of library practice in the United States. Most recently, during the height of pandemic closures in the United States, dozens of libraries developed their own in-house CDL systems to increase access to textbooks, reserves, and research. Many libraries have

developed CDL systems for their own use during this time period, such as: NYU Shanghai Library's CDL system, documented in Qinghua Xu et al., *Implementing Controlled Digital Lending with Google Drive and Apps Script: A Case Study at the NYU Shanghai Library*, 6 International Journal of Librarianship 37-54 (2021) (https://perma.cc/RHM7-NDGK); Caltech's Digital Borrowing System (DIBS) (https://perma.cc/XY7Z-7MTE); University of Florida Libraries' Textbook-focused CDL program (https://perma.cc/ZRU9-4EAK); and Miami University in Ohio's Limited Online Library Access (LOLA) (https://perma.cc/D9L8-AAKA). Notably, HathiTrust, a consortium of university libraries, employed a digital loaning solution for its member libraries, called the Emergency Temporary Access Service (ETAS) (https://perma.cc/N28E-NDUZ), that was hailed as a successful solution to the access-related problems created by pandemic closures.

Further, large library consortia have also explored consortial CDL models. The Boston Library Consortium (BLC), a library consortium group comprised of over 250 libraries, is implementing controlled digital lending for their entire consortia. The Davis Educational Foundation awarded BLC a two-year $215,000 grant to accelerate its implementation of CDL. The large grant supports the CDL plans described in BLC's groundbreaking CDL report, "Consortial CDL: Implementing Controlled Digital Lending as a Mechanism for Interlibrary Loan" (https://perma.cc/K9TY-H6H4).

Libraries' expanded use of CDL was followed by a rapid formation of new library advocacy organizations dedicated to fostering and empowering communities to engage in and adopt CDL, such as: the Controlled Digital Lending Implementers (CDLI) (https://perma.cc/7HXC-YC5K); CDL Information & Recommendation Cooperative (CIRC) (https://perma.cc/YZX2-YMW2); Consortial Approaches to Controlled Digital Lending

(https://perma.cc/46PK-D3HF); and the CDL Co-op (https://perma.cc/5FDK-N4UN). These organizations have run monthly seminars, maintained active listservs, published papers, and generally provided a supportive network for the community interested in CDL.

In addition to the formation of these CDL communities, vendors, software developers, and standards organizations have framed controlled digital lending as the new baseline for digitized access, and have since been writing grants, developing software, and streamlining systems for CDL integration into library work. For example, the Ex Libris Group, a division of Clarivate (a for-profit, publicly traded international corporation) has begun development of a software system to integrate CDL into their customers' libraries. *See* Kun Lin, *Controlled Digital Lending With Existing Tools In The Toolbox: Alma Digital* (2018), https://perma.cc/8PLG-U4VK.

Further, the National Information Standards Organization (NISO), a nonprofit membership organization that identifies, develops, maintains, and publishes technical standards, has begun work on the development of a consensus framework for implementing CDL book content in libraries. The Andrew W. Mellon Foundation awarded NISO a grant of $125,000 in 2021 to move this CDL framework forward. *NISO Awarded Mellon Funding for Controlled Digital Lending Project*, NISO (last visited July 11, 2022), https://perma.cc/L3YX-PYH8.

## III.    CDL is a service that preserves the investment taxpayers make in library collections.

CDL increases access to the works that libraries have already acquired, maximizing access to these materials and extending their limited resources to their communities in the digital space. Building capacity through a flexible physical-digital approach and increasing patron choice extends the reach of libraries without sacrificing existing services. In this way, CDL provides taxpayers an excellent return on their investment by supporting efficient and equity-

promoting digital services without disrupting the business relationship that currently exists between libraries, publishers, and authors.

CDL helps preserve precious space in libraries' open stacks. As libraries acquire new books, they must move older books from the shelves to make space. Linda Holmes, *Hard Choices: Do Libraries Really Destroy Books?*, NPR (Oct. 12, 2011), https://perma.cc/U9MB-WAYB. Physical storage is costly for libraries, and maintaining the physical copies of books that libraries lend with CDL requires resources as well. Paul N. Courant & Matthew "Buzzy" Nielsen, *On the Cost of Keeping a Book*, The Idea of Order: Transforming Research Collections for 21st Century Scholarship 81 (June 2010), https://perma.cc/6V34-EE48. Libraries are most likely to get rid of their older, less popular, probably out-of-print books. Some libraries even destroy the old books to make space. *Id*. However, these are precisely the same kinds of books for which digital copies are unavailable. Through CDL, libraries can significantly improve the accessibility of works that might otherwise remain unused.

