# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

HACHETTE BOOK GROUP, INC., HARPERCOLLINS
PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN
RANDOM HOUSE LLC,

                                  Plaintiffs,

   v.

INTERNET ARCHIVE and DOES 1

through 5, inclusive,

                                 Defendants.

Case No.
1:20-CV-
04160-JGK

## BRIEF OF AMICUS CURIAE AUTHORS ALLIANCE, INC. IN SUPPORT OF DEFENDANTS

# TABLE OF CONTENTS

*TABLE OF AUTHORITIES* .................................................................................... *ii*

*INTEREST OF AMICUS CURIAE* ....................................................................... *1*

*ARGUMENT* .......................................................................................................... *2*

   I.   **Controlled Digital Lending Maintains Copyright's Balance of Interests and Does Not Reduce Financial Incentives for Authors.** ............................................. 4

   II.   **Controlled Digital Lending Promotes Broad Public Availability to Books in a Format Relevant to Readers.** ................................................................................ 7

   III.   **Controlled Digital Lending Ensures that Books Are Preserved** ........................... 11

   IV.   **Controlled Digital Lending Facilitates Author Research** ..................................... 13

*CONCLUSION* ....................................................................................................... *15*

i

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1995)............................................. 13

*Authors Guild, Inc. v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)............................................. 3, 12

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ................................................. 4, 8

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994) ............................................................ 2

*Fox Film Corp. v. Doyal*, 286 U.S. 123 (1932) ............................................................................ 3

*Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018)......................................... 8

*Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2011) .................... 12

*Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417 (1984) .................................. 2, 4

*Sundeman v. Seajay Soc'y, Inc.,* 142 F.3d 194 (4th Cir. 1998) .................................................. 14

*Twentieth Century Music Corp. v. Aiken*, 422 U. S. 151 (1975) ................................................... 8

**Statutes**

17 U.S.C. § 107.......................................................................................................................... 4, 13

**Other Authorities**

*Access to Library Resources and Services*, AM. LIBRARY ASSOC.,
    https://www.ala.org/advocacy/intfreedom/access.................................................................. 10

Andrew Albanese, *Survey Says Library Users Are Your Best Customers,* PUBLISHERS WEEKLY,
    Oct. 28, 2011, https://www.publishersweekly.com/pw/by-topic/industry-news/publishing-and-
    marketing/article/49316-survey-says-library-users-are-your-best-customers.html................... 6

*Authors Guild Model Trade Book Contract*, AUTHORS GUILD,
    https://go.authorsguild.org/contract_sections/4 ...................................................................... 7

Caity Weaver, *Does 'The Da Vinci Code' Writer Have a Secret?*, N.Y. TIMES, July 29, 2021,
    https://www.nytimes.com/2021/07/29/style/dan-brown-advice-book.html ........................... 12

CORNELL UNIVERSITY LIBRARY, REPORT OF THE COLLECTION DEVELOPMENT EXECUTIVE
     COMMITTEE TASK FORCE ON PRINT COLLECTION USAGE (2010),
     https://ecommons.cornell.edu/handle/1813/45424 ..................................................... 9

David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library
     Books* (2018), http://nrs.harvard.edu/urn-3:HUL.InstRepos:42664235 ................................ 1, 5

Geoffrey A. Fowler, *Want to Borrow that E-book from the Library? Sorry, Amazon Won't Let
     You.*, WASH. POST, Mar. 10, 2021,
     https://www.washingtonpost.com/technology/2021/03/10/amazon-library-ebook-monopoly/ . 9

H.R. Rep. No. 94–1476 (1976) ............................................................................................ 4, 11

Herbert Mitgang, *Authors Seek Pay for Loan of Books*, N.Y. TIMES, Jan. 2, 1985,
     https://www.nytimes.com/1985/01/02/books/authors-seek-pay-for-loan-of-books.html ........... 5

Jane Friedman, *The Book P&L: How Publishers Make Decisions About What to Publish*, JANE
     FRIEDMAN BLOG, last updated Sept. 30, 2021, https://www.janefriedman.com/book-pl/ .......... 7

Lis Hartman, *Breaking Down 2021's Bestsellers by Publisher*, Publishers Weekly, Jan. 14, 2022,
     https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/88301-
     breaking-down-2021-s-bestsellers-by-publisher.html .......................................................... 2, 6

