UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X
HACHETTE BOOK GROUP, INC.,                :
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY  :
SONS, INC., and PENGUIN RANDOM HOUSE LLC, :     Case No. 1:20-cv-04160-JGK
                                          :
            Plaintiffs,                   :
                                          :
-against-                                 :
                                          :
INTERNET ARCHIVE and DOES 1 through 5,    :
inclusive,                                :
                                          :
            Defendants.                   :
------------------------------------------X

# *AMICI CURIAE* BRIEF OF 17 COPYRIGHT SCHOLARS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jason M. Schultz
*Counsel for Amici Curiae*
Technology Law & Policy Clinic
NYU School of Law
245 Sullivan St. #609
New York, NY 10012
(212) 992-7365
jason.schultz@exchange.law.nyu.edu

# TABLE OF CONTENTS

TABLE OF AUTHORITIES...………………………………………………………………… ii

INTERESTS OF AMICI CURIAE.…………………………………………………………..… 1

SUMMARY OF ARGUMENT.…………………………………………………………….….. 1

ARGUMENT…………………………………………………………………………………… 4

    I. Copyright law entitles libraries to lend lawfully made copies without interference from copyright holders…………………………………………………………………………… 4

        A.    First Sale prevents the downstream control of books sought by Plaintiffs…………… 4

        B.    Controlled Digital Lending (CDL) is consistent with Congress's intent to protect library lending from copyright holder interference……………………………………… 8

    II. Because CDL's purpose and character is to effectuate digital library lending without any cognizable copyright harms, it should be deemed a fair use………………………………….. 9

        A.    The purpose of CDL is to enable libraries to carry out the traditional activities of lending in the digital age………………………………………………………….…… 9

        B.    Because CDL implements copy owners' long-standing right to lend, it does not harm any cognizable copyright market………………………………………………...…… 10

CONCLUSION…………………………………………………………………………………. 12

APPENDIX……………………………………………………………………………………... 14

# TABLE OF AUTHORITIES

**Cases**

*Am. Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661 (5th Cir. 1978) .............................................. 6
*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ...................................................... 3
*Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132 (2d Cir. 2013) .............................................. 11
*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ................................................ 11
*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ........................ 14
*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908) ............................................................ 2, 5, 13
*Bureau of Nat'l Literature v. Sells*, 211 F. 379 (W.D. Wash. 1914) ........................................... 7
*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ....................................................... 14
*Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018) .................................. 3, 4, 12
*Doan v. Am. Book Co.*, 105 F. 772 (7th Cir. 1901) .................................................................... 7
*Isbrandtsen Co. v. Johnson*, 343 U.S. 779 (1952) ...................................................................... 6
*Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013) .............................................. passim
*Samantar v. Yousuf*, 560 U.S. 305 (2010) .................................................................................. 6

**Statutes**

17 U.S.C. § 107(4) ..................................................................................................................... 11
17 U.S.C. § 108 ............................................................................................................................ 6
17 U.S.C. § 109 ........................................................................................................................ 7, 8
17 U.S.C. § 109(b) ....................................................................................................................... 6
Computer Software Rental Amendments Act of 1990, Pub. L. No. 101-650, 104 Stat. 5134 ....... 6
Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541 ................................................. 2, 7, 10

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 8 .......................................................................................................... 7

**Other Authorities**

Aaron Perzanowski & Jason Schultz, *Digital Exhaustion*, 58 UCLA L. Rev. 889 (2010) ............. 6
Andrew Albanese, *Survey Says Library Users Are Your Best Customers*, Publishers Weekly, Oct. 28, 2011 ................................................................................................................................ 11
H.R. Rep. No. 60-2222 (1909) ..................................................................................................... 8
H.R. Rep. No. 94-1476 (1976) ......................................................................................... 2, 6, 8, 10
Molly Shaffer Van Houweling, *The New Servitudes*, 96 Geo. L.J. 885 (2007) ............................ 6
R. Anthony Reese, *The First Sale Doctrine in the Era of Digital Networks*, 44 B.C. L. Rev. 577 (2003) ..................................................................................................................................... 6
S. Rep. No. 94-473 (1975) ............................................................................................................ 8
Samuel F. Ernst, *Why Patent Exhaustion Should Liberate Products (Not Just People)*, 93 Denv. U. L. Rev. 899 (2016) ......................................................................................................... 12

