**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive,<br><br>    Defendants. | Case No. 1:20-cv-04160-JGK |

**BRIEF OF *AMICI CURIAE***
**PROFESSORS AND SCHOLARS OF COPYRIGHT LAW**
**IN SUPPORT OF PLAINTIFFS AND IN OPPOSITION TO INTERNET ARCHIVE**

Jacqueline C. Charlesworth
Charlesworth Law
15671 Royal Ridge Road
Sherman Oaks, CA  91403
917.432.7343
jacqueline@charlesworthlaw.com

*Attorneys for Amici Curiae*
*Copyright Law Professors and Scholars*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF AMICI CURIAE ................................................................................1

SUMMARY OF ARGUMENT .....................................................................................1

ARGUMENT ..................................................................................................................5

I.    There Is No Exemption for CDL Activities Under the Copyright Act or Judicial Precedent ............................................................................................5

    A.  There Is No Authority to Support IA's Claim of Fair Use .....................5

        1.  Fair Use Is Negated by the Second Circuit's *Google Books* and *HathiTrust* Decisions .............................................................5

        2.  Courts Have Repeatedly Rejected Unauthorized "Format Shifting" of Copyrighted Works as Fair Use.......................................6

    B.  *ReDigi* Confirms There Is No "Digital First Sale" Right ......................7

    C.  The Exceptions for Libraries in Section 108 Do Not Begin to Approach the Conduct at Issue Here ........................................................9

II.   IA and Its Collaborators Are Not Entitled To Declare Their Own Exception to Copyright Law ..............................................................................10

    A.  Congress Has Reviewed These Issues and Chosen Not To Act ...........12

    B.  Only Congress Can Amend the Copyright Act......................................14

        1.  IA and Its Supporters Do Not Speak for Anyone But Themselves ................14

        2.  It Is up to Congress to Decide Copyright Policy ............................15

CONCLUSION.............................................................................................................16

APPENDIX

CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

## Cases

*Authors Guild, Inc. v. Google, Inc.*,
    804 F.3d 202 (2d Cir. 2015) .................................................... 5, 6

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014) ...................................................... 5

*Capitol Records, Inc. v. ReDigi Inc.*,
    910 F.3d 649 (2d Cir. 2018) ............................................ 7, 8, 9, 16

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) .................................................... 7

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) ........................................... 6, 7

## Constitution and Statutes

U.S. Const. art. I, § 8, cl. 8 ...................................................... 4

17 U.S.C. § 106 .................................................................... 8

17 U.S.C. § 107 .................................................................... 3

17 U.S.C. § 108 .......................................................... 9, 10, 13, 14

17 U.S.C. § 109 ....................................................... 3, 8, 9, 11, 13

17 U.S.C. § 202 .................................................................... 8

17 U.S.C. § 504 ................................................................... 11

Copyright Alternative in Small-Claims Enforcement Act (CASE Act),
    Pub. L. No. 116-260 (2020) ................................................ 12-13

Orrin G. Hatch-Bob Goodlatte Music Modernization Act,
    Pub. L. No. 115-264 (2018) ................................................ 12-13

## Legislative Materials

H.R. Rep. No. 14-1976 (1976) ...................................................... 8

*A Case Study for Consensus Building: The Copyright Principles Project: Hearing Before the
    Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary
    H.R.*, 113th Cong. (2013) ....................................................... 12

*First Sale Under Title 17: Hearing Before the Subcomm. on Courts,
    Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.*,
    113th Cong. (2014) ............................................................. 12

*Preservation and Reuse of Copyrighted Works: Hearing Before the Subcomm. on Courts,*
  *Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,*
  113th Cong. (2014) .................................................................................................. 12

*The Scope of Fair Use: Hearing Before the Subcomm. on Courts,*
  *Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,*
  113th Cong. (2014) .................................................................................................. 12

### Other Authorities

Lila Bailey et al., *Position Statement on Controlled Digital Lending by Libraries,*
  https://controlleddigitallending.org/statement (last visited July 30, 2022) ............................. 2

Chris Freeland, *Maximizing institutional investment in print resources through controlled digital*
  *lending Or, You Don't Have to Buy it Again!,* https://www.crl.edu/sites/default/files/event_
  materials/ 7_Freeland_Internet%20Archive.pdf (last visited July 30, 2022) ................... 14-15

David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending*
  *of Library Books* (2018), https://controlleddigitallending.org/whitepaper ............. 2, 3, 10, 11

