# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC,<br><br>                    Plaintiffs,<br><br>-against-<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive,<br><br>                    Defendants. | Case No. 1:20-CV-04160-JGK |

**BRIEF OF *AMICI CURIAE* INTERNATIONAL PUBLISHERS ASSOCIATION, FEDERATION OF EUROPEAN PUBLISHERS, INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL AND MEDICAL PUBLISHERS, INTERNATIONAL CONFEDERATION OF SOCIETIES OF AUTHORS AND COMPOSERS, INTERNATIONAL FEDERATION OF FILM PRODUCERS ASSOCIATIONS, INTERNATIONAL VIDEO FEDERATION, AND INTERNATIONAL FEDERATION OF THE PHONOGRAPHIC INDUSTRY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**MILLER KORZENIK SOMMERS RAYMAN LLP**
Matthew Leish
The Paramount Building
1501 Broadway, Suite 2015
New York, NY 10036
Phone: 212 752 9200
Email: mleish@mkslex.com

**WIGGIN LLP**
Theodore M. Shapiro (*pro hac vice*)
Mikah Pajaczkowska-Russell
Sinclaire Marber Schäfer
Rue de Namur, 72
Brussels, 1000 Belgium
Phone: +32 (0) 2 892 1104
Email: Ted.Shapiro@wiggin.eu

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* .................................................................................1

SUMMARY OF ARGUMENT ......................................................................................3

ARGUMENT ...............................................................................................................5

    I.    International Copyright and Related Rights Law...........................................6

    II.   U.S. Obligations Under International Copyright and Related Rights Treaties ...........7

    III.   Internet Archive's Activities Breach International Copyright Law ............................8

       A.   Reproduction Right .....................................................................................9

       B.   Derivative Works ......................................................................................10

       C.   Making Available Right .............................................................................10

    IV.   Internet Archive's Conduct Breaches the Three-Step Test.......................................14

       A.   First Criterion: "Certain Special Cases"...................................................16

       B.   Second Criterion: "Conflict with the Normal Exploitation of the Work"................17

       C.   Third Criterion: "Unreasonably Prejudice the Legitimate Interests of Rightholders" 18

    V.   Lending in International Copyright Law....................................................19

CONCLUSION...........................................................................................................21

# TABLE OF AUTHORITIES

## Cases

BGH [Federal Court of Justice] Feb. 25, 1999, I ZR 118/96 (Ger.) ........................................ 16

*Capitol Records, LLC v. ReDigi, Inc.*, 934 F. Supp. 2d 640 (S.D.N.Y 2013) ......................... 12

*Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2d Cir. 1995) ...................................................... 5

Case C-117/15, *Reha Training Gesellschaft für Sport v Gesellschaft für musikalische Aufführung - und mechanische Vervielfältigungsrechte (GEMA) eV*, ECLI:EU:C:2016:379 (May 13, 2016) .......................................................................................................................... 13

Case C-174/15, *Vereniging Openbare Bibliotheken v Stichting Leenrecht*, ECLI:EU:C:2016:856 (Nov. 10, 2016) .......................................................................... 20, 21

Case C-263/18, *Nederlands Uitgeversverbond v Tom Kabinet Internet BV*, ECLI:EU:C:2019:1111 (Dec. 19, 2019) ................................................................ 12, 13, 19

Case C-419/13, *Art & Allposters Int'l BV v Stichting Pictoright*, ECLI:EU:C:2015:27 (Jan. 22, 2015) .............................................................................................................................. 19

Case C-435/12, *ACI Adam BV v Stichting de Thuiskopie*, ECLI:EU:C:2014:254 (Apr. 10, 2014) .................................................................................................................................... 20

Case C-527/15, *Stichting Brein v Wullems*, ECLI:EU:C:2017:300 (Apr. 26, 2017) ......... 16, 20

Cour de Cassation [Cass.] [Supreme Court], 1e civ., Feb. 28 2006, Bull civ. I, No. 126 (Fr.) 16

*Golan v Holder*, 565 U.S. 302 (2012) .......................................................................................... 8

LG Frankfurt [District Court], Feb. 9, 2018, 2-03 O 494/14 (Ger.) ........................................... 5

*Murray v. The Charming Betsey*, 6 U.S. 64 (1804) ..................................................................... 8

OLG Frankfurt [Higher Regional Court], Apr. 30 2019, 11 U 27/18 (Ger.) ............................. 5

*Shazam Prods. v Only Fools The Dining Experience* [2022] EWHC 1379 IPEC (U.K.) ....... 16

*Spanski Enters. Inc. v. Telewizja Polska S.A*, 883 F.3d 904 (D.C. Cir. 2018) ........................ 12

## Statutes

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853 (1988) 6

Copyright Act § 26(1)(c) (Kenya) ............................................................................................... 19

Copyright Act art. 20 (Turk.) ....................................................................................................... 19

Digital Millennium Copyright Act, tit. I, Pub. L. No. 105-304, 112 Stat. 2860, 2861 (1998) . 6, 15

Directive 2001/29/EC of the European Parliament and Council of May 22, 2001 on the Harmonization of Certain Aspects of Copyright and Related Rights in the Information Society, 2001 OJ (L 167) 10 .................................................................................... 11, 12, 13

Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property, 2006 O.J. (L 376) 28 ..................................................................... 20

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ....................... 6

## Treaties

Agreement on Trade-Related Aspects of Intellectual Property Rights Agreement, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 1869 U.N.T.S. 299 ................................................................................................................ 5, 14

Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886 (Paris Text 1971, as amended Sept. 28, 1979), S. Treaty Doc. No. 99-27 .....................................passim

WIPO Copyright Treaty, Dec. 20, 1996, 2186 U.N.T.S. 121 ..........................................passim

WIPO Performances and Phonograms Treaty, Dec. 20, 1996, 2186 U.N.T.S. 203 .........passim

