UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC,<br><br>     *Plaintiffs*,<br><br>   v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive,<br><br>     *Defendants*. | Case No. 1:20-CV-04160-JGK |

**BRIEF OF *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., AND PENGUIN RANDOM HOUSE LLC'S MOTION FOR SUMMARY JUDGMENT**

COWAN, DeBAETS, ABRAHAMS & SHEPPARD LLP

Nancy E. Wolff
Alexander Gigante
Elizabeth Safran
41 Madison Avenue, 38th Floor
New York, New York 10010
Tel.: (212) 974-7474
Fax: (212) 974-8474

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

STATEMENT OF INTEREST ........................................................................................ 1

SUMMARY OF THE ARGUMENT ............................................................................... 2

ARGUMENT ................................................................................................................... 4

I.      DEFENDANT'S PRACTICE IS NOT SANCTIONED UNDER COPYRIGHT LAW.... 4

        A.      Defendant's Mass Digitization And Distribution Of Full Books
                Is Not A Fair Use .................................................................................. 5

        B.      Defendant's Practice is Not Allowed Under the First-Sale Doctrine ................... 8

        C.      Section 108 Does Not Support Defendant's Practice ............................... 9

II.     DEFENDANT'S PRACTICE, IF ALLOWED, WOULD DEVASTATE
        OTHER CREATIVE INDUSTRIES ............................................................... 11

        A.      Creative Industries Have Undertaken Substantial Efforts Towards Digitization
                And Would Be Harmed By Sanctioning Defendant's Practice ........................... 12

III.    ONLY CONGRESS IS EMPOWERED TO DECIDE WHETHER AND UNDER
        WHAT CIRCUMSTANCES TO EXPAND EXCEPTIONS THAT ALLOW NON-
        RIGHTSHOLDERS TO DIGITIZE AND DISTRIBUTE WORKS ............................... 17

        A.      Congress Alone Has the Authority to Modify Section 108's Reproduction
                Protections for Libraries and Archives ................................................. 18

        B.      Congress Alone Has the Authority to Consider Expanding the First-Sale
                Doctrine to Permit Digitization and Distribution of Works................................. 21

CONCLUSION.................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

Cases

*A&M Records, Inc. v. Napster, Inc.,*
284 F.3d 1091 (9th Cir. 2002) ................................................................. 13, 14

*Association of Am. Publishers, Inc. v. F*rosh,
2022 WL 484926 (D. Md. Feb. 16, 2022) ................................................... 21

*Authors Guild v. Google,Inc.,*
804 F.3d 202 (2d Cir. 2015) ......................................................................... 5

*Authors Guild, Inc. v.HathiTrust,*
755 F.3d 87 (2d Cir. 2014) ........................................................................... 5

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994)............................................................................. 5, 6, 7

*Capitol Recs., LLC v. ReDigi, Inc.,*
910 F.3d 649 (2d Cir. 2018),
*cert. denied*, 139 S. Ct. 2760 (2019) .......................................................... 3, 8

*Close v. Sotheby's, Inc.,*
894 F.3d 1061 (9th Cir. 2018) ...................................................................... 8

*Harper & Row Publishers, Inc. v. Nation Enters.,*
471 U.S. 539 (1985)...................................................................................... 4

*McGucken v. Pub Ocean Ltd.,*
2022 WL 3051019 (9th Cir. 2022) ................................................................ 5

*Midway Mfg. Co. v. Artic Int'l, Inc.,*
704 F.2d 1009 (7th Cir. 1983) ...................................................................... 7

*U.S. v. Kozeny,*
541 F.3d 166 (2d Cir. 2008) ......................................................................... 7

Statutes

17 U.S.C. § 107.......................................................................................... 5, 8

17 U.S.C. § 108......................................................................................... passim

17 U.S.C. § 109............................................................................................... 8

U.S. Const. art. I, § 8, cl. 8............................................................................................ 12

Other Authorities

Alicia Wallace, Covid Hit Nashville Hard. Now the Performing Arts Are Staging
    a Comeback, FOX 55 News (June 12, 2022)........................................................ 18

Alison Flood, Internet Archive Accused of Using Covid-19 as 'An Excuse for Piracy',
    Guardian (Mar. 30, 2020) ................................................................................... 18

*Brief of Screen ActorsGuild-American Fede,*
    *ration of Television and Radio Artists, Directors Guild ofAmerica, Inc. et al.*
    *as Amici Curiae in Support of Petitioners,*
    *American Broad. Cos., Inc. v. Aereo Inc.,*
    2014 WL 880972 (2014)........................................................................... 15, 16, 21

Chris Melore, Libraries are More Popular Than ever – Even as People Borrow
    Fewer Books, Study Finds (Apr. 5, 2022) ............................................................ 11

Daniel A. Gross, The Suprisingly Big Business of Library e-Books,
    New Yorker (Sept. 2, 2021)................................................................................... 11

David Newhoff, Why Internet Archive is in Legal Trouble and Deserves to Be,
    The Illusion of More (July 18, 2022)..................................................................... 12

Gabriela Pereira, An Internet Abomination: There's No Such thing as
    *"Free Books"*, diyMFA (Mar. 31, 2020) ............................................................ 10

Jennifer Wilber, A Brief History of eBooks, TurboFuture (Dec. 28, 2020)................................ 10

Michael D. Smith, The Truth About Piracy, Technology Policy Institute (Feb. 2, 2016)............ 17

*New Report Illustrates How Modern Record Labels Remade Themselves in*
    *the Streaming Era*, Musonomics, ......................................................................... 14

Richard Romano, eBook Usage in U.S. Public Libraries: Freading Sixth
    Annual Survey (LibraryJournal) (2015) ................................................................ 10

U.S. Copyright Office, Section 108 of Title 17: A Discussion Document of the
    Register of Copyrights 9 (2017) ........................................................................... 19

