# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and PENGUIN
RANDOM HOUSE LLC,

                       Plaintiffs,

         v.

INTERNET ARCHIVE and DOES 1 through
5, inclusive,

                       Defendants.

Case No. 1:20-CV-04160-JGK

---

**[PROPOSED] MEMORANDUM OF LAW OF *AMICI CURIAE*
THE AUTHORS GUILD, INC., WESTERN WRITERS OF AMERICA, CANADIAN
AUTHORS ASSOCIATION, AMERICAN PHOTOGRAPHIC ARTISTS, THE
WRITERS' UNION OF CANADA, INTERNATIONAL AUTHORS FORUM,
AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, ROMANCE WRITERS OF
AMERICA, SOCIETY OF CHILDREN'S BOOK WRITERS AND ILLUSTRATORS,
EUROPEAN WRITERS COUNCIL, NATIONAL WRITERS UNION, GRAPHIC
ARTISTS GUILD, AMERICAN SOCIETY FOR COLLECTIVE RIGHTS LICENSING,
SOCIETY OF AUTHORS, SISTERS IN CRIME, INTERNATIONAL FEDERATION OF
JOURNALISTS, DRAMATISTS GUILD OF AMERICA, NATIONAL PRESS
PHOTOGRAPHERS ASSOCIATION, NOVELISTS INC., ASSOCIATION OF
AUTHORS AGENTS, THE AMERICAN SOCIETY OF JOURNALISTS AND
AUTHORS, THE UNION DES ÉCRIVAINES ET DES ÉCRIVAINS QUÉBÉCOIS, AND
EUROPEAN VISUAL ARTISTS IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

REITLER KAILAS & ROSENBLATT LLP
885 THIRD AVENUE
NEW YORK NEW YORK 10022
ATTORNEYS FOR *AMICI CURIAE*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF INTEREST OF *AMICI* ....................................................... 1

SUMMARY OF ARGUMENT ............................................................................ 1

ARGUMENT ...................................................................................................... 4

    I.    OPEN LIBRARY IS NOT FAIR USE ................................................... 4

        A.    Open Library Is Not A Transformative Use ........................................ 4

        B.    Open Library's CDL Practices Are Certain to Cause Significant Harm to Authors' Incomes ............................................................ 8

            1.    Open Library Will Decimate the Library Ebook Licensing and Consumer Ebook Markets From Which *Amici*'s Members Derive A Significant Share of Their Incomes ............................ 9

            2.    The Court Must Consider the Harm to the Value of the Works if Open Library's CDL Practices were to Become Widespread and Unrestricted…………………………….…………….10

            3.    Open Library Directly Harms the Market for Back In Print Works and Adversely Impacts Authors' Ability to Reuse Works ...................................................................................... 15

               i.    Rights Reversion and the Back In Print Market ................................ 16

               ii.    The significance of author income from back in print books and reuses................................................................................... 18

            4.    Open Library Will Deprive Copyright Owners of Royalties Paid For Lending By Non-U.S. Libraries Under the Public Lending Right ........................................................................... 20

CONCLUSION ................................................................................................... 21

APPENDIX ........................................................................................................ 233

# TABLE OF AUTHORITIES

## CASES

*American Geophysical Union v. Texaco, Inc.*,
  60 F.3d 913 (2d Cir. 1994) ........................................................................................... 20

*Authors Guild v. Google, Inc.*,
  804 F.3 202 (2d Cir. 2015) ..................................................................................... 2, 4, 5

*Authors Guild v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014) ............................................................................................. 2

*Campbell v. Acuff-Rose Music*,
  510 U.S. 569, 590 (1994) ............................................................................................. 10

*Capitol Records v. ReDigi, Inc.*,
  910 F.3d 649 (2d Cir. 2018) ........................................................................................... 4

*Clean Flicks of Colorado v. Soderbergh*,
  433 F. Supp. 2d 1236 (D. Colo. 2006) ......................................................................... 15

*Disney Enters. v. VidAngel*,
  869 F.3d 848, 852 (9th Cir. 2017) ........................................................................... 4, 14

*New York Times Co. v. Tasini*,
  533 U.S. 483 (2001) ....................................................................................................... 6

## STATUTES

17 U.S.C. § 106 ..................................................................................................................... 2

17 U.S.C. § 109 .................................................................................................................. 2, 7

17 U.S.C. § 201 .................................................................................................................. 6, 7

17 U.S.C. § 1201(a)(1)(C) .................................................................................................... 4

## OTHER AUTHORITIES

1976 U.S.C.C.A.N. 5659, 5738 ............................................................................................ 6

Abraham L. Kaminstein, U.S. Copyright Office, Divisibility of Copyrights, Study No. 11 (June 1957), in Copyright Law Revision: Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 2d Sess. 17–23 (Comm. Print 1960) ................................................................................................................................. 6

David Hansen & Kyle Courtney, *White Paper on Controlled Digital Lending of Library Books,*
https://controlleddigitallending.org/whitepaper ....................................................................... 5, 16

Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control
Technologies, 80 Fed. Reg. 65944–01, 65960 (Oct. 28, 2015) ....................................................... 5

H.R. Rep. 94-1476, at 123 (1976) .................................................................................................. 6

https://www.authorsguild.org/industry-advocacy/u-s-district-court-grants-win-to-plaintiffs-in-
kiss-library-ebook-piracy-suit/ ..................................................................................................... 11

https://www.makeuseof.com/tag/the-best-6-sites-to-get-free-ebooks/ ......................................... 11

Jim Parker, "The Public Lending Right and What It Does," WIPO Magazine June 2018,
https://www.wipo.int/wipo_magazine/en/2018/03/article_0007.html .......................................... 20

S. Rep. 94-473, at 106–07 (1975) ................................................................................................... 6

See https://www.authorsguild.org/wp-content/uploads/2021/10/AG-Comments-re-USTR-021-
0013-2021-Notorious-Markets-List.pdf ....................................................................................... 11

*Six Takeaways from the Authors Guild 2018 Author Income Survey*,
https://www.authorsguild.org/industry-advocacy/six-takeaways-from-the-authors-guild-2018-
authors-income-survey/ ................................................................................................................... 3

The Authors Guild's Model Trade Book Contract and Commentary, Section 2, Grant of Rights,
https://go.authorsguild.org/contract_sections/2. ........................................................................... 6

The Authors Guild's Model Trade Book Contract and Commentary, Section 5, Royalties,
https://go.authorsguild.org/contract_sections/5 ............................................................................ 8

# PRELIMINARY STATEMENT[1]

Amici Curiae The Authors Guild, Inc., Western Writers of America, Canadian Authors Association, American Photographic Artists, The Writers' Union of Canada, International Authors Forum, American Society of Media Photographers, Romance Writers of America, Society of Children's Book Writers and Illustrators, European Writers Council, National Writers Union, Graphic Artists Guild, American Society for Collective Rights Licensing, Society of Authors, Sisters in Crime, International Federation of Journalists, Dramatists Guild of America, National Press Photographers Association, Novelists Inc., Association of Authors Agents, The American Society of Journalists and Authors, The Union des Écrivaines et des Écrivains Québécois, and European Visual Artists (collectively, "*Amici*") respectfully submit this [Proposed] Memorandum of Law in Support of their Motion for Leave to File Amici Curiae Brief and Proposed Amici Curiae Brief in support of Plaintiffs Hachette Book Group, Inc.'s, HarperCollins Publishers LLC's, John Wiley & Sons, Inc.'s, and Penguin Random House LLC's Motion for Summary Judgment.

