# SUPPLEMENTAL McNAMARA DECLARATION

# EXHIBIT 3

ATTORNEYS EYES ONLY

```
1              IN THE UNITED STATES DISTRICT COURT
2            FOR THE SOUTHERN DISTRICT OF NEW YORK
3
4
5    HACHETTE BOOK GROUP, INC.,
     HARPERCOLLINS PUBLISHERS LLC,
6    JOHN WILEY & SONS, INC., and
     PENGUIN RANDOM HOUSE LLC,
7
              Plaintiffs,
8
         vs.                        No. 1:20-cv-04160-JGK
9
     INTERNET ARCHIVE and DOES 1
10   through 5, inclusive,
11            Defendants.
     _____/
12
13             -- ATTORNEYS' EYES ONLY --
14
15   VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITIONS
16         OF PENGUIN RANDOM HOUSE BY JEFF WEBER
17              Remote Zoom Proceedings
18               Ho-Ho-Kus, New Jersey
19             Friday, November 19, 2021
20
21
22
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Pages 1 - 290                       Job No. 4867863
```

Page 1

ATTORNEYS EYES ONLY

1   this issue?

2       A.   Yes.

3       Q.   What is that person's name?

4       A.   Her name is Madison Forsander.

5       Q.   Would you mind spelling that last name for me?    17:02:12

6       A.   Sure.  F-O-R-S-A-N-D-E-R.

7       Q.   Okay.  And you had mentioned in your testimony

8   some variables impacting PRH's ability to tell when

9   the -- when PRH titles were available for borrowing from

10  the Internet Archive; is that accurate?    17:02:42

11      A.   Oh, you mean like the specific dates; is that

12  what you mean?  Like when it would go up and --

13      Q.   Yes.  So -- yes.

14      A.   Right.

15      Q.   So what I was asking was just whether you had --    17:02:52

16  was it correct that you had testified that there were

17  variables impacting PRH's ability to ascertain when

18  titles were available on the Internet Archive for

19  borrowing?

20      A.   Right.  Specifically, we don't know exactly when    17:03:08

21  things go up.  It's -- it's -- it's left up to us to find

22  it.

23      Q.   So has PRH, all of that context notwithstanding,

24  has PRH observed a change in revenues for the titles that

25  are involved in this lawsuit coinciding with availability    17:03:27

ATTORNEYS EYES ONLY

1  for borrowing, as best PRH can ascertain, from the
2  Internet Archive?
3      A.  Well, I guess the way I would answer that is we
4  know for a fact that the Internet Archive is presenting
5  themselves as an aggregator, and aggregators that we deal    17:03:49
6  with pay us.
7          So we know that right off the bat, there's a --
8  there's -- there's revenue that we should have that we're
9  not having.  Because they act on their own.  They don't
10 pay us.  They don't actually act the way an aggregator      17:04:06
11 should.
12         Secondarily, we know that they're out there
13 talking to libraries and telling them that somehow that
14 this scanning thing is somehow a legitimate way for them
15 to source copies, and we now see that there are libraries   17:04:21
16 that right next to an OverDrive checkout button will have
17 a button there that says "get from the Internet Archive."
18         So we could have had more revenues right there
19 from -- from a legitimate aggregator, but instead it's
20 going to the Internet Archive.                              17:04:37
21         And then I guess third what we can see is that
22 there's consumers who may otherwise purchase those books
23 that are now being offered this as like a free
24 alternative in a way that the author doesn't get
25 compensated, the publisher doesn't get compensated, and     17:04:55

Page 203

ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | there's always going to be people who are willing to just | |
| 2 | take the free alternative, especially if it's presented | |
| 3 | with kind of a -- the way the Internet Archive does it, | |
| 4 | which is like this facade of legitimacy, where they're | |
| 5 | actually making people feel like they're not stealing | 17:05:11 |
| 6 | when they are. | |
| 7 | So, yes, there's always going to be kind of | |
| 8 | piracy or whatever, but I think this goes another step | |
| 9 | further, where it -- they take it another step where they | |
| 10 | try to make both the library feel like they're doing | 17:05:23 |
| 11 | something that's protected, which it's not, and then they | |
| 12 | also try to make consumers feel like okay about | |
| 13 | downloading these things for free, where, again, the | |
| 14 | author's not being compensated, the publisher's not being | |
| 15 | compensated and they don't have the right to make these | 17:05:39 |
| 16 | copies. | |
| 17 | So I guess if you're looking for a way for me to | |
| 18 | say how we are harmed by this or where there's revenue | |
| 19 | that we should have had that we don't, I think that's the | |
| 20 | way I would answer it, which is:  It's pretty clear to me | 17:05:50 |
| 21 | that what they're doing is taking revenue away from us. | |
| 22 | Can I tell you exactly how much?  No.  But I can | |
| 23 | tell you it's substantial, and I can tell you that if the | |
| 24 | Internet Archive did not exist, that we think we would | |
| 25 | have more revenues than we do. | 17:06:08 |

