# Prince Declaration
# Exhibit 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3     ---------------------------------------------------x

 4     HACHETTE BOOK GROUP, INC.,

       HARPERCOLLINS PUBLISHERS LLC,

 5     JOHN WILEY & SONS, INC., and

       PENGUIN RANDOM HOUSE LLC,

 6

 7              Plaintiffs,

 8     vs.                    Case No. 1:20-cv-04160-JGK

 9

       INTERNET ARCHIVE and DOES 1

10     through 5, inclusive,

11

12              Defendants.

13     ---------------------------------------------------x

14

15        *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

16

17     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

18                     JEFFREY PRINCE

19                Thursday, June 9, 2022

20

21

22

23

24     Reported By: Lynne Ledanois, CSR 6811

25     Job No. 5255194
```

Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          My main point, whatever that was, it          11:29AM

2     doesn't change that not accounting for those factors

3     calls into question the reliability of their

4     results.

5          Q    Did you have the information available to      11:29AM

6     you that would have been necessary to take into

7     account the potential confounding factors that in

8     your view should have been taken into account in

9     Dr. Reimers's and Dr. Jørgensen's reports?

10         A    A couple of things.  I'm not sure to the      11:30AM

11    extent what I would have had or not had.  We did not

12    do a full investigation of all the data that we could

13    have assembled.

14         Again, that wasn't part of what my

15    understanding of what I was asked to do was.          11:30AM

16         So I did not -- I guess the other thing to

17    highlight there is that what I gave were a number of

18    examples.  I wasn't attempting to say, here's the

19    exhaustive list, here's everything that needs to be

20    accounted for and how.                                11:30AM

21         I was simply pointing out that here's a

22    number of things that not accounting for those alone

23    create major problems with the ability to come to

24    these conclusions.

25         Q    Even taking into account the issues you      11:31AM

                                                      Page 58

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    relationships informative about the questions that    11:32AM

2    she's trying to answer?

3          Again, I think as I pointed out in my

4    report, there is a lot of reasons to doubt that

5    that's the case.                                      11:32AM

6    BY MR. GRATZ:

7       Q    Do you think that it would be possible to

8    do an improved version of Dr. Jørgensen's analysis

9    taking into account additional data that would

10   provide greater reliability in answering those       11:33AM

11   questions?

12         MS. STEINMAN:  Objection.

13         THE WITNESS:  It may be possible.  But as

14   I said, I haven't gone through and tried to collect

15   or assess the data that might be available and the    11:33AM

16   way to incorporate it properly.

17         All I know is that the analysis that he

18   did is not adequate to come to the conclusions that

19   he came to.

20   BY MR. GRATZ:                                         11:33AM

21      Q    Do you think that it would be impossible

22   to do an improved version of Dr. Reimers's analysis

23   taking into account additional data that provide

24   greater reliability in answering the questions

25   Dr. Reimers was seeking to answer?                    11:34AM
```

Page 60

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              MS. STEINMAN:  Objection.                11:34AM

 2              THE WITNESS:  Again, I would say the same

 3     thing, I haven't fully assessed what available

 4     additional information or how to incorporate it if

 5     one were to try to improve.                        11:34AM

 6              But again, I believe what was done is not

 7     adequate to be able to come to the conclusions that

 8     she came to.

 9     BY MR. GRATZ:

10        Q    Do you have particular expertise in the    11:35AM

11     book publishing industry versus other industries?

12        A    I have familiarity with book publishing

13     primarily through the study of copyright law.

14              I developed a course when I was at Cornell

15     on economic regulation that included that topic, and 11:35AM

16     material from that course is also used in

17     accounting.

18              MS. STEINMAN:  Off the record.  Jeff, your

19     mic is dropping a little bit.

20              THE WITNESS:  I'll try to speak up.        11:36AM

21     BY MR. GRATZ:

22        Q    When did you teach that course that

23     covered copyright law?

