Prince Declaration

Exhibit 5

Page 1

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------------------x

4    HACHETTE BOOK GROUP, INC.,

     HARPERCOLLINS PUBLISHERS LLC,

5    JOHN WILEY & SONS, INC., and

     PENGUIN RANDOM HOUSE LLC,

6

7              Plaintiffs,

8    vs.                    Case No. 1:20-cv-04160-JGK

9

     INTERNET ARCHIVE and DOES 1

10   through 5, inclusive,

11

12             Defendants.

13   ---------------------------------------------------x

14

15     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

16                   SUSAN HILDRETH

17              Monday, May 17, 2022

18

19

20

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 5228055

Page 44

1           MS. McNAMARA:  Jessie, and I would suggest

2     to you we have had a strict rule in these

3     depositions that you do not have speaking

4     objections.

5           You can say objection to form.  You can

6     say, you know, something like vague.  But you get

7     into specifics, you're coaching the witness and I

8     ask you to stop.

9           MS. LANIER:  Well, I respectfully object

10    to your classification of my objections as coaching

11    the witness.  I also don't think that was a speaking

12    objection.

13          I'd just ask you to rephrase the question,

14    please.

15          MS. McNAMARA:  I'll ask the witness to do

16    so, not you.

17      Q    Ms. Hildreth --

18          MS. McNAMARA:  Can we have read back the

19    last question?

20          (Discussion off the record.)

21          (Requested testimony read by the reporter.)

22          MS. LANIER:  Same objection.

23    BY MS. McNAMARA:

24      Q    Can you answer the question, Ms. Hildreth?

25      A    I understand that a specific author would

Page 45

1    not receive a royalty for a specific title.  I am

2    looking at the situation in my mind more globally in

3    terms of overall what royalties would go to not a

4    specific author but a number of authors.

5            So that's my response to that.

6        Q    If the specific title that was available

7    through CDL was Catcher in the Rye by J.D. Salinger,

8    let's say, and you would agree that then the

9    Salinger estate would not receive a royalty if that

10   work was available via the Internet Archive and CDL?

11           MS. LANIER:  Objection, calls for

12   speculation.

13           THE WITNESS:  I'd have to know the context

14   of that question and I mean -- frankly, I'd have to

15   know the context of the question and there could be

16   many other avenues for obtaining access to

17   The Catcher in the Rye than purely relying

18   necessarily on CDL or the Digital Lending Library

19   for it.

20   BY MS. McNAMARA:

21       Q    Do you have a general opinion,

22   Ms. Hildreth, as to whether the plaintiffs have

23   suffered any economic harm as a result of the

24   Digital Lending Library?

25       A    I'm challenged in answering that question

1      A    My opinion is not necessarily based on fact.

2    But from what I know of the e-book demand for --

3    generally in public libraries in the CD O or available

4    at a Digital Lending Library is a factor there.

5           But the demand for e-books and the revenue

6    that publishers and authors have had from the

7    expansion of the e-book market in public libraries

8    would lead me to the opinion that publishers and

9    authors are receiving -- are receiving funds as a

10   result of e-books in the library marketplace.

11     Q    The question really was not whether they

12   are receiving funds in the library marketplace,

13   because as I understand your testimony, you

14   recognize that there is a thriving e-book licensing

15   market for libraries; isn't that right?

16     A    Yes.

17     Q    And it's a thriving e-book market that has

18   increased in recent years; isn't that right?

19     A    Correct, yes.

20     Q    And that e-book market is predicated on

21   licensing revenues that are paid by libraries to

22   entities like OverDrive; is that right?

23     A    Correct, yes.

24     Q    And CDL does not pay those same licensing

25   revenues or Internet Archive's CDL practices do not

Page 48

```
 1   pay those same licensing revenues, isn't that right?
 2           MS. LANIER:  Objection, compound.
 3   BY MS. McNAMARA:
 4       Q    You can answer the question.
 5       A    Yes, as far as I understand, yes.
 6       Q    They do not pay those licensing revenues?
 7       A    Yes.
 8       Q    Now, let's turn to your qualifications
 9   that support your expert report.
10           You indicate that you are currently a
11   library consultant; is that right?
12       A    Yes.  Could I ask if you're referring to a
13   certain part of the report that I should be referring
14   to?
15       Q    I believe Paragraph 1 you say --
16       A    Oh, okay.
17       Q    -- "I am currently working as a library
18   consultant."
19       A    Yes.
20       Q    You say that you're currently working as a
21   library consultant focusing on library executive
22   recruitment, strategic planning, organizational
23   review and community engagement; is that right?
24       A    Yes.
25       Q    Is that a full-time occupation?
```

Page 195

1    budget for e-books was being serviced through CDL,

2    then if I understand your testimony correctly, they

3    would redirect that -- those acquisition funds to

4    other services provided by the library; is that

5    right?

