**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY      :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,

                                               :       Case No. 1:20-cv-04160-JGK

                 Plaintiffs,

                                               :

-against-

                                               :

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,                                        :

                 Defendants.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### PLAINTIFFS' RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL FACTS

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House LLC ("PRH") (collectively, the "Publishers") pursuant to Local Rule 56.1(b) of the United States District Court for the Southern District of New York, submit this Response to Defendant Internet Archive's Rule 56.1 Statement of Material Facts (each paragraph of which is referred to herein as a "Statement"). The Publishers submit this Response solely for purposes of the Internet Archive's pending Motion for Summary Judgment and reserve the right to challenge the purported truth of any statements made in the Internet Archive's Rule 56.1 Statement of Material Facts at any trial of this action.[1]

    1.       The Internet Archive is a 501(c)(3) public charity. Declaration of Joseph C. Gratz submitted herewith ("Gratz Decl.") Ex. A ¶1 (Stipulation of Undisputed Facts ("Stipulation")).

---

[1] Unless otherwise noted, this Response uses the same abbreviations and capitalized terms as those set forth in the Publishers' Rule 56.1 Statement of Material Facts (ECF No. 113).

**Publishers' Response**:  Undisputed.

2.      The guiding mission of the Internet Archive is to provide universal access to all knowledge.  Declaration of Brewster Kahle submitted herewith ("Kahle Decl.") ¶ 4.

**Publishers' Response**:  Undisputed.

3.      In furtherance of that mission, over more than two decades, the Internet Archive has preserved, curated, and made available much of humanity's most important information.  *Id*. ¶ 5.

**Publishers' Response**:  Undisputed that Internet Archive has distributed millions of copies of unauthorized ebooks and other works, but not material and vague as to the meaning of "preserved, curated, and made available much of humanity's most important information."

4.      The Internet Archive has become a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals.  *Id.* ¶ 6.

**Publishers' Response**:  Undisputed that Internet Archive has millions of users and has partnered with certain institutions, but otherwise disputed.  Lacks foundation because Internet Archive provides no evidence supporting the claim that it is "a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals," whereas there is evidence to show that a relatively small proportion of libraries have endorsed or joined Internet Archive's in-copyright ebook lending initiatives – and doubts have been raised about their legality.  *See* Rule 56.1 Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment, ECF 107 ("Pubs. SUMF") ¶¶77-109.  Also this Statement is not material and is vague as to the meaning of "a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals."

5.      One of the Internet Archive's first projects was to archive every public webpage

on the fledgling World Wide Web.  Today, over a quarter century of web history is preserved and accessible through the Internet Archive's Wayback Machine.  The Wayback Machine has become a crucial database for journalists, researchers, lawyers, and courts.  Kahle Decl. ¶ 7.

**Publishers' Response**:  Undisputed, but not material because the Wayback Machine is not at issue in this action.

6.     The Internet Archive works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts.  Kahle Decl. ¶ 8.

**Publishers' Response**:  Undisputed for the purpose of this motion only.  Lacks foundation because Internet Archive provides no evidence supporting the claim that it "works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts."

7.     The Internet Archive has been a member of the American Library Association since 2000.  The Internet Archive is also an affiliate member of the Boston Library Consortium, and participates in interlibrary loan via the OCLC and RapidILL interlibrary loan networks. Kahle Decl. ¶¶ 9.

**Publishers' Response**:  Undisputed, but not material and incomplete since Internet Archive's participation in the OCLC and Rapid ILL interlibrary loan networks is limited to scholarly monographs and/or periodicals.  *See* Supplemental Declaration of Elizabeth A. McNamara dated September 2, 2022 ("Suppl. McN Decl."), Ex. 11.

8.     In December 2006, the State of California formally recognized the Internet Archive as a library, making it eligible to receive funding under the Library Services and Technology Act and qualifying it for E-Rate, a federal program that provides discounts to

schools and libraries to ensure they are able to obtain affordable telecommunications services. Kahle Decl. ¶ 10.

**Publishers' Response**:  Undisputed that the California State Librarian Susan Hildreth sent Internet Archive a letter in December 2006 referring to Internet Archive as a library eligible to receive LSTA funding and E-Rate funding, but not material since it long pre-dates IA's controlled digital lending program and vague as to the meaning of "the State of California formally recognized the Internet Archive as a library."

9.      In mid-2007, the Internet Archive was awarded a Library Services and Technology Act grant for its Open Library project (openlibrary.org) – an effort to create a comprehensive library book catalog with a webpage for every book published.  Kahle Decl. ¶ 11.

**Publishers' Response**:  Undisputed, but not material because the "Open Library project" referenced in this Statement was implemented specifically to build a "card catalog" of webpages for books, not for any activity related to controlled digital lending, and the funding expired before Internet Archive started scanning and distributing in-copyright books.  Suppl. McN Decl. Ex. 12 (Cressaty Tr. 214:16-219:14).  A clarification is also required: the "Open Library project" referred to in the above Statement is different from the "Open Libraries" project that is at issue in this action (the "Open Libraries Project"), which was launched in or about 2018, without LSTA funding, "to increase lending counts" on Internet Archive's Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches."  Declaration of Elizabeth A. McNamara, ECF 96 ("McN Decl.") ¶¶67-68, 103.

10.      The Internet Archive has also received grant funding from the Institute of Museum and Library Services ("IMLS"), an independent federal agency whose mission is to

support museums, libraries, and related organizations.  For example, in 2017, the Internet

Archive received a grant under the IMLS's Laura Bush 21st Century Library Program.  In order

to receive this grant, the Internet Archive had to qualify as a library or library-related

organization.  Kahle Decl. ¶ 12.

**Publishers' Response**:  Undisputed, but incomplete and not material because the IMLS

funding cited above was awarded for purposes unrelated to the in-copyright book distribution

scheme at issue in this action.  Kahle Decl. ¶12, Ex. 2.

11.     This lawsuit concerns the Internet Archive's implementation of Controlled Digital

Lending ("CDL"), through which the Internet Archive digitizes its print books and lends them

digitally to its patrons.  Complaint, ECF No. 1 ("Compl.").

**Publishers' Response**:  Undisputed that this lawsuit involves IA's implementation of

CDL, but incomplete because the lawsuit is not only limited to Internet Archive's lending of

digital scans of "its print books" – *i.e.*, print books that Internet Archive owns and/or maintains

possession of.  Since the Internet Archive began directing its efforts towards the Open Libraries

Project in 2018, it has become a central hub and libraries participating in the project – each

known as a "Partner Library" – send their catalogues to Internet Archive for overlap analysis.

McN. Decl. ¶¶67-68, 103.  Internet Archive does not make new scans of books in Partner

Library collections that it has already scanned (nor does it take possession of the matching print

editions in the Partner Library's collections); rather, every time a book in the Partner Library's

catalogue matches an ebook on the Website through the overlap analysis, Internet Archive

increases by one the number of concurrent checkouts of that book permitted on the Website and

lends its digital scan against physical copies that remain in the possession of the Partner Library

(the "Open Libraries Process").  *Id.*

12.     In 2011, in partnership with over two dozen library systems including the Boston Public Library, the Internet Archive made an initial collection of more than 80,000 books available for digital lending.  Kahle Decl. ¶ 13.

**Publishers' Response**:  Undisputed, but not material and incomplete since Internet Archive initially restricted its scanning of in-copyright works to out-of-print books and it loaned books on an "in-library" basis in 2011 – meaning that the ebooks were accessible only to accredited users of a participating physical library's network – but subsequently abandoned these limitations.  McN Decl. ¶¶34-35, 63-64.

13.     In November 2011, the Internet Archive's digital lending effort was unanimously endorsed by all fifty state libraries through the Chief Officers of State Library Agencies ("COSLA").  Kahle Decl.  ¶ 14.

**Publishers' Response**:  Undisputed, but not material and incomplete since the "digital lending effort" referenced in this Statement, which was geographically limited and pre-dated widespread adoption of authorized library ebook lending, bears no resemblance to Internet Archive's current "digital lending effort," where Internet Archive now acts as a central hub and lends out digital copies based on the number of print copies in the possession of each of its "Partner Libraries" without ever taking possession of the matching print editions in each libraries' collection.  McN Decl. ¶¶67-68, 103; Declaration of Jeffrey Weber, ECF 95 ("Weber Decl.") ¶10.

14.     As of this filing, the Internet Archive contains more than three million books available for borrowing in its collection.  Kahle Decl.  ¶ 15.

**Publishers' Response**:  Undisputed.

15.     The Internet Archive launched and expanded this program on the basis that it is

fair use.  *Id.* ¶ 16.

**Publishers' Response**:  Disputed but not admissible.  Whether the Internet Archive's activities constitute fair use is a legal conclusion inappropriate for a Rule 56.1 statement, and must therefore be disregarded.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).  And this Statement lacks foundation since Internet Archive withheld documents regarding advice concerning fair use of its practices based on privilege.  Suppl. McN Decl. Ex. 9.  Moreover, Kahle Decl. ¶¶16 and 17 cite only the *White Paper* and *Position Statement* concerning CDL, both published in 2018, as the basis for Kahle's purported good faith belief in IA's fair use defense.  Kahle Decl. Exs. 5, 6.  But IA's infringement of in-copyright books pre-dates 2018 and therefore IA did not "launch" its program in reliance on such publications.  McN Decl. ¶¶62-64.  Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Further, it is disputed that Internet Archive "launched and expanded this program on the basis that it is fair use" since there is contrary evidence that Internet Archive knew or should have known that its conduct was not fair use.  McN Decl. ¶¶77-109.

16.     In developing and maintaining this belief, the Internet Archive and its Digital Librarian, Brewster Kahle, relied on *A White Paper on Controlled Digital Lending of Library Books*, authored by Dave Hansen, then the Associate University Librarian and Lead Copyright & Information Policy Officer for Duke University, and Kyle Courtney, then a copyright advisor for Harvard University Library – each copyright scholars known to the Internet Archive to be respected in their fields.  The White Paper concludes that "there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use."  Kahle Decl. ¶ 16.

**Publishers' Response**: Disputed but lacks foundation, states a legal conclusion and not

admissible for the reasons set forth in Statement 16, which is incorporated herein by reference.

17.     The Internet Archive and Mr. Kahle also relied on the *Position Statement on

Controlled Digital Lending*.  This document was co-authored by Mr. Courtney; Mr. Hansen;

Mary Minow, then affiliated with the Berkman Klein Center for Internet and Society at Harvard

University; Jason Schultz, a Professor of Clinical Law at New York University School of Law;

and Michelle Wu, then a law professor and librarian at the Georgetown Law Center.  Lila Bailey,

the Internet Archive's most senior lawyer, was also a co-author of this statement.  The Internet

Archive understood all co-authors of the *Position Statement* to be well-respected copyright

scholars.  Dozens of copyright law professors and scores of libraries and library associations

became signatories to the statement, including the Association of Research Libraries, Boston

Public Library, Los Angeles Public Library, the Metropolitan New York Library Council, and

the Chief Officers of State Library Agencies, representing the state librarians of all fifty

states.  *Id.* ¶ 17.

