# EXHIBIT 7



Reports of Cases

JUDGMENT OF THE COURT (Third Chamber)

10 November 2016*

(Reference for a preliminary ruling — Copyright and related rights — Rental right and lending right in
respect of copyright works — Directive 2006/115/EC — Article 1(1) — Lending of copies of works —
Article 2(1) — Lending of objects — Lending of a digital copy of a book — Public libraries)

In Case C-174/15,

REQUEST for a preliminary ruling under Article 267 TFEU from the Rechtbank Den Haag (District
Court, The Hague, Netherlands), made by decision of 1 April 2015, received at the Court on 17 April
2015, in the proceedings

**Vereniging Openbare Bibliotheken**

v

**Stichting Leenrecht,**

intervening parties:

**Vereniging Nederlands Uitgeversverbond,**

**Stichting LIRA,**

**Stichting Pictoright,**

THE COURT (Third Chamber),

composed of L. Bay Larsen, President of the Chamber, M. Vilaras, J. Malenovský (Rapporteur),
M. Safjan and D. Šváby, Judges,

Advocate General: M. Szpunar,

Registrar: M. Ferreira, Principal Administrator,

having regard to the written procedure and further to the hearing on 9 March 2016,

after considering the observations submitted on behalf of:

— Vereniging Openbare Bibliotheken, by P. de Leeuwe and D. Visser, advocaten,

— Vereniging Nederlands Uitgeversverbond, by C. Alberdingk Thijm and C. de Vries, advocaten,

---

* Language of the case: Dutch.



— Stichting LIRA and Stichting Pictoright, by J. Seignette, M. van Heezik, G. van der Wal and M. Kingma, advocaten,

— the Czech Government, by S. Šindelková, D. Hadroušek and M. Smolek, acting as Agents,

— the German Government, by T. Henze, J. Möller and D. Kuon, acting as Agents,

— the Greek Government, by G. Alexaki, acting as Agent,

— the French Government, by D. Segoin, G. de Bergues and D. Colas, acting as Agents,

— the Italian Government, by G. Palmieri, acting as Agent, assisted by S. Fiorentino and A. Collabolletta, avvocati dello Stato,

— the Latvian Government, by I. Kalniņš and D. Pelše, acting as Agents,

— the Portuguese Government, by L. Inez Fernandes and T. Rendas, acting as Agents,

— the United Kingdom Government, by J. Kraehling, acting as Agent, and N. Saunders, Barrister,

— the European Commission, by F. Wilman, T. Scharf and J. Samnadda, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 16 June 2016,

gives the following

## Judgment

1   This request for a preliminary ruling concerns the interpretation of Article 4(2) of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society (OJ 2001 L 167, p. 10), and of Article 1(1), Article 2(1)(b) and Article 6(1) of Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property (OJ 2006 L 376, p. 28).

2   The request has been made in proceedings between Vereniging Openbare Bibliotheken (Public library association; 'the VOB') and Stichting Leenrecht (Lending right foundation; 'the Stichting'), concerning a possible infringement of the exclusive lending right referred to in Article 1(1) of Directive 2006/115.

## Legal context

### International law

3   The World Intellectual Property Organisation (WIPO) adopted the WIPO Copyright Treaty in Geneva on 20 December 1996 ('the WIPO Treaty'). That Treaty was approved on behalf of the European Community by Council Decision 2000/278/EC of 16 March 2000 (OJ 2000 L 89, p. 6).

4   Article 7(1) of that treaty states:

'Authors of:

(i)   computer programs;

(ii)   cinematographic works; and

(iii)  works embodied in phonograms, as determined in the national law of Contracting Parties;

shall enjoy the exclusive right of authorising commercial rental to the public of the originals or copies of their works.'

5    The diplomatic conference that adopted the WIPO Treaty also adopted, among other documents, the 'Agreed statement concerning Articles 6 and 7', which is annexed to that treaty ('the agreed statement annexed to the WIPO Treaty') and is worded as follows:

'As used in these Articles, the expressions "copies" and "original and copies" being subject to the right of distribution and the right of rental under the said Articles, refer exclusively to fixed copies that can be put into circulation as tangible objects.'

