# EXHIBIT 8



Reports of Cases

OPINION OF ADVOCATE GENERAL
SZPUNAR
delivered on 16 June 2016 [1]

Case C-174/15

**Vereniging Openbare Bibliotheken**
v
**Stichting Leenrecht**
(Request for a preliminary ruling

from the Rechtbank Den Haag (District Court, The Hague, Netherlands))


(Copyright and related rights — Rental and lending right in respect of copyright works — Directive 2001/29/EC — Directive 2006/115/EC — Electronic books — Public libraries)


**Introduction**

1. Libraries are one of civilisation's most ancient institutions, predating by several centuries the invention of paper and the emergence of books as we know them today. In the 15th century, they successfully adapted to, and benefited from, the invention of printing and it was to the libraries that the law of copyright, which emerged in the 18th century, had to adjust. Today we are witnessing a new, digital revolution, and one may wonder whether libraries will be able to survive this new shift in circumstances. Without wishing to overstate its importance, the present case undeniably offers the Court a real opportunity to help libraries not only to survive, but also to flourish.

2. Indeed, it is a commonplace to say that digital technology and the advent of the internet have had a profound effect on many areas of activity, including creative work and, in particular, literature. The introduction of electronic books has significantly altered both the publishing sector and readers' habits, and this is just the beginning. While electronic books may never replace printed books, the fact remains that, for certain categories of book and on certain markets, the volume of electronic book sales equals or surpasses the volume of printed book sales and some works are published only in digital format.[2] Similarly, some readers, and they are ever more numerous, are leaving aside printed books and turning to electronic reading devices. Very young readers may never have accustomed themselves to printed books.

---

[1] — Original language: French.

[2] — For example, Stephen King's *Riding the Bullet* (Simon & Schuster, 2000) or *Starość Aksolotla* (*The Old Axolotl*) by Jacek Dukaj (Allegro, 2015).



Case 1:20-cv-04160-JGK-OTW   Document 170-8   Filed 09/02/22   Page 3 of 20

3. If libraries are unable to adapt to this trend they risk marginalisation and may no longer be able to fulfil the task of cultural dissemination which they have performed for thousands of years. The institution of a regulatory framework to accommodate the modernisation of the way in which libraries operate has, for some time, been a subject of intense debate, both among stakeholders and in legal theory.[3] The question of whether — and if so on what legal basis — libraries may lend electronic books is at the heart of this debate. The present case will enable the Court to provide a judicial answer to that question.

**Legal framework**

*EU law*

Directive 2001/29/EC

4. Article 1 of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society,[4] entitled 'Scope', provides, in paragraph 2(b) thereof:

'Except in the cases referred to in Article 11 [making technical adjustments to certain directives in the field of copyright], this directive shall leave intact and shall in no way affect existing Community provisions relating to:

…

(b)  rental right, lending right and certain rights related to copyright in the field of intellectual property.'

5. Article 2 of that directive, entitled 'Reproduction right', provides, under point (a):

'Member States shall provide for the exclusive right to authorise or prohibit direct or indirect, temporary or permanent reproduction by any means and in any form, in whole or in part:

(a)  for authors, of their works.'

6. Article 3 of the same directive, entitled 'Right of communication to the public of works and right of making available to the public other subject matter', provides in paragraph 1 thereof:

'Member States shall provide authors with the exclusive right to authorise or prohibit any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access them from a place and at a time individually chosen by them.'

---

3 — To give just a few examples, see Davies, P., 'Access v. contract: competing freedoms in the context of copyright limitations and exceptions for libraries' in *European Intellectual Property Review*, 2013/7, p. 402; Dreier, T., 'Musées, bibliothèques et archives: de la nécessité d'élargir les exceptions au droit d'auteur' in *Propriétés intellectuelles*, 2012/43, p. 185; Dusollier, S., 'A manifesto for an e-lending limitation in copyright' in *Journal of Intellectual Property, Information Technology and E-Commerce Law*, 2014/5(3); Matulionyte, R., 'E-lending and a public lending right: is it really a time for an update?' in *European Intellectual Property Review*, 2016/38(3), p. 132; Siewicz, K., 'Propozycja nowelizacji prawa autorskiego w zakresie działalności bibliotek' in *Zeszyty naukowe Uniwersytetu Jagiellońskiego. Prace z prawa własności intelektualnej*, 2013/122, p. 54; Zollinger, A., 'Les bibliothèques numériques, ou comment concilier droit à la culture et droit d'auteur' in *La semaine juridique. Entreprise et affaires*, 2007/25, p. 18.
4 — OJ 2001 L 167, p. 10.

7. Article 4 of Directive 2001/29, entitled 'Distribution right', provides as follows:

'1. Member States shall provide for authors, in respect of the original of their works or of copies thereof, the exclusive right to authorise or prohibit any form of distribution to the public by sale or otherwise.

2. The distribution right shall not be exhausted within the Community in respect of the original or copies of the work, except where the first sale or other transfer of ownership in the Community of that object is made by the rightholder or with his consent.'

8. Lastly, Article 5 of Directive 2001/29, entitled 'Exceptions and limitations', provides in paragraphs 1(b) and 2(c) thereof:

'1. Temporary acts of reproduction referred to in Article 2, which are transient or incidental [and] an integral and essential part of a technological process and whose sole purpose is to enable:

…

(b)  a lawful use

of a work or other subject matter to be made, and which have no independent economic significance, shall be exempted from the reproduction right provided for in Article 2.

2. Member States may provide for exceptions or limitations to the reproduction right provided for in Article 2 in the following cases:

…

(c)  in respect of specific acts of reproduction made by publicly accessible libraries, educational establishments or museums, or by archives, which are not for direct or indirect economic or commercial advantage.'

Directive 2006/115/EC

9. Article 1 of Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property,[5] entitled 'Object of harmonisation', provides:

'1. In accordance with the provisions of this Chapter [Chapter I, entitled "Rental and lending right"], Member States shall provide, subject to Article 6, a right to authorise or prohibit the rental and lending of originals and copies of copyright works, and other subject matter as set out in Article 3(1).

2. The rights referred to in paragraph 1 shall not be exhausted by any sale or other act of distribution of originals and copies of copyright works and other subject matter as set out in Article 3(1).'

10. Article 2 of that directive, entitled 'Definitions', provides in paragraph 1(b) thereof:

'For the purpose of this Directive the following definitions shall apply:

…

---

5 — OJ 2006 L 376, p. 28.

(b) "lending" means making available for use, for a limited period of time and not for direct or indirect economic or commercial advantage, when it is made through establishments which are accessible to the public.'

11. Article 3 of the same directive, entitled 'Rightholders and subject matter of rental and lending right', provides, in paragraph 1(a) thereof:

'The exclusive right to authorise or prohibit rental and lending shall belong to the following:

(a) the author in respect of the original and copies of his work.'

