**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>Plaintiffs,<br><br>v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>Defendants. | Case No. 1:20-CV-04160-JGK |

*REDACTED* **DEFENDANT INTERNET ARCHIVE'S RESPONSE TO PLAINTIFFS'**
**RULE 56.1 STATEMENT AND ADDITIONAL STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S OPPOSITION TO**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

## <u>TABLE OF CONTENTS</u>

**Page**

EVIDENTIARY OBJECTION TO THE MCNAMARA DECLARATION..................................1

RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT ...........................................................3

ADDITIONAL STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT
    INTERNET ARCHIVE'S OPPOSITION TO PLAINTIFFS' MOTION FOR
    SUMMARY JUDGMENT ............................................................................................162

Defendant Internet Archive respectfully submits this evidentiary objection to the Declaration of Elizabeth A. McNamara (ECF No. 96); Response to Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC's (collectively, "Plaintiffs") Rule 56.1 Statement in Support of Plaintiffs' Motion for Summary Judgment (ECF No. 107); and additional statement of material facts in support of the Internet Archive's opposition to Plaintiffs' motion for summary judgment.

## EVIDENTIARY OBJECTION TO THE MCNAMARA DECLARATION

The Court should disregard portions of the declaration of Plaintiffs' counsel Elizabeth A. McNamara ("McNamara Declaration") (ECF No. 96), filed in support of Plaintiffs' motion for summary judgment against the Internet Archive.  The declaration includes improper argument and facts not based on the personal knowledge of Ms. McNamara.

Under Rule 56, a declaration in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  This Court must disregard—and may even strike—portions of a declaration that does not meet these requirements.  *See FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) (citing *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995)).

The McNamara Declaration contains impermissible statements of argument and fact. *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (attorney affirmation with "arguments and factual assertions" was "patently improper in that he could not possibly have personal knowledge of the matters discussed").  Attorney declarations are generally used, "in connection with a summary judgment motion, to place documents produced in discovery before the Court."  *Vantage Point*, 266 F. Supp. 3d at 654 (citation omitted).  The McNamara

Declaration, however, "goes beyond the introduction of documents and veers into legal arguments and factual allegations for which [counsel] has no personal knowledge." *Id.* This Court should disregard the offending portions. *Id.*

Throughout the McNamara Declaration, counsel includes argumentative statements. In Paragraph 14, for example, counsel begins by stating, "Internet Archive's conduct will deprive the Publishers (and their authors) of revenue." After reciting uncited facts and referring to language of one of the Internet Archive's experts, counsel ends with: "This testimony confirms that the logical outcome of [Controlled Digital Lending] is less revenues for the publisher and author of the particular titles IA distributes for free on its website." Beginning and ending a paragraph with conclusions may be a powerful rhetorical device, but, under Rule 56, should be limited to the Plaintiffs' legal brief—not a factual declaration.

The McNamara Declaration's detours into argument get only more frequent. Rather than stating the facts (or purported facts), counsel stretches them, saying that the Internet Archive "admits" it does or doesn't do X and "acknowledges" that it does or doesn't do Y. Counsel delves into partisan analysis, starting paragraphs with "The evidence shows . . . ." and "Nor does the data support . . . ." Indeed, in Paragraph 118, for example, the declaration departs from statements of fact within the declarant's personal knowledge to take the role of advocate ("Any claim that Internet Archive is supposed to be different from aggregators like OverDrive is undermined further by the striking similarity between the two platforms.") and factfinder ("The home page of openlibrary.org strongly resembles the interface that public library patrons use to read authorized ebook via OverDrive."). By the end of the McNamara Declaration, even a subheading includes argument: "Internet Archive's Various and Shifting Policy Rationales for Its Activities Are Not Supported by the Evidence."

The McNamara Declaration also contains several statements of fact—often cited verbatim as an undisputed fact in Plaintiffs' Rule 56.1 Statement, as further addressed below—that are accompanied by no citation in support and nor any foundation for counsel's personal knowledge.  For example, counsel places herself in the role of others, stating, "Internet Archive users view the Website as a substitute for authorized library ebooks" (¶ 121), and, "Moreover, the needs of print disabled readers are already served by HathiTrust" (¶ 122).  Statements such as these are speculative and unsupported and must be disregarded, as "[a]n attorney's affidavit or declaration not based on personal knowledge carries no weight."  *Vantage Point*, 266 F. Supp. 3d at 654 (citing cases in support).

The Internet Archive objects to those portions of the McNamara Declaration that are not directly supported by a citation to admissible evidence or for which that declaration does not lay a foundation for Ms. McNamara's personal knowledge of the fact and urges this Court to disregard them.

## RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT[1]

The below response is made for purposes of Plaintiffs' Motion for Summary Judgment, and reflects an effort to avoid factual disputes regarding matters that are not material to that motion, even where the fact as stated by Plaintiffs is misleading or incorrect.  That the Internet Archive does not dispute a fact herein does not constitute an admission of that fact for any other purpose.

1.  The Plaintiffs are four of the leading book publishers in the United States.

---

[1] The Internet Archive has not imported headings from Plaintiffs' Rule 56.1 Statement.  This is not meant to constitute a concession concerning the assertions in those headings.

**Response:**  Not disputed (but immaterial).

2. Hachette is a publishing company based in New York.  The history of Hachette in the United States stretches back nearly two centuries, to the 1837 founding of Little, Brown and Company ("Little Brown").  Hachette works with bestselling authors who have been awarded Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals and Nobel Prizes.  Last year, Hachette published more than 1,400 adult titles in print and digital format, 300 books for young readers and 450 audio book titles.  Sevier Decl. ¶5.

**Response:**  Not disputed (but immaterial).

3. HarperCollins is a publishing company based in New York.  HarperCollins has more than 200 years of history in the book publishing industry, with a current catalog of in-print works that exceeds 50,000.  Writing in virtually every genre, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among others.  R-A Decl. ¶5.

**Response:**  Not disputed (but immaterial).

4. PRH is a publishing company based in New York.  Its history stretches back to the mid-nineteenth century founding of several venerable imprints—including Putnam (1838, publisher of Herman Melville and Edgar Allan Poe), Dutton (1852, publisher of H.G. Wells and Gore Vidal) and Frederick Warne & Co. (1865, publisher of the Beatrix Potter books).  The global PRH portfolio contains more than 275 independent imprints, which annually publish approximately 15,000 new titles per year.  Each year PRH sells roughly 800 million books across print books, audiobooks, and ebooks formats.  Weber Decl. ¶2.

**Response:**  Not disputed (but immaterial).

5.  Wiley is a publishing company based in Hoboken, New Jersey.  The company was founded in 1807 and focuses on publishing scientific and medical works in print and digital formats.  Wiley publishes over 2,000 new books each year and currently offers over 120,000 titles in its catalog.  (Pavese Decl. ¶¶2,9.)

**Response:**  Not disputed (but immaterial).

6.  Internet Archive was founded in 1996 by Brewster Kahle, who remains its leader. (McN Decl. ¶28.)

**Response:**  Not disputed (but immaterial).

7.  This action concerns the unauthorized reproduction and distribution of in-copyright ebooks on Internet Archive's interrelated archive.org and openlibrary.org websites (collectively, the "Website").  (McN Decl. ¶1.)

**Response:**  Not disputed.

8.  Internet Archive offers several other different online services, including the Wayback Machine.  This action does not challenge those other online services, including the Wayback Machine.  (McN Decl. ¶30.)

**Response:**  Not disputed (but immaterial).

9.  Instead, this action concerns the "Books to Borrow" portion of the Website, on which Internet Archive provides its users with digital versions of physical books in their entirety. (McN Decl. ¶1.)

**Response:**  Not disputed.

10.  Books have long been essential to our society.  Fiction and non-fiction alike, they transport us to new worlds, broaden our horizons, provide us with perspective, reflect the evergrowing knowledge of humanity in every field, spark our imaginations and deepen our

understanding of the world. Yet, books are not self-generating.  They are the product of training and study, talent and grit, perseverance and creativity, investment and risk, and untold hours of work.  Compl. ¶4; Ans. ¶4.

**Response:**  Not disputed.

11.  Books generally require a significant creative investment by authors.  Often, it may take years for an author to write a single book.  (Sevier Decl. ¶13; R-A Decl. ¶54; Weber Decl. Pavese Decl. ¶12; Cisneros Decl. ¶5.)

**Response:**  Not disputed (but immaterial).

12.  Authors may rely on revenue streams from advances and royalties paid by publishers to support them during the writing process and for years after their books are published.  (Sevier Decl. ¶17, 22; R-A Decl. ¶55; Weber Decl. ¶29; Cisneros Decl. ¶9.)  The author Sandra Cisneros has stated that "Internet Archive hurts all of the authors whose work it steals and it should be stopped so that it does not threaten anybody else's chances of living from their pen."  (Cisneros Decl. ¶16.)

**Response:**  Not disputed that "Authors may rely on revenue streams from advances and royalties paid by publishers to support them during the writing process and for years after their books are published."  Not disputed that Sandra Cisneros is accurately quoted.  Disputed that Ms. Cisneros's quote is true.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrate that the Internet Archive's digital lending library has no effect on revenues for books.  Plaintiffs'

Statement of Undisputed Material Facts ("PSMF")[2] ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited thereto).  To the extent Ms. Cisneros's quote is being offered as truth, her statement is not admissible evidence.  She has not laid a foundation for her knowledge concerning any effects the Internet Archive may have on "all of the authors," and her statements concerning these supposed effects as well as her statements concerning hypothetical future events are speculative.  *See Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 306 (2d Cir. 2008) ("The non-moving party [on summary judgment] may not rely on conclusory allegations or unsubstantiated speculation.") (cleaned up).

13.  The Publishers invest in authors and their books by bearing the upfront costs that are required to get a book published and sold through various book markets.  For this reason, the Publishers bear most of the financial risk associated with book publishing.  Book publishers have no guarantee that they will recoup their investment in any particular title.  (Sevier Decl. ¶¶13-30; R-A Decl. ¶¶55-56; Weber Decl. ¶¶26-28; Pavese Decl. ¶12.)

**Response:**  Not disputed (but immaterial).

14.  The Publishers collectively spend hundreds of millions of dollars each year in costs in connection with the books they publish.  (Sevier Decl. ¶15; Weber Decl. ¶26.)

**Response:**  Not disputed (but immaterial).

15.  For the Works in suit, the Publishers typically pay each author of a new work a non-refundable advance against future royalties.  The amount of the advance varies, and the author

---

[2] Cites to "PSMF" are to the Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts.  Cites to "DSMF" are to the Internet Archive's Rule 56.1 Statement of Material Facts.

can use the advance to cover living or other expenses while they work on writing the book. (Sevier Decl. ¶17; R-A Decl. ¶55.)

**Response:**  Not disputed (but immaterial).

16.  Per their publishing agreements, authors are generally are not required to refund the advance—even if the book never earns enough revenue to "earn out" the advance.  (Sevier Decl. ¶17; R-A Decl. ¶55.)

**Response:**  Not disputed (but immaterial).

17.  The advance payments are recouped, if at all, from sales of the books.(Sevier Decl. ¶30; R-A Decl. ¶55.)

**Response:**  Not disputed (but immaterial).

18.  The Publishers employ editors, who are literary professionals that select new works for acquisition and work with their authors to provide editorial advice to improve the text, and other support.  (Cisneros Decl. ¶8; Sevier Decl. ¶¶7, 16, 19; R-A Decl. ¶¶7, 56;Weber Decl. ¶26.)

**Response:**  Not disputed (but immaterial).

19.  The Publishers also hire copy editors to correct grammar, spelling and ensure consistency throughout a particular work.  Additionally, the Publishers maintain art departments and illustrators to design book covers and legal departments that work with authors on pre-publication review and on defending the Publishers' works.  (Sevier Decl. ¶¶20-21; R-A Decl. ¶56; Cisneros Decl. ¶8.)

**Response:**  Not disputed (but immaterial).

20.  The Publishers employ design professionals to layout print and digital editions of the books they publish.  (Sevier Decl. ¶20; R-A Decl. ¶56.)

**Response:**  Not disputed (but immaterial).

21.  For audiobooks, the Publishers employ a separate production process involving the reading and recording of a title.  (Sevier Decl. ¶20.)

**Response:**  Not disputed (but immaterial).

22.  The Publishers devote resources to marketing their books.  Marketing can continue for the life cycle of a book and is not limited to its initial publication.(Cisneros Decl. ¶8; R-A Decl. ¶56; Sevier Decl. ¶23; Weber Decl. ¶26)

**Response:**  Not disputed (but immaterial).

23.  The Publishers each maintain sales departments that promote the sales of the titles in the Publishers' catalogue.  (Sevier Decl. ¶¶24-25; R-A Decl. ¶56; Weber Decl. ¶26.)

**Response:**  Not disputed (but immaterial).

24.  The Publishers respective marketing departments engage in a broad range of promotional activities, which may include social media campaigns, website development, trade and consumer advertising; distribution of review and promotional copies of the book to members of the media and influential readers; in-store displays and other placement promotions; and author tours and readings.  (Sevier Decl. ¶¶23, 27; R-A Decl. ¶56.)

**Response:**  Not disputed (but immaterial).

25.  The Publishers' respective sales departments work on sales of their titles across the different channels or markets that books are published in, including retail outlets, wholesalers, and aggregators that sell to libraries. (Sevier Decl. ¶¶24-35; R-A Decl. ¶56.)

**Response:**  Not disputed (but immaterial).

26. The Publishers also undertake the costs of distributing books in all the formats they have rights to, which includes printing costs associated with the creation of print books. (Sevier Decl. ¶29; Weber Decl. ¶27.)

**Response:** Not disputed (but immaterial).

27. The commercial success of any book is uncertain. (Weber Decl. ¶28; Sevier Decl. ¶34.)

**Response:** Not disputed.

28. The sales of any one book are driven by numerous factors. Every book is unique and has a unique life cycle. (Sevier Decl. ¶¶34, 80; Weber Decl. ¶28, 88.)

**Response:** Not disputed.

29. These factors include seasonality, school uses, marketing, relevance of topics of current interest, pricing of the work and competing works, supply chain issues and other factors. (Sevier Decl. ¶80.)

**Response:** Not disputed.

30. In 2020, COVID, the Black Lives Matter movement, and the presidential primaries and election had an impact on individual book sales and licenses that different by title. (Sevier Decl. ¶81.)

**Response:** Not disputed.

31. Title revenue figures, and library checkouts, alone do not indicate the cause of an increase or decrease. (Sevier Decl. ¶¶80-81; Weber Decl. ¶88.)

**Response:** Not disputed.

32.  The Publishers are incentivized to maximize long term revenue from every book they publish because the sales of successful books pay for upfront investments in new books.  (Pavese Decl. ¶14; Sevier Decl. ¶¶37-38; R-A Decl. ¶¶34-38; Weber Decl. ¶¶29-32.)

**Response:**  Not disputed (but immaterial).

33.  The authors of the Works in Suit assigned to the Publishers the exclusive rights to publish their Works in certain formats—including print, ebook and often audio.  The publishing agreement for the Works in Suit also grant rights for the Works in defined geographic areas, typically either the entire world or the United States.  (Pavese Decl. ¶13; Sevier Decl. ¶31; R-A Decl. ¶57; Weber Decl. ¶29; McN Decl. ¶8.)

**Response:**  Not disputed.

34.  These exclusive rights derive from copyright law, which was designed to provide authors an incentive to write books by giving them a limited monopoly over sales once their books are published.  (R-A Decl. ¶58.)

**Response:**  This paragraph recites a legal conclusion rather than a fact, which is inappropriate for a Rule 56.1 statement and must therefore be disregarded.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2015) (refusing to credit "legal conclusions or conclusory allegations" contained in 56.1 statement).  Further, the cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).

35.  The Publishers' ability to generate income derives from their ability to exclusively exercise certain rights they obtain from authors including:  (a) the right to sell books for their copyright term; and (b) the right to collect separate income streams for each different format.  (Weber Decl. ¶30; R-A Decl. ¶57; Sevier Decl. ¶8.)

**Response:**  Not disputed to the extent the assertions in this paragraph apply to

HarperCollins.  Disputed to the extent these assertions purportedly apply to Wiley, Penguin

Random House, or Hachette.  First, Mr. Weber (Penguin Random House), Mr. Sevier (Hachette),

and Ms. Restivo-Alessi (HarperCollins) have not established a foundation for their knowledge of

Wiley's ability to generate income.  Moreover, the cited paragraphs of Mr. Weber's and Mr.

Sevier's declarations do not support the assertions in this paragraph.  *See* Fed. R. Civ. P.

56(c)(1).

36.  Some of the profits the Publishers receive from books they publish are used to pay

the costs of publishing new authors or books.  (Weber Decl. ¶29; Sevier Decl. ¶30; R-A Decl.

¶63; Pavese Decl. ¶14.)

**Response:**  Not disputed (but immaterial).

37.  Some of the profits the Publishers receive from books they publish are used to

develop new technologies or improve current technologies associated with various format they

publish the works in, like ebooks or audiobooks.  (Pavese Decl. ¶15; R-A Decl. ¶2; Weber Decl.

¶29.)

**Response:**  Not disputed (but immaterial).

38.  All but two of the Works in Suit were published more than five years before this

action was commenced.  (McN Decl. ¶115.)

**Response:**  Not disputed.

39.  Depending on the Publisher, backlist books are defined as titles that were first

published more than either one or two years ago.  (Sevier Decl. ¶36; R-A Decl. ¶60; Weber Decl.

¶30.)  The vast majority of the Works in Suit were published more than five years ago, and some

were published decades ago.  (McN Decl. ¶115; R-A Decl. ¶¶64-65;Weber Decl. ¶21.)

**Response:**  Not disputed.

40.   The Works in Suit continue to earn revenues and are significant books for the Publishers.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

**Response:**  Not disputed.

41.   The Publishers' backlist catalogs provide revenue that helps them invest in new works and/or new authors.  (Sevier Decl. ¶¶13-30; R-A Decl. ¶¶58-68; Weber Decl. ¶¶29-32; Pavese Decl. ¶14.)

**Response:**  Not disputed.

42.   Year over year, many of the Works in Suit sell thousands of copies and generate significant annual revenues, including in ebook form.  Each of the Publishers' revenues for the Works in Suit are reflected in their sales records produced in this action.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

**Response:**  Not disputed.

43.   Many of the Works in Suit were first published decades ago and several have become literary classics or are well-known, highly regarded titles, including for example "The Lord of the Flies" by William Golding, "Song of Solomon" and "The Bluest Eye" by Toni Morrison, "The Catcher in the Rye" by J.D. Salinger, and "The House on Mango Street" by Sandra Cisneros.  (Weber Decl. ¶¶21-22; McN Decl. ¶7.)

**Response:**  Not disputed (but immaterial).

44.   The Publishers rely on backlist titles like the Works in Suit to generate revenue year on year for sometimes decades after first publication.  These revenues can offset the costs of new books that underperform or result in a loss.  (Sevier Decl. ¶37; R-A Decl. ¶¶61-68; Weber Decl.¶¶30-31; Pavese Decl. ¶14.)

**Response:**  Not disputed.

45.  A review of the sales revenues for the Works in Suit demonstrates the Publishers' reliance on books published more than five years ago for substantial revenue.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)  For example, HarperCollins first published the C. S. Lewis novel "The Lion, the Witch and the Wardrobe (The Chronicles of Narnia)" in 1950. Over the course of the last 72 years, the book has been named to TIME Magazine's 100 Best Young-Adult Books of All Time and 100 best English-language novels published since 1923. Since 1950, sales from the title have generated HarperCollins over $47.5 million in revenue.  (R-A Decl. ¶45.)

**Response:**  Not disputed.

46.  Another Work in Suit published by HarperCollins, Zora Neale Hurston's "Their Eyes Were Watching God," a classic of the Harlem Renaissance and Hurston's best-known work, was originally published in 1937.  Between 1992 and 2020, HarperCollins sold more than five million copies of the title, earning the company over $38 million in net sales.  (R-A Decl. ¶65.)

**Response:**  Not disputed.

47.  The classic *Little House in the Big Woods*, published in 1932 as the first book in the "Little House" series, earned HarperCollins over $7 million in net sales between 1992 and 2020. (R-A Decl. ¶65.)

**Response:**  Not disputed.

48.  Even those titles bringing in smaller sums of revenue are important to each Publisher on a cumulative basis and remain important to their authors or estates, on an individual basis. (Weber Decl. ¶30.)

**Response:**  Not disputed (but immaterial).

49.   Revenue from backlist titles for three of the Publishers has matched or exceeded the revenue for frontlist books in certain years.  (Sevier Decl. ¶36; R-A Decl. ¶61 & Ex. 1; Weber Decl. ¶32.)

**Response:**   Not disputed.

50.   For Hachette, revenue from the sale of backlist ebook titles exceeded frontlist ebook revenue in 2019 and 2020.  (Sevier Decl. ¶36; R-A Decl. ¶61 & Ex. 1; Weber Decl. ¶32.)

**Response:**   Not disputed.

51.   One backlist title published by Hachette in 1951, "Catcher in the Rye," generated tens of millions of dollars in sales between 1999 and 2020.  (Sevier Decl. ¶37.)

**Response:**   Not disputed.

52.   Between 2017 and 2020, PRH's backlist revenue exceeded its revenue from frontlist titles (i.e., books published within the last year).   This is so despite that the fact that in that same period of time, PRH published bestselling frontlist biographies of First Lady Michelle and President Barack Obama (2018 and 2020, respectively).  (Weber Decl. ¶32.)

**Response:**   Not disputed.

53.   Backlist book revenue makes up more than 60% of HarperCollins' annual print book revenue from the sale of all adult and children's titles.  (R-A Decl. ¶61.)

**Response:**   Not disputed.

54.   Between 2017 and 2020, the number of backlist library ebook units sold by HarperCollins exceeded the number of frontlist library ebook units sold.  For example, in 2020, HarperCollins sold approximately 700,000 frontlist units versus 3.3 million backlist units.  (R-A Decl. ¶61.)

**Response:**   Not disputed.

55.  The majority of Hachette's most successful books do not earn the bulk of their earnings in the first five years.  Rather, they earn revenue over the course of many years or even decades after the publication date.  (Sevier Decl. ¶36.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).

56.  Backlist sales are also important because books may not achieve their full commercial potential in their first year of publication.  It may take years for a book to start selling in large quantities for a number of different (and sometimes unpredictable) factors.  (Weber Decl. ¶31.)

**Response:**  Not disputed.

57.  Even books that were critically well-received when published may see significant jumps in revenue well after they were first published, including author life events.  (Sevier Decl. ¶80; Weber Decl. ¶31.)  For example, the death of author Toni Morrison in August 2019 corresponded with a significant jump in library ebook checkouts and associated revenue for works authored by Ms. Morrison.

**Response:**  Not disputed.

58.  Sales of a particular work may go up or down based on other external factors.  For instance, sales of a title can increase rapidly if a news story brings a particular subject into prominence or if an author receives an award or sudden fame or if a popular movie version of a book is released.  (Sevier Decl. ¶¶38, 80; R-A Decl. ¶67.)

**Response:**  Not disputed.

59.  For example, the book "Crazy Rich Asians" by Kevin Kwan was first published by PRH in 2013.  When a motion picture adaptation of the film was released in 2018, library ebook

checkouts for the title through OverDrive, the library ebook aggregator, increased by a factor of over nine.  (McN Decl. ¶115; Weber Decl. ¶31.)

**Response:**  Not disputed (but immaterial).

60.  An author may not "break out" before publishing multiple books and when an author does achieve success later in their career, the Publishers will usually see a significant uptick in revenue from their earlier works, even if those works did not sell well when first released. (Sevier Decl. ¶38; R-A Decl. ¶67.)

**Response:**  Not disputed.

61.  The book "The 5 Simple Fixes That Will Make You Healthy, Fit, and Eternally Awesome" by Darin Olien, was published by an imprint of HarperCollins in February 2015.  For the first five years after it was published, the ebook title had been checked out by library patrons across the United States in the low double-digits (and sometimes in the single digits) each month. Then, in July 2020, checkouts spiked, eventually resulting in nearly 700 checkouts in September 2020 alone.  (McN Decl. ¶116.)

**Response:**  Not disputed (but immaterial).

62.  The increased interest in the book, over five years after its publication, coincided with the July 2020 release of the Netflix series "Down to Earth with Zac Efron," in which the actor Zac Efron promoted the "5 Simply Fixes" book at the beginning of each episode.  (McN Decl. ¶116.)

**Response:**  Not disputed (but immaterial).

63.  The Publishers' right to collect revenue from the sale of their books in each format —and to control the terms and conditions governing each format—can make it possible for the Publishers to support authors and invest in the next generation of books.  (R-A Decl. ¶68; Sevier

Decl. ¶48; Weber Decl. ¶¶36.)  And, just as in the music and film industries, every format is a different product geared to different (sometimes overlapping) channels and sold under different terms that correspond to each format's unique qualities.  (R-A Decl. ¶12.)

**Response:**  Not disputed (but immaterial).

64.  The Publishers' publishing agreements for the Works in Suit, produced in this action, generally include specific royalty rates payable to the author based on the format of the book, channel of distribution, and other factors.  The agreements for the Works in Suit show that the authors will receive specific and generally different royalty rates for the different formats the book is published in, e.g., hardcover, trade paperback, mass market paperback, ebook, and/or audio book.  (Sevier Decl. ¶18; Weber Decl. ¶34; R-A Decl. ¶12.)

**Response:**  Not disputed.

65.  Because each of the publishing agreements for the Works in Suit include different royalty rates for different formats of the Works, the Publishers and their authors are paid on sales of each format that a book is published in.  (Sevier Decl. ¶39; R-A Decl. ¶¶12, 57.).

**Response:**  Not disputed.

66.  Over the last three decades, the Publishers have collectively invested millions of dollars in developing new formats and markets to deliver their works in the digital age, including ebooks.  (Weber Decl. ¶¶53-82; R-A Decl. ¶¶11-24; Sevier decl. ¶¶45-48; Pavese Decl. ¶¶11-20.)

**Response:**  Not disputed (but immaterial).

67.  The Publishers' investments over the last three decades have contributed to the development and success of ebooks and audiobooks.  Digital works (ebooks and audiobooks) are distinct book formats from print books.  (Weber Decl. ¶¶53-82; R-A Decl. ¶¶17-24; Sevier Decl.

¶45-48; Pavese Decl. ¶¶11-20.)  Ebook pricing, both commercial and library ebooks, is distinct from the prices of print books.  The different pricing is based on the fact that the different formats (print books vs. ebooks) are used differently in the commercial and library markets and is a control mechanism that helps to make the distribution of ebooks economically sustainable.  (Weber Decl. ¶¶46-49.)

> **Response:**  Not disputed.

68.  The development of ebooks and audiobooks have been a benefit for the public and the new format have allowed the Publishers to reach different audiences.  (Sevier Decl. ¶41; Weber Decl. ¶¶53-54.)

> **Response:**  Not disputed (but immaterial).

69.  In the late 1990's and early 2000's, the music industry witnessed the growth and eventual dominance of file sharing sites like Napster, Limewire, and Kazaa.  (R-A Decl. ¶15.)

> **Response:**  Not disputed (but immaterial).

70.  Napster, for example, allowed users to search for virtually any popular song and download an unauthorized, unrestricted MP3 music file onto the user's computer for free.  (R-A Decl. ¶15.)

> **Response:**  Not disputed (but immaterial).

71.  The record companies had not yet developed an authorized alternative for consumers to access digital music when the file sharing sites, like Napster, became popular.  By the time the music industry took legal action against the file sharing sites or took steps to create an easily accessible alternative, the pirate sites had proliferated.  (R-A Decl. ¶15.)

> **Response:**  Not disputed (but immaterial).

72.  Countless unauthorized MP3 files had already been uploaded and shared on the Internet with users around the world.  Consumers had already been presented with a popular alternative that presented no barrier to an unauthorized and free copy of a song.  (R-A Decl. ¶15.)

    **Response:**  Not disputed (but immaterial).

73.  After these services were identified as copyright infringers and ordered to cease operations, the music publishing industry largely embraced authorized streaming services as a primary means to deliver music files over the Internet.  These streaming services offer a subscription model, which makes streaming music affordable for many consumers, while preventing against the proliferation of free illegal copies.  (R-A Decl. ¶16.)

    **Response:**  Not disputed (but immaterial).

74.  It has been  reported that this streaming model tends to disproportionality favor the most popular music artists while less popular artists are less favored and often get mere fractions of a cent per stream.  (R-A Decl. ¶16.)

