**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>    Plaintiffs,<br><br> v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>    Defendants. | Case No. 1:20-CV-04160-JGK |

**DEFENDANT INTERNET ARCHIVE'S MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT ..................................................................................1

II.     ADDITIONAL FACTS ...........................................................................................2

III.    ARGUMENT .........................................................................................................3

        A.      The Internet Archive's CDL implementation is a fair use that serves
                copyright's essential purpose. ...............................................................3

                1.      Plaintiffs misstate law and facts relevant to Factor One............................3

                        a.      The Internet Archive's CDL implementation is entirely
                                noncommercial and publicly beneficial. .........................................4

                                i.      Receiving $5,561.41 in affiliate link revenue does
                                        not make the Internet Archive's lending program
                                        commercial.........................................................................7

                                ii.     Receiving money from other libraries for scanning
                                        and storing out-of-copyright books does not make
                                        the Internet Archive's lending of in-copyright books
                                        commercial.........................................................................9

                                iii.    Facilitating digital lending of non-circulating copies
                                        owned and stored by other libraries does not affect
                                        the analysis.......................................................................10

                        b.      CDL is transformative...............................................................10

                        c.      Transformativeness is not required for the first factor to
                                favor the Internet Archive, particularly given the
                                noncommercial nature of its digital lending and the public
                                benefits it produces. ..................................................................13

                2.      The second and third factors do not favor Plaintiffs................................14

                3.      Plaintiffs misstate law and facts relevant to Factor Four.........................15

                        a.      There is no market for licenses to lend books a library
                                already owns. .............................................................................15

                        b.      Loaning books to library patrons one at a time is consistent
                                with economic expectations at the time the publisher sells
                                the book......................................................................................16

c.     Interference with the publishers' attempts to segment the market is not cognizable harm under the fourth factor. ................18

d.     *Google Books* does not aid Plaintiffs. ............................................19

e.     The fourth factor looks to what would happen if the defendant's particular practice, with all of its attendant costs and limitations, became widespread. ....................................21

B.     The National Emergency Library was also fair use...............................................23

C.     Arguments raised by Plaintiffs' amici do not affect the outcome in this case....................................................................................................................................23

1.     Many amici raise concerns related to other factual situations not presented by the facts here, and fair use takes into account the particular factual situation before the Court. ..............................................23

2.     Section 108 does not limit fair use...............................................................26

3.     This case does not present a question for Congress...................................27

4.     This case does not turn on international law..............................................28

a.     International law does not affect the scope of fair use in the United States. ..................................................................................28

b.     To the extent the Court looks to international law, other governments have found CDL lawful and consistent with treaty obligations......................................................................................29

IV.     CONCLUSION.................................................................................................................32

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
  896 F.3d 437 (D.C. Cir. 2018) ..........................................................................6, 11

*American Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994)..........................................................................4, 6, 7, 15

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)..........................................................................7, 26

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) .............................................................. *passim*

*Bacon v. Avis Budget Grp., Inc.*,
  357 F. Supp. 3d 401 (D.N.J. 2018),
  *aff'd*, 959 F.3d 590 (3d Cir. 2020) ..........................................................24

*Bell v. Worthington City Sch. Dist.*,
  No. 2:18-CV-961, 2020 WL 2905803 (S.D. Ohio June 2, 2020)...........................................14

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006)..........................................................................5, 13

*Cambridge University Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) ...............................................................13, 14, 22

*Campbell v. Acuff-Rose Music*,
  510 U.S. 569 (1994)...........................................................................13, 14, 27

*Capitol Recs., LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018)...........................................................12, 19, 20, 22

*Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001).........................................................................16

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) .....................................................................11, 12

*Doan v. Am. Book Co.*,
  105 F. 772 (7th Cir. 1901) ........................................................................18

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018).................................................................10, 12, 24

*Google LLC v. Oracle Am., Inc.*,
141 S. Ct. 1183 (2021)..................................................................................14, 24, 27, 28

*Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*,
497 F. Supp. 2d 627 (E.D. Pa. 2007) ...................................................................24

*Kruger v. Virgin Atl. Airways, Ltd.*,
976 F. Supp. 2d 290 (E.D.N.Y. 2013) .................................................................30

*L.A. News Serv. v. CBS Broad., Inc.*,
305 F.3d 924 (9th Cir. 2002),
*amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002) ..................................13

*Mojave Desert Holdings, LLC v. Crocs, Inc.*,
844 F. App'x 343 (Fed. Cir. 2021) .......................................................................24

*Oracle v. SAP*,
765 F.3d 1081 (9th Cir. 2014) ..............................................................................16

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
No. CV-13-02075-TUC-JGZ, 2015 WL 11170727 (D. Az. May 11, 2015) ...........6

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012).................................................................................6, 7

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984)....................................................................................... *passim*

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014)............................................................................10, 13

**Statutes**

17 U.S.C. § 107..................................................................................13, 21, 26, 27

17 U.S.C. § 108..............................................................................................24, 26

**Rules**

S.D.N.Y. Local Rule 56.1 .............................................................................3, 7, 8, 9

**Other Authorities**

Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886,
as last revised at Paris July 24, 1971, *as amended*, Sept. 28, 1979, Art. 9(2) ........28

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, § 2(1) ............28

Brief for Amicus Curiae Law Professors & Scholars in Support of Appellee, *Authors Guild v. Google, Inc.*, 2014 WL 3556331 (July 10, 2014)..........................................29

H.R. Rep. No. 94-1476 (1976)...........................................................................................12, 27

Judgment, *Vereniging Openbare Bibliotheken v. Stichting Leenrecht*, Case C-174/15 (Nov. 10, 2016) ...........................................................................29

Opinion of Advocate General, *Vereniging Openbare Bibliotheken v. Stichting Leenrecht*, Case C-174/15 (June 16, 2016).......................................................30

Paul Courant et al., *On the Cost of Keeping a Book*, *in* The Idea of Order (Council on Library & Info. Res., Ed. 2010) ............................................................21

Defendant Internet Archive respectfully submits this Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment.

## I.      PRELIMINARY STATEMENT

Plaintiffs' motion is thick with accusation and rhetoric, but thin on actual evidence.  That may be because the Internet Archive's CDL program seeks to do something major publishers can't imagine:  Without seeking payment or profit, improve the value of *physical* books for libraries and their patrons and, in the process, help ensure that libraries can continue to serve their mission in the 21st century.  Plaintiffs assume that such a project must harm their efforts to license ebooks—but they do not show it.  Indeed, their conflation of licensed ebooks with scanned copies of physical books exposes the real goal of this lawsuit.  Plaintiffs would like to force libraries and their patrons into a world in which books can only be accessed, never owned, and in which availability is subject to the rightsholders' whim.

Working with peer libraries around the country, the Internet Archive supports a different model that is more consistent with traditional library practice and better serves the purposes of copyright.  Its CDL program has created an extraordinary and growing corpus of books for 21st century readers, fostering the growth of knowledge and culture.  And digital lending of physical books costs rightsholders no more or less than, for example, lending books via a bookmobile or interlibrary loan.  In each case, the books the library lends are bought and paid for, ensuring that rightsholders receive all of the financial benefits to which they are entitled.

