**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC <br><br> Plaintiffs, <br><br> v. <br><br> INTERNET ARCHIVE and DOES 1 through 5, inclusive <br><br> Defendants. | Case No. 1:20-CV-04160-JGK |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT INTERNET**
**ARCHIVE'S MOTION FOR SUMMARY JUDGMENT**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

# TABLE OF CONTENTS

Page

I.  INTRODUCTION .................................................................................................. 1

II. ARGUMENT ......................................................................................................... 2

    A.  Internet Archive's Digital Lending Is a Lawful Fair Use. .................................. 2

        1.  Factor One ................................................................................................ 2

            a.  The Internet Archive's digital lending program is noncommercial. 2

            b.  The Internet Archive's digital lending program is transformative. . 3

            c.  Digital lending would still be fair use even if it were not transformative. ................................................................................. 5

            d.  *ReDigi*, *MP3.com*, and *VidAngel* do not weigh against a finding of fair use here. ............................................................................... 5

        2.  Factor Two ............................................................................................... 7

        3.  Factor Three ............................................................................................. 7

        4.  Factor Four .............................................................................................. 8

            a.  Plaintiffs present no evidence of market harm beyond the unquantified suppositions of their executives and high-level observations about economic theory ................................................ 8

            b.  Data about the NEL sheds light on what would happen if CDL became widespread. .................................................................... 9

            c.  Plaintiffs' expert's critiques of Dr. Reimers and Dr. Jørgensen do not show that their analyses were incorrect or unreliable. ............ 10

                i.  The relatively small number of loans from Internet Archive tends to show that there was no market effect, not that the experts' analyses were unreliable ..................................... 10

                ii.  Measuring units, not dollars, better illuminates whether marketplace substitution occurred .................................... 11

                iii. Plaintiffs cannot defeat summary judgment by arguing that the experts should have considered information that Plaintiffs chose to withhold. ............................................. 11

                iv.  Plaintiffs provide no reason to think that taking into account additional factors would make any difference. .... 12

                v.  Controlling for additional factors in fact didn't make any difference. ..................................................................... 13

B.    The publishers' arguments regarding sections 108 and 109 attack a straw man, since the Internet Archive's defense is based on section 107. ............................ 13

    1.    Section 109 does not limit section 107's protections for digital lending. . 14

    2.    Neither Congress nor the Copyright Office has ever rejected digital lending. ................................................................................................. 14

C.    Plaintiffs have not raised a genuine issue of material fact regarding Internet Archive's reasonable belief that its actions constituted fair use.......................... 15

    1.    Plaintiffs' claim concerns reproduction, so statutory damages must be remitted. ................................................................................................. 16

    2.    The Internet Archive is a "library or archives.".................................... 16

    3.    Plaintiffs cannot create a dispute of fact by pointing to unchallenged assertions of privilege. ......................................................................... 17

    4.    Mr. Kahle identified a number of reasonable grounds that he had for believing that the Internet Archive's actions constituted fair use. ............ 17

D.    Plaintiffs do not substantively address the National Emergency Library. ............ 18

III.    CONCLUSION ............................................................................................. 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
No. 13-CV-1215 (TSC), 2022 WL 971735 (D.D.C. Mar. 31, 2022)......................................9

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ...................................................................................2, 3

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ...........................................................................7, 14, 18

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ......................................................................*passim*

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006) ...................................................................................2, 5

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ..........................................................................5, 7, 10, 13

*Capitol Records, LLC v. ReDigi Inc.*,
910 F.3d 649 (2d Cir. 2018) ...........................................................................5, 6, 18

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013) ...................................................................................2

*In re Cnty. of Erie*,
546 F.3d 222 (2d Cir. 2008) ...................................................................................17

*Disney Enters. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ...................................................................................5, 6

*Fox News Network, LLC v. TVEyes, Inc.*,
124 F. Supp. 3d 325 (S.D.N.Y. 2015) ...................................................................................4

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) ...........................................................................3, 4, 6, 18

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ...................................................................................7

*Reich v. S. New England Telecomm. Corp.*,
121 F.3d 58 (2d Cir. 1997) ...................................................................................17

*In re Schick*,
   No. 96 B 42902 (SMB), 1998 WL 397849 (S.D.N.Y. July 16, 1998) ................................... 8

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ................................................................................................... 3, 4, 6

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
   756 F.3d 73 (2d Cir. 2014) .................................................................................................. 5

*UMG Recordings, Inc. v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ................................................................................... 6

**Rules**

Fed. R. Civ. P. 56(d) .............................................................................................................. 17

**Other Authorities**

Brewster Kahle, *Weaving Books into the Web—Starting with Wikipedia*, Internet
   Archive Blogs (Oct. 29, 2019), https://blog.archive.org/2019/10/29/weaving-
   books-into-the-web-starting-with-wikipedia/ ...................................................................... 5

Brief of Cable News Network, Inc. et al. as Amici Curiae, Nos. 15-3885(L) & 15-
   3886(XAP), 2016 WL 3475399 (S.D.N.Y. June 22, 2016) ................................................. 4

Consortium of National and University Libraries (Ireland), *Irish Librarians
   condemn publisher Wiley's removal of hundreds of titles from ebook
   collections* (Sept. 20, 2022), https://conul.ie/irish-librarians-condemn-
   publisher-wileys-removal-of-hundreds-of-titles-from-ebook-collections/ ........................... 19

Dep't of Commerce Internet Policy Task Force, *White Paper on Remixes, First
   Sale, and Statutory Damages* (Jan. 2016),
   https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pd .................... 15

Fight for the Future, *Authors For Libraries*,
   https://www.fightforthefuture.org/Authors-For-Libraries .................................................. 20

George Washington University Libraries, *Important E-Book News for GW
   Faculty and Students* (Oct. 6, 2022), https://library.gwu.edu/Wiley-ebook-
   removal ................................................................................................................................ 19

H.R. Rep. No. 94-1476 ........................................................................................................... 16

S. Rep. No. 105-190 (1998) .................................................................................................... 16

U.S. Copyright Office, *DMCA Section 104 Report*, Vol. 1, at 102 (Aug. 2001),
   https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf ......................... 15

Wiley, *Statement on Wiley eBooks Featured in ProQuest Academic Complete Library* (Oct. 5, 2022), https://newsroom.wiley.com/press-releases/press-release-details/2022/Statement-on-Wiley-eBooks-Featured-in-ProQuest-Academic-Complete-Library/default.aspx ..........................................................................19

## I.      INTRODUCTION

Plaintiffs' Opposition mostly attempts to manufacture a controversy around two undisputed facts: (1) that the Internet Archive's digital lending is a noncommercial service that expands the utility of physical books; and (2) that digital lending has not harmed Plaintiffs' ebook rentals or any other market.

That attempt fails.

As to the first fair use factor, the record shows that the Internet Archive is a non-profit organization that lends books, for free, as part of its noncommercial mission: to expand access to knowledge.  Plaintiffs' efforts to muddy the waters by pointing to the Internet Archive's so-called "commercial aspects" run contrary to controlling law in this Circuit and the actual facts of this case.

Similarly, on factor four, no reasonable jury presented with this record could conclude that the Internet Archive's digital lending harms the relevant market.  Rather than making use of their unfettered access to more than a decade of empirical data, Plaintiffs simply assert that market harm is "self-evident."  When pressed for details, they concede that it is "harder to create an accurate metric measuring that harm" because the Internet Archive's lending has been "small"—but still they insist that, any day now, CDL might "substantially expand" and "meet worldwide demand" of all readers, destroying the book industry.  Speculation does not suffice to raise a fact issue, especially where that speculation runs contrary to the affirmative econometric analysis showing that harm is highly unlikely.

All that CDL does, and all it can ever do, is offer a limited, digital alternative to physically handing a book to a patron.  Libraries deciding how to meet their patrons' needs for digital access to books are not making a choice between paying ebook licensing fees or getting books for free.  Libraries pay publishers under either approach—but digital lending lets libraries

make their own decisions about which books to circulate physically, and which to circulate digitally instead.  That choice means that librarians can continue to maintain permanent collections of books, to preserve those books in their original form for future generations, and to lend them to patrons one at time, as they have always done.  Above all, it means librarians can continue to advance the ultimate purpose of copyright: "the intellectual enrichment of the public."  *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (citation omitted).

## II.   ARGUMENT

### A.   Internet Archive's Digital Lending Is a Lawful Fair Use.

Plaintiffs' Opposition to the Internet Archive's fair use claim is unpersuasive on all four factors, and even weaker in answering the overarching fair use question: "whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' would be better served by allowing the use than by preventing it."  *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).

#### 1.   Factor One

##### a.   The Internet Archive's digital lending program is noncommercial.

It is hard to imagine a less commercial activity than lending books, for free, to patrons, for a limited time, at the lender's own expense.  That's what the Internet Archive does, and has been doing for more than a decade, consistent with its overall mission: to preserve and promote access to knowledge and culture, including books.

Plaintiffs seek to muddy the waters, by insisting that the Internet Archive has "commercial aspects" and ignoring the binding legal precedent: *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994).  In that case, the court appropriately focused on whether *the use in question* was commercially exploitative, because "[t]he commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of

copyrighted material to capture significant revenues as a direct consequence of copying the

original work." *Id*. at 922.  Plaintiffs do not apply that standard; instead, they look to cases from

other circuits and attempt to manufacture facts that don't match the record.  *See* Internet

Archive's Opp'n to Pls.' Mot. For Summ. J. ("IA Opp'n Br.") 4–9, ECF No. 173.

        **b.**        **The Internet Archive's digital lending program is**
                      **transformative.**

The Internet Archive's digital lending is transformative in the same way that the use in

*Sony* was transformative: it "utilize[s] technology to achieve the transformative purpose of

improving the efficiency of delivering content without unreasonably encroaching on the

commercial entitlements of the rights holder." *Fox News Network, LLC v. TVEyes, Inc.*, 883

F.3d 169, 177 (2d Cir. 2018).  As the Second Circuit Court of Appeals noted in *Google Books*, a

transformative use "communicates something new and different from the original **or expands its**

**utility**, thus serving copyright's overall objective of contributing to public knowledge." *Authors*

*Guild v. Google, Inc.* ("*Google Books*"), 804 F.3d 202, 214 (2d Cir. 2015) (emphasis added).

Plaintiffs attempt to distinguish this view of transformativeness, but their arguments are

unpersuasive.  Plaintiffs first argue that *Sony* did not involve the distribution of videotapes to

others, only the use by the individual who recorded them, while the Internet Archive lends books

it owns to its patrons.  Plaintiffs' Opp'n to Internet Archive's Mot. for Summ. J. ("Pls.' Opp'n

Br.") at 13, ECF No. 169.  But that cannot distinguish the *TVEyes* view of *Sony*; TVEyes was

held to be transformative under *Sony* precisely because it "enable[d] TVEyes's clients to view

[certain] Fox programming." *TVEyes*, 883 F.3d at 177.  Thus, the fact that the Internet Archive

enables its patrons to borrow books digitally actually shows why the *TVEyes* discussion of

transformativeness is directly on point.  (The discussion of *Sony* from the out-of-circuit *Napster*

case that Plaintiffs cite is not about transformativeness at all.)

Plaintiffs next argue that *Sony* and *TVEyes* do not apply because the publishers received payment for the books. Pls.' Opp'n Br. at 14. But in *TVEyes*, the same was true: that case dealt not with free over-the-air television but with "cable services such as Comcast and Cablevision." *Fox News Network, LLC v. TVEyes, Inc.*, 124 F. Supp. 3d 325, 328 (S.D.N.Y. 2015). Plaintiffs insist that a library that purchases a book is not "entitled to receive the content" of that book, and that a library patron that borrows the book is not entitled to read it, Pls.' Opp'n Br. at 14, but do not explain why. Indeed, their own economist, Dr. Prince, disagrees. Decl. of Joseph C. Gratz in Supp. of Internet Archive's Reply, submitted herewith ("Gratz Reply Decl."), Ex. 1 ("Prince Dep. Tr.") at 66:17-67:2.

Plaintiffs also claim that CDL does not "utilize technology to achieve the transformative purpose of improving the efficiency of delivering content," *TVEyes*, 883 F.3d at 177, because other technologies (like OverDrive) *also* improve the efficiency of delivering content. Pls.' Opp'n Br. at 14–15. But the question is not whether the defendant is making the *first and only* use of technology to improve the efficiency of delivering content. Indeed, in *Sony*, the copyright holders had already developed prerecorded videodiscs that also delivered the content efficiently. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 422 (1984). Similarly, in *TVEyes*, other television clipping services provided the same functionality, but that did not alter the court's analysis. *See* Brief of Cable News Network, Inc. et al. as Amici Curiae, Nos. 15-3885(L) & 15-3886(XAP), 2016 WL 3475399 (S.D.N.Y. June 22, 2016), at *13 (discussing other television clipping services).

Finally, Plaintiffs argue that the Internet Archive's digital lending does not "expand [the] utility" of physical books, *Google Books*, 804 F.3d at 214, because the additional uses digital lending enables are, in Plaintiff's view, "peripheral." Pls.' Opp'n Br. at 15. In fact, the ability to

"weave books into the web" is both useful and central to the Internet Archive's project: to connect digital learners not just with digital resources like Wikipedia, but with authoritative print sources.  *See* Brewster Kahle, *Weaving Books into the Web—Starting with Wikipedia*, Internet Archive Blogs (Oct. 29, 2019), https://blog.archive.org/2019/10/29/weaving-books-into-the-web-starting-with-wikipedia/.  For example, digital lending also makes it possible for patrons to access books without having their reading habits tracked by commercial entities, like OverDrive and Amazon, that may not share librarians' traditional commitment—supported by law in some states—to protecting privacy.

### c.    Digital lending would still be fair use even if it were not transformative.

Whether or not digital lending is a transformative use, it is a fair use.

Not all fair uses are transformative.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84–85 (2d Cir. 2014); *Blanch*, 467 F.3d at 252 n.3.  In *Swatch*, for example, the Second Circuit Court of Appeals concluded that the first factor favored fair use "regardless of how transformative" the use was.  756 F.3d at 85.  Further, its analysis acknowledges that the use in question (news reporting) was a "public purpose" named in the preamble to section 107.  *Id.* at 82.

Here, the Internet Archive supports multiple such public purposes, including research and education.  Internet Archive's Br. in Supp. of Its Mot. for Summ. J. ("IA Opening Br.") at 8, 18–19, ECF No. 106; Defendant's Statement of Material Facts ("DSMF") ¶¶ 1–6, ECF No. 98.

### d.    *ReDigi*, *MP3.com*, and *VidAngel* do not weigh against a finding of fair use here.

Plaintiffs cite three cases about situations very different from noncommercial one-to-one digital lending of books a library owns.  *See* Pls.' Opp'n Br. at 5–6 (citing *ReDigi*, *MP3.com*, and

*VidAngel*).  None weighs against a finding of fair use here.

Critically, all three cases addressed claims of fair use by defendants who were using the plaintiffs' works for commercial profit.  *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000); *Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017).  Here, by contrast, the Internet Archive is a nonprofit that does not gain any revenue from digital lending.

With respect to *VidAngel*, as discussed in the Internet Archive's Opposition brief, the Ninth Circuit Court of Appeals applied a different understanding of transformativeness than the one adopted in this circuit (in particular, the understanding of *Sony* as a case involving transformative use).  IA Opp'n Br. at 11–12.

The reasons why *ReDigi* and *VidAngel* do not weigh against fair use here are addressed in Internet Archive's Opposition brief.  *See* IA Opp'n Brief at 22 (addressing *ReDigi*); IA Opp'n Br. at 11–12 (addressing *VidAngel*).

Finally, the district court's view of transformativeness in *MP3.com* cannot be reconciled with the Second Circuit Court of Appeals' current view of transformativeness, as expressed in *TVEyes* and *Google Books*, both of which were decided after *MP3.com*.  Judge Rakoff dismissed the extent to which the service at issue "expand[ed] the utility" of the works at issue, as required by *Google Books*, 804 F.3d at 214, and the extent to which it "improve[d]the efficiency of delivering content," as required by *TVEyes*, 883 F.3d at 177, holding instead that regardless of their utility, "[w]hile such services may be innovative, they are not transformative."  *MP3.com*, 92 F. Supp 2d at 351.  That is contrary to the current law of this circuit.  That is not to say that the ultimate result in *MP3.com* was wrong; the commerciality of the service, along the remaining factors at issue in that case, could have supported a finding of no fair use in that case.  But the

case does not weigh against a finding that nonprofit digital lending of books a library owns is fair use.

### 2.      Factor Two

Plaintiffs' claims about the second factor boil down to two points, neither of which is persuasive.  *First*, Plaintiffs argue that their choice to sue over "seminal books of American literature," Pls.' Opp'n Br. at 16, affects the analysis.  But the same was true in *Google Books* and *HathiTrust,* and in neither case did the court allow plaintiffs' cherry-picking to influence the decision

*Second*, Plaintiffs argue that the publication date of the WIS does not matter because they are entitled to profit from their back catalogues.  But that is not the question for this factor; rather, the second factor considers whether the use affects "the author's right to control the first public appearance of his expression."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564 (1985).  There is no such effect in this case

The nature of the work "has rarely played a significant role in the determination of a fair use dispute."  *Google Books*, 804 F.3d at 220.  The same is true here.

### 3.      Factor Three

Contrary to Plaintiffs' argument, there is no "heavy presumption" against fair use where an entire work is used.  Instead, courts examine whether the amount of the original work used is "reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586; *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).  Here, use of the entire work is appropriate and necessary.  Like the use at issue in *Google Books,* "not only is the copying of the totality of the original reasonably appropriate to [the Internet Archive's] transformative purpose, it is literally necessary to achieve that purpose."  *Google Books*, 804 F.3d at 221.  Libraries do not lend snippets; they lend *books*.

4.      **Factor Four**

Plaintiffs have had access to years of market data and, if that data supported their theory of harm, they would surely have brought it forward.  They have not, because they cannot point to a dime they lost or are likely to lose because of Internet Archive's digital lending.

The Internet Archive offered this Court specific empirical evidence showing a lack of market harm.  Plaintiffs respond with a theory of harm so vague that it is non-falsifiable, based on nothing more than conjecture.  That does not suffice to defeat summary judgment.

a.      **Plaintiffs present no evidence of market harm beyond the unquantified suppositions of their executives and high-level observations about economic theory.**

In support of their contention that the Internet Archive's digital lending substitutes in the marketplace for consumer ebooks and library ebook rentals, Plaintiffs present two sources of authority.  They present the testimony of their executives, who feel that the Internet Archive's digital lending *simply must* cause market harm, though Plaintiffs say they have never tried to measure such harm.  And they present the testimony of Dr. Prince, who is usually engaged as an expert to perform empirical, econometric analyses, based on data.  Prince Dep. Tr. at 20:12-21:18. In this case, though, he was not given any empirical data, and was instructed not to engage in any of his own econometric analysis.  *Id.* at 55:22-56:15; 202:23-204:10.  Instead, he was instructed to try to explain why the analyses of the Internet Archive's experts, Dr. Jørgensen and Dr. Reimers, might be unreliable.  But, critically, he was not given the data he would have needed to tell whether those objections might have changed the results.  *Id.* at 203:7-204:10.  He was just hired to throw up a cloud of what-ifs—without attempting to show that those what-ifs would matter.  *Id.* at 216:6-218:13.

"Speculative and conclusory allegations are insufficient to show that there is a genuine issue for trial."  *In re Schick*, No. 96 B 42902 (SMB), 1998 WL 397849, at *6 (S.D.N.Y. July 16,

1998).  Plaintiffs' expert posits a variety of theories about other analyses that might lead to different results, but he *didn't do any of them*.

Plaintiffs' expert also imagines some reasons why digital lending might affect the market. But as he admitted, "I mean, you can make theoretical arguments, but then you could also do an empirical analysis to assess that."  Prince Dep. Tr. at 93:20-24.  When asked whether there were potential sales that Plaintiffs in fact lost, however, he responded: "I don't have empirical evidence of that."  *Id.* at 212:21-213:3.

In the fair use context, this kind of conjecture is not enough to send the issue to trial. "One can reasonably expect that if over the last four years market harm was occurring, or was likely to occur, Plaintiffs could provide economic data and analysis showing that to be the case." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, No. 13-CV-1215 (TSC), 2022 WL 971735, at *17 (D.D.C. Mar. 31, 2022) (granting summary judgment on fair use).  "The fact that they do not provide any quantifiable evidence, and instead rely on conclusory assertions and speculation long after Defendant first began [the challenged conduct], is telling."  *Id.*

        **b.**     **Data about the NEL sheds light on what would happen if CDL became widespread.**

Plaintiffs' claim that the Internet Archive's analysis understates the potential harm, given how "widespread" the Internet Archive's CDL implementation could become (Pls.' Opp'n Br. at 24–25), does not withstand scrutiny.

- Plaintiffs assert that the Internet Archive might "substantially expand the number of Partner Libraries in the Open Libraries project," Pls.' Opp'n Br. at 24, thereby making available enough copies "to meet worldwide demand without wait lists."  *Id.* at 25.  But that was precisely the situation during the NEL:  the number of Partner Libraries did not limit the number of concurrent loans.  Plaintiffs' Statement of Material Facts ("PSMF")

9

¶¶ 542–543, ECF No. 107.

- Plaintiffs worry that libraries "would be able to link from their website card catalogs." Pls.' Opp'n Br. at 24.  But Plaintiffs admit that both Open Libraries partners and other libraries already link to the Internet Archive from their website card catalogs.  PSMF ¶¶ 393–396.

- Plaintiffs imagine that "other organizations could opportunistically brand themselves a library and harm Plaintiffs by performing similar functions."  Pls.' Opp'n Br. at 25.  But fair use depends on the use, not the label the user adopts.  *See* IA Opp'n Br. at 24.

- Finally, Plaintiffs worry that the Internet Archive's lending program might become "much better known to the public" than it was during the NEL.  Pls.' Opp'n Br. at 24. But there was substantial awareness of the NEL, with stories in the New York Times, Los Angeles Times, The New Yorker, NPR, Forbes, Slate, and dozens of other outlets.

Dr. Reimers' and Dr. Jørgensen's analysis of the NEL as a "natural experiment," therefore, appropriately predicted "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590 (cleaned up).

        **c.**    **Plaintiffs' expert's critiques of Dr. Reimers and Dr. Jørgensen do not show that their analyses were incorrect or unreliable.**

Instead of presenting their own analysis of the available data, Plaintiffs simply critique the analyses performed by Dr. Reimers and Dr. Jørgensen.  Those critiques miss the mark.

        **i.**    **The relatively small number of loans from Internet Archive tends to show that there was no market effect, not that the experts' analyses were unreliable.**

Plaintiffs contend, Pls.' Opp'n Br. at 23–24, that Dr. Reimers and Dr. Jørgensen's conclusions must be unreliable because the Internet Archive's loan volume is too small.  As

Plaintiffs point out, the small number of loans meant that in some cases the statistical analysis could not determine whether availability via Internet Archive had a very small positive or a very small negative effect on sales and licensed lending. Pls.' Opp'n Br. at 23-24. But the statistical analysis tells us with great certainty *the thing that matters to the fourth factor:* the effect on the market for or value of the work, whatever direction it went, was exceedingly small or nonexistent. ECF No. 108-01 ("Jørgensen Expert Rpt.") ¶¶ 53, 58; ECF No. 109-01 ("Reimers Expert Rpt.") ¶ 38. That tilts the fourth factor in favor of fair use.

### ii. Measuring units, not dollars, better illuminates whether marketplace substitution occurred.

Plaintiffs complain that the Internet Archive's experts should have examined revenue data, rather than the number of units sold or borrowed by consumers. Pls.' Opp'n Br. at 25, 29. In fact, unit sales are a more reliable indicator of whether the Internet Archive's digital lending impacted the Works in Suit, because unit sales are a better indicator of consumer demand. ECF No. 109-02 ("Reimers Reply Rpt.") ¶¶ 14, 15. And, at any rate, controlling for price did not make a difference to Dr. Reimers' analysis. *Id.*

Dr. Jørgensen analyzed the number of checkouts via OverDrive, rather than the number of dollars, both because the number of borrows is a better indicator of consumer demand and because the nature of Plaintiffs' licensing deals does not allow attribution of revenue to particular borrows. ECF No. 108-02 ("Jørgensen Reply Rpt.") ¶ 26; Gratz Reply Decl., Ex. 2 (Jørgensen Dep. Tr.) at 104:16-105:3.

### iii. Plaintiffs cannot defeat summary judgment by arguing that the experts should have considered information that Plaintiffs chose to withhold.

Plaintiffs argue that Dr. Reimers' and Dr. Jørgensen's analyses are not reliable because they did not directly compare the Works in Suit to other books that were not available for digital

lending via the Internet Archive.  Pls.' Opp'n Br. 29.  Dr. Reimers and Dr. Jørgensen were not able to conduct that analysis because, although the Internet Archive requested data about those other books in discovery, Plaintiffs refused to produce it.  The Internet Archive moved to compel, and the Magistrate Judge expressed the view that the data Plaintiffs had already produced should be sufficient: "You don't necessarily need gold-plated Tiffany garden shears, if they even exist, to prune a bush."  Status Conference Hearing Tr. at 12:3-4, ECF No. 62.  In light of that guidance, the Internet Archive's experts performed statistical analysis on the available data to determine whether there was a market effect, and found that there was no statistical evidence of such an effect.  Jørgensen Expert Rpt. ¶ 8; Reimers Expert Rpt. ¶ 10.

For example, Dr. Reimers used Amazon sales ranking data rather than using absolute sales data about books other than the WIS, because Plaintiffs refused to produce that sales data.  Plaintiffs' expert then argued using ranking data might render the analysis less precise.  ECF No. 167 ("Prince Decl.") ¶ 60.  But when asked in deposition what Dr. Reimers should have done differently, Plaintiffs' expert's only solution was to "try to get relevant sales data directly," Prince Dep. Tr. at 225:7-8—precisely what Internet Archive tried to do, and precisely what Plaintiffs prevented.

### iv. Plaintiffs provide no reason to think that taking into account additional factors would make any difference.

Plaintiffs float a laundry list of factors that they say the Internet Archive's experts didn't take into account:  seasonal changes in book demand, the macroeconomic effects and supply chain issues caused by COVID-19, the Black Lives Matter movement, the 2020 Presidential election, and so on.  Critically, Plaintiffs' own expert didn't have any reason to think any of these factors moved the results in any particular direction, or by any particular amount.  Prince Dep. Tr. at 217:22-218:6.  Nor did he consider *whether* one even could control for those factors.  *Id.* at

216:6-217:21.

> ### v. Controlling for additional factors in fact didn't make any difference.

Unlike Plaintiffs' expert, the Internet Archive's experts actually undertook to control for additional factors Plaintiffs identified, where it was possible to do so. For example, in response to the criticism that seasonal differences in sales could affect the results, Dr. Reimers did a new analysis that took seasonality into account. Reimers Reply Rpt. ¶ 8. Before adjusting for seasonality, the estimated effect of availability via the Internet Archive was not statistically distinguishable from zero; after adjusting for seasonality, the effect was still not statistically distinguishable from zero. *Id.* Dr. Jørgensen also examined Plaintiffs' expert's seasonality criticism and found it inconsistent with the data. Jørgensen Reply Rpt. ¶ 33.

Similarly, Plaintiffs' expert said that Dr. Reimers should have controlled for price and book reviews in her analysis of book sales—but when she did so, the estimated effect of availability via the Internet Archive got even *smaller*, and even less distinguishable from zero. Reimers Reply Rpt. ¶ 4(c).

Plaintiffs' expert suggested that unusual amounts of interest in books about racial justice or the election might have affected the results. Observing that those effects would be seen primarily in nonfiction books rather than fiction books, Dr. Reimers performed a new analysis excluding nonfiction books, and found no meaningful change. Reimers Reply Rpt. ¶ 5.

Dr. Reimers and Dr. Jørgensen's reports provide just the kind of "favorable evidence about relevant markets" that weighs in favor of a finding of fair use. *Campbell*, 510 U.S. at 590. Plaintiffs present no opposing analysis of their own. The fourth factor favors fair use.

> ### B. The publishers' arguments regarding sections 108 and 109 attack a straw man, since the Internet Archive's defense is based on section 107.

Plaintiffs suggest that this Court may not find fair use if Congress has failed to enact a

statutory provision covering that same activity.  Pls.' Opp'n Br. at 2.  This gets the analysis

backwards:  statutory provisions are safe harbors that offer legal certainty.  Fair use allows courts

to review a range of activities not expressly contemplated in the Copyright Act and assess

whether they are consistent with copyright's purpose.  In any event, Congress has never rejected

CDL.

### 1.     Section 109 does not limit section 107's protections for digital lending.

Plaintiffs claim that CDL depends on an "expansive conception of the first sale doctrine."

Pls.' Opp'n Br. at 2.  To the contrary, CDL rests firmly on fair use, as set forth in section 107.

Like section 108, section 109 provides a safe harbor for libraries to use lawfully acquired books,

but it does not displace section 107's additional and often overlapping protections.  *See, e.g.*,

*HathiTrust*, 755 F.3d at 94 n.4 (section 108 does not displace section 107's additional and

overlapping protections).

### 2.     Neither Congress nor the Copyright Office has ever rejected digital lending.

While it has considered and rejected numerous proposals that would require libraries to

pay publishers to lend books they already own, *see* IA Opening Br. at 34, Congress has never

rejected digital lending by libraries.  As discussed below, agency consideration of other

proposals identified by Plaintiffs, Pls.' Opp'n Br. at 3–4, does not weigh against a finding of fair

use.

Plaintiffs turn first to the legislative history of the Digital Millennium Copyright Act.  In

the course of those proceedings, as Plaintiffs note, some groups suggested that Congress should

adopt a specific safe harbor for one species of digital first sale, and that suggestion, along with

many others, was not included in the final legislation.  Pls.' Opp'n Br. 3.  That absence tells us

nothing about Congress's view of the practice at issue here: digitally lending copies of physical

books, at no cost, for limited times and subject to strict controls.

Plaintiffs' reliance on reports from the Copyright Office and the Department of Commerce is equally misplaced.  The Copyright Office's 2001 report chose not to recommend expansion of section 109 to encompass a significantly different practice from that at issue here: a general public right to transmit a digital copy of a work, contingent on deletion of the original. Indeed, the report expressly indicates that it is *not* taking a position on "ways to address library issues related to the first sale doctrine": "The fact that we did not recommend adopting a 'digital first sale' provision at this time does not mean that the issues raised by libraries are not potentially valid concerns."  U.S. Copyright Office, *DMCA Section 104 Report*, Vol. 1, at 102 (Aug. 2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf.

As for the 2016 Department of Commerce report, while that report did not advise changes to section 109, it also recognized that legislative change would not always be necessary to accommodate new uses, and that "the fair use doctrine is a fundamental linchpin of the U.S. copyright system."  Dep't of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages*, at 10 (Jan. 2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf.  Far from weighing against a finding of fair use, that report recognizes that "the application of fair use to library activities and the digitization of library collections has recently been the subject of attention in the courts," *Id.* at 62 n.381, and recommends "continu[ing] to monitor legal and marketplace developments to ensure that library lending and preservation concerns are addressed."  *Id.* at 62.

### C.    Plaintiffs have not raised a genuine issue of material fact regarding Internet Archive's reasonable belief that its actions constituted fair use.

If the Court finds that Internet Archive's implementation of CDL or the temporary NEL

was not fair use, it should remit statutory damages.  Plaintiffs do not raise a genuine issue of material fact regarding remittitur.

> **1.      Plaintiffs' claim concerns reproduction, so statutory damages must be remitted.**

Plaintiffs contend that the remittitur provision of section 504(c)(2) does not apply where a plaintiff alleges both reproduction and distribution of copies to the public.  That interpretation is at odds with the language of the statute and would render the provision a nullity.

*First*, an award of statutory damages does not relate to each particular exclusive right under section 106 separately, but to all of the claimed infringement of a particular work.  *See, e.g.*, H.R. Rep. No. 94-1476 at 162 (when "multiple exclusive rights" in a particular work are involved, there is still at most one award of statutory damages).  Remittitur is therefore required on Plaintiffs' entire claim.

*Second*, a rule that plaintiffs cannot get statutory damages against libraries and archives for reproduction, but they can get statutory damages for public distribution of the very same copies, would make the provision useless for most purposes.  Indeed, the legislative history of this provision makes no reference to a limitation to certain exclusive rights.  H.R. Rep. No. 94-1476 at 163.  That is likely because one of the main reasons libraries would be making reproductions that they believed to be fair use would be to provide those copies to library patrons—not to shut them away.

> **2.      The Internet Archive is a "library or archives."**

Neither section 504(c)(2) nor any other part of the Copyright Act defines "library" or "archives" to require physical lending of materials.  The legislative history Plaintiffs cite stands only for the proposition that "references to 'the premises of the library or archives' in amended sections 108 (b)(2) and (c)(2) mean only physical premises" as opposed to library websites.  S.

Rep. No. 105-190, 62 (1998).  As to the question whether the Internet Archive is a "library or archives" more generally, that issue is discussed in the Internet Archive's Opposition brief, ECF No. 173 at 24.  *See also* DSMF ¶ 8.

>    **3.**     **Plaintiffs cannot create a dispute of fact by pointing to unchallenged assertions of privilege.**

Plaintiffs argue that because the Internet Archive did not waive the attorney-client privilege regarding communications relating to digital lending, Plaintiffs are relieved of their burden to show that the Internet Archive did not reasonably believe that digital lending was fair use.

Plaintiffs are wrong.

In other contexts, the Second Circuit Court of Appeals has held that the statutory phrase "had reasonable grounds for believing" states an "objective reasonableness" standard.  *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997).  Where, as here, a statute sets forth "an objective, not a subjective, test," *In re Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008), the question is whether there were objective grounds for the proposition the defendant believed, not what the defendant subjectively knew or was told.   In such circumstances, advice of counsel is irrelevant and "cannot be used to support the defense."  *Id.*  In order for privileged material to be implicated by a claim or defense, "a party must *rely* on privileged advice from his counsel to make his claim or defense."  *Id.*  Accordingly, even if Plaintiffs had sought disclosure of Internet Archive's privileged documents or identified them in a Fed. R. Civ. P. 56(d) affidavit, those documents would not have been relevant to the inquiry.

>    **4.**     **Mr. Kahle identified a number of reasonable grounds that he had for believing that the Internet Archive's actions constituted fair use.**

Plaintiffs assert that the record is "replete" with evidence that shows that the Internet Archive lacked reasonable grounds for its belief that digital lending is a lawful fair use.  Again,

their claims do not withstand scrutiny.

Plaintiffs first complain that the Internet Archive started digital lending before the White Paper and the Position Statement were published.  But as noted above, the statute sets forth an objective standard, and Plaintiffs have not shown that the state of the law between 2011 and 2018 would have made the Internet Archive belief less reasonable.   To the contrary, between 2011 and 2018, courts decided *HathiTrust*, *Google Books*, *Cambridge University Press*, *TVEyes*, and *ReDigi*—which, as discussed in the Internet Archive's motion, all bolster the case that CDL is fair use.

Nor does Jonathan Band's article about the *ReDigi* opinion show a lack of reasonable grounds for the Internet Archive's belief.   To the contrary, that article expresses the view that the *ReDigi* opinion "did not address" the argument that "purpose and intent of section 109 should positively influence the 'purpose and character' assessment in the fair use analysis" and that Mr. Band's client—the Library Copyright Alliance, not the Internet Archive—"still believes this theory is correct."  McNamara Decl. Ex. 138 at 4–5, ECF No. 96-156.

Finally, Plaintiffs assert that the Internet Archive "did not follow the practices prescribed in the White Paper."  Pls.' Opp'n Br. at 32.  The White Paper identifies "six basic system design elements" which the White Paper says "are, we believe, all that are necessary to make a compelling legal case for CDL."  The Internet Archive's CDL implementation incorporates all six of those elements, and Plaintiffs do not identify how it does not.

### D.       Plaintiffs do not substantively address the National Emergency Library.

While Plaintiffs say that the National Emergency Library was "grandly-titled" and say it was "presumptuous" of the Internet Archive to think that the NEL maintained an owned-to-loaned limitation because all of the country's libraries were closed, they do not say, much less show, why that belief was wrong.  Accordingly, the Internet Archive's motion should be granted

both as to its implementation of CDL and to the NEL.

## III.     CONCLUSION

When they returned to campus this fall, students at Georgetown, George Washington University, and the other members of the Washington Research Library Consortium found 1,379 books published by Plaintiff Wiley could no longer be borrowed in electronic form from those institutions' libraries.[1]  They disappeared from those libraries' virtual shelves, because Wiley decided to stop licensing them to the academic library market as of August 31, 2022.[2]  And according to Plaintiffs' theory in this case, that means libraries could not loan them out digitally at all.  After a public backlash, Wiley restored the titles for the academic year,[3] but the message was sent: the ability of libraries to serve their patrons is subject to publishers' whims.

That is what this case is about: whether the selection of books available from libraries digitally will be chosen by librarians, or instead determined by publishers' unilateral and unreviewable licensing choices.  This Court is being asked to decide whether copyright law gives publishers the power to dictate which books in a library's collection can and cannot be loaned digitally.  As more than a hundred authors whose books are published by Plaintiffs said in a recent open letter: "We fear a future where libraries are reduced to a sort of Netflix or Spotify for

---

[1] George Washington University Libraries, *Important E-Book News for GW Faculty and Students* (Oct. 6, 2022), https://library.gwu.edu/Wiley-ebook-removal.

[2] Consortium of National and University Libraries (Ireland), *Irish Librarians condemn publisher Wiley's removal of hundreds of titles from ebook collections* (Sept. 20, 2022), https://conul.ie/irish-librarians-condemn-publisher-wileys-removal-of-hundreds-of-titles-from-ebook-collections/.

[3] *See* Wiley, *Statement on Wiley eBooks Featured in ProQuest Academic Complete Library* (Oct. 5, 2022), https://newsroom.wiley.com/press-releases/press-release-details/2022/Statement-on-Wiley-eBooks-Featured-in-ProQuest-Academic-Complete-Library/default.aspx.

books, from which publishers demand exorbitant licensing fees in perpetuity[.]"[4]  This Court

should grant summary judgment for the Internet Archive, reaffirming that libraries can continue

to carry out their mission in the digital world.

Dated:  October 7, 2022                    DURIE TANGRI LLP


                                  By: _____/s/ Joseph C. Gratz_____
                                       Joseph C. Gratz (*Pro Hac Vice*)
                                       Jessica E. Lanier (*Pro Hac Vice*)
                                       Aditya V. Kamdar (*Pro Hac Vice*)
                                       Annie A. Lee (*Pro Hac Vice*)
                                       217 Leidesdorff Street
                                       San Francisco, CA 94111
                                       (415) 362-6666
                                       jgratz@durietangri.com
                                       jlanier@durietangri.com
                                       akamdar@durietangri.com
                                       alee@durietangri.com

                                       ELECTRONIC FRONTIER FOUNDATION
                                       Corynne McSherry (*Pro Hac Vice*)
                                       Kit Walsh (*Pro Hac Vice*)
                                       Cara Gagliano (*Pro Hac Vice*)
                                       815 Eddy Street
                                       San Francisco, CA 94109
                                       (415) 436-9333
                                       corynne@eff.org
                                       kit@eff.org
                                       cara@eff.org

                                       Attorneys for Defendant
                                       INTERNET ARCHIVE

---

[4] Fight for the Future, *Authors For Libraries*, https://www.fightforthefuture.org/Authors-For-Libraries (hyperlinks in original); Gratz Reply Decl. ¶ 4 (listing more than 100 signatories and examples of their books published by Plaintiffs).

## CERTIFICATE OF COMPLIANCE

I hereby certify that the following statements are true:

This brief complies with the formatting rules of the Individual Practices of Judge John G. Koeltl Section II.D and the Court's Order regarding word count (ECF No. 80).  It has been prepared using a proportionally spaced typeface using Microsoft Word 365 Version 2108 in 12-point Times New Roman font and includes 5,974 words.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ
