# EXHIBIT 1

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF NEW YORK
 3   ------------------------------------------------------x
 4   HACHETTE BOOK GROUP, INC.,
     HARPERCOLLINS PUBLISHERS LLC,
 5   JOHN WILEY & SONS, INC., and
     PENGUIN RANDOM HOUSE LLC,
 6
 7               Plaintiffs,
 8   vs.                         Case No. 1:20-cv-04160-JGK
 9
     INTERNET ARCHIVE and DOES 1
10   through 5, inclusive,
11
12               Defendants.
13   ------------------------------------------------------x
14
15       *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*
16
17     REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF
18                      JEFFREY PRINCE
19                 Thursday, June 9, 2022
20
21
22
23
24   Reported By: Lynne Ledanois, CSR 6811
25   Job No. 5255194
```

Page 1

1  different venue.                                                10:25AM

2          So you have all these patents that

3  contribute to that standard.

4          Everyone then has some right to get some

5  payment for those and there has to be an established    10:25AM

6  rate as to what is a fair rate for the contributing

7  patents.

8          So in this case, Qualcomm was charging a

9  certain rate for its patent portfolio for Apple to

10 use in its smartphones and Apple disputed that rate,    10:25AM

11 so they were litigating that.

12     Q   What was your involvement in that

13 litigation?

14     A   So my role actually focused on the standard

15 nonessential patents.  So Qualcomm's -- what Qualcomm   10:25AM

16 did was they sold a large portfolio of patents at a

17 single rate.  And that involves standard essential

18 patents and standard nonessential patents.

19         So my focus was on the latter, where I

20 perform various analyses to assess value that those     10:25AM

21 patents provide.

22     Q   What were those analyses?

23     A   This was a combination of surveys and

24 econometric analysis depending on the different

25 technology in play.                                     10:26AM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | So to the extent that I could do | 10:26AM |
| 2 | econometric analysis using market data, I did that. | |
| 3 | In some cases that wasn't feasible, so I | |
| 4 | also utilized surveys to get an assessment of value | |
| 5 | for different improvements. | 10:26AM |
| 6 | Q   Do you use econometric data in preference | |
| 7 | to survey data in assessing questions like the one | |
| 8 | that you addressed in the Qualcomm/Apple case? | |
| 9 | MS. STEINMAN:  Objection. | |
| 10 | THE WITNESS:  I'm reluctant to give a | 10:27AM |
| 11 | blanket answer to that.  I try to use the method | |
| 12 | that I think is most appropriate given the | |
| 13 | circumstances. | |
| 14 | I will say that if I believe market data | |
| 15 | are adequate, I will go that route.  But oftentimes | 10:27AM |
| 16 | there are deficiencies and to the extent that those | |
| 17 | are significant enough, I'm -- I have and am | |
| 18 | perfectly willing to utilize surveys as well. | |
| 19 | BY MR. GRATZ: | |
| 20 | Q   The next case on my list is Apple against | 10:27AM |
| 21 | WI-LAN.  We talked about WI-LAN against Apple.  This | |
| 22 | is Apple against WI-LAN. | |
| 23 | What is the relationship between those two | |
| 24 | cases on your C.V.? | |
| 25 | A   So those -- what is the date on that one? | 10:28AM |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  report, one of the things I was asked to do that's            11:24AM

2  relevant here is thinking about if this behavior

3  were expanded beyond what was currently done, what

4  would be the implications of that.

5         As I say in the report, I think there's              11:24AM

6  reason to believe that the harm would be quite a bit

7  more substantial in that case.

8  BY MR. GRATZ:

9     Q   Do you have any opinions about the size of

10 those harms other than the ones we've now talked            11:25AM

11 about already?

12        MS. STEINMAN:  Objection.

13        THE WITNESS:  Nothing specific comes to

14 mind, although I reserve whatever -- if there's

15 anything in the report that we have not covered in          11:25AM

16 this what might fall under this umbrella, it would

17 still qualify as my opinion and I would update it

18 with any further information.

19 BY MR. GRATZ:

20    Q   Did you engage in any statistical                    11:25AM

21 analysis -- strike that.

22        Did you engage in any econometric analysis

23 to attempt to identify the size of the harms that

24 you discuss?

25    A   I would say in my critiques of Dr. Reimers's   11:26AM

```
 1    and Dr. Jørgensen's report, the analysis that I did      11:26AM
 2    would be consider econometric.
 3              I did not put forth an independent model,
 4    but I did perform an econometric analysis on their
 5    work.                                                    11:26AM
 6       Q    Why didn't you put forth your own
 7    econometric analysis?
 8              MS. STEINMAN:  Objection.
 9              THE WITNESS:  Again, my understanding is
10    that the burden was on the other side to establish      11:26AM
11    that there was not harm.
12              So my role was to -- or one of the
13    things -- one of the pieces of the scope of my
14    report was to lay out the economic reasoning for the
15    different types of harm that likely occurred.           11:26AM
16    BY MR. GRATZ:
17       Q    In your report when you discuss
18    Dr. Reimers's and Dr. Jørgensen's analyses, you
19    identify a number of potential confounding factors
20    that in your view should have been taken into           11:27AM
21    account to make their results more accurate; is that
22    right?
23       A    I think that's fair.  I would say, you know,
24    I would say accurate, reliable.
25              To add credibility to the conclusions they    11:27AM
```

Page 56

1   mean?                                                    11:43AM

2        A    Well, I think I'm contrasting that with

3   digital licensing where in those cases, they often

4   come with terms of use by the publisher.  So my

5   understanding is with the purchase of the physical      11:43AM

6   book, there's not such terms of use.

7        Q    Do you know why there aren't such terms of

8   use with print books that are purchased by

9   libraries?

10            MS. STEINMAN:  Objection, no foundation.      11:43AM

11            THE WITNESS:  I don't want to overstate my

12  legal expertise, but I believe it has to do with the

13  right of first sale.  So in that case they are

14  buying the book, so then they can use it

15  accordingly.                                            11:44AM

16  BY MR. GRATZ:

17       Q    From an economic point of view, when a

18  library buys a print book, is one of the things it's

19  getting an entitlement to lend that print book out

20  physically?                                             11:44AM

21       A    I believe that that ability comes with a

22  purchase.

23       Q    And when a library has bought a print book

24  and lends that book physically to one of its

25  patrons, that patron is entitled to read it; is that   11:44AM

| | | |
|---|---|---|
| 1 | right? | 11:44AM |
| 2 |     A   I believe, yes, they can read the book, yes. | |
| 3 |     Q   From an economic point of view, when a | |
| 4 | library buys a print book, do you have a view as to | |
| 5 | whether one of the things it's getting is an | 11:45AM |
| 6 | entitlement to lend that print book out digitally? | |
| 7 |         MS. STEINMAN:  Objection. | |
| 8 |         THE WITNESS:  My understanding is that | |
| 9 | they don't have that right to do that. | |
| 10 | BY MR. GRATZ: | 11:45AM |
| 11 |     Q   That's your understanding based on the -- | |
| 12 | based on copyright law as it's been explained to you | |
| 13 | by counsel? | |
| 14 |         MS. STEINMAN:  Objection, the witness | |
| 15 | is -- any conversations between counsel and Prince, | 11:45AM |
| 16 | Professor Prince are privileged.  So I direct him | |
| 17 | not to answer. | |
| 18 |         MR. GRATZ:  Let me ask a better question. | |
| 19 |     Q   Do you have any nonprivileged source of | |
| 20 | that understanding? | 11:45AM |
| 21 |     A   I believe I reviewed some case law on this | |
| 22 | in crafting my report that if -- my recollection is | |
| 23 | that it established that there isn't the right to use | |
| 24 | or to generate a digital copy when advertising a | |
| 25 | physical book. | 11:46AM |

Veritext Legal Solutions
866 299-5127

```
 1        Q    What would affect whether that, in fact,        12:45PM
 2   occurred?
 3        A    I mean, there is a number of elements, I
 4   mean, for one, it would depend upon whether those who
 5   are recording for their own personal consumption would   12:45PM
 6   instead rent or buy if they weren't allowed to do
 7   that.  But I don't know the extent to which that's the
 8   case.  I haven't done that analysis.
 9        Q    Would the incentive to make movies be
10   greater, less or the same in the circumstance where      12:46PM
11   people could not tape movies shown on TV and watch
12   them later?
13             MS. STEINMAN:  Objection.
14             THE WITNESS:  Again, that would depend on
15   what that rule change would imply in terms of the        12:46PM
16   return someone would get on their investment in a
17   movie.  To the extent that that return would go up,
18   that would increase incentives.
19   BY MR. GRATZ:
20        Q    The question whether that return would         12:46PM
21   actually go up is an empirical one?
22        A    I mean, you can make theoretical arguments,
23   but then you could also do an empirical analysis to
24   assess that.
25        Q    In your report, you provide opinions about     12:47PM
```

Page 93

| | | |
|---|---|---|
| 1 | not teach because I was running the department and an | 4:36PM |
| 2 | institute. | |
| 3 | I will be stepping down from the institute | |
| 4 | this summer and then I'll be stepping down as chair | |
| 5 | next year. | 4:36PM |
| 6 | And so my steady state is I would teach | |
| 7 | three classes a year, but that's been disrupted | |
| 8 | because of my administrative roles. | |
| 9 | Q    Do you spend more time on your expert | |
| 10 | witness work and consulting work or on your | 4:36PM |
| 11 | teaching? | |
| 12 | A    As I said, now anything I do would be more | |
| 13 | than teaching because I'm not teaching right now. | |
| 14 | That would not be the case when I'm back to a | |
| 15 | three-course load. | 4:36PM |
| 16 | The other major component of my job is | |
| 17 | research, which actually takes up most of my time. | |
| 18 | Q    That was going to be my next question. | |
| 19 | About what percentage of your time do you | |
| 20 | spend on your consulting work, including expert | 4:36PM |
| 21 | witness testimony? | |
| 22 | A    Somewhere in the neighborhood of 20 percent. | |
| 23 | Q    In your work on your expert report, did | |
| 24 | you attempt to numerically estimate the size of the | |
| 25 | effect you believe Internet Archive's controlled | 4:38PM |

```
 1   digital lending had on publisher's revenues?           4:38PM
 2           MS. STEINMAN:  Objection, asked and
 3   answered.
 4           THE WITNESS:  I did not try to quantify
 5   that, no.                                              4:38PM
 6   BY MR. GRATZ:
 7       Q   Do you know whether that effect would be
 8   positive or negative?
 9       A   I laid out the economic reasoning that I
10   believe points to it being detrimental, having harm.   4:38PM
11       Q   But you don't know whether that economic
12   reasoning, in fact, played out in that way; right?
13           MS. STEINMAN:  Objection.
14           THE WITNESS:  I don't have the numerical
15   estimates on that.  I think it's -- whatever its       4:39PM
16   economic reasoning or general theoretical arguments,
17   to the extent that the premises are sensible and
18   credible, I believe that the conclusions then
19   reasonably follow.  And I believe those assumptions
20   were credible.                                         4:39PM
21   BY MR. GRATZ:
22       Q   It is possible that upon examination of
23   the data through an econometric analysis, it would
24   turn out that the effect was either zero or positive
25   with respect to publishers' revenues?                  4:39PM
```

| | | |
|---|---|---|
| 1 |       MS. STEINMAN:  Objection. | 4:39PM |
| 2 | BY MR. GRATZ: | |
| 3 |     Q   Is that right? | |
| 4 |     A   It's possibly.  I think no one's provided | |
| 5 | credible evidence to demonstrate that to be the case. | 4:39PM |
| 6 |     Q   And you did not attempt to engage in that | |
| 7 | econometric analysis to make that determination? | |
| 8 |     A   Right, understanding that the burden was on | |
| 9 | the other side to establish there was no harm, I did | |
| 10 | not engage in that. | 4:40PM |
| 11 |     Q   I want to turn to Page 66, | |
| 12 | Paragraph 107 -- I'm sorry.  Page 63, Paragraph 107. | |
| 13 |     A   Yes. | |
| 14 |     Q   And this is in a section titled | |
| 15 | "Dr. Jørgensen's comparison of Internet Archive's | 4:41PM |
| 16 | conduct to OverDrive lending is misleading and | |
| 17 | irrelevant." | |
| 18 |        Do you see that? | |
| 19 |     A   Yes. | |
| 20 |     Q   In Paragraph 107, you write that | 4:41PM |
| 21 | "Moreover, according to Dr. Jørgensen's analysis, | |
| 22 | there was a huge variability in Internet Archive's | |
| 23 | relative checkout volume among the book titles, | |
| 24 | suggesting that some authors might be impacted more | |
| 25 | heavily than the average provided by Dr. Jørgensen." | 4:42PM |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | (nonzero) sales at least five years after | 4:55PM |
| 2 | publication - for USA Today list bestsellers, for | |
| 3 | all books published by Plaintiffs, and for the works | |
| 4 | in suit - establishes that there were potential | |
| 5 | sales that Plaintiff Publishers lost as a result of | 4:55PM |
| 6 | Internet Archive's actions." | |
| 7 |     Do you see that? | |
| 8 |   A  Yes. | |
| 9 |   Q  That's an overstatement, isn't it, in that | |
| 10 | I think you've testified you're not expressing the | 4:55PM |
| 11 | opinion that lost sales, in fact, occurred but | |
| 12 | instead that your arguments from economic theory | |
| 13 | lead one to the conclusion that the conditions were | |
| 14 | such that one would expect lost sales to have | |
| 15 | occurred? | 4:56PM |
| 16 |     MS. STEINMAN: Objection. | |
| 17 |     THE WITNESS: Yes, that's right. But I | |
| 18 | don't see how this statement is an overstatement | |
| 19 | relative to that framework. | |
| 20 | BY MR. GRATZ: | 4:56PM |
| 21 |   Q  Do you know whether there were potential | |
| 22 | sales that plaintiff publishers, in fact, lost as a | |
| 23 | result of Internet Archive's actions? | |
| 24 |     MS. STEINMAN: Objection. | |
| 25 |     THE WITNESS: Again, I lay out the | 4:56PM |

| | | |
|---|---|---|
| 1 | economic reasoning.  I don't have empirical evidence | 4:56PM |
| 2 | of that.  But this sentence doesn't claim to have | |
| 3 | empirical evidence of that. | |
| 4 | BY MR. GRATZ: | |
| 5 |     Q   It's claiming that something, in fact, | 4:56PM |
| 6 | occurred in the world; isn't it? | |
| 7 |     A   I don't think so. | |
| 8 |     Q   Turning to Paragraph 105, and we may have | |
| 9 | an opportunity to discuss this later in connection | |
| 10 | with Dr. Jørgensen's rebuttal report. | 4:57PM |
| 11 |     But in Paragraph 105, you discuss | |
| 12 | Dr. Jørgensen's estimates of -- related to OverDrive | |
| 13 | revenue. | |
| 14 |     Do you see that? | |
| 15 |     A   Yes. | 4:57PM |
| 16 |     Q   Did you include or exclude audio book | |
| 17 | revenues in the analysis set forth in Paragraph 105? | |
| 18 |     A   Well, I believe audio books were in here. | |
| 19 |     Q   Upon having read Dr. Jørgensen's rebuttal | |
| 20 | report and reflecting on the matter, do you think a | 4:58PM |
| 21 | better calculation would remove audio books? | |
| 22 |     A   I believe that's right.  I also believe that | |
| 23 | that doesn't have a major impact on the figures. | |
| 24 |     Q   Have you done that calculation? | |
| 25 |     A   I've discussed it with Analysis Group.  I | 4:58PM |

Page 213

| | | |
|---|---|---|
| 1 | the documents that I requested a moment ago. | 5:01PM |
| 2 |     Q    Do you think, considering that -- strike | |
| 3 | that. | |
| 4 |     There are a number of potential controls | |
| 5 | or rather -- strike that. | 5:02PM |
| 6 |     There are a number of potential | |
| 7 | confounding factors that you identified in your | |
| 8 | report that you criticized Dr. Reimers and/or | |
| 9 | Dr. Jørgensen for not taking into account; is that | |
| 10 | right? | 5:02PM |
| 11 |     A    Yes. | |
| 12 |     Q    Do you have a view as to whether one could | |
| 13 | do an analysis that takes all of those confounding | |
| 14 | factors into account? | |
| 15 |     A    Well, I haven't attempted to do the full | 5:02PM |
| 16 | measure that they tried to do.  I think, you know, | |
| 17 | there's various ways one might approach the problem. | |
| 18 |     One could try to directly account for all | |
| 19 | those confounding factors or attempt other ways of | |
| 20 | conducting an analysis that would effectively deal | 5:03PM |
| 21 | with the presence of those confounding factors. | |
| 22 |     So I haven't gone through that analysis to | |
| 23 | determine what might be the optimal path, if one is | |
| 24 | possible, but that's the kind of things I would | |
| 25 | consider. | 5:03PM |

| | | |
|---|---|---|
| 1 | Q Have you concluded whether or not one is | 5:03PM |
| 2 | possible; that is, whether it would be possible to | |
| 3 | control for the potential confounding factors that | |
| 4 | you identified? | |
| 5 | A I haven't done that full assessment and what | 5:03PM |
| 6 | the -- what's fully possible here. | |
| 7 | Q For example, one of the potential | |
| 8 | confounding factors you identify is awareness of | |
| 9 | issues relating to racial justice. | |
| 10 | Do you recall that? | 5:04PM |
| 11 | A Yes. | |
| 12 | Q Do you have any views on how one could | |
| 13 | control for that factor? | |
| 14 | A I haven't fully thought that through, what | |
| 15 | would be the optimal way to deal with that. | 5:04PM |
| 16 | I think what I was doing here is just | |
| 17 | highlighting that that clearly was going on and that | |
| 18 | one would need to calculate that. | |
| 19 | Q Is the same true of the other potential | |
| 20 | confounding factors that you identified? | 5:04PM |
| 21 | A Yes, I think that's fair. | |
| 22 | Q Do you have a view as to whether the | |
| 23 | effects of the confounding factors you identify | |
| 24 | would go in one direction or the other? | |
| 25 | MS. STEINMAN: Objection. | 5:05PM |

1                THE WITNESS:  I mean, that's -- I don't                5:05PM

2    believe I laid all that out in the report.  I think

3    a lot of them would tend to, if ignored, downplay

4    the effects that they are trying to measure.

5                But I can't say that that's universally              5:05PM

6    true.  I would want to look at that individually.

7    BY MR. GRATZ:

8        Q    Do you have a view as to the size of the

9    effects of the confounding factors you identify?

10       A    I don't give a numerical value for that, but            5:05PM

11   I think with the reasoning that I have laid out,

12   there's reason to think that their effects could be

13   non-trivial.

14       Q    Turning to Paragraph 80.

15       A    Okay.                                                    5:07PM

16       Q    In the last sentence you say, "Moreover,

17   Dr. Jørgensen did not examine the effect of Internet

18   Archive's conduct on any other plaintiff besides

19   Hachette."

20            Do you see that?                                         5:07PM

21       A    I do.

22       Q    Do you know why Dr. Jørgensen did not

23   examine the effect on Internet Archive's conduct on

24   any other plaintiff besides Hachette?

25       A    I believe he, in his rebuttal report, may                5:07PM

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

| | | |
|---|---|---|
| 1 | can identify that would address this criticism? | 5:28PM |
| 2 |       MS. STEINMAN:  Objection. | |
| 3 |       THE WITNESS:  I would have to think about | |
| 4 | it.  I mean, there are methods that people have | |
| 5 | employed to try and assess and account for the size | 5:28PM |
| 6 | of the bias. | |
| 7 |       You know, one could try to get relevant | |
| 8 | sales data directly so you don't have the | |
| 9 | measurement error issue.  Those are a couple of | |
| 10 | things to think about, but I haven't fully thought | 5:28PM |
| 11 | through all the possibilities here. | |
| 12 | BY MR. GRATZ: | |
| 13 |   Q   Turning to Paragraph 93, I want to ask | |
| 14 | about the second-to-last sentence here. | |
| 15 |       But let me know when you're ready to | 5:29PM |
| 16 | answer questions about that sentence. | |
| 17 |   A   Okay. | |
| 18 |   Q   It says, "If it were the case that the 127 | |
| 19 | works in suit were scanned by Internet Archive at a | |
| 20 | time when they were experiencing increased demand, | 5:29PM |
| 21 | on average, Dr. Reimers percent failed to control | |
| 22 | for the possibility that sales would have been even | |
| 23 | higher in the absence of Internet Archive's | |
| 24 | conduct." | |
| 25 |       Do you see that? | 5:29PM |

Veritext Legal Solutions
866 299-5127

1        I, LYNNE M. LEDANOIS, a Certified
2   Shorthand Reporter of the State of California, do
3   hereby certify:
4        That the foregoing proceedings were taken
5   before me at the time and place herein set forth;
6   that a record of the proceedings was made by me
7   using machine shorthand which was thereafter
8   transcribed under my direction; that the foregoing
9   transcript is a true record of the testimony given.
10       Further, that if the foregoing pertains to
11  the original transcript of a deposition in a Federal
12  Case, before completion of the proceedings, review
13  of the transcript [] was [X] wasn't requested.
14       I further certify I am neither financially
15  interested in the action nor a relative or employee
16  of any attorney or party to this action.
17       IN WITNESS WHEREOF, I have this date
18  subscribed my name.

21  Dated: June 13, 2022

                    *Lynne Marie Ledanois*
                    LYNNE MARIE LEDANOIS
25                  CSR No. 6811

Page 268