**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

*REDACTED* **DEFENDANT INTERNET ARCHIVE'S REPLY TO PLAINTIFFS'
RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL FACTS**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

The below reply to Plaintiffs' response to the Internet Archive's Rule 56.1 Statement of Material Facts is made for purposes of the Internet Archive's Motion for Summary Judgment and reflects an effort to demonstrate where purported disputes of fact are not actually in dispute.

1.      The Internet Archive is a 501(c)(3) public charity. Declaration of Joseph C. Gratz submitted herewith ("Gratz Decl.") Ex. A ¶1 (Stipulation of Undisputed Facts ("Stipulation")).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

2.      The guiding mission of the Internet Archive is to provide universal access to all knowledge.  Declaration of Brewster Kahle submitted herewith ("Kahle Decl.") ¶4.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

3.      In furtherance of that mission, over more than two decades, the Internet Archive has preserved, curated, and made available much of humanity's most important information.  *Id*. ¶ 5.

**Plaintiffs' Response:**  Undisputed that Internet Archive has distributed millions of copies of unauthorized ebooks and other works, but not material and vague as to the meaning of "preserved, curated, and made available much of humanity's most important information."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs appear not to dispute their own version of the asserted fact, which they do not support with any evidence in the record.  *See* Local Civil Rule 56.1(d).  Nor is Plaintiffs' statement that the asserted fact is "not material" and "vague" a denial of the asserted fact.

4.      The Internet Archive has become a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals. *Id.* ¶6.

**Plaintiffs' Response:**  Undisputed that Internet Archive has millions of users and has partnered with certain institutions, but otherwise disputed. Lacks foundation because Internet Archive provides no evidence supporting the claim that it is "a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals," whereas there is evidence to show that a relatively small proportion of libraries have endorsed or joined Internet Archive's in-copyright ebook lending initiatives – and doubts have been raised about their legality. *See* Rule 56.1 Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment, ECF 107 ("Pubs. SUMF") ¶¶77-109.  Also this Statement is not material and is vague as to the meaning of "a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' claim that the asserted fact lacks foundation is incorrect, as it is supported by the Declaration of Brewster Kahle, the Chair and Digital Librarian who founded the Internet Archive over two decades ago, and his declaration lays a foundation for his personal knowledge of this and other assertions.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).  Plaintiffs' statement that the asserted fact is "not material" and "vague" is not a denial of the asserted fact.

5.     One of the Internet Archive's first projects was to archive every public webpage on the fledgling World Wide Web. Today, over a quarter century of web history is preserved and accessible through the Internet Archive's Wayback Machine.  The Wayback Machine has become a crucial database for journalists, researchers, lawyers, and courts.  Kahle Decl. ¶ 7.

**Plaintiffs' Response:**  Undisputed, but not material because the Wayback Machine is not at issue in this action.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

6.     The Internet Archive works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts.  Kahle Decl. ¶ 8.

**Plaintiffs' Response:**  Undisputed for the purpose of this motion only. Lacks foundation because Internet Archive provides no evidence supporting the claim that it "works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact "[L]acks foundation because Internet Archive provides no evidence" in support is incorrect, as the asserted fact cites to the Declaration of Brewster Kahle in support, and his declaration lays a foundation for his personal knowledge of this and other assertions.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

7.     The Internet Archive has been a member of the American Library Association since 2000. The Internet Archive is also an affiliate member of the Boston Library Consortium, and participates in interlibrary loan via the OCLC and RapidILL interlibrary loan networks. Kahle Decl. ¶¶ 9.

**Plaintiffs' Response:**  Undisputed, but not material and incomplete since Internet Archive's participation in the OCLC and Rapid ILL interlibrary loan networks is limited to scholarly monographs and/or periodicals. See Supplemental Declaration of Elizabeth A. McNamara dated September 2, 2022 ("Suppl. McN Decl."), Ex. 11.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "incomplete" is not a denial of the asserted fact.

8.      In December 2006, the State of California formally recognized the Internet Archive as a library, making it eligible to receive funding under the Library Services and Technology Act and qualifying it for E-Rate, a federal program that provides discounts to schools and libraries to ensure they are able to obtain affordable telecommunications services. Kahle Decl. ¶ 10.

**Plaintiffs' Response:**  Undisputed that the California State Librarian Susan Hildreth sent Internet Archive a letter in December 2006 referring to Internet Archive as a library eligible to receive LSTA funding and E-Rate funding, but not material since it long pre-dates IA's controlled digital lending program and vague as to the meaning of "the State of California formally recognized the Internet Archive as a library."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "vague" is not a denial of the asserted fact.

9.      In mid-2007, the Internet Archive was awarded a Library Services and Technology Act grant for its Open Library project (openlibrary.org) – an effort to create a comprehensive library book catalog with a webpage for every book published.  Kahle Decl. ¶ 11.

**Plaintiffs' Response:**  Undisputed, but not material because the "Open Library project" referenced in this Statement was implemented specifically to build a "card catalog" of webpages for books, not for any activity related to controlled digital lending, and the funding expired before Internet Archive started scanning and distributing in-copyright books. Suppl. McN Decl.

Ex. 12 (Cressaty Tr. 214:16-219:14). A clarification is also required: the "Open Library project" referred to in the above Statement is different from the "Open Libraries" project that is at issue in this action (the "Open Libraries Project"), which was launched in or about 2018, without LSTA funding, "to increase lending counts" on Internet Archive's Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches." Declaration of Elizabeth A. McNamara, ECF 96 ("McN Decl.") ¶¶67-68, 103.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

10.     The Internet Archive has also received grant funding from the Institute of Museum and Library Services ("IMLS"), an independent federal agency whose mission is to support museums, libraries, and related organizations.  For example, in 2017, the Internet Archive received a grant under the IMLS's Laura Bush 21st Century Library Program.  In order to receive this grant, the Internet Archive had to qualify as a library or library-related organization.  Kahle Decl. ¶ 12.

**Plaintiffs' Response:**  Undisputed, but incomplete and not material because the IMLS funding cited above was awarded for purposes unrelated to the in-copyright book distribution scheme at issue in this action.  Kahle Decl. ¶12, Ex. 2.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

11.     This lawsuit concerns the Internet Archive's implementation of Controlled Digital Lending ("CDL"), through which the Internet Archive digitizes its print books and lends them digitally to its patrons.  Complaint, ECF No. 1 ("Compl.").

**Plaintiffs' Response:**  Undisputed that this lawsuit involves IA's implementation of CDL, but incomplete because the lawsuit is not only limited to Internet Archive's lending of digital scans of "its print books" – *i.e.*, print books that Internet Archive owns and/or maintains possession of. Since the Internet Archive began directing its efforts towards the Open Libraries Project in 2018, it has become a central hub and libraries participating in the project – each known as a "Partner Library" – send their catalogues to Internet Archive for overlap analysis. McN. Decl. ¶¶67-68, 103. Internet Archive does not make new scans of books in Partner Library collections that it has already scanned (nor does it take possession of the matching print editions in the Partner Library's collections); rather, every time a book in the Partner Library's catalogue matches an ebook on the Website through the overlap analysis, Internet Archive increases by one the number of concurrent checkouts of that book permitted on the Website and lends its digital scan against physical copies that remain in the possession of the Partner Library (the "Open Libraries Process"). *Id*.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" is not a denial of the asserted fact.

12.     In 2011, in partnership with over two dozen library systems including the Boston Public Library, the Internet Archive made an initial collection of more than 80,000 books available for digital lending.  Kahle Decl. ¶ 13.

**Plaintiffs' Response:**  Undisputed, but not material and incomplete since Internet Archive initially restricted its scanning of in-copyright works to out-of-print books and it loaned

books on an "in-library" basis in 2011 – meaning that the ebooks were accessible only to accredited users of a participating physical library's network – but subsequently abandoned these limitations.  McN Decl. ¶¶34-35, 63-64.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "incomplete" is not a denial of the asserted fact.

13.     In November 2011, the Internet Archive's digital lending effort was unanimously endorsed by all fifty state libraries through the Chief Officers of State Library Agencies ("COSLA").  Kahle Decl.  ¶ 14.

**Plaintiffs' Response:**  Undisputed, but not material and incomplete since the "digital lending effort" referenced in this Statement, which was geographically limited and pre-dated widespread adoption of authorized library ebook lending, bears no resemblance to Internet Archive's current "digital lending effort," where Internet Archive now acts as a central hub and lends out digital copies based on the number of print copies in the possession of each of its "Partner Libraries" without ever taking possession of the matching print editions in each libraries' collection. McN Decl. ¶¶67-68, 103; Declaration of Jeffrey Weber, ECF 95 ("Weber Decl.") ¶10.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "incomplete" is not a denial of the asserted fact.

14.     As of this filing, the Internet Archive contains more than three million books available for borrowing in its collection.  Kahle Decl.  ¶ 15.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

15.     The Internet Archive launched and expanded this program on the basis that it is fair use.  *Id.* ¶ 16.

**Plaintiffs' Response:**  Disputed but not admissible.  Whether the Internet Archive's activities constitute fair use is a legal conclusion inappropriate for a Rule 56.1 statement, and must therefore be disregarded. *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).  And this Statement lacks foundation since Internet Archive withheld documents regarding advice concerning fair use of its practices based on privilege. Suppl. McN Decl. Ex. 9. Moreover, Kahle Decl. ¶¶16 and 17 cite only the *White Paper* and *Position Statement* concerning CDL, both published in 2018, as the basis for Kahle's purported good faith belief in IA's fair use defense. Kahle Decl. Exs. 5, 6. But IA's infringement of in-copyright books pre-dates 2018 and therefore IA did not "launch" its program in reliance on such publications. McN Decl. ¶¶62-64. Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Further, it is disputed that Internet Archive "launched and expanded this program on the basis that it is fair use" since there is contrary evidence that Internet Archive knew or should have known that its conduct was not fair use.  McN Decl. ¶¶77-109.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs' argument about the inappropriateness of whether the Internet Archive's lending program is or is not a fair use is a straw man.  The Internet Archive makes no such claim here; rather it asserts as a fact that the Internet Archive launched and expanded its lending program on the basis—the belief, as made clear in the following numbered paragraph—that it is a fair use.

The asserted fact does not lack foundation for the reasons stated in the Internet Archive's reply brief, section II.C.3.

Finally, Plaintiffs cite to statements in the McNamara Declaration that includes statements by those that disagree with the Internet Archive's fair use position, but do not support Plaintiffs' own assertion that the Internet Archive "knew or should have known that its conduct was not fair use"—as whether or not the lending program was fair use truly is a legal conclusion inappropriate for a Rule 56.1 response. *Julian v. MetLife, Inc.*, No. 17-CV-957 (AJN), 2021 WL 3887763, at *6 (S.D.N.Y. Aug. 31, 2021).

16.     In developing and maintaining this belief, the Internet Archive and its Digital Librarian, Brewster Kahle, relied on *A White Paper on Controlled Digital Lending of Library Books*, authored by Dave Hansen, then the Associate University Librarian and Lead Copyright & Information Policy Officer for Duke University, and Kyle Courtney, then a copyright advisor for Harvard University Library – each copyright scholars known to the Internet Archive to be respected in their fields. The White Paper concludes that "there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use."  Kahle Decl. ¶ 16.

**Plaintiffs' Response:** Disputed but lacks foundation, states a legal conclusion and not admissible for the reasons set forth in Statement 16, which is incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The Internet Archive incorporates its reply to Plaintiffs' response to paragraph 15.

17.     The Internet Archive and Mr. Kahle also relied on the *Position Statement on Controlled Digital Lending*.  This document was co-authored by Mr. Courtney; Mr. Hansen; Mary Minow, then affiliated with the Berkman Klein Center for Internet and Society at Harvard

University; Jason Schultz, a Professor of Clinical Law at New York University School of Law; and Michelle Wu, then a law professor and librarian at the Georgetown Law Center. Lila Bailey, the Internet Archive's most senior lawyer, was also a co-author of this statement. The Internet Archive understood all co-authors of the *Position Statement* to be well-respected copyright scholars. Dozens of copyright law professors and scores of libraries and library associations became signatories to the statement, including the Association of Research Libraries, Boston Public Library, Los Angeles Public Library, the Metropolitan New York Library Council, and the Chief Officers of State Library Agencies, representing the state librarians of all fifty states. *Id.* ¶ 17.

**Plaintiffs' Response:**  Disputed but inadmissible.  Lacks foundation since Brewster Kahle could not have relied on the *Position Statement* referenced above in developing and maintaining his belief that Internet Archive's scanning and distribution of in-copyright ebooks was fair use because Internet Archive engaged in those activities from at least 2011 – seven years before the *Position Statement* was published in 2018. Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Also incomplete because the Statement omits that Michelle Wu had been engaged as an attorney for Internet Archive from 2017 until at least March of 2018 (McN Decl. ¶86) and because the Boston Public Library and Los Angeles Public Library no longer appear as signatories on the version of the *Position Statement* posted on line as of the date of this filing.  Suppl. McN Decl. Ex. 16.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The Internet Archive states that it and Mr. Kahle relied on the *White Paper* and the *Position Statement* "in developing and maintaining" its belief that its lending library was fair use.

Defendant's Rule 56.1 Statement of Material Facts ("DSMF") ¶ 16–17, ECF No. 98.  It is perfectly possible to "develop" and "maintain" a belief regarding an act after first engaging in that act.  As the Internet Archive states in its Statement of Material Facts (and as Mr. Kahle supports in his declaration, pursuant to Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4)), the Internet Archive launched and expanded its lending program on the basis that it was fair use, full stop. The Internet Archive and Mr. Kahle developed and maintained that belief by relying on the legal argument and analysis contained within the *White Paper* and the *Position Statement*.  Plaintiffs' further statement that the asserted fact is "incomplete" is not a denial of the asserted fact.

18.     The Internet Archive – or another 501(c)(3) public charity it works closely with, Open Library of Richmond – lawfully acquires print books by purchase or donation that it wishes to make available for digital lending.  Kahle Decl. ¶ 18; Gratz Decl. Ex. A (Stipulation).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

19.     Open Library of Richmond holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.  Kahle Decl. ¶ 19.

**Plaintiffs' Response:**  Undisputed, but vague as to the meaning of "many."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

20.     The Internet Archive or Open Library of Richmond owns at least one lawfully made copy of each of the 127 Works in Suit ("Works in Suit").  Gratz Decl. Ex. A (Stipulation).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

21.     The Internet Archive sends print books to a scanning center, where an operator carefully turns and photographs each page using a book-digitization device the Internet Archive developed called a Scribe.  Gratz Decl. Ex. B ¶¶ 80–82 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but vague as to the meaning of "carefully turns."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

22.     The print book is then placed in archival storage, and its specific location is carefully tracked.  Gratz Decl. Ex. B ¶ 83 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but vague as to the meaning of "carefully tracked."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

23.     Print books stored in the physical archive facilities are non-circulating; it is not available to be accessed in its print form.  Kahle Decl. ¶ 20.

**Plaintiffs' Response:**  Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

24.     The digital images of the book are processed and formatted, and if the book meets certain criteria set by Internet Archive policies, it is then made available for digital lending to one registered patron at a time. Gratz Decl. Ex. B ¶¶ 80, 111–25 (Suppl. Expert Rpt. Of Ian Foster).

**Plaintiffs' Response:**  Undisputed, with the clarification that the only current "criteria set by Internet Archive policies" is that Internet Archive claims not to post books published within the last five years, which is a non-binding policy that it intermittently violates. McN Decl. ¶ 35.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.
Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

25.     Anyone can become a patron of the Internet Archive – and digitally borrow books
for free by signing up for an Internet Archive account. (Internet Archive has policies, not
relevant here, for terminating accounts.) Kahle Decl. ¶ 21; Gratz Decl. Ex. B ¶ 19 (Suppl. Expert
Rpt. of Ian Foster).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

26.     Doing so grants them a digital library card that lets them borrow up to ten books
at a time from the collection, for limited periods of up to fourteen days.  Kahle Decl. ¶ 22.

**Plaintiffs' Response:**  Undisputed, but incomplete and misleading because the fourteen
day loans can be renewed indefinitely depending upon demand for the title in question. This
Statement is also vague as to "digital library card."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.
Plaintiffs' statement that the asserted fact is "incomplete," "misleading," and "vague" is not a
denial of the asserted fact.  Plaintiffs do not support their assertion with any evidence in the
record.  *See* Local Civil Rule 56.1(d).

27.     The Internet Archive offers its patrons several ways of engaging with a book they
have borrowed.  Gratz Decl. Ex. B ¶¶ 31, 35–36 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but vague as to the meaning of "several ways of
engaging."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.
Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

28.     The patron can read the book in their web browser through a tool called

BookReader.  *Id.* ¶ 31.

**<u>Plaintiffs' Response:</u>** Undisputed.

**<u>Internet Archive's Reply</u>**:  Plaintiffs do not dispute the asserted fact.

29.     BookReader lets patrons flip through a book's pages, zoom in on a book's

images, enlarge the book's text for easier reading, and search through the book.  Kahle Decl.

¶ 23.

**<u>Plaintiffs' Response:</u>** Undisputed.

**<u>Internet Archive's Reply</u>**:  Plaintiffs do not dispute the asserted fact.

30.     When finished, the patron may return the book.  Gratz Decl. Ex. B ¶ 32 (Suppl.

Expert Rpt. of Ian Foster).

**<u>Plaintiffs' Response:</u>** Undisputed.

**<u>Internet Archive's Reply</u>**:  Plaintiffs do not dispute the asserted fact.

31.     Otherwise, the loan will automatically expire at the end of the loan period. At that

point, the patron is no longer able to access the book, and it is once again available to be

borrowed.  Kahle Decl. ¶ 24.

**<u>Plaintiffs' Response:</u>**  Undisputed, but incomplete and requiring clarification that users

can renew their loans of books indefinitely subject to demand for the title from other users.

**<u>Internet Archive's Reply</u>**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs' statement that the asserted fact is "incomplete" and "requiring clarification" is not a

denial of the asserted fact.

32.     Instead of reading books in their web browsers, patrons can choose to download an encrypted PDF or encrypted ePub version of the book onto their computer or device. Gratz Decl. Ex. B ¶¶ 35–36 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

33.     These files are secured using the same security system that Plaintiffs use to secure digital files of Plaintiffs' books: a type of "digital rights management" or "DRM" software created by Adobe. Gratz Decl. Ex. C, Deposition Transcript of Steve Potash ("Potash Dep. Tr.") 81:1–82:5.

**Plaintiffs' Response:**  Disputed.  In the deposition testimony cited above, Mr. Potash confirms that "one of [the]" methods of digital rights management software utilized by OverDrive is Adobe Digital Editions. Potash Dep. Tr. 81:1–82:5. But the deposition testimony does not confirm that each of the "Plaintiffs use" this same software. *Id.* Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs admit they lend books via OverDrive's technical systems (see, e.g., Plaintiffs' Statement of Material Facts ("PSMF") ¶ 161, ECF No. 107).  And as noted in the asserted fact, OverDrive's CEO testified that one of the methods of digital rights management ("DRM") OverDrive uses to lend Plaintiffs' books is Adobe Digital Editions.

34.     The Adobe DRM allows only the authorized patron to download and read the borrowed book using authorized software and prevents the patron from copying or further distributing the book or from accessing it after their loan has ended.  Kahle Decl. ¶ 25.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

35.     The Internet Archive does not digitally loan all books it has scanned. Instead, it implements a number of policies that limit the books available for digital lending.  *Id*. ¶ 26.

**Plaintiffs' Response:**  Undisputed for the purposes of this motion only, subject to the clarification that the only current "polic[y]" is that Internet Archive claims to not post books published within the last five years, which is a non-binding policy that it intermittently violates. McN Decl. ¶35. The Statement is also vague and lacks foundation. No admissible evidence is cited to support the Statement the IA "implements a number of policies that limit the books available for digital lending. Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' additional "clarification" and their statement that the asserted fact is "vague" is not a denial of the asserted fact.  Plaintiffs' statement that the asserted fact "lacks foundation" and that "[n]o admissible evidence is cited" is incorrect, as the asserted fact cites to the Declaration of Brewster Kahle in support, *see* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4), and in context the "number of policies" are outlined in the following paragraphs of the Internet Archive's 56.1 Statement.

36.     As applicable here, to be available for digital lending, a digital book must have been scanned from a print copy owned by the Internet Archive.  Kahle Decl.  ¶ 27.

**Plaintiffs' Response:**  Disputed.  The Internet Archive makes ebooks available for digital lending based on print books that are owned by and in the physical possession of its Partner Libraries, not the Internet Archive. McN Decl. ¶¶67-68, 103. Since the Internet Archive

began directing its efforts towards the Open Libraries Project in 2018, the Internet Archive now acts as a central hub lending a single ebook scan against physical books owned by Partner Libraries via the Open Libraries Process. *Id*. Furthermore Open Libraries Director Chris Freeland acknowledged that the Website may contain books that were scanned from the collections of libraries like the Boston Public Library, and not Internet Archive's collection. *Id*. ¶43.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs offer no evidence that any of the Works in Suit were not scanned from a print copy owned by the Internet Archive.  *See* Local Civil Rule 56.1(d).

37.     It is the Internet Archive's policy not to lend books published within the previous five years.  Gratz Decl. Ex. B ¶¶ 113, 123 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, with the clarification that the Internet Archive does not always comply with its voluntary and non-binding five year limitation. For example, two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the Internet Archive's Website that same year.  McN Decl. ¶¶35,  115.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

38.     This limitation is intended to exclude from lending the latest bestsellers, as a belt-and-suspenders accommodation to publishers.  Kahle Decl. ¶ 28.

**Plaintiffs' Response:**  Undisputed, but not material and vague as to the meaning of "a belt-and-suspenders accommodation to publishers."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "vague" is not a denial of the asserted fact.

39.    Dr. Imke Reimers analyzed revenue patterns of works on the USA Today Top 150 Bestsellers List. Declaration of Imke Reimers submitted herewith ("Reimers Decl.") Ex. 1 ¶¶ 9, 20–24 (Reimers Expert Rpt.).

**Plaintiffs' Response:**  Undisputed that Dr. Reimers purported to analyze the USA Today Top 150 Bestseller List but disputed that these rankings are equivalent to revenue. Declaration of Jeffrey T. Prince dated September 2, 2022 ("Prince Decl."), ¶¶29, 60.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs do not dispute that Dr. Reimers analyzed the USA Today Top 150 Bestseller List. Plaintiffs' purportedly dispute that "these rankings are [not] equivalent to revenue" is not the asserted fact; rather, the asserted fact is that Dr. Reimers analyzed "revenue ***patterns***."  As Dr. Reimers explains in her reply report, unit sales and revenues are very closely related. Declaration of Imke Reimers ("Reimers Decl.") Ex. 2 ¶¶ 14–15, ECF No. 109-2 ("Reimers Reply Rpt.") (emphasis added).

40.    Between 1994 and 2021, only 21% of the book appearances on the USA Today weekly bestseller list first appeared at least 52 weeks earlier.  *Id.* ¶¶ 9, 21–24.

**Plaintiffs' Response:**  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

41.     Between 1994 and 2021, only 8% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than two years earlier.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Plaintiffs' Response:**  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

42.     Between 1994 and 2021, only 2% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than five years earlier.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Plaintiffs' Response:**  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

43.     For titles that enter the Top 150 bestseller list, approximately 90% of sales occur in the first five years after publication.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Plaintiffs' Response:**  Disputed, but not material and misleading because this Statement suggests that the Publishers are only concerned with sales in the first five years after publication of a book and conflates unit sales and revenues.  The Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works.  SUMF¶¶38-62; *see also* Prince Decl. ¶81. This Statement is also misleading and lacks foundation because Dr. Reimers only purported to analyze bestseller list data going back to 1994 and her analysis thus does not have any relevance to book sales before that date. Expert Report of Imke Reimers, Ph.D., ECF 109-1 ("Reimers Report"), ¶ 9.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs purport to dispute the asserted fact—that 90% of bestsellers' sales occur in the first five years after publication—but offer no evidence from the record to dispute that fact.  *See* Local Civil Rule 56.1(d).  Rather, Plaintiffs state that the asserted fact is "not material" and "misleading" for reasons irrelevant to the asserted fact, and thus do not deny the asserted fact. Finally, Plaintiffs' statement that the asserted fact "lacks foundation" is incorrect:  Dr. Reimers explains in her report that, because of her lack of "access to granular sales data for a large set of individual titles over a long period of time," she reached her conclusion by analyzing twenty-eight years of available data and comparing her findings with sales data produced by Plaintiffs. Reimers Decl. Ex. 1 ¶¶ 20–28, ECF No. 109-1 ("Reimers Expert Rpt.").

44.     Books published by HarperCollins that are less than a year old account for between 37% and 40% of all units sold between 2017 and 2019 and 34% in 2020. Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. D (HC0030132).

**Plaintiffs' Response:**  Disputed.  *See* Prince Decl. ¶81; Prince Decl. Ex. 1 ("Prince Report") ¶¶109-115. This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute this fact.  Dr. Prince, in his expert report, accepts these calculations as correct (and uses them to support his own calculations).  Declaration of Jeffrey T. Prince ("Prince Decl.") Ex. 1 ¶ 111 n.288, ECF No. 167-01 ("Prince Report").  Plaintiffs' statement that the asserted fact is "misleading" and "not material" is not a denial of the asserted fact, nor are Plaintiffs' statements relevant to the asserted fact as explained in the Internet Archive's reply to Plaintiffs' Response to Paragraph 43.

45.     Books published by Penguin Random House that are less than a year old account for between 47% and 52% of all units sold between 2017 and 2019 and 43% in 2020. Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. E (PRH0072194).

**Plaintiffs' Response:**  Disputed.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115. This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute this fact.  Dr. Prince, in his expert report, accepts these calculations as correct (and uses them to support his own calculations).  Prince Report ¶ 111 n.288.  Plaintiffs' statement that the asserted fact is "misleading" and "not material" is not a denial of the asserted fact, nor are Plaintiffs' statements

relevant to the asserted fact as explained in the Internet Archive's reply to Plaintiffs' Response to Paragraph 43.

46.     Books published by Hachette that are less than two years old account for between 70% and 73% of all units sold between 2017 and 2019 and 65% in 2020.  Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. F (HACHETTE0012377).

**Plaintiffs' Response:**  Disputed.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115. This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute this fact.  Dr. Prince, in his expert report, accepts these calculations as correct (and uses them to support his own calculations).  Prince Report ¶ 111 n.288.  Plaintiffs' statement that the asserted fact is "misleading" and "not material" is not a denial of the asserted fact, nor are Plaintiffs' statements relevant to the asserted fact as explained in the Internet Archive's reply to Plaintiffs' Response to Paragraph 43.

47.     Based on the available data, most of the Works in Suit behave consistently with the patterns of the works on the USA Today Top 150 Bestsellers List in that sales drop off quickly after publication and most sales occur within five years after a book is published. Reimers Decl. Ex. 1 ¶¶ 9, 21, 26–28 (Reimers Expert Rpt.); *Id.* Ex. 2 ¶¶ 10, 11 (Reimers Reply Rpt.).

**Plaintiffs' Response:** Disputed and lacks foundation.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115. Reimers does not do an analysis of each Work in Suit concerning its sales starting from the years since it was first published. Reimers Report ¶ 27.  And the record evidence shows that Works in Suit include numerous perennial sellers – like *Catcher in the Rye,*

*The Lion, the Witch, and the Wardrobe, The Bell Jar, Little House on the Prairie, Lord of the Flies, The House on Mango Street,* or *Song of Solomon,* for example – that have generated significant income far beyond the first few years after publication. Declaration of Ben Sevier, ECF 92 ("Sevier Decl."), ¶¶34-38; Declaration of Chantal Restivo-Alessi, ECF 94 ("R-A Decl.") ¶¶6, 63-68. Thus it is erroneous to claim that the majority of sales revenue for most of the Works in Suit takes place within five years after a book is published when a book remains available for purchase in subsequent years and generates significant sales in subsequent years. The claim that "most sales" of a particular book "occur within five years after a book is published" ignores the fact that some books continue to have sales for many decades, or that some books spike later in their life cycle (such as lesser-known books made into movies or early undiscovered works by later successful authors). Prince Report ¶110. Backlist titles, including titles originally published more than five years ago, in the aggregate, are significant drivers of Plaintiff Publishers' revenue and business model and represent economic incentives that are necessary to encourage publication and dissemination of new creative works.  Prince Report ¶111.  Additionally, vague as to the meaning of "most of the Works in Suit."

**<u>Internet Archive's Reply</u>**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statements in response—that "some books" continue to sell many decades after they are published, that "some books" spike later, and that backlist titles are important to Plaintiffs' bottom lines—does not contradict the Internet Archive's asserted fact, supported by expert analysis, that based on the available data, for most of the Works in Suit, sales drop off quickly after publication and most sales occur within the first five years after a book is published.  That Plaintiffs consider "most of the Works in Suit" "vague" is not a denial of the asserted fact.

48.     Peak sales for most titles occur within one to two years after the date of the first publication of the title. Reimers Decl. Exs. 1 ¶¶ 20, 28 (Reimers Expert Rpt.) & 2 ¶¶ 9–15 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Disputed.  It is erroneous to claim that the majority of sales peak within one to two years of first publication when a book remains available for purchase in subsequent years. The claim that "[p]eak sales" of a particular book "occur within one to two years after the date of the first publication of the title" ignores the fact that some books continue to have sales for many decades, or that some books spike later in their life cycle (such as lesser-known books made into movies or early undiscovered works by later successful authors). Weber Decl. ¶¶30-32; R-A Decl. ¶¶59-68; Sevier Decl. ¶¶34-38. Backlist titles, including titles originally published more than five years ago, in the aggregate, are significant drivers of Plaintiff Publishers' revenue and business model and represent economic incentives that are necessary to encourage publication and dissemination of new creative works.  *Id.*  Additionally, this Statement is vague as to the meaning of "most titles."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statements in response—that "some books" continue to sell many decades after they are published, that "some books" spike later, and that backlist titles are important to Plaintiffs' bottom lines—does not contradict the Internet Archive's asserted fact, supported by expert analysis, that peak sales for "most titles" occur within one to two years of first publication.  That Plaintiffs consider "most titles" "vague" is not a denial of the asserted fact.

49.     As a result of human error, two Works in Suit published in 2019—*All the President's Women: Donald Trump and the Making of a Predator* and *The Man Who Solved the*

*Market*—were made available for digital lending. The mistake was rectified as soon as the Internet Archive realized the error.  Kahle Decl. ¶ 29.

**Plaintiffs' Response:**  Undisputed, with the clarification that Internet Archive "realized the error" only after this action was filed identifying the Works in Suit referenced above. Compl., Ex. A.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

50.   Two factors determine the number of digital copies of a particular book that can be borrowed at any given time from the Digital Lending Library.  *Id.* ¶ 30.

**Plaintiffs' Response:**  Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

51.   First, the Internet Archive makes available one digital copy for each non-circulating print copy of a book it has in archival storage. *Id.* ¶ 31; Gratz Decl. Ex. B ¶ 130 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

52.   Second, for any of those books the Internet Archive has made available for CDL, the Internet Archive works with dozens of library partners – from the University of Arizona to the Delaware County District Library in Ohio – to contribute their own non-circulating copies of that book toward the number of lendable copies.  Even if a partner library has multiple copies of a particular book, the Internet Archive counts only one additional copy per library.  Kahle Decl. ¶ 32; Gratz Decl. Ex. B ¶¶ 130, 141 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but incomplete and with the clarification that Internet Archive does not take physical possession or ownership of the matching print edition in the Partner Library's collections, and Internet Archive acknowledges that it has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously" – and Internet Archive has not put in place any technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating. McN Decl. ¶¶68, 107. And lacks foundation with respect to the claim that Delaware County District Library in Ohio is a Partner Library because it was not disclosed as such in response to relevant interrogatory requests. McN Decl. Ex. 114, Interrogatory No. 12. The Statement is also misleading because early iterations of the Open Library Project increased lending counts according to the total number of physical books of a given title in the library's collection, not by one book per library only.  McN Decl. ¶¶65-67.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and addition of a "clarification" are not denials of the asserted fact.  Further, Plaintiffs' own expert witness, Dr. Ian Foster, acknowledges that Delaware County District Library in Ohio is a partner library.  *See* Foster Decl. ¶¶ 83–84, Figure 8, ECF No. 90.

53.     For example, if the Internet Archive has one non-circulating physical copy of *Little House on the Prairie*, and three partner libraries have each chosen to contribute a physical copy of *Little House on the Prairie*, then the Internet Archive would loan *Little House on the Prairie* to up to four patrons at a time.  Each concurrent loan would thus still be associated with one non-circulating physical copy.  If all four copies of *Little House on the Prairie* were checked

out, patrons seeking to borrow *Little House on the Prairie* could join a waitlist until one or more copies were checked back in.  Kahle Decl. ¶ 33.

**Plaintiffs' Response:**  Undisputed except Publishers dispute that "each concurrent loan would thus still be associated with one-noncirculating physical copy." Internet Archive has not put in place any technical measures to ensure that "[e]ach concurrent loan would thus still be associated with one non-circulating physical copy;" specifically, the Internet Archive has not put in place any technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating – and it has acknowledged that it has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously."  McN Decl. ¶107.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs do not genuinely dispute that the Internet Archive's partner libraries contribute non-circulating copies toward its lending program (¶ 52, above).  While the Internet Archive may not know each of its library partners' circulation statuses at all times, Plaintiffs offer no evidence that an Internet Archive loan was associated with a circulating copy at a partner library.  *See* Local Civil Rule 56.1(d).

54.     Many libraries other than the Internet Archive digitally loan print books. *See, e.g.*, HathiTrust, *Emergency Temporary Access Service*, at https://www.hathitrust.org/ETAS-Description (describing a system by which more than 200 academic libraries enabled digital lending of books in their physical collections during the COVID-19 pandemic); Carnegie Mellon University Libraries, *Introducing Controlled Digital Lending*, at https://www.library.cmu.edu/about/news/2020-10/introducing-controlled-digital-lending

(describing use of CDL at Carnegie Mellon); Michigan State University Libraries, *Controlled Digital Lending at Michigan State University*, at https://www.slideshare.net/BaltimoreNISO/weller-and-lndsay-case-study-on-implementation-of-cdl (describing use of CDL at Michigan State); Caltech Library, *Implementing Controlled Digital Lending as a Core Library Service*, at https://www.cni.org/wp-content/uploads/2021/03/CNI_Implementing_Davison.pdf (describing use of CDL at Caltech); National Information Standards Organization, *Interoperable System of Controlled Digital Lending*, at https://www.niso.org/standards-committees/is-cdl (describing standards body's work to establish technical standards for "CDL as a natural extension of existing rights held and practices undertaken by libraries for content they legally hold"); Project ReShare, *Project ReShare and Stanford Libraries Launch Controlled Digital Lending Implementers Group*, at https://librarytechnology.org/pr/25314 (describing organization for librarians working to implement CDL in their respective libraries).

     **Plaintiffs' Response:**  Undisputed that "libraries other than the Internet Archive digitally loan print books" but disputed that the Internet Archive's activities are the same as those followed by the libraries referenced in this Paragraph. *See* Suppl. McN Decl. ¶12. This Statement is further misleading because the websites cited in this Statement reflect that these programs are each limited to lending from collections of university libraries and provide access only to members of those universities and, in some cases, restrict lending to limited course materials; additionally, the cited programs were specifically implemented in response to access issues precipitated by the COVID-19 pandemic, not in the regular course of business. *Id*. This Statement is also vague with respect to the phrase "many libraries."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' manufactured dispute that "the Internet Archive's activities are the same as those followed by the libraries referenced in this Paragraph" is irrelevant to the asserted fact. Plaintiffs' statements that the asserted fact is "misleading" and "vague" are not denials of the asserted fact.

55.     Digital lending is particularly helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, and patrons who have print disabilities that make it more difficult to hold or read print books.  Kahle Decl. ¶ 34.

**Plaintiffs' Response:**  Undisputed, but not material because the vast majority of Internet Archive users are not print disabled (less than 0.2% of the accounts currently registered with the Website are for print disabled people, and the needs of print disabled readers are already served by HathiTrust), and because Internet Archive does not target users in particular geographic locations (it admits that whenever an ebook it checked out on its website, it does not know the geographic location of the person who checked out that ebook). McN Decl. ¶¶ 122-23. Also not material because Internet Archive's "digital lending" does not provide efficiencies in delivering ebook content "for brief or spontaneous access to books" that do not otherwise exist through the Publishers' existing library ebook market , which Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶ 9.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

56.     Digital lending is also particularly helpful for brief or spontaneous access to books – for example, for checking citations or references, or looking up discrete facts – that wouldn't be worth a trip to a brick-and-mortar library.  *Id.* ¶ 35.

**Plaintiffs' Response:**  Undisputed, but not material and incomplete because Internet Archive's "digital lending" does not provide efficiencies in delivering ebook content "for brief or spontaneous access to books" that do not otherwise exist through the Publishers' existing library ebook products, which are available via a market that Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶9.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "incomplete" is not a denial of the asserted fact.

57.    The International Federation of Library Associations and Institutions has observed, in its position statement on the subject, that CDL "has helped to fulfil the mission of libraries to support research, education and cultural participation within the limits of existing copyright laws." Gratz Decl. Ex. G (https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf).

**Plaintiffs' Response:**  Undisputed, but with the clarification that the document cited in the Statement above is not specifically directed at the Internet Archive's activities. Gratz Decl. Ex. G. Furthermore, this document states that "[c]ontrolled digital lending provides an alternative to a licensing approach, and so a means of redressing the balance" – which provides additional support for the Publishers' argument that the Internet Archive offers a competing substitute which will result in potential lost revenue from licensing ebooks to consumers in the Publishers' commercial market and to patrons in the Publishers' library markets. *Id*.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

58.     Digital lending also allows the Internet Archive to promote education, research, preservation, and scholarship.  Kahle Decl. ¶ 36.

**Plaintiffs' Response:**  Undisputed, but incomplete and not material because Internet Archive's "digital lending" does not "promote education, research, preservation, and scholarship" in any way that is not already promoted through the Publishers' existing library ebook products, which are available via a market that Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶9.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

59.     Writers use books they have borrowed from the Internet Archive as a resource for inspiration or research for their own works. Declaration of Laura Gibbs submitted herewith ("Gibbs Decl.") ¶¶ 5, 8.

**Plaintiffs' Response:**  Undisputed, but incomplete and not material because authorized library ebook versions of the Works in Suit and other titles available through the Publishers' authorized ebook market, which Internet Archive's own expert testified is "thriving" and "has increased in recent years" (McN Decl. ¶9), equally serve "as a resource for inspiration or research."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

60.     The Internet Archive has made knowledge resources like Wikipedia more reliable by enabling readers to confirm that books cited as authorities actually support the encyclopedia's entries.  Kahle Decl. ¶ 37.

**Plaintiffs' Response:**  Undisputed, but incomplete and not material because this is not the primary use or function of Internet Archive's Website and the Wikipedia links are sufficiently peripheral that the Internet Archive completely neglected to mention them in its December 2021 interrogatory responses where it stated the basis for its fair use defense. Suppl. McN Decl. Ex. 1. Additionally, vague as to the meaning of "resources like Wikipedia" because this Paragraph only references Wikipedia and no other "resources" or websites.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

61.     In 2019, with funding from the U.S. Department of the Interior, the Internet Archive digitized and made available books related to the incarceration of Japanese Americans during World War II.  *Id.* ¶ 40.

**Plaintiffs' Response:**  Undisputed, but incomplete and immaterial to the extent that Internet Archive obtained permission from the copyright owner to digitize any of the materials referenced above.  *See* Kahle Decl. Ex. 10.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

62.     The Wikipedia article on the Internment of Japanese Americans currently cites and links to 20 books available via CDL from the Internet Archive. *Id.* & Ex. 9 at 70 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Plaintiffs' Response:**  Undisputed, but not material because this is not the primary use or function of Internet Archive's Website and the Wikipedia links are sufficiently peripheral that the Internet Archive completely neglected to mention them in its December 2021 interrogatory responses where it stated the basis for its fair use defense.  Suppl. McN Decl. Ex. 1.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

63.     There are 202,026 citations in Wikipedia articles in English that link to books available to borrow from the Internet Archive via CDL, and those links lead to 88,284 different books. Kahle Decl. ¶ 39 & Ex. 9 at 1 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Plaintiffs' Response:**  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

64.     The Wikipedia article on World War II cites, and links to, 48 different CDL books. Kahle Decl. ¶ 38 & Ex. 9 at 2–4 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Plaintiffs' Response:**  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

65.     A partial listing of the CDL books cited in Wikipedia articles, limited to articles that cite 10 or more such books, goes on for more than three hundred single-spaced pages. Kahle Decl. Ex. 9 at 1-337 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Plaintiffs' Response:**  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

66.     In 2022, a group of volunteer librarians curated collections of books that have been censored by school districts across the country but are still borrowable from the Internet Archive.  Kahle Decl. ¶ 44.

**Plaintiffs' Response:**  Undisputed, with the clarification that the citation in the Statement should be to Kahle Decl. ¶41 (not ¶44), but not material because books cited in the article supporting the above Statement (Kahle Ex. 11) are available as authorized ebooks – including *The Glass Castle*, *The Hunger Games*, *Beyond Magenta: Transgender Teens Speak Out* and *Catch-22*.  Suppl. McN Decl. ¶ 15.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" and statement that the asserted fact is "not material" is not a denial of the asserted fact.

67.     At the beginning of the COVID-19 pandemic, and for many months thereafter, most schools and libraries were physically closed to prevent the spread of the coronavirus. Gratz

Decl. Exs. H (https://www.ala.org/pla/issues/covid-19/march2020survey) & I
(https://www.edweek.org/leadership/map-coronavirus-and-school-closures-in-2019-
2020/2020/03).

**Plaintiffs' Response:**  Undisputed, but vague with respect to "many months."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.
Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

68.     School districts reached out to the Internet Archive concerned that students and
teachers could no longer physically access books – including hundreds of copies of assigned
books that the school had already purchased.  Kahle Decl. ¶ 42.

**Plaintiffs' Response:**  Undisputed for the purposes of this motion only, but not
admissible. This proposed "fact" is not supported by admissible evidence, in violation of Local
Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  That
school districts reached out to the Internet Archive is supported by the Declaration of Brewster
Kahle, *see* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).  Further, the school districts' expressed
concerns are being offered for their effect on the Internet Archive and on Mr. Kahle.

69.     Libraries reached out to the Internet Archive worried about how they could best
serve their communities when they could not physically loan out millions of print books now
locked away.  *Id.* ¶ 43.

**Plaintiffs' Response:**  Undisputed for the purposes of this motion only but not
admissible.  This proposed "fact" is not supported by admissible evidence, in violation of Local
Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  That school districts reached out to the Internet Archive is supported by the Declaration of Brewster Kahle, *see* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).  Further, the school districts' expressed concerns are being offered for their effect on the Internet Archive and on Mr. Kahle.

70.  By the Internet Archive's estimation – based on data from the federal Institute of Museum and Library Services – the closure of libraries took 650 million books out of circulation.  *Id.* ¶ 44.

**Plaintiffs' Response:**  Undisputed, but with the clarification that "650 million books" refers only to print books, because ebooks may be downloaded for free by library patrons anywhere there is an internet connection, including during the start of the pandemic when many public libraries were closed to the public. Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

71.  Hearing these pleas, the Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio. Since all of the libraries were closed, the Internet Archive reasoned, there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place.  Kahle Decl. ¶ 45.

**Plaintiffs' Response:**  Undisputed that "Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio." Whether "all of the libraries were closed" or whether there were "more non-circulating copies locked up … than would be borrowed via the Internet Archive" is unsubstantiated speculation and is not a material fact.  And the issue of

whether "there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place" is a legal conclusion inappropriate for a Rule 56.1 statement, and must therefore be disregarded. *See Nadel*, 57 F. Supp. 3d at 293 n. 6.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  As Mr. Kahle explains in his declaration, the Internet Archive was in close contact with school districts and libraries, and he therefore had a basis for understanding that each of those libraries was closed, preventing physical access to physical books.  Kahle Decl. ¶¶ 42–45.  That was the Internet Archive's "reason[]" for proposing temporarily lifting the technical controls enforcing its one-to-one ratio.  Further, whether there were more non-circulating library copies than Internet Archive borrows is not a legal conclusion; if it were truly in question, it would be an issue of fact.

72.  The Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently.  *Id.* ¶ 46.

**Plaintiffs' Response:**  Undisputed that Internet Archive put in place a program intended to "address this problem quickly[,]" but whether or not "[t]he Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently" is unsubstantiated speculation and is not a material fact.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' claim that the asserted fact is "unsubstantiated speculation" is incorrect, as it is supported by the Declaration of Brewster Kahle, the Chair and Digital Librarian of the Internet Archive.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

73.     Adam Silverman, one of HarperCollins's Rule 30(b)(6) designees, testified that it took a month – from April to May of 2020 – to negotiate a pandemic-related special request with the Chicago Public School System. Gratz Decl. Ex. J, Deposition Transcript of Adam Silverman ("Silverman Dep. Tr.") 270:6–273:14.

**Plaintiffs' Response:**  Undisputed, but incomplete and misleading because the deposition testimony and the exhibit displayed during this portion of testimony (Exhibit 264, HC0015518) reflects that HarperCollins responded attentively to the special request. Suppl. McN Decl. Ex. 17. Indeed, after HarperCollins secured permission from the relevant authors, the aggregator negotiating on behalf of the school district responded with additional demands and even apologized for the delay, which was not caused by HarperCollins. *See id.* at HC0015523 ("Hi Adam, Thank you so much for your patience in waiting to hear from CPS.").

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.  Further, the evidence Plaintiffs point to (Suppl. McNamara Decl. Ex. 17, HC0015518, ECF No. 166-17) shows that, while the Chicago Public School system may have caused a delay of a few days, the entire process of negotiating and securing permissions for them took HarperCollins an entire month, in part because of delays caused by HarperCollins itself.

74.     The Internet Archive launched the National Emergency Library ("NEL") on March 24, 2020, intending for this program to "run through June 30, 2020, or the end of the US national emergency, whichever is later."  Kahle Decl. ¶ 47 & Ex. 12.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

75.     Prior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement, and more than 100 institutions signed a statement in support of the National Emergency Library.  Kahle Decl. ¶ 48 & Ex. 7.

**Plaintiffs' Response:**  Undisputed, with the clarification that the citation above should be to Kahle Decl. Ex. 13 (not Ex. 7), that "more than 100 institutions signed a statement in support of the National Emergency Library" but disputed that "[p]rior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement," because this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  That the Internet Archive consulted with schools and libraries for their input and endorsement prior to the launch of the National Emergency Library is supported by the Declaration of Brewster Kahle. *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

76.     There was also widespread public support, including, for example, an article written by Jill Lepore in *The New Yorker* titled, "The National Emergency Library Is a Gift to Readers Everywhere."  Gratz Decl. Ex. K.

**Plaintiffs' Response:**  Undisputed that the Internet Archive accurately references the title of an article published by *The New Yorker*, but disputed that the National Emergency Library had widespread public support because the evidence shows that the Internet Archive was aware that there were "copyright concerns" about the National Emergency Library, and groups including the U.S. Register of Copyrights, authors, advocacy organizations that support the rights and interests of authors, and librarians across the United States made public statements or sent private messages to Internet Archive questioning the legality of the National Emergency Library.

McN Decl. ¶¶130-142. Further, the article published in *The New Yorker* is inadmissible for the truth of statements referred to therein, as it is an out-of-court statement by a non-party in violation of Local Rule 56.1(d) and thus must be disregarded for that purpose.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  That there were individuals and entities that purport to have questioned the legality of the National Emergency Library is not a denial that there was "widespread public support."  Further, that Ms. Lepore's article is titled "The National Emergency Library Is a Gift to Readers Everywhere" is not introduced for the truth that the NEL was a gift to readers, but rather for the fact that Ms. Lepore's article demonstrates positive sentiment toward the NEL, including Ms. Lepore's then-existing state of mind.

77.  The Internet Archive believed then, and believes now, that under those unique circumstances, operating the NEL was fair use.  Kahle Decl. ¶ 49.

**Plaintiffs' Response:**  Disputed.  The facts show that Internet Archive believed or had reason to believe that the NEL was not fair use. McN Decl. ¶¶77-109. The ultimate question of whether the Internet Archive's activities actually did constitute fair use is a legal conclusion inappropriate for a Rule 56.1 statement, and any suggestion that the NEL was fair use as a matter of fact must be disregarded.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  None of the purported evidence cited to by Plaintiffs demonstrates that the Internet Archive believed that the NEL was not fair use.  That the ultimate question of whether the Internet Archive's activities actually constituted fair use is irrelevant.

78.  The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries.  *Id.* ¶ 50.

**<u>Plaintiffs' Response:</u>**  Disputed.  The question of whether the NEL "benefitted teachers, students, researchers, and readers" is a legal question subsumed by the fair use inquiry, as is the question of whether the NEL "benefits" the individuals listed above by striking the balance necessary to achieve the Copyright Act's purpose of incentivizing the creation and dissemination of books. Such a legal conclusion is inappropriate for a Rule 56.1 statement. *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014). Moreover, whether or not "The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries" is unsubstantiated speculation and is not a material fact.

**<u>Internet Archive's Reply</u>**:  Plaintiffs do not genuinely dispute the asserted fact. Whether the NEL benefited teachers, students, researchers, and readers is not a legal conclusion. Nor is it unsubstantiated, as it is supported by evidence within and attached to the Declaration of Brewster Kahle (¶¶ 51–51).  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

79.     When the University of Oklahoma campus shut down in spring of 2020, students no longer had access to physical library books.  Gibbs Decl.  ¶ 4.

**<u>Plaintiffs' Response:</u>**  Undisputed, but incomplete and not material because campus lockdowns did not affect the availability of authorized ebooks available to students through the University of Oklahoma collections.  Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

**<u>Internet Archive's Reply</u>**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

80.    Humanities instructor Laura Gibbs relied on the Internet Archive to provide her students access to books she had placed on reserve at the campus library before the pandemic closures.  *Id.*

**Plaintiffs' Response:**  Undisputed, but incomplete because books cited by Laura Gibbs including Divakaruni's *Palace of Illusions*, *Neela: Victory Song* and *The Conch-Bearer* – are all available as authorized library ebooks. Suppl. McN Decl. ¶16.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" is not a denial of the asserted fact.

81.    Through her use of the Internet Archive, Ms. Gibbs discovered additional relevant books for her students that were not otherwise available through the University of Oklahoma library system.  *Id.* ¶ 5.

**Plaintiffs' Response:**  Undisputed, but incomplete for the same reasons set forth in the Publishers' Response to Statement 80, which is incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" is not a denial of the asserted fact.

82.    Ms. Gibbs has since retired from teaching but regularly writes about African folktales available to borrow through the Internet Archive.  *Id.* ¶ 7.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

83.    Half of English teacher Lauren Sherman's tenth grade students had left their copies of the Folger edition of *Much Ado About Nothing* in their lockers, which they were forbidden from accessing after the pandemic started. Declaration of Lauren Sherman submitted herewith ("Sherman Decl.") ¶ 7.

43

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

84.      In addition to giving students the option to re-purchase the book or to attempt to access their local public library's digital collection, Ms. Sherman was able to direct them to an online version to borrow through the Internet Archive.  *Id*.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

85.      When his university library shut down, Daniel Smith, a Ph.D. student at the University of Cambridge, similarly could not access the books he needed to write his dissertation.  Declaration of Daniel Smith submitted herewith ("Smith Decl.") ¶4.

**Plaintiffs' Response:**  Undisputed that Smith could not access physical books from Cambridge University libraries when those facilities were closed, but incomplete and misleading because Smith testified that at least one book he accessed through Internet Archive for his dissertation was available as authorized ebooks through Cambridge University's library network. McN Decl. ¶121, Ex. 165 (Smith Tr. 73:4-77:16).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.

86.      Mr. Smith turned to the Internet Archive, where he was able to borrow primary and secondary source material and complete his dissertation on time.  *Id*. ¶ 5.

**Plaintiffs' Response:**  Undisputed that Smith accessed materials for his dissertation via Internet Archive's website, but incomplete and misleading because Smith testified that at least one book he accessed through Internet Archive for his dissertation was available as authorized

ebooks through Cambridge University's library network. McN Decl. ¶121, Ex. 165 (Smith Tr. 73:4-77:16).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.

87.     Benjamin Saracco is a librarian at a hospital library affiliated with a medical school in New Jersey that serves doctors, nurses, medical students, and other healthcare workers. Declaration of Benjamin Saracco submitted herewith ("Saracco Decl.") ¶7.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

88.     In March 2020, the governor ordered buildings, including academic libraries, to be closed.  *Id.* ¶ 8.

**Plaintiffs' Response:**  Undisputed, but the Publishers object that this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The asserted fact is supported by the Declaration of Benjamin Saracco, a librarian at a hospital library affiliated with a medical school in New Jersey.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

89.     Mr. Saracco received a flood of requests from students, nurses, and doctors for information about COVID-19 and relevant patient care to address the high rate of hospitalization in the state. *Id.* ¶ 9.

**Plaintiffs' Response:**  Undisputed that Mr. Saracco stated that he received "multiple requests" for the *Student Manual for Basic Life Support* and the *Advanced Cardiac Life Support*

*Provider Manual* in the declaration cited in Statement 89, but the Publishers object that this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Saracco Decl. This Statement is also misleading because Mr. Saracco did not testify that the requests for these materials were, as a matter of fact, related to "COVID-19 and relevant patient care" or "to address the high rate of hospitalization in the state." *Id.* ¶8. Rather, Saracco testified that "[a]s a librarian I cannot know with certainty what our materials were ultimately used for in the hospital, but at the time, I was under the impression that healthcare workers that were requesting these materials might be using them to treat COVID-19 patients admitted to our affiliated hospital" – which lacks foundation and is pure speculation. *Id.*

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The asserted fact is supported by the Declaration of Benjamin Saracco, a librarian at a hospital library affiliated with a medical school in New Jersey.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4). Mr. Saracco specifically testified that he was "flooded with requests from medical students, nurses, and doctors for information during that time, particularly about COVID and COVID patient care to address the high rates of hospitalization in the state."  Saracco Decl. ¶ 8, ECF No. 102.  Plaintiffs' statement that the asserted fact is "misleading" is not a denial of the asserted fact.

90.     With no access to physical library materials, Mr. Saracco was able to direct doctors and nurses to patient care training manuals, such as the *Basic Life Support for Healthcare Providers and the Advanced Cardiovascular Life Support Provider Manual*, available for borrowing from the Internet Archive via CDL. *Id.*

**Plaintiffs' Response:**  Undisputed, but incomplete and misleading because Basic Life Support is available as an authorized ebook and Benjamin Saracco testified that the Advanced

Cardiovascular Life Support Provider Manual was available as an authorized ebook and, to hisknowledge, his library never requested permission to provide free or discounted access during the pandemic.  Suppl. McN Decl. Ex. 15 (Saracco Tr. 252:18-257:21).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.

91.     Dozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time.  Kahle Decl. ¶ 51 & Exs. 14–17.

**Plaintiffs' Response:**  Undisputed, but whether or not "[d]ozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time" is not a material fact.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not a material fact" is not a denial of the asserted fact.

92.     The largest number of concurrent loans for any Work in Suit was for *The Lion, The Witch, and the Wardrobe*, which had at most 888 concurrent loans. That figure represents the sum of the peak concurrent loan numbers for each of the editions of that book which were available for borrowing. Gratz Decl. Ex. B ¶ 196; *id.* at Ex. T3 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but misleading because this figure incorporates data from the calendar year 2020, not just the period when the NEL was active.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "misleading" is not a denial of the asserted fact.

93.     There are over 9,000 public library systems in the United States alone. *Id.* Ex. L (https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

94.     Virtually every library was closed during the NEL.  *Id.*

**Plaintiffs' Response:**  Undisputed that many physical libraries were closed to physical visitors during the NEL, but with the clarification that "[v]irtually every library was closed during the NEL" is misleading because libraries maintained their digital presence during the NEL and made authorized ebooks available to be downloaded for free by library patrons anywhere there is an internet connection. Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

95.     More than 888 public libraries in the United States have a copy of *The Lion, the Witch, and the Wardrobe*.  Gratz Decl. Ex.  Ex. M (https://www.worldcat.org/title/lion-the-witch-and-the-wardrobe/oclc/28291231).

**Plaintiffs' Response:**  Undisputed, but inadmissible because Exhibit M to the Gratz Declaration is not admissible for the truth of the referenced statement, in violation of Local Rule 56.1(d), as it is an out-of-court statement by a non-party (*i.e.*, hearsay). Additionally, this Statement is misleading because Exhibit M to the Gratz Declaration appears to only concern physical copies of *The Lion, the Witch and the Wardrobe*, and does not account for authorized ebook copies.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The records of OCLC WorldCat regarding library catalogs are records of a regularly conducted activity (i.e., library cataloging) that fall into the hearsay exception of Fed. R. Evid. 803(6), and is also a "list[] . . . generally relied on by . . . persons in particular occupations," here the occupation of librarianship, under Fed. R. Evid. 803(17).

96.     Although the NEL was slated to end on June 30, 2020, the Internet Archive shut it down two weeks early – on June 16, 2020 – after this lawsuit was filed.  Kahle Decl. ¶ 52.

**Plaintiffs' Response:**  Undisputed, but with the clarification that in a blog post announcing the creation of the NEL, the Internet Archive stated that the NEL "will run through June 30, 2020, or the end of the US national emergency, whichever is later."  McN Decl. Ex. 168.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

97.     The Plaintiffs are among the largest and most profitable book publishers in the United States. Gratz Decl. Ex. N, Deposition Transcript of Skip Dye ("Dye Dep. Tr.") 369:20–370:7; *see also id.* Ex. O (https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/72889-ranking-america-s-largest-publishers.html).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

98.     In recent years, Plaintiffs' profits have increased. Gratz Decl. Ex. Exs. P–R (Excerpt of Bertelsmann 2018, 2019, 2021 Annual Reports), Exs. S–T (Excerpts of Wiley 2020, 2021 Form 10-K), Ex. U–V (Excerpts of News Corp. 2019, 2021 Annual Report), Ex. W–Y (Excerpts of Lagardere 2018, 2020, 2021 Registration Document).

**Plaintiffs' Response:**  Undisputed, but not material and vague with respect to "recent years."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "vague" is not a denial of the asserted fact.

99.      In 2020 and 2021, the publishing industry as a whole enjoyed record profits for electronic and physical formats of books. Gratz Decl. Ex. Z ("*A Year for the (Record) Books in Publishing*" describing 2020 profits), Ex. AA ("*America's Biggest Publishers Keep Posting Profits*" describing 2021 profits); Ex. BB ("*In Surprise Ending for Publishers: In 2020, Business Was Good*" describing 2020 profits).

**Plaintiffs' Response:**  Undisputed, but not material.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

100.      When the four Plaintiffs filed suit against the Internet Archive in June of 2020, they selected the Works in Suit.  Compl. Ex. A, ECF No. 1-1.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

101.      The Works in Suit include non-fiction and fiction works and works from many genres (fantasy, children's, psychology, science, sports, biography, and others).  *Id.* ¶¶ 21, 22.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

102.      All of the Works in Suit were published prior to being digitized and loaned by the Internet Archive. Kahle Decl. ¶ 28 (all of the Works in Suit were made available for borrowing

after lawfully acquired – bought or donated – new or used physical copies of the Works in Suit were digitized and the Internet Archive does not acquire physical copies of books that have not been published); *see also* Compl. ¶¶ 6, 21, ECF No. 1.

**Plaintiffs' Response:**  Undisputed, but with the clarification that it is not clear how it would be practically feasible for the Internet Archive or any other entity to "digitize[] and loan[]" a book before that book is "published" and that Kahle has publicly stated that the Website should ultimately make "the bulk of unpublished things … universally accessible." McN Decl. Ex. 49, p. 2 (punctuation omitted).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

103.    Plaintiffs sell physical copies of books to libraries and to readers.  *See* Gratz Decl. Ex. CC, Deposition Transcript of Josh Marwell ("Marwell Dep. Tr.") 59:3–9.

**Plaintiffs' Response:**  Undisputed, but with the clarification that Plaintiffs do not sell physical books to libraries directly but rather via wholesalers.  Weber Decl. ¶43.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

104.    Plaintiffs license electronic copies of books ("ebooks") to libraries and readers. Gratz Decl. Ex. C, Potash Dep. Tr. 141:20–142:9.

**Plaintiffs' Response:**  Undisputed, but with the clarification that the Plaintiffs do not license ebooks to libraries directly; rather, the Publishers enter into agreements with aggregators (*i.e.*, distributors) such as OverDrive, who in turn license the ebooks to libraries and manage the relevant platforms.  McN Decl. ¶11; R-A Decl. ¶75; Sevier Decl. ¶ 42 n.2.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

105.    Licensed ebooks are distributed to patrons of libraries that have purchased licenses via "aggregators."  Gratz Decl. Ex. N, Dye Dep. Tr. 36:20–37:8; 86:14–18.

**Plaintiffs' Response:**  Undisputed, with the clarification that library ebook aggregators license the Publishers' ebooks to libraries according to set terms and conditions designed to enforce the various models that each Publisher has selected for that market, including terms that permit the Publishers to exercise control over the digital files to set the limited extent of usage, which is determined in relation to the pricing, as well as terms that limit reproduction, distribution, and that reinforce the requirements for digital rights management software to prevent piracy.  Weber Decl. ¶44.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

106.    There are multiple licensing structures for ebooks. One is a "one copy/one user" or "perpetual access" model that allows libraries to lend out one copy at a time to patrons for a discrete period of time, with no expiration from the licensing libraries' digital collection. Gratz Decl. Ex. C, Potash Dep. Tr. 49:4–50:2; *id.* Ex. N, Dye Dep. Tr. 120:22–121:7.

**Plaintiffs' Response:**  Undisputed that there are multiple licensing structures for ebooks and that one is a "one copy/one user" structure that allows libraries to lend out one copy at a time to one patron at a time for a discrete period of time. A license obtained under the "one copy/one use" model can have a perpetual term or a metered term, including a time-limited term Further, the same clarification about license terms set forth in the Publishers' Response to Statement 105 applies and is incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs do not support the rest of their response with any evidence in the record.  *See* Local Civil Rule 56.1(d).

107.    The "perpetual access" model is not currently in use by Hachette, HarperCollins, or Penguin Random House for ebooks made available through aggregators to public libraries. ECF No. 92 ¶¶ 61, 65 (Declaration of Ben Sevier); ECF No. 94 ¶¶ 30, 32 (Declaration of Chantal Restivo-Alessi); ECF No. 95 ¶¶ 69, 75 (Declaration of Jeffrey Weber); Gratz Decl. Ex. C, Potash Dep. Tr. 50:3–53:9.

**Plaintiffs' Response:**  Undisputed, with the clarification that HarperCollins, Penguin Random House, and Hachette each ceased offering a perpetual term to public libraries in 2011, 2018, and 2019, respectively.  R-A Decl. ¶¶30- 32; Weber Decl. ¶¶71-75; Sevier Decl. ¶65.

Accordingly, any time a public library purchased an ebook with a perpetual license term pursuant to the licensing terms offered by HarperCollins, Penguin Random House, and Hachette up until 2011, 2018, and 2019, respectively, that library continues to maintain the title in its collection and may lend it to patrons on a one-copy, one-user basis in perpetuity. *See* Sevier Decl. ¶68.  The Publishers further state that Hachette, HarperCollins, and Penguin Random House each currently offer a one-copy, one-user model with a perpetual term to academic libraries because academic libraries have different needs and lending patterns than public libraries, and that Wiley maintains a one-copy, one user model with perpetual access for its trade books that it makes available to all libraries as ebooks, including public libraries.  Sevier Decl. ¶68; R-A Decl. ¶40; Weber Decl. ¶77; Declaration of Alan Pavese, ECF 93 ("Pavese Decl."), ¶¶5, 25-26.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

108.     Another type of license is metered access by time. Under this model, a library has the ability to loan an ebook to patrons for a discrete period of time, commonly two years, to an ebook title.  Gratz Decl. Ex. C, Potash Dep. Tr. 44:17–24.

**Plaintiffs' Response:**  Undisputed, with the same clarifications about license terms set forth in the Publishers' Response to Statement 105 and 106, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of "clarifications" is not a denial of the asserted fact

109.     Another type of license is metered access by the number of check-outs, commonly twenty-six checkouts. Under this model, a library has the ability to loan an ebook to patrons until that copy of an ebook has been borrowed twenty-six times. *Id.*

**Plaintiffs' Response:**  Undisputed, with the clarification that library ebook aggregators license the Publishers' ebooks to libraries according to set terms and conditions designed to enforce the various models that each Publisher has selected for that market, including twenty-six circulation model. Weber Decl. ¶44. These terms permit the Publishers to exercise control over the digital files to set the limited extent of usage, which is determined in relation to the pricing, as well as terms that limit reproduction, distribution, and that reinforce the requirements for digital rights management software to prevent piracy.  *Id.*; R-A Decl. ¶¶21-23.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact

110.     Plaintiffs do not sell ebooks to libraries outright.  Kahle Decl. ¶ 53.

**Plaintiffs' Response:**  Undisputed, but with the clarification that the Publishers understand the term "sell . . . outright" to mean the sale of "non-encrypted" files without any contractual preconditions on their further use. *See* McN Decl. ¶12. The Publishers – together with other book publishers, music, and movie companies – cannot agree to those terms because providing digital platforms with unprotected files – with no technical security measures or legally binding agreement limiting the purchaser's use of the file – invites unrestricted copying and distribution of the files, with predictably devastating results on the market for that work. Sevier Decl. ¶¶42-43, 61-64; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23. Unrestricted digital files are not sold commercially or to libraries. *Id*. Further, the Internet Archive has identified only a handful of publishers that have agreed to sell ebook files on these terms – the literary press 11:11 and the affiliated anarchist publishers PM Press and AK Press – and has cited no documentary evidence to establish that Internet Archive's purchase of those materials amounts to an "outright" sale.  McN Decl. Ex. 5 (Kahle Depo. Tr. 139:23-140:12).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact

111.    The Internet Archive purchases ebooks from publishers who are willing to sell them outright (rather than license them).  *Id.*

**Plaintiffs' Response:**  Undisputed, but not material and subject to the clarifications set forth in the Publishers' Response to Statement 110, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and addition of "clarifications" are not denials of the asserted fact

112.    The Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them).  *Id.* ¶ 54.

**Plaintiffs' Response:**  Undisputed with the same clarification regarding the term "purchase" as provided for the term "sell" in Statement 110, but not material and with the objection that whether "[t]he Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them)" is purely hypothetical and not admissible.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and addition of "clarifications" are not denials of the asserted fact.  That the Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them) is supported by the Declaration of Brewster Kahle, *see* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4), its founder, Digital Librarian, and Chair and is neither hypothetical nor inadmissible.

113.    Plaintiffs have declined each time the Internet Archive has asked to buy ebooks. *Id.* ¶ 55.

**Plaintiffs' Response:**  Undisputed with the same clarification regarding the term "buy" as provided for the term "purchase" in Statement 112, but not material and subject to the clarifications set forth in the Publishers' Response to Statement 110, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of "clarifications" and statement that the asserted fact is "not material" are not denials of the asserted fact

114.    The ███ aggregator is OverDrive, which has about ███ of the market share of the library ebook market in the United States.  Gratz Decl. Ex. C, Potash Dep. Tr. 196:5–12.

**Plaintiffs' Response:**  Undisputed that OverDrive is the largest library ebook aggregator for public libraries.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

115.    One of the ways OverDrive offers ebooks for reading is through its Libby application.  *See* https://www.overdrive.com/apps/libby; Gratz Decl. Ex. C, Potash Dep. Tr. 82:19–24.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

116.    From March 2017 until March 23, 2020 (*i.e.*, prior to the NEL), the number of checkouts of the Works in Suit from the Internet Archive was ████ of the number of checkouts of the Works in Suit from OverDrive. Declaration of Rasmus Jørgensen submitted herewith ("Jørgensen Decl.") Ex. 1 ¶ 36 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster); *id.* Ex. DD (OverDrive_Supp_002).

**Plaintiffs' Response:**  Undisputed for purposes of this motion only that, on average, the number of checkouts of the Works in Suit by Internet Archive was ████ of the number of checkouts of the Works in Suit from OverDrive, one of several library ebook aggregators, for the time period cited above, but (a) there was significant variability in this percentage among the Works in Suit; (b) percentages such as this mask absolute numbers; (c) during this time period, Internet Archive had fewer members, borrows and concurrent copies available to loan than it does currently; (d) if CDL were legal and became more widespread, the percentage of checkouts on Internet Archive as compared with OverDrive would substantially increase, as would the impact on the Publishers; and (e) this Statement is not material to the ultimate issue of whether

the Publishers suffered market harm, including but not limited to in the form of lost revenue

from ebook licenses. *See* Prince Decl., *passim*; The Publishers' Memorandum of Law in

Opposition to Internet Archive's Motion for Summary Judgment ("Publishers' Opposition

Brief"), Section V. It is also not material because it is no defense to copyright infringement for

the infringer to argue that its infringing copies make up only a small proportion of some market

or customer segment. *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 568 (1985)

("[T]o negate fair use one need only show that if the challenged use should become widespread,

it would adversely affect the potential market for the copyrighted work.) (internal quotations and

citation omitted).

     **Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs' additional statements in response are not denials of the asserted fact.

     117.    Looking at data from 2017-2020, which includes the period of time when the

NEL was operational, the total loan volume of Works in Suit from the Internet Archive was

████████████ of the number of OverDrive checkouts for the Works in Suit.  Jørgensen Decl.

Ex. 1 ¶¶ 8, 35 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs.

T5 & T6 (Suppl. Expert Rpt. of Ian Foster).

     **Plaintiffs' Response:**  Undisputed for purposes of this motion only that, on average, the

number of checkouts of the Works in Suit by Internet Archive was ████████ of the number of

checkouts of the Works in Suit from OverDrive, one of several library ebook aggregators, for the

time period cited above, but the Publishers object to this Statement as non- material and

misleading for the reasons set forth in their Response to Statement 116, which are incorporated

herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' additional statements in response are not denials of the asserted fact.

118.    The expert reports of Drs. Reimers and Jørgensen conclude that the Internet Archive's lending practices had no negative effect on the market for the Works in Suit. Jørgensen Decl. Ex. 1 ¶ 8 (Jørgensen Expert Rpt.); Reimers Decl. Ex. 1 ¶ 9 (Reimers Expert Rpt.).

**Plaintiffs' Response:**  Disputed.  As a preliminary matter, neither Dr. Reimers nor Dr. Jorgensen reached an actual conclusion that "Internet Archive's lending practices had no negative effects on the market for the Works in Suit." *See, e.g.*, Expert Report of Rasmus Jorgensen, ECF 108-1 ("Jorgensen Report") ¶ 8; Reimers Report, Section D.; Prince Decl. Ex. 3 (Reimers Tr. 178) (conceding that her "study of the Amazon print sales rankings in [her] expert report" is a statistical analysis that does not "definitively prove anything."); Prince Decl., Section III(C).

The Publishers further dispute and object to the expert opinions set forth in Statement 118 because they are inadmissible, and must therefore be disregarded for violating Local Rule 56.1(d), for the following reasons (which are henceforth referred to, collectively, as the "Expert Opinion Objection"). The Publishers dispute any expert opinion in the above paragraph that purports to establish that Internet Archive did not inflict market harm on the Publishers or impair the value of their copyrights in the Works in Suit or any other book. The expert opinions of Dr. Jorgensen and Dr. Reimers are inadmissible because, *inter alia*, they are unreliable and based on insufficient facts and impermissibly flawed principles and methods (which also have not been reliably applied), for all the reasons set forth in the Prince Declaration and the Publishers' Opposition Brief (Section V), including but not limited to the failure to adequately

control for other factors. In the event of a trial, the Publishers will file a *Daubert* motion to strike the opinions of Dr. Jorgensen and Dr. Reimers under Federal Rule of Evidence 702.  *See, e.g.*, *City of Providence v. Bats Global Markets*, 2022 WL 902402 at *12-13 (S.D.N.Y. 2022); *Lamarr- Arruz v. CVS Pharmacy*, 2017 WL 4277188 at *10 (S.D.N.Y. 2017); *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 at *10-11 (S.D.N.Y. 2014). Further, while the Publishers do not dispute the record facts regarding Internet Archive "loans" of the Works in Suit, OverDrive check-outs of the Works in Suit, Hachette sales records or verified Amazon print rankings of the Works in Suit on which the Internet Archive's experts base their analysis, the conclusions of the IA experts regarding whether or not the Internet Archive had a causal impact on the Publishers' sales and check-outs are merely opinions and not facts suitable for a Rule 56.1 Statement. See, e.g., *Goris v. Breslin*, 2009 U.S. Dist. LEXIS 57108, at *3 (S.D.N.Y. July 6, 2009) (for the purposes of deciding summary judgment, this "court's reliance on … experts' affidavit is limited to the undisputed facts"); Local Rule 56.1(d); Prince Decl. Ex. 4 (Reimers Tr. 178:4-13) (testimony from Dr. Reimers conceding that her "study of the Amazon print sales rankings in [her] expert report" is a statistical analysis that does not "definitively prove anything.").

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

First, both experts conclude that the Internet Archive's lending practices had no negative effect on the market for the Works in Suit.  *See* Reimers Expert Rpt. ¶ 9 ("I have reached the following conclusion[] . . . [there is] no evidence that the decrease in [ebook] sales and revenues was spurred by the operation of the Internet Archive's digital lending program"); *id.* ("I have reached the following conclusion[] . . . I find no evidence that availability of [the Works in Suit] for borrowing from the Internet Archive's digital lending program depressed book sales of print

books through other channels."); Declaration of Rasmus Jørgensen ("Jørgensen Decl.") Ex. 1 ¶¶ 8, 51, ECF No. 108-01 ("Jørgensen Expert Rpt.") ("Therefore, the evidence is not consistent with Plaintiffs' theory that IA's loan volume of the Works-in-Suit reduced digital lending through OverDrive").  The fact that the Internet Archive's experts made these conclusions is a fact appropriate for a Rule 56.1 statement.

Second, those conclusions are suitable for a Rule 56.1 statement.  *See Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 838 (S.D.N.Y. 2018) (rejecting argument, in motion to strike portions of Rule 56.1 statement, that expert opinions are inadmissible).  Further, Plaintiffs make no effort to properly exclude them for purposes of summary judgment.  Indeed, each of the cases Plaintiffs cites involves a motion to exclude.  *See City of Providence v. Bats Global Markets*, *Inc.*, 14-cv-2811 (JMF) 2022 WL 902402 (S.D.N.Y. March 28, 2022) (motion to exclude expert testimony filed simultaneously with motion for summary judgment); *Lamarr-Arruz v. CVS Pharmacy*, *Inc.*, 15-cv-04261 (JGK) 2017 WL 4277188 (S.D.N.Y. Sept. 26, 2017) (motion to exclude expert testimony filed simultaneously with motion for class certification); *In re Elec. Books Antitrust Litig.*, Nos 11MD 2293 (DCL), 12 Civ. 3394 (DLC), 2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) (motion to exclude expert testimony from consideration of class certification motion, summary judgment motion, and trial). Here, Plaintiffs make no motion to exclude.

Third, for the reasons set forth in Dr. Reimers' and Dr. Jørgensen's reply reports, Reimers Reply Rpt. ¶¶ 1–20; Jørgensen Decl. Ex. 2 ¶¶ 10, 17–40, ECF No. 108-02 ("Jørgensen Reply Rpt."), Dr. Prince's methodological criticisms are unfounded.

119.    Dr. Reimers analyzed the change of the Amazon rankings of the Works in Suit relative to when each edition of a Work in Suit was made available for lending through the NEL. Reimers Decl. Ex. 1 ¶¶ 36–54 (Reimers Expert Rpt.).

**Plaintiffs' Response:**  Undisputed that Dr. Reimers purported to analyze the change of the Amazon print book rankings of the Works in Suit relative to when each edition of a Work in Suit was made available for lending through the NEL, but incomplete and misleading to the extent that it suggests that Dr. Reimers reliably measured the change or the impact on relevant markets. Prince Decl. Sections III(A) and III(C). The Publishers also clarify that Dr. Reimers opined that she "cannot conclude that the NEL had either a positive or negative effect on the Amazon sales rankings of print editions" since she found earlier seasonal trends with similar size effects for the Works in Suit. Reimers Report ¶¶51-53. Further, the Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in this Statement 119 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.  Further, Plaintiffs' purported clarification does not dispute the asserted fact. Finally, Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

120.    Amazon rankings are a good proxy for the market for print sales because using ranking data controls for factors that affect the physical book retail market as a whole and

because Amazon makes up at least 50% of the market share for print books.  Reimers Decl. Ex. 1
¶¶ 35, 36, 41–43 (Reimers Expert Rpt.).

      **<u>Plaintiffs' Response:</u>**  Disputed but not admissible and not material.  Amazon rankings
for print books of the Works in Suit are not relevant to the ultimate issue of whether IA
negatively affected revenue from licensing and sales to U.S. libraries and consumers. This
Statement is also incomplete and misleading because Dr. Reimers did not perform any analysis
to justify her belief that Amazon print book rankings "are a good proxy" for the market for print
sales and fails to account for the fact that unit sales are not interchangeable with revenue figures.
Prince Decl. ¶60; Prince Decl. Ex. 4 (Reimers Tr. 122-24, 126-28). Further, the Publishers assert
the Expert Opinion Objections from their Response to Statement 118, and incorporate them by
reference herein, and object that the expert opinions set forth in Statement 120 are inadmissible –
and should be disregarded pursuant to Local Rule 56.1(d).

      **<u>Internet Archive's Reply</u>**:  Plaintiffs do not genuinely dispute the asserted fact.
Plaintiffs' contention that Amazon rankings are "not relevant" is not a denial of the asserted fact.
Plaintiffs' statements that the asserted fact is "incomplete" and "misleading" is not a denial of
the asserted fact.  Finally, Plaintiffs' "Expert Opinion Objections from their Response to
Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that
statement, which is incorporated here.

      121.    When editions of the Works in Suit were first made available for borrowing from
the Internet Archive via CDL, their corresponding print sales at retail did not decline relative to
other books.  Reimers Expert Rpt. ¶¶ 10, 38, 47.

      **<u>Plaintiffs' Response:</u>**  Disputed but inadmissible.  The Publishers assert the Expert
Opinion Objections from their Response to Statement 118, and incorporate them by reference

herein, and object that the expert opinions set forth in Statement 121 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Further, this Statement is not an accurate summary of Dr. Reimers cited expert report. Dr. Reimers did not reach an actual conclusion on this measure and her range of likely results included a harmful impact on the Works in Suit's Amazon print sales rankings after they were first made available for borrowing from the Internet Archive via CDL. Prince Decl. ¶¶59-60; *see also* Reimers Report ¶¶ 38, 46 ("[W]e cannot say with certainty" whether people buy fewer or more copies after a Work is uploaded).

**Internet Archive's Reply**:  Plaintiffs' do not genuinely dispute the asserted fact.  The asserted fact accurately summarizes Dr. Reimers' finding of "no evidence that availability of these titles for borrowing from the Internet Archive's digital lending program depressed book sales of print books through other channels."  Reimers Expert Rpt. ¶ 10.  Finally, Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

122.    When the Works in Suit were removed from the Internet Archive after this lawsuit was filed, their print sales slightly worsened relative to other books. Reimers Decl. Ex. 1 10, 38, 49, 50 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 122 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Further, this Statement mischaracterizes Dr. Reimer's cited report, in which she only examined Amazon print rankings (not print sales) and only claimed that she found "some (weak) evidence that taking the Works in Suit off the Internet Archive hurt the Amazon sales rankings of their print editions slightly."  Reimers Report

¶10). Further, this Statement is also not material because Amazon rankings for print books are not relevant to the ultimate issue of whether IA negatively affected revenue from print sales and do not directly translate into revenue.

**Internet Archive's Reply**:  Plaintiffs' do not genuinely dispute the asserted fact.  The asserted fact accurately summarizes Dr. Reimers' conclusion.  *See* Reimers Expert Rpt. ¶ 49 ("[T]he estimated rankings drop (worsen) almost immediately after the book's removal from the Internet Archive.  That is, when the book are no longer available on the Internet Archive, ***their unit sales at Amazon decrease relative to other books***.") (emphasis added).  Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

123.    Historical Amazon data is only publicly available for print books – not for ebooks. Reimers Decl. Ex. 1 nn.33, 36 (Reimers Expert Rpt.); *id.* Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Undisputed for purposes of this motion only that Amazon does not make the same historical ranking data publicly available for ebooks as it does for print books, but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

124.    Because there is not publicly available commercial performance data about ebooks, and because Plaintiffs declined to produce the monthly performance data the Internet

Archive requested, Dr. Reimers was unable to make similar calculations regarding the sales of consumer ebooks.  Reimers Decl. Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Undisputed that Dr. Reimers did not perform an analysis based on publicly available consumer ebook data, but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement. Further, the Publishers dispute that Dr. Reimers was unable to perform calculations regarding the impact of the Internet Archive on the Publishers' commercial ebooks because of any failure on their part to produce any documents. The Internet Archive voluntarily agreed to withdraw its request for additional monthly data. *See* Suppl. McN Decl. ¶9; *id*. Ex. 8, p. 9 ("We are pleased to inform the Court that, subject to meaningful compliance with the agreements reached, which are memorialized in a separate document, the parties have resolved the various issues identified in the Letter Motions, together with related discovery disputes."). This Statement is also incomplete and misleading because a comparison by Dr. Reimers of the commercial performance of the Works in ebook form before a particular date with the commercial performance after that date would not demonstrate whether the market for a particular Work in Suit was harmed by the Internet Archive given the inability of Internet Archive's experts to impose sufficient controls to discount extraneous factors and account for the fact that the sales of every book are unique. Prince Decl. ¶¶35-86.  Any suggestion that the Publishers improperly deprived Internet Archive of necessary data is further misleading because Internet Archive obtained voluminous data about both the Works as well as "books other than the Works in Suit" published by the four Plaintiff Publishers and by other book publishers that partner with OverDrive from a third-party subpoena to OverDrive; specifically, the Internet Archive received data reflecting monthly revenues and digital checkouts

for the Works in Suit and more than 300 other books as well as checkout figures for current
OverDrive public and academic library customers located in the United States, on an annualized
basis for each year from 2010 through 2020, and on a monthly basis for each month in the
calendar year 2020.  Suppl. McN Decl. Ex. 7.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.
Plaintiffs' statements that the asserted fact is "not material," "incomplete," and "misleading" is
not a denial of the asserted fact.  Plaintiffs' sole dispute concerns whether Plaintiffs failed to
produce monthly data requested by the Internet Archive, and Plaintiffs' account is incorrect, as
explained in the Internet Archive's reply brief at II.A.4.c.iii.

125.    The Internet Archive requested monthly commercial performance data for the
Works in Suit for the time period from 2011 to 2020. Def.'s Req. for Pre-motion Disc. Conf. at
3, ECF No. 47.

**Plaintiffs' Response:**  Undisputed, but not material, incomplete and misleading for the
reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by
reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.
Plaintiffs' statement that the asserted fact is "not material, incomplete, and misleading" is not a
denial of the asserted fact.

126.    Plaintiffs declined to produce the requested monthly data. Pls.' Resp. to Req. for
Pre-motion Disc. Conf. at 3 n.1, ECF No. 49.

**Plaintiffs' Response:**  Undisputed that the Publishers "declined to produce the requested
monthly data," but incomplete and misleading because Publishers had "already produced
monthly sales data from Hachette for 2020," because producing the requested information would

have been extremely burdensome due to the fact that the Publishers did not keep their data in the form requested and because the Publishers had already produced a vast wealth of detailed sales and related financial data. Suppl. McN Decl. Ex. 8, pp. 5-7. This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete," "misleading," and "not material" is not a denial of the asserted fact.

127.    Each book began to be available for digital lending on a particular known date, so having monthly commercial performance data would allow a comparison of the commercial performance before that particular date with the commercial performance after that date. Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

**Plaintiffs' Response:**  Disputed but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement. This Statement is also incomplete and misleading because "a comparison of the commercial performance before that particular date with the commercial performance after that date" would not demonstrate whether the commercial ebook market for a particular Work in Suit was harmed given the inability of Internet Archive's experts to impose adequate controls to discount extraneous factors or account for the fact that the sales of every book are unique.  Prince Decl. ¶¶35-86; Weber Decl. ¶28.

This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statements that the asserted fact is "not material," "incomplete," and "misleading" is not a denial of the asserted fact.  Further, Plaintiffs do not address—let alone dispute—the fact as stated:  that monthly commercial performance data (from before and after a particular date) would allow a comparison of that data before and after that date.  Whether or not that comparison demonstrates what Plaintiffs contend is irrelevant to the asserted fact.

128.   Hachette was the only Plaintiff to produce monthly data for all of its Works in Suit, but Hachette only produced this data for 2020. Hachette produced annual data for 2015 to 2019. Gratz Decl. ¶ 43; *see also* Gratz Decl. Ex. JJ (HACHETTE0002474) & Ex. KK (HACHETTE0002475).

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

129.   For its Works in Suit, HarperCollins produced annual data for 2017 to 2020. Gratz Decl. ¶ 44; *see also* Gratz Decl. Ex. LL (HC0010272).

**Plaintiffs' Response:**  Undisputed that HarperCollins produced annual data at least for 2017 to 2020, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

130.    For its Works in Suit, Penguin Random House produced annual data for 2010 to 2020.  Gratz Decl. ¶ 45; *see also* Gratz Decl. Ex. MM (PRH0025907).

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

131.    For its Works in Suit, Wiley produced annual data for 1996 to 2020.  Gratz Decl. Ex. 46; *see also* Gratz Decl. Ex. NN (WILEY0005650).

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

132.    The Internet Archive requested data about the commercial performance of all Plaintiffs' books, broken down by month, since 2011. Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47.

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

133.    This data would allow a comparison of the commercial performance of books that were available for digital lending with books that were not available for digital lending. *Id.*

**Plaintiffs' Response:**  Disputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs claim to dispute the asserted fact but offer no evidence in the record to do so. *See* Local Civil Rule 56.1(d).  Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

134.    Plaintiffs refused to provide data about books other than the Works in Suit. Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47; Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 1, 3, ECF No. 49.

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

135.    The Internet Archive requested that Plaintiffs produce monthly commercial performance data about a set of books Plaintiffs regarded as comparable to the Works in Suit, but Plaintiffs refused.  Gratz Decl. ¶ 42.

**Plaintiffs' Response:**  Undisputed, but incomplete and misleading because the Publishers' declined to produce the requested data because that would be "burdensome in the extreme" and "irrelevant" given the reality that, "since books are not fungible widgets," there "is no such thing as a 'comparable book.'" Suppl. McN Decl. Ex. 8, p. 6. This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete," "misleading," and "not material" is not a denial of the asserted fact.

136.    The National Emergency Library provided an opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit.  Reimers Report ¶¶34, 35, 37; Jorgensen Report ¶49.

**Plaintiffs' Response:**  Undisputed that the National Emergency Library provided a potential opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit but only (a) under the then-current level of usage of the IA's Website and (b) if the study were done in a reliable fashion,

including by accounting for other factors affecting the market for each Work in Suit. *See* Prince Decl. ¶¶76-85.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

137.   Dr. Reimers observed the Amazon rankings for the Works in Suit relative to when the NEL was launched. Reimers Decl. Ex. 1 ¶¶34, 48–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶3–8 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  This Statement is essentially identical to Statement 119 and the Publishers' Response thereto is incorporated by reference here.

**Internet Archive's Reply**:  The Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 119.

138.   The Amazon rankings for the Works in Suit improved by approximately 2% at the time the NEL was launched. The Amazon rankings held steady while the NEL was in effect. Then, around the time that most Works in Suit were removed from the Internet Archive, the rankings reverted to their pre-NEL levels.  However, the Works in Suit behaved similarly the year prior at the same time of the year.  In sum, the Amazon rankings of the Works in Suit did not undergo a statistically significant decrease relative to when the NEL was launched. Reimers Decl. Ex. 1 ¶¶ 51–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 138 above are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Further, this Statement misrepresents the findings in Dr. Reimers' cited Expert Report and Reply Expert Report regarding her analysis of the impact of the NEL on the Amazon print rankings of the Works in Suit, including her

ultimate conclusion – which was that she "cannot conclude [based on this data] that the NEL had either a positive or a negative effect on the Amazon sales rankings of print editions." *See, e.g.*, Reimers Report ¶¶48-54.  This Statement is also incomplete and not material because Dr. Reimers merely observed Amazon rankings for print books of the Works in Suit, which are not relevant to the ultimate issue of whether IA negatively affected revenue from licensing and sales to U.S. libraries and consumers, including in ebook format.  Prince Decl. ¶¶29-34.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The asserted fact accurately characterizes Dr. Reimers' findings—including her ultimate conclusion that there is "no statistically significant evidence that a book's inclusion in the Internet Archive's lending library or the launch of the NEL hurt or harmed its sales on Amazon."  Reimers Expert Rpt. ¶ 55.  Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.  Finally, Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

139.    Dr. Reimers concluded that these observations signified that the NEL did not depress Plaintiffs' unit sales of physical formats of the Works in Suit.  Reimers Decl. Ex. 1 ¶¶ 10, 53 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Disputed but inadmissible, misleading, incomplete and not material for all the reasons set forth in the Publishers' Response to Statement 138, which are incorporated by reference herein, including the Expert Opinion Objections.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.  The Internet Archive incorporates its reply to Plaintiffs' response to paragraph

138, as well as its reply to Plaintiffs' "Expert Opinion Objections" from their response to paragraph 118.

140.    Dr. Jørgensen observed the change in OverDrive checkouts for the Works in Suit after the shutdown of the NEL and effective removal of the Works in Suit from the Internet Archive.  He observed that after the closure of the NEL, the number of OverDrive check-outs of the Works in Suit ████████████████████████████████████ ████████████████████████ Jørgensen Decl. Ex. 1 ¶¶ 49–53 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 17 (Jørgensen Reply Rpt.).

**Plaintiffs' Response:**  Undisputed that Dr. Jorgensen observed the OverDrive checkouts for the Works in Suit in June 2020, ███████████████████████████████████ ███████████████████████████████████████, but the Publishers dispute any implication that Dr. Jørgensen established that this result was caused by the Internet Archive's actions or the NEL. Further, this Statement is incomplete and misleading because, as Dr. Jørgensen admits, checkout frequency does not directly translate to revenue for library ebooks licenses, which are frequently based on a term of years or 24 circulations. Prince Decl. ¶¶29-33; Reply Expert Report of Rasmus Jorgensen, Ph.D, ECF 108-2 ("Jørgensen Reply"), ¶26; Prince Decl. Ex. 3 (Jørgensen Tr. 101:3-19). The Publishers also assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 140 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' dispute of "any implication" of the asserted fact and statements that the asserted fact is

"incomplete" and "misleading" are not denials of the asserted fact.  Finally, the Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 118 regarding admissibility.

141.    Dr. Jørgensen concluded that the evidence was not consistent with Plaintiffs' theory that the Internet Archive's loan volume of the Works in Suit reduced digital lending through OverDrive.  *Id.*

**Plaintiffs' Response:**  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 141 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs claim to dispute the asserted fact but offer no evidence in the record to do so.  *See* Local Civil Rule 56.1(d).  Finally, the Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 118 regarding admissibility.

142.    Dr. Jørgensen also analyzed whether the closure of the NEL impacted Hachette's book sales of the Works in Suit.  Jørgensen Decl. Ex. 1 ¶¶ 54–58 (Jørgensen Expert Rpt.).

**Plaintiffs' Response:**  Undisputed that Dr. Jorgensen purported to analyze whether the closure of the NEL impacted Hachette's paperback and ebook sales of their Works in Suit, but incomplete and misleading to the extent that it suggests that Dr. Jorgensen reliably analyzed the impact of the closure of the NEL on these sales.  Prince Decl. ¶¶35-53.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.

143.    Dr. Jørgensen was unable to analyze whether the closure of the NEL impacted all four of the Plaintiffs' sales of the Works in Suit because Hachette was the only Plaintiff – despite the Internet Archive's requests – to produce monthly sales data for 2020 for each of its Works in Suit. Jørgensen Decl. Ex. 1 ¶ 54 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 40 (Jørgensen Reply Rpt.); Gratz Decl. ¶¶ 42–46.

**Plaintiffs' Response:**  Undisputed that Dr. Jorgensen did not perform analysis based on monthly sales data for the Works in Suit published by PRH, HarperCollins or Wiley, but this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and "misleading" is not a denial of the asserted fact.

144.    When the Internet Archive shut down the NEL, Hachette did not see increases in paperback or ebook sales of the Works in Suit. Rather, Hachette's sales of the Works in Suit contracted approximately 21% between the second and third quarter of 2020 for paperbacks and approximately 29% between the second and third quarter of 2020 for ebooks. Jørgensen Decl. Ex. 1 ¶¶ 57–58 (Jørgensen Expert Rpt.).

**Plaintiffs' Response:**  The Statement recited above is disputed but inadmissible. The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 144 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Statement 144 also does not accurately summarize the content of the cited Jorgensen Expert Report.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs claim to dispute the asserted fact but offer no evidence in the record to do so.  *See* Local Civil Rule 56.1(d).  Rather, Plaintiffs point to the Jorgensen Expert Report, which supports the asserted fact, as it states:  between the second and third quarters of 2020, "the quarter-over-quarter decrease in Hachette's paperback sales of the Works-in-Suit was approximately 21 percent" and "Hachette's ebook sales of the Works-in-Suit decreased by about 29 percent between the second and third quarter of 2020." Jørgensen Expert Rpt. ¶¶ 57–58.  Finally, the Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 118 regarding admissibility.

145.    Dr. Jørgensen concluded this simultaneous contraction was not indicative that the Internet Archive's lending of Hachette's Works in Suit acted as market substitutes. Jørgensen Decl. Ex. 1¶¶ 57–58 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶¶ 17–18 (Jørgensen Reply Rpt.).

**Plaintiffs' Response:**  The Statement recited above is disputed but inadmissible. The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 145 above are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Statement 144 also does not accurately summarize the content of the cited Jorgensen Expert Report.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs claim to dispute the asserted fact but offer no evidence in the record to do so.  *See* Local Civil Rule 56.1(d).  Rather, Plaintiffs point to the Jorgensen Expert Report, which supports the asserted fact, as it states:  "the reduction in IA's loan volume following the closing of NEL happened at the same time as Hachette's paper back sales contracted, which is not indicative of

the 'substitution' effect purported by Plaintiffs" and "the reduction in IA's digital lending of the Works-in-Suit published by Hachette between the second and third quarter of 2020 was not associated with increased ebook sales to Hachette, as one would expect according to Plaintiffs' purported theory of 'competing substitutes.'"  Jørgensen Expert Rpt. ¶¶ 57–58.  Finally, the Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 118 regarding admissibility.

146.    Dr. Prince made no attempt to quantify the effect of the Internet Archive's digital lending on Plaintiffs. Gratz Decl. Ex. EE, Deposition Transcript of Jeffrey Prince ("Prince Dep. Tr.") 52:16–53:21, 54:9–16, 202:23–203:10, 230:3–8.

**Plaintiffs' Response:**  Undisputed that Dr. Prince did not perform a special damages analysis providing a specific monetary figure quantifying the extent of the harm created by Internet Archive's free ebooks website on the Plaintiffs, but Dr. Prince did "la[y] out the economic reasoning that [he] believes[s] points to it being detrimental, having harm" (Prince Decl. Ex 2 (Prince Tr. 203:7-10); *see also* Prince Decl. ¶¶15-19; Prince Report ¶¶54-65) and indicated that the harm would be substantial, including if Internet Archives practices scaled up or became widespread.  Prince Decl. ¶¶76-86; Prince Report ¶¶66-72. This Statement is also not material because the Publishers do not have the burden of proving market harm under the fourth factor, and market harm includes potential harm, including if the defendant's conduct were to become widespread.  17 U.S.C. §107; *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) ("Fair use is an affirmative defense" to copyright infringement and IA "bears the burden of proving it.").

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' assertion that the asserted fact is "not material" is not a denial of the asserted fact.

147.     Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues. Gratz Decl. Ex. N, Dye Dep. Tr. 106:3–107:13; *id.* Ex. FF, Deposition Transcript of Allison Lazarus ("Lazarus Dep. Tr.") 27:9–12; 38:12–22; *id.* Ex. GG, Deposition Transcript of Chantal Restivo-Alessi ("Restivo-Alessi Dep. Tr.") 224:7–225:9; *id.* Ex. HH, Deposition Transcript of Alan Pavese ("Pavese Dep. Tr.") 55:3–16.

**Plaintiffs' Response:**  Undisputed that the Plaintiffs did not perform a special damages analysis providing a specific monetary figure quantifying the extent of the harm created by Internet Archive's free ebooks website on Plaintiffs, but the filed Declarations of Jeffery Weber and Chantal Alessi-Restivo state that IA's failure to pay the Plaintiffs fees for its lending of ebooks amount to millions of dollars (Weber Decl. ¶84; R-A Decl. ¶¶70-71) and the Publishers all testified repeatedly they believe that Internet Archive harms their book sales based on extensive experience in the publishing field and common sense. *See, e.g.*, Suppl. McN Decl. Ex. 2 (R-A Tr. 141:3-141:11); *id* Ex. 3 (Weber Tr. 202:23-203:11, 205:22-206:9, 207:4-23, 214:3-24); *id* Ex. 4 (Pavese Tr. 51:11-54:24, 190:22-192:13); *id* Ex. 6 (Lazarus Tr. 48:3-51:23); Weber Decl. Ex. 26 (Dye Tr. 372:25-374:23). This Statement that "Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues" also misrepresents the Publishers' testimony. *See, e.g.*, Suppl. McN Decl. Ex. Ex. 6 (Lazarus Tr. 36:5-41:24). This Statement is also not material because the Publishers do not have the burden of proving market harm under the fourth factor, and market harm includes potential harm, including if the defendants conduct were to become widespread.  17 U.S.C.  §107; *TVEyes, Inc.*, 883 F.3d at 176.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  That the Publishers' representatives, none of whom were offered as experts, claim without support that the Internet Archive cost them "millions" or that their book sales were harmed does not

genuinely dispute the asserted fact that Plaintiffs made no attempt to quantify the effect of the

Internet Archive's digital lending on their revenues.  Nor does Plaintiffs' claim of misrepresented

testimony hold up—none of the cited deposition testimony of Ms. Lazarus demonstrates

Hachette attempting to quantify the effect of the ***Internet Archive's*** digital lending on their

revenues.  Finally, Plaintiffs' statement that the asserted fact is "not material" is not a denial of

the asserted fact.

148.    Even if you were to assume that CDL reduced the necessity of lending those

titles via licensed ebooks, and even if books more than five years old all became easier to

lend electronically through CDL for all libraries, libraries would not spend less money on

acquisitions. They would reallocate their spending away from ebook licensing for those titles

being accessed through CDL and would spend more on ebook licensing for newer titles or on

print books. Declaration of Susan Hildreth submitted herewith ("Hildreth Decl.") Ex. 1 ¶ 106

(Hildreth Expert Rpt.).

**Plaintiffs' Response:**  Undisputed that if books "became easier to lend electronically

through CDL for all libraries, … they would reallocate their spending away from ebooks

licensing for those titles being accessed through CDL." Disputed that "libraries would not spend

less money on acquisitions" and "would spend more on ebook licensing for newer titles or on

print books." Ms. Hildreth further testified that if a library were to forgo purchasing an ebook

license for a particular title because that title was available through CDL, the author and

publisher of that title would not receive the payment they would have received had the library

purchased an authorized edition – which means that authors and publishers would be harmed

even if the libraries reallocated money to purchasing other authorized ebooks. McN Decl. Ex. 19

(Hildreth Tr. 44:24-45:4). Ms. Hildreth also testified that libraries could reallocate budgets to

non-book purchases (*e.g.*, DVDs and games) and that discretionary acquisition budgets are constantly under pressure – which means that local authorities could reduce funding for acquiring books if CDL reduced demand for authorized ebooks. Suppl. McN Decl. Ex. 5 (Hildreth Tr. 198:23-203:25; 225:17-226:12).

The Publishers further dispute and object to disputed portions of the expert opinions of Ms. Hildreth set forth in Statement 148 *supra* because they are inadmissible, and must therefore be disregarded for violating Local Rule 56.1(d), for the following reasons.  The Publishers dispute any expert opinion in the above paragraph that purports to establish that Internet Archive did not inflict market harm on the Publishers or impair the value of their copyrights in the Works in Suit or any other book. Any such opinion from Ms. Hildreth is inadmissible because, *inter alia*, Ms. Hildreth lacks the expertise necessary to state an opinion about the conduct of all libraries nationwide and did not arrive at her conclusions by any kind of objective process, let alone the kind of sound methodology required for expert testimony.  Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Expert Report of Susan H. Hildreth, ECF 110-1 ("Hildreth Report"), ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion. And at her deposition, Ms. Hildreth testified that she did not have access to any relevant data from any of the 9,000 public library systems in the United States that could possibly support her specious conclusion.  Prince Decl. Ex. 5 (Hildreth Depo. Tr. 259:1-262:6). In the event of a trial, the Publishers reserve the right to file a motion to strike portions of Ms. Hildreth's expert reports under Federal Rule of Evidence 702. *See* Fed. R. Evid. 702(1) (expert testimony must be "based upon sufficient facts or data"); *Johnson Elec. N.Am. Inc. v. Mabuchi*

*Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000). Further, Ms. Hildreth's opinions

about whether or not the Internet Archive had a causal impact on the Publishers' sales and check-

outs are merely opinions and not facts suitable for a Rule 56.1 Statement.  See, e.g., *Goris v.*

*Breslin*, 2009 U.S. Dist. LEXIS 57108, at *3 (S.D.N.Y. July 6, 2009) (for the purposes of

deciding summary judgment, this "court's reliance on … experts' affidavit is limited to the

undisputed facts");  Local Rule 56.1(d).

**Internet Archive's Reply**:  Plaintiffs' dispute is a mischaracterization of Ms. Hildreth's

testimony that is not supported by the cited evidence, as explained in the Internet Archive's

response to Plaintiffs' 56.1 Statement (¶¶ 526, 602):

> Ms. McNamara asked: "Is it your expert opinion that libraries will
> spend less money on licensing the e-book editions of the particular
> titles that were provided through CDL?" Ms. Hildreth answered:
> "That is possible, yes, but whether it would ever in fact occur
> would depend on the circumstances." Later, when asked, "When a
> library acquires via CDL a series of books, they are not paying
> licenses for those works; isn't that right?" Ms. Hildreth testified:
> "They are not paying for CDL licenses when they receive or obtain
> content through CDL." Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr.
> 264:3-264:12; Gratz Opp'n Decl. Ex. 6, Hildreth errata.
>
> Ms. Hildreth also testified that she did not know whether the
> availability of books through the Internet Archive's Digital
> Lending Library had in fact had any effect on demand for e-book
> licenses and that she did not "have a view" on whether libraries
> would actually purchase fewer e-book licenses for titles it makes
> available through CDL. "I think it would be determined on a case-
> by-case basis depending on what the libraries' needs would be in
> terms of their collection." *See* Gratz Opp'n Decl. Ex. 5, Hildreth
> Dep. Tr. 257:1-258:6.

Further, Ms. Hildreth's opinions are suitable for a Rule 56.1 statement.  *See Olin Corp.*,

332 F. Supp. at 838 (rejecting argument, in motion to strike portions of Rule 56.1 statement, that

expert opinions are inadmissible).  As described in her expert reports, Ms. Hildreth has over

forty-eight years of library administration experience, including as the State Librarian of

California and the Director of the federal Institute of Museum and Library Services from 2011 to 2015, where she worked closely with and oversaw data collection about libraries.  Hildreth Ex. 1 ¶ 2, ECF No. 110-01.  "[E]xperience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Fed. R. Evid. 702, Advisory Committee's Note; *see also Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Finally, Plaintiffs make no effort to properly exclude Ms. Hildreth for purposes of summary judgment.  Indeed, each of the cases Plaintiffs cites involves a motion to exclude.  *See City of Providence*, 2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) (motion to exclude expert testimony filed simultaneously with motion for summary judgment); *Lamarr-Arruz*, 2017 WL 4277188 (S.D.N.Y. Sept. 26, 2017) (motion to exclude expert testimony filed simultaneously with motion for class certification); *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) (motion to exclude expert testimony from consideration of class certification motion, summary judgment motion, and trial). Here, Plaintiffs make no motion to exclude.

149.    With CDL in place in libraries throughout the United States, libraries would have additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products.  Hildreth Decl. ¶ 109.

**Plaintiffs' Response:**  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs cite to no evidence in the record in support of their dispute.  *See* Local Civil Rule 56.1(d).  Finally, Plaintiffs' admissibility objections are unfounded and incorrect for the reasons laid out in the Internet Archive's reply to Plaintiffs' response to paragraph 148.

150.    There have been no instances of a library paying for access to fewer ebook copies of a title – or buying fewer copies of a physical book for a title – where that title is available for borrowing through CDL, either from the IA or from another library.  *Id.* Ex. 2 ¶ 8 (Hildreth Reply Rpt.).

**Plaintiffs' Response:**  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs cite to no evidence in the record in support of their dispute.  *See* Local Civil Rule 56.1(d).  Finally, Plaintiffs' admissibility objections are unfounded and incorrect for the reasons laid out in the Internet Archive's reply to Plaintiffs' response to paragraph 148.

151.    Most libraries strive to spend their entire annual materials allocation within the fiscal year in which funds were allocated. In fact, it is highly unusual for a library not to spend the entire allocation each year.  *Id.* Ex. 1 ¶ 71 (Hildreth Expert Rpt.).

**Plaintiffs' Response:**  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein. This proposed "fact" is also not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Hildreth Report ¶7),

she does not cite to any study, data collection, or any other information to support this purely speculative conclusion.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs cite to no evidence in the record in support of their dispute.  *See* Local Civil Rule 56.1(d).  Finally, Plaintiffs' admissibility objections are unfounded and incorrect for the reasons laid out in the Internet Archive's reply to Plaintiffs' response to paragraph 148.

152.   Libraries help readers discover books – through purposeful searching as well as accident or "serendipity."  Readers can browse physical shelves of libraries and a library's online catalog.  Hildreth Decl. Ex. 1 ¶¶ 34, 35, 39 (Hildreth Expert Rpt.).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

153.   Libraries generally begin lending a book as soon as it is published.  Hildreth Decl. ¶ 5.

**Plaintiffs' Response:**  Disputed but not admissible.  Vague and lacks foundation. This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Hildreth Report ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion. This Statement is also incomplete and misleading because libraries continue to purchase books in paper and ebook editions long after first publication – as is the case with decades old Works in Suit such as *Their Eyes Were Watching God*, Catcher *in the Rye* and *Lord of the Flies*.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs cite to no evidence in the record in support of their dispute.  *See* Local Civil Rule

56.1(d).  Finally, Plaintiffs' admissibility objections are unfounded and incorrect for the reasons

laid out in the Internet Archive's reply to Plaintiffs' response to paragraph 148.

Dated:  October 7, 2022                    DURIE TANGRI LLP


By:                  */s/ Joseph C. Gratz*
                     Joseph C. Gratz (*Pro Hac Vice*)
                     Jessica E. Lanier (*Pro Hac Vice*)
                     Aditya V. Kamdar (*Pro Hac Vice*)
                     Annie A. Lee (*Pro Hac Vice*)
                     217 Leidesdorff Street
                     San Francisco, CA 94111
                     (415) 362-6666
                     jgratz@durietangri.com
                     jlanier@durietangri.com
                     akamdar@durietangri.com
                     alee@durietangri.com

                     ELECTRONIC FRONTIER FOUNDATION
                     Corynne McSherry (*Pro Hac Vice*)
                     Kit Walsh (*Pro Hac Vice*)
                     Cara Gagliano (*Pro Hac Vice*)
                     815 Eddy Street
                     San Francisco, CA 94109
                     (415) 436-9333
                     corynne@eff.org
                     kit@eff.org
                     cara@eff.org

                     Attorneys for Defendant
                     INTERNET ARCHIVE

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 7, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*Joseph C. Gratz*
_____
Joseph C. Gratz
