**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY SONS, INC., and PENGUIN RANDOM HOUSE LLC, : : : | |
| Plaintiffs, : | Case No. 1:20-cv-04160-JGK |
| -against- : | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive, : : | |
| Defendants. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFFS' RESPONSE TO INTERNET ARCHIVE'S RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT AND ADDITIONAL STATEMENT OF MATERIAL FACTS**

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House LLC ("PRH") (collectively, the "Publishers"), pursuant to Local Rule 56.1(b) of the United States District Court for the Southern District of New York, submit this Response to Defendant Internet Archive's Response to Plaintiffs' Rule 56.1 Statement and Additional Statement of Material Facts. *See* Doc. 172 ("IA-RSUMF"). The Publishers submit this Response solely for purposes of their pending Motion for Summary Judgment and reserve the right to challenge the purported truth of any statements made in the Internet Archive's Additional Statement of Material Facts at any trial of this action.[1]

---

[1] Unless otherwise noted, this Response uses the same abbreviations and capitalized terms as those set forth in the Publishers' Rule 56.1 Statement of Material Facts (ECF No. 113).

**RESPONSE TO INTERNET ARCHIVE'S IMPROPER OBJECTIONS TO CERTAIN OF PLAINTIFFS' UNDISPUTED STATEMENTS OF FACTS**

Internet Archive disputes a small fraction of the Publishers' Undisputed Statements of Material Facts (Doc. 113), but the vast majority of these objections are improper and were clearly formulated to avoid conceding indisputable facts that range from inconvenient to deeply harmful for Internet Archive. These objections fall roughly into three categories – (1) objections to the McNamara Declaration, (2) objections to statements based on studies conducted by certain Plaintiffs and (3) otherwise evasive responses.

*First*, Internet Archive objects to portions of the McNamara Declaration filed in support of the Publishers' Motion for Summary Judgment (Doc. 96) on the grounds that it "contains impermissible statements of argument and fact" (*see* IA-RSUMF, 1-3) – but this attack is unfounded because the paragraphs that IA challenges are garden variety examples of an attorney setting forth record evidence in a declaration. "It is well established that an attorney's affidavit can be used, in connection with a summary judgment motion, to place documents produced in discovery before the Court." *Pace v. Air Liquid Systems Corp.*, 171 F.Supp.3d 254, 272 (S.D.N.Y. 2016). Such declarations are not objectionable simply because they summarize the evidence to which they cite, or explain its import; to the contrary, "[a]ttorney affidavits are … allowed a degree of latitude to characterize the evidence by informing the court of the basis for the summary judgment motion and identifying the portion of the record counsel believes demonstrates the absence of genuine issues of fact." *Trustees of Local 8A-28A Welfare Fund v. Am. Group Administrators*, No. 14-cv-1088, 2017 WL 3700899, at *1 (E.D.N.Y. Aug. 25, 2017) (internal quotes omitted). And, despite IA's objection to what it characterizes as "argumentative statements" (IA-RSUMF, 2), "[t]he Court is capable of discerning from the [Declaration] what statements were made on the basis of [McNamara's] firsthand knowledge; what statements are

summaries of evidence in the record; and what documents the Court should review in determining the accuracy of those summaries." *Pace*, 171 F.Supp.3d at 272.

Internet Archive nevertheless challenges 14 Statements for being based on "improper attorney testimony in the form of Ms. McNamara's Declaration," but these objections do not withstand scrutiny.[2] Each of the paragraphs that IA challenges from the McNamara Declaration contains an entirely proper summary of and/or citation to record evidence. For instance:

- Statement 103 states that "[c]onsumers pay for an ebook that they download from an authorized e-vendor whether or not they read the whole book or only consult a small portion of it." IA does not dispute this Statement in its Response, but nevertheless objects that this is "one of many examples … where the only support for an assertion is improper attorney testimony in the form of Ms. McNamara's Declaration." This is false. In reality, Statement 103 cites Paragraph 10 of the McNamara Declaration, which identifies and summarizes *four documentary exhibits* that set forth the Publishers' consumer ebook terms, which contain no variation depending on how much the consumer actually reads. *See* McN Decl.

---

[2] The paragraphs of the McNamara Declaration cited in support of two of the challenged Statements (McN Decl. ¶45, cited in Statement 300; and McN Decl. ¶108, cited in Statement 501) contained incomplete or erroneous citations, but nevertheless are fully supported by evidence in the record. *See* McN Decl. Ex. 56 (containing quotation from McN Decl. ¶45 cited in Statement 300); McN Decl. Ex. 103 (Open Libraries Form, erroneously cited in McN Decl. ¶108 as McN Dec. Ex. 153).

¶10, citing Weber Decl. Ex. 21, R-A Decl. Ex. 4, Sevier Decl. Ex. 6, Pavese Decl. Ex. 5.

- Statement 378 states that "Internet Archive has marketed the Open Libraries project to libraries as a substitute for paying for authorized ebooks via authorized library ebook aggregators and as a means of obtaining 'free ebooks for your patrons' with 'no cost involved.'" IA disputes this Statement because "[t]he only cited evidence for the assertion that the Internet Archive has done so is improper attorney testimony in the form of Ms. McNamara's Declaration." But Paragraph 71 of the McNamara Declaration – which is cited in Statement 378 – identifies and appropriately summarizes ten indisputable examples of Internet Archive marketing itself to libraries as an alternative to paying for library ebooks – including quotations from an email the Director of Open Libraries wrote to a library promising "free ebooks for your patrons" with "no cost involved." *See* McN Decl. ¶71(a)-(i).

- Statement 333 states that "Internet Archive via affiliated entities acquired Better World Books." IA once again objects that "the only cited evidence for the assertion that the 'Internet Archive … acquired Better World Books' is improper attorney testimony in the form of Ms. McNamara's Declaration." But this objection disregards the fact that Paragraph 56 of the McNamara Declaration (upon which Statement 333 relies) is not conjecture from Attorney McNamara, but rather a summary of indisputable record evidence demonstrating how IA and its founder gained control and effective ownership of Better World Books. *See* McN Decl. ¶56.

4

The remaining objections to the McNamara Declaration are equally without merit and should be seen for what they are – an attempt to avoid admitting true facts.[3]  The Statements should be deemed admitted.

*Next*, Internet Archive "disputes" the results of studies conducted by PRH and HarperCollins – which indicate that a high proportion of total ebook reads are attributable to readers of library ebooks – on the grounds that the "study's conclusions are … hearsay" and based on a "voluminous data file."  *See* IA-RSUMF ¶¶175, 177-80.  This objection must be rejected, however, because the studies are records created and maintained in the ordinary course of business, and therefore excepted from the rule against hearsay.  *See* FRE 803(6).  And IA offers no authority to support its bold claim that these conclusions should be disregarded because they are based on "voluminous data."  To the contrary, the Federal Rules of Evidence specifically allow parties to "use a summary … to prove the content of voluminous writings … that cannot be conveniently examined in court."  FRE 1006.

*Finally*, Internet Archive provides evasive Responses that were clearly designed to avoid admitting inconvenient (but indisputable) facts.  For instance:

- Statement 349 states that Jacques Cressaty, IA's 30(b)(6) witness for financial matters, testified that "every single page of the Archive is monetized."  IA disputes this statement on the spurious grounds that "[t]he questioning attorney prompted Mr. Cressaty with the quoted phrase."  For reasons that should be obvious, IA cannot dispute or disavow Mr. Cressaty's testimony simply because the questioning attorney "prompted" a response that resulted in affirmative testimony by the witness, like here.  If this was the law – and it is assuredly not –

---

[3] *See* Responses to Statements 241, 300, 474, 501, 514, 523, 532, 544, 562, 602, and 612.

routine questions and answers in a deposition could be stricken for "prompting" the witness. IA makes similar objections to other Statements in an effort to walk back other pieces of (damning) deposition testimony from its witnesses, which should also be rejected. *See* Responses to Statements 309, 526.

- Statement 337 states that "Kahle is the Chairman of Better World Libraries and a Director of Better World Books, which is controlled by "people affiliated with the Austin Kahle [sic] Empire." (McN Decl. ¶56.)" IA disputes this Statement with the nonresponsive objection that "Better World Books is a 501(c)(3), as is its sole shareholder Better World Libraries. Each entity has a board with three members. Gratz Opp'n Decl. Ex.3, Patton-Schmidt Dep. Tr.101:5-20; 70:23-71:2, 80:4-81:7, 83:1-21, 86:21-88:15." But Better World Libraries' own tax documents describe Kahle as its "Chairman" (McN Decl. Ex. 88, Better World Libraries' 2019 990-PF Return), BWB's 30(b)(6) witness confirmed that Kahle sits on Better World Books' board (Gratz Opp. Decl. Ex.3, Patton-Schmidt Tr. 87:14-18), and IA's 30(b)(6) witness testified that "people affiliated with the Austin Kahle Empire have a controlling interest on the Better World Books' board." McN Decl. Ex. 45 (Cressaty Tr. 249:5-10).

- Statement 524 states that "Internet Archive has acknowledged that its Website competes with distributors of the Publishers' authorized ebooks. IA's witness, Mr. Karpales, wrote an email stating that 'reality has it that we are competing for eyeballs with Amazon … OverDrive … and countless other websites,' and he confirmed at his deposition that IA was "competing for eyeballs" with various

entities." IA nonsensically disputes this Statement on the grounds that "'[c]ompetes for eyeballs' is not equivalent to 'competing.'"

- Statement 544 states that "[d]emand for ebooks on IA's Website increased after lending limits were relaxed and, even after those limits were reimposed, key metrics like monthly circulation and number of total members have remained higher than their pre-pandemic levels." IA does not dispute the underlying facts (that monthly circulation and total members increased) but nonetheless disputes this Statement because "Plaintiffs have not laid a foundation for why an increase in monthly circulations and an increase in the number of total patrons constitutes an increase in demand." This is another nonsensical objection because increased circulation and website usage necessarily translates into increased demand for IA's ebooks. Any suggestion to the contrary defies common sense.

In sum, Internet Archive's objections to and/or denials of the above Statements are without basis and the Statements should be deemed admitted. Fed. R. Civ. P. 56(e)(2).

## RESPONSE TO INTERNET ARCHIVE'S ADDITIONAL STATEMENT OF FACTS

154. While the Internet Archive did not begin digitally lending books until 2011, providing universal access to books has been a part of its mission for nearly the entirety of its history. Kahle Opp'n Decl. ¶3.

**Publishers' Response**: Undisputed.

155. Soon after its founding in 1996, the Internet Archive began hosting other digital content—including digital texts—in addition to its snapshots of the World Wide Web. Then, the Internet Archive focused on hosting public domain books. Kahle Opp'n Decl. ¶4.

**Publishers' Response**: Undisputed but not material.

156. Hundreds of years of literature could fit easily in storage of ever smaller size, and the Internet Archive made a point of demonstrating this in 2002, when it drove its Bookmobile ("1,000,000 Books Inside (soon)") across the country, allowing readers of all ages to access, download, and print books in the public domain. *Id.*

**Publishers' Response**: Undisputed but not material.

157. The Internet Archive began scanning print books around 2004 when it helped form the Open Content Alliance, a consortium of libraries, universities, and companies—including the University of California, the University of Toronto, the Smithsonian Institution Libraries, and the National Archives of the United Kingdom, as well as Yahoo, Adobe, HP Labs, and Microsoft—that aimed to preserve and provide online access to digitized books. Kahle Opp'n Decl. ¶5.

**Publishers' Response**: Undisputed but not material that around 2004 Internet Archive "helped form the Open Content Alliance, a consortium of libraries, universities, and companies … that aimed to preserve and provide online access to digitized books." Disputed to the extent this Statement implies the Open Content Alliance's scanning of books was analogous to IA's current practice of digitizing and making available in-copyright works without seeking permission from the owners, since the Open Content Alliance focused on making available public domain works, and sought permission from copyright holders before making available in-copyright works. *See* Katie Hafner, "In Challenge to Google, Yahoo Will Scan Books," NEW YORK TIMES, https://www.nytimes.com/2005/10/03/business/in-challenge-to-google-yahoo-will-scan-books.html.

158. Within a few years, the Internet Archive launched Open Library, which aimed to become the largest catalog of books, while providing free access to public domain books the Internet Archive had scanned. Kahle Opp'n Decl. ¶6.

**Publishers' Response**: Undisputed but not material because the catalog on Open Library did not distribute in-copyright books.

159.  The first decade and a half of improvements to technologies used for scanning print books and displaying their digitized text laid the foundation for the Internet Archive—along with the dozens of other libraries it partnered with—to begin lending books online to patrons, for free, for short periods of time.  Kahle Opp'n Decl. ¶7.

**Publishers' Response**: Undisputed for the purpose of this motion only that "improvements to technologies used for scanning print books and displaying their digitized text" made it possible for Internet Archive to begin lending public domain books online to patrons, for free, for short periods of time."  Disputed that IA "partnered" with "dozens of other libraries" on the basis that this assertion lacks foundation, because IA provides no evidence supporting this claim, in particular in reference to in-copyright works.  The use of the word "partnered" is also vague.

160.  Now, the Internet Archive has more than 3.6 million books available for digital lending, and millions more public-domain books that can be downloaded and kept, not just borrowed.  Kahle Opp'n Decl. ¶8.

**Publishers' Response**: Undisputed.

161.  Of those millions of items, this lawsuit is about 127 Works in Suit, which are among what Plaintiffs say are the 33,000 books published by Plaintiffs that are available for borrowing from Internet Archive and are also available in digital form, such as via OverDrive.  PSMF¶¶240-41.

**Publishers' Response**: Undisputed and Internet Archive admits the facts contained in Statement 161.  *See, e.g.*, IA-RSUMF ¶¶198-201, 522.

162. The Internet Archive lends books—for free—to patrons for a limited time at its own expense. Those expenses include equipment, personnel, and, especially, acquisition and storage costs for the physical books that are being lent digitally. The Internet Archive has spent millions of dollars on its digital lending program. Kahle Opp'n Decl. ¶ 12.

**Publishers' Response**: Undisputed that Internet Archive "lends books—for free—to patrons for a limited time." With regard to the remaining facts in Statement 162, disputed since no foundation is provided for any of these facts which, in any event, are not material. Further, the record shows that at least some of the facts are false, including the suggestion that IA supports its lending program entirely "at its own expense," since it is undisputed that between 2020 and 2021 ███████████████████████████████████████████ ███████████████ (IA-RSUMF ¶343), and that Open Library of Richmond ("OLR") – the company that owns and stores the books IA scans and lends (IA-RSUMF ¶313) – received ███ ███████████████████████████████████████████ ███████████ IA-RSUMF ¶335; *see also* Cressaty Tr. at 269:30-270:24, ███████ ███████████████████████████████████████████

163. The Internet Archive is just one beneficiary of a broader Better World Books program that provides books to a range of nonprofit organizations, including Books for Africa, school systems, prison ministries, and battered women's shelters. Gratz Opp'n Decl. Ex.3, Patton-Schmitt Dep. Tr. 27:12-28:5; *see also id.* at 40:2-41:21 (explaining that other donation recipients also have "wish lists" of specific book categories and titles).

**Publishers' Response**: Undisputed that Better World Books provides books to a range of non-profit organizations, but misleading to the extent it implies Internet Archive does not have closer ties to, or does not receive greater benefits from, BWB than other "nonprofit

organizations." Brewster Kahle, the founder of IA, is also a Director of BWB (Gratz Opp. Decl. Ex. 3, Patton-Schmitt Tr. 87:14-17) and Chairman of its sole shareholder Better World Libraries (McN Decl. Ex. 88; Gratz Opp. Decl. Ex. 3, Patton-Schmitt Tr. 80:18-81:7), and it is undisputed that Open Library of Richmond, an entity "fund[ed] from [Kahle's] personal finances" (IA-RSUMF ¶317), ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (IA-RSUMF ¶333). The evidence also shows that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (IA-RSUMF ¶343), ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Patton-Schmitt Tr. at 29:5-10. In addition, the evidence shows that Open Library of Richmond – the company that owns and stores the books IA scans and lends (IA-RSUMF ¶313) received ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ IA-RSUMF ¶335. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Cressaty Tr. at 269:30-270:24.



164. From the beginning of the affiliate link program with Better World Books through February 10, 2021, the Internet Archive received only $5,561.41 in such revenue. Kahle Opp'n Decl. ¶19.

**Publishers' Response**: Disputed since the Statement lacks foundation that Internet Archive received only $5,561.41 in revenue from the affiliate link program with Better World Books through February 10, 2021. Further, the Statement is misleading because the undisputed facts show IA receives other benefits from Better World Books, including those referenced in Publishers' Responses to Statements 162-63. *See also* IA-RSUMF ¶¶ 323-47.

165. Better World Books is a for-profit business that has adapted its business model to support libraries and other literacy programs. Public and academic libraries across the country actively support Better World Books' model by providing books they have culled from their collections. Gratz Opp'n Decl.Ex.3, Patton-Schmitt Dep. Tr. 31:11-16. When one of those books is sold, a portion of the proceeds goes to the library. *Id.* 63:12-21.

**Publishers' Response**: Undisputed but not material that "Better World Books is a for-profit business that has adapted its business model to support libraries and other literacy programs." Undisputed but not material that "Public and academic libraries across the country actively support Better World Books' model by providing books they have culled from their collections." Disputed that "[w]hen one of those books [culled from a library's collection] is sold, a portion of the proceeds goes to the library," because the cited evidence does not support this Statement. In the deposition testimony cited, Ms. Patton-Schmitt merely states that Better World Books "give[s] a portion of the proceeds back" from the sale of various categories of donated books, and provides as an example a scenario in which an individual donating books stipulates that 10 percent of the sales from those books must go to the Red Cross. Gratz Opp. Decl. Ex. 3, Patton-Schmitt Dep. Tr. 63:5-10.

166. Better World Books helps libraries recoup some of their investment in their collections while extending the lives of books that may otherwise have been thrown away. If Better World Books does not believe it can sell a book, it donates it if possible, or, as a last resort, recycles it. *Id.* 31:21-32:4, 35:1-36:11.

**Publishers' Response**: Undisputed but not material that "If Better World Books does not believe it can sell a book, it donates it if possible, or, as a last resort, recycles it." Disputed that "Better World Books helps libraries recoup some of their investment in their collections,"

12

because the cited evidence does not support this statement.  In the deposition testimony cited, Ms. Patton-Schmitt does not identify any material benefit that accrues to libraries from Better World Books' sale, donation, or recycling of books.

167.  Libraries have a long history of resource sharing, including through interlibrary loan programs.  Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 40-46, 51, 82-88, 89-95, 98-101.

**Publishers' Response**: Undisputed but not material.  Further, the Statement is vague as to the meaning of "long history" and "resource sharing."

168.  The Internet Archive has no evidence that the owned to loaned ratio was exceeded as the result of physical access to a physical book owned by a partner library.  Kahle Opp'n Decl. ¶ 26.

**Publishers' Response**: Undisputed that Internet Archive has produced "no evidence that the owned to loaned ratio was exceeded as the result of physical access to a physical book owned by a partner library," but not material because IA's purported compliance with the owned to loaned ratio is an element of its fair use defense and IA therefore has the burden of proof on this point.  *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) ("Fair use is an affirmative defense" to copyright infringement and IA "bears the burden of proving it.").  IA admits that it exercises no control over circulation of the physical copies of books in Partner Libraries that it counts towards its overlap analysis (IA-RSUMF ¶¶ 492-500), has "no way of knowing … whether the physical and digital copies of a book [are] in circulation simultaneously"-(IA RSUMF ¶495), and indeed that it is affirmatively aware that certain Partner Libraries do *not* remove the physical books from their shelves (IA-RSUMF ¶ 494).

169.  Libraries regularly repair and re-bind books that are worn, rather than buying new copies from publishers.  Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 87–88.

**Publishers' Response**: Undisputed but not material.

Dated: New York, New York

October 7, 2022

**DAVIS WRIGHT TREMAINE LLP**

 */s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
 lindasteinman@dwt.com
 jackbrowning@dwt.com
 jessefeitel@dwt.com
 carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
 scott@oandzlaw.com
 danae@oandzlaw.com

*Attorneys for Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC*