**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY    :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,

                                        :       Case No. 1:20-cv-04160-JGK

                    Plaintiffs,

                                          :

-against-

                                          :

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,
                                          :

                    Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      jessefeitel@dwt.com
      carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**
Scott A. Zebrak (*pro hac vice*)
Matthew J. Oppenheim
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

*Attorneys for Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc. and Penguin Random House LLC*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................... 1

ARGUMENT .......................................................................................................... 4

I.      THE FIRST FACTOR WEIGHS HEAVILY AGAINST FAIR USE............................... 4

        A.      IA Fails to Demonstrate that CDL Is Transformative ............................ 5
        B.      IA Fails to Demonstrate that Its Activities Are Noncommercial........................ 11

II.     THE SECOND AND THIRD FACTORS WEIGH HEAVILY AGAINST FAIR USE.. 13

III.    THE FOURTH FACTOR WEIGHS HEAVILY AGAINST FAIR USE ........................ 13

        A.      IA Does Not Disprove that CDL Deprives the Publishers of Customary Licensing Fees .................................................................................................... 14
        B.      IA Fails to Disprove that Publishers Lose Potential Sales of Authorized Ebooks Because of CDL .................................................................................. 16

IV.     IA'S DEFENSE OF THE NEL CONFIRMS THAT CDL IS NOT FAIR USE............. 20

CONCLUSION......................................................................................................... 20

CERTIFICATION OF COMPLIANCE ...................................................................... 22

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
  896 F.3d 437 (D.C. Cir. 2018) ................................................................................................9

*Amer. Geophysical Union v. Texaco*,
  60 F.3d 913 (2d Cir. 1994) .......................................................................................8, 11, 12

*Authors Guild v. Google*,
  804 F.3d 202 (2d Cir. 2015) .......................................................................................... *passim*

*Cambridge Univ. Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) ...........................................................................................10

*Campbell v. Acuff-Rose Music*,
  510 U.S. 569 (1994) ............................................................................................11, 16, 19

*Capitol Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018) .......................................................................................... *passim*

*Fox News Network v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) .......................................................................................... *passim*

*Harper & Row Pubs., Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ..........................................................................................................4, 12

*Infinity Broadcasting Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) ................................................................................................10

*Ringgold v. Black Ent. Television*,
  126 F.3d 70 (2d Cir. 1997) ..................................................................................................14

*Soc. of Holy Transfiguration Monastery v. Gregory*,
  689 F.3d 29 (1st Cir. 2012) ................................................................................................12

*Sony Corp. v. Universal City Studios*,
  464 U.S. 417 (1984) ..................................................................................................... *passim*

*Swatch Gp Mgmt Serv. v. Bloomberg*,
  756 F.3d 73 (2d Cir. 2014) ............................................................................................8, 10

*Telephone Digest v. U.S. Telephone Ass'n*,
  841 F. Supp. 5 (S.D.N.Y. 1993) ..........................................................................................13

*UMG Recordings v. MP3.com*,
　　92 F. Supp. 2d 349 (S.D.N.Y. 2000).............................................................3, 8, 18

*WPIX v. Ivi, Inc.*,
　　691 F.3d 275 (2d Cir. 2012)...........................................................................4

**Statutes**

17 U.S.C. § 102.............................................................................................3, 15

17 U.S.C. § 107.........................................................................................9, 10, 11

17 U.S.C. § 109...............................................................................................6

## PRELIMINARY STATEMENT

Internet Archive's opposition to summary judgment reflects a long-overdue retreat from its untenable legal argument – squarely rejected by the Second Circuit in *ReDigi* – that the first sale doctrine animates fair use and justifies the unauthorized reproduction of nearly four million in-copyright ebooks.  Other than two passing mentions of "first sale," IA's fatally-flawed exhaustion argument has essentially vanished from its fair use defense of blatant misappropriation.  *See* Doc. 173 ("IA-Opp.") 12, 22.  IA's about-face is hardly surprising since Congress repeatedly rejected a digital first sale doctrine, and no court has ever held or suggested that the mere possession of physical copies of books – or records or films – allows any party to engage in mass digitization and systematic worldwide distribution of newly created ebooks to the public.  Doc. 169 ("Pubs-Opp.") 2-12.

Since Internet Archive has jettisoned the mainstay of its defense, all that remains is a thin veneer of pseudo-legal argument – which boils down to the contention that *Sony* (as interpreted by *TVEyes*) permits a non-profit entity to "improve the value of *physical* books" it owns by reproducing and republishing them "in the way that is most efficient for [a] library and its patrons" to consume.  IA-Opp. 1, 10.  To restate the obvious: *Sony* permitted individual Betamax owners to record broadcast television for home viewing at convenient times – *i.e.*, time-shifting for personal use.  It did not permit anything akin to a technology company systematically scanning millions of books and distributing complete unauthorized ebooks, for free, on an online platform available to anyone in the world.  No court has adopted IA's expansive view of *Sony*. *See* Pubs-Opp. 13-14.  Clinging to one sentence from *TVEyes*, IA suggests that the Second Circuit interpreted *Sony* to hold that any utility-expanding use is presumptively fair.  But IA

ignores *TVEyes*' devastating (for IA) holding that the defendant's media monitoring service was "*not* justifiable as a fair use" even though its search capabilities were highly-efficient and significantly more transformative than IA's Website, which offers ebooks-on-demand as a substitute for authorized ebooks. *Fox News Network v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018). IA also suggests that *Google Books*' controlling analysis is irrelevant (*see* IA-Opp. 12), even though the Second Circuit envisaged the scenario at hand and stated that any claim against an infringer who "convert[ed] … books into a digitized form and ma[de] that digitized version available to the public *would be strong*." *Authors Guild v. Google*, 804 F.3d 202, 225 (2d Cir. 2015) ("*Google Books*") (emphasis added). Simply put, IA cannot establish fair use by pointing out the superior efficiency of ebooks over physical books – particularly when authorized ebooks (which IA euphemistically calls an "additional option for libraries") provide the exact same efficiencies. IA-Opp. 1.

Lacking a serious legal defense, Internet Archive resorts to scare tactics. IA suggests publishers will "permanently lock up culture" and cause centuries-old library systems to collapse if IA is not free to willfully copy physical books instead of paying for authorized ebooks. *See, e.g.*, *id*. ("Plaintiffs would like to force libraries and their patrons into a world in which books … can only be accessed, never owned, and in which availability is subject to the rightsholders' whim."). But the Second Circuit considered similar "policy based arguments" in *ReDigi* and told IA (as an *amicus*) that "it is Congress they should persuade" to change the law, not the courts. *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 664 (2d Cir. 2018). IA's fear that the Publishers will withhold books from the public based upon a "whim" is a delusion. To the contrary, the Publishers have *significantly expanded* their offerings. As much as IA downplays

2

the vital role Publishers play, it is undisputed that they pioneered a "thriving" library ebook market through which they distribute virtually their entire catalogues and facilitate hundreds of millions of free loans each year to library users.  Doc. 172 ("IA-RSUMF") ¶¶163-68.  And this newer market exists side-by-side with the print market, through which the Publishers will continue to sell physical books for libraries to lend alongside authorized ebooks.  *Id.*

It is, in fact, IA that "permanently lock[s] up culture" (IA-Opp. 1) by sequestering millions of books in inaccessible shipping containers and suggesting that physical library books should literally be pulled off the shelves to ostensibly comply with CDL.  IA-RSUMF ¶312.  The Publishers' embrace of authorized library ebooks is the antithesis of this model. The Publishers' forward-looking adoption of licensing programs is consistent with the approach of other creative industries that harness the possibilities of digital technology while mitigating inherent risks – and thus precipitated the profusion of books, movies, television and music instantly available online today in a broad range of formats.

In the end, Internet Archive asks this Court to adopt a radical proposition that would turn copyright law upside down by allowing IA to convert millions of physical books into ebook formats and distribute them worldwide without paying rightsholders.  IA admits that digital formats are "materially more valuable to readers" and "more efficient" (IA-Opp. 5, 16), but the law is clear that IA cannot "misappropriate" that value merely because there is "consumer demand for it."  *UMG Recordings v. MP3.com,* 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000).  Since the purpose of copyright is to incentivize the creation of new works, authors and publishers – not IA – hold the exclusive right to publish their books in all formats and distribute them via select channels.  17 U.S.C. §102.  As the Supreme Court observed decades ago, any "infringer may

claim to benefit the public by increasing public access to the copyright work," but if books "could be pirated away by a competing publisher[,] the public would soon have nothing worth reading." *Harper & Row Pubs.*, *Inc. v. Nation Enters.*, 471 U.S. 539, 559, 569 (1985). *See also WPIX v. Ivi, Inc.*, 691 F.3d 275, 287-88 (2d Cir. 2012) (public interest favors copyright owners over expanded Internet access).

With briefing completed, the undisputed facts and settled law lead to the inexorable conclusion that IA's practice of CDL is not fair use. Summary judgment should be awarded to the Publishers as to liability for copyright infringement.

## ARGUMENT

## I.   THE FIRST FACTOR WEIGHS HEAVILY AGAINST FAIR USE

The pivotal first factor weighs in the Publishers' favor because undisputed material facts demonstrate that IA's digitization and distribution of full copies of books via CDL is not transformative.[1]   "To be transformative, a use must do something more than repackage or republish the original copyrighted work" (*TVEyes*, 883 F.3d at 176), and IA fails that test because it does nothing more than republish the original copyrighted work in a format that

---

[1] Internet Archive admits 94% of the Publishers' 635 facts entirely or in large part, including the facts establishing non-transformativeness, the vast majority of facts regarding the Publishers' markets and digital strategies, and the vast majority of facts regarding IA's operations. *See*, *e.g.*, IA-RSUMF ¶¶82-117, 119-45, 154-68, 170, 172, 182-201, 203-14, 242-54, 262-88, 291-299, 316-32, 338-43, 350-77, 379-99, 491-500, 502-03. The few IA responses purporting to dispute facts are based on improper objections. *See* Doc. 178 at 2-7.

replicates the functionality of authorized ebooks.  It is also significant (although less important) that IA's use of the Works is commercial in nature.

A.     **IA Fails to Demonstrate that CDL Is Transformative**

Faced with the reality that its activities are quintessentially non-transformative, Internet Archive plays fast and loose with facts and law.  Emblematic of this approach is its baseless contention that "CDL does not involve 'systematically republishing,' … but rather systematically delivering a book on a one-to-one basis to the one patron who has borrowed that book, subject to strict controls."  IA-Opp. 11.  But IA explicitly admits that it "*republishes*" unauthorized ebook editions by scanning physical books, including each of the Works, and has used that term internally to describe this process.  IA-RSUMF ¶¶231, 242, 519, 522 (emphasis added).  Since it is undisputed that IA scans and "republishes" books, IA's copying is not transformative by definition.  *TVEyes*, 883 F.3d at 176, quoting *Authors Guild v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).  *See also Google Books*, 804 F.3d at 226-27 (republication of physical books as ebooks infringes the exclusive right to create derivative works).[2]

Equally disingenuous is Internet Archive's assertion that "*Sony* is directly on point" and dictates that CDL is transformative.  IA-Opp. 10.  *Sony*'s holding was limited to individuals using Betamax recorders for the narrow purpose of "time-shifting for private home use."  *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 446 (1984).  IA nevertheless suggests that, "[l]ike

---

[2] Contrary to IA's brief  (IA-Opp. 3), the Publishers have not conceded the legality of IA's "related" activities except for its distribution of books in the Daisy format for the blind.  The references to Wikipedia citations are a diversionary tactic as the overwhelming purpose of IA's Website is to distribute entire books.  Pubs-Opp. 15.

the home viewers in that case, Internet Archive patrons are simply accessing books libraries have purchased in the way that is most efficient for the library and its patrons."  IA-Opp. 10.  The fatal flaw in this analogy is that, unlike the individuals who engaged in sporadic copying in *Sony*, IA (not its "patrons") is the one systematically republishing every book it can obtain as an unauthorized ebook.  Nothing in *Sony* suggests that the Supreme Court would have permitted Sony to record all of the content on broadcast television and loan free copies to Betamax owners on-demand.  Yet the linchpin of IA's transformativeness argument is that *Sony* somehow permits a technology company to scan millions of print books and post free ebook copies on the Internet subject to amorphous CDL limitations.  This stretches *Sony* far beyond recognition.

Internet Archive misguidedly relies on an observation in *Sony* that Betamax users were "authoriz[ed] to watch" the television shows they recorded to argue that CDL is lawful because "the one patron who has borrowed a particular library book is entitled to access it."  IA-Opp. 11.  Again, IA improperly conflates the actions of individual users with its mass-digitization project.  Further, while library patrons do have the right to borrow a lawfully acquired physical book, this right stems from a library's right, as the book's owner, to distribute "that copy"  under the first sale doctrine.  17 U.S.C. §109.  But as even IA now agrees, per *ReDigi*, the first sale doctrine provides no right for a library to reproduce physical books as newly minted ebooks, and thus IA's users are not "entitled to access" these illegal digital copies.

IA fares no better with its suggestion that *TVEyes* and *ReDigi's* discussion of *Sony* somehow created a broad rule whereby uses of technology that deliver unlicensed content "more efficiently" are generally transformative.  *First*, these Second Circuit decisions cannot – and do not purport to – alter the limited (and readily distinguishable) holding in *Sony*.  *Second*, IA

plucks language from *TVEyes* and *ReDigi* out of context, but ignores the remainder of those decisions – which destroy IA's argument that its practice of CDL is transformative.  The crucial fact in *TVEyes*, which IA strategically omits, is that TVEyes' media monitoring service for television broadcasts achieved "the transformative purpose of enhancing efficiency" only "insofar as it enables users to isolate, from an ocean of programming, material that is responsive to their interests and needs." *TVEyes*, 883 F.3d at 177, 185.  Critically, the Second Circuit distinguished this "modestly transformative" search function from the feature that displayed lengthy news clips, which the court described as simply "republish[ing] that content unaltered from its original form, with no new expression, meaning or message." *Id*. at 178.  The display of TV news clips – like the ebooks-on-demand feature of IA's Website – was *not* transformative because it fulfilled the "same purpose" as the original (*i.e.*, "learning the information reported"). *Id*.  Since *TV Eyes* held that there is nothing transformative about distributing the same content as was distributed by the rightsholder, nothing in that decision suggests that the Second Circuit intended to permit format-shifting and global distribution of whole unauthorized ebooks.

*ReDigi* – the decision that Internet Archive dares not mention – further debunks IA's self-serving contention that *Sony* immunizes any infringement that provides "more efficient delivery of content to one entitled to receive it."  IA-Opp. 12.  Judge Leval cited the same sentence from *TVEyes* about uses that "improv[e] the efficiency of delivering content" but narrowly cabined the category of legitimately "utility-expanding transformative fair uses" by listing specific examples – including copying by search engines that displayed only "tiny, low-resolution thumbnail" images, "copying works into a database used to detect plagiarism" and, per *Sony*, recording "the content of a telecast to enable a single, noncommercial home viewing at a more convenient

time." *ReDigi*, 910 F.3d at 661.[3]  IA's wholesale republication of ebooks – which, IA admits, provide an "excellent additional option" to authorized ebooks (IA-Opp. 1) – fulfills the same purpose as the original (*i.e.*, reading) and self-evidently lacks the utility-enhancing transformativeness of *ReDigi*'s examples.  Instead, IA's Website is closely analogous to ReDigi's non-transformative platform that also sought to maintain a kind of one-to-one ratio. *ReDigi*, 910 F.3d at 661.  *See also UMG Recordings*, 92 F. Supp. 2d at 351 ("[R]epackag[ing] recordings to facilitate their transmission through another medium" is not transformative).

Next, IA asks the Court to disregard *Google Books* – and its clear instruction that a "strong" infringement case exists against anyone who republishes entire scanned books – because, according to IA, the Second Circuit failed to "apply the view of *Sony* later developed" in *TVEyes* and *ReDigi*.  IA-Opp. 12.  This novel abrogation argument is belied by the fact that *TV Eyes* expressly relied on *Google Books*, observing that it "provides the starting point for analysis." *TVEyes*, 883 F.3d at 174-179.  *See also ReDigi*, 910 F.3d at 661 (citing *Google Books* as the foundation for the notion of utility-expanding transformative uses).  Notably, *TVEyes* also stated that *Google Books* "tested the boundaries of fair use" in mass digitization cases (883 F.3d at 174) – boundaries which IA willfully transgresses.  IA-RSUMF ¶¶225-28.  IA similarly seeks to discount *VidAngel* for failing to apply "the understanding of transformativeness" developed in

---

[3] The Second Circuit has occasionally characterized *Sony* as a "non-transformative use" case.  *See, e.g., Swatch Gp Mgmt Serv. v. Bloomberg,* 756 F.3d 73, 84 (2d Cir. 2014), citing *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994)); *Amer. Geophysical Union v. Texaco*, 60 F.3d 913, 920 (2d Cir. 1994) (citing *Sony* for the proposition that "the Supreme Court appears to have rejected the view that a use must be transformative. . . to be a fair use").

*TVEyes* and *ReDigi*.  IA-Opp. 12, citing *Disney Enterprises v. VidAngel*, 869 F.3d 848 (9th Cir. 2017).  Yet *VidAngel* is one of many decisions and authorities, including reports from the Register of Copyrights, rejecting the notion that format-shifting to enhance public access is transformative.[4]

Internet Archive then turns inexplicably to a D.C. Circuit decision about the publication of private technical standards referenced in public laws.  IA-Opp. 11, quoting *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437 (D.C. Cir. 2018) ("*ASTM*"). While IA claims that *ASTM* "reflects *Sony*'s approach" (IA-Opp. 11), *ASTM* did not rely on *Sony* in its analysis of the first factor.  Instead, the court *rejected* the broad principle that it is always transformative to make a technical standard "more accessible" and narrowly held that a transformative purpose existed only when reproduction of the text's exact language was "essential to comprehending one's legal duties."  *ASTM*, 896 F.3d at 450-51.  Thus, in addition to being factually distinguishable, *ASTM* is not a "utility expanding transformative fair use[]" case and does not support IA's strained argument.  *ReDigi*, 910 F.3d at 661.

Alternatively, Internet Archive looks to *Swatch*, *Cambridge University Press* ("*CUP*") and a handful of other decisions to make a back-up argument that CDL is fair use even if it is not transformative.  IA-Opp. 13-14.  One of many reasons to distinguish those cases is that the copying there advanced a specific "'public purpose' named in the preamble to §107," while IA's

---

[4] S*ee* Doc. 99 ("Pubs-Mov.") 24, Pubs-Opp. 5-6.  *See also* Doc. 96-189 (Letter from Register of Copyrights to Sen. Udall), 11-12  ("[C]ourts have held that reproducing the text of physical books in digital format is not transformative unless the change in format results in new uses for the work.").

practice of CDL does not.  *Id*. at 13, quoting *Swatch*, 756 F.3d at 84-85.  In *Swatch*, for instance, the Second Circuit held that Bloomberg engaged in "news reporting" by "obtaining and disseminating" a recording of a corporation's earnings conference call because the public's interest in hearing what was said (including extemporaneous elements like the tone of the speakers) justified its dissemination.  *Id*.  Similarly, in *CUP*, the university's digitization of course materials advanced the enumerated purpose of "teaching (including multiple copies for classroom use)."  *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1258 (11th Cir. 2014), citing 17 U.S.C. 107.[5]  While IA tries to squeeze into the preamble by asserting that its Website facilitates research and teaching, the mere fact that "a secondary use can facilitate research does not itself support a finding that the secondary use is transformative."  *TVEyes*, 883 F.3d at 178 n.4; *Infinity Broadcasting Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (inquiry focuses on defendant's actions, not users).

Finally, Internet Archive's desperation to find a decision – any decision – to support its theory of CDL is exposed by its lengthy discussion of a case before the Court of Justice of the European Union ("CJEU").  IA-Opp. 29-32.  IA cites the Advocate General's brief – which is advocacy, not precedent – to argue that the CJEU's decision endorses the legality of CDL as practiced by IA.  *Id*. at 30-32.  It does not.  The CJEU parsed a Dutch statute requiring libraries to pay authors for every loan of their physical books and held that the same compulsory licensing regime applied to digital loans (Doc. 170-7, 7-10 ) – which is the opposite of the free-books-on-

---

[5] The 11th Circuit found that digitizing book chapters was "not transformative," even for the socially beneficial purpose of providing "reading material for students in university courses."  *Id* at 1262-63.

demand regime IA demands here.  Moreover, IA defeats its own argument by asserting that foreign decisions do "not affect the scope of fair use in the United States."  IA-Opp. 28.

In sum, the total lack of transformativeness decisively tips the first factor in the Publishers' favor.

### B.      IA Fails to Demonstrate that Its Activities Are Noncommercial

Internet Archive reveals its weakness by protesting too much that it is not "a commercial enterprise."  IA-Opp. 3-10.  "[T]he mere fact that the use is … not for profit does not insulate it from a finding of infringement."  *Campbell*, 510 U.S. at 584.  Moreover, the extent to which a use is "of a commercial nature or is for nonprofit educational purposes" (17 U.S.C. §107) is a nuanced analysis, not a brightline based on tax status or direct payment.  *See Texaco*, 60 F.3d at 921-22.  Here, it is undisputed that IA is not an educational institution or creator of educational materials, but rather a company that engages in activities that are unquestionably commercial. *See* Pubs-Mov. 25-28; Pubs-Opp. 15-16.

Internet Archive disingenuously backs away from its entanglements with the for-profit bookseller Better World Books, contending that IA "has no control over Better World Books' business," "does not profit from it" and "is just one beneficiary of a broader Better World Books program that provides books to a range of nonprofit organizations."  IA-Opp. 7-8.  The undisputed facts tell a different story and prove the existence of a symbiotic relationship: IA stated that its "best path to millions of books is arm-in-arm with BWB" and that "the successful operation of BWB will provide funding back to [IA] to ensure that it can continue to deliver free services to the world"; the BWB "pipeline" provides IA millions of books and BWB ███████████; IA's Website drives users to

buy books from BWB and IA receives affiliate revenue from such sales; and Open Library of

Richmond (the entity in the Kahle/Austin Empire that owns IA's books) ████████████

████████████████████████████████████████████████████████████. IA-

RSUMF ¶¶313, 327, 329, 331, 333, 334-45, 343, 346-47.

No more credible is Internet Archive's contention that the Second Circuit only deems a

non-profit company to be commercial if it "captures significant revenues *as a direct consequence*

of copying the original work."  IA-Opp. 4, quoting *Texaco*, 60 F.3d at 922.  *Texaco* does not

create a brightline rule requiring proof that the infringement "is a revenue-generating exercise."

*Id*. at 4.  Instead, the Second Circuit held that the first factor *disfavored* Texaco because it "reaps

… some *indirect* economic advantage from its photocopying" of journal articles used in the

development of new products.  *Texaco*, 60 F.3d at 922 (emphasis added). "Conceptualized this

way, it is not obvious why it is fair for Texaco to avoid having to pay at least some price to

copyright holders for the right to photocopy the original articles."  *Id.  See also Harper & Row*,

471 U.S. at 562 ("The crux of the profit/nonprofit distinction is not whether the sole motive of

the use is monetary gain but whether the user stands to profit from exploitation of the

copyrighted material without paying the customary price.").  IA also suggests that *Holy

Transfiguration* is inconsistent with Second Circuit precedent (IA-Opp. 6), but neglects to

mention that decision follows a Second Circuit holding for its core holding that "profit, in this

context, is … not limited simply to dollars and coins; instead, it encompasses other non-

monetary calculable benefits or advantages."  *Soc. of Holy Transfiguration Monastery v.

Gregory*, 689 F.3d 29, 61 (1st Cir. 2012), citing *Weissman v. Freeman*, 868 F.2d 1313, 1324 (2d

Cir. 1989).

Simply put, there is no support for Internet Archive's suggestion that it is "entirely noncommercial" simply because it is a nonprofit entity that does not charge users to read ebooks. *See Telephone Digest v. U.S. Telephone Ass'n*, 841 F. Supp. 5, 10 (S.D.N.Y. 1993) (no fair use "despite USTA's … non-profit status").  The fact that IA is funded by the private wealth of a technology multi-millionaire and other for-profit interests undermines the argument that IA is a purely non-commercial enterprise.

## II.      THE SECOND AND THIRD FACTORS WEIGH HEAVILY AGAINST FAIR USE

The second and third factors weigh in the Publishers' favor because IA's copying was "extensive and inclusive of all that is important from a copyrighted work."  *TVEyes*, 883 F.3d at 179.  Internet Archive does not substantively dispute that every Work IA scanned was expressive (not purely factual) and republished in its entirety.  IA nevertheless incorporates an argument from its opening brief that copying entire works is necessary for CDL because "[b]orrowing a book from a library necessarily entails borrowing the whole thing."  Doc 106 ("IA-Mov.") 23.  But the third factor does not automatically favor infringers who claim they need to reproduce entire works to achieve their goals, regardless of transformativeness or market substitution.  To the contrary, wholesale copying of expressive Works weighs against fair use.  *See* Pubs-Mov. 29.

## III.     THE FOURTH FACTOR WEIGHS HEAVILY AGAINST FAIR USE

Internet Archive does not dispute that it bears the evidentiary burden of disproving market harm.  Pubs-Mov. 20.  Yet IA does not overcome the Publishers' clear showing that IA causes two forms of market harm – lost license fees to the Publishers and lost potential ebook sales from libraries and consumers.

### A.   IA Does Not Disprove that CDL Deprives the Publishers of Customary Licensing Fees

Market harm is definitively established, as it was in *TVEyes*, because Internet Archive "depriv[es the Publishers] of licensing revenue" by "providing [the Publishers'] content to [IA's] clients *without* payment to [them]." *TVEyes*, 883 F.3d at 180 (emphasis in original). IA does not dispute that all the Publishers need to do to win the fourth factor is (1) "show a traditional, reasonable, or likely to be developed market for licensing" and (2) establish IA's failure to pay the fee participants in that market customarily pay. *Ringgold v. Black Ent. Television*, 126 F.3d 70, 81 (2d Cir. 1997).

The Publishers have satisfied this test. It is undisputed, and Internet Archive's own expert confirmed, that the Publishers' library ebook market is "thriving" and "predicated on licensing revenues that are paid by libraries to entities like OverDrive" – which have generated tens of millions of dollars for the Publishers. IA-RSUMF ¶168. IA further admits that it uploaded unauthorized ebook copies of each Work to its Website, where they were collectively checked out nearly 50,000 times, but never paid the standard fees that libraries pay to lend ebooks. *Id*. at ¶¶204, 578-80. Likewise, IA admits that it posted more than 33,000 of the Publisher's ebooks on its Website without paying a license fee and plans to expand its operations under this model. IA-RSUMF ¶¶232, 238, 522. These undisputed facts conclusively establish market harm.

In a futile attempt to avoid this inevitable conclusion, Internet Archive asserts that "the customary price payable to a publisher to lend a book a library has already purchased is zero." IA-Opp. 15. No one disputes the truism that libraries can lend lawfully acquired physical books without paying fees. The license fees actually at issue – the ones IA indisputably refuses to pay

14

– are the fees libraries across the country routinely pay to distribute authorized ebooks.[6]
Critically, IA admits that "[p]rint books are not priced with the expectation that they will be
distributed in both print and digital formats" (IA-RSUMF ¶¶93, 613), and concedes that its
ebook formats "improve the value of *physical* books."  IA-Opp. 1.  It is also undisputed that the
Publishers market physical books and library ebooks under entirely distinct models with different
pricing, terms of sale and royalty splits.  IA-RSUMF ¶¶66-67, 90-92.  By purposefully conflating
ebooks with physical books, IA transparently appropriates the benefits of format shifting without
paying the fees customarily paid for authorized library ebook editions.  The assumption that
purchasing a physical book gives IA the right to publish separate ebook products violates the
axiomatic principle that copyright owners have the exclusive right to publish and market books
in different formats of their choosing.  *See Google Books*, 804 F.3d at 225 ("An author's right to
control and profit from the dissemination of her work ought not to be evaded by conversion of
the work into a different form." ); 17 U.S.C. §102.[7]

For the reasons set forth above, the Court need go no further to find significant market
harm and determine that the fourth factor weighs against fair use.

---

[6] Contrary to IA's unsupported contention, the Publishers do not only license ebooks to libraries "when a
library does not already own a book" (IA-Opp. 15), but in all instances in which the libraries desire a
digital version of the title.  IA-RSUMF ¶117.

[7] Internet Archive also suggests that courts need not "assume a willing buyer and a willing seller for the
license" (IA-Opp. 15), but this is flatly contradicted by *TVEyes*, 883 F.3d at 180 ("[T]he failure to strike a
deal satisfactory to both parties does not give TVEyes the right to copy Fox's copyrighted material
without payment.").

**B.      IA Fails to Disprove that Publishers Lose Potential Sales of Authorized Ebooks Because of CDL**

Internet Archive does not disprove that the Publishers lose substantial potential sales of authorized ebooks to libraries and consumers by distributing its own ebook versions to be read in lieu of authorized editions.  IA concedes that the fourth factor, by its terms, looks at IA's effect on the "potential" market for or value of the copyrighted work.  Nor does it rebut the Publishers' moving brief on the governing legal standard.  Pubs-Mov. 33-35.  "Factor Four is necessarily intertwined with Factor One" (*ReDigi*, 910 F.3d at 662), because a non-transformative "duplication of the entirety of an original … clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur."  *Campbell*, 510 U.S. at 591 (citations omitted).  In short, what is critical under the fourth factor is the nature of the competing product.  Here, IA republished duplicate copies of the Works and invited the public to "Read [IA's] Free Library Books Online" (Doc. 96-12) – and cannot seriously deny that IA's ebooks "could usefully serve as a competing substitute for the original."  *Google Books*, 804 F.3d at 221-22.

The only "evidence" IA offers to satisfy its burden of proof is Professor Jorgensen's expert report comparing ebook sales and lending data of the Works from two isolated quarters in 2020 – which offers unreliable conclusions and hardly rebuts either the common sense economic principle that users are drawn to free goods as a substitute for paid goods, or the caselaw set forth in the Publishers' moving brief.  *See* Pubs-Opp. 26-28 (rebutting Jorgensen); Pubs-Mov. 34-35 (citing cases).  As these cases confirm, a plaintiff need not produce financial data quantifying lost sales, especially where, as here, IA distributes verbatim copies.  Moreover, the nature of the book market means that there are innumerable factors impacting book sales that make it

exceptionally difficult to separate out one causal factor from another. Pubs-Opp. 27-28. Further, IA's loan volume has grown dramatically since IA removed the Works from its Website and, with its Open Libraries project, IA has expanded its lending limits exponentially by leveraging library books from across the country; its goals include further growth. IA-RSUMF ¶¶232-35, 249, 364-76, 389-91, 545-46. The backlist book market is an important, substantial market for the Publishers (*id.* at ¶¶40-54), and the undisputed facts easily demonstrate that IA's Website, which includes full copies of the Works and more than 33,000 of the Publishers' other in-copyright books (IA-RSUMF ¶586), makes it "like[ly] that potential customers may opt to acquire the copy in preference to the original." *Google Books*, 804 F.3d at 223.

More telling, IA admits that it specifically instructs libraries *not* to acquire authorized ebooks by advising "libraries that they need not spend money on authorized ebooks because their patrons can instead access ebooks titles on the Internet Archive's website and/or use their print copies to leverage them into digital copies." IA-RSUMF ¶605. *See also* ¶¶471, 395 ("[E]very library can transform itself into a digital library" by "circulat[ing] a digital version" of the physical books it owns via IA's Website). IA also admits that "many libraries" have integrated links to IA ebooks on their websites. *Id.* at ¶396. And leaving no doubt that IA expects its ebooks to substitute for authorized digital editions, IA tells libraries that it can "leverage controlled digital lending to provide your patrons with free ebooks of your physical collections" – a pitch that IA variously summarizes as "You Don't Have to Buy It Again" and "Cost: $0." *Id.* at ¶¶379-83, 387, 605.

Nor is there any dispute that Website users read IA's free ebooks in full (*id.* at ¶¶257-60) and, in some cases, have done so in lieu of using authorized versions. It is undisputed that PRH

lost at least two ebook deals because customers chose to use IA's Website instead. *Id.* at ¶¶563-64. One IA user read an IA ebook that he could have read in an authorized format through his university because "it didn't matter" where the book came from as long as he was "getting these materials [he] needed." *Id.* at ¶528. Another IA user included links to IA ebooks in her blog rather than ebooks on authorized platforms because IA "is reaching a potentially broader audience." *Id.* at ¶529. IA further admits – as did its expert (IA-RSUMF ¶599) – that CDL "reallocate[s] spending away" from certain books to other books and thus deprives rightsholders of the former books of royalties, which is the definition of market substitution. IA-Opp. 20.

Faced with this irrefutable evidence of market substitution and the likelihood of significant lost revenues as Internet Archive expands, IA makes a handful of evasive arguments that can be dismissed out of hand. *First*, IA suggests that its ebooks are not competing substitutes for authorized library ebooks because "loaning books to library patrons one at a time is consistent with economic expectations at the time the publisher sells the [print] books." IA-Opp. 16. But this argument is untenable after IA's *admission* that "[p]rint books are not priced with the expectation that they will be distributed in both print and digital formats." IA-RSUMF ¶¶92, 613. Ebook formats, as IA puts it, "improve the value of *physical* books" (IA-Opp. 1), and IA's ebooks are free competing substitutes because they "misappropriate[]" this value from the Publishers and their authors. *UMG Recordings*, 92 F.Supp.2d at 352. The hollowness of IA's position on this point is summed up by its concessions that authorized ebook licensing is "an excellent additional option" for libraries that want to use CDL "instead of or in addition to" platforms like OverDrive – which are thinly veiled euphemisms for direct market substitution. IA-Opp. 1, 18.

Next, IA argues that *Google Books* has no applicability because Google did not "own copies of the books" or practice CDL.  IA-Opp. 20.  But the thrust of *Google Books* is that Google's copying was fair because the "snippet view" does not "provide a significant substitute for the purchase of the author's book" – and the Second Circuit clearly signaled that republishing whole books would constitute substitution.  *Google Books*, 804 F.3d at 224-25.  Similarly unavailing are IA's efforts to distinguish the fourth factor analysis in *American Buddha*, *CUP* and *ReDigi* on the grounds that the defendants in those cases did not maintain a physical copy of the underlying work.  IA-Opp. 22.  Nothing in those decisions remotely suggests they would have turned out differently if the defendants had implemented some form of CDL – to the contrary, the Second Circuit found market harm even after ReDigi sought to maintain a form of IA's (inadequately enforced) owned-to-loaned ratio by deleting the original song file before resale.  *See* Pubs-Opp. 4-5; IA-RSUMF ¶¶492-506.

Finally, Internet Archive suggests that CDL is not likely to become widespread because maintaining the physical books to lend against is not "free nor infinitely scalable."  IA-Opp. 21. This argument misses the point because the correct analysis assumes that infringing conduct will become widespread and does not require the rightsholder to prove it.  *Campbell*, 510 U.S. at 590. Further, the contention that IA cannot easily scale up its activities is belied by record evidence that IA can seamlessly increase its lending counts by running overlap analyses on millions of books already sitting on the shelves of nearly 9,000 public libraries that are not currently Open Libraries Partners – which is an acute danger if this Court condones CDL.  IA-RSUMF ¶¶364- 69, 462.  *See also* Pubs-Opp. 24-25 (addressing catastrophic harm caused if IA scales up).  IA strains credulity by asserting that it faces logistical constraints when it has added 2.5 million in-

copyright books to its Website since the start of this action and increased the number of concurrent copies available to loan by more than 2.8 million copies under the Open Libraries project. *Id.* ¶¶389, 266-69.

## IV.   IA'S DEFENSE OF THE NEL CONFIRMS THAT CDL IS NOT FAIR USE

Internet Archive contends that abandoning the supposedly sacrosanct owned-to-loaned ratio during the NEL period "does not undermine the fair use analysis; if anything, it strengthens it." IA-Opp. 23.  By doubling down on the argument that the tenets of CDL can be ignored to serve IA's immediate goals, IA essentially concedes that there are no meaningful controls on its practices.  This conclusion is buttressed by admissions that IA does nothing to ensure that its Partner Libraries comply with the owned-to-loaned ratio and knows that some libraries do not follow CDL protocol (IA-RSUMF ¶¶482, 494-506) – yet IA remains unconcerned that CDL "allows patrons of a given library more copies than their local library owns." IA-Opp. 10.  These facts expose controlled digital lending for what it is – a cynical branding exercise designed to repackage industrial-scale copyright infringement as a legitimate enterprise.  IA's practice of CDL is not fair use and should be stopped.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for summary judgment with respect to the causes of action set forth in the Complaint.

Dated: New York, New York
   October 7, 2022

       **DAVIS WRIGHT TREMAINE LLP**

       */s/ Elizabeth A. McNamara*
       Elizabeth A. McNamara
       Linda Steinman
       John M. Browning
       Jesse Feitel
       Carl Mazurek

1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        lindasteinman@dwt.com
        jackbrowning@dwt.com
        jessefeitel@dwt.com
        carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
        scott@oandzlaw.com
        danae@oandzlaw.com

*Attorneys for Hachette Book Group,*
*Inc., HarperCollins Publishers LLC,*
*John Wiley & Sons, Inc., and Penguin*
*Random House LLC*

**CERTIFICATION OF COMPLIANCE**

As counsel of record to Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc. and Penguin Random House LLC, I hereby certify that this brief complies with the type-volume limitations set forth in this Court's Individual Rule II.D and complies with all formatting requirements set forth therein.  I am relying upon the word count function of the word-processing system (Microsoft Word), which indicates that 5,992 words appear in the brief, except for the portions excluded from the word count by Rule II.D.

/s/ *Elizabeth A. McNamara*

_____

Elizabeth A. McNamara