N3K5hacA

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   HACHETTE BOOK GROUP, INC., et
    al.,
4
                   Plaintiffs,
5
            v.                          20 Civ. 4160 (JGK)
6                                       Remote Proceeding
    INTERNET ARCHIVE, et al.,
7
                   Defendants.
8
    ------------------------------x
9                                       New York, N.Y.
                                        March 20, 2023
10                                      1:00 p.m.

11  Before:

12                  HON. JOHN G. KOELTL,

13                                      U.S. District Judge

14                          APPEARANCES

15

16  DAVIS WRIGHT TREMAINE, LLP
         Attorneys for Plaintiffs
17  BY:  ELIZABETH A. McNAMARA

18
    MORRISON & FOERSTER, LLP
19       Attorneys for Defendants
    BY:  JOSEPH C. GRATZ
20

21

22

23

24

25
```

1          (Case called; The Court and all parties appearing

2     telephonically)

3          THE COURT:  This is Judge Koeltl.  Who is on the phone

4     who will be arguing for the plaintiffs?

5          MS. McNAMARA:  Elizabeth McNamara of Davis Wright

6     Tremaine, your Honor.  Good afternoon.

7          THE COURT:  Good afternoon.

8          And who is on the phone who will be arguing for the

9     defendant?

10          MR. GRATZ:  Good afternoon, your Honor.  Joe Gratz

11     from Morrison & Foerster for Internet Archive.

12          THE COURT:  OK.  I am familiar with the papers, I will

13     listen to argument.  It is not necessary to repeat everything

14     you said in the lengthy papers.

15          So, unless the parties have otherwise agreed, these

16     are cross-motions for summary judgments.  I will listen to the

17     plaintiff first.

18          MS. McNAMARA:  Thank you, your Honor.

19          At the outset, your Honor, and since you are familiar

20     with the papers I really want to step back and very briefly

21     address two overarching issues central to this action.

22          First, the very foundation to controlled digital

23     lending and Internet Archive's fair use defense is the fiction

24     that physical or print books are one in the same as digital

25     books, that's IA argues that there is no difference between

1    someone checking out the print book or a digital version of

2    that same book.  Thus they claim there is no harm, no foul, to

3    engage in the mass reproduction of physical books, transforming

4    them to digital works and distributing them entirely on the

5    Internet.  But IA now admits that the central thesis to CDL is

6    false.  Indeed, to press their transformative use argument, IA

7    argues the exact opposite, that digital books are materially

8    more valuable because they provide greater efficiencies and

9    allow readers to check out books from home or on the go.  But,

10   put simply, the IA cannot have it both ways.  The reality is

11   that Internet Archive, via CDL, is usurping that greater value

12   by creating unauthorized eBooks without paying the customary

13   fees, the exact fees regularly paid by thousands of libraries

14   across the country when they license authorized eBooks, fees

15   that, in turn, compensate authors.  In short, CDL is built on a

16   fallacy that does not withstand scrutiny and this record

17   defeats CDL as a theory and as a fair use.

18        Second, your Honor, no law supports IA's mass

19   duplication and digitization of millions of books to distribute

20   the entire works for the identical purpose that they were

21   originally published:  To be read.  And, for good reason.  If

22   IA's conduct was sanctioned it would eviscerate the rights and

23   controls of the copyright holders.  Indeed, the Second Circuit

24   in *Authors Guild v. Google*, foreshadowed the very fact pattern

25   before this Court and said a claim based on an infringer who

1    converted books into a digitized form and made that digitized

2    version available to the public would be strong.

3            IA is well aware that case after case has rejected

4    mass duplication schemes when they deliver the works for the

5    same purpose as originally published, whether books or music or

6    movies or television.  In short, IA is not asking this Court to

7    enforce or follow the law, it's asking this Court to change the

8    law.  And this is all by design, your Honor.  Brewster Kahle,

9    IA's founder and funder, is on a mission to make all knowledge

10   free and his goal is to circulate eBooks to billions of people

11   by transforming all library collections from analog to digital.

12   But IA does not want to pay authors or publishers to realize

13   this grand scheme and they argue it can be excused from paying

14   the customary fees because what they're doing is in the public

15   interest.  But IA is well aware that this is not the correct

16   forum.

17           The Second Circuit was faced with similar arguments in

18   *Capitol Records v. ReDigi* where IA, as an amici, pressed the

19   Second Circuit to expand the first sale doctrine in Section 109

20   of the Copyright Act via fair use or otherwise, to a digital

21   first sale.  The Second Circuit declined ReDigi's and IA's

22   invitation pointedly saying:  If ReDigi and its champions have

23   persuasive arguments to support the change of law they

24   advocate, it is Congress they should persuade.  We reject the

25   invitation to substitute our judgment for that of Congress.

N3K5hacA

1          Yet, Internet Archive is back again asking this Court

2     to do what the Second Circuit refused to do.  This Court should

3     reject IA's same invitation.  In short, no facts or laws

4     support IA's fair use defense and it should be summarily

5     rejected.

6          Now I will turn --

7          THE COURT:  Oh.

8          MS. McNAMARA:  Go ahead.

9          THE COURT:  I thought you were done.

10          MS. McNAMARA:  No.  I was going to turn to the four

11     factors and dig in a little deeper, if that's OK, your Honor.

12          THE COURT:  OK.  Briefly.

13          MS. McNAMARA:  OK.  Well, I think the critical thing I

14     want to say on the transformative use issue, your Honor, is

15     that IA admits that it is not engaging in any transformative

16     use in the typical way but it, instead, relies on *Google Books*

17     *v. TVEyes* and *ReDigi* where it was recognized that if you

18     utilize technology to achieve the transformative purpose of

19     improving the efficiency of delivery of content it can be a

20     fair use, but the problem is that IA ignores the actual

21     holdings of each of those cases that it relies on.  And, even

22     more importantly, it ignores that for a use to be

23     transformative under the utility theory, it only applies where

24     the challenged use served a different function or purpose.  And

25     they admit here that there is no different function or purpose,

1    they are doing precisely what the Second Circuit said you

2    should not do which is to merely re-package or re-formulate the

3    work in the paradigmatic version of a derivative work where the

4    Courts found that was not utilization.

5           Judge Leval specifically reinforced the precise point

6    from *TVEyes* that in order for something to be, to address, to

7    be a utility-expanding use, it needs to have a different

8    function; it cites *HathiTrust* and its search function, or the

9    Fourth Circuit by *Paradigm*, or the *Perfect Pens* case in the

10   Ninth Circuit with the thumbnails, or *Sony*, which of course

11   Internet Archive tries to argue is directly on point.  But, in

12   fact, *Sony* merely dealt with individual one-time time shifting

13   and the Supreme Court made it clear, it defined the term "time

14   shifting" to be a one-time use.  *Sony* did not deal with

15   distribution, it merely dealt with one-time reproduction.  And,

16   in fact, every case that has addressed massive duplication and

17   format shifting, like what Internet Archive is doing here, has

18   found it to be not a fair use.  That's *UMG* out of the Southern

19   District, *Napster* out of the Ninth, the *Gregory* case out of the

20   First, or most importantly I think the *VidAngel* case out of the

21   Ninth Circuit.

22          Internet Archive asks this Court to ignore this

23   consistent body of law because it claims that the Second

24   Circuit has more recently adopted a more expansive view of the

25   transformative uses but, as your Honor is well aware, the

1   Second Circuit does not exist on an island with a unique

2   approach, nor has it departed from its consistent holdings

3   finding no fair use when works are duplicated and made

4   available for the precise same purpose as they were originally

5   published whether it be *Infinity*, *Weissman* or *TVEyes* or *ReDigi*.

6        So here, in short, there is really nothing

7   transformative by IA's mass reproduction of plaintiffs' works

8   that now exceed 33,000 and growing and delivering them to the

9   world to be used for the same purpose that the plaintiffs are

10  marketing these works.

11       I don't think I need to touch on the second and third

12  factors, your Honor, which clearly weigh strongly in favor of

13  the plaintiffs.  And on the commercial use issue under the

14  first factor, I would simply note that there is no dispute that

15  IA is using the plaintiffs' works in order to generate more

16  attention, more readership, more users, and those are the

17  precise types of benefits that can be given to a defendant and

18  weigh against them under the commercial use.  As the First

19  Circuit pointedly said, they don't need to line their pockets

20  with money in order to achieve a benefit under the first use.

21  And that's what the --

22       THE COURT:  Can I --

23       MS. McNAMARA:  Sure.

24       THE COURT:  Let me just stop you there just for a

25  moment.

N3K5hacA

1         MS. McNAMARA:  Sure.

2         THE COURT:  What Second Circuit cases do you rely on

3    to say that the use here was commercial?

4         MS. McNAMARA:  I think the most on point case out of

5    the Second Circuit, your Honor, is *Weissmann v. Freeman* where

6    it was an academic situation and it was recognized that the

7    defendant was not achieving money by appropriating another

8    student's paper and holding it out as his own but it was he was

9    achieving benefits through status, tenure, and the like and

10   that that was sufficient to tilt the first factor on that

11   element against them.

12        THE COURT:  And that's how you would also say that

13   this isn't really a non-profit educational purpose within the

14   meaning of fair use?

15        MS. McNAMARA:  Yes, your Honor.  It is a non-profit

16   entity, although as we have spelled out in great detail in the

17   papers, it has many commercial elements that earn to the

18   benefit of growing their site and so in that way there are

19   commercial benefits as well, whether it be they're entwining

20   with the for-profit entity Federal Books, or the commercial

21   benefits that they achieved by the $35 million in scanning

22   books, but I think mainly it is really that on the backs of the

23   plaintiffs' works they achieve greater recognition and growth

24   and users and that is a benefit under, as I said *Weissmann*, as

25   well out of the Ninth Circuit the *Worldwide Church* which

N3K5hacA

1  recognized growth in membership as well as the *Gregory* decision

2  out of the First Circuit.  And so, for that reason, we would

3  say that the commercial/non-commercial distinction does not

4  benefit Internet Archive in addition to not being

5  transformative.

6        THE COURT:  OK.  Go ahead.

7        MS. McNAMARA:  Turning briefly to market harm, your

8  Honor -- well, I would just say on factors two and three,

9  clearly all the works are highly expressive including some of

10  this country's most iconic works and those are at the core of

11  what the Copyright Act was intended to protect, and there is

12  also no dispute that the entire works are copied and

13  distributed in full so both those factors should weigh in favor

14  of the plaintiff.

15        THE COURT:  You also include non-fiction works

16  including the works in suit, don't you?

17        MS. McNAMARA:  Yes, your Honor.  There are claimed

18  non-fiction works which are equally protected as well as

19  fiction.  It is "Blink" by Malcolm Gladwell and countless other

20  non-fiction works.

21        THE COURT:  OK.  Go ahead.

22        MS. McNAMARA:  Now, on the market harm issue of

23  course, as your Honor is well aware, it intersects with the

24  first factor and whereas here, there is really no

25  transformative use then the market harm is -- and where there

N3K5hacA

is direct substitution which plainly exists here, the market
harm necessarily tilts towards the plaintiffs.  But here there
is no dispute on the record that the plaintiffs have lost
significant, massive, millions of dollars in licensing revenues
because IA admits that there is a thriving eBook market where
publishers license eBooks to libraries and this market is
predicated on licensing revenues.  And there is no dispute that
the publishers earn tens of millions of hundreds of millions of
dollars in licensing revenues to the library market alone,
setting aside the commercial eBook market.  And IA doesn't
dispute that it refuses to pay any license fees and it hasn't
paid any for the 33,000-plus works of the plaintiffs that exist
on their website.  But IA's admissions I think, importantly, do
not stop there.  They not only admit that it fails to pay the
customary license fees, it also admits that it actively
encourages legitimate libraries to not license eBooks.  IA's PR
campaign to bring libraries into Open Libraries Project,
include such entreaties as *'You don't have to buy it twice'*
expressly telling them to not license the works from the
plaintiffs or OverDrive.

On this record, therefore, there is no question that
there is substantial market harm from lost license fees and
this is the precise type of evidence that the Second Circuit
considered in *TVEyes* to find that the fourth factor weighed in
plaintiff's favor.  And in *TVEyes* --

N3K5hacA

1          THE COURT:  Let me just stop you there.

2          I understand the argument for every scanned copy of a

3     book there is no license fee paid to the publisher and there is

4     no eBook being bought from the publishers.  You say all of

5     that's undisputed.  Wouldn't the defendant say there is no

6     indication that the libraries would have otherwise purchased an

7     eBook so there is no evidence of actual harm?  And on the other

8     hand, there are all of defendants' experts who say there has

9     been no net loss to the publishers because their revenues have

10    been going up, there is no evidence that they have actually

11    lost revenue in terms of the bottom line and you all dispute

12    those assertions in the dueling 56.1 statements.  So, aren't

13    there issues of fact on the question of whether the publishers

14    have in fact been harmed?

15         MS. McNAMARA:  No, your Honor, because as I think you

16    have just -- I think -- very well laid out, there is two forms

17    of harm asserted by the plaintiffs, one is the lost license

18    fees and the fact that they haven't paid license fees for these

19    works is not disputed, they don't dispute that, and it is not

20    disputed that if they had acquired the works that they're

21    distributing via an authorized fashion, those fees would have

22    been paid and the plaintiffs have been deprived of those fees

23    so that harm is real.

24         THE COURT:  Let's stop there just for a moment.

25         There is also no evidence that the defendants would

N3K5hacA

have paid those license fees, no evidence that they would have

bought the eBook were it not otherwise available to them for

free, right?

MS. McNAMARA:  Well, if I am understanding you

correctly, are you voicing their position that there is no

licensing market for CDL?

THE COURT:  Either that, or that simply there is no

evidence what the defendants would have otherwise paid to the

plaintiffs for the ability to make the eBook.

Do you follow?

MS. McNAMARA:  Yes, I do follow, your Honor and --

THE COURT:  I fully understand.  I mean I fully

understand your argument.  I mean your argument is there is a

market for eBooks and that is the relevant market, and by

scanning the publishers' works the defendants are depriving the

plaintiff of those licensing fees.  But you began this argument

by saying this is all undisputed.  Whether there would in fact

be licensing fees is a question, isn't it?

MS. McNAMARA:  No, your Honor.  I think another way of

saying that is would they enter into the license, and that is a

question, but that's a question that the Courts resolve in the

plaintiff's favor.  That was the very case in *TVEyes*, your

Honor, where it was argued, *'Well, we tried to enter into a

license'* or *'You wouldn't agree to a license with us'*, and the

Court says it doesn't matter whether you would agree to the

N3K5hacA

1    license that was offered or not.  That's not the issue.  The

2    issue is that the market exists, it is extant, it is thriving,

3    and you are refusing to participate in that market and because,

4    like, let's say you don't like the price or you don't like the

5    terms, the answer to that is not that you steal it.  That is

6    basically IA's answer, is that we don't like that market, we

7    don't want to pay it, it's not in our interest to pay it, and

8    so we are entitled to just duplicate your work without

9    authorization and distribute it to the world.  Well, that isn't

10   the way the law works and it is not the way we work in markets.

11             THE COURT:  OK.

12             MS. McNAMARA:  And --

13             THE COURT:  The other question that I posed is what do

14   you do with all of the alleged statements of undisputed facts

15   that the defendants put forth that there is no ultimate harm to

16   the plaintiffs because their total revenues have been going up,

17   there is no evidence that they would have had a greater bottom

18   line were these scanned books not been available without the

19   license.

20             Follow me?

21             MS. McNAMARA:  Yes, your Honor.

22             First of all, they put forth two experts, one was

23   Dr. Reimers, whose study merely looked at sales of print books

24   based on Amazon best seller lists and this motion addresses the

25   eBook market, both commercial and library.  So, Reimers' study

1    is really not even relevant in any way to this analysis.

2              So then with Jorgensen's study, which is what I think

3    you are specifically referencing, they include what they call

4    his natural experiment using data from the few months that the

5    Internet Archive had the National Emergency Library open during

6    the early days of the pandemic when IA threw out any pretense

7    of controls on CDL.  But this natural experiment used by

8    Jorgensen involved the most unnatural data.  Jorgensen takes 25

9    works published by Hachette and compares their checkout data on

10   OverDrive from the second quarter of 2020, when NEL was

11   operating, and the third quarter of 2020, after the lawsuit was

12   filed and the works in suit were removed.  But Jorgensen

13   ignores and provides no controls for the fact that the second

14   quarter of 2020 was when the world was shut down because of

15   COVID and the publishing industry saw an unprecedented increase

16   in eBook sales or licenses as people were stuck at home and

17   were scrambling for books or anything to do.  And as the world

18   began to open up in Q3, the increase that your Honor was just

19   referencing was that was -- that was the increase in Q2.  Once

20   we got to Q3 when they compare it, the sales and checkouts on

21   OverDrive, as well as elsewhere, reverted to norm, thus the

22   supposed average downturn that Jorgensen saw in Q3, which he

23   says shows that there was no harm, can't logically be

24   attributed to or even associated with the National Emergency

25   Library shutdown and that is one of the many glaring problems

1    with Jorgensen's.

2            But the Court doesn't have to say, you know, resolve

3    the dispute over admissibility of Jorgensen's work on this

4    motion because the Court has two other means of finding that

5    there is significant market harm that weighs in the plaintiffs'

6    favor.  The first is what I already described was the lost

7    license fees, and the second is as *ReDigi* underscored, that the

8    fourth factor's focus is whether the copying at issue brings to

9    market a competing substitute.  Here there is no dispute that

10   what Internet Archive is offering is a competing substitute if

11   the quality isn't the same as the plaintiffs' authorized eBooks

12   which only underscores why this whole utility of transformative

13   use argument carries so little weight.  But there is no dispute

14   that it is a substitute, people check out the books and can

15   read them which is the very purpose that the plaintiffs provide

16   their works.  Thus, the bottom line is that the law dictates

17   that when there is a free alternative for the essentially the

18   same product and when that becomes widely available, the

19   copyright owner will necessarily suffer.  And case after case

20   recognizes this common sense reality that you cannot compete

21   with free.  That was found in *Napster*, in *ReDigi*, in *Gregory*,

22   and elsewhere.  And it is important, I would say, I think in

23   closing, your Honor, on the license --

24            THE COURT:  Let me just pause there.

25            MS. McNAMARA:  Sure.

N3K5hacA

1          THE COURT:  Your position is you disagree with the

2     defendant's experts, you say that there are disputed issues of

3     fact with respect to the defendant's experts but I don't have

4     to resolve those disputes in connection with this motion.

5          MS. McNAMARA:  Correct, your Honor; because of the

6     fact that they are offering a competing substitute and because

7     of the irrefutable damage and loss of the licensing fees.  And

8     what I wanted to say about the licensing fees, your Honor, is

9     that what exists right now with the Open Libraries Project,

10    only eight or nine public libraries have signed on to join

11    Internet Archive in this endeavor, yet there are more than

12    9,000 library systems in the United States, if even relatively,

13    you know, if a significant percentage of those libraries were

14    to sign on and join Internet Archive in their CDL and their

15    appropriation of works, the damage to the plaintiffs would be

16    extraordinary, it would be massive, and that is precisely the

17    type of looking forward that was done in *TVEyes* with Fox, where

18    they had a nascent market but the Court recognized that there

19    would be millions of dollars in damages if it was given the

20    green light and allowed.  And that is precisely what would

21    happen here, your Honor.  If CDL and Internet Archive's actions

22    were given the green light, the damage to the publishers and

23    damage to creators and the damage to authors would be beyond

24    measure.

25          THE COURT:  What relief do you seek on this motion?

1          MS. McNAMARA:  We seek a finding of liability, your

2     Honor, and the issuance of a permanent injunction.

3          THE COURT:  Are there any issues with respect to

4     damage, statutory damages, and the like?

5          MS. McNAMARA:  Well, your Honor, the plaintiff has

6     moved on Section 504 under statutory damages which I am happy

7     to address.  Would you like me to briefly address that?

8          THE COURT:  No.  I realize that there is a dispute

9     with respect to that.  My question really goes to the formation

10    of a judgment.  I would have thought that there are issues that

11    couldn't be resolved on this motion with respect to, for

12    example, you say we are looking for an injunction.  What the

13    scope of the injunction would be is something that is really

14    not discussed so far as I can recall in the papers.  The issue

15    of whether there should be statutory damages or whether there

16    is an exception for good faith in this case for statutory

17    damages is something that's argued out but I would have thought

18    that all of the issues with respect to the formation of an

19    appropriate judgment are really not laid out, so far as I could

20    tell, in the papers.  I would have thought that that's a

21    separate issue to be decided subsequently.

22         MS. McNAMARA:  Yes, your Honor.  I mean, I think that

23    I would opine two things or observe two points on that.  Yes, I

24    think the primary purpose of this motion is for liability as a

25    finding of liability.  I would think that with the finding of

N3K5hacA

1  liabilities the parties could work together on what judgment

2  might be the appropriate one to issue, and if there are

3  disputed issues surrounding that then we would come before your

4  Honor to hopefully get those resolved in one way or another.

5  But, the primary issue on this motion is liability.  We do

6  think that given the liability and given the irreparable harm,

7  that injunctive relief is fully warranted and could be issued

8  and the parties would be prepared -- or at least we, as the

9  plaintiffs, would be prepared to provide your Honor with

10  proposed language for an injunction.

11             THE COURT:  OK.  Thank you.

12             MS. McNAMARA:  Thank you.

13             THE COURT:  All right.  Let me listen to the

14  defendants.  Mr. Gratz?

15             MR. GRATZ:  Thank you, your Honor.  Good afternoon.

16  Joe Gratz with Morrison & Foerster representing the Internet

17  Archive.

18             We are here today to determine who controls the future

19  of library lending:  Big publishers or librarians.

20             Controlled digital lending allowed libraries to do

21  digitally what they have always done physically:  To loan a

22  book they own to one patron at a time.  Now, loaning a book

23  digitally by its nature involves making copies.  That is why

24  the question in this case is one of fair use rather than an

25  application of Section 109.  The question is whether that

N3K5hacA

copying, which is incidental to loaning the books a library

owns, is fair use.  Fair use ensures that copyright extends

only as far as is necessary to provide incentives for creation

and that it does not extend further.  Allowing libraries to

lend books they own to one patron at a time serves copyright's

purpose of aiding the creation and dissemination of knowledge.

And lending books by more efficient technological means does

not offend the purposes of copyright.  Instead, it more

effectively furthers those purposes.

So, I want to turn now to the first fair use factor

and in addressing these I will touch on a number of the points

that Ms. McNamara discussed.

First, with respect to commerciality, the use is

wholly non-commercial.  Internet Archive is a 501(c)(3) public

charity and doesn't take in any revenue from digital lending.

We aren't doing this to benefit ourselves, like any other

library, we are doing this to benefit the public by acquiring

books at our own expense and making them available to patrons

at our own expense.  Publishers identify some other programs at

Internet Archive that do bring in revenue, but those don't have

anything to do with lending.

To address the *Weissmann* case which that Ms. McNamara

identified and cited for the first time in the publishers'

reply brief, a few points on that case, your Honor.  First,

that was a case between two academics about gaining status and

1    tenure and so on, and those things in the academic world are

2    the equivalent of gaining dollars, right?  They translate into

3    dollars in the academic world and that was the basis for the

4    ruling in *Weissmann*, that there was some level of

5    commerciality.  That is not true here, right?  Lots of people

6    want to take books out from our library but that does not make

7    our use commercial and it doesn't cause some monetary benefit

8    to -- ultimately in our job.

9             The last point I want to make on the *Weissmann v.*

10   *Freeman* case is that it predates the Supreme Court's *Campbell*

11   opinion in which the Supreme Court gave us some of sort of the

12   modern guidance about how to speak about commerciality in the

13   context of the first factor.  And so, that's why we don't there

14   I the *Weissmann* case stands for the proposition that any time a

15   fair user has a reason to want to do what they're doing, or

16   ends up in any way along any axis better off because they

17   engaged in fair use, that that means that the fair use was

18   commercial in nature.  That would sweep in almost every

19   non-commercial phase.

20            Second, turning from the commerciality question --

21   unless there is anything your Honor would like to discuss about

22   it -- to the question of transformative rights.

23            This use is transformative and it is transformative in

24   a specific way.  It is transformative in the same way that the

25   use in *Sony* was transformative.  As the *TVEyes* case said, it

N3K5hacA

utilizes technology to achieve the transformative purpose of

improving the efficiency of delivering content without

unreasonably encroaching on the commercial entitlements of the

rights holder.  And, as Judge Leval later explained in the

*ReDigi* case, that it was achieved without unreasonably

encroaching on commercial entitlements of the rights holder

because the improved deliveries was to one entitled to receive

the content.

Libraries are entitled to lend books they own and

patrons are entitled to read the books they have borrowed, and

for that reason utilizing this technology to more efficiently

lend books is a transformative purpose in the Second Circuit as

case law.

THE COURT:  Could I just stop you there?

MR. GRATZ:  Yes, your Honor.

THE COURT:  Who do you analogize yourself to in the

*Sony* case?  Do you analogize yourself to *Sony* or do you

analogize yourself to the home viewer who was otherwise

entitled to watch the free television program and who did the

time shifting?

MR. GRATZ:  So, in sort of technical doctrinal terms,

your Honor, I think we are analogous to the home user since

they were the one making the copy in that circumstance and we

are the ones making the non-commercial copy in this

circumstance and we are --

N3K5hacA

1            THE COURT:  But --

2            MR. GRATZ:  Yes, your Honor?

3            THE COURT:  So, if you analogize the library to the

4    home viewer, it was clear that the home viewer would time shift

5    in order to be able to view the program at another time, but it

6    was clear in *Sony* that the Court distinguished that home viewer

7    from making the copy, if you will, available, to the general

8    public.  Here, the libraries make the copy which are then

9    available to anyone who wishes to get a copy under specific

10   terms of the eBook.  That seems to be very different from the

11   individual home viewer who simply time shifts in order to be

12   able to see, at a more convenient time, the program that the

13   home viewer could have otherwise seen at the more awkward time.

14   And --

15           MR. GRATZ:  Two options.

16           THE COURT:  Hold on.  Hold on.  Hold on one SEC?

17           MR. GRATZ:  I'm sorry, your Honor.

18           THE COURT:  It appears that the Courts who have read

19   *Sony* have been careful to limit *Sony* to that individual use

20   rather than availability to the "general public," and it is

21   clear that there was language in *Sony* itself which made it

22   clear that with respect to copyright infringement, it was

23   looking solely at the individual home viewer.

24           Go ahead, your turn.

25           MR. GRATZ:  Placing, your Honor, I think the lens with

1   which to view *Sony* is the lens through which the *TVEyes* and

2   *ReDigi* cases discussed it, and the question that those cases

3   asked is whether the viewer was entitled to do what they were

4   doing to view this, and this was just making that process --

5            THE COURT:  Didn't *ReDigi* and *TVEyes* make it clear

6   that *Sony* was not about distribution to the general public?

7            MR. GRATZ:  Well, so I don't think that *ReDigi* and

8   *TVEyes* drew that line, partially because the way that they

9   talked about *Sony* as was a case of utilizing technology to

10  achieve the transformative purpose of improving the efficiency

11  of delivering consent.  And read that way, that was both -- in

12  the *Sony* situation that was both something that the individual

13  user was doing, whose fair use was being analyzed, and in that

14  situation it was something that *Sony* would do.

15           THE COURT:  But *ReDigi* and *TVEyes*, in both cases,

16  found no fair use.

17           MR. GRATZ:  They did.  They found, on the balancing

18  all of the factors, that there was no fair use, that's right,

19  your Honor, in those commercial situations.

20           THE COURT:  OK.  And *ReDigi*, I thought, made it

21  reasonably clear, that if you copied the entire work and made

22  the entire work available, that would not be fair use.

23           MR. GRATZ:  Well, I don't think that's what *ReDigi*

24  stands for, your Honor.  I think *ReDigi* -- there are certainly

25  situations in which making the entirety available to someone is

N3K5hacA

1  fair use.  *HathiTrust* gives us one such example.

2          THE COURT:  And *Google*.  But let's finish with *ReDigi*

3  before we get to *Google Books*.

4          OK.  Go ahead.

5          MR. GRATZ:  Certainly.

6          The situation in *ReDigi* was one that the Court found

7  to be minimally transformative and found not to be fair use,

8  thus the things for which we are reciting *ReDigi* in the context

9  of our transformative argument is its discussion of *Sony*, in

10  particular its further explanation of the *TVEyes* gloss on *Sony*

11  telling us how the Court of Appeals understands *Sony* in the

12  context of transformativeness.  I agree with you, your Honor,

13  that were we doing what *ReDigi* is doing, that is, operating a

14  commercial service for the resale of digital goods, that would

15  fall directly into *ReDigi*.

16          THE COURT:  So, how do you distinguish, other than by

17  saying it is dicta, the comments by the Court of Appeals in

18  *Google Books* which appeared to say that there would be a strong

19  case for copyright infringement and not fair use if *Google* had

20  not only copied all of the works but made the works available,

21  not simply as a means of searching for individual terms and

22  snippets but a way of accessing the entire work.  There would

23  be a strong case that that would not be fair use.

24          MR. GRATZ:  We don't disagree, your Honor, with the

25  idea that if you take the exact facts of *Google Books*, that is,

N3K5hacA

snippets were available to any number of people concurrently at

any given time, made available by a commercial company, right?

If you take those facts and you sort of enlarge the snippet to

the size of the entire book, that would present -- we agree

with the Court that that would present a very difficult case

for fair use.  That is not what happened here.  This issue is

not just that it is dicta, the issue is that it is discussing

the situation that doesn't match the facts here and doesn't

match the most important fact which is that what Internet

Archive is doing is stimulating the limitations of physical

lending through its digital lending program, rather than the

thing the Second Circuit was talking about in *Google Books*

which is making the entire book available to a limited number

of people concurrently.

            THE COURT:  Wait.

            MR. GRATZ:  And I would add, in *Google Books*, Google

didn't own a copy.

            THE COURT:  But I had thought that one of the points

of *Google Books* was to say if you copied the entire work and

then made it available, that would be a strong case of

copyright infringement and not fair use.  In this case Internet

Archive copies the entire work, it has a right to the work, but

it has not received a license to duplicate the work, to

reproduce the work.  What comparable case is there that a

person who has the right to the work, has the author's or

N3K5hacA

1   publisher's right to reproduce the work?  Which is at the core

2   of what IA does.

3           MR. GRATZ:  I point, your Honor -- I'm sorry, your

4   Honor.

5           THE COURT:  No, I appreciate that.  That's one of the

6   problems of a telephone conference but you are very polite and

7   I appreciate it.

8           I realize that in your papers you are trying to

9   analogize to other situations but, at its starkest, what is

10  happening is IA has a book and without a license it reproduces

11  the book, which it then lends out, it lends out the eBook, the

12  scanned copy of the book which it retains.  Is there any

13  comparable case which says that that is permissible fair use?

14          MR. GRATZ:  There is, your Honor.  Obviously I want to

15  start by emphasizing that there would be no need to talk about

16  fair use if there was not a reproduction occurring, right,

17  without a license.  That is the sort of -- that is the reason

18  we are discussing fair use at all, and as to your Honor's

19  question what is the case --

20          THE COURT:  Wait a minute.

21          MR. GRATZ:  I think --

22          THE COURT:  Wait a minute.

23          MR. GRATZ:  I think the closest case is *HathiTrust*.

24          THE COURT:  But that was found not to be fair use.

25          MR. GRATZ:  That was found to be fair use, your Honor.

N3K5hacA

1          THE COURT:  I'm sorry.  Yes, it was, but the entire

2    work was not made available.  Yes, they --

3          MR. GRATZ:  It was, your Honor.

4          THE COURT:  OK.  I will go back.  *HathiTrust* was the

5    predecessor to *Google Books*.

6          MR. GRATZ:  That's right, your Honor, and I want to

7    particularly direct your Honor's attention to the second half

8    off the second fair use analysis in the *HathiTrust* case which

9    is addressing not the situation of developing a searchable

10   database, which is very similar to the *Google Books* situation,

11   but the situation of making available complete books to library

12   patrons where those library patrons had print disability.  And

13   obviously that is not precisely what is going on here because

14   on the one hand they were not limiting the number of copies to

15   the number of copies they had, as we do, to simulate lending,

16   physical lending, but also the --

17         THE COURT:  In *HathiTrust* -- at least my

18   understanding, I will go back and check -- was also a question

19   of the ability to find things in works that had previously been

20   published so the works were put into a database but the

21   database didn't allow users to view any portion of the books

22   that they were searching.  And if that's right, it's not nearly

23   analogous to what IA does here.

24         MR. GRATZ:  I agree.

25         THE COURT:  Here the entire book is available and the

1    book was not available in *HathiTrust*.

2           MR. GRATZ:  So I agree with your Honor that the book

3    was not available.

4           THE COURT:  I will certainly double-check again

5    *HathiTrust*, but then my question remains for the most

6    analogous -- and of course *HathiTrust* preceded *Google Books*

7    where *Google* had the language from the Court of Appeals that

8    there would be a strong case if the entire work were made

9    available.  But, is there any other case that is closely

10   analogous to what IA does here where a Court has found that's

11   fair use?

12          MR. GRATZ:  I want to begin by just noting, just so

13   your Honor can write it down --

14          THE COURT:  Hold on one second?

15          MR. GRATZ:  Yes.

16          THE COURT:  You are very -- I have said before that

17   you are very good and very polite and I appreciate that, but I

18   also appreciate my question being answered first and then

19   giving me the explanation second.  So, we have gone over

20   *HathiTrust* and the question remains what case do you rely on as

21   most analogous which says that what IA was doing here was fair

22   use.

23          MR. GRATZ:  The most factually analogous case is

24   *HathiTrust* in the factual situation presented at page 101 and

25   thereafter in the case.  I agree with your Honor that the

1    factual situation presented in the earlier part of the opinion

2    with respect to a searchable database is not closely analogous

3    to the situation, though I hasten to add Internet Archive has

4    done that as well like *HathiTrust* is engaged in the scanning

5    for the purposes of making a searchable database, as well as,

6    in *HathiTrust*, making the entire book available under

7    particular conditions.

8            THE COURT:  And, as I understand it, the plaintiffs

9    haven't challenged, at least on this motion, those kinds of

10   search.

11           MR. GRATZ:  That's right.  They do not challenge

12   search and I think importantly they challenge only with respect

13   to the 127 books they chose, all of which are available for, in

14   OverDrive.

15           THE COURT:  OK.  Any other case than *HathiTrust*?

16           MR. GRATZ:  If your Honor is looking for factual, sort

17   of very closely analogous factual situations, we think that

18   *HathiTrust*, and particularly the second half of *HathiTrust*,

19   presents the strongest one.  I agree that there have not been

20   many litigated cases about the breadth of non-profit libraries'

21   rights to lend or otherwise make available materials in books

22   they own, in our view that's because there hasn't been much

23   question that libraries making available --

24           THE COURT:  Wait a moment.  Wait a moment.  Wait a

25   moment.  Wait a moment.

1              That, of course, elides the issue to say that this

2    case is about the ability of a library to lend a book that it

3    owns.  It ignores whether the library has a right to copy

4    wholesale, the book, which it otherwise owns.  Does the library

5    have the right to lend a book that it owns?  Of course.  That's

6    not the issue in the case.  Does the library have the right to

7    make a copy of the book that it otherwise owns and then lend

8    that eBook, which it has made, without a license, and without

9    permission, to patrons of the library?

10             To formulate the issue in this case as simply does a

11   library have a right to lend a book that it owns elides the

12   issue in the case, doesn't it?

13             MR. GRATZ:  We think these issues are very closely

14   related, your Honor, that is, the question whether a library

15   has a right to lend a book it owns is, we think, a very

16   important one, and we agree with you that the answer is

17   obviously "yes."  We agree that the question whether the

18   library has the right to lend the physical book, physically,

19   does not necessarily answer the question, in every case, does

20   the library have the right to lend to one person digitally when

21   they are not lending out the physical book physically.

22             THE COURT:  Wait, wait, wait.  You keep avoiding the

23   question.  Right?  You avoid the question of whether the

24   library has the right to reproduce the book that it otherwise

25   has a right to possess which is really at the heart of the

1    case, right?  The publisher has a copyright right to control

2    reproduction so every time you formulate the issue as simply

3    does a library have the right to lend a book that it owns

4    without saying does the library have the right to reproduce

5    that book without a license, without permission, without the

6    payment of a license fee, you ignore the central issue in the

7    case, don't you?

8         MR. GRATZ:  Let me reformulate our position in this

9    way then, your Honor.

10        It is our position, first, that a library has a right

11   to physically lend a book; and second, that a library has the

12   right, under fair use, to make whatever copies are necessary to

13   facilitate digital lending of that book, so long as there is

14   only one patron at a time who can borrow the book for each copy

15   that the library has bought and paid for.

16        THE COURT:  OK.  Let's pause on that then.  What case,

17   do you think, that supports that proposition?  Is it *HathiTrust*

18   at page 101?  OK.  I will go back again to *HathiTrust* which

19   did, of course, precede *Google Books*.  But, any other case

20   which is remotely on point for that proposition?

21        MR. GRATZ:  I think the best case is *HathiTrust* at

22   101.  I think we have discussed the *Sony* case and the extent to

23   which it is or is not analogous, but we think it stands for the

24   proposition that copies that are made in furtherance of doing

25   something that otherwise is ever concededly lawful, getting the

1    work to someone who is entitled to see or read it, are copies

2    copying that is privileged under fair use.

3          And there is a further line of case --

4          THE COURT:  Could I just -- why doesn't that

5    completely undercut the copyright holder's right to prevent

6    reproduction other than with a license?

7          MR. GRATZ:  Every fair use involves reproduction

8    without the consent of the copyright holder without a license,

9    and every litigated fair use involves a situation where the

10   copyright holder so strongly disapproves that they have filed

11   suit.  So, the facts that the --

12         THE COURT:  That's a fair point.

13         MR. GRATZ:  And that is why fair use takes into

14   account -- fair use is sort of capacious and takes into account

15   the purpose of the use which, in *Sony*, as here, is getting the

16   work to someone who is entitled to get at it, albeit in a way

17   that the copyright holder does not wish for it to be gotten to

18   that person, there by videotaped time shifting, and here by

19   digitizing and making available a digital copy while

20   withholding a physical copy from circulation.

21         THE COURT:  Go ahead.

22         MR. GRATZ:  And so, your Honor --

23         THE COURT:  Could I --

24         MR. GRATZ:  Go ahead, your Honor.

25         THE COURT:  It is a related point but is it fair that

1    you are not relying on the first sale doctrine under

2    Section 109?

3         MR. GRATZ:  It is correct that we are not relying on

4    Section 109.  We think that the common law of exhaustion

5    provides further support for the idea that what we are doing is

6    something that is favored under the first factor because

7    lending a book is one of the incidents of ownership and

8    engaging reproduction that is sort of merely incident to

9    exercising the incidence of ownership is something that common

10   law exhaustion approved of, for example, in the *Doan v.*

11   *American Book* case that we cited in the papers.  But it is

12   correct that we are not -- we do not independently rely on

13   Section 109, just on the common law doctrine from which it

14   arose.

15        THE COURT:  OK.  *Doan* is over a hundred years old.

16   Any other case other than *Doan* that you rely on for the notion

17   that your concept of reproduction in the common law first sale

18   doctrine supports you in this case?

19        MR. GRATZ:  There are not directly cases on point,

20   your Honor.  The other authority to which we would direct your

21   Honor is the legislative history of Section 109 which indicates

22   that it intends not to disturb the common law and, in

23   particular, reaffirms that libraries are entitled to lend

24   books, although I recognize they are talking about physical

25   lending.  We think that the clear entitlement to make a

1   particular book available to a particular patron justifies the

2   incidental copying that is necessary to do that digitally.

3           THE COURT:  And *ReDigi* seemed to be fairly clear that

4   Congress, by adopting 109, has formulated the metes and bounds

5   of the first sale doctrine and that any other changes should

6   come from Congress and not from the courts.  So whatever the

7   legislative history shows with respect to 109, 109 states the

8   law according to the Court of Appeals that shouldn't be changed

9   without Congress otherwise amending 109 or passing another

10  statute.

11          MR. GRATZ:  That is right as to a defense under

12  Section 109 and we are not asserting a defense under

13  Section 109.  We are asserting that --

14          THE COURT:  You are saying that the concept behind

15  Section 109 should be read into the fair use factor.

16          MR. GRATZ:  We are, your Honor, in the same way that

17  the concept behind, for example, Section 121 was read into the

18  first fair use factor in the post-page 101 portion of the

19  *HathiTrust* opinion.  There, there was a specific enumerated

20  exception for certain activities because they served a certain

21  purpose and the Court -- and the activity that the defendant

22  engaged in fell outside the specific contours of the statutory

23  language and the Court held that, nonetheless, the existence of

24  that statute was -- that what the defendant was doing was in

25  furtherance of the purposes of that statute even though it fell

N3K5hacA

outside the express bounds of exactly what that statute created

a safe harbor for, favored rather than disfavored a finding of

fair use and they found fair use there.  We think the same is

true here with respect to exhaustion as opposed to Section 121.

THE COURT:  OK.  Go ahead.

MR. GRATZ:  We hasten to add that we think this use is

a favored one whether or not it is transformative because it is

not expanding the number of people who can access a given book

at a given time and it serves the purpose of copyright, which

is to expand access to expressive works without harming the

incentives to create those works.  The use at issue gets

library books to people who might otherwise not be able to

access them and that aids in scholarship and research and

promotes the creation and diffusion of knowledge that is

discussed at some length in the amicus brief filed by authors

who support controlled digital lending, the Authors Alliance

brief.

Just to close on the first factor, that's why we think

the first factor strongly favors a finding of fair use.  As to

the second factor, we agree with Ms. McNamara that all

different types of works are involved and, as in *Google Books*

and *HathiTrust*, we think that makes this factor one of little

significance.

As to the third factor, the amounts used.  Borrowing a

library book necessarily involves borrowing the whole thing and

N3K5hacA

1     the use of the entirety, as in the back half of *HathiTrust*, is

2     necessary to that favored purpose of making library lending

3     more efficient.

4            If I can turn now to the fourth factor, the effect on

5     the market, this is the unusual case where we could measure

6     whether there is an effect on the market and plaintiffs provide

7     no opposing empirical evidence that there was.

8            You asked Ms. McNamara whether there are issues of

9     fact with respect to harm and in our view there are not and

10    that question is resolved in the defendant's favor.  There is

11    no evidence that the publishers have lost a dime.  They say

12    that in the hypothetical world where the publisher was entitled

13    to get a fee for this they would have gotten a fee for this and

14    they didn't get a fee for this but that simply assumes the

15    conclusion.  Courts don't assume that there is a licensing

16    market.  Courts use the analysis from --

17           THE COURT:  Isn't it plain that there is a market for

18    eBooks?

19           MR. GRATZ:  There is a market for eBooks but that is

20    not the relevant question.  There was, for example, in *Sony*, a

21    market for videotapes of movies but that is not the level of

22    specificity at which the analysis operates.  Here, the relevant

23    question, the relevant economic actor, the person deciding what

24    to do, whether to engage in this use, is the library who owns a

25    book and wants to circulate it to their patrons digitally and

N3K5hacA

1    not circulate it physically.  And from the point of view of

2    such a library, there is no license they can get from the

3    publishers to allow them to scan their book and circulate it

4    digitally.  That is because there has never been a licensing --

5         THE COURT:  But they could buy an eBook or they could

6    license an eBook from the publisher.

7         MR. GRATZ:  That is correct.  And we think it is not

8    dispositive and arguably not relevant because, for example, in

9    *Sony*, the record evidence was that the consumer in question

10   could have purchased a pre-recorded videotape or a laser disk

11   or rented one.  In a way that did not relate to their

12   entitlement to receive that content which is why we think the

13   Second Circuit's focus in interpreting *Sony* is so, you know, is

14   so focused on that the delivery was to one entitled to receive

15   the content, not just anybody.  And so that's why we don't

16   think -- the fact that there is a licensed marked for libraries

17   who don't own a book or a license market for license that has

18   nothing to do with the library owning the book.

19        THE COURT:  But wait a minute.  Why do you define the

20   market that way rather than to simply say a library, whether

21   they own a physical copy or not, has the ability to license an

22   eBook from a publisher.  Rather than to pay that licensing fee

23   to the publisher, some libraries choose to make their own copy

24   and to lend that copy.  Why isn't it self-evident that that

25   deprives the publisher of the fee that the publisher could

1   otherwise obtain from licensing an eBook to that library?

2           MR. GRATZ:  It is because with respect to the copies

3   at issue in the CDL situation, the copies the issue here, the

4   question is not between OverDrive and nothing, right?  The

5   question is between physically lending the book to a particular

6   patron, for which no payment would be due to the publisher, or

7   digitally lending a book to the patron.  The question is not

8   what would happen if they didn't own a book or the patron

9   didn't want it digitally or the patron didn't -- that is, the

10  question is we have got a copy available and we can loan it to

11  a particular patron.  The fact that if we didn't have a copy or

12  regardless whether we have a copy we could get some other, rent

13  a copy and loan it to that patron, we don't think, enters into

14  the analysis.

15          THE COURT:  Why not?

16          MR. GRATZ:  Because the question is what is the

17  alternative.  The alternative, in our situation, is physical

18  lending.  Everyone agrees that instead of -- if a particular

19  patron wants a book we can hand it to them, mail it to them,

20  whatever.  Right?  Bring a bookmobile around to their

21  neighborhood.  That is the relevant alternative not --

22          THE COURT:  Hold on.  Hold on.

23          The library has a desire to lend to a customer or

24  patron an eBook.  The library can, without authorization, make

25  a -- scan the entire book in its collection and lend out that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N3K5hacA

1    eBook or it could purchase a license from the publisher.  It

2    chooses to simply make a copy itself without paying a fee and

3    to lend that copy.  Why is the relevant market then not eBooks?

4            MR. GRATZ:  The relevant market is not eBooks because

5    in the second of your Honor's hypotheticals, the library is not

6    lending a book from its collection.  The library still has and

7    could lend to someone else the physical book in its collection.

8    And so, in that way, the two situations don't precisely line

9    up.

10           THE COURT:  OK.  Is --

11           MR. GRATZ:  It is certainly possible -- I'm so sorry,

12   your Honor.

13           THE COURT:  Thank you.  I didn't mean to interrupt

14   you.

15           Is it fair that your experts don't analyze a market

16   for eBooks?  They come to the conclusion that the existence of

17   Internet Archive has not deprived the publishers of revenues

18   because their revenues have all gone up despite the existence

19   of IA simplified?

20           MR. GRATZ:  Our experts have done both of those two

21   things, your Honor.  They have analyzed the revenues and shown

22   that the revenues have gone up, but in particular, with respect

23   to Dr. Jorgensen's analysis, he analyzed the demand for eBooks

24   through OverDrive to determine whether availability through CDL

25   had any effect on the demand through OverDrive, that is,

1    whether there was any substitution between borrowing via

2    OverDrive and borrowing via CDL, or whether, for example

3    hypothetically, all of the lending on CDL if the CDL did not

4    exist would happen, is lending of those physical books or other

5    copies of physical books.  And what Dr. Jorgensen found is

6    there was such effect, that is, when books were available in

7    CDL, made available in CDL, the demand for them from OverDrive

8    did not decrease and when they were removed the demand for them

9    did not increase.  And so, we think that shows -- and the

10   plaintiffs prevent no opposing analysis.  These two things are

11   not market substitutes, or at least to the extent they are

12   market substitutes, that the degree of loss from that

13   substitution is immeasurably small and in our view overwhelmed

14   by the countervailing public benefits of CDL.

15            THE COURT:  OK.

16            MR. GRATZ:  Dr. Jorgensen's analysis, we think, is

17   very important to getting comfortable with the idea that this

18   is not a harm to the publishers but only a benefit to libraries

19   and readers by making something that would have been happening

20   otherwise, that is, the lending of these very same physical

21   copies physically, making that more efficient.

22            If digital lending had caused a hit to plaintiffs

23   revenue that could weigh against fair use and the question

24   there would be what's the reason for the loss.  Right?  If the

25   reason for the loss is cognizable under the fourth factor

N3K5hacA

1    because there is substitution or one that is not cognizable

2    under the fourth factor because it derived -- it had some other

3    source, it is not from substitution.  We don't think we even

4    get there because the magnitude of the effect and the only

5    analysis that is before the Court is zero.

6         I want, just briefly, to respond to a point that

7    Ms. McNamara made about the kinds of harm they are claiming.

8    They are claiming harm from not having engaged with and done

9    these lends through OverDrive instead, and we have been

10   discussing that at some length and why we don't think that is a

11   comparable situation.  And the second thing that Ms. McNamara

12   identified was that, in her view, these are substitutes for one

13   another.  And the point that I want to make with respect to

14   that is a finding that these were substitutes would not answer

15   the question to the fourth factor.  It would answer the

16   question whether any demonstrated harm or any identified harm

17   was cognizable under the fourth factor.  There still has to be

18   some harm there and there has been no evidence of such harm

19   such that taking away CDL from libraries will harm those

20   libraries and their patrons with no countervailing economic

21   benefit to publishers.

22         THE COURT:  But the burden is on the defendants to

23   show lack of harm as the Court of Appeals made it clear in

24   *Warhol*, because it's an affirmative defense and so --

25         MR. GRATZ:  So, your Honor --

N3K5hacA

1           THE COURT:  Hold on.  Let me finish on that point.

2           So, irrespective of the lack of evidence of harm, the

3    argument that there is a market for eBooks and for every copy

4    that IA makes of a book, it deprives the publishers of the

5    licensing revenue for that eBook and I would have thought that

6    under *Warhol* that would be sufficient.  No?

7           MR. GRATZ:  We don't think that it is, your Honor,

8    because there would need to be a reason to think that the

9    publishers were worse off than the situation in which the fair

10   use did not occur at all.  Right?  That is the comparable

11   situation unless there is a sort of -- unless there is a

12   licensing market for that precise thing.  And, as we have been

13   discussing, we don't think there is.  Libraries, in making

14   available books that they own to one patron at a time, do not

15   owe licensing fees.

16          THE COURT:  But libraries do license eBooks from the

17   publishers.  The publishers make a substantial amount of money

18   from licensing eBooks to libraries, right?

19          MR. GRATZ:  They certainly do and we think -- we have

20   no quarrel with that and no quarrel with libraries choosing

21   that, for example, for books that they don't own a copy of or

22   for books that they want to lend out more copies than they own.

23   There are lots of good reasons for a library to engage in

24   licensing with OverDrive.  We think that libraries also can --

25   everyone agrees that libraries can also lend copies they own

N3K5hacA

```
 1    physically.  The only question is whether those same lends,
 2    those same patrons can be made more efficient using digital
 3    technology and that involves inevitably making copies, but that
 4    inevitability of making copies in such situations evidently is
 5    why fair use is there.  Right?  To make sure that copyright's
 6    purpose continues to be served, even where something otherwise
 7    would be prima facie because it involves some amount of
 8    copyright.
 9             I guess the point I want to make in response to your
10    Honor's concerns is I agree that we have been acting as though
11    we have the burden and I think we can assume we have the
12    burden --
13             THE COURT:  Of course.
14             MR. GRATZ:  -- although no Court of Appeals has
15    decided --
16             THE COURT:  It is an affirmative defense, right?
17             MR. GRATZ:  It is an affirmative defense, and in the
18    situation where the use is non-commercial I think it remains an
19    open question where the burdens lie.  The point I want to make,
20    your Honor, it doesn't matter because whatever our burden is we
21    have met it by showing no harm.
22             The thing that I want to raise is imagine
23    hypothetically -- Ms. McNamara will think this is impossible --
24    but I want to imagine, hypothetically, that in fact the
25    publishers were not made worse off by CDL.  Right?  That is,
```

every lend through CDL is a lend that if CDL does not exist
either would not have occurred at all or would have occurred
using a physical copy.  In that situation there is no
justification for a ruling that this is not fair use because it
benefits the public without causing any harm to rights holders
versus the situation where the use did not occur at all.

　　　　And the second thing I want to raise is that
hypothetical is consistent with all of the record evidence.
Right?  That is what we think is happening and the plaintiffs
have not provided evidence that something else is happening and
for that reason, because the Supreme Court has so recently
reminded us that under the fourth factor it is important to
look at the source of the law and balance the magnitude of that
loss against the public benefit of the use.  We think that
analysis turns out very clearly in favor of us doing this
because the magnitude of the law is infinitesimally small, so
small that it cannot be measured, and the public benefit of
more efficient library lending is so great.

　　　　THE COURT:  What case are you relying on for that, by
the way?

　　　　MR. GRATZ:  I am relying on Google v. Oracle,
specifically at 1206, that potential loss of revenue is not the
whole story, one is to look not just at the amount but also at
the source of the law.  And in the *Wright v. Warner Books* case
that is quoted in *Warhol*, the analysis of the fourth factor

1    requires us to balance the benefit the public will derive if

2    the use is permitted and the personal gain the copyright owner

3    will receive if the use is denied.  That's *Wright v. Warner*

4    *Books* at 739, which is quoted in *Warhol* at page 48.

5         The other case I would point out on that is *MCA v.*

6    *Wilson*, another Second Circuit case, which said that the less

7    adverse effect that an alleged infringing use has on the

8    copyright owner's expectation of gain, the less public benefit

9    need to be shown to justify the use.

10        And then again *Google v. Oracle* directs us to take

11   into account the public benefits the copying will likely

12   produce and whether those public benefits are comparatively

13   important or unimportant when compared with the dollar amounts

14   likely lost, taking into account as well the nature of the

15   source of the loss.  That's *Google v. Oracle* at 1206.

16        THE COURT:  The fact --

17        MR. GRATZ:  And we think that balance turns out very

18   cleanly in our direction.

19        THE COURT:  I was just going to say that the facts of

20   *Google v. Oracle* are a long way away from the facts of this

21   case.  Fair?

22        MR. GRATZ:  They are, your Honor, although I don't

23   think that one can take the Supreme Court's sort of discussion

24   of how to think about fair use as a principle only good for

25   case about particular subject matter.

N3K5hacA

1          THE COURT:  Oh no.  No.  I pay great attention to what

2     the Supreme Court has to say and apply it as best I can to the

3     facts of the case before me, so.

4          MR. GRATZ:  That is what we are all trying to do here,

5     your Honor.

6          THE COURT:  OK.  Could you finish up?

7          MR. GRATZ:  I will.

8          So, because making library lending of books that

9     libraries have bought and paid for more efficient serves the

10    purposes of copyright, the Court should rule that CDL, as

11    practiced by the Internet Archive, is fair use.

12         I will be happy to address any of the other issues

13    that we have all discussed today.  We have all filed lots of

14    papers but I would be happy to address anything else that the

15    Court would like to discuss.

16         THE COURT:  No, thank you.  You have covered all of my

17    questions.

18         MR. GRATZ:  Thank you, your Honor.

19         THE COURT:  So, Ms. McNamara?

20         MS. McNAMARA:  Yes, your Honor.

21         THE COURT:  Go ahead.

22         MS. McNAMARA:  Thank you.

23         You have already been very generous with your time and

24    I don't want to keep you much longer, I just have a few points

25    I would like to make in response to some of the arguments made

N3K5hacA

1  by Mr. Gratz.

2          The first is that he seeks to distinguish the entire

3  body of law that has consistently held that massive duplication

4  and distribution of works in their entirety is not a fair use.

5  He tried to distinguish that primarily by emphasizing that

6  Internet Archive is a non-profit library.  I direct your

7  attention to the observation in *Google Books*, which I think is

8  instructive.  There, one of the side issues in the case was the

9  fact that Google was going to be returning these digital copies

10  of the books to libraries and the plaintiffs there suggested,

11  well, the libraries might misuse them.  The Second Circuit made

12  clear in *Google Books* that there wasn't evidence in the record

13  to show that the libraries had been misusing them but if it

14  did, they would be liable for infringement.  So I think one can

15  draw from that that the Second Circuit was clearly signaling

16  that if a library engages in mass reproduction and duplication

17  precisely as Internet Archive is doing itself, and trying to

18  get other libraries across the country to do the same, it

19  would, indeed, be infringement and not a fair use.

20          Second of all, your Honor, on the *HathiTrust* case that

21  Mr. Gratz put great weight on, he was shy to say that the

22  limited exception where the Court did allow the distribution of

23  copies was specifically limited to established disabled blind

24  users and that that is a use specifically benefited in the

25  Copyright Act itself, much as news is and why the Second

N3K5hacA

Circuit in *Swatch* made an exception on the one time copying in the *Swatch* case.  That is not the case here.  Internet Archive is massively copying and distributing these entire works to the entire world without discrimination.  Anybody can sign up and anybody can get a copy of the work.

Now, next on *Sony*, I think clearly while Internet Archive wants to be in the shoes of the user there, they are the *Sony*, and *Sony* made it clear that *Sony* was not there -- *Sony* was not involved in the duplication, it was the individual users who were doing, in their homes, doing the one-time copying, no distributing.  So *Sony* is just not the same on the facts.

Then, as to first sale doctrine and the contention that it should still inform the fair use analysis, if not, and give one an entire green light or pass, again, the Second Circuit in *ReDigi* addressed that issue.  It addressed the comparable case to *Doan* which is the case the plaintiffs cite on, the Second Circuit cited *Sells*, which was virtually identical to *Doan* and dealt with the copying of a cover or making a book physically able to be kind of refurbished so that it could still be duplicated.  And even with that limited kind of restoration of the work, rather than the entire duplication of the works at issue here, the Second Circuit said, Look, when the Congress passed Section 109, they did it in a more concrete, narrow way, and those cases have no application, and

1   if you want to change the law, go to Congress.  As I said at

2   the outset, what Internet Archive is trying to do is back here

3   asking your Honor to effectively change the law.

4        Now, next they talk about we have a copy that

5   libraries are free to go and get copies from OverDrive if they

6   don't have a physical book or they want another copy.  But that

7   is not the premise to the massive licensing market that exists

8   here, your Honor.  It serves all libraries when they have

9   digital works, physical works, both, because they have readers

10  want their works in different formats and the libraries are out

11  to serve readers.  And if this was only limited to libraries

12  that didn't own the physical books so they needed to get the

13  digital work, then there would be no reason for their PR

14  campaign saying you don't have to buy it again.  The reason it

15  says "again" is because they're instructing libraries don't

16  license that from the plaintiffs, just engage in CDL and take

17  the work.  That's their point.  And even their own expert,

18  *Hildreth*, gave her expert opinion that libraries will spend

19  less money on licensing eBooks if they're available to CDL.

20  There is no dispute in this record, your Honor, that the

21  plaintiffs suffer and they will suffer massively if CDL were

22  given a green light by the loss of this licensing market, which

23  would necessarily also have a significant impact on the

24  commercial market because, as the basic economic principle and

25  common sense is you cannot compete with free.

N3K5hacA

1          And then, finally, as to the point that we didn't

2   present any opposing analysis.  We did.  We provided an expert

3   report, we provided the report by Prince who made it clear that

4   the damages would be massive.

5          And, as your Honor correctly pointed out, the burden

6   of proof on all factors of fair use are on the defendant, not

7   the plaintiffs, and Mr. Gratz said no Circuit Court has held

8   that, but in fact the *University Press v. Patton* case out of

9   the Eleventh Circuit in 2014 held that it is an affirmative

10  defense and the burden is on the defendant regardless of

11  whether the defendant is a non-profit or educational

12  institution.  And here, of course, that was dealing with an

13  educational institution.  Internet Archive is not an

14  educational institution, they're distributing all manner of

15  books whether it be romance, fantasy, anything.  And to the

16  degree that there is an educational take-away from those works,

17  that is the result of the publishers and authors and the hard

18  work and the creation of those works, not by anything being

19  done by Internet Archive.

20         So, for all of those reasons, your Honor, we again ask

21  that the Court grant the plaintiff's motion for summary

22  judgment and deny Internet Archive's motion for summary

23  judgment.

24         THE COURT:  All right.  Thank you, all.

25         MS. McNAMARA:  Thank you.

N3K5hacA

1              THE COURT:  I will take the motions under advisement.

2      I appreciated the briefs and I appreciated the arguments.

3      Thank you, all.  Great.  Bye now.

4              MS. McNAMARA:  Thank you very much, your Honor.

5      Bye-bye.

6              MR. GRATZ:  Thank you, your Honor.

7              THE COURT:  OK.  Bye.

8                               o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25