UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN
WILEY & SONS, INC., and PENGUIN
RANDOM HOUSE LLC,

               Plaintiffs,

     -against-

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,

            Defendants.

Case No. 1:20-cv-04160-JGK-OTW

---

## DEFENDANT INTERNET ARCHIVE'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Notice is hereby given that Defendant Internet Archive appeals to the United States Court of Appeals for the Second Circuit from the August 11, 2023 Judgment and Permanent Injunction (Dkt. No. 215); the March 24, 2023 Opinion and Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendant's Motion for Summary Judgment (Dkt. No. 188); and from any and all orders, rulings, findings, and/or conclusions adverse to Defendant Internet Archive. True and correct copies of Dkt. Nos. 215 and 188 are attached hereto as Exhibits 1-2.

Dated:   September 11, 2023          Respectfully submitted,
         San Francisco, CA
                                     MORRISON & FOERSTER LLP

                                     By:  /s/ Joseph C. Gratz
ELECTRONIC FRONTIER                      Joseph C. Gratz (*Pro Hac Vice*)
FOUNDATION                               Annie A. Lee (*Pro Hac Vice*)
                                         425 Market Street
                                         San Francisco, CA 94105
Corynne McSherry (*Pro Hac Vice*)        Telephone: (415) 268-7000
Kit Walsh (*Pro Hac Vice*)               Fax: (415) 268-7522
Cara Gagliano (*Pro Hac Vice*)           JGratz@mofo.com
815 Eddy Street                          AnnieLee@mofo.com
San Francisco, CA 94109
Telephone: (415) 436-9333                Aditya V. Kamdar (*Pro Hac Vice*)
Fax: (415) 436-9993                      2100 L Street NW, Suite 900
corynne@eff.org                          Washington, DC 20037
kit@eff.org                              Telephone: (202) 887-1500
cara@eff.org                             Fax: (202) 887-0763
                                         AKamdar@mofo.com

              *Counsel for Defendant Internet Archive*

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY    :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,
                                                                       :      Case No. 1:20-cv-04160-JGK
                          Plaintiffs,
                                                                       :
-against-
                                                                       :
INTERNET ARCHIVE and DOES 1 through 5,
inclusive,                                                             :

                          Defendants.                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

[PROPOSED] CONSENT JUDGMENT AND PERMANENT INJUNCTION SUBJECT
TO RESERVATION OF RIGHT OF APPEAL

WHEREAS, on June 1, 2020, Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC (the "Plaintiffs") commenced this action (the "Action") against Internet Archive alleging copyright infringement of literary works, namely unauthorized creation of ebooks from print copies of books and public display, distribution, and performance of the ebooks through www.archive.org and/or www.openlibrary.org; and

WHEREAS, on March 24, 2023, the Court issued an "Opinion and Order" in the Action (ECF No. 188) ("Opinion and Order") granting the Plaintiffs' motion for summary judgment and holding the Internet Archive liable for copyright infringement of the Plaintiffs' works in suit;

WHEREAS, prior to the entry hereof, the Internet Archive has worked in active concert and participation with the Open Library of Richmond, the owner of physical books scanned and made available to the public by the Internet Archive on its website under its "Books to Borrow" collection;

WHEREAS, in the interest of efficiency and judicial economy, Plaintiffs and Internet Archive (the "Parties") have agreed to a stipulated monetary judgment payment in the Action under and subject to the terms set forth in a separate confidential agreement ("Monetary Judgment Payment"), expressly conditioned upon the Internet Archive's reservation of its right to appeal the finding of liability for copyright infringement set forth in the Opinion and Order and as incorporated into any final judgment; and

WHEREAS, in the interest of efficiency and judicial economy, Plaintiffs and the Internet Archive stipulate to the declaratory relief and terms of a permanent injunction set forth below expressly conditioned upon Internet Archive's reservation of its right to appeal the finding of

liability for copyright infringement set forth in the Opinion and Order and as incorporated into any final judgment and its right to appeal the Permanent Injunction on the ground that the Internet Archive should not have been held liable for copyright infringement and as further described below.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

A.    This Court has subject matter jurisdiction over this action, which arises under the Copyright Act of 1976, 17 U.S.C. §§101 et seq, pursuant to 28 U.S.C. §§ 1331 and 1338.

B.    Judgment is entered for Plaintiffs and against Defendant on Plaintiffs' claims against Defendant for copyright infringement under 17 U.S.C. §501.

C.    The activities of the Internet Archive in engaging in "controlled digital lending" of the 127 Works in Suit as further described in the Opinion and Order constitute copyright infringement;

D.    The activities of the Internet Archive in engaging in the "National Emergency Library" in connection with the 127 Works in Suit as further described in the Opinion and Order constitute copyright infringement; and

E.    The Court hereby enters the following permanent injunction (the "Permanent Injunction"):

1.    "Covered Book" shall mean any in-copyright book or portion thereof, whether in existence as of the date hereof or later created, in which any Plaintiff (or any subsidiary or corporate affiliate of a Plaintiff) (a) owns or controls an exclusive right under the Copyright Act and makes the title commercially available for sale or license [~~in any format OR~~ in any electronic text format]; and (b) has provided notice to the Internet Archive regarding such title by sending the Internet Archive a machine readable catalog in a standardized form identifying such commercially available titles (including any updates thereto in the Plaintiffs' discretion), or other similar form of notification, once 14 days have elapsed since the receipt of such notice. A "Covered Book" includes all in-copyright editions of such title.

2.    Subject to the terms of Paragraphs 4, 5 and 6 below, the Internet Archive, its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with such persons (collectively, the "Internet Archive Parties" and each individually an "Internet Archive Party"), are permanently enjoined and restrained from engaging in any of the following acts in, from or to the United States:

a)    the distribution to the public, public display, and/or public performance, of Covered Books in, from or to the United States in

any digital or electronic form, including without limitation on the Internet Archive website (collectively "Unauthorized Distribution");

b)   the reproduction of Covered Books for Unauthorized Distribution;

c)   the creation of derivative works of the Covered Books for Unauthorized Distribution;

d)   inducing, or knowingly and materially contributing to, any individual or entity's infringing reproduction, public distribution, public display and/or public performance of Covered Books in any digital or electronic form, as those terms are used in the law of contributory copyright infringement applied by the Second Circuit; and/or

e)   profiting from another individual or entity's infringing reproduction, public distribution, public display and/or public performance of Covered Books in any digital or electronic form while declining to exercise a right to stop or limit it, as those terms are used in the law of vicarious copyright infringement applied by the Second Circuit.

3.   This Permanent Injunction is effective immediately and shall not be stayed pending appeal of the Opinion and Order.  Internet Archive shall provide a copy of this Permanent Injunction to each of its officers, agents, servants, employees, and attorneys.  Internet Archive shall also provide a copy of this Permanent Injunction to Open Library of Richmond, libraries whose print books have been counted by Internet Archive toward its maximum lendable digital copies on Internet Archive's website, and all persons in active concert or participation with Internet Archive or its officers, agents, servants, employees, or attorneys in connection with the Covered Books.

4.   The Internet Archive Parties shall not be in violation of the terms of Paragraph 2 with respect to:

a)   Any uses to which exceptions and limitations set forth in 17 U.S.C. § 108, and §§ 110-122 are properly applicable (with Plaintiffs reserving all rights to contest such applicability);

b)   An Internet Archive Party's use of any Covered Book for which such party obtains express written authorization for that use from a party that owns or controls the applicable rights to such Covered Book, provided such authorization is in force and valid at the time of such party's use of the Covered Book;

c)   An Internet Archive Party's use of Covered Books for the purpose of accessibility for "eligible persons," as that term is defined in 17

U.S.C. § 121(d)(3), provided that such use meets the statutory conditions of 17 U.S.C §§ 121 or 121A, or is consistent with fair use, for example as set forth in *Authors Guild v. Hathitrust*, 755 F.3d 87 (2d Cir. 2014); or

d)    Notwithstanding the foregoing definition of a Covered Book as including a portion thereof, an Internet Archive Party's use of Covered Books for the purpose of distribution, public display, or public performance of short portions of a Covered Book, provided that such use is consistent with fair use, for example as set forth in *Authors Guild v. Google, Inc.*, 804 F.2d 202 (2d Cir. 2015) and *Andy Warhol Foundation v. Goldsmith*, 143 S. Ct. 1258 (2023).

5.    By way of clarification:

a)    nothing herein constitutes a grant to the Internet Archive Parties or any other person of a license, right, permission, consent, or authorization with respect to any copyrighted works, whether any Covered Books or otherwise;

b)    nothing herein means that acts outside the scope of the specific prohibitions in Paragraph 2 are non-infringing or excused under any of the exceptions or limitations set forth in the United States Copyright Act or that Plaintiffs waive any claims regarding such acts; and

c)    nothing herein impacts any right of Plaintiffs to seek to recover damages under 17 U.S.C. § 504, or costs, including attorneys' fees, under 17 U.S.C. § 505.

6.    By way of further clarification and without modifying Paragraph 2(d) or 2(e) of this Permanent Injunction, nothing herein (i) limits any Internet Archive Party's ability to assert that it is not liable for monetary relief, or injunctive or other equitable relief, with respect to any infringement of copyright that arises from acts described in 17 U.S.C. § 512(a)-(e) ("Section 512"), or (ii) enjoins any act which qualifies for a limitation on remedies under Section 512.

7.    Nothing herein limits the Internet Archive's right to appeal the finding of liability for copyright infringement as addressed in the Opinion and Order and as incorporated into any final judgment.

8.    Nothing herein limits the Internet Archive's right to appeal this Permanent Injunction on the ground that Internet Archive should not have been held liable for copyright infringement. Further, nothing herein limits any Party from appealing the Court's resolution of the Parties' dispute concerning whether the definition of Covered Book in Paragraph E(1) of this Consent

Judgment pertains to books "in any format" or only "in any electronic text format."

9. Internet Archive shall provide a sworn declaration of compliance with this Court's Permanent Injunction within 30 days of its issuance.

10. During the first 60 days following the entry of this Permanent Injunction, in the event that any Plaintiff believes that any enjoined party is not in compliance with this Permanent Injunction and wishes to seek appropriate relief from the Court, such Plaintiff shall first provide notice to the Internet Archive Party of its intent to file for relief 7 days prior to such filing, except in instances in which the Covered Book was initially published within five years preceding such notice. Such notice to the Internet Archive Party does not need to identify individual Covered Books. This provision has no effect after the expiration of the 60 day period.

11. This Court shall retain exclusive and continuing jurisdiction over the parties and over the subject matter of this Action for purposes of interpreting, implementing, and enforcing the Permanent Injunction.

12. Pursuant to the Opinion and Order, the Clerk of the Court shall enter judgment for Plaintiffs. The Clerk of the Court is directed to close this case.

APPROVED AND ORDERED THIS _11th_ day of _August_, 2023

John G. Koeltl, U.S.D.J.

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————

HACHETTE BOOK GROUP, INC.,
ET AL.,                                          20-cv-4160 (JGK)

                              Plaintiffs,        OPINION & ORDER

              - against -

INTERNET ARCHIVE, ET AL.,

                              Defendants.
—————————————————————————

JOHN G. KOELTL, District Judge:

     The plaintiffs in this action, four book publishers, allege
that the defendant, an organization whose professed mission is to
provide universal access to all knowledge, infringed the
plaintiffs' copyrights in 127 books (the "Works in Suit") by
scanning print copies of the Works in Suit and lending the
digital copies to users of the defendant's website without the
plaintiffs' permission. The defendant contends that it is not
liable for copyright infringement because it makes fair use of
the Works in Suit. See 17 U.S.C. § 107. The parties now cross-
move for summary judgment. For the following reasons, the
plaintiffs' motion for summary judgment is **granted**, and the
defendant's motion for summary judgment is **denied**.[1]

—————————————————

[1] The Complaint also names five John Doe defendants. ECF No. 1
("Compl."), ¶ 27. The cross-motions for summary judgment concern only
Internet Archive, the named defendant.

**I.**

**A.**

The following facts are undisputed unless otherwise noted.

The plaintiffs -- Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons., Inc. ("Wiley"), and Penguin Random House LLC ("Penguin") (together, the "Publishers") -- are four of the leading book publishers in the United States. Pls.' 56.1, ECF No. 113, ¶ 1. They obtain from authors the exclusive rights to publish books in print and digital formats, including electronic copies of books, or "ebooks." Id. ¶¶ 63-68. Publishers and authors generally are paid for sales of each format in which a book is published. Id. ¶ 65.

The defendant, Internet Archive ("IA"), is a non-profit organization dedicated to providing "universal access to all knowledge." Def.'s 56.1, ECF No. 98, ¶¶ 1-2. Brewster Kahle, IA's Chairman, founded the organization in 1996. Pls.' 56.1 ¶ 216. One of IA's first projects was to document the history of the Internet by archiving every public webpage on the World Wide Web through IA's "Wayback Machine." Def.'s 56.1 ¶ 5. IA also works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts. Id. ¶ 6.

2

This dispute concerns the way libraries lend ebooks. Public and academic libraries in the United States spend billions of dollars each year obtaining print books and ebooks for their patrons to borrow for free. Pls.' 56.1 ¶ 113. Libraries usually buy their print books from publishers or wholesalers. Id. ¶ 114. Copies of ebooks, however, are typically not bought but licensed to libraries from publishers through distributors called "aggregators." Id. ¶ 117. The Publishers task aggregators with ensuring that a library lends its ebooks only to the library's members. Id. ¶¶ 123, 125. The Publishers also require aggregators to employ approved "digital rights management" ("DRM") software and other security measures to prevent unauthorized copying or distribution of ebook files. Id. ¶ 126. Demand for library ebooks has increased over the past decade. In 2012, OverDrive, the largest aggregator, processed 70 million digital checkouts of ebooks and audiobooks; by 2020, that number had risen to 430 million. Id. ¶¶ 119, 164.

The Publishers use several licensing models to profit from the distribution of ebooks to libraries. Id. ¶¶ 120, 122. All four Publishers offer a "one-copy, one-user" model: Libraries pay a single fee for an ebook and patrons check out a copy of that ebook successively, subject to community-based and DRM restrictions. Id. ¶ 127. Each Publisher offers academic libraries

3

a perpetual term under this model, and Wiley grants perpetual one-copy, one-user licenses to academic and public libraries alike. Id. ¶¶ 130-132. Hachette and Penguin limit their one-copy, one-user licenses for public libraries to one- or two-year terms, during which there is no limit on the number of times an ebook can be read and after which a library must purchase a new license. Id. ¶¶ 134, 147. HarperCollins uses a "26-Circ Model," which allows libraries to circulate an ebook twenty-six times, over any time period, before the license expires. Id. ¶¶ 135-140. HarperCollins and Penguin also use a Pay-Per-Use model -- a one-time circulation to a single patron at a significantly reduced fee -- and Wiley has experimented with various subscription models. Id. ¶¶ 141-146, 155, 191. The Publishers' library expert testified, and IA does not dispute, that this "thriving ebook licensing market for libraries" has "increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive." Id. ¶ 168. For example, library ebook licenses generate around $59 million per year for Penguin. Id. ¶ 170. Between 2015 and 2020, HarperCollins earned $46.91 million from the American library ebook market. Id. ¶ 172.

IA offers readers a different way to read ebooks online for free. Over the past decade, IA has scanned millions of print books and made the resulting ebooks publicly available on its

4

archive.org and openlibrary.org websites (together, the "Website"). Id. ¶¶ 7, 236; Def.'s 56.1 ¶ 12. IA's basic modus operandi is to acquire print books directly or indirectly, digitally scan them, and distribute the digital copies while retaining the print copies in storage. The Open Library of Richmond (the "Open Library"), another non-profit organization run by Brewster Kahle, buys or accepts donations of print books, primarily from Better World Books ("BWB"), a for-profit used bookstore affiliated with IA and the Open Library. Pls.' 56.1 ¶¶ 313-314, 317, 322, 338. The Open Library then sends the books to IA scanning centers, where operators turn and photograph each page using a book-digitization device called a "Scribe." Id. ¶¶ 281-283. After scanning, the print books are stored in double-stacked shipping containers and are not circulated. Id. ¶¶ 310-312; Def.'s 56.1 ¶ 23.

IA's Website includes millions of public domain ebooks that users can download for free and read without restrictions. Def.'s 56.1 ¶¶ 158, 160. Relevant to this action, however, the Website also includes 3.6 million books protected by valid copyrights, including 33,000 of the Publishers' titles and all of the Works in Suit. Pls.' 56.1 ¶¶ 14, 240; Def.'s 56.1 ¶ 160. The Publishers did not authorize IA to create digital copies of the Works in

Suit or to distribute those unauthorized ebook editions on IA's Website. Pls.' 56.1 ¶ 243.

IA does not make its ebook copies of copyright-protected works available for mass download. Instead, it professes to perform the traditional function of a library by lending only limited numbers of these works at a time through "Controlled Digital Lending," or "CDL." Def.'s 56.1 ¶ 11. CDL's central tenet, according to a September 2018 Statement and White Paper by a group of librarians, is that an entity that owns a physical book can scan that book and "circulate [the] digitized title in place of [the] physical one in a controlled manner." Pls.' 56.1 ¶ 436. CDL's most critical component is a one-to-one "owned to loaned ratio." Id. Thus, a library or organization that practices CDL will seek to "only loan simultaneously the number of copies that it has legitimately acquired." Id. "For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization." Id. According to IA, CDL is especially helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, patrons with disabilities that make it difficult

6

to hold or read print books, and patrons who want brief or spontaneous access to books and for whom it would not be worth a trip to a brick-and-mortar library. Def.'s 56.1 ¶¶ 55-56.

Under IA's implementation of CDL, two factors determine the number of digital copies of a book that can be borrowed at any time from IA's Website. Id. ¶ 50. First, IA makes available one digital copy for each non-circulating print book it keeps in storage. Id. ¶ 51. Second, IA partners with libraries to "contribute" the number of their print copies of the book toward the number of lendable copies on IA's Website. Id. ¶ 52. Even if a partner library has multiple copies of a book, IA counts only one additional copy per library. Id. For example, if IA owns one non-circulating print copy of Laura Ingalls Wilder's Little House on the Prairie (1932), and three partner libraries each contribute a copy of the book, IA would lend its digital copy of Little House on the Prairie to up to four patrons at a time. Id. ¶ 53.[2]

---

[2] IA, which also has scanning agreements with libraries, will only lend ebooks scanned from print copies owned by IA or the Open Library. Pls.' 56.1 ¶¶ 293-294; Def.'s 56.1 ¶ 36. IA's policy is also not to lend books published within the previous five years, as a "belt-and-suspenders accommodation to publishers." Def.'s 56.1 ¶¶ 37-38. As a result of "human error," however, two Works in Suit published in 2019 were made available for digital lending. Id. ¶ 49. Soon after IA realized the error, the titles were removed. Id.

Around 2018, IA began expanding significantly its lending capacity of copyright-protected works through the "Open Libraries" project. Pls.' 56.1 ¶ 355. Libraries now can "pool[] their physical collections" with IA "in order to make more lendable copies of digital books available to their users and the world." Id. ¶ 363. To participate, a Partner Library sends its catalogue to IA to run an "overlap analysis" that compares ISBN numbers for the Partner Library's physical holdings with IA's digital holdings. Id. ¶ 365. Whenever a book in the Partner Library's catalogue matches an ebook on IA's Website, IA increases by one the number of concurrent checkouts of that book allowed on the Website. Id. ¶ 367. As of late 2021, 62 Partner Libraries, including 13 public libraries, had contributed books through IA's overlap analysis. Id. ¶ 392. IA encourages Partner Libraries to populate their websites with links to IA's Website. Id. ¶¶ 393-396.

Anyone can become a patron of IA, and borrow up to ten ebooks at a time for up to fourteen days each, by submitting a valid email address. Def.'s 56.1 ¶¶ 25-26. IA never charges patrons fees for any service, including borrowing books. Id. ¶ 25. The Website has titles in popular categories, including Romance, Thrillers, "Books we Love," and "Trending Books." Pls.' 56.1 ¶¶ 514-516. Patrons can read books they have checked out on

IA's BookReader web browser platform, or they can download a
"High Quality" encrypted PDF or ePub version of the ebook.[3] Id. ¶¶
207-209, 277; Def.'s 56.1 ¶¶ 32, 34. IA secures its downloadable
versions with software that prevents the patron from copying,
accessing, or distributing the book after the loan period. Def.'s
56.1 ¶ 34. The BookReader application also has a "Read Aloud"
feature that converts the text to audio and plays it aloud. Pls.'
56.1 ¶ 276. After a book is checked out, a "Purchase at Better
World Books" button appears at the top of the browser window.
Id. ¶ 346. This button links to BWB's website, where patrons can
buy a used print copy of the book. Id. ¶ 347. BWB pays IA
whenever someone buys a book after using the "Purchase at Better
World Books" link. Id. IA's Website also includes a link to
"Donate" to IA. Id. ¶ 348.

In March 2020, the Covid-19 pandemic closed libraries
nationwide and, by IA's estimation, took 650 million print books
out of circulation. Def.'s 56.1 ¶ 70. Judging itself "uniquely
positioned to be able to address this problem quickly and
efficiently," on March 24, 2020, IA launched what it called the
National Emergency Library ("NEL"), intending it to "run through

---

[3] PDF and ePub are file formats.

9

June 30, 2020, or the end of the US national emergency, whichever
is later." Id. ¶¶ 72, 74. During the NEL, IA lifted the technical
controls enforcing its one-to-one owned-to-loaned ratio and
allowed up to ten thousand patrons at a time to borrow each ebook
on the Website. Pl.'s 56.1 ¶¶ 542-543, 547. IA ended the NEL on
June 16, 2020, shortly after this action was filed, and returned
to its "traditional controlled digital lending," which remains in
effect. Id. ¶ 571; Def.'s 56.1 ¶ 96.

In the two years after the NEL, IA's user base increased
from 2.6 million to about 6 million. Pls.' 56.1 ¶¶ 248, 250. As
of 2022, IA hosts about 70,000 daily ebook "borrows." Id. ¶ 249.

**B.**

The Publishers filed this action on June 1, 2020, alleging
that IA infringed their copyrights in the 127 Works in Suit.
Compl. ¶ 2. The Works in Suit are a range of published fiction
and non-fiction works, including William Golding's Lord of the
Flies (1954), Toni Morrison's The Bluest Eye (1970), Zora Neale
Hurston's Their Eyes Were Watching God (1937), young adult novels
by Daniel Handler (pen name Lemony Snicket), and Patrick
Lencioni's best-selling management books. Pls.' 56.1 ¶ 199; see
also ECF No. 1, Ex. A (listing the Works in Suit). The author of
each Work in Suit assigned to one of the Publishers the exclusive
rights to publish the Work in print and ebook form. Id. ¶ 33. All

10

the Works in Suit are available as authorized ebooks that may be purchased by retail customers or licensed to libraries. Id. ¶ 201.

On July 28, 2020, IA answered the Complaint, principally asserting a defense of "fair use" with respect to its lending of the Works in Suit through IA's online library generally and during the NEL specifically. Answer, ECF No. 33, at 24. After extensive discovery, the parties now cross-move for summary judgment on IA's liability for copyright infringement. See ECF Nos. 87, 97.

## II.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears

11

the initial burden of "informing the district court of the basis
of its motion" and identifying the matter that "it believes
demonstrate[s] the absence of a genuine issue of material fact."
Celotex, 477 U.S. at 323. The substantive law governing the case
will identify those facts that are material and "[o]nly disputes
over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).[4]

In determining whether summary judgment is appropriate, the
Court must resolve all ambiguities and draw all reasonable
inferences against the moving party. Matsushita Elec. Indus. Co.
v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the moving
party meets its burden, the nonmoving party must produce evidence
in the record and "may not rely simply on conclusory statements
or on contentions that the affidavits supporting the motion are
not credible." Ying Jing Gan v. City of New York, 996 F.2d 522,
532 (2d Cir. 1993). When there are cross motions for summary
judgment, the Court must assess each of the motions and determine

---

[4] Unless otherwise noted, this Opinion and Order omits all
alterations, citations, footnotes, and internal quotation marks in quoted
text.

12

whether either party is entitled to judgment as a matter of law. Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am., 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012).

## III.

The Constitution empowers Congress to enact copyright laws "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. "The Copyright Act furthers this core purpose by granting authors a limited monopoly over (and thus the opportunity to profit from) the dissemination of their original works of authorship." Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 95 (2d Cir. 2014). "The owner of a copyright has the exclusive right to -- or to license others to -- [1] reproduce, [2] perform publicly, [3] display publicly, [4] prepare derivative works of, and [5] distribute copies of, his copyrighted work." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106). "To establish copyright infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in § 106." Arista, 604 F.3d at 117.

13

The Publishers have established a prima facie case of copyright infringement. First, the Publishers hold exclusive publishing rights in the Works in Suit pursuant to 17 U.S.C. § 106, and the Works were timely registered with the Copyright Office. Pls.' 56.1 ¶¶ 210-214. Second, IA copied the entire Works in Suit without the Publishers' permission. See id. ¶¶ 242-245. Specifically, IA does not dispute that it violated the Publishers' reproduction rights, by creating copies of the Works in Suit, 17 U.S.C. § 106(1); the Publishers' rights to prepare derivative works, by "recasting" the Publishers' print books into ebooks, id. § 106(2); the Publishers' distribution rights, by distributing ebook copies of the Works in Suit to IA's users, id. § 106(3); the Publishers' public performance rights, through the "read aloud" function on IA's Website, id. § 106(4); and the Publishers' display rights, by showing the Works in Suit to users through IA's in-browser viewer, id. § 106(5).[5]

---

[5] The Publishers also allege, and IA does not dispute, that IA committed secondary copyright infringement by contributing to, inducing, and vicariously causing direct infringement by users who obtained ebooks on IA's Website. Compl. ¶¶ 138-150; Pls.' 56.1 ¶ 209; see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) ("One infringes contributorily by intentionally inducing or encouraging direct infringement and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it.").

IA argues, however, that this infringement is excused by the doctrine of fair use. This doctrine allows some unauthorized uses of copyrighted works "to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994). While rooted in the common law, fair use is a statutory exception to copyright infringement. The Copyright Act of 1976 provides that "the fair use of a copyrighted work" for "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." Id. § 107.

"In determining whether the use made of a work in any particular case is a fair use," the Copyright Act directs courts to consider the following factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The four factors are not exclusive, but each must be considered in a "case-by-case analysis," with the results "weighed together[] in light of the purposes of copyright." Fox

News Network, LLC v. TVEyes, Inc., 883 F.3d 169, 176 (2d Cir. 2018). Fair use presents a mixed question of law and fact and may be resolved on summary judgment where, as here, the material facts are undisputed. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560 (1985). Because fair use is an affirmative defense, the party asserting fair use bears the burden of proof. TVEyes, 883 F.3d at 176.[6]

### A.

The first fair use factor addresses "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Courts "consider the extent to which the

---

[6] A separate provision of the Copyright Act gives "libraries and archives" limited authorization to reproduce and distribute certain copyrighted works without permission for preservation, replacement, and research. 17 U.S.C. § 108. Section 108 does not define "library," although some legislative history suggests that Congress did not intend Section 108 to encompass "online digital 'libraries' . . . that exist only in the virtual (rather than physical) sense." S. Rep. No. 105-190, 62 (1998). It is unnecessary to decide whether IA's online library is protected under Section 108, because IA does not justify its infringing acts under that section. Nonetheless, the Publishers argue that the Court should not deem IA's conduct to be fair use under Section 107 because doing so "would undermine the Congressional intent behind the limited exceptions" of Section 108. Pls.' Opp. to Def.'s Memo., ECF No. 169, at 8. This argument wrongly entwines Sections 107 and 108. Section 108 "in [no] way affects the right of fair use as provided by section 107." 17 U.S.C. § 108(f)(4); cf. HathiTrust, 755 F.3d at 94 n.4 ("[W]e do not construe § 108 as foreclosing our analysis of the Libraries' activities under fair use[.]"). Whether IA's conduct is fair use turns on an analysis of the Section 107 factors and any other relevant factors and is not foreclosed by the existence of Section 108.

secondary work is 'transformative,' as well as whether it is
commercial." <u>Andy Warhol Found. for the Visual Arts, Inc. v.
Goldsmith</u>, 11 F.4th 26, 37 (2d Cir. 2021), <u>cert. granted</u>, 142 S.
Ct. 1412 (2022).

**1.**

In this Circuit, consideration of the first factor focuses
chiefly on the degree to which the secondary use is
"transformative." <u>Id.</u> A transformative use "adds something new,
with a further purpose or different character, altering the first
with new expression, meaning, or message, rather than merely
superseding the original work." <u>Capitol Recs., LLC v. ReDigi
Inc.</u>, 910 F.3d 649, 660 (2d Cir. 2018). A secondary use also may
be transformative if it "expands [the] utility" of the original
work. <u>TVEyes</u>, 883 F.3d at 176. "Although transformative use is
not absolutely necessary for a finding of fair use,
transformative works lie at the heart of the fair use doctrine,
and a use of copyrighted material that merely repackages or
republishes the original is unlikely to be deemed a fair use."
<u>Id.</u> at 176-77.

17

There is nothing transformative about IA's copying and unauthorized lending of the Works in Suit.[7] IA does not reproduce the Works in Suit to provide criticism, commentary, or information about them. See 17 U.S.C. § 107. IA's ebooks do not "add[] something new, with a further purpose or different character, altering the [originals] with new expression, meaning or message." Campbell, 510 U.S. at 579. IA simply scans the Works in Suit to become ebooks and lends them to users of its Website for free. But a copyright holder holds the "exclusive[] right" to prepare, display, and distribute "derivative works based upon the copyrighted work." 17 U.S.C. § 106. An ebook recast from a print book is a paradigmatic example of a derivative work. Authors Guild v. Google, Inc., 804 F.3d 202, 215 (2d Cir. 2015) ("Google Books") (citing 17 U.S.C. § 101). And although the changes involved in preparing a derivative work "can be described as transformations, they do not involve the kind of transformative purpose that favors a fair use finding." Id.; see also Penguin Grp. (USA) v. Am. Buddha, No. 13-cv-2017, 2015 WL 11170727, at

---

[7] The Publishers do not challenge certain uses IA makes of the Works in Suit, including "indexing them for the purpose of searching, displaying short excerpts in response to searches and citations, and supporting research in text and data mining." Def.'s Memo., ECF No. 106, at 16-17. The Publishers limit their claims to IA's digital lending of entire ebook versions of the Works in Suit.

\*2-4 (D. Ariz. May 11, 2015) (service that made complete copies of copyrighted print works and published them online was not transformative because republication did "not imbue the Works with new expression or meaning").[8]

The Court of Appeals for the Second Circuit previewed as much in HathiTrust and Google Books, cases that "test[ed] the boundaries of fair use." Google Books, 804 F.3d at 206. The defendant in HathiTrust scanned whole copies of millions of books, including those protected by valid copyrights, to create a database on which the general public could search for particular terms across the scanned works. 755 F.3d at 91. The creation of this "full-text searchable database [was] a quintessentially transformative use," the court held, because "the result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it

---

[8] Other cases consistently have held that the first fair use factor weighs against infringers who do nothing more than "change[] the format" of a preexisting work, as IA does here. Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 108 n.2 (2d Cir. 1998); accord Disney Enters. v. VidAngel, 869 F.3d 848, 862 (9th Cir. 2017) (explaining that courts "unanimously reject the view that "space-shifting" is fair use under § 107" and holding that it was not fair use to "make[] illegal copies of pre-selected movies [on discs] and then sell[] streams . . . . in a different format than that in which they were bought"); UMG Recordings, Inc. v. MP3.com, Inc., 92 F. Supp. 2d 349, 350-52 (S.D.N.Y. 2000) (service that "simply repackage[d] [] recordings to facilitate their transmission through another medium" was not transformative). These cases further support the conclusion that IA's use of the Works in Suit is not transformative.

19

is drawn." Id. at 97. Importantly, the database did not "allow users to view any portion of the books they [were] searching" and therefore, unlike IA's Website, "d[id] not add into circulation any new, human-readable copies of any books" or "merely repackage or republish the originals." Id.

Google Books similarly found transformative use in Google's scanning of copyrighted books to create a database that included a "snippet view" search function that allowed readers to view a few lines of text containing searched-for terms. 804 F.3d at 208. The snippet view showed the searcher "just enough context surrounding the searched term" to help the searcher evaluate whether the book fell within the scope of the searcher's interest "without revealing so much as to threaten the author's copyright interests." Id. at 208, 216. But the Court of Appeals cautioned that "[i]f Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public," precisely what the Publishers allege in this case, the "claim [for copyright infringement] would be strong." Id. at 225. If HathiTrust and Google Books demarcated the boundaries of fair use, this case shows what conduct remains squarely beyond fair use.

Asked at oral argument on the current motions for its best authority on the first fair use factor, IA directed the Court to

20

a second holding in HathiTrust: that fair use allowed the defendant to provide "print-disabled patrons with versions of all the works contained in its digital archive in formats accessible to them." 755 F.3d at 101. But HathiTrust's endorsement of this distribution of complete ebooks was carefully limited to print-disabled readers. See id. at 102 (relying on the Supreme Court's and Congress' endorsement of "[m]aking the copy of a copyrighted work for the convenience of a blind person" as an example of fair use); see also 17 U.S.C. § 121 (Limitations on exclusive rights: Reproductions for blind or other people with disabilities). HathiTrust reiterated that outside this context, when a defendant "recasts copyrighted works into new formats," it appears to "creat[e] derivative works over which the author ordinarily maintains control." 755 F.3d at 101. IA's ebooks are available to the general public, not only to the print-disabled. HathiTrust's second holding therefore does not begin to support IA's copying and distribution of the Works in Suit.

   The principal argument IA raised in its papers was that it expands the "utility" of the Works in Suit. See TVEyes, 883 F.3d at 176. By scanning print books and lending them one at a time over the Internet while retaining a copy of the print originals, IA claims that it performs the transformative function of making the delivery of library books more efficient and convenient.

21

But IA distorts the way courts have treated utility-expanding transformative uses. IA does not expand the utility of the Works in Suit by "provid[ing] information about" them. ReDigi, 910 F.3d at 661. Creating a full-text searchable database "in a manner that [does] not allow users to read the texts," as in HathiTrust, is an example of such a utility-expanding transformative use. Id. The same is true for copying protected work into a database to detect plagiarism, see A.V. ex rel. Vanderhye v. iParadigms, LLC, 562 F.3d 630, 639 (4th Cir. 2009), and displaying tiny, low-resolution "thumbnail" art reproductions that link to the websites containing the originals, see Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165 (9th Cir. 2007); Kelly v. Arriba Soft Corp., 336 F.3d 811, 818-19 (9th Cir. 2003). Far from providing information about the Works in Suit, IA's ebooks merely replace those authorized by the Publishers.

Nor does IA expand the utility of the Works in Suit in the other way recognized in this Circuit: by using technology to "improv[e] the efficiency of delivering content" to "one entitled to receive the content" in a way that does not "unreasonably encroach[] on the commercial entitlements of the rights holder." ReDigi, 910 F.3d at 661 (citing Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417 (1984)); see also TVEyes, 883 F.3d at 177. IA relies heavily on Sony. Sony was accused of

22

contributory copyright infringement based on its sale of Betamax
machines to customers who could then copy programs to be viewed
at a later time even though the customers could have viewed the
programs for free when they were broadcast. 464 U.S. at 421, 448-
55. The Supreme Court held that customers who used the Betamax
machines to "time-shift" satisfied the first fair use factor,
because "time-shifting for private home use" was a
"noncommercial, nonprofit activity" and the Betamax machine
"merely enable[d] a viewer to see such a work which he had been
invited to witness in its entirety free of charge." Id. at 449.
IA argues that its digital lending is "at least as transformative
as the use at issue in Sony," because IA and its Partner
Libraries already paid for print copies of the Works in Suit and
because a patron who digitally borrows one of IA's ebooks is "the
one person in the world who is then borrowing that
particular . . . library book." Def.'s Memo., ECF No. 106, at 17-
18.

     But Sony is plainly inapposite. IA is not comparable to the
parties in Sony -- either to Sony, the alleged contributory
copyright infringer, or to the home viewers who used the Betamax
machine for the noncommercial, nonprofit activity of watching
television programs at home. Unlike Sony, which only sold the
machines, IA scans a massive number of copies of books and makes

them available to patrons rather than purchasing ebook licenses

from the Publishers. IA is also unlike the home viewers in <u>Sony</u>,

who engaged in the "noncommercial, nonprofit activity" of viewing

at a more convenient time television programs that they had the

right to view for free at the time they were originally

broadcast. 464 U.S. at 449. The home viewers were not accused of

making their television programs available to the general public.

Although IA has the right to lend print books it lawfully

acquired, it does not have the right to scan those books and lend

the digital copies en masse. To hold otherwise would be to ignore

the teaching of the Court of Appeals for the Second Circuit in

<u>Google Books</u> that there would be a "strong" claim for copyright

infringement if Google had distributed digitized copies of

complete books. 804 F.3d at 225; <u>see also</u> <u>A&M Recs., Inc. v.</u>

<u>Napster, Inc.</u>, 239 F.3d 1004, 1019 (9th Cir. 2001) (finding <u>Sony</u>

to be "inapposite" because its time shifting did not "involve

distribution of the copyrighted material to the general public").[9]

---

[9] <u>TVEyes</u>, another case involving transformative use in a utility-
expanding technology, helps IA even less than <u>Sony</u> does. The defendant in
that case copied all television programming in the United States, as well
as its closed-captioning text, into a database, then offered a commercial
subscription service that allowed business and professional clients to
search the transcripts and watch up to ten minutes of selected video
segments. 883 F.3d at 175. The court found the defendant's secondary use
"at least somewhat transformative" because "it enable[d] nearly instant
access to a subset of material -- and to information about the material --
that would otherwise be irretrievable, or else retrievable only through

Finally, IA argues that its digital lending is transformative because it "facilitates new and expanding interactions between library books and the web." Def.'s Memo. at 18. For example, "writers of Wikipedia articles" can "borrow books from the Internet Archive's collection, and then link from their article to a particular page" on IA's Website, and librarians can "curate, and make available online, collections of banned books." Id.; see also Def.'s 56.1 ¶¶ 60-65. But these purported uses are not transformative. "[A] use does not become transformative by making an invaluable contribution to the progress of science and cultivation of the arts." HathiTrust, 755 F.3d at 96. Instead, "a transformative work is one that serves a new and different function from the original work and is not a substitute for it." Id. IA offers no transformative use of the

_____

prohibitively inconvenient or inefficient means." Id. at 177. IA appropriately does not analogize its library to the service in TVEyes: The court ultimately held that any modest transformative uses were easily outweighed by the harm to the rights holders' market under the fourth fair use factor. Id. at 180-81. By providing Fox's copyrighted programming to its clients "without payment to Fox, TVEyes . . . usurped a market that properly belong[ed] to the copyright-holder." Id. at 180. As discussed below, the same is true here. Any "efficiency" IA offers by giving users instant, unauthorized access to the Works in Suit is easily outweighed by the harm that this access inflicts on the Publishers' commercial entitlements as the copyright holders to market the ebooks that IA produces and provides.

Works in Suit, which strongly suggests that the first fair use factor favors the Publishers.

### 2.

The first factor also directs courts to consider whether the secondary use "is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).

IA argues that its library is "wholly noncommercial" because IA is a non-profit organization that does not charge patrons to borrow books and because private reading is noncommercial in nature. Def.'s Memo. at 16. However, IA's non-profit status and decision not to charge patrons are not dispositive. See Weissmann v. Freeman, 868 F.3d 1313, 1324 (2d Cir. 1989) ("The absence of a dollars and cents profit does not inevitably lead to a finding of fair use."). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Harper & Row, 471 U.S. at 562.

IA exploits the Works in Suit without paying the customary price. IA uses its Website to attract new members, solicit donations, and bolster its standing in the library community. See Pls.' 56.1 ¶¶ 379-388. Better World Books also pays IA whenever a patron buys a used book from BWB after clicking on the "Purchase

at Better World Books" button that appears on the top of webpages for ebooks on the Website. Id. ¶¶ 340, 346-347; see also id. ¶ 349 (testimony of IA's Director of Finance that "every single page of the Archive is monetized"). IA receives these benefits as a direct result of offering the Publishers' books in ebook form without obtaining a license. Although it does not make a monetary profit, IA still gains "an advantage or benefit from its distribution and use of" the Works in Suit "without having to account to the copyright holder[s]," the Publishers. Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1118 (9th Cir. 2000). The commercial-noncommercial distinction therefore favors the Publishers. See also, e.g., Weissmann, 868 F.2d at 1324 (finding commercial use where professor's verbatim copying of academic work could allow him to "profit" by gaining authorship credit and recognition among his peers); Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 61 (1st Cir. 2012) (church official's posting of religious texts on website was "commercial" because he "benefitted by being able to provide, free of cost, the core text of the [copyrighted] Works to members of [his] faith, and by standing to gain at least some recognition within [his] religious community for providing electronic access"); Am. Buddha, 2015 WL 11170727, at *4 (finding commercial use where online library solicited donations and stood

27

to gain recognition and financial support by posting copyrighted
books).

It is "largely irrelevant" that an IA patron's private
reading of an ebook provided by IA is noncommercial. See De
Fontbrune v. Wofsy, 39 F.4th 1214, 1224 (9th Cir. 2022); see also
Princeton Univ. Press v. Michigan Document Servs., Inc., 99 F.3d
1381, 1386 (6th Cir. 1996) (rejecting fair use defense where
college-town copy shop copied portions of books and sold them to
students in "coursepacks" intended for educational use). What
matters is whether IA profited from copying the Works. And
although the "commercial nature of a secondary use is of
decreased importance when the use is sufficiently transformative
such that the primary author should not reasonably expect to be
compensated," Andy Warhol Found., 11 F.4th at 44, this is far
from that situation. The Publishers reasonably expect to be
compensated for the reproduction of their copyrighted works, and
IA stands to profit from its non-transformative exploitation of
the Works in Suit. The commercial-noncommercial distinction, like
the transformativeness inquiry, therefore counsels against a
finding of fair use.

**3.**

IA makes a final argument that the first factor favors fair
use because, according to IA, by reproducing and distributing

28

only ebook editions of print books that were lawfully acquired, IA furthers the goals of copyright's "first sale" doctrine. This argument is without merit.

A "common-law doctrine with an impeccable historic pedigree," Kirtsaeng v. John Wiley & Sons, Inc., 568 U.S. 519, 538 (2013), the first sale doctrine is codified at 17 U.S.C. § 109(a).[10] The doctrine provides that a "rights holder's control over the distribution of any particular copy or phonorecord that was lawfully made effectively terminates when that copy or phonorecord is distributed to its first recipient." ReDigi, 910 F.3d at 655. Thus, "the lawful purchaser of a copy of a book is free to resell, lend, give, or otherwise transfer that copy without violating the copyright holder's exclusive right of distribution," and "[t]he copy so resold or re-transferred may be re-transferred again and again without violating the exclusive distribution right." Id.

Section 109(a) does not excuse IA's unauthorized reproduction of the Works in Suit. The first sale doctrine limits a copyright owner's distribution right under § 106(3), but

---

[10] "Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a).

Section 109(a) "says nothing about the rights holder's control under § 106(1) over reproduction of a copy or phonorecord." ReDigi, 910 F.3d at 656. Although Section 109 entitles IA and its Partner Libraries to resell or lend their lawfully acquired print copies of the Works in Suit, "unauthorized reproduction," which is at the heart of IA's online library, "is not protected" by § 109(a). Id. at 659.

Acknowledging this, IA refashions a first sale argument within its fair use analysis. IA argues that although "Section 109 does not expressly encompass the reproduction right, neither does it abrogate the common-law principle favoring the ability of the owner of a copy to freely give, sell, or lend it." Def.'s Memo. at 19-20. But IA points to no case authorizing the first recipient of a book to reproduce the entire book without permission, as IA did to the Works in Suit. IA cites only Doan v. American Book Co., 105 F. 772 (7th Cir. 1901), for the proposition that the "common-law doctrine of exhaustion can encompass reproduction of copyrighted material." Def.'s Memo. at 21. That century-old case merely held that the owner of a schoolbook could reproduce new copies of the book's cover, because the right of ownership "includes the right to maintain the book as nearly as possible in its original condition, so far, at least, as the cover and binding of the book is concerned." 105

30

F. at 777. By its terms, <u>Doan</u> does little to help IA, which seeks permission to do far more than replace for personal use the cover and binding of print books it already owns.

Moreover, the Court of Appeals has cautioned courts against relying on "the purported breadth of the first sale doctrine as originally articulated by the courts" in older cases, given Section 109(a)'s narrower reach. <u>See</u> <u>ReDigi</u>, 910 F.3d at 664 (citing <u>Bureau of Nat'l Literature v. Sells</u>, 211 F. 379, 381-82 (W.D. Wash. 1914), which found no infringement, in light of the first sale doctrine, where reseller re-bound used books and held them out as new books). In <u>ReDigi</u>, the Court of Appeals plainly held that the first sale doctrine has now been codified in Section 109(a), that it does not include a right of reproduction, and that any broader scope of the first sale doctrine should be sought from Congress, not the courts. <u>Id.</u>

Nor does IA's promise not to lend simultaneously its lawfully acquired print copies and its unauthorized reproductions help its case. As an initial matter, IA has not kept its promise. Although the Open Library's print copies of the Works in Suit are non-circulating, IA concedes that it has no way of verifying whether Partner Libraries remove their physical copies from circulation after partnering with IA. Pls.' 56.1 ¶¶ 495-496. To the contrary, IA knows that some Partner Libraries do not remove

31

the physical books from their shelves, and even if a Partner
Library puts a physical book into a non-circulating reference
collection, it could be read in the library while the ebook
equivalent is checked out. Id. ¶¶ 494, 497. IA also does not
inform Partner Libraries when an ebook in its collection is
checked out, and Partner Libraries do not tell IA when their
physical copies are circulating. Id. ¶ 498. IA admits it has
never taken action against a Partner Library that did not
suppress circulation properly. Id. ¶ 499.

Even full enforcement of a one-to-one owned-to-loaned ratio,
however, would not excuse IA's reproduction of the Works in Suit.
ReDigi is instructive. The defendant in that case created a
computer program that allowed users to resell lawfully acquired
digital music files. 910 F.3d at 652-54. ReDigi sought to ensure
that its files never existed in more than one place at once by
deleting the original file from the seller's computer once a copy
was made on ReDigi's servers. See id. at 656. Echoing CDL's core
principle -- that a physical book should not be in use at the
same time as its digital copy -- ReDigi argued that, under the
first sale doctrine, it did not unlawfully reproduce new copies
but merely facilitated the transfer of copies lawfully acquired.
Id.

32

The Court of Appeals rejected this argument. It explained that the measures ReDigi took to avoid increasing the total number of copies in existence did "not rebut or nullify the fact that" ReDigi's program unquestionably created new copies of each work and involved unauthorized reproduction. Id. at 657. As the court explained, in language that applies equally to IA: "We are not free to disregard the terms of [Section 109(a)] merely because the entity performing an unauthorized reproduction makes efforts to nullify its consequences by the counterbalancing" removal from circulation of the preexisting copies. Id. at 658.

IA accepts that ReDigi forecloses any argument it might have under Section 109(a). But in pressing its first sale argument under the guise of fair use, IA ignores that ReDigi also rejected the fair use defense. Id. at 660-64. The ReDigi software was not transformative because the company "ma[d]e no change in the copyrighted work[s]," but merely "provide[d] a market for the resale of digital music files, which resales compete[d] with sales of the same recorded music by the rights holder." Id. at 661. The same is true of IA's online library. IA in no way transforms the use of the Works in Suit. It merely creates derivative ebooks that, when lent to the public, compete with those authorized by the Publishers. The promise of a one-to-one

33

"owned-to-loaned ratio," whether cast under Section 109 or fair use, is no defense.

* * *

The crux of IA's first factor argument is that an organization has the right under fair use to make whatever copies of its print books are necessary to facilitate digital lending of that book, so long as only one patron at a time can borrow the book for each copy that has been bought and paid for. See Oral Arg. Tr. 31:10-15. But there is no such right, which risks eviscerating the rights of authors and publishers to profit from the creation and dissemination of derivatives of their protected works. See 17 U.S.C. §§ 106(1), (2). IA's wholesale copying and unauthorized lending of digital copies of the Publishers' print books does not transform the use of the books, and IA profits from exploiting the copyrighted material without paying the customary price. The first fair use factor strongly favors the Publishers.

**B.**

The second fair use factor directs courts to consider "the nature of the copyrighted work." Id. § 107(2). "[S]ome works are closer to the core of intended copyright protection than others," and "fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. at 586. Two distinctions

34

are relevant to this analysis: (1) "whether the work is
expressive or creative, such as a work of fiction, or more
factual, with a greater leeway being allowed to a claim of fair
use where the work is factual or informational," and (2) "whether
the work is published or unpublished, with the scope of fair use
involving unpublished works being considerably narrower." Blanch
v. Koons, 467 F.3d 244, 256 (2d Cir. 2006).

The second factor favors the Publishers. "[C]reative
expression for public dissemination falls within the core of the
copyright's protective purposes." Campbell, 510 U.S. at 586. The
Works in Suit are published works of fiction and non-fiction. The
fiction books, as paradigmatic creative works, are close to the
core of intended copyright protection. See, e.g., Am. Buddha,
2015 WL 11170727, at *5. But the Copyright Act also values and
seeks to protect the non-fiction Works in Suit, which contain
"subjective descriptions and portraits . . . whose power lies in
the author's individualized expression," Harper & Row, 471 U.S.
at 563, and are "far removed from the . . . factual or
descriptive work more amenable to fair use," MP3.com, 92 F. Supp.
2d at 351; cf. Nihon Keizai Shimbun, Inc. v. Comline Bus. Data,
Inc., 166 F.3d 65, 72-73 (2d Cir. 1999) (explaining that
"predominantly factual news articles" are "less close to the core

35

than more fictional pieces" or pieces whose "expressive elements" are "dominant features of the works").

IA argues that because most of the Works in Suit were published more than five years before IA copied them, IA has not interfered with the authors' "right to control the first public appearance of [their] expression." Def.'s Memo. at 22 (citing Harper & Row, 471 U.S. at 562). IA is correct that the unpublished nature of a work tends to negate a defense of fair use. Harper & Row, 471 U.S. at 554. However, "the converse is not necessarily true; neither Harper & Row nor any principle of fair use counsels that the publication of the copyrighted work weighs in favor of fair use." Dr. Seuss Enters., L.P. v. ComicMix LLC, 983 F.3d 443, 456 (9th Cir. 2020). Published works do not lose copyright protection after five years.

Finally, although the second factor is not "likely to help much in separating the fair use sheep from the infringing goats" in cases involving transformative copying, Campbell, 510 U.S. at 586, IA has not made transformative use of the Works in Suit. IA has simply copied the Works in Suit wholesale and made the copies available for lending. That this dispute involves original works close to the core of copyright protection further counsels against a finding of fair use.

36

**c.**

Under the third fair use factor, courts consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). IA copied the entire Works in Suit and made the copies available for lending. Wholesale copying like this "tends to disfavor a finding of fair use." ReDigi, 910 F.3d at 662; see also, e.g., On Davis v. The Gap, Inc., 246 F.3d 152, 175 (2d Cir. 2001); Am. Buddha, 2015 WL 11170727, at *5.

It is true that copying an entire work is sometimes necessary to make a fair use of the work. Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 613 (2d Cir. 2006). In Google Books and HathiTrust, for example, it was "reasonably necessary" for the defendants "to make use of the entirety of the works in order to enable" the transformative uses of portions of the underlying works. See Google Books, 804 F.3d at 221; HathiTrust, 755 F.3d at 98. In this case, however, IA copied the Works in Suit wholesale for no transformative purpose and created ebooks that, as explained below, competed directly with the licensed ebooks of the Works in Suit. IA's wholesale copying therefore cannot be excused, and the third factor weighs strongly in the Publishers' favor.

37

**D.**

The fourth fair use factor is "the effect of the [copying] use upon the potential market for or value of the copyrighted work[s]." 17 U.S.C. § 107(4). This factor focuses on whether a secondary use "usurps the market for the [original] by offering a competing substitute." Andy Warhol Found., 11 F.4th at 48. "When a secondary use competes in the rightsholder's market as an effective substitute for the original, it impedes the purpose of copyright," which is "to incentivize new creative works by enabling their creators to profit from them." ReDigi, 910 F.3d at 662. The fourth factor necessarily relates to the first and third factors. The less transformative a secondary use is under the first factor, the more "likely it will supplant the commercial market for the original." Id. So too, the larger the amount of the original that is taken under the third factor, "the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original." Google Books, 804 F.3d at 221.

Like the other three factors, the fourth factor strongly favors the Publishers. "[A] copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work," and "the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."

38

TVEyes, 883 F.3d at 180. In this case, there is a "thriving ebook
licensing market for libraries" in which the Publishers earn a
fee whenever a library obtains one of their licensed ebooks from
an aggregator like OverDrive. Pls.' 56.1 ¶¶ 577-578. This market
generates at least tens of millions of dollars a year for the
Publishers. Id. ¶¶ 170, 172. And IA supplants the Publishers'
place in this market. IA offers users complete ebook editions of
the Works in Suit without IA's having paid the Publishers a fee
to license those ebooks, and it gives libraries an alternative to
buying ebook licenses from the Publishers. Indeed, IA pitches the
Open Libraries project to libraries in part as a way to help
libraries avoid paying for licenses. See Pls.' 56.1 ¶ 383
(presentation IA gave to libraries asserting that pairing with IA
means that "You Don't Have to Buy It Again!"); id. ¶ 382
(different presentation promising that the Open Libraries project
"ensures that a library will not have to buy the same content
over and over, simply because of a change in format"). IA thus
"brings to the marketplace a competing substitute" for library
ebook editions of the Works in Suit, "usurp[ing] a market that
properly belongs to the copyright-holder." TVEyes, 833 F.3d at
179.

It is equally clear that if IA's conduct "becomes
widespread, it will adversely affect the potential market for

the" Works in Suit. <u>Andy Warhol Found.</u>, 11 F.4th at 48. IA could
expand the Open Libraries project far beyond the current
contributing partners, allowing new partners to contribute many
more concurrent copies of the Works in Suit to increase the loan
count. New organizations like IA also could emerge to perform
similar functions, further diverting potential readers and
libraries from accessing authorized library ebooks from the
Publishers. This plainly risks expanded future displacement of
the Publishers' potential revenues. <u>See, e.g.,</u> <u>Gregory</u>, 689 F.3d
at 65 ("If anyone could freely access the Works, electronically
or otherwise, the [plaintiff] would have no market in which to
try and publish, disseminate, or sell its [Works].");  <u>Am. Buddha</u>,
2015 WL 11170727, at *6 ("[U]nrestricted and widespread conduct
of the sort engaged in by American Buddha would essentially gut
the potential market for the Works.").[11]

_____

[11] It is no answer for IA to argue that the Publishers have provided
"no concrete evidence" of past market harm. Def.'s Memo. at 28. That is not
the Publishers' burden. A rightsholder bears only "some initial burden of
identifying relevant markets." <u>Andy Warhol Found.</u>, 11 F.4th at 49; <u>see also</u>
<u>id.</u> ("[W]e have never held that the rightsholder bears the burden of
showing actual market harm. Nor would we so hold."). In this case, the
Publishers have met their burden by identifying the thriving library ebook
licensing market, with its tens of millions of dollars in annual revenue,
as a market that IA's copying stands to harm. <u>See</u> <u>Ringgold v. Black Ent.</u>
<u>Television, Inc.</u>, 126 F.3d 70, 81 (2d Cir. 1997) ("Ringgold is not required
to show a decline in the number of licensing requests for the 'Church
Picnic' poster since the ROC episode was aired. The fourth factor will
favor her if she can show a 'traditional, reasonable, or likely to be
developed' market for licensing her work as set decoration.").

IA argues that it does not compete in the library ebook market because it only offers libraries a way to "lend a copy the library owns," while library ebook licenses "are not tied to what print books the library owns or what the library does with them." Def.'s Memo. at 30. But IA's free library ebook model need not mimic the Publishers' licensing schemes in every respect to provide a significantly competing substitute. An accused infringer usurps an existing market "where the infringer's target audience and the nature of the infringing content is the same as the original." Cariou, 714 F.3d at 709; see also Andy Warhol Found., 11 F.4th at 50. That is the case here. For libraries that are entitled to partner with IA because they own print copies of books in IA's collection, it is patently more desirable to offer IA's bootleg ebooks than to pay for authorized ebook licenses. To state the obvious, "[i]t is difficult to compete with a product

---

There is also no merit to IA's contention, raised for the first time at argument, that "in the situation where the use is non-commercial . . . it remains an open question where the burdens lie." Oral Arg. Tr. At 43:17-19. As explained above, IA's use of the Works in Suit is commercial under the first factor. In any event, IA unequivocally bears the burden to show a lack of market harm. See Andy Warhol Found., 11 F.4th at 49 (collecting cases uniformly explaining that because "[f]air use is an affirmative defense," the "ultimate burden of proving that the secondary use does not compete in the relevant market is appropriately borne by the party asserting the defense: the secondary user").

offered for free." Sony BMG Music Ent. v. Tenenbaum, 672 F. Supp. 2d 217, 231 (D. Mass. 2009).

Equally unavailing is IA's reliance on various metrics that allegedly demonstrate that its online library has not harmed, or is not likely to harm, the Publishers' financial bottom lines. IA's experts observed that print sales of the Works in Suit and general demand for library ebooks did not decrease while the Works in Suit were available on IA's Website; that Amazon rankings for the Works in Suit improved when IA's digital lending skyrocketed (and government lockdowns were in full effect) at the beginning of the Covid-19 pandemic; and that, despite the removal of the Works in Suit from IA's library in June 2020, OverDrive checkouts of the Works in Suit did not increase. See Def.'s 56.1 ¶¶ 121-122, 138, 140-141, 150. IA attributes these outcomes to the "discovery" effect of its book lending: Patrons decide they enjoy the books they have borrowed through IA enough to purchase those books and recommend them to others. See Def.'s Memo. at 25.[12]

---

[12] The Publishers argue that, were there a trial, they would move under Federal Rule of Evidence 702 to exclude the entire testimony of two of IA's experts, as well as portions of IA's third expert's opinions, on the grounds that they are based on insufficient facts and impermissibly flawed principles and methods. Pls.' Opp. to Def.'s Memo. at 18 n.1. It is unnecessary to assess the reliability of IA's expert opinions, because even

But these metrics do not begin to meet IA's burden to show a
lack of market harm. Taking them at face value, they show at best
that the presence of the Works in Suit in IA's online library
correlated, however weakly, with positive financial indicators
for the Publishers in other areas. They do not show that IA's
conduct caused these benefits to the Publishers. In any event, IA
cannot offset the harm it inflicts on the Publishers' library
ebook revenues, see, e.g., Andy Warhol Found., 11 F.4th at 48;
TVEyes, 883 F.3d at 180, by pointing to other asserted benefits
to the Publishers in other markets. Nor could those asserted
benefits tip the scales in favor of fair use when the other
factors point so strongly against fair use. See, e.g., Campbell,
510 U.S. at 590 n.21 ("Even favorable evidence, without more, is
no guarantee of fairness. Judge Leval gives the example of the
film producer's appropriation of a composer's previously unknown
song that turns the song into a commercial success; the boon to
the song does not make the film's simple copying fair." (citing
Pierre Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105,
1124 n.84 (1990)). Ultimately, the question under the fourth
factor is whether the infringing use "pose[s] cognizable harm" in

_____

accepting their conclusions, they do not help IA meet its burden to show a
lack of market harm in this case.

the relevant market, in this case the market for authorized library ebook licenses. See Andy Warhol Found., 11 F.4th at 51. That harm here is evident.

It is also irrelevant to assessing market harm in this case that IA and its Partner Libraries once purchased print copies of all the Works in Suit. The Publishers do not price print books with the expectation that they will be distributed in both print and digital formats, Pls.' 56.1 ¶ 92, and "[a]ny allegedly positive impact of [a] defendant's activities on [the] plaintiffs' prior market in no way frees [the] defendant to usurp a further market that derives from the reproduction of the plaintiffs' copyrighted works." MP3.com, 92 F. Supp. 2d at 352; see also Infinity Broadcast, 150 F.3d at 111. The Publishers are entitled to revenue from all formats of the Works in Suit, regardless whether IA lawfully acquired the Works in print first.

Finally, the Court must consider "the public benefits [IA's] copying will likely produce." Andy Warhol Found., 11 F.4th at 50. IA argues that its digital lending makes it easier for patrons who live far from physical libraries to access books and that it supports research, scholarship, and cultural participation by making books widely accessible on the Internet. But these alleged benefits cannot outweigh the market harm to the Publishers. "Any copyright infringer may claim to benefit the public by increasing

44

public access to the copyrighted work." Harper & Row, 471 U.S. at 569. It is clear that IA's distribution of ebook copies of the Works in Suit without a license deprives the Publishers of revenues to which they are entitled as the copyright holders. See TVEyes, 883 F.3d at 179. The fourth factor therefore strongly favors the Publishers.

### E.

Each enumerated fair use factor favors the Publishers, and although these factors are not exclusive, IA has identified no additional relevant considerations. At bottom, IA's fair use defense rests on the notion that lawfully acquiring a copyrighted print book entitles the recipient to make an unauthorized copy and distribute it in place of the print book, so long as it does not simultaneously lend the print book. But no case or legal principle supports that notion. Every authority points the other direction. Of course, IA remains entitled to scan and distribute the many public domain books in its collection. See Pls.' 56.1 ¶ 294. It also may use its scans of the Works in Suit, or other works in its collection, in a manner consistent with the uses deemed to be fair in Google Books and HathiTrust. What fair use does not allow, however, is the mass reproduction and distribution of complete copyrighted works in a way that does not transform those works and that creates directly competing

substitutes for the originals. Because that is what IA has done with respect to the Works in Suit, its defense of fair use fails as a matter of law.

**IV.**

IA also argues that it made fair use of the Publishers' copyrights during the National Emergency Library. The analysis above applies even more forcefully to the NEL, during which IA amplified its unauthorized lending of ebook versions of the Works in Suit by lifting the one-to-one owned-to-loaned ratio. IA's defense of fair use with respect to the NEL therefore also fails.

**V.**

Finally, IA asks that statutory damages be remitted if the Court rejects IA's fair use defense. See Def.'s Memo. at 35-36. Section 504 of the Copyright Act directs courts to remit statutory damages where, as relevant here, the infringer is a "nonprofit educational institution, library, or archives," or one of its agents or employees, and the defendant "infringed by reproducing the work in copies" and "believed and had reasonable grounds for believing" that its use of the work was fair use. 17 U.S.C. § 504(c)(2). At this point, IA's statutory remittance argument is premature. IA may renew the argument in connection with the formation of an appropriate judgment.

46

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the plaintiffs' motion for summary judgment is **granted** and the defendants' motion for summary judgment is **denied**. The parties should submit their respective proposals (or preferably a joint proposal) for the appropriate procedure to determine the judgment to be entered in this case. The submission or submissions should be made within fourteen (14) days of the date of this Opinion and Order. The Clerk is respectfully directed to close all pending motions.

**SO ORDERED.**

Dated:     New York, New York
           March 24, 2023

                                        _____
                                             John G. Koeltl
                                        United States District Judge