Libraries play an important role in preserving and amplifying historical and cultural works of marginalized groups. For example, the Jamestown S'Klallam Tribal Library in Washington worked to preserve the history of Native American tribes of the Pacific Northwest through a digital collection the tribal community can access from anywhere. Derek Kilmer, *Jamestown S'Klallam Library Wins National Medal for Museum and Library Service* (May 22, 2019), https://perma.cc/7SNQ-7DPX. Simply put, CDL is a service that protects and adds value to the investment taxpayers make in library collections and allows libraries to do more with the funds they have.

**IV.    The licensed digital lending market prevents libraries from fulfilling their mission of preservation and providing equitable access to information.**

**A.    Negotiation for eBook access is virtually nonexistent for libraries.**

With digital content, publishers control not only the production but also the distribution of materials. Within this power structure, publishers have routinely denied libraries access to content, which was not possible in an analog world. Several publishers and eBook aggregators prevent libraries from acquiring eBooks with licensing (or purchasing) terms, making it impossible for libraries to fully meet their standard access and preservation missions. Often, eBook licenses offered to libraries come with many restrictions on use and are prohibitively expensive, or worse, unavailable to libraries at any price. David Moore, *Publishing Giants Are Fighting Libraries on E-Books*, Sludge (Mar. 17, 2022), https://perma.cc/3BFJ-6W69; Shawnda Hines, *ALA turns to Congress as Macmillan ignores public call to reverse library eBook embargo*, ALA News (Nov. 1, 2019), https://perma.cc/G4YL-WG6R. When they are available, eBooks can cost a library three to 10 times the consumer prices for the same eBook. Jenny Rothschild, *Hold On, eBooks Cost How Much? The Inconvenient Truth About Library eCollections*, Sm@rt B*t(c)hes Trashy Books (Sept. 6, 2020), https://perma.cc/KYK5-TNV8. In fact, the Plaintiffs charge libraries between a 44 percent (HarperCollins) and a 298 percent (Hachette) markup on licenses for eBooks, as compared with physical books. *Publisher Price Watch*, ReadersFirst (last visited July 8, 2022), https://perma.cc/ULD5-EWBH.

Virtually all libraries hold physical books in their collections that are as old as their own existences, with collections spanning decades. Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, Legal Reference Services Quarterly (Aug. 24, 2021), https://perma.cc/6W6C-J4EY. These materials were obtained through gift or for a one-time fee and have been used continually since. The only "added" cost during the years of ownership were

repair and maintenance. *Id.* In contrast, licensed eBooks contain artificial limits, requiring a library to pay an inflated price many times over for continued use of the same title. Currently, all eBook licenses offered by the top publishers—including those who are parties to this case—arbitrarily expire either after 24 months or 26 checkouts. *Publisher Price Watch*, ReadersFirst (last visited July 8, 2022), https://perma.cc/ULD5-EWBH. Most books last significantly longer than 26 uses through standard maintenance and repair, and libraries replace only a very small number of titles. Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, Legal Reference Services Quarterly 16 (Aug. 24, 2021), https://perma.cc/6W6C-J4EY. The bloated pricing, arbitrary limits, and other abuses in the licensing market, with which libraries have previously never had to contend, threatens both the autonomy and the very existence of libraries.

The inequity of licensed eBook lending especially came to light during the COVID-19 pandemic, when many libraries lacked the ability to lend the physical books they already owned in their collections. According to librarians in Rhode Island, the children's classic *Charlotte's Web* was entirely unavailable in their state due to publisher restrictions. *Testimony on Rhode Island Bill*, ReadersFirst (May 3, 2022), https://perma.cc/8MHA-6R9G. One school library reported paying $27 per student per year for a digital copy of *The Diary of Anne Frank.* Jennie Rose Halperin, *Publishers Are Using E-books to Extort Schools and Libraries*, The Daily Beast (Apr. 18, 2021), https://perma.cc/VR6A-DJBK. The same title can be purchased in print by a library for a one-time price, used without limit, and repaired until the book wears out. In addition, in October 2020, the National Education Association reported that nearly a quarter of students did not have what they needed for online learning. Cindy Long, *One-Quarter of U.S. Students Don't Have What They Need for Online Learning*, NEA News (Oct. 21, 2020), https://perma.cc/7E5T-GSJH. Without

CDL, libraries were forced to abandon their print collections and try to replicate those collections by finding licensing options—in effect paying for their collections again.

With the consolidation of the publishing industry, big publishers have virtually no incentive (market pressure or otherwise) to offer competitive rates and terms to libraries. Most libraries have little, if any, bargaining power and are rarely able to change the terms of the contracts offered to them by publishers. Gabrielle Emanuel, *Inside the eBook 'War' Waging Between Libraries and Publishers*, GBH News (Jan. 6, 2020), https://perma.cc/L4NR-N3HW. When setting prices, there is no negotiation process. *See* Katelyn Mirabelli, *The Consolidation of Book Publishing in the U.S.: A Network Graph Study*, Pratt Institute (May 11, 2021), https://perma.cc/G52F-NRFT; *see also* Daniel A. Gross, *The Surprisingly Big Business of Library E-Books*, The New Yorker (Sept. 2, 2021), https://perma.cc/D4YZ-7SEJ. As a result, many libraries face financial and practical challenges in making eBooks available to their patrons and are constrained or unable to develop their own digital collections.

### B.     Books loaned via CDL are distinct from licensed eBooks.

To be clear: CDL does not replace licensed eBook lending. First, many books are not currently available for digital lending. *IFLA Statement on Controlled Digital Lending*, Int'l Fed'n Libr. Ass'ns & Insts. (June 2, 2021), https://perma.cc/38KS-24H8 ("a very small share of books are currently available in digital form for libraries, due either to being out of print (and so no investment is made in releasing digital versions), a lack of resources in publishing houses, or a refusal to sell to libraries"). For example, many works are out-of-print, a rightsholder may simply lack the economic incentive to digitize the book, or, in some cases, the original contract between the publisher and author may not contain broad enough terms for the publisher to release the work

as an eBook. In some cases, the publisher may refuse to sell to libraries. Where books are unavailable for eBook lending, CDL bridges the gap.

Even when a work is available for lending as an eBook, lending via CDL offers different features and serves different purposes. A patron may need to consult a particular past edition of a book, or a specific copy might have scholarly significance that can only be effectively shared via CDL. For example, a print version of a work from a public figure's personal book collection might contain noteworthy marginalia that offers valuable insight into their thoughts, unavailable anywhere else. *See, e.g.*, Mark O'Connell, *The Marginal Obsession with Marginalia*, New Yorker (Jan. 26, 2012), https://perma.cc/R7CU-PSVD.

In contrast to commercial publishers, libraries understand and place high importance on the need for preserving and maintaining access to works regardless of consumer demand. Dept. Com. Internet Policy Task Force, *White Paper On Remixes, First Sale, And Statutory Damages: Copyright Policy, Creativity, And Innovation In The Digital Economy* 49 (2016), https://perma.cc/R5HG-X3X4 ("[Library associations] stated that many publishers will not have the financial incentive, or the institutional stability, to preserve digital materials for the long term, while libraries collectively seek to preserve all aspects of cultural heritage, not just materials with potential economic value"). Preservation is crucial for the public domain. Society cannot benefit from works that have fallen into the public domain once the copyright holders' claim to them have lapsed if no copies are preserved. *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 103 (2d Cir. 2014) ("By storing digital copies of the books, the [HathiTrust Digital Library] preserves them for generations to come, and ensures that they will still exist when their copyright terms lapse"). CDL therefore promotes the goals of the Copyright Act and the fair use exception, which is "[t]o

preserve the potential future use of artistic works for purposes of teaching, research, criticism, and news reporting." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003).

Further, the quality between licensed eBooks and books available via CDL differs significantly. Even the Plaintiffs note the lower quality of books offered by the Internet Archive. ECF No. 1, at 6 (describing the Internet Archive's books as "low quality scans"). The quality is sufficient for a user to read the CDL books from a utilitarian perspective, but the CDL scans lack many of the features and characteristics in licensed eBooks that consumers may seek out. Licensed eBooks feature crisp text, customizable font size and layout, and often interactive features such as hyperlinks. In contrast, CDL involves the digitization of paper books, which results in inferior graphic quality and differing customization features. This makes it more likely that the book will be used out of necessity, or only briefly, rather than supplanting the market for the work. The low-quality scans (in addition to the digital rights management protections) also make it less likely that downstream bootleggers will make copies of the work.

The Plaintiffs claim that CDL serves the same function and purpose as their business. ECF No. 1, at 21 ("The basic purpose of IA's massive book digitization project is the same as Plaintiffs' basic purpose in publishing books, which is to distribute reading material"). However, despite both disseminating the contents of books, their objectives are substantially different. As with traditional library lending, CDL primarily serves those who only need temporary access to a work or lack the means to purchase the work. Libraries have no profit goals and are motivated by education, the dissemination of knowledge, and preservation.

Publishers assert that current licensing regimes are sufficient to support library activities. In systems like Overdrive, however, the long-practiced and legally protected lending practice of interlibrary loan cannot be actualized. In response to limited budgets, limited space, and frequent

inability to buy books that are out of print, libraries often band together to lend materials through interlibrary loan. Interlibrary loan is one of the key methods by which materials are shared between libraries and provided to scholars, researchers, students, and other patrons. Due to strict publisher terms in licensing agreements, libraries often cannot lend eBooks to other libraries through interlibrary loan. Lauren, *Libraries and eBooks: An Introduction*, Denver Public Library (Oct. 30, 2019), https://perma.cc/CED2-7NEB. By limiting what can be loaned through interlibrary loan, all communities face an unnecessary loss of access to a broader range of materials. CDL brings the economic benefits of libraries to the communities most in need. *See* Joanna Sei-Ching, *Disparities in Public Libraries' Service Levels Based on Neighborhood Income and Urbanization Levels: A Nationwide Study*, 45 Am. Soc'y for Inf. Sci. & Tech. 1 (June 3, 2009), https://perma.cc/YS3Z-KANG.

Another key element is that eBook lending is often administered by third-party eBook aggregators. As such, libraries have limited control over the lending process and even their own collections. This means that publishers have widespread leverage to collect data about library patrons, implicating inviolable privacy interests that libraries have long guarded. *Privacy*, Am. Libr. Ass'n (last modified Apr. 2017), https://perma.cc/C5MH-MABU (discussing importance of privacy with respect to library services). CDL enables libraries to lend books on their own terms, allowing them to avoid the problematic privacy-implicating data collection practices of publishers and eBook aggregator services that may otherwise be unavoidable with licensed eBooks. *See* Laura Hautala, *What eBooks at the Library Mean for Your Privacy*, CNET (Apr. 8, 2019), https://perma.cc/W5LG-EGYL.

Further, because libraries do not own the books that they acquire, publishers often reserve the right to alter or revoke books at will, implicating serious preservation and censorship concerns.

*See* Annalee Newitz, *Amazon Secretly Removes "1984" from the Kindle*, Gizmodo (July 18, 2009, 7:00 PM), https://perma.cc/38SA-AQ3X. CDL gives libraries more control over the integrity of their collections, ensuring their books are not surreptitiously edited or revoked. In the case of a service disruption, having multiple sources of information availability also better ensures that the materials are consistently and reliably available. *Preservation Principles*, LOCKSS, https://perma.cc/R34U-UHWQ (discussing importance of both distribution and decentralization). In recent years, online misinformation has become rampant, and it is more essential than ever to have access to reliable sources of information. Argyri Panezi, *A Public Service Role for Digital Libraries: The Unequal Battle Against (Online) Misinformation Through Copyright Law Reform and the Emergency Electronic Access to Library Material*, 31 Cornell J.L. & Pub. Policy (forthcoming) (2021).

CDL is a feature of ownership, not a substitute for licensing. It is not intended to replace or circumvent a library's existing eBook holdings, but it can serve as a powerful tool for bridging the gap between print and electronic resources for readers and researchers.

## CONCLUSION

In sum, libraries have a long-standing history of supporting the public's access to books. As technology evolves, libraries continually adapt their services to provide access in innovative ways to better serve their patrons, and CDL is such an innovation. Each time libraries embrace access-expanding innovations, the courts have acknowledged how these practices benefit the public. CDL is the next chapter of upholding access and should persist for a new generation of patrons. Because of this, we ask this Court to protect CDL.

July 14, 2022

Respectfully submitted,

/s/ Yuliya M. Ziskina

Yuliya M. Ziskina
Kyle K. Courtney
Library Futures Institute
319 Main Street
Biddeford, ME 04005
(206) 819-1015
juliya@libraryfutures.net

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,984 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with Individual Practice Rule 2.D of Judge John G. Koeltl (to whom this case has been assigned).

/s/ Yuliya M. Ziskina
Yuliya M. Ziskina