National Writers Union et al., *FAQ on Controlled Digital Lending*, Feb. 2019,
     https://nwu.org/wp-content/uploads/2019/08/CDL-FAQ-15AUG2019-v104.pdf .................... 5

Pamela Samuelson, *Possible Futures of Fair Use*, 90 WASH. L. REV. 815 (2015) ...................... 11

Rachel Deahl, *Could Publishers and Agents Agree on a Flat Royalty Rate?*, PUBLISHERS
     WEEKLY, June 3, 2016, https://www.publishersweekly.com/pw/by-topic/industry-
     news/publisher-news/article/70565-could-publishers-and-agents-agree-on-a-flat-royalty-
     rate.html ................................................................................................................................ 7

Rebecca Rosen, *The Missing 20th Century: How Copyright Protection Makes Books Vanish*,
     ATLANTIC, Mar. 30, 2012, https://www.theatlantic.com/technology/archive/2012/03/the-
     missing-20th-century-how-copyright-protection-makes-books-vanish/255282/ .................... 12

Sarah Nicholas, *How Much do Authors Make Per Book?*, BOOK RIOT, May 11, 2021,
     https://bookriot.com/how-much-do-authors-make-per-book/ ............................................... 6, 7

U.S. Dep't of Justice, *Justice Department Reaches Settlement with Macmillan in E-Books Case*,
     Feb. 8, 2013, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-
     macmillan-e-books-case. .......................................................................................................... 2

U.S. Dep't of Justice, *Justice Department Reaches Settlement with Three of the Largest Book
     Publishers and Continues to Litigate Against Apple Inc. and Two Other Publishers to Restore
     Price Competition and Reduce E-book Prices*, Apr. 11, 2012,

https://www.justice.gov/opa/pr/justice-department-reaches-settlement-three-largest-book-publishers-and-continues-litigate ............................................................................................. 2

## INTEREST OF *AMICUS CURIAE*[1]

Authors Alliance is a 501(c)(3) nonprofit that seeks to advance the interests of authors who want to serve the public good by sharing their creations broadly. Authors Alliance has over 2,300 members, including academic authors, novelists, narrative nonfiction authors, journalists, and other authors who share its mission. Its Advisory Board includes two Nobel Laureates, a Poet Laureate of the United States, three MacArthur Fellows, and distinguished professors from leading institutions from across the United States.[2]

Authors Alliance has an interest in this case because our members rely heavily on libraries such as the Internet Archive, both to make their own works available to readers and to access other literary works for their own research. We think it reasonable and expected that libraries will implement systems—such as Controlled Digital Lending—to adapt how they lend books in light of current technology, and to ensure that authors reach readers. A negative ruling in this case on the legality of CDL would severely restrict the reach and impact of our work.

---

[1] This brief was not authored in whole or in part by counsel for any party to this appeal, nor was it funded by such party or any party's counsel. No person other than the amicus curiae, its members, or its counsel contributed money intended to fund this brief.

David Hansen joined Authors Alliance as its Executive Director on June 15, 2022. Hansen is a co-author of the original paper outlining the legal dimensions of Controlled Digital Lending. *See* David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library Books* (2018), http://nrs.harvard.edu/urn-3:HUL.InstRepos:42664235.

[2] Although no Advisory Board members had a role with this brief, nor does the Advisory Board have any decision-making authority for Authors Alliance, in an abundance of caution we disclose that Brewster Kahle serves as one member of Authors Alliance's 25-person Advisory Board. The Authors Alliance Board of Directors and its Advisory Board are publicly listed, here: https://www.authorsalliance.org/about/

1

## ARGUMENT

Authors Alliance submits this brief in order to present this Court with a broader picture of authors' incentives and motivations, and to explain why many authors thus support Internet Archive's Controlled Digital Lending ("CDL") program and others like it. A major focus of this suit is the question of whether CDL is permissible under the doctrine of fair use. Because fair use requires an analysis of its factors "in light of the purposes of copyright," *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578 (1994) and because one of the purposes of the Copyright Act is to provide authors with incentives to create, *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 480 (1984), we believe these views are particularly relevant.

The four publishers that are the plaintiffs in this case represent a massive concentration of publishing market power. *See* Lis Hartman, *Breaking Down 2021's Bestsellers by Publisher*, PUBLISHERS WEEKLY, Jan. 14, 2022, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/88301-breaking-down-2021-s-bestsellers-by-publisher.html. These publishers make much of Internet Archive disrupting the "ecosystem" and "market equilibrium" for the sale of books online. Complaint, ECF No. 1, at ¶¶ 10, 46. That ecosystem has long been out of balance, due not to the Internet Archive's activities, but to these publishers' leveraging of their power to insist on a marketplace in which they exercise almost absolute control over access, preservation, and research.[3] The Copyright Act has never accorded copyright owners such sweeping control, as "in certain circumstances, giving authors [or rightsholders] absolute control

---

[3] At least three of these four same publishers have exercised their substantial market power to control the ebook market in ways that have limited readership and driven up costs for the public to access and use books. *See, e.g.*, U.S. Dep't of Justice, *Justice Department Reaches Settlement with Three of the Largest Book Publishers and Continues to Litigate Against Apple Inc. and Two Other Publishers to Restore Price Competition and Reduce E-book Prices*, Apr. 11, 2012, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-three-largest-book-publishers-and-continues-litigate; U.S. Dep't of Justice, *Justice Department Reaches Settlement with Macmillan in E-Books Case*, Feb. 8, 2013, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-macmillan-e-books-case.

over all copying from their works would tend in some circumstances to limit, rather than expand, public knowledge." *Authors Guild, Inc. v. Google, Inc.*, 804 F.3d 202, 211-112 (2d Cir. 2015). In anticipation of this brief, Authors Alliance sought feedback from Authors Alliance members and other authors to investigate how authors viewed CDL.[4] Many of those surveyed voiced strong support for CDL. Authors Alliance thus submits this brief in order to demonstrate that plaintiffs' representations about authors and their incentives do not apply to all authors. Instead, while some authors may share plaintiffs' view of CDL as inconsistent with their interests, authors are not a monolith, and many support it strongly.

CDL accomplishes core objectives of the copyright system—objectives that benefit authors and readers alike and that maintain the balance of rights as between copyright owners and readers. CDL serves the interests of authors in at least four distinct ways. Thus, our argument proceeds as follows: First, CDL preserves copyright's balance of interests without reducing author incentives to create. Second, CDL enables broad public availability of literary works, helping authors see their own works reach wide audiences and gain exposure. Third, CDL facilitates the preservation of literary works, especially for works that are no longer available commercially. Finally, CDL is an effective and efficient research tool, helping authors access sources they need to create new works of authorship.

Copyright is designed to incentivize new creation while also ensuring that the public benefits from the works of authors. *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932). The ways in which authors use and rely on CDL—enabling broad public availability, preservation, and research—are favored under fair use. Facilitating access to ideas and creativity in literary

---

[4] Authors Alliance launched a CDL survey to elicit feedback on CDL from members and other authors in February 2021 and collected responses through April 2022. A true and correct copy of Authors Alliance's survey is attached as Exhibit A.

3

works by making the works broadly available is in the public interest, and weighs in favor of fair use. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014). Preserving works for archival purposes is similarly consistent with fair use, ensuring copyrighted works do not disappear, H.R. Rep. No. 94–1476, at 73 (1976), and indeed this is precisely what CDL's preservation functions achieve. Finally, scholarly research is a prototypical fair use, embedded as it is within the very language of the Copyright Act. 17 U.S.C. § 107 (naming "criticism," "scholarship" and "research" as fair uses).

I.    **Controlled Digital Lending Maintains Copyright's Balance of Interests and Does Not Reduce Financial Incentives for Authors.**

Authors are at the core of copyright's incentive structure. The temporary monopoly that copyright grants, subject to certain exceptions and limitations, is intended to incentivize new creation while also ensuring the public benefits "from the labor of authors." *Fox Film Corp.*, 286 U.S. at 127. The doctrine of fair use steps in to strike a balance, preserving incentives for authors to create while enabling others to build on the knowledge these works advance. *Sony*, 464 U.S. at 479. CDL is a socially beneficial use that does not disincentivize the creation of new creative works of authorship, and the traditional balance of interests and incentive structure in copyright are unharmed by CDL for two main reasons.

First, CDL loans are only possible when the lending institution has *already* purchased a print book, for which an author receives royalties from their publisher if any are due. This undermines plaintiffs' claim that CDL causes market harm to authors by diminishing royalties they

receive from library sales, ECF No. 1 at ¶¶ 119, 123,[5] because CDL requires that libraries only loan out the number of CDL copies as print books that have been acquired. David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library Books* (2018), http://nrs.harvard.edu/urn-3:HUL.InstRepos:42664235. Authors have already been compensated for the sale of those books in the traditional way authors have come to expect, with libraries left to then freely distribute those books to users.

The precise means and terms of lending to users have traditionally been left to the library to decide; what matters is that each copy of a book that a library holds is already paid for, and they are only using that one copy to the benefit of readers and the public. U.S. law has never required libraries to gain permission or pay again and again for each loan they make, despite the wishes of some rightsholders. *See* National Writers Union et al., *FAQ on Controlled Digital Lending*, Feb. 2019, https://nwu.org/wp-content/uploads/2019/08/CDL-FAQ-15AUG2019-v104.pdf (calling for the establishment of a national Public Lending Right to "provided remuneration of authors when books or e-books are borrowed from libraries."); Herbert Mitgang, *Authors Seek Pay for Loan of Books*, N.Y. TIMES, Jan. 2, 1985, https://www.nytimes.com/1985/01/02/books/authors-seek-pay-for-loan-of-books.html (describing proposed federal legislation that would establish a public lending right, supported by rightsholder groups).

The system of free library lending has served authors well for decades, and there is ample evidence that free library access actually drives sales for authors. *See, e.g.,* Andrew Albanese*, Survey Says Library Users Are Your Best Customers,* PUBLISHERS WEEKLY, Oct. 28, 2011, https://www.publishersweekly.com/pw/by-topic/industry-news/publishing-and-

---

[5] Indeed, plaintiffs' motion for summary judgment does not identify any concrete financial harm to authors that has occurred as a result of the Internet Archive's CDL program. *See* Pls. Motion for Summary Judgment, ECF No. 99, at 37.

marketing/article/49316-survey-says-library-users-are-your-best-customers.html ("Our data show that over 50% of all library users report purchasing books by an author they were introduced to in the library . . . This debunks the myth that when a library buys a book the publisher loses future sales[.]"). Authors want and need libraries to purchase their books, but the copyright system has never required libraries to pay for those books again and again in order to provide readers with access in formats relevant for them in light of evolving technology.

Second, even in the unlikely case that the licensing market that the plaintiffs imagine reaped windfalls for them, ECF No. 1 at ¶ 112, it would have little financial benefit for many authors. While plaintiffs comprise the bulk of the major U.S. trade publishers and thus dominate the trade market, Lis Hartman, *Breaking Down 2021's Bestsellers by Publisher*, PUBLISHERS WEEKLY, Jan. 14, 2022, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/88301-breaking-down-2021-s-bestsellers-by-publisher.html, it is not the case that all, or even most, authors publish books with these publishers. Indeed, plaintiffs purport to publish "the most successful and leading authors in the world" ECF No. 1 at ¶ 1, but these authors represent a vanishingly small percentage of working authors. Sarah Nicholas, *How Much Do Authors Make Per Book?*, BOOK RIOT, May 11, 2021, https://bookriot.com/how-much-do-authors-make-per-book/. Authors are not a monolith in terms of their views or motivations for writing books: while some may share plaintiffs' views that CDL is harmful to the publishing ecosystem, many others support CDL, as evidenced by the feedback Authors Alliance received from its members and other authors.

Even if plaintiffs were correct in arguing that eliminating CDL would enhance publisher revenues (which they are not), the financial structure of the publishing industry demonstrates that authors are unlikely to share in these spoils. When an author makes a book deal with a trade

publisher such as the plaintiffs in this case, they often receive a lump sum "advance against royalties." Authors do not receive income from book sales until this advance has "earned out," that is, when royalties due to the author from book sales surpass the total advance paid. *Id.*; *see also Authors Guild Model Trade Book Contract*, Authors Guild, https://go.authorsguild.org/contract_sections/4. For example, if an author receives an advance of $20,000 and is entitled to a 10% royalty rate on book sales, they will not earn out their advance and receive royalty payments from their publisher unless and until that 10% royalty rate yields more than $20,000. Importantly, this arrangement has been designed and implemented by plaintiffs and other publishers, who set contract terms for publication contracts and standardize royalty rates without involvement from authors. Rachel Deahl, *Could Publishers and Agents Agree on a Flat Royalty Rate?*, Publishers Weekly, June 3, 2016, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/70565-could-publishers-and-agents-agree-on-a-flat-royalty-rate.html.

While statistics are sparse, industry insiders have estimated that approximately 70% of published authors do not earn out their advances. Jane Friedman, *The Book P&L: How Publishers Make Decisions About What to Publish*, Jane Friedman Blog, last updated Sept. 30, 2021, https://www.janefriedman.com/book-pl/. For these authors, no income is received beyond the original advance, making the author income question in many cases entirely separate from the book sales question. For authors who write to be read, like many Authors Alliance members and survey respondents, SP6, SP8, CDL enhances, rather than diminishes, author incentives to create.

II.     **Controlled Digital Lending Promotes Broad Public Availability to Books in a Format Relevant to Readers.**

Authors—and particularly Authors Alliance members—want their books to be read. The Copyright Act shares this objective. "Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U. S. 151, 156 (1975).

Controlled digital lending supports authorship by facilitating broad public availability of works of authorship, enabling these literary works to reach wide, diverse audiences via technology that allows them to efficiently discover and evaluate the contents of those works. Facilitating access to works for readers who are entitled to access but could not otherwise read them is a fair use consistent with the aims of the Copyright Act, *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101-103 (2nd Cir. 2014), and serves the interests of authors who prioritize seeing their works reach readers so that they may have the maximum impact on public discourse.

Particularly where a use is noncommercial, courts are wary of "inhibit[ing] access to ideas without any countervailing benefit." *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1983). Secondary uses are favored in the fair use analysis when they use "technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018) (citing *Sony*, 464 U.S. 417 (1983)). As a noncommercial use that facilitates efficient access to literary works in a format usable for contemporary readers, the broad public availability of works that CDL enables makes it consistent with fair use.

Without the enhanced public availability CDL provides, some authors could face substantial difficulty reaching readers. Authors of all types fight constantly against the risk of digital obscurity; for many readers, especially younger readers, if a book is not online, it effectively

does not exist to them. This is a particular risk for academic works, *see, e.g.,* CORNELL UNIVERSITY LIBRARY, REPORT OF THE COLLECTION DEVELOPMENT EXECUTIVE COMMITTEE TASK FORCE ON PRINT COLLECTION USAGE, 2 (2010), https://ecommons.cornell.edu/handle/1813/45424 (reporting that only 45% of Cornell Library print monographs published since 1990 have circulated), which make up many of the books written by Authors Alliance members. When books remain on library shelves and undiscovered by readers, the purposes of copyright are not served. When a publisher only issues the work in physical book form, many readers are effectively unreachable.

One Authors Alliance member explained that their "publisher only issued [their] work in hardcover, didn't print many copies, and priced it so high that . . . [j]ust about the only buyers who could afford [the] book were libraries." SP8. Without CDL, authors in such situations could be unable to reach readers without the ability to access physical books at libraries due to physical distance or disability. Physical books on library shelves are inherently limited by geographic constraints, further limiting the availability of works like this member's. Even when a publisher does issue an ebook version, certain publishers restrict a library's ability to acquire digital versions of work altogether, Geoffrey A. Fowler, *Want to Borrow that E-book from the Library? Sorry, Amazon Won't Let You.*, WASH. POST, Mar. 10, 2021, https://www.washingtonpost.com/technology/2021/03/10/amazon-library-ebook-monopoly/; SP12, or place strict controls on when and to whom those libraries can provide access for ebooks that they will license, placing these works out of the reach of many readers.

Authors Alliance members value seeing their works reach broad audiences, and many survey participants affirmed that the enhanced availability that CDL provides advances their interest in reaching readers. SP2, SP3. CDL's role in facilitating access to works of authorship took on particular salience during the COVID-19 pandemic. One survey respondent observed that

"[t]hroughout the past year, authors whose writings were available through CDL were more likely to be seen and cited than those whose works were locked away." SP4. Authors who "want [their] works to have the widest possible readership," SP2, and "want to see [their] stories out in front of audiences around the world," SP17, are served by the enhanced broad availability that CDL provides.

CDL helps authors reach more diverse audiences they would not have reached otherwise, such as "readers who might be interested in checking them out via digital means and who may not have the resources to purchase them." SP17. Libraries have historically played a role in democratizing access to information, and this role remains critical in the digital age. *See Access to Library Resources and Services*, AM. LIBRARY ASSOC., https://www.ala.org/advocacy/intfreedom/access ("As the digital world continues to evolve, libraries help ensure that people can access the information they need – regardless of age, education, ethnicity, language, income, physical limitations or geographic barriers[.]"). Enhancing the accessibility of works, and particularly making works readily available to library readers who could not otherwise access them due to physical distance, print disabilities, or mobility disabilities serves the interests of Authors Alliance's members and helps them achieve their ultimate goal of seeing their works broadly available and accessible to as many readers as possible. SP2 ("I want my works to have the widest possible readership."), SP6 (I want [my works] to be as widely read as possible. I write to be read."). For these authors, CDL advances their interests by providing an additional way to get books in the hands of readers. SP17. And even for readers of print books, CDL access can enhance discoverability. CDL allows those print readers, particularly those who would never have purchased a print copy sight-unseen, to thoroughly evaluate the suitability and relevance of a particular book first. For authors who have as their highest goal seeing their work

reach readers, the digital format of CDL greatly enhances the chances of reaching more readers. In these cases, "making the print version of . . . books available through CDL can give readers digital access to [the] work that they wouldn't have otherwise." SP12.

### III.   Controlled Digital Lending Ensures that Books Are Preserved.

Controlled digital lending enables the preservation of books that are no longer available commercially, ensuring that these works do not disappear into obscurity. Books have short commercial lives compared to the duration of copyright, and once books are no longer available from commercial outlets, they become much less accessible to readers. Indeed, the House of Representatives' Committee on the Judiciary Report on the 1976 copyright law revision observes that "the making of duplicate copies for purposes of archival preservation certainly falls within the scope of 'fair use.'" H.R. Rep. No. 94–1476, at 73 (1976); *see also* Pamela Samuelson, *Possible Futures of Fair Use*, 90 WASH. L. REV. 815, 834 n. 125 (2015) (observing that preservation efforts by HathiTrust in *Authors Guild v. HathiTrust* was consistent with the preservation fair use articulated in the House Report). Without CDL, libraries face a difficult choice with fragile, out of print materials: continue to make the original print copies available to users and risk their inevitable destruction, or lock down access to the original, making access difficult or nearly impossible for a large number of potential readers.

Without library preservation, literary works that are no longer available commercially could cease to be accessible to the general public at all. In 2012, law professor Paul Heald demonstrated the phenomenon of older books "disappearing" by studying the number of editions of new books available on Amazon. Rebecca Rosen, *The Missing 20th Century: How Copyright Protection Makes Books Vanish,* ATLANTIC, Mar. 30, 2012, https://www.theatlantic.com/technology/archive/2012/03/the-missing-20th-century-how-

copyright-protection-makes-books-vanish/255282/. Heald found that there was a marked decrease in a book's availability for books published from the late 1920s through the 1990s. *Id.* For example, there were many more books published in the 1910s available on Amazon than in the 1990s (presumably since the former category of works had entered the public domain). *Id.* The loss of access to knowledge that this problem represents demonstrates the need for stronger efforts to preserve literary works so that the knowledge they hold is not lost.

Publishers assert that they alone should have the right to dictate whether titles are available in digital formats. ECF No. 1 at ¶ 45. But to grant rightsholders such control undermines copyright's objective of encouraging the progress of knowledge. Many publishers have not made licenses available for their backlists. Indeed, in many cases it is likely that publishers are unsure if they hold the rights they claim are necessary for such use. *See Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613, 614 (S.D.N.Y 2011) (holding that the publisher's contractual right to "print, publish and sell the work[s] in book form" did not encompass ebook publishing rights). Without CDL programs to fill the gap in availability, older books could fail to be preserved altogether.

When literary works are preserved by libraries and made available to borrow via CDL, the knowledge and ideas they contain are not lost, serving copyright's goal of facilitating the progress of knowledge and socially productive onward creation. The problem of commercially unavailable books from the 20th century "disappearing" and the effectiveness of CDL as a solution is illustrated by a recent news story about an older, obscure work by a prominent author which the story's author was unable to obtain despite substantial efforts. Caity Weaver, *Does 'The Da Vinci Code' Writer Have a Secret?*, N.Y. TIMES, July 29, 2021, https://www.nytimes.com/2021/07/29/style/dan-brown-advice-book.html. Unable to locate and acquire a physical copy of the book in question,

the story's author dubbed the matter a "mystery." *Id.* Yet the work—a satirical dating advice book written by author Dan Brown—was available as a CDL loan from the Internet Archive. CDL can, and does, serve an important preservation function for works that would otherwise fall into obscurity. Within this context, CDL can serve as a potent means of preserving an author's works, ensuring they are not lost even as the work's commercial reach is limited. Survey respondents supported CDL's ability to keep works from disappearing, whether they originated as print books or digital works of authorship. SP4, SP14.

## IV.   Controlled Digital Lending Facilitates Author Research.

Finally, controlled digital lending can be a powerful research tool for authors in the process of creating new original works of authorship. Plaintiffs allege that "IA plays no role in the hard work of researching, writing, or publishing the works . . . Nor does IA contribute to the underlying scholarship through commentary or criticism." ECF No. 1 at ¶ 9. This is not true: the access to research sources that authors obtain through CDL plays a critical role in their creation of new works. Using others' works for research purposes is one of the prototypical fair uses, identified as an example in the preamble to the fair use statute, 17 U.S.C. § 107, and recognized by numerous courts. *See, e.g., Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991). When a particular use facilitates research, fair use is favored even when the use is commercial in nature since this research often serves "a broader public purpose." *Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 922 (2d Cir. 1995). CDL is noncommercial in nature, further underscoring that its research function is consistent with fair use.

Libraries have relied on fair use to play an important intermediary role for authors by providing full-text copies for research purposes with appropriate restrictions on reuse similar to

those that CDL employs. For example, in *Sundeman v. Seajay Society, Inc.,* 142 F.3d 194 (4th Cir. 1998), the Fourth Circuit found in in favor of the defendant Seajay Society, an archive, when it provided two full-text copies of an unpublished manuscript of *Blood of My Blood* by author Margorie Kinnan Rawlings to another library and to a literary scholar, Dr. Anne Blythe. *Id.* at 208. As with CDL, the Seajay Society placed careful limits on reuse—"access to the copy was restricted, and photocopying it was prohibited[.]" *Id.* at 199. Also like CDL, Seajay provided the researcher full-text access, which is necessary for scholarly analysis. *Id.* at 206. The Court concluded that Seajay's use in providing a full-text copy to Blythe was fair because it supported the author's underlying research and scholarship, purposes which "serve the public benefit and aid in the development of the arts." *Id*. at 207.

Without CDL, many authors would face obstacles in accessing the research sources they need in order to create new works of authorship. SP12. Authors with print or mobility disabilities may not be able to access physical books or read them in an appropriate format, and such authors are disadvantaged when they are not able to borrow works via CDL. Particularly during the early days of the COVID-19 pandemic, when researchers' ability to access physical books on library shelves was limited, CDL has served as a way for authors to discover and access primary sources they need to create new works of authorship. Many of Authors Alliance's members are authors of nonfiction works who rely on their ability under the fair use doctrine to draw on the works of others in their scholarship, consistent with the very purposes of copyright law.

For authors creating new literary works that draw on existing works, the ability to access other authors' works in a CDL format significantly simplifies the research process. Respondents to Authors Alliance's CDL survey voiced their support for CDL as a way to access works about a diverse range of research areas. SP7, SP12. While some authors may be able to access hard copies

of these works in physical libraries, authors are not always able to physically access these spaces, whether due to print or mobility disability or an author's physical location. For example, for authors writing in languages not spoken in the countries they live in, CDL can be an invaluable way to "read other writers' works, learn new storytelling techniques, and check out resources that help [] improve [the author's] writing[.]" SP17. Even for authors with regular access to libraries containing primary sources they need to create new works of authorship, CDL enables authors to access a wider variety of sources than those contained in a single library in many cases. An author's ability to use CDL as a research tool also supports their authorship in its efficiency, as decreasing time needed to track down sources leads to more time for authors to conduct their scholarship, SP12, contributing to the progress of knowledge.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendant the Internet Archive's motion for summary judgment.

Dated: July 14, 2022                                   Respectfully submitted,

Rachel Brooke Leswing*
Authors Alliance
2705 Webster St., #5805
Berkeley, CA
*Counsel for amicus curiae*


*application for admission *pro hac vice* pending

15