## INTERESTS OF AMICI CURIAE

Amici are 17 copyright scholars from various institutions who share a deep knowledge and interest in copyright law. They specialize in copyright law, policy, and history, with several amici routinely participating as *amicus curiae* in copyright and intellectual property cases. In the following brief, they bring their combined expertise to bear on the copyright exhaustion, First Sale, and fair use issues presented by this case. As scholars and practitioners in this space, amici have a significant interest in aiding the Court's consideration of this case.

## SUMMARY OF ARGUMENT[1]

For well over a century, copyright law has enabled libraries to lawfully lend books and other materials they own, however they see fit. The social benefits of library lending are enormous, and the practice has become an essential method for ensuring public access to information, especially books. As digital delivery has grown more common, and in some cases essential, libraries have adapted by lending materials to patrons using new technologies and formats. Plaintiffs' lawsuit threatens this core function, insisting that digital library lending be outlawed unless the plaintiffs control how, where, to whom, and at what price it occurs. Such a drastic shift in who controls library lending would fundamentally change not only how libraries work but also their relationships with their patrons and collections in the digital era.

---

[1] Counsel for amici would like to thank Navya Dasari and Elizabeth Pott, past participants in NYU Law's Technology Law & Policy Clinic, for their help in preparing this amicus brief.

Plaintiffs advocate for this shift by reading the Copyright Act far too narrowly, ignoring the broader common law doctrine, policy objectives, and history of copyright exhaustion (the principle underlying the First Sale doctrine), and its importance in analyzing the first factor of the fair use analysis of this case. They fail to acknowledge that for libraries to fulfill their mission of distributing lawfully made materials to patrons, incidental reproductions are often necessary, and that the purpose and character of such distributions and reproductions are entirely in line with both Supreme Court precedent and Congress's balancing of the interests of copyright holders and copy owners. Plaintiffs ignore these realities, incorrectly suggesting that the reproductions and distributions at issue in this case should be functionally separated in the context of digital library lending even though they are inextricably linked as part of the Factor One analysis. Moreover, they contend that the purpose of these incidental reproductions—effectuating lawful library lending—should be ignored as a matter of copyright law and policy. But to do so would rewrite more than a century of copyright law, making it nearly impossible for libraries to fulfill their mission in the digital environment.

Plaintiffs' arguments are also inconsistent with longstanding common law traditions repeatedly embraced by the courts and Congress. Drawing from deep-rooted principles disfavoring servitudes on chattels and safeguarding the right to alienate personal property, the Supreme Court has consistently prevented copyright holders from extending their rights to control post-sale uses. *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013); *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908). And each time Congress has incorporated exhaustion explicitly into the Copyright Act, it has made clear that those common law principles are to be preserved—including specifically recognizing that libraries should be able to lend copies "under any conditions [they] choose[] to impose." H.R. Rep. No. 94-1476, at 79 (1976).

The unassailable public value of library lending is inseparable from the fair use analysis in this case. In *Capitol Records v. ReDigi*, the Second Circuit explained that unauthorized reproductions may be "excused as fair use" when they occur in conjunction with a lawful use, including when such a use "expands [an original work's] utility." *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018) (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015)); *id.* (offering by example the efficient digital delivery of a work to one with rights to view it) (citing *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018)); *id.* at 662 n.16 (offering by example reproductions made for the purpose of storing lawfully purchased digital files in the cloud).

More specifically, Judge Leval recognized in *Capitol Records v. ReDigi* that distribution authorized under the First Sale doctrine itself could constitute a justification for the lawful reproduction of incidental copies. As he described approvingly, "A secondary market can readily be imagined for first purchasers who cost-effectively place 50 or 100 (or more) songs on an inexpensive device such as a thumb drive and sell it." *Id.* at 659. Thus, reproductions that enhance digital efficiency, storage, or resale of lawfully made works are fair uses. By that same logic, reproductions that enable digital library lending, like those made possible through Controlled Digital Lending (CDL), should also be considered fair.

Moreover, unlike the profit-seeking sales at issue in *ReDigi*, libraries' lending activities are noncommercial. Free, nonprofit library lending has been a cornerstone of access to science and the arts in the United States for nearly two hundred years. Without the ability to lend digital copies of books already in their collections through programs such as CDL, libraries risk both the loss of independent control over their holdings and crushing budgetary shortfalls. Without CDL, libraries could be forced to pay copyright holders every time a patron borrows a digital copy of a

print book, and copyright holders would enjoy an unprecedented power to restrict when, where, and on which devices patrons can access books. Copyright holders would wield absolute authority to prevent libraries from acquiring and preserving digital books and to cut off digital access to books already in those collections at any future time or place or for any arbitrary reason.

To preserve the crucial societal function of library lending in the digital age, this Court should recognize that any incidental reproductions and subsequent distributions made through Controlled Digital Lending are fair uses. In particular, when examining the purpose and character of CDL as part of the first fair use factor, the Court should find that enabling library lending—an activity recognized as lawful by courts and Congress for over a century as part of common law exhaustion and the First Sale doctrine—weighs heavily in favor of fair use. It should also recognize that, to the extent plaintiffs can credibly claim any market harm from CDL, such harms are not cognizable under the fourth fair use factor. They are harms that copyright law has always traditionally accepted as part of the balance struck by courts and Congress through application of common law copyright exhaustion and the First Sale doctrine.

## ARGUMENT

### I. Copyright law entitles libraries to lend lawfully made copies without interference from copyright holders.

    A. **First Sale prevents the downstream control of books sought by Plaintiffs.**

For over a century, courts have consistently rejected publishers' attempts to use copyright law to control downstream uses of their books by developing common law protections for

4

libraries and other book owners. For example, in the seminal decision *Bobbs-Merrill*, the Supreme Court rejected an attempt by publishers to use copyright law to mandate downstream retail prices after initial authorized sales, recognizing that to give over such control would conflict with the property rights of book owners. *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350 (1908) ("[T]he copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose . . . a limitation at which the book shall be sold at retail by future purchasers[.]"). *Bobbs-Merrill* emphasized that courts must not extend the privileges of copyright owners beyond those granted by Congress. *Id* at 346. *See also Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (noting the "impeccable historic pedigree" of common law exhaustion and that "[w]hen a statute covers an issue previously governed by the common law, we must presume that Congress intended to retain the substance of the common law.") (quoting *Samantar v. Yousuf*, 560 U.S. 305, 320 n.13 (2010)) (internal quotation marks omitted); *see also Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident").

In defining those rights, Congress was mindful of the crucial role which libraries play in our society. Incorporated into both the 1909 and 1976 Copyright Acts, the statutory doctrine of First Sale enshrines the common law and commonsense principle that a copyright owner who parts with a given copy exhausts their exclusive rights with respect to that copy. *See generally Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013); *Am. Int'l Pictures, Inc. v. Foreman*, 576 F.2d 661, 664 (5th Cir. 1978) (First Sale "extinguishes the copyright holder's ability to control the course of copies placed in the stream of commerce"); Aaron Perzanowski & Jason

5

Schultz, *Digital Exhaustion*, 58 UCLA L. Rev. 889, 892–94 (2010) (articulating the history, role, and purpose of the First Sale doctrine); Molly Shaffer Van Houweling, *The New Servitudes*, 96 Geo. L.J. 885 (2007); R. Anthony Reese, *The First Sale Doctrine in the Era of Digital Networks*, 44 B.C. L. Rev. 577 (2003). Besides the right to distribute, copy owners also have the right to reproduce aspects of a work necessary to "render [copies they own] serviceable" for use or subsequent distribution. *Doan v. Am. Book Co.*, 105 F. 772, 777 (7th Cir. 1901) (holding that copyright owner's sale of books "carried with it the ordinary incidents of ownership in personal property[,]" allowing a purchaser or any subsequent owner of such books to reproduce aspects necessary in order to exercise their personal property rights, including the right of subsequent distribution); *Bureau of Nat'l Literature v. Sells*, 211 F. 379, 381–82 (W.D. Wash. 1914) (finding no infringement, in light of First Sale doctrine, where reseller re-bound used books and held them out as new books). These are rights crucial to the operation of non-profit libraries, a fact of which Congress was aware when it crafted copyright legislation. *See* H.R. Rep. No. 94-1476, at 79 (1976) (underscoring the importance of libraries' ability to lend without seeking permission from copyright holders as a motivation for § 109); 17 U.S.C. § 108 (2006) (allowing libraries to reproduce works for archival and preservation purposes); Computer Software Rental Amendments Act of 1990, Pub. L. No. 101-650, §§ 801–05, 104 Stat. 5134 (1990) (codified at 17 U.S.C. § 109(b)) (prohibiting the rental, lease, or lending of phonorecords by owners, with an exception for nonprofit libraries).

      Nevertheless, Plaintiffs here seek to control downstream uses of copies where they have already exhausted their rights via the First Sale doctrine. A library employing CDL lawfully acquires a physical copy of a book before creating or lending a digital copy. Under the CDL approach, libraries maintain a strict one-to-one ratio between the physical copies they own and

digital copies they lend. Thus, for every single book available for loan via CDL, a first sale has already occurred. Libraries' right to lend the physical copies in their collections under the common law of exhaustion and 17 U.S.C. § 109 is beyond dispute. CDL simply allows libraries to exercise their "ordinary incidents of ownership" with respect to those physical copies by making them "serviceable" for lending to the same patrons at the same frequency in a digital format. In doing so, CDL sustains the circulation of lawfully acquired books in the library's collection, especially when physical access is restricted as it has been numerous times during the current pandemic. Since each physical copy is taken out of circulation during a CDL loan, the digital copy functions identically to the print copy. To prevent libraries from lending digital copies under these circumstances would be to deny them the incidents of copy ownership and impose artificial constraints on their ability to lend lawfully purchased books, contrary to copyright law's established principles and policy objectives.

The Supreme Court has cautioned against interpretations of copyright law that would disrupt library lending practices. Following the codification of the First Sale doctrine in the 1976 Copyright Act, the Supreme Court again affirmed the freedoms of book owners to dispense of lawfully made copies without constraint. *Kirtsaeng*, 568 U.S. at 540. The Court defended the exhaustion doctrine and methods of library lending that it enables as critical to copyright's constitutional objectives, warning that forcing libraries to yield to publishers before lending books in their collections would "fail to further… the Progress of Science and useful Arts." *Id.* (citing U.S. Const. art. I, § 8, cl. 8). The First Sale doctrine is "deeply embedded" in the lending practices of libraries, which have historically depended on its protection. *Id.* at 544. As the Court understood, disturbing a doctrine so important to libraries' functioning would produce "intolerable consequences" for copyright law. *Id.*

Preventing libraries from lending digital books would produce similarly intolerable consequences. It would allow publishers to dictate not only which books libraries make available to their patrons, but also under what conditions libraries can lend them. Consistent with longstanding copyright principles, libraries should retain the ability to lend copies of lawfully acquired works in their collections as they see fit.

**B. Controlled Digital Lending (CDL) is consistent with Congress's intent to protect library lending from copyright holder interference.**

When Congress codified § 109 in the 1976 Copyright Act, the House Committee specifically noted its intent to "restate[] and confirm[]" what the common law and the 1909 Act had already established regarding the First Sale doctrine and copyright exhaustion without narrowing the scope of those protections. H.R. Rep. No. 94-1476, at 79 (1976); S. Rep. No. 94-473, at 71 (1975); H.R. Rep. No. 60-2222, at 13 (1909). More specifically, Congress recognized the crucial role of libraries. Section 109 was adopted in part to ensure that libraries would retain their ability to lend the books they own "under any conditions [they] choose[] to impose." H.R. Rep. No. 94-1476, at 79 (1976). Lending digital copies of books via CDL is one such set of conditions. Plaintiffs' arguments directly contradict this Congressional imperative, seeking to limit libraries' right to lend their collections, emphasizing the technological difference between print and digital books, while ignoring that CDL makes this practice all but identical from a practical perspective.

## II. Because CDL's purpose and character is to effectuate digital library lending without any cognizable copyright harms, it should be deemed a fair use.

### A. The purpose of CDL is to enable libraries to carry out the traditional activities of lending in the digital age.

Historically, libraries have adapted to new formats by shifting their collections and policies to meet patron demand. They acquired paperbacks, books-on-tape, and home video collections, making them all available to patrons, often over the objections of copyright holders. More recently, many libraries began digitizing their collections to enable collection-wide searching and other forms of research. *See Authors Guild, Inc. v. Google Inc.*, 721 F.3d 132 (2d Cir. 2013); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014).

Today, we are in the midst of another shift, as patrons increasingly benefit from digital access to their local libraries' collections. The CDL model allows libraries to lend digitized versions of lawfully acquired print copies already in their collections. Those loans are made available under a strict one-to-one ratio of physical copies owned to copies available for loan. CDL thus helps libraries continue their centuries-old noncommercial lending programs in a manner that meets the needs of today's patrons and is fully consistent with copyright law's common law exhaustion and First Sale doctrines, as well as its twin objectives of broad public access and sustainable creative incentives. Such purposes weigh heavily in favor of fair use.

CDL is also similar to the digitization methods that the Second Circuit approved of in *HathiTrust*, where the Court acknowledged that "expand[ing] access to the print-disabled" was a valid purpose under Factor One. *HathiTrust*, 755 F.3d at 102. The Court based its conclusion on Congressional intent for copyright law to accommodate the disabled, as evidenced in the

9

legislative history of the 1976 Copyright Act, the Americans with Disabilities Act, and the Chafee Amendment. *Id.* Similarly, as established above, Congress has declared its intent for copyright law to protect the ability of libraries to lend books within their collections "under any conditions [they] choose[] to impose." H.R. Rep. No. 94-1476, at 79 (1976).

Moreover, the use of technology to improve the efficiency of otherwise lawful uses also favors fair use. As the Second Circuit recently explained, a use may also be transformative where it "'utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder' because the improved delivery was to one entitled to receive the content." *Redigi*, 910 F.3d at 661 (quoting *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018) (internal citation omitted)).

CDL does precisely that. It allows libraries to improve the efficiency of delivering books to patrons by harnessing new digitization and distribution technologies. Those deliveries are only available to those "entitled to receive the content," namely library patrons. *Id.* And by limiting the number of copies available for lending to the number of lawfully acquired physical copies the library owns, CDL ensures that libraries stay within their rights as copy owners and do not encroach unreasonably on the commercial entitlements of publishers. *Id.* at 659 (noting that copyright law would allow for reasonable reproductions to enable copy owners' "cost-effective[]" transfer of digital music files under the First Sale doctrine).

### B. Because CDL implements copy owners' long-standing right to lend, it does not harm any cognizable copyright market.

Copyright law's long embrace of common law exhaustion and statutory First Sale also supports a finding that the fourth fair use factor weighs in favor of CDL. The fourth factor

10

considers the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Here, there is good reason to believe that library lending boosts both reading and book sales, undercutting any claim of market harm. Andrew Albanese, *Survey Says Library Users Are Your Best Customers*, Publishers Weekly, Oct. 28, 2011 (noting that library patrons are more likely than non-library users to purchase books, including e-books).

Even if library lending did reduce sales for new physical or electronic books, that harm would not be cognizable as a matter of copyright law. Resale, lending, and other secondary markets for lawfully made or acquired copies have been repeatedly protected by the courts and Congress despite any negative impact they may have on the sale or licensing of copyrighted works. Any harms—speculative or actual—that flow from libraries' lending are the same harms that exhaustion and the First Sale doctrine have imposed for over a century. *Kirtsaeng*, 568 U.S. at 552 (holding that copyright law does not guarantee publishers the right to maximize profits, especially from secondary markets protected by the First Sale doctrine); *Bobbs-Merrill*, 210 U.S. at 350 (same). Market harm that may result from library lending is simply one of the many forms of market harm that are not properly included in the fourth factor analysis. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591–92 (1994) ("We do not, of course, suggest that a parody may not harm the market at all, but when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act."); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614–15 (2d Cir. 2006) (holding that use of a work within a transformative market does not cause a copyright holder to suffer cognizable market harm and that copyright owners cannot prevent others from entering "fair use" markets and "may not preempt exploitation of transformative markets").

In the context of secondary uses, including library lending, intellectual property law also

guards against double recovery. *See* Samuel F. Ernst, *Why Patent Exhaustion Should Liberate Products (Not Just People)*, 93 Denv. U. L. Rev. 899 (2016). Once a patentee or copyright holder sells a copy, they lose the right to control its downstream use. Any apparent market harm they suffer is offset by that initial sale. That underlying logic animates the First Sale doctrine. And in a case considering the ongoing viability of library lending in the digital environment, it ought to inform this court's understanding of the scope of cognizable market harm. Because every book within the library was lawfully acquired, the copyright owners were already paid what they were owed. Any subsequent reading by a patron or the public was never promised to them as a sale.

CDL merely replicates the market dynamics that analog first sale and library lending have supported for centuries. Requiring that every digital loan be tied to a physical book within the library's collection maintains the quid pro quo that the publisher be paid once—but only once—in return for public access to each copy purchased. The digital lending of books already within libraries' collections does not alter the fundamentally symbiotic dynamic between libraries and publishers.

## CONCLUSION

As libraries increasingly shift toward digital lending, plaintiffs see this as an opportunity to seize control of this longstanding practice and extract additional fees from libraries seeking to do what libraries have always done—lend the titles in their collections to their patrons in convenient and useful formats. Allowing copyright holders to gain control over digital lending by outlawing CDL would pose an existential threat to the role libraries have historically exercised and to the common law and statutory doctrines and policies that have supported them

for over a century. We therefore urge the Court to conclude that library CDL constitutes a fair use.

                                                Respectfully submitted,

Dated: July 14, 2022                     /s/ Jason Schultz
                                                Jason M. Schultz
                                                *Counsel for Amici Curiae*
                                                NYU Technology Law & Policy Clinic
                                                NYU School of Law
                                                245 Sullivan St. #609
                                                New York, NY 10012
                                                (212) 992-7365
                                                jason.schultz@exchange.law.nyu.edu

# APPENDIX[2]

Derek E. Bambauer
Professor of Law
College of Law, University of Arizona

Irene Calboli
Professor of Law
Texas A&M University School of Law

Bryan Choi
Assistant Professor of Law
Ohio State University
Moritz College of Law & Department of Computer Science and Engineering

Julie E. Cohen
Mark Claster Mamolen Professor of Law and Technology
Georgetown Law

Ariel Katz
Associate Professor
Faculty of Law, University of Toronto

Raymond Ku
Professor of Law & Laura B. Chisolm Distinguished Research Scholar
Case Western Reserve University School of Law

Sarah Lamdan
Professor of Law
City University of New York School of Law

Stacey Lantagne
Professor of Law
Western New England University School of Law

---

[2] Organizational affiliations are included for identification purposes only.

Joseph Scott Miller
Ernest P. Rogers Chair of Intellectual Property & Unfair Competition Law
University of Georgia Law School

Deirdre K. Mulligan
Professor & Co-Director, Algorithmic Fairness & Opacity Group
University of California, Berkeley School of Information

Aaron Perzanowski
Thomas W. Lacchia Professor of Law
University of Michigan

Jason Schultz
Professor of Clinical Law
New York University School of Law

Jessica Silbey
Professor of Law & Yanakakis Faculty Research Scholar
Boston University School of Law

Kevin L. Smith
Dean of Libraries, University of Kansas
Director, University Press of Kansas

Jennifer Sturiale
Visiting Assistant Professor
Delaware Law School, Widener University

Sunita Tripathy
PhD researcher, Law Department
European University Institute, Italy

Samuel Trosow
Associate Professor
University of Western Ontario
Faculty of Law & Faculty of Information and Media Studies