House Judiciary Committee, *Copyright,* https://judiciary.house.gov/issues/copyright/
  (last visited July 30, 2022) ....................................................................................... 12

House Judiciary Committee, *US Copyright Law Review,*
  https://republicans-judiciary.house.gov/us-copyright-law-review/
  (last visited July 30, 2022) ....................................................................................... 12

David Newhoff, *Publishers' Suit Against Internet Archive Is Pro-Author, Not Anti-Library*
  (July 11, 2022), https://illusionofmore.com/publishers-suit-against-internet-archive-is-pro-
  author-not-anti-library/ ............................................................................................. 4

*Sign the Position Statement,* https://controlleddigitallending.org/sign
  (last visited July 30, 2022) ....................................................................................... 11

*Signatories to the Position Statement on Controlled Digital Lending by Libraries,*
  https://controlleddigitallending.org/signatories (last visited July 30, 2022) ......................... 11

U.S. Copyright Office, *DMCA Section 104 Report* xviii (2001),
  https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf .......................... 13

U.S. Copyright Office, *Notice of Inquiry,*
  81 Fed. Reg. 36594 (June 7, 2016) ............................................................................ 14

U.S. Copyright Office, *Section 108 of Title 17* (Sept. 2017),
  https://www.copyright.gov/policy/section108/discussion-document.pdf ............................. 14

U.S. Department of Commerce Internet Policy Task Force,
   *White Paper on Remixes, First Sale, and Statutory Damages* (Jan. 2016),
   https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf ................... 13

Michelle M. Wu, *The Case for a Unified International Digital Library* (Apr. 13, 2022),
   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4149920 ............................................. 2

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are the professors and scholars of copyright law identified in the Appendix (collectively, "Copyright Professors").  Copyright Professors study and teach copyright and related areas of law at academic institutions across the United States.  They have no stake in the outcome of this case other than their interest in ensuring that copyright law is interpreted and develops in a manner consistent with its constitutional and statutory foundations so that creativity, dissemination of works, and innovation will continue to flourish.[1]

## SUMMARY OF ARGUMENT

The Internet Archive ("IA") presents itself as an altruistic enterprise, though it is part of a portfolio of business interests operated by millionaire businessman Brewster Kahle.  It operates websites through which it digitally distributes unauthorized copies of copyright-protected books for free.  The IA websites mimic and are designed to compete with legitimate ebook services that compensate publishers and authors:



---

[1] Plaintiffs have consented to the filing of this brief, and the Internet Archive has stated it does not object to the filing of an *amicus* brief on behalf of law professors in support of Plaintiffs in this action.  Neither the parties nor their counsel authored this brief in whole or in part, or contributed money intended to fund the preparation or submission of this brief.

Pls. Opening Br. (ECF 99) at 11 (comparing IA's Open Library site to OverDrive, a licensed ebook service).[2]

IA and *amici* who support IA ("IA *amici"*)—many of whom are affiliated with the libraries of richly endowed universities and/or have ties to IA itself—object to the fact that the Copyright Act and judicial decisions do not allow mass reproduction and digital distribution of works for general use without a license from the rightsholder.  They also object to paying licensing fees to book publishers and authors for the right to distribute digital copies of physical books.  To overcome the limitations of copyright, IA and IA *amici* Michelle Wu, Kyle Courtney, David Hansen and Jason Schultz—and others in the library community—devised a theory called "controlled digital lending" or "CDL."  They advanced this theory because they recognized that no existing exception to copyright allows for IA's unauthorized activities or the even more expansive global agenda they advocate.[3]

To further their objectives, IA and its collaborators generated and publicized a position statement and white paper outlining CDL and encouraging others in the library community to sign on.  *See* Lila Bailey et al., *Position Statement on Controlled Digital Lending by Libraries*, https://controlleddigitallending.org/statement (last visited July 30, 2022) ("Position Statement"); David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library Books* (2018), https://controlleddigitallending.org/whitepaper ("White Paper").  These documents drew on an earlier work by IA *amicus* Michelle Wu, who had been serving as IA's

---

[2] In order to digitally distribute books to users, IA scans physical copies of the books and stores the digital files in a database.  Additional digital copies beyond the original scanned copy are made to deliver and reproduce the books on consumer devices.  *See* Pls. Opening Br. (ECF 99) at 18.

[3] For more on the CDL global agenda, *see* Michelle M. Wu, *The Case for a Unified International Digital Library* (Apr. 13, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4149920.

counsel.  *See* White Paper at 2 & n.4; *see also* Pls. Opp'n to Requests of Michelle Wu et al. to Appear as Amici Curiae (July 15, 2022) (ECF 138) at 4.

Although CDL is presented by IA and IA *amici* as an established library practice, it is in fact a concept that IA invented as a shield for itself and its library collaborators.  CDL is neither permitted by the Copyright Act nor supported by legal precedent.  There is no authority to support the notion that systematic copying of books for digital distribution to the public as a substitute for licensed ebooks constitutes a fair use under section 107.  Indeed, there is significant precedent *against* any such concept.  Further, the first sale (or "exhaustion") doctrine codified in section 109—addressed to the transfer of traditional physical copies—does not extend to digital distribution, which necessarily involves the making of new copies.  This, too, is confirmed by decisive judicial precedent.

As it is clear that neither section 107 nor section 109 provides a basis for CDL, its proponents fall back on an argument that when fair use and first sale are combined, the rules of copyright are somehow reversed to permit the activities in question.  As IA explains this alchemy: "Because Section 109 does not address the reproduction right implicated by digital lending," the fair use doctrine of section 107 "steps in" to "avoid applications of copyright law that would elevate form over substance."  IA's Opening Br. (ECF 106) at 20.  According to the IA, two copyright "wrongs" can make a right.

As scholars and teachers of copyright, Copyright Professors are concerned with IA and IA *amici*'s attempt to manufacture a wide-ranging exception to the protections of the Copyright Act for their own special benefit.  Such conduct by private actors is inconsistent with the fair and balanced development of copyright law.  In this case, the supposed exemption is all the more concerning because it is based on the fact—or perhaps more precisely, is *because* of the fact—

that the activities it seeks to legitimize are infringing under the Copyright Act, as confirmed by ample judicial precedent.

The unauthorized reproduction and digital distribution of copyrighted works by IA and others disrupts a significant, well-developed publishing market for ebooks and diminishes compensation to rightsholders and authors.  A broad exception to copyright protection with these consequences is not something that can or should be enacted through a self-defined policy of the parties who stand to benefit.

IA and its collaborators fail to appreciate that the impact of substituting unauthorized alternatives for licensed ebooks will affect publishers' ability to invest in and distribute new works of authorship, a key concern of copyright law.  They are similarly unconcerned about the plight of authors, who lose royalty income under the CDL paradigm; under CDL, authors are expected to subsidize the IA and participating libraries—including libraries of some of the wealthiest universities in the world.  Yet another unexamined concern is the sheer breadth of an exception that would seemingly allow any website to call itself a "library" and distribute unauthorized copies of books for free, as IA is doing here.[4]  These matters are simply ignored or dismissed by IA and IA *amici*, who are concerned with their preferred interests alone.

IA and its supporters in the library community are not the arbiters of copyright law. Under the Constitution, the rights and limitations of copyright are established by Congress.  U.S. Const. art. I, § 8, cl. 8.  It is up to Congress to review and consider potential changes to the Copyright Act.  Unlike private actors, Congress has the ability to consult with and weigh the

---

[4] As commentators have observed, IA's websites are akin to typical pirate sites.  *See, e.g.*, David Newhoff, *Publishers' Suit Against Internet Archive Is Pro-Author, Not Anti-Library* (July 11, 2022), https://illusionofmore.com/publishers-suit-against-internet-archive-is-pro-author-not-anti-library/ ("The allegations about IA imply an operation that is barely distinguishable from other mass-piracy enterprises ….").

interests of *all* affected stakeholders, and consider how best to achieve the constitutional goal of promoting progress through the protections of copyright.

IA and its collaborators are asking this Court to legislate a wide-ranging exemption from copyright protection that is in conflict with the Copyright Act and authoritative judicial precedent.  This Court should decline the invitation.

**ARGUMENT**

**I.     There Is No Exemption for CDL Activities Under the Copyright Act or Judicial Precedent**

Neither the Copyright Act nor judicial precedent sanctions unlicensed systematic copying and digital distribution of in-copyright books for public consumption.  Such conduct falls outside of any plausible interpretation of fair use and is not encompassed by the "first sale" doctrine, which applies only to the sale or lending of physical copies of books.  Nor is there any authority to suggest that fair use can be bootstrapped to enlarge the first sale privilege beyond its statutory limits or in a manner that defies express judicial precedent confirming those limits.

**A.  There Is No Authority to Support IA's Claim of Fair Use**

**1.  Fair Use Is Negated by the Second Circuit's *Google Books* and *HathiTrust* Decisions**

The flaws in IA's fair use argument are explored at length in Plaintiffs' opening brief. *See* Pls. Opening Br. (ECF 99) at 19-42.  Copyright Professors do not repeat that discussion here. What is worth emphasizing, however, is that the two fair use cases that come closest to addressing IA's core conduct here—mass copying of copyright-protected books—*Authors Guild, Inc. v. Google, Inc.,* 804 F.3d 202 (2d Cir. 2015) ("*Google Books*") and *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ("*HathiTrust*"), both decided by the Second Circuit— negate IA's claims.  In each of these cases, the defendant scanned complete copies of books to

permit full-text searching by the public, deemed by the court to be a transformative use. But in neither case did the defendant make complete works available to or distribute them to the general public as substitutions for the originals.

As the Second Circuit explained in *Google Books*:

In *HathiTrust*, notwithstanding the defendant's full-text copying, the search function revealed virtually nothing of the text of the originals to the public. Here [in *Google Books*], through the snippet view, more is revealed to searchers than in *HathiTrust.*

Without a doubt, enabling searchers to see portions of the copied texts could have determinative effect on the fair use analysis. The larger the quantity of the copyrighted text the searcher can see and the more control the searcher can exercise over what part of the text she sees, the greater the likelihood that those revelations could serve her as an effective, free substitute for the purchase of the plaintiff's book….

Google has constructed the snippet feature in a manner that substantially protects against its serving as an effectively competing substitute for Plaintiffs' books….

804 F. 3d at 222. While the copying in both cases was determined to be a fair use for the transformative purpose of full-text searching, the linchpin of the Second Circuit's rationale was that *the works were not made available to the general public as a substitute for a purchased copy*. As the *Google Books* opinion summed it up: "If Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong." *Id.* at 225.

### 2. Courts Have Repeatedly Rejected Unauthorized "Format Shifting" of Copyrighted Works as Fair Use

The argument that converting physical copies into digital formats so they can be enjoyed in a different medium should be considered fair use is not at all new, and it has been repeatedly rejected by courts. In *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000) ("*MP3.com*"), for example, an early online music service purchased tens of thousands of

CDs and converted them to MP3 files. *Id.* at 350. The MP3.com service allowed users to listen to the digitized albums if they could "prove" that they already owned a copy of the CD by inserting it into a connected CD-ROM drive, or buying it from MP3.com. Although both the service and user owned physical copies of the CD, the court held that the copying was not transformative and not a fair use, ruling that "defendant's activities on their face invade plaintiffs' statutory right to license their copyrighted sound recordings to others for reproduction." *Id.* at 352.

More recently, in *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), the Ninth Circuit rejected an analogous claim by a service that "ripped" Blu-Ray and DVD discs to create a library of films in which objectionable content had been tagged. *Id.* at 853. Users of the VidAngel service who purchased a Blu-Ray or DVD copy of a film (which was retained by the service and could later be sold back) were then able to stream a sanitized version of that film. *Id.* at 853-54. Despite the fact that the service maintained physical copies of the films it was streaming, the Ninth Circuit strongly disagreed with the service's argument that its "space shifting" of films from physical to digital formats constituted fair use, explaining that courts have "unanimously rejected" such claims. *Id.* at 862-63 (citing *MP3.com* and other authorities).

Significantly, the defendants in these predecessor cases involving other types of copyrighted works relied on the same logic as IA and its *amici*—that mere possession of a physical copy transforms unauthorized copying to a digital format into a fair use. It does not.

**B. *ReDigi* Confirms There Is No "Digital First Sale" Right**

*Capitol Records, Inc. v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018) ("*ReDigi*")—all but ignored by IA and its supporters—belies IA's attempt to cobble together a CDL exception from

7

fair use, a defense to infringement, and the first sale doctrine, a limiting principle that applies only to physical goods. *ReDigi* makes clear that section 109 is inapplicable to the making of new copies (as IA must do to populate and operate its websites). Crucially, it also illustrates that the fair use defense does not "step in" to exonerate conduct outside the boundaries of section 109.

Section 109 of the Copyright Act, which codifies the common law first sale doctrine, allows the owner of a particular copy of the work that has been lawfully made "to sell or otherwise dispose of the possession of that copy" without permission of the copyright owner. 17 U.S.C. § 109(a). Section 109 references only section 106(3)—the distribution right—and does not permit the making of new copies, either physical or digital. Nor does it permit the distribution of unauthorized copies. *See id.* ("Notwithstanding the provisions of section 106(3), the owner of a particular copy … lawfully made under this title … is entitled ... to sell or otherwise dispose of the possession of that copy …..").  Section 202 of the Copyright Act further confirms that a "[t]ransfer of ownership of any material object … does not of itself convey any rights in the copyrighted work embodied in the object." 17 U.S.C. § 202.[5]

In *ReDigi*, defendants operated a service purporting to permit the resale of digital music files. When a music file was uploaded for "resale" through the ReDigi service, the service deleted the original file from the seller's hard drive and, upon purchase, made a new copy of the file for the purchaser. 910 F.3d at 652-54. The Second Circuit flatly rejected defendants' argument that their conduct was permissible under the first sale doctrine, holding that ReDigi's

---

[5] Relying on selective citation of the legislative history of section 109 as part of the 1976 Copyright Act, IA and its supporters claim that a library that acquires a physical book is entitled to lend that copy "under any conditions it chooses to impose." H.R. Rep. No. 14-1976, at 79 (1976); *see, e.g.*, 17 Copyright Scholars Br. at 2, 6, 8, 10 (referencing same congressional commentary four times). But this language clearly refers to *physical* copies of books. Indeed, the same passage goes on to clarify that "[u]nder section 202 [of the Act] however, the owner of the physical copy or phonorecord cannot reproduce or perform the copyrighted work publicly without the copyright owner's consent." *Id.*

system resulted in the making of one or more "[u]nauthorized reproduction[s] … not protected by 109(a)," thereby violating the record labels' exclusive rights under the Copyright Act. *Id.* at 659. The court went on to reject defendants' alternative argument that their activities were protected by fair use, as ReDigi's service invaded and undermined the plaintiffs' market. *See id.* at 662-63 (the fourth factor "weighs powerfully against fair use"). The Second Circuit's commentary on ReDigi's efforts to expand the first sale doctrine beyond its limits is especially pertinent to the case before this Court:

> [A]s to the argument that we should read § 109(a) to accommodate digital resales because the first sale doctrine protects a fundamental entitlement, without regard to the terms of § 109(a) … *we think such a ruling would exceed the proper exercise of the court's authority*."

*Id.* at 664 (emphasis added).

The critical holding in *ReDigi* is relegated to a brief footnote in IA's opening brief and the case is mentioned only once in the many *amicus* briefs supporting IA. *See* IA's Opening Br. (ECF 106) at 20 n.3; 17 Copyright Scholars Br. (ECF 129-1) at 3 (misconstruing *ReDigi* decision). It is remarkable that the proponents of CDL barely acknowledge this critical opinion of the Second Circuit in their submissions to this Court—and perhaps even more remarkable that they did not take it into consideration in continuing to promote CDL after the case was decided in 2018.

### C. The Exceptions for Libraries in Section 108 Do Not Begin to Approach the Conduct at Issue Here

Notably, the Copyright Act contains an entire section devoted to exceptions for reproduction and distribution for libraries and archives: section 108. Section 108 is not even mentioned in IA's opening brief and is not meaningfully addressed in any of the briefs of IA's

*amici* supporters.  *See, e.g.*, IA Opening Br. (ECF 106) at iv (table of authorities).  Presumably

this is because none of its provisions comes close to authorizing the conduct at issue here.

Section 108 is focused on customary library activities such as preservation, interlibrary

loans, and research activities involving particular works.  *See generally* 17 U.S.C. § 108.

Although section 108 does not preempt an independent fair use justification for library activities,

17 U.S.C. § 108(f)(4), it is noteworthy that there is no suggestion that a library can engage in

systematic reproduction or distribution (physical or electronic) of copyrighted works in

competition with the copyright owner.  To the contrary, the exemptions set forth in section 108

are aimed at "isolated and unrelated reproduction or distribution" of particular works and do not

immunize the "concerted reproduction or distribution of multiple copies ... of the same material."

17 U.S.C. § 108(g).  The activities carried out through CDL are far afield from the carefully

drawn exceptions for libraries enacted by Congress.

## II.    IA and Its Collaborators Are Not Entitled To Declare Their Own Exception to Copyright Law

There is no question that IA, whose counsel participated in framing the Position

Statement on CDL that the White Paper supports, was well aware of the lack of authority to

support CDL at the time those documents were created in 2018.  *See* White Paper at 1; Position

Statement (listing co-authors of statement, including Lila Bailey, policy counsel to the IA).[6]

The White Paper in fact notes significant concerns with the contention that CDL is a fair use.

*See, e.g.*, White Paper at 19 (noting that CDL "is not clearly transformative," an important factor

to establish fair use), 33 ("[T]here are no fair use cases that square precisely with this use

---

[6] The authors of the Position Statement are: Lila Bailey, IA; Kyle K. Courtney, Harvard University
Library; David Hansen, Duke University; Mary Minow, Harvard University; Jason Schultz, NYU Law;
and Michelle Wu (no affiliation listed).  *See* Position Statement.

scenario ….”), 42 (“There are no cases directly on point, and some contrary authority ….”).  The White Paper further acknowledges that judicial opinions on the critical issue of “digital first sale” do not support the application of the first sale doctrine in the digital context.  *See, e.g.*, *id.* at 15 (decisions on existence of a digital first sale right are “primarily negative”), *id.* & n.68 (discussing district court’s rejection of section 109 defense in *ReDigi* case).  The White Paper explains that libraries considering CDL will “encounter risk” and could face lawsuits, as there are “no cases directly on point, and some contrary authority.”  *Id.* at 32-35, 42.[7]

Evidently believing there is strength in numbers, IA and its supporters—sophisticated actors with the benefit of counsel—nonetheless elected to adopt and promote the CDL model in the face of multiple judicial decisions that clearly establish that the systematic reproduction and digital distribution of copyrighted books in the manner they advocate is not permitted under the Copyright Act.  Under guise of the CDL fig leaf, IA has copied millions of in-copyright books and made them freely available to the public as a substitute for licensed ebooks.  Pls. Opening Br. (ECF 99) at 1.  And it has not stopped there.  IA and its collaborators have urged adoption of CDL by other institutions, encouraging them to disregard the law as well.  *See Sign the Position Statement,* https://controlleddigitallending.org/sign (last visited July 30, 2022); *Signatories to the Position Statement on Controlled Digital Lending by Libraries*, https://controlleddigitallending.org/signatories (last visited July 30, 2022).  The fact that IA has convinced others to sign on, however, does not make its conduct any more lawful.

---

[7] To encourage participation despite the legal risk, the White Paper suggests that should a library be sued, it might avoid damages by asserting state sovereign immunity, or seek a remittitur of statutory damages pursuant to 17 U.S.C. § 504(c)(2).  *Id.* at 34-35.  On this point, Copyright Professors observe that with respect to libraries, section 504(c)(2) refers only to *reproduction* of a work—not distribution, public display or other exploitations implicated by CDL—and applies only where the library had “reasonable grounds” to believe the reproduction was fair use.  *See* 17 U.S.C. § 504(c)(2).  It is difficult to see how CDL participants could take much comfort from this provision.

11

**A.  Congress Has Reviewed These Issues and Chosen Not To Act**

In recent years, as in the past, Congress has kept a careful eye on evolving digital technologies and their impact on copyright owners and users, including the library community. From 2013 to 2015, the House Judiciary Committee conducted a comprehensive review of the Copyright Act to determine whether there were areas of the law that should be updated, including existing exceptions for fair use and libraries, as well as the first sale doctrine.  *See* House Judiciary Committee, *US Copyright Law Review*, https://republicans-judiciary. house.gov/us-copyright-law-review/ (last visited July 30, 2022) (listing hearings, including "The Scope of Fair Use," "Preservation and Reuse of Copyrighted Works," and "First Sale Under Title 17").  The 20 hearings included 100 witnesses representing a wide range of stakeholders, including representatives from the library, publisher, author and user communities.  *See* House Judiciary Committee, *Copyright*, https://judiciary.house.gov/issues/copyright/ (last visited July 30, 2022).[8]  Notably, among the witnesses was John Ossenmacher, founder and CEO of ReDigi, who testified on the ReDigi business model.  *First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. 19-38 (2014).  After concluding this extensive review of copyright law, Congress determined that reforms were needed in some areas and declined to take action in others.[9]

---

[8]  *See generally A Case Study for Consensus Building: The Copyright Principles Project: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2013); *The Scope of Fair Use: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2014); *Preservation and Reuse of Copyrighted Works: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2014); *First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. 19-20 (2014).  Witnesses from the library community included Laura N. Gasaway of the University of North Carolina School of Law; Gregory Lukow of the Library of Congress; James G. Neal of Columbia University; and Greg Cram of the New York Public Library.
[9] For example, Congress saw a need to overhaul the music licensing provisions of the Copyright Act to create a new, more efficient process for music streaming services.  In 2018 it enacted the Orrin G. Hatch-

Significantly, Congress chose not to alter existing provisions on fair use, first sale, or library exceptions.

Congress has also solicited and received input from the Copyright Office on potential changes to the law, including whether the first sale right of section 109 should be extended to the digital realm.  In 2001, at Congress's request, the Copyright Office reviewed the question of digital first sale—which, the Office presciently observed, "entails an exercise of [the] exclusive right [of reproduction] that is not covered by section 109."  U.S. Copyright Office, *DMCA Section 104 Report* xviii (2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf.  After considering comments and testimony from a range of stakeholders, including libraries, the Office recommended against amending the Copyright Act to create such a right.  *Id.* at xx.  The Office explained that unlike physical copies, digital reproductions do not degrade and can be instantly disseminated—and "adversely effect[*sic*] the market for the original to a much greater degree than transfers of physical copies."  *Id.* at xix.  Fifteen years later, in 2016, after weighing comments and testimony from the library community (including Kyle Courtney), book publishers, and others, the U.S. Department of Commerce came to a similar conclusion, recommending against adoption of a digital first sale right.  *See* U.S. Department of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* 61, 104 (Jan. 2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf.

Section 108, too, has been the subject of study by the Copyright Office and reports to Congress.  In 2016, the Office published a notice of inquiry regarding potential updates to the library exceptions, noting that the Office had led and participated in major discussions on

---

Bob Goodlatte Music Modernization Act ("MMA").  Pub. L. No. 115-264 (2018).  Congress also focused attention on small copyright infringement claims, ultimately resulting in passage of the Copyright Alternative in Small-Claims Enforcement Act ("CASE Act") in 2020.  Pub. L. No. 116-260 (2020).

potential changes to section 108 since 2005.  U.S. Copyright Office, *Notice of Inquiry*, 81 Fed.

Reg. 36594, 36594 (June 7, 2016).  In 2017, the Office issued a followup discussion document,

*Section 108 of Title 17*, laying out recommended updates, including the ability to make digital

copies of individual works on request of users under certain conditions.  U.S. Copyright Office,

*Section 108 of Title 17*, at 1-4 (Sept. 2017), https://www.copyright.gov/policy/section108/

discussion-document.pdf.  Contrary to what one might expect, the discussion document

explained that "many members of the library and archives communities" were resistant to

updating section 108.  *Id.* at 1.  It may be for this reason Congress has declined to act in this area

for the present.

### B.  Only Congress Can Amend the Copyright Act

CDL is not a fair use or an implementation of legitimate first sale rights (or any

combination of the two), but a unilateral attempt fundamentally to change copyright law.  This

Court should not indulge IA and IA *amici*'s effort to dispense with the legislative process and

enact a self-declared exception from the requirements of the Copyright Act.

### 1.  IA and Its Supporters Do Not Speak for Anyone But Themselves

The proponents of CDL openly acknowledge that they do not like publishers' licensing

terms and their goal is to avoid paying publishers licensing fees for digital uses.  *See, e.g.*, Wu

Br. (ECF 119-1) at 11 ("Licensing is not a workable alternative to CDL because it is overly

restrictive and disproportionately costly to libraries."); Chris Freeland, *Maximizing institutional*

*investment in print resources through controlled digital lending Or, You Don't Have to Buy it*

*Again!* at 2, https://www.crl.edu/sites/default/files/event_materials/7_Freeland_Internet

%20Archive.pdf (last visited July 30, 2022).  But IA and its supporters are not the only parties with a stake in digital distribution models for books.  The publishers who invest in new works and authors who write them are essential participants in that marketplace.

It is telling that IA and IA *amici* barely mention the fate of authors under the CDL regime.  The interests of those whose works CDL proponents seek to free from copyright are either minimized or dismissed.  IA simply asserts that "CDL does not harm … authors" because, under the CDL paradigm, authors do not deserve to be compensated for the additional copies of their works that are made and distributed.  IA Opening Br. (ECF 106) at 1-2.

The lone IA *amicus* brief that purports to address the interests of authors was submitted by the Authors Alliance, Inc. ("AA").  Significantly, the AA is headed by David Hansen, a co-author of the CDL White Paper; Brewster Kahle, IA's founder, sits on its Advisory Board.  AA Br. (ECF 125-1) at 1 n.1.  Remarkably, the AA takes the position that even though authors will not receive royalties under CDL, this should not be concerning.  *See id.* at 6-7.  The AA brief claims that because some authors have not yet earned out publisher advances, authors as a class are "unlikely to share in the[] spoils" of royalties generated by digital distribution.  It further suggests that those authors who *would* receive royalties may merely "write to be read."  *Id.*  In AA's view of the world, authors should be satisfied to supply their life's work to IA for nothing.

### 2.  It Is up to Congress to Decide Copyright Policy

The wide-ranging exception sought by IA and its library supporters is not a question for the courts, but Congress.  This is especially the case here, where Congress has conducted a recent review of the copyright doctrines at issue and declined to act.

As Judge Leval cogently observed in the *ReDigi* case:

As for whether the economic consequences of adopting ReDigi's program are beneficial and further the objectives of copyright, we take no position.  Courts are poorly equipped to assess the inevitably multifarious economic consequences that would result from such changes of law.  So far as we can see, the establishment of ReDigi's resale marketplace would benefit some … at the expense of others.

If ReDigi and its champions have persuasive arguments in support of the change and law they advocate, it is Congress they should persuade.

*ReDigi*, 910 F.3d at 664.

The same is true here.

## CONCLUSION

For the reasons set forth above, this Court should grant Plaintiffs' motion for summary judgment and deny that of IA.

Dated:  August 5, 2022

<div style="margin-left:40%">

Respectfully submitted,

/s/ Jacqueline C. Charlesworth
Jacqueline C. Charlesworth

Charlesworth Law
15671 Royal Ridge Road
Sherman Oaks, CA  91403
917.432.7343
jacqueline@charlesworthlaw.com

*Attorneys for Amici Curiae*
*Copyright Law Professors and Scholars*

</div>

**APPENDIX**

*Note:  Organizational affiliations are included for identification purposes only.*

Sandra Aistars
Clinical Professor
Director Arts and Entertainment Advocacy Clinic
George Mason University, Antonin Scalia Law School
Sr. Scholar & Fellow, Copyright Research & Policy
Center for Intellectual Property x Innovation Policy

Jonathan M. Barnett
Torrey H. Webb Professor of Law
Gould School of Law
University of Southern California

Jon M. Garon
Professor of Law
Director, Intellectual Property, Cybersecurity, and Technology Law Program
Nova Southeastern University, Shepard Broad College of Law

Joshua Kresh
Managing Director
Center for Intellectual Property x Innovation Policy
George Mason University, Antonin Scalia Law School

Stan Liebowitz
Ashbel Smith Professor
University of Texas at Dallas

Philippa Loengard
Lecturer-in-Law
Executive Director
Kernochan Center for Law, Media and the Arts
Columbia Law School

Adam Mossoff
Professor of Law
George Mason University, Antonin Scalia Law School

Christopher Newman
Associate Professor of Law
George Mason University, Antonin Scalia Law School

Sean O'Connor
Professor of Law
George Mason University, Antonin Scalia Law School
Faculty Director
Center for Intellectual Property x Innovation Policy

Sean Pager
Professor of Law
Michigan State University

Eric Priest
Professor of Law
University of Oregon School of Law

Zvi S. Rosen
Assistant Professor of Law
Southern Illinois University School of Law
2015-2016 Abraham L. Kaminstein Scholar in Residence at the U.S. Copyright Office.

Mark F. Schultz
Professor
Goodyear Tire & Rubber Company Endowed Chair in Intellectual Property Law
Director
Intellectual Property & Technology Law Center
The University of Akron School of Law

## CERTIFICATE OF COMPLIANCE

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,276 words (exclusive of cover page, certificate of compliance, table of contents, and table of authorities) and complies with the requirements of Local Rule 11.1 of the Southern District of New York and Individual Practice Rule II.D of Judge John G. Koeltl.

/s/ Jacqueline C. Charlesworth
Jacqueline C. Charlesworth

Charlesworth Law
15671 Royal Ridge Road Sherman
Oaks, CA  91403 917.432.7343
jacqueline@charlesworthlaw.com

*Attorneys for Amici Curiae*
*Copyright Law Professors and Scholars*