## Other Authorities

Chairman of the Comms. of Experts, *Basic Proposal for the Substantive Provisions of the Treaty on Certain Questions Concerning the Protection of Literary and Artistic Works to Be Considered by the Diplomatic Conference*, in *Records of the Diplomatic Conference on Certain Copyright and Neighboring Rights Questions* (vol. 1, 1999), WIPO Doc. CRNR/DC/4 (Aug. 30, 1996).............................................................................................10

*Copinger and Skone James on Copyright* (18th ed. 2020) .....................................................15

Jane C. Ginsburg, *Letter from the US: Exclusive Rights, Exceptions and Uncertain Compliance with International Norms*, 241 RIDA 163 (2014) ...........................................11

Jim Parker, *The public lending right and what it does*, WIPO Mag., June 2018 ...................20

Jorg Reinbothe & Silke von Lewinski, *The WIPO Treaties on Copyright: A Commentary on the WCT, the WPPT and the BTAP* (2015) ................................................................10, 12

M.R.F. Senftleben, *Copyright, Limitations and the Three-Step Test: An Analysis of the Three-Step Test in International and EC Copyright Law* (2004) .......................................14, 16, 19

Michel Walter & von Lewinski, *European Copyright Law* (2010)........................................16

Mihály Ficsor, *Guide to the Copyright and Related Rights Treaties Administered by WIPO and Glossary of Copyright and Related Rights Terms* (2004)......................................passim

Ficsor, *The Law of Copyright and the Internet* (2002) ............................................................7

Ficsor, *Tom Kabinet: the question of 'online exhaustion' in the shadow of UsedSoft and VOB and in the light of RedDigi and Allposters*, Copyright See-Saw (Mar. 23, 2019) ..............20

Panel Report, United States—Section 110(5) of the U.S. Copyright Act, WTO Doc. WT/DS160/R (June 15, 2000)...............................................................................8, 15, 17, 19

*Proposals for Revising the Substantive Copyright Provisions* in *Records of the Intellectual Property Conference of Stockholm (1967)*, WIPO Doc. S/1 (vol. 1, 1971)........................17

Reg. of Copyrights, *The Making Available Right in the United States* (2016)........................11

## INTERESTS OF *AMICI CURIAE*

The *Amici* are a collection of international and regional trade bodies based outside of the United States ("**U.S.**") representing copyright and related right holders across a broad range of content sectors and from every corner of the globe.[1]

The International Publishers Association ("**IPA**") is the international federation of national, regional, and specialist book publishers' associations representing all aspects of book and journal publishing globally.  IPA actively fights against censorship and promotes copyright, literacy, and freedom of speech on behalf of its member associations and publishers. Established in 1896, its membership comprises 89 organizations from 73 countries[2].  The IPA is based in Geneva, Switzerland and is an accredited observer at the World Intellectual Property Organization ("**WIPO**").

The Federation of European Publishers ("**FEP**") is an independent, non-commercial umbrella association of book publishers' associations in the European Union ("**EU**").  FEP represents 29 national associations of book publishers of the EU and European Economic Area. Founded in 1967, FEP deals with European legislation and advises publishers' associations on copyright and other legislative issues.

The International Association of Scientific, Technical and Medical Publishers ("**STM**") is a non-profit international trade association of more than 140 scholarly, scientific, technical, medical, and professional publishers collectively responsible for more than two-thirds of the

---

[1] Plaintiffs have consented to the filing of this brief; Internet Archive has stated that it does not oppose a motion for leave to file this brief provided that the motion and the proposed brief are filed no later than August 9, 2022. No person or entity other than *Amici* and their counsel have authored this brief in whole or in part or made monetary contributions to its preparation or submission.

[2] Although the Association of American Publishers, Inc. is a member of IPA, it has not participated in the preparation or submission of this brief.

English-language scholarly and professional literature. STM works to support the integrity and quality of the scholarly record on behalf of its members, including through anti-piracy activities and interventions in copyright infringement cases. First organized in 1969, STM is based in The Netherlands and has members in Europe, North America, and Asia. STM is an accredited observer at WIPO.

The International Confederation of Societies of Authors and Composers ("**CISAC**") is a non-profit, non-governmental organization based in Paris, France, and is the world's leading network of authors' societies. With 228 member societies in 119 countries, CISAC represents more than four million creators across the world, spanning a wide array of artistic repertoires, including music, audiovisual, drama, literature, and visual arts. CISAC has, over the years, been a staunch advocate for the rights and interests of creators across the globe, seeking to ensure their intellectual property rights are adequately protected.

The International Federation of Film Producers Associations ("**FIAPF**") is an organization representing the interests of motion picture and television producers worldwide. It consists of 36 member organizations in 29 countries. FIAPF is the only large-scale organization of motion picture and television producers with a global reach, and has extensive experience enforcing intellectual property rights worldwide, particularly in an online context. FIAPF is an accredited observer at WIPO.

The International Video Federation ("**IVF**") represents individual companies and associations representing companies, active in all segments of the film and audiovisual sector in Europe, with a focus on commercial and regulatory matters relevant to the publication of films and audiovisual content on physical carriers as well as via all forms of legal online distribution channels. The IVF is an accredited observer at WIPO.

The International Federation of the Phonographic Industry ("**IFPI**") is the international trade association for the recording industry worldwide. The membership across IFPI and its

National Group network comprises some 8,000 major and independent record companies and affiliate industry associations in over 70 countries.   IFPI demonstrates recorded music's economic value in creating growth, jobs and investment, and its cultural value to society and in people's lives.   It works to make sure that the rights of its members, who create, produce, and invest in music, are properly protected and enforced, and works to help its members license and generate commercial value for music through every available channel across the world. IFPI is an accredited observer at WIPO.

The *Amici* have strong interests in the preservation of an effective level of copyright protection for copyright and related right holders in the U.S. and abroad.   The *Amici* have particular expertise in the practice of international copyright and related rights law and extensive experience with how national and regional copyright laws implemented around the world serve to promote the public interest by incentivizing the creation, financing, production, marketing, and distribution of copyright works.   That experience provides them with a unique international perspective on the issues before the Court.

## SUMMARY OF ARGUMENT

The Court should grant the Plaintiffs' Motion for Summary Judgment for the reasons articulated in their Memorandum.   In this brief, the *Amici* focus on the need to ensure U.S. compliance with its obligations under international copyright and related rights treaties.   These treaties establish certain exclusive rights for rightholders including, *inter alia*, rights of reproduction, distribution, and making available.   The rationale behind the granting of those rights comports fully with the rationale for copyright protection under the U.S. Constitution. These international treaties also establish limits on the permissible scope of limitations and exceptions to those exclusive rights.   As a result of its international treaty obligations, the U.S. has an obligation to ensure that rightholders whose rights are violated by unauthorized uses of

their protected works have an effective means of enforcing such rights.  Any defenses put forward to justify such uses must survive scrutiny under international norms.

Internet Archive ("**IA**")'s purported "lending" of eBooks squarely infringes exclusive rights of the Plaintiffs defined and set out in international copyright law.  The facts relied on by IA in support of a defense of fair use to justify such infringement, including its contrived system of "controlled digital lending", do not meet the minimum standard for protection as defined by international treaties.  U.S. courts are required to apply the defense of fair use in a manner that satisfies the required standards established by international copyright and related rights treaties described *infra*, and any exception that purports to enable IA's copying and making available of protected eBooks worldwide on an immense scale fails to do so.  The international copyright and related rights framework prohibits the U.S. from establishing exceptions to exclusive rights that do not meet those standards.

IA's conduct raises two major concerns for international rightholders:

*First*, the ability to enforce their rights effectively and protect them from being infringed on an unprecedented scale in the U.S.  A decision in favor of IA would severely limit the practical ability of rightholders, such as the *Amici*, to enforce their rights effectively against an Internet platform engaged in unauthorized copying and dissemination of protected works on an industrial scale and thereby threaten to place the U.S. in breach of its international obligations and responsibilities.

*Second*, the potential spillover effect that a decision in favor of IA could have for enforcement of copyright and related rights outside the U.S.  Rightholders have always faced the problem of pursuing counterfeit or infringing copies produced in countries with lax copyright enforcement practices that cross borders and infiltrate markets in other countries.  If U.S. law is now perceived to allow businesses like IA to function without restraint, or as

unreliable and inconsistent with relevant international law, this spillover problem will be global, massive, and potentially irreversible.

## ARGUMENT

The *Amici* do not repeat details on the history of IA and its practices, which are covered by the parties' submissions. The *Amici* do however, draw the Court's attention to the fact that infringing acts undertaken by IA will occur not only in the U.S., but also abroad—anywhere that an eBook is made available—regardless of whether it is accessed. Such acts will be subject to the jurisdiction of courts abroad. *See, e.g.*, LG Frankfurt [District Court], Feb. 9, 2018, 2-03 O 494/14, *aff'd* OLG Frankfurt [Higher Regional Court], Apr. 30 2019, 11 U 27/18 (Ger.) (works in the public domain in the U.S., which were accessible and directed to users in Germany via the U.S. defendant's website, could be infringed in Germany where they still enjoyed copyright; a contrary finding would lead to the making available of works to the public worldwide on the basis of the law of the country where the platform was located).

The U.S. is a party to the four core international treaties on copyright and related rights: the Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886 (Paris Text 1971, as amended Sept. 28, 1979), S. Treaty Doc. No. 99-27 ("**Berne Convention**"), ratified and implemented in 1989; the Agreement on Trade-Related Aspects of Intellectual Property Rights Agreement, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 1869 U.N.T.S. 299 ("**TRIPS**"), ratified and implemented in 1995; and the WIPO Copyright Treaty, Dec. 20, 1996, 2186 U.N.T.S. 121 ("**WCT**") and WIPO Performances and Phonograms Treaty ("**WPPT**"), Dec. 20, 1996, 2186 U.N.T.S. 203, both ratified and implemented in 2002.[3] These treaties impose obligations on the U.S. to provide

---

[3] These treaties and agreements are not self-executing (*see Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 83 (2d Cir. 1995)) and were implemented by the: Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102

rightholders, such as those represented by the *Amici*, with protections for their intellectual property in the U.S. and serve to ensure that U.S. rightholders receive protection in foreign countries party to those accords pursuant to the principle of national treatment.

In particular, the treaties both establish exclusive rights granted to rightholders (*e.g.*, the rights of reproduction, distribution and making available) and provide clear restrictions on the limitations or exceptions that can be imposed upon those rights on the basis of a standard referred to as the "three-step test".  A careful application of the three-step test to the instant matter yields a clear result: the elaboration of an exception that permits IA's activity, which distorts accepted international standards of public lending by holding that it amounts to fair use, would: (1) put the U.S. in direct conflict with its international treaty obligations; (2) be out of line with the application of exceptions regarding public lending in the EU and elsewhere; and (3) set a dangerous global precedent that would compromise the ability of rightholders to manage the digital lending and eBook markets for their content.

## I.  International Copyright and Related Rights Law

The modern system of international copyright and related rights law emerged from a series of nineteenth century bilateral agreements between European countries intended to establish base levels of protection that contracting parties must grant to nationals of other contracting parties (known as the principle of "national treatment").  *See* Mihály Ficsor, *Guide to the Copyright and Related Rights Treaties Administered by WIPO and Glossary of Copyright and Related Rights Terms* 6 (2004) ("**WIPO Guide & Glossary**").  The objective of this system is to ensure minimum standards of protection amongst contracting parties in order to provide the public with the maximum amount of access to creative and other copyright works.

---

Stat. 2853 (1988); Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) (TRIPS); and Digital Millennium Copyright Act, tit. I, Pub. L. No. 105-304, 112 Stat. 2860, 2861 (1998) (WCT and WPPT).

Today, international copyright law is contained in a complex structure of conventions and other treaties that include the four core treaties referenced *supra*. The oldest copyright instrument, the Berne Convention, remains the most fundamental element of this structure. It identifies the core rights and establishes limitations on exceptions to those rights, and all subsequent treaties refer to and uphold its provisions. *See, e.g.*, TRIPS art. 9 (requiring WTO members to comply with the basic provisions of the Berne Convention), art. 2 (setting out a safeguard clause in favor of the Berne Convention); *see also* WCT art. 1(4); WPPT art. 3 (*vis-à-vis* the Rome Convention, citation omitted).

This international regime requires the U.S. and all other signatory countries to provide copyrightable works of authorship (including virtually all the works contained in the books that IA has copied) and other subject-matter with certain exclusive rights, including the right to reproduce the works and to display the works publicly, as well as the right to make those works available to the public. The regime also prohibits the U.S. from creating any exceptions to these exclusive rights, other than (1) in certain special cases that (2) do not conflict with the normal exploitation of works or (3) unreasonably prejudice the legitimate interests of copyright owners. *See* Ficsor, *The Law of Copyright and the Internet* 280–88, 300–03 (2002). This standard for judging the legitimacy of limitations and exceptions, which is a pervasive feature of the entire international copyright system, is referred to as the "three-step test".

## II.    U.S. Obligations Under International Copyright and Related Rights Treaties

The U.S. has traditionally been a leader in the international arena of the protection of copyright and related rights. The U.S. has sought more stringent, rather than less stringent, respect for intellectual property rights, and it has consistently taken the position in its negotiations with its WTO partners that "effectiveness" of a party's enforcement and remedies means enforcement and remedies that "work in practice." As part of its efforts to ensure strong

protection for U.S. copyright and other subject matter abroad, the U.S. has also been the leading champion for national treatment in treaties negotiated at WIPO.

U.S. courts have long accepted that they are bound to interpret and apply laws passed by Congress in a manner that avoids conflicts with international norms, particularly in the case of explicit obligations that the U.S. has accepted further to its negotiation and ratification of copyright and related rights treaties. *Murray v. The Charming Betsey*, 6 U.S. 64 (1804) ("An act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *Golan v Holder*, 565 U.S. 302, 335 (2012) ("Congress determined that U.S. interests were best served by our full participation in the dominant system of international copyright protection … includ[ing] ensuring exemplary compliance with our international obligations"). Those obligations include ensuring that copyright exceptions and limitations, including fair use, pass the three-step test.

The U.S. is thus obligated to meet the minimum standards for copyright protection required of members of the Berne Convention, TRIPS, WCT, and WPPT. Failure to do so can lead to international sanctions under certain circumstances. *See* Panel Report, United States—Section 110(5) of the U.S. Copyright Act, WTO Doc. WT/DS160/R (June 15, 2000) ("**WTO Report**") (in TRIPS proceedings brought by the EU, a WTO panel concluded that a U.S. statute based on overly broad exceptions to the exclusive right to publicly perform musical works violated the three-step test, following which the U.S. was obligated to pay the EU millions of dollars in compensation).

## III.    Internet Archive's Activities Breach International Copyright Law

The *Amici* are principally concerned that failure to grant the Plaintiffs' Motion would leave rightholders without an effective means of enforcing their rights against the massive infringement undertaken by IA through industrial scale copying and making available of

protected works on the Internet for the world to access without prior authorization or even compensation to rightholders.

The Plaintiffs have satisfied the *prima facie* elements of copyright infringement, namely by demonstrating ownership of a valid copyright and infringement of the copyright by IA. IA's activity infringes rights including the rights of: (1) reproduction, by creating copies of scanned books; (2) preparing derivative works, by "recasting" the Publishers' print books into an eBook format; (3) distribution, by making available eBooks on its website; (4) public performance, by the "read aloud" function on its website; and (5) display, by the in-browser viewer. *See* Pls.' Mem. Supp. Summ. J. 18–19.

Each of these rights find their basis in international copyright and related rights law and should be understood with reference to that law. Below, the *Amici* focus in particular on the exclusive right of making available to the public and whether a finding that IA's activity amounts to fair use would be considered an acceptable limitation on the scope of that right under the three-step test. It would not.

### A. Reproduction Right

The exclusive right of reproduction is a fundamental component of modern copyright law. It is enshrined in Article 9 of the Berne Convention, having first appeared there in 1967. As stated in the WIPO Guide & Glossary at 55:

> The coverage of the right of reproduction under [Article 9] paragraph (1) is absolute; it extends to reproduction "in any manner or form." Therefore, by definition, it cannot be extended any further. If an act is reproduction, Article 9 covers it inevitably.

There is no doubt that IA's acts of scanning hardcopy published books on an industrial scale creates copies of those works, and so infringes the reproduction right—further copies are made when those copies are uploaded onto its servers. The Agreed Statement concerning Article 1(4) of the WCT notes that "[i]t is understood that the storage of a protected work in digital

9

form in an electronic medium constitutes a reproduction within the meaning of Article 9". WCT n.1; *see also* WPPT n.6 (applying the same principle to protected performances and phonograms).

### B. Derivative Works

Article 2(3) of the Berne Convention states that "[t]ranslations, adaptations, arrangements of music and other alterations of a literary or artistic work shall be protected as original works without prejudice to the copyright in the original work."  The creation of an eBook from a physical book is contained within the definition of "alterations of a literary work".

### C. Making Available Right

The infringed rights of distribution, public performance, and public display are also found in the international treaties, although terminology differs across jurisdictions.  In this regard, the *Amici* focus on the exclusive right of "making available".

This exclusive right encompasses the making available of works, fixed performances and phonograms by wire or wireless means, in such a way that members of the public may access them from a place and at a time individually chosen by them.  The right was initially conceived as forming part of the communication to the public right along with elements of the distribution right.  *See* Chairman of the Comms. of Experts, *Basic Proposal for the Substantive Provisions of the Treaty on Certain Questions Concerning the Protection of Literary and Artistic Works to Be Considered by the Diplomatic Conference*, in *Records of the Diplomatic Conference on Certain Copyright and Neighboring Rights Questions* 204 (vol. 1, 1999), WIPO Doc. CRNR/DC/4 (Aug. 30, 1996).  It is one of the main innovations in the WCT and the WPPT.  *See generally* Jorg Reinbothe & Silke von Lewinski, *The WIPO Treaties on Copyright: A Commentary on the WCT, the WPPT and the BTAP* (2015).  In the WCT, the making available right is part the general communication to the public right in Article 8.  For related

10

rights, the making available right is formulated as a separate right in Articles 10 and 14 of the WPPT for performers and producers of phonograms respectively.

Despite the link to the communication to the public right and due to the different legal traditions of the WIPO Member States negotiating the treaty—and the debates leading to the adoption of the WCT and WPPT—these instruments embrace the so-called "umbrella solution". *See* WIPO Guide & Glossary, *supra*, at 207. This solution permits contracting parties to characterize the making available right in a way which best fits in their regional or national legal system. For example, they may design it as a separate right or consider it an act of distribution. The key point is that the parameters set by the treaties are respected.

Contracting Parties are thus free to decide whether to create a new separate right or to incorporate it in an already existing exclusive right. The predominant approach, however, has been to implement the making available right as a communication to the public or transmission type right. *See, e.g.*, Directive 2001/29/EC of the European Parliament and Council of May 22, 2001 on the Harmonization of Certain Aspects of Copyright and Related Rights in the Information Society, 2001 OJ (L 167) 10 ("**InfoSoc Directive**") art. 3. Some Contracting Parties have implemented the right as a distribution right or as a combination of distribution and communication to the public rights. The U.S. has considered that a combination of the distribution and the performance rights constitutes a making available right. Reg. of Copyrights, *The Making Available Right in the United States* 4 (2016).

Thus, what matters is not what one calls the right but whether applicable legislation reflects the main parameters of the right. In so far as the scope of the making available right is concerned, it is generally considered that it covers two connected acts: (1) the offer of the work, which may be accessed individually by members of the public; and (2) the subsequent transmission of the work to a member of the public at his or her request. However, there is no requirement that such transmission actually takes place; the offer of access to the content is

sufficient.  *See* Reinbothe & von Lewinski, *supra*, at *¶*7.8.26–27; *see also Spanski Enters. Inc. v. Telewizja Polska S.A*, 883 F.3d 904 (D.C. Cir. 2018) (holding that on-demand video streaming service initiated in Poland and transmitted to U.S. audience violated the public performance right under 17 U.S.C. § 106(4)).  A further important element of the making available is interactivity (*i.e.*, its on-demand nature)—the right must allow members of the public to access the content from a place and at a time of their choice.

Finally, the making available right may only be restricted on the basis of Article 10 of WCT and Article 16 of WPPT (*i.e.*, only exceptions or limitations which pass the three-step test are permissible).  Moreover, the right cannot be subject to exhaustion including where a Contracting Party qualifies making available as an act of distribution.  *Capitol Records, LLC v. ReDigi, Inc.*, 934 F. Supp. 2d 640, 654–56 (S.D.N.Y 2013); *see also* InfoSoc Directive, rec. 29, art. 3(3); Case C-263/18, *Nederlands Uitgeversverbond v Tom Kabinet Internet BV*, ECLI:EU:C:2019:1111 (Dec. 19, 2019)[4].  It is also not possible to impose a restriction on the exercise of the exclusive making available right on the basis of Article 11*bis*(2) of the Berne Convention, which refers to compulsory licenses and mandatory collective management for certain other forms of communication to the public.  *See* WIPO Guide & Glossary, *supra*, at 294.

EU copyright law would consider the activities of IA to infringe the exclusive right of making available to the public under Article 3 of the InfoSoc Directive.  For authors, the exclusive right of making available to the public is a form of communication to the public.  The same would hold for the exclusive right of reproduction in Article 2 of the InfoSoc Directive. There is considerable jurisprudence in the EU on the meaning of communication to the public. As set out in case law of the Court of Justice of the European Union ("**CJEU**"), an act of

---

[4] Available at: https://curia.europa.eu/juris/liste.jsf?num=C-263/18.

communication to the public includes two cumulative criteria, namely: (1) an "act of communication" of a work; and (2) the communication of that work to a "public".  *See* Case C-117/15, *Reha Training Gesellschaft für Sport v Gesellschaft für musikalische Aufführung - und mechanische Vervielfältigungsrechte (GEMA) eV*, ECLI:EU:C:2016:379, ¶37 (May 13, 2016).[5]

The first element, the "act of communication", refers to any transmission of the protected works, irrespective of the technical means or process used.  The second element, "to the public", requires that the protected work be made available to a public not already contemplated by the rightholder, or using a different technical means than already authorized by the rightholder.  The CJEU has repeatedly held that "communication to the public" as set out in Article 3 of the InfoSoc Directive is to be construed broadly, considering in particular the Directive's objective of establishing a high level of protection for authors.

IA provides multiple users who seek access to a specific copyright work with access to a copy (often a single copy) of that work that is available on its servers.  This is an act of communication in that it (1) makes a copyright work available on the Internet (2) to a large number of persons (sufficient to constitute a "public") (3) using a different means of transmission for the protected works than that originally used to make the work available.

As discussed *supra*, the CJEU has also clarified in the *Tom Kabinet* decision that the making available of eBooks (and other digital formats) is not subject to exhaustion.  *See also* InfoSoc Directive art. 3(3).  Moreover, the exhaustion principle is not relevant in the context of reproduction under EU law—it is a limitation on the distribution right that applies only to "fixed copies that can be put into circulation as tangible objects".   WCT n.5; WPPT n.3.  In any event, subject to any applicable specific exceptions (*e.g.*, for preservation purposes under

---

[5] Available at https://curia.europa.eu/juris/liste.jsf?num=C-117/15.

certain conditions), the creation of eBooks by scanning literary works without authorization and creating a new format would not be permissible under EU law.

## IV.    Internet Archive's Conduct Breaches the Three-Step Test

The three-step test is designed to ensure the appropriate balance between exceptions and exclusive rights by providing successive and cumulative criteria that must be met by any limitations or exceptions[6] to any rights protected under international copyright law.   The defenses as pleaded and relied on by IA fail to pass the test.

The three-step test was first formulated in 1967 as a compromise to the controversial issue of how to deal with limitations and exceptions at the international level in relation to the Berne Convention.  *See* M.R.F. Senftleben, *Copyright, Limitations and the Three-Step Test: An Analysis of the Three-Step Test in International and EC Copyright Law* 163 (2004).  The Berne Convention incorporates the three-step test into the grant of the core authors' rights; indeed, it is often contained within the same article.  For example, Article 9 (regarding the reproduction right) builds the three-step test in at (2) as follows: "It shall be a matter for legislation in the countries of the Union to permit the reproduction of such works in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author."

The three-step test has since been incorporated into subsequent treaties:  Article 13 of TRIPS extended the three-step test beyond the right of reproduction to all economic rights under copyright and related rights, and Article 10 of WCT and Article 16(2) of WPPT further extended the test to any rights newly recognized under the two WIPO treaties.

---

[6] "Limitations and exceptions" encompasses all kinds of free uses, non-voluntary licenses, as well as other possible limitations (such as subjecting the right to obligatory collective management).  *See* WIPO Guide & Glossary, *supra*, at 286–87.

While contracting parties to each of the Berne Convention, TRIPS, WCT, and WPPT have discretion and flexibility to enact exceptions to copyright in their own national copyright law, any exception must meet the three conditions of the three-step test, namely that:

1. limitations and exceptions can only be applied in a limited special case;
2. limitations and exceptions cannot conflict with a normal exploitation of (rights in) works or other protected subject matter; and
3. limitations and exceptions cannot unreasonably prejudice the legitimate interests of rightholders.

The three conditions apply on a cumulative and successive basis, each being a separate and independent requirement that must be satisfied. Failure to comply with any one of the three conditions results in failure of the test. *See* WTO Report, *supra*, at ¶6.97. If an exception does not pass the first step, there is no need to advance to the second. In turn, failure to pass the second step means that the third step need not be applied.

The three-step test is not only directed at national legislatures but also at courts. For example, Article 5(5) of the InfoSoc Directive provides that all exceptions and limitations "shall only be applied in certain special cases which do not conflict with a normal exploitation of the work or other subject-matter and do not unreasonably prejudice the legitimate interests of the rightholder". This provision, which codifies the three-step test in EU law, is a parameter for Member State construction and application of copyright exceptions and limitations. In practice, therefore, "in order to come within an exception, the act in question must not only satisfy the terms of the exception but must also conform to the three-step test". *Copinger and Skone James on Copyright* § 9-12 (18th ed. 2020).

Although the three-step test applies to any exception or limitation provided for in Articles 5(1)–(4) of the InfoSoc Directive, Member States retain some leeway in that the Directive does not explicitly require the test to be transposed into national law. *See* Michel

Walter & von Lewinski, *European Copyright Law* ¶11.5.78 (2010). Nonetheless, a large majority of Member States have implemented the test in their national laws, and the courts, including in those that have not, regularly apply the test. *See, e.g.*, Cour de Cassation [Cass.] [Supreme Court], 1e civ., Feb. 28 2006, Bull civ. I, No. 126 (Fr.); BGH [Federal Court of Justice] Feb. 25, 1999, I ZR 118/96 (Ger.); *see also Shazam Prods. v Only Fools The Dining Experience* [2022] EWHC 1379 IPEC (U.K.)[7]. The inclusion of the test in the Directive has also meant the CJEU has applied it on several occasions. *See e.g.*, Case C-527/15, *Stichting Brein v Wullems*, ECLI:EU:C:2017:300 (Apr. 26, 2017) ("***Filmspeler***").[8]

The risks of non-compliance with those treaty obligations—and specifically with the three-step test—are not theoretical. For example, and as described *supra*, WTO members can bring dispute-resolution proceedings against a signatory to TRIPS where that country fails to provide the requisite level of protection with the potential for trade sanctions.

## A. First Criterion: "Certain Special Cases"

Any exception or limitation must be grounded in public policy and balance rightholder and user interests; the first criterion therefore requires that any exception or limitation is not overly broad or a general open-ended exemption from the obligation to protect the right concerned. *See* Senftleben, *supra*, at 152. Although "fair use doctrine is a limitation that *can* be qualified as sufficiently 'certain' in the sense of the three-step test" (emphasis added), there is no justification for extending the fair use defense to cover the type of conduct undertaken by IA. *Id.* at 165. The same would hold for other limitations under U.S. copyright law. Such a limitation would impact a series of exclusive rights including the making available right (distributing eBooks) and the right of reproduction (creating eBooks, uploading them, and

---

[7] Available at: https://www.bailii.org/ew/cases/EWHC/IPEC/2022/1379.html.

[8] Available at: https://curia.europa.eu/juris/liste.jsf?num=C-527/15.

subsequent downloads).  Any sweeping limitation which would extend to all books without any specific conditions (beyond certain questionable elements unilaterally defined by IA) to narrow its scope cannot be considered a "special case".  As a result, it is already clear at this juncture that IA's activity cannot pass muster under the three-step test—failure to pass the first step is sufficient.  However, IA also fails to meet the other two conditions.

### B.  Second Criterion: "Conflict with the Normal Exploitation of the Work"

The second criterion requires that limitations and exceptions do not interfere with the extraction of the economic value of rights by the rightholder.  That is, the exception or limitation should not grant permissions that enter into economic competition with the rights in the works.  *See* WTO Report, *supra*, at ¶6.183.  The criterion encompasses "all forms of exploiting a work which have, or are likely to acquire, considerable economic or practical importance", including future exploitation.  *Proposals for Revising the Substantive Copyright Provisions* in *Records of the Intellectual Property Conference of Stockholm (1967)* 112, WIPO Doc. S/1 (vol. 1, 1971).

IA's commercial mass digitization project supplants the Plaintiffs' well-established markets for sales of eBooks and licensing of eBooks to libraries for lending.  IA urges libraries to use its website instead of licensing authorized library eBooks, literally telling them "You Don't Have to Buy it Again!"  Pls.' Mem. 1.  It stands to reason that consumers who access eBooks illegally made available by IA are also not likely to buy the same eBook titles. Moreover, IA effectively pre-empts publishers' negotiations with potential licensees, and thus conflicts with, and unreasonably prejudices, publishers' efforts to compete in the digital arena. For example, the ability of IA to make unauthorized databases available for free interferes with the launch of licensed databases, including those which could provide more unrestricted access to books—and thus could be of greater and more certain public benefit.

E-lending is, simply put, different than print lending.  Unlike physical books, the quality of eBooks generally does not degrade.  Digital copies may be fungible whereas copies of physical books are not.  Traditional lending is geographically limited in the sense that both digital and analogue library services (and consequently offers to libraries) are directed at patrons in their "catchment" area; it is also temporally limited in that those patrons may need to make trips to and from the library to borrow and return books.  The online market IA offers is unbounded geographically or temporally, enabling and speeding up repeated use of the works on a global scale.  If IA's activities are held to be fair use, publishers would therefore need to factor in this globality to any sale or license to a library, a further indication of the potential for a negative impact on the market.

Overbroad or inadequate interpretations of fair use would disincentivize legal offers of content, as publishers will not be able to invest in legal distribution of titles in digital formats where they cannot recoup their investments in innovative and new business models.  This in turn restricts rightholders' ability to freely decide when and how to publish titles in digital formats, curtailing the commercial exploitation of those titles in the digital markets.  In short, if judicially sanctioned unfair competition from IA reduces incentives for the development of new licensed services, those valuable and socially beneficial business models may never see the light of day.  The legitimate interest of copyright owners to be compensated for the systematic commercial use of their works would be completely ignored, with a negative impact on recoupment of costs as well as on future investment in creation and production.  As a result, consumers will end up with less access and fewer options—not more.

## C.  Third Criterion: "Unreasonably Prejudice the Legitimate Interests of Rightholders"

The third criterion is only relevant where the exception in question has satisfied the first two steps and involves a balance of the interests of rightholders with the interests of the

beneficiary of the limitation or exception.  An exception or limitation may cause certain prejudice to the legitimate interests of owners of rights, but the principle of reasonable proportionality should prevail.  Typically, the third step of the test is satisfied by some form of remuneration, but more broadly could encompass the legal interests of rightholders to exercise and benefit from their rights—in either case, IA fails this step.  *See* WTO Report, *supra*, at ¶6.229; Senftleben, *supra*, at 217.

## V.    Lending in International Copyright Law

Lending is defined as the "transfer of the possession of a copy of a work or an object of related rights for a limited period of time for non-profit-making purposes (for example, by lending libraries)".  WIPO Guide & Glossary, *supra*, at 294.  As a general matter, international copyright and related rights treaties do not establish specific rights in respect of lending.  In some countries where lending rights are recognized, the right is reduced to a so-called "public lending right", which would typically fall under the exclusive right of distribution.  *See, e.g.*, Copyright Act § 26(1)(c) (Kenya); Copyright Act art. 20 (Turk.) (both including lending under the distribution right).

As noted *supra*, the doctrine of exhaustion (*i.e.*, first sale) applies only to the distribution right, and that right applies only to tangible copies.  *See* InfoSoc art. 4; *see also* Case C-419/13, *Art & Allposters Int'l BV v Stichting Pictoright*, ECLI:EU:C:2015:27, ¶23 (Jan. 22, 2015) (the rule of exhaustion "does not apply in a situation where a reproduction of a protected work, after having been marketed in the European Union with the copyright holder's consent, has undergone an alteration of its medium … and is placed on the market again in its new form")[9]; Case C-263/18, *Tom Kabinet*.  EU Member States may derogate from the exclusive lending right in respect of public lending provided that at least authors are

---

[9] Available at: https://curia.europa.eu/juris/liste.jsf?num=C-419/13.

19

remunerated in addition to the original remuneration received when a library acquired the copy (though some institutions may be exempted from paying). *See* Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property, 2006 O.J. (L 376) 28 ("**Related Rights Directive**") arts. 2, 6; *see also* Jim Parker, *The public lending right and what it does*, WIPO Mag., June 2018, at 38–39. In addition to remuneration, a further important aspect of lending rights is the requirement that the copies used for lending come from a legal source. Exceptions will not operate where copies are made from illegal sources or where access to the content in the first instance was illicit. Case C-435/12, *ACI Adam BV v Stichting de Thuiskopie*, ECLI:EU:C:2014:254 (Apr. 10, 2014)[10]; Case C-527/15, *Filmspeler*.

The CJEU has found that lending under the Related Rights Directive could potentially cover one-copy-one-user lending of eBooks and, as a result, Member States may establish such an exception—they are not however required to do so. *See* Case C-174/15, *Vereniging Openbare Bibliotheken v Stichting Leenrecht*, ECLI:EU:C:2016:856, ¶¶52–54 (Nov. 10, 2016) ("***VOB***").[11] The consistency of this decision with the WCT has been vigorously contested in the legal doctrine. *See, e.g.*, Ficsor, *Tom Kabinet: the question of 'online exhaustion' in the shadow of UsedSoft and VOB and in the light of RedDigi and Allposters*, Copyright See-Saw ¶8.1 (Mar. 23, 2019)[12] (arguing that the theory of e-lending is not in accordance with existing international, EU, and national norms). Acts that are covered by the exclusive rights of reproduction and making available may be characterized as e-lending but only to the extent that the conditions of the three-step test are satisfied. *Id.* at ¶8.2; *see also* WCT n.5 (referring to tangible copies). In any event, the CJEU was insistent that digital lending could only fall

---

[10] Available at: https://curia.europa.eu/juris/liste.jsf?num=C-435/12.

[11] Available at: https://curia.europa.eu/juris/liste.jsf?num=C-174/15.

[12] Available at http://www.copyrightseesaw.net/en/papers?page=2.

within exceptions for public lending where (1) only one copy may be downloaded during the lending period and (2) after that period has expired, the downloaded copy can no longer be used by that user. Otherwise, the analogy to physical lending cannot apply.

IA does not make only one copy of a work available to a user during a lending period—multiple loans of the same copy of a work are possible. Pls.' Mem. 15. The "digital lending" that IA purports to undertake cannot be classified as lending according to the reasoning of the CJEU. IA is clearly engaged in the unauthorized making available to the public of eBooks. Indeed, the CJEU qualified its decision in *VOB* by stating that the lending right is not exhausted by the distribution of a copyright work, and Member States retain the ability to make lending subject to an authorized first sale, such that there is not an explicit exception for digital lending under EU law. Case C-174/15, *VOB*, at ¶59–65. The CJEU also held that the public lending exception cannot be applied to the making available by a public library of a digital copy of a book in the case where that copy was obtained from an unlawful source. *Id.* at ¶70.

From the international perspective, the "lending" undertaken by IA will infringe the exclusive rights of reproduction and making available under the WCT unless found to be permissible under the three-step test, which as set out *supra*, it is not.

## CONCLUSION

The *Amici* respectfully submit that the Court should grant the Plaintiffs' Motion for Summary Judgment. In this case, which involves an extraordinary—indeed, unprecedented—amount of copying and dissemination of copyrighted expression, it is essential that the Court also consider the international implications of allowing IA's activities. If IA's view of "fair use" in this case takes hold, the result would be an unbounded exception that runs afoul of numerous international obligations that the U.S. has solemnly taken on by not only entering into agreements and treaties but taking a leading role in their very existence. That would not only injure authors and publishers——and potentially the broader rightholder community—but

also place the country out of step with the rest of the world and, ultimately, harm the public. The importance of the judicial decisions from the U.S. in the international arena cannot be overstated.

Dated: August 11, 2022                           Respectfully submitted,


/s/ Matthew Leish                        /s/ Theodore M. Shapiro
Matthew Leish                            Theodore M. Shapiro (*pro hac vice*)
**MILLER KORZENIK SOMMERS**               Mikah Pajaczkowska-Russell
**RAYMAN LLP**                            Sinclaire Marber Schäfer
The Paramount Building                   **WIGGIN LLP**
1501 Broadway, Suite 2015                Rue de Namur, 72
New York, NY 10036                       Brussels, 1000 Belgium
Phone: 212 752 9200                      Phone: +32 (0) 2 892 1104
Email: mleish@mkslex.com                 Email: Ted.Shapiro@wiggin.eu


                                         *Counsel for Amici Curiae*

**WORD COUNT CERTIFICATION**

I hereby certify that this brief complies with the formatting and word count requirements set forth in this Court's Individual Practices II.D.  According to the word count function of Microsoft Word, this brief contains 6,920 words (excluding cover page, table of contents, table of authorities, and certification of compliance).

Dated: August 11, 2022

/s/ Matthew Leish
Matthew Leish
**MILLER KORZENIK SOMMERS
RAYMAN LLP**
The Paramount Building
1501 Broadway, Suite 2015
New York, NY 10036
Phone: 212 752 9200
Email: mleish@mkslex.com

/s/ Theodore M. Shapiro
Theodore M. Shapiro (*pro hac vice*)
Mikah Pajaczkowska-Russell
Sinclaire Marber Schäfer
**WIGGIN LLP**
Rue de Namur, 72
Brussels, 1000 Belgium
Phone: +32 (0) 2 892 1104
Email: Ted.Shapiro@wiggin.eu

*Counsel for Amici Curiae*

23

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2022, this Brief of *Amici Curiae* was filed through the Court's Electronic Case Filing ("**ECF**") system.  Notice of this filing will be sent electronically to the parties as identified on the Notice of Electronic Filing ("**NEF**") and may be accessed through the Court's system.

/s/ Matthew Leish
Matthew Leish
**MILLER KORZENIK SOMMERS RAYMAN LLP**
The Paramount Building
1501 Broadway, Suite 2015
New York, NY 10036
Phone: 212 752 9200
Email: mleish@mkslex.com

/s/ Theodore M. Shapiro
Theodore M. Shapiro (*pro hac vice*)
Mikah Pajaczkowska-Russell
Sinclaire Marber Schäfer
**WIGGIN LLP**
Rue de Namur, 72
Brussels, 1000 Belgium
Phone: +32 (0) 2 892 1104
Email: Ted.Shapiro@wiggin.eu

*Counsel for Amici Curiae*