U.S. Sales Database, RIAA.......................................................................................... 13

*The American Motion Picture And Television Industry Creating Jobs,*
    *Trading Around the World*, MPA (Nov. 2021) ...................................................... 14

Video Games in the 21st Century: The 2020 Economic Impact Report...................................... 16

What Do We Know About 2020 Movie & TV Piracy Trends Worldwide,
  Alliance for Creativity and Entertainment ................................................................ 15

*What is the Mechanical Licensing Collective (MLC)?*, SongTrust ............................................ 14

# STATEMENT OF INTEREST[1]

The Copyright Alliance is dedicated to promoting and protecting the ability of creative professionals to earn a living from their creativity. It is a nonprofit, nonpartisan 501(c)(4) public interest and educational organization and represents the copyright interests of over 2 million individual creators and over 15,000 organizations across the entire spectrum of creative industries, including authors, songwriters, musical composers and recording artists, graphic and visual artists, photographers, journalists, documentarians, screen, television and filmmakers, and software developers. The Copyright Alliance's membership encompasses these individual creators and innovators, creative union workers, and small businesses in the creative industry, as well as the organizations and corporations that support and invest in them. The livelihoods of this diverse array of creators and companies depend on the exclusive rights guaranteed by copyright law.

The Copyright Alliance's members rely heavily on copyright law to protect and commercialize their works, which in turn incentivizes the creation of new works and promotes the progress of the arts. The Copyright Alliance and its members have a strong interest in the proper application of copyright law, including with respect to Defendant Internet Archive ("Defendant") 's practice of digitizing and distributing entire published books to the public for free and without authorization. While Defendant's infringing activity is already harming existing markets for books, if the practice expands to other copyrighted works, such as music, film, television, video games, and the visual arts, it would cause widespread harm to all creative professionals and undermine

---

[1] No counsel for any party authored this brief in whole or in part, and no party or counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. Only *amicus curiae* or their counsel made such a monetary contribution that was intended to fund preparing or submitting this brief. Some Copyright Alliance members are, or are affiliates of, Plaintiffs in this matter.

the very purpose of copyright.

The Copyright Alliance submits this amicus brief in support of Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC's ("Plaintiffs") Motion for Summary Judgment, *see* Dkt. No. 87, and to address the broad-reaching legal and practical consequences of Defendant's so-called "Controlled Digital Lending"[2] on creators and owners of copyrighted works. Defendant's activity threatens not only books, the publishing industry, and the livelihoods of authors and book publishers, but all other types of copyrighted works, creative professionals, and creative industries. Permitting Defendant to scan and distribute large collections of digitized versions of copyrighted works to any user anywhere for free would undermine existing licensing markets and strip creators and copyright owners of their statutory rights to commercialize and control their works.

The Copyright Alliance also submits this brief to raise policy reasons that dictate a rejection of the manufactured expansion of copyright law that Defendant advances in defense of its unauthorized reproduction, display, and distribution of full versions of copyright protected works.[3]

## SUMMARY OF THE ARGUMENT

Defendant's arguments are contrary to the Copyright Act's (the "Act") text and espouse a distorted theory of fair use. While Defendant cloaks its unauthorized scanning and distribution of

---

[2] While Defendant purports to replace one physical copy with a digital copy under what it calls Controlled Digital Lending, the lending is not in fact controlled. Defendant admits that it permitted unrestricted distribution of works during the pandemic and is amassing large quantities of books in order to digitize multiple copies of works that are in copyright and commercially available by publishers and authors. *See* Plaintiff's Complaint ("Cmpl.") at 4–5.

[3] Plaintiffs have consented to the filing of this brief. Defendant Internet Archive has not objected to the Copyright Alliance's request for consent to file.

copyrighted books as serving the public good, there is no legal support for its practice under copyright law, and that the consequences of its activity will cause long-term harm to the creation of new works that enrich our culture. Defendant's practice of wholesale scanning of physical works does not fit within the bounds of fair use because the works created by this practice serve the exact same purpose as the works they infringe. Nor does the first-sale doctrine under §109 to support Defendant's position, as the doctrine does not permit a physical work to be digitized and distributed. *See Capitol Recs., LLC v. ReDigi, Inc*., 910 F.3d 649, 659–63 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2760 (2019). Likewise, the limited reproduction rights granted to libraries and archives under §108 does not cover Defendant's wholesale copying and digital distributions. Defendant's pursuit of its own policy objectives does not justify its blatant disregard of the plain language of the Act and related caselaw.

Moreover, while Defendant purports to provide the public with content it wants in the format it wants, the public already has access to lawful digital and print versions of books, which can be lawfully licensed, purchased, and borrowed from local libraries. Instead of supporting preservation or the distribution of works under the clearly limited terms of §108, Defendant's practice, if sustained, will hinder the ability of authors, publishers, and other creators to commercialize existing works and create new ones. By flooding the market with free alternatives and usurping the market for eBooks and other creative works, namely music, film, video games, and visual arts in digital format, Defendant would destroy incentives to create and distribute new works to the public and jeopardize entire professional classes of creators.

Summary Judgment in favor of Defendant that condones its practices would have far-reaching effects beyond the publishing industry and would threaten to damage, if not destroy, entire markets that are necessary to support the development of creative works. It may start here

with books, but by judicial extension, could quickly threaten motion pictures, music, software, video games, and other works that enrich our society. For example, the music and film industries have heavily invested in providing the public with content in a digital format that can be listened to or viewed from any device, anytime and anywhere. The catalog of music and film available in digital format is not limited to works "born digital" but includes works from back catalogs of analog music and film productions that have been carefully digitized and preserved and are now available in the marketplace for the public to stream, license, or buy. This usurpation of rightsholders' exclusive rights of reproduction and distribution causes harm as it erodes existing markets, which runs expressly contrary to the intent of copyright. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985) ("[I]t should not be forgotten that the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas."). Today, there may be only a few libraries that are collaborating with Defendant, but if the court permits this practice, it is feasible that the country's entire network of libraries could send Defendant their physical books and other collected works, permitting it to "lend" for free thousands of copies of the bestsellers from every artistic industry—books, music, film, and more—all to compete with lawfully made licensable digital works and streaming services. This practice is akin to allowing users to "steal" from the Internet because it is easy and free. A ruling permitting such unchecked piracy would have devastating, far-reaching effects, which this Court must not allow.

## **ARGUMENT**

### I. **DEFENDANT'S PRACTICE IS NOT SANCTIONED UNDER COPYRIGHT LAW**

Defendant's practice of copying and distributing digitized protected works runs afoul of the protections afforded by the Act and cannot be supported by any of the Act's lawful exceptions,

including fair use, the first-sale doctrine, and §108's limited reproduction rights for libraries and archives.

### A.  Defendant's Mass Digitization And Distribution Of Full Books Is Not A Fair Use

We agree with the Plaintiffs' and their other *amicis'* arguments that Defendant's mass scanning and distribution of digital versions of physical books falls well outside the bounds of copyright law. Without repeating these arguments in full, it is important to emphasize that the digital copying of physical books and their unauthorized distribution by Defendant does not constitute a fair use under §107. *See* 17 U.S.C. § 107. These copies serve the same purpose as the digital books lawfully created by publishers on behalf of authors that are already available in the marketplace, meaning that Defendant's practice fails at the very first fair use factor, which addresses the "purpose and character of the use." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578–79 (1994). The fact that Defendant may be efficient at wholesale scanning does not give the works new purpose or character, nor does providing a work for free that is already available to libraries for licensing or legal acquisition. *See McGucken v. Pub Ocean Ltd.*, 2022 WL 3051019, at *5 (9th Cir. 2022) (noting that photos had been used for exactly the same purpose for which they were lawfully licensed to other users and rejecting fair use defense). In contrast with cases such as *Authors Guild v. Google, Inc.* and *Authors Guild, Inc. v. HathiTrust*, in which digitization did qualify as fair use because it gave the works a new purpose or character,[4] here Defendant

---

[4] *Authors Guild v. Google, Inc.* held that Google's mass digitization of copyrighted works qualified as fair use where it provided a transformative search function and snippet display that augmented public knowledge about the works without creating a substantial substitute for them. 804 F.3d 202, 207, 225 (2d Cir. 2015). Meanwhile, *Authors Guild, Inc. v. HathiTrust*, found that mass digitization of more than 20 million copyrighted works for purposes of full-text searching and access for individuals with print disabilities was fair use. 755 F.3d 87, 101 (2d Cir. 2014).

simply copies and distributes works in digital format, imbuing no new purpose or character in the works.

Further, a finding that the mere reproduction and distribution of a physical work in a different format satisfies the first factor of the fair use test, even though it fails to add any new meaning or insights,[5] would allow fair use to swallow up all of the other exceptions under the Act. The clear and specific guidance to librarians and archivists on conditions appropriate for reproducing full works under §108 and the limited right of first sale under §109, which allows sales of used physical books, would be rendered meaningless if Defendant's practices are sanctioned. The fair use exception is intended to apply on a case-by-case basis to individual uses of copyrighted works that serve the purpose of copyright, not mass digitization of full works. By contrast, §108 very specifically outlines the conditions under which a qualified library or archive can digitize and make available complete works. Specifically, a qualifying library may **only** make a limited number of digital copies of available full works in order to replace a work that is damaged, destroyed, lost, stolen, or unusable in the existing format after certain conditions are met, including a library's undertaking reasonable efforts to determine that an unused replacement cannot be obtained at a fair price and ensuring that the digital copy is not made available to the public in that format outside the library's physical format. *See* 17 U.S.C. § 108(c). To apply fair use in this instance, then, would lead to dueling exceptions within the Act, which Congress did not intend.

Further, the fact that §108, in particular, already contemplates the limited reproduction of

---

[5] *Campbell* instructs that an investigation into the first fair use factor necessarily questions whether the new work "adds something new with a further purpose or different character, altering the first with new expression, meaning, or message . . . ." *See Campbell*, 510 U.S. at 579.

physical works in digital formats, indicates that Congress considered digitization of physical works separate from, and not to be sustained under, fair use. *See U.S. v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) (reviewing statutory canons and instructing courts to read statutory sections "not in isolation from the context of the whole Act" but in conjunction with "the provisions of the whole law, and to its object and policy") (internal quotations and citations omitted). This reading makes sense for policy reasons, as well, considering that such an overly broad interpretation of fair use would eviscerate an author's exclusive right to authorize distribution of copies under §106. The Court should not interpret §107 in such a way as would render entire other sections of the Act meaningless.

Moreover, Defendant's practice also gives rise to significant market harm under the fourth fair use factor, addressing "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell*, 510 U.S. at 590. As Defendant unlawfully copies and distributes rightsholders' works, it undercuts their own ability to choose to distribute their works in digital format.

Because thriving markets already exist for digital books and other content, including music, films, and video games, Defendant's practice, if sustained, would also present a threat to new technology Congress sought to avoid. Congress specifically designed the Act to anticipate and grow with emerging technology and formats of copyrighted works, crafting the language of the Act to allow its provisions to accommodate such shifts, without requiring repeated amendments. *See, e.g.*, *Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1011 (7th Cir. 1983) ("[T]he legislative history of the Copyright Act of 1976 suggests that Congress probably wanted the courts to interpret the definitional provisions of the new act flexibly, so that it would cover new technologies as they appeared, rather than to interpret those provisions narrowly and so force

Congress periodically to update the act."); *see also* 17 U.S.C. § 108(c) (acknowledging that "existing format[s] in which [a] work is stored" may "become obsolete" and directing libraries' and archives' rights of reproduction around this possibility). It would run contrary to Congressional intent to upend the foothold of already prospering multimedia digital markets, especially where Congress intended the Act to accommodate their growth.

Whether turning to the black letter law, the effect that contorting §107 to abide Defendant's practice would have on the rest of the Act, or Congressional intent, it is clear that Defendant's practice finds no support under fair use.

B.  **Defendant's Practice is Not Allowed Under the First-Sale Doctrine**

Defendant cannot turn to the first-sale doctrine to support its practice of copying and reproducing digitized versions of protected works. The first-sale doctrine applies only to the disposition of a lawfully owned copy of a work, *see* 17 U.S.C. § 109(a), and does not protect reproductions. Specifically, the first-sale doctrine allows the owner of an authorized copy to sell the copy the owner possesses, without the authority of the copyright owner, but does not permit the owner to make a digital reproduction of the work for purposes of further distribution or resale. *See ReDigi, Inc*., 910 F.3d at 657 (determining that mass resale of digital music files created a reproduction by purchaser's computer or storage device, contrary to the first-sale doctrine). Format shifting is expressly outside the bounds of this limited doctrine.

Nor should Congress expand the first-sale doctrine to allow the digitization and distribution of protected works by those who merely own a specific copy of the work, which is Defendant's practice. Doing so would upend the purpose of the first-sale doctrine, which aims to protect owners' physical property rights, not afford them additional rights under copyright. *See id.* at 664; *see also Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1070 (9th Cir. 2018) (noting that the first-

doctrine serves purposes under the common law's "refusal to permit restraints on the alienation of chattels" and to "free[] courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods"). Reproduction rights remain exclusively within the province of rightsholders under §106. Expanding these rights in a backdoor fashion through the first-sale doctrine to any party who wishes to copy and redistribute a work would lead to absurd results, flooding the market with copies and drastically disincentivizing authors from creating new works.

**C.   <u>Section 108 Does Not Support Defendant's Practice</u>**

Defendant's practice of copying, digitizing, and distributing works does not meet the specific, narrowly tailored conditions provided under §108 that allow qualified libraries to reproduce and distribute works when there is no indirect commercial advantage or interference with functional markets. *See also* 17 U.S.C. § 108. Nor should Defendant be considered a library that could even qualify for the protections of §108 in the first instance.

Under §108, a qualifying library may make only a limited number of digital copies of full works available for preservation purposes (i.e., to replace a work that is damaged, destroyed, lost, stolen, or unusable in the existing format) after certain conditions are met, including that a library must make a reasonable effort to determine that an unused replacement cannot be obtained at a fair price and that the digital copy is not made available to the public outside the library's physical premises. *See* 17 U.S.C. § 108(c). This provision within §108 speaks only to preservation, not distribution, and is narrowly crafted to avoid any distribution of replacement copies outside of the premises of a library.

Not only does Defendant exceed these conditions with its excessive digital copying and distribution, but it cannot be considered a "library" under §108. It is a private actor, operating

entirely online. Section 108's carefully crafted exceptions contemplate libraries engaged in "reproducing equipment located on [] *premises*" whose collections are "open to the public" or available to broad categories of researchers, beyond those merely affiliated with a particular "institution" of which the library is part. *See* 17 U.S.C. § 108(a). It also allows the creation of limited digital copies provided that they are not made publicly available "outside the *premises* of the library . . . ." *See id*. at § 108(c). This language indicates that Congress never intended §108's narrow exceptions to apply to an actor like Defendant, which creates digital copies of copyrighted works for distribution.[6]

The approach to digital lending undertaken by actual, qualifying "libraries" further distinguishes them from Defendant. Digitized versions of physical works, or eBooks, have been readily available to consumers for nearly 15 years, including from libraries.[7] In fact, by 2015, over 90% of U.S. public libraries offered eBook lending. Many of those libraries use OverDrive, which provides eBook access to over 81,000 libraries and schools in 106 countries.[8] Unlike Defendant,

---

[6] Defendant has no premises open to the public to visit for reading, scholarship, or research. Defendant exists wholly online, and its books are locked up in a warehouse. *See, e.g.*, Gabriela Pereira, *An Internet Abomination: There's No Such thing as "Free Books"*, diyMFA (Mar. 31, 2020), [https://diymfa.com/community/internet-archive](https://diymfa.com/community/internet-archive).

[7] Commercially available eReaders have been available since the mid-2000s, with the Sony Librie's release in 2004, the Kindle Reader's in 2007, and the Apple iBooks apps in 2010. *See E-reader*, Wikipedia, [https://en.wikipedia.org/wiki/E-reader](https://en.wikipedia.org/wiki/E-reader) (last visited Aug. 12, 2022); *see also* Jennifer Wilber, *A Brief History of eBooks*, TurboFuture (Dec. 28, 2020), [https://turbofuture.com/consumer-electronics/The-History-of-eBooks#:~:text=The%20first%20prototype%20eReader%20device,easily%20handle%20their%20reading%20loads](https://turbofuture.com/consumer-electronics/The-History-of-eBooks#:~:text=The%20first%20prototype%20eReader%20device,easily%20handle%20their%20reading%20loads).

[8] *See* Richard Romano, *eBook Usage in U.S. Public Libraries: Freading Sixth Annual Survey*, LibraryJournal 2015, at 7, [https://s3.amazonaws.com/WebVault/ebooks/LJSLJ_EbookUsage_PublicLibraries_2015.pdf](https://s3.amazonaws.com/WebVault/ebooks/LJSLJ_EbookUsage_PublicLibraries_2015.pdf) (last visited Aug. 12, 2022). A decade-spanning report by data and analytics group WordsRated noted that digital borrowing is now

which offers no physical space for the public to visit for reading and research, traditional community libraries have been lending lawfully licensed eBooks for years to their local patrons. Juxtaposing Defendant's practice of mass unauthorized copying and distribution of digital copies against that of actual, qualifying libraries, which use lawful licenses to lend to the public, further separates Defendant from actual "libraries" operating under §108.

## II.   DEFENDANT'S PRACTICE, IF ALLOWED, WOULD DEVASTATE OTHER CREATIVE INDUSTRIES

Although this case concerns only the 127 books that the Plaintiffs have put into issue, if the Court were to accept Defendant's disingenuous and irresponsible theory of copyright law, the harmful—and potentially disastrous—ramifications would impact a broad swath of the Copyright Alliance's membership. There are over 9,000 library systems in the United States, *see* Defendant's Rule 56.1 Statement, ¶ 93 (Dkt No. 98), but most so far have refrained from joining Defendant's project because of legitimate "copyright concerns." *See* Plaintiffs' Rule 56.1 Statement, ¶ 297 (Dkt. No. 113). A ruling from this Court that removed those "concerns" likely would open the proverbial floodgate. Hundreds, if not thousands, of those systems—each presumably comprised

---

driving library collections, with over 58 percent of book selections being available online as of 2019, *see* Chris Melore, *Libraries are More Popular Than ever – Even as People Borrow Fewer Books*, Study Finds (Apr. 5, 2022), https://www.studyfinds.org/libraries-more-popular/ (finding that as of 2019, eBooks comprised at least a third of a typical library's collection), a figure only driven up by the end of March 2020, owing to coronavirus-related library closures, when 74% of U.S. libraries reported expanded digital collections. Daniel A. Gross, *The Suprisingly Big Business of Library e-Books*, New Yorker (Sept. 2, 2021), https://www.newyorker.com/news/annals-of-communications/an-app-called-libby-and-the-surprisingly-big-business-of-library-e-books. *Who We Are*, OverDrive, https://company.overdrive.com/company-profile/who-we-are/?_ga=2.253310474.20716945951659023713-5403bd68-cfef-4fce-a87f-86a54aef5825 (last visited July 28, 2022).

of many individual branches—would feel free to make available to Defendant their collections, not just of books, but also of music, films, video games, photographic prints, and other copyrighted works. Given Defendant's practice of calculating its reproduction and distribution of copies by the number of its library members, *see* Defendant's Rule 56.1 Statement, ¶¶ 52–53, the prospect of an exponential growth in free copies of copyrighted works is patent. Even with its current limited library participation, Defendant admits to already having had 888 copies of a title on loan concurrently, *id.* at ¶¶ 92, 95.  As one commentator has observed: "If IA 'partners' with enough libraries, it would then justify mass distribution of the ebooks it makes and, apparently, without any control whatsoever  . . . . After [IA] swallows the entire commercial market for ebooks, music, motion pictures, video games, etc. would quickly follow." David Newhoff, *Why Internet Archive is in Legal Trouble and Deserves to Be*, The Illusion of More (July 18, 2022), https://illusionofmore.com/why-internet-archive-is-in-legal-trouble-and-deserves-to-be/.

Defendant must not be allowed to proceed on its intended course, leaving entire creative industries' livelihoods in its wake.

### A.   Creative Industries Have Undertaken Substantial Efforts Towards Digitization And Would Be Harmed By Sanctioning Defendant's Practice

The creative industries' adaptation to changing technologies and platforms, incentivized by the protections of the Act, has sought to promote the "useful Arts" as the Framers intended in the Constitution. *See* U.S. Const. art. I, § 8, cl. 8. Allowing Defendant to misappropriate protected works would risk significant damage to those creative industries. The music industry, for example, adopted its own robust digitization practice following the harm incurred during the advent of the digital era. It was one of the first intellectual property sectors to suffer the onslaught of digital freeloaders, as Napster and other internet pirates appropriated wholesale the catalogues of record companies and music publishers, harming not just labels and publishers but the thousands of

working songwriters and composers that rely on performance and mechanical royalties from digital content services. Internet piracy deprived all of them a return on their investments in creating, producing, marketing, and distributing music, and denied them their justly earned reward for their creative endeavors. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002).

Beginning in 2015, the industry was able to reverse the downtrend in record sales, however, by leaning heavily into digitization, fueled largely by growth in paid subscription and on-demand streaming. In 2021, paid subscriptions ($8.6 billion) and on-demand streaming ($1.8 billion) accounted for 69 percent of all revenues generated by music sales. *See U.S. Sales Database*, RIAA, https://www.riaa.com/u-s-sales-database/ (last visited Aug. 12, 2022). For recording artists, as well as music publishers, songwriters, and composers who increasingly rely on mechanical and performance royalties from digital content services as opposed to physical sales, legitimately licensing these services, including to libraries, makes up a significant part of their businesses and livelihoods.[9]

The increase in earnings that the music industry has seen enables it to invest substantial revenues (to wit, $5.8 billion) into the development and marketing of artists and repertoire.[10] This encourages the entry of new artists into the market and the creation of new music, all to the benefit of music consumers who have embraced these new digital platforms. Record labels have partnered

---

[9] Artists receive remuneration—and an incentive to create—through a variety of contractual and statutory arrangements, including traditional royalty deals, profit-sharing, and licensing configurations.

[10] *See Record Companies: Powering the Music Ecosystem*, IFPI, https://powering-the-music-ecosystem.ifpi.org/ (last visited Aug. 12, 2022); *The Value of a Label*, IFPI Global Music Report 2019, https://powering-the-music-ecosystem.ifpi.org/download/GMR_The_Value_of_a_Label.pdf (last visited Aug. 12, 2022).

with streaming services like Spotify, Apple Music, and Amazon to provide easy access to any music a consumer might want.[11] Consumers may choose from dozens of services offering vast catalogues of millions of recordings, as these services pay license fees to the record companies, which then pay the publishers and artists.[12] If music, like books, can be distributed for free by libraries, consumers will no longer have any incentive to pay for the premium streaming services that Apple Music, Spotify, Amazon, or others offer, which in turn directly support musicians and allow them to create new music for their fans.

Like the music industry, the motion-picture industry is a thriving industry that contributes significantly to the economy. The Motion Picture Association ("MPA") estimates that film production employs 2.2 million people nationwide, at over $192 billion dollars in annual wages. *2020 | The American Motion Picture And Television Industry Creating Jobs, Trading Around the World*, MPA (Nov. 2021), https://www.motionpictures.org/wp-content/uploads/2022/01/MPA_US_Economic_Contribution_2020_Final.pdf. The industry also makes large contributions to local economies and accounts for $17.3 billion in export revenue alone. *Id*.

Permitting libraries to digitize and distribute archives of movies to the public for free,

---

[11] "Record labels have evolved to become music-based entertainment companies, focused on engaging fans with a continuous stream of social, 'snackable' music-based content." *New Report Illustrates How Modern Record Labels Remade Themselves in the Streaming Era*, Musonomics, https://musonomics.org/modernlabelreport (last visited Aug. 12, 2022).

[12] *See, e.g., What is the Mechanical Licensing Collective (MLC)?*, SongTrust, https://help.songtrust.com/knowledge/what-is-the-mechanical-licensing-collective-mlc (last visited Aug. 12, 2022); *About Spotify*, Spotify, https://newsroom.spotify.com/company-info/ (Spotify offers over 80 million tracks) (last visited Aug. 12, 2022).

would have a significant, harmful impact on this vibrant economy. Just as with books and music, copyright and valid licensing is the linchpin for the film industry, which is essential to "protecting the fundamental rights of creators—and bolstering the policies that protect them—so that [the] industry can continue to ignite the passions of fans everywhere." *What We Do*, MPA, https://www.motionpictures.org/what-we-do/safeguarding-creativity/ (last visited Aug. 12, 2022) (hereinafter *MPA: What We Do*). A healthy, vibrant industry is critical not just for the studios, but also for the creative artists: the actors, writers, and many others who contribute to the making of a film. For example, the SAG-AFTRA and Writers Guild of America agreements with film studios provide for residual payments to artists from retransmission and redistribution of films, including via the Internet. *See Brief of Screen Actors Guild-American Federation of Television and Radio Artists, Directors Guild of America, Inc. et al. as Amici Curiae in Support of Petitioners, American Broad. Cos., Inc. v. Aereo Inc.,* 2014 WL 880972, at \*27-31 (2014). These residuals are a "crucial source of income that can often be the lifeblood of the working actor and writer, particularly in difficult economic times and the periods between projects." *Id*. at 31. Residual payments make major contributions to the union pension and health plans, too. *Id*. at 32 n.14.  The unauthorized distribution of films, by contrast, would deprive these individuals of this critical income stream.

The film industry is also not immune to theft of its intellectual property. Globally in 2020, there were approximately 137 billion total visits to piracy sites worldwide, with over 11 billion downloads of pirated films, primetime TV, and video-on-demand; in 2015, the estimated commercial value of this digital piracy amounted to $160 billion. What Do We Know About 2020 Movie & TV Piracy Trends Worldwide, Alliance for Creativity and Entertainment, https://www.alliance4creativity.com/wp-content/uploads/2021/06/ACE-Piracy-infographic-2020-Final.pdf (last visited Aug. 12, 2022). The pirate site Megaupload.com alone is said to have

diverted as much as 8.5 percent of the revenue from the three major studios. Brett Danaher, Michael D. Smith, Gone in 60 Seconds: The Impact of the Megaupload Shutdown on Movie Sales, 33 Int'l J. of Indus. Org., 1 (Mar. 2014). To combat piracy, the industry is engaged in ongoing copyright enforcement to diminish the unauthorized distribution of works.[13] Defendant's theory of fair use that permits the distribution of unauthorized digital copies of works to users would cripple these enforcement efforts by providing pirates with a colorable defense for their thievery.

All creative industries would be impacted by any judicial expansion of fair use that permits wholesale copying and distribution of works from an analog format to digital without authorization. The video game industry is just another example of an economic powerhouse that employs many creative individuals[14] in the creation and design of games and is estimated to generate approximately $41 billion in direct economic output.[15] Video games meld technology with "visual arts, creativity, storytelling, and entertainment culture . . . [to create] a new form of visual art and entertainment and a new platform for experimentation and innovation in advanced technology development." *Games in the 21st Century* at 1. Weakening copyright protection to allow the distribution of so-called fair use digital copies of games from one format to an unauthorized digital format would displace sales in the marketplace and discourage creative and

---

[13] "To reduce piracy" the "industry's comprehensive approach to protecting both creators and audiences includes . . . enforcement actions" under the Act. *MPA: What We Do*.

[14] The industry creates direct employment for upwards of 143,000 personnel, with nearly half a million employed when accounting for "direct, indirect, and induced economic impacts." *Video Games in the 21st Century: The 2020 Economic Impact Report*, at 1, https://www.theesa.com/wp-content/uploads/2019/02/Video-Games-in-the-21st-Century-2020-Economic-Impact-Report-Final.pdf (last visited Aug. 12, 2022) (hereinafter *Games in the 21st Century*).

[15] *Id.*

innovative activities.

Music, film, television, and video gaming are all highly creative industries that rely on copyright to protect their huge investments in developing content and to safeguard the incomes of all those who depend on a rational market operating under transparent rules. Defendant's distorted theory of copyright law would upend the market's rationality by allowing the distribution of untold numbers of "free" digital copies to compete with authorized digital copies offered for sale or license. These industries' experiences with piracy leaves no doubt that a ruling in favor of Defendant and its notion of "free" competition will degrade revenues and undermine the incentive to create that underlies the concept of copyright, as copyright owners could no longer look to the Act for protection. Extrapolating from the music industry's experience of the early 2000s for example, it is not unreasonable to predict that sales and revenues once again would be drained away from these creative industries by free "borrowings" from Defendant's "library." There would be less incentive for artists to create and for these industries to make the investments needed to develop, market, and distribute artists' creations.[16]

## III.  ONLY CONGRESS IS EMPOWERED TO DECIDE WHETHER AND UNDER WHAT CIRCUMSTANCES TO EXPAND EXCEPTIONS THAT ALLOW NON-RIGHTSHOLDERS TO DIGITIZE AND DISTRIBUTE WORKS

Defendant is scanning copyrighted works at an enterprise level with no legal basis. Worse,

---

[16] The consensus of many independent studies is that sites offering free music via various delivery systems reduced legitimate sales by as much as 20 percent overall. *See* Michael D. Smith, *The Truth About Piracy*, Technology Policy Institute (Feb. 2, 2016), https://techpolicyinstitute.org/publications/intellectual-property/copyright-and-piracy/the-truth-about-piracy/. It is highly likely that a shift to free distribution from Defendant would disincentivize users from paying for streaming services, such as Spotify Premium or Apple Music, as would be true for motion picture and television streaming, discussed immediately *infra*.

it attempts to justify its policy of aggressive scanning and distribution of full-print works in knowing contravention of the Act, using the recent COVID-19 pandemic to claim that its desire to provide digital access of works qualifies as a public good.[17] But Defendant conveniently ignores the existing efforts of publishers to provide access to many of the same published books in digital format and disregards the harm to creators that results from its practices. *See* Defendant's Mem. of Law in Supp. of Mot. for Summ. J. ("Def's. Mot.") at 8–11. While Defendant attempts to rewrite the law though its misguided "Controlled Digital Lending" theory, it is only for Congress to determine whether any change in the copyright law is necessary.

**A. Congress Alone Has the Authority to Modify Section 108's Reproduction Protections for Libraries and Archives**

Only Congress may consider expanding the exceptions for libraries and archives under §108. Resting the decision with Congress, not the courts or any one individual or company, is both by design and crucial, considering that Congress and its agencies are positioned to undertake the significant research, review, and notice and comment periods that attend changes to the law.

---

[17] Defendant's "public good" argument ignores the fact that its COVID-19 practices hurt creators, who were already incredibly hard hit by the pandemic. *See, e.g.*, Alicia Wallace, *Covid Hit Nashville Hard. Now the Performing Arts Are Staging a Comeback*, FOX 55 News (June 12, 2022), https://www.wfft.com/news/business/covid-hit-nashville-hard-now-the-performing-arts-are-staging-a-comeback/article_ede57721-73e4-5fc6-af73-d1a2da020290.html (noting that the U.S. performing arts industry lost more than half of its jobs beginning in March 2020 in big and small city centers alike, with no swift rebound, particularly in Nashville, whose creative industry lost more revenue from April to July 2020 than any other large U.S. metro area); *see also* Alison Flood, *Internet Archive Accused of Using Covid-19 as 'An Excuse for Piracy'*, Guardian (Mar. 30, 2020), https://www.theguardian.com/books/2020/mar/30/internet-archive-accused-of-using-covid-19-as-an-excuse-for-piracy.

Defendant is not a legislative body and cannot simply make its own rules. Moreover, it lacks the incentive that Congress has to ensure that the interests of all stakeholders, libraries, and creators are heard, and that precaution is taken to avoid harming existing markets for digital work.

Section 108 reform has been a priority of Congress, the Library of Congress ("LOC"), and the U.S. Copyright Office for a number of years.[18] All three entities have recognized that the digital era presents new opportunities and challenges, involving balancing the rights of creators with the needs of users. *See generally* U.S. Copyright Office, Section 108 of Title 17: A Discussion Document of the Register of Copyrights 9 (2017), available at https://www.copyright.gov/policy/section108/discussion-document.pdf (hereinafter "Discussion Report"). Beginning in 2005, the Copyright Office, in partnership with the Library of Congress's National Digital Information Infrastructure and Preservation Program, initiated an independent committee of distinguished and experienced librarians, copyright owners, archivists, academics, and other experts (the "Study Group") to examine §108 in light of digital technologies and "provide findings and recommendations on how to revise the copyright law in order to ensure an appropriate balance among the interests of creators and other copyright holders, libraries and archives in a manner that best serves the national interest." *Id.* at 9–10. The Study Group's findings culminated in a §108 Report published March 31, 2008, in which the issued recommendations for Congress for potential amendments to the current Act that maintained the sought-after balance

---

[18] As discussed in Section I.C. *supra*, the Act allows qualified libraries that meet §108's statutory requirements to reproduce and distribute works without a rightsholder's permission under specific narrowly tailored conditions, and only when there is no indirect commercial advantage or interference with functional markets. Defendant is not a qualified library under these parameters, nor can it be considered a library in the first instance.

between rightsholders, libraries, and the public. *Id.* at 10. In September 2017, the Register of Copyrights issued its Discussion Report, with recommendations and model statutory language for possible reform that would update the statutory framework to encompass preservation in a digital era while maintaining restrictions on mass digitization to protect rightsholders and, particularly, to encourage thriving markets. *See generally* Discussion Report.

The Discussion Report acknowledged the desire to expand §108 activities to accommodate the public's access to libraries' or archives' wide-ranging collections but recommended doing so in a manner that would respect authors' rights. *Id*. at 23. The Report made clear that for a work to be considered "disseminated to the public," such dissemination must be with the authorization of the author or rightsholder. *Id.* at 24.

In the Copyright Office's view, a carefully revised §108 would provide a much more solid ground upon which to base the vitally important work of digital reproduction and access for scholars and future generations than reliance on fair use, which by necessity requires a case-by-case approach.[19] The Discussion Report stressed that the time was ripe to engage in §108 reform, but nonetheless, there has been no reform to date. In the meantime, Defendant has chosen to circumvent Congress, the LOC and the U.S. Copyright Office and instead take matters into their own hands by creating out of whole cloth a legal fiction they refer to as "Controlled Digital

---

[19] *Id.* at 11, 13–14. Prior to hearing witness testimony, Judiciary Committee Chairman Bob Goodlatte noted that "[r]ecently some have suggested that instead of updating section 108 for the digital age, preservation activities should be covered by the fair use provisions of section 107. While it is probably true that there are clear-cut cases in which fair use would apply to preservation activities, fair use is not always easy to determine, even to those with large legal budgets. Those with smaller legal budgets or a simple desire to focus their limited resources on preservation may prefer to have better statutory guidance than exists today." *Id.* at 11.

Lending." *See* Def's. Mot.at 16.

> **i. Section 108 Requires Careful Balancing of Competing Interests, Which Congress is Uniquely Positioned to Consider**

The various competing interests surrounding libraries' and archives' digitization rights requires Congressional oversight in order to achieve a balanced result. While §108 addresses user requests for copies of works, it expressly balances such requests with the rights of the copyright holders and the need to prevent infringement. Section 108 recognizes the importance of controlling libraries' and archives' making and distributing copies of works so that they do not interfere with commercial markets.[20] Section 108 does not provide exceptions based on the efficiency of the library's scanning abilities, nor does it allow the distribution of entire works on a mass scale.

**B. Congress Alone Has the Authority to Consider Expanding the First-Sale Doctrine to Permit Digitization and Distribution of Works**

Similarly, only Congress has the authority to expand the first-sale doctrine beyond its current application to only physical works.  In *Association of American Publishers, Inc. v. Frosh*, the court stated that only Congress could expand the first-sale doctrine to digital copies, not a Court

---

[20] For example, §108(c) permits libraries and archives to make three copies of a work if an existing copy is "damaged, deteriorating, lost or stolen" or if "the existing format in which the work is stored has become obsolete," but even then, only if further conditions are met. As discussed, this requires the library or archives to have undertaken a "reasonable effort" to determine that "an unused replacement cannot be obtained at a fair price" and provide assurance that they will not make the digital reproduction available to the public outside their premises. *Id.* Additionally, a format is only deemed "obsolete" if the machine or device necessary to perceive the work "is no longer manufactured or is no longer reasonably available in the commercial marketplace." *Id.*; *see also* Discussion Report at 28. (reasoning that "there is insufficient need for libraries or archives to make preservation copies of published or publicly disseminated copyrighted works where there is no evidence of any significant risk of loss, such as for works readily available on the market").

or a state.  2022 WL 484926, at *12 (D. Md. Feb. 16, 2022).

It is clear from the text and history of the Act that the balance of rights and exceptions surrounding digitization of copyrighted works is to be decided by Congress alone. Agencies, such as the Copyright Office and the Department of Commerce's Internet Policy Task Force, have cautioned Congress not to expand the first-sale doctrine to digital transmission because of the risk of increased infringement, as well as risks to the creative industries' primary markets.[21]

Striking the balance between the critical functions of libraries and the importance of preserving the exclusive rights of copyright holders, however, is squarely in the province of Congress and not the courts, and cannot be left in the hands of one entity. Defendant cannot be the one to determine the format and distribution method of a copyright holder's work without the owner's authority and consent.

## **CONCLUSION**

For the reasons set forth above, the Copyright Alliance, as *amicus curiae*, respectfully requests that the Court grant Plaintiffs' motion for summary judgment and deny Defendant's cross motion for summary judgment.

---

[21] The Copyright Office recommended against expanding the first-sale doctrine to digital transmissions in part because "[t]he risk that expansion of section 109 [would] lead to increased digital infringement weigh[ed] heavily against such an expansion." U.S. Copyright Office, DMCA Section 104 Report 99 (2001), available at https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf. In 2016, the Department of Commerce's Internet Policy Task Force prepared a "White Paper on Remixes, First Sale, and Statutory Damages." Dep't of Commerce Internet Policy Task Force, White Paper on Remixes, First Sale, and Statutory Damages (2016), available at https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf. The Task Force likewise recommended against expansion of the first sale doctrine to digital transmissions. *Id.* at 58.

Dated:  August 12, 2022

COWAN, DEBAETS, ABRAHAMS &
SHEPPARD LLP

/s/ Nancy E. Wolff
Nancy E. Wolff
Alex Gigante
Elizabeth Safran
41 Madison Avenue, 38th Floor
New York, New York 10010
Tel.: (212) 974-7474
Fax: (212) 974-8474
nwolff@cdas.com
agigante@cdas.com
esafran@cdas.com

*Attorneys for Amicus Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the formatting and word count requirements set forth in this Court's Individual Practices II.D. According to the word count function of Microsoft Word, this brief contains 6924 words (excluding cover page, table of contents, table of authorities, certification of compliance, and certification of service).

/s/ Nancy E. Wolff
Nancy E. Wolff

## <u>CERTIFICATE OF SERVICE</u>

I, Nancy E. Wolff, hereby certify that a true and correct complete copy of the foregoing Brief of Amicus Curiae in Support of Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC's Motion for Summary Judgment has been served on all counsel of record via the Court's CM/ECF service.


/s/ Nancy E. Wolff
Nancy E. Wolff