## STATEMENT OF INTEREST OF *AMICI*

The *Amici* are all organizations that represent the professional interests of writers and other creators. The identity and interests of each of the *Amici* are set forth in the attached Appendix.

## SUMMARY OF ARGUMENT

Defendant Internet Archive ("IA") has engaged, and continues to engage, in willful infringement of Plaintiffs' copyrighted literary works ("Works") on a massive scale. Through its so-called Open Library program ("Open Library"), IA has created a vast unauthorized online

---

[1] The parties have consented to the submission of this brief by *Amici*. Neither the parties not their counsel have authored this brief, and neither they nor any other person or entity other than counsel for *Amici* contributed money that was intended to fund preparing or submitting this brief.

database of literary works that anyone in the world can access for free, which differs from the most flagrantly illegal pirate websites chiefly by reason of its enormous scale. IA has reproduced and distributed digital copies of these works under the pretext that it is merely a library, loaning "books" to its patrons by means of a process it refers to as controlled digital lending, or "CDL" – which in reality is neither controlled nor limited to lending.[2]

As set forth more fully below, Open Library is not a fair use. Moreover, it is irreconcilable with several fundamental principles of U.S. copyright law, including the statute's recognition of a copyright owner's separate exclusive rights of distribution and reproduction under 17 U.S.C. § 106, and the express limitations Congress placed on the first-sale doctrine, which permits distribution, but not reproduction, of lawfully-made physical copies of a work under 17 U.S.C. § 109. If Open Library's practices are found legal, any website calling itself a library could digitize or copy any in-copyright creative works and "lend" out copies, including in a manner that actually downloads the copies on users' computers. This will gut copyright law and, as a result, will greatly diminish our country's literary and other creative output. IA's policy arguments regarding these statutory provisions must in any event be addressed to Congress, not to this Court.

IA's implausible assertion of fair use merely rehashes arguments that this Court, the Second Circuit and the U.S. Supreme Court have squarely and consistently rejected. Open Library's digitization and distribution of Plaintiff's Works is not transformative, including by the standards of the Second Circuit in *Authors Guild v. Google, Inc.*, 804 F.3 202 (2d Cir. 2015) ("*Google Books*") and *Authors Guild v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ("*HathiTrust*") on

---

[2] This brief does not address the so-called "controlled digital lending" practices of other entities or institutions, but only refers to IA's practices with respect to its Open Library program which it defends under the rubric of "controlled digital lending."

which IA purports to rely, but instead uses the literary works in their entirety for their original intended purpose, merely providing a free substitute for authorized library ebook lending.

IA's infringements have caused and will continue to cause significant harm to *Amici*'s members. Many members' works are part of the "long tail" of older published works that earn much of their revenue from licensed electronic uses rather than sales of new copies. Because authors and many other creators today generally earn so little from their writing,[3] they rely on income from the long tail and even a seemingly minor reduction in such income will materially impact the authors, visual artists, photographers, and other creators who depend on it. IA itself concedes, *see* IA Mem., ECF 106 at p. 13, that libraries will be likely to shift their finite acquisition resources away from ebook licenses for older titles, if this Court allows them to offer ebooks of those older works to users for free. So the works that IA has unilaterally deemed unworthy of full copyright protection are the very ones whose creators will be most significantly harmed by IA's willful and widespread infringement. Further, creators and their publishers will find it more challenging to bring older titles back into print, whether in physical or electronic form, if they must compete with free Open Library-generated ebooks from IA. Such free Open Library-generated ebooks will also create a direct market substitute for authorized lending by libraries outside the U.S., which lending – unlike Open Library – generates royalties for creators under the public lending right recognized by many other countries.

The Court should harbor no illusions: the public-spirited veneer of "library lending" behind which IA seeks to disguise its massive infringement is a Trojan horse. It undermines the careful balancing of interests that Congress codified in the Copyright Act and poses a grave threat to the

---

[3] *Six Takeaways from the Authors Guild 2018 Author Income Survey*, https://www.authorsguild.org/industry-advocacy/six-takeaways-from-the-authors-guild-2018-authors-income-survey/ (Accessed August 11, 2022).

livelihoods of countless individual copyright owners who are members of *Amici*. The Plaintiffs'

motion for summary judgment should be granted in all respects.

## ARGUMENT

### I.      OPEN LIBRARY IS NOT FAIR USE

The inapplicability of fair use to book digitization technologies such as Open Library is

well-settled. In June 2015, the Copyright Office published a report on the subject of orphan works

and mass digitization,[4] which specifically considered *inter alia* whether mass digitization by

libraries could be entitled to a fair use defense under §107.  The Copyright Office stated at *19

that "there is broad agreement that no colorable fair use claim exists [for] providing digital access

to copyrighted works in their entirety." Since that time, the significant fair use decisions that have

spoken to these issues, including *Google Books* and *Capitol Records v. ReDigi, Inc.*, 910 F.3d 649

(2d Cir. 2018) ("*ReDigi*"), have only reinforced that conclusion.

### A.      Open Library Is Not A Transformative Use

Open Library is not a transformative use.  It is merely a new spin on the much-discredited

"space-shifting" or "format-shifting" argument that internet-enabled infringers from Napster

onward have tried and failed to foist on the courts. As the Ninth Circuit noted in *Disney Enters. v.*

*VidAngel*, 869 F.3d 848, 852 (9th Cir. 2017) ("*VidAngel*"):

> The reported decisions unanimously reject the view that space-
> shifting is fair use under § 107. *See A&M Records*, 239 F.3d at 1019
> (rejecting 'space shifting' that 'simultaneously involve[s]
> distribution of the copyrighted material to the general public');
> *UMG Recordings*, 92 F.Supp.2d at 351 (rejecting "space shift" of
> CD files to MP3 files as 'another way of saying that the
> unauthorized copies are being retransmitted in another medium—an
> insufficient basis for any legitimate claim of transformation').
> Indeed, in declining to adopt an exemption to the DMCA for space-
> shifting, *see* 17 U.S.C. § 1201(a)(1)(C), the Librarian of Congress

---

[4] 2015 WL 5821453 (CPY.OFC 2015).

> relied on the Register of Copyright's conclusion that 'the law of fair
> use, as it stands today, does not sanction broad-based space-shifting
> or format-shifting.' Exemption to Prohibition on Circumvention of
> Copyright Protection Systems for Access Control Technologies, 80
> Fed. Reg. 65944–01, 65960 (Oct. 28, 2015).

Although IA does not employ the vocabulary of space-shifting or format-shifting in this litigation, perhaps because the courts have so often rejected those arguments, Open Library in fact does nothing other than change the format in which a literary work is embodied, so that the *work* (not the *copy*) can be made available to readers in a different location. The so-called White Paper on CDL, upon which IA and its *Amici* rely heavily, concedes the point. *See* David Hansen & Kyle Courtney, *White Paper on Controlled Digital Lending of Library Books,* https://controlleddigitallending.org/whitepaper (Accessed August 10, 2022) ("White Paper") at 25 ("What CDL does allow is a change of the format in which that lend is made").

Therefore, Open Library is not a transformative use. The Second Circuit in *Google Books* states explicitly that "recasting of a novel as an ebook," as IA does here, fails to "involve the kind of transformative purpose that favors a fair use finding." *Google Books* at 215. Because the Second Circuit itself began by noting that the case "tests the boundaries of fair use," *id.* at 206, this Court should not expand the definition of transformative use to reach a fact pattern that *Google Books* itself flatly declared to fall outside those boundaries.

As the Second Circuit has recognized, an ebook is not a transformative use of a print book; to the contrary, it is merely another format in which the underlying literary work can be exploited. The practices of the publishing industry are built around this distinction between print, electronic, audio, and other formats. Authors monetize their copyrights by granting specific rights to

publishers.[5]  As provided by the Copyright Act, an author may choose to transfer (usually by "license") her copyright ownership in whole or in part and may choose to license certain of her exclusive rights but retain others.  *See* 17 U.S.C. § 201.  Congress expressly recognized the importance of the divisibility of these exclusive rights by providing, in the text of the statute, that "any subdivision of any of the rights specified by section 106" may be owned separately.  17 U.S.C. § 201(d)(2); *see also New York Times Co. v. Tasini*, 533 U.S. 483, 494 (2001).

As the House of Representatives and Senate pointed out in their committee reports, this provision was the "first explicit statutory recognition of the principle of divisibility of copyright in our law."  H.R. Rep. 94-1476, at 123 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5738; S. Rep. 94-473, at 106–07 (1975).  Each of the exclusive rights enumerated in Section 106 "may be subdivided indefinitely" and "each subdivision of an exclusive right may be owned and enforced separately."  H.R. Rep. 94-1476, at 61; S. Rep. 94-473, at 57; *see also* Abraham L. Kaminstein, U.S. Copyright Office, Divisibility of Copyrights, Study No. 11 (June 1957), in Copyright Law Revision: Studies Prepared for the Subcomm. on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 2d Sess. 17–23 (Comm. Print 1960) (discussing the need for divisibility of copyrights).  IA's attempt to apply the fair use doctrine in this instance undermines Congress' intent in allowing rights to be divided and transferred separately in the Copyright Act.

Determining how to separate and monetize their bundle of rights requires authors and their representatives to make careful decisions about how they want their work to be released and exploited (including when, in what territories, and in which formats).  In recent years, given the

---

[5] *See* The Authors Guild's Model Trade Book Contract and Commentary, Section 2, Grant of Rights, https://go.authorsguild.org/contract_sections/2. (Accessed August 10, 2022).

advent of technology that makes reading literary works on electronic devices possible, along with the growing popularity of ebooks, the decision of whether to grant licenses to ebooks and other electronic rights are key considerations for authors and other creators.  Whether authors choose to publish with a traditional publisher or self-publish, however, the agreements always specify the precise rights and formats being licensed.  IA's actions here undercut that exclusivity and interfere with authors' abilities to separately license their rights.

If IA's arguments in this litigation were accepted, any author or other creator who conveyed to a publisher the right to sell print copies of a work of authorship would, *de facto,* be granting IA and other online self-titled or actual libraries the right to reproduce and distribute that work in electronic form, as an unintended third-party beneficiary of the grant of print rights. The copyright statute allows the owner of a lawfully-made physical copy to dispose of that copy as they wish, 17 U.S.C. §109; IA's logic would extend that rule to allow the recipient of that physical copy to make additional copies of the underlying work in different formats, meaning that a copyright owner would have no ability to license rights separably.  Needless to say, such a rule would gut copyright law and the divisibility of rights that is so central to the 1976 Copyright Act.

The Copyright Act instead rejects any such mandatory bundling of print publication rights and other economically significant rights.  There is no compulsory license for digital derivatives of literary, pictorial or other works of authorship, let alone one that is triggered simply by virtue of print publication of such works.  Those rights are separate, and as a practical matter they are separately conveyed by authors.  17 U.S.C. § 201(d).  As noted above, when an author publishes a literary work, he or she typically makes separate grants of print rights, audio rights, ebook rights, and other rights, whether to different publishers or to one publisher under a single agreement.  Each of the rights granted is taken into account in negotiating the advance paid to the author and the

other commercial terms of the publishing contract.  IA's offering unauthorized derivative versions of ebooks through Open Library will significantly interfere with authors' abilities to grant exclusive electronic text rights to publishers and other licensees.  This material interference is not without financial consequence, as it would severely diminish the value of these rights for authors because authors will no longer have the ability to grant exclusive ebook rights to potential licensees and fully exploit their rights in each separate format, which in turn will result in a loss of market opportunity and revenue streams.

By engaging in massive and uncompensated "format-shifting" from print books to ebooks, IA is robbing authors of their right to separately license the rights that Congress created for them.

### B.     Open Library's CDL Practices Are Certain to Cause Significant Harm to Authors' Incomes

As the Plaintiffs have described, Open Library' offering of ebooks serves as a direct substitute for authorized sales and licenses of ebooks. As such, it currently causes and is likely to cause even more harm in ensuing years to the ebook markets.  ECF 99 at pp. 29-39.  Each lost sale by their publishers results in a direct loss of income for authors. Authors, when publishing through traditional publishers such as plaintiffs, are generally paid a royalty for each copy of the book sold. The royalty rate is a percentage of either the list price of the book or the net receipts, with different rates for different formats.  Today, most publishers pay authors 25% of the net receipts for all ebooks, including library licenses.[6]  Because library licenses are generally more expensive than sales of ebooks to consumers, the author's share is a greater total amount (for instance, a library license to an ebook priced at $35 would result in a royalty of $8.75, as compared to $3.00 for a consumer ebook priced at $12).

---

[6] The Authors Guild's Model Trade Book Contract and Commentary, Section 5, Royalties, https://go.authorsguild.org/contract_sections/5 (Accessed August 11, 2022).

Accordingly, authors stand to lose significant income from Open Library's substitution of library licenses alone if the court were to erroneously find that IA's use were fair use. Morevoer, Open Library also replaces sales directly to consumers, as so many consumers will choose free ebooks over purchasing an ebook, and this further results in lost income for authors. *See* ECF 99 at pp. 29-39. Last and perhaps most importantly from authors' perspective, Open Library's practices, especially should they become widespread and unrestricted, will eradicate the market for authors' bringing the books back into print after publishers have ceased selling their books and the authors have reclaimed their rights.

1.   **Open Library Will Decimate the Library Ebook Licensing and Consumer Ebook Markets From Which *Amici*'s Members Derive A Significant Share of Their Incomes**

IA admits, *see* ECF 106 at p. 13, that libraries will shift finite resources away from ebook licenses for older titles. Instead of removing those ebooks from their catalogs, libraries will use controlled digital lending to provide ebooks to their users. This will greatly reduce ebook sales for backlist books. The backlist is extremely important revenue for both publishers is extremely important. In 2019 backlist books comprised 63 percent of overall US book sales. This figure jumped even higher during the pandemic when 67 percent of all US book sales were backlist titles.[7]

In this way, the author will not only be deprived of income from licensing, but the availability of free unlicensed copies will hinder library patrons from buying the book. Moreover, if IA's Open Library practices become widespread – which will occur if IA prevails in this suit –

---

[7]   *See* https://www.janefriedman.com/how-the-pandemic-is-affecting-book-publishing/ (Accessed August 12, 2022); *see also* https://www.publishersweekly.com/pw/by-topic/industry-news/bea/article/86464-u-s-book-show-backlist-strategies-to-build-revenue.html (The pandemic "brought the long tail in a big way," Penguin Random House Publisher Services v-p of marketing Matthew Shatz said… he long tail theory asserts that products in low demand can collectively build a larger market share than a few high sellers over a given amount of time. "For 20 years, we didn't really see it that way," Shatz said. "But with Covid-19, the concept just might be a concrete example of the long tail at work.").

every library can start making digital copies instead of licensing ebooks and the long tail will fizzle out, eviscerating the potential market for authors to bring their books back into print – a market tat older authors in particular are reliant on simply to put food on the table.

Moreover, when that happens, the harm caused by Open Library will extend not just to the exploitation of copyright owners' existing works, but will also disadvantage copyright owners in future contract negotiations, as the availability of a no-cost library ebook option will devalue any ebook rights such copyright owners may be able to convey to publishers. A publisher could not rationally be expected to pay much, if anything, to the author for the right to license ebooks to libraries, if Open Library can make such access universally available to readers without consent by or payment to publishers. Accordingly, the disappearance of this market would be devastating for the members of *Amici*.

      **2.**      **The Court Must Consider the Harm to the Value of the Works if Open Library's CDL Practices were to Become Widespread and Unrestricted**

Market harm under the fourth factor is much broader than simply adding up specific instances of past harm. Under *Campbell,* the Court must weigh the market harm that would result if the infringing conduct were to become "unrestricted and widespread." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 590 (1994). If IA were to prevail in this action, then any library, or even anyone who calls themselves a library, could digitize books and make them available. If that were the case, libraries would no longer have any need to license ebooks. Indeed, part of IA's plan is to allow libraries to use its ebooks instead of having to license ebooks. As plaintiffs' brief states, "IA openly markets the Open Libraries project with promises that Partner Libraries no longer need to license ebooks: joining as a Partner Library 'ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format.' Plaintiff's Statement of

Undisputed Material Facts, ECF 107 ("SUMF") ¶382.  Or, as it pithily suggests, 'You Don't Have to Buy It Again.' *Id.* at ¶383.

Relatively few libraries are currently partner libraries in the Open Libraries program mainly, it appears, due to their rightful concerns about copyright.  If the court were to rule in IA's favor, many other libraries would likely join as partners.  It is difficult to imagine how a viable library licensing ebook market could be sustained in that case.

Further, any entity that called itself a library could use a decision condoning Open Library to justify making digital copies of physical books and distributing them as ebooks.  And that is exactly what some of the world's most popular, high-volume pirate sites such as Library Genesis (Libgen), Z-Library,[8] and the now defunct Kiss Library,[9] already do. "Library Genesis." Far from operating in the shadows, these notorious pirate sites appear prominently in search results and informational articles alongside legal libraries and ebook sources such as Project Gutenberg, Over Drive, and others.[10]  For example, the third result in a simple Google search query for "Download free books" elicits an article from popular how-to website Makeuseof.com that lists Library Genesis at #2 on the list of "10 best free ebook download sites."  Even more alarmingly, Z-Library,

---

[8] Libgen and Z-Library domains are not only the most high-traffic locations for pirate ebook acquisitions, they rank among the most high-traffic locations overall on the global internet. For e.g., in a submission concerning notorious pirates to the US Trade Representative's Office the Authors Guild noted that one of Libgen's domains ranked #2758 (among the over-1.8 billion websites) and a Z-Library domain ranked #5301 in global engagement rankings over a 90-day period. See https://www.authorsguild.org/wp-content/uploads/2021/10/AG-Comments-re-USTR-021-0013-2021-Notorious-Markets-List.pdf (Accessed August 10, 2022).

[9] Kiss Library was taken down as a result of a civil lawsuit by author plaintiffs, Amazon, and Penguin Random House, organized in part by the Authors Guild. See https://www.authorsguild.org/industry-advocacy/u-s-district-court-grants-win-to-plaintiffs-in-kiss-library-ebook-piracy-suit/ (Accessed August 10, 2022).

[10] https://www.makeuseof.com/tag/the-best-6-sites-to-get-free-ebooks/(Accessed August 10, 2022).

possibly the most high-profile and highly trafficked book piracy site in the world, which unabashedly calls itself "The world's largest ebook library," appears third in results for the query "free ebook library" and fourth in the query for "ebook library" after library ebook sales and licensing platform Overdrive and the New York Public Library's popular "E-Book Central" catalogs.  Below are screen shots of the search query:





The interpolation of the high traffic pirate sites with legitimate library portals in common search results is both a product of elaborate subterfuge[11] by pirate sites to appear as legitimate libraries and an inability to distinguish between legal library lending and illegal downloads by internet readers. The lack of distinction between pirate sites and legitimate ebook sources, and the lack of safeguards to prevent pirate sites from appearing in responses to innocent search queries is

---

[11] Pirate sites often have a form for "DMCA" takedowns to deceive users into thinking they're user-generated-content sites with safe harbor protections.

devastating for authors and publishers.  A finding that Open Library's use is fair use will erase the careful distinction under copyright law between legitimate library functions and wholly infringing activity and make their deceptions even more convincing.

In sum, the fourth fair-use factor is not a damage calculation but requires the Court to weigh the consequences of such a ruling on the library ebook market, which would likely disappear as a source of revenue for many members of *Amici* as well as the entire consumer ebook market, which will likely be gravely damaged as well.  ECF 99 at pp. 29-39.

The "owned to loaned" fiction asserted by IA does not eliminate the market harm Open Library causes.  The basic underlying assumption of "owned to loaned" is that the market for "owned" print books and the market for "loaned" ebooks are the same market, so that circulation of a copyrighted work in any format is fungible with circulation of that work in any other format.[12] The record belies that assumption, as copyright owners and libraries have over many years created and participated in entirely separate markets for the sale of physical books and the licensing of ebooks, at different prices and on different terms and conditions.

Accordingly, the Ninth Circuit in *VidAngel* rejected the fair use argument of the defendant video service, which bought legitimate copies of videos, created edited versions, and then streamed the edited versions to the nominal "owners" of those authorized copies.  The fact that the process began with a legitimate copy "in no way frees defendant to usurp a *further market* that directly derives from reproduction of the Plaintiffs' copyrighted works." *VidAngel* at 861 (quoting *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F.Supp.2d 349, 352 (S.D.N.Y. 2000)) (emphasis added).

---

[12] *See, e.g.,* IA Mem., ECF 106 at p. 12 (discussing the effect of IA's unauthorized ebooks on the "corresponding print sales at retail" of the same titles).  The record here is clear: what IA *owns* are printed books.  What it *loans* is access to a digital embodiment of a copyrighted work. The record is equally clear that those are different markets.

Likewise in *Clean Flicks of Colorado v. Soderbergh*, 433 F. Supp. 2d 1236 (D. Colo. 2006), the defendant bought legitimate DVD copies of videos, made edited "family friendly" versions of the videos, burned the edited versions onto new DVDs, and sold each edited DVD together with the original, unedited DVD. This required "maintaining a one-to-one ratio of the original and edited versions," like Open Library, *id.* at 1240, but was held infringing even though the Plaintiffs "do not compete in this alternative market" for edited versions of their films. *Id.* at 1242. If the one-to-one ratio did not sufficiently favor defendant in *Clean Flicks*, even when Plaintiffs did *not* participate in the "alternative market," it is an even weaker factor here, where copyright owners actively license libraries to lend ebooks.

### 3. Open Library Directly Harms the Market for Back In Print Works and Adversely Impacts Authors' Ability to Reuse Works

The harm that results from Internet Archive's unauthorized scanning and distribution of copyrighted works is not limited to substitution of publisher's library ebook lending licenses or consumer ebooks. It radiates beyond the market for the publishers' books, which, although the most visible and dominant market for literary works, is not the only one. A vibrant market exists for books that are brought back in print, for resales of rights, and for reissues after titles have been retired from a publishers' catalog. *Amici* respectfully ask the court to consider the implications of IA's activities on this market, which may be smaller and less prominent than the traditional market for publishers' books, but that is no less significant to author earnings.

IA's activities harm authors both by substituting their potential income from publishers' consumer sales and ebook licenses, and by substituting for ebook editions of books that publishers have ceased production (referred to as "out of print") and the authors have brought back into print, or which they intend to republish. Authors generally rely on multiple revenue streams to pull together a living, and they are increasingly exploring new ways to revive out of print works when

the rights have reverted to them, especially as ebooks. Yet IA denies this market even exists. It claims that copying and distributing "out of print" books is fair use,[13] because unavailability of a book through normal trade channels means there is no market for the work, and hence there can be no harm to the author. This wanton assumption ignores the myriad ways in which authors reuse and reissue works that have gone out of print and to which publishers have reverted rights.

### i.    Rights Reversion and the Back In Print Market

Most trade book contracts grant exclusive rights to the publisher for the "duration of copyright" (life of the author plus seventy years), but they also contain a clause known as the reversion of rights or out of print clause, which allows authors to request their rights back if the book is out of print or no longer available for sale through normal retail channels or available through the publisher's catalog, or if sales fall under a certain amount. [14] Once such event occurs, the author has a right to demand a reversion of rights, and the publisher typically has six months to respond by either informing the author that it intends to reprint the book (and then do so within a specified time thereafter) or to grant the request. A reversion of rights or out of print clause is a critical component of a publishing contract and for authors, getting rights back is a highly consequential event because it allows them to exploit the work in myriad other ways to generate income. Each year, the Authors Guild's legal team handles approximately 35-40 reversion of rights matters, an literacy agents routinely assist their clients to get rights back, and authors also contact their publishers directly to request reversions.

---

[13] In its Answer to the Plaintiff's Complaint, IA, citing to the CDL *White Paper*, argues that its practices fall under fair use because "[e]very book in its collection has already been published and most are out of print." IA Answer at p. 3; *see* CDL *White Paper* at 40.

[14] This is a generalization of a "typical" trade book contract. All of the five largest publishers follow this custom with some variation, as do most small and medium sized trade publishers.

Self-publishing new editions of books previously published by trade publishers is an increasingly popular way to exploit reverted rights. Typically, the amount an author can expect to earn from the sale of a self-published copy, or even for a download of a single chapter or excerpt, is higher than their trade royalty from an individual sale. The author's royalty for a new traditionally published print book is typically only 5-15% of the list price of the book (recently smaller publishers are paying the same percentage but on net receipts, which is the amount left over after deducting taxes, discounts, and other fees from a book's list price).[15]  From sales of publishers' ebook and digital audio editions, authors typically get a 25% share of the net receipts. By comparison, authors can obtain as much as 35-70% from each sale of a self-published copy. Several models exist today—from self-publishing through Kindle Direct, Apple Books, Kobo to reissues by niche smaller publishers in genre markets and reading apps—for authors to reissue out of print books as new editions, and earn from them.

Authors working in particular genres such as romance, mystery, horror, and thriller frequently reissue previously published and reverted titles in "boxed sets" with new books or in genre-specific anthologies.  Academic authors often reissue titles, which keeps their work relevant and accessible while also contributing to their income.  Authors also use their reverted titles to create first edition digital ebooks of their works (which Open Library's "scanned" copies directly pre-empt), as well as audio works.  Since 2016, the Authors Guild's "Back in Print" program has republished 215 books by Authors Guild members.

---

[15] Publishers incentivize retailers and bookstores to carry books by offering discounts, which can range anywhere between 35% to 50% or higher of the book's list price. For instance, if the author's contract with a publisher states a 10% list price royalty on a book priced at $25, the author gets $2.5 per copy sold. If the contract provides for a 10% royalty on net receipts for a $25 book with a 35% discount to the retailer, the author's payment will be reduced accordingly after taxes and the discount are deducted from the sale price.

###### ii.    The significance of author income from back in print books and reuses

The total revenue generated by reissues in many cases may be modest in comparison to when a book first enters the market, but the income authors receive from them is far from negligible and can sometimes make the difference between being able to pay the mortgage or not.  As such, the harm to authors from the impact of IA's activities on this market is in some ways more profound due to two related reasons: (1) the smaller size of the back in print market compared to the traditional market; and (2) the overall decline in author incomes.  Because the size of the back in print market is relatively small compared to the market for new books, the displacement of a small number of total potential sales by Open Library has a disproportionate impact on the author's earnings as those lost sales cannot be rectified through overall volume of sales for that title.  If a reader who is interested in the book searches for it online and finds an unauthorized scanned copy on Open Library, there will be less of an incentive for the reader to pay for an author's self-published copy, from which the author may stand to gain anywhere between 35-70% of the sale made through a typical online ebook retailer ($7-$14 for a $20 book).  If ten potential users opt for the unauthorized scan over the authorized copy, then the author has already lost $70-$140.  This amount may seem like a pittance to some but weighed against the extreme depression in author incomes over the years, it is a lot.

According to the 2018 Authors Guild income survey the median writing income of full-time book authors was $20,300, which is below the current federal poverty guidelines for a family of three.[16]  In this precarious context, even a few hundred dollars per year from reissue earnings amounts to significant earnings.  To illustrate the importance of reissue earnings and how authors

---

[16]    https://www.authorsguild.org/industry-advocacy/authors-guild-survey-shows-drastic-42-percent-decline-in-authors-earnings-in-last-decade/ (accessed August 12, 2022).

participate in this market, *amicus* The Authors Guild shares just a few anecdotes from their members:

> I'm the author of more than 100 novels, most of them traditionally published. I have been reissuing my romances, mysteries and other novels since 2010. During this time, my earnings from my reissued books have kept me solvent through treatment for breast cancer, through putting two sons through college, and through numerous other financial challenges. At this point, I have reissued approximately 80 of my books. (Jacqueline Diamond)
>
> Reversions allowed me to exploit digital rights. I was able to invest in a start-up imprint, which has republished all the HarperCollins originals, and I receive income directly from those sales. A trilogy was repackaged as a boxed set and placed in KDP Select, and all royalties and read-through percentages accrue to me. (Author prefers to remain anonymous)
>
> I'm making about 8K a year. I'd probably do better if I were better at publicity. This is obviously far less than I made at [publisher] but it's still money from books I wrote 10 , 15, and 20 years ago. (Author prefers to remain anonymous)
>
> I did a four book fantasy series for Scholastic called THE UNICORN CHRONICLES. The first volume sold over a million copies. I regained the rights to the series and have been republishing the books myself. Right now the books are published as ebooks through a number of vendors, and as print on demand via Amazon. The way they are tracking, I expect to make about $10,000 from them this year. I should note that this is with virtually no publicity or advertising, save for pushing them on my FB and Twitter pages. (Bruce Coville)

Reissuing previously published works to generate income is by no means restricted to writers. Reissued works is a substantial source of income for photographers, and artists, who license illustrations, designs, and photography for new uses. Visual works and images that become recognizable and popular through prior use regularly repackaged into commercial products and open new markets for their creators.

4.      Open Library Will Deprive Copyright Owners of Royalties Paid For Lending By Non-U.S. Libraries Under the Public Lending Right

Another source of revenue for members of *amici* is royalty income from the public lending right ("PLR").  Currently, thirty-four countries – including the United Kingdom, every country in Europe, Canada, Israel, and Australia – support authors, illustrators, photographers, translators, and other creators with cash payments from the national government in compensation for the free library lending of their books.[17]  Writing in *WIPO Magazine*, Jim Parker observed in 2018 that "PLR payments make a real difference in authors' lives . . . .  And PLR can be a life-saver for established and retired writers with long backlists of published works which remain available for loan in public libraries even when their works are out of print."[18]

Even U.S. authors receive a share of PLR-royalties collected in certain countries. In just the last three years, the Authors Registry, an affiliate of the Authors Guild, has received $952,466 in PLR fees from just one country, the Netherlands, of which it has thus far paid out $718,583 to individual U.S. authors.  While the average payment was $157, over 150 payments to authors were over $1,000, and the largest was $10,864.

If IA's activities were to become widespread, library lending to members of the public in countries that have implemented PLR would inevitably decline, as readers worldwide would access IA's unauthorized frictionless Open Library substitutes rather than borrowing either print or electronic copies from their local libraries. Such non-U.S. revenues are properly cognizable as market harm under the fourth fair use factor.  Not only is this market "traditional, reasonable or

---

[17] www.prlinternational.com, accessed July 30, 2022.  An additional twenty-nine countries are in the process of implementing PLR.  *Id.*

[18] Jim Parker, "The Public Lending Right and What It Does," WIPO Magazine June 2018, https://www.wipo.int/wipo_magazine/en/2018/03/article_0007.html (accessed July 30, 2022).

likely to develop," *American Geophysical Union v. Texaco, Inc.* 60 F.3d 913, 930 (2d Cir. 1994), it exists and is mandated by law in most of the developed world.

## **CONCLUSION**

Authors, illustrators, photographers, and other creators of books make a vital contribution to education, to literacy, and to the shared culture on which our society rests. Impoverishing authors threatens to impoverish that culture. Libraries are an essential means by which those contributions are made available to the public, but without the creators, libraries would have nothing to lend. Libraries have always been a critical part of the overall publishing ecosystem and have always paid for each of the copies they lend out to their users. To sustain the publishing economy that allows authors and other creators to continue to create, they should continue to do so. For the foregoing reasons, and the reasons set forth in Plaintiffs' Memorandum of Law (ECF 99), Plaintiffs' motion for summary judgment should be granted in all respects.

 Dated:  August 12, 2022

Respectfully submitted,

 *s/ Robert W. Clarida*
Robert W. Clarida
Brett Van Benthysen
**REITLER KAILAS & ROSENBLATT LLP**
885 Third Avenue, 20th Floor
New York, NY 10022
Tel: (212) 209-3044
rclarida@reitlerlaw.com
bvanbenthysen@reitlerlaw.com

*Counsel for Amici Curiae*

## CERTIFICATION

The undersigned hereby certifies that the [PROPOSED] MEMORANDUM OF LAW OF AMICI CURIAE THE AUTHORS GUILD, INC., WESTERN WRITERS OF AMERICA, CANADIAN AUTHORS ASSOCIATION, AMERICAN PHOTOGRAPHIC ARTISTS, THE WRITERS' UNION OF CANADA, INTERNATIONAL AUTHORS FORUM, AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, ROMANCE WRITERS OF AMERICA, SOCIETY OF CHILDREN'S BOOK WRITERS AND ILLUSTRATORS, EUROPEAN WRITERS COUNCIL, NATIONAL WRITERS UNION, GRAPHIC ARTISTS GUILD, AMERICAN SOCIETY FOR COLLECTIVE RIGHTS LICENSING, SOCIETY OF AUTHORS, SISTERS IN CRIME, INTERNATIONAL FEDERATION OF JOURNALISTS, DRAMATISTS GUILD OF AMERICA, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, NOVELISTS INC., ASSOCIATION OF AUTHORS AGENTS, THE AMERICAN SOCIETY OF JOURNALISTS AND AUTHORS, THE UNION DES ÉCRIVAINES ET DES ÉCRIVAINS QUÉBÉCOIS, AND EUROPEAN VISUAL ARTISTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT complies with the formatting and count limit set forth in Rule II.D. of the Individual Practices Of Judge John G. Koeltl.  The word count, exclusive of the caption, table of contents, table of authorities, signature block, and appendix is 6350 according to the word-processing system used to prepare the document.

Dated:  August 12, 2022

          *s/ Robert W. Clarida*
          Robert W. Clarida

**APPENDIX**

**IDENTITY AND INTEREST OF *AMICI CURIAE***

Founded in 1912, The Authors Guild, Inc. (the "Guild") is a national non-profit association of over 12,000 professional, published writers of all genres including periodicals and other composite works. The Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and fair pay. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The Guild's members are the creators on the front line, fighting for their constitutional rights under copyright to reap financial benefits from their labors.

American Photographic Artists ("APA") is a leading nonprofit organization run by, and for, professional photographers since 1981. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide.

The <u>American Society for Collective Rights Licensing</u> (ASCRL) is a 501(c)(6) not-for-profit corporation founded in the United States to collect and to distribute collective rights revenue for photography and illustration to United States authors and rights holders, and to foreign national authors and rights holders, whose works are published in the United States. ASCRL, represents over 16,000 illustrators and photographers and is the leading collective rights organization in the United States for this constituency of rights owners. ASCRL is a zealous defender of the primary rights of illustrators and photographers, and ASCRL promotes the collective administration of rights, and the establishment of secondary rights, as alternative means of advancing and expanding the marketplace of its constituents.

The <u>National Press Photographers Association</u> ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution of copyrighted works. NPPA's members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, NPPA has vigorously promoted and defended the rights of photographers and journalists, including intellectual property rights and freedom of the press in all its forms, especially as it relates to visual journalism.

<u>Sisters in Crime</u> is the premier crime writing association focused on equity and inclusion in our community and in publishing. Founded in 1986 to represent and advocate for women crime writers, we celebrate and honor this history with our name while we continue to work for all who share our commitment to and love for a vibrant, inclusive community. Our 4,500+ members enjoy access to tools to help them learn, grow, improve, thrive, reinvent if necessary. They also gain a community of supportive fellow writers and readers, both peers to share the peaks and valleys of writing, and mentors to model the way forward.

The <u>Society of Children's Book Writers and Illustrators</u>, a nonprofit 501(c)3 organization, is a professional organization specifically for individuals who write, illustrate, and translate for children and young adults. Our mission is to support those creators, and the creation of quality children's books in every region of the world.

The <u>National Writers Union</u> (NWU) is an independent national labor union that advocates for freelance and contract writers and media workers. The NWU includes local chapters as well as at-large members nationwide and abroad. The NWU works to advance the economic conditions of writers and media workers in all genres, media, and formats. NWU membership includes, among others, journalists, fiction and nonfiction book authors, poets, novelists, playwrights, editors, academic writers, business and technical writers, website and e-mail newsletter content providers, bloggers, social media producers, podcasters, videographers, illustrators, photographers, graphic artists, and other digital media workers. NWU members have created many published book-length works as well as many stories, articles, poems, photographs, illustrations, and other short-form works included in published books and e-books

The <u>International Federation of Journalists</u> (IFJ) is the world's largest organization of journalists, representing 600,000 media professionals from 187 trade unions and associations in 141 countries. Established in 1926, the IFJ is the organization that speaks for journalists within the United Nations system and within the international trade union movement. The IFJ organizes collective action to support journalists' unions in their fight for fair pay, decent working conditions and in defense of their labor rights; promotes international action to defend press freedom and social justice through strong, free and independent trade unions of journalists; fights for gender equality in all its structures, policies and programs; opposes discrimination of all kinds and condemns the use of media as propaganda or to promote intolerance and conflict; and believes in freedom of political and cultural expression. IFJ does not subscribe to any given political viewpoint, but promotes collective action to defend human rights, democracy and media pluralism.

<u>The Writers' Union of Canada </u>(TWUC) is the national organization of professionally published writers. TWUC was founded in 1973 to work with governments, publishers, booksellers, and readers to improve the conditions of Canadian writers. Now over 2,500 members strong, TWUC advocates on behalf of writers' collective interests, and delivers value to members through advocacy, community, and information. TWUC believes in a thriving, diverse Canadian culture that values and supports writers.

<u>Graphic Artists Guild, Inc.</u> (GAG) has advocated on behalf of illustrators, graphic designers, and other graphic artists for fifty years. The Guild educates graphic artists on best practices through webinars, Guild e-news, resource articles, and meetups. The *Graphic Artists Guild Handbook: Pricing & Ethical Guidelines* raises industry standards and provides graphic artists and their clients guidance on best practices and pricing standards.

The European Writers' Council – Fédération des Associations Européennes d'Ecrivains (EWC - FAEE AISBL) is the federation of 46 national organisations of professional writers and translators in 31 countries including the EU and EEA, as well as Belarus, Iceland, Norway, Montenegro, Switzerland, and United Kingdom, altogether writing in 31 languages and translated globally. The EWC's member associations represent 160,000 individual authors in the book and text sector in all genres. The EWC is recognised by the European Union, UNESCO, and WIPO.

Since 1977 the EWC defends the professional interests of its represented 160,000 writers and translators in economic, legal and political contexts, their right to remuneration and compensation for their works, their relevance in cultural and social policy, freedom of expression, freedom of association, and the importance of lesser spoken and written languages.

In particular, the EWC champions the diversity of literatures while raising awareness for both the role of authors in society and the need to have their social, moral and economic rights respected in the digital age. This is especially relevant when their numerous translations are distributed digitally, and their legal right to remuneration must be guaranteed.

500,000 works are published in Europe each year. A significant proportion of which are both literary and non-fiction works are distributed in original or translation in the Anglo-American markets and make a notable contribution to the economic ecosystem. Accordingly, we also focus our attention on safeguarding the legitimate moral and economic interests of our writers and translators in a global context.

Novelists, Inc., is a group of multi-published authors whose statement of purpose is to provide a communications network among published authors of popular novels; to further the professional interests of the organization's members; to pursue such other goals to be deemed beneficial to the membership.

Founded in 1948, the <u>American Society of Journalists and Authors</u> is the nation's largest professional organization for independent nonfiction writers. Our members are outstanding nonfiction freelance journalists and book authors who meet ASJA's exacting standards of professional achievement. ASJA serves the entire freelance and publishing communities, through a variety of programs and initiatives. We support the plaintiffs' efforts to protect the rights of both our members and non-member journalists and authors whose careers will be adversely affected if Internet Archives prevails in this action.

<u>Canadian Authors Association</u> (CAA) is Canada's first and longest-running national writers' organization. Founded in 1921 by Stephen Leacock and other prominent authors of the day, CAA provides writers with a wide variety of programs, services and resources to help them develop their skills in both the craft and the business of writing, enhance their ability to earn a living as a writer, and have access to a Canada-wide network of writers and publishing industry professionals.

CAA is a membership-based organization for writers in all areas of the profession—aspiring, emerging and professional—in every genre and across all writing-related professions. As a not-for-profit national arts service organization with charitable status, much of what CAA does benefits all writers, whether they are members or are affiliated with us as partners or through other writing groups.

<u>The Association of Authors' Agents</u> (AAA) is a British voluntary trade association whose members are all UK- and Republic of Ireland-based literary agencies.

International Authors Forum (IAF) has over 80 member organisations, representing over 700,000 authors and campaigns for their interests in every country from around the globe, including countries in North America, Europe, Africa, Asia, and Oceania. Member organisations include artists societies, writers' unions, audio-visual authors guilds and collecting societies. These represent all types of writers and visual artists including academic, educational and scientific writers, as well as poets, novelists, screenwriters, fine artists, designers and photographers.

Our organization is dedicated to the protection and advancement of authors' rights and interests. The International Authors Forum advocates for balanced copyright and contracting laws that guarantee fair treatment for authors and promotes authors' rights and collective management in order to ensure equitable compensation for authors. It also provides authors' organisations with an international platform for cooperation and networking.

Recognized as a voice for authors on the world stage, our organization participates in international fora, government consultations, litigation, and conferences. International Authors has a deep understanding of the impact of copyright treaties, jurisprudence and legislation on the global arts, journalism, research, academic writing, and translation industries.

The Society of Authors is the largest UK trade union for writers. Established in 1884, its membership of nearly 12,000 includes writers, illustrators, and literary translators of all kinds and genres. It provides free individual advice to its members, and campaigns and lobbies on the issues that most affect authors.

A core focus of The Society of Authors' campaigns is on fair renumeration, strong copyright laws and freedom of expression. Authors cannot produce and live from their work without having the rights, enforceable and enshrined in law, to control when and how their work is disseminated, to ensure they are credited and to be duly compensated. They oppose online piracy and uses of their work without consent in the strongest possible terms. Free availability of books is an essential threat not only to sales and royalties, but also to the perceived value of creativity.

The <u>American Society of Media Photographers, Inc.</u> (the "ASMP") is a 501(c)(6) non-profit trade association representing thousands of members who create and own substantial numbers of copyrighted photographs, films, and other creative works. These members all envision, design, produce, and sell their works in the commercial market to entities as varied as multinational corporations to local mom-and-pop stores, and every group in between. In its seventy-six-year history, the ASMP has been committed to protecting the rights of all visual creators.

<u>Western Writers of America</u>, formed in 1953, is the pre-eminent association of professional writers dedicated to the traditions, legends, development and history of the American West. Our mission is to create, appreciate, publicize, and promote the Literature of the West for the World.® We have more than 750 members, who write books (fiction and nonfiction), screenplays, poetry, songs, and short material (fiction and nonfiction).

The Dramatists Guild of America is the only professional organization promoting the interests of playwrights, composers, lyricists, and librettists writing for the stage. Established over 100 years ago for the purpose of aiding dramatists in protecting both the artistic and economic integrity of their work, The Dramatists Guild of America continues to educate, and advocate on behalf of, its over 8,000 members. The Dramatists Guild of America believes a vibrant, vital theater is an essential element of this country's ongoing cultural debate, and seeks to protect those individuals who write for the theater to ensure its continued success.

Romance Writers of America ("RWA"), founded in 1980, is a nonprofit trade association, with a membership of more than 4,000 romance writers and related industry professionals, whose mission is to advance the professional interests of career-focused romance writers through networking and advocacy. RWA works to support the efforts of its members to earn a living, to make a full-time career out of writing romance—or a part-time one that supplements his/her main income.

The Union des écrivaines et des écrivains québécois (UNEQ) is the only representative association of literary artists in Québec (Canada), with over 1,600 members. This professional union has been working since 1977 to defend the socioeconomic rights of writers and to promote Québec literature in Québec, Canada, and abroad.

European Visual Artists (EVA) represents all collective management organizations in the EU which are managing visual repertoire for over 130,000 authors of visual works, including fine arts, photography, illustration, street art, design, and architecture.

-31-