Page 204

Veritext Legal Solutions
866 299-5127

ATTORNEYS EYES ONLY

```
 1              And then further, I guess I could tell you that
 2     if other people took it upon themselves to behave the way
 3     that the Internet Archive does, the market would collapse
 4     in on itself.
 5              And this kind of goes further to my point         17:06:19
 6     earlier when I talked about how we look at things on --
 7     we look at things not on a format-by-format basis.  We
 8     look at it as the content as a whole.
 9              We've seen examples elsewhere in other countries
10     where if one format becomes dominant and you get less     17:06:33
11     revenue for that format, the entire market collapses.
12     The hardcovers come with it, the paperbacks come with it.
13              So I think there's -- this is more than just
14     like can I determine exactly to the cent at any given
15     time what it is.  This is really about almost existential 17:06:49
16     harm that can be brought -- brought by this.
17              So I don't -- I don't -- I don't think there's
18     any way to say it other than that.
19         Q.  Okay.  Lots to unpack in that answer, and I've
20     got a couple of followup questions.                        17:07:05
21         A.  Sure.
22         Q.  But I did want to circle back to my original
23     question, which was:  With respect to revenues from the
24     titles that are at issue in this lawsuit, that are PRH
25     titles, has PRH observed a change in revenue for those    17:07:18
```

Page 205

ATTORNEYS EYES ONLY

```
 1   titles relative to when they were available for borrowing

 2   from the Internet Archive?

 3           MS. STEINMAN:  Objection.  Asked and answered.

 4           THE WITNESS:  So, yeah, I'll say it again.  I

 5   mean, for every title that is available at any point in      17:07:33

 6   the Internet Archive, one, at a minimum, if the Internet

 7   Archive was behaving as a legitimate aggregator, we

 8   should have been paid -- paid for those copies, and the

 9   author should have been compensated.

10           Two, a library should have been paying them for      17:07:46

11   it, also.  So the library should have -- should have

12   actually transacted so that there would have been some --

13   some recompense, too.

14           And then three, they're offering consumers who

15   may otherwise have purchased the book something for free    17:07:59

16   that they couldn't have gotten.

17           So that's going to be the case for every book

18   that they put on there.  There's the ones that are in

19   this lawsuit and every book that they put on there that

20   they shouldn't that's on our copyright as well.              17:08:09

21           MS. LANIER:  So I'm going to have to object to

22   that answer is not responsive because what I'm asking is

23   whether PRH has observed changes in revenues from the

24   titles that are implicated in this lawsuit, and it sounds

25   like from your answer that there actually has not been an   17:08:30
```

Veritext Legal Solutions
866 299-5127

```
 1   observed change in revenues from those titles, and I've
 2   asked this question a couple times, and I'll give you one
 3   more shot to answer it.
 4        Q.   Has PRH observed a change in revenues from those
 5   titles?                                                      17:08:45
 6             MS. STEINMAN:  Objection.  Asked and answered.
 7             THE WITNESS:  PRH has noticed that the Internet
 8   Archive is not -- is not compensating authors or
 9   publishers for the content that they rightly deserve to
10   get compensated for.                                          17:08:56
11             We see that they're basically just taking it and
12   using -- and making illegal copies to serve their own
13   purposes.
14             So they should be -- they should be -- they
15   should be paying us as an aggregator if they were at all     17:09:07
16   legitimate.  They should be not -- not putting out to
17   libraries that suddenly a physical book can become an
18   eBook and just be copied by whoever it likes.  Like
19   that's -- that's -- that's just not the way this works.
20   An eBook and a physical book are two different things         17:09:22
21   with two very different rules.
22             And secondarily, they shouldn't be offering a
23   free option to consumers.
24             MS. LANIER:  Okay.  I'll object again to that
25   answer as nonresponsive, but we'll move on because I want    17:09:35
```

```
 1   their website.
 2           Is it accurate that you testified about that
 3   earlier?
 4       A.  Yes.
 5       Q.  Do you have evidence that patrons of those           17:12:15
 6   libraries are visiting the Internet Archive's website
 7   from those links?
 8       A.  I don't.
 9       Q.  Okay.  Do you have evidence that patrons are
10   using the Internet Archive to the exclusion of using        17:12:31
11   libraries -- other libraries in which they have
12   membership?
13           MS. STEINMAN:  Objection.  That was really
14   unclear.  Can we rephrase that?
15           MS. LANIER:  Sure.                                   17:12:47
16       Q.  Do you have evidence that patrons are borrowing
17   books from the Internet Archive to the exclusion of
18   borrowing books from other libraries in which they might
19   be members?
20           MS. STEINMAN:  Objection.                            17:13:00
21           Go ahead, Jeff.
22           THE WITNESS:  I think just the fact that the
23   Internet Archive's link is put next to a legitimate
24   aggregator's link or a legitimate library's link is proof
25   enough.  I think -- I think it's -- it's reasonable to      17:13:14
```

Page 210

```
1    assume that if -- if there's -- if there's holds on that,
2    but yet the Internet Archive says that they can do it at
3    the same time in there that that's -- that's -- that's
4    technically something that should have gone to a hold or
5    maybe another copy purchased through a legitimate source.    17:13:33
6         So I think it's reasonable to assume that that's
7    exactly what's happening.
8         Q.  BY MS. LANIER:  Do you have any evidence to
9    support your assumptions that that's happening?
10        A.  My evidence is that they're on these sites, and    17:13:44
11   they're there -- that they are making the offer.  I doubt
12   a library would put it up there if no one wanted it and
13   if no one was clicking on it.
14        And we've -- we've seen, even from the -- the
15   documents that we've gotten from the Internet Archive, if   17:14:00
16   you just go on the Internet Archive right now, you can
17   see that there are lends and there are borrows or however
18   they phrase it.
19        So it's clear that people are borrowing from --
20   from these -- if that's the way to even put it.  They're   17:14:14
21   bootlegging from these documents that are uploaded there.
22   So it's clear that there's action.
23        Q.  Okay.  Anything else?
24        MS. STEINMAN:  What was our question?  What was
25   the "anything else" talking to?                             17:14:33
```

Page 211

```
 1              MS. LANIER:  Fair enough.
 2        Q.  Any evidence to support your assumptions that
 3   that's happening, which is that borrowing from the
 4   Internet Archive occurs at the expense of borrowing from
 5   a library?                                                  17:14:47
 6        A.  So I'm glad that you said that it's at the
 7   expense of borrowing from a library because I think
 8   that's -- that's the -- the main point that we're trying
 9   to make here, is that there are legitimate ways to borrow
10   from a library, and the Internet Archive is not one of    17:15:04
11   them.
12             So I think -- I think that's -- that's what the
13   proof is, the fact that they -- they present themselves
14   as some kind of aggregation solution and that -- that
15   they go up against an OverDrive or a Bibliotheca or a     17:15:22
16   Baker & Taylor, who is out there being done correctly,
17   it's being done to our specs.  It's being done -- it's
18   being done with regard to territory restrictions that are
19   in force.  It's actually serving a community.  I think --
20   I think that's what the proof is.                         17:15:39
21        Q.  Okay.  And you testified in a previous answer to
22   one of my questions that you couldn't tell how much the
23   damage was, but it was substantial.
24             Do you recall saying that?
25        A.  Yes.                                             17:15:53
```

Veritext Legal Solutions
866 299-5127

ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q. And my question to you is: If you don't know | |
| 2 | how much, how do you -- how are you able to say the | |
| 3 | damage is substantial? | |
| 4 | A. I mean, it's pretty clear to me because, again, | |
| 5 | if -- if everyone behaved the way the Internet Archive is | 17:16:07 |
| 6 | behaving and they just pretended that somehow having a | |
| 7 | copy of a physical book gave them the right to digitize | |
| 8 | it and distribute it, the market would just collapse in | |
| 9 | on itself. That doesn't take much imagination to -- to | |
| 10 | realize it's the truth. | 17:16:25 |
| 11 | So, I mean, in stages, the more popular they | |
| 12 | get, the bigger the problem will be. But I think that's | |
| 13 | just what the damage is. It's just there -- it would be | |
| 14 | incredibly hard for an author or a publisher to get the | |
| 15 | revenue that they're due for the work that they put into | 17:16:43 |
| 16 | it if suddenly it was possible for just one place to | |
| 17 | decide that they could take a copy, perhaps a used copy | |
| 18 | of a physical book, digitize it, and then distribute it | |
| 19 | to as many people as they feel is -- is justified in | |
| 20 | their own mind. | 17:17:00 |
| 21 | Q. Have you ever visited the Internet Archive.org? | |
| 22 | A. I have. | |
| 23 | Q. Have you ever borrowed a book from Archive.org? | |
| 24 | A. I've borrowed one, yes. | |
| 25 | Q. What book did you borrow? | 17:17:10 |

Page 213

1	A.  That's a good question.  I don't remember what
2	it was.  It may have been The Lost Symbol by Dan Brown.
3	Q.  Okay.  Did you borrow that for personal reasons?
4	A.  No.
5	Q.  Okay.  Why did you borrow it?                            17:17:26
6	A.  I wanted to see what the -- the experience was.
7	Q.  Okay.  And what -- what did you think about the
8	experience?
9	A.  I mean, honestly, it made me angry the entire
10	time I was doing it.                                         17:17:44
11	Q.  Okay.
12	A.  It was -- it was pretty clear to me what they
13	were doing.  It was pretty clear to me that it -- that
14	was a self-justified way to somehow prop themselves up
15	as -- as something they're not.                              17:17:55
16	    I think the entire time I was doing that I was
17	thinking about, you know, our author, who I just
18	downloaded something for free, that he should have been
19	compensated for.
20	    The entire time I was doing it, I was thinking       17:18:06
21	about public libraries that -- that do support us and
22	that do advertising campaigns on our behalf.  They do
23	marketing with us.  They do -- they do reads and
24	community events.
25	    I was thinking -- I was thinking about the           17:18:20

Page 214

```
 1   consumer who just did that one click who could have had
 2   the same experience that I did and would have spent money
 3   on that book so that we were compensated correctly.  And
 4   that's -- that's what I thought the entire experience.
 5   It honestly -- it made me very angry.                          17:18:37
 6           And I -- and I don't see how anyone could
 7   self-justify this to themselves.
 8       Q.  Under the two-year access model that is normally
 9   in place, does PRH receive additional revenue for a
10   checkout from a library?                                       17:18:57
11       A.  Meaning once -- once the library has paid
12   initially to buy it, is there ever --
13       Q.  Yes.
14       A.  No.  It's an upfront payment.
15       Q.  Okay.  What did you think about the quality of         17:19:07
16   the scan of The Lost Symbol that you borrowed?
17       A.  I think it was -- it was not as good as an eBook
18   that we would put out, but I think it's probably good
19   enough for those who are willing to make the tradeoff and
20   get something for free that they could have otherwise          17:19:26
21   paid for.
22       Q.  So if given your druthers, you would read an
23   eBook of The Lost Symbol rather than the digitized book
24   you checked out?
25           MS. STEINMAN:  Objection.                              17:19:40
```

Page 215

ATTORNEYS EYES ONLY

```
1   STATE OF CALIFORNIA     ) ss:
2   COUNTY OF MARIN         )
3
4           I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5   hereby certify:
6           That the foregoing deposition testimony was
7   taken before me at the time and place therein set forth
8   and at which time the witness was administered the oath;
9           That testimony of the witness and all objections
10  made by counsel at the time of the examination were
11  recorded stenographically by me, and were thereafter
12  transcribed under my direction and supervision, and that
13  the foregoing pages contain a full, true and accurate
14  record of all proceedings and testimony to the best of my
15  skill and ability.
16          I further certify that I am neither counsel for
17  any party to said action, nor am I related to any party
18  to said action, nor am I in any way interested in the
19  outcome thereof.
20          IN WITNESS WHEREOF, I have subscribed my name
21  this 22nd day of November, 2021.
22
23
24
                    LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
25
```

Page 287