24        A    I taught that throughout my time at Cornell

25     from 2004 to 2010.                                  11:36AM
```

Page 61

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    the break?                                    3:50PM

 2           MS. STEINMAN:  Objection, that's

 3    privileged.  I direct you not to answer.

 4    BY MR. GRATZ:

 5       Q    What are those thoughts?              3:50PM

 6       A    In general, obviously with Dr. Reimers, she

 7    put in more variability into her analysis.  But I

 8    think it's -- it still is not able to capture a proper

 9    estimate of what the effect of putting the book up on

10    Internet Archive is.                          3:50PM

11           So the broader point would be, A, she only

12    focuses on just that component, so adding more

13    controls to that particular set of analyses that she

14    did in her original report and then, B, it still

15    suffers from the same sets of problems.       3:51PM

16           You put in a few extra controls, it's

17    still the case that there is a number of other

18    things that are going on that are important that are

19    difficult or that she was not able to control for.

20           I think she generally suffers from a   3:51PM

21    problem of the difficulty that arises when you want

22    to have a small window around the event to be able

23    to properly identify what's going on.  But the event

24    at the time it took place is when there was not as

25    much action in terms of Internet Archive's presence  3:51PM
```

Page 175

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | in the marketplace. | 3:51PM |
| 2 | And so to look at the window around, say, | |
| 3 | availability in 2015, one would reasonably be | |
| 4 | skeptical as to whether that says much about what | |
| 5 | availability would do in 2020. | 3:52PM |
| 6 | But then to extend the analysis to 2020 | |
| 7 | and still use the same dummy variable for | |
| 8 | availability in 2015, now you're stuck in a | |
| 9 | situation that's such a long period that there's | |
| 10 | many things that likely changed over that time frame | 3:52PM |
| 11 | as to make it very difficult to say it's due to the | |
| 12 | posting on Internet Archive. | |
| 13 | So that's the general critique that I | |
| 14 | think just isn't able to be addressed with what her | |
| 15 | additional analysis does. | 3:52PM |
| 16 | Q    Anything else? | |
| 17 | A    Let's see.  This is all off the top of my | |
| 18 | head.  I have not obviously submitted a written | |
| 19 | document about this. | |
| 20 | But I think, again, with Dr. Reimers, I | 3:52PM |
| 21 | agree that she concedes that looking at e-Books is | |
| 22 | important, but she claims she couldn't do it. | |
| 23 | That's her claim. | |
| 24 | I think the relative importance of the | |
| 25 | backlist, I think she added some important | 3:53PM |

Page 176

1    clarifications there, that it could actually be        3:53PM

2    quite a bit more substantial than I think she

3    originally implied.

4              With Dr. Jørgensen, I think, you know, in

5    his case, we're still in a situation where he's        3:53PM

6    really just doing a pre-post analysis and saying any

7    difference that you see is because of the takedown

8    of the NEL.

9              And I think that's just -- you know, his

10   additional analysis doesn't mitigate that fact.  And   3:53PM

11   I guess, you know, the analogy that I have in my

12   mind is this is why people would be reluctant --

13   I've done a lot of airline analysis.  And airline

14   analyst researchers generally don't draw a lot of

15   conclusion by looking at, say, Q3 versus Q4 in 2001.   3:54PM

16             So a lot of times people would drop that

17   from the analysis because they recognize there are

18   major macroeconomic events that would very plausibly

19   interfere with your ability to identify the effects

20   that you're intending to measure.                      3:54PM

21             I think that's exactly the kind of concern

22   that Dr. Jørgensen has to grapple with here because

23   there are major events going on at the time that

24   he's looking at.

25             So then to act like you can do a pre-post    3:54PM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    digital lending had on publisher's revenues?              4:38PM

2              MS. STEINMAN:  Objection, asked and

3    answered.

4              THE WITNESS:  I did not try to quantify

5    that, no.                                                  4:38PM

6    BY MR. GRATZ:

7         Q    Do you know whether that effect would be

8    positive or negative?

9         A    I laid out the economic reasoning that I

10   believe points to it being detrimental, having harm.    4:38PM

11        Q    But you don't know whether that economic

12   reasoning, in fact, played out in that way; right?

13             MS. STEINMAN:  Objection.

14             THE WITNESS:  I don't have the numerical

15   estimates on that.  I think it's -- whatever its        4:39PM

16   economic reasoning or general theoretical arguments,

17   to the extent that the premises are sensible and

18   credible, I believe that the conclusions then

19   reasonably follow.  And I believe those assumptions

20   were credible.                                          4:39PM

21   BY MR. GRATZ:

22        Q    It is possible that upon examination of

23   the data through an econometric analysis, it would

24   turn out that the effect was either zero or positive

25   with respect to publishers' revenues?                   4:39PM

Veritext Legal Solutions
866 299-5127

1    don't know if I have the particular figures, but I        4:58PM

2    remember a rough estimate was that it -- I think it

3    was maybe a 5 to 10 percent effect on the numbers that

4    I originally put forth.

5         Q    In what direction?                             4:59PM

6         A    They would go down by that about 5 to

7    10 percent, I believe.

8         Q    Just for the record, what are the numbers

9    that results from the new analysis that excludes

10   audio books?                                             4:59PM

11        A    These are revenues from OverDrive for the

12   works in suit at various points in time.

13             So let's see.  This is -- I guess the most

14   relevant figure would be the 1.56 million through

15   OverDrive for sales of the works in suit between         4:59PM

16   2017 and 2020.  So that number would be a bit lower

17   if you take out audio books.

18        Q    Right and my question was:  Just for the

19   record and recognizing that you may or may not be

20   able to answer it sitting here today, what number        5:00PM

21   does that change to in your revised analysis?

22        A    I don't know specifically.  I think it's in

23   the 1.4 something range million, but I'm not sure

24   exactly.

25        Q    What would you need to reference to be          5:00PM

                                            Page  214

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
1    similarities in -- let's see.  What does she call        6:07PM

2    them?  Transaction costs, okay.

3              But again, my response to that would be

4    that while there may be some overlap in the

5    transaction costs, they are not the same.              6:07PM

6              I don't think what she's laid out there

7    establishes that they are the same.

8              So Paragraph 3, I think this is just her

9    reiterating this claim that she made that they will

10   spend the same amount of money and I stand by my       6:08PM

11   point that even if they did spend the same amount of

12   money, it wouldn't necessarily go to the same

13   people.  So I think she's not addressed that point.

14             Paragraph 4 she's just saying there's

15   no -- she herself has no evidence to support my        6:08PM

16   claim, but that doesn't mean it's not economically

17   well reasoned.

18             She clarifies what she claims are

19   mischaracterizations of opinions that she offers.  I

20   don't think I have a lot to comment there.             6:09PM

21             Paragraph 6 we've already covered.

22             And then 8, she's just stating her

23   opinion.

24             And then 9, she's just saying she doesn't

25   have evidence to support my claim.  But again, that    6:10PM
```

Page 250

```
 1    doesn't mean it's incorrect.                          6:10PM

 2            So I think that's the extent of my

 3    reaction to Ms. Hildreth.

 4    BY MR. GRATZ:

 5        Q    Anything else?                                6:10PM

 6        A    I don't think so.  I think those are my main

 7    points to be made.  I'm happy to discuss Jørgensen.

 8        Q    Great.  Let's turn to Exhibit 4.

 9        A    So for this one and for Dr. Reimers,

10    obviously those are more extensive, but obviously I    6:10PM

11    did think a bit about what they had to say.

12            On Jørgensen's, I think we covered some

13    grounds, so I'll try not to be too redundant.  One

14    is that I think he frames his rebuttal as though the

15    burden of proof is on me.                              6:11PM

16            That's incorrect.  The burden of proof is

17    on him to show that there was no harm.

18            So he repeatedly criticizes me for not

19    demonstrating harm when the exercise here is for him

20    to demonstrate no harm.                                6:11PM

21            So I think that's a false premise of his

22    report that's important to highlight.

23            Then I guess another main point that we

24    have covered so I won't belabor this too much, but,

25    you know, the fact still remains he brings in some    6:11PM
```

Page 251

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    new data points, he tries to argue that there's not          6:11PM

2    seasonality in any meaningful sense.

3           But he's -- it doesn't relieve him of the

4    issue, which is there clearly were major

5    macroeconomic events driven by primarily COVID that          6:12PM

6    were occurring exactly at the point in time that

7    he's looking at.

8           So we see big spikes in library e-Book

9    checkouts right around the time that he's looking at

10   and then they start to drop off on the latter               6:12PM

11   period, which there's lots of reasons we might think

12   that that would occur that had nothing do with the

13   closing of the National Emergency Library.

14          Simple reversion to steady state could be

15   one, in addition to many other events that were            6:12PM

16   occurring exactly at that point in time.

17          So I think, again, as I said before, his

18   overall analysis suffers from the fact that he's

19   effectively doing a time series analysis over two

20   points in time during a period where major                 6:12PM

21   macroeconomic events were occurring.  And then

22   trying to say that we can use that analysis to say

23   something definitive about one particular event

24   amongst many over that exact same period of time.

25          I think that's just not something we can            6:13PM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | do without analysis. | 6:13PM |
| 2 | There is a number of factors that are | |
| 3 | changing, and even if you tried to just look at | |
| 4 | seasonality per se, there's a number of other events | |
| 5 | that in conjunction together with have an impact. | 6:13PM |
| 6 | I think it's still the case that he's | |
| 7 | looking at checkouts as opposed to revenues and as I | |
| 8 | said in my report, there's a complex relationship | |
| 9 | between checkouts and revenues. | |
| 10 | And so I think he's not able to draw any | 6:13PM |
| 11 | definitive conclusions by just looking at checkouts | |
| 12 | alone. | |
| 13 | Q    I want to ask a question about that. | |
| 14 | A    Yes. | |
| 15 | Q    Which is:  When it comes to patron demand, | 6:14PM |
| 16 | if we are measuring patron demand, are checkouts or | |
| 17 | revenues the right thing to look at? | |
| 18 | A    If you're talking about quantity demanded, | |
| 19 | then that's fine if you want to talk about checkouts. | |
| 20 | But here the harm that I understand that | 6:14PM |
| 21 | we should be looking at is lost revenues. | |
| 22 | And so he can say his analysis is about | |
| 23 | demand, but the conclusions that he needs to draw | |
| 24 | needs to pertain to the harm which would be measured | |
| 25 | in revenues. | 6:14PM |

Page 253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q    It's true, is it not, that if there is no      6:15PM

2    change in patron demand, there will be no change in

3    revenues?

4             MS. STEINMAN:  Objection.

5             THE WITNESS:  Not necessarily, because      6:15PM

6    what if there was a change in the pricing that was

7    engaged in or it could be the same number of units

8    but priced differently, then revenues would be

9    different.

10   BY MR. GRATZ:                                          6:15PM

11     Q    Please continue.

12     A    Let's see.  I think the only other thing

13   that comes to mind is, you know, he critiques my

14   inclusion of audio books.  We've already covered that

15   ground.                                                6:15PM

16             My assessment is that my recollection and

17   our rough assessment on that is that it doesn't have

18   a major impact on the figure that I put forth.  I

19   think it goes down, like I said, somewhere in the

20   neighborhood of 5 to 10 percent.                       6:16PM

21             I think that's -- I'm trying to look

22   through a little bit more.

23             Oh, I recall he said something along the

24   lines of some of the harm that I analyzed is

25   contradictory.  I think that's setting it up           6:16PM

                                            Page 254

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    of him using relative volumes.  He tries to paint it      6:18PM

2    as though it's -- I'm saying that one shouldn't look

3    at OverDrive or look at IA checkouts versus

4    OverDrive.  Again, that's not my point.

5         My point was he couched everything in              6:18PM

6    terms of IA's checkouts as a percentage of

7    OverDrive, which by and large is a relatively small

8    percentage, but in a sense then that's setting him

9    up to find a zero effect.  By starting with small

10   numbers to begin with, then by construction you're      6:18PM

11   making it easier to get a zero in your estimates.

12        But it's to mask the fact that in absolute

13   terms, it still can be a non-trivial impact.

14        Let's see.

15        He tries to compare the percentage decline        6:19PM

16   in OverDrive and compare that to the market decline

17   and says that the OverDrive decline was larger, it

18   was ███████ versus 3 percent, and says that then

19   demonstrates that the macroeconomic forces couldn't

20   be driving it because OverDrive's decline is greater    6:19PM

21   in percentage terms.

22        I think that, again, is an overstatement

23   at least.  I think the decline in the overall

24   market, even at 3 percent, turns into a significant

25   number in absolute terms, substantial number in         6:19PM

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          One thing is she does not -- she still          6:21PM

2     does not have any analysis that considers

3     plaintiffs' sales to libraries.  She's not looking

4     at the library market, which I think is an important

5     component to this case.                               6:22PM

6          As we mentioned before, she herself has

7     identified e-Books as the closest substitute, you

8     know, I think some level of analysis needs to be

9     included there, it's still not there.

10         You know, as we discussed before, her          6:22PM

11    rebuttal really just focuses on one of the analysis

12    she originally did.  She did the -- she talks about

13    when the books were originally made available

14    through CDL on Internet Archive.

15         And, you know, I'll reiterate my point          6:22PM

16    that I made earlier today, which is even with her

17    added controls, she still has the problem of either

18    having a small window which would then allow us to

19    at least potentially have proper identification,

20    even though I think there's still many important      6:22PM

21    controls missing, around a point in time where for

22    the vast majority of the books, Internet Archive's

23    constituency was not very large.

24         So I would be worried that any effects she

25    might be able to find there is not indicative of      6:23PM

Page 258

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    what the book's presence on the website would be in    6:23PM
 2    2020.  But then to extend her window out to years
 3    like 2018, 2019 or 2020 means for a lot of the
 4    books, we're talking about trying to say something
 5    about impacts, say, five years later from posting a    6:23PM
 6    book five years prior.
 7              That's always going to be suspect in
 8    econometric analysis because -- and I believe she
 9    even made this -- agreed with this point in her
10    deposition that, you know, if we go -- the longer      6:23PM
11    the window, the more you worry that there are other
12    factors that are influencing the result and not the
13    one that you're looking at.
14              So I think that puts her analysis in a
15    tough spot.  It makes it difficult with the methods    6:24PM
16    that she's using to get a reliable estimate of what
17    the impact of the book being made available in 2020
18    would have been.
19              I guess beyond that, you know, a lot of
20    the issues are -- there's still certainly a number     6:24PM
21    of confounding factors that she just either doesn't
22    or isn't able to include that even in a situation
23    where the data aren't available, that doesn't
24    automatically mean that the estimate means it's a
25    proper unbiased estimate.                              6:24PM
```

```
 1                So I just think that there is a number of      6:24PM

 2      factors that still weren't included.  She included a

 3      couple more, but I don't think that is sufficient to

 4      fully address the -- quite a few concerns that one

 5      would have in terms of confounding factors.           6:25PM

 6                I'm trying to think.  She talks about --

 7      she concedes some of my points about lifetime

 8      analysis, how to properly do that and, you know,

 9      what would be proper measures of the actual size of

10      the backlist.  You know, her lower bound went quite   6:25PM

11      a bit lower, I think it went down to 45 percent.

12                I think under other assumptions, it's

13      possible for it to go even lower, but I think she

14      already conceded quite a bit in a regard.

15                What else?                                   6:25PM

16                MS. STEINMAN:  Take your time and look

17      through.

18                THE WITNESS:  She makes this point about

19      borrowing versus owning the book would make a big

20      difference in whether people buy the book later.  I   6:26PM

21      didn't see a lot of foundation for that claim.

22                I didn't see a lot of support that she put

23      forward for that claim, so it seemed quite

24      speculative to me.

25                What else?  I think this may have come up    6:27PM
```

Page 260

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    when we were discussing Jørgensen, but I think this    6:27PM

 2    also applies to Dr. Reimers that in a sense, even if

 3    we take her analyses at face value, they are really

 4    kind of average effects.

 5           So it's not allowing us to distinguish          6:27PM

 6    impact for individual works in suit.  So there could

 7    be -- you know, again, even if we took her analysis

 8    as giving us a reliable estimate, which I've given a

 9    lot of reasons why we would be worried about that,

10    the average effect that she's finding may mask         6:27PM

11    non-trivial impacts on particular works in suit.

12           Let me see if I have anything else.

13           I guess one other thing that I remember is

14    she puts in seasonality controls by putting in month

15    dummy variables.  But that's not the same as putting   6:28PM

16    in time fixed effects, which I think is quite

17    important here.

18    BY MR. GRATZ:

19      Q    How are those things different?

20      A    So the seasonality variables that she          6:28PM

21    includes, so this would be, say, a January, a

22    February, a March dummy variable for each.  And so for

23    each observation, it would tell you which month that

24    observation took place in.

25           So that could control for if year after        6:29PM
```

Page 261

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    year, there's a seasonality component to what's        6:29PM

 2    going on to, say, demand that varies through the

 3    year.

 4             So for example, the example I like to give

 5    is gasoline consumption.  We all know there is a        6:29PM

 6    seasonality pattern where consumption goes up as you

 7    get into summertime and then goes back down in the

 8    wintertime.  So that would be a consistent

 9    year-after-year fluctuation through the year that we

10    would call seasonality effects.                         6:29PM

11             But separate from that would be time fixed

12    effects which now you are allowing for differences

13    that are occurring for various reasons over time,

14    not limiting ourselves to just seasonality factors.

15             This would allow for, you know, September      6:29PM

16    of 2019 to have different general demand conditions

17    than September of 2020, for example.

18             So her September dummy variable is going

19    to put the same dummy variable for those two

20    observations.  With time fixed effects, it would        6:30PM

21    allow for differences in general market conditions,

22    general values for the dependent variable in

23    September of 2020 versus September of 2019.

24             I think that's something that is worth

25    seriously considering here because we're exactly in     6:30PM
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    that situation where even if you properly identified    6:30PM

 2    seasonality effects, there's reason to believe that

 3    the overall macroeconomic conditions in 2020, even

 4    if it's the same month, looked quite a bit different

 5    than they did in the same month in 2019.               6:30PM

 6              So I don't believe she, as I recall and

 7    looking at it now, included time fixed effects that

 8    would address that kind of concern, which I think

 9    there's very good reason to have here because we all

10    know there was a major macroeconomic event in 2020.    6:31PM

11              I think that covers a lot.

12         Q    Is there anything else?

13         A    I think that's all I've got from what I can

14    pull together.

15         Q    Just taking a moment now with Exhibits 3,    6:31PM

16    4 and 5, the Hildreth, Reimers -- strike that.

17              Exhibit 3, the Hildreth reply report,

18    Exhibit 4, the Jørgensen reply report and Exhibit 5,

19    the Reimers reply report before you, are there any

20    other opinions that you've formed in this case that    6:31PM

21    we've not -- that you have not identified for us

22    yet?

23              MS. STEINMAN:  Again, I would encourage

24    you to take your time.  I know it's been a very long

25    day, but take your time, look at them before you       6:32PM
```

Page 263

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    answer the response.                              6:32PM

 2          THE WITNESS:  I'll give it one more look

 3    here to see if there's anything that stands out.

 4          The only other thing I can think of, I

 5    think one of the takeaways I had from Dr. Reimers's  6:33PM

 6    rebuttal is quite a bit of reluctance to allow that

 7    any findings in markets like for music or movies

 8    would be informative with regard to books.

 9          I think that's too strong a statement.  I

10    think what I kind of read into the way she was      6:33PM

11    writing about that was because they are not exactly

12    the same, there's nothing we can learn from those

13    other markets.

14          And I guess my response would be, but

15    there are non-trivial similarities which would allow  6:33PM

16    us to then say there is at least some reason to

17    think that findings from some of those related

18    markets could at least be informative about what

19    we'd expect in this market.

20    BY MR. GRATZ:                                      6:34PM

21        Q    Anything else?

22        A    I think that's as far as I can go.  I think

23    as far as I can remember, that's about all the ground

24    I remember covering.

25        Q    Going once, going twice, let me know if   6:34PM
```

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1            I, LYNNE M. LEDANOIS, a Certified

 2    Shorthand Reporter of the State of California, do

 3    hereby certify:

 4            That the foregoing proceedings were taken

 5    before me at the time and place herein set forth;

 6    that a record of the proceedings was made by me

 7    using machine shorthand which was thereafter

 8    transcribed under my direction; that the foregoing

 9    transcript is a true record of the testimony given.

10            Further, that if the foregoing pertains to

11    the original transcript of a deposition in a Federal

12    Case, before completion of the proceedings, review

13    of the transcript [] was [X] wasn't requested.

14            I further certify I am neither financially

15    interested in the action nor a relative or employee

16    of any attorney or party to this action.

17            IN WITNESS WHEREOF, I have this date

18    subscribed my name.

19

20

21    Dated: June 13, 2022

22

23

24

              LYNNE MARIE LEDANOIS

25            CSR No. 6811

                                          Page  268
```