6              MS. LANIER:  Objection, vague.

7              THE WITNESS:  Again, I would want to look

8    at the context that -- of the library services, the

9    neighborhood, the community.  They might determine

10   that they wanted to spend more funds on languages

11   in -- on non-world languages to enhance their

12   collection.

13             They might decide that they would spend,

14   if additional funds were available, on community

15   outreach, which would not necessarily be part of the

16   acquisitions budget.

17             But the point that I would like to try to

18   be clear about is I do not think that because a

19   library might be able to achieve some of its

20   acquisitions content through CDL, I don't think that

21   the initial reaction to that at the local level

22   would be to reduce the library budget by a

23   commensurate amount.

24   BY MS. McNAMARA:

25        Q    I understand that.  But I also understand

Page 196

1   from your testimony that what the funding entity,

2   whether it be state or local would do, would be to

3   redirect those funds to other services; is that

4   correct?

5           MS. LANIER:  Objection, vague.

6           THE WITNESS:  I stated that -- and I would

7   continue to assert that the funds could well be used

8   for further different types of acquisitions.  They

9   also could be used for other types of services.

10          You would have to look at the specific

11  context to make that determination.  I don't think

12  it's a situation where you can make a global

13  statement or a generalized statement.

14  BY MS. McNAMARA:

15      Q    In Paragraphs 65 and 66 of your report,

16  you indicate that library budgets have generally

17  increased over the last ten years; is that right?

18      A    That's correct.

19      Q    Are you aware that during the pandemic,

20  libraries were awarded federal stimulus money?

21      A    Yes.

22      Q    Do you know approximately how much

23  stimulus money was awarded?

24      A    I don't want to make a guess, an uninformed

25  guess, no.

1      Q    Does $250 million sound approximately

2    correct?

3           MS. LANIER:  Objection, asked and

4    answered.

5    BY MS. McNAMARA:

6      Q    Do you know the answer?

7      A    The reason why I hesitate to agree to

8    250 million is that's a very similar amount to the

9    block grant funding for the states.

10          That could be the amount.  But I'm sorry,

11   I didn't follow that closely, so I don't have

12   specific knowledge.

13     Q    Are you aware that the money awarded via

14   the federal stimulus package was used for libraries

15   to license e-books?

16     A    I don't -- I would not -- it would not be

17   unreasonable if that were an eligible expense.  I

18   don't know that for certain.

19     Q    Are you aware that some publishers adapted

20   their terms so that the money from the federal

21   stimulus package could be spent on licensing

22   e-books?

23          MS. LANIER:  Objection, calls for

24   speculation.

25          THE WITNESS:  I'm not aware that that

Page 198

1    happened, but that would be wonderful if it

2    happened.

3    BY MS. McNAMARA:

4         Q    In Paragraph 67 you say, "There are still

5    patrons who want to read print books and don't see

6    technology or digital materials as their primary

7    method of engaging in the world."

8              Do you see that?

9         A    Yes.

10        Q    Do you know what, if anything, Internet

11   Archive offers to patrons who do not want to engage

12   with digital media?

13        A    I'm not aware of what they do to provide --

14   to service patrons that don't want to deal with

15   digital media.

16        Q    Okay.  Your report discusses acquisition

17   budgets.

18             Are you familiar with that?

19        A    Yes.

20        Q    I believe that's in -- starts in

21   Paragraph 69 of your report.

22        A    Yes.

23        Q    Your report indicates that there are a

24   number of different things that -- other than books

25   that libraries purchase with their acquisition

Page 199

1   budgets, including magazines and reference

2   materials, nonprint physical content like CDs or

3   DVDs or videos or streaming services and also

4   objects to loan including libraries of things, tools

5   and games.

6           Do you see that?

7       A   Yes.

8       Q   And these are all materials that libraries

9   may purchase with their acquisition budgets; is that

10  correct?

11      A   Yes.

12      Q   What are library of things?

13      A   Oh, the library of things is a service that

14  libraries are providing where they purchase games,

15  tools, different kinds of creative activities.  So

16  they actually loan like a tool or a game as opposed to

17  loaning a print or an e-copy of something.

18      Q   Do you know with regard to these things

19  that you can acquire through the acquisition

20  budgets, whether it be magazines or CDs or DVDs or

21  videos or tools or games, do you know whether any of

22  those things are available or subject to CDL?

23          MS. LANIER:  Objection, vague.

24          THE WITNESS:  I really don't know.  I

25  don't -- I don't know.

Page 200

1              And the one that I have -- I have no idea

2      if there would be some kind of CDL implication with

3      the streaming services.  But I don't think that CDL

4      is subject to these other categories.

5      BY MS. McNAMARA:

6          Q    Do you know of any libraries that have

7      elected to rip and distribute DVDs on an

8      owned-to-loaned basis?

9                  MS. LANIER:  Objection, vague.

10                 THE WITNESS:  Could you repeat the

11     question?

12     BY MS. McNAMARA:

13         Q    Are you aware of a practice where you

14     could take a DVD and rip it and create a copy of it?

15                 MS. LANIER:  Same objection.

16                 THE WITNESS:  Well, first of all, CDs and

17     DVDs are really being phased out of libraries in

18     lieu of streaming services.

19                 I do not know of libraries that have done

20     that practice with DVDs.

21     BY MS. McNAMARA:

22         Q    Wouldn't the same principle arguably apply

23     to DVDs as books if the library could leverage it in

24     some fashion to make it available to its users?

25                 MS. LANIER:  Objection, vague, lacks

1   foundation.

2          THE WITNESS:  I don't feel qualified to

3   respond to that question.

4   BY MS. McNAMARA:

5      Q    If libraries can leverage their print

6   collections of books through a CDL, could that free

7   up money in the acquisition budget for these nonbook

8   categories?

9      A    It certainly could do that.  It could also

10  free up money for fiction and nonfiction in print and

11  digital formats as well as some of these other

12  categories.

13  BY MS. McNAMARA:

14     Q    You would agree that if they were able to

15  leverage print collections through CDL and they

16  freed up some acquisition budget, they could use

17  that money to buy movies; is that right?

18     A    They would probably use that money to

19  support access to streaming services.  And I also

20  think they would use that for acquisition of

21  additional digital or print materials.

22          The lion's share, if you will, or the

23  largest share of these materials budgets are

24  allocated to fiction and nonfiction print and

25  digital.  So I would imagine that additional funds

1    could go there.

2            They could also go to these other

3    categories, but the other categories are not the

4    primary categories in the acquisition budgets.

5       Q    But you agree that the acquisition -- the

6    fund freed up through CDL could go to purchasing

7    video games or other nonbook categories; isn't that

8    right?

9            MS. LANIER:  Objection, asked and

10   answered.

11           THE WITNESS:  Yes, they could.

12   BY MS. McNAMARA:

13      Q    So doesn't that undermine your thesis that

14   libraries will spend the same amount of money on

15   books and e-books regardless of whether CDL is

16   implemented?

17           MS. LANIER:  Objection, vague.

18           THE WITNESS:  As I said previously, the

19   materials budget has many different elements in it

20   and although it could be that if funds were freed

21   up, they'd be used to add some tools to the tool

22   lending library, there's -- depending on the context

23   and the requirements of the users, because the large

24   share of collections are in fiction and nonfiction

25   digital and print, I think it's just as likely, if

Page 203

1    not more likely, that those funds would be used to

2    buy additional e or print copies materials.

3    BY MS. McNAMARA:

4         Q    But you're speculating on that, aren't

5    you?

6              MS. LANIER:  Objection, mischaracterizes

7    prior testimony.

8              THE WITNESS:  Because the -- because

9    libraries have had -- over the last ten years, they

10   have shifted their budgets to obtain more and more

11   e-content and e-books, and they have not ever really

12   been able to satisfy in most cases the demand for

13   e-books, I don't feel that it's complete speculation

14   to say that e-books are one of the most

15   highly-demanded items in this acquisitions budget

16   and that it would be -- it would not be unusual that

17   more e-books were added because e-books I think

18   they've reduced -- they're reducing expenses for

19   print format.  They are increasing expenses for

20   digital format and they do not have sufficient money

21   in those budgets to address all the requests for

22   digital formats.

23             So I think it's highly likely that

24   additional funds would be allocated to digital

25   format purchases.

Page 216

```
 1            MS. LANIER:  Objection, vague, calls for
 2   speculation.
 3            THE WITNESS:  I don't have knowledge that
 4   would help inform my answer whether they would or
 5   wouldn't do that.
 6   BY MS. McNAMARA:
 7       Q    My question wasn't whether they would or
 8   wouldn't do it.
 9            I was saying since you've agreed nothing
10   binds them to five years, they could change that
11   tomorrow if they wanted; isn't that right?
12            MS. LANIER:  Same objection and asked and
13   answered.
14            THE WITNESS:  It's not unreasonable that
15   they could do that.  But I am not -- there is no
16   reason for me to believe that they necessarily would
17   do that.
18   BY MS. McNAMARA:
19       Q    The reallocation -- I mean, you say in the
20   next sentence, "They would reallocate their spending
21   away from e-book licensing for those titles being
22   accessed through CDL and would spend more on e-book
23   licensing for newer titles or on print books."  Is
24   that correct?
25       A    Yes.
```

Page 217

1      Q    Again, what is the basis for your
2  contention that libraries would reallocate their
3  spending away from the titles that are available
4  through CDL and instead use that same money for
5  newer titles or on print books?
6      A    Again, I would refer to my practice and
7  experience of acquisitions approaches in libraries
8  where they were -- are always trying to obtain
9  additional copies of e-books and/or new print books.
10     Q    And so in this scenario that you're
11 describing in Paragraph 106, the library would no
12 longer be paying licenses for the e-books that are
13 available via CDL; is that right?
14          MS. LANIER:  Objection, vague.
15          THE WITNESS:  Yes, that's correct.
16 BY MS. McNAMARA:
17     Q    And the spending on e-book licensing,
18 either the new books or on print books, would be for
19 different works, would it not?
20          MS. LANIER:  Objection, vague.
21          THE WITNESS:  I think in some cases it
22 would be for different works.
23 BY MS. McNAMARA:
24     Q    Is your argument here in Paragraph 106
25 that the publishers will not suffer any financial

Page 218

1    harm because libraries have a fixed amount of money
2    to spend on acquisitions every year and will
3    inevitably spend it all?
4              MS. LANIER:  Objection, vague.
5              THE WITNESS:  My position here is that in
6    most circumstances, the library would spend all of
7    its materials acquisitions budget on e-books or
8    print books and, therefore, even though the spending
9    might be in somewhat different formats, the
10   publishers would receive revenues from those
11   acquisitions.
12   BY MS. McNAMARA:
13        Q    But you've agreed that they would not
14   receive revenue for the works that they are
15   obtaining through CDL; isn't that right?
16             MS. LANIER:  Objection, asked and answered
17   and mischaracterizes previous testimony.
18             THE WITNESS:  Yes.
19   BY MS. McNAMARA:
20        Q    In Paragraph 106 you're talking about
21   libraries generally; is that correct?
22        A    I'm talking about specifically really my
23   experience in public libraries.
24        Q    And again, do you feel comfortable with
25   your expert opinion that what you're stating in

Page 225

1      Q     Internet Archive is not primarily funded

2   by tax dollars, are they?

3             MS. LANIER:  Objection, calls for

4   speculation.

5             THE WITNESS:  I don't know all of their

6   revenue sources, but I don't think the primary

7   sources are public dollars.

8   BY MS. McNAMARA:

9      Q     To the degree that e-books are available

10  through CDL on Internet Archive, the user is not

11  getting the benefit of any original acquisition or

12  payment of tax dollars by Internet Archive, are

13  they?

14            MS. LANIER:  Objection, vague.

15            THE WITNESS:  I would say correct.

16  BY MS. McNAMARA:

17     Q     Paragraph 107 of your report, you indicate

18  in the last sentence, "Because of these required

19  expenses, the materials budget, which is

20  discretionary compared to other expenditures, is

21  often used as the budget balancer on an annual

22  basis - meaning that where reductions must be made

23  to balance the budget, those reductions are often

24  made to the materials budget."

25            Do you see that?

Page 226

1        A    Yes.

2        Q    Are you suggesting that acquisition

3   budgets are at particular risk of being squeezed

4   because they are discretionary?

5             MS. LANIER:  Objection, vague as to

6   "squeezed."

7             THE WITNESS:  I am suggesting that it is

8   not uncommon that required expenses -- legally

9   required expenses, say insurance or updating of fire

10  equipment or a variety of expenses that are required

11  to keep a building open to the public may take

12  priority over expenses allocated to materials.

13  BY MS. McNAMARA:

14       Q    In Paragraph 109 of your report, you

15  indicate that "In light of the priority of materials

16  acquisition and the current state of limited budgets

17  for those materials, libraries would not reduce

18  their materials budgets if reliance on CDL for

19  certain digital content reduced their spending on

20  the particular titles that were provided through

21  CDL."

22            Do you see that?

23       A    Yes.

24       Q    Is it your expert opinion that libraries

25  will spend less money on licensing the e-book

Page 259

1      Q    Do you have data that is available to you

2  that would cover e-books licensing should CDL become

3  common in the 9,000 -- what was it, 9,000?

4      A    9,000 systems.

5      Q    The 9,000 library systems, do you know of

6  any data that would indicate what these 9,000

7  libraries would do with regard to reallocation of

8  their resources should they all start to employ CDL?

9      A    I don't have any immediate awareness of data

10 in terms of the 9,000 library systems.  There could be

11 some kind of analysis done on a couple of sample

12 libraries to see what the trends might be.

13     Q    Do you know whether any public library has

14 done -- has created data concerning their

15 reallocation of e-book licenses when they use CDL?

16     A    I'm not aware of any that have done that.

17     Q    And we've established in your testimony

18 that a relative handful of public libraries are

19 actually using CDL; isn't that right?

20          MS. LANIER:  Objection, vague and

21 mischaracterizes previous testimony.

22          THE WITNESS:  I would say that we can

23 agree in terms of public libraries that have signed

24 on to the CDL statement, that's a limited number.

25 And there hasn't been a data set created as far as I

Page 260

```
 1   know that has determined what public libraries are
 2   or not using CDL.
 3   BY MS. McNAMARA:
 4       Q    And -- but we also did look -- in addition
 5   to the public libraries that signed on to the
 6   controlled digital lending statement, we looked at
 7   the public libraries that have been identified as
 8   partner libraries with Internet Archive.
 9             Do you recall that?
10       A    Yes.
11       Q    Do you recall that there were
12   approximately six or seven public libraries that
13   have become partner libraries with the Internet
14   Archive?
15       A    Yes.
16       Q    So any data set arising out of the
17   practices of those six or seven libraries, do you
18   believe that that would be representative of the
19   9,000 public libraries that exist in the United
20   States?
21             MS. LANIER:  Objection, vague, lacks
22   foundation.
23             THE WITNESS:  If I were to attempt to do
24   an analysis, which I'm not necessarily going to do,
25   I would not feel that I had to be bound by either
```

1  the signatories to the controlled digital lending

2  statement or the partner libraries in terms of who

3  is using CDL to access and review the kind of

4  information that we're talking about.

5          I would want to determine some kind of a

6  sampling that had a large, medium, small library

7  using CDL to do a very simple analysis.

8  BY MS. McNAMARA:

9    Q    And how would you conduct that sample

10  analysis with today's data?

11   A    I would have to think about that.  I have

12  not developed a plan for that.

13   Q    But are you planning to do such an

14  analysis?

15          MS. LANIER:  Objection, asked and

16  answered.

17          THE WITNESS:  I really have to think about

18  it and I'm not committed to do doing that.

19  BY MS. McNAMARA:

20   Q    I'm not asking you whether you're

21  committed, Ms. Hildreth.

22          I'm trying to understand that if you were

23  to conduct such an analysis, how would you go about

24  getting that data and conducting an analysis that

25  could be deemed to be representative of the 9,000

Page 262

1   public libraries in the United States?

2           MS. LANIER:  Objection, vague.

3           THE WITNESS:  I think it could be very

4   challenging to do that analysis.  I think what you

5   could come up with is a sampling that might identify

6   a trend.

7           But at this point the data collection is

8   not universally done so that you would have a

9   statement and could represent what might be

10  happening in most public libraries in the U.S.

11  BY MS. McNAMARA:

12      Q    Thank you.

13           You were asked the question:  Do you know

14  whether the availability of books on the Digital

15  Lending Library has, in fact, had any effect on

16  demand for e-book licenses?

17           You said:  I don't know.

18           Do you see that -- I mean do you

19  understand that?

20      A    Yes, I understand that.

21      Q    So you can't say that the availability of

22  e-books on the Digital Lending Library has had no

23  demand for e-book licenses, can you?

24           MS. LANIER:  Objection, vague.

25           THE WITNESS:  I can say that I don't know

Page 266

1          I, LYNNE M. LEDANOIS, a Certified

2     Shorthand Reporter of the State of California, do

3     hereby certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that a record of the proceedings was made by me

7     using machine shorthand which was thereafter

8     transcribed under my direction; that the foregoing

9     transcript is a true record of the testimony given.

10          Further, that if the foregoing pertains to

11     the original transcript of a deposition in a Federal

12     Case, before completion of the proceedings, review

13     of the transcript [X] was [] wasn't requested.

14          I further certify I am neither financially

15     interested in the action nor a relative or employee

16     of any attorney or party to this action.

17          IN WITNESS WHEREOF, I have this date

18     subscribed my name.

19

20

21     Dated: May 19, 2022

22

23                    *Lynne Marie Ledanois*

24          _____

          LYNNE MARIE LEDANOIS

25          CSR No. 6811