**Publishers' Response**:  Disputed but inadmissible.  Lacks foundation since Brewster

Kahle could not have relied on the *Position Statement* referenced above in developing and

maintaining his belief that Internet Archive's scanning and distribution of in-copyright ebooks

was fair use  because Internet Archive engaged in those activities from at least 2011 – seven

years before the *Position Statement* was published in 2018.  Accordingly, this proposed "fact" is

not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and

must therefore be disregarded.  Also incomplete because the Statement omits that Michelle Wu

had been engaged as an attorney for Internet Archive from 2017 until at least March of 2018

(McN Decl. ¶86) and because the Boston Public Library and Los Angeles Public Library no

longer appear as signatories on the version of the *Position Statement* posted on line as of the date of this filing.  Suppl. McN Decl. Ex. 16.

18.     The Internet Archive – or another 501(c)(3) public charity it works closely with, Open Library of Richmond – lawfully acquires print books by purchase or donation that it wishes to make available for digital lending.  Kahle Decl. ¶ 18; Gratz Decl. Ex. A (Stipulation).

**Publishers' Response**:  Undisputed.

19.     Open Library of Richmond holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.  Kahle Decl. ¶ 19.

**Publishers' Response**:  Undisputed, but vague as to the meaning of "many."

20.     The Internet Archive or Open Library of Richmond owns at least one lawfully made copy of each of the 127 Works in Suit ("Works in Suit").  Gratz Decl. Ex. A (Stipulation).

**Publishers' Response**:  Undisputed.

21.     The Internet Archive sends print books to a scanning center, where an operator carefully turns and photographs each page using a book-digitization device the Internet Archive developed called a Scribe.  Gratz Decl. Ex. B ¶¶ 80–82 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, but vague as to the meaning of "carefully turns."

22.     The print book is then placed in archival storage, and its specific location is carefully tracked.  Gratz Decl. Ex. B ¶ 83 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, but vague as to the meaning of "carefully tracked."

23.     Print books stored in the physical archive facilities are non-circulating; it is not available to be accessed in its print form.  Kahle Decl. ¶ 20.

**Publishers' Response**:  Undisputed.

24.     The digital images of the book are processed and formatted, and if the book meets

certain criteria set by Internet Archive policies, it is then made available for digital lending to one registered patron at a time. Gratz Decl. Ex. B ¶¶ 80, 111–25 (Suppl. Expert Rpt. Of Ian Foster).

**Publishers' Response**: Undisputed, with the clarification that the only current "criteria set by Internet Archive policies" is that Internet Archive claims not to post books published within the last five years, which is a non-binding policy that it intermittently violates. McN Decl. ¶35.

25. Anyone can become a patron of the Internet Archive – and digitally borrow books – for free by signing up for an Internet Archive account. (Internet Archive has policies, not relevant here, for terminating accounts.) Kahle Decl. ¶ 21; Gratz Decl. Ex. B ¶ 19 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**: Undisputed.

26. Doing so grants them a digital library card that lets them borrow up to ten books at a time from the collection, for limited periods of up to fourteen days. Kahle Decl. ¶ 22.

**Publishers' Response**: Undisputed, but incomplete and misleading because the fourteen day loans can be renewed indefinitely depending upon demand for the title in question. This Statement is also vague as to "digital library card."

27. The Internet Archive offers its patrons several ways of engaging with a book they have borrowed. Gratz Decl. Ex. B ¶¶ 31, 35–36 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**: Undisputed, but vague as to the meaning of "several ways of engaging."

28. The patron can read the book in their web browser through a tool called BookReader. *Id.* ¶ 31.

**Publishers' Response**:  Undisputed.

29.     BookReader lets patrons flip through a book's pages, zoom in on a book's images, enlarge the book's text for easier reading, and search through the book.  Kahle Decl. ¶ 23.

**Publishers' Response**:  Undisputed.

30.     When finished, the patron may return the book.  Gratz Decl. Ex. B ¶ 32 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed.

31.     Otherwise, the loan will automatically expire at the end of the loan period.  At that point, the patron is no longer able to access the book, and it is once again available to be borrowed.  Kahle Decl. ¶ 24.

**Publishers' Response**:  Undisputed, but incomplete and requiring clarification that users can renew their loans of books indefinitely subject to demand for the title from other users.

32.     Instead of reading books in their web browsers, patrons can choose to download an encrypted PDF or encrypted ePub version of the book onto their computer or device.  Gratz Decl. Ex. B ¶¶ 35–36 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed.

33.     These files are secured using the same security system that Plaintiffs use to secure digital files of Plaintiffs' books:  a type of "digital rights management" or "DRM" software created by Adobe.  Gratz Decl. Ex. C, Deposition Transcript of Steve Potash ("Potash Dep. Tr.") 81:1–82:5.

**Publishers' Response**:  Disputed.  In the deposition testimony cited above, Mr. Potash confirms that "one of [the]" methods of digital rights management software utilized by

OverDrive is Adobe Digital Editions.  Potash Dep. Tr. 81:1–82:5.  But the deposition testimony does not confirm that each of the "Plaintiffs use" this same software.  *Id.*  Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

34.     The Adobe DRM allows only the authorized patron to download and read the borrowed book using authorized software and prevents the patron from copying or further distributing the book or from accessing it after their loan has ended.  Kahle Decl. ¶ 25.

**Publishers' Response**:  Undisputed.

35.     The Internet Archive does not digitally loan all books it has scanned.  Instead, it implements a number of policies that limit the books available for digital lending.  *Id.* ¶ 26.

**Publishers' Response**:  Undisputed for the purposes of this motion only, subject to the clarification that the only current "polic[y]" is that Internet Archive claims to not post books published within the last five years, which is a non-binding policy that it intermittently violates. McN Decl. ¶35.  The Statement is also vague and lacks foundation.  No admissible evidence is cited to support the Statement the IA "implements a number of policies that limit the books available for digital lending. Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

36.     As applicable here, to be available for digital lending, a digital book must have been scanned from a print copy owned by the Internet Archive.  Kahle Decl.  ¶ 27.

**Publishers' Response**:  Disputed.  The Internet Archive makes ebooks available for digital lending based on print books that are owned by and in the physical possession of its Partner Libraries, not the Internet Archive.  McN Decl. ¶¶67-68, 103.  Since the Internet Archive began directing its efforts towards the Open Libraries Project in 2018, the Internet Archive now

acts as a central hub lending a single ebook scan against physical books owned by Partner Libraries via the Open Libraries Process. *Id.* Furthermore Open Libraries Director Chris Freeland acknowledged that the Website may contain books that were scanned from the collections of libraries like the Boston Public Library, and not Internet Archive's collection. *Id.* ¶43.

37.    It is the Internet Archive's policy not to lend books published within the previous five years.  Gratz Decl. Ex. B ¶¶ 113, 123 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, with the clarification that the Internet Archive does not always comply with its voluntary and non-binding five year limitation.  For example, two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the Internet Archive's Website that same year.  McN Decl. ¶¶35,  115.

38.    This limitation is intended to exclude from lending the latest bestsellers, as a belt-and-suspenders accommodation to publishers.  Kahle Decl. ¶ 28.

**Publishers' Response**:  Undisputed, but not material and vague as to the meaning of "a belt-and-suspenders accommodation to publishers."

39.    Dr. Imke Reimers analyzed revenue patterns of works on the USA Today Top 150 Bestsellers List.  Declaration of Imke Reimers submitted herewith ("Reimers Decl.") Ex. 1 ¶¶ 9, 20–24 (Reimers Expert Rpt.).

**Publishers' Response**:  Undisputed that Dr. Reimers purported to analyze the USA Today Top 150 Bestseller List but disputed that these rankings are equivalent to revenue.  Declaration of Jeffrey T. Prince dated September 2, 2022 ("Prince Decl."), ¶¶29, 60.

40.    Between 1994 and 2021, only 21% of the book appearances on the USA Today

weekly bestseller list first appeared at least 52 weeks earlier.  *Id.* ¶¶ 9, 21–24.

**Publishers' Response**:  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

41.     Between 1994 and 2021, only 8% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than two years earlier.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Publishers' Response**:  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

42.     Between 1994 and 2021, only 2% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than five years earlier.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Publishers' Response**:  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

43.     For titles that enter the Top 150 bestseller list, approximately 90% of sales occur

in the first five years after publication.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Publishers' Response**:  Disputed, but not material and misleading because this Statement suggests that the Publishers are only concerned with sales in the first five years after publication of a book and conflates unit sales and revenues.  The Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works.  SUMF¶¶38-62; *see also* Prince Decl. ¶81.  This Statement is also misleading and lacks foundation because Dr. Reimers only purported to analyze bestseller list data going back to 1994 and her analysis thus does not have any relevance to book sales before that date.  Expert Report of Imke Reimers, Ph.D., ECF 109-1 ("Reimers Report"), ¶ 9.

44.     Books published by HarperCollins that are less than a year old account for between 37% and 40% of all units sold between 2017 and 2019 and 34% in 2020.  Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. D (HC0030132).

**Publishers' Response**:  Disputed.  *See* Prince Decl. ¶81; Prince Decl. Ex. 1 ("Prince Report") ¶¶109-115.  This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

45.     Books published by Penguin Random House that are less than a year old account for between 47% and 52% of all units sold between 2017 and 2019 and 43% in 2020.  Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. E (PRH0072194).

**Publishers' Response**:  Disputed.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115.  This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

46.     Books published by Hachette that are less than two years old account for between 70% and 73% of all units sold between 2017 and 2019 and 65% in 2020.  Reimers Decl. Ex.1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. F (HACHETTE0012377).

**Publishers' Response**:  Disputed.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115.  This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

47.     Based on the available data, most of the Works in Suit behave consistently with the patterns of the works on the USA Today Top 150 Bestsellers List in that sales drop off quickly after publication and most sales occur within five years after a book is published. Reimers Decl. Ex. 1 ¶¶ 9, 21, 26–28 (Reimers Expert Rpt.); *Id.* Ex. 2 ¶¶ 10, 11 (Reimers Reply Rpt.).

**Publishers' Response**: Disputed and lacks foundation.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115.  Reimers does not do an analysis of each Work in Suit concerning its sales starting from the years since it was first published. Reimers Report ¶ 27.  And the record evidence shows that Works in Suit include numerous perennial sellers – like *Catcher in the Rye, The Lion, the Witch, and the Wardrobe, The Bell Jar, Little House on the Prairie, Lord of the Flies, The House on Mango Street,* or *Song of Solomon,* for example – that have generated significant income far beyond the first few years after publication.  Declaration of Ben Sevier, ECF 92 ("Sevier Decl."), ¶¶34-38; Declaration of Chantal Restivo-Alessi, ECF 94 ("R-A Decl.") ¶¶6, 63-68.  Thus it is erroneous to claim that the majority of sales revenue for most of the Works in Suit takes place within five years after a book is published when a book remains available for purchase in subsequent years and generates significant sales in subsequent years. The claim that "most sales" of a particular book "occur within five years after a book is

published" ignores the fact that some books continue to have sales for many decades, or that some books spike later in their life cycle (such as lesser-known books made into movies or early undiscovered works by later successful authors). Prince Report ¶110. Backlist titles, including titles originally published more than five years ago, in the aggregate, are significant drivers of Plaintiff Publishers' revenue and business model and represent economic incentives that are necessary to encourage publication and dissemination of new creative works. Prince Report ¶111. Additionally, vague as to the meaning of "most of the Works in Suit."

48.     Peak sales for most titles occur within one to two years after the date of the first publication of the title. Reimers Decl. Exs. 1 ¶¶ 20, 28 (Reimers Expert Rpt.) & 2 ¶¶ 9–15 (Reimers Reply Expert Rpt.).

**Publishers' Response**: Disputed. It is erroneous to claim that the majority of sales peak within one to two years of first publication when a book remains available for purchase in subsequent years. The claim that "[p]eak sales" of a particular book "occur within one to two years after the date of the first publication of the title" ignores the fact that some books continue to have sales for many decades, or that some books spike later in their life cycle (such as lesser-known books made into movies or early undiscovered works by later successful authors). Weber Decl. ¶¶30-32; R-A Decl. ¶¶59-68; Sevier Decl. ¶¶34-38. Backlist titles, including titles originally published more than five years ago, in the aggregate, are significant drivers of Plaintiff Publishers' revenue and business model and represent economic incentives that are necessary to encourage publication and dissemination of new creative works. *Id*. Additionally, this Statement is vague as to the meaning of "most titles."

49.     As a result of human error, two Works in Suit published in 2019—*All the President's Women: Donald Trump and the Making of a Predator* and *The Man Who Solved the*

*Market*—were made available for digital lending.  The mistake was rectified as soon as the Internet Archive realized the error.  Kahle Decl. ¶ 29.

**Publishers' Response**:  Undisputed, with the clarification that Internet Archive "realized the error" only after this action was filed identifying the Works in Suit referenced above. Compl., Ex. A.

50.     Two factors determine the number of digital copies of a particular book that can be borrowed at any given time from the Digital Lending Library.  *Id.* ¶ 30.

**Publishers' Response**:  Undisputed.

51.     First, the Internet Archive makes available one digital copy for each non-circulating print copy of a book it has in archival storage.  *Id.* ¶ 31; Gratz Decl. Ex. B ¶ 130 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed.

52.     Second, for any of those books the Internet Archive has made available for CDL, the Internet Archive works with dozens of library partners – from the University of Arizona to the Delaware County District Library in Ohio – to contribute their own non-circulating copies of that book toward the number of lendable copies.  Even if a partner library has multiple copies of a particular book, the Internet Archive counts only one additional copy per library.  Kahle Decl. ¶ 32; Gratz Decl. Ex. B ¶¶ 130, 141 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, but incomplete and with the clarification that Internet Archive does not take physical possession or ownership of the matching print edition in the Partner Library's collections, and Internet Archive acknowledges that it has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously" – and Internet

Archive has not put in place any technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating.  McN Decl. ¶¶68, 107.  And lacks foundation with respect to the claim that Delaware County District Library in Ohio is a Partner Library because it was not disclosed as such in response to relevant interrogatory requests.  McN Decl. Ex. 114, Interrogatory No. 12.  The Statement is also misleading because early iterations of the Open Library Project increased lending counts according to the total number of physical books of a given title in the library's collection, not by one book per library only.  McN Decl. ¶¶65-67.

53.    For example, if the Internet Archive has one non-circulating physical copy of *Little House on the Prairie*, and three partner libraries have each chosen to contribute a physical copy of *Little House on the Prairie*, then the Internet Archive would loan *Little House on the Prairie* to up to four patrons at a time.  Each concurrent loan would thus still be associated with one non-circulating physical copy.  If all four copies of *Little House on the Prairie* were checked out, patrons seeking to borrow *Little House on the Prairie* could join a waitlist until one or more copies were checked back in.  Kahle Decl. ¶ 33.

**Publishers' Response**:  Undisputed except Publishers dispute that "each concurrent loan would thus still be associated with one-noncirculating physical copy."  Internet Archive has not put in place any technical measures to ensure that "[e]ach concurrent loan would thus still be associated with one non-circulating physical copy;" specifically, the Internet Archive has not put in place any technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating – and it has acknowledged that it has "no way of knowing whether a book … was

being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously."  McN Decl. ¶107.

54.     Many libraries other than the Internet Archive digitally loan print books.  *See, e.g.*, HathiTrust, *Emergency Temporary Access Service*, at https://www.hathitrust.org/ETAS-Description (describing a system by which more than 200 academic libraries enabled digital lending of books in their physical collections during the COVID-19 pandemic); Carnegie Mellon University Libraries, *Introducing Controlled Digital Lending*, at https://www.library.cmu.edu/about/news/2020-10/introducing-controlled-digital-lending (describing use of CDL at Carnegie Mellon); Michigan State University Libraries, *Controlled Digital Lending at Michigan State University*, at https://www.slideshare.net/BaltimoreNISO/weller-and-lndsay-case-study-on-implementation-of-cdl (describing use of CDL at Michigan State); Caltech Library, *Implementing Controlled Digital Lending as a Core Library Service*, at https://www.cni.org/wp-content/uploads/2021/03/CNI_Implementing_Davison.pdf (describing use of CDL at Caltech); National Information Standards Organization, *Interoperable System of Controlled Digital Lending*, at https://www.niso.org/standards-committees/is-cdl (describing standards body's work to establish technical standards for "CDL as a natural extension of existing rights held and practices undertaken by libraries for content they legally hold"); Project ReShare, *Project ReShare and Stanford Libraries Launch Controlled Digital Lending Implementers Group*, at https://librarytechnology.org/pr/25314 (describing organization for librarians working to implement CDL in their respective libraries).

        **Publishers' Response**:  Undisputed that "libraries other than the Internet Archive digitally loan print books" but disputed that the Internet Archive's activities are the same as

those followed by the libraries referenced in this Paragraph. *See* Suppl. McN Decl. ¶12.  This Statement is further misleading because the websites cited in this Statement reflect that these programs are each limited to lending from collections of university libraries and provide access only to members of those universities and, in some cases, restrict lending to limited course materials; additionally, the cited programs were specifically implemented in response to access issues precipitated by the COVID-19 pandemic, not in the regular course of business.  *Id*.  This Statement is also vague with respect to the phrase "many libraries."

55.     Digital lending is particularly helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, and patrons who have print disabilities that make it more difficult to hold or read print books.  Kahle Decl. ¶ 34.

**Publishers' Response**:  Undisputed, but not material because the vast majority of Internet Archive users are not print disabled (less than 0.2% of the accounts currently registered with the Website are for print disabled people, and the needs of print disabled readers are already served by HathiTrust), and because Internet Archive does not target users in particular geographic locations (it admits that whenever an ebook it checked out on its website, it does not know the geographic location of the person who checked out that ebook).  McN Decl. ¶¶122-23. Also not material because Internet Archive's "digital lending" does not provide efficiencies in delivering ebook content "for brief or spontaneous access to books" that do not otherwise exist through the Publishers' existing library ebook market , which Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶9.

56.     Digital lending is also particularly helpful for brief or spontaneous access to books – for example, for checking citations or references, or looking up discrete facts – that wouldn't be worth a trip to a brick-and-mortar library.  *Id.* ¶ 35.

**Publishers' Response**:  Undisputed, but not material and incomplete because Internet Archive's "digital lending" does not provide efficiencies in delivering ebook content "for brief or spontaneous access to books" that do not otherwise exist through the Publishers' existing library ebook products, which are available via a market that Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶9.

57.     The International Federation of Library Associations and Institutions has observed, in its position statement on the subject, that CDL "has helped to fulfil the mission of libraries to support research, education and cultural participation within the limits of existing copyright laws."  Gratz Decl. Ex. G (https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf).

**Publishers' Response**:  Undisputed, but with the clarification that the document cited in the Statement above is not specifically directed at the Internet Archive's activities.  Gratz Decl. Ex. G.  Furthermore, this document states that "[c]ontrolled digital lending provides an alternative to a licensing approach, and so a means of redressing the balance" – which provides additional support for the Publishers' argument that the Internet Archive offers a competing substitute which will result in potential lost revenue from licensing ebooks to consumers in the Publishers' commercial market and to patrons in the Publishers' library markets.  *Id*.

58.     Digital lending also allows the Internet Archive to promote education, research, preservation, and scholarship.  Kahle Decl. ¶ 36.

**Publishers' Response**:  Undisputed, but incomplete and not material because Internet Archive's "digital lending" does not "promote education, research, preservation, and scholarship" in any way that is not already promoted through the Publishers' existing library

ebook products, which are available via a market that Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶9.

59.     Writers use books they have borrowed from the Internet Archive as a resource for inspiration or research for their own works.  Declaration of Laura Gibbs submitted herewith ("Gibbs Decl.") ¶¶ 5, 8.

**Publishers' Response**:  Undisputed, but incomplete and not material because authorized library ebook versions of the Works in Suit and other titles available through the Publishers' authorized ebook market, which Internet Archive's own expert testified is "thriving" and "has increased in recent years" (McN Decl. ¶9), equally serve "as a resource for inspiration or research."

60.     The Internet Archive has made knowledge resources like Wikipedia more reliable by enabling readers to confirm that books cited as authorities actually support the encyclopedia's entries.  Kahle Decl. ¶ 37.

**Publishers' Response**:  Undisputed, but incomplete and not material because this is not the primary use or function of Internet Archive's Website and the Wikipedia links are sufficiently peripheral that the Internet Archive completely neglected to mention them in its December 2021 interrogatory responses where it stated the basis for its fair use defense.  Suppl. McN Decl. Ex. 1.  Additionally, vague as to the meaning of "resources like Wikipedia" because this Paragraph only references Wikipedia and no other "resources" or websites.

61.     In 2019, with funding from the U.S. Department of the Interior, the Internet Archive digitized and made available books related to the incarceration of Japanese Americans during World War II.  *Id.* ¶ 40.

**Publishers' Response**:  Undisputed, but incomplete and immaterial to the extent that

Internet Archive obtained permission from the copyright owner to digitize any of the materials referenced above.  *See* Kahle Decl. Ex. 10.

62.     The Wikipedia article on the Internment of Japanese Americans currently cites and links to 20 books available via CDL from the Internet Archive.  *Id.* & Ex. 9 at 70 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Publishers' Response**:  Undisputed, but not material because this is not the primary use or function of Internet Archive's Website and the Wikipedia links are sufficiently peripheral that the Internet Archive completely neglected to mention them in its December 2021 interrogatory responses where it stated the basis for its fair use defense.  Suppl. McN Decl. Ex. 1.

63.     There are 202,026 citations in Wikipedia articles in English that link to books available to borrow from the Internet Archive via CDL, and those links lead to 88,284 different books.  Kahle Decl. ¶ 39 & Ex. 9 at 1 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Publishers' Response**:  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

64.     The Wikipedia article on World War II cites, and links to, 48 different CDL books.  Kahle Decl. ¶ 38 & Ex. 9 at 2–4 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Publishers' Response**:  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

65.     A partial listing of the CDL books cited in Wikipedia articles, limited to articles that cite 10 or more such books, goes on for more than three hundred single-spaced pages.  Kahle Decl. Ex. 9 at 1-337 (Wikipedia Citations to Books Available to Borrow from Internet Archive

via CDL).

**Publishers' Response**:  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

66.    In 2022, a group of volunteer librarians curated collections of books that have been censored by school districts across the country but are still borrowable from the Internet Archive.  Kahle Decl. ¶ 44.

**Publishers' Response**:  Undisputed, with the clarification that the citation in the Statement should be to Kahle Decl. ¶41 (not ¶44), but not material because books cited in the article supporting the above Statement (Kahle Ex. 11) are available as authorized ebooks – including *The Glass Castle*, *The Hunger Games*, *Beyond Magenta: Transgender Teens Speak Out* and *Catch-22*.  Suppl. McN Decl. ¶ 15.

67.    At the beginning of the COVID-19 pandemic, and for many months thereafter, most schools and libraries were physically closed to prevent the spread of the coronavirus.  Gratz Decl. Exs. H (https://www.ala.org/pla/issues/covid-19/march2020survey) & I (https://www.edweek.org/leadership/map-coronavirus-and-school-closures-in-2019-2020/2020/03).

**Publishers' Response**:  Undisputed, but vague with respect to "many months."

68.    School districts reached out to the Internet Archive concerned that students and teachers could no longer physically access books – including hundreds of copies of assigned books that the school had already purchased.  Kahle Decl. ¶ 42.

**Publishers' Response**:   Undisputed for the purposes of this motion only, but not admissible.  This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

69.     Libraries reached out to the Internet Archive worried about how they could best serve their communities when they could not physically loan out millions of print books now locked away.  *Id.* ¶ 43.

**Publishers' Response**:  Undisputed for the purposes of this motion only but not admissible.  This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

70.     By the Internet Archive's estimation – based on data from the federal Institute of Museum and Library Services – the closure of libraries took 650 million books out of circulation. *Id.* ¶ 44.

**Publishers' Response**:  Undisputed, but with the clarification that "650 million books" refers only to print books, because ebooks may be downloaded for free by library patrons anywhere there is an internet connection, including during the start of the pandemic when many public libraries were closed to the public.  Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

71.     Hearing these pleas, the Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio.  Since all of the libraries were closed, the Internet Archive reasoned, there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place.  Kahle Decl. ¶ 45.

**Publishers' Response**:  Undisputed that "Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio."  Whether "all of the libraries were closed" or whether there were "more non-circulating copies locked up … than would be borrowed via the Internet Archive" is unsubstantiated speculation and is not a material fact.  And the issue of

whether "there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place" is a legal conclusion inappropriate for a Rule 56.1 statement, and must therefore be disregarded. *See Nadel*, 57 F. Supp. 3d at 293 n. 6.

72.      The Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently. *Id.* ¶ 46.

**Publishers' Response**: Undisputed that Internet Archive put in place a program intended to "address this problem quickly[,]" but whether or not "[t]he Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently" is unsubstantiated speculation and is not a material fact.

73.      Adam Silverman, one of HarperCollins's Rule 30(b)(6) designees, testified that it took a month – from April to May of 2020 – to negotiate a pandemic-related special request with the Chicago Public School System.  Gratz Decl. Ex. J, Deposition Transcript of Adam Silverman ("Silverman Dep. Tr.") 270:6–273:14.

**Publishers' Response**: Undisputed, but incomplete and misleading because the deposition testimony and the exhibit displayed during this portion of testimony (Exhibit 264, HC0015518) reflects that HarperCollins responded attentively to the special request.  Suppl. McN Decl. Ex. 17.  Indeed, after HarperCollins secured permission from the relevant authors, the aggregator negotiating on behalf of the school district responded with additional demands and even apologized for the delay, which was not caused by HarperCollins.  *See id.* at HC0015523 ("Hi Adam, Thank you so much for your patience in waiting to hear from CPS.").

74.      The Internet Archive launched the National Emergency Library ("NEL") on March 24, 2020, intending for this program to "run through June 30, 2020, or the end of the US

national emergency, whichever is later."  Kahle Decl. ¶ 47 & Ex. 12.

**Publishers' Response**:  Undisputed.

75.     Prior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement, and more than 100 institutions signed a statement in support of the National Emergency Library.  Kahle Decl. ¶ 48 & Ex. 7.

**Publishers' Response**:  Undisputed, with the clarification that the citation above should be to Kahle Decl. Ex. 13 (not Ex. 7), that "more than 100 institutions signed a statement in support of the National Emergency Library" but disputed that "[p]rior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement," because this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

76.     There was also widespread public support, including, for example, an article written by Jill Lepore in *The New Yorker* titled, "The National Emergency Library Is a Gift to Readers Everywhere."  Gratz Decl. Ex. K.

**Publishers' Response**:  Undisputed that the Internet Archive accurately references the title of an article published by *The New Yorker*, but disputed that the National Emergency Library had widespread public support because the evidence shows that the Internet Archive was aware that there were "copyright concerns" about the National Emergency Library, and groups including the U.S. Register of Copyrights, authors, advocacy organizations that support the rights and interests of authors, and librarians across the United States made public statements or sent private messages to Internet Archive questioning the legality of the National Emergency Library. McN Decl. ¶¶130-142.  Further, the article published in *The New Yorker* is inadmissible for the truth of statements referred to therein, as it is an out-of-court statement by a non-party in

violation of Local Rule 56.1(d) and thus must be disregarded for that purpose.

77.    The Internet Archive believed then, and believes now, that under those unique circumstances, operating the NEL was fair use.  Kahle Decl. ¶ 49.

**Publishers' Response**:  Disputed.  The facts show that Internet Archive believed or had reason to believe that the NEL was not fair use.  McN Decl. ¶¶77-109.  The ultimate question of whether the Internet Archive's activities actually did constitute fair use is a legal conclusion inappropriate for a Rule 56.1 statement, and any suggestion that the NEL was fair use as a matter of fact must be disregarded.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).

78.    The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries.  *Id.* ¶ 50.

**Publishers' Response**:  Disputed.  The question of whether the NEL "benefitted teachers, students, researchers, and readers" is a legal question subsumed by the fair use inquiry, as is the question of whether the NEL "benefits" the individuals listed above by striking the balance necessary to achieve the Copyright Act's purpose of incentivizing the creation and dissemination of books.  Such a legal conclusion is inappropriate for a Rule 56.1 statement.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).  Moreover, whether or not "The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries" is unsubstantiated speculation and is not a material fact.

79.    When the University of Oklahoma campus shut down in spring of 2020, students no longer had access to physical library books.  Gibbs Decl.  ¶ 4.

**Publishers' Response**:  Undisputed, but incomplete and not material because campus lockdowns did not affect the availability of authorized ebooks available to students through the University of Oklahoma collections.  Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl.

¶¶41-43.

80.     Humanities instructor Laura Gibbs relied on the Internet Archive to provide her students access to books she had placed on reserve at the campus library before the pandemic closures.  *Id*.

**Publishers' Response**:  Undisputed, but incomplete because books cited by Laura Gibbs – including Divakaruni's *Palace of Illusions*, *Neela: Victory Song* and *The Conch-Bearer* – are all available as authorized library ebooks. Suppl. McN Decl. ¶16.

81.     Through her use of the Internet Archive, Ms. Gibbs discovered additional relevant books for her students that were not otherwise available through the University of Oklahoma library system.  *Id.* ¶ 5.

**Publishers' Response**:  Undisputed, but incomplete for the same reasons set forth in the Publishers' Response to Statement 80, which is incorporated herein by reference.

82.     Ms. Gibbs has since retired from teaching but regularly writes about African folktales available to borrow through the Internet Archive.  *Id.* ¶ 7.

**Publishers' Response**:  Undisputed.

83.     Half of English teacher Lauren Sherman's tenth grade students had left their copies of the Folger edition of *Much Ado About Nothing* in their lockers, which they were forbidden from accessing after the pandemic started.  Declaration of Lauren Sherman submitted herewith ("Sherman Decl.") ¶ 7.

**Publishers' Response**:  Undisputed.

84.     In addition to giving students the option to re-purchase the book or to attempt to access their local public library's digital collection, Ms. Sherman was able to direct them to an online version to borrow through the Internet Archive.  *Id*.

**Publishers' Response**:  Undisputed.

85.     When his university library shut down, Daniel Smith, a Ph.D. student at the University of Cambridge, similarly could not access the books he needed to write his dissertation.  Declaration of Daniel Smith submitted herewith ("Smith Decl.") ¶ 4.

**Publishers' Response**:  Undisputed that Smith could not access physical books from Cambridge University libraries when those facilities were closed, but incomplete and misleading because Smith testified that at least one book he accessed through Internet Archive for his dissertation was available as authorized ebooks through Cambridge University's library network. McN Decl. ¶121, Ex. 165 (Smith Tr. 73:4-77:16).

86.     Mr. Smith turned to the Internet Archive, where he was able to borrow primary and secondary source material and complete his dissertation on time.  *Id*. ¶ 5.

**Publishers' Response**:  Undisputed that Smith accessed materials for his dissertation via Internet Archive's website, but incomplete and misleading because Smith testified that at least one book he accessed through Internet Archive for his dissertation was available as authorized ebooks through Cambridge University's library network. McN Decl. ¶121, Ex. 165 (Smith Tr. 73:4-77:16).

87.     Benjamin Saracco is a librarian at a hospital library affiliated with a medical school in New Jersey that serves doctors, nurses, medical students, and other healthcare workers. Declaration of Benjamin Saracco submitted herewith ("Saracco Decl.") ¶ 7.

**Publishers' Response**:  Undisputed.

88.     In March 2020, the governor ordered buildings, including academic libraries, to be closed.  *Id.* ¶ 8.

**Publishers' Response**:  Undisputed, but the Publishers object that this proposed "fact" is

not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

89.  Mr. Saracco received a flood of requests from students, nurses, and doctors for information about COVID-19 and relevant patient care to address the high rate of hospitalization in the state. *Id.* ¶ 9.

**Publishers' Response**:  Undisputed that Mr. Saracco stated that he received "multiple requests" for the *Student Manual for Basic Life Support* and the *Advanced Cardiac Life Support Provider Manual* in the declaration cited in Statement 89, but the Publishers object that this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Saracco Decl. ¶8. This Statement is also misleading because Mr. Saracco did not testify that the requests for these materials were, as a matter of fact, related to "COVID-19 and relevant patient care" or "to address the high rate of hospitalization in the state." Saracco Decl. *Id.*  Rather, Saracco testified that "[a]s a librarian I cannot know with certainty what our materials were ultimately used for in the hospital, but at the time, I was under the impression that healthcare workers that were requesting these materials might be using them to treat COVID-19 patients admitted to our affiliated hospital" – which lacks foundation and is pure speculation.  *Id.*

90.  With no access to physical library materials, Mr. Saracco was able to direct doctors and nurses to patient care training manuals, such as the <u>*Basic Life Support* for</u> <u>*Healthcare Providers* and the</u> <u>*Advanced Cardiovascular Life Support Provider Manual*</u>, available for borrowing from the Internet Archive via CDL.  *Id.*

**Publishers' Response**:  Undisputed, but incomplete and misleading because *Basic Life Support* is available as an authorized ebook and Benjamin Saracco testified that the *Advanced*

*Cardiovascular Life Support Provider Manual* was available as an authorized ebook and, to his knowledge, his library never requested permission to provide free or discounted access during the pandemic.  Suppl. McN Decl. Ex. 15 (Saracco Tr. 252:18-257:21).

91.    Dozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time.  Kahle Decl. ¶ 51 & Exs. 14–17.

**Publishers' Response**:  Undisputed, but whether or not "[d]ozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time" is not a material fact.

92.    The largest number of concurrent loans for any Work in Suit was for *The Lion, The Witch, and the Wardrobe*, which had at most 888 concurrent loans.  That figure represents the sum of the peak concurrent loan numbers for each of the editions of that book which were available for borrowing.  Gratz Decl. Ex. B ¶ 196; *id.* at Ex. T3 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, but misleading because this figure incorporates data from the calendar year 2020, not just the period when the NEL was active.

93.    There are over 9,000 public library systems in the United States alone.  *Id.* Ex. L (https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey).

**Publishers' Response**:  Undisputed.

94.    Virtually every library was closed during the NEL.  *Id.*

**Publishers' Response**:  Undisputed that many physical libraries were closed to physical visitors during the NEL, but with the clarification that "[v]irtually every library was closed

during the NEL" is misleading because libraries maintained their digital presence during the NEL and made authorized ebooks available to be downloaded for free by library patrons anywhere there is an internet connection.  Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

95.      More than 888 public libraries in the United States have a copy of *The Lion, the Witch, and the Wardrobe*.  Gratz Decl. Ex.  Ex. M (https://www.worldcat.org/title/lion-the-witch-and-the-wardrobe/oclc/28291231).

**Publishers' Response**:  Undisputed, but inadmissible because Exhibit M to the Gratz Declaration is not admissible for the truth of the referenced statement, in violation of Local Rule 56.1(d), as it is an out-of-court statement by a non-party (*i.e.*, hearsay).  Additionally, this Statement is misleading because Exhibit M to the Gratz Declaration appears to only concern physical copies of *The Lion, the Witch and the Wardrobe*, and does not account for authorized ebook copies.

96.      Although the NEL was slated to end on June 30, 2020, the Internet Archive shut it down two weeks early – on June 16, 2020 – after this lawsuit was filed.  Kahle Decl. ¶ 52.

**Publishers' Response**:  Undisputed, but with the clarification that in a blog post announcing the creation of the NEL, the Internet Archive stated that the NEL "will run through June 30, 2020, or the end of the US national emergency, whichever is later."  McN Decl. Ex. 168.

97.      The Plaintiffs are among the largest and most profitable book publishers in the United States.  Gratz Decl. Ex. N, Deposition Transcript of Skip Dye ("Dye Dep. Tr.") 369:20–370:7; *see also id.* Ex. O (https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/72889-ranking-america-s-largest-publishers.html).

**Publishers' Response**:  Undisputed.

98.     In recent years, Plaintiffs' profits have increased.  Gratz Decl. Ex.  Exs. P–R
(Excerpt of Bertelsmann 2018, 2019, 2021 Annual Reports), Exs. S–T (Excerpts of Wiley 2020,
2021 Form 10-K), Ex. U–V  (Excerpts of News Corp. 2019, 2021 Annual Report), Ex. W–Y
(Excerpts of Lagardere 2018, 2020, 2021 Registration Document).

**Publishers' Response**:  Undisputed, but not material and vague with respect to "recent
years."

99.     In 2020 and 2021, the publishing industry as a whole enjoyed record profits for
electronic and physical formats of books.  Gratz Decl. Ex. Z ("*A Year for the (Record) Books in
Publishing*" describing 2020 profits), Ex. AA ("*America's Biggest Publishers Keep Posting
Profits*" describing 2021 profits); Ex. BB ("*In Surprise Ending for Publishers: In 2020, Business
Was Good"* describing 2020 profits).

**Publishers' Response**:  Undisputed, but not material.

100.    When the four Plaintiffs filed suit against the Internet Archive in June of 2020,
they selected the Works in Suit.  Compl. Ex. A, ECF No. 1-1.

**Publishers' Response**:  Undisputed.

101.    The Works in Suit include non-fiction and fiction works and works from many
genres (fantasy, children's, psychology, science, sports, biography, and others).  *Id.* ¶¶ 21, 22.

**Publishers' Response**:  Undisputed.

102.    All of the Works in Suit were published prior to being digitized and loaned by the
Internet Archive.  Kahle Decl. ¶ 28 (all of the Works in Suit were made available for borrowing
after lawfully acquired – bought or donated – new or used physical copies of the Works in Suit
were digitized and the Internet Archive does not acquire physical copies of books that have not

been published); *see also* Compl. ¶¶ 6, 21, ECF No. 1.

**Publishers' Response**:  Undisputed, but with the clarification that it is not clear how it would be practically feasible for the Internet Archive or any other entity to "digitize[] and loan[]" a book before that book is "published" and that Kahle has publicly stated that the Website should ultimately make "the bulk of unpublished things … universally accessible." McN Decl. Ex. 49, p. 2 (punctuation omitted).

103.  Plaintiffs sell physical copies of books to libraries and to readers.  *See* Gratz Decl. Ex. CC, Deposition Transcript of Josh Marwell ("Marwell Dep. Tr.") 59:3–9.

**Publishers' Response**:  Undisputed, but with the clarification that Plaintiffs do not sell physical books to libraries directly but rather via wholesalers.  Weber Decl. ¶43.

104.  Plaintiffs license electronic copies of books ("ebooks") to libraries and readers. Gratz Decl. Ex. C, Potash Dep. Tr. 141:20–142:9.

**Publishers' Response**:  Undisputed, but with the clarification that the Plaintiffs do not license ebooks to libraries directly; rather, the Publishers enter into agreements with aggregators (*i.e.*, distributors) such as OverDrive, who in turn license the ebooks to libraries and manage the relevant platforms.  McN Decl. ¶11; R-A Decl. ¶75; Sevier Decl. ¶ 42 n.2.

105.  Licensed ebooks are distributed to patrons of libraries that have purchased licenses via "aggregators."  Gratz Decl. Ex. N, Dye Dep. Tr. 36:20–37:8; 86:14–18.

**Publishers' Response**:  Undisputed, with the clarification that library ebook aggregators license the Publishers' ebooks to libraries according to set terms and conditions designed to enforce the various models that each Publisher has selected for that market, including terms that permit the Publishers to exercise control over the digital files to set the limited extent of usage, which is determined in relation to the pricing, as well as terms that limit reproduction,

distribution, and that reinforce the requirements for digital rights management software to prevent piracy.  Weber Decl. ¶44.

106.    There are multiple licensing structures for ebooks.  One is a "one copy/one user" or "perpetual access" model that allows libraries to lend out one copy at a time to patrons for a discrete period of time, with no expiration from the licensing libraries' digital collection.  Gratz Decl. Ex. C, Potash Dep. Tr. 49:4–50:2; *id.* Ex. N, Dye Dep. Tr. 120:22–121:7.

**Publishers' Response**:  Undisputed that there are multiple licensing structures for ebooks and that one is a "one copy/one user" structure that allows libraries to lend out one copy at a time to one patron at a time for a discrete period of time.  A license obtained under the "one copy/one use" model can have a perpetual term or a metered term, including a time-limited term Further, the same clarification about license terms set forth in the Publishers' Response to Statement 105 applies and is incorporated by reference herein.

107.    The "perpetual access" model is not currently in use by Hachette, HarperCollins, or Penguin Random House for ebooks made available through aggregators to public libraries.  ECF No. 92 ¶¶ 61, 65 (Declaration of Ben Sevier); ECF No. 94 ¶¶ 30, 32 (Declaration of Chantal Restivo-Alessi); ECF No. 95 ¶¶ 69, 75 (Declaration of Jeffrey Weber); Gratz Decl. Ex. C, Potash Dep. Tr. 50:3–53:9.

**Publishers' Response**:  Undisputed, with the clarification that HarperCollins, Penguin Random House, and Hachette each ceased offering a perpetual term to public libraries in 2011, 2018, and 2019, respectively.  R-A Decl. ¶¶30- 32; Weber Decl. ¶¶71-75; Sevier Decl. ¶65.  Accordingly, any time a public library purchased an ebook with a perpetual license term pursuant to the licensing terms offered by HarperCollins, Penguin Random House, and Hachette up until 2011, 2018, and 2019, respectively, that library continues to maintain the title in its

collection and may lend it to patrons on a one-copy, one-user basis in perpetuity.  *See* Sevier

Decl. ¶68.  The Publishers further state that Hachette, HarperCollins, and Penguin Random

House each currently offer a one-copy, one-user model with a perpetual term to academic

libraries because academic libraries have different needs and lending patterns than public

libraries, and that Wiley maintains a one-copy, one user model with perpetual access for its trade

books that it makes available to all libraries as ebooks, including public libraries  Sevier Decl.

¶68; R-A Decl. ¶40; Weber Decl. ¶77; Declaration of Alan Pavese, ECF 93 ("Pavese Decl."),

¶¶5, 25-26.

108.    Another type of license is metered access by time.  Under this model, a library has

the ability to loan an ebook to patrons for a discrete period of time, commonly two years, to an

ebook title.  Gratz Decl. Ex. C, Potash Dep. Tr. 44:17–24.

**Publishers' Response**:  Undisputed, with the same clarifications about license terms set

forth in the Publishers' Response to Statement 105 and 106, which are incorporated by reference

herein. .

109.    Another type of license is metered access by the number of check-outs,

commonly twenty-six checkouts.  Under this model, a library has the ability to loan an ebook to

patrons until that copy of an ebook has been borrowed twenty-six times.  *Id.*

**Publishers' Response**:  Undisputed, with the clarification that library ebook aggregators

license the Publishers' ebooks to libraries according to set terms and conditions designed to

enforce the various models that each Publisher has selected for that market, including twenty-six

circulation model.  Weber Decl. ¶44. These terms permit the Publishers to exercise control over

the digital files to set the limited extent of usage, which is determined in relation to the pricing,

as well as terms that limit reproduction, distribution, and that reinforce the requirements for

digital rights management software to prevent piracy.  *Id.*; R-A Decl. ¶¶21-23.

110.   Plaintiffs do not sell ebooks to libraries outright.  Kahle Decl. ¶ 53.

**Publishers' Response**:  Undisputed, but with the clarification that the Publishers understand the term "sell . . . outright" to mean the sale of "non-encrypted" files without any contractual preconditions on their further use.  *See* McN Decl. ¶12.  The Publishers – together with other book publishers, music, and movie companies – cannot agree to those terms because providing digital platforms with unprotected files – with no technical security measures or legally binding agreement limiting the purchaser's use of the file – invites unrestricted copying and distribution of the files, with predictably devastating results on the market for that work. Sevier Decl. ¶¶42-43, 61-64; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.  Unrestricted digital files are not sold commercially or to libraries.  *Id.*  Further, the Internet Archive has identified only a handful of publishers that have agreed to sell ebook files on these terms – the literary press 11:11 and the affiliated anarchist publishers PM Press and AK Press – and has cited no documentary evidence to establish that Internet Archive's purchase of those materials amounts to an "outright" sale.  McN Decl. Ex. 5 (Kahle Depo. Tr. 139:23-140:12).

111.   The Internet Archive purchases ebooks from publishers who are willing to sell them outright (rather than license them).  *Id.*

**Publishers' Response**:  Undisputed, but not material and subject to the clarifications set forth in the Publishers' Response to Statement 110, which are incorporated herein by reference.

112.   The Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them).  *Id.* ¶ 54.

**Publishers' Response**:  Undisputed with the same clarification regarding the term "purchase" as provided for the term "sell" in Statement 110, but not material and with the

objection that whether "[t]he Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them)" is purely hypothetical and not admissible.

113.    Plaintiffs have declined each time the Internet Archive has asked to buy ebooks. Id. ¶ 55.

**Publishers' Response**:  Undisputed with the same clarification regarding the term "buy" as provided for the term "purchase" in Statement 112, but not material and subject to the clarifications set forth in the Publishers' Response to Statement 110, which are incorporated herein by reference.

114.    The ▮▮▮▮ aggregator is OverDrive, which has about ▮▮▮ of the market share of the library ebook market in the United States.  Gratz Decl. Ex. C, Potash Dep. Tr. 196:5–12.

**Publishers' Response**:  Undisputed that OverDrive is the largest library ebook aggregator for public libraries.

115.    One of the ways OverDrive offers ebooks for reading is through its Libby application.  *See* https://www.overdrive.com/apps/libby; Gratz Decl. Ex. C, Potash Dep. Tr. 82:19–24.

**Publishers' Response**:  Undisputed.

116.    From March 2017 until March 23, 2020 (*i.e.*, prior to the NEL), the number of checkouts of the Works in Suit from the Internet Archive was ▮▮▮▮ of the number of checkouts of the Works in Suit from OverDrive.  Declaration of Rasmus Jørgensen submitted herewith ("Jørgensen Decl.") Ex. 1 ¶ 36 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster); *id.* Ex. DD (OverDrive_Supp_002).

**Publishers' Response**:  Undisputed for purposes of this motion only that, on average,

the number of checkouts of the Works in Suit by Internet Archive was ███████ of the number of checkouts of the Works in Suit from OverDrive, one of several library ebook aggregators, for the time period cited above, but (a) there was significant variability in this percentage among the Works in Suit; (b) percentages such as this mask absolute numbers; (c) during this time period, Internet Archive had fewer members, borrows and concurrent copies available to loan than it does currently; (d) if CDL were legal and became more widespread, the percentage of checkouts on Internet Archive as compared with OverDrive would substantially increase, as would the impact on the Publishers; and (e) this Statement is not material to the ultimate issue of whether the Publishers suffered market harm, including but not limited to in the form of lost revenue from ebook licenses.  *See* Prince Decl., *passim*; The Publishers' Memorandum of Law in Opposition to Internet Archive's Motion for Summary Judgment ("Publishers' Opposition Brief"), Section V.  It is also not material because it is no defense to copyright infringement for the infringer to argue that its infringing copies make up only a small proportion of some market or customer segment.  *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 568 (1985) ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work.) (internal quotations and citation omitted).

117.    Looking at data from 2017-2020, which includes the period of time when the NEL was operational, the total loan volume of Works in Suit from the Internet Archive was ██ ███████ of the number of OverDrive checkouts for the Works in Suit.  Jørgensen Decl. Ex. 1 ¶¶ 8, 35 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed for purposes of this motion only that, on average,

the number of checkouts of the Works in Suit by Internet Archive was ▮▮▮▮▮ of the number of checkouts of the Works in Suit from OverDrive, one of several library ebook aggregators, for the time period cited above, but the Publishers object to this Statement as non-material and misleading for the reasons set forth in their Response to Statement 116, which are incorporated herein by reference.

118.    The expert reports of Drs. Reimers and Jørgensen conclude that the Internet Archive's lending practices had no negative effect on the market for the Works in Suit. Jørgensen Decl. Ex. 1 ¶ 8 (Jørgensen Expert Rpt.); Reimers Decl. Ex. 1 ¶ 9 (Reimers Expert Rpt.).

**Publishers' Response**: Disputed.  As a preliminary matter, neither Dr. Reimers nor Dr. Jorgensen reached an actual conclusion that "Internet Archive's lending practices had no negative effects on the market for the Works in Suit."  *See, e.g.*, Expert Report of Rasmus Jorgensen, ECF 108-1 ("Jorgensen Report") ¶ 8; Reimers Report, Section D.; Prince Decl. Ex. 3 (Reimers Tr. 178) (conceding that her "study of the Amazon print sales rankings in [her] expert report" is a statistical analysis that does not "definitively prove anything.");  Prince Decl., Section III(C).

The Publishers further dispute and object to the expert opinions set forth in Statement 118 because they are inadmissible, and must therefore be disregarded for violating Local Rule 56.1(d), for the following reasons (which are henceforth referred to, collectively, as the "Expert Opinion Objection").  The Publishers dispute any expert opinion in the above paragraph that purports to establish that Internet Archive did not inflict market harm on the Publishers or impair the value of their copyrights in the Works in Suit or any other book.  The expert opinions of Dr. Jorgensen and Dr. Reimers are inadmissible because, *inter alia*, they are unreliable and based on

insufficient facts and impermissibly flawed principles and methods (which also have not been reliably applied), for all the reasons set forth in the Prince Declaration and the Publishers' Opposition Brief (Section V), including but not limited to the failure to adequately control for other factors.  In the event of a trial, the Publishers will file a *Daubert* motion to strike the opinions of Dr. Jorgensen and Dr. Reimers under Federal Rule of Evidence 702.  *See, e.g.*, *City of Providence v. Bats Global Markets*, 2022 WL 902402 at *12-13 (S.D.N.Y. 2022);  *Lamarr-Arruz v. CVS Pharmacy*, 2017 WL 4277188 at *10 (S.D.N.Y. 2017); *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 at *10-11 (S.D.N.Y. 2014).  Further, while the Publishers do not dispute the record facts regarding Internet Archive "loans" of the Works in Suit, OverDrive check-outs of the Works in Suit, Hachette sales records or verified Amazon print rankings of the Works in Suit on which the Internet Archive's experts base their analysis, the conclusions of the IA experts regarding whether or not the Internet Archive had a causal impact on the Publishers' sales and check-outs are merely opinions and not facts suitable for a Rule 56.1 Statement.  See, e.g., *Goris v. Breslin*, 2009 U.S. Dist. LEXIS 57108, at *3 (S.D.N.Y. July 6, 2009) (for the purposes of deciding summary judgment, this "court's reliance on … experts' affidavit is limited to the undisputed facts");  Local Rule 56.1(d); Prince Decl. Ex. 4 (Reimers Tr. 178:4-13) (testimony from Dr. Reimers conceding that her "study of the Amazon print sales rankings in [her] expert report" is a statistical analysis that does not "definitively prove anything.").

119.    Dr. Reimers analyzed the change of the Amazon rankings of the Works in Suit relative to when each edition of a Work in Suit was made available for lending through the NEL. Reimers Decl. Ex. 1 ¶¶ 36–54 (Reimers Expert Rpt.).

**Publishers' Response**:  Undisputed that Dr. Reimers purported to analyze the change of

the Amazon print book rankings of the Works in Suit relative to when each edition of a Work in

Suit was made available for lending through the NEL, but incomplete and misleading to the

extent that it suggests that Dr. Reimers reliably measured the change or the impact on relevant

markets.  Prince Decl. Sections III(A) and III(C).  The Publishers also clarify that Dr. Reimers

opined that she "cannot conclude that the NEL had either a positive or negative effect on the

Amazon sales rankings of print editions" since she found earlier seasonal trends with similar size

effects for the Works in Suit.  Reimers Report ¶¶51-53.  Further, the Publishers assert the Expert

Opinion Objections from their Response to Statement 118, and incorporate them by reference

herein, and object that the expert opinions set forth in this Statement 119 are inadmissible – and

should be disregarded pursuant to Local Rule 56.1(d).

120.    Amazon rankings are a good proxy for the market for print sales because using

ranking data controls for factors that affect the physical book retail market as a whole and

because Amazon makes up at least 50% of the market share for print books.  Reimers Decl. Ex. 1

¶¶ 35, 36, 41–43 (Reimers Expert Rpt.).

**Publishers' Response**:  Disputed but not admissible and not material.  Amazon rankings

for print books of the Works in Suit are not relevant to the ultimate issue of whether IA

negatively affected revenue from licensing and sales to U.S. libraries and consumers.  This

Statement is also incomplete and misleading because Dr. Reimers did not perform any analysis

to justify her belief that Amazon print book rankings "are a good proxy" for the market for print

sales and fails to account for the fact that unit sales are not interchangeable with revenue figures.

Prince Decl. ¶60; Prince Decl. Ex. 4 (Reimers Tr. 122-24, 126-28).  Further, the Publishers assert

the Expert Opinion Objections from their Response to Statement 118, and incorporate them by

reference herein, and object that the expert opinions set forth in Statement 120 are inadmissible –

and should be disregarded pursuant to Local Rule 56.1(d).

121.    When editions of the Works in Suit were first made available for borrowing from the Internet Archive via CDL, their corresponding print sales at retail did not decline relative to other books.  Reimers Decl. Ex. 1 ¶¶ 10, 38, 47 (Reimers Expert Rpt.).

**Publishers' Response**:  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 121 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Further, this Statement is not an accurate summary of Dr. Reimers cited expert report.  Dr. Reimers did not reach an actual conclusion on this measure and her range of likely results included a harmful impact on the Works in Suit's Amazon print sales rankings after they were first made available for borrowing from the Internet Archive via CDL.  Prince Decl. ¶¶59-60; *see also* Reimers Report ¶¶ 38, 46 ("[W]e cannot say with certainty" whether people buy fewer or more copies after a Work is uploaded).

122.    When the Works in Suit were removed from the Internet Archive after this lawsuit was filed, their print sales slightly worsened relative to other books.  Reimers Decl. Ex. 1 10, 38, 49, 50 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Publishers' Response**:  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 122 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Further, this Statement mischaracterizes Dr. Reimer's cited report, in which she only examined Amazon print rankings (not print sales) and only claimed that she found "some (weak) evidence that taking the Works in Suit off the Internet Archive hurt the Amazon sales rankings of their print editions slightly."  Reimers Report

¶10).  Further, this Statement is also not material because Amazon rankings for print books are not relevant to the ultimate issue of whether IA negatively affected revenue from print sales and do not directly translate into revenue.

123.    Historical Amazon data is only publicly available for print books – not for ebooks.  Reimers Decl. Ex. 1 nn.33, 36 (Reimers Expert Rpt.); *id.* Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

**Publishers' Response**:  Undisputed for purposes of this motion only that Amazon does not make the same historical ranking data publicly available for ebooks as it does for print books, but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement.

124.    Because there is not publicly available commercial performance data about ebooks, and because Plaintiffs declined to produce the monthly performance data the Internet Archive requested, Dr. Reimers was unable to make similar calculations regarding the sales of consumer ebooks.  Reimers Decl. Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

**Publishers' Response**:  Undisputed that Dr. Reimers did not perform an analysis based on publicly available consumer ebook data, but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement.  Further, the Publishers dispute that Dr. Reimers was unable to perform calculations regarding the impact of the Internet Archive on the Publishers' commercial ebooks because of any failure on their part to produce any documents. The Internet Archive voluntarily agreed to withdraw its request for additional monthly data.  *See* Suppl. McN Decl. ¶9; *id.* Ex. 8, p. 9 ("We are pleased to inform the Court that, subject to

meaningful compliance with the agreements reached, which are memorialized in a separate document, the parties have resolved the various issues identified in the Letter Motions, together with related discovery disputes.").  This Statement is also incomplete and misleading because a comparison by Dr. Reimers of the commercial performance of the Works in ebook form before a particular date with the commercial performance after that date would not demonstrate whether the market for a particular Work in Suit was harmed by the Internet Archive given the inability of Internet Archive's experts to impose sufficient controls to discount extraneous factors and account for the fact that the sales of every book are unique.  Prince Decl. ¶¶35-86.  Any suggestion that the Publishers improperly deprived Internet Archive of necessary data is further misleading because Internet Archive obtained voluminous data about both the Works as well as "books other than the Works in Suit" published by the four Plaintiff Publishers and by other book publishers that partner with OverDrive from a third-party subpoena to OverDrive; specifically, the Internet Archive received data reflecting monthly revenues and digital checkouts for the Works in Suit and more than 300 other books as well as checkout figures for current OverDrive public and academic library customers located in the United States, on an annualized basis for each year from 2010 through 2020, and on a monthly basis for each month in the calendar year 2020.  Suppl. McN Decl. Ex. 7.

125.    The Internet Archive requested monthly commercial performance data for the Works in Suit for the time period from 2011 to 2020.  Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

**Publishers' Response**:  Undisputed, but not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

126.    Plaintiffs declined to produce the requested monthly data.  Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 3 n.1, ECF No. 49.

**Publishers' Response**:  Undisputed that the Publishers "declined to produce the requested monthly data," but incomplete and misleading because Publishers had "already produced monthly sales data from Hachette for 2020," because producing the requested information would have been extremely burdensome due to the fact that the Publishers did not keep their data in the form requested and because the Publishers had already produced a vast wealth of detailed sales and related financial data.  Suppl. McN Decl. Ex. 8, pp. 5-7.  This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

127.    Each book began to be available for digital lending on a particular known date, so having monthly commercial performance data would allow a comparison of the commercial performance before that particular date with the commercial performance after that date.  Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

**Publishers' Response**:  Disputed but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement.  This Statement is also incomplete and misleading because "a comparison of the commercial performance before that particular date with the commercial performance after that date" would not demonstrate whether the commercial ebook market for a particular Work in Suit was harmed given the inability of Internet Archive's experts to impose adequate controls to discount extraneous factors or account for the fact that the sales of every book are unique.  Prince Decl. ¶¶35-86; Weber Decl. ¶28. This Statement is also not material, incomplete and misleading for the reasons set forth in the

Publishers' Response to Statement 124, which are incorporated herein by reference.

128.    Hachette was the only Plaintiff to produce monthly data for all of its Works in Suit, but Hachette only produced this data for 2020.  Hachette produced annual data for 2015 to 2019.  Gratz Decl. ¶ 43; *see also* Gratz Decl. Ex. JJ (HACHETTE0002474) & Ex. KK (HACHETTE0002475).

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

129.    For its Works in Suit, HarperCollins produced annual data for 2017 to 2020. Gratz Decl. ¶ 44; *see also* Gratz Decl. Ex. LL (HC0010272).

**Publishers' Response**:  Undisputed that HarperCollins produced annual data at least for 2017 to 2020, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

130.    For its Works in Suit, Penguin Random House produced annual data for 2010 to 2020.  Gratz Decl. ¶ 45; *see also* Gratz Decl. Ex. MM (PRH0025907).

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

131.    For its Works in Suit, Wiley produced annual data for 1996 to 2020.  Gratz Decl. Ex. 46; *see also* Gratz Decl. Ex. NN (WILEY0005650).

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are

incorporated herein by reference.

132.     The Internet Archive requested data about the commercial performance of all Plaintiffs' books, broken down by month, since 2011.  Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47.

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

133.     This data would allow a comparison of the commercial performance of books that were available for digital lending with books that were not available for digital lending.  *Id.*

**Publishers' Response**:  Disputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

134.     Plaintiffs refused to provide data about books other than the Works in Suit.  Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47; Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 1, 3, ECF No. 49.

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement124, which are incorporated herein by reference.

135.     The Internet Archive requested that Plaintiffs produce monthly commercial performance data about a set of books Plaintiffs regarded as comparable to the Works in Suit, but Plaintiffs refused.  Gratz Decl. ¶ 42.

**Publishers' Response**:  Undisputed, but incomplete and misleading because the Publishers' declined to produce the requested data because that would be "burdensome in the

extreme" and "irrelevant" given the reality that, "since books are not fungible widgets," there "is no such thing as a 'comparable book.'"  Suppl. McN Decl. Ex. 8, p. 6.  This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

136.  The National Emergency Library provided an opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit.  Reimers Report ¶¶34, 35, 37; Jorgensen Report ¶49.

**Publishers' Response**:  Undisputed that the National Emergency Library provided a potential opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit but only (a) under the then-current level of usage of the IA's Website and (b) if the study were done in a reliable fashion, including by accounting for other factors affecting the market for each Work in Suit.  *See* Prince Decl. ¶¶76-85.

137.  Dr. Reimers observed the Amazon rankings for the Works in Suit relative to when the NEL was launched.  Reimers Decl. Ex. 1 ¶¶34, 48–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶3–8 (Reimers Reply Expert Rpt.).

**Publishers' Response**:  This Statement is essentially identical to Statement 119 and the Publishers' Response thereto is incorporated by reference here.

138.  The Amazon rankings for the Works in Suit improved by approximately 2% at the time the NEL was launched.  The Amazon rankings held steady while the NEL was in effect. Then, around the time that most Works in Suit were removed from the Internet Archive, the rankings reverted to their pre-NEL levels.  However, the Works in Suit behaved similarly the year prior at the same time of the year.  In sum, the Amazon rankings of the Works in Suit did

not undergo a statistically significant decrease relative to when the NEL was launched. Reimers

Decl. Ex. 1 ¶¶ 51–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**<u>Publishers' Response</u>**: Disputed but inadmissible. The Publishers assert the Expert

Opinion Objections from their Response to Statement118, and incorporate them by reference

herein, and object that the expert opinions set forth in Statement 138 above are inadmissible –

and should be disregarded pursuant to Local Rule 56.1(d). Further, this Statement misrepresents

the findings in Dr. Reimers' cited Expert Report and Reply Expert Report regarding her analysis

of the impact of the NEL on the Amazon print rankings of the Works in Suit, including her

ultimate conclusion – which was that she "cannot conclude [based on this data] that the NEL had

either a positive or a negative effect on the Amazon sales rankings of print editions." *See, e.g.*,

Reimers Report ¶¶48-54. This Statement is also incomplete and not material because Dr.

Reimers merely observed Amazon rankings for print books of the Works in Suit, which are not

relevant to the ultimate issue of whether IA negatively affected revenue from licensing and sales

to U.S. libraries and consumers, including in ebook format. Prince Decl. ¶¶29-34.

139.    Dr. Reimers concluded that these observations signified that the NEL did not

depress Plaintiffs' unit sales of physical formats of the Works in Suit. Reimers Decl. Ex. 1

¶¶ 10, 53 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**<u>Publishers' Response</u>**: Disputed but inadmissible, misleading, incomplete and not

material for all the reasons set forth in the Publishers' Response to Statement 138, which are

incorporated by reference herein, including the Expert Opinion Objections.

140.    Dr. Jørgensen observed the change in OverDrive checkouts for the Works in Suit

after the shutdown of the NEL and effective removal of the Works in Suit from the Internet

Archive. He observed that after the closure of the NEL, the number of OverDrive check-outs of

the Works in Suit ████████████████████████████████████████████████

████████████ Jørgensen Decl. Ex. 1 ¶¶ 49–53 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 17

(Jørgensen Reply Rpt.).

**Publishers' Response**:  Undisputed that Dr. Jorgensen observed the OverDrive

checkouts for the Works in Suit in June 2020, ████████████████████████████

█████████████████████████████████████████████████, but the

Publishers dispute any implication that Dr. Jorgensen established that this result was caused by

the Internet Archive's actions or the NEL.  Further, this Statement is incomplete and misleading

because, as Dr. Jorgensen admits, checkout frequency does not directly translate to revenue for

library ebooks licenses, which are frequently based on a term of years or 24 circulations.  Prince

Decl. ¶¶29-33; Reply Expert Report of Rasmus Jorgensen, Ph.D, ECF 108-2 ("Jorgensen

Reply"), ¶26; Prince Decl. Ex. 3 (Jorgensen Tr. 101:3-19).  The Publishers also assert the Expert

Opinion Objections from their Response to Statement 118, and incorporate them by reference

herein, and object that the expert opinions set forth in Statement 140 are inadmissible – and

should be disregarded pursuant to Local Rule 56.1(d).

141.    Dr. Jørgensen concluded that the evidence was not consistent with Plaintiffs'

theory that the Internet Archive's loan volume of the Works in Suit reduced digital lending

through OverDrive.  *Id.*

**Publishers' Response**:  Disputed but inadmissible.  The Publishers assert the Expert

Opinion Objections from their Response to Statement 118, and incorporate them by reference

herein, and object that the expert opinions set forth in Statement 141 are inadmissible – and

should be disregarded pursuant to Local Rule 56.1(d).

142.    Dr. Jørgensen also analyzed whether the closure of the NEL impacted Hachette's

book sales of the Works in Suit.  Jørgensen Decl. Ex. 1 ¶¶ 54–58 (Jørgensen Expert Rpt.).

**Publishers' Response**:  Undisputed that Dr. Jorgensen purported to analyze whether the closure of the NEL impacted Hachette's paperback and ebook sales of their Works in Suit, but incomplete and misleading to the extent that it suggests that Dr. Jorgensen reliably analyzed the impact of the closure of the NEL on these sales.  Prince Decl.  ¶¶35-53.

143.    Dr. Jørgensen was unable to analyze whether the closure of the NEL impacted all four of the Plaintiffs' sales of the Works in Suit because Hachette was the only Plaintiff – despite the Internet Archive's requests – to produce monthly sales data for 2020 for each of its Works in Suit.  Jørgensen Decl. Ex. 1 ¶ 54 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 40 (Jørgensen Reply Rpt.); Gratz Decl. ¶¶ 42–46.

**Publishers' Response**:  Undisputed that Dr. Jorgensen did not perform analysis based on monthly sales data for the Works in Suit published by PRH, HarperCollins or Wiley, but this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

144.    When the Internet Archive shut down the NEL, Hachette did not see increases in paperback or ebook sales of the Works in Suit.  Rather, Hachette's sales of the Works in Suit contracted approximately 21% between the second and third quarter of 2020 for paperbacks and approximately 29% between the second and third quarter of 2020 for ebooks.  Jørgensen Decl. Ex. 1 ¶¶ 57–58 (Jørgensen Expert Rpt.).

**Publishers' Response**:  The Statement recited above is disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 144 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Statement 144

also does not accurately summarize the content of the cited Jorgensen Expert Report.

145.    Dr. Jørgensen concluded this simultaneous contraction was not indicative that the Internet Archive's lending of Hachette's Works in Suit acted as market substitutes.  Jørgensen Decl. Ex. 1¶¶ 57–58 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶¶ 17–18 (Jørgensen Reply Rpt.).

**Publishers' Response**:  The Statement recited above is disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 145 above are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Statement 144 also does not accurately summarize the content of the cited Jorgensen Expert Report.

146.    Dr. Prince made no attempt to quantify the effect of the Internet Archive's digital lending on Plaintiffs.  Gratz Decl. Ex. EE, Deposition Transcript of Jeffrey Prince ("Prince Dep. Tr.") 52:16–53:21, 54:9–16, 202:23–203:10, 230:3–8.

**Publishers' Response**:  Undisputed that Dr. Prince did not perform a special damages analysis providing a specific monetary figure quantifying the extent of the harm created by Internet Archive's free ebooks website on the Plaintiffs, but Dr. Prince did "la[y] out the economic reasoning that [he] believes[s] points to it being detrimental, having harm" (Prince Decl. Ex 2 (Prince Tr. 203:7-10); *see also* Prince Decl. ¶¶15-19; Prince Report ¶¶54-65) and indicated that the harm would be substantial, including if Internet Archives practices scaled up or became widespread.  Prince Decl. ¶¶76-86; Prince Report ¶¶66-72.   This Statement is also not material because the Publishers do not have the burden of proving market harm under the fourth factor, and market harm includes potential harm, including if the defendant's conduct were to become widespread.  17 U.S.C. §107; *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169,

176 (2d Cir. 2018) ("Fair use is an affirmative defense" to copyright infringement and IA "bears the burden of proving it.").

147.    Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues.  Gratz Decl. Ex. N, Dye Dep. Tr. 106:3–107:13; *id.* Ex. FF, Deposition Transcript of Allison Lazarus ("Lazarus Dep. Tr.") 27:9–12; 38:12–22; *id.* Ex. GG, Deposition Transcript of Chantal Restivo-Alessi ("Restivo-Alessi Dep. Tr.") 224:7–225:9; *id.* Ex. HH, Deposition Transcript of Alan Pavese ("Pavese Dep. Tr.") 55:3–16.

**Publishers' Response**:  Undisputed that the Plaintiffs did not perform a special damages analysis providing a specific monetary figure quantifying the extent of the harm created by Internet Archive's free ebooks website on Plaintiffs, but the filed Declarations of Jeffery Weber and Chantal Alessi-Restivo state that IA's failure to pay the Plaintiffs fees for its lending of ebooks amount to millions of dollars (Weber Decl. ¶84; R-A Decl. ¶¶70-71) and the Publishers all testified repeatedly they believe that Internet Archive harms their book sales based on extensive experience in the publishing field and common sense.  *See, e.g.*, Suppl. McN Decl. Ex. 2 (R-A Tr. 141:3-141:11); *id* Ex. 3 (Weber Tr. 202:23-203:11, 205:22-206:9, 207:4-23, 214:3-24); *id* Ex. 4 (Pavese Tr. 51:11-54:24, 190:22-192:13); *id* Ex. 6 (Lazarus Tr. 48:3-51:23); Weber Decl. Ex. 26 (Dye Tr. 372:25-374:23).  This Statement that "Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues" also misrepresents the Publishers' testimony.  *See, e.g.*, Suppl. McN Decl. Ex. Ex. 6 (Lazarus Tr. 36:5-41:24).  This Statement is also not material because the Publishers do not have the burden of proving market harm under the fourth factor, and market harm includes potential harm, including if the defendants conduct were to become widespread.  17 U.S.C.  §107; *TVEyes, Inc.*, 883 F.3d at 176.

148.    Even if you were to assume that CDL reduced the necessity of lending those titles

via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions.  They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books.  Declaration of Susan Hildreth submitted herewith ("Hildreth Decl.") Ex. 1  ¶ 106 (Hildreth Expert Rpt.).

**Publishers' Response**:  Undisputed that if books "became easier to lend electronically through CDL for all libraries, … they would reallocate their spending away from ebooks licensing for those titles being accessed through CDL."  Disputed that "libraries would not spend less money on acquisitions" and "would spend more on ebook licensing for newer titles or on print books."  Ms. Hildreth further testified that if a library were to forgo purchasing an ebook license for a particular title because that title was available through CDL, the author and publisher of that title would not receive the payment they would have received had the library purchased an authorized edition – which means that authors and publishers would be harmed even if the libraries reallocated money to purchasing other authorized ebooks. McN Decl. Ex. 19 (Hildreth Tr. 44:24-45:4). Ms. Hildreth also testified that libraries could reallocate budgets to non-book purchases (*e.g.*, DVDs and games) and that discretionary acquisition budgets are constantly under pressure – which means that local authorities could reduce funding for acquiring books if CDL reduced demand for authorized ebooks. Suppl. McN Decl. Ex. 5 (Hildreth Tr. 198:23-203:25; 225:17-226:12).

The Publishers further dispute and object to disputed portions of the expert opinions of Ms. Hildreth set forth in Statement 148 *supra* because they are inadmissible, and must therefore be disregarded for violating Local Rule 56.1(d), for the following reasons.  The Publishers

dispute any expert opinion in the above paragraph that purports to establish that Internet Archive did not inflict market harm on the Publishers or impair the value of their copyrights in the Works in Suit or any other book.  Any such opinion from Ms. Hildreth is inadmissible because, *inter alia*, Ms. Hildreth lacks the expertise necessary to state an opinion about the conduct of all libraries nationwide and did not arrive at her conclusions by any kind of objective process, let alone the kind of sound methodology required for expert testimony.  Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Expert Report of Susan H. Hildreth, ECF 110-1 ("Hildreth Report"), ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion.  And at her deposition, Ms. Hildreth testified that she did not have access to any relevant data from any of the 9,000 public library systems in the United States that could possibly support her specious conclusion.  Prince Decl. Ex. 5 (Hildreth Depo. Tr. 259:1-262:6). In the event of a trial, the Publishers reserve the right to file a motion to strike portions of Ms. Hildreth's expert reports under Federal Rule of Evidence 702.  *See* Fed. R. Evid. 702(1) (expert testimony must be "based upon sufficient facts or data"); *Johnson Elec. N.Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000).  Further, Ms. Hildreth's opinions about whether or not the Internet Archive had a causal impact on the Publishers' sales and check-outs are merely opinions and not facts suitable for a Rule 56.1 Statement.  See, e.g., *Goris v. Breslin*, 2009 U.S. Dist. LEXIS 57108, at *3 (S.D.N.Y. July 6, 2009) (for the purposes of deciding summary judgment, this "court's reliance on … experts' affidavit is limited to the undisputed facts");  Local Rule 56.1(d).

149.    With CDL in place in libraries throughout the United States, libraries would have

additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products.  Hildreth Decl. ¶ 109.

**Publishers' Response**:  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.

150.    There have been no instances of a library paying for access to fewer ebook copies of a title – or buying fewer copies of a physical book for a title – where that title is available for borrowing through CDL, either from the IA or from another library.  *Id.* Ex. 2 ¶ 8 (Hildreth Reply Rpt.).

**Publishers' Response**:  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.

151.    Most libraries strive to spend their entire annual materials allocation within the fiscal year in which funds were allocated.  In fact, it is highly unusual for a library not to spend the entire allocation each year.  *Id.* Ex. 1 ¶ 71 (Hildreth Expert Rpt.).

**Publishers' Response**:  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.  This proposed "fact" is also not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Hildreth Report ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion.

152.    Libraries help readers discover books – through purposeful searching as well as accident or "serendipity."  Readers can browse physical shelves of libraries and a library's online

catalog.  Hildreth Decl. Ex. 1 ¶¶ 34, 35, 39 (Hildreth Expert Rpt.).

**Publishers' Response**:  Undisputed.

153.    Libraries generally begin lending a book as soon as it is published.  Hildreth Decl. ¶ 5.

**Publishers' Response**:  Disputed but not admissible.  Vague and lacks foundation.  This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Hildreth Report ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion.  This Statement is also incomplete and misleading because libraries continue to purchase books in paper and ebook editions long after first publication – as is the case with decades old Works in Suit such as *Their Eyes Were Watching God*, Catcher *in the Rye* and *Lord of the Flies*.

Dated: New York, New York
   September 2, 2022

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
          lindasteinman@dwt.com
          jackbrowning@dwt.com
          jessefeitel@dwt.com
          carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
          scott@oandzlaw.com
          danae@oandzlaw.com

*Attorneys for Hachette Book Group,
Inc., HarperCollins Publishers LLC,
John Wiley & Sons, Inc., and Penguin
Random House LLC*