*EU law*

Directive 2001/29

6    Recitals 2 and 9 of Directive 2001/29 state:

'(2)   The European Council, meeting at Corfu on 24 and 25 June 1994, stressed the need to create a general and flexible legal framework at Community level in order to foster the development of the information society in Europe. This requires, inter alia, the existence of an internal market for new products and services. Important Community legislation to ensure such a regulatory framework is already in place or its adoption is well under way. Copyright and related rights play an important role in this context as they protect and stimulate the development and marketing of new products and services and the creation and exploitation of their creative content.

…

(9)   Any harmonisation of copyright and related rights must take as a basis a high level of protection, since such rights are crucial to intellectual creation. Their protection helps to ensure the maintenance and development of creativity in the interests of authors, performers, producers, consumers, culture, industry and the public at large. Intellectual property has therefore been recognised as an integral part of property.'

7    Article 1(2)(b) of that directive provides:

'Except in the cases referred to in Article 11, this Directive shall leave intact and shall in no way affect existing Community provisions relating to:

…

(b)   rental right, lending right and certain rights related to copyright in the field of intellectual property;

…'

8 Article 4 of that directive, entitled 'Distribution right', provides:

'1. Member States shall provide for authors, in respect of the original of their works or of copies thereof, the exclusive right to authorise or prohibit any form of distribution to the public by sale or otherwise.

2. The distribution right shall not be exhausted within the [European Union] in respect of the original or copies of the work, except where the first sale or other transfer of ownership in the [European Union] of that object is made by the rightholder or with his consent.'

Directive 2006/115

9 Directive 2006/115 codified and repealed Council Directive 92/100/EEC of 19 November 1992 on rental right and lending right and on certain rights related to copyright in the field of intellectual property (OJ 1992 L 346, p. 61).

10 Recitals 2 to 5, 7, 8 and 14 of Directive 2006/115 are worded as follows:

'(2) Rental and lending of copyright works and the subject matter of related rights protection is playing an increasingly important role in particular for authors, performers and producers of phonograms and films. Piracy is becoming an increasing threat.

(3) The adequate protection of copyright works and subject matter of related rights protection by rental and lending rights as well as the protection of the subject matter of related rights protection by the fixation right, distribution right, right to broadcast and communication to the public can accordingly be considered as being of fundamental importance for the economic and cultural development of the [European Union].

(4) Copyright and related rights protection must adapt to new economic developments such as new forms of exploitation.

(5) The creative and artistic work of authors and performers necessitates an adequate income as a basis for further creative and artistic work, and the investments required particularly for the production of phonograms and films are especially high and risky. The possibility of securing that income and recouping that investment can be effectively guaranteed only through adequate legal protection of the rightholders concerned.

...

(7) The legislation of the Member States should be approximated in such a way as not to conflict with the international conventions on which the copyright and related rights laws of many Member States are based.

(8) The legal framework of the [European Union] on the rental right and lending right and on certain rights related to copyright can be limited to establishing that Member States provide rights with respect to rental and lending for certain groups of rightholders and further to establishing the rights of fixation, distribution, broadcasting and communication to the public for certain groups of rightholders in the field of related rights protection.

...

(14)  It is also necessary to protect the rights at least of authors as regards public lending by providing for specific arrangements. However, any measures taken by way of derogation from the exclusive public lending right should comply in particular with Article 12 of the Treaty.'

11  Article 1 of that directive provides:

'1.  In accordance with the provisions of this Chapter, Member States shall provide, subject to Article 6, a right to authorise or prohibit the rental and lending of originals and copies of copyright works, and other subject matter as set out in Article 3(1).

2.  The rights referred to in paragraph 1 shall not be exhausted by any sale or other act of distribution of originals and copies of copyright works and other subject matter as set out in Article 3(1).'

12  Article 2(1) of Directive 2006/115 provides:

'For the purposes of this Directive the following definitions shall apply:

(a)  "rental" means making available for use, for a limited period of time and for direct or indirect economic or commercial advantage;

(b)  "lending" means making available for use, for a limited period of time and not for direct or indirect economic or commercial advantage, when it is made through establishments which are accessible to the public;

...'

13  Article 6(1) of Directive 2006/115 provides:

'Member States may derogate from the exclusive right provided for in Article 1 in respect of public lending, provided that at least authors obtain a remuneration for such lending. Member States shall be free to determine this remuneration taking account of their cultural promotion objectives.'

*Netherlands law*

14  Article 10(1) of the Auteurswet (Law on Copyright) of 23 September 1912 ('the Aw') provides:

'For the purposes of this Law, "literary, scientific or artistic works" shall mean:

1°.  books, brochures, newspapers, periodicals and other written material;

...

and, in general, any product in the literary, scientific or artistic domain, expressed by any means and in any form.'

15  Article 12 of the Aw provides:

'1.  The disclosure of a literary, scientific or artistic work shall include:

...

3°  The rental or lending of all or part of a copy of a work, with the exception of works of architecture and works of applied arts, or a reproduction thereof, put into circulation by the rightholder or with his consent;

…

3. "lending", within the meaning of paragraph 1(3°), means making available for use, for a limited period of time and not for direct or indirect economic or commercial advantage, when it is made through establishments which are accessible to the public.

…'

16  Under Article 15c(1) of the Aw:

'Lending, as defined in Article 12(1)(3°), of all or part of a copy of a literary, scientific or artistic work, or a reproduction thereof, put into circulation by the rightholder or with his consent, shall not constitute an infringement of the copyright in that work, provided that fair remuneration is paid by the person who carries out that lending or arranges for it to be carried out. …'

**The dispute in the main proceedings and the questions referred for a preliminary ruling**

17  The VOB represents the interests of all public libraries in the Netherlands.

18  Those libraries lend out books in physical format and, in return, pay a lump sum to the Stichting, which is the foundation designated by the Minister for Justice (Netherlands) to collect lending right payments.

19  The Stichting distributes the lending right payments which it collects to rightholders through collective management organisations, such as the Stichting LIRA, which is responsible for the management of rights relating to literary, dramatic and dramatico-musical works, and the Stichting Pictoright, which is responsible for the management of rights relating to visual works such as works created by plastic artists, photographers, illustrators, designers and architects.

20  Under the Netherlands legislation, the amount of the lending right payment is set by the Stichting Onderhandelingen Leenvergoedingen ('the StOL'), a foundation designated for that purpose by the Minster for Justice.

21  While the question as to whether or not the digital lending of an electronic book comes within the scope of Article 15c of the Aw had been discussed within the StOL since 2004, the StOL's management board finally decided, in a meeting held on 24 March 2010, to answer that question in the negative.

22  In addition, at the request of the Ministry of Education, Culture and Science (Netherlands), the Instituut voor Informatierecht van de Universiteit van Amsterdam (Institute for information law of the University of Amsterdam, Netherlands) and the consultancy firm SEO drafted a report which also concluded that the digital lending of electronic books by libraries did not come within the scope of that exception.

23  On the basis of that report, the Netherlands Government drew up draft legislation on libraries providing for the creation of a national digital library for the remote digital lending of electronic books. That draft legislation is based on the premiss that the digital lending of electronic books does not come within the scope of that exception.

24    At present, public libraries make electronic books available via the internet, on the basis of licensing agreements with rightholders.

25    The VOB is challenging that draft legislation and has therefore brought proceedings before the referring court in which it seeks a declaration that, essentially, the current Law on Copyright already covers digital lending.

26    In those circumstances, the Rechtbank Den Haag (District Court, The Hague) decided to stay the proceedings and to refer the following questions to the Court for a preliminary ruling:

'(1)    Are Articles 1(1), 2(1)(b) and 6(1) of Directive 2006/115 to be construed as meaning that "lending" as referred to in those provisions also means making copyright-protected novels, collections of short stories, biographies, travelogues, children's books and youth literature available for use, not for direct or indirect economic or commercial advantage, via a publicly accessible establishment

    —    by placing a digital copy (reproduction A) on the server of the establishment and enabling a user to reproduce that copy by downloading it on to his/her own computer (reproduction B),

    —    in such a way that the copy made by the user when downloading (reproduction B) is no longer usable after a limited period, and

    —    in such a way that other users cannot download the copy (reproduction A) on to their computers during that period?

(2)    If Question 1 is to be answered in the affirmative: does Article 6 of Directive 2006/115 and/or any other provision of EU law preclude Member States from imposing on the application of the restriction on the lending right included in Article 6 of Directive 2006/115 a condition that the copy of the work made available by the establishment (reproduction A) must have been brought into circulation by an initial sale or other transfer of ownership of that copy within the European Union by the rightholder or with his consent within the meaning of Article 4(2) of Directive 2001/29?

(3)    If Question 2 is to be answered in the negative: does Article 6 of Directive 2006/115 lay down other requirements for the source of the copy (reproduction A) provided by the establishment, for instance the requirement that the copy was obtained from a lawful source?

(4)    If Question 2 is to be answered in the affirmative: is Article 4(2) of Directive 2001/29 to be construed as meaning that the initial sale or other transfer of ownership of material as referred to in that provision also means making available remotely by downloading, for use for an unlimited period, a digital copy of copyright-protected novels, collections of short stories, biographies, travelogues, children's books and youth literature?'

**Consideration of the questions referred**

*The first question*

27    By its first question, the referring court asks, in essence, whether Article 1(1), Article 2(1)(b) and Article 6(1) of Directive 2006/115 must be interpreted as meaning that the concept of 'lending', within the meaning of those provisions, covers the lending of a digital copy of a book, where that lending is carried out by placing that copy on the server of a public library and allowing the user concerned to

reproduce that copy by downloading it onto his own computer, bearing in mind that only one copy may be downloaded during the lending period and that, after that period has expired, the downloaded copy can no longer be used by that user.

28   It must be noted that Article 1(1) of Directive 2006/115, which provides that 'Member States shall provide … a right to authorise or prohibit the … lending of originals and copies of copyright works, and other subject matter', does not specify whether the concept of 'copies of copyright works', within the meaning of that provision, also covers copies which are not fixed in a physical medium, such as digital copies.

29   In addition, Article 2(1)(b) of that directive defines 'lending' as making available for use, for a limited period of time and not for direct or indirect economic or commercial advantage, when that lending is made through establishments which are accessible to the public. However, it does not follow from that provision that the subject matter referred to in Article 1(1) of that directive must also include intangible objects, such as those of a digital nature.

30   In those circumstances, it is appropriate, first of all, to examine whether that are grounds to justify the exclusion, in all cases, of the lending of digital copies and intangible objects from the scope of Directive 2006/115.

31   In that regard, in the first place, it follows from recital 7 of Directive 2006/115 that 'the legislation of the Member States should be approximated in such a way as not to conflict with the international conventions on which the copyright and related rights laws of many Member States are based'.

32   The conventions which that directive must respect include, in particular, the WIPO Treaty, to which the European Union and all the Member States are parties.

33   Consequently, it is necessary to interpret the concepts of 'objects' and 'copies', for the purposes of Directive 2006/115, in the light of the equivalent concepts in the WIPO Treaty (see, by analogy, judgment of 15 March 2012, *SCF*, C-135/10, EU:C:2012:140, paragraph 55).

34   According to the agreed statement annexed to the WIPO Treaty, the concepts of 'original' and 'copies', in Article 7 of that treaty, in relation to the right of rental, refer 'exclusively to fixed copies that can be put into circulation as tangible objects'. It follows that intangible objects and non-fixed copies, such as digital copies, are excluded from the right of rental.

35   It is therefore necessary to interpret the concept of 'rental', in Article 2(1)(a) of Directive 2006/115, as referring exclusively to tangible objects, and to interpret the concept of 'copies', in Article 1(1) of that directive, as referring, as regards rental, exclusively to copies fixed in a physical medium.

36   That said, although the title of Directive 2006/115 refers, in certain language versions, to the 'rental and lending right', in the singular, and although, as a rule, that directive governs jointly the various aspects of that right which constitute the systems of rental and lending, it nevertheless does not follow that the EU legislature necessarily intended to give the same meaning to the concepts of 'objects' and 'copies', whether with regard to the rental system or to the lending system, including public lending within the meaning of Article 6 of that directive.

37   First, recitals 3 and 8 of that directive, in certain language versions, do not refer to the 'rental and lending right' in the singular, but rather to the rental and lending 'rights', in the plural.

38   Secondly, as can be seen from Article 2(1)(a) and (b) of Directive 2006/115, the EU legislature sought to define the concepts of 'rental' and 'lending' separately. Thus the subject matter of 'rental' is not necessarily identical to that of 'lending'.

39    It follows from the foregoing that although, as can be seen from paragraph 35 of the present judgment, intangible objects and non-fixed copies, such as digital copies, must be excluded from the rental right, governed by Directive 2006/115, so as not to be in breach of the agreed statement annexed to the WIPO Treaty, neither that treaty nor that agreed statement preclude the concept of 'lending', within the meaning of that directive, from being interpreted, where appropriate, as also including certain lending carried out digitally.

40    In the second place, it must be recalled, as mentioned in paragraph 9 of the present judgment, that Directive 2006/115 codifies and reproduces, in substantially identical terms, the provisions of Directive 92/100. The preparatory work preceding the adoption of Directive 92/100 does not support the conclusion that lending carried out in digital form should be excluded, in all cases, from the scope of that directive.

41    It is true that the explanatory memorandum on the Proposal for a Council Directive on rental right, lending right, and on certain rights related to copyright (COM(90) 586 final) mentions the European Commission's desire to exclude the making available by way of electronic data transmission from the scope of Directive 92/100.

42    However, it must be noted, in the first place, that it is not evident that the Commission intended to apply such an exclusion to digital copies of books. The examples mentioned in that explanatory memorandum related exclusively to the electronic transmission of films. Moreover, at the time when that explanatory memorandum was drawn up, digital copies of books were not used to such an extent that it can validly be presumed that they had implicitly been taken into account by the Commission.

43    In the second place, it must be noted that the desire voiced by the Commission in that explanatory memorandum finds no direct expression in the actual text of the proposal which led to the adoption of Directive 92/100 or in that directive.

44    It follows from the foregoing considerations that there is no decisive ground allowing for the exclusion, in all cases, of the lending of digital copies and intangible objects from the scope of Directive 2006/115.

45    That conclusion is, moreover, borne out by the objective pursued by Directive 2006/115. Recital 4 of that directive states, inter alia, that copyright must adapt to new economic developments such as new forms of exploitation. Lending carried out digitally indisputably forms part of those new forms of exploitation and, accordingly, makes necessary an adaptation of copyright to new economic developments.

46    In addition, to exclude digital lending entirely from the scope of Directive 2006/115 would run counter to the general principle requiring a high level of protection for authors.

47    While it is true that that general principle appears only implicitly in recital 5 of Directive 2006/115, it is nevertheless emphasised in Directive 2001/29, recital 9 of which states that any harmonisation of copyright must take as its basis 'a high level of protection'.

48    Thus, such a general principle must be taken into account in interpreting directives which, like Directive 2006/115, are intended to harmonise the various aspects of copyright while having a more limited aim than that of Directive 2001/29.

49    In view of the conclusion set out in paragraph 44 of the present judgment, it must next be verified whether the public lending of a digital copy of a book, carried out in conditions such as those indicated in the question referred, is capable of coming within the scope of Article 6(1) of Directive 2006/115.

50   In that respect, it must be noted that, although Article 6(1) of Directive 2006/115 — as a derogation from the exclusive lending right laid down in Article 1 of that directive — must, according to the Court's settled case-law, be interpreted strictly, the fact remains that the interpretation given must also enable the effectiveness of the exception thereby established to be safeguarded and its purpose to be observed (see, to that effect, judgments of 4 October 2011, *Football Association Premier League and Others*, C-403/08 and C-429/08, EU:C:2011:631, paragraphs 162 and 163, and of 1 December 2011, *Painer*, C-145/10, EU:C:2011:798, paragraph 133).

51   Given the importance of the public lending of digital books, and in order to safeguard both the effectiveness of the derogation for public lending referred to in Article 6(1) of Directive 2006/115 ('the public lending exception') and the contribution of that exception to cultural promotion, it cannot therefore be ruled out that Article 6(1) of Directive 2006/115 may apply where the operation carried out by a publicly accessible library, in view of, inter alia, the conditions set out in Article 2(1)(b) of that directive, has essentially similar characteristics to the lending of printed works.

52   In the present case, as can be seen from the wording of the question referred, the dispute in the main proceedings concerns the lending of a digital copy of a book, carried out by placing it on the server of the public library and allowing the user concerned to reproduce that copy by downloading it onto his own computer, bearing in mind that only one copy may be downloaded during the lending period and that, after that period has expired, the downloaded copy can no longer be used by that user.

53   Such an operation must be regarded as having — in view, inter alia, of the conditions established in Article 2(1)(b) of Directive 20016/115 — essentially similar characteristics to the lending of printed works, since, first, the limitation of simultaneous downloads to a single copy implies that the lending capacity of the library concerned does not exceed that which it would have as regards a printed work and, secondly, that lending is made for only a limited period.

54   In view of all the foregoing considerations, the answer to the first question is that Article 1(1), Article 2(1)(b) and Article 6(1) of Directive 2006/115 must be interpreted as meaning that the concept of 'lending', within the meaning of those provisions, covers the lending of a digital copy of a book, where that lending is carried out by placing that copy on the server of a public library and allowing a user to reproduce that copy by downloading it onto his own computer, bearing in mind that only one copy may be downloaded during the lending period and that, after that period has expired, the downloaded copy can no longer be used by that user.

*The second question*

55   By its second question, the referring court asks, in essence, whether Article 6 of Directive 2006/115 and/or any other provision of EU law must be interpreted as precluding a Member State from making the application of Article 6(1) of Directive 2006/115 subject to the condition that the digital copy of a book made available by the public library must have been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the holder of the right of distribution to the public or with his consent, for the purpose of Article 4(2) of Directive 2001/29.

56   In that regard, first of all, although it follows from the very wording of Article 4(1) and (2) of Directive 2001/29 that Member States are to provide for authors the exclusive right to authorise or prohibit any form of distribution to the public, by sale or otherwise, of the original of their works or of copies thereof, and that that distribution right is exhausted within the European Union only where the first sale or other transfer of ownership in the European Union of that object is made by the rightholder or with his consent, it follows from Article 1(2)(b) of that directive that the latter leaves intact and in no way affects the provisions of EU law relating to the lending right.

57 It follows that Article 4(2) of Directive 2001/29 is not relevant to the interpretation of Article 6(1) of Directive 2006/115.

58 Next, Article 1(2) of Directive 2006/115 provides that the exclusive lending right, laid down in Article 1(1) of that directive, is not exhausted by any sale or other act of distribution of originals and copies of copyright works.

59 The Court has already held that forms of exploitation of a protected work, such as public lending, are different in nature from a sale or any other lawful form of distribution, since the lending right remains one of the prerogatives of the author notwithstanding the sale of the physical medium containing the work. Consequently, the lending right is not exhausted by the sale or any other act of distribution, whereas the distribution right may be exhausted, but only and specifically upon the first sale in the European Union by the rightholder or with his consent (see, to that effect, judgment of 6 July 2006, *Commission* v *Portugal*, C-53/05, EU:C:2006:448, paragraph 34 and the case-law cited).

60 It should be noted, lastly, that Article 6(1) of Directive 2006/115 is intended to balance the interests of authors, on the one hand, and cultural promotion — which is an objective of general interest underlying the public lending exception and justifying the possibility for Member States to derogate, under that provision, from the exclusive right laid down in Article 1 of that directive as regards public lending — on the other hand. In that context, at least the authors must receive remuneration for that lending.

61 Article 6(1) of Directive 2006/115, read in conjunction with recital 14 of that directive, which indicates that it is necessary to protect authors' rights as regards public lending, and in view of the requirements flowing from the general principle imposing a high level of protection for authors, mentioned in paragraphs 47 and 48 above, must be regarded as laying down only a minimum threshold of protection for authors required when the public lending exception is being implemented. It follows that the Member States cannot be prevented from setting, where appropriate, additional conditions such as to improve the protection of authors' rights beyond what is expressly laid down in that provision.

62 In the present case, the national legislation lays down an additional condition for the application of the public lending exception, referred to in Article 6(1) of Directive 2006/115. That condition requires that the digital copy of a book made available by the public library must have been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the holder of the right of distribution to the public or with his consent, for the purpose of Article 4(2) of Directive 2001/29.

63 As the Advocate General has rightly pointed out, in point 85 of his Opinion, unlike the case where a lending right is acquired with the consent of the author, in the case where the lending right arises under the exception laid down in Article 6(1) of Directive 2006/115, by way of derogation from that consent requirement, its application to some works could prejudice the legitimate interests of authors.

64 Consequently, a condition, such as that at issue in the main proceedings — according to which, in the context of the public lending exception, the Member States may require that a digital copy of a book subject to such lending must have first been put into circulation by the rightholder or with his consent — is capable of reducing the risks referred to in the previous paragraph and therefore of improving the protection of authors' rights in the implementation of that exception. Consequently, such an additional condition must be considered to be in accordance with Article 6(1) of Directive 2006/115.

65 In view of the foregoing, the answer to the second question is that EU law, and in particular Article 6 of Directive 2006/115, must be interpreted as not precluding a Member State from making the application of Article 6(1) of Directive 2006/115 subject to the condition that the digital copy of a

book made available by the public library must have been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the holder of the right of distribution to the public or with his consent, for the purpose of Article 4(2) of Directive 2001/29.

*The third question*

66  By its third question, the referring court asks, in essence, whether Article 6(1) of Directive 2006/115 must be interpreted as precluding the public lending exception laid down therein from applying to the making available by a public library of a digital copy of a book in the case where that copy was obtained from an unlawful source.

67  In that regard, first of all, although the wording of Article 6(1) of Directive 2006/115 does not expressly set out any requirement that the source of the copy made available by the public library must be lawful, nevertheless one of the objectives of that directive is to combat piracy, as can be seen from recital 2 thereof.

68  To accept that a copy lent out by a public library may be obtained from an unlawful source would amount to tolerating, or even encouraging, the circulation of counterfeit or pirated works and would therefore clearly run counter to that objective.

69  Next, the Court has already held, with regard to the private copying exception laid down in Article 5(2)(b) of Directive 2001/29, that that exception does not cover the case of copies made from an unlawful source (judgment of 10 April 2014, *ACI Adam and Others*, C-435/12, EU:C:2014:254, paragraph 41).

70  In that respect, the Court has held that copyright holders cannot be required to tolerate infringements of their rights which may accompany the making of private copies. If the Member States had the option of adopting legislation which also allowed reproductions for private use to be made from an unlawful source, it would clearly be detrimental to the proper functioning of the internal market. The application of such national legislation might unreasonably prejudice copyright holders (see, to that effect, judgment of 10 April 2014, *ACI Adam and Others*, C-435/12, EU:C:2014:254, paragraphs 31, 35 and 40).

71  All of those arguments relating to the private copying exception appear relevant to the application of the public lending exception and may therefore be transposed, by analogy, to the context of Article 6(1) of Directive 2006/115.

72  In view of the foregoing, the answer to the third question is that Article 6(1) of Directive 2006/115 must be interpreted as meaning that it precludes the public lending exception laid down therein from applying to the making available by a public library of a digital copy of a book in the case where that copy was obtained from an unlawful source.

*The fourth question*

73  In view of the answer given to the second question, it is not necessary to answer the fourth question, since the latter was submitted only in the event of a negative answer to the second question.

**Costs**

74  Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Third Chamber) hereby rules:

1.  **Article 1(1), Article 2(1)(b) and Article 6(1) of Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property must be interpreted as meaning that the concept of 'lending', within the meaning of those provisions, covers the lending of a digital copy of a book, where that lending is carried out by placing that copy on the server of a public library and allowing a user to reproduce that copy by downloading it onto his own computer, bearing in mind that only one copy may be downloaded during the lending period and that, after that period has expired, the downloaded copy can no longer be used by that user.**

2.  **EU law, and in particular Article 6 of Directive 2006/115, must be interpreted as not precluding a Member State from making the application of Article 6(1) of Directive 2006/115 subject to the condition that the digital copy of a book made available by the public library must have been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the holder of the right of distribution to the public or with his consent, for the purpose of Article 4(2) of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society.**

3.  **Article 6(1) of Directive 2006/115 must be interpreted as meaning that it precludes the public lending exception laid down therein from applying to the making available by a public library of a digital copy of a book in the case where that copy was obtained from an illegal source.**

[Signatures]