12. Lastly, Article 6 of the directive, entitled 'Derogation from the exclusive public lending right', provides, in paragraphs 1 and 3 thereof:

'1. Member States may derogate from the exclusive right provided for in Article 1 in respect of public lending, provided that at least authors obtain a remuneration for such lending. Member States shall be free to determine this remuneration taking account of their cultural promotion objectives.

…

3. Member States may exempt certain categories of establishments from the payment of the remuneration referred to in paragraphs 1 and 2.'

*Netherlands law*

13. The Law on Copyright (Auteurswet) institutes the lending right in Article 12(1)(3) and Article 12(3). The derogation for public lending is instituted in Article 15c(1) of that law.

**The facts, the procedure and the questions referred for a preliminary ruling**

14. There is a lively debate in several Member States, including the Netherlands, concerning the lending of electronic books by libraries. Further to a report commissioned by the Netherlands Ministry of Education, Culture and Science, it was concluded that the lending of electronic books did not fall within the scope of the exclusive lending right for the purposes of the provisions transposing Directive 2006/115 into Netherlands law. Consequently, the lending of electronic books by public libraries cannot benefit from the derogation provided for in Article 6(1) of that directive, which has also been transposed into Netherlands law. A draft law on libraries, based on that premiss, has been drawn up by the government.

15. However, the applicant in the main proceedings, Vereniging Openbare Bibliotheken ('VOB'), an association of which every public library in the Netherlands is a member, does not concur with that view. It is persuaded that the relevant provisions of Netherlands law must also apply to digital lending. Consequently, it has instituted proceedings before the referring court against Stichting Leenrecht, a foundation entrusted with collecting the remuneration due to authors under the public lending derogation and the defendant in the main proceedings, for a declaratory judgment holding, in substance, first, that the lending of electronic books falls within the scope of the lending right, secondly, that the making available of electronic books for an unlimited period of time constitutes a sale for the purposes of the provisions governing the distribution right and, thirdly, that the lending of electronic books by public libraries against the payment to authors of a fair remuneration does not constitute copyright infringement.

16. VOB states that its action concerns lending under the system which the referring court describes as 'one copy one user'. Under that system, the electronic books at a library's disposal may be downloaded by a user for a lending period during which those books will not be accessible to other library users. At the end of the period, the book in question will automatically become unusable for the borrower in question and may then be borrowed by other users. VOB has also stated that it wishes to limit the scope of its action to 'novels, collections of short stories, biographies, travelogues, children's books and youth literature'.

17. The interveners in the main proceedings are Stichting Lira ('Lira'), an organisation which collectively manages rights and represents the authors of literary works and Stichting Pictoright ('Pictoright'), an organisation which collectively manages rights and represents the creators of visual artworks, both of which support the form of order sought by VOB, and Vereniging Nederlands Uitgeversverbond ('NUV'), a publishers' association, which supports the contrary view.

18. The Rechtbank Den Haag (District Court, The Hague, Netherlands) considers that its response to VOB's application depends upon the interpretation of provisions of EU law and has referred the following questions to the Court of Justice for a preliminary ruling:

'(1) Are Articles 1(1), 2(1)(b) and 6(1) of Directive 2006/115 to be interpreted as meaning that "lending" within the meaning of those provisions includes the making available for use of copyright-protected novels, collections of short stories, biographies, travelogues, children's books and youth literature, other than for direct or indirect economic or commercial advantage, by a publicly accessible establishment

— by placing a digital copy (reproduction A) on the server of the establishment and enabling a user to reproduce that copy by downloading it onto his own computer (reproduction B),

— in such a way that the copy made by the user when downloading (reproduction B) is no longer usable after the expiry of a given period, and

— in such a way that other users cannot download the copy (reproduction A) onto their computers during that period?

(2) If question 1 is answered in the affirmative, does Article 6 of Directive 2006/115 and/or any other provision of EU law preclude Member States from making the application of the restriction on the lending right referred to in Article 6 of Directive 2006/115 subject to the condition that the copy of the work made available by the establishment (reproduction A) has been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the rightholder or with his consent, within the meaning of Article 4(2) of Directive 2001/29?

(3) If question 2 is answered in the negative, does Article 6 of Directive 2006/115 impose other requirements concerning the source of the copy (reproduction A) made available by the establishment, such as a requirement that the copy has been obtained from a legal source?

(4) If question 2 is answered in the affirmative, is Article 4(2) of Directive 2001/29 to be interpreted as meaning that the "first sale or other transfer of ownership" of material referred to in that provision includes the making available for use, remotely by downloading, for an unlimited period, of a digital copy of copyright-protected novels, collections of short stories, biographies, travelogues, children's books and youth literature?'

19. The order for reference was received at the Court on 17 April 2015. Written observations were lodged by VOB, NUV, Lira and Pictoright, the German, Greek, French, Italian, Latvian, Portuguese and United Kingdom Governments and the European Commission. A hearing was held on 9 March 2016 which was attended by VOB, NUV, Lira and Pictoright, the Czech, Greek and French Governments and the Commission.

**Assessment**

20. The national court has referred four questions for a preliminary ruling. The first of them is of capital importance, since it raises the issue of whether or not the lending of electronic books may fall within the scope of Directive 2006/115. If that first question is answered in the negative, the other questions will no longer be relevant. I shall therefore focus my analysis on the first question. The second, third and fourth questions concern the conditions which electronic books must fulfil in order potentially to be lent under the public lending derogation. I shall deal with them briefly together.

*The first question*

Preliminary observations

21. By its first question, the national court asks, in substance, whether Article 1(1) of Directive 2006/115, read together with Article 2(1)(b) of that directive, is to be interpreted as meaning that the making available to the public, for a limited period of time, of electronic books by public libraries falls within the scope of the lending right enshrined in Article 1.

22. In accordance with the subject matter of the main proceedings, as defined in the application lodged by VOB, the referring court restricts its question to 'novels, collections of short stories, biographies, travelogues, children's books and youth literature'. However, whilst I can accept that the issue before the Court in the present case is confined to electronic books, to the exclusion of the other categories of subject matter protected by the lending right,[6] I find it difficult to circumscribe that issue in the way that the referring court does. Indeed, the category of literary works which the referring court identifies is not, in my opinion, determined by reference to any objective criteria such as might justify a different legal treatment of that category of works. The Court's answer to the first question referred for a preliminary ruling must therefore apply, without distinction, to works of all types that exist in the form of an electronic book.

23. It is, in my opinion, vital that the interpretation of Directive 2006/115 should meet the needs of contemporary society and make it possible to reconcile the various interests at stake. At the same time, that interpretation must be consistent with the European Union's international obligations and the reasoning underlying other acts of EU law in the field of copyright. I shall now address those various issues.

---

6 — Differential treatment does appear to be permitted by the wording itself of Article 6 of Directive 2006/115, paragraph 2 of which contemplates the possibility of not applying the lending right to phonograms, films and computer programs, subject to the introduction of remuneration for authors. Moreover, since phonograms (including audio books) and videograms are usually recorded on a physical device, the fact that they are included, in that form, within the scope of the lending right does not cause a problem. That, however, is manifestly not the case with electronic books, which are normally distributed only through downloading.

*The axiological basis for an interpretation of Directive 2006/115 that reflects current interests*

24. Directive 2006/115 is not a new normative act. It is, in fact, a codification of Council Directive 92/100/EEC of 19 November 1992 on rental right and lending right and on certain rights related to copyright in the field of intellectual property,[7] which is one of the first two acts of secondary law in the field of copyright.[8] In so far as concerns the lending right, Directive 92/100 was never substantially altered, neither when it was codified by Directive 2006/115 nor prior to that. The provisions governing the lending right currently in force are therefore essentially the same as those adopted in 1992.

25. It is, I think, undeniable that, at that time, the EU legislature did not contemplate the inclusion of the lending of electronic books within the concept of lending of Directive 92/100, if for no other reason than because the technology for commercially viable electronic books was then only in its infancy. Moreover, in so far as the Commission expressly stated, in its explanatory memorandum to that directive, that the directive did not apply to the making available to the public of works via electronic data transmission (downloading), it was referring solely to phonograms and videograms.[9] It did not even mention the downloading of books.

26. Does that mean that the provisions of Directive 2006/115 must still be interpreted today in such a way as to exclude the lending of electronic books from the concept of lending for the purposes of that directive? I think not, for three sets of reasons.

27. First of all, I take the view that it is imperative to give legal acts an interpretation which takes into account developments in technology, markets and behaviour and not to fix such acts in the past by adopting too rigid an interpretation.[10]

28. An interpretation of this kind, which might be described as 'dynamic' or 'evolving', is, in my opinion, necessary, particularly in fields where technological progress has a profound effect, such as copyright. Indeed, technological progress today is so rapid that it easily outstrips the legislative process, such that attempts to adapt legal provisions by that means are often defeated, with legal acts becoming obsolete the moment they are adopted or shortly thereafter. Directive 2006/115 is itself a perfect illustration of the phenomenon. Its provisions on renting, which were intended to regulate the market for the renting of cassettes, CDs and DVDs, are now outdated because the renting of phonograms and videograms, at least on the European market, has all but given way to online availability.[11] The anachronistic character of obsolete legal rules is a common source of interpretative problems, uncertainty and juridical lacunae. In such cases, only an adjusted judicial interpretation will be able to ensure the effectiveness of the legislation in question in a sector experiencing such rapid technological and economic development.

---

7 — OJ 1992 L 346, p. 61.

8 — The other being Council Directive 91/250/EEC of 14 May 1991 on the legal protection of computer programs (OJ 1991 L 122, p. 42).

9 — COM(90) 586 final, pp. 33 to 35. Similarly, academic authorities who accepted that the directive applied to digital lending and renting did not contemplate its application to books, but only to phonograms and videograms. 'Digital' renting was, in their eyes, more akin to a type of television broadcast 'video on demand' (see Reinbothe, J., von Lewinsky, S., *The EC directive on rental and lending rights and on piracy*, Sweet & Maxwell, London, 1993, pp. 41 and 42).

10 — The fact that the United States Constitution of 1787 can still apply and the fact that certain clauses of the Magna Carta of 1215 can still be part of the legal order of the United Kingdom of Great Britain and Northern Ireland is due in part to the fact that the interpretation they are given is not of the era of George Washington or of King John, but one that has been adapted to modern times.

11 — This phenomenon of accelerated obsolescence also affects academic writing, one author observing 'Looking at a book written … 15 years ago, entitled *Internet and the Law*, my own book on interactive television of 5 years ago, and an article on the conservation of works on the Internet of 3 years ago, I note with regret how out of date they have become' (Markiewicz, R., 'Internet i prawo autorskie — wykaz problemów i propozycje ich rozwiązań' in *Zeszyty naukowe Uniwersytetu Jagiellońskiego. Prace z prawa własności intelektualnej*, 2013/121, p. 5). What might one say then of a directive the original version of which is almost 25 years old?

29. Such an approach also seems to be consistent with the legislature's intentions when adopting EU laws in the field of copyright. Indeed, recital 4 of Directive 2006/115 states that 'copyright ... must adapt to new economic developments ...'. That same desire to adapt to new technological and economic developments is also apparent from recitals 2, 5 and 8 of Directive 2001/29, which remains the principal act of EU law in the field of copyright. How could such adaptation and 'updating' of legislative provisions be achieved other than by giving them an adequate interpretation?

30. The lending of electronic books is the modern equivalent of the lending of printed books. I do not concur with the argument put forward in this case that there is a fundamental difference between electronic books and traditional books, or between the lending of electronic books and the lending of printed books. Clearly, electronic books take a different format, one that is perhaps more convenient is certain situations (and less so in others) and support certain functions, such as text searching and translation, that printed books cannot. Those characteristics are nevertheless secondary and their importance will depend on the subjective preferences of each user. The same applies to the argument that the fundamental advantage of digital lending lies in the fact that it does not require the user physically to go to a library, since it is a remote process. One could legitimately reply that some people prefer to go to a library, for the human contact.

31. However, what is in my opinion decisive is the objective element: in borrowing a book, either traditional or electronic, from a library a user wishes to acquaint himself with the content of that book, without keeping a copy of it at home. From that point of view there is no substantial difference between a printed book and an electronic book or between the methods by which they are lent.

32. The interpretation of Directive 2006/115 must therefore take that reality into account and align the legal framework for the lending of electronic books with that for the lending of traditional books.

33. Secondly, the main purpose of copyright is to protect the interests of authors. It is not by chance that, in the main proceedings, the organisations which represent the interests of authors, Lira and Pictoright, have intervened in support of the form of order sought by VOB. This might seem paradoxical, but it is a consequence of the market forces which currently prevail in the field of lending electronic books.

34. Indeed, such a market does exist and libraries do indeed lend books in electronic form. However, since this type of lending is not regarded as being covered by the concept of lending for the purposes of Directive 2006/115, it cannot benefit from the derogation for public lending provided for in Article 6(1) of the directive. The lending of electronic books is therefore arranged under licensing agreements concluded between libraries and publishers. For a specially negotiated fee, publishers will make available to libraries electronic books which the libraries then have the right to lend to users. According to the assertions of Lira and Pictoright, these contractual relationships are principally of benefit to publishers or other intermediaries in the electronic book trade, while no adequate remuneration is received by authors.

35. If, on the other hand, digital lending were regarded as falling within the scope of Directive 2006/115, and thus within the scope of the derogation provided for in Article 6(1) thereof, authors would as a result receive remuneration, in accordance with the requirement laid down in that provision, in addition to that generated by the sale of books and independently of agreements concluded with publishers.

36. Not only would an interpretation of Directive 2006/115 according to which digital lending fell within the concept of 'lending' not be detrimental to the interests of authors, it would also make it possible for their interests to be protected better than they can be in the current climate, which is governed solely by the laws of the market.

37. Thirdly and lastly, the considerations which lead me to favour an interpretation of Directive 2006/115 that takes technological developments into account are those which I mentioned in the introductory part of this Opinion. Since time immemorial, libraries have lent books without having to seek authorisation. Some of them, legal deposit libraries, have not even had to purchase their own copies. That may be explained by the fact that books are not regarded as an ordinary commodity and that literary creation is not a simple economic activity. The importance of books for the preservation of, and access to culture and scientific knowledge has always taken precedence over considerations of a purely economic nature.

38. Today, in the digital age, libraries must be able to continue to fulfil the task of cultural preservation and dissemination that they performed when books existed only in paper format. That, however, is not necessarily possible in an environment that is governed solely by the laws of the market. First, libraries, and public libraries especially, do not always have the financial means to procure electronic books, with lending rights, at the high prices demanded by publishers. That applies especially to libraries operating in disadvantaged areas, where their role is most important. Secondly, publishers and intermediaries in the electronic book trade are often reticent to conclude agreements with libraries to enable them to lend electronic books. In fact, they fear that such lending will be detrimental to their interests in that it will reduce sales or prevent them from developing their own business models for making material available for a limited period of time. Consequently, they either contractually limit the opportunities which libraries have of lending electronic books, for example by stipulating a maximum number of loans or a period after publication of a book during which it may not be lent, or they refuse to enter into such contractual relations with libraries.[12]

39. Without the privileges which flow from a derogation from the exclusive lending right, libraries are therefore in danger of no longer being able to perpetuate, in the digital environment, the role which was always theirs in the era of printed books.

40. For the reasons which I have set out above, I am of the opinion that it is necessary, when interpreting the concept of 'lending' for the purposes of Directive 2006/115, not to be bound by what might have been in the mind of the EU legislature when it initially adopted the directive (that is to say, Directive 92/100), but instead to give a definition which is in step with developments in technology and in the market since that time. It is now necessary to analyse whether such an interpretation indeed follows from the wording of the provisions of Directive 2006/115 itself and whether it is consistent with other European Union legal texts in the field of copyright and with the European Union's international obligations.

---

[12] — For more extensive information on how digital lending works, see the report by Mount, D., for Taalunie, Bibnet and Bibliotheek.nl, *A Review of Public Library E-Lending Models*, December 2014 (http://stichting.bibliotheek.nl), cited by Lira and Pictoright in their written observations. See also the European Bureau of Library, Information and Documentation Associations (EBLIDA) position paper *The Right to E-read*, May 2014, www.eblida.org; Davies, P., op. cit.; Dusollier, S., op. cit.; the International Federation of Library Associations and Institutions (IFLA) 2014 eLending Background Paper, www.ifla.org; Fischman Afori, O., 'The Battle Over Public E-Libraries: Taking Stock and Moving Ahead' in *International Review of Intellectual Property and Competition Law*, 2013, p. 392; Matulionyte, R., op. cit.; and, concerning the American market, O'Brien, D.R., Gasser, U., Palfrey, J., 'E-books in Libraries, A Briefing Document developed in preparation for a Workshop on E-Lending in Libraries', *Berkman Center Research Publication* No 2012-15.

The consistency of the proposed interpretation with the texts in force

– The wording and structure of Directive 2006/115

41. In order to analyse whether the proposed interpretation follows from the wording and structure of Directive 2006/115, it is necessary first of all to take account of the objectives of the exclusive lending right and of the derogation from that right for public lending. In so far as the exclusive lending right is concerned, its objective is to ensure that authors receive adequate remuneration from this form of exploitation of their works. Given that the exploitation of electronic books by way of lending is a reality, it seems to me entirely coherent for that form of lending to be included within the scope of the exclusive lending right.

42. In so far as concerns the objective of the public lending derogation, I have already set out the arguments which, in my opinion, militate in favour of allowing public libraries to benefit from that derogation in connection with the lending of electronic books.[13]

43. Secondly, it is necessary to consider whether the wording of Directive 2006/115 permits an interpretation of its provisions on lending which includes the lending of electronic books. It may be recalled that Article 1(1) of that directive provides that 'Member States shall provide … a right to authorise or prohibit the … lending of *originals and copies* of copyright works …'.[14] It could, therefore, be argued that the mention of originals and copies restricts the scope of the lending right to works that are recorded on a physical medium, with which they are lent. That would exclude electronic books, which are usually made available via electronic data transmission or downloading and thus without any connection to the physical medium.[15] However, I do not think that such an interpretation is correct.

44. In my opinion, copies, for the purposes of the provision under consideration, must not be equated solely with physical copies of a work. Indeed, a copy is merely the result of an act of reproduction and a work exists only in the form of the original and the copies thereof, which are the result of the reproduction of the original. While traditional copies, in the case of books in printed form, are necessarily contained in a physical medium, that is not so of electronic copies. It is also interesting to note that the French-language version of the proposal which led to Directive 92/100 did not use the term 'copie, but 'reproduction'.[16] To assert that the reproduction of a work does not consist in the creation of a copy would be contrary to the logic underlying copyright.

45. Nor do I think that the fact that Article 2(1)(b) of Directive 2006/115, in the French-language version, refers to the lending of 'objets' can preclude an interpretation of the directive which includes the lending of electronic books. First of all, the addition of this word 'objets' does not appear in all language versions. On the contrary, most versions merely refer to 'lending'.[17] Secondly, Directive 2006/115 uses the term 'objets' to designate all the subject matter of the rental and lending right, which is listed in Article 3(1) thereof.[18] The word therefore has no independent meaning other than that which, in so far as works are concerned, is conveyed by the terms 'original' and 'copies'.

---

13 — See, in particular, points 33 to 39 of this Opinion.
14 — My emphasis.
15 — The physical medium is initially the server of the establishment which makes the electronic book available and then the computer or other digital equipment of the user. The connection with the physical medium is therefore broken during the transmission.
16 — COM(90) 586 final (OJ 1991 C 53, p. 35). This analysis is also corroborated by the German-language version of Directive 2006/115, which employs the term 'Vervielfältigungsstück', which evokes the act of reproduction ('Vervielfältigung' — see Article 2 of the German version of Directive 2001/29). See also, to that effect, Gautrat, P., 'Prêt public et droit de location: l'art et la manière' in *RTD Com.*, 2008, p. 752 (paragraph 16).
17 — See, for example, the German-, Polish- and English-language versions of the directive.
18 — Namely, originals and copies of works, fixations of performances, phonograms and films.

Case 1:20-cv-04160-JGK-OTW   Document 170-8   Filed 09/02/22   Page 12 of 20

OPINION OF MR SZPUNAR — CASE C-174/15
VERENIGING OPENBARE BIBLIOTHEKEN

46. Thirdly, as regards the argument raised by the French Government that the principle that exceptions must be interpreted strictly militates against broadening the scope of the concept of 'lending' to include the lending of electronic books, it should be observed that the issue here is the interpretation not of an exception but of the rule, that is to say the scope of the lending right provided for in Article 1(1) of Directive 2006/115.

47. Furthermore, as regards the derogation provided for in Article 6(1) of Directive 2006/115, it must be borne in mind that, while exceptions to copyright must be interpreted strictly, their interpretation must nevertheless enable the effectiveness of the exception to be safeguarded and permit observance of the exception's purpose.[19] Too restrictive an interpretation of the concept of lending would undermine the effectiveness and purpose of the derogation in so far as the lending of electronic books is concerned.

48. For those reasons, I think that an interpretation of the concept of lending which includes the lending of electronic books is contrary to neither the objective nor the wording of Directive 2006/115.

– Coherence within the copyright system under EU law

49. In the present case, it has been argued by NUV and the German and French Governments that broadening the scope of application of the concept of 'lending' for the purposes of Directive 2006/115 to include the lending of electronic books would be inconsistent with other European Union legal texts in the field of copyright, and principally with Directive 2001/29. They allege, first of all, a terminological incompatibility, inasmuch as certain terms, such as 'copy' and 'object' are used in ways that are incompatible with the concept of digital lending. Secondly, such a broad interpretation of the concept of lending would conflict with the right of communication to the public and the right to make works available to the public, enshrined in Article 3 of Directive 2001/29. According to that argument, the lending of electronic books falls within the scope of the right to make works available to the public, from which there is no derogation of the kind provided for in Article 6(1) of Directive 2006/115. Consequently, the inclusion of digital lending in Directive 2006/115 and the application of the derogation would be an infringement of Article 3 of Directive 2001/29.

50. In so far as the first of those arguments is concerned, I must observe that, if the principle of perfect terminological consistency within European Union copyright law had to be applied unconditionally, it would then be necessary to adopt the definitions of certain concepts, such as 'copy', 'sale' and 'distribution', given by the Court of Justice in its judgment in *Usedsoft*.[20] Indeed, that judgment, delivered by the Grand Chamber and concerning the interpretation of Directive 2009/24/EC of the European Parliament and of the Council of 23 April 2009 on the legal protection of computer programs,[21] is the only judgment to date in which the Court has interpreted certain concepts of copyright law in the context of the digital environment.

51. Thus, on the basis of provisions which use substantially the same terminology as Directive 2001/29,[22] the Court held that what was downloaded via the internet was a *copy* of a work, in that case a computer program,[23] and that such downloading, accompanied by a user licence of indefinite duration, constituted a *sale* of the copy in question entailing the exhaustion of the right to distribute that copy.[24]

---

19 — See, in particular, judgments of 4 October 2011 in *Football Association Premier League and Others*, C-403/08 and C-429/08, EU:C:2011:631, paragraph 163, and 3 September 2014 in *Deckmyn and Vrijheidsfonds*, C-201/13, EU:C:2014:2132, paragraph 23.
20 — Judgment of 3 July 2012, C-128/11, EU:C:2012:407.
21 — OJ 2009 L 111, p. 16.
22 — The principal terms in question being 'copy', 'reproduction' and 'sale'.
23 — Judgment of 3 July 2012 in *Usedsoft*, C-128/11, EU:C:2012:407, in particular paragraphs 35, 37 and 47.
24 — Judgment of 3 July 2012 in *Usedsoft*, C-128/11, EU:C:2012:407, paragraphs 47 and 48.

52. In accordance with the principle of terminological consistency, rigorously applied, the term 'copy' used in both Directive 2001/29 and Directive 2006/115 ought to be understood as including digital copies with no physical medium. That same principle would also afford a simple solution to the problem, widely debated by legal theoreticians and present also in this case, of the exhaustion of the distribution right following a sale by electronic data transmission. Indeed, Article 4(2) of Directive 2001/29 is formulated, in substance, in identical terms to Article 4(2) of Directive 2009/24 and consequently it ought, in principle, to be interpreted in identical fashion.

53. If, on the other hand, it was considered that the same terms may, in the context of Directive 2001/29, be interpreted differently from the way in which the Court interpreted them in its judgment in *Usedsoft* in the context of Directive 2009/24, then I see no reason why that same 'terminological autonomy' should not apply in the relationship between Directive 2001/29 and Directive 2006/115.[25]

54. I must also add that, in my view, the judgment in *Art & Allposters International*[26] neither calls into question nor limits in any way the conclusions which follow from the *Usedsoft* judgment. The former judgment concerned the transfer of a work by means of a chemical, rather than a digital process directly from one physical medium (paper) to another physical medium (canvas). It was in that context that the Court held in that judgment that, in establishing the distribution right, the EU legislature wished to give authors control over the initial marketing in the European Union of *each* tangible object incorporating their work,[27] whereas the replacement of the medium resulted in the creation of a new (tangible) object[28] and there could therefore be no question of exhaustion of the distribution right.[29] However, that case in no way touched upon the question of whether the distribution right could be exhausted after the transfer of ownership of a digital copy of a work.

55. In so far as concerns the second argument mentioned in point 49 above, which concerns the right of communication to the public and the right to make works available to the public, suffice it to observe that Directive 92/100 predates Directive 2001/29 and that the latter directive, in accordance with recital 20 and Article 1(2)(b) thereof, leaves intact and in no way affects provisions of EU law already in force relating, inter alia, to the lending right provided for in Directive 92/100 (codified by Directive 2006/115). Directive 92/100 therefore constitutes a *lex specialis* vis-à-vis Directive 2001/29. Moreover, the same argument was raised in the case which gave rise to the judgment in *Usedsoft* and the Court responded to it in similar fashion.[30] The classification of the lending of electronic books as 'lending' for the purposes of Directive 2006/115 would therefore not be in contradiction with Article 3 of Directive 2001/29.

56. It has also been argued that the lending of electronic books implies, in addition to the act of lending in the strict sense, acts of reproduction on the part of both the library and the user, which could infringe the exclusive right of authors to authorise or prohibit such reproduction, enshrined in Article 2 of Directive 2001/29.

---

25 — This assertion does not appear to me to be invalidated by the very recent judgment of 31 May 2016 in *Reha Training* (C-117/15, EU:C:2016:379). In that case, the Court was asked to rule on an alleged difference in interpretation, in its case-law, of the concept of 'communication to the public' within the context of Directive 2001/29 and that of Directive 2006/115. Repeating the wording of a previous judgment, the Court held that the concepts used by the two directives at issue must have the same meaning, unless the EU legislature has, in a specific legislative context, expressed a different intention (paragraph 28). However, the fact that the concept of 'communication to the public' must be interpreted in the same way in the context of those two directives seems to me to be in no way disputed. Moreover, the summary of the previous case-law, contained in paragraphs 35 to 52 of the judgment in *Reha Training*, shows no inconsistency in the interpretation of that concept. However, concerning the concept of 'copy', the legislature stated clearly, in recital 29 of Directive 2001/29, the specific context in which that notion is used in that directive, namely that of the distribution right, the exhaustion of which cannot occur because of online distribution. However, such a limitation of the concept of 'copy' — which includes, in my view, digital copies (see point 44 of this Opinion) — is unnecessary with regard to the lending right governed by Directive 2006/115 because, in any event, that right cannot be exhausted, irrespective of how the concept of 'copy' is defined.

26 — Judgment of 22 January 2015, C-419/13, EU:C:2015:27.

27 — Judgment of 22 January 2015 in *Art & Allposters International*, C-419/13, EU:C:2015:27, paragraph 37.

28 — Ibid., paragraph 43.

29 — Ibid., paragraph 49 and operative part.

30 — Judgment of 3 July 2012 in *Usedsoft*, C-128/11, EU:C:2012:407, paragraph 51.

57. However, in so far as concerns reproductions made by libraries, they are, in my opinion, covered by the exception to the reproduction right provided for in Article 5(2)(c) of Directive 2001/29, read in the light of the Court's judgment in '*Technische Universität Darmstadt*'.[31] That provision provides for an exception to the reproduction right for 'specific acts of reproduction made by publicly accessible libraries … which are not for … economic … advantage'. In the abovementioned judgment, the Court held that that exception could apply so as to enable libraries to complete acts of communication to the public under another exception, provided for in Article 5(3)(n) of Directive 2001/29.[32] By analogy, the exception under Article 5(2)(c) of the same directive ought to come into play to enable libraries to benefit from the derogation from the lending right provided for in Article 6(1) of Directive 2006/115.

58. In so far as concerns the reproduction made by a user on his computer or any other electronic reading device when downloading a book borrowed from a library, that is, in my opinion, covered by the mandatory exception provided for in Article 5(1) of Directive 2001/29. Indeed, such a reproduction is temporary, since the copy made on the user's equipment will be deleted or deactivated automatically at the end of the loan period. It is also incidental and an integral part of a technological process, that is to say, downloading. Lastly, the only purpose of such a reproduction is to enable a lawful use to be made of the work, namely use in the context of a digital loan. Neither does it have any independent economic significance. Such a reproduction therefore fulfils the conditions listed in Article 5(1) of Directive 2001/29, as interpreted in the case-law of the Court.[33]

59. Lastly, the argument has been raised in this case, by the French Government in particular, that the differential treatment, for value added tax purposes, of books in a physical medium and books distributed by electronic data transmission, which the Court accepted in its judgments in *Commission* v *France*[34] and *Commission* v *Luxembourg*,[35] demonstrates that those two book formats are not equivalent. I must nevertheless observe, first of all, that the question in the present case is not whether printed books and electronic books are comparable, but whether the lending of electronic books is equivalent to the lending of traditional books. As I observed in point 31 of this Opinion, the two types of lending are, in my view, equivalent in so far as concerns their essential and objectively relevant characteristics.

60. Secondly, it must be observed that the approach adopted by the Court in those two judgments was based on the wording of provisions of EU law relating to value added tax (VAT) which, in treating supplies provided digitally as services, did not permit the application of a reduced rate of VAT to books having no physical medium. However, lending, whether it is of an electronic book or a printed book, is always a service, and consequently the distinction drawn in the case-law mentioned does not apply.

---

31 — Judgment of 11 September 2014 in *Eugen Ulmer*, C-117/13, EU:C:2014:2196.
32 — Judgment of 11 September 2014 in *Eugen Ulmer*, C-117/13, EU:C:2014:2196, paragraphs 43 to 46.
33 — See judgments of 4 October 2011 in *Football Association Premier League and Others*, C-403/08 and C-429/08, EU:C:2011:631, paragraphs 161 to 180, and 5 June 2014 in *Public Relations Consultants Association*, C-360/13, EU:C:2014:1195, paragraphs 22 to 52, in particular paragraphs 29 to 33.
34 — Judgment of 5 March 2015, C-479/13, EU:C:2015:141.
35 — Judgment of 5 March 2015, C-502/13, EU:C:2015:143.

61. Moreover, the distinction thus drawn between printed books and digital books raises serious questions concerning its consistency with the principle of tax neutrality, which is the expression in the fiscal sphere of the principle of equality.[36] I would observe that the Commission has recently published an action plan on VAT in which it specifically contemplates the alignment of the VAT rate applicable to digital books and newspapers with that applicable to printed books.[37] That approach confirms the stance taken by the Commission, also in the present case, that electronic books and printed books are in substance equivalent.

62. I conclude from the foregoing considerations that an interpretation of the concept of 'lending' for the purposes of Article 1(1) of Directive 2006/115 which includes the lending of electronic books and thus permits the application of the derogation from the lending right provided for in Article 6(1) of that directive is in no way incompatible or inconsistent with the body of provisions of EU law in the field of copyright.

– Consistency with international obligations

63. The European Union is a contracting party to several international conventions in the field of copyright, in particular the World Intellectual Property Organisation Copyright Treaty (WCT), adopted in Geneva on 20 December 1996.[38] Acts of secondary law must therefore be consistent with — and must also be interpreted consistently with — that treaty.[39] It is therefore necessary to ascertain whether an interpretation of the concept of 'lending' for the purposes of Article 1(1) of Directive 2006/115 that includes the lending of electronic books may be reconciled with the Copyright Treaty.

64. That treaty contains no provisions relating to the lending right. At best, Article 7 thereof deals with the right of commercial rental, that is to say, the rental for remuneration of computer programs, cinematographic works and works embodied in phonograms.[40] Neither public lending nor electronic books are covered by that provision.

65. If lending, or in any event the lending of electronic books, is covered by the Copyright Treaty, it is because it constitutes a specific form of use of the right of communication to the public, enshrined in Article 8 of the treaty.[41] In principle, that right is transposed into EU law by Article 3 of Directive 2001/29. However, Directive 2006/115 constitutes a *lex specialis* vis-à-vis Directive 2001/29, including Article 3 thereof.[42]

66. Article 10(1) of the Copyright Treaty provides that the contracting parties may lay down limitations on and exceptions to the rights enshrined in the treaty, provided that they are restricted to 'special cases that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author'. Those conditions are commonly referred to as 'the three-stage test'. In my view, the public lending derogation provided for in Article 6(1) of Directive 2006/115 fulfils, in so far as the lending of electronic books is concerned, those three conditions.

---

36 — See the request for a preliminary ruling lodged by the Polish Constitutional Court in *Rzecznik Praw Obywatelskich* (C-390/15), currently pending before the Court.

37 — Communication from the Commission to the European Parliament, the Council and the European Economic and Social Committee of 7 April 2016 — Towards a single EU VAT area — Time to decide (COM(2016) 148 final), p. 12.

38 — Treaty approved on behalf of the European Community by Council Decision 2000/278/EC of 16 March 2000 (OJ 2000 L 89, p. 6).

39 — See, to that effect, judgment of 22 January 2015 in *Art & Allposters International*, C-419/13, EU:C:2015:27, paragraph 38 and the case-law cited).

40 — See Article 7(1) of the Copyright Treaty.

41 — Article 8 provides that '… authors of literary and artistic works shall enjoy the exclusive right of authorising any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them'.

42 — See point 55 of this Opinion.

67. First, as regards the condition that the exception must relate to special cases, I would observe that the derogation for public lending is restricted in two ways: it does not extend to all forms of communication to the public, but only one particular form, namely lending, or in other words, the making available of works for a limited period of time, and the only beneficiaries of the derogation are establishments (libraries) open to the public which derive no profit from their lending activities. Moreover, the public lending derogation pursues a legitimate aim in the public interest which is, in the broadest terms, universal access to culture.

68. Secondly, as regards the condition that there must be no conflict with a normal exploitation of the work, it has been asserted, in particular by NUV in its observations, [43] that the lending of electronic books by electronic data transmission (downloading), by contrast with the traditional lending of printed books, is so similar to the usual forms of distribution of such books that it does conflict with the normal exploitation of copyright in that it too easily substitutes for the purchase of books on the market. That, it submits, is mainly because, with digital lending, there is no need for the user physically to go to a library and so it is comparable to purchasing over the internet, and because electronic books which are borrowed from libraries do not deteriorate with use and are thus identical in one respect to purchased books, that it to say, they are always 'new'. Furthermore, the ease with which electronic books can be reproduced without any loss of quality increases the risk of usage that goes beyond what is permitted in the context of lending.

69. However, those arguments fail to take into account the other characteristics of the lending of electronic books which distinguish such lending from purchasing. First of all, digital lending is limited in time and thus merely enables a user to acquaint himself with the content of a book, without keeping a copy of it. Next, the opportunities for such lending are limited by the number of copies (digital copies) at a library's disposal and so users are not certain of being able to borrow a given electronic book when they want to. Lastly, several studies show that the lending of books, either traditional or electronic, does not reduce the volume of book sales but may instead increase it by encouraging reading habits. [44]

70. The mere fact that certain electronic book sellers have developed business models similar to digital renting cannot by itself constitute an obstacle to the application of the public lending derogation to electronic books. Indeed, that derogation pursues a legitimate objective in the public interest that cannot be restricted to areas that are not touched by economic activity. Otherwise any lending activity could be displaced by commercial renting, of either tangible or intangible goods, and thus render the derogation entirely redundant.

71. On the other hand, the fact that publishers and intermediaries offer libraries licences for digital lending and are developing their own renting models, in the sense of the making available of works for a limited period of time, demonstrates that digital lending as such does not work against the exploitation of copyright, contrary to what is sometimes asserted.

72. In so far as concerns the risks associated with the lending of electronic books, I would observe that technological protection measures, which today are used universally, such as automatic deactivation of the copy after the expiry of the loan period, print prevention and the blocking of further copying, make it possible to limit those risks substantially.

---

43 — See also Matulionyte, R., op. cit.
44 — Dusollier, S., op. cit., EBLIDA, op. cit., p. 13 and the documents cited, and Matulionyte, R., op. cit. and the documents cited.

73. In any event, it is ultimately up to the Member States, if they wish to introduce the public lending derogation for electronic books, to structure the rules of that derogation in such a way that that form of lending really is the functional equivalent of traditional lending and that it does not conflict with the normal exploitation of copyright. Solutions such as the 'one copy one user' model, at issue in the main proceedings, or the compulsory use of technological protection measures, should make that achievable.

74. Thirdly and lastly, in accordance with the last condition, the derogation must not unreasonably prejudice the legitimate interests of authors. Those interests, in so far as concerns the exploitation of copyrights, are principally economic in nature. In an environment governed solely by the laws of the market, the ability of authors to protect their own interests depends above all on their negotiating power vis-à-vis publishers. Some are certainly capable of obtaining satisfactory terms, others are not, as is demonstrated by the position which Lira and Pictoright have expressed in the present case. Article 6(1) of Directive 2006/115 provides that, where the public lending derogation is introduced, authors should obtain remuneration. Since that remuneration is unconnected with negotiations between author and publisher, not only does it enable the legitimate interests of authors to be safeguarded, but it could also be more advantageous for them.

75. Article 8 of the Copyright Treaty, read together with Article 10 thereof, does not therefore, in my opinion, preclude the concept of lending for the purposes of Article 1(1) of Directive 2006/115 from being interpreted in such a way as to include the lending of electronic books.

76. It could be objected that the terms 'original' and 'copies' used in Directive 2006/115 must be understood in the same way as the terms 'original' and 'copies' used in Articles 6 and 7 of the Copyright Treaty. According to the agreed statement concerning those two articles annexed to the treaty, those terms 'refer exclusively to fixed copies that can be put into circulation *as tangible objects*'.[45] That would therefore exclude the lending of electronic books from the concept of the 'lending of originals and copies' in Directive 2006/115.

77. However, those provisions of the Copyright Treaty concern the right of distribution (Article 6) and the right of commercial rental of subject matter other than books (Article 7). Therefore, I do not think that that agreed statement, applied by analogy to Directive 2006/115, can prevent those terms from being interpreted in a different fashion in connection with a form of exploitation covered by Article 8 of the treaty.

78. Moreover, while the Court held, in its judgment in *Usedsoft*,[46] in connection with the right of distribution of computer programs, which clearly falls within the scope of the agreed statement in question, that the right of distribution and the principle of its exhaustion applied equally to sales by *electronic data transmission* (downloading), then, *a fortiori*, the same could apply in the case of lending, which does not fall within the scope of the distribution right or the lending right.

Conclusion on the first question referred for a preliminary ruling

79. The considerations set out above may be summarised as follows. The lending of electronic books by public libraries is not a project for the future, and still less is it merely 'wishful thinking'. Quite the contrary, it is a phenomenon that actually exists. However, as a result of the restrictive interpretation of the concept of the 'lending right' which is prevalent in the Member States, that phenomenon is entirely subject to the laws of the market, by contrast with the lending of traditional books, which benefits from rules which are favourable to libraries. An adjusted interpretation of the existing legislative framework is therefore necessary, in my opinion, in order to enable libraries to benefit from those same favourable conditions in the contemporary digital environment. Such an interpretation

---

45 — My emphasis.
46 — Judgment of 3 July 2012, C-128/11, EU:C:2012:407.

would not only be in the public interest of access to science and culture, it would also be in the interests of authors. At the same time, it would in no way be contrary to the wording or general structure of the legal texts in force. On the contrary, only an interpretation of that kind will enable those legal texts fully to fulfil the function assigned them by the legislature, which is to adapt the law of copyright to the realities of the information society.

80. I therefore propose that the answer to the first question referred for a preliminary ruling should be that Article 1(1) of Directive 2006/115, read together with Article 2(1)(b) of that directive, is to be interpreted as meaning that the lending right enshrined in Article 1 includes the making available to the public of electronic books by libraries for a limited period of time. Member States that wish to introduce the derogation provided for in Article 6 of the same directive for the lending of electronic books must ensure that the way in which that lending is carried out is not in conflict with the normal exploitation of works and does not unreasonably prejudice the legitimate interests of authors.

*The second to fourth questions*

81. The second to fourth questions referred for a preliminary ruling, which should in my view be analysed together, concern possible requirements as to the source of copies lent by libraries which the national legislature would be entitled to establish when introducing the derogation from the lending right provided for in Article 6(1) of Directive 2006/115 for the lending of electronic books. The referring court wishes to ascertain, in substance, whether that provision is to be interpreted as meaning that the national legislature is authorised to require that copies of electronic books lent by libraries have been put into circulation by a first sale or other transfer of ownership in the European Union by the rightholder or with his consent, within the meaning of Article 4(2) of Directive 2001/29. If that question is answered in the affirmative, the referring court asks whether the making available to the public of an electronic book constitutes such a first sale or other transfer of ownership. If, on the other hand, that question is answered in the negative, the referring court asks the Court of Justice about the possibility of introducing other requirements, such as a requirement that the copy being lent has been obtained from a legal source.

82. According to what the referring court has itself stated in its order for reference, those questions are based on the wording of the current provisions of Netherlands law, which imply such a requirement in the context of the derogation for public lending in so far as printed books are concerned. Thus, by referring to Article 4(2) of Directive 2001/29, the referring court has introduced into the present case the question of the exhaustion of the distribution right. However, I think that the mechanism of exhaustion bears no relation to the lending right, which is what is at issue in this case.

83. Indeed, the lending right, as conceived of in Directive 2006/115, is entirely independent of the exhaustion of the distribution right. First of all, in accordance with Article 1(2) of that directive, the rental and lending rights are not exhausted with the exhaustion of the distribution right. In other words, it is not sufficient merely to purchase a copy of a work in order to be able to lend or rent it freely. It is also necessary to acquire, separately, the right to lend or rent that copy, either by obtaining the consent of the rightholder, under a contract, or pursuant to the derogation for public lending provided for in Article 6 of Directive 2006/115, if that provision has been transposed into national law.

84. Secondly, the acquisition of the right to lend or rent a work is in no way dependent, under Directive 2006/115, on the exhaustion of the distribution right. The right to lend or rent may relate, for example, to works that were never intended for public disclosure, such as manuscripts, doctoral theses and so on.

85. If a lending right or rental right is acquired with the consent of the author, it may be assumed that the author's interests are sufficiently protected. If, on the other hand, the lending right arises under the derogation, its application to works that were never intended to be published could prejudice the legitimate interests of authors, and not just their financial interests. It therefore seems to me to that there is justification for Member States requiring, in the context of the derogation provided for in Article 6(1) of Directive 2006/115, that electronic books that are lent should first have been made available to the public by the rightholder or with his consent. Of course, such a limitation must not be formulated in such a way as to restrict the scope of the derogation, including in so far as concerns the format in which works may be lent.

86. Lastly, as regards the question whether the copy of the work must be from a lawful source, the Court has already held, with regard to the private copying exception provided for in Article 5(2)(b) of Directive 2001/29, that that exception does not require copyright holders to tolerate infringements of their rights which may accompany the making of private copies. Accordingly, that provision must be interpreted as not covering the case of private copies made from an unlawful source.[47]

87. The same interpretation must, in my opinion, prevail, by analogy, to the case of the derogation from the lending right provided for in Article 6(1) of Directive 2006/115 in so far as electronic books are concerned. That is *a fortiori* so since that derogation benefits establishments the great majority of which are public and which may legitimately be expected to pay close attention to observance of the law. That last point, it seems to me, needs no further explanation.

88. I therefore propose that the answer to the second to fourth questions referred for a preliminary ruling should be that Article 6(1) of Directive 2006/115 must be interpreted as not precluding Member States which have introduced the derogation provided for in that provision from requiring that electronic books which are lent under that derogation should first have been made available to the public by the rightholder or with his consent, provided that that limitation is not formulated in such a way as to restrict the scope of the derogation. That provision must also be interpreted as applying solely to electronic books obtained from lawful sources.

**Conclusion**

89. In light of all of the foregoing, I propose that the Court's answer to the questions referred by the Rechtbank Den Haag (District Court, The Hague) should be as follows:

(1) Article 1(1) of Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property, read together with Article 2(1)(b) of that directive, is to be interpreted as meaning that the lending right enshrined in Article 1 includes the making available to the public of electronic books by libraries for a limited period of time. Member States that wish to introduce the derogation provided for in Article 6 of the same directive for the lending of electronic books must ensure that the way in which that lending is carried out is not in conflict with the normal exploitation of works and does not unreasonably prejudice the legitimate interests of authors.

(2) Article 6(1) of Directive 2006/115 must be interpreted as not precluding Member States which have introduced the derogation provided for in that provision from requiring that electronic books which are lent under that derogation should first have been made available to the public by the rightholder or with his consent, provided that that limitation is not formulated in such a way as to restrict the scope of the derogation. That provision must be interpreted as applying solely to electronic books obtained from lawful sources.

---

47 — Judgment of 10 April 2014 in *ACI Adam and Others* (C-435/12, EU:C:2014:254, paragraphs 31 and 41).