    **Response:**  Not disputed (but immaterial).

75.  While these streaming services offered an alternative to piracy and afforded the record companies with a modicum of control, it came at the expense of artist revenue.  (R-A Decl. ¶16.)

    **Response:**  Not disputed (but immaterial).

76.  By around 2002, the Publishers began to enter the digital book market.  They worked to develop a sustainable digital book market in which they could offer affordable ebooks but with critical controls.  (R-A Decl. ¶17; Weber Decl. ¶56.)

    **Response:**  Not disputed (but immaterial).

77.  The nature of the digital medium dictated that distribution be reasonably limited so as not to threaten the Publishers' overall book markets.  (R-A Decl. ¶17; Weber Decl. ¶¶65-69; Pavese Decl. ¶¶22-24.)

**Response:**  Not disputed (but immaterial).

78.  The experience of the music industry also taught the Publishers that it was critical to prevent pirates from illegally converting print works into digital works to be widely distributed on the Internet, including for free.  (R-A Decl. ¶17.; Weber Decl. ¶55; Pavese Decl. ¶20.)

**Response:**  Not disputed (but immaterial).

79.  While ebooks display the same text as print books and both are used by consumers to read the same underlying work, there are several key differences between these two formats that informed the Publishers' development of discrete terms and conditions and pricing for ebooks. (R-A Decl. ¶18; Weber Decl. ¶¶38-42.)

**Response:**  Not disputed.

80.  An ebook is a digital file that consists of specially formatted text that readers typically download to their personal computers or devices from either commercial sites (like Amazon books) or from their local library (often via OverDrive).  (Weber Decl. ¶39; Sevier Decl. ¶¶20, 25.)

**Response:**  Not disputed.

81.  Ebooks generally do not degrade.  Ebooks generally do not get damaged or lost. (Weber Decl. ¶39; Sevier Decl. ¶53; R-A Decl. ¶21.)

**Response:**  Disputed.  Even though ebooks do not degrade in the same way that physical books do, a huge amount of money and effort is required to maintain the integrity of a digital file that constitutes an ebook.  These digital files are stored on servers, and the servers that host data

at the Internet Archive require constant maintenance and repair. The physical servers themselves range from nearly nine years old to brand new, and components of those servers are replaced regularly when they fail or when they are damaged by electrical or environmental conditions. Currently, a new server with a full set of hard drives costs tens of thousands of dollars. The hard drives in a server fail regularly—on average, two to three drives fail per day out of our fleet of nearly 30,000. This ongoing maintenance requires an operations team consisting of five full-time employees. To the extent Plaintiffs suggest that digitized books can be set aside for years without technical maintenance and still be accessed, they are incorrect. Decl. of Brewster Kahle in Supp. of Internet Archive's Opp'n to Pls.' Mot. for Summ. J. submitted herewith ("Kahle Opp'n Decl.") ¶ 15.

82. Readers do not have to travel to a bookstore or library to obtain ebooks. Whether commercial ebooks or ebooks obtained from their library, readers can download ebooks at any time from their home, office, or on the go. (Weber Decl. ¶39; Sevier Decl. ¶54; R-A Decl. ¶20.)

**Response:** Not disputed.

83. Ebooks contain technological features that enhance the reader's experience, including text digitized for an electronic device. Ebooks also allow readers to interact with the works by running searches across the text or even reading in the dark. Ebooks also make it easier to carry multiple books. A reader can carry multiple ebooks on a single device without the burden of carrying multiple print copies. (Weber Decl. ¶39; R-A Decl. ¶20.)

**Response:** Not disputed.

84. By contrast, print books are tangible objects. They need to be physically moved from place to place, costing time and money that both increase with distance. Over time, they can exhibit wear and tear. (R-A Decl. ¶19; Weber Decl. ¶38.)

22

**Response:**  Not disputed.

85.  There is a practical limit to the number of people who are able to access—i.e., hold in hand and read—a print book as a material object.  (R-A Decl. ¶19; Weber Decl. ¶38.)

**Response:**  Not disputed.

86.  The same characteristics of an ebook that make the format so attractive to consumers present a potential risk for both authors and the Publishers.  (R-A Decl. ¶21; Weber Decl. ¶41.)

**Response:**  Not disputed.

87.  First, an unrestricted digital file containing the text of a book could be repeatedly and rapidly reproduced and distributed to Internet users around the world at no or minimal cost.  (R-A Decl. ¶21; Weber Decl. ¶41.)

**Response:**  Not disputed.

88.  Second, a digital file does not deteriorate as pages in a physical book do, and ebooks take up negligible physical space.  (R-A Decl. ¶21; Weber Decl. ¶39.)

**Response:**  Not disputed.

89.  The Publishers considered these characteristics when they developed business models that set limits on the broad dissemination capabilities of an electronic file so as not to decimate their broader book markets.  (R-A Decl. ¶21; Pavese Decl. ¶5; Weber Decl. ¶¶38-42.)

**Response:**  Not disputed.

90.  The Publishers distribute ebooks under a different model than print books.  (R-A Decl. ¶¶22-23, 28-41; Weber Decl. ¶¶42-49; Pavese Decl. ¶¶21-31.)

**Response:**  Not disputed.

91.  When projecting possible revenues from a book, the Publishers take into account that they will receive revenues from each of the formats they publish the book in, including

hardcover, paperback, ebook and/or audiobook.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶¶20, 46.)

      **Response:**  Not disputed.

92.  Print books are not priced with the expectation that they will be distributed in both print and digital formats.  (R-A Decl. ¶2.)

      **Response:**  Not disputed.

93.  Each of the Publishers have played a role in the development of new digital book formats designed to reach new audiences.  (Weber Decl. ¶¶55-61; R-A Decl. ¶¶13-16; Sevier decl. ¶¶44-48; Pavese Decl. ¶¶11-20.)

      **Response:**  Not disputed (but immaterial).

94.  Starting in the late 1990's and continuing into the early 2000's, each of the Publishers began investing in the development of authorized mechanisms for distributing ebooks.  (Weber Decl. ¶¶55-61; R-A Decl. ¶¶13-16; Sevier decl. ¶¶44-48; Pavese Decl. ¶¶11-20.)

      **Response:**  Not disputed (but immaterial).

95.  For example, some of the divisions of what is now PRH began in the late 1990's to invest in creating authorized mechanisms for distributing digital books in order to create viable products for consumers to read as an affordable alternative to using pirate websites.(Weber Decl. ¶56.)

      **Response:**  Not disputed (but immaterial).

96.  At the same time, Random House, Inc. ("Random House") (a predecessor of PRH) and Wiley, together with publisher McGraw Hill, were members of the Open Ebook consortium that designed the original standard format for ebooks that evolved into the ePub ebook format that was launched in 2007 and remains in wide use today.  (Weber Decl. ¶57.)

**Response:**  Not disputed (but immaterial).

97.  By 2000, Random House had invested more than $5 million into the development of ebook publishing software and pledged to invest $10 million more within the next three to five years after that.  (Weber Decl. ¶57.)

**Response:**  Not disputed (but immaterial).

98.  The Publishers distribute commercial ebooks to paying consumers with restrictions geared to the nature of the digital medium.  (Sevier Decl. ¶45; Weber Decl. ¶43; R-A Decl. ¶¶22-23.)

**Response:**  Not disputed.

99.  Several of the Publishers use an agency model for distributing commercial ebooks. The Publishers' retained agents, which include Amazon or Barnes & Noble, impose terms and conditions on those downloading commercial ebooks and restrict them to one user account.(Weber Decl. ¶43; R-A Decl. ¶23; Sevier Decl. ¶45.)

**Response:**  Not disputed (but immaterial).

100.  For example, the Terms of Use set by Amazon in connection with ebooks purchased through its Kindle platform state as follows:

> Use of Kindle Content. Upon your download or access of Kindle
>
> Content and payment of any applicable fees . . ., the Content
>
> Provider grants you a non-exclusive right to view, use, and display
>
> such Kindle Content an unlimited number of times . . ., solely
>
> through a Kindle Application or as otherwise permitted as part of
>
> the Service, solely on the number of Supported Devices specified
>
> in the Kindle Store, and solely for your personal, non-commercial

use.  Kindle Content is licensed, not sold, to you by the "Content

Provider."  Further, the Amazon Terms of Use provide under

"Limitations" that the purchaser "may not sell, rent, lease,

distribute, broadcast, sublicense, or otherwise assign any rights to

the Kindle Content or any portion of it to any third party. . . .

(R-A Decl. ¶23.; Weber Decl. ¶43.)

**Response:**  Not disputed (but immaterial).

101.  The Publishers also required, and still do require, that entities distributing their

ebooks to the public use DRM technology to ensure that the digital book files are limited to one

user account at a time.  (Sevier Decl. ¶¶45-46; Weber Decl. ¶43; R-A Decl. ¶23.)

**Response:**  Not disputed (but immaterial).

102.  In or around the early 2000's, PRH began distributing ebook editions of selected

books to consumers through specialized electronic retail platforms.  The popularity of ebooks

then grew rapidly after the release of dedicated e-readers like Amazon's Kindle (2007) and

Apple's iPad (2010).  (Pavese Decl. ¶19; R-A Decl. ¶30; Sevier Decl. ¶44; Weber Decl. ¶59.)

**Response:**  Not disputed (but immaterial).

103.  Consumers pay for an ebook that they download from an authorized e-vendor,

whether or not they read the whole book or only consult a small portion of it.  (McN Decl. ¶10.)

**Response:**  Not disputed.  However, the cited evidence is not admissible.  This is one of

many examples throughout Plaintiffs' 56.1 Statement where the only support for an assertion is

improper attorney testimony in the form of Ms. McNamara's Declaration.  *Omnipoint*

*Commc'ns, Inc. v. Common Council of City of Peekskill*, 202 F. Supp. 2d 210, 213 (S.D.N.Y.

2002) (attorney's affidavit or declaration not based on personal knowledge carries no weight);

*see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that

inadmissible statements in affidavits submitted in support of summary judgment motion are

incapable of raising material issues of fact); *Wahad v. FBI*, 179 F.R.D. 429, 435 (S.D.N.Y. 1998)

(citing *United States v. Alessi*, 599 F.2d 513, 514–15 (2d Cir. 1979)) (when affidavit does not

comply with requirements of Rule 56, the offending portions should be disregarded).

104.  Since the early 2000's, millions of consumers have acquired authorized ebooks

published by the Plaintiffs.  (R-A Decl. ¶24.)

**Response:**  Not disputed.

105.  While the figures have varied over time, in fiscal year 2021, ebooks constituted

approximately 14% of HarperCollins' U.S. book revenue (not including audiobooks).  (R-A

Decl. ¶24.)

**Response:**  Not disputed.

106.  For Penguin Random House, by 2020, retail ebooks constituted somewhere

between 12 and 15% of the book market.  (Weber Decl. ¶5.)

**Response:**  Not disputed.

107.  For Hachette, in 2021, ebook revenue from the retail and library channels made up

approximately 15% of their business.  (Sevier Decl. ¶46.)

**Response:**  Not disputed.

108.  Today, the Publishers offer virtually all of their new titles in ebook format. The

exceptions tend to be for books that are not well-suited to the digital realm (like certain

children's books or cookbooks), or reprints of books originally published by other publishers for

which the Publishers do not have the digital rights.  (Sevier Decl. ¶46; R-A Decl. ¶24; Weber

Decl. ¶60; Pavese Decl. ¶18.)

**Response:**  Not disputed.

109.  In 2007, Random House had only approximately 3800 ebook titles available and Penguin had approximately 300 ebook titles available.  Today, virtually all original titles in the adult trade books category published by PRH are available as an ebook, including the 48 Works in Suit published by PRH.  (Weber Decl. ¶60.)

**Response:**  Not disputed.

110.  The Publishers invested time and money to publish their backlist titles as ebooks. In several cases, the Publishers had to separately acquire ebook rights from its authors where older publication agreements did not encompass these right.  Once they acquired the ebook rights, the Publishers published the works as ebooks.  (Sevier Decl. ¶47; Weber Decl. ¶60.)

**Response:**  Not disputed.

111.  As a result, the vast majority of each of the adult trade titles in each Publisher's backlist catalog are also now published as ebooks.  (Weber Decl. ¶60; R-A Decl. ¶24; Sevier Decl. ¶47.)

**Response:**  Not disputed.

112.  Each Work in Suit is available as a commercial ebook.  Each Work in Suit was available as a commercial ebook when Internet Archive first scanned and posted the Work on its Website for distribution.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

**Response:**  Not disputed.

113.  Public and academic libraries in the United States spend billions of dollars each year—typically from local tax revenue—on obtaining books for patrons to access for free.  For example, public libraries spent almost $1.5 billion on physical and ebooks in 2019.  (McN Decl. ¶11.)

**Response:**  Not disputed.

114.  The history of libraries lending print books stretches back hundreds of years.  Under this lending model, the Publishers sell copies of print books to libraries, or to wholesalers serving the library market, who in turn sell to libraries.  (R-A Decl. ¶26; Weber Decl. ¶43.)

**Response:**  Not disputed.

115.  Many public libraries provide services to their local communities, ranging from a curated selection of books and communications geared towards the interests and needs of community members, to services like free internet and community-tailored tutoring sessions. Public libraries also promote literacy.  (R-A Decl. ¶25.)

**Response:**  Not disputed.

116.  Public libraries often increase the visibility of the Publishers' works, including through author visits, book clubs, creating virtual and physical displays to promote certain book for different occasions, and/or email marketing directed to the interests of local library patrons. (R-A Decl. ¶27; Sevier Decl. ¶¶49-50.)

**Response:**  Not disputed.

117.  Each of the Publishers make their ebooks available to libraries through library distributors (or "aggregators"), who license the Publishers' ebooks to libraries, and each of the Works in Suit were available as ebooks from libraries.  (R-A Decl. ¶28; Sevier ¶10l; Weber Decl. ¶6; Pavese Decl. ¶3.)

**Response:**  Not disputed.

118.  The Publishers' sales records produced in this action track the revenues earned when library aggregators obtained each of the Works in Suit for licensing to libraries.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)  Further, OverDrive maintained records

capturing the number of library ebook checkouts for the Works in Suit between 2017 and 2020, as well as OverDrive's revenue for ebooks of the Works in Suit acquired by libraries from OverDrive during this time period.  (McN Decl. ¶11.)

**Response:**  Not disputed that OverDrive maintains records of library ebook checkouts and its revenue from these library ebook checkouts.  Not disputed that, in this case, OverDrive produced records containing ebook revenue and checkout data from 2017 to 2020 for the Works in Suit.  Disputed that the Plaintiffs' sales records produced in this case show revenues from the time library aggregators obtained each of the Works in Suit for licensing to libraries.  Hachette's sales records show annual revenue data from 2015 to 2019 and monthly data from 2020.  Decl. of Joseph C. Gratz in Supp. of Internet Archive's Mot. for Summ. J. ("Gratz Opening Decl.") Exs. JJ & KK, HACHETTE0002474-2475.  HarperCollins sales records show annual revenue data from 2017 to 2020.  *Id.* Ex. LL, HC0010272.  Wiley's sales records show annual revenue from 2001 to 2020.  Pavese Decl. Ex. 3, WILEY0005650.  Penguin Random House's sales records show annual revenue data from 2010 to 2020.  Gratz Opening Decl. Ex. MM, PRH0025907.  Plaintiffs' record cites do not support the assertion that they produced revenue data for the Works in Suit beginning when "library aggregators obtained each of the Works in Suit for licensing for libraries."  *See* Fed. R. Civ. P. 56(c)(1).

119.  The largest aggregator is OverDrive, which licenses authorized ebooks to more than 14,000 public and academic libraries for free distribution to their patrons.  (McN Decl. ¶11.)

**Response:**  Not disputed.

120.  The authorized library ebook market is governed by licensing terms that the Publishers have developed over many years, and continue to refine to this day.  (Weber Decl. ¶77.)

**Response:**  Not disputed.

121.  The music, movie, and television industry also utilize licensing terms to make digital goods available to the public.  (R-A Decl. ¶28.)

**Response:**  Not disputed (but immaterial).

122.  The specific terms of the Publishers' various licensing models are enforced in the library aggregators' licenses to libraries.  (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

**Response:**  Not disputed.

123.  As part of this licensing regime, the four Publishers require that a library or library consortia can lend each Publisher's ebooks only to its own verified library members.  For example, public libraries often restrict lending to local residents with a library card.  For school and university libraries, lending is often restricted to their students, professors, and staff.  (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

**Response:**  Not disputed.

124.  For example, Wiley's Ebook Distribution Agreement with ProQuest defines an "Authorized User" as follows:  "For public libraries:  library staff, individual residents of Customer's reasonably defined geographic area served, and walk-in patrons while they are on site" and "For schools and other academic institutions:  currently enrolled students, faculty, staff and visiting scholars, as well as walk-in patrons while they are on-site.  (Pavese Decl. ¶23.)

**Response:**  Not disputed.

125.  In Wiley's agreement with library ebook aggregator OverDrive, Wiley requires OverDrive to "require participating [libraries] to take reasonable measures to ensure that only Authorized Patrons of their libraries . . . may access the offline or download collection" and that

"OverDrive will require that participating [libraries] provide it the right to audit their access control systems."  (Pavese Decl. ¶23.)

    **Response:**  Not disputed.

    126.  The Publishers also require that each library aggregator employ approved DRM and other security measures to ensure that only one-user account can access each copy of a Publisher's ebook, and to prevent the unauthorized copying or distribution of ebook files. (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

    **Response:**  Not disputed that the Publishers require "each library aggregator" to "employ approved DRM and other security measures" or that these measures are designed "to prevent the unauthorized copying or distirbution of ebook files."  Not disputed that, as to Hachette, HarperCollins, and Penguin Random House, the applied DRM is designed to prevent access by more than one-user account.  Disputed as to Wiley because, as explained in Plaintiffs' Statement of Undisputed Material Facts ("PSMF"), Wiley offers a one-copy, three-users access model.  *See* PSMF ¶ 148 and cited authority.

    127.  Starting in the early 2000's, and still today, each of the Publishers made library ebooks available on a "one-copy, one-user" licensed basis.  This license terms allows multiple library patrons to check out a single copy successively, subject to the community-based limitations described above and DRM restrictions.  Each of the Publishers initially offered this model with a perpetual term.  (Sevier Decl. ¶51; R-A Decl. R-A Decl. ¶¶30; Weber Decl. ¶68; Pavese Decl. ¶¶5, 22.)

    **Response:**  Not disputed.

    128.  Under the one-copy, one user model, libraries pay a license fee when they select a title for their collection.  (Weber Decl. ¶76; R-A Decl. ¶¶33, 37; Pavese Decl. ¶5; Sevier Decl.

¶¶68, 74.)  The library pays the same license fee regardless of whether library patrons read the entire ebook or short excerpts.  (McN Decl. ¶10.)

**Response:**  Not disputed.

129.  The same is true for commercial ebook licenses:  like print books, a purchaser pays for the work regardless of whether the purchaser actually reads any or all of the book.  (McN Decl. ¶10.)

**Response:**  Not disputed.  However, the cited evidence is not admissible.  The only cited evidence is improper attorney testimony in the form of Ms. McNamara's Declaration. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

130.  As library ebooks became increasingly more popular, HarperCollins, Penguin Random House, and Hachette each determined that a perpetual term for its one-copy, one-user model was not serving the economic interests of its authors.  They each ceased offering a perpetual term to public libraries in 2011, 2018, and 2019, respectively.  (Sevier Decl. ¶65; R-A Decl. ¶¶30-32; Weber Decl. ¶¶71-75.)

**Response:**  Not disputed.

131.  These three Publishers currently offer a one-copy, one-user model with a perpetual term to academic libraries.  Academic libraries have different needs and lending patterns than public libraries.  (Sevier Decl. ¶68; R-A Decl. ¶40; Weber Decl. ¶77).

**Response:**  Not disputed.

132.  Wiley maintains a one-copy, one user model with perpetual access for its trade books that it makes available to all libraries as ebooks.  (Pavese Decl. ¶¶5, 25-26.)

**Response:**  Disputed only to the extent Plaintiffs intend this paragraph to suggest that Wiley only a offers one-copy, one-user model for trade ebooks that it makes available to all libraries.  Wiley offers a one-copy, three-users access model.  *See* PSMF ¶ 148 and cited authority.

133.  Today, each of the Publishers offer somewhat different licensing terms for library ebooks:

**Response:**  Not disputed.

134.  In 2019, Hachette adopted a two-year term for its one-copy, one user model for library patrons to access its trade ebooks, which remains in effect today.  At the end of two-years from the date of purchase, the terms governing this lending model state that "the Digital Book will expire and will no longer be available … unless repurchased."  (Sevier Decl. ¶¶65-68.)

**Response:**  Not disputed.

135.  In 2011, HarperCollins adopted a one-copy, one-user model with a total of 26 circulations ("26-Circ Model"), which remains in effect today.  (R-A Decl. ¶¶32-35.)

**Response:**  Not disputed.

136.  Under the 26-Circ Model, a library ebook is available for twenty-six circulations. Once the twenty-six circulations are exhausted, the library can decide whether to re-order the ebook for an additional twenty-six circulations, or use their resources to buy other titles.  (R-A Decl. ¶32.)

**Response:**  Not disputed.

137.  For many years, HarperCollins priced the 26-Circ model at the same price as the suggested retail price for print books; currently it is priced at slightly more than the suggested retail price for print books.  (R-A Decl. ¶33.)

**Response:**  Not disputed.

138.   HarperCollins enacted this model with the intention that it be similar to the economics that govern the sale of print books that show wear and tear from usage and need to be replaced or are lost over time.  (R-A Decl. ¶33.)

**Response:**  Not disputed.

139.   The price per circulation of a library ebook under the 26-Circ Model is lower than the price of a commercial ebook.  (R-A Decl. ¶33.)

**Response:**  Not disputed.

140.   The 26-Circ Model generated just over $3.45 million in revenue for HarperCollins in fiscal year 2014; by fiscal year 2019, the model generated over $9.95 million.  (R-A Decl. ¶35.)

**Response:**  Not disputed.

141.   In 2017, HarperCollins adopted an additional library distribution model to supplement its 26-Circ Model, the Pay-Per-Use model ("PPU Model"), which remains in effect today.  (R-A Decl. ¶36.)

**Response:**  Not disputed.

142.   Under this model, libraries offer their patrons an opportunity to borrow an ebook from HarperCollins' catalog and pay a fee for a single, individual use only when a particular title is checked out by a patron.  (R-A Decl. ¶36.)

**Response:**  Not disputed.

143.   Currently, all HarperCollins titles qualify for the PPU Model twelve months after the initial publication date.  Libraries also retain the option to obtain these backlist titles under the 26-Circ Model as well.  (R-A Decl. ¶36.)

**Response:**  Not disputed.

144.  The PPU Model allows a library to license the right to a single circulation of an ebook for a small percentage of the price of an ebook license under the 26-Circ Model.  (R-A Decl. ¶36.)

**Response:**  Not disputed.

145.  The PPU Model addresses two needs in the library channel.  First, smaller libraries with few members that are less likely to fully exhaust all twenty-six circulations in the standard model can access a broader catalog for their patrons and manage their budgets on a month-to-month basis.  Second, larger libraries that have focused on widely read titles can provide their patrons with access to a much broader selection of books at a lower cost:  if only a few members of a public library are interested a book, the library can obtain ebook copies for that handful of individuals at a price point lower than the 26-Circ Model.  (R-A Decl. ¶36.)

**Response:**  Not disputed.

146.  In fiscal year 2018, just after it was introduced, the model generated $154,789 in revenue for HarperCollins.  By fiscal year 2020, HarperCollins earned over $2 million in revenue from library ebook checkouts via the PPU Model.  (R-A Decl. ¶33.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).

147.  In 2018, PRH adopted a two-year metered model for library patrons to access its trade ebooks, which remains in effect today.  Through one of PRH's aggregator partners, a library obtains a license to make one copy of an ebook available to patrons on a "one-copy, one-user" basis, but for "a limited term of two (2) years from the time that each such copy is first purchased and available for lending by that institution…"  At the end of the two-year period, the

ebook copy "will expire" and the library must obtain another copy if it wants to keep lending that ebook through the aggregator's platform.  (Weber Decl. ¶75.)

**Response:**  Not disputed.

148.  For its trade titles, Wiley continues to offer libraries a one-copy, one-user model or one-copy, three-users model, both with a perpetual term.  Under these models, when a library obtains a license for one ebook copy of a Wiley title, only one—or three—users at a time can access that copy.  A library's license to lend out the copy under the terms of the license does not expire.  The one-copy, one-user and one-copy, three-users model are Wiley's most popular lending models for its trade ebooks.  (Pavese Decl. ¶22.)

**Response:**  Not disputed.

149.  Wiley developed these models largely with the interests of academic libraries in mind.  (Pavese Decl. ¶25.)

**Response:**  Not disputed (but immaterial).

150.  Academic libraries are the primary customers of Wiley's science and academic-focused titles, which make up the majority of its catalog.  While all libraries exist to serve patrons and expand access to information, academic libraries have a slightly different mission than their public counterparts.  Academic libraries highly prioritize the building of long-term collections, whereas public libraries often weed their collections.  Further, professors and college students tend to make somewhat different uses of academic-focused ebooks than the general public does with trade ebooks in the public library context.  (Pavese Decl. ¶25.)

**Response:**  Not disputed.

151.  As a result of these differences, a perpetual licensing model is particularly attractive to academic libraries.  Although Wiley adopted a perpetual term for its one-copy, one-user and

one-copy, three users models with academic libraries in the forefront of its mind, Wiley has

concluded that it is simpler for the company to offer a perpetual term for all ebook titles,

including trade book titles, licensed to all libraries (including public libraries) under these

models.  (Pavese Decl. ¶¶25-26.)

**Response:**  Not disputed.

152.  Wiley sets the digital list price for its library ebooks on the one-copy, one-user

model at the same price as its print list price.  (Pavese Decl. ¶24.)

**Response:**  Not disputed.

153.  Although Wiley, because of its principal role as an academic publisher, licenses its

trade book ebooks to all libraries for a perpetual term at the same price as a print book, in a

fashion closely akin to the acquisition of print books, the Internet Archive posts thousands of

Wiley books on its Website along with the other Publishers' books.  (Pavese Decl. ¶8.)

**Response:**  Not disputed that Wiley's "principal role" is as "an academic publisher."  Not

disputed that Wiley "licenses its trade book ebooks to all libraries for a perpetual term at the

same price as a print book."  Not disputed that the Internet Archive makes certain of the

Publishers' books available for borrowing.

Disputed that Wiley's conveyance of ebooks to aggregators who then convey those

ebooks to libraries is "closely akin to the acquistion of print books."  Ebooks are licensed, not

sold, to libraries, limiting the rights libraries have with respect to those copies (including the

right to resell).  Ebook licenses—even ones for a perpetual term—restrict libraries from using an

ebook as they do a physical book.  For instance, a library cannot resell or weed the ebook when

demand for the title decreases.  As another example, an ebook cannot, without special permission

from the publisher or aggregator, be used in interlibrary loan.  Hildreth Decl. Ex. 1, Hildreth

Expert Rpt. ¶¶ 40-46, 51, 82-88, 89-95, 98-101; *see also* Gratz Opening Decl. Ex. C, Potash Dep

Tr. 141:14-142:24; Decl. of Joseph C. Gratz in Supp. of Opp'n to Pls.' Mot. for Summ J.

submitted herewith ("Gratz Opp'n Decl.") Ex. 1, Potash Dep. Ex. 4 (Scheds. A & F).  *See also*

Library Futures Amicus Brief 11, ECF No. 142 ("Several publishers and ebook aggregators

prevent libraries from acquiring eBooks with licensing (or purchasing) terms, making it

impossible for libraries to fully meet their standard access and preservation missions.  Often,

eBook licenses offered to libraries come with many restrictions on use and are prohibitively

expensive, or worse, unavailble to libraries at any price.").

154.  Because Wiley's books largely serve the academic community, the company also

has worked with the leading academic-focused aggregators EBSCO and ProQuest to develop

additional and unique lending models that serve the specific needs of libraries and readers of

Wiley's science-focused and other titles.  (Pavese Decl. ¶¶3-4, 27-30.)

**Response:**  Not disputed.

155.  For instance, Wiley works with these library ebook aggregators to offer

subscription-based models.  These subscription models offer libraries to prospect of paying for

students to have unlimited access to a large volume of ebooks.  Three of the Works in Suit

published by Wiley are available under these subscription models.  (Pavese Decl. ¶¶28-29.)

**Response:**  Not disputed.

156.  Wiley also works with its aggregator partners to offer a "Concurrent User Access

Model," which is specifically designed to account for the frequent but brief use of titles in

academic settings.  Under that model, content is available for a maximum of 365 "uses" within a

particular year.  A use is defined to exclude a brief consultation of less than 10 minutes.  (Pavese

Decl. ¶30.)

**Response:**  Not disputed.

157.  Likewise, Wiley offers a number of "Short Term Loans"—ranging from one-day, seven-day, 14-day, and 28-day periods—where a library purchases access to a title for only that specific period of time.  (Pavese Decl. ¶30.)

**Response:**  Not disputed.

158.  In addition to the Publishers' investments in the ebook format, the library ebook aggregators have invested in the creation of convenient platforms and applications that can be used by library patrons to download free ebooks to their devices anywhere there is an internet connection.  (Weber Decl. ¶68, 82; R-A Decl. ¶¶42-43.)

**Response:**  Not disputed.

159.  For example, the country's leading library ebook aggregator, OverDrive, has developed the Libby app for public libraries.  (Weber Decl. ¶82; R-A Decl. ¶¶42.).

**Response:**  Not disputed.

160.  Using the Libby app, a library patron can enter her local library card information and be granted instant access to that library's ebook holdings.  (R-A Decl. ¶42.)

**Response:**  Not disputed.

161.  The library patron may check out and access library ebooks using the app.  If a title is not available, a patron may place a hold on the book and receive a notification when the title is available to be checked out.  (R-A Decl. ¶42.)

**Response:**  Not disputed.

162.  Several other leading aggregators have developed similar platforms and applications for patrons to use to access library ebooks.  (Weber Decl. ¶68.)

**Response:**  Not disputed.

163.  The authorized library ebook market has provided library members across the United States with hundreds of millions of ebooks.  (Weber Decl. ¶10; McN Decl. ¶11.)

**Response:**  Not disputed.

164.  The number of licensed library ebooks checked out via OverDrive was ▮▮▮▮▮ in 2010, but this increased ▮▮▮▮ to nearly ▮▮▮▮▮ checkouts in 2020.  (McN Decl. ¶11.) Additionally, in 2012, OverDrive processed 70 million total digital checkouts (which includes both ebooks and audiobooks); by 2020, the number of total digital checkouts ballooned to 430 million.  (McN Decl. ¶11.)

**Response:**  Not disputed.

165.  During that same ten-year time span, the number of different titles that were checked out by patrons via OverDrive increased exponentially from ▮▮▮▮ to more than ▮▮▮▮ .  (McN Decl. ¶11.)

**Response:**  Not disputed.

166.  According to the American Library Association, more than 93% of libraries in the United States lend ebooks to their patrons.  (Weber Decl. ¶10.)  In 2020, more than 100 public library systems exceeded one million digital checkouts via OverDrive.  (Weber Decl. ¶10.)

**Response:**  Not disputed.

167.  According to the Institute of Museum and Library Services ("IMLS"), an independent federal agency that provides library grants, museum grants, policy development, and research, between FY 2014 and FY 2018, the percentage of libraries offering electronic collection materials increased from 80 percent to 90 percent.  (Weber Decl. ¶11.)  The IMLS data further reflects that the biggest growth in ebook adoption between 2014 and 2018  was

"among rural libraries (14 percent) compared to other locales (between 1 and 8 percent)." (Weber Decl. ¶11.)

**Response:**  Not disputed.

168.  Internet Archive's library expert, Susan Hildreth, testified that there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive." (McN Decl. ¶9.)

**Response:**  Not disputed.

169.  The Publishers' annual revenue from the library ebook market has increased from only a few million to hundreds of millions of dollars in less than a decade. (Weber Decl. ¶8.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Mr. Weber's Declaration (and Exhibit 2 thereto) shows only that Penguin Random House earned more than $5 million from United States digital library sales in 2010 and more than $83 million in 2020.  But digital library sales, for Penguin Random House, "includes both ebooks and digital audio."  It is therefore impossible to ascertain, from the evidence cited, how much revenue is attributable to the library ebook market specifically. Moreover, there is no cited evidentiary support for the assertion concerning the Publishers' annual revenue from the library ebook market, and Mr. Weber lacks personal knowledge of the other three Plaintiffs' revenues from the library ebook market.

170.  For example, in 2010, PRH earned over $5 million from U.S. digital library sales, which includes both ebooks and digital audio.  By 2020, that figure had grown to over $83 million.  Ebooks currently generate $59 million for PRH from library channels.  (Weber Decl. ¶8.)

**Response:**  Not disputed.

171.  From January 2017 and August 2019, approximately 25% of PRH's annual ebook revenue was generated from U.S. digital library sales; the remaining approximately 75% of revenue was generated from retail channels.  (Weber Decl. ¶64.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Paragraph 64 of Mr. Weber's Declaration discusses a Penguin Random House study of "titles published and distributed by [Penguin Random House] and first published between January 2017 and August 2019"—not sales revenues from January 2017 and August 2019 for all titles (which would include at least titles first published before January 2017).  Moreover, the exhibit referenced in paragraph 64 of Mr. Weber's Declaration, Exhibit 1, is a voluminous data file, which Mr. Weber cites without providing any guidance as to what information specifically in the data file the court should refer.  *See Stein v. N. Assur. Co. of Am.*, 09-cv-1029(TCP)(AKT), 2012 WL 1605365, at *1 n.2 (E.D.N.Y. May 7, 2012) ("[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations.") (citation omitted) (alteration in original).

172.  HarperCollins earned $46.91 million in revenue from ebooks in the United States library market between 2015 and 2020.  Library ebook licenses also make up an increasing percentage of HarperCollins' overall ebook revenue.  In fiscal year 2015, library ebook licenses in the United States constituted 2.3% of HarperCollins' total U.S. ebook revenue.  By fiscal year 2020, that share grew substantially to 7.4% and reached 12.9% of all U.S. ebook revenue by mid-2021.  As of mid-2021, HarperCollins earned over $19 million in revenue from library ebook licenses in the United States.  (R-A Decl. ¶48.)

**Response:**  Not disputed.

173.  The numbers of Americans reading authorized free ebooks from the library has increased more than the number of people purchasing ebooks in the retail market.  (Sevier Decl. ¶57; R-A Decl. ¶50.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Paragraph 50 of Ms. Restivo-Alessi's (HarperCollins) Declaration only describes data concerning the number of ebook checkouts that were made available to library patrons, not the number of ebook checkouts of HarperCollins ebooks that actually occurred.  Paragraph 57 of Mr. Sevier's (Hachette) Declaration notes only a shift from retail towards library, especially for backlist titles, and notes that 38% of Hachette backlist ebooks were bought at retail and 62% were checked out from libraries.  Neither record cite has laid a foundation for why these data points support the assertion in this paragraph concerning the rate at which each channel of revenue has increased.

Moreover, some of the cited evidence is not admissible.  Paragraph 57 of Mr. Sevier's (Hachette) Declaration cites a Hachette study.  Sevier Decl. Ex. 4.  While the Internet Archive does not dispute that the Mr. Sevier accurately quotes the conclusions of the study, to the extent Plaintiffs offer the study for the truth of its contents, the study is hearsay.  Fed. R. Evid. 801, 802.  *Young v. Daughters of Jacob Nursing Home*, No. 09-CV-7475 (CS), 2011 WL 2714208, at *1 n.1 (S.D.N.Y. July 12, 2011), *aff'd sub nom. Young v. Daughter of Jacob Nursing Home, (D.O.J.)*, 491 F. App'x 263 (2d Cir. 2012) ("It is also settled that exhibits submitted in connection with a summary judgment motion must be authenticated and non-hearsay in order to be considered.").

174.  Three of the Publishers have performed analyses to determine the proportion of ebook readers in the United States who access authorized ebooks for free from a library, as

compared with purchasing a commercial ebook.  (Sevier Decl. ¶¶55-59; Weber Decl. ¶¶6, 64; R-A Decl. ¶50.)

    **Response:**  Not disputed (but immaterial).

    175.  In 2020, PRH performed a preliminary study using nearly 87,000 titles first published by the company between January 2017 and August 2019 and compared library checkouts via OverDrive with commercial ebooks purchased from Amazon and other retail platforms.  The study determined that library patrons checked out the ebook titles 34.3 million times, which accounted for approximately 39% of all ebook reads for these titles.  Which means that, of all the Americans reading PRH ebooks available during this nearly three year time period, 39% obtained the ebook for free from a library.  (Weber Decl. ¶¶6, 64.)

    **Response:**  Not disputed that in 2020 Penguin Random House "performed a preliminary study using nearly 87,000 titles first published" by Penguin Random House "between January 2017 and August 2019."  Not disputed that this study "compared library checkouts via OverDrive with commercial ebooks purchased form Amazon and other retail platforms."

    However, disputed to the extent this paragraph relies on inadmissible evidence.  While the Internet Archive does not dispute that Mr. Weber (Penguin Random House) accurately summarizes the conclusions of the study, to the extent the study's conclusions are being offered for their truth, the study is hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  Therefore, the cited evidence is not admissible.  Moreover, the exhibit referenced in paragraphs 6 and 64 of Mr. Weber's Declaration, Exhibit 1, is a voluminous data file, which Mr. Weber cites without providing any guidance as to what information specifically in the data file the Court should refer.  *See Stein*, 2012 WL 1605365, at *1 n.2 ("[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a

motion for summary judgment, district courts are entitled to order litigants to provide specific record citations.") (citation omitted) (alteration in original).

176.   Moreover, the 39% percent of eBook reads from library patrons accounted for only 25% of PRH's total ebook revenue for that same time period, with the remaining approximately 75% of ebook revenue coming from consumers that purchased their ebooks.  (Weber Decl. ¶¶6, 64.)

**Response:**  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Paragraphs 6 and 64 of Mr. Weber's Declaration discusses a Penguin Random House study of "titles published and distributed by Penguin Random House and first published between January 2017 and August 2019"—not sales revenues from January 2017 and August 2019 for all titles (which would include at least titles first published before January 2017).  Moreover, the exhibit referenced in paragraphs 6 and 64 of Mr. Weber's Declaration, Exhibit 1, is a voluminous data file, which Mr. Weber cites without providing any guidance as to what information specifically in the data file the court should refer.  *See Stein*, 2012 WL 1605365, at *1 n.2 ("[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations.") (citation omitted) (alteration in original).

177.   In a 2021 study, Hachette looked at three years of data comparing the number of authorized ebook circulations of its titles to library patrons via OverDrive, as compared with the number of consumers purchasing their ebooks.  It found that between 2017 and 2020, library ebook circulations made up, on average, 50% of "reads."  In other words, the study reflected that

half of the people who read Hachette's ebooks are library readers who obtained the ebooks for free.  (Sevier Decl. ¶¶55-56.)

**Response:**  Not disputed that the study purports to examine "three years of data comparing the number of authorized ebook circulations of its titles to libary patrons via OverDrive, as compared with the number of consumers purchasing their ebooks." Not disputed that the study's purported findings were that "between 2017 and 2020, library ebook circulations made up, on average, 50% of 'reads.'"

Disputed to the extent the cited evidence is not admissible.  If the conclusions of the study are being quoted or summarized for the truth of the matter asserted, the study is hearsay. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook sales and Circulations[] Overview 2017-2020 at HACHETTE0010912 ("Key Observations"). To the extent the "overview" is being offered for the truth of its contents, the "overview" is also hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

178.  The study also reflected that, although library ebooks made up 50% of reads, library ebooks brought in only 13% of total ebook revenue for Hachette; the remaining approximately 87% of revenue was generated from retail channels.  (Sevier Decl. ¶56.)

**Response:**  Not disputed that the study purportedly "reflected that, although library ebooks made up 50% of reads, library ebooks brough in only 13% of total ebook revenue for Hachette; the remaining approximately 87% of revenue was generated from retail channels."

Disputed to the extent the cited evidence is not admissible.  If the conclusions of the study are being quoted or summarized for the truth of the matter asserted, the study is hearsay.

Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  Moreover Mr. Sevier's

Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this

paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook sales and Circulations[] Overview 2017-

2020 at HACHETTE0010912 ("Key Observations").  To the extent the "overview" is being

offered for the truth of its content, the "overview" is also hearsay.  Fed. R. Evid. 801, 802;

*Young*, 2011 WL 2714208, at *1 n.1.

179.  Hachette's analysis also concluded that since 2017, the percentage of their

consumer reads has been shifting from retail towards library, especially for backlist.  Of all HBG

backlist ebooks either purchased or checked out in 2020, 38% were bought at retail and 62%

checked out from libraries.  (Sevier Decl. ¶57.)

**Response:**  Not disputed that the purported conclusions of the study are that "since 2017,

the percentage of [Hachette's] consumer reads has been shifting from retail towards library,

especially for backlist.  Of all HBG backlist ebooks either purchased or checked out in 2020,

38% were bought at retail and 62% checked out from libraries."

Disputed to the extent the cited evidence is not admissible.  If the conclusions of the

study are being quoted or summarized for the truth of the matter asserted, the study is hearsay.

Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  Moreover Mr. Sevier's

Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this

paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook sales and Circulations[] Overview 2017-

2020 at HACHETTE0010912 ("Key Observations").  To the extent the "overview" is being

offered for the truth of its contents, the "overview" is also hearsay.  Fed. R. Evid. 801, 802;

*Young*, 2011 WL 2714208, at *1 n.1.

180.  Finally, the study reflected that in the year 2020, library ebooks brought in 16% of total ebook revenue for Hachette.  During the same year, 57% of the people who read Hachette's ebooks were library readers who obtained the ebooks for free.  (Sevier Decl. ¶56.)

**Response:**  Not disputed that the "study reflected that in the year 2020, library ebooks brought in 16% of total ebook revenue for Hachette.  During the same year, 57% of the people who read Hachette's ebooks were library readers who obtained the ebooks for free."

Disputed to the extent the cited evidence is not admissible.  If the conclusions of the study are being quoted or summarized for the truth of the matter asserted, the study is hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his Declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook sales and Circulations[] Overview 2017-2020 at HACHETTE0010912 ("Key Observations").  To the extent the "overview" is being offered for the truth of its contents, the "overview"" is also hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

181.  In 2021, through its 26-Circ and PPU models, HarperCollins made over 63 million ebook checkouts available to library patrons through its library ebook sales, exceeding retail ebook sales by more than 30 million.  This figure reflects all potential check-outs under the 26-Circ model, not actual check-outs.  (R-A Decl. ¶50.)

**Response:**  Not disputed that "in 2021, through its 26-circ and PPU models, HarperCollins made more than 63 million ebook checkouts available to library patrons."  Disputed to this extent the assertions in this paragraph are offered to support an argument that retail sales exceeded checkouts:  Ms. Restivo-Alessi (HarperCollins) does not lay a foundation

for using available instead of actual check-outs to show that the number of retail sales exceeded check-outs.

182.  While HarperCollins made more "reads" available through library ebook sales than through retail sales, library ebook revenue accounted for approximately 10-15% of the company's ebook revenue in 2021.  (R-A Decl. ¶50.)

   **Response:**  Not disputed.

183.  The Publishers make efforts to ensure that their ebooks are available in a format accessible to the blind and visually disabled, at no cost to those patrons.  (Sevier Decl. ¶71; R-A Decl. ¶51; Pavese Decl. ¶.)

   **Response:**  Not disputed (but immaterial).

184.  Hachette and HarperCollins make their works available through Bookshare, which is the world's largest accessible online library for people with print disabilities.  Bookshare makes its services available, free of charge, to all qualifying students in the United States through an award from the U.S. Department of Education, Office of Special Education Programs.  (Sevier Decl. ¶51; R-A Decl. ¶51.)

   **Response:**  Not disputed (but immaterial).

185.  As a result, Bookshare is free for all qualified U.S. students.  Individuals who are not students or international patrons can pay a nominal annual fee for their membership. Bookshare makes content available through a range of assistive technologies, including braille readers, text to speech and ebooks.  If a reader requested title is print exclusive or has never yet been available in ebook format, the Publishers produce a special PDF exclusive to Bookshare for the unique purpose of fulfilling this obligation to readers.  (Sevier Decl. ¶51.)

   **Response:**  Not disputed (but immaterial).

186.  For the general population, the Publishers also produce ebooks with the typical features of type resizing, page magnification, and screen contrast so readers can adjust the text to their preference.  (R-A Decl. ¶52; Sevier Decl. ¶71.)

**Response:**  Not disputed (but immaterial).

187.  Starting in March 2020, as the COVID-19 pandemic caused various shutdowns, the Publishers enacted programs and new lending models to assist libraries and schools to meet the increased demand for ebooks.  (Sevier Decl. ¶70; Weber Decl. ¶¶79-80; R-A Decl. ¶41.)

**Response:**  Not disputed.

188.  During the pandemic, many public libraries in the United States were provided with time-limited federal funding under the American Rescue Plan Act that could be directed towards obtaining library ebooks for patrons.  Some of the Publishers adjusted their models to allow libraries to qualify for this funding.  (R-A Decl. ¶41; Weber Decl. ¶79.)

**Response:**  Not disputed.

189.  PRH implemented two library ebook models in the spring of 2020.  (Weber Decl. ¶79.)

**Response:**  Not disputed.

190.  First, PRH created a one-year metered model under which libraries can purchase a license to access an ebook title on a one-copy, one-user basis for half the digital list price than the company's standard two-year model.  (Weber Decl. ¶79.)

**Response:**  Not disputed.

191.  Second, PRH created a pay-per-use model.  If a library participates in this model, the patrons of that library are given the option to access a one-time, time-limited loan of any ebook in PRH's catalog.  Each time a title is checked out through this model, the library pays

10% of the standard digital list price under PRH's standard two-year library ebook model.
(Weber Decl. ¶80.)

    **Response:**  Not disputed.

    192.  Starting in the beginning of the pandemic, Hachette adopted protocols under which
teachers and professors could obtain up to 250 codes for their students to use to obtain ebooks
that could be read in lieu of physical copies that were inaccessible.  (Sevier Decl. ¶70.)

    **Response:**  Not disputed.

    193.  In response to the pandemic, Hachette also provided discount ebooks to academic
libraries on a case-by-case basis, either under a simultaneous use option that allowed up to
twenty students to read a single copy of an ebook for two months for $20, or through a
discounted one-copy, one user model where a library would be charged $3 for each ebook copy,
for a three-month access period.  (Sevier Decl. ¶70.)

    **Response:**  Not disputed.

    194.  During the pandemic, HarperCollins temporarily instituted a prorated, time-metered
model for libraries to make HarperCollins' ebooks available to their patrons.  The company
developed this model with the intent to allow libraries to spend their time-limited federal funding
on licensed ebooks.  (R-A Decl. ¶41.)

    **Response:**  Not disputed.

    195.  At the start of the pandemic, HarperCollins reduced prices on approximately 1,000
popular backlist trade and children's ebook titles for several months.  (R-A Decl. ¶41.)

    **Response:**  Not disputed.

    196.  HarperCollins also expanded the titles in the PPU model at this time.  While the
PPU Model had previously been confined to books published more than eighteen months ago,

the company moved up the time frame for frontlist books to enter the PPU Model to six months post-publication.  (R-A Decl. ¶41.)

**Response:**  Not disputed.

197.  Additionally, starting in the beginning of the pandemic, HarperCollins extended permission to authors, educators, and librarians to read the company's titles online and on video. (R-A Decl. ¶41.)

**Response:**  Not disputed (but immaterial).

198.  The Publishers brought this suit as to each of the 127 literary works listed in Exhibit A (the "Works") to their Complaint.  (McN Decl. ¶7.)

**Response:**  Not disputed.

199.  The 127 Works in Suit range from well-known titles like *The Bell Jar* and *Lord of the Flies*, to groundbreaking titles, like Zora Neale Hurston's *Their Eyes Were Watching God* or Toni Morrison's *Bluest Eye*, to popular non-fiction and fiction titles, like Malcolm Gladwell's *Blink*, Gillian Flynn's *Gone Girl*, Ann Patchett's *Commonwealth*, and George R.R. Martin's *A Dance with Dragons* (from the *Game of Thrones* series), to classic children's titles, like the *Big Nate* or *Lemony Snicket* books, to biographies, to romance novels, like CJ Redwine's *Defiance*, and Patrick Lencioni's best-selling management books.  (McN Decl. ¶7; Weber Decl. ¶¶21-22; Sevier Decl. ¶73; R-A Decl. ¶6; Pavese Decl. ¶18.)

**Response:**  Not disputed.

200.  For each of the Works in Suit, the Publishers obtained from each author the exclusive rights to publish the underlying work in multiple formats, including hardcover, paperback, and ebook formats.  (McN Decl. ¶8.)

**Response:**  Not disputed.

201.  All 127 Works in Suit are available as authorized ebooks, which retail consumers pay to read and libraries pay to license so that they can be loaned for free to their patrons. (Sevier Decl. ¶9; Weber Decl. ¶20; R-A ¶20; Pavese Decl. ¶18.)

**Response:**  Not disputed.

202.  Over the three years prior to this action, the Works in Suit collectively generated over $1 million in library ebook revenues alone for the respective Publishers and their authors. (Weber Decl. ¶23; R-A ¶49.)

**Response:**  Disputed to the extent the cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  There is no cited support for the assertion that the "Works in Suit collectively generated over $1 million in library ebook revenues alone" "over the three years prior to this action" "for . . . their authors."  Further, Plaintiffs do not provide any support for the authors of the Works in Suit making over $ 1 million in library ebook revenue for "the three years prior to this action."  There is therefore not sufficient evidence to show that the Works in Suit generated over $1 million in library ebook revenue.

203.  The Works in Suit were checked out on Internet Archive's Website 46,307 times between March 2017 and approximately September 2, 2020.  (Foster Decl. ¶104.)  As of May 2020, Internet Archive provided registered users of its website with digital versions of the physical books embodying the Works in Suit.  (Offner Decl. ¶14.)

**Response:**  Not disputed, but note that, in both Dr. Foster's Report and in his Declaration, the exact number is 46,305, not 46,307.

204.  Digital versions of each of the Works in Suit could be accessed on Internet Archive's website using a standard Internet Archive account.  A specially qualified account held

be someone with a print disability was not necessary to access the Works in Suit.  (Offner Decl. ¶6.)

      **Response:**  Not disputed.

      205.  The Internet Archive generates a "details" page for each book listed on its website, with a separate URL.  (Offner Decl. ¶8.)

      **Response:**  Not disputed.

      206.  As of May 2020, each of the Works in Suit had a "details" page with a separate URL on the Internet Archive's website.  (Offner Decl. ¶14.)

      **Response:**  Not disputed.

      207.  As of May 2020, while on the "details" pages for all of the Works in Suit, a user could click a button labeled "Borrow".  (Offner Decl. ¶11.)

      **Response:**  Not disputed.

      208.  As of May 2020, after clicking the "Borrow" button on the "details" pages for all of the Works in Suit, a user would obtain access to each full book for 14 days.  (Offner Decl. ¶14.)

      **Response:**  Not disputed.

      209.  For all of the Works in Suit, once a user accessed each full book, a user could:

      **Response:**  Not disputed.

      209.1.  Scroll through and read the book within the Internet Archive website's online book-reader interface;

      **Response:**  Not disputed.

      209.2.  Utilize the listen feature, called "Read this book aloud," of the Internet Archive website's online book-reader interface to hear an audio rendering of each book; and

      **Response:**  Not disputed.

209.3.  Use the download feature to download each full book from Internet Archive website, for access on a computer using Adobe Digital Editions.  The download feature allowed for downloads in both PDF and ePUB formats.  (Offner Decl. ¶12.)

**Response:**  Not disputed.

210.  Hachette holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Hachette is identified as the publisher.  (McN Decl. ¶8.)

**Response:**  Not disputed.

211.  HarperCollins holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which HarperCollins is identified as the publisher.  (McN Decl. ¶8.)

**Response:**  Not disputed.

212.  Penguin Random House holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Penguin Random House is identified as the publisher. (McN Decl. ¶8.)

**Response:**  Not disputed.

213.  Wiley holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Wiley is identified as the publisher.  (McN Decl. ¶8.)

**Response:**  Not disputed.

214.  Each of the 127 Works was registered with the United States Copyright Office within the time period required to recover statutory damages and attorneys' fees under 17 U.S.C. § 412 with respect to the allegations set forth in the Complaint.  (McN Decl. ¶8.)

**Response:**  Not disputed.

215.  Internet Archive endorses the phrase "Universal Access to All Knowledge."  (McN Decl. ¶27.)

**Response:**  Not disputed (but immaterial).

216.  Internet Archive was founded in 1996 by Brewster Kahle, who currently serves as its Chairman.  (McN Decl. ¶28.)

**Response:**  Not disputed (but immaterial).

217.  Mr. Kahle is a computer scientist who sold two technology companies in the 1990s, one to AOL and another to Amazon.  (McN Decl. ¶28.)

**Response:**  Not disputed (but immaterial).

218.  The considerable profits from those sales were used, in part, to fund the Kahle/Austin Foundation, which Kahle runs as President with his wife and which reported assets worth approximately $120 million in 2019.  (McN Decl. ¶28.)

**Response:**  Not disputed (but immaterial).

219.  Internet Archive is a 501(c)(3) corporation. (McN Decl. ¶29.)

**Response:**  Not disputed.

220.  In a 2017 grant application, Internet Archive stated that it has a guaranteed source of philanthropic support to sustain its basic services in perpetuity."  (McN Decl. ¶29.)

**Response:**  Not disputed.

221.  Internet Archive's activities are in large part funded by Mr. Kahle's various entities, including the Kahle/Austin Foundation.  IA's former Director of Finance Jacques Cressaty testified that Mr. Kahle "would use various ways of channeling these funds [to IA]" including via the Kahle/Austin Foundation.  (McN Decl. ¶29.)

**Response:**  Not disputed (but immaterial).

222.  Government funding made up only 1.8% of Internet Archive's revenue between 2011 and 2020.  (McN Decl. ¶29.)

**Response:**  Not disputed (but immaterial).

223.  Mr. Kahle wrote in a March 1, 1997 article for Scientific American that "the continued reduction in price of data storage, and also data transmission, could lead to interesting applications as all the text of a library, music of a radio station, and video of a video store become cost effective to store and later transmitted in digital form."  (McN Decl. ¶31.)

**Response:**  Not disputed (but immaterial).

224.  In approximately 2000 or 2001, Internet Archive started uploading public domain books to its Website in order to "build[] a digital library".  (McN Decl. ¶31.)

**Response:**  Not disputed.

225.  The Google Books service at issue in *Authors Guild v. Google, Inc*., 804 F.3d 202 (2d Cir. 2015), allowed users to search through and read "snippets" of books, but did not allow users to access the complete text of a book.  (McN Decl. ¶¶33-34.)

**Response:**  Not disputed.

226.  In a December 20, 2006 article, Mr. Kahle was quoted as saying "[t]he whole Google Books Search looks like Amazon's Search Inside the Book.  Let's go open with these collections.  These are beautiful books."  (McN Decl. ¶33.)

**Response:**  Not disputed (but immaterial).

227.  About a year later, Internet Archive announced that "together with the Boston
Public library and the Woods Hole Library, it would start scanning out-of-print but in-copyright
works to be distributed through a digital interlibrary loan system."  (McN Decl. ¶34.)

**Response:**  Not disputed (but immaterial).

228.  In contrast, a New York Times article stated that "Google scans copyrighted works
as well, but it does not allow users to read the full text of those books online, and it allows
publishers to opt out of the program."  (McN Decl. ¶34.)

**Response:**  Not disputed (but immaterial).

229.  Mr. Kahle has stated that he sees Internet Archive's activities in connection with the
Website as a "rebellious" act that "SIMPLY ASSUME[s]" that Internet Archive "can perform a
function in the online environment that [libraries] routinely perform in the physical print
environment."  (McN Decl. ¶15.)

**Response:**  Disputed to the extent the assertions in this paragraph are misleading (but
immaterial).  This quote is in the context of discussing Controlled Digital Lending specifically,
not the Internet Archive per se:  "But you don't always need to break down doors or smash locks
to make progress.  CDL is also a quiet and powerful little tool that lets libraries do something
that might feel rebellious: SIMPLY ASSUME they they can []Perform a function in the online
environment that they routinely perform in the physical print environment, in order to ensure that
knowledge can be equitable shared."  McNamara Decl. Ex. 27 at INTARC00142135.  Further,
Chris Freeland appears to have given this presentation, not Brewster Kahle.  *See* McNamara
Decl. Ex. 27 at INTARC00142018.

230.  Today, subject to its claim that it does not post books published within the last five years, Internet Archive scans any in-copyright books it acquires and posts ebook versions of those titles on its Website.  (McN Decl. ¶35.)

**Response:**  Not disputed that the Internet Archive, as a matter of course, does not loan books that have been published within the last five years.  Disputed that the Internet Archive "scans any in-copyright books it aquires and posts ebook versions of those titles on its Website." Before scanning a book it lawfully acquires, the Internet Archive ascertains whether the book is one the Internet Archive affirmatively wants to digitize.  Internet Archive has not yet lawfully acquired, scanned, and made available for digital lending.  Kahle Opp'n Decl. ¶ 17; *see also* Gratz Opp'n Decl. Ex. 2, Mills Dep. Tr. 154:6-155:3.

231.  Internet Archive does not always comply with its five year limitation.  For example, two of the Works in Suit, All the Presidents' Women and The Man Who Solved the Market, were published in 2019 and republished on the IA's Website that same year.  (McN Decl. ¶115.)

**Response:**  Not disputed.

232.  Internet Archive has set public goals for the number of in-copyright books it would like to make available for borrowing as ebooks on the Website.  For example, in March 2018, Internet Archive announced that its short-term goal is to digitize more than four million in-copyright books and add them to the Website.  (McN Decl. ¶36.)

**Response:**  Not disputed.

233.  Then, eight months after this lawsuit was filed, Internet Archive announced that it had added its two millionth in-copyright book to the Website on February 3, 2021.  (McN Decl. ¶36.)

**Response:**  Not disputed.

234.  IA currently lists more than 3 million in-copyright books on its Website.  If IA continues to add in-copyright books at a similar rate, it is on track to meet its four million-book milestone within a year.  (McN Decl. ¶36.)

**Response:**  Not disputed.

235.  In an August 2011 article in *The Guardian*, Mr. Kahle stated that he has a "realistic goal of 10 million books—the equivalent of a major university library."  (McN Decl. ¶36.)

**Response:**  Not disputed (but immaterial).

236.  At present, anybody in the world with an Internet connection and a valid email account can obtain an account to access any of the millions of ebooks available on IA's Website. (McN Decl. ¶3.)

**Response:**  Not disputed.

237.  Chris Freeland, Internet Archive's Director of Open Libraries, testified that any person can "sign up" for free access to the Website "from anywhere in the world" by entering "[b]asic contact information including [an] email address."  (McN Decl. ¶3.)

**Response:**  Not disputed.

238.  According to Mr. Freeland, Internet Archive "[l]end[s] to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into [controlled digital lending] by particular users."  (McN Decl. ¶3.)

**Response:**  Not disputed.

239.  The Publishers commenced this copyright infringement action on June 1, 2020, alleging that Internet Archive was infringing the 127 Works in Suit.  (McN Decl. ¶7.)

**Response:**  Not disputed.

240.  An analysis of the Website shows that over 33,000 in-copyright books published by the Publishers in print and digital form are available on the Website.  (McN Decl. ¶7.)

**Response:**  Not disputed.

241.  The Works in Suit are a fraction of the more than 33,000 in-copyright books published by the Publishers that Internet Archive has posted as ebooks on the Website without authorization, license or any compensation.  (McN Decl. ¶7; Foster Decl. ¶¶112-118.)

**Response:**  Not disputed that the Works in Suit are not the only books published by Plaintiffs that the Internet Archive loans to its patrons.  Not disputed that the Internet Archive loans books without permission from Publishers.  Not disputed that the Internet Archive does not pay licensing fees to Plaintiffs for lending books.  Disputed that the Publishers do not receive compensation for the books the Internet Archive lends.  Publishers are compensated for the books the Internet Archive digitizes and makes available for lending when the physical copy is sold for the first time.  Gratz Opening Decl. Ex. A, Stipulation of Undisputed Facts ("Stipulation") ¶ 2.  Further, the only support cited for the assertion that the Internet Archive loans books published by Publishers "without . . . any compensation" is improper attorney testiomny in the form of Ms. McNamara's Declaration.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  (The cites to the Foster Declaration do not reference compensation at all.)

242.  Internet Archive scanned physical books published by the Plaintiffs and "republishes" ebook editions on the Website.  (McN Decl. ¶13.)

**Response:**  Not disputed.

243.  The Publishers have not granted Internet Archive permission to scan their physical books to create digital copies.  (McN Decl. ¶13.)  The Plaintiffs have not granted Internet

Archive permission to distribute these unauthorized ebook editions on the Website.  (McN Decl. ¶13.)

    **Response:**  Not disputed.

    244.  Internet Archive admits that it lacks permission from the Publishers to engage in these activities.  (McN Decl. ¶13.)

    **Response:**  Not disputed.

    245.  Mr. Freeland testified that Internet Archive does not "pay royalties in connection with the digitization of [each author's] work" or "pay authors royalties for making their books available for free" on the Website.  (McN Decl. ¶37.)

    **Response:**  Not disputed.

    246.  Mr. Freeland testified that Internet Archive does not "license materials" for its Website. (McN Decl. ¶12.)

    **Response:**  Not disputed.

    247.  When this lawsuit was filed in June 2020, Internet Archive admitted in its Answer to the Complaint that "more than 1.3 million books are available on archive.org for one patron to borrow at a time."  (McN Decl. ¶1.)

    **Response:**  Not disputed.

    248.  Since June 2020, the number of in-copyright ebooks available on the Website has increased to over 3.2 million.  (McN Decl. ¶1.)

    **Response:**  Not disputed.

    249.  The Website effectuates about 70,000 "borrowing events" per day—which amounts to 25 million per year.  (McN Decl. ¶2.)

    **Response:**  Not disputed.

250.  As of July 2022, IA's Website reflects that it has 5.9 million users.  This figure was 2.6 million when this action was filed in June 2020.  (McN Decl. ¶2.)

**Response:**  Not disputed.

251.  According to Internet Archive, at the time this action was filed, any user who logged in with a valid Internet Archive account could "borrow" for free in-copyright ebooks for a period of 14 days.  (McN Decl. ¶4.)

**Response:**  Not disputed.

252.  After this action was filed, Internet Archive changed it practices and now its default option allows valid users to "borrow" free in-copyright ebooks for a period of one hour.  (McN Decl. ¶4.)

**Response:**  Not disputed.

253.  Internet Archive still offers users the ability to "borrow" a book for 14 days if the title is available for concurrent lending by more than person at once.  Each title has a lending cap based on the number of concurrent loans of the work is allowed at one time. If the lending cap for a particular ebook title has been exceeded, the user goes on a waitlist until it becomes available.  (McN Decl. ¶4.)

**Response:**  Not disputed.

254.  Internet Archive has indicated that it offers "High Quality Page Images" of the books available for reading or downloading on its Website.  (McN Decl. ¶4.)

**Response:**  Not disputed.

255.  One of Internet Archive's experts, Dr. Imke Reimers, testified that the quality of the scans were "fine," "quite similar to the Google Books scans," and sufficiently clear to serve as a "potential substitute" for authorized library or commercial ebooks.  (McN Decl. ¶4.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Dr. Reimers testified that the Internet Archive's digitized books "vary in quality" and that it was an "empirical question" as to whether digitized books served as "substitutes" for ebooks.  McNamara Decl. ¶ 4 & Ex. 11, Reimers Dep. Tr. 21:19-23:11.

256.  Internet Archive invites its users to read the ebooks on the Website.  For example, the top of the home page of openlibrary.org invites readers to "Read Free Library Books Online."  (McN Decl. ¶5.)  Internet users who search Google for terms like "free ebooks," "borrow ebooks" or "Toni Morrison beloved free read" will see links to Internet Archive's Free Ebook Website on the first page of results, above any links to platforms offering the Plaintiffs' authorized library ebooks.  (McN Decl. Exhibit 185.)

**Response:**  Disputed.  The only support cited for the sentence in this Paragraph related to Google searches is McNamara Exhibit 185, which is not authenticated by any declaration. *Young*, 2011 WL 2714208, at *1 n.1 ("Exhibits submitted in connection with a summary judgment motion must be authenticated and non-hearsay in order to be considered.").  Further, Exhibit 185 does not support the assertion for which it is cited:  that generic "Internet users who search Google for terms" will see certain results.  Rather, Exhibit 185 appears to depict searches conducted by a logged-in user whose user name begins with "J."  Exhibit 185 suggests that this logged-in user has previously conducted searches:  The visible Google result states, "This search may be relevant to recent activity."  *Id.*, ECF p. 4.

257.  Mr. Kahle testified that once an ebook is checked out, a user can "flip through or read all the pages, absolutely."  (McN Decl. ¶4.)

**Response:**  Not disputed.

258.  Internet Archive's library expert admitted that "certainly some [ebooks] could be read in an hour."  (McN Decl. ¶4.)

**Response:**  Not disputed.

259.  Internet Archive is aware that at least some of its users use the Website to read books in full.  In June 2020, when Internet Archive changed its default loan period from 14 days to 1 hour, it received complaints from users.  (McN Decl. ¶5.)

**Response:**  Not disputed.

260.  For example, one user asked the Internet Archive, "How come all the books I try to read have a one hour limit? I'm confused and I'd just love to finish a series I'm reading."  (McN Decl. ¶5.)

**Response:**  Not disputed.

261.  As of July 2020, there are more than 1.1 million ebooks listed for 14-day downloads on the Website.  (McN Decl. ¶4.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).[3]

---

[3] To the extent Plaintiffs meant to cite to paragraph 5 rather than 4 of the McNamara Declaration, the cited evidence also does not support the assertion in this paragraph.  The McNamara Declaration cites to Exhibit 3 for this assertion, a PDF of the Books to Borrow landing page from archive.org.  The Books to Borrow landing page indicates that there are more than 1.1 million ebooks listed for 14-day downloads, but it is not evident from the document that this figure is accurate as of July 2020, rather than the date the landling page was preserved as a PDF.  In fact, the document appears to have been saved in July of 2022.  *See* ECF p. 5.

262.  For the books that are available on the Website for one hour loans only, the top of the page view tells users that the loans are "[r]enewable every hour, pending availability." (McN Decl. ¶6.)

**Response:**  Not disputed.

263.  Internet Archive's dissemination of ebooks on its Website has expanded in recent years.  (Foster Decl. ¶18.)

**Response:**  Not disputed.

264.  The number of ebooks that Internet Archive makes available for lending on its Website has increased from (a) 648,117 scans on April 1, 2018; (b) 965,499 scans on April 1, 2019; (c) 1,476,344 scans on May 26, 2020; and (d) 3,211,204 scans on February 19, 2022. (Foster Decl. ¶18.)

**Response:**  Not disputed.

265.  The data further reflects an increase in Internet Archive's scanning of the Publishers' works in 2020 and 2021 after the Publishers filed suit in June 2020, as compared to prior years.  (Foster Decl. ¶18.)

**Response:**  Not disputed.

266.  Since this action was filed, Internet Archive has added a total of 2,993 in-copyright works published by Hachette for lending on the Website.  (Foster Decl. ¶118, Figure 11.)

**Response:**  Not disputed.

267.  Since this action was filed, Internet Archive has added a total of 4,171 in-copyright works published by HarperCollins for lending on the Website.  (Foster Decl. ¶118, Figure 12.)

**Response:**  Not disputed.

268.  Since this action was filed, Internet Archive has added a total of 9,558 in-copyright works published by PRH for lending on the Website.  (Foster Decl. ¶118. Figure 13.)

**Response:**  Not disputed.

269.  Since this action was filed, Internet Archive has added a total of 2,622 in-copyright works published by Wiley for lending on the Website.  (Foster Decl. ¶118, Figure 14.)

**Response:**  Not disputed.

270.  The Website's home page includes a "BOOKS" tab that, when clicked, prominently shows icons for "Books to Borrow" and "Open Library."  The first icon leads to a page for the "Books to Borrow" collection of electronic books on the Website.  The second icon leads to the Openlibrary.org page, which is a component of Internet Archive's Website.  (Foster Decl. ¶21.)

**Response:**  Not disputed.

271.  Internet Archive organizes its various content into "collections."  The "Books to Borrow" page provides access to digitized books within the "inlibrary" collection, reported as holding 3,211,204 items as of Feb 21, 2022 and presently at over 3.4 million  (Foster Decl. ¶21; McN Decl. ¶1.)

**Response:**  Not disputed.

272.  Clicking on the "About" icon on the "Books to Borrow" page toggles to text explaining that "Books in this collection may be borrowed by logged in patrons.  You may read the books online in your browser or, in some cases, download them into Adobe Digital Editions, a free piece of software used for managing loans."  The description at the "About" icon on the "Books to Borrow" page, at https://archive.org/details/inlibrary?tab=about, also indicates:

> Please note that works in this collection are protected by copyright
>
> law (Title 17 U.S. Code) and copying, redistribution or sale,

whether or not for profit, by the recipient is not permitted unless

authorized by the rightsholder or by law.

(Foster Decl. ¶23.)

**Response:** Not disputed.

273. Until June 2020, the Website functionality enabled downloads of any borrowed book into Adobe Digital Editions. After this action was filed, in June 2020, Internet Archive changed its system so that only 14 day loans allowed downloads of the books. The 1-hour loans are available for online viewing in your browser. (Foster Decl. ¶24.)

**Response:** Not disputed.

274. Users can presently use a search feature on the "Books to Borrow" page to locate titles within the collection. Apart from that search interface, the Internet Archive groups books into various "Topics and Subjects" for users to find a book. (Foster Decl. ¶24.)

**Response:** Not disputed.

275. The Internet Archive requires users to be logged in to an Internet Archive account to access many of its functions, including full access to free copies of complete digital books in the inlibrary collection. (Foster Decl. ¶27.)

**Response:** Not disputed.

276. The "BookReader application" allows the user to use the arrow keys on their keyboard, or to click on navigation buttons in the reader, to move to different pages in the borrowed book. The BookReader app on the Website also has a "Read Aloud" feature, which a logged in user can activate for a borrowed book by clicking on headphones icon in the BookReader. The feature converts the text to audio and plays it aloud. (Foster Decl. ¶28.)

**Response:** Not disputed.

277.  With a 14-day loan, the user is presented with text providing for additional "DOWNLOAD OPTIONS" including "ENCRYPTED ADOBE EPUB" and "ENCRYPTED ADOBE PDF" (with "High Quality Page Image").  Clicking on the latter results in a file download to a user's computer, which can be opened in the "Adobe Digital Editions 4.5" application. The scanned book is then in the user's Adobe Digital Editions "Library," from where the user can open and read it on a computer and a variety of other devices, including an iPad.  (Foster Decl. ¶30.)

**Response:**  Not disputed.

278.  Depending on the number of concurrent loans allowed, multiple users can obtain and read copies of the same Internet Archive scan of a book at the same time.  (Foster Decl. ¶31.)

**Response:**  Not disputed.

279.  Internet Archive has developed technology to facilitate its practice of obtaining physical books and of scanning those books in order to distribute the resulting ebooks on its Website.  (McN Decl. ¶38.)

**Response:**  Not disputed.

280.  According to Mr. Kahle's "Universal Access to Knowledge" speech in 2006, Internet Archive had by that time "developed [its] own little book scanner to get the cost per page—if you were to scan inside the United States—down to ten cents."  (McN Decl. ¶39.)

**Response:**  Not disputed.

281.  That machine, known as a Scribe, photographs the pages of books, which are turned manually by an operator raising and lowering a V-shaped pane of glass that keeps the pages flat. (McN Decl. ¶39.)

**Response:**  Not disputed.

282.  The photographs of each page of the book are run through software developed by Internet Archive, also called Scribe, to create digital copies of print books.  The Scribe machine and software are collectively known as the Scribe system.  (McN Decl. ¶39.)

**Response:**  Not disputed.

283.  Internet Archive subsequently created "digitization centers," where operators run multiple Scribe machines to scan high volumes of books.  Around 2009, Internet Archive partnered with a company called Data Datum to scan books in China.  (McN Decl. ¶40.)

**Response:**  Not disputed.

284.  Internet Archive also operates scanning centers in the United States, United Kingdom and Canada.  (McN Decl. ¶40.)

**Response:**  Not disputed.

285.  In 2019, IA opened a "superscanning" center in Cebu, Philippines that receives shipping containers full of books and digitizes them for inclusion on the Website.  (McN Decl. ¶40.)

**Response:**  Not disputed.

286.  Using these facilities, as of about 2021, Internet Archive scans about 3,500 books a day, which amounts to 1.28 million books annually.  (McN Decl. ¶40.)

**Response:**  Not disputed.

287.  Internet Archive does not license ebooks and does not pay any royalties to authors or publishers in connection with its digitizing and posting books on its Website for free.  (McN Decl. ¶12.)

**Response:**  Not disputed.

288.  Instead, Internet Archive stocks its Website by scanning and digitizing physical books that it obtains primarily via two channels—(1) by partnering with libraries to scan their collections, and (2) acquiring print books.  (McN Decl. ¶41.)

**Response:**  Not disputed.

289.  Internet Archive enters into contracts with certain libraries to scan their collections as part of a "commercial" book scanning business.  IA's book scanning business has generated more than $35 million of income since 2011.  (McN Decl. ¶ 42.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  The Internet Archive's book digitizing activities pursuant to agreements with libraries are not a commercial business.  The vast majority of scanning relationships the Internet Archive has with libraries involve the scanning of public domain books.  These books are not made available for borrowing through the lending library: Internet Archive patrons are able to download public domain materials with no restrictions. Kahle Opp'n Decl. ¶ 14.

290.  Participating libraries enter into an agreement to provide IA with print books from their collections to scan, which can be done on premises or offsite.  The scanning process keeps the book intact and, once scanned, the physical books return to the library for further circulation. (McN Decl. ¶42.)

**Response:**  Disputed (but immaterial).  Apart from a few exceptions, books subject to scanning agreements the Internet Archive enters into with libraries are not the books the Internet Archive lends to patrons.  Kahle Opp'n Decl. ¶ 14.

291.  Under standard terms in the Scanning Agreement, Internet Archive "provide[s] one digital copy of each digitized [book] … to the Library and will retain additional Digital Copies.

Internet Archive will post Digital Copies on the Internet Archive in a newly created sub-collection… The Digital Copies will be freely available from Internet Archive via HTTP, Torrent or a similar method."  (McN Decl. ¶43.)

**Response:**  Not disputed.

292.  The terms further state that both the library and Internet Archive "may freely use their Digital Copies … in any manner" that is "permitted under applicable copyright law," including "reproducing, displaying, storing, modifying, or distributing the Digital Copies." (McN Decl. ¶43.)

**Response:**  Not disputed.

293.  Internet Archive engaged in marketing to invite libraries to participate in a scanning project.  For example, Internet Archive produced a flier inviting libraries to "Digitize your Collections [a]t one of our Regional Digitization centers or on your Table Top Scribe locally" that promises "[u]nlimited downloads of your items, with perpetual access.  Keep and distribute copies!"  (McN Decl. ¶42.)

**Response:**  Not disputed.

294.  The majority of the books Internet Archive scanned from library collections were in the public domain, but some books are in-copyright.  (McN Decl. ¶43.)

**Response:**  Not disputed.

295.  Mr. Freeland first testified that in-copyright books scanned from library collections cannot be checked out on its Website.  (McN Decl. ¶43.)

**Response:**  Not disputed.

296.  But, after he was shown an example of a work scanned from the collection of the Boston Public Library that apparently was available for borrowing, Mr. Freeland testified that in-

copyright "books may well be available for lending on archive.org that were obtained via scanning agreement..."  (McN Decl. ¶43.)

    **Response:**  Not disputed.

    297.  According to Internet Archive, libraries were apparently reluctant to allow IA to scan in-copyright books because of "copyright concerns."  (McN Decl. ¶¶44-45.)

    **Response:**  Not disputed.

    298.  Mr. Kahle stated in a July 2019 blog post that Internet Archive "has worked with 500 libraries over the last 15 years to digitize 3.5M books.  But based on copyright concerns the selection has often been restricted to [public domain] books."  (McN Decl. ¶44.)

    **Response:**  Not disputed.

    299.  Internet Archive's former Director of Finance, Jacques Cressaty, also testified that, by 2016, "our library partners ran out of books that were out of copyright, so pre-1923, and they're reluctant to give us books that were in copyright."  (McN Decl. ¶43.)

    **Response:**  Not disputed.

    300.  To obtain physical books to scan, Internet Archive has looked to sources outside of libraries that have executed scanning agreements.  Internet Archive has gathered some books from donations, including  "about 500,000 books" by 2011.  (McN Decl. ¶45.)

    **Response:**  Disputed.  Apart from a few exceptions, books subject to scanning agreements the Internet Archive enters into with libraries are not the books the Internet Archive lends to patrons.  Kahle Opp.n Decl. ¶ 14.  Further, the cited evidence, improper testimony in the form of Ms. McNamara's Declaration, is not admissible.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

301.  Internet Archive also purchased books that its scanning contractor, "Datum Data," had obtained "through their connections in China."  (McN Decl. ¶45.)

**Response:**  Not disputed.

302.  Internet Archive has no policy in place to assess whether a particular physical book in its collection is a counterfeit copy before making a digital copy of the book and making that digital copy available for lending.  (McN Decl. ¶45.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1).  Further, Andrea Mills testified that the Internet Archive's practice was to reject—not scan—a book when either the ISBN on that book is not a valid ISBN or when the ISBN yields metadata that does not match the book.  Kahle Opp'n Decl. ¶ 18; Gratz Opp'n Decl. Ex. 2, Mills Dep. Tr. 116:12-117:6; Gratz Opening Decl. Ex. A, Stipulation ¶ 2.

303.  Internet Archive has also obtained books by absorbing entire library collections.  In 2020, the defunct Marygrove College donated its entire collection of "70,000 books" and other works.  (McN Decl. ¶46.) (

**Response:**  Not disputed.

304.  The materials in the Marygrove College collection were packed for shipping, digitized and resulting ebook copies were posted on the Website.  (McN Decl. ¶46.)

**Response:**  Not disputed.

305.  Internet Archive also has operated a book sponsorship program that allows users to contribute money towards the purchase and scanning of particular books they want to see added to the Website.  (McN Decl. ¶47.)

**Response:**  Not disputed.

306.  Mr. Cressaty testified that, "[i]f you have a book that you are interested in having a digital copy of …, you can send us money or you can send us a book plus a donation to cover the cost of … the digitization of that book."  (McN Decl. ¶47.)

**Response:**  Not disputed.

307.  Mr. Cressaty further testified that "the donor gives Internet Archive money in excess of the price of the book, and that money covers the purchase of the book and its scanning."  (McN Decl. ¶47.)

**Response:**  Not disputed.

308.  Internet Archive also has funded its projects with donations of bitcoin.  For instance, Internet Archive received "$1M in Bitcoin" from the anonymous donor behind the "Pineapple Fund."  (McN Decl. ¶48.)

**Response:**  Not disputed.

309.  Internet Archive testified that "there's no way you can tell" where this money is coming from and the source "could be ISIS, for all you know."  (McN Decl. ¶48.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  The quoted language is from the questioning attorney. *See* McNamara Decl. ¶ 48 & Ex. 45, Cressaty Dep. Tr. 114:12-116:18.

310.  The physical books Internet Archive obtains are typically packed into shipping containers and sent to offshore digitization facilities in Cebu or China, where they are rendered into ebooks by the Scribe system.  (McN Decl. ¶49.)

**Response:**  Not disputed.

311.  The books are then shipped back to facilities operated by IA's affiliates, where they "are stored in double-stacked shipping containers in … physical archive facilities in Richmond, CA and Pennsylvania."  (McN Decl. ¶49.)

**Response:**  Not disputed.

312.  Unlike the physical books in the collections of public libraries, the physical books Internet Archive "preserves" in shipping containers are not available to the public.  (McN Decl. ¶49.)

**Response:**  Not disputed.

313.  The books and the facilities housing the shipping containers are legally owned by a separate entity, Open Library of Richmond Inc. ("OLR").  (McN Decl. ¶50.)

**Response:**  Not disputed.

314.  Mr. Kahle testified that "the Open Library of Richmond [] is actually the organization that stores and owns the books." (McN Decl. ¶50.)

**Response:**  Not disputed.

315.  Internet Archive does not own the physical books that it makes available on its Website.  (McN Decl. ¶50.)

**Response:**  Disputed to the extent this is misleading as worded.  A nonprofit that works closely with the Internet Archive, Open Library of Richmond, holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.  For simplicity, regarding ownership of print books, the Internet Archive uses the term "Internet Archive" to refer collectively to the Internet Archive and Open Library of Richmond.  The Internet Archive or Open Library of Richmond lawfully acquire print books by purchasing or receiving a donation.  The Internet Archive digitizes physical books to which it – or Open Library of

Richmond—has legal title. Decl. of Brewster Kahle in Supp. of Internet Archive's Mot. for Summ. J. ("Kahle Opening Decl.") ¶¶ 18, 19, 27; *see also* Kahle Opp'n Decl. ¶¶ 10, 16.

316.  According to Internet Archive's 990 tax form, Open Library of Richmond paid Internet Archive a $4,840,000 grant in 2016.  (McN Decl. ¶50.)

**Response:**  Not disputed (but immaterial).

317.  Mr. Kahle is the principal officer of Open Library of Richmond.  He funds the entity from his personal finances.  (McN Decl. ¶50.)

**Response:**  Not disputed.

318.  Internet Archive has a number of other affiliate companies in addition to OLR. (McN Decl. ¶50.)

**Response:**  Not disputed.

319.  During his deposition, Mr. Cressaty referred to these companies as the "Kahle/Austin Empire."  (McN Decl. ¶50.)

**Response:**  Not disputed.

320.  These companies own Internet Archive's "headquarters, warehouses and some distributed data centers.  (McN Decl. ¶50.)

**Response:**  Not disputed.

321.  According to Internet Archive, these companies were created "[a]s a strategy to mitigate risk."  (McN Decl. ¶50.)

**Response:**  Not disputed.

322.  In or about 2013, Internet Archive started sourcing physical books to scan and post on its Website from the for profit, used book retailer, Better World Books ("BWB"). BWB has

obtained nearly 400 million print books, including from libraries discarding (or what Internet Archive describes as BWB's "weeding") unwanted copies.   (McN Decl. ¶51.)

**Response:**  Not disputed.

323.  In April 2013, Internet Archive and BWB drafted a memorandum of understanding, which stated that ██████████████████████████████████████████ ████████████████████████████████████████  (McN Decl. ¶51.)

**Response:**  Not disputed.

324.  Internet Archive would periodically identify print books that it wanted to acquire based on what was available from BWB's inventory, which BWB either donated or sold to IA for a modest fee.  (McN Decl. ¶52.)

**Response:**  Not disputed.

325.  In a 2016 email from Brewster Kahle to BWB's Director, Strategic Sales & Partnerships, for instance, Mr. Kahle stated that Internet Archive had identified "about 13k books that were … 'desirable' for us" from BWB's list and offered to purchase those "books for $1 each."  (McN Decl. ¶52.)

**Response:**  Not disputed.

326.  Eventually, in 2018 Internet Archive sent a "wish list" containing approximately "1.5M ISBNs" for BWB to run against its list to determine which books were available.  (McN Decl. ¶53.)

**Response:**  Not disputed.

327.  In that same message, Mr. Kahle and Freeland "agreed that our best path to millions of books is arm-in-arm with BWB…"  (McN Decl. ¶53.)

**Response:**  Not disputed.

328.  By April 2018, IA was ███████████████████████████████ ████████████  (McN Decl. ¶53.)

**Response:**  Not disputed.

329.  In the fall of 2018, Internet Archive started exploring the possibility of acquiring Better World Books.  In an email sent to Kahle on November 12, 2018, the founder of BWB wrote that ██████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████ (McN Decl. ¶54.)

**Response:**  Not disputed.

330.  On April 17, 2020, Mr. Kahle wrote in an email to a potential investor that Better World Books "get[s] 30 million books a year, and sell[s] 10 million – the others are donated or recycled.  We want more of the flow…  This is a bold move and our library colleagues believe it can help rearrange how books work in the library field in general:  libraries buy books, and now consign or donate them to BWB, the new non-profit would keep 1 copy for digitization and preservation, the rest get sold.  This is what BWB does already, but we would ramp this up.  As a self sustaining business, this will keep the books flowing year after year."  (McN Decl. ¶55.)

**Response:**  Not disputed.

331.  In the same message, Mr. Kahle also wrote that "they are a going concern and hopefully even profitable.  If they generate money then they could pay for the digitization…"

and that "The successful operation of BWB will provide funding back to The Internet Archive to ensure that it can continue to deliver free services to the world…" (McN Decl. ¶55.)

**<u>Response:</u>** Not disputed that Mr. Kahle wrote "they are a going concern and hopefully even profitable. If they generate money then they could pay for the digitization . . ." Disputed that Mr. Kahle was the origin for the following quote: "The successful operation of BWB will provide funding back to The Internet Archive to ensure that it can continue to deliver free services to the world . . ." This second quote was a relayed observation from Jim Michalko, memorialized in an email from Mr. Kahle. Further, each of the quotes in this paragraph is from a different email in the thread—not "in the same message." *Compare* McNamara Decl. Ex. 84, Kahle Apr. 18, 2019 email to Baldwin at INTARC00397107-08, *with* Kahle Apr. 19, 2019 email to Baldwin at INTARC00397106 (discussing Michalko's observations).

332. Finally, Mr. Kahle wrote that Internet Archive would obtain "maybe 7 million [books] over the next few years" (*id.*) at a rate of "1mm books per year." (McN Decl. ¶55.)

**<u>Response:</u>** Not disputed.

333. In June 2019, Internet Archive via affiliated entities acquired Better World Books. According to the Executive Vice President and General Counsel of Better World Books, Ms. Patton-Schmidt, ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████ (McN Decl. ¶56.)

**<u>Response:</u>** Not disputed that Ms. Patton-Schmidt testified as quoted. Disputed that the "Internet Archive via affiliated entities acquired Better World Books." Better World Books and Better World Libraries (Better World Books's sole shareholder) each have their own independent

board.  Neither entity is controlled by the Internet Archive.  Gratz Opp'n Decl. Ex. 3, Patton-Schmidt Dep. Tr. 101:5-20, 70:23-71:2, 80:4-81:7, 83:1-21, 86:21-88:15.  ███████████ OMITTED

███████████████████████████████████████████████████████████████

███████████  Further, the only cited evidence for the assertion that the "Internet Archive . . . acquired Better World Books" is improper attorney testimony in the form of Ms. McNamara's Declaration.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

334.  Mr. Kahle used funds from his personal fortune to fund the transaction.  The funds passed through OLR before the funds were received by Better World Books.  (McN Decl. ¶56.)

**Response:**  Disputed (but immaterial).  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).

335.  As part of the transaction, OLR ███████████████████████████████████

███████████████████████████████████  (McN Decl. ¶56.)

**Response:**  Not disputed.

336.  Under the terms of the acquisition Better World Libraries – a 501(c)(3) corporation controlled by Kahle – became the sole shareholder of Better World Books.  (McN Decl. ¶56.)

**Response:**  Not disputed that Better World Libraries is the sole shareholder of Better World Books.  Disputed to the extent the cited evidence does not support the assertion that Better World Libraries is a corporation "controlled by Kahle."  *See* Fed. R. Civ. P. 56(c)(1).  Gratz Opp'n Decl. Ex. 3, Patton-Schmidt Dep. Tr. 101:5-20, 70:23-71:2, 80:4-81:7, 83:1-21, 86:21-88:15.  Moreover, the promissory note (McNamara Decl. Ex. 86) is between Open Library of Richmond and Better World Books.

337.   Kahle is the Chairman of Better World Libraries and a Director of Better World Books, which is controlled by "people affiliated with the Austin Kahle [sic] Empire."  (McN Decl. ¶56.)

**Response:**  Disputed.  Better World Books is a 501(c)(3), as is its sole shareholder Better World Libraries.  Each entity has a board with three members.  Gratz Opp'n Decl. Ex. 3, Patton-Schmidt Dep. Tr. 101:5-20; 70:23-71:2, 80:4-81:7, 83:1-21, 86:21-88:15.

338.   Internet Archive announced the acquisition on November 6, 2019 in a blog post. The post stated that "[t]his new relationship will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books…  Any book that does not yet exist in digital form will go into a pipeline for further digitization, preservation and access."  (McN Decl. ¶57.)

**Response:**  Not disputed.

339.   Internet Archive and Better World Books have explored and adopted a number of what the two entities have described as "synergies" – or "ways that BWB could work with IA and its affiliates to make both business perform better."  (McN Decl. ¶58.)

**Response:**  Not disputed.

340.   For instance, webpages for books on the Better World Books website are provided with links to "borrow" those books from the Internet Archive's Website.  (McN Decl. ¶58.)

**Response:**  Not disputed.

341.   According to BWB's Ms. Patton-Schmidt, following its acquisition, Better World Books ███████████████████████████████████████████  (McN Decl. ¶60.)

**Response:**  Not disputed.

342.  Ms. Patton-Schmidt further testified that "Better World Books has vast management experience in libraries e-commerce and supply chain management that can be beneficial to IA." (McN Decl. ¶60.)

**Response:**  Not disputed (but immaterial).

343.  Ms. Patton-Schmidt testified that between 2020 and 2021, ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████ (McN Decl. ¶60.)

**Response:**  Not disputed (but immaterial).

344.  Between the acquisition in July 2019 and September 12, 2021, Better World Books has identified and packed up more than 2.8 million books from Internet Archive's "wishlist." (McN Decl. ¶ 61.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Evid. 56(c)(1).  The evidence instead states that 337,540 of the scanned books from this time frame were from the Internet Archive wishlist.  McNamara Decl. ¶ 61 & Ex. 95 at BWB_000420, BWB_000423.

345.  Many of these books have been shipped off to the Cebu scanning center for digitization, posted on the IA's Website, and set for eventual delivery to the facilities operated by IA affiliates for "preservation."  (McN Decl. ¶61.)

**Response:**  Not disputed.

346.  Webpages for ebooks on the Internet Archive's Website contain links to purchase that title from Better World Books, including a "Purchase at Better World Books" button that appears at the top of the window when users read an ebook on IA's ebook browser.  (McN Decl. ¶61.)

**Response:**  Not disputed.

347.  Internet Archive receives a payment from Better World Books every time a user clicks on a link on the Internet Archive's Website to purchase a used book from Better World Books' website.  (McN Decl. ¶59.)

**Response:**  Disputed.  The Internet Archive does not receive a payment from Better World Books every time a user clicks on a link on the Internet Archive's website.  The Internet Archive only receives a small amount from Better World Books each time a user clicks on a link to Better World Books's website and the user buys a book from Better World Books using that link.  *See* Kahle Opp'n Decl. ¶ 19; *see also* Gratz Opp'n Decl. Ex. 4, Karpeles Dep. Tr. 184:19-185:12.

348.  The webpages on IA's Website also include links to "Donate" to the Internet Archive.  (McN Decl. ¶59.)

**Response:**  Not disputed.

349.  As Internet Archive's former Director of Finance testified, "every single page of the Archive is monetized."  (McN Decl. ¶61.)

**Response:**  Disputed.  The evidence cited does not support the assertion in this Paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  The questioning attorney prompted Mr. Cressaty with the quoted phrase.  Moreover, the context of the line of questioning was the "Donate" button.  *See* McNamara Decl. ¶ 59 & Ex. 45, Cressaty Dep. Tr. 206:12-208:4.

350.  The screenshot below reflects the Website's "Donate" option.



(McN Decl. ¶59.)

**Response:**  Not disputed.

351.  The limits placed by Internet Archive on how the ebooks on its Website have changed over time.  Initially, Internet Archive had "80,000+" in-copyright ebooks in its "In-Library eBook Lending Program.  (McN Decl. ¶63.)

**Response:**  Not disputed.

352.  In an email from this time, Internet Archive's Office Manager stated that the ebooks could "only be borrowed by a patron of a physical library that participates in [Internet Archive's] program" and that the ebooks must be "access[ed] through our site from the physical library's network."  (McN Decl. ¶63.)

**Response:**  Not disputed.

353.  Later, Internet Archive removed any geographical limits so that anybody in the world with an Internet connection could access in-copyright books on the Website.  (McN Decl. ¶64.)

**Response:**  Not disputed.

354.  Internet Archive has not reinstated any geographic limits since this initial phase. (McN Decl. ¶64.)

**Response:**  Not disputed.

355.  In or about 2018, Internet Archive began what it called its "Open Libraries" project. Prior to that time, IA limited the number of concurrent loans on any one title to the number of physical copies of the title owned by IA (or an affiliated entity).  (McN Decl. ¶67.) (¶70)

**Response:**  Not disputed.

356.  On November 13, 2018, Mr. Freeland published a blogpost stating that this "own one, loan one principle" based on the books Internet Archive owned was "viable, but limited," and "for controlled digital lending to work at scale, more physical copies are needed to loan against, especially for titles … that enter the public zeitgeist and become part of a major news story."  (McN Decl. ¶65.)

**Response:**  Not disputed.

357.  Two years before Internet Archive started the Open Libraries project, in October 2016, Mr. Kahle issued a statement titled "Transforming Our Libraries into Digital Libraries:  A digital book for every physical book in our libraries."  (McN Decl. ¶66.)

**Response:**  Not disputed (but immaterial).

358.  In that statement, Mr. Kahle proposed a "collaborative effort [with libraries] to select and digitize the most useful books of the 20th and 21st centuries, and to build a robust system to circulate the resulting e-books to millions, and eventually billions of people."  (McN Decl. ¶66.)

**Response:**  Not disputed.

359.  According to the statement, Mr. Kahle sought to achieve this goal by collaborating with libraries "to digitize the materials efficiently, minimizing duplication, and lend the texts with the same limitations placed on physical books."  (McN Decl. ¶66.)  Mr. Kahle wrote that "Internet Archive could create a circulation system that would administer the lending [for

libraries].  In effect, then, each library can choose from a variety of methods to lend digital versions of the physical books in their collection.  This would keep the local libraries in control but leverage the convenience of a cloud-based system that others maintain and update."  (McN Decl. ¶66.)

**Response:**  Not disputed.

360.  To accomplish this, Mr. Kahle stated that, "in each library's online catalog, when a digital version of a book exists [on Internet Archive], we can include a web-link on the record for the physical book, giving readers the ability to browse the book on screen or to borrow it from the convenience of their homes.  In this way, we can smoothly enhance a library's collection, from analog to digital, at scale. . . . To build this future, we will need the participation of multiple sectors to bring thousands of libraries digital."  (McN Decl. ¶66.)

**Response:**  Not disputed.

361.  According to Mr. Kahle, this "collaborative digital library collection and circulations system," "could help deliver e-books to millions of patrons with a flip of a digital switch."  (McN Decl. ¶66.)

**Response:**  Not disputed.

362.  The concept identified in Mr. Kahle's 2016 statement would eventually be named the "Open Libraries" project.  (McN Decl. ¶67.)

**Response:**  Not disputed.

363.  According to Internet Archive, this program allows libraries to "pool[] their physical collections" with Internet Archive "in order to make more lendable copies of digital books available to their users and the world."  (McN Decl. ¶67.)

**Response:**  Not disputed.

364. According to its website, the purpose of the Open Libraries project is "to increase lending counts" on IA's Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches." (McN Decl. ¶67.)

**Response:** Not disputed.

365. Under this system, a library participating in the Open Libraries project – known as a "Partner Library" – sends its catalogue to Internet Archive to "run an overlap analysis that compares [ISBN numbers for] their physical holdings with our digital holdings." (McN Decl. ¶68.)

**Response:** Not disputed.

366. Internet Archive does not make new scans of the libraries' books identified by the overlap analysis. Internet Archive does not take possession of the print book owned by the Partner Library. (McN Decl. ¶68.)

**Response:** Not disputed.

367. Rather, every time a book in the Partner Library's catalogue matches an ebook on IA's Website, Internet Archive "just increases by one the number of concurrent checkouts of that book" permitted on the Website. (McN Decl. ¶68.)

**Response:** Not disputed.

368. According to Mr. Freeland, Internet Archive does not "set any upper limit to the number of copies available via concurrent lending." As a result, the overlap analysis dictates that "if a hundred partner libraries possessed a copy of the same book, the Internet Archive would be able to lend a hundred copies of that book simultaneously." (McN Decl. ¶68.)

**Response:** Not disputed.

369.  Mr. Freeland testified that if there were "a thousand libraries that had the same book and put them into controlled digital lending," then one thousand users would be able to view the ebook scan on the Website."  (McN Decl. ¶68.)

**Response:**  Not disputed.

370.  In order to become a Partner Library in the Open Libraries project, libraries need to submit an "online form."  (McN Decl. ¶69.)

**Response:**  Not disputed (but immaterial).

371.  That form states that "Internet Archive's Open Libraries project offers the prospect of making every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own."  (McN Decl. ¶69.)

**Response:**  Not disputed.

372.  According to the Open Libraries Form Agreement, Partner Libraries that participate in the project agree to "share their catalog of books with the number of copies of each book with the Internet Archive."  (McN Decl. ¶69.)

**Response:**  Not disputed.

373.  The Open Libraries Form Agreement imposes no substantive restrictions on the Partner Libraries' use of the physical books that match the ebooks on the Website.  (McN Decl. ¶69.)

**Response:**  Not disputed that there are no substantive restrictions on the use of physical books expressly imposed in the Form Agreement.

374.  The Open Libraries Form Agreement imposes no contractual requirement that the Partner Library remove the print book from circulation when the Internet Archive is lending out an ebook correlated with that print book.  (McN Decl. ¶69.)

**Response:**  Not disputed.

375.  The Open Libraries Form Agreement provides that any partner "Library may integrate links to the borrowable Books in their catalog and other services.  The Internet Archive will add books to the collections offered on the Internet Archive's sites."  (McN Decl. ¶69.)

**Response:**  Not disputed.

376.  It is currently free for libraries to become Partner Libraries.  (McN Decl. ¶70.)

**Response:**  Not disputed.

377.  Mr. Kahle has stated that "it would be understandable if we charged libraries that did not contribute digitization or backend services for access to digital books.  It would be equally understandable to charge a one-time transfer fee to libraries that wanted to store their own local copies" of the ebooks on the IA Website.  (McN Decl. ¶70.)

**Response:**  Not disputed.

378.  Internet Archive has marketed the Open Libraries project to libraries as a substitute for paying for authorized ebooks via authorized library ebook aggregators and as a means of obtaining "free ebooks for your patrons" with "no cost involved."  (McN Decl. ¶71.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  The Internet Archive has not marketed the Open Libraries project as a "substitute for paying for authorized ebooks via authorized library ebook aggregators."  The only cited evidence for the assertion that the Internet Archive has done so is improper attorney testimony in the form of Ms. McNamara's Declaration.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  As explained above, whether a digitized book in fact acts as a substitute is an "empirical question."  *See supra* ¶ 255; *see also* McNamara Decl. ¶ 4 & Ex. 11, Reimers Dep. Tr. 23:4-11.

Moreover, the assertions in this paragraph mischaracterize the underlying exhibits (27, 104-113) identified and discussed in the paragraph.  This assertion quotes two phrases out of context "free ebooks for your patrons" and "no cost involved."  The full quote in which these phrases appear is:  "I understand that ASU is not deaccessioning materials at this time, following your storage buildout.  Should that change, we would love to work with you on getting those materials digitized and housed in our physical archive. . . .  As for our lending collection, we are keen to run an overlap study between the materials you hold in print and those that we have digitized.  Where there's a match, we would use your physical inventory to increase our lending counts by 1 for those books.  What we would need from ASU is either a MARC dump from your catalog or an ISBN export and then we can run that analysis.  As I mentioned there is no cost involved - free ebooks for your patrons."  McNamara Decl. Ex. 104 at INTARC00416931.  The phrases "no cost" and "free ebooks for your patrons" are therefore used to explain that there is no cost to run the overlap study or to digitize materials that ASU might ultimately "deaccession."

379.  Mr. Freeland sent an email to the Associate Dean of University of Oklahoma Libraries stating that "[t]he main offer we have in hand with the Open Libraries today is the ability to match your physical holdings with the 1.1M in-copyright books we have *already* digitized and where there's a match, provide you back a link to the digitized book."  (McN Decl. ¶71.)

**Response:**  Not disputed.

380.  In another instance, an Internet Archive representative sent a librarian an email stating that the Open Libraries project "can leverage controlled digital lending to provide your patrons with free ebooks of your physical collections.  As an Open Libraries, we match your in-

copyright holdings with our digital holdings and serve free ebooks where they overlap.  Join

Open Libraries, access free ebooks – so simple, we had to share!"  (McN Decl. ¶71.)

**Response:**  Not disputed.

381.  Mr. Freeland gave a presentation entitled "Open Libraries Introduction & Internet

Archive programs" that included the following slide:



(McN Decl. ¶71)

**Response:**  Not disputed.

382.  The notes to a slide for a separate presentation that Mr. Freeland gave to libraries

stated that the Open Libraries project "ensures that a library will not have to buy the same

content over and over, simply because of a change in format."  (McN Decl. ¶71.)

**Response:**  Not disputed.

383.  Another presentation about the Open Libraries project by Mr. Freeland was titled

"Maximizing institutional investments in print resources through controlled digital lending" –

with the subtitle, "Or, You Don't Have to Buy it Again!"  (McN Decl. ¶71.)

**Response:**  Not disputed.

384.  In 2019, a vendor acting on behalf of Internet Archive sent an email to one of the subscribers to its Library.Link Network, the Evergreen Indiana Library Consortium, with a subject line of "Free eBooks for Indiana Evergreen."  (McN Decl. ¶71.)  That email stated that "Open Libraries provides a way for you to offer digitized books to your patrons for free" and that joining as a partner would "bring this added value to your libraries."  (McN Decl. ¶71.)

**Response:**  Not disputed that an Internet Archive vendor emailed the Evergreen Indiana Library Consortium in 2019.  Not disputed that the Evergreen Indiana Library Consortium is a subscriber to Library.Link.  Not disputed that the subject line of this email was "Free eBooks for Indiana Evergreen."  Not disputed that the email contains the quoted phrase:  "Open Libraries provides a way for you to offer digitized books to your patrons for free."  Disputed to the extent this quoted language is being offered for its truth, it is not admissible evidence.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

385.  In another instance, the same representative sent an email message to libraries asking whether they "would like to participate and get free ebooks for your end users."  (McN Decl. ¶71.)

**Response:**  Not disputed.

386.  The same vendor sent a librarian an email inviting them to join the Open Libraries project, which stated that the "1, 2, 3 of it is, once you sign the form we do the rest… would you like to participate and get free ebooks for your end users?... Internet Archive now offers FREE ebooks for all Library.Link libraries when you participate in the Open Libraries Controlled Digital Lending (CDL) project."  (McN Decl. ¶71.)

**Response:**  Not disputed.

387.  Internet Archive's Website contains a video of a July 14, 2021 presentation entitled "Implementation & Integration:  CDL for All Libraries" that describes controlled digital lending as a "[l]ow risk, reasonable solution that preserves legal and fiscal value in collections" and contains the following slide:



(McN Decl. ¶71.)

**Response:**  Not disputed.

388.  Internet Archive gave a presentation at the 2019 Library Leaders Forum that summarized the "[s]teps to participate in Open Libraries:  Join Open Libraries, Share your catalog, Overlap study, Integrate links back into your catalog, Lend digital books to your patrons."  (McN Decl. ¶71.)

**Response:**  Not disputed.

389.  At the 2020 Library Leaders summit, Mr. Kahle announced that "2.8M copies" of in-copyright books were added to concurrent lending counts through the Open Libraries' project. (McN Decl. ¶72.)

**Response:**  Not disputed.

390.  Mr. Freeland testified that the number of books added through overlap analysis has increased since that time.  (McN Decl. ¶72.)

**Response:**  Not disputed.

391.  Chris Freeland testified that Internet Archive had 81 Partner Libraries as of December 2021.  (McN Decl. ¶72.)

**Response:**  Not disputed.

392.  As of December 24, 2021, Internet Archive's Objections and Responses to Plaintiffs' Second Set of Interrogatories stated that 62 Partner Libraries contributed books to the overlap analysis and 13 of those were public libraries.  (McN Decl. ¶72.)

**Response:**  Not disputed.

393.  Many libraries – both Partner Libraries and other libraries – have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their library websites. (McN Decl. ¶73.)

**Response:**  Not disputed.

394.  For instance, the Georgetown University Law Library's catalog features the language "Full text availability" next to a particular title and presents a link to access the "full text" of the title through "Internet Archive Controlled Digital Lending."  (McN Decl. ¶73.)

**Response:**  Not disputed.

395.  Likewise, the Dartmouth College Library's catalog entry for "The Catcher in the Rye," which is one of the Works in Suit, features a link to access an ebook version through the Internet Archive's Website.  (McN Decl. ¶73.)

**Response:**  Not disputed.

396.  Many other unaffiliated libraries have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their main library websites, including public library systems in New York, California, and elsewhere.  (McN Decl. ¶74.)

**Response:**  Not disputed.

397.  According to Mr. Freeland, for each Partner Library that contributes its catalogue for overlap analysis, the Internet Archive gets "an additional copy to lend" of every matching book "without … having to incur the cost associated with scanning."  (McN Decl. ¶75.)

**Response:**  Not disputed.

398.  Mr. Freeland testified that "[a]s a result of the Internet Archive implementing overlap analysis … wait lists [have] been reduced on" the Website "for certain titles."  (McN Decl. ¶75.)

**Response:**  Not disputed.

399.  Mr. Freeland testified that "the more books Internet Archive has been able to obtain and scan" through the Internet Archive's acquisition of Better World Books, "the greater likelihood there would be matches in the overlap analysis with potential partner libraries."  (McN Decl. ¶75.)

**Response:**  Not disputed.

400.  Prior to about 2018, IA did not rely on a model called "Control Digital Lending" to support its scanning and republication of in-copyright books.  (McN Decl. ¶77.)

**Response:**  Not disputed that the term "Controlled Digital Lending" was not used before 2018.  (The term was first used in or about 2017.)  Disputed to the extent this paragraph suggests that the model that was eventually called Controlled Digital Lending was not in use before 2018.  The Internet Archive has been practicing the concept of what is now called Controlled Digital Lending since at least 2011.  Kahle Opp'n Decl. ¶ 9.

401.  As Mr. Kahle stated in the "Universal Access to Knowledge" speech he gave in 2006, Internet Archive had "found that if you put things out there in a nonprofit setting, it works

for people in the sense that they don't gripe.  The idea of opt-out as opposed to opt-in – putting it

up and then if somebody complains, taking it down – works very well in these sorts of

communities.  I would suggest being a bit bold and making things available..." (McN Decl.

¶77.)

**Response:**  Not disputed that Mr. Kahle is quoted accurately or that the quote is from a

2006 speech called "Universal Access to Knowledge."  Disputed to the extent this assertion is

misleading:  this quote is from a portion of Mr. Kahle's speech discussing discussing archival

audio collections.  *See* McNamara Decl. ¶ 77 & Ex. 49 at PLAINTIFFS0001113.

402.  By 2015, the Copyright Office had issued a report concluding that "[t]here is broad

agreement that no colorable fair use claim exists" for "providing digital access to copyrighted

works in their entirety." (McN Decl. ¶78.)

**Response:**  Not disputed.

403.  In the prior year, a subcommittee of the Judiciary Committee of the House of

Representatives held hearings about the first sale doctrine, including on whether to adopt a

digital first sale doctrine.  (McN Decl. ¶78.)

**Response:**  Not disputed.

404.  Groups including the Association of American Publishers strongly opposed the

adoption of a digital first sale doctrine.  (McN Decl. ¶78.)

**Response:**  Not disputed.

405.  While the subcommittee announced unrelated reforms for the Copyright Office and

the Congress passed the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, the Copyright

Act was not amended to recognize a digital first sale defense.  (McN Decl. ¶78.)

**Response:**  Not disputed.

406.  In 2017, Internet Archive applied for a $100 million grant from the MacArthur Foundation.  According to its application, Internet Archive intended to use the grant to "turn 80% of library collections digital by 2023."  (McN Decl. ¶79.)

**Response:**  Not disputed.

407.  Lila Bailey, Internet Archive's in-house policy counsel, testified that "as part of the grant proposal, barriers to solving the problem are identified.  One of the significant barriers to libraries being able to loan out their digital collections was … copyright uncertainty, lack of clarity in the law."  (McN Decl. ¶79.)

**Response:**  Not disputed.

408.  Ms. Bailey further testified that "the MacArthur Grant Challenge" is "what precipitated having a meeting in May of 2017 concerning Controlled Digital Lending."  (McN Decl. ¶79.)

**Response:**  Not disputed (but immaterial).

409.  Accordingly, the Internet Archive convened what it described as the "Open Libraries Copyright Workshop" on May 23 and 24, 2017 to "consider the digitize and lend model that the Internet Archive is proposing to expand through the MacArthur Foundation's 100%Change grant."  (McN Decl. ¶79.)

**Response:**  Not disputed (but immaterial).

410.  The Workshop was led by one of IA's advisors for the grant, the copyright scholar Pamela Samuelson, and was "modeled after a meeting that she did around the Google books case."  (McN Decl. ¶79.)

**Response:**  Not disputed (but immaterial).

411.  According to Ms. Bailey's testimony, Ms. Samuelson "wanted to basically have an open discussion, an academic discussion with other scholars and library practitioners who understood how libraries were engaging in this practice."  (McN Decl. ¶80.)

**Response:**  Not disputed (but immaterial).

412.  The participant roster for the Workshop submitted as part of the MacArthur Foundation Application included Ms. Bailey, Mr. Kahle, two other Internet Archive employees, two of the lawyers that have appeared for IA in this action (Joseph Gratz and Corynne McSherry) and several other individuals who would later participate in formulating a digital lending theory – including David Hansen, Kyle Courtney, Jason Schultz, Mary Minow and Michelle Wu.  (McN Decl. ¶80.)

**Response:**  Not disputed (but immaterial).

413.  Ms. Bailey testified that she was not aware of "any copyright lawyers who represent copyright creators at this panel."  (McN Decl. ¶80.)

**Response:**  Not disputed (but immaterial).

414.  At a dinner shortly after the Workshop, Ms. Bailey "started talking about the idea of writing something up" with Courtney, Hansen and Wu.  (McN Decl. ¶81.)

**Response:**  Not disputed (but immaterial).

415.  Michelle Wu was a Georgetown University law professor and librarian who was another advisor to Internet Archive for the McArthur Grant and, according to Internet Archive, "crafted the legal theory behind Controlled Digital Lending."  (McN Decl. ¶81.)

**Response:**  Not disputed (but immaterial).

416.  Ms. Wu also was retained by Internet Archive as its counsel, but did not reveal that affiliation in her letter submitted in support of IA's MacArthur grant application.  (McN Decl. ¶81.)

**Response:**  Not disputed (but immaterial).

417.  Kyle Courtney is a Copyright Advisor at Harvard University and David Hansen was the Lead for Copyright and Information Policy and Associate University Librarian at Duke University.  (McN Decl. ¶81.)

**Response:**  Not disputed (but immaterial).

418.  Ms. Bailey described Wu, Courtney and Hansen as "[f]riends of the Internet Archive."  (McN Decl. ¶81.)

**Response:**  Not disputed (but immaterial).

419.  According to Ms. Bailey, at the May 2017 dinner, Ms. Bailey, Mr. Courtney, Mr. Hansen and Ms. Wu decided to draft "something short and easy for a non-lawyer to understand about the legal underpinning of Controlled Digital Lending."  (McN Decl. ¶81.)

**Response:**  Not disputed.

420.  The group subsequently decided that there should also be a "white paper" that would address the legal issues more fully.  (McN Decl. ¶81.)

**Response:**  Not disputed.

421.  The MacArthur Foundation rejected the Internet Archive's application for the $100 million grant in September 2017.  (McN Decl. ¶82.)

**Response:**  Not disputed (but immaterial).

422.  The primary drafters of a statement describing controlled digital lending (the "Statement") emerged as Ms. Bailey, Mr. Courtney, Mr. Hansen, Ms. Wu, Mary Minow, and Jason Schultz.  (McN Decl. ¶82.)

**Response:**  Not disputed.

423.  Mr. Courtney and Mr. Hansen were also subsequently selected to draft a white paper on controlled digital lending (the "White Paper").  (McN Decl. ¶82.)

**Response:**  Not disputed.

424.  Mr. Courtney and Mr. Hansen sent a draft of the White Paper to Ms. Bailey prior to publication for her edits and comments.  (McN Decl. ¶82.)

**Response:**  Not disputed.

425.  When Mr. Freeland was asked about the status of the White Paper, he wrote in an email that "IA is officially NOT leading the effort for the sake of being impartial."  (McN Decl. ¶82.)

**Response:**  Not disputed (but immaterial).

426.  In its MacArthur grant application, Internet Archive wrote that a "working group willing to craft a joint statement" about controlled digital lending had formed after the May 2017 meeting in San Francisco, that the group's work "is now in progress[,]" and that "[t]his critical area of work is led by Internet Archive's legal counsel, Lila Bailey."  (McN Decl. ¶79.)

**Response:**  Not disputed (but immaterial).

427.  When Ms. Bailey was informed that the release of the White Paper may be delayed, she wrote in an email to Mr. Courtney, Mr. Hansen, Ms. Wu, and Ms. Minow and Schultz to the group to say that "[t]he Internet Archive has more than an academic interest in this moving forward" and that "it will be a complete failure and waste of our time if it's not released by [an

upcoming IA event].  I'm just being real about the impact of delay on my client (and potentially on my job if this isn't done… seriously guys)."  (McN Decl. ¶83.)

    **Response:**  Not disputed (but immaterial).

428.  Other scholars were consulted during the project for their thoughts on the draft Statement, including Peter Jaszi, a copyright expert and advisor to the Internet Archive who attended the Workshop.  (McN Decl. ¶84.)

    **Response:**  Not disputed.

429.  An Internet Archive blog post refers to Mr. Jaszi as one of Bailey's "heroes." (McN Decl. ¶84.)

    **Response:**  Not disputed.

430.  Mr. Jaszi wrote to at least one librarian to warn them that the draft Statement was a "one-sided puff piece that seriously misrepresents both the state of the law and the risks to institutions of pursing the strategy" and that controlled digital lending "serve[s] the institutional interests of the IA."  (McN Decl. ¶84.)

    **Response:**  Not disputed.

431.  Additionally, library copyright expert Kenneth Crews wrote in an email responding to a draft of the Statement to say that "CDL use is NOT identical to current physical lending" and that if physical copies of books "are still available for non-circulating use, one could argue that you have doubled the number of readable and useable copies."  (McN Decl. ¶85.)

    **Response:**  Not disputed.

432.  The Statement and White Paper on controlled digital lending were published simultaneously in September 2018 on the website.  https://controlleddigitallending.org/ (the "CDL Website").  (McN Decl. ¶86.)

**Response:**  Not disputed (but immaterial).

433.  Ms. Bailey testified that she was part of the "collaborative effort" that resulted in the publication of the Statement and White Paper on the CDL Website.  (McN Decl. ¶79.)

**Response:**  Not disputed.

434.  The Statement lists as co-authors Ms. Bailey, Mr. Courtney, Mr. Hansen, Ms. Minow, Mr. Shultz, and Ms. Wu.  (McN Decl. ¶86.)

**Response:**  Not disputed.

435.  The Statement does not disclose that Michelle Wu had been engaged as an attorney for Internet Archive from 2017 until at least March or 2018.  (McN Decl. ¶86.)

**Response:**  Not disputed (but immaterial).

436.  The Statement includes the following statement:

> "Properly implemented, CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner.  Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation.  For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization.  *Essentially, CDL must maintain an 'owned to loaned' ratio.*  Circulation in any format is controlled so that only one user can use any given copy at a time, for a limited time.  Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or

distributing additional copies."

(McN Decl. ¶86.)

     **Response:**  Not disputed.

     437.  The Statement further claims that "there are two main areas of copyright law that support CDL:  the principle of exhaustion and the fair use doctrine."  (McN Decl. ¶87.)

     **Response:**  Not disputed.

     438.  The Statement states that the "first sale" doctrine allows creating and lending digital files of the physical books because "any time there is a lawful transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy is terminated or 'exhausted.'"  (McN Decl. ¶87.)

     **Response:**  Disputed to the extent the passage is incorrectly quoted.  The accurate quote is "any time there is an authorized transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy is terminated or exhausted."  *See* McNamara Decl. ¶ 87 & Ex. 133 at INTARC00458736.  Plaintiffs replaced "authorized" with "lawful."

     439.  The Statement makes the proposition that "fair use and copyright exhaustion can work together to effectuate CDL practices."  (McN Decl. ¶87.)  The Statement acknowledges that there is no "directly analogous case on point" to support this proposition.  (McN Decl. ¶87.)

     **Response:**  Not disputed.

     440.  The Statement states that controlled digital lending is not unlawful because the "purposes of library lending … all focus on socially beneficial outcomes that favor fair use" and because there is no market harm "because properly implemented CDL programs maintain an 'owned to loaned ratio' that is comparable to physical lending."  (McN Decl. ¶87.)

**Response:**  Not disputed.

441.  The White Paper acknowledges that there is a "considerable point of concern that CDL is not clearly transformative."  (McN Decl. ¶88.)

**Response:**  Not disputed.

442.  The White Paper states that in "mass digitization cases involving books – *Google Books* …, for example – courts have largely focused on how those projects enabled transformative access to information by enabling text search, as well as research uses, such as text and date mining."  (McN Decl. ¶88.)

**Response:**  Not disputed.

443.  The White Paper emphasizes, in italicized text, that "libraries must truly exercise *control* in the process."  (McN Decl. ¶89.)

**Response:**  Not disputed.

444.  The White Paper states that "[w]hen the digital copy is being read by a patron, however, the physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one."  (McN Decl. ¶89.)

**Response:**  Not disputed.

445.  The White Paper states that libraries must "ensure that original works are acquired lawfully," "lend each digital version only to a single user at a time just as a physical copy would be loaned," "limit the time period for each lend" and "use digital rights management to prevent wholesale copying and redistribution."  (McN Decl. ¶89.)

**Response:**  Not disputed.

446.  The White Paper includes several "risk mitigation" measures that controlled digital lenders can implement to further reduce legal risk, including:

446.1.  adding artificial "friction" by extending the time between digital lends, more closely mirroring how physical books are lent and returned;

**Response:**  Not disputed.

446.2.  "introduce characteristics that mimic physical degradation[,]" by, as the White Paper explains, "plac[ing] the same limit on circulation of the digital copy" that would approximate the number of times a print book would be circulated before it degrades;

**Response:**  Not disputed.

446.3.  limiting the audience to "particular communities of users" (*e.g.*, students of an academic institution or "local residents") "to limit the overall reach of the copy and therefore the potential market effect;"

**Response:**  Not disputed.

446.4.  only distributing older works published pre-1989 and public domain books;

**Response:**  Not disputed (but immaterial).

446.5.  only distributing out-of-print or orphan works; and

**Response:**  Not disputed.

446.6.  only distributing highly factual books.  (McN Decl. ¶90.)

**Response:**  Not disputed.

447.  Internet Archive's Policy Counsel testified that Internet Archive does not practice any of the risk mitigation measures listed in the White Paper.  (McN Decl. ¶90.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Ms. Bailey was only asked about certain risk mitigation measures listed in the White Paper.  The Internet Archive has not implemented the risk mitigation measures Ms. Bailey was questioned about at her deposition (introducing artificial

friction; mimicing physical degradation; limiting patrons to particular communities; limiting

loaned works to older works, public domain works, out of print works, or orphan works; and

distributing nonfiction or primarily factual—not "highly factual" works).  But the Internet

Archive practices other risk mitigation techniques outlined in the White Paper, including:  (i) the

Internet Archive's physical books do not circulate while the digitized book is loaned;

(ii) applying controls to what users can do with copies while loaned (limiting copying, etc.) in

addition to protections to prevent wholesale copying; and (iii) limiting access to books based on

feedback from rightsholders about specific materials.  Kahle Opening Decl. ¶¶ 16-17; *see*

McNamara Decl. ¶ 90 & Ex. 123, (White Paper) at INTARC00358280 (listing other risk

mitigation techniques Ms. Bailey was not questioned about at her deposition).

448.  The Statement and the White Paper was criticized by groups including the

Association of American Publishers ("AAP") and the Authors Guild.  (McN Decl. ¶91.)

**Response:**  Not disputed.

449.  On February 4, 2019, the AAP released a "Statement on Flawed Theory of

'Controlled Digital Lending'" which stated that "AAP strongly disagrees with the analysis of the

White Paper and its call to libraries to copy and transmit entire books to the public in disregard

of the law.  CDL not only rationalizes what would amount to systematic infringement, it

denigrates the incentives that copyright law provides to authors and publishers to document,

write, invest in, and disseminate literary works for the benefit of the public ecosystem."  (McN

Decl. ¶91.)

**Response:**  The fact that the AAP made this statement is not material.  Not disputed that

the AAP released the quoted statement or that the statement is quoted accurately.  However, to

the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.

108

Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  All available evidence—including

the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available

sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has

no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and

declarations cited therein).

450.  On January 8, 2019, the Authors Guild released a statement entitled "Controlled

Digital Lending is Neither Controlled nor Legal."  (McN Decl. ¶92.)

**Response:**  Not disputed (but immaterial).

451.  The Authors Guild statement explained that Internet Archive had "started rejecting

notices sent by Guild members asking for unauthorized digital copies of their books to be taken

down, citing that it 'operates consistently with the "Controlled Digital Lending [sic].'"  (McN

Decl. ¶92.)

**Response:**  The fact that the Authors Guild made this statement is not material.  Not

disputed that the Authors Guild made the quoted statement or that the statement is quoted

accurately.  However, to the extent this quoted statement is being offered for its truth, the cited

evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

Further, the Authors Guild's theories about what "would" happen are unsupported speculation.

*Major League Baseball Props., Inc.*, 542 F.3d at 306.  All available evidence—including the

sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources,

and expert analysis—demonstrates that the Internet Archive's digital lending library has no

effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations

cited therein).

452.  The Authors Guild statement stated that Internet Archive's "threat to author income and the ebook market comes from two directions: 1) unauthorized scanning and e-lending of books that were previously published only in physical formats would usurp the market for creating new ebook versions; and 2) instead of purchasing library ebook licenses (which are more expensive than consumer editions for good reason), libraries would simply digitize the print book from their collection, depriving authors and publishers of important licensing income."  (McN Decl. ¶93.)

**Response:**  The fact that the Authors Guild made this statement is not material.  Not disputed that the Authors Guild made the quoted statement or that the statement is quoted accurately.  However, to the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  Further, the Authors Guild's theories about what "would" happen are unsupported speculation. *Major League Baseball Props., Inc.*, 542 F.3d at 306.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

453.  "Needless to say," the statement continued, "if Internet Archive's plans to expand Open Library to all libraries are realized, it would eventually decimate the market for library ebooks, put a massive dent in the ebook market in general, and usurp authors' rights to bring their older works back to the market."  (McN Decl. ¶93.)

**Response:**  The fact that the Authors Guild made this statement is not material.  Not disputed that the Authors Guild made the quoted statement or that the statement is quoted

accurately.  However, to the extent this quoted statement is being offered for its truth, the cited

evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

Further, the Authors Guild's theories about what "would" happen are unsupported speculation.

*Major League Baseball Props., Inc.*, 542 F.3d at 306.  All available evidence—including the

sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources,

and expert analysis—demonstrates that the Internet Archive's digital lending library has no

effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations

cited therein).

454.  In several email messages, Mr. Freeland responded to similar complaints about

CDL from an English authors' union.  After Tom Blake, a librarian at the Boston Public Library,

forwarded him emails from the union's chief executive complaining that CDL "prevent[s]

authors [from] making a living by licensing the content of [their] work," Mr. Freeland wrote,

"Nice that they included their real interest:  'negotiate and purchase lending licenses from the

copyright owners.'"  (McN Decl. ¶94.)

**Response:**  The fact that the English author's union chief wrote to Boston Public Library

is not material.  Not disputed that Tom Blake forwarded Mr. Freeland emails from an English

authors' union.  Disputed that the contents of the email from the English author's union is about

CDL per se.  Moreover, this email is not accurately quoted.  *See* McNamara Decl. Ex. 136 at

INTARC00420085.  Not disputed that Mr. Freeland's email is accurately quoted.  To the extent

the quoted statement of the English author's union chief is being offered for its truth, the cited

evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

Moreover, his theories about any purported effects are unsupported speculation.  *Major League*

*Baseball Props., Inc.*, 542 F.3d at 306.  Further, all available evidence—including the sales data

Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

455.  In December 2018, the Second Circuit issued its decision in *Capitol Records, LLC v. ReDigi Inc*., 910 F.3d 649 (2d Cir. 2018), in which the Court held that "[u]nauthorized reproduction is not protected by" the first sale doctrine and that "the making of such reproductions is not a fair use."  (McN Decl. ¶95.)

**Response:**  Not disputed that this decision was issued by the Second Circuit in December of 2018.  Disputed to the extent Plaintiffs suggest this passage applies to all reproductions. "[S]uch reproductions" is referring specifically to the facts of *ReDigi* not to the digitized books at issue in this case.  *See Capitol Recs., LLC v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018).  The full quote is:  "We conclude that the operation of ReDigi version 1.0 in effectuating a resale results in the making of at least one unauthorized reproduction.  Unauthorized reproduction is not protected by § 109(a).  It violates the rights holder's exclusive reproduction rights under § 106(1) unless excused as fair use.  For reasons explained below, we conclude that the making of such reproductions is not a fair use."  *Id.* at 659.

456.  Jonathan Band, who is counsel for the American Library Association ("ALA"), submitted an amicus brief to the Second Circuit in *ReDigi* on behalf of Internet Archive, the ALA and others.  (McN Decl. ¶96.)

**Response:**  Not disputed.

457.  The brief submitted by Mr. Band was in support of the defendant, ReDigi, and urged the Second Circuit to hold that ReDigi's practices were covered by the first sale doctrine or fair use.  (McN Decl. ¶96.)

**Response:**  Not disputed.

458.  The brief explained that "A fair use finding in this case would provide libraries with additional legal certainty to roll out innovative services such as the Internet Archive's Open Library."  (McN Decl. ¶96.)

**Response:**  Not disputed.

459.  After the *ReDigi* decision was issued, Mr. Band published an article stating that it "raises questions concerning the viability of Controlled Digital Lending … by libraries," which "must be carefully reevaluated in light of this decision."  (McN Decl. ¶96.)

**Response:**  Not disputed.

460.  In that article, Mr. Band warned that "the decision calls into question the theoretical underpinnings of CDL.  Specifically, CDL relies on the fair use right to replicate the first sale right in the digital environment.  Judge Leval's decision, however, could be read to suggest that the objectives of the first sale right cannot guide the fair use analysis."  (McN Decl. ¶96.)

**Response:**  Not disputed.

461.  Academic libraries make up the majority of signatories to the Statement.  (McN Decl. ¶98.)

**Response:**  Not disputed (but immaterial).

462.  Of the 9,000 public libraries in the United States only a handful endorsed the Statement.  (McN Decl. ¶98.)

**Response:**  Not disputed (but immaterial).

463.  Copyright experts Mr. Band, Mr. Crews and Mr. Jaszi did not sign on as a signatory to the Statement.  (McN Decl. ¶98.)

**Response:**  Not disputed.

464.  The American Library Association did not sign on as a signatory to the Statement. (McN Decl. ¶98.)

**Response:**  Not disputed.

465.  The MIT Press had previously allowed IA to digitize a selection of backlist books. (McN Decl. ¶98.)

**Response:**  Not disputed.

466.  The MIT Press did not sign on as a signatory to the Statement.  In an email, a representative from the MIT Press told Internet Archive that it would not be a signatory to the Statement because "being able to monetize digital sales of trade books and text books is currently a significant part of what allows us to survive as an [open access] friendly mission driven publisher."  (McN Decl. ¶98.)

**Response:**  Not disputed that a representative of the MIT Press made the quoted statement or that the statement is quoted accurately.  However, to the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

467.  Starting in about 2019, Internet Archive began to reference the Statement and White Paper in its outreach to libraries in connection with the Open Libraries project.  (McN Decl. ¶99.)

**Response:**  Not disputed.

468.  For example, in a November 2018 email to a prospective Partner Library in Oregon, Mr. Freeland wrote that "[l]ast October, "a group of copyright scholars, including Michelle Wu from Georgetown Law, Kyle Courtney from Harvard Library, Dave Hansen from Duke University Libraries, and Lila Bailey from Internet Archive worked together on two documents meant to help libraries understand the legal framework for our digital lending, described as 'controlled digital lending.'  Those two documents have been released [on the CDL Website]." (McN Decl. ¶99.)

**Response:**  Not disputed.

469.  Internet Archive published a blog post on July 29, 2020 stating that "CDL is a respectful and secure way to bring the breadth of our library collections to digital leaners… Publishers are seeking to shut this library down, claiming copyright law does not allow it.  Our response is simple:  Copyright law does not stand in the way of libraries' rights to own books, to digitize their books, and to lend those books to patrons in a controlled way."  (McN Decl. ¶99.)

**Response:**  Not disputed.

470.  Internet Archive convened a panel at the Boston Public Library "to seek to educate the public on the work of the Internet Archive and Open Libraries" and the event description stated that "[t]hrough controlled digital lending, libraries can make twentieth century scholarship available that is largely absent from their digital holdings in a way that respects the rights of authors and publishers."  (McN Decl. ¶99.)

**Response:**  Not disputed.

471.  A July 1, 2019 blogpost by Mr. Kahle stated that "[w]e believe that every library can transform itself into a digital library.  If you own the physical book, you can choose to circulate a digital version instead."  (McN Decl. ¶99.)

**Response:**  Not disputed.

472.  In another blogpost, the Internet Archive referenced a February 11, 2021 "mythbusting" panel that "dispelled myths about CDL" by "[e]mphasizing the limited and controlled aspect of the practice" and explaining that "[t]he 'fair use' section of the law allows libraries to responsibly lend materials, and experts say logically includes both print and digital works."  (McN Decl. ¶99.)  The blogpost also states that "[t]he law makes no mention of the amount of material that can be made available under 'fair use,' so for libraries to fulfill their purpose they can make complete books – whether in print or digital – available to patrons." (McN Decl. ¶99.)

**Response:**  Not disputed.

473.  Another Internet Archive presentation entitled "How Controlled Digital Lending Works for Libraries" contained a slide stating that "Controlled digital lending is a longstanding widespread library practice that you can use to help your patrons access digitized books.  The Internet Archive has more than 1.8M digitized books you can claim & offer your patrons today. Your library can participate by joining Open Library."  (McN Decl. ¶99.)

**Response:**  Not disputed.

474.  Internet Archive does not indemnify Partner Libraries for liability arising from its infringement.  As Mr. Freeland wrote to a librarian at Duke University, Mr. Kahle "generally gets allergic to indemnification clauses…"  (McN Decl. ¶100.)

**Response:**  Not disputed that Mr. Freeland is accurately quoted or that the quote is from an email to a librarian at Duke University.  Not disputed that the Internet Archive does not indemnify Partner Libraries.  But note that the only cited evidence for this assertion, improper attorney testimony in the form of Ms. McNamara's Declaration, is not admissible evidence. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  Further, categorizing the Internet Archive's activity as "infringement" is a legal conclusion, not a fact, which is inappropriate for a Rule 56.1 statement and must therefore be disregarded. *See Nadel*, 57 F. Supp. 3d at 293 n.6.

475.  At least four Partner Libraries have withdrawn from the Open Libraries project since this action was filed.  (McN Decl. ¶100.)

**Response:**  Disputed to the extent the assertions in this paragraph are meant to suggest that four Partner Libraries withdrew from the Open Libraries project as a result of the lawsuit. Three of the four Partner Libraries who withdrew their books from the Open Libraries program after this lawsuit was filed withdrew as their physical facilities were reopening and their physical books became accessible.  Kahle Opp'n Decl. ¶ 22.

476.  According to Mr. Freeland, the owned-to-loaned principle is the "most critical" principle of CDL.  (McN Decl. ¶101.)

**Response:**  Not disputed.

477.  According to the Statement, to comply with the "owned-to-loan" principle,  a "library may only loan simultaneously the number of copies that it has legitimately acquired." (McN Decl. ¶101.)

**Response:**  Not disputed.

478. According to the Internet Archive, the overlap analysis conducted as part of the Open Libraries project enables libraries to "pool[] their physical collections in order to make more lendable copies of digital books available…" (McN Decl. ¶101.)

**Response:** Not disputed.

479. Mr. Freeland described this practice in an email to a librarian, where he stated that "libraries put one copy in for our matched records (even if you have multiple copies), and those counts are added to a pool for a given book. When a patron checks out a book, they are checking out a copy from the pool, not an individual library; for a variety of reasons, including reader privacy, we don't connect the circulation back to an individual library." (McN Decl. ¶101.)

**Response:** Not disputed.

480. Mr. Kahle testified that a match under the overlap analysis will "increase the number of concurrent borrowers by one, independent of the number that [the partner library] ha[s] in the library." (McN Decl. ¶102.)

**Response:** Not disputed.

481. Mr. Kahle testified that that if three Partner Libraries contributed a book to the concurrent lending count under an overlap analysis and one of those libraries, for instance the MIT Library, only had one physical copy, three MIT patrons would be able to read the ebook on the Website at once. (McN Decl. ¶102.)

**Response:** Disputed as phrased. The MIT patrons in this hypothetical would also need to be Internet Archive patrons in order to borrow the book from the Internet Archive. Further, the three MIT patrons would only be able to borrow the book from the Internet Archive if all four copies were not already on loan. McNamara Decl. ¶ 102 & Ex. 5, Kahle Dep. Tr. 204:16-207:15; *see also* Kahle Opp'n Decl. ¶¶ 11, 21, 26.

482.  Mr. Freeland testified that the overlap analysis allows Partner Libraries to loan more copies than they individually own.  (McN Decl. ¶102.)

**Response:**  Not disputed.

483.  According to Mr. Freeland, "If the Internet Archive possessed one copy of Catcher in the Rye and then [a] partner library had one copy" that was added from its system, "and then another partner library added a third copy to the Open Library system, there would be available for concurrent borrowing from Internet Archive users of three copies."  (McN Decl. ¶102.)

**Response:**  Not disputed.

484.  Under its current system, "[a]ll users have equitable access to the materials [Internet Archive] lend[s].  When a library adds a copy into [the] lending counts, that book can be checked out by any user."  (McN Decl. ¶103.)

**Response:**  Disputed.  Exhibit 149 to the McNamara Declaration was not filed. Therefore, this assertion is not supported by admissible evidence.

485.  Internet Archive has stated that non- Partner Libraries can integrate links to Internet Archive ebooks into their websites.  For example, in a 2020 blogpost, Internet Archive stated that, "To be clear, you don't have to join the program to access our books.  Anyone can link to our books right now."  (McN Decl. ¶103.)

**Response:**  Not disputed.

486.  A librarian at Fordham University contacted Internet Archive in July 2020 about the possibility of "digitiz[ing] approximately 450 volumes … to support CDL for distance learning." (McN Decl. ¶104.)

**Response:**  Not disputed.

487.  The Fordham librarian stated that "[t]hese are largely or entirely in-copyright books, so the scans could not be made public, and will only be released to our users in proportion to the number of physical copies which we have embargoed."  (McN Decl. ¶104.)

**Response:**  Not disputed.

488.  In response, Mr. Freeland replied "[t]hat's not how our implementation of CDL currently works – we lend to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into CDL by particular users, so there's no way for us to limit use to only your patrons.  Happy to discuss further on a call."  (McN Decl. ¶104.)

**Response:**  Not disputed.

489.  In 2019, Mr. Freeland received an inquiry from Wendy Knapp, the Deputy Director of Indiana State Library, asking whether its copies of a particular book, *Slaughterhouse Five*, "would be added to the total number of copies in OpenLibrary.org" or whether those books would start "a new waitlist just for Indiana patrons…"  (McN Decl. ¶105.)

**Response:**  Not disputed.

490.  Mr. Freeland responded that the Indiana State Library's copies "would decrease the waitlist and be loaned to all users" of IA's website.  (McN Decl. ¶105.)  Indiana's Deputy Director responded that her Library "still have hesitation around the idea that a format shift has not been indisputably set as a fair use" and declined to join as an Open Libraries Partner Library. (McN Decl. ¶105.)

**Response:**  Not disputed.

491.  The White Paper instructs that "libraries must truly exercise control in the process." (McN Decl. ¶106.)

**Response:**  Not disputed.

492.  The Open Libraries Form contains no provisions on how libraries implement CDL because Internet Archive considers this to be a "local decision."  (McN Decl. ¶106.)

**Response:**  Not disputed.

493.  In response to an email from a librarian expressing "concern[] about being in compliance," Mr. Freeland wrote that "how libraries limit circulation for books in CDL is a local decision made by the library… [Some] libraries are taking the approach that they don't need to suppress circulation because the likelihood is slim that all our digital copies and all the physical copies across our network of partners are all checked out at the same time."  (McN Decl. ¶106.)

**Response:**  Not disputed.

494.  Mr. Freeland testified that Internet Archive "was aware … that some partner libraries did not suppress circulation when they agreed to bec[o]me a partner library and put their books into controlled digital lending."  (McN Decl. ¶106.)

**Response:**  Not disputed.

495.  Mr. Freeland testified that Internet Archive has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously."  (McN Decl. ¶107.)

**Response:**  Not disputed.

496.  Mr. Freeland testified that Internet Archive does not know how Partner Libraries store the physical books counted in the overlap analysis.  (McN Decl. ¶107.)

**Response:**  Not disputed.

497.  Mr. Freeland testified that Internet Archive is also aware that even if a library puts a physical book into a non-circulating reference collection, it could be read in the library while the ebook equivalent is checked out.  (McN Decl. ¶107.)

**Response:**  Not disputed.

498.  Internet Archive does not employ a technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating.  (McN Decl. ¶107.)

**Response:**  Not disputed.

499.  Mr. Freeland testified that Internet Archive has never "taken any action against a library that did not suppress circulation properly."  (McN Decl. ¶107.)

**Response:**  Not disputed.

500.  Mr. Kahle testified that "monitoring" libraries would amount to "hav[ing] people going and snooping around," which it will not do.  (McN Decl. ¶107.)

**Response:**  Not disputed.

501.  According to the Open Libraries Form, Internet Archive requires Partner Libraries to submit their catalogues on a "quarterly" basis so that Internet Archive can re-run the overlap analysis to periodically add new books that the library acquired and subtract books that dropped out of the collection as a result of weeding.  (McN Decl. ¶108.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph:  Exhibit 153 to the McNamara Declaration is not the Open Libraries Form.  *See* Fed. R. Civ. P. 56(c)(1).  The only remaining authority for the assertions in this paragraph is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  Further, even though its agreements with Partner Libraries still require at least quarterly overlap analysis, the Internet Archive now runs overlap analysis monthly.  Kahle Opp'n Decl. ¶ 23.

502.  Mr. Freeland testified that in first years of the Open Libraries project, it did not "require updates at a specific time frame" and "sometimes Internet Archive did annual updates" depending on "the library's preferences."  (McN Decl. ¶108.)

**Response:**  Not disputed.

503.  Mr. Freeland testified that Internet Archive does not employ any measures to ensure the accuracy of the catalogues it receives; Internet Archive "depends on our partners for verifying the data."  (McN Decl. ¶108.)

**Response:**  Not disputed.

504.  According to Mr. Freeland's testimony, while Internet Archive began to run the overlap analysis on a monthly basis after this action was filed, it still does not require Partner Libraries to inform it when they weed out books and no longer physically own the titles.  (McN Decl. ¶108.)

**Response:**  Not disputed.

505.  Mr. Freeland testified that it was possible the concurrent lending count for an ebook could exceed the number of Partner Libraries with that physical book in their collection, if a library discarded a print copy at any time after that library has engaged in the overlap analysis. (McN Decl. ¶108.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  Fed. R. Civ. P. 56(c)(1).  Mr. Freeland in fact testifies that the assertion in this paragraph is "unlikely."  McNamara Decl. Ex. 7, Freeland Dep. Tr. 108:5-109:3.  Moreover, the concurrent lending count can always exceed the number of Partner Libraries with a book because the Internet Archive will have at least one copy of the book to which Partner Libraries contribute additional copies.  Foster Decl. ¶ 42; Gratz Opening Decl. Ex. B, Foster Suppl. Expert Rpt. ¶ 63.

506.  Mr. Kahle testified that Internet Archive also does not "audit library collections to ensure that the library still owns the physical copy it's lending against" because, according to Mr. Kahle, the "Internet Archive doesn't snoop around dumpsters or things."  (McN Decl. ¶108.)

**Response:**  Not disputed.

507.  Internet Archive's overlap analysis has resulted in errors that have led to inaccurate concurrent loan caps due to certain inaccurate or not properly organized data and metadata.(Foster Decl. ¶88.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  Fed. R. Civ. P. 56(c)(1).  Foster's Declaration states that overlap analysis "can lead" to errors, not that the overlap analysis "has resulted in errors."  Foster Decl. ¶ 88.

508.  The Internet Archive has stated that "Open Library's book catalog has millions of books and thousands of data errors.  Sometimes author names are misspelled, book covers are missing, or works and authors are duplicated or conflated."  (McN Decl. ¶109.)

**Response:**  Not disputed.

509.  Internet Archive asserted in the first paragraph of the Executive Summary to its application for the $100 million McArthur Foundation grant that "there's almost a century of knowledge still living only on the printed page, missing from our digital shelves."  (McN Decl. ¶111.)

**Response:**  Not disputed (but immaterial).

510.  In 2018, Mr. Kahle wrote to the Librarian of Congress, Carla Hayden, stating that controlled digital lending was "a way to get 20th century books onto the net respectfully."  (McN Decl. ¶111.)  In that email, Kahle also forwarded a blog post by Mr. Courtney and Mr. Hansen to the Librarian of Congress, Carla Hayden, stating that the goal of controlled digital lending is

"particularly to help address access to the large number of books published in the '20th Century black hole' that have little hope of otherwise being made available to readers"  (McN Decl. ¶111.)

    **Response:**  Not disputed (but immaterial).

511.  The Internet Archive has stated that the "black hole" refers to the gap between the date when books enter the public domain (currently 1926) and "the 1990s."  (McN Decl. ¶111.)

    **Response:**  Not disputed.

512.  Mr. Kahle stated in the "Transforming Our Libraries into Digital Libraries" paper that "[t]he Internet Archive, working with library partners, proposes bringing millions of books online, through purchase or digitization, starting with the books most widely held and used in libraries and classrooms."(McN Decl. ¶112.)

    **Response:**  Not disputed.

513.  Mr. Kahle continued by stating that, "[f]or the books we can not [sic] buy in electronic form, I am proposing a collaborative effort to select and digitize the most useful books of the 20th and 21st centuries."  (McN Decl. ¶112.)

    **Response:**  Not disputed.

514.  The homepage for Internet Archive's Website lists books in categories like "Trending Books," "Romance," "Thrillers," "Kids," "Classic Books" and "Books We Love." (McN Decl. ¶113.)  The home page of openlibrary.org strongly resembles the interface that public library patrons use to read authorized ebooks via OverDrive.  (McN Decl. ¶118.)

    **Response:**  Not disputed that openlibrary.org lists books in categories as described. However, the only support for the assertions in the second sentence of this paragraph is improper

attorney testimony in the form of Ms. McNamara's Declaration.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

515.  There is no category on the homepage for "Lost 20th Century Books."  (McN Decl. ¶113.)

**Response:**  Not disputed.

516.  The "program lead for OpenLibrary.org," Michael "Mek" Karpeles, confirmed that "there are tens of thousands of readers on Open Library who are looking for romance novels, self-help books, kids books, and modern thrillers."  (McN Decl. ¶113.)

**Response:**  Not disputed.

517.  Internet Archive's breakdown of ebooks by publication date on its Website shows that 78.9% of the in-copyright books were published after 1980 and only 6.2% of those books were published before 1963.  (McN Decl. ¶114.)

**Response:**  Not disputed.  But note that the calulcation actually demonstrates 77.9% of the in-copyright books were published after 1980.

518.  Internet Archive has represented to the Court that it "limits its digital lending to books published in the past five or more years."  (McN Decl. ¶115.)

**Response:**  Not disputed.

519.  Two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the IA's Website that same year.  (McN Decl. ¶113; Foster Decl. ¶69.)

**Response:**  Not disputed.

520.  Mr. Freeland testified that Internet Archive "add[s] ebooks" to the Website that are "available to purchase commercially or to license to libraries."  (McN Decl. ¶117.)

**Response:**  Not disputed.

521.  Mr. Freeland testified that Internet Archive does not take steps "to make sure that the books they add to the Open Libraries projects are not yet available in digital form" and does not "instruct libraries to segregate out books that are otherwise available in digital form."  (McN Decl. ¶117.)

**Response:**  Not disputed.

522.  The 127 Works in Suit – which are all available as authorized library ebooks – were republished as unauthorized ebooks on the Website; the Website has also posted 33,000 other titles available from the Publishers in digital formats.  (McN Decl. ¶115; *See* Foster Decl. ¶¶112-117; Pavese Decl. ¶18; R-A Decl. ¶49; Sevier Decl. ¶9; Weber Decl. ¶60)

**Response:**  Not disputed.

523.  The home page of openlibrary.org resembles the interface that public library patrons use to read authorized ebooks via OverDrive; both pages display rows of thumbnail book covers available to be "borrowed," organized into categories of general interest such as "Trending" books.  (McN Decl. ¶118.)

**Response:**  Not disputed that openlibrary.org lists has thumbnail book covers organized into categories of general interest.  However, the only support for these assertions is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

524.  Internet Archive has acknowledged that its Website competes with distributors of the Publishers' authorized ebooks.  Mr. Karpeles wrote an email stating that "reality has it that we are competing for eyeballs with Amazon, Goodreads (45M monthly users), Overdrive, OCLC

Worldcat, and countless other websites…"  (McN Decl. ¶119.)  Mr. Karpeles reiterated this statement during his deposition.  (McN Decl. ¶119.)

**Response:**  Disputed.  Not disputed that Mr. Karpeles's email is quoted accurately. Disputed to the extent that the cited evidence does not support the remaining assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  "Competes for eyeballs" is not equivalent to "competing," and Mr. Karpeles testified at his deposition that the Internet Archive was "competing for eyeballs."  McNamara Decl. Ex. 157, Karpeles Dep. Tr. 241:15-242:5. Moreover, the Internet Archive does not view itself as a "competitor" to OverDrive, Amazon, or other similar  websites or services.  Nor does it offer similar services to these entities.  It does not license ebooks—to other parties such as patrons or from aggregators or publishers.  It digitizes physical books it has lawfully acquired.  Kahle Opening Decl. ¶ 18; *see also* Kahle Opp'n Decl. ¶¶ 16, 24.

525.  Mr. Karpeles also created a document listing the library ebook aggregators OverDrive and Hoopla, as well as the ebook retail platforms Amazon and Google Books – all of which license the Publishers' works – as "similar services" to Internet Archive.  (McN Decl. ¶119.)

**Response:**  Not disputed that Mr. Karpeles created the document titled "Open Library Design Ecosystem."  Not disputed that OverDrive, Hoopla, and Amazon, and Google Books are among the entities listed under a heading of "Similar Services" relative to openlibrary.org. McNamara Decl. Ex. 164 at ECF pp. 3-4.  Other listed similar services are Librarything, Goodreads, ShelfJoy, Better World Books, Worldcat, Bibliogs, and Digital Library, fivebooks.com, The Free Library, and World Library.  *Id.*  The cited evidence does not support

the remaining assertion in this paragraph—that OverDrive, Hoopla, Amazon, and Google Books are similar services to the Internet Archive.  *See* Fed. R. Civ. P. 56(c)(1).

526.  Internet Archive's library expert, Susan Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL."  (McN Decl. ¶120.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  The selectively quoted language is from the questioning attorney and mischaracterizes Ms. Hildreth's response and her ultimate expert opinions.  *See* Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 226:24-227:4; Gratz Opp'n Decl. Ex. 6, Hildreth errata; Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 106-109.

Ms. McNamara asked:  "Is it your expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL?"  Ms. Hildreth answered:  "That is possible, yes, but whether it would ever in fact occur would depend on the circumstances."  Later, when asked, "When a library acquires via CDL a series of books, they are not paying licenses for those works; isn't that right?"  Ms. Hildreth testified:  "They are not paying for CDL licenses when they receive or obtain content through CDL."  Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 264:3-264:12; Gratz Opp'n Decl. Ex. 6, Hildreth errata.

Ms. Hildreth also testified that she did not know whether the availability of books through the Internet Archive's Digital Lending Library had in fact had any effect on demand for e-book licenses and that she did not "have a view" on whether libraries would actually purchase fewer e-book licenses for titles it makes available through CDL.  "I think it would be determined on a case-by-case basis depending on what the libraries' needs would be in terms of their collection."  *See* Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 257:1-258:6.

527.  Ms. Hildreth further testified that "I think it could be likely that with CDL materials meeting some patron requests, the result that [sic] the library would not necessarily have to license the specific title to make patron demand, they would be able and it is likely that they would purchase additional e-materials … to meet other patron demand."  (McN Decl. ¶120.) Ms. Hildreth acknowledged "that a specific author would not receive a royalty for a specific title" if revenue was shifted in this way.  (McN Decl. ¶120.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  The selectively quoted language mischaracterizes Ms. Hildreth's testimony and expert opinions.  Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 106-109. For instance, Ms. Hildreth also testified that:  "Q.  If the specific title that was available through CDL was Catcher in the Rye by J.D. Salinger, let's say, and you would agree that then the Salinger estate would not receive a royalty if that work was available via the Internet Archive and CDL?  MS. LANIER:  Objection, calls for speculation.  THE WITNESS:  I'd have to know the context of that question and I mean -- frankly, I'd have to know the context of the question and there could be many other avenues for obtaining access to The Catcher in the Rye than purely relying necessarily on CDL or the Digital Lending Library for it."  McNamara Decl. Ex. 19, Hildreth Dep. Tr. 45:6-19.

528.  A user of the Website testified that he read an ebook on Internet Archive's Website that he could have read in an authorized ebook format through his university library because "it didn't matter to me … whether I was using Internet Archive or [the authorized platform]… [I]t didn't … matter to me.  Or it didn't factor into my thinking because I was more concerned with getting these materials I needed…"  (McN Decl. ¶121.)

**Response:**  Not disputed.

529.  Another Internet Archive user who writes blogs distributing links to ebooks on Internet Archive testified that she would not add links to authorized ebook platforms, in part because "[t]he Internet Archive is reaching a potentially broader audience than the North Carolina Digital Library."  (McN Decl. ¶121.)

**Response:**  Not disputed.

530.  Internet Archive has stated that the ebooks on its Website serve the needs of print disabled users.  For example, it stated in the Executive Summary of the MacArthur Foundation application that "[w]orking with US libraries and Benetech, operator of the world's largest digital library for people with disabilities that impact reading, the Internet Archive (IA) will bring millions of free digital ebooks to billions of people.  For the blind, ebooks are a lifeline…" (McN Decl. ¶122.)

**Response:**  Not disputed.

531.  The vast majority of Internet Archive users are not print disabled; only 2 print disabled users were added in 2017 and, by 2021, there were only 10,891 such users – which is less than 0.2% of the accounts currently registered with the Website.  (McN Decl. ¶122.)

**Response:**  Not disputed.

532.  The needs of print disabled readers are served by HathiTrust, which "provides print-disabled patrons with versions of all of the [20 million +] works contained in its digital archive in formats accessible to them" – and HathiTrust truly focuses on the print disabled by prohibiting the general population from accessing full ebooks.  (McN Decl. ¶122; *Authors Guild, Inc., v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014).)

**Response:**  Not disputed that the quote from *Authors Guild Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014), is accurate.  The cited evidence for the remaining assertions in this

paragraph—that "[t]he needs of print disabled readers are served by HathiTrust" and that "HathiTrust truly focuses on the print disabled" is improper attorney testimony in the form of Ms. McNamara's declaration. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435. Disputed to the extent that, as phrased, the assertions in this paragraph are misleading. In order to access full books from HathiTrust, patrons with print disabilities "must be affiliated with [a HathiTrust member institution] that has opted-into the program." *HathiTrust*, 755 F.3d at 101.

533. Internet Archive also stated in the Executive Summary of their application for the MacArthur Foundation grant that by "digitizing millions of books, we unlock them for communities with limited or no access" – particularly "people in rural areas." (McN Decl. ¶123.)

**Response:** Not disputed.

534. Mr. Freeland testified that Internet Archive does not target particular geographic locations because "someone could sign up from anywhere in the world." (McN Decl. ¶123.)

**Response:** Not disputed.

535. Mr. Freeland testified that it would not know whether a user checking out an ebook from the Website "was coming from New York City or coming from some small town in Upstate New York" because Internet Archive only maintains "state- or country-level" geographic data about users. (McN Decl. ¶123.)

**Response:** Not disputed.

536. When commenting on the Statement, the library copyright expert Kenneth Crews noted that the argument that CDL is necessary to serve individuals in rural areas is "not very convincing. Many rural communities are well served. Sometime[s] the biggest need is in the

cities, where parking is miserable, and realistically students and profs are doing their research at home."  (McN Decl. ¶124.)

**Response:**  Not disputed that Mr. Crews is accurately quoted.  To the extent Mr. Crews's quote is being offered for its truth, it is not admissible evidence.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

537.  The founder of OverDrive testified that "many of the public libraries that are [his] customers … serve rural communities," "serve disabled communities," "serve poor communities or impoverished communities" – including by OverDrive making donations when appropriate. (McN Decl. ¶124.)

**Response:**  Not disputed.

538.  National data indicates that rural communities have seen more growth and value from authorized library ebooks than libraries serving more densely populated districts.  (McN Decl. ¶124.)

**Response:**  Not disputed.

539.  Internet Archive also asserted in its Answer to the Complaint that the ebooks on its Website can be used for data or text mining.  (Ans. at p. 2.)

**Response:**  Not disputed.

540.  Mr. Freeland testified in his capacity as Internet Archive's 30(b)(6) witness on this topic that he does not know "what percentage of users engage" in those practices and knows of only three projects that could be described as datamining.  (McN Decl. ¶126.)

**Response:**  Not disputed.

541.  On March 24, 2020, Internet Archive launched a "National Emergency Library" in the wake of COVID-19 pandemic shutdowns of libraries.  (McN Decl. ¶127.)

**Response:**  Not disputed.

542.  According to Mr. Kahle, the National Emergency Library drew from the same pool of ebooks that were previously available on the Website, but it "suppressed the wait-list function" – *i.e.*, "[d]id away with the one-to-one ratio."  (McN Decl. ¶127.)  The blog post announced that "we lend to the world" (McN Decl. ¶127.)

**Response:**  Not disputed.

543.  Mr. Freeland testified that Internet Archive "did away with waitlists" and "did away with the one-to-one ratio" by raising the cap on concurrent loans to 10,000.  (McN Decl. ¶128.)

**Response:**  Not disputed.

544.  Demand for ebooks on IA's Website increased after lending limits were relaxed and, even after those limits were reimposed, key metrics like monthly circulation and number of total members have remained higher than their pre-pandemic levels.  (McN Decl. ¶128.)

**Response:**  Not disputed that both monthly circulations and the number of total patrons of Open Library are higher now than before March 2020.  Disputed to the extent that the assertion that "[d]emand for ebooks on IA's Website increased after lending limits were relaxed" is not supported by admissible evidence.  The only support for this assertion is improper attorney testimony in the form of Ms. McNamara's Declaration.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  Plaintiffs have not laid a foundation for why an increase in monthly circulations and an increase in the number of total patrons constitutes an increase in demand.

545.  For example, as of September 2019, IA reported over 2.7 million total "Members" of the Website; by April 2022, that figure had nearly doubled to over 5.5 million.  (McN Decl. ¶128.)

**Response:**  Not disputed.

546.  As of March 2020, IA reported that the number of "ebooks borrowed" "over the last 28 days" on the Website was 41,296; by July 2022, the number of ebooks borrowed over the last 28 days is listed as over 349,984 – a more than eightfold increase.  (McN Decl. ¶128.)

**Response:**  Not disputed.

547.  Mr. Freeland testified that Internet Archive did not require users of the National Emergency Library "to certify that they were directly impacted by COVID-19" to access Internet Archive's ebooks on demand and without waitlists.  (McN Decl. ¶129.)

**Response:**  Not disputed.

548.  Ms. Bailey wrote that the Internet Archive did not put in place any such requirement because "we don't have the time or staffing to allow us to limit NEL access only to people directly impacted by COVID 19."  (McN Decl. ¶129.)

**Response:**  Not disputed.

549.  Internet Archive offered rightsholders an option to "opt-out" of the National Emergency Library, but Mr. Freeland testified that when an author would send such an opt-out request, books that "were taken out of the National Emergency Library, … were not taken out of controlled digital lending."  (McN Decl. ¶129.)

**Response:**  Not disputed.

550.  Mr. Freeland testified that Internet Archive was aware that there were "copyright concerns" about the National Emergency Library.  (McN Decl. ¶130.)

**Response:**  Not disputed.

551.  Senator Tom Udall of New Mexico wrote to Maria Strong, the U.S. Register of Copyrights, to urge her "to examine the National Emergency Library that has been organized by

the Internet Archive which is operating without typical library license and is causing authors in New Mexico concern about the integrity of their copyrights." (McN Decl. ¶130.)

  **Response:** Not disputed.

  552. Senator Udall noted that "[s]ince the emergence of e-books, libraries have provided e-books to readers through legally well-established means of paying for licensing fees for e-books that they lend, of which a portion of the licensing fees extend to authors as royalties." (McN Decl. ¶130.) But given the National Emergency Libraries distribution of ebooks without payment, he had "heard from authors who are concerned that such action is not legal and presents additional challenges to them at an economically difficult time." (McN Decl. ¶130.)

  **Response:** Not disputed that Senator Udall is accurately quoted. To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

  553. In response, Register Strong wrote that, despite the Internet Archive's claim "that the books in the National Emergency Library 'focus on materials published during the 20th century, the vast majority of which do not have a commercially available ebook,' and which therefore would not be publicly available when schools and libraries are closed[,]" "the Internet Archive does not appear to have verified if any of the works in its collection were available to the public in digital formats prior to including those books in its collection or removing its waiting lists." (McN Decl. ¶131.)

  **Response:** Not disputed that Register Strong is accurately quoted. To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

554.  Register Strong also wrote that "The types of materials included in the National Emergency Library, which include Stephen King thrillers and joke books, also suggest that at least some of the materials are likely to be accessed for entertainment rather than educational purposes."  (McN Decl. ¶132.)

**Response:**  Not disputed that Register Strong is accurately quoted.  To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

555.  Two days after the launch of the National Emergency Library, the Director of Stanford University Press made "a formal request to exclude all [its] content from the National Emergency library."  (McN Decl. ¶133.)

**Response:**  Not disputed.

556.  The Director explained that "[w]e do not grant those rights to our content, and do not agree that the current coronavirus emergency constitutes an argument for copyright violation. To support the community during this crisis, we are in the process of making all our content more liberally available through the existing library aggregators, and responding to individual requests for content access."  (McN Decl. ¶133.)

**Response:**  Not disputed that Alan Harvey is accurately quoted.  To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

557.  In a subsequent email to Mr. Freeland, the Stanford University Press Director stated Internet Archive's practices were "entirely unacceptable" given that "IA simply grabbed everything without any discussion and the bad will is now oozing through us all."  (McN Decl. ¶133.)

**Response:**  Not disputed that Mr. Harvey is accurately quoted.  To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

558.  On March 31, 2020, the Director the University of Minnesota Press wrote an email to Mr. Freeland stating that "the National Emergency Library goes further than we can legally or ethically allow."  (McN Decl. ¶134.)

**Response:**  Not disputed that Douglas Armato is accurately, albeit selectively, quoted. (Mr. Armato also wrote:  "I'm a longtime fan of the work that the Internet Archive does, . . . ." McNamara Decl. Ex. 174.)  To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

559.  After acknowledging that takedown requests had been sent, Mr. Freeland stated that he would "be happy to discuss making limited Minnesota content available as part of the National Emergency Library, understanding that we *always* consult authors or rights holders before making such decisions – indeed, we've just done a round of that for course books we've made openly available for emergency course use on our Manifold OA platform.  We'd also need some kind of binding legal agreement."  (McN Decl. ¶134.)

**Response:**  Not disputed that quote was said.  Disputed that the quote is from Mr. Freeland:  The quote is from Mr. Armato.  Further, to the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

560.  On April 2, 2020, the Executive Director of the Authors Guild, Mary E. Rasenberger, wrote to Mr. Kahle to "set up a time to talk" about the National Emergency Library.  (McN Decl. ¶135.)  According to the email, she wanted to "dispel any rumors you have

heard that the Authors Guild is planning to bring suit.  The Guild is not; we cannot possibly

afford a litigation.  We were financially stressed as you know before COVID-19 and having to

cancel our gala means a loss of over a quarter of the revenue in our budget.  We are instead

addressing this bold infringement by letting authors know how they can request IA to take their

books down, and we hope to appeal to your decency in asking you to shut this ill-planned (even

if well-intentioned) initiative down.  There are plenty of other sources for books for students and

teachers right now.  We can help you point people to them."  (McN Decl. ¶135.)

    **Response:**  Not disputed that Mary Rasenberger is accurately quoted.  To the extent this

quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid.

801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

    561.  Mr. Kahle responded to this message by writing, "We talked before, and I felt

deposed by a lawyer, which you are, and therefore not a good idea for layman [sic] (and against

some lawyer ethics rules as I understand it); and so I talked with multiple of your board members

with no apparent effect.  We are actively working with others and are making great progress.

Wish us all luck, we are all trying to get a digital world that works for everyone."  (McN Decl.

¶136.)

    **Response:**  Not disputed.

    562.  The Internet Archive did not respond to public complaints by the AAP.  (McN

Decl. ¶136.)

    **Response:**  Disputed.  The only support for the assertion in this paragraph is improper

attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible

evidence.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179

F.R.D. at 435.

563.  On April 8, 2020, PRH approved a request by a school for special COVID-19 class set pricing for *Interview with the Vampire* by Anne Rice and *Lolita* by Vladimir Nabokov. (McN Decl. ¶137.)

**Response:**  Not disputed.

564.  But PRH was informed by OverDrive that "the school will not be moving forward with a purchase.  They cited that they needed the materials more urgently and the professor was able to find both titles on the Internet Archive / DPLA site with simultaneous checkout so they used those versions."  (McN Decl. ¶137.)

**Response:**  Not disputed.

565.  On April 14, 2020, Mr. Kahle wrote an email to the Executive Director of the Authors Alliance and Pamela Samuelson (who sits on its Board of Directors) to notify them that "the Authors Guild is going to be meeting with some staffers [in Congress] about copyright matters, and possibly about NEL as well.  I thought I would alert you to this, as the Authors Alliance, I think, was formed to be at the table when these discussions were happening."  (McN Decl. ¶138.)

**Response:**  Not disputed (but immaterial).

566.  Mr. Kahle is on the Advisory Board to the Authors Alliance, and Dave Hansen, one of the White Paper's co-authors, is on the Staff.  (McN Decl. ¶138.)

**Response:**  Not disputed (but immaterial).

567.  Internet Archive asked the Authors Alliance to endorse the National Emergency Library but according to an email response, the Authors Alliance "didn't support the NEL [National Emergency Library]."  (McN Decl. ¶138.)

**Response:**  Not disputed that the Internet Archive asked the Authors Alliance to endorse the National Emergency Library.  Disputed that the Authors Alliance responded that they "didn't support the NEL."  The Authors Alliance email states that the Authors Alliance "is not planning to endorse the NEL."  *See* McNamara Decl. ¶ 138 & Ex. 179 at INTARC000462974.  To the extent the Authors Alliance statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

568.  Mr. Kahle posted a blogpost on April 14, 2020 entitled "The National Emergency Library – Who Needs It?  Who Reads It?  Lessons from the First Two Weeks."  (McN Decl. ¶139.)

**Response:**  Not disputed that Mr. Kahle posted a blogpost so titled.  Disputed to the extent that he did so on April 7, 2020, not April 14, 2020.  *See* McNamara Decl. ¶ 139 & Ex. 180.

569.  In the blogpost, Mr. Kahle wrote that "[W]e moved in 'Internet Time' and the speed and swiftness of our solution surprised some and caught others off guard. In our rush to help we didn't engage with the creator community and the ecosystem in which their works are made and published. We hear your concerns and we've taken action: the Internet Archive has added staff to our Patron Services team and we are responding quickly to the incoming requests to take books out of the National Emergency Library.  While we can't go back in time, we can move forward with more information and insight based on data the National Emergency Library has generated thus far."  (McN Decl. ¶139.)

**Response:**  Not disputed.

570.  The Internet Archive ended the National Emergency Library on June 10, 2020, ten days after the Publishers filed this action and two weeks before the earliest possible date Internet archive had previously announced for its closure.  (McN Decl. ¶140.)

**Response:**  Disputed.  The Internet Archive announced the end of the National Emergency Library on June 10, 2020.  The National Emergency Library was closed on June 16, 2020.  *See* McNamara Decl. ¶ 140 & Ex. 181.

571.  According to the blog post, Mr. Kahle announced that Internet Archive would return to "traditional controlled digital lending" pursuant to overlap analysis, which it continues to practice to this day.  (McN Decl. ¶140.)

**Response:**  Not disputed.

572.  On September 4, 2020, the Executive Director of HathiTrust, Mike Furlough, declined an invitation from Kahle to speak on a panel called "Digital Lending in a Pandemic." (McN Decl. ¶141.)

**Response:**  Disputed (but immaterial).  The invitation to HathiTrust was from Mr. Freeland, not Mr. Kahle, and the event was titled "Digital Lending in a Pandemic."  This was not the title of the panel.  *See* McNamara Decl. ¶ 141 & Ex. 182 at INTARC00448940.

573.  During COVID-19, HathiTrust expanded access to its ebooks in the wake of school library closures but imposed, among other restrictions, limits to ensure that only students of the institutions affected could read those works.  (McN Decl. ¶141.)

**Response:**  Disputed.  The assertions in this paragraph are not supported by the cited evidence.  *See* Fed. R. Civ. P. 56(c)(1).  The cited evidence, both the webpage from HathiTrust and Skip Dye's mail, state that "students, faculty, and staff" may take advantage of the expanded

access—not just students.  *See* McNamara Decl. Exs. 183 & 184.  Further, the cited evidence is

not admissible.  *See* Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

574.  Mr. Furlough declined the invitation to speak because "[i]f I am asked to define the

difference between what we have done and what you have done and are now doing, I will end up

pointing out that we have put a good many more *controls* on the service that you did for NEL

or for ongoing lending … I may have to end up directly contrasting some things, which would

implicitly suggest a criticism of your approach.  And we made some very different decisions –

when we did our legal analysis, it pointed us in directions that are quite different from those you

have taken.  And we did not feel that the methods you were employing were ones *we* could

defend.  We didn't think we could rely on the same legal theories that you were relying on.  I'd

rather keep all that to ourselves and not be quoted or paraphrased as suggesting that your actions

are NOT defensible, especially at your own party."  (McN Decl. ¶142.)

**Response:**  Not disputed that Mr. Furlough is accurately quoted.  To the extent this

quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid.

801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

575.  The Internet Archive has scanned, posted and distributed the Works in Suit for short

term loans to its users without authorization from the Publishers.  (McN Decl. ¶13.)

**Response:**  Not disputed.

576.  The Internet Archive has not paid the Publishers or their authors any fees for their

use and distribution of the Works in Suit.  (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶70; Sevier

Decl. ¶74; Weber Decl. ¶84.)

**Response:**  Disputed.  Publishers and authors have been paid for the copies the Internet Archive uses:  They receive payment when the copy used for digitization was sold for the first time.  Gratz Opening Decl. Ex. A, Stipulation ¶ 2.

577.  As stated by the Internet Archive's expert witnesses, Susan Hildreth, there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive."  (McN Decl. ¶9.)

**Response:**  Not disputed.

578.  When a library obtains an ebook from an authorized aggregator (like OverDrive) that is published by one of the Publishers for lending to its patrons, that Publisher earns a fee. (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:**  Not disputed.

579.  The Internet Archive holds itself out a "non-profit library."  (McN Decl. ¶¶1, 77; R-A Decl. ¶70.)

**Response:**  Not disputed.

580.  The Internet Archive does not pay the Publishers the fees paid by libraries engaged in short-term loans of ebooks.  (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶¶70-71; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:**  Not disputed.

581.  IA added over 19,000 of the Publishers' books to its Website after the Publishers filed suit.  (Foster Decl. ¶118, Figures 11-14.)

**Response:**  Not disputed that the Foster Declaration's description of tables of scans of publishers' works following the filing of this lawsuit add up to over 19,000.  Disputed to the

extent the cited evidence does not support the assertion that each of these scans are separate works.  *See* Fed. R. Civ. P. 56(c)(1).  The cited evidence only suggests these are separate scans. *See* Foster Decl. ¶ 118, figs. 11-14.

582.  In addition to the Works in Suit, the Internet Archive is distributing ebooks for additional works in each of the Publishers' respective catalogs:

**Response:**  Not disputed.

582.1.  Internet Archive distributes 4,519 titles published by Hachette, which constitutes 34.6% of the titles currently published by Hachette in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

582.2.  Internet Archive distributes 7,055 titles published by HarperCollins, which constitutes 36.7% of the titles currently published by HarperCollins in print and digital form. (Foster Decl. ¶117.)

**Response:**  Not disputed.

582.3.  Internet Archive distributes 16,496 titles published by Penguin Random House, which constitutes 35.8% of the titles currently published by Penguin Random House in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

582.4.  Internet Archive distributes 4,933 titles published by Wiley, which constitutes 15.5% of the titles currently published by Wiley in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

583.  The percentage is higher if one looks at books initially published more than five years ago.  For these books:

**Response:**  Not disputed.

583.5.  Internet Archive distributes 4,220 titles published by Hachette, which constitutes 54.6% of the titles currently published by Hachette in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

583.6.  Internet Archive distributes 15,746 titles published by Penguin Random House, which constitutes 48.4% of the titles currently published by Penguin Random House in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

583.7.  Internet Archive distributes 4,889 titles published by Wiley, which constitutes 21.3% of the titles currently published by Wiley in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

584.  Internet Archive has not paid the Publishers the fee customarily paid by libraries engaged in library ebook lending for each of these additional titles.  (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶¶70-71; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:**  Disputed.  Libraries do not "customarily" pay a fee to Publishers for CDL. Gratz Opening Decl. Ex. A, Stipulation ¶ 2.  There is no evidence in the record that any entity has ever paid a license fee for Controlled Digital Lending.

585.  The Publishers earn substantial fees from the library ebook market.  For example, between 2017-2020, the 48 Works in Suit published by PRH generated approximately $1.23 million in U.S. library ebook revenue.  (Weber Decl. ¶49.)  During the same time period, the 33 Works in Suit published by HarperCollins generated over $768,000 in revenue from the license of library ebooks.  In short, for these 88 Works in Suit, the two Publishers earned almost $2 million in library ebook revenues.  (R-A Decl. ¶49.)

**Response:**  Not disputed that, from 2017-2020, HarperCollins earned more than $768,000 in revenue from the license of library ebooks of the Works in Suit it publishes. Disputed in that the cited portion of Mr. Weber's Declaration does not support the assertion that "between 2017-2020, the 48 Works in Suit published by PRH generated approximately $1.23 million in U.S. library ebook revenue." *See* Fed. R. Evid. 56(c)(1).

586.  By extrapolation, the Publishers earn many millions in library ebook revenues for the 33,000 works published by them in print and digital form that are posted on the Internet Archive.  (R-A Decl. ¶49.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Ms. Restivo-Alessi's Declaration only discusses revenue from 2017 to 2020 from library ebook licenses for the Works in Suit published by HarperCollins.  Moreover, Ms. Restivo-Alessi has not established foundation for having knowledge concerning the library ebook revenues for Penguin Random House, Hachette, or Wiley.  Her extrapolation is unsupported speculation.  *Major League Baseball Props., Inc.*, 542 F.3d at 306 ("The non-moving party [on summary judgment] may not rely on conclusory allegations or unsubstantiated speculation.") (cleaned up).  Moreover, all available evidence— including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly-available sources, and expert analysis—demonstrate that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

587.  It would cost Internet Archive millions of dollars to license authorized library versions of the Works in Suit and the Publishers' 33,000 other titles that currently reside on the

Internet Archive for national, unlimited distribution without a metering limit.  (R-A Decl. ¶71; Weber Decl. ¶84.)

**Response:**  Disputed.  The assertions in this paragraph are not supported by admissible evidence.  Ms. Restivo-Alessi (HarperCollins) and Mr. Weber (Penguin Random House) have not established foundation for having personal knowledge concerning the cost of or parameters for licensing library ebooks from Hachette or Wiley—with respect to the Works in Suit or any works not at issue, under any type of access model.  In addition, HarperCollins, Hachette, and Penguin Random House do not offer any of their trade ebooks to libraries under a perpetual access model.  *See* PSMF ¶¶ 124, 127, 130.  And none of the Plaintiffs license ebooks for "national, unlimited distribution."  *Id.*  Therefore, asserting "it would cost" the Internet Archive "millions of dollars" to license library ebooks "for national, unlimited distribution without a metering limit" describes an impossibility and is speculative.  *Major League Baseball Props., Inc.*, 542 F.3d at 306.  Moreover, this assertion alludes to the commercial performance of works not at issue.  The Internet Archive requested such commercial performance data, but Plaintiffs refused to produce it.  ECF Nos. 47 (IA letter to Court requesting discovery conference) & 49 (Plaintiffs' response).

588.  Both the number of the Publishers' titles being distributed by the Internet Archive, and the number of its members and borrows has grown over time, including since this lawsuit was filed.  (*See supra* ¶¶544-547.)

**Response:**  Not disputed.

589.  Internet Archive provides libraries and their patrons with a free alternative to licensed ebooks from the Publishers' authorized library ebook aggregators.  Internet Archive

provides an option not to pay the fees for authorized library ebooks.  (R-A Decl. ¶¶75-79; Pavese Decl. ¶32; Weber Decl. ¶¶85-86, 88, 90-93; Sevier Decl. ¶¶76-77.)

**Response:**  Disputed.  Borrowing library books—whether from the Internet Archive or from a public or academic library—is free to patrons.  PSMF ¶ 113.  Digitizing physical books is not a "free alternative" for libraries.  It lets them lend either the physical book they have or a digital version.  Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶ 51.

590.  Internet Archive provides short term ebook lending to users.  (McN Decl. ¶¶4-5, 13; R-A Decl. ¶75.)

**Response:**  Not disputed.

591.  Authorized library ebook aggregators – working pursuant to agreements with the Publishers – also provide short term ebook lending to users.  (McN Decl. ¶11; R-A Decl. ¶75.)

**Response:**  Not disputed.

592.  By providing short term ebook lending on the internet, Internet Archive and authorized library ebook aggregators perform a similar function.  (McN Decl. ¶¶117-121; R-A Decl. ¶75.)  Internet Archive does not compensate the Publishers and authorized library lending does compensate the Publishers.  (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶¶75-76; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:**  Disputed.  Library ebook aggregators facilitate library lending of ebooks. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 43, 98. Libraries actually lend those books. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶ 14.  Internet Archive behaves similarly to a library, not an aggregator, because it loans books to patrons.  Restivo-Alessi Decl. ¶ 76, Sevier Decl. ¶ 77, Weber Decl. ¶¶ 16, 19; Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 43, 98.  Publishers are

compensated when a physical copy of a book is sold the first time.  Gratz Opening Decl. Ex. A, Stipulation ¶ 2.

593.  By creating ebooks through the scanning of the Publishers' print books, the Internet Archive enables public and academic libraries to avoid certain licensing restrictions that each Publisher has devised for the library ebook market.  (Pavese ¶¶23, 34; R-A Decl. ¶¶2, 29,75; Sevier Decl. ¶67; Weber Decl. ¶70.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Digitizing physical books allows libraries to lend either the physical book they have or a digital version.  The Internet Archive's digital lending library does not "enable" libraries to "avoid certain licensing restrictions" any more than the physical lending of books constitutes avoiding licensing restrictions.  *See* Hildreth Decl. Exs. 1 & 2, Hildreth Expert Rpt. ¶¶ 47-54, 106-109 & Reply Expert Rpt. ¶ 8.

594.  Internet Archive does not restrict the users of its Website to identified community residency or academic credentials; rather, Internet Archive distributes its ebooks on its Website without a limiting term (such as for two years) or a limiting number of circulations (like 26).  (McN Decl. ¶¶4, 6, 62; R-A Decl. ¶75.)

**Response:**  Not disputed that the Internet Archive does not "restrict the users of its Website to identified community residency or academic credentials."  Disputed to the extent that "without a limiting term" is misleading.  The Internet Archive strives to keep physical books it owns—as well as the digitized versions—forever.  The Internet Archive does not make a digitized book unavailable for lending after a certain amount of time or after a certain number of check-outs.  Kahle Opp'n Decl. ¶ 13.

595.  Multiple libraries have links to IA's Website on their websites.  (*See supra* at ¶¶393-396.)  When a library puts a link on its website sending its local patrons to the IA's Website, the ebooks available on the Website are not authorized for lending by the Publishers. (McN Decl. ¶13.)

**Response:**  Not disputed.

596.  When a library puts a link on its website sending its local patrons to IA's Website, that library's local patrons may have the ability to borrow from a collection of ebooks not available in its own local library's collection.  (McN Decl. ¶¶104, 108; R-A Decl. ¶76.)

**Response:**  Not disputed, but, for the sake of clarity, anyone who signs up to be a patron may borrow books from the Internet Archive regardless of other libraries they are patrons of. Any library can link to the Internet Archive.  Kahle Opp'n Decl. ¶ 25.

597.  Susan Hildreth, Internet Archive's library expert, stated in her report that libraries engage in CDL "to leverage their existing physical collection" to obtain ebooks.  (McN Decl. ¶14.)

**Response:**  Not disputed.

598.  When libraries leverage their existing physical collections to obtain ebooks, they do not pay for authorized ebooks.  (McN Decl. ¶14; R-A Decl. ¶78.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Further, there is no evidence that any libraries who use Controlled Digital Lending are not paying for authorized ebooks.  *See* Gratz Opp'n Decl. Ex. 6, Hildreth errata; Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 226:24-227:4, 257:1-258:8; Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 106-109.

599.  Ms. Hildreth also stated in her report that "if a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title – or on purchasing print books."  (McN Decl. ¶14.)

**Response:**  Not disputed.

600.  If a library decides not to license an ebook title from authorized ebook aggregators because digitized print copies are available for borrowing under CDL and uses the money on another ebook title, that other ebook title may not be written by the same author or published by the same publisher as the first title.  (McN Decl. ¶14.; R-A Decl. ¶¶75; 78.)

**Response:**  Not disputed.

601.  Ms. Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL." (McN Decl. ¶14.)

**Response:**  Disputed.  See response to paragraph 526, above.

602.  As a result, the Publisher and author will receive less money from the library for those particular titles.  (McN Decl. ¶14.)

**Response:**  Disputed.  The only support for this assertion is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  Further, Ms. McNamara's theory about what "will" happen is unsupported speculation.  *Major League Baseball Props., Inc.*, 542 F.3d at 306 ("The non-moving party [on summary judgment] may not rely on conclusory allegations or unsubstantiated speculation.") (cleaned up).  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from

publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).  *See also* response to paragraph 526 above.

603.  The Internet Archive's Open Libraries Agreement form explicitly states, "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own."  (McN Decl. ¶69.)

**Response:**  Not disputed.

604.  The Publishers experience lost potential ebook license revenues when a library makes their collection digital by using a physical volume that they own, rather than obtaining an authorized ebook license for a fee from an authorized ebook aggregator.  (R-A Decl. ¶78.)

**Response:**  Disputed.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis— demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).  See response to paragraph 526 above.

605.  The Internet Archive has advised libraries that they need not spend money on authorized ebooks because their patrons can instead access ebook titles on the Internet Archive's Website and/or use their print copies to leverage them into digital copies.  (*See supra* at ¶¶380; 597-98; R-A Decl. ¶78.).

**Response:**  Not disputed.

606.  For example, in presentations to libraries, Internet Archive has explained that its model "ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format."  (McN Decl. ¶71; R-A Decl. ¶78.)

**Response:**  Not disputed.

607.  As another example, in a document titled "Maximizing institutional investment in print resources through controlled digital lending," Internet Archive summarizes its project as "Or, You Don't Have To Buy It Again."  (McN Decl. ¶71; R-A Decl. ¶78.)

**Response:**  Not disputed that Mr. Freeland gave a presentation titled "Maximizing institutional investment in print resources through controlled digital lending."  Not disputed that the second slide of this presentation reads "Or, You Don't Have to Buy It Again!"  McNamara Decl. Ex. 109.  The assertion that this is how the Internet Archive "summarizes its project" is not supported by the cited evidence.  *See* Fed. R. Civ. P. 56(c)(1).

608.  The Publishers experience lost revenues when a library does not "repurchase the content again" via an authorized ebook license and instead makes use of the Internet Archive's ebook for its patrons.  (R-A Decl. ¶78.)

**Response:**  Disputed.  See response to paragraph 598 above.  All available evidence— including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).  Further, the cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Ms. Restivo-Alessi has not laid a foundation for her knowledge of the revenues for library ebooks realized by Penguin Random House, Hachette, or Wiley.

609.  As of June 2020, when the Works in Suit were removed from the Internet Archive, it had fewer members and monthly loans than today.  (*See supra* ¶¶544-547.)

**Response:**  Not disputed.

154

610.  If the Internet Archive's conduct continues or other similar websites follow its example and its practices become widespread, there will be more free ebooks to satisfy user demand.  (R-A Decl. ¶¶76-79; Weber Decl. ¶50.)

**Response:**  Disputed.  The cited evidence is not admissible.  HarperCollins and Penguin Random House's theories about what "will" happen are unsupported speculation.  *Major League Baseball Props., Inc.*, 542 F.3d at 306.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

611.  There are many millions of print books housed in libraries nationwide.  (McN Decl. ¶11.; R-A Decl. ¶79.)

**Response:**  Not disputed.

612.  While fewer than 15 public libraries now act as Partner Libraries in the Open Libraries project, their widespread participation would increase the number of IA's copies of the type of trade books published by the Plaintiffs.  (McN Decl. ¶72.)

**Response:**  Disputed.  The only support for the statement "their widespread participation would increase the number of IA's copies of the type of trade books published by Plaintiffs" is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  Moreover, Ms. McNamara's theory about what "would" happen is unsupported speculation.  *Major League Baseball Props., Inc.*, 542 F.3d at 306.

613.  The Publishers price and sell print based on the assumption that they are material objects with limited distribution capabilities.  (R-A Decl. ¶22; Sevier Decl. ¶40; Weber Decl. ¶42.)

**Response:**  Not disputed.

614.  A consumer who wishes to read a particular book can read or download the ebook for free from IA's Website rather than obtaining the ebook from Amazon, B&N.com, or the Publishers' other e-vendors for a fee.  (Sevier Decl. ¶¶9, 75; R-A Decl. ¶80; Weber Decl. ¶¶87-93.)

**Response:**  Disputed to the extent that this assertion is misleading.  A reader who wishes to read a particular book may also read or download the book for free from a traditional library.  *See generally* Hildreth Decl. Exs. 1 & 2, Hildreth Expert Rpt. & Reply Rpt.

615.  If a consumer obtained an ebook from Amazon, B&N.com, or the Publishers other e-vendors, the consumer would pay a fee for the work.  (R-A Decl. ¶80.)  If the same consumer instead obtains the ebook from IA's Website, they would not pay a fee for the work.  (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:**  Disputed to the extent that this assertion is misleading.  A reader who wishes to read a particular book may also read or download the book for free from a traditional library.  *See generally* Hildreth Decl. Exs. 1 & 2, Hildreth Expert Rpt. & Reply Rpt.

616.  The Publishers employ anti-piracy vendors.  This retention is informed by the belief that the distribution of free unauthorized digital copies of their book on internet websites leads to lost sales revenue.  (Pavese ¶20; R-A Decl. ¶81; Sevier ¶21; Weber ¶17.)

**Response:**  Not disputed.

617.  Hachette's study of library and commercial ebook sales from 2017 to 2020 shows that its library ebook reads are increasing, while its retail ebook sales are declining.  This study includes data which shows, for instance, that revenues for certain writers who have had steady commercial ebook sales has gone down while the circulation numbers for their library ebooks have gone up.  (Sevier Decl. ¶¶57; 58-59.)

**<u>Response:</u>**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████     *See* Sevier Decl. Ex. 4 at HACHETTE0010915.  Further, the cited evidence is not admissible to the extent it is being offered for the truth of its contents.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook Sales and Circulations[] Overview 2017-2020.  To the extent the "overview" is being offered for the truth of its contents, the "overview" is also hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

618.  This study suggests that free short term lending of ebooks may potentially serve as a substitute for the acquisition of commercial ebooks.  (Sevier Decl. ¶59.)

**<u>Response:</u>**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Evid. 56(c)(1); *see* McNamara Decl. ¶ 4 & Ex. 11 (whether an item serves as a substitute is an empirical question).  Further, the cited evidence is not admissible to the extent it is being offered for the truth of its contents.  Fed. R. Evid. 801, 802; *Young*, 2011

WL 2714208, at *1 n.1.  Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of

the study described in his declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library

Ebook Sales and Circulations[] Overview 2017-2020.  To the extent the "overview" is being

offered for the truth of its contents, the "overview" is also hearsay.  Fed. R. Evid. 801, 802;

*Young*, 2011 WL 2714208, at *1 n.1.

619.   These trends in the Hachette study show that members of the public are increasingly

using free ebook options, such as from libraries.  (Sevier Decl. ¶¶55-59; *see also* Weber Decl.

¶64.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this

paragraph.  *See* Fed. R. Evid. 56(c)(1).  Further, the cited evidence is not admissible to the extent

it is being offered for the truth of its contents.  Fed. R. Evid. 801, 802; *Young*, 2011 WL

2714208, at *1 n.1.  Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the

study described in his declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook

Sales and Circulations[] Overview 2017-2020.  To the extent the "overview" is being offered for

the truth of its contents, the "overview" is also hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011

WL 2714208, at *1 n.1.

620.   If there were widespread and unrestricted adoption of the conduct practiced by

Internet Archive, that would lead to a greater supply of copies of each backlist ebook title

available for free short term loan from internet websites, with reduced or no waitlists.  (R-A

Decl. ¶81; Weber Decl. ¶¶90-93.)

**Response:**  Disputed.  The cited evidence is not admissible.  HarperCollins and Penguin

Random House's theories about what "will" happen are unsupported speculation.  *Major League*

*Baseball Props., Inc.*, 542 F.3d at 306.

621.  The Foster Declaration provides examples in which the Internet Archive has made metadata errors or other mistakes with assorted ramifications, including instances in which in-copyright books have been treated as public domain, or titles have been confused.  (Foster Decl. ¶88; Weber Decl. ¶89; Sevier Decl. ¶78.)

**Response:**  Not disputed.

622.  The Plaintiffs or their representatives have sent copyright notices to Internet Archive identifying unauthorized copies of the Plaintiffs' works to be removed.  (Foster Decl. ¶119.)

**Response:**  Not disputed.

623.  Internet Archive failed to remove or disable access to certain of the alleged infringements cited in copyright notices that the Plaintiffs or their representatives sent before the lawsuit, both for some of the Works in Suit and for other works published by the Plaintiffs. (Foster Decl. ¶122.)

**Response:**  Not disputed.

624.  On July 23, 2014, "PRH emailed its catalog to Internet Archive in an Excel spreadsheet, demanding that IA remove "[u]nauthorized, scanned versions of Penguin Random House titles being lent to patrons... immediately."  (Weber Decl. ¶17.)

**Response:**  Not disputed.

625.  The email added that the "attached file includes both print and eBook isbn for all Random House titles, and print isbns (only) for Penguin titles.  It includes close to 60,000 unique isbns.  Please let us know the time frame in which we can expect these titles to be removed, and if you need anything additional from us to facilitate this process."  (Weber Decl. ¶17.)

**Response:**  Not disputed.

626.  In response, the Internet Archive provided assurances that it would comply with this demand; Internet Archive's Office Manager stated that "We've been disabling lending access to our list of items with matching ISBN metadata that also have either an Ebook ISBN or 'Y' in the 'Ebook Eligible' column on your spreadsheet. I will confirm when this has been completed." (Weber Decl. ¶17.)

**Response:**  Not disputed.

627.  Of the 58,754 ISBNs listed in the July 2014 PRH catalog, 35,413 (60.3%) remain in PRH's current commercial catalog, and 23,341 (39.7%) do not.  (Prince Decl. ¶134.)

**Response:**  Disputed that this fact is supported by a Prince Declaration, which Plaintiff did not file.  Not disputed that it is supported by the Foster Declaration.

628.  Today, the Internet Archive makes nearly half of the books listed in the 2014 PRH catalog available for lending on the Website; the Website currently makes available (a) 47.1% (16,681 of 35,413) of the 2014 catalog books that are in PRH's current catalog; (b) 48.7% (11,366 of 23,341) of the 2014 catalog books that are not in PRH's current catalog; and (c) 47.7% (28,047 of 58,754) of all 2014 catalog books.  (Prince Decl. ¶134.)

**Response:**  Disputed that this fact is supported by a Prince Declaration, which Plaintiff did not file.  Not disputed that it is supported by the Foster Declaration.

629.  Likewise, in 2018, counsel for HarperCollins sent Internet Archive a letter "demand[ing] that you immediately disable the 'Borrow eBook' function for our books still under copyright."  (R-A Decl. ¶83.)

**Response:**  Not disputed.

630.  Internet Archive did not comply with this cease and desist letter.  (R-A Decl. ¶83.)

**Response:**  Not disputed.

631.  As a result, HarperCollins instructed its anti-piracy vendor to send takedown notices to Internet Archive for hundreds of links to in-copyright works on the Website.  Despite these notices, Internet Archive has continued to upload and make thousands of HarperCollins works available for lending.  (R-A Decl. ¶83.)

**Response:**  Not disputed.

632.  Other Plaintiffs or their representatives have sent copyright notices to IA identifying unauthorized copies of Plaintiffs' works to be removed.  (Pavese Decl. ¶6; Sevier Decl. ¶82).

**Response:**  Not disputed.

633.  Internet Archive failed to remove or disable access to certain of the alleged infringements cited in those notices, both for the Works in Suit, and for other works.  (Foster Decl. ¶122.)

**Response:**  Not disputed.

634.  Internet Archive has also received requests from authors requesting that their books be removed from the Website.  For example, Internet Archive received an email from an author writing "from a little farm house in Tasmania where [she had] existed on a meager writer income for the past ten years in order to support my two children as a single mother," who told IA that it was "stealing" from her by posting her books and had imperiled her ability to "feed [her] kids and pay [her] house loan."  (McN Decl. ¶24.)

**Response:**  Not disputed that the Internet Archive has received requests from authors requesting that their books be removed from openlibrary.org.  Not disputed that the email is accurately quoted.  Disputed to the extent that this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

635.  In that same message, the author asked "[c]ould you please consider an agreement between myself and my publishers that will offer remuneration for any future lendings.  If not could you remove [my] titles from your system."  "Incidentally," the email continued, "I noticed Girls Night In 4 was listed… the authors in that collection gave those stories over for free to support the War Child charity.  I'm concerned that [a] valuable charity is missing out on sales.  Could you also please consider within your heart and soul if what you are doing is honourable [sic] towards authors.  We all love books and we all love sharing books, but the original creator needs to be paid at some stage in your system."  (McN Decl. ¶24.)

**Response:**  Not disputed that the email is accurately quoted.  Disputed to the extent that this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.


## ADDITIONAL STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT[4]

154.    While the Internet Archive did not begin digitally lending books until 2011, providing universal access to books has been a part of its mission for nearly the entirety of its history.  Kahle Opp'n Decl. ¶ 3.

155.    Soon after its founding in 1996, the Internet Archive began hosting other digital content—including digital texts—in addition to its snapshots of the World Wide Web.  Then, the Internet Archive focused on hosting public domain books.  Kahle Opp'n Decl. ¶ 4.

---

[4] The numbering of the paragraphs in this section continues from the Statement of Material Facts the Internet Archive submitted in support of its Motion for Summary Judgment.

156.     Hundreds of years of literature could fit easily in storage of ever smaller size, and the Internet Archive made a point of demonstrating this in 2002, when it drove its Bookmobile ("1,000,000 Books Inside (soon)") across the country, allowing readers of all ages to access, download, and print books in the public domain.  *Id.*

157.     The Internet Archive began scanning print books around 2004 when it helped form the Open Content Alliance, a consortium of libraries, universities, and companies— including the University of California, the University of Toronto, the Smithsonian Institution Libraries, and the National Archives of the United Kingdom, as well as Yahoo, Adobe, HP Labs, and Microsoft—that aimed to preserve and provide online access to digitized books.  Kahle Opp'n Decl. ¶ 5.

158.     Within a few years, the Internet Archive launched Open Library, which aimed to become the largest catalog of books, while providing free access to public domain books the Internet Archive had scanned.  Kahle Opp'n Decl. ¶ 6.

159.     The first decade and a half of improvements to technologies used for scanning print books and displaying their digitized text laid the foundation for the Internet Archive—along with the dozens of other libraries it partnered with—to begin lending books online to patrons, for free, for short periods of time.  Kahle Opp'n Decl. ¶ 7.

160.     Now, the Internet Archive has more than 3.6 million books available for digital lending, and millions more public-domain books that can be downloaded and kept, not just borrowed.  Kahle Opp'n Decl. ¶ 8.

161.     Of those millions of items, this lawsuit is about 127 Works in Suit, which are among what Plaintiffs say are the 33,000 books published by Plaintiffs that are available for

borrowing from Internet Archive and are also available in digital form, such as via OverDrive. PSMF ¶¶ 240-41.

162.    The Internet Archive lends books—for free—to patrons for a limited time at its own expense.  Those expenses include equipment, personnel, and, especially, acquisition and storage costs for the physical books that are being lent digitally.  The Internet Archive has spent millions of dollars on its digital lending program.  Kahle Opp'n Decl. ¶ 12.

163.    The Internet Archive is just one beneficiary of a broader Better World Books program that provides books to a range of nonprofit organizations, including Books for Africa, school systems, prison ministries, and battered women's shelters.  Gratz Opp'n Decl. Ex. 3, Patton-Schmitt Dep. Tr.  27:12-28:5; *see also id.* at 40:2-41:21 (explaining that other donation recipients also have "wish lists" of specific book categories and titles).

164.    From the beginning of the affiliate link program with Better World Books through February 10, 2021, the Internet Archive received only $5,561.41 in such revenue.  Kahle Opp'n Decl. ¶ 19.

165.    Better World Books is a for-profit business that has adapted its business model to support libraries and other literacy programs.  Public and academic libraries across the country actively support Better World Books' model by providing books they have culled from their collections.  Gratz Opp'n Decl. Ex. 3, Patton-Schmitt Dep. Tr. 31:11-16.  When one of those books is sold, a portion of the proceeds goes to the library.  *Id.* 63:12-21.

166.    Better World Books helps libraries recoup some of their investment in their collections while extending the lives of books that may otherwise have been thrown away.  If Better World Books does not believe it can sell a book, it donates it is possible, or, as a last resort, recycles it.  *Id.* 31:21-32:4, 35:1-36:11.

167.     Libraries have a long history of resource sharing, including through interlibrary loan programs.  Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 40-46, 51, 82-88, 89-95, 98-101.

168.     The Internet Archive has no evidence that the owned to loaned ratio was exceeded as the result of physical access to a physical book owned by a partner library.  Kahle Opp'n Decl. ¶ 26.

169.     Libraries regularly repair and re-bind books that are worn, rather than buying new copies from publishers.  Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 87–88.


Dated:  September 2, 2022                    DURIE TANGRI LLP


                                   By:                   /s/ Joseph C. Gratz
                                        Joseph C. Gratz (*Pro Hac Vice*)
                                        Jessica E. Lanier (*Pro Hac Vice*)
                                        Aditya V. Kamdar (*Pro Hac Vice*)
                                        Annie A. Lee (*Pro Hac Vice*)
                                        217 Leidesdorff Street
                                        San Francisco, CA 94111
                                        (415) 362-6666
                                        jgratz@durietangri.com
                                        jlanier@durietangri.com
                                        akamdar@durietangri.comp
                                        alee@durietangri.com

                                        ELECTRONIC FRONTIER FOUNDATION
                                        Corynne McSherry (*Pro Hac Vice*)
                                        Kit Walsh (*Pro Hac Vice*)
                                        Cara Gagliano (*Pro Hac Vice*)
                                        815 Eddy Street
                                        San Francisco, CA 94109
                                        (415) 436-9333
                                        corynne@eff.org
                                        kit@eff.org
                                        cara@eff.org

                                        Attorneys for Defendant
                                        INTERNET ARCHIVE

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Joseph C. Gratz*
_____
JOSEPH C. GRATZ