Ebook licensing can be an excellent additional option for libraries, which is why libraries spend millions in rental fees on behalf of their patrons.  But it should not be the only option.  Copyright law was never intended to be a means to permanently lock up culture or force libraries and readers to depend on the licensing choices of a few publishing behemoths.  For the reasons

set forth below, and in the Internet Archive's Motion for Summary Judgment, the Court should deny Plaintiffs' Motion.

## II.   ADDITIONAL FACTS

While the Internet Archive did not begin digitally lending books until 2011, providing universal access to books has been a part of its mission for decades.  Add'l Statement of Material Facts in Supp. of Def.'s Opp'n to Pls.' Mot. for Summ. J. ("ASMF") ¶ 154.  Soon after its founding in 1996, the Internet Archive began hosting other digital content—including digital texts—in addition to its snapshots of the World Wide Web.  *Id.* ¶ 155.  At that time, the Internet Archive focused on hosting public domain books.  *Id.*  Hundreds of years of literature could fit easily in storage of ever smaller size, and the Internet Archive made a point of demonstrating this in 2002, when it drove its Bookmobile ("1,000,000 Books Inside (soon)") across the country, allowing readers of all ages to access, download, and print books in the public domain.  *Id.* ¶ 156.

The Internet Archive began scanning print books in 2004, when it helped form the Open Content Alliance.  *Id.* ¶ 157.  This consortium of libraries, universities, and companies—including the University of California, the University of Toronto, the Smithsonian Institution Libraries, and the National Archives of the United Kingdom, as well as Yahoo, Adobe, HP Labs, and Microsoft—worked together to preserve and provide online access to digitized books.  *Id.*  A few years later, the Internet Archive launched Open Library, which aimed to become the world's largest catalog of books and to provide free access to public domain books the Internet Archive had scanned.  *Id.* ¶ 158.

The first decade and a half of improvements to technologies used for scanning print books and displaying their digitized text laid the foundation for the Internet Archive—along with the dozens of other libraries (from the Boston Public Library to the San Francisco Public

Library) with which it partnered—to begin lending books online to patrons, for free, for short periods of time. *Id.* ¶ 159.

Today, the Internet Archive makes more than 3.6 million books available for digital lending, and millions more public-domain books available for permanent download. *Id.* ¶ 160. This lawsuit concerns 127 books among those millions. *Id.* ¶ 161. Plaintiffs claim those 127 books are selected from 33,000 books published by Plaintiffs that are available for borrowing from the Internet Archive and are also available in digital form, such as via OverDrive. Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("PSMF") ¶¶ 240–41. While Plaintiffs challenge the digital lending of books that are also available via OverDrive to patrons without print disabilities, they do not challenge any of the Internet Archive's related activities: lending books to those with print disabilities, making short excerpts available in response to links from Wikipedia, lending out-of-print books, or lending in-print books that are not available via OverDrive.

## III.    ARGUMENT

We begin by discussing why the facts and case law do not support Plaintiffs' arguments that the first and fourth fair-use factors weigh against a finding that the Internet Archive's CDL implementation is fair use. After briefly discussing the application of those factors to the National Emergency Library, we respond to arguments raised in amicus briefs supporting Plaintiffs.

### A.    The Internet Archive's CDL implementation is a fair use that serves copyright's essential purpose.

#### 1.    Plaintiffs misstate law and facts relevant to Factor One.

Plaintiffs' Factor One analysis attempts to portray the Internet Archive's digital lending program as a commercial enterprise that merely replicates ebook licensing. That portrayal

cannot be squared with binding precedent or the undisputed facts.

> **a.    The Internet Archive's CDL implementation is entirely noncommercial and publicly beneficial.**

Plaintiffs' missteps begin with a manufactured theory of commerciality that relies on the wrong legal standard.  The standard that binds this Court is the one set forth in *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994).  In that case, the court held that "[t]he commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues *as a direct consequence* of copying the original work."  *Id.* at 922 (emphasis added).  Further, "courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest."  *Id.*

Moreover, the inquiry is not whether the defendant organization itself has commercial aspects (though the Internet Archive does not) but whether *the use in question* is commercially exploitative.  In *Texaco*, for example, the fact that a researcher worked for a commercial entity did not, by itself, render his copying of journal articles commercial.  Instead, the court considered whether the use in question led to commercial gain for his employer.

Here, Plaintiffs offer no evidence that either the Internet Archive or its digital lending program is a revenue-generating exercise.  The Internet Archive is a not-for-profit organization that lends books, for free, to patrons, for a limited time, at its own expense.  Those expenses include equipment, personnel, and, especially, acquisition and storage costs for the physical books that are being lent digitally; the Internet Archive has spent millions of dollars on its digital lending program.  ASMF ¶ 162.

At the same time, the Internet Archive's CDL implementation "benefits the broader public interest," *Texaco* at 922; *see* IA Opening Br. 7–8.  CDL helps libraries carry out their

traditional lending activities, consistent with hundreds of years of public policy.  Copyright

Scholars Amicus Br. 9, ECF No. 141.  CDL supports authors by providing them with a research

tool and ensuring that their works reach a broad audience—whether or not their publishers

choose to invest in keeping their works available.  Authors Alliance Amicus Br. 7, 13, ECF No.

144.  As amici Intellectual Property Law Professors note, a work accessed through the Internet

Archive "is materially more valuable to readers than the original that they can't get, that costs

too much, or that they don't know about . . . ."  IP Law Professors Amicus Br. 4 (citation

omitted), ECF No. 143.  Further, "[t]his ability to equalize and share resources is a particularly

important function in times of extreme social isolation, such as the global COVID pandemic."

*Id.*; *see also Blanch v. Koons*, 467 F.3d 244, 254 (2d Cir. 2006) ("Notwithstanding the fact that

artists are sometimes paid and museums sometimes earn money, the public exhibition of art is

widely and we think properly considered to 'have value that benefits the broader public

interest.'") (citation omitted).

　　　　That someone else engages in commercial activity that has aspects in common with a

given practice does not make that practice more commercial.  For example, in *Sony*, the

existence of a market for renting prerecorded videotapes, as opposed to recording movies

broadcast on TV, did not render the home videotaping at issue in that case commercial.  *Sony*

*Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-51 (1984); *id.* at 484 (Blackmun,

J., dissenting).

　　　　Lacking controlling precedent for their legal theory, Plaintiffs look to cases that arise

outside of this Circuit.  The first, *American Buddha*, is an Arizona case that is easily

distinguishable on the facts.  It involved a fringe site apparently devoted primarily to publishing

the personal musings of its founders, Tara and Charles Carreon.  *See*

https://web.archive.org/web/20140329000447/http://www.american-buddha.com/ (archiving the website at issue).  While the site purported to provide an "online library" as well, that "library" was nothing like the Internet Archive.  Instead, it made digital copies available without restriction.  The site had a "donate" button, but, if that were enough to render a use commercial, then almost every use by a nonprofit organization would be considered commercial.  *Penguin Grp. (USA) Inc. v. Am. Buddha*, No. CV-13-02075-TUC-JGZ, 2015 WL 11170727, at *2, *4 (D. Az. May 11, 2015).  As amici IP Law Professors note, that would not serve the purposes of copyright.  IP Law Professors Amicus Br. 2–8; *see generally Am. Soc'y for Testing & Materials ("ASTM") v. Public.Resource.Org, Inc.*, 896 F.3d 437, 449 (D.C. Cir. 2018) (use that served nonprofit's mission and was also mentioned in fundraising for that mission "hardly rises to the level" of a "commercial" use).  Indeed, many public libraries have a "donate" button on pages where they lend books, including the New York Public Library,[1] the Queens Public Library,[2] and the Brooklyn Public Library.[3]  Those buttons do not turn their library lending into a commercial activity.

The second, *Holy Transfiguration*, is a First Circuit Court of Appeals decision that addressed a wide variety of copyright issues raised by a church official's publication of religious texts on a website, also without restriction.  *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012).  That case contradicts the *Texaco* standard by collapsing

---

[1] https://browse.nypl.org/iii/encore/record/C__Rb21302139 ("Give" link at top).

[2] https://www.queenslibrary.org/book/The-lion,-the-witch-and-the-wardrobe/991270 ("Donate" button at top).

[3] https://www.bklynlibrary.org/item?b=11247559 ("Donate Now" link at bottom).

the commercial/noncommercial inquiry, asking merely whether the defendant had "benefitted" in any way from the activity in question. *Id.* at 61. On that theory, virtually every use would be commercial, since every fair user has some reason to want to engage in the fair use. For example, the home taping in *Sony* would be commercial because the user "benefitted" by being able to watch the movie at a time different than it was broadcast, and the use in *HathiTrust* would be commercial because the libraries "benefitted" by being able to fulfill their mission of preserving books and making them available to the print disabled. That circularity is why the Second Circuit Court of Appeals applies a different standard, properly focusing on whether the defendant "capture[d] significant revenues as a direct consequence of copying the original work." *Texaco* at 921.

> ### i. Receiving $5,561.41 in affiliate link revenue does not make the Internet Archive's lending program commercial.

Plaintiffs also paint an inaccurate picture of what the Internet Archive does and how it and its partners operate.

*First*, Plaintiffs misrepresent the nature of the relationship between the Internet Archive and Better World Books, which is far from the commercial partnership that Plaintiffs make it out to be. As an initial matter, the Internet Archive does not "effectively own" Better World Books. *Contra* Publishers' Opening Br. 27. The sole shareholder of Better World Books is Better World Libraries, a nonprofit organization that itself has no owner or shareholders. *See* Internet Archive's Resp. to Pls.' Rule 56.1 Statement of Undisputed Materials Facts submitted herewith ("IA Resp.") ¶ 333. The Internet Archive has no control over Better World Books' business and does not profit from it. *See id.*

Through selective use of facts, Plaintiffs also create the misleading impression that certain aspects of the relationship between the Internet Archive and Better World Books are

unique to that partnership.  For example, Plaintiffs discuss the books the Internet Archive[4]

obtains through Better World Books as if this were a special benefit that only the Internet

Archive enjoys.  *See* Publishers' Opening Br. 13, 27.  Plaintiffs fail to mention, however, that the

Internet Archive is just one beneficiary of a broader Better World Books program that provides

books to a range of nonprofit organizations, including Books for Africa, school systems, prison

ministries, and battered women's shelters.  ASMF ¶ 163.

      Nor is there anything special, much less commercial, about the Internet Archive's

inclusion of affiliate links to Better World Books on its website.  In this case, the revenue that the

Internet Archive received when a book was purchased from Better World Books through these

affiliate links—just $5,561.41 from the inception of the program through February 10, 2021.

ASMF ¶ 164—is tiny in comparison to the millions of dollars the Internet Archive has spent on

developing and operating its digital lending program.  *Id.* ¶ 162.

      In reality, the Internet Archive and Better World Books are distinct and complementary

parts of the library ecosystem.  Whereas the Internet Archive is a nonprofit public charity that

directly provides free library services to the public, *see generally* IA Opening Br. 3–8, Better

---

[4] A nonprofit that works closely with the Internet Archive, Open Library of Richmond, holds

legal title to and maintains physical possession of many of the print books in its physical archive

facilities.  Defendant's Rule 56.1 Statement of Material Facts ¶ 19.  For simplicity, regarding

ownership of print books, we use the term "Internet Archive" to refer collectively to the Internet

Archive and Open Library of Richmond.  It is undisputed that the Internet Archive or Open

Library of Richmond owns at least one lawfully made copy of each of the Works in Suit.  *Id.* ¶

20.

World Books is a for-profit business that has adapted its business model to support libraries and other literacy programs. Public and academic libraries across the country actively support Better World Books' model by providing books they have culled from their collections. ASMF ¶ 165. When one of those books is sold, a portion of the proceeds goes to the library. *Id.* In this way, Better World Books helps libraries recoup some of their investment in their collections while extending the lives of books that may otherwise have been thrown away. If Better World Books does not believe it can sell a book, it donates it if possible, or, as a last resort, recycles it. *Id.* ¶ 166. Given the nature of Better World Books' business model, working closely with the Internet Archive serves the missions of both organizations—to expand access to books and to support all forms of library lending—not the Internet Archive's bottom line.

> ### ii.    Receiving money from other libraries for scanning and storing out-of-copyright books does not make the Internet Archive's lending of in-copyright books commercial.

*Second*, the Plaintiffs attempt to piece together a case for commerciality by combining unrelated parts of Internet Archive's charitable work. Separately from the digital lending program at issue in this lawsuit, the Internet Archive scans and digitally stores books owned by other libraries as a service to those libraries. But the books scanned for other libraries are, by and large, books that are no longer subject to copyright, and are not made available via lending. It is undisputed that Internet Archive (not other libraries who use Internet Archive's scanning services) owns the books at issue here. Defendant's Rule 56.1 Statement of Material Facts ("DSMF") ¶¶ 18, 20. Put another way, these separate scanning services (and the methods by which Internet Archive recoups its costs for them) are simply not at issue here.

        **iii.**     **Facilitating digital lending of non-circulating copies owned and stored by other libraries does not affect the analysis.**

*Third*, the Open Libraries project does not change the analysis.  The Internet Archive is proud to be able to work with other libraries to improve access to their books.  Plaintiffs' accusation that the project allows patrons of a given library to access more copies than their local library owns is a red herring; libraries have a long history of resource sharing, such as through interlibrary loan programs, without causing any harm to rightsholders.  ASMF ¶ 167.  The Internet Archive trusts librarians to comply with CDL's basic own-to-loan requirement, and does not need to peer over the shoulders of the librarians at Georgetown or Johns Hopkins or the Boston Public Library.  Tellingly, in the many months of discovery in this case, Plaintiffs never bothered to ask any of the Internet Archive's partner libraries about how they have handled the Works in Suit, which is one reason they have no actual evidence of any mishandling (nor is Internet Archive aware of any).  ASMF ¶ 168.

        **b.**     **CDL is transformative.**

Plaintiffs also misconstrue the standard for transformativeness.  The transformativeness inquiry does not turn on whether the secondary user adds criticism or commentary.  *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014).  Transformativeness may also be accomplished by expanding the utility of the work where, as here, "it utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder."  *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018).

*Sony* is directly on point.  Like the home viewers in that case, Internet Archive patrons are simply accessing books libraries have purchased in the way that is most efficient for the library and its patrons.  If those patrons traveled to a library to check out the physical book, or a

library mailed a physical book, no one would blink an eye.  CDL does not involve

"systematically republishing," as the Publishers suggest, Publishers' Opening Br. 23, but rather

systematically delivering a book on a one-to-one basis to the one patron who has borrowed that

book, subject to strict controls.  Indeed, any encroachment on commercial entitlements is even

less here than in *Sony*, where an unlimited number of viewers could choose to time-shift and

share the recordings with any number of friends and family, for months or years after the original

recording was created.

   *ASTM v. Public.Resource.Org* offers additional guidance.  In that case, a non-profit

posted scanned copies of standards that had been incorporated by reference into law in

furtherance of its mission to make the law freely available online.  The standards development

organizations ("SDOs") that claimed copyright in those standards argued, *inter alia*, that Public

Resource's use was not transformative because the SDOs also posted some of the standards on

their own websites, albeit subject to a variety of contractual conditions, and the standards were

also available in some libraries.  On appeal, the D.C. Circuit Court of Appeals held that

"distributing copies of the law for purposes of facilitating public access" could be transformative

where such information was "essential to comprehending one's legal duties."  896 F.3d at 450.

This analysis reflects *Sony*'s approach:  Because the public is subject to the law, the public is

entitled to access it, and making that access more efficient is a transformative use.  Here,

similarly, the one patron who has borrowed a particular library book is entitled to access it, and

making that access more efficient is a transformative use.

   The Ninth Circuit Court of Appeals applied a different understanding of

transformativeness in *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), on

which Plaintiffs rely.  In that case, which addressed a commercial video streaming service, the

court did not apply the understanding of transformativeness (in particular the understanding of *Sony* as a case involving transformative use) applied in *TVEyes* and *ReDigi*, both of which were decided after *VidAngel*.   And, of course, the commercial video streaming service at issue in *VidAngel* was not a noncommercial service bringing traditional library lending of print collections to the digital age.   Digital lending, unlike commercial video streaming, facilitates the use of books in a host of ways that serve the purposes of copyright, such as helping to correct misinformation and helping librarians and others curate, and make available online, collections of banned books.   IA Opening Br. 8.   It helps ensure that the public's ability to access books is not subject to the whims of the publishers.   Relatedly, it helps ensure that the first sale doctrine can continue to serve its vital public interest purpose in the digital age, in keeping with an unbroken history of protections for library lending.   Copyright Scholars Amicus Br. 6–10, ECF No. 141; *see also* H.R. Rep. No. 94-1476, at 79 (1976) ("A library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose.").

Nor does the discussion of transformativeness in *Authors Guild v. Google, Inc.*, 804 F.3d 202, 216-18 (2d Cir. 2015) ("*Google Books*"), answer the transformativeness question here. That case also predates *TVEyes* and *ReDigi*, so it is not surprising that it does not apply the view of *Sony* later developed by the Second Circuit Court of Appeals in those decisions.   And the court would have had no occasion to apply that view of *Sony* in any event, because *Google Books* did not involve more efficient delivery of content to one entitled to receive it, but instead dissemination of snippets of content to an unlimited number of members of the public concurrently.   *Google Books* at 209-10.

c.   **Transformativeness is not required for the first factor to favor the Internet Archive, particularly given the noncommercial nature of its digital lending and the public benefits it produces.**

As discussed above, digital lending is a transformative use that improves the efficiency of the delivery of content to library patrons entitled to access the book they borrowed.  But whether or not digital lending is a transformative use, it is a fair use.  Not all fair uses are transformative. *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994); *see also Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 84–85; *Blanch*, 467 F.3d at 252 n.3.  In *Swatch*, the Second Circuit Court of Appeals concluded that while Bloomberg's distribution of a recorded earnings call was "arguably transformative," the first factor favored fair use "regardless of how transformative" the use was.  756 F.3d at 85.  Among the considerations in Bloomberg's favor was the use's news reporting function—a "public purpose" named in the preamble to § 107.  *Id.* at 82.  Here, the Internet Archive supports multiple such public purposes, including research and education.  IA Opening Br. 8, 18–19; DSMF ¶¶ 1–6.

*Cambridge University Press v. Patton* also supports the conclusion that transformativeness is not required for the first factor to favor a particular use.  769 F.3d 1232 (11th Cir. 2014).  In *Cambridge University Press*, the infringement claim was predicated on a university policy that allowed professors to make scanned versions of copyrighted materials available to students to access and copy.  *Id.* at 1239.  On appeal, the court both agreed with the trial judge's determination that the use was not transformative and affirmed its finding that the first factor nonetheless favored fair use.  *Id.* at 1267.  In reaching this conclusion, the appellate court relied on the noncommercial nature of the use and its provision of "a broader public benefit—furthering the education of students at a public university."  *Id.*; *see also L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938–39 (9th Cir. 2002), *amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002) (because news reporting is a "favored purpose" under § 107, first

13

factor favored fair use even where minimally transformative at best and commercially motivated); *Bell v. Worthington City Sch. Dist.*, No. 2:18-CV-961, 2020 WL 2905803, at *6–*7 (S.D. Ohio June 2, 2020) (finding first factor favored fair use where use was educational but not transformative).

Here, as in *Cambridge University Press*, the noncommercial nature of the Internet Archive's digital lending program, its support for favored statutory purposes, and the public benefits it produces all tilt the first factor heavily towards fair use. "There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021). Indeed, as amici Intellectual Property Law Professors explain, fair use is intended, in large part, to encourage socially beneficial noncommercial uses. IP Law Professors Amicus Br. 2–3. The Internet Archive's digital lending does precisely that. *See, e.g.*, IA Opening Br. 7–8, 18–19; Crews & Smith Amicus Br. 10–11, 13, ECF No. 145.

Moreover, digital lending advances the fundamental purposes of copyright by directly facilitating the creation of new works of authorship. *See* Authors Alliance Amicus Br. 13–15, ECF No. 144; IA Opening Br. 18–19; *see also Campbell*, 510 U.S. at 575 (explaining fair use's role in fulfillment of copyright's purpose). Where a use so squarely advances the policy goals of fair use doctrine and copyright as a whole—without subverting the rightsholders legitimate financial expectations, Section III.A.3.b., *infra*—the first factor favors fair use, whether or not the use is transformative.

>        **2.    The second and third factors do not favor Plaintiffs.**

As discussed in the Internet Archive's Motion for Summary Judgment, the second and third factors also weigh against Plaintiffs' motion. IA Opening Br. 21–24.

3.      **Plaintiffs misstate law and facts relevant to Factor Four.**

Plaintiffs' fourth-factor analysis rests on the assumption that because the public benefits from digital lending, Plaintiffs must be harmed by it.  That view is inconsistent with the factual record and with the decisions of the Second Circuit Court of Appeals.

a.      **There is no market for licenses to lend books a library already owns.**

Plaintiffs argue that Internet Archive harms the market for or value of their books because the Internet Archive does not pay the "customary price" for the activities it undertakes.  But as discussed in Internet Archive's Opening Brief, IA Opening Br. 29–30, the customary price payable to a publisher to lend a book a library has already purchased is zero.  Accordingly, there is no "traditional, reasonable, or likely to be developed" market.  *Texaco*, 60 F.3d at 929– 30.

There is, of course, also a market to license access to ebooks when a library does not already own a book.  But as Dr. Jørgensen's analysis shows, the Internet Archive's activities do not affect that market at all.  DSMF ¶¶ 140–41.

Plaintiffs assert that "the 'vice of circularity' only arises in cases where the secondary use is transformative and thus justifies the non-payment of a fee."  Publishers' Opening Br. 33.  As discussed above, the use at issue here *is* transformative.  Section III.A.1.b., *supra*.  But the bigger problem with Plaintiffs' argument is that the very case in which that analysis arose, *Texaco*, addressed *non*-transformative copying, and the court still examined whether the claimed licensing market was "traditional, reasonable, or likely to be developed."  60 F.3d at 929–30.  If Plaintiffs were right, the court would not have needed to undertake that analysis.

*Texaco* also contradicts Plaintiffs' suggestion that this Court must assume a willing buyer and a willing seller for the license.  Again, in *Texaco*, the court did not assume that a market with

15

a willing buyer and a willing seller existed; instead, it inquired whether such a market was "traditional, reasonable, or likely to be developed."  On Plaintiffs' view, that inquiry could never matter, because the court would always assume that such a market exists.  Indeed, Plaintiffs' view does not rely on fair use case law at all; rather, they draw from copyright *damages* analyses, which *assume* as their starting point that the defendant is liable for infringement.  The fair use analysis, by contrast, determines *whether* the defendant is liable for infringement. *Oracle v. SAP* did not address fair use at all, 765 F.3d 1081 (9th Cir. 2014), and *Davis v. The Gap, Inc.* applied the willing buyer / willing seller approach only with respect to damages, 246 F.3d 152, 167 (2d Cir. 2001).

> ### b. Loaning books to library patrons one at a time is consistent with economic expectations at the time the publisher sells the book.

Digital lending allows more efficient access to a particular copy of a book than would be possible without digital technology.  Specifically, it allows one library patron at a time to borrow a book without the need to travel to a library or wait for a book to come in the mail; that efficiency is one of the reasons digital lending is favored under the first factor.  IA Opening Br. 17.  To the extent Plaintiffs experience economic harm from digital lending, it is exactly the same source of economic harm they would experience from physical lending:  the possibility that some consumers take books out from the library instead of buying them.

Copyright law does not grant publishers the right to limit libraries only to inefficient lending methods, in hopes that those inefficiencies will lead frustrated library patrons to buy their own copies.  The fundamental limit, which digital lending does not disturb, is that libraries can only lend as many copies as they own.  That patrons have to go to the library is not a fundamental limit; after all, copyright law forbids neither inter-library loans nor bookmobiles.  That library staff needs to physically handle books is not a fundamental limit; computerized

sorting systems have long since reduced that need.  That it takes time to physically move a book from one patron to another is not a fundamental limit; if a library sends books via overnight FedEx rather than handing or mailing them to a patron, that does not work a cognizable harm to publishers, though it makes library lending more efficient.[5]  That many libraries choose to only loan books to people in one specific geographical area is not a fundamental limit; the Brooklyn Public Library offers access to its entire digital collection to young adults anywhere in the United States in response to book bans at some local libraries,[6] and the Queens Public Library offers library cards to anyone in the United States for an annual fee.[7]  The publishers are well aware of all of these longstanding library practices.  That the Internet Archive makes its collection available to every person in every community in America makes Internet Archive more, not less, of a library.

To be sure, publishers would prefer—and might profit from—a world in which they had complete control over library lending and could charge libraries for each additional circulation of a book the library already bought.  But their preferences do not tell us anything about the scope of their rights under copyright law.

---

[5] *See, e.g.*, https://www.nypl.org/books-by-mail (offering book lending by mail to homebound patrons); https://www.nysoclib.org/sites/default/files/pdf/BooksByMailPolicy.pdf (offering book lending by mail to all patrons).

[6] https://www.bklynlibrary.org/books-unbanned

[7] https://www.queenslibrary.org/about-us/news-media/blog/2094 ("An eCard only requires a valid email address. It is free if you live, work, go to school or own property in New York State, while it is $50 if you are out of state.").

Nor do publishers have a right to limit libraries to lending a book the library owns only a particular number of times.  Books do not come with an expiration date, and libraries regularly repair and re-bind books that are worn, rather than buying new copies from publishers.  ASMF ¶¶ 167, 169.  Rebinding books so that they last longer is not copyright infringement.  *Doan v. Am. Book Co.*, 105 F. 772, 777 (7th Cir. 1901).

Publishers might indeed make more money if they could require libraries to re-buy books after they had been borrowed 26 times.  Publishers' Opening Br. 9.  But the law does not give publishers that right.  Libraries own the books they have purchased, and they have the right to lend them to one patron at a time—even the 27th time.

The existence of a product (OverDrive) that permits libraries to rent access to some books on behalf of their patrons does not affect the analysis.  Libraries may offer access to books via OverDrive *instead of or in addition* to lending books they have purchased, and that is a perfectly reasonable choice for libraries to make.  But digitally lending books the library bought does not displace OverDrive revenue; they are different things, and the publishers, having chosen to sell books to libraries, should not be able to double-dip.

> c. **Interference with the publishers' attempts to segment the market is not cognizable harm under the fourth factor.**

Plaintiffs complain that their "digital strategy" depends on their ability to dictate the terms on which libraries can loan books.  Publishers' Opening Br. 32.  This is not a new complaint:  As discussed in library scholars' amicus brief, publishers and booksellers have wanted more control over library lending for centuries.  Crews & Smith Amicus Br. 13–14.  But the law does not permit publishers to dictate the terms on which libraries can loan books to patrons, and it never has.  Indeed, the very same arguments would apply to physical lending;

publishers would benefit equally from control of both.  But despite decades of pleading, neither Congress nor the courts have given publishers control of either.  *See* IA Opening Br. 30.

The Supreme Court rejected a very similar argument in *Sony*.  There, movie studios argued that allowing noncommercial copying would upset their carefully calibrated licensing market.  *Sony*, 464 U.S. at 483 n.35 (Blackmun, J., dissenting) ("A VTR owner who has taped a favorite movie for repeated viewing will be less likely to rent or buy a tape containing the same movie, watch a televised rerun, or pay to see the movie at a theater.").  But the person who taped a movie being broadcast in their area was "entitled to receive" that movie.  *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018).  The movie studios could gain revenue by renting prerecorded videocassettes to people who were *not* already entitled to access the material (such as people who had not received and recorded a licensed broadcast of it).  But the fact that they could not *also* gain revenue by renting prerecorded videocassettes to people who *were* already entitled to access the material did not give rise to a cognizable harm.  The right to control noncommercial home taping was not within the copyright holder's monopoly there, just as the right to control noncommercial library lending is not within the copyright holder's monopoly here.

### d.    *Google Books* does not aid Plaintiffs.

Plaintiffs fare no better under the fourth-factor analysis in the *Google Books* case.  There, the question was whether the display of small portions of books to an unlimited number of concurrent internet users, by a commercial entity that did not own a copy of the book in question, would substitute for sales of books to those internet users.  804 F.3d at 207, 223–24.  The Court of Appeals held that while some market substitution was possible, it would not be sufficiently substantial to tilt the fourth factor against fair use.  *Id.* at 224.

19

Crucially, in *Google Books* the alleged harm had to be measured against a baseline of *no alternative access*:  Google did not own copies of the books and could not make them available physically as an alternative to the digital access it provided.  Under those circumstances, "[i]f Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong."  *Id.* at 225.  Here, by contrast, the relevant baseline is *physical library lending*:  Internet Archive and its partners own copies of the books and could loan them to the very same patrons physically as an alternative to the digital access it provides.  With or without CDL, those particular physical copies could be read by one patron at a time; CDL simply makes that lending more efficient.  And that increase in efficiency did not lead to any reduction in book sales, or to any reduction in borrowing from libraries that did not own the book and therefore had to license access via OverDrive.  DSMF ¶¶ 140–45.

That digital lending may substitute for undisputedly noninfringing physical lending of the same books cannot weigh against fair use.  In *Sony*, for example, the copying at issue was a substitute for an alternative that did not involve any copying—namely, watching the movies at the time they were broadcast, rather than at a later time.  That is why, as the *ReDigi* court recognized, it was important that the people watching the recorded movies in *Sony* were already "entitled to receive" those movies by a means everyone agreed was noninfringing.  *ReDigi*, 910 F.3d at 661.

And, at any rate, as discussed in Internet Archive's Opening Brief, any effect—if one existed—would not decrease the amount of money paid to publishers by libraries; it would at most reallocate spending away from older books and toward newer books.  IA Opening Br. 33.

For this reason, any market effect would not impact incentives to create or publish new books, and would not be cognizable under the fourth factor.  *Id.* 33–34.

Further, even a showing of *some* market effect would not weigh against a finding of fair use.  "[T]he possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original."  *Google Books*, 804 F.3d at 224.  Instead, "[t]here must be a meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'"  *Id.* (quoting 17 U.S.C. sec. 107(4)).  As the evidence in the record shows, there has been no such effect and, even if many more libraries began practicing CDL, no meaningful or significant effect on the market would occur.  IA Opening Br. 26–28; DSMF ¶¶ 119–22, 136–39, 140–45.

> **e.**    **The fourth factor looks to what would happen if the defendant's particular practice, with all of its attendant costs and limitations, became widespread.**

The practice at issue here is the Internet Archive's digital lending program, with all its attendant costs and limitations.  The fourth factor looks to whether market harm would be likely if *that program* became widespread.

As a practical matter, that is extremely unlikely to occur, given the owned-to-loaned limitation:  for every concurrent digital loan, there must be a non-circulating physical copy.  Thus, in order to expand the number of concurrent loans even for books that have already been scanned, Internet Archive or partner libraries would need to purchase additional copies from publishers and would need to store those copies.  Neither of those is free nor infinitely scalable: while Internet Archive and partner libraries work hard to be efficient, buying and storing books costs money.  *See, e.g.*, Paul Courant et al., *On the Cost of Keeping a Book*, *in* The Idea of Order (Council on Library & Info. Res., Ed. 2010), at https://www.clir.org/wp-

content/uploads/sites/6/pub147.pdf (analyzing the long-term cost of book storage in various

scenarios).  Those costs are on top of the costs of scanning and maintaining digital storage of the

controlled digital copy used to facilitate lending.

In this respect, CDL is easily distinguishable from the activities at issue in cases finding

market harm.  In *American Buddha*, for example, the defendant did not own a lawfully made

copy for each concurrent user and did not impose any technological restrictions that prevented

further copying.  In *Cambridge*, 769 F.3d at 1239, the university imposed *none* of the controls

applied in the Internet Archive's implementation of CDL.  In *ReDigi*, the defendant did not

prevent the seller of the file from retaining his own copy even after he sold it (unlike Internet

Archive's technology at issue here, which undisputedly prevents patrons from retaining a copy of

a book when their loan period expires).  910 F.3d at 654.  Indeed, the *ReDigi* court recognized

that while the technology then before the court permitted the creation of unauthorized copies,

"other technology may exist or be developed that could lawfully effectuate a digital first sale."

*Id.* at 659.  Without that technology, on those facts, the court found market harm.

In fact, as Dr. Jørgensen's analysis showed, even if Internet Archive's lending scaled up a

great deal, there would be no effect on publishers' markets.  DSMF ¶¶ 140–45.  Given that the

Internet Archive has proffered detailed evidence disproving cognizable market harm, such harm

cannot be assumed; it "must be demonstrated."  *Sony*, 464 U.S. at 451.  Plaintiffs—who have just

had two of the most profitable years in the history of the publishing industry—make no such

demonstration.  Instead, they rely on the speculation that "it is not difficult to envision" a future

in which there was market harm.  Publishers' Opening Br. 38.  This does not suffice.

Publishers claim to have "decades of experience" and to be applying "basic economic

common sense."  Publishers' Opening Br. 39.  The Internet Archive also has decades of

experience lending books (and has seen no market harm thus far), and is also applying basic economic common sense (that digitally lending a particular library book to one patron at a time, has the same economic consequences as physically lending the same book to one patron at a time).  The conflict between those positions is resolved by the only empirical evidence before the Court:  that Internet Archive's lending—at its current scale or at a much larger scale—has caused and would cause no effect on the market for or value of Plaintiffs' works.

**B.      The National Emergency Library was also fair use.**

The NEL does not undermine the fair use analysis; if anything, it strengthens it.  The Internet Archive does not apologize for temporarily filling a desperate public need for books when libraries and schools shut their doors.  And as explained in the Internet Archive's Opening Brief, the evidence shows that the NEL did not harm the market for books given the number of physical copies that were taken out of circulation, virtually overnight.  IA Opening Br. 26–28, 35.

**C.      Arguments raised by Plaintiffs' amici do not affect the outcome in this case.**

**1.      Many amici raise concerns related to other factual situations not presented by the facts here, and fair use takes into account the particular factual situation before the Court.**

Several of Plaintiffs' amici express concerns about the effect of CDL with respect to works that are notably different from the Works in Suit, and practices notably different from the Internet Archive's:

- The Authors Guild expresses concern about the effect of CDL on out-of-print books, Authors Guild Amicus Br. 15–19, ECF No. 165, but all of the Works in Suit are in-print, PSMF ¶ 40.

- The Authors Guild expresses concern regarding third parties who do not practice CDL, such as Library Genesis, *id.* 11–14, but the Court's ruling here will turn on only the particular practices described in the record. *Oracle*, 141 S. Ct. at 1197–98. The Authors Guild argues that "any entity calling itself a library" would benefit from a decision in favor of the Internet Archive. Authors Guild Amicus Br. 11. What makes the Internet Archive a library is not the use of the word "library;" the Internet Archive is a library because it owns an organized permanent collection of materials that it makes available to its patrons for reference or borrowing. Indeed, in another context, this Court recognized that the Internet Archive "is expressly permitted by Congress" to engage in activities set forth in 17 U.S.C. § 108(f)(3), *TVEyes*, 124 F. Supp. 3d at 332 n.4, and the statute expressly permits only "a library or archives" to engage in those activities. 17 U.S.C. § 108(f)(3). *See also, e.g.*, *Mojave Desert Holdings, LLC v. Crocs, Inc.*, 844 F. App'x 343, 346 n.2 (Fed. Cir. 2021) (referring to Internet Archive as "a nonprofit library in San Francisco, California"); *Bacon v. Avis Budget Grp., Inc.*, 357 F. Supp. 3d 401, 431 n.23 (D.N.J. 2018), *aff'd*, 959 F.3d 590 (3d Cir. 2020) ("The Internet Archive is a nonprofit online digital library."); *Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 631 (E.D. Pa. 2007) ("the Internet Archive is a nonprofit organization that has created an online library . . . . Its digital database is equivalent to a paper library, . . . .").

- The Copyright Alliance[8] expresses concern regarding owners of copyright in works other than books, such as movies or television programs.  Copyright Alliance Amicus Br. 14–16, ECF No. 162.  Again, because the fair use analysis is fact-specific, the result here may or may not carry over to cases involving those other types of works, depending on the particular facts of those future cases.

- The Authors Guild expresses concern about what would happen in a situation where an author granted print publication rights separately from electronic publication rights.  Authors Guild Amicus Br. 6–7.  Here, Plaintiffs hold both the print and electronic publication rights.  PSMF ¶ 33.  And at any rate, while a copyright holder may separately assign parts of their bundle of rights, that divisibility of rights does not enlarge the bundle or permit control of acts that would otherwise be fair use.

- The Authors Guild expresses concern that lending by the Internet Archive to patrons in countries where libraries pay to lend books they own could reduce the fees paid by libraries in those countries.  Authors Guild Amicus Br. 20–21.  But international lending is nothing new; indeed, the International Federation of Library Associations ("IFLA") first published its principles for international

---

[8] The Association of American Publishers, which instigated this lawsuit, has a seat on the board of the Copyright Alliance.  https://copyrightalliance.org/about/boards/.  One of the law firms representing Plaintiffs in this action sits on the Copyright Alliance Legal Advisory Board.  *Id.*

interlibrary loan in 1954.[9]  Libraries in the United States have never paid for the

right to lend books they own, whether to patrons in the United States or abroad.

And, indeed, as noted in Internet Archive's Opening Brief, IFLA supports CDL.

DSMF ¶ 57.

Thus, because the fair use analysis turns on the facts before the Court, arguments by

amici about what might happen in other cases presenting other facts do not affect the outcome

here with respect to the Works in Suit.

### 2.    Section 108 does not limit fair use.

Both the Copyright Alliance and Plaintiffs' scholar amici argue that the limited scope of

Section 108 of the Copyright Act affects Internet Archive's fair use arguments under Section 107

of the Copyright Act.  Copyright Alliance Amicus Br. 18–21; Plaintiffs' Scholars Amicus Br. 9–

10, ECF No. 163.  This argument is directly contrary to the express text of Section 108, which

states that "Nothing in this section . . . in any way affects the right of fair use as provided by

section 107[.]"  17 U.S.C. § 108(f)(4).  Citing this statutory provision, the Second Circuit Court

of Appeals rejected this very argument.  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94 n.4

(2d Cir. 2014) ("[W]e do not construe § 108 as foreclosing our analysis of the Libraries'

activities under fair use, and we proceed with that analysis.").

---

[9] International Federation of Library Associations, *International Resource Sharing and*

*Document Delivery: Principles and Guidelines for Procedure*, https://www.ifla.org/wp-

content/uploads/2019/05/assets/docdel/documents/international-lending-en.pdf ("First agreed by

IFLA 1954").

### 3. This case does not present a question for Congress.

Both the Copyright Alliance and the scholars writing in support of Plaintiff argue that this case presents a question which should be answered by Congress, not by judicial application of Section 107. Copyright Alliance Amicus Br. 21–22; Plaintiffs' Scholars Amicus Br. 14–16.

The Supreme Court disagrees. In its most recent fair use case, the Court recognized "that application of a copyright doctrine such as fair use has long proved a cooperative effort of Legislatures and courts, and that Congress, in [the Court's] view, intended that it so continue." *Oracle*, 141 S. Ct. at 1208. As the Court recognized in its prior fair use case, "Congress meant § 107 'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way' and intended that courts continue the common-law tradition of fair use adjudication." *Campbell*, 510 U.S. at 577 (quoting H.R. Rep. No. 94-1476, at 66 (1976)).

Moreover, that argument could apply to any fair use case. All fair use cases could be characterized as an "effort to dispense with the legislative process and enact a self-declared exception from the requirements of the Copyright Act." Plaintiffs' Scholars Amicus Br. 14. One could just as easily characterize *Sony* as an effort to enact a self-declared exception for noncommercial videotaping, or *Campbell* as an effort to enact a self-declared exception for parody, or *Oracle* as an effort to enact a self-declared exception for computer interfaces. But Congress decided to cede the development of fair use to the courts, expressing its intention that "[b]eyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis." H.R. Rep. No. 94-1476, at 66 (1976).

**4.**     **This case does not turn on international law.**

**a.**     **International law does not affect the scope of fair use in the United States.**

Amici International Rightsholders[10] argue that international treaties should influence the Court's analysis here.  These amici have raised this same argument in multiple appellate fair use cases.  *See, e.g.*, Br. of Amici Curiae "Copyright Thought Leaders" in Support of Petitioners, *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183 (2021) (No. 18-956), 2020 WL 1154739; Br. of Amici Curiae Int'l Rightsholders in Support of Appellants, *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (No. 13-4829), 2014 WL 1509693.  The Courts of Appeals and the Supreme Court have always rejected it *sub silentio*; no court has even bothered to mention it in its opinion.  *See generally, e.g.*, *Oracle*, 141 S. Ct. 1183; *Google Books*, 804 F.3d 202.

That is for good reason: when it comes to copyright, what matters is Congressional enactments, not the text of the treaties themselves, because the treaties themselves are "not self-executing."  Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, § 2(1).  Indeed, the very treaty provision on which amici rely expressly says that, "It shall be *a matter for legislation* in the countries of the Union to permit the reproduction of such works in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author."  Berne

---

[10] Plaintiff Wiley has a seat on the board of amicus International Association of Scientific, Technical, and Medical Publishers.  https://www.stm-assoc.org/about-stm/stm-board/  Plaintiff Penguin Random House has a seat on the Executive Committee of the International Publishers Association.  https://www.internationalpublishers.org/about-ipa/governance/executive-committee-members

Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as last revised at Paris July 24, 1971, *as amended*, Sept. 28, 1979, https://wipolex.wipo.int/en/text/283693, Art. 9(2) (emphasis added).  *Other countries* may have decided to require courts to directly apply that "three-step test" to the facts of particular cases.  International Rightsholders Amicus Br. 15–16, ECF No. 154.  Their choice tells us nothing about what the treaty requires, or what the United States Congress has decided to do with respect to fair use.  *See generally* Brief for Amicus Curiae Law Professors & Scholars in Support of Appellee, *Authors Guild v. Google, Inc.*, 2014 WL 3556331 (July 10, 2014) (addressing the same argument made by the same amici in another fair use case).

Indeed there is no reason to believe that the United States intended to hobble the development of fair use in the digital environment.  To the contrary, the United States diplomatic delegation underscored during treaty drafting that "it was essential that the Treaties permit the application of the evolving doctrine of 'fair use,' which was recognized in the laws of the United States of America, and which was also applicable in the digital environment."  WIPO Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, Geneva, Dec. 2-20, 1996, Summary Minutes, Main Committee I, ¶ 488, WIPO Doc. CRNR/DC/102, pdf. p. 70 (Aug. 26, 1997), at https://www.wipo.int/edocs/mdocs/diplconf/en/crnr_dc/crnr_dc_102.pdf.

> **b.**   **To the extent the Court looks to international law, other governments have found CDL lawful and consistent with treaty obligations.**

To the extent international law matters, it points very firmly in favor of permitting CDL. For example, the highest court of the European Union has approved the practice.  In *Vereniging Openbare Bibliotheken v Stichting Leenrecht*, Case C-174/15 (Nov. 10, 2016) ("*VOB*"), https://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX:62015CJ0174, Decl. of Joseph C. Gratz in Supp. of Opp'n to Pls.' Mot. for Summ. J. submitted herewith ("Gratz Opp'n Decl.")

Ex. 7, the Court of Justice of the European Union ("CJEU") addressed the question whether CDL was consistent with European laws and treaties regarding lending.  The court decided that it was, holding that CDL had "essentially similar characteristics to the lending of printed works, since, first, the limitation of simultaneous downloads to a single copy implies that the lending capacity of the library concerned does not exceed that which it would have as regards a printed work and, secondly, that lending is made for only a limited period."  Gratz Opp'n Decl. Ex. 7 ¶ 53.

The CJEU's ruling implicitly embraced the opinion of its Advocate General.  Opinion of Advocate General Szpunar, *VOB*, C-174/15 (June 16, 2016), https://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX:62015CC0174, Gratz Opp'n Decl. Ex. 8 ("Advocate General Op.").  In the CJEU, the Advocate General is a member of the court, appointed under the same procedure as judges, who "represents neither of the parties, but instead provides an independent opinion to the court," *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 300 n.2 (E.D.N.Y. 2013).  Here, the Advocate General found that CDL was consistent with the EU's implementation of the three-step test, adopting arguments similar to those made by Internet Archive in this matter, and rejecting many arguments similar to those made by Plaintiff in this matter.  Advocate General Op. ¶¶ 66–75

With respect to the first step, "the condition that the exception must relate to special cases," the Advocate General found that a rule permitting digital lending met that requirement because (1) it was limited to "lending, or in other words, the making available of works for a limited period of time"; and (2) it was limited to "establishments (libraries) open to the public which derive no profit from their lending activities."  Advocate General Op. ¶ 67a.  Further, the

rule permitting CDL "pursues a legitimate aim in the public interest which is, in the broadest

terms, universal access to culture." *Id.*

 With respect to the second step, the Advocate General found that there was "no conflict

with a normal exploitation of the work." *Id.* ¶ 68*; see also id.* 73. There, as here, publishers had

argued that digital lending "too easily substitutes for the purchase of books on the market"

because "there is no need for the user physically to go to a library" and thus made digital

lending, from the perspective of the reader, "comparable to purchasing over the internet." *Id.* ¶

68. The publishers had also argued that "electronic books which are borrowed from libraries do

not deteriorate with use and are thus identical in one respect to purchased books, that it to say,

they are always 'new.'" *Id.* The Advocate General rejected these arguments, holding that the

restrictions inherent in CDL meant that they did not substitute for purchases of books, because

"digital lending is limited in time and thus merely enables a user to acquaint himself with the

content of a book, without keeping a copy of it," and "the opportunities for such lending are

limited by the number of copies (digital copies) at a library's disposal and so users are not certain

of being able to borrow a given electronic book when they want to." *Id.* ¶ 69. The Advocate

General also observed that "several studies show that the lending of books, either traditional or

electronic, does not reduce the volume of book sales but may instead increase it by encouraging

reading habits." *Id.*

 The publishers also argued there, as here, that CDL would harm commercial ebook

lending services. *Id.* ¶ 70. The Advocate General found that "[t]he mere fact that certain

electronic book sellers have developed business models similar to digital renting cannot by itself

constitute an obstacle to" permitting nonprofit libraries to practice CDL. *Id.* Because CDL

"pursues a legitimate objective in the public interest," he found, it could not be restricted on the

basis of publishers' decision to offer a for-profit service with facially similar functionality.  *Id.*

"Otherwise," he found, "any lending activity could be displaced by commercial renting, of either

tangible or intangible goods," and thus all nonprofit lending—even traditional physical lending

of books by libraries—might be disallowed because of a possibility it could compete with

commercial renting.  *Id.*

The Advocate General concluded by observing that implementations of CDL could

ensure that digital lending "really is the functional equivalent of traditional lending and that it

does not conflict with the normal exploitation of copyright" by adopting "the 'one copy one user'

model" and making use of "technological protection measures."  *Id.* ¶ 73.  He observed that

digital lending would not interfere with the legitimate interests of authors.  *Id.* ¶ 74.

Accordingly, the Advocate General concluded, CDL was consistent with the three-step test.  *Id.* ¶

75.

Thus, far from weighing in Publishers' favor here, an examination of the treatment of

CDL by other countries shows that the CJEU and its Advocate General have considered and

rejected the arguments advanced by Plaintiffs against CDL, and have expressly found it

consistent with copyright treaties.

## IV.    CONCLUSION

Copyright does not stand in the way of a library's right to do what libraries have always

done: lend a book it owns to one patron at a time.  Plaintiffs' motion for summary judgment

should be denied.

Dated:  September 2, 2022                    DURIE TANGRI LLP


By:                 */s/ Joseph C. Gratz*
        Joseph C. Gratz (*Pro Hac Vice*)
        Jessica E. Lanier (*Pro Hac Vice*)
        Aditya V. Kamdar (*Pro Hac Vice*)
        Annie A. Lee (*Pro Hac Vice*)
        217 Leidesdorff Street
        San Francisco, CA 94111
        (415) 362-6666
        jgratz@durietangri.com
        jlanier@durietangri.com
        akamdar@durietangri.com
        alee@durietangri.com

        ELECTRONIC FRONTIER FOUNDATION
        Corynne McSherry (*Pro Hac Vice*)
        Kit Walsh (*Pro Hac Vice*)
        Cara Gagliano (*Pro Hac Vice*)
        815 Eddy Street
        San Francisco, CA 94109
        (415) 436-9333
        corynne@eff.org
        kit@eff.org
        cara@eff.org

        Attorneys for Defendant
        INTERNET ARCHIVE

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the following statements are true:

This brief complies with the formatting rules of the Individual Practices of Judge John G. Koeltl Section II.D and the Court's Order regarding word count (ECF No. 80).  It has been prepared using a proportionally spaced typeface using Microsoft Word 365 Version 2108 in 12-point Times New Roman font and includes